# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| JUDY JIEN,<br>2007 Keith Circle, Apt. 8<br>Springdale, AR 72764 | CIVIL ACTION NO. 1:19-CV-2521 |
| | |
| KIEO JIBIDI, and<br>317 Berry Street, Apt. 203<br>Springdale, AR 72764 | CLASS ACTION COMPLAINT |
| | |
| ELAISA CLEMENT,<br>2781 Alton Avenue, Apt. B<br>Springdale, AR 72764. | JURY TRIAL DEMANDED |
| | |
| on behalf of themselves and all others similarly<br>situated, | |
| | |
|        Plaintiffs, | |
| | |
| v. | |
| | |
| PERDUE FARMS, INC,<br>31149 Old Ocean City Road<br>Salisbury, MD 21804<br>County of Residence: Wicomico County | |
| | |
| PERDUE FOODS LLC,<br>31149 Old Ocean City Road<br>Salisbury, MD 21804<br>County of Residence: Wicomico County | |
| | |
| TYSON FOODS, INC.,<br>2200 West Don Tyson Parkway<br>Springdale, AR 72762 | |
| | |
| TYSON PREPARED FOODS, INC.,<br>2200 West Don Tyson Parkway<br>Springdale, AR 72762 | |
| | |
| THE HILLSHIRE BRANDS COMPANY,<br>2200 West Don Tyson Parkway<br>Springdale, AR 72762 | |
| | |
| TYSON FRESH MEATS, INC.,<br>2200 West Don Tyson Parkway<br>Springdale, AR 72762 | |

TYSON PROCESSING SERVICES, INC.,
2200 West Don Tyson Parkway
Springdale, AR 72762

TYSON REFRIGERATED MEATS, INC.,
2200 West Don Tyson Parkway
Springdale, AR 72762

KEYSTONE FOODS, LLC,
905 Airport Road, Suite 400
West Chester, Pennsylvania 19380

EQUITY GROUP EUFAULA DIVISION,
LLC,
57 Melvin Clark Road
Bakerhill, AL 36027

EQUITY GROUP - GEORGIA DIVISION,
LLC,
7200 Highway 19
P.O. Box 369
Camilla, GA 31730

EQUITY GROUP KENTUCKY DIVISION,
LLC,
2294 KY Highway 90 W
Albany, KY 42602

PILGRIM'S PRIDE CORPORATION,
1770 Promontory Circle,
Greeley, CO 80634

PILGRIM'S PRIDE CORPORATION OF
WEST VIRGINIA, INC.,
129 Potomac Avenue
Moorfield, WV 26836

SANDERSON FARMS, INC.,
127 Flynt Road
Laurel, MS 39443

SANDERSON FARMS, INC.
(PROCESSING DIVISION),
127 Flynt Road
Laurel, MS 39443

SANDERSON FARMS, INC. (FOODS
DIVISION),
127 Flynt Road
Laurel, MS 39443

KOCH FOODS, INC.,
1300 West Higgins Rd.,
Suite 100
Park Ridge, IL 60068

JCG FOODS OF ALABAMA, LLC,
1300 West Higgins Rd.,
Suite 100
Park Ridge, IL 60068

JCG FOODS OF GEORGIA, LLC,
1300 West Higgins Rd.,
Suite 100
Park Ridge, IL 60068

JCG INDUSTRIES, INC.,
1300 West Higgins Rd.,
Suite 100
Park Ridge, IL 60068

KOCH FOODS LLC,
1835 Kerr Street
Chattanooga, TN 37408-2017

KOCH FOODS OF ALABAMA, LLC,
3500 West Boulevard
Montgomery, AL 36108

KOCH FOODS OF ASHLAND, LLC,
515 Tyson Road
Ashland, AL 36251

KOCH FOODS OF GADSDEN, LLC,
501 Paden Road
Gadsden, AL 35903

KOCH FOODS OF CUMMING, LLC,
221 Meadow Drive
Cumming, GA 30040-2691

KOCH FOODS OF GAINESVILLE, LLC,
950 Industrial Blvd.
Gainesville, GA 30501-6746

KOCH FOODS OF MISSISSIPPI, LLC,
4688 Highway 80 East
Morton, MS 39117

WAYNE FARMS, LLC,
4110 Continental Drive
Oakwood, Georgia 30566

WFSP FOODS, LLC,
112 Plugs Drive
Decatur, AL 35601

MOUNTAIRE FARMS, INC.,
29005 John J. Williams Hwy.
Millsboro, DE 19966

MOUNTAIRE FARMS OF DELAWARE,
INC.,
29005 John J. Williams Hwy.
Millsboro, DE 19966

PECO FOODS, INC.,
1101 Greensboro Avenue
Tuscaloosa, AL 35401

SIMMONS FOODS, INC.,
601 North Hico Street
Siloam Springs, AR 72761

SIMMONS PREPARED FOODS, INC.,
601 North Hico Street
Siloam Springs, AR 72761

FIELDALE FARMS CORPORATION,
555 Broiler Blvd.
Baldwin, GA 30511

GEORGE'S, INC.,
402 West Robinson Ave.
Springdale, AR 72764

OZARK MOUNTAIN POULTRY, INC.,
1000 North 2nd Sreet
Rogers, AR 72756

GEORGE'S CHICKEN, LLC,
19992 Senedo Road
Edinburg, VA 22824

GEORGE'S FOODS, LLC,
19992 Senedo Road
Edinburg, VA 22824

GEORGE'S PROCESSING, INC.,
402 West Robinson Ave.
Springdale, AR 72764

HOUSE OF RAEFORD FARMS, INC.,
3425 U.S. Hwy 117 South
Rose Hill, NC 28458

HOUSE OF RAEFORD FARMS OF
LOUISIANA, LLC,
3867 2nd Street
Shreveport, LA 71101

O.K. FOODS, INC.,
4601 North Sixth Street
Fort Smith, AR 72904

HARRISON POULTRY, INC.,
107 East Star Street
Bethlehem, GA 30620

MAR-JAC POULTRY, INC.,
1020 Aviation Blvd.
Gainesville, GA 30501

MAR-JAC POULTRY MS, LLC,
1301 James Street
Hattiesburg, MS 39401

MAR-JAC POULTRY AL, LLC,
1020 Aviation Blvd.
Gainesville, GA 30501

MAR-JAC POULTRY, LLC,
1020 Aviation Blvd.
Gainesville, GA 30501

MAR-JAC HOLDINGS, INC.,
1020 Aviation Blvd.
Gainesville, GA 30501

AMICK FARMS, LLC,
2079 Batesburg Highway
Batesburg, SC 29006

CASE FOODS, INC.,
385 Pilch Road
Troutman, NC 28166

CASE FARMS PROCESSING, INC.,
385 Pilch Road
Troutman, NC 28166

ALLEN HARIM FOODS, LLC,
29984 Pinnacle Way
Millsboro, DE 19966

AGRI STATS, INC., and
6510 Mutual Drive
Fort Wayne, IN 46825

WEBBER, MENG, SAHL AND
COMPANY, INC. d/b/a WMS &
COMPANY, INC.
1200 E. High Street, Suite 104
Pottstown, PA 19464

            Defendants.

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................................... 1

II.  JURISDICTION AND VENUE ..................................................................................... 4

III. PARTIES ........................................................................................................................ 6

  A.   Plaintiffs ................................................................................................................ 6

  B.   Defendants ............................................................................................................. 7

    1.   Perdue Defendants .......................................................................................... 7

    2.   Tyson Defendants ........................................................................................... 7

    3.   Pilgrim's Defendants ...................................................................................... 9

    4.   Sanderson Farms Defendants ....................................................................... 10

    5.   Koch Foods Defendants ................................................................................ 11

    6.   Wayne Farms Defendants ............................................................................. 14

    7.   Mountaire Farms Defendants ....................................................................... 14

    8.   Peco Foods, Inc. ........................................................................................... 15

    9.   Simmons Foods Defendants ......................................................................... 15

    10.  Fieldale Farms Corporation ......................................................................... 15

    11.  George's Defendants ..................................................................................... 15

    12.  House of Raeford Defendants ....................................................................... 16

    13.  O.K. Foods, Inc. ........................................................................................... 17

    14.  Harrison Poultry, Inc. ................................................................................... 17

    15.  Mar-Jac Poultry Defendants ......................................................................... 17

    16.  Amick Farms, LLC ....................................................................................... 18

    17.  Case Foods Defendants ................................................................................. 19

    18.  Allen Harim Foods, LLC .............................................................................. 19

i

19. Agri Stats, Inc. ........................................................................................ 19

20. Webber, Meng, Sahl and Company, Inc. .......................................... 20

IV. AGENTS AND CO-CONSPIRATORS .................................................... 20

V.  TRADE AND COMMERCE ..................................................................... 21

VI. FACTUAL ALLEGATIONS ...................................................................... 22

   A. Background ................................................................................................ 22

     1. Chicken Industry ................................................................................ 22

     2. Chicken Processing Plants ................................................................ 23

     3. Chicken Processing Plant Workers .................................................. 24

     4. Compensating Chicken Processing Plant Workers ........................ 25

     5. Limited Role of Labor Unions ......................................................... 27

     6. Demographics of Chicken Processing Plant Workers ................... 27

   B. Conspiracy to Fix Wages ........................................................................ 30

     1. "Off the Books" In-Person Meetings to Fix Compensation ........ 32

     2. Exchanging Detailed Wage Data Through Agri Stats ................... 38

     3. Plant-to-Plant Communications About Compensation .................. 43

     4. Plus Factors that Render the Chicken Industry Susceptible to Collusion ...................... 46

   C. Market Power of Defendant Processors ................................................ 49

   D. Anticompetitive Effects and Injury Suffered by Class Members ...................... 50

VII. STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS ...................... 53

   A. Continuing Violation ............................................................................... 53

   B. Fraudulent Concealment ......................................................................... 53

     1. Plaintiffs Did Not and Could Not Have Discovered Defendants' Misconduct ............. 53

     2. Defendants Actively Concealed the Conspiracy ........................... 54

VIII. CLASS ACTION ALLEGATIONS ......................................................... 56

IX. CAUSES OF ACTION ......................................................................................................... 59

X.  PRAYER FOR RELIEF ...................................................................................................... 66

XI. JURY TRIAL DEMAND...................................................................................................... 67

Based on the investigation of counsel, including interviews with industry participants, consultation with economists, and a review of public statements, Plaintiffs Judy Jien, Kieo Jibidi and Elaisa Clement (collectively, "Plaintiffs") bring this action on behalf of themselves individually and on behalf of a class (the "Class") consisting of all persons employed by Defendants[1] as non-supervisory production and maintenance employees at chicken processing plants in the continental United States from January 1, 2009 until the present (the "Class Period").

## I.    INTRODUCTION

1.    For more than a decade, Defendants have conspired and combined to fix and depress the compensation paid to non-supervisory production and maintenance employees at chicken processing plants in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.    Defendants consist of 18 chicken processors and many of their subsidiaries and affiliates ("Defendant Processors"), which process and produce more than 90 percent of the chicken sold in the United States, and two consulting companies that facilitate the exchange of competitively sensitive compensation data, Agri Stats, Inc. ("Agri Stats") and Webber, Meng, Sahl and Company, Inc. d/b/a WMS and Company, Inc. ("WMS").

---

[1] The term "Defendants" herein refers to the following companies: Perdue Farms, Inc.; Perdue Foods LLC; Tyson Foods, Inc.; Tyson Prepared Foods, Inc.; The Hillshire Brands Company; Tyson Fresh Meats, Inc.; Tyson Processing Services, Inc.; Tyson Refrigerated Processed Meats, Inc.; Keystone Foods, LLC; Equity Group Eufaula Division, LLC; Equity Group—Georgia Division, LLC; Equity Group Kentucky Division, LLC; Pilgrim's Pride Corporation; Pilgrim's Pride Corporation of West Virginia, Inc.; Sanderson Farms, Inc.; Sanderson Farms, Inc. (Foods Division); Sanderson Farms, Inc. (Processing Division); Koch Foods, Inc.; JCG Foods of Alabama, LLC; JCG Foods of Georgia, LLC; JCG Industries, Inc.; Koch Foods LLC; Koch Foods of Alabama, LLC; Koch Foods of Ashland, LLC; Koch Foods of Gadsden LLC; Koch Foods of Cumming LLC; Koch Foods of Gainesville LLC; Koch Foods of Mississippi LLC; Wayne Farms, LLC; WFSP Foods, LLC; Mountaire Farms, Inc.; Mountaire Farms of Delaware, Inc.; Peco Foods, Inc.; Simmons Foods, Inc.; Simmons Prepared Foods, Inc.; Fieldale Farms Corporation; George's, Inc.; Ozark Mountain Poultry, Inc.; George's Chicken, LLC; George's Foods, LLC; George's Processing, Inc.; House of Raeford Farms, Inc.; House of Raeford Farms of Louisiana, LLC; O.K. Foods, Inc.; Harrison Poultry, Inc.; Mar-Jac Poultry, Inc.; Mar-Jac Poultry MS, LLC; Mar-Jac Poultry AL, LLC; Mar-Jac Poultry, LLC; Mar-Jac Holdings, Inc.; Amick Farms, LLC; Case Foods, Inc.; Case Farms Processing, Inc.; Allen Harim Foods, LLC; Agri Stats, Inc.; and Webber, Meng, Sahl and Company, Inc.

3.      Defendant Processors own and operate approximately 200 chicken processing plants in the continental United States.  These chicken processing plants have employed hundreds of thousands of Class Members who have processed live chickens into poultry products sold to retailers and consumers.  Class Members have occupied various positions along processing lines, from hanging live chickens to slaughtering the birds to slicing meat from their bones to repairing the processing machines.

4.      Defendant Processors have compensated Class Members with hourly wages and employment benefits.  Each Defendant Processor has established a schedule for wage rates and employment benefits based on the specific position and years of experience of the Class Members. At each Defendant Processor, wage rates and employment benefits were established and approved during the Class Period by senior executives at corporate headquarters.

5.      Since January 1, 2009, Defendants have conspired to fix and depress the hourly wages and benefits paid to Class Members.  Defendants have engaged in this unlawful conspiracy to maximize their profits by reducing labor costs, which have comprised a substantial share of each Defendant Processor's total operating costs.

6.      Defendants formed, implemented, monitored and enforced the conspiracy in three ways.  First, senior executives of the Defendant Processors, including human resources executives and directors of compensation, held recurring "off the books" in-person meetings at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, during which they exchanged information about, discussed, agreed upon and ultimately fixed the wages and benefits of Class Members at artificially depressed levels.  These "off the books" meetings between senior executives of the Defendant Processors responsible for determining the compensation of Class Members involved such brazen wage-fixing that at least one Defendant Processor recently stopped attending.

7.     Second, on a highly frequent basis, Defendant Processors exchanged detailed, current and non-public wage and benefits information through surveys conducted by Agri Stats and WMS.  Each Defendant Processor subscribed to and partnered with Agri Stats to exchange and receive—on a monthly basis—effective hourly wage rates regarding categories of chicken processing plant workers from each Defendant Processor's plants.  Similarly, WMS conducted a detailed annual survey of the hourly wages and benefits paid by each Defendant Processor to each category of chicken processing plant worker and circulated the survey results to senior executives of the Defendant Processors during in-person meetings.  While both Agri Stats and WMS have claimed that the exchanged compensation data was anonymous, the data was sufficiently granular and disaggregated that executives of Defendant Processors could and did easily match the distributed wage data to chicken processing plants operated by specific Defendant Processors.  Defendant Processers used the data obtained from Agri Stats and WMS to fix and depress the compensation paid to Class Members and ensure and confirm that no conspirator deviated from the conspiracy.

8.     Third, managers located at Defendant Processors' chicken processing plants engaged in bilateral and regional exchanges of wage and benefits information.  Those managers frequently reached out directly to their counterparts at competitors' chicken processing plants to request and exchange wage and benefits data, including data regarding plans for *future* wages and benefits.  Those plant-to-plant exchanges of wage and benefits information were conducted through various mediums, including telephone calls and surveys disseminated through electronic listservs.  The wage data obtained from these plant-to-plant information exchanges was provided to executives of the Defendant Processors, who used the data to facilitate the fixing of compensation.

9.      Numerous characteristics of the chicken processing industry have facilitated the formation and implementation of the conspiracy, including but not limited to, the following: (a) vertical integration; (b) high barriers to entry; (c) industry concentration; (d) fungibility of chicken processing plant workers; (e) inelastic labor supply; (f) numerous opportunities to collude; (g) personal relationships between executives at competing chicken processors; and (h) a history of government investigations into collusive actions.

10.      The intended and actual effect of Defendants' conspiracy to fix compensation has been to reduce and suppress the wages and benefits paid to Class Members since January 2009 to levels materially lower than they would have been in a competitive market.  During the Class Period, even while worker productivity and processing line speeds increased significantly, wage increases provided to Class Members were highly restrained and limited.  Economic analysis conducted by expert economists retained by Plaintiffs shows that the wages of plant workers employed by non-poultry food manufacturers were higher, and increased at a materially more rapid rate, than those paid by Defendant Processors to Class Members during the Class Period.

11.      The agreements entered by Defendants to fix and depress wages and benefits have unreasonably restrained trade in violation of the Sherman Act, 15 U.S.C. § 1.  Plaintiffs, on their own behalf and on behalf of the Class, bring this antitrust action to enjoin Defendants from continuing their unlawful agreements and to recover actual, compensatory and treble damages, as well as costs, attorneys' fees and interest.  Plaintiffs demand a trial by jury.

## II.      JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because the classes contain more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of each class is a citizen of a state different from Defendants.  The Court

also has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

13.     This Court has personal jurisdiction over Defendants.  Defendants Perdue Farms, Inc. and Perdue Foods LLC reside in this District and used their headquarters in Salisbury, Maryland to implement and coordinate the restraints of trade described below.  In addition, Defendants: (1) transacted substantial business in the United States, including in this District; (2) transacted with, and caused injury to, Class Members located throughout the United States, including in this District; and (3) committed substantial acts in furtherance of the unlawful scheme in the United States, including in this District.  For example:

- Each of the Defendants regularly sold chicken in the state of Maryland during the Class Period and continues to sell chicken in the state of Maryland;

- Defendants Perdue Farms, Inc. and Perdue Foods LLC are headquartered and incorporated in the state of Maryland;

- Defendant The Hillshire Brands Company is incorporated in Maryland;

- Defendants Amick Farms, LLC; Perdue Farms, Inc.; Perdue Foods LLC; and Allen Harim Foods, LLC operated chicken processing plants in the state of Maryland during the Class Period and provided compensation to Class Members in those plants at suppressed rates as a result of the conspiracy between all the Defendants alleged herein;

- Defendants Amick Farms, LLC; Perdue Farms, Inc.; Perdue Foods LLC; Mountaire Farms, Inc.; Tyson Foods, Inc.; Case Foods, Inc.; and Allen Harim Foods, LLC have employees located in the state of Maryland;

- Defendants Agri Stats and WMS regularly provided services to Defendant Processors in the state of Maryland during the Class Period, including to Perdue Farms, Inc. and Perdue

Foods LLC; and

- the leading trade associations representing the chicken processing industry—the National Chicken Council and the U.S. Poultry & Egg Association—held meetings in the state of Maryland during the Class Period that were attended by the Defendants, such as the three-day "Chicken Media Summit" that was held in Cambridge, Maryland in April 2015.

14. Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. §1391(b), (c), and (d) because one or more of the Defendants transacted business, was found, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## III.   PARTIES

### A. Plaintiffs

15. Judy Jien was employed as a deboner at a chicken processing plant operated by George's, Inc. in Springdale, Arkansas and at a chicken processing plant operated by Tyson Foods, Inc. in Springdale, Arkansas during the Class Period. She is a resident of the state of Arkansas.

16. Kieo Jibidi was employed as a deboner at a chicken processing plant operated by Simmons Foods, Inc. in Decatur, Arkansas and at a chicken processing plant operated by Tyson Foods, Inc. in Springdale, Arkansas during the Class Period. She is a resident of the state of Arkansas.

17. Elaisa Clement was employed as a deboner at a chicken processing plant operated by George's, Inc. in Springdale, Arkansas during the Class Period. He is a resident of the state of Arkansas.

### B.  Defendants

#### 1.      Perdue Defendants

18.      Perdue Farms, Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland.  During the Class Period, Perdue Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

19.      Perdue Foods LLC is a privately held Maryland limited liability company headquartered in Salisbury, Maryland. Perdue Foods LLC is a subsidiary of Perdue Farms, Inc. During the Class Period, Perdue Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

20.       Defendants Perdue Farms, Inc. and Perdue Foods LLC are collectively referred to as "Perdue."

#### 2.      Tyson Defendants

21.      Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas.  During the Class Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

22.      Tyson Prepared Foods, Inc. is a Delaware corporation located in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods, Inc.  During the Class Period, Tyson Prepared Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

23.      The Hillshire Brands Company is a Maryland corporation located in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods, Inc.  During the Class Period,

Hillshire Brands Company and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

24.     Tyson Fresh Meats, Inc. is a Delaware corporation located in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods, Inc.  During the Class Period, Tyson Fresh Meats, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

25.     Tyson Processing Services, Inc. is a Delaware corporation located in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods, Inc.  During the Class Period, Tyson Processing Services, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

26.     Tyson Refrigerated Processed Meats, Inc. is a Delaware corporation located in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods, Inc.  During the Class Period, Tyson Refrigerated Processed Meats, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

27.     Keystone Foods, LLC is a Delaware corporation located in West Chester, Pennsylvania, and is a wholly owned subsidiary of Tyson Foods, Inc.  During the Class Period, Keystone Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

28.     Equity Group Eufaula Division, LLC is a Delaware corporation located in Bakerhill, Alabama, and is a wholly owned subsidiary of Tyson Foods, Inc.  During the Class Period, Equity Group Eufaula Division, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the

United States.

29.     Equity Group—Georgia Division, LLC is a Delaware corporation located in Camilla, Georgia, and is a wholly owned subsidiary of Tyson Foods, Inc.  During the Class Period, Equity Group—Georgia Division, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

30.     Equity Group Kentucky Division, LLC is a Delaware corporation located in Albany, Kentucky, and is a wholly owned subsidiary of Tyson Foods, Inc.  During the Class Period, Equity Group Kentucky Division, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

31.     Defendants Tyson Foods, Inc.; Tyson Prepared Foods, Inc.; The Hillshire Brands Company; Tyson Fresh Meats, Inc.; Tyson Processing Services, Inc.; Tyson Refrigerated Processed Meats, Inc.; Keystone Foods, LLC; Equity Group Eufaula Division, LLC; Equity Group—Georgia Division, LLC; and Equity Group Kentucky Division, LLC are collectively referred to as "Tyson."

**3.     Pilgrim's Defendants**

32.     Pilgrim's Pride Corporation is a Delaware corporation headquartered in Greeley, Colorado.  JBS USA Holdings, Inc. holds a 75.3% controlling interest in Pilgrim's Pride Corporation.  JBS USA Holdings and Pilgrim's Pride Corporation are subsidiaries of JBS SA, a Brazilian corporation headquartered in Sao Paulo, Brazil.  During the Class Period, Pilgrim's Pride Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

33.     Around December 1, 2008, Pilgrim's Pride Corporation filed a voluntary Chapter

11 petition in the United States Bankruptcy Court for the Northern District of Texas. Effective December 28, 2009, Pilgrim's Pride Corporation was discharged from bankruptcy under a plan of reorganization that paid all creditors in full. Pilgrim's Pride Corporation participated in the conspiracy alleged herein throughout the Class Period, including before and after its discharge from bankruptcy.

34. Regardless of whether Pilgrim's Pride Corporation participated in the conspiracy throughout the Class Period, this Complaint seeks to recover damages from Pilgrim's Pride Corporation only for Pilgrim's Pride Corporation's post-discharge conduct, and in no way seeks to violate any orders of the above referenced Bankruptcy Court. However, by operation of law, the damages arising from Pilgrim's Pride Corporation's post-discharge conduct include damages incurred by Plaintiffs and the other Class Members throughout the Class Period. This Complaint also seeks to recover damages from the other Defendants for Pilgrim's Pride Corporation's pre-discharge conspiratorial conduct.

35. Pilgrim's Pride Corporation of West Virginia, Inc. is a West Virginia corporation located in Moorefield, West Virginia, and is a wholly owned subsidiary of Pilgrim's Pride Corporation. During the Class Period, Pilgrim's Pride Corporation of West Virginia, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

36. Defendants Pilgrim's Pride Corporation and Pilgrim's Pride Corporation of West Virginia, Inc. are collectively referred to as "Pilgrim's."

### 4.   Sanderson Farms Defendants

37. Sanderson Farms, Inc. is a publicly held Mississippi corporation headquartered in Laurel, Mississippi. During the Class Period, Sanderson Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or

benefits to Class Members in the United States.

38.     Sanderson Farms, Inc. (Foods Division) is a Mississippi corporation located in Laurel, Mississippi, and is a wholly owned subsidiary of Sanderson Farms, Inc.  During the Class Period, Sanderson Farms, Inc. (Foods Division) and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

39.     Sanderson Farms, Inc. (Processing Division) is a Mississippi corporation located in Laurel, Mississippi, and is a wholly owned subsidiary of Sanderson Farms, Inc.  During the Class Period, Sanderson Farms, Inc. (Processing Division) and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

40.     Defendants Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), and Sanderson Farms, Inc. (Processing Division) are collectively referred to as "Sanderson Farms."

**5.     Koch Foods Defendants**

41.     Koch Foods, Inc. is a privately held Delaware corporation with its corporate headquarters in Park Ridge, Illinois.  During the Class Period, Koch Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

42.     JCG Foods of Alabama, LLC is an Alabama corporation with its headquarters in Park Ridge, Illinois, and is a wholly owned subsidiary of Koch Foods, Inc.  During the Class Period, JCG Foods of Alabama, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

43.     JCG Foods of Georgia, LLC is a Georgia corporation with its headquarters in Park

11

Ridge, Illinois, and is a wholly owned subsidiary of Koch Foods, Inc.  During the Class Period, JCG Foods of Georgia, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

44.     JCG Industries, Inc. is an Illinois corporation with its headquarters in Park Ridge, Illinois, and is a wholly owned subsidiary of Koch Foods, Inc.  During the Class Period, JCG Industries, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

45.     Koch Foods LLC is a Tennessee corporation with its headquarters in Chattanooga, Tennessee, and is a wholly owned subsidiary of Koch Foods, Inc.  During the Class Period, Koch Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

46.     Koch Foods of Alabama, LLC is an Alabama corporation with its headquarters in Montgomery, Alabama, and is a wholly owned subsidiary of Koch Foods, Inc.  During the Class Period, Koch Foods of Alabama, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

47.     Koch Foods of Ashland, LLC is an Alabama corporation with its headquarters in Montgomery, Alabama, and is a wholly owned subsidiary of Koch Foods, Inc.  During the Class Period, Koch Foods of Ashland, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

48.     Koch Foods of Gadsden, LLC is an Alabama corporation with its headquarters in Montgomery, Alabama, and is a wholly owned subsidiary of Koch Foods, Inc.  During the Class

Period, Koch Foods of Gadsden, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

49.     Koch Foods of Cumming LLC is a Georgia corporation with its headquarters in Cumming, Georgia, and is a wholly owned subsidiary of Koch Foods, Inc.  During the Class Period, Koch Foods of Cumming LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

50.     Koch Foods of Gainesville LLC is a Georgia corporation with its headquarters in Gainesville, Georgia, and is a wholly owned subsidiary of Koch Foods, Inc.  During the Class Period, Koch Foods of Gainesville LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

51.     Koch Foods of Mississippi LLC is a Mississippi corporation with its headquarters in Morton, Mississippi, and is a wholly owned subsidiary of Koch Foods, Inc.  During the Class Period, Koch Foods of Mississippi LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

52.     Defendants Koch Foods, Inc.; JCG Foods of Alabama, LLC; JCG Foods of Georgia, LLC; JCG Industries, Inc.; Koch Foods LLC; Koch Foods of Alabama, LLC; Koch Foods of Ashland, LLC; Koch Foods of Gadsden, LLC; Koch Foods of Cumming LLC; Koch Foods of Gainesville LLC; and Koch Foods of Mississippi LLC are collectively referred to as "Koch Foods."

### 6.  Wayne Farms Defendants

53.    Wayne Farms, LLC is a Delaware corporation headquartered in Oakwood, Georgia. It is an affiliate of its parent company, Continental Grain Company, which is a privately held company in Arlon, Belgium.  During the Class Period, Wayne Farms, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

54.    WFSP Foods, LLC is a Georgia corporation with its headquarters in Decatur, Alabama, and is a wholly owned subsidiary of Wayne Farms, LLC.  During the Class Period, WFSP Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

55.    Defendants Wayne Farms, LLC and WFSP Foods, LLC are collectively referred to as "Wayne Farms."

### 7.  Mountaire Farms Defendants

56.    Mountaire Farms, Inc. is a privately held Delaware corporation with its headquarters in Millsboro, Delaware.  During the Class Period, Mountaire Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

57.    Mountaire Farms of Delaware, Inc. is a privately held Delaware corporation located in Millsboro, Delaware, and is a wholly owned subsidiary of Mountaire Farms, Inc.  During the Class Period, Mountaire Farms of Delaware, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

58.    Defendants Mountaire Farms, Inc. and Mountaire Farms of Delaware, Inc. are collectively referred to as "Mountaire."

### 8.    Peco Foods, Inc.

59.    Peco Foods, Inc. is a privately held Alabama corporation headquartered in Tuscaloosa, Alabama.  During the Class Period, Peco Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

### 9.    Simmons Foods Defendants

60.    Simmons Foods, Inc. is a privately held Arkansas corporation headquartered in Siloam Springs, Arkansas.  During the Class Period, Simmons Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

61.    Simmons Prepared Foods, Inc. is a privately held Arkansas company headquartered in Siloam Springs, Arkansas, and is a wholly owned subsidiary of Simmons Foods, Inc.  Simmons Prepared Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

62.    Defendants Simmons Foods, Inc. and Simmons Prepared Foods, Inc. are collectively referred to as "Simmons" or "Simmons Foods."

### 10.    Fieldale Farms Corporation

63.    Fieldale Farms Corporation is a privately held Georgia corporation headquartered in Baldwin, Georgia.  During the Class Period, Fieldale Farms Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

### 11.    George's Defendants

64.    George's, Inc. is a privately held Arkansas corporation headquartered in Springdale, Arkansas.  During the Class Period, George's, Inc. and/or its predecessors, wholly

owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

65.     Ozark Mountain Poultry, Inc. is an Arkansas corporation headquartered in Rogers, Arkansas, and is a wholly owned subsidiary of George's, Inc.  During the Class Period, Ozark Mountain Poultry, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

66.     George's Chicken, LLC is a Virginia corporation headquartered in Edinburg, Virginia, and is a wholly owned subsidiary of George's, Inc.  During the Class Period, George's Chicken, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

67.     George's Foods, LLC is a Virginia corporation headquartered in Edinburg, Virginia, and is a wholly owned subsidiary of George's, Inc.  During the Class Period, George's Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

68.     George's Processing, LLC is an Arkansas corporation headquartered in Springdale, Arkansas, and is a wholly owned subsidiary of George's, Inc.  During the Class Period, George's Processing, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

69.     Defendants George's, Inc.; Ozark Mountain Poultry, Inc.; George's Chicken, LLC; George's Foods, LLC; and George's Processing, LLC are collectively referred to as "George's."

**12.     House of Raeford Defendants**

70.     House of Raeford Farms, Inc. is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina.  During the Class Period, House of Raeford Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, divisions, or other affiliates

employed and paid wages and/or benefits to Class Members in the United States.

71.     House of Raeford Farms of Louisiana, LLC is a Louisiana corporation headquartered in Shreveport, Louisiana, and is a wholly owned subsidiary of House of Raeford Farms, Inc.  During the Class Period, House of Raeford Farms of Louisiana, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

72.     Defendants House of Raeford Farms, Inc. and House of Raeford Farms of Louisiana, LLC are collectively referred to as "House of Raeford."

**13.     O.K. Foods, Inc.**

73.     Defendant O.K. Foods, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas.  O.K. Foods, Inc. is a subsidiary of Industrias Bachoco S.A., a Brazilian corporation headquartered in Sao Paulo, Brazil.  During the Class Period, O.K. Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

**14.     Harrison Poultry, Inc.**

74.     Harrison Poultry, Inc. is a Georgia corporation located in Bethlehem, Georgia. During the Class Period, Harrison Poultry, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

**15.     Mar-Jac Poultry Defendants**

75.     Mar-Jac Poultry, Inc. is a Georgia corporation located in Gainesville, Georgia. During the Class Period, Mar-Jac Poultry, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

76.     Mar-Jac Poultry MS, LLC is a Mississippi limited liability corporation located in Hattiesburg, Mississippi.   During the Class Period, Mar-Jac Poultry MS, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

77.     Mar-Jac Poultry AL, LLC is an Alabama limited liability corporation located in Gainesville, Georgia.  During the Class Period, Mar-Jac Poultry AL, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

78.     Mar-Jac Poultry, LLC is a Delaware corporation located in Gainesville, Georgia. During the Class Period, Mar-Jac Poultry, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

79.     Mar-Jac Holdings, Inc. is a Delaware corporation located in Gainesville, Georgia and is the parent company of Mar-Jac Poultry, Inc.; Mar Jac Poultry, MS LLC; Mar-Jac Poultry AL, LLC; and Mar-Jac Poultry, Inc.  During the Class Period, Mar-Jac Holdings, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

80.     Defendants Mar-Jac Poultry, Inc.; Mar-Jac Poultry MS, LLC; Mar-Jac Poultry AL, LLC; Mar-Jac Poultry, LLC; and Mar-Jac Holdings, Inc. are collectively referred to as "Mar-Jac Poultry."

### 16.    Amick Farms, LLC

81.     Amick Farms, LLC is a privately held Delaware limited liability company with its corporate headquarters in Batesburg, South Carolina.  Amick Farms, LLC is a wholly owned subsidiary of OSI Group, LLC, a privately held Delaware corporation with its corporate

headquarters in Aurora, Illinois.   During the Class Period, Amick Farms, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

### 17.   Case Foods Defendants

82.     Case Foods, Inc. is a privately held Delaware corporation with its corporate headquarters in Troutman, North Carolina.  During the Class Period, Case Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

83.     Case Farms Processing, Inc. is a privately held North Carolina corporation with its corporate headquarters in Troutman, North Carolina, and is a wholly owned subsidiary of Case Foods, Inc.  During the Class Period, Case Farms Processing, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

84.     Defendants Case Foods, Inc. and Case Farms Processing, Inc. are collectively referred to as "Case Foods."

### 18.   Allen Harim Foods, LLC

85.     Allen Harim Foods, LLC is a Delaware company with its corporate headquarters in Millsboro, Delaware.  During the Class Period, Allen Harim Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

### 19.   Agri Stats, Inc.

86.     Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana and is a subsidiary of Eli Lilly & Co.  Eli Lilly & Co. is an Indiana corporation located in Indianapolis, Indiana.   Throughout the Class Period, Agri Stats facilitated the exchange of confidential,

proprietary, and competitively sensitive compensation data among Defendant Processors and their co-conspirators.

**20. Webber, Meng, Sahl and Company, Inc.**

87.     Webber, Meng, Sahl and Company, Inc. d/b/a WMS and Company, Inc. is a Pennsylvania corporation located in Pottstown, Pennsylvania.  Throughout the Class Period, WMS facilitated the exchange of confidential, proprietary, and competitively sensitive compensation data among Defendant Processors and their co-conspirators.

## IV.   AGENTS AND CO-CONSPIRATORS

88.     The following named entities have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy:

    a.   Claxton Poultry Farms, Inc. is a Georgia corporation located in Claxton, Georgia. During the Class Period, Claxton Poultry Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to non-supervisory production and maintenance workers at chicken processing plants in the continental United States.

    b.   Norman W. Fries, Inc., d/b/a Claxton Poultry Farms, Inc. is a Georgia corporation located in Claxton, Georgia.  During the Class Period, Norman W. Fries, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to non-supervisory production and maintenance workers at chicken processing plants in the continental United States.

    c.   Foster Farms, LLC is a privately held California corporation headquartered in Modesto, California.  During the Class Period, Foster Farms, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to non-supervisory production and maintenance

workers at chicken processing plants in the continental United States.

    d.   Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California. Foster Poultry Farms is a related entity of Foster Farms, LLC. During the Class Period, Foster Poultry Farms and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to non-supervisory production and maintenance workers at chicken processing plants in the continental United States.

89.    Various other persons, firms and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

90.    Each Defendant and co-conspirator named herein acted as the agent or joint-venturer of, or for, the other Defendants and co-conspirators with respect to the acts, violations and common course of conduct alleged herein.

## V.    TRADE AND COMMERCE

91.    The conspiracy formed, implemented and enforced by Defendants and co-conspirators was intended to depress, and did in fact depress, the wages and benefits of Class Members nationwide.

92.    The conspiracy restrained competition between Defendant Processors for the payment of wages and benefits to, and hiring of, Class Members nationwide, including Class Members who were located in states other than the states in which the chicken processing plants that employed them were located.

93.    Defendant Processors and co-conspirators made payments to Class Members by

mailing or transmitting funds across state lines.

94.     Defendant Processors and co-conspirators employed Class Members to process chicken for sale in interstate and foreign commerce.

95.     Defendants Agri Stats and WMS provided services to Defendant Processors located in multiple different states and exchanged confidential, proprietary, and competitively sensitive data among Defendant Processors across state lines.

96.     The activities of Defendants and co-conspirators were within the flow of interstate commerce of the United States, and were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

## VI.   FACTUAL ALLEGATIONS

### A. Background

#### 1. Chicken Industry

97.     Chickens raised for meat consumption are typically slaughtered and processed before the age of 13 weeks.[2]   According to a 2012 report by Focus Management Group, such chickens "are a commodity product with little or no product differentiation based on the processors."

98.     Chickens processed for consumption may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value-added product.

99.     Chicken processing is concentrated in the hands of the Defendant Processors, which control more than 90 percent of the production of processed chicken in the United States. Defendant Processors earn more than $30 billion in annual revenue from the sale of processed

---

[2] As used in this Complaint, the term "chicken" does not encompass spent hens (i.e., chickens raised to lay eggs and only slaughtered after the age of 15 weeks).

chicken.

100.     Defendant Processors are vertically integrated companies that control nearly every aspect of chicken production.   When commercial chicken production first emerged, different companies owned businesses involved in the different stages of chicken production.   Specifically, different companies owned: hatcheries, where eggs are hatched; growers, which raise the hatched chickens; feed mills, which produce and supply food products for the chickens; and processing plants, where live chickens are slaughtered and turned into poultry products for sale and consumption.   Today, approximately 90 percent of chickens for consumption are produced by vertically integrated companies, such as Defendant Processors, that each own or controll their own hatcheries, feed mills, growers, and processing plants.

### 2.   Chicken Processing Plants

101.     Once chickens for consumption reach maturity, they are typically processed in chicken processing plants.   There are two kinds of chicken processing plants.   The first— slaughterhouse facilities—kill chickens and convert the carcasses into raw chicken products fit for human consumption.   The second—further processing facilities—convert the raw chicken into value-added forms by cutting, deboning, breading, cooking or otherwise engaging in additional processing.   The Class is comprised of workers employed by Defendant Processors in both slaughterhouse facilities and further processing facilities.

102.     Collectively, Defendant Processors currently own approximately 200 chicken processing plants in the continental United States.   A majority of those chicken processing plants are located in the South.

103.     Chicken processing plants are typically located near the growers with which they contract.   As a result, the vast majority of Defendant Processors' chicken processing plants are

clustered in groups in rural areas.  In fact, each Defendant Processor owns at least one chicken

processing plant that is within 28 miles of a competitor's chicken processing plant.  For that reason,

each Defendant Processor has risked the loss of processing plant employees to, and in fact did lose

processing plant employees to, a competitor's nearby chicken processing plant.  The geographic

proximity of chicken processing plants means that, in a competitive labor market, many chicken

processing plant workers could and would switch their employment to rival chicken processing

plants when offered higher wages and/or superior benefits.  The following map identifies the

locations of the chicken processing plants currently operating in the continental United States:



### 3.  Chicken Processing Plant Workers

104.   Each year during the Class Period, Defendant Processors collectively employed

approximately 250,000 workers at their chicken processing plants.

105.   Because Defendant Processors produce commodity chicken products in a similarly

efficient and vertically integrated manner, their chicken processing facilities were and are

characterized by highly similar operations and thus highly similar labor requirements.

Accordingly, the non-supervisory production and maintenance workers employed by Defendant

Processors at each of their approximately 200 chicken processing plants in the continental United States during the Class Period, *i.e.* Class Members, were easily categorized into a limited set of discrete job positions.

106.    For example, in their chicken processing plants, each Defendant Processor employs "live hangers," who hang live chicken by their feet onto fast-moving metal hooks; "eviscerators," who remove the internal organs from chicken carcasses; and "deboners," who remove bones from chicken carcasses.

### 4.  Compensating Chicken Processing Plant Workers

107.    Compensation of chicken processing plant workers comprises a significant share of the total operating costs of each Defendant Processor.  The second largest cost component of producing chickens for consumption is the cost of chicken processing plant labor, which on average comprises approximately 16 percent of Defendant Processors' total operating costs.

108.    Decisions regarding the compensation of chicken processing plant workers during the Class Period were made by and at each Defendant Processors' corporate headquarters.  This reflects the significance of labor costs to Defendant Processors' overall profitability.  While local plant managers sometimes made recommendations for wage adjustments, hourly wages and benefits were ultimately determined and approved by senior executives at each Defendant Processor's corporate headquarters.  The fact that decision-making regarding wages and benefits was centralized in the hands of senior corporate executives materially facilitated the formation and implementation of the wage-fixing conspiracy alleged herein.

109.    Multiple former human resources employees of the Defendant Processors have explained that senior executives at corporate headquarters exclusively set the wages and benefits of processing plant workers in a centralized fashion.  For example, a former human resources

manager who worked at three different chicken processing plants owned by Tyson, Pilgrim's and Perdue during the Class Period stated that compensation to chicken processing plant workers at all three companies was exclusively determined at and by each of the company's corporate offices. Another former Tyson employee explained that Tyson's corporate office established a "wage scale" for all of Tyson's chicken processing plant workers consisting of a starting hourly rate for each position and incremental increases for that starting hourly rate up to the maximum wage.

110.    During the Class Period, senior executives of the Defendant Processers determined the hourly wages and benefits for Class Members.  When those corporate executives set hourly wages, they established a wage schedule that compensated workers according to their position in the processing plant.

111.    Some chicken processing plant positions were paid more wages by Defendant Processors than other positions, largely due to the greater skill required by those positions.  For example, "deboners" are typically paid more than many other non-supervisory workers on the processing line.  Effectively deboning a chicken requires some experience and training, and Defendant Processors earn more money when a chicken is deboned effectively, *i.e.* cut closest to the bone to maximize the amount of meat obtained.  Nonetheless, the compensation for all chicken processing plant positions was determined in a systematic way using compensation schedules within each Defendant Processor that were aligned with the compensation for the same positions at other Defendant Processors.

112.    During the Class Period, the compensation provided by Defendant Processors to Class Members was comprised of an hourly wage rate plus benefits.  Those benefits typically included health care, paid time off, a retirement savings plan, disability insurance and life insurance.  Each Defendant Processor calculated a specific dollar value for the benefits paid to

26

each Class Member.

113.    The total compensation paid to Class Members, inclusive of benefits, was referred

to within the industry as the "fully loaded wage."  For example, according to Perdue, the "fully

loaded wage" at the company's Delmarva processing plants in 2016 was $17.12 for the lowest

paid plant worker.  That "fully loaded wage" was comprised of a $12 hourly wage plus a benefits

package equal to $5.12 per hour.

114.    At times, when Defendants increased hourly wages for Class Members, they

simultaneously decreased the value of benefits to offset the hourly wage increase.  For example, a

former employee of Tyson explained that annual increases in hourly wages at a Tyson plant were

effectively eliminated each year by charging the plant workers higher insurance premiums.

### 5.  Limited Role of Labor Unions

115.    Approximately one-third of chicken processing plant workers are members of

unions.  The United Food and Commercial Workers International Union represents approximately

90% of those unionized workers.

116.    There is not a significant disparity between the compensation provided to unionized

and non-unionized workers in chicken processing plants.  Collective bargaining agreements often

specify a particular wage increase for year one and then often require that, in subsequent years of

the agreements, unionized workers are entitled to the average wages per position paid by the

Defendant Processor.  Those average wages are calculated based on what is paid to both unionized

and non-unionized workers.

### 6.  Demographics of Chicken Processing Plant Workers

117.    During the Class Period, the compensation paid to Class Members was artificially

depressed and left many of those workers in poverty.  A 2015 report by the nonprofit Oxfam

America titled "Lives on the Line" states, "Most workers on the poultry processing line earn wages that place them near or below the poverty line.  Wages average around $11 per hour; annual income for most is between $20,000 and $25,000.  The federal poverty level for a family of three in 2015 is $20,090; for a family of four it's $24,250.  An average poultry worker supporting two children qualifies for Head Start, SNAP (food stamps), and the National School Lunch Program.  In addition, workers often turn to local charities and food banks to supplement their income; in many poultry towns, thrift stores and food banks dominate local storefronts."

118.    Despite the poor compensation, working in a chicken processing plant is one of the most dangerous jobs in the United States.  The 2015 report by Oxfam America states that "the rates of injuries and illness" in chicken processing plants "are shockingly high."  The Occupational Safety and Health Administration ("OSHA") and the United States Department of Labor classify poultry as "a hazardous industry."  In February 2015, OSHA acknowledged that "the incidence rate of occupational illness cases, including musculoskeletal disorders, reported in the poultry industry in 2011 and 2012 has remained high—at more than five times the average for all US industries."  In April 2015, the Centers for Disease Control and the National Institute for Occupational Safety and Health reported the results of an evaluation of 191 poultry workers at a plant in Maryland: 76 percent had abnormal results from a nerve conduction test (indicating damage to nerves), and 34 percent had evidence of carpal tunnel syndrome.  In 2004, Human Rights Watch reported that poultry workers are 14 times more likely than other workers to suffer debilitating injuries stemming from repetitive trauma—like "claw hand" (in which the injured fingers lock in a curled position) and ganglion cysts (fluid deposits under the skin).

119.    In a 2016 report titled "No Relief," Oxfam America wrote, "While the poultry industry today enjoys record profits and pumps out billions of chickens, the reality of life inside

the processing plant remains grim and dangerous.  Workers earn low wages, suffer elevated rates of injury and illness, toil in difficult conditions, and have little voice in the workplace."

120.    Due to the poor compensation, grueling work and high risk of physical injury, many Americans have no interest in employment as a chicken processing plant worker.  For that reason, Defendant Processors often recruit workers who have limited alternative options for employment. Christopher Cook, author of the book "Diet for a Dead Planet: Big Business and the Coming Food Crisis," said that chicken processors recruit "a variety of economically desperate and socially isolated populations."  Debbie Berkowitz, OSHA's former Senior Policy Adviser, said, "It's an industry that targets the most vulnerable group of workers and brings them in.  And when one group gets too powerful and stands up for their rights, they figure out who's even more vulnerable and move them in."

121.    Many of the workers recruited and hired by Defendant Processors are migrant workers, refugees, asylum-seekers, immigrants employed under EB3 visas, prison laborers, and participants in court-ordered substance abuse programs.  In a 2015 report, Oxfam America wrote, "The poultry industry has a complicated history of tapping marginalized populations for its workforce. … Of the roughly 250,000 poultry workers in the US, most are minorities, immigrants, or refugees, and a significant percentage is female."

122.    For example, Norman Beecher, a former Human Resources manager for Defendant Case Farms LLC, actively recruited refugees from the Guatemalan civil war.  Mr. Beecher explained to historian Leon Fink, "I didn't want [Mexicans].  Mexicans will go back home at Christmastime.  You're going to lose them for six weeks.  And in the poultry business you can't afford that.  You just can't do it.  But Guatemalans can't go back home.  They're here as political refugees.  If they go back home, they get shot."

29

123.    In a 2017 article titled "Exploitation and Abuse at the Chicken Plant," *The New Yorker* reported that Defendant Case Farms LLC "finds new ways to keep labor costs down.  For a time, after the Guatemalan workers began to organize, Case Farms recruited Burmese refugees.  Then it turned to ethnic Nepalis expelled from Bhutan, who today make up nearly 35 percent of the company's employees in Ohio. … Recently, Case Farms has found a more captive workforce.  One blazing morning last summer in Morganton, an old yellow school bus arrived at Case Farms and passed through the plant's gates, pulling up to the employee entrance.  Dozens of inmates from the local prison filed off, ready to work at the plant."

124.    Many chicken processing plant workers do not speak English and lack significant education.  Accordingly, many chicken processing plant workers cannot easily obtain stable employment outside the chicken industry.  A former employee of Pilgrim's during the Class Period explained that many chicken processing plant workers never graduated from high school and did not speak English and thus were limited from pursuing work outside a chicken processing plant.  Similarly, a former employee of George's during the Class Period explained that chicken processors "catered" to workers who did not speak English and lacked a strong educational background and that it would be difficult for chicken processing plant workers to find work outside a chicken processing plant because of "communication issues."

**B.  Conspiracy to Fix Wages**

125.    Beginning in January 2009 and continuing to the present, Defendants have conspired with each other to fix and depress the compensation paid to non-supervisory production and maintenance workers at Defendant Processor's chicken processing plants in the continental United States.

126.    Multiple events took place in the chicken industry in 2008 and 2009 that facilitated

the formation and implementation of the conspiracy, including:

    a.   In 2008, Tyson, the largest chicken processor in the United States, re-subscribed to Agri Stats.  Tyson had previously terminated its relationship with, and subscription to, Agri Stats, but the company resumed exchanging detailed and proprietary wage information with other Defendant Processors through Agri Stats in 2008.

    b.   In December 2008, the second largest chicken processor, Pilgrim's Pride Corporation, filed for bankruptcy.  The bankruptcy resulted from total costs—including labor costs—exceeding the revenue earned by the company.  The bankruptcy of Pilgrim's Pride Corporation triggered competing chicken processors to consider methods of managing costs in order to avoid the same fate.

    c.   In 2009, following the bankruptcy filing of Pilgrim's Pride Corporation, the multinational JBS S.A, which is the largest meat processing company in the world, acquired a majority stake in Pilgrim's Pride Corporation.  The acquisition resulted in a change in the leadership of the human resources department at Pilgrim's Pride Corporation.

    d.   In April 2009, the human resources committees of the two leading trade associations representing the interests of Defendant Processors—the National Chicken Council and the U.S. Poultry & Egg Association—merged to form the Joint Poultry Industry Human Resources Council.

127.   Defendants formed and implemented the conspiracy to reduce labor costs and maximize profits.  In the absence of the conspiracy, Defendant Processors would have competed with each for labor during the Class Period by offering higher wages and superior benefits to Class Members.  This is particularly true given that each Defendant Processor owns and operates a

chicken processing plant that is within 28 miles of a competitor's processing plant, meaning that many workers could easily switch to rival chicken processing plants offering better compensation in a competitive market. The conspiracy permitted Defendant Processors to restrain competition for chicken processing plant workers and thus reduce labor costs and increase profits.

128.     In furtherance of the formation, implementation and enforcement of the conspiracy, Defendants have engaged in the following misconduct:

    a.   Conducted "off the books" in-person meetings between senior executives of Defendant Processors during which they fixed and depressed the wages and benefits paid to chicken processing plant workers;

    b.   Exchanged detailed, timely and competitively sensitive wage data through Agri Stats and WMS, thereby permitting Defendants to continuously identify how much each Defendant Processor was paying chicken processing plant workers;

    c.   Conducted bilateral plant-to-plant exchanges of compensation data, including data regarding anticipated future increases in wages.

**1.     "Off the Books" In-Person Meetings to Fix Compensation**

129.     Beginning on or before 2009, senior executives of Defendant Processors conducted regular in-person meetings to exchange information about, discuss and ultimately fix the wages and benefits provided to non-supervisory production and maintenance workers at chicken processing plants in the continental United States.

130.     For example, during each year of the Class Period, senior executives from the Defendant Processors who were responsible for determining the compensation of chicken processing plant workers conducted an in-person meeting at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida. According to former employees of Perdue and Pilgrim's, those meetings

were attended by Directors of Compensation, Directors of Benefits, Compensation Analysts and/or Vice-Presidents of Human Resources from each of the leading chicken processors.

131.    While these meetings often occurred around the same time as the U.S. Poultry & Egg Association's annual Human Resources Seminar, the meetings were not part of the association's published schedule or any other association's published schedule.  According to a former employee of Perdue, the meetings were "off the books" because of the confidential nature of the communications.

132.    During these annual "off the books" meetings held at the Hilton Sandestin Resort Hotel & Spa during the Class Period, the senior executives of Defendant Processors engaged in two procedures to fix and depress the wages of Class Members.  First, the executives exchanged timely data regarding wages and benefits paid to Class Members through a comprehensive and detailed survey.  Second, the executives held roundtable discussions to agree on and fix wages and benefits paid to Class Members.

133.    A former employee of Pilgrim's explained that, each year, both the commission of the annual survey and the off-the-books meeting attended by senior executives of Defendant Processors were *fully paid* by one of the three largest chicken processors. Those three largest chicken processors—which included Tyson and Pilgrim's—would alternate payment of the survey and roundtable meeting each year.  For example, Tyson would pay for the survey and meeting one year; Pilgrim's would pay for the survey and meeting the next year; a third Defendant Processor paid for the survey and meeting the following year; and the cycle would renew.

134.    During the Class Period, the survey was conducted by WMS, a compensation consulting firm based in Pottstown, Pennsylvania.  WMS states on its website that it "offers many types of surveys from industry-specific compensation surveys to company-specific job content

surveys.  Unlike traditional surveys that yield ambiguous answers to generic questions, our company or industry-tailored assessments are based on real programs and issues within your organization or industry that result in answers based on real-time data."

135.    Prior to each annual "off-the-books" meeting held during the Class Period, each Defendant Processor provided detailed information to WMS regarding wages and benefits paid to Class Members, including *current* hourly rates for specific chicken processing positions.  A former employee of Pilgrim's explained that each participating Defendant Processor submitted detailed wage and benefits information to WMS for "all positions within the facilities."  She explained that the wage data submitted to WMS included average hourly wages for each processing line position as well as the number of people employed in each such position.  She further explained that the benefits data submitted to WMS included identifying which health insurance plans were offered, the price of health insurance premiums, how much of that premium was paid by the employer, the number of paid time-off allowances, and the value of 401(k) retirement plan contributions. A former employee of Tyson explained that the survey also requested "detailed" information about health plan deductibles and whether the provided health insurance plan involved an open or closed network.

136.    At the "off-the-books" in-person meetings, WMS randomly assigned a number to each attending Defendant Processor and subsequently circulated the wage and benefits data obtained through the survey to the attendees of the in-person meeting, with the names of the Defendant Processors replaced by their randomly assigned number.  WMS also circulated the average and median wage rates for each chicken processing plant position based on the data provided by the Defendant Processors, thereby establishing a benchmark that facilitated wage-fixing discussions.

137.    Despite the WMS survey's superficial attempt to conceal the identities of the participating Defendant Processors, it was made apparent to each attendee—by the nature of the data and related conversations between attendees—exactly which company had provided which wage and benefits information.  According to a former employee of Pilgrim's, WMS distributed a list of all survey participants to the attendees of the in-person meetings.  A former employee of Perdue explained that it was not difficult to determine which company reported which compensation data in the WMS survey when "you're sitting in a meeting and the person across from you [from a competing processor] is reporting on what they do."  A former employee of Pilgrim's said that attendees at the in-person meetings discussed whether they paid a particular position less or more than the WMS survey average and also discussed why they paid certain positions higher or lower wages depending upon the responsibility assigned to that position.

138.    Defendant Processors used the WMS survey data to modify their compensation systems.  For example, a former employee of Pilgrim's said she used the wage data from the WMS survey to help determine wage rates at Pilgrim's.

139.    After WMS had circulated the survey data to senior executives of the Defendant Processors at the annual "off-the-books" meetings during the Class Period, those executives engaged in roundtable discussions to review the results of the WMS survey and to determine and agree upon the optimal compensation for chicken processing plant workers, including the optimal benefits.  According to a former employee of Perdue, the executives at the off-the-books meetings specifically discussed "competitive benefit information" including health insurance deductibles, paid time off and 401(k) plans.  During these roundtable discussions, the senior executives of the Defendant Processors agreed upon and fixed the wages and benefits that they would provide to non-supervisory production and maintenance workers at chicken processing plants in the

continental United States, *i.e.* Class Members.  During those discussions, the senior executives of

the Defendant Processors also chastised any Defendant Processor that had deviated—by making

unauthorized increases to worker compensation—from agreed-upon wages that had been fixed at

prior in-person meetings.

140.    A senior executive from Tyson noted during a private conversation in or around

2018 that the discussions about wages and benefits at the "off the books" meetings held at the

Hilton Sandestin Resort Hotel & Spa in Destin, Florida were so inappropriate and improper that

that the company would no longer attend them.

141.    The "off-the-books" meetings at which the Defendant Processors exchanged

competitively sensitive compensation data and fixed the wages and benefits of Class Members,

occurred during each year of the Class Period at the Hilton Sandestin Resort Hotel & Spa in Destin,

Florida.

142.    In addition to the above meetings held at the Hilton Sandestin Resort Hotel & Spa

in Destin, Florida, there were many other in-person meetings during the Class Period between

senior executives of the Defendant Processors who had responsibility for determining wages and

benefits paid to Class Members.  Many of those meetings were sponsored by trade associations

that advocate for the interests of the Defendant Processors.  Upon information and belief, during

many of those meetings, the senior executives discussed and agreed on wages and benefits to be

paid to Class Members.  Those meetings include:

    a.  <u>Seminars and Meetings of the U.S. Poultry & Egg Association</u>.  The U.S. Poultry
        & Egg Association describes itself as the world's largest and most active poultry
        organization, and each Defendant Processor is a member.  Each year of the Class
        Period, the Association held a Human Resources Seminar, often at the Hilton
        Sandestin Resort Hotel & Spa in Destin, Florida.  The Defendant Processors'
        employees responsible for setting plant worker wages—including senior
        executives, Vice Presidents of Human Resources, Directors of Compensation,
        Directors of Benefits, and Compensation Analysts—routinely attended the Human

Resources Seminar.  A former employee who worked at three different chicken processing plants operated by Tyson, Pilgrim's and Perdue, said that the attendees at the Association's annual Human Resources Seminar knew each other very well and could have readily discussed wages of processing plant workers over dinner. In addition, senior executives of the Defendant Processors serve on the board of directors of the Association, and that board conducted in-person meetings four times a year during the Class Period.

b.  Board meetings of the National Chicken Council.  The National Chicken Council exclusively represents chicken processors, and its members account for approximately 95 percent of the chicken sold in the United States.  Each Defendant Processor is a member of the National Chicken Council.  The CEOs of the Defendant Processors serve on the board of directors of the National Chicken Council, and that board of directors met at least four times a year during the Class Period.  In conjunction with some of these meetings, executives from Agri Stats made presentations, and the CEOs of the Defendant Processors held private dinners.

c.  Meetings of the Joint Poultry Industry Human Resources Council.  This Council was formed by merging the human resources committees of the U.S. Poultry & Egg Association, National Chicken Council and the National Turkey Federation.  The Council is comprised of senior human resources executives, including executives of the Defendant Processors who formed and implemented the wage-fixing conspiracy.  The Council exclusively focuses on labor issues, such as wages and benefits, and it held an in-person meeting on an annual basis during the Class Period, often at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida.

d.  Meetings of the Georgia Poultry Federation.  The Georgia Poultry Federation "is a non-profit trade association which represents the poultry industry in Georgia, the nation's leading broiler[3] producing state."  Many of the Defendant Processors are members of the Georgia Poultry Federation.  It held meetings at least three times a year during the Class Period, which were attended by executives from those Defendant Processors.

e.  Meetings of the North Carolina Poultry Federation.  The mission of the North Carolina Poultry Federation "is to create a favorable climate for business success for everyone involved in the poultry industry in North Carolina."  Many of the Defendant Processors are members of the North Carolina Poultry Federation.  It conducted several meetings during each year of the Class Period, which were attended by executives of those Defendant Processors.

f.  Meetings of The Poultry Federation.  The Poultry Federation is a non-profit trade organization that represents the poultry and egg industries in Arkansas, Missouri, and Oklahoma.  Many of the Defendant Processors are members of The Poultry Federation, and it conducted several meetings each year of the Class Period, which were attended by the executives of those Defendant Processors.

---

[3] The term "broiler" means chicken raised for meat consumption.

## 2.   Exchanging Detailed Wage Data Through Agri Stats

143.    In addition to conducting "off the books" in-person meetings during which they discussed and fix wages and benefits, Defendant Processors also exchanged detailed and competitively sensitive wage information each month in furtherance of the conspiracy through a subscription to Agri Stats.  The agreement to exchange, and the actual exchange of, detailed wage information through Agri Stats itself restrained wage competition for processing plant workers in the chicken industry, and greatly facilitated the formation, implementation and enforcement of the conspiracy.

144.    Agri Stats is a self-described "management reporting and benchmarking company" that "provides consultation on data analysis, action plan development and management practices of participating companies."  Agri Stats' mission is to "[i]mprove the bottom line profitability for our participants by providing accurate and timely comparative data while preserving confidentiality of individual companies."

145.    On February 15, 2017, in an article titled "Is the Chicken Industry Rigged?," *Bloomberg Businessweek* reported, "Agri Stats provides chicken producers with a rare level of detail, in uncommonly timely fashion.  The company's reports, portions of which Bloomberg Businessweek reviewed, contain exhaustive data about the internal operations of the nation's biggest poultry corporations, including bird sizes, product mixes, and financial returns at participating plants. … Today, at Agri Stats' headquarters in Fort Wayne, dozens of software engineers, data specialists, and marketing managers oversee one of the largest private storehouses of information ever compiled about a single sector of the agricultural economy.  According to Cox, clients submit their sales invoices in real time—when someone sells a truck of chicken to the Kroger grocery chain, for example, the invoice goes to Agri Stats soon after."

38

146.    A former employee of Perdue during the Class Period noted that Agri Stats was responsible for "collusion in the poultry industry."

147.    Agri Stats gathers information from, and exchanges information between, more than 95 percent of U.S. chicken processors.  Agri Stats partnered with each of the Defendant Processors to obtain and exchange timely and competitively sensitive compensation information regarding non-supervisory production and maintenance workers at chicken processing plants.

148.    Every Defendant Processor and co-conspirator participated in Agri Stats during the Class Period and provided and received the detailed information described herein.   Upon information and belief, in the wake of a $1.3 billion jury verdict in 2004 against Tyson for a conspiracy to manipulate pay to cattle farmers, increased fears of antitrust liability led Tyson to withdraw from Agri Stats.  However, in or around January 2008, Tyson resumed its subscription with and participation in Agri Stats.  Upon information and belief, on or around 2014, Tyson again withdrew from Agri Stats but then again resumed its subscription with and partnership in Agri Stats in or around 2016.

149.    During the Class Period, on a monthly basis, each Defendant Processor provided effective hourly wage rates regarding each category of chicken processing plant worker from each of their chicken processing plants in the continental United States to Agri Stats.  Upon information and belief, that information was transmitted to Agri Stats through direct electronic submissions by the Defendant Processors.  Agri Stats utilized an audit process to verify the accuracy of data regarding each plant, sometimes directly contacting Defendant Processors to verify data.

150.    Agri Stats subsequently compiled the wage data that it received from the Defendant Processors and, each and every month during the Class Period, distributed that disaggregated compilation to each of the subscribing Defendant Processors.  The compilation contained *current*

effective hourly wage rates for categories of non-supervisory production and maintenance worker at chicken processing plants throughout the continental United States owned and operated by Defendant Processors.  The compilation also contained average hourly wage rates for chicken processing plant positions, both nationwide and broken down by region.  Additionally, the compilation also identified the productivity of particular processing plant positions, such as birds per man hour and labor hours per pound.

151.    While Agri Stats claims the distributed data is anonymous, the data is sufficiently granular and disaggregated that executives of Defendant Processors could and did easily and precisely match all the distributed wage data with specific chicken processing plants owned by specific Defendant Processors in specific regions.

152.    A former employee of Perdue during the Class Period said that Agri Stats data was "supposedly confidential" but he knew from being in the industry and around the "good old boy system" that Perdue and every other processor participating in Agri Stats knew precisely which company reported which data.  He added that it is "just bullshit" to suggest that each Defendant Processor did not know which company was reporting which compensation data to Agri Stats and explained that the Defendant Processors had "been looking at the same numbers for years so they've figured out who is who."

153.    A former employee of Pilgrim's during the Class Period explained that Agri Stats data could "totally" be reverse engineered to determine which company's plant was associated with which reported data and that, during meetings at processing plants to review Agri Stats data, colleagues would specifically point out that certain compensation data was associated with a particular competitor's plant in a specific location.

154.    A former employee of Perdue said that Perdue brought in Agri Stats personnel to

teach management "how to extract information" from Agri Stats data.  During the Class Period, Agri Stats met with each Defendant Processor and its executives quarterly.  Since Agri Stats travelled between each Defendant Processor regularly and discussed the nonpublic, proprietary data at those meetings, Agri Stats was in a unique position to share information among Defendant Processors to enforce the agreement.  Additionally, during each year of the Class Period, Agri Stats and its subsidiary Express Markets Inc. held "Broiler Outlook Conferences" that were attended by senior executives of the Defendant Processors and which addressed some of the data collected by Agri-Stats from Defendant Processors.

155.    As a result of their subscriptions to Agri Stats, during each month of the Class Period, Defendant Processors could determine and knew how much each subscribing Defendant Processor was paying in wages to Class Members at their chicken processing plants.  Defendant Processers used the Agri Stats exchange of current wage data to fix and harmonize the wages paid to Class Members and to monitor, and confirm that no conspirator deviated from, the wage-fixing conspiracy.  A former employee of Perdue said that it would be "stupid to think" that Agri Stats did not have "an influence on" chicken processing worker wages.

156.    Agri Stats exchanged detailed wage information between Defendant Processors on a *monthly* basis during the Class Period.  This monthly dissemination of hourly wage data from each of the Defendant Processors allowed the Defendants to efficiently implement the wage-fixing scheme and systematically monitor and enforce compliance with it.  Defendants were able to constantly monitor each other's compensation levels to ensure that no Defendant Processor offered materially more in compensation than another.

157.    During the Class Period, Defendant Processors regularly reviewed Agri Stats wage data at corporate headquarters and on a regular basis at each individual plant.  For example, at

chicken processing plants operated by Perdue, Agri Stats data was reviewed at monthly or quarterly plant meetings during the Class Period.  Similarly, a former employee of George's said that Agri Stats data was reviewed during quarterly plant meetings during the Class Period to assess plant performance.  Joe Sanderson, then-CEO and Chairman of Sanderson Farms, stated publicly that "we live and die by Agri Stats."  A former employee of Perdue said that Perdue spent "enormous effort analyzing Agri Stats" and that the CEO was an "Agri Stats guru and nut" who had an "absolute understanding" of the reported Agri Stats data.

158.    Defendant Processors regularly relied upon Agri Stats data to determine the wages of workers at chicken processing plants.  For example, a former employee at a Pilgrim's plant said that a Pilgrim's corporate officer visited the plant every quarter to review Agri Stats data with plant management; that during those meetings, Agri Stats wage data regarding processing plant workers was extensively compared with the plant's own wage figures; and that, when the Agri Stats data was being reviewed, the shared goal of the corporate officer and the plant managers was to ensure that the Pilgrim's plant was paying wages that were exactly in the middle of the reported Agri Stats wage data.  The former employee of Pilgrim's explained that a department at Pilgrim's corporate office was specifically tasked with visiting each chicken processing plant operated by Pilgrim's to ensure that their compensation rates were exactly in the middle of reported Agri Stats data.

159.    In 2009, shortly after Pilgrim's had filed for bankruptcy in December 2008, the company engaged in collective bargaining negotiations with United Food and Commercial Workers International Union as part of a reorganization plan.  During the course of those negotiations, Pilgrim's executives insisted that labor costs be within the Agri Stats average range in each of the company's chicken processing plants.

160.    There is no plausible, non-conspiratorial justification for Defendant Processors,

with Agri Stats' agreement and participation, to have secretly shared, on a monthly basis, highly confidential and proprietary information about their *current* compensation to chicken processing plant workers, as broken down by worker position.  In a competitive market, such proprietary, competitively sensitive information would remain a closely guarded secret.

161.    Defendant Processors' monthly exchange of detailed, current, and disaggregated information regarding the wages of chicken processing workers was anticompetitive.  It resulted in lower compensation for all Class Members than each would have received in a competitive market, and it materially increased the profits of Defendants Processors.

162.    On February 15, 2017, in an article titled "Is the Chicken Industry Rigged?," *Bloomberg Businessweek* reported, "Armed with Agri Stats data, the biggest chicken producers have been enjoying an unprecedented era of stability and profitability.  At Tyson, operating margins in the chicken division have risen sharply since 2009, when they were 1.6 percent, according to SEC filings.  The next year they were up to 5.2 percent.  After a brief dip, they climbed to 7.9 percent in 2014, an astounding 12 percent in 2015, and 11.9 percent in 2016.  A similar trend has been under way at Pilgrim's Pride, where operating margins went from 3.08 percent in 2012 to 14.02 percent in 2014 and 12.77 percent in 2015, according to data compiled by Bloomberg. The recovery from recession accounts for some of the gains, but the poultry industry's profit margins still have been abnormally fat and long-lasting by historical standards."

163.    Agri Stats has profited from collecting and reporting Defendants Processors' confidential business information, including by charging substantial fees of hundreds of thousands of dollars annually to each Defendant Processor.

### 3.   Plant-to-Plant Communications About Compensation

164.    In furtherance of the wage-fixing conspiracy, the individual plants owned and

operated by the Defendant Processors often engaged in bilateral exchanges of wage information with competing chicken processing plants in the same region.  The information obtained from these data exchanges was provided to the corporate headquarters of the respective Defendant Processors, which used this regional information to facilitate the setting of artificially depressed wages.

165.   A former employee of a Pilgrim's chicken processing plant said that corporate headquarters would ask each plant to obtain information about current and future wages at competing chicken processing plants.  That information was often obtained directly from those competing chicken processing plants through information-sharing channels.

166.   A former employee of Peco Foods said that human resources managers at local chicken processing plants "shared [wage information] within the industry" all the time.  He explained that "local plants talk" and "knew what competitors are doing and how much they are paying."  He said that human resources staff would often contact their counterparts at a competitor plant and share information about starting pay rates, pay increases and employment benefits.  He explained that this "type of thing happened all the time."

167.   These plant-to-plant communications often involved the exchange of detailed wage data regarding *future* wages (which are not part of Agri Stats reports).  For example, these exchanges were sometimes initiated by a Defendant Processor's plant if a competing chicken processing plant was expanding and thus intended to hire a large number of new workers.  In that situation, the plant initiating the exchange of wage information data is seeking to ensure that its wages will be like those at the newly expanded plant, in order to avoid turnover and wage competition for labor.

168.   For example, a Pilgrim's chicken processing plant in Mayfield, Kentucky requested

44

and obtained the pay rates of plant workers from competitor chicken processing plants in the fall of 2017. A rival Tyson chicken processing plant in nearby Union City, Tennessee was planning to expand its "live hang" operation. As a result, a plant manager at Pilgrim's Mayfield plant reached out to a counterpart at Tyson's Union City plant and obtained *future* pay rates for processing line positions at the newly expanded plant. During the same time period, another manager at Pilgrim's Mayfield plant contacted a counterpart at a nearby Perdue processing plant in Bowling Green, Kentucky and obtained that rival plant's pay rates for processing line workers. These and other pay rates obtained from competing plants were compiled into a single document and transmitted to senior executives at Pilgrim's corporate headquarters. A former employee of Pilgrim's explained that these kinds of exchanges of wage data between regional Pilgrim's, Tyson and Perdue plants had been occurring for years.

169.    A former employee of Wayne Farms, who worked out of the company's corporate offices, was tasked with developing pay bands for processing plant workers. To assist with that project, the former employee distributed surveys to multiple chicken processors in the Southeast region during the Class Period that requested information about wages paid to processing plant positions. The survey was disseminated through an email listserv to dozens of other chicken processing plants in the Southeast region. Multiple processing plants returned completed surveys to the former Wayne Farms employee.

170.    A former employee of Perdue during the Class Period stated that the company sometimes distributed wage surveys to competing chicken processors.

171.    Defendant Processors also arranged and conducted tours of each other's chicken processing plants as a means to exchange information. For example, in April 19-21, 2013, Pilgrim's CEO Bill Lovette, Perdue Chairman of the Board Jim Perdue, and Sanderson Farms

President Lampkin Butts attended a "Chicken Media Summit" in North Carolina that included visits by attendees to a local Sanderson Farms processing plant. Similarly, in April 19-21, 2015, another "Chicken Media Summit" was held on Maryland's Eastern Shore, and it included tours of one of Perdue's local processing plant. Upon information and belief, these and other plant tours included discussion of labor practices.

### 4. Plus Factors that Render the Chicken Industry Susceptible to Collusion

172.   The chicken processing industry is characterized by numerous features, or plus factors, that render the industry particularly susceptible to collusion and bolster the plausibility of the conspiracy alleged herein. These include: (1) vertical integration; (2) high barriers to entry; (3) industry concentration; (4) fungibility of chicken processing plant labor; (5) inelastic labor supply; (6) numerous opportunities to collude; (7) personal relationships between executives at competing chicken processors; and (8) a history of government investigations into collusive actions.

173.   The chicken industry is, by far, the most vertically integrated segment of agriculture. Defendant Processors own and operate nearly every stage of chicken production, from the feed mills to the hatcheries to the processing plants. Accordingly, Defendant Processors control the compensation of the vast majority of workers in the *entire* chicken industry. Defendant Processors can and do leverage that power to form and implement wage-fixing conspiracies that preclude chicken processing workers from switching to alternate higher-paying positions within the chicken industry.

174.   The chicken processing industry is characterized by high entry barriers. These barriers include the high costs of: constructing and operating a processing complex, including hatcheries, feed mills, and processing plants; establishing and operating a distribution network

capable of delivering poultry products to grocery chains or wholesalers; developing and investing in a skilled contract-farmer base; and ensuring compliance with onerous federal and state government mandates and regulations.  The cost of constructing a processing complex alone is in excess of $100 million.  As a result, it is exceptionally expensive and logistically complex for new chicken processors to emerge and compete with Defendant Processors.

175.    The chicken processing industry is highly concentrated.  According to a November 2013 USDA report, "[d]uring the past 16 years, firms in the Broiler industry continued to decrease in number and grow in size, thereby gaining further economies of scale and scope in processing and marketing.  According to the National Chicken Council, 55 federally inspected Broiler companies operated in 1995, compared with 41 companies in 2010."  Presently, there are only approximately 30 such companies.   The chicken processing industry's top-eight-firms concentration ratio has increased from 53.1% in 1997 to 79.3% in 2013.

176.    Chicken processors view the non-supervisory production and maintenance workers that comprise the Class as fungible.  Workers within the same positions are generally interchangeable, permitting Defendant Processors to readily compare and match each other's compensation levels.

177.    The market for chicken processing workers is characterized by inelastic labor supply.  Due to the demographics and educational background of many chicken processing workers, industry-wide changes in wage rates do not substantially affect the rate of participation in chicken processing positions.

178.    Defendants have had numerous opportunities to collude.  As noted above, the senior executives of Defendant Processors responsible for determining wages and benefits for chicken processing plant workers attended multiple in-person meetings during each year of the Class

Period.  Many of those meetings were sponsored by chicken industry trade associations, such as

the U.S. Poultry & Egg Association, the National Chicken Council, the Joint Poultry Industry

Human Resources Council, the Georgia Poultry Federation, the North Carolina Poultry

Federation, and The Poultry Federation.  Other such in-person meetings were sponsored by Agri

Stats and investment banks.

179.   Executives of Defendant Processors have close personal relationships with each

other.  A former employee of Perdue said that management in the industry formed a "tight-knit

circle" and exchanged information frequently.   The former Perdue employee noted that, for

example, Jim Perdue, chairman of Perdue, and Ronald Cameron, the owner of Mountaire Farms,

regularly attend church together.  Another former employee, who worked at three different chicken

processing plants operated by Tyson, Pilgrim's and Perdue, said that the senior executives of those

three companies knew each other very well.

180.   The history of the chicken processing industry is replete with government

investigations and collusive actions.  For example, in April 1973, the United States Department of

Justice ("DOJ") filed a civil antitrust action against the National Broiler Marketing Association

("NBMA") for conspiring to fix the prices of broilers in violation of Section 1 of the Sherman Act.

The DOJ sought to enjoin the NBMA and its dozens of members from continuing a conference

call program whereby members coordinated the pricing and production of broilers.

181.   The DOJ is currently investigating the chicken industry for engaging in anti-

competitive conduct.  In June 2019, the DOJ disclosed that the agency had launched a criminal

investigation into whether chicken processors have violated the antitrust laws.  Specifically, on

June 21, 2019, the DOJ filed a motion requesting that the U.S. District Court for the Northern

District of Illinois stay discovery in a civil class action alleging price-fixing by many of the

Defendant Processers and other chicken processors.  The DOJ explained that the stay was necessary "to protect the grand jury investigation" into anticompetitive conduct in the chicken industry.

### C.  Market Power of Defendant Processors

182.   The relevant market is the employment of non-supervisory production and maintenance workers at chicken processing plants in the continental United States ("Relevant Market").

183.   The relevant geographic market is the continental United States.

184.   A hypothetical cartel that controlled a large share of the Relevant Market, as Defendant Processors collectively do here, could profitably suppress wages and benefits paid to non-supervisory production and maintenance workers at chicken processing plants below competitive levels.  In such circumstances, chicken processing workers would not be able to defeat such artificial wage and benefits suppression by mobilizing organized opposition or switching employment to other non-conspiring chicken processors.

185.   Defendant Processors possess market power in the Relevant Market.  Defendant Processors pay compensation to non-supervisory production and maintenance workers at chicken processing plants that comprise more than 90 percent of the Relevant Market.

186.   There are no close economic and/or functional substitutes for non-supervisory production and maintenance workers at chicken processing plants.  Defendant Processors require such workers to process chickens.

187.   Each Defendant Processor provides compensation to non-supervisory production and maintenance employees at its chicken processing plants at identical or near identical levels, regardless of the region of the country in which the company's plants are located.  Because each

Defendant Processor pays the same, or nearly the same, wages and benefits to its to non-supervisory production and maintenance employees at chicken processing plants regardless of geographic region, conduct that suppresses compensation to those non-supervisory production and maintenance workers in one chicken processing plant location would necessarily suppress compensation to non-supervisory production and maintenance workers in all of the Defendant Processor's chicken processing plants in all the geographic regions of the continental United States.

188.    Absent the conduct challenged in this Complaint, Defendant Processors would consider each other to be competitors for non-supervisory production and maintenance workers at chicken processing plants, given that Defendant Processors (a) each own and operate at least one chicken processing plant that is within 28 miles of another Defendant Processor's chicken processing plant; (b) could open or acquire chicken processing plants in areas where another Defendant Processor already operates; and (c) compete with each other on a nation-wide basis to recruit and incentivize non-supervisory production and maintenances workers to move to areas where the Defendant Processors operate chicken processing plants.

189.    Defendants collectively possess market and monopsony power in the Relevant Market in that they have the power, collectively, and through the challenged conduct, to profitably suppress compensation to non-supervisory production and maintenance workers at chicken processing plants below competitive levels.

### D.  Anticompetitive Effects and Injury Suffered by Class Members

190.    As a result of Defendants' anticompetitive conduct alleged herein, competition between Defendant Processors over wages and benefits was restrained or eliminated in the market for non-supervisory production and maintenance workers in chicken processing plants in the

continental United States during the Class Period.

191.    As a result of Defendants' anticompetitive conduct alleged herein, the wages and benefits of non-supervisory production and maintenance workers in chicken processing plants in the continental United States were fixed, stabilized, or maintained at artificially depressed levels during the Class Period.

192.    The purpose of the conspiratorial conduct of the Defendants was to depress, fix, or maintain the wages and benefits of non-supervisory production and maintenance workers in chicken processing plants in the continental United States and, as a direct and foreseeable result of the conspiratorial conduct, Plaintiffs and the Class received wages and benefits at artificially-depressed rates during the Class Period.

193.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their businesses or property, having received lower wages and benefits during the Class Period than they would have received in the absence of Defendants' illegal contract, combination, or conspiracy.  As a result, Plaintiffs and the Class have suffered damages.

194.    This is an injury of the type that the antitrust laws were meant to punish and prevent.

195.    An analysis conducted by economists retained by Plaintiffs shows that the discrepancy between the wages of workers employed by food manufacturers (including manufacturers of grain, sugar, dairy, seafood and other foods) and the wages of workers employed by chicken processing plants materially increased during the Class Period.  According to the preliminary economic analysis, that discrepancy sharply expanded at the onset of the Class Period.

196.    A 2015 report published by Oxfam America about chicken processing plant workers titled "Lives on the Line" states, "Over the last 30 years or so, the real value of wages has declined dramatically—almost 40 percent since the 1980s.  Meanwhile, compensation for poultry

executives is soaring: In just the last four years, compensation for Tyson's chairman rose 260 percent to $8.8 million; compensation for Pilgrim's president and chief executive officer rose 290 percent to $9.3 million."

197.    While wages and benefits paid to Plaintiffs and the Class were artificially depressed during the Class Period, the productivity of those workers greatly increased.  A primary reason for that increase in productivity is that processing line speeds were substantially increased.  As a result, even while Plaintiffs and the Class worked harder during the Class Period, the wages and benefits received by them were artificially depressed.  Thus, while labor productivity in Defendant Processors' chicken processing plants has substantially increased over the past two decades, labor costs have declined for Defendant Processors during that same period.

198.    In a competitive market, Defendant Processors would have competed to recruit, hire and retain non-supervisory production and maintenance workers during the Class Period by offering higher wages and superior benefits, and many Class Members would have switched employment to different Defendant Processors as a result of that competition for labor.  Yet, by entering into the alleged conspiracy, Defendant Processors were able to reduce and stabilize turnover rates.  Defendants' scheme to fix and depress wages and benefits harmonized compensation to Class Members across the industry and thus reduced the incentive for Class Members to switch employment between Defendant Processors.

199.    The effects and injuries caused by Defendants' agreements commonly impacted all non-supervisory production and maintenance workers at their chicken processing plants in the continental United States because Defendant Processors valued internal equity, i.e. the idea that similarly situated employees should be compensated similarly.  Each Defendant Processor established a pay structure to accomplish internal equity.  For example, a former employee of

Perdue explained that hourly wage increases for chicken processing plant workers were made company-wide.  Defendant Processors fixed narrow wage ranges for their chicken processing plant workers in the continental United States with similar job positions and similar levels of experience and also maintained certain wage differentials between different chicken processing plant positions.

## VII.    STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.  Continuing Violation

200.    During the Class Period, Defendants' conspiracy was a continuing violation in which Defendants repeatedly invaded Plaintiffs' and Class Members' interests by adhering to, enforcing, and reaffirming the anticompetitive agreements described herein.  Indeed, Defendants continue to exchange competitively sensitive information regarding, and to discuss and agree on, wages and benefits to pay Class Members through the present.

201.    Defendants' continuing adherence to, enforcement of and reaffirmation of the anticompetitive agreements throughout the Class Period was and is consummated through, among other conspiratorial acts, "off the books" in-person meetings conducted each year to discuss and fix compensation to Class Members, the monthly exchange of competitively sensitive wage data through Agri Stats, the renewal of subscriptions to Agri Stats, participation in annual wage and benefits surveys operated by WMS, and other communications between Defendants.

### B.  Fraudulent Concealment

#### 1.   Plaintiffs Did Not and Could Not Have Discovered Defendants' Misconduct

202.    Plaintiffs and other Class Members had neither actual nor constructive knowledge of the facts constituting their claim for relief.  Plaintiffs and Class Members did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the

conspiracy alleged herein until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy to fix and depress wages and benefits paid to non-supervisory production and maintenance workers in chicken processing plants.

203.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Neither chicken processors nor compensation to chicken processing plant workers are exempt from antitrust regulation, and thus, Plaintiffs reasonably considered it to be a competitive industry until recently. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of wages and benefits paid by Defendant Processors to non-supervisory production and maintenance workers in chicken processing plants in the continental United States.

204.    Plaintiffs exercised reasonable diligence. Plaintiffs and the other Class Members could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and co-conspirators to conceal their combination.

### 2. Defendants Actively Concealed the Conspiracy

205.    Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and the other Class Members.

206.    The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to conducting secret "off the books" meetings, engaging in surreptitious communications that do not create or involve written records, exchanging competitively sensitive wage data through a nonpublic and proprietary

system, and concealing the existence and results of commissioned wage surveys. Defendants formed and implemented the combination and conspiracy in a manner specifically designed to avoid detection.

207.    During the Class Period, Defendants affirmatively and falsely represented that they paid wages and benefits reflective of a competitive market for labor.  For example, in October 2015, in response to a report from Oxfam America decrying compensation and working conditions in chicken processing plants in the United States, Tysons said in a statement, "We believe in fair compensation, a safe and healthy work environment and in providing workers with a voice." Perdue also responded to the Oxfam America report by stating in October 2015 that the company provides "competitive wages" above minimum wage.  That same month, the National Chicken Council and U.S. Poultry & Egg Association—the two leading trade associations that are controlled by and represent the interests of Defendant Processors—issued a joint statement that provides, "Poultry processing plants compete for the local workforce and therefore must pay competitive wages and offer competitive benefits. …  Poultry processing companies offer competitive insurance benefits that includes family and dependent coverage."  These false representations were used to conceal the conspiracy.

208.    Defendant Processors also advertised to potential processing plant employees that their wages and benefits were "competitive," *i.e.* the result of competition in the labor market for chicken processing plant employees.  For example, Tyson claims in public advertisements that its compensation is "competitive."  The company further states on its website, under the title "Fair Compensation": "We offer employees competitive pay and benefits…"  These representations falsely indicate that Tyson's compensation is determined through competition in the labor market with other Defendant Processors.  Similarly, Perdue advertises on its website: "We offer

competitive wages and a comprehensive benefits package…" This statement falsely indicates that Perdue's compensation is determined through competition in the labor market with other Defendant Processors.

209. By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and the other Class Members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

## VIII.   CLASS ACTION ALLEGATIONS

210. Plaintiffs bring this action on behalf of themselves, and on behalf of the members of the following class, under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3):

> All persons employed by Defendant Processors as non-supervisory production and maintenance workers at chicken processing plants in the continental United States from January 1, 2009 until the present.

211. The following persons and entities are excluded from the proposed Class: office clerical employees, guards, watchmen, salesmen, foreman, supervisors and executives employed by Defendants; Defendants, co-conspirators, and any of their subsidiaries, predecessors, officers, or directors; and federal, state or local governmental entities.

212. The Class definition mirrors the definition of employees as used by the Defendants and in the industry, including in contracts between unions and the Defendant Processors and in Defendant Processors' own human resources records. As such, it provides clear, objective criteria understood by class members and Defendants, and it allows the parties to identify class members.

213. Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed.

214. The Class is so numerous that joinder of all members in this action is impracticable.

Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contains hundreds of thousands of similarly situated workers.

215.    The Class is readily identifiable and is one for which records should exist.

216.    Plaintiffs' claims are typical of those of the Class.  Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

217.    Plaintiffs and Class Members were injured by the same unlawful conduct, which resulted in them receiving less in compensation for working in chicken processing plants than they would have in a competitive market.

218.    Plaintiffs will fairly and adequately protect and represent the interests of Class.  The interests of the Plaintiffs are aligned with, and not antagonistic, to the Class.

219.    Questions of law and fact common to the Class Members predominate over questions, if any, that may affect only individual members because Defendants have acted and refused to act on grounds generally applicable to the Class Members.

220.    Questions of law and fact common to the Class include:

a.    Whether Defendants engaged in an agreement, combination, or conspiracy to fix, depress, maintain, or stabilize the wages and benefits paid to Class Members;

b.    Whether Defendants' exchange of nonpublic, competitively sensitive information about wages and benefits paid to Class Members constitutes, or furthered, an agreement, combination, or conspiracy in restraint of trade;

c.    Whether such agreements constituted violations of the Sherman Antitrust Act;

d.    The identity of the participants of the alleged conspiracy;

e.    The duration of the conspiracy alleged herein and the acts performed by Defendants

57

and their co-conspirators in furtherance of the conspiracy;

f.   Whether Defendants fraudulently concealed their misconduct;

g.   Whether and to what extent Defendants' anticompetitive scheme suppressed wages
and benefits paid to Class Members below competitive levels;

h.   The nature and scope of injunctive relief necessary to restore competition; and

i.   The measure of damages suffered by Plaintiff and the Class.

221.   Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

222.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.   The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged.   Further, individual joinder of all damaged members of the Class is impractical, and the prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.   Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that is not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

223.   Defendants have acted on grounds generally applicable to the Class, thereby

making final injunctive relief appropriate with respect to the Class as a whole.

IX.     CAUSES OF ACTION

FIRST CLAIM FOR RELIEF
CONSPIRACY TO DEPRESS COMPENSATION IN VIOLATION OF
SECTION 1 OF SHERMAN ANTITRUST ACT

224.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

225.    Beginning in January 1, 2009, and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to fix, depress, maintain and stabilize the wages and benefits paid to non-supervisory production and maintenance workers at Defendant Processors' chicken processing plants in the continental United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

226.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to:

a.   Reached agreements—through in-person meetings, exchanges of information and other communications—to fix, depress, maintain and stabilize the wages and benefits paid to non-supervisory production and maintenance workers at Defendant Processors' chicken processing plants in the continental United States;

b.   Implemented, monitored and enforced that conspiracy to depress compensation through the regular exchange of competitively sensitive, nonpublic, and detailed wage and benefits data with the assistance of Agri Stats and WMS; and

c.   Paid the fixed, depressed, maintained and stabilized wages and benefits to their

non-supervisory production and maintenance workers at their chicken processing

plants in the continental United States.

227.    Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Act.

228.    The combination and conspiracy alleged herein has had the following effects,

among others:

a.  Competition for the retaining and hiring of non-supervisory production and

maintenance workers at Defendant Processors' chicken processors plants has been

restrained, suppressed, and/or eliminated in the continental United States; and

b.  Wages and benefits paid to non-supervisory production and maintenance workers

employed at Defendants' chicken processors plants have been fixed, depressed,

maintained and stabilized at artificially low, noncompetitive levels throughout the

continental United States.

229.    Plaintiffs and the other Class Members have been injured and will continue to be

injured in their businesses and property by receiving less in wages and benefits from Defendant

Processors than they would have in the absence of the combination and conspiracy.

**COUNT II**
**CONSPIRACY TO EXCHANGE COMPENSATION INFORMATION**
**IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT**

230.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

allegation set forth in the preceding paragraphs of this Complaint.

231.    Beginning in January 1, 2009, and continuing through the present, Defendants and

their co-conspirators have engaged in a continuing agreement to regularly exchange detailed,

timely, competitively sensitive and non-public information about the compensation being paid or

to be paid to their to non-supervisory production and maintenance workers at chicken processing

plants in the continental United States.  This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

232.    The relevant market is the employment of non-supervisory production and maintenance workers at chicken processing plants in the continental United States, and the relevant geographic market is the continental United States.

233.    Defendant Processors possess market power in the Relevant Market.  Defendant Processors control more than 90 percent of the Relevant Market.  Defendant Processors' collective market power includes the power to jointly set compensation for non-supervisory production and maintenance workers at chicken processing plants in the continental United States below competitive levels.  This joint power clearly exists because it has been used by Defendant Processors to pay Class Members sub-competitive compensation.

234.    Defendants could and did profitably suppress wages and benefits paid to non-supervisory production and maintenance workers at chicken processing plants in the continental United States below competitive levels.  In such circumstances, chicken processing workers would not be able, and were not able, to defeat such artificial wage and benefits suppression by switching their employment to non-conspiring chicken processors, as Defendants and co-conspirators control more than 90 percent of the chicken processing plants.

235.    A slight decrease in compensation to non-supervisory production and maintenance workers at chicken processing plants in the continental United States from a competitive level could be imposed collectively by the Defendant Processors without causing too many such workers to switch employment to non-chicken industries.  Many of these workers are often constrained from switching employment to non-poultry industries because of their limited education, their limited language skills, their limited job skills, the absence of job opportunities, their legal status,

the expense of moving, and/or other obligations.

236.    Defendant Processors view the non-supervisory production and maintenance workers that comprise the Class as fungible.  Workers within the same positions are generally interchangeable, permitting Defendant Processors to readily to compare and match each other's compensation.

237.    The information regularly exchanged by Defendants pursuant to the agreement has consisted of detailed, competitively sensitive and non-public information about current and future compensation to non-supervisory production and maintenance workers at chicken processing plants.  The information exchanges specifically included:

    a.    The exchange each month, through Agri-Stats, of effective hourly wages for categories of non-supervisory production and maintenance worker at chicken processing plants in the continental United States operated by Defendant Processors;

    b.    The exchange each year, through the WMS survey, of benefits and hourly wages provided to each category of non-supervisory production and maintenance worker at chicken processing plants in the continental United States operated by Defendant Processors;

    c.    Frequent exchanges between plant managers—through telephone calls, emails and electronic listservs—of current and future wages and benefits paid to each category of non-supervisory production and maintenance worker at particular chicken processing plants operated by Defendant Processors.

238.    Defendant Processors' regular compensation information exchanges, directly and through Agri Stats and WMS, reflected concerted action between horizontal competitors in the

market for chicken processing plant labor.

239.    Each Defendant Processor furnished competitively sensitive information to other Defendant Processors with the understanding that it would be reciprocated.  That is, one Defendant Processor would not have provided information to Agri Stats or WMS or directly to another Defendant Processor's plants, without the understanding that they would receive comparable information from other Defendant Processors.

240.    The exchanging of such compensation information by Defendant Processors is inconsistent with the joint guidance provided by the DOJ and the Federal Trade Commission ("FTC").  In October 2016, the two agencies issued a joint "Antitrust Guidance for Human Resource Professionals."  That Antitrust Guidance states:

> Sharing information with competitors about terms and conditions of employment can also run afoul of the antitrust laws.  Even if an individual does not agree explicitly to fix compensation or other terms of employment, exchanging competitively sensitive information could serve as evidence of an implicit illegal agreement.  While agreements to share information are not per se illegal and therefore not prosecuted criminally, they may be subject to civil antitrust liability when they have, or are likely to have, an anticompetitive effect.  Even without an express or implicit agreement on terms of compensation among firms, evidence of periodic exchange of current wage information in an industry with few employers could establish an antitrust violation because, for example, the data exchange has decreased or is likely to decrease compensation. …

> However, not all information exchanges are illegal. It is possible to design and carry out information exchanges in ways that conform with the antitrust laws. For example, an information exchange may be lawful if:

> • a neutral third party manages the exchange,
> • the exchange involves information that is relatively old,
> • the information is aggregated to protect the identity of the underlying sources, and
> • enough sources are aggregated to prevent competitors from linking particular data to an individual source.

241.    The compensation information exchanges by Defendant Processors—through Agri Stats, WMS surveys, plant-to-plant communications, and other means—have not complied with

three of the four criteria established by the DOJ and FTC.  The exchanged wage and benefits information was not "relatively old" or historical; rather, the information concerned current and future wages and benefits, including current wages paid by Defendant Processors that were exchanged each month of the Class Period through Agri Stats.  The exchanged wage and benefits information was not "aggregated to protect the identity of the underlying sources"; rather, the information was *disaggregated*, as compensation information was provided for chicken processing plants operated by, and categories of processing plant workers employed by, each Defendant Processor.  The exchanged wage and benefits information was not "effectively aggregated to conceal the underlying source"; rather, the information was shared in such a disaggregated manner that Defendant Processors' executives readily and predictably could and did reverse engineer the information to match specific wage and benefits data to individual chicken processing plants operated by each of the Defendant Processors.

242.   The agreement to exchange compensation information eliminated a major incentive for Defendant Processors to increase compensation to non-supervisory production and maintenance workers at their chicken processing plants in the continental United States during the Class Period.  The advantage of raising compensation is to retain and attract more such workers by exceeding the compensation paid by competing chicken processing plants.

243.   The agreement to regularly exchange detailed and non-public information about current and prospective compensation to non-supervisory production and maintenance workers at chicken processing plants in the continental United States assured that the provision of superior compensation by any Defendant Processor would be timely and specifically known by its competitors.  Such an agreement, therefore, eliminated the incentive of each Defendant Processor to outbid its competitors during the Class Period.

244.    When chicken processors that are competing for the same workers exchange their compensation plans and levels, comfort replaces uncertainty and reduces incentives to raise wages or benefits.  Accordingly, each Defendant Processor used the compensation data obtained through the information exchanges to reduce the uncertainty that they should have faced from not knowing what their competitors were offering and providing in the labor market.  This strategic information was a material factor in Defendant Processors' decisions to depress and stabilize wages and benefits paid to non-supervisory production and maintenance workers at their chicken processing plants in the continental United States during the Class Period.

245.    The exchange of compensation information between Defendant Processors during the Class Period increased their relative bargaining power in setting wages and benefits for non-supervisory production and maintenance workers at their chicken processing plants in the continental United States.   With such information, Defendant Processors knew what their competitors were paying comparable workers, while those workers and new applicants lacked access to most or all of such information and thus knew much less about the competitive landscape.

246.    The regularity and detail of the information exchanged, the related communications about wages and benefits between individuals exchanging the information, the relationships of trust developed among the individuals exchanging the information, and the pervasive desire to control and restrain labor costs, encouraged Defendants and their co-conspirators to use the information to match (and not exceed) each other's compensation levels for non-supervisory production and maintenance workers at their chicken processing plants in the continental United States during the Class Period.

247.    Defendants' unlawful agreements to exchange, and the actual exchanges of, nonpublic, timely and detailed compensation data, were not reasonably necessary to further any

procompetitive purpose. The information exchanged between Defendant Processors and their high-level executives was disaggregated, company specific, current and forward-looking, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

248.    The information-exchange agreement has had the effect of (1) reducing and suppressing competition among Defendant Processors in the compensation of non-supervisory production and maintenance workers at their chicken processing plants in the continental United States and (2) depressing the compensation of such employees.

249.    As a result of the unlawful agreement alleged herein to exchange compensation information, Plaintiffs and the other Class Members have been injured in their business or property by receiving artificially depressed compensation during the Class Period.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray that:

A.  The Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein, appoint plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.  Defendants' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.  Plaintiffs and the other Class Members recover their damages from each Defendant, jointly and severally, in an amount to be determined, and that this damages amount be trebled pursuant to 15 U.S.C. § 15(a);

D. Plaintiffs and the other Class Members be awarded pre- and post-judgment interest as allowed by law and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

E. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other entities or persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracies, or combinations alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect;

F. Plaintiffs and the other Class Members recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

G. Plaintiffs and the other Class Members be granted such other relief as the case may require and deemed proper to this Court.

## XI. JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable in this case.

Dated: August 30, 2019                         Respectfully submitted,

                                   _____/s/ Matthew K. Handley_____
                                   Matthew K. Handley (D. Md. Bar # 18636)
                                   HANDLEY FARAH & ANDERSON PLLC
                                   777 6th Street, NW, Eleventh Floor
                                   Washington, DC 20001
                                   Telephone: (202) 559-2433
                                   mhandley@hfajustice.com

                                   George F. Farah (*pro hac vice* forthcoming)
                                   HANDLEY FARAH & ANDERSON PLLC
                                   81 Prospect Street
                                   Brooklyn, NY 11201
                                   Telephone: (212) 477-8090
                                   gfarah@hfajustice.com

William A. Anderson (*pro hac vice* forthcoming)
HANDLEY FARAH & ANDERSON PLLC
4730 Table Mesa Drive
Suite G-200
Boulder, CO 80305
Telephone: (202) 559-2433
wanderson@hfajustice.com

Daniel A. Small (D. Md. Bar # 20279)
Benjamin D. Brown (*pro hac vice* forthcoming)
Brent W. Johnson (*pro hac vice* forthcoming)
Alison S. Deich (*pro hac vice* forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW
5th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Fax: (202) 408-4699
dsmall@cohenmilstein.com
bbrown@cohenmilstein.com
bjohnson@cohenmilstein.com
adeich@cohenmilstein.com

Steven W. Berman (*pro hac vice* forthcoming)
Breanna Van Engelen (*pro hac vice* forthcoming)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, Washington  98101
Tel: (206) 623-7292
steve@hbsslaw.com
breannav@hbsslaw.com

Shana E. Scarlett (*pro hac vice* forthcoming)
Rio R. Pierce (*pro hac vice* forthcoming)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel: (510) 725-3000
shanas@hbsslaw.com
riop@hbsslaw.com

*Counsel for Plaintiffs*