**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

|  |  |  |
|---|---|---|
| Judy Jien, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | **No. 19-cv-02521-SAG** |
| Perdue Farms, Inc., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR JOINT MOTION TO DISMISS**

# **TABLE OF CONTENTS**

**Page**

I.      PRELIMINARY STATEMENT ...............................................................................1

II.     SUMMARY OF PLAINTIFFS' ALLEGATIONS ...................................................5

III.    PLAINTIFFS FAIL TO ALLEGE A CLAIM FOR CONSPIRACY TO FIX
        WAGES ...................................................................................................................6

        A.      Plaintiffs Allege No Direct Evidence of an Agreement to Fix Wages. ..................7

        B.      Plaintiffs Do Not Allege Circumstantial Evidence of a Wage-Fixing
                Agreement. ...............................................................................................................8

IV.     PLAINTIFFS FAIL TO ALLEGE A RULE OF REASON VIOLATION BASED
        ON EXCHANGES OF COMPENSATION INFORMATION ........................................17

        A.      The Complaint Fails to Plead a Plausible Relevant Market. ................................18

        B.      Plaintiffs Have Failed to Allege that the Putative Information Exchange
                Agreement Has Anticompetitive Effects. ..............................................................26

V.      PLAINTIFFS FAIL TO ALLEGE ACTUAL INJURY TO THEMSELVES OR
        ANTITRUST INJURY ..........................................................................................27

        A.      The Complaint Fails to Allege Actual Injury. ......................................................27

        B.      The Complaint Fails to Allege an Antitrust Injury. ..............................................28

VI.     PLAINTIFFS' CLAIMS ARE TIME-BARRED ..................................................30

        A.      Plaintiffs Fail to Allege Fraudulent Concealment. ...............................................30

        B.      Plaintiffs Fail to Plead a "Continuing Violation." ................................................35

VII.    CONCLUSION ......................................................................................................36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A Soc'y Without a Name v. Virginia*,
    655 F.3d 342 (4th Cir. 2011) ...............................................................................35

*Advanced Health–Care Servs., Inc. v. Radford Cmty. Hosp.*,
    910 F.2d 139 (4th Cir. 1990) ...............................................................................26

*Akers v. Maryland State Educ. Ass'n*,
    376 F. Supp. 3d 563 (D. Md. 2019) ....................................................................11

*Am. Dental Ass'n v. Cigna Corp.*,
    605 F.3d 1283 (11th Cir. 2010) ...........................................................................14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...............................................................................7, 10, 32

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990) ..............................................................................28, 29

*Bank of Am., N.A. v. Knight*,
    725 F.3d 815 (7th Cir. 2013) ...............................................................................10

*In re Beef Indus. Antitrust Litig.*,
    907 F.2d 510 (5th Cir. 1990) .................................................................................8

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ....................................................................... *passim*

*BNLfood Invs. Ltd. SARL v. Martek Biosciences Corp.*,
    No. WDQ-11-0446, 2011 WL 6439451 (D. Md. Dec. 14, 2011) ...........................27

*Boland v. Consol. Multiple Listing Serv., Inc.*,
    868 F. Supp. 2d 506 (D.S.C. 2011) .....................................................................32

*In re Broiler Chicken Antitrust Litig.*,
    290 F. Supp. 3d 772 (N.D. Ill. 2017) ..................................................................11

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011) ............................................................................7, 18

*Charlotte Telecasters v. Jefferson Pilot Corp.*,
    546 F.2d 570, 574 (4th Cir. 1976) ......................................................................33

*In re California Title Ins. Antitrust Litig.*,
  2009 WL 1458025 (N.D. Cal. May 21, 2009) ................................................................16, 28

*Cargill, Inc. v. Monfort of Colo., Inc.*,
  479 U.S. 104 (1986)...........................................................................................................27

*Chapman v. N.Y. State Div. for Youth*,
  546 F.3d 230 (2d Cir. 2008)...............................................................................................23

*In re Cotton Yarn Antitrust Litig.*,
  505 F.3d 274 (4th Cir. 2007) .............................................................................................35

*DataCell v. Visa, Inc.*,
  No.  14–cv–1658, 2015 WL 4624714, at *7 (E.D. Va. July 30, 2015) ................................29

*Doe v. Walker*,
  746 F. Supp. 2d 667 (D. Md. 2010) ....................................................................................23

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
  637 F.3d 435 (4th Cir. 2011) .............................................................................................19

*Edmonson v. Eagle Nat'l Bank*,
  922 F.3d 535 (4th Cir. 2019) .................................................................................31, 32, 33

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007)..................................................................................................15

*Fleming v. United States*,
  200 F. Supp. 3d 603 (D. Md. 2016) ....................................................................................36

*GO Comput., Inc. v. Microsoft Corp.*,
  508 F.3d 170 (4th Cir. 2007) .............................................................................................34

*In re Graphics Processing Units Antitrust Litig.*,
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) ..............................................................................15

*Hall v. United Air Lines, Inc.*,
  296 F. Supp. 2d 652 (E.D.N.C. 2003)............................................................................14, 15

*Hall v. Virginia*,
  385 F.3d 421 (4th Cir. 2004) .............................................................................................23

*Hanger v. Berkley Grp., Inc.*,
  No. 13-CV-113, 2015 WL 3439255 (W.D. Va. May 28, 2015)............................20, 21, 23, 24

*In re Hawaiian & Guamanian Cabotage Antitrust Litig.*,
  647 F. Supp. 2d 1250 (W.D. Wash. 2009) ..........................................................................16

*Hirschler v. GMD Invest. Ltd. P'ship*,
  Civ. A. No. 90-1289-N, 1990 WL 263438 (E.D. Va. Dec. 18, 1990) ....................................35

*Holiday Wholesale Grocery Co. v. Philip Morris Inc.*,
  231 F. Supp. 2d 1253 (N.D. Ga. 2002) ................................................................................15

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
  99 F. Supp. 3d 610 (D. Md. 2015) ......................................................................................27

*Kloth v. Microsoft Corp.*,
  444 F.3d 312 (4th Cir. 2006) ...............................................................................................29

*Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne LLC*,
  No. 1:11-CV-872 AJT/TCB, 2011 WL 5872885 (E.D. Va. Nov. 22, 2011)....................18, 19

*Lewis v. Casey*,
  518 U.S. 343 (1996).............................................................................................................27

*LLM Bar Exam, LLC v. Barbri, Inc.*,
  271 F. Supp. 3d 547, 589 (S.D.N.Y. 2017) ........................................................................1, 2

*In re LTL Shipping Servs. Antitrust Litig.*,
  No. 08-MD-01895-WSD, 2009 WL 323219 (N.D. Ga. Jan. 28, 2009)..................................17

*Lux v. Judd*,
  651 F.3d 396 (4th Cir. 2011) ...............................................................................................27

*Maisha v. Univ. of N.C.*,
  641 Fed. Appx. 246 (4th Cir. 2016)......................................................................................35

*In re Managerial, Prof. & Tech. Employees*,
  No. MDL 1471, 02-cv-2924-GEB, 2008 WL 3887619 (D.N.J. Aug. 20, 2008)....................19

*In re Managerial, Prof. and Tech. Employees*,
  No. MDL 1471, 02-cv-2924-GEB, 2006 WL 38937 (D.N.J. Jan. 5, 2006) ...........................19

*Maple Flooring Mfrs. Ass'n v. United States*,
  268 U.S. 563 (1925).............................................................................................................17

*Mayor and City Council of Baltimore v. Actelion Pharm., Ltd.*,
  No. GLR-18-3560, 2019 WL 4805677 (D. Md. Sept. 30, 2019)...........................................27

*Mayor and City Council of Baltimore v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013)...................................................................................................7

*In re: McCormick & Co., Inc.*,
  217 F. Supp. 3d 124 (D.D.C. 2016) ......................................................................................29

iv

*In re: Mexican Gov't Bonds Antitrust Litig.*,
  No. 18-CV-2830, 2019 WL 4805854 (S.D.N.Y. Sept. 30, 2019)............................................10

*Military Order of Purple Heart Serv. Found., Inc. v. Others First, Inc.*,
  No. GLR-12-1483, 2012 WL 6761816 (D. Md. Dec. 28, 2012) ......................................20, 24

*Molinari v. Consol Energy Inc.*,
  No. 12-cv-1085, 2012 WL 5932979 (W.D. Pa. Nov. 27, 2012)............................................21

*Monahan et al. v. Koch Foods, Inc. et al.*,
  Case No. 1:16-cv-09490, ECF No. 1 (N.D. Ill. Oct. 4, 2016) ..................................34

*Mooney v. AXA Advisors, L.L.C.*,
  19 F. Supp. 3d 486 (S.D.N.Y. 2014)........................................................................20

*Muigai v. IB Prop. Holdings, LLC*,
  No. 08:09-CV-01623-AW, 2010 WL 5173313 (D. Md. Dec. 14, 2010).................................7

*In re Musical Instruments and Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) .................................................................................14

*Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*,
  419 F.3d 462 (6th Cir. 2005) .................................................................................20

*Ogden v. Little Caesar Enters., Inc.*,
  393 F. Supp. 3d 622 (E.D. Mich. 2019)...................................................................25

*Oxbow Carbon & Minerals LLC v. Union Pac. Ry. Co.*,
  926 F. Supp. 2d 36 (D.D.C. 2013) (*Oxbow I*)...............................................27, 28

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
  911 F.3d 505 (8th Cir. 2018) ...........................................................................12, 17

*Persian Gulf Inc. v. BP West Coast Prods. LLC*,
  Case No. 3:15-cv-01749-L-BGS, 2016 WL 4574357 (S.D. Cal. July 14, 2016) ...................14

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
  828 F.2d 211 (4th Cir. 1987) ...................................................................30, 31, 33

*In re Pork Antitrust Litig.*,
  Civ. No. 18-1776, 2019 WL 3752497 (D. Minn. Aug. 8, 2019) ...........................2, 10, 11, 12

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997).....................................................................................20

*In re Railway Indus. Employee No-Poach*,
  395 F. Supp. 3d 464 (W.D. Pa. 2019)...................................................................18, 25

*Robertson v. Sea Pines Real Estate Cos.*,
   679 F.3d 278 (4th Cir. 2012) .......................................................31, 33

*Rx.com v. Medco Health Solutions, Inc.*,
   322 Fed. Appx. 394 (5th Cir. 2009).....................................................33

*SD3 II LLC v. Black & Decker (U.S.) Inc.*,
   888 F.3d 98 (4th Cir. 2018) .........................................................31, 34

*SD3, LLC v. Black & Decker (U.S.), Inc.*,
   215 F. Supp. 3d 486 (E.D. Va. 2016), *aff'd sub nom. SD3 II*, 888 F.3d..........................32, 33

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) ........................................................ *passim*

*Shaev v. Baker*,
   No. 16-CV-05541 (JST), 2017 WL 1735573 (N.D. Cal. May 4, 2017)..................................23

*Simpson v. Sanderson Farms, Inc.*,
   744 F.3d 702 (11th Cir. 2014) .....................................................28, 29

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016)...................................................................27

*Stearns v. Page*,
   48 U.S. 818 (1849)........................................................................33

*Super. Offshore Intern., Inc. v. Bristow Group Inc.*,
   738 F. Supp. 2d 505 (D. Del. 2010).......................................................8

*Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*,
   71 F.3d 119 (4th Cir. 1995) ..............................................................31

*Therapearl, LLC v. Rapid Aid Ltd.*,
   No. 13-cv-2792, 2014 WL 4794905 (D. Md. Sept. 25, 2014).................................24

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001)........................................................13, 19, 21, 24

*United States v. Citizens & S. National Bank*,
   422 U.S. 86 (1975)........................................................................17

*United States v. U.S. Gypsum Co.*,
   438 U.S. 422 (1978)...................................................................17, 26

*Waters v. Electrolux Home Prods., Inc.*,
   Civ. No. 5:13-cv-151, 2016 WL 3926431 (N.D.W. Va. July 18, 2016)................................18

*White v. R.M. Packer Co.,*
    635 F.3d 571 (1st Cir. 2011)..................................................................................16

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
    401 U.S. 321 (1971)..........................................................................................30

**Statutes**

15 U.S.C. § 15b................................................................................................30

Sherman Act, 15 U.S.C. § 1 ................................................................ *passim*

**Other Authorities**

Fed. R. Civ. P. 9(b) ..........................................................................................31

Fed. R. Civ. P.  12(b) ........................................................................................23

## I.      PRELIMINARY STATEMENT

Though Plaintiffs' Complaint is lengthy, it is short on facts and viable allegations. Plaintiffs instead rely on vague assertions of so-called "off the books" meetings and benchmarking exercises to support allegations of a nationwide, decade-long conspiracy to fix wages.  Through their hodge-podge of allegations, Plaintiffs fail to allege a plausible theory to support their claims filed on behalf of an enormous putative class of employees holding an array of low-skill jobs across a wide range of distinct local markets. The Complaint is deficient in several key respects, each of which merits its dismissal.

Pleading an antitrust conspiracy requires that Plaintiffs state "enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atlantic v. Twombly*, 127 S. Ct. 1955, 1965 (2007).  In this case, Plaintiffs' core allegation is that 18 chicken producers have conspired along with two benchmarking services to fix and depress wages at chicken processing plants in the United States.  Consolidated Complaint ("Compl.") ¶ 1.  Despite many paragraphs describing the industry in general, Plaintiffs' Complaint does not contain what it must to survive this motion— "factual matter" backing up their central wage-fixing theory.

Indeed, apart from one allegation noting a single worker's wages at a single plant for a single year, *id.* ¶ 113, Plaintiffs allege ***no*** facts actually showing what Defendants' wages even were—much less facts showing that Defendants changed or otherwise depressed wages ***in parallel***. Plaintiffs thus do not allege "basic building block[s] of an antitrust conspiracy," *LLM Bar Exam, LLC v. Barbri, Inc.*, 271 F. Supp. 3d 547, 589 (S.D.N.Y. 2017), and the Complaint should be dismissed.

***First, Plaintiffs' alleged conspiracy to fix wages cannot be sustained.***  Plaintiffs' central claim is that Defendants formed an agreement to fix and suppress processing-worker wages in 2009.  Compl. ¶ 125.  Plaintiffs allege that:  Defendants have since set compensation at "off the

1

books" meetings attended by unspecified executives (*see, e.g., id.* ¶¶ 6, 132); Defendants were aware of each other's wages through industry surveys (*see, e.g., id.* ¶¶ 7, 137); and that processing-worker wages, although continuing to increase during the alleged conspiracy period, have benefitted only from "limited" increases (*see, e.g., id.* ¶ 10).

These allegations are not enough to plead conspiracy under the Sherman Act. Plaintiffs plead no direct evidence expressly establishing conspiratorial agreement. And they do not plead a plausible circumstantial case either. "For a § 1 claim to survive" on the basis of only circumstantial pleading, Plaintiffs must plausibly allege (1) "parallel conduct," and (2) "further circumstance[s] pointing toward a meeting of the minds," or "plus factors." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 424-25 (4th Cir. 2015) (internal citation omitted). Here, Plaintiffs fail at the first step. The Complaint contains *no* factual allegations about when or to what extent any given Defendant changed its wages—much less any allegations showing that this conduct was "parallel" to changes made by other Defendants. This alone is fatal to their Complaint. *See*, *e.g.*, *SD3*, 801 F.3d at 424 (requiring that antitrust plaintiffs plead parallel conduct, and "specify" each defendants' "involve[ment] in the alleged conspiracy"); *In re Pork Antitrust Litig.*, Civ. No. 18-1776, 2019 WL 3752497, at *7 (D. Minn. Aug. 8, 2019) (granting motion to dismiss, where plaintiffs failed to plead parallel conduct); *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 517 (8th Cir. 2018) (affirming same);; *LLM Bar Exam, LLC*, 271 F. Supp. 3d at 589 (same).

Setting aside their failure to allege parallel conduct, Plaintiffs fare no better satisfying the second step of the pleading requirements: they also fail to allege "plus factors" that make conspiracy plausible. This is particularly true in light of the fact that, as Plaintiffs admit,

compensation for unskilled chicken processing labor in "real" inflation-adjusted terms began trending downward decades before any alleged 2009 conspiracy.  Compl. ¶ 196.

**Second, Plaintiffs' alleged "conspiracy" to exchange information is similarly deficient.** Plaintiffs bring a second purported "conspiracy" claim, this time alleging an agreement to exchange compensation information.  Although this is not properly denominated as a per se "conspiracy" claim (as information exchanges are governed by the separate "rule of reason" standard), Plaintiffs' information exchange allegations fare no better than their deficient per se conspiracy claims.  To survive a motion to dismiss a rule of reason claim, Plaintiffs must allege facts plausibly showing anticompetitive effects in a relevant product and geographic market.  *See*, *e.g.*, *DataCell v. Visa, Inc.*, No. 1:14-cv-1658, 2015 WL 4624714, at *7 (E.D. Va. July 30, 2015); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002).

Plaintiffs contend that the relevant product market consists only of chicken-processing labor.  Compl. ¶ 182.  By discussing only the chicken industry, Plaintiffs confuse the issue of what the relevant "product" in this case is.  The "product" Plaintiffs allege has been affected by conspiracy is *labor*, not chicken.  Yet, Plaintiffs allege no facts plausibly showing the confines of this *labor* market.  They do not consider the market "where employment positions are reasonably interchangeable with those offered by defendant[s]," *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 472 (6th Cir. 2005) (internal citations omitted).  And they likewise confuse the geographic market, contending that the relevant market here is the "continental United States," Compl. ¶ 183, even though labor opportunities in one state or metropolitan area may be greatly different from those in another, and even though many of Plaintiffs' own allegations suggest that the market for putative Class Members' employment is local.  These "glaring deficiencies" are again fatal.  *See*, *e.g.*, *E.I. du Pont de Nemours & Co. v.*

3

*Kolon Industries, Inc.*, 637 F.3d 435, 444 (4th Cir. 2011); *Mooney v. AXA Advisors, LLC*, 19 F. Supp. 3d 486, 499 (S.D.N.Y. 2014).

Plaintiffs' information-exchange claim also fails for another distinct reason:  it does not allege how or even if the purported information exchanges led to "anticompetitive effects" in the relevant market.  Plaintiffs' allegations do not show how Defendants set wages so as to harm competition—an omission that again requires their Complaint be dismissed.  *Dickson*, 309 F.3d at 211 (4th Cir. 2002).

*Third,  Plaintiffs fail to allege any actual injury or antitrust injury and thus lack standing to bring these claims.*  The Complaint fails to allege how even the named Plaintiffs were personally injured by the Defendants' alleged conduct or how wages were actually depressed.  Nor does the Complaint allege an injury of the type the antitrust laws were intended to prevent.  Because the Plaintiffs fail to allege any injury at all, they similarly fail to establish the requisite causal connection to a purported antitrust violation.

*Finally, Plaintiffs' claims are time-barred.*  Plaintiffs assert that the conspiracy began in 2009—well before the limitations period—but fail to allege that the Defendants reached an agreement during the limitations period, or any other specific conduct that could demonstrate a continuing violation.  Plaintiffs' allegations of fraudulent concealment also fall short: Plaintiffs offer only conclusory allegations that the alleged conduct was concealed, biased characterizations that conduct was "off the books" or "secret," and general unsupported assertions that Defendants falsely represented that their wages were competitive.  None of these arguments is legally sufficient to support claims brought many years too late.

For these reasons, the Complaint should be dismissed with prejudice.

4

## II.   SUMMARY OF PLAINTIFFS' ALLEGATIONS

Plaintiffs allege a decade-long conspiracy among 18 chicken processors (and affiliates) and two consulting companies to fix the wages of non-supervisory production and maintenance workers.  Defendants operate chicken processing plants in the United States and employ hourly-paid workers to assist in processing live chickens into poultry products.  Compl. ¶¶ 3-4.  Plaintiffs contend that Defendants have conspired for more than ten years to exchange salary information and thereby "fix and depress" Plaintiffs' wages.  *Id.* ¶¶ 1, 6, 7.

**Chicken Processing Employees:**   According to the Complaint, chicken processing employees ("Class Members") occupy various positions along processing lines, including preparing the birds for processing, slaughtering them, removing meat for packaging, and repairing the processing machines.  *Id.* ¶ 3.  The Complaint identifies "live hangers," "eviscerators," and "deboners" as examples of discrete job positions.  The three named Plaintiffs are purported to have been deboners, who typically are paid more than other positions because Defendants earn more money when a chicken is deboned effectively, *i.e.*, cut closest to the bone to maximize the amount of meat obtained.  *Id.* ¶ 111.  Many of these job positions are "fungible," meaning that workers within the same positions are generally interchangeable.  *Id.* ¶ 176.  Many putative Class Members are "migrant workers, refugees, asylum-seekers, immigrants employed under EB3 visas, prison laborers, and participants in court-ordered substance abuse programs."  *Id.* ¶ 121.  They may have "limited language skills," "limited job skills," and they may lack legal status.  *Id.* ¶ 235.  Approximately one-third are members of labor unions.  *Id.* ¶ 115.

**Relevant Market Allegations**:   The Complaint defines the relevant product market as "employment of non-supervisory production and maintenance workers at chicken processing plants," *id.* ¶ 182, *i.e.*, "the market for chicken processing workers," *id.* ¶ 177.  They also assert that "[t]here are no close economic and/or functional substitutes for non-supervisory production

5

and maintenance workers at chicken processing plants" because Defendants "require such workers to process chickens." *Id.* ¶ 186.  That circular argument infects the entire Complaint.  Notably absent are any allegations concerning whether jobs in other industries are or are not reasonably good substitutes for jobs at chicken processing plants.  With respect to the geographic market, the Complaint asserts that it is "the continental United States." *Id.* ¶ 183.  Yet Plaintiffs concede that most chicken processing facilities are concentrated near each other in the southeastern United States, *id.* ¶ 103, and that many putative Class Members are often constrained from switching employment because of the expense of moving, *id.* ¶ 235.

**Wage Allegations:**  Plaintiffs also contend that the purported conspiracy resulted in fixed, stabilized, and depressed wages for putative Class Members.  The Complaint itself undermines this allegation by also including numerous references to wage *increases* for putative Class Members.  *See, e.g.*, Compl. ¶¶ 114, 139, 166, 199.  According to the Complaint, actual wages paid to putative Class Members are lower than they would have been absent the alleged conduct. *Id.* ¶ 193. Yet the Complaint identifies **only one** example of an actual wage rate paid by **a single Defendant** and only at **a single time**.  *See id.* ¶ 113.

## III.   PLAINTIFFS FAIL TO ALLEGE A CLAIM FOR CONSPIRACY TO FIX WAGES

Plaintiffs fail to plead facts stating a plausible wage-fixing conspiracy.  To advance such a claim, antitrust plaintiffs must plead "enough factual matter (taken as true) to suggest that [the requisite] agreement was made." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 424 (4th Cir. 2015) ("*SD3*") (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556 (2007)).  Plaintiffs fail to do so.  They plead no facts plausibly showing direct evidence of any conspiracy to suppress wages, nor do they adequately plead that conspiracy through circumstantial evidence, which requires allegations of both "parallel conduct" and what courts have termed "plus factors" or "something more." *Id.* at 424.

6

### A.     Plaintiffs Allege No Direct Evidence of an Agreement to Fix Wages.

Plaintiffs allege no direct evidence of an agreement among Defendants to fix wages. "Direct evidence of a conspiracy . . . is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011) (internal quotations omitted). No such allegations are in Plaintiffs' Complaint.

Plaintiffs repeatedly allege that Defendants discussed, "agree[d] on[,] and fix[ed] wages and benefits." Compl. ¶ 132. But these assertions merely restate an element of their putative conspiracy claim. Such "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do'" under the motion to dismiss standard. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). And courts "give no effect at all to 'legal conclusions couched as factual allegations.'" *Mayor and City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (citation omitted); *see Muigai v. IB Prop. Holdings, LLC*, No. 08:09-CV-01623-AW, 2010 WL 5173313, at *4 (D. Md. Dec. 14, 2010) (dismissing complaint where "Plaintiff allege[d] no specific facts as to how or when [defendant] conspired [and] ma[de] mere legal conclusions … based on ambiguous behavior").

Instead, Plaintiffs attempt to show an unlawful agreement through bare assertions that Defendants attended meetings and participated in industry surveys, and through other disjointed allegations that contain no explicit confirmation of a preceding agreement. *See*, *e.g.*, Compl. ¶¶ 6, 11, 132, 139, 142 (discussing alleged surveys and industry meetings). For example, the Complaint's statements about industry meetings and surveys do not identify any "particular individuals," "the specific parties to the [purported] agreement," or any "document or conversation explicitly manifesting the existence of the agreement in question." *Burch*, 662 F.3d at 226 (citations omitted). Indeed, Plaintiffs' assertions of alleged "off the books" meetings, *see, e.g.*, Compl. ¶ 132, cite an anonymous source who provides no explicit or corroborating factual

assertions that he or she even attended the alleged meeting.  These allegations are far from being direct evidence of any agreement, much less an unlawful agreement to fix wages.  *See Super. Offshore Intern., Inc. v. Bristow Group Inc.*, 738 F. Supp. 2d 505, 512–13 (D. Del. 2010) (granting motion to dismiss, and noting that "[p]laintiff is mistaken that the statement reportedly made by an unidentified 'operator' that 'everyone more or less agreed to the necessity of a more or less equal rate hike for everyone,' confirms an agreement among Defendants" where "the operator's statement . . . requires multiple speculative inferences," and "ha[d] not been verified.").  These allegations are not direct evidence because they still require a logical inference that attending meetings and participating in industry surveys resulted in an unlawful agreement.  *See Twombly*, 550 U.S. at 565 n.10 (dismissing complaint that "mentioned no specific time, place, or person involved in the alleged conspiracies.").

### B.    Plaintiffs Do Not Allege Circumstantial Evidence of a Wage-Fixing Agreement.

Plaintiffs also fail to allege circumstantial evidence of a plausible wage-fixing agreement.  To do so, Plaintiffs' allegations must plead parallel conduct by Defendants and "plus factors" suggesting that the parallel conduct resulted from concerted action.  *SD3*, 801 F.3d at 424; *Twombly*, 550 U.S. at 567.  Here, Plaintiffs do neither.  They allege almost no facts about wage rates or pay scales, and say nothing about when or how wages changed or moved in parallel.  They likewise plead no "plus factors," which are "further circumstances pointing toward a meeting of the minds."  *SD3*, 801 F.3d at 430 (citation omitted).

### 1.    Plaintiffs Do Not Allege Parallel Conduct.

To allege parallel conduct, Plaintiffs must "plead[] facts indicating that the defendants acted 'similarly,'" or that their "actions were uniform."  *SD3*, 801 F.3d at 427 (citations omitted); *accord In re Beef Indus. Antitrust Litig.*, 907 F.2d 510, 514 (5th Cir. 1990) (articulating that

plaintiffs asserting circumstantial claims "must first demonstrate that the defendants' actions were parallel."). The Complaint fails to satisfy this element, for it contains barely any facts about Defendants' wage payments at all, and certainly none showing that they moved in parallel.

In fact, Plaintiffs fail to allege *even a single instance* in which an individual Defendant lowered, raised, or changed wages, much less an instance in which two or more Defendants did so in parallel. The only non-conclusory allegation Plaintiffs make about any specific Defendants' compensation—in the entire 249-paragraph Complaint—is that that the "fully loaded wage" for some unspecified job at a *single Defendant's* processing plant located on the Delmarva Peninsula at some point in 2016 "was $17.12 for the lowest paid plant worker" and was composed of "a $12 hourly wage plus a benefits package equal to $5.12 per hour." Compl. ¶ 113. Plaintiffs do not plead any other facts about *any hourly rates* (or any other element of compensation) *for any other processing facility for any year* of their purportedly decade-long conspiracy.

And for even the lone Delmarva facility, Plaintiffs allege no facts about other workers at that plant or to show that the one "fully loaded wage" was parallel to any wage paid by any other Defendant. Plaintiffs thus provide no facts about Defendants' wages at all. They show no movement in parallel by any two (much less all) Defendants. Plaintiffs allege no facts about wages before 2009, much less facts to show that wages actually changed after the beginning of the alleged conspiracy. Despite having ready access to the wage histories of the named Plaintiffs, nowhere in the Complaint do Plaintiffs allege that their wages from a particular Defendant increased, decreased, or otherwise moved in parallel with those of another Defendant, or even say anything whatsoever about the named Plaintiffs' compensation. At best, Plaintiffs assert only boilerplate allegations (*e.g.*, that each Defendant "pays the same, or nearly the same wages and benefits") that

are exactly the type of legal conclusions and group pleading insufficient to survive a motion to dismiss.  *See, e.g.*, *Iqbal*, 556 U.S. at 679; *SD3*, 801 F.3d at 422-23.

Nor do Plaintiffs' few non-conclusory allegations about the "real value of wages" and the ***average*** industry compensation demonstrate parallel wages.   Plaintiffs' assertions that "the real value of wages has declined dramatically … since the 1980s," Compl. ¶ 196, and that Oxfam reported that "[w]ages average[d] around $11 an hour," *id*. ¶ 117, in 2015 say nothing about ***actual*** wages and other compensation paid by individual Defendants and whether their conduct over the ten-year alleged conspiracy period was even parallel.  As one district court recently explained when dismissing an antitrust claim based on supposedly parallel supply decreases, industry-wide data "does nothing to indicate how any of the individual Defendants acted."  *In re Pork Antitrust Litig.*, 2019 WL 3752497, at *8.  That court reasoned that, without "specific information regarding each Defendant, the Court has no basis to analyze which, how many, or when any of the individual Defendants may have affirmatively acted to reduce the supply of pork.  And that type of information is vital to pleading parallel conduct."  *Id*.  Indeed, aggregated statistics are merely "group pleading in another form" that "obscure any given Defendant's contribution to an observed trend."  *In re: Mexican Gov't Bonds Antitrust Litig.*, No. 18-CV-2830, 2019 WL 4805854, at *7 (S.D.N.Y. Sept. 30, 2019).  Plaintiffs' Complaint suffers from these same defects.

The Fourth Circuit is in accord: a complaint must "'specify how . . . defendants [were] involved in the alleged conspiracy' without relying on 'indeterminate assertions' against all 'defendants.'"  *SD3*, 801 F.3d at 422 (citations omitted).  Not doing so is fatal:  "if [the complaint] fails to allege particular facts against a particular defendant, then the defendant must be dismissed." *Id*.; *see also Bank of America, N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) ("Each defendant is entitled to know what he or she did that is asserted to be wrongful.  A complaint based on a

10

theory of collective responsibility must be dismissed.  That is true even for allegations of conspiracy."); *Akers v. Maryland State Educ. Ass'n,* 376 F. Supp. 3d 563, 573 (D. Md. 2019) ("[A] plaintiff in a § 1 case cannot assemble some collection of defendants and then make vague, nonspecific allegations against all of them as a group." (quoting *SD3*, 801 F.3d at 422)).  By failing to plead ***any*** facts concerning how any Defendant acted or changed wages in parallel with any other Defendant, Plaintiffs have not plausibly alleged that any Defendant conspired.

Even cases denying dismissal underscore the inadequacy of Plaintiffs' allegations.  The "civil class action" that Plaintiffs reference, Compl. ¶ 181, concerns a purported conspiracy to restrain the supply of chicken.  *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 781 (N.D. Ill. 2017).  As a more recent decision observed in distinguishing that case, the plaintiffs in *Broiler Chicken* alleged "specific production cuts from specific individual defendants."  *In re Pork Antitrust Litigation*, 2019 WL 3752497, at *8.  And in *SD3*, in which the Fourth Circuit permitted a group boycott claim to proceed against some but not all defendants, plaintiffs claimed that defendants acted in tandem over "a matter of months," specifically pleading parallel conduct as to some defendants.  801 F.3d at 420.  Here, Plaintiffs allege no facts about how and when specific Defendants set wages, much less how they acted in parallel in doing so.

Given these deficiencies alone, Plaintiffs' Count I, alleging a purported wage-fixing claim, should be dismissed.  *See SD3*, 801 F.3d at 424 (requiring parallel conduct to allege circumstantial case of conspiracy); *In re Pork Antitrust Litig.*, 2019 WL 3752497, at *7 (granting motions to dismiss for failure to allege parallel conduct).  Because Plaintiffs plead neither that Defendants' conduct was "similar" or "uniform" nor any facts regarding Defendants' actions with respect to wages at all, dismissal should also follow here.  *SD3*, 801 F.3d at 427.

### 2. Plaintiffs' Plus Factors Do Not Support An Inference of Agreement.

"Because [Plaintiffs] fail[] to plausibly plead parallel conduct, no discussion of any 'plus factors' is necessary," and the Complaint should simply be dismissed. *See, e.g.*, *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516-17 (8th Cir. 2018); *In re Pork Antitrust Litig.*, 2019 WL 3752497, at *7 ("[P]lus factors without plausible allegations of parallel conduct are insufficient to establish an inference of an agreement.").

Even so, Plaintiffs' wage-fixing claim also fails for want of sufficient allegations of "plus factors." As the Supreme Court has explained, allegations of parallel conduct, without more, do not suggest a conspiracy. *See Twombly*, 550 U.S. at 556-57. Accordingly, pleading a circumstantial § 1 conspiracy requires allegations of parallel conduct *and* "plus factors" that "raise[] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557; *see also SD3*, 801 F.3d at 424.

### a. Plaintiffs' Plus Factors Do Not Support an Inference of Agreement.

Plaintiffs' purported plus factors include: (1) general characteristics of the chicken industry, *e.g.*, purported "vertical integration," "high barriers to entry," "fungibility of chicken processing plant labor," and "inelastic labor supply;" (2) industry concentration; (3) trade association activity or "opportunities to collude," as well as "personal relationships between executives at competing chicken processors," and (4) a history of government investigations into collusive actions. Compl. ¶ 172. None of Plaintiffs' purported plus factors plausibly suggest an agreement over wages for low-skill manual labor.

***First***, Plaintiffs allege in conclusory fashion that the chicken industry is "particularly susceptible to collusion" due to "vertical integration," "high barriers to entry," "industry concentration," "fungibility of processing plant labor," "inelastic labor supply" and "relationships

between executives at competing chicken processors."  Compl. ¶ 172.  These are buzzwords. Vertical integration, high barriers to entry, and industry concentration are concepts relevant only to output markets.  *See Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (noting the "danger in applying [market definition] factors mechanically in the context of monopsony or oligopsony" because the factors that indicate market power in a monopsony are the reverse of those that indicate market power in a seller).  They have no meaning in labor markets.  The remaining three alleged "plus factors" might conceivably touch on labor issues in some oblique way, but, as discussed below, they rest on fatally flawed market definition allegations.

Furthermore, even if a properly defined "market" had the cited economic characteristics, these allegations would suggest only that a conspiracy might be possible, not that a conspiracy was plausible.  Markets characterized by such factors may be subject to possible collusion, but they also are susceptible to lawful oligopolistic behavior where each competitor takes into account the actions and potential actions of others in making independent decisions.  *See, e.g.*, *Twombly*, 550 U.S. at 553-54.  Even if the labor market was in fact highly concentrated (which the Complaint reveals it is not) and if Defendants had acted in parallel (which is not even alleged), these characteristics still would provide no basis for distinguishing unlawful conspiracy from lawful independent action.

***Second***, even if just the chicken industry were the relevant market, Plaintiffs do not plausibly show that this market is concentrated.  Plaintiffs concede that the chicken industry has "approximately 30" relevant companies and a 79% "top-eight" concentration ratio, which flatly refutes their concentration assertion.  Compl. ¶ 175.  In fact, that the "top eight" firms in the industry have a 79% share suggests that the average firm has slightly less than a 10% market share.

13

The few facts Plaintiffs allege, therefore, suggest that the industry is "unconcentrated" by any sensible economic measure.[1]

  ***Third***, Plaintiffs allege that Defendants had "numerous opportunities to collude" at industry meetings sponsored by the National Chicken Council, the U.S. Poultry & Egg Association, and other similar industry organizations.   Compl. ¶¶ 13, 129-142.   But mere participation in industry meetings lends no support to conspiracy claims.   *See In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015); *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295 (11th Cir. 2010) ("It was well-settled [even] before *Twombly* that participation in trade organizations provides no indications of conspiracy.") (citations omitted); *see also Persian Gulf Inc. v. BP West Coast Prods. LLC*, Case No. 3:15-cv-01749-L-BGS, 2016 WL 4574357, at \*5 (S.D. Cal. July 14, 2016) ("[P]articipation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement." (citations omitted)); *Hall v. United Air Lines, Inc.*, 296 F. Supp. 2d 652, 664 (E.D.N.C. 2003) ("[M]ere membership in a trade association [and] attendance at trade association meetings . . . are not, in and of themselves, condemned or even discouraged by the antitrust laws." (citations omitted)).

---

[1] Both the Department of Justice and Federal Trade Commission use the Herfindahl-Hirschman Index ("HHI") to measure market concentration.  The HHI is calculated by summing the squares of the market shares of market participants.  "The [federal antitrust] agencies generally consider markets in which the HHI is between 1,500 and 2,500 points to be moderately concentrated, and consider markets in which the HHI is in excess of 2,500 points to be highly concentrated."  *See* https://www.justice.gov/atr/herfindahl-hirschman-index (last accessed November 21, 2019).  Here, Plaintiffs fail to plead facts allowing any precise calculation.  That failure is telling, especially when Plaintiffs' "top-eight" figure—reaching only 79%—does not suggest that the industry is likely to cross the 1500-point, "moderately concentrated" threshold.  (Dividing 79% eight ways, squaring those results, and then adding back together would yield an HHI of only about 800).  Whatever the actual number, Plaintiffs cannot rely on industry concentration as a plus factor without actually pleading facts to support an allegation of concentration.

Plaintiffs' allegations regarding certain "off the books" meetings also are not viable plus factors.  Compl. ¶ 132.  In *SD3*, the Fourth Circuit identified and discussed the types of secret meeting allegations that could be considered plus factors, and the Complaint falls far short of the standard set by the court.  801 F.3d at 439-40 (concurring op.) (reciting two pages of allegations regarding who attended the meeting, what was said at the meeting, and the specific actions that each defendant took after the meeting consistent with the alleged agreement).  In particular, Plaintiffs' allegations here are based on an anonymous source's purported statement about what allegedly happened at a meeting, but with no evidence that the source even attended the meeting and with no explicit or corroborating facts such as who attended and what was said.

**Fourth**, Plaintiffs contend that "[t]he history of the chicken processing industry is replete with government investigations and collusive actions," Compl. ¶ 180, alleging that 46 years ago, chicken producers faced a lawsuit of unspecified outcome, *id.* ¶ 180, and that there currently is a Department of Justice investigation.  *Id.* ¶ 181.  Courts routinely reject such "if it happened there, it could have happened here" assertions.  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007); *see also Hall*, 296 F. Supp. 2d at 663 (finding "no case law. . . where 'history of collusion' is used as a plus factor courts consider in cases alleging illegal collusion in an oligopolistic market."); *see also In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (holding that a DOJ investigation "carries no weight in pleading an antitrust conspiracy claim," especially when "[i]t is unknown whether the investigation will result in indictments or nothing at all."); *Holiday Wholesale Grocery Co. v. Philip Morris Inc.*, 231 F. Supp. 2d 1253, 1305 (N.D. Ga. 2002) ("The law generally disfavors use of such 'historical' evidence.").

        **b.**        **Plaintiffs' Allegations Actually Suggest the Absence of Conspiracy.**

Plaintiffs' allegations actually weigh against the inference of a conspiracy to suppress wages beginning in 2009, as such an inference does not square with compensation trends described in the Complaint. Plaintiffs' core allegation is that in 2009, Defendants agreed to fix and suppress wages, which subsequently increased but, allegedly, less than they would have in a competitive market. *See* Compl. ¶¶ 110, 126. Yet Plaintiffs fail to plead any facts showing how relevant wages changed even generally as the result of any such conspiracy. Instead, the Complaint affirmatively alleges that the real value of chicken-processing wages was *already* trending downward at the time of the alleged conspiracy: "*[o]ver the last 30 years or so*, the real value of wages has declined dramatically—*almost 40 percent since the 1980s*." Compl. ¶ 196 (emphasis added).

An allegation of agreement is not plausible when antitrust plaintiffs do not plead that anything *actually changed* after the supposed agreement was established. Rather, "pricing behaviors do not function as 'plus factors' when they are ***stable over time***, because that factual context undermines any inference that the pricing behavior represents a sudden shift marking the beginning of a price-fixing conspiracy." *White v. R.M. Packer Co.*, 635 F.3d 571, 581 (1st Cir. 2011) (emphasis added); *see also In re California Title Ins. Antitrust Litig.*, No. 08-01341-JSW, 2009 WL 1458025, at *7 (N.D. Cal. May 21, 2009) ("Plaintiffs, however, do not [put] forth facts regarding the Defendants' pricing behavior prior to the alleged conspiracy, although Plaintiffs allege that pricing in California has remained stable since at least 1998. Thus, there are no allegations suggesting an 'unprecedented change' in the Defendants' behavior."); *In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d 1250, 1259–60 (W.D. Wash. 2009) ("[P]laintiffs supply no data concerning pricing practices predating the alleged anticompetitive agreement, and they fail to link the lockstep fuel surcharge fluctuations to anything other than the

16

type of parallel conduct generally present in a homogeneous market.") (citations omitted); *In re LTL Shipping Servs. Antitrust Litig.*, No. 08-MD-01895-WSD, 2009 WL 323219, at *17 (N.D. Ga. Jan. 28, 2009) (granting motion to dismiss, when "Defendants' fuel surcharges are not alleged to be either historically unprecedented or enacted at the same time.").

Here, Plaintiffs' factual allegations are even less plausible than in these cases.  Instead of failing to plead facts showing a change, Plaintiffs affirmatively allege facts undermining one. Plaintiffs' Complaint reflects an "obvious alternative explanation," *Twombly*, 550 U.S. at 567: the "real value" of wages was not higher during the alleged conspiracy period only because wages were already declining for over 30 years and that trend merely continued.  A continuation of a 30-year trend does nothing to suggest a conspiracy.  Without allegations of ***any*** change to wages whatsoever—and instead an allegation of consistency over time—Plaintiffs' wage-fixing claim cannot survive.

As noted above, Plaintiffs' plus-factor allegations are irrelevant given their total failure to plead parallel conduct.  *Park Irmat Drug Corp.*, 911 F.3d at 517.  Even if the Court were to consider them, they do not support an inference of any agreement, much less an agreement to fix wages, for the reasons stated above.  Therefore, Plaintiffs have failed to allege a wage-fixing conspiracy.

## IV.   PLAINTIFFS FAIL TO ALLEGE A RULE OF REASON VIOLATION BASED ON EXCHANGES OF COMPENSATION INFORMATION

Information exchanges "can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive."  *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978); *see also Maple Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 582–83 (1925).  Accordingly, they are judged under the rule of reason.  *See United States v. Citizens & Southern Nat'l Bank*, 422 U.S. 86, 113 (1975) ("[T]he dissemination of price information is not

itself a *per se* violation of the Sherman Act.") (citations omitted). To state a Sherman Act Section 1 information-exchange claim, in addition to antitrust injury (discussed below), Plaintiffs must allege: (1) an agreement to exchange information; (2) a relevant antitrust market, and (3) anticompetitive effect in that market resulting from the information exchange. *See Burtch,* 662 F.3d at 223 (requiring agreement); *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne LLC*, No. 1:11-CV-872 AJT/TCB, 2011 WL 5872885, at *3 (E.D. Va. Nov. 22, 2011) ("[T]he sufficiency of the Complaint as to all of plaintiff's antitrust claims necessarily depends in the first instance on whether the plaintiff has sufficiently alleged a market within which the defendant produced an anticompetitive effect . . . .").

Plaintiffs' allegations fail to meet any of these requirements. The product and geographic markets they allege are implausible and defy common sense. And Plaintiffs rely on nothing more than generalizations and conclusory assertions that the alleged information-exchange agreement "reduc[ed] and suppress[ed] competition" and "depress[ed] the compensation" of putative Class Members. Compl. ¶ 248.

A.    **The Complaint Fails to Plead a Plausible Relevant Market.** [2]

To survive a motion to dismiss the information exchange claim, Plaintiffs must allege plausible product and geographic markets. They do neither. First, their product market is

---

[2] Although Plaintiffs' failure to plead a plausible labor market plainly merits dismissal, these pleading deficiencies also warrant striking Plaintiffs' class allegations. *Waters v. Electrolux Home Prods., Inc.*, Civ. No. 5:13-cv-151, 2016 WL 3926431, at *4 (N.D.W. Va. July 18, 2016) (courts may strike class allegations if those allegations "are facially deficient"); *see also In re Railway Indus. Employee No-Poach*, 395 F. Supp. 3d 464, 506 (W.D. Pa. 2019) (granting pre-discovery motion to strike class allegations in pleadings by a putative class of employees against railway equipment supplier employers for alleged violations of Sherman Act Section 1). The three named plaintiffs here, who allege that they worked only in Arkansas, purport to represent an expansive nationwide class which, under their definition, includes all persons employed in non-supervisory production and maintenance roles at chicken processing plants during the last ten years—a class of over 250,000 employees from over 200 individual poultry processing plants around the country performing different tasks in different local labor markets under different micro- and macro-

implausibly limited only to employment in chicken processing plants.  Compl. ¶ 182.  Second,

their geographic market implausibly encompasses the entire continental United States.  *Id.* ¶ 183.

These "glaring deficiencies" demand dismissal of the information exchange claim.  *See E.I. du*

*Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 444 (4th Cir. 2011); *see also*

*Lansdowne on the Potomac Homeowners Ass'n Inc.,* 2011 WL 5872885, at *3 ("[T]he sufficiency

of the [c]omplaint . . . necessarily depends . . . on whether the plaintiff has sufficiently alleged a

market . . .  [because] the existence *vel non* of anti-competitive effects . . . must be measured by

---

economic conditions.  *See* Compl. ¶ 1.  This class will fail for the same reasons Plaintiffs' product
market fails:  the Complaint shows that putative Class Members are not the same in the labor
market.

Specifically, although Plaintiffs' proposed labor market is too narrow for all class members, the
degree to which it is too narrow will vary.  As discussed above, the labor market is too narrow
because it ignores the reasonable job substitutes Putative Class Members will consider.  And the
degree to which it is too narrow will vary because Putative Class Members will have different
views on what other jobs are reasonable substitutes.  This is exactly what the Court held in *Todd.*
In that case, where oil and gas industry employees sued their employers alleging a wage-reducing
information exchange, the court ***repeatedly*** denied class certification because, while all class
members were oil and gas industry employees, each class member would have differing job
opportunities *outside* of the oil & gas industry.   The court explained the incurable class defect:
"the employment opportunities that members of the class would consider interchangeable would
differ in important respects, including salary, job requirements and industries in which they are
offered."  *In re Managerial, Prof. and Tech. Employees*, No. MDL 1471, 02-cv-2924-GEB, 2006
WL 38937, at *6-7 (D.N.J. Jan. 5, 2006).  Here, all Class Members can likely seek employment
in, at a minimum, other agricultural and processing industries.  But at least some Class Members
will also have additional opportunities.  Some putative Class Members are immigrants and lack
legal status; others do not.  Compl. ¶ 121.  Some have criminal records; others do not.  *Id.* ¶¶ 121,
123.   Some have English-language skills; others do not.  *Id.* ¶ 235.  Some are represented by
union; others are not.  *Id.* ¶¶ 158-59.  Some worked in one state, others in one or more other
states.  *Id.* ¶ 235.  Workers without criminal records, limited language skills, and undocumented
status, can plainly work in many different industries.  And geographical differences will matter
too, where industries and opportunities are not equally distributed across the country.  *Id.*
¶ 103.   All of this means class certification will inevitably fail:  what jobs putative Class Members
might find will instead "vary based upon the individual's qualifications and experience."  *In re
Managerial, Prof. & Tech. Employees*, No. MDL 1471, 02-cv-2924-GEB, 2008 WL 3887619, at
*6-9 (D.N.J. Aug. 20, 2008) (discussing class orders and granting summary judgment).

the relevant market."); *Mooney* 19 F. Supp. 3d at 501 ("The federal courts, in the context of Rule 12 motions to dismiss, have not hesitated to reject market allegations that make no economic sense . . . .") (internal quotations and citation omitted).

### 1.     Plaintiffs' Product Market Definition is Implausible.

Plaintiffs' alleged product market fails because it is implausibly limited only to non-supervisory jobs at ***chicken processing plants***, and Plaintiffs neglect to allege why other similar low-skill manual labor jobs are not reasonable substitutes.  Because Plaintiffs "fail[] even to attempt a plausible explanation as to why [the] market should be limited" to just chicken-processing employment, the Complaint must be dismissed.  *Military Order of Purple Heart Serv. Found., Inc. v. Others First, Inc.*, No. GLR-12-1483, 2012 WL 6761816, at *5 (D. Md. Dec. 28, 2012).

To survive a motion to dismiss, a "proposed relevant market . . . [must] encompass all interchangeable substitute products . . . ." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (affirming dismissal for failure to plead a relevant market because the definition was too narrow); *see also Hanger v. Berkley Grp., Inc.*, No. 13-CV-113, 2015 WL 3439255, at *9 (W.D. Va. May 28, 2015) (dismissing antitrust complaint brought by sales personnel because plaintiffs failed to allege that "timeshare sales personnel could not look elsewhere for employment"). When, as here, the Complaint alleges a conspiracy among employers, Plaintiffs' relevant market definition must consider whether other "employment positions are reasonably interchangeable with those offered by defendant[s]." *Nat'l Hockey League Players Ass'n*, 419 F.3d at 472.

Plaintiffs assert that the labor market is limited to "the employment of non-supervisory production and maintenance workers at chicken processing plants" (Compl. ¶ 182), but allege no facts explaining why a chicken worker's job prospects are limited to working at a chicken plant,

as opposed to jobs that are reasonable substitutes in the local areas where they live and work, including at other poultry or meat processing plants or other industries that similarly require low-skill workers.[3]  Nor do Plaintiffs otherwise plead facts to suggest that these reasonable substitutes should be excluded from their market definition. Courts dismiss buyer-side conspiracies against employers where plaintiffs fail to allege facts to show why similar positions in other industries are not reasonable substitutes.  *See, e.g., Hanger*, 2015 WL 3439255, at *10 (dismissing complaint brought by timeshare sales personnel because plaintiffs "wholly fail[ed] to account for competition posed by purchasers of salespersons' services generally.").

Plaintiffs also plead no facts suggesting that skills or knowledge unique to chicken-processing make such a narrow market plausible.  *See, e.g.*, *Molinari v. Consol Energy Inc.*, No. 12-cv-1085, 2012 WL 5932979, at *6 (W.D. Pa. Nov. 27, 2012) (dismissing complaint where plaintiff alleged no facts to suggest "working as a safety coordinator in a separate industry would not be equivalent….").  Instead, Plaintiffs plead the opposite:

- **Limited Job Skills.**  According to Plaintiffs, chicken workers have "limited job skills," are "fungible," and are "generally interchangeable."  Compl. ¶¶ 176, 235–36;

- **No Unique Skills Required.**  Plaintiffs also allege that almost any able-bodied person could perform non-supervisory chicken processing plant jobs—including "inmates from the local prison[s]" and "participants in court-ordered substance abuse programs."  *Id.* ¶¶ 121–23; and

- **Low Compensation.**  Plaintiffs further allege chicken workers earn "between $20,000 and $25,000 annually."  *Id.* ¶ 117.

---

[3] Plaintiffs' allegations that there are no substitutes for chicken-processing workers from the perspective of Defendant Processors, *e.g.*, Compl. ¶ 186, do nothing to support Plaintiffs' attempt to limit the product market to chicken processing employment. Plaintiffs allege a buyer-side conspiracy among Defendants as labor purchasers, and the proper market inquiry considers "***competing buyers***[] . . . who are seen by sellers as being reasonably good substitutes." *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (emphasis added) (relevant inquiry is "the commonality and interchangeability of the buyers, not the commonality and interchangeability of the sellers.").

Thus, Plaintiffs' own allegations suggest that chicken processing workers are much like low-skilled workers in other industries, and Plaintiffs plead no facts explaining why other jobs (including not only other food processing plants, but also warehouses, distribution centers, factories, retail establishments, restaurants and more) are not substitutes.

Tellingly, Plaintiffs do not allege any lack of alternative low-skill manual labor jobs with similar rates of pay in any area.  Nor could they, because data from the United States Bureau of Labor Statistics ("BLS") demonstrates that millions of alternative jobs exist in states where chicken processing plants are located.[4]   In fact, the BLS classifies all non-supervisory meat processing plant jobs—beef, pork, poultry and fish—together because each requires similar "skills, education and/or training."   U.S. Bureau of Labor Statistics, 2018 Standard Occupational Classification System (June 20, 2018).  Notably, BLS does not classify any poultry processing plant job as unique from any other meat processing jobs—instead, the agency lumps all of these similar jobs together.  Similarly, Plaintiffs themselves suggest that all "food manufactur[ing] jobs (including manufacturers of grain, sugar, dairy, seafood and other foods)" are sufficiently similar to chicken processing plant jobs that employee wages for the latter should be benchmarked to the former.  Compl. ¶ 195.  Public data also shows numerous opportunities beyond these similar processing industries:  Alabama, Arkansas, Georgia, and Mississippi—the states with the highest

---

[4] The BLS groups poultry processing workers together with other meat processing workers.  *See* U.S. Bureau of Labor Statistics, 2000 SOC codes, titles, and definitions (2000), https://www.bls.gov/soc/2000/socguide.htm.  For example, the 2018 BLS classifies a "Poultry Eviscerator" within "Meat, Poultry, and Fish Cutters and Trimmers," which is defined as work in which people "[u]se hands or hand tools to perform routine cutting and trimming of meat, poultry, and seafood."   U.S. Bureau of Labor Statistics, 2018 SOC Definitions, at 155, https://www.bls.gov/soc/2018/soc_2018_definitions.pdf.

alleged volume of chicken processing plants (Compl. ¶ 103)—had over one million low-skilled manual labor jobs paying reasonably similar wages.  *See also* Casagrande Decl. Ex. A.[5]

Finally, Plaintiffs' product market definition is implausible because the Complaint concedes that chicken processing plant employees could, at the very least, switch to processing jobs for other types of poultry, like turkey.  *See* Compl. ¶ 235 ("Many . . . workers are often constrained from switching employment to ***non-poultry*** industries . . . ."  (emphasis added)).[6] Likewise, even the materials on which Plaintiffs rely suggest that substitutable employment is available in other protein and agricultural industries. For example, the Complaint relies upon a WATT Poultry USA map to allege where chicken processing plants are located.  Compl. ¶ 103. That same map series also demonstrates the proximity of ***turkey*** processing plants nearby—plants that need workers, and could hire the same laborers that chicken processors do.  Yet, Plaintiffs again "make no effort to consider, as they must, the reasonable interchangeability and cross-elasticity of [turkey processing jobs]."  *Hanger*, 2015 WL 3439255, at *10; *see also Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) ("[Plaintiff] contends that the relevant market for our analysis here is the market for 'restraint training services to private child care providers' [but] this definition is too narrow [because plaintiff] has failed to show how the market for restraint training services to child care providers is any different from restraint training

---

[5] The court "may properly take judicial notice of [] information" in the public record when "reviewing the dismissal of the complaint under Rule 12(b)(6)."  *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004); *Doe v. Walker*, 746 F. Supp. 2d 667, 678 n.14 (D. Md. 2010) ("Court may take judicial notice of matters of public record from sources—such as . . . the Government Accountability Office—whose accuracy cannot be reasonably questioned.")  BLS statistics are among those records whose accuracy cannot be reasonably questioned.  *Shaev v. Baker*, No. 16-CV-05541 (JST), 2017 WL 1735573, at *7 (N.D. Cal. May 4, 2017) (taking judicial notice of documents from government websites, including the Bureau of Labor Statistics).

[6] *See also* U.S. Dep't of Labor, *Glossary of Consumer Expenditure Surveys*, Feb. 13, 2015, https://www.bls.gov/cex/csxgloss.htm ("Poultry includes fresh and frozen chickens and other fresh and frozen poultry (Cornish hens, turkey, duck, etc.).")

services . . . [for] social service agencies, law enforcement agencies, correctional facilities, educational facilities, and even airlines."); *Therapearl, LLC v. Rapid Aid Ltd.*, No. 13-cv-2792, 2014 WL 4794905, at *8 (D. Md. Sept. 25, 2014) ("Therapearl has not attempted a plausible explanation as to why the market should be limited to hot/cold therapy packs and exclude potential substitute products."); *Military Order of Purple Heart Serv. Found., Inc.*, 2012 WL 6761816, at *5 ("A plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal." (citation omitted)).  As a result, Plaintiffs' rule-of-reason claim must be dismissed.  *Hanger*, 2015 WL 3439255, at *10 ("Plaintiffs' failure to properly allege relevant product and geographic markets . . . is fatal to their claims.").

### 2.    Plaintiffs Fail to Allege a Plausible Geographic Market.

Plaintiffs' asserted geographic market—the continental United States—fares no better. Compl. ¶ 183.  A proper geographic market "is defined by the area within which the defendant's customers . . . can practicably turn to alternative supplies if the defendant were to raise its prices." *It's My Party, Inc. v. Live Nation*, Inc., 811 F.3d 676, 682 (4th Cir. 2016).  In a case brought by employees in which the allegation is a *buyer*-side conspiracy, the same test applies conversely; the geographic market is the area within which a defendant's employees can practicably turn for alternative employment if wages are lowered.  *Todd*, 275 F.3d at 202.  Plaintiffs' putative national geographic market rests on the facially implausible premise that a non-supervisory chicken processing plant employee earning less than $25,000 annually, Compl. ¶ 117, who is working in, for example, Alabama, views a job at a California plant as a practical alternative.  Not one factual allegation supports that assumption.

Indeed, the facts Plaintiffs *do allege* undercut their own premise.  For example, Plaintiffs allege that "many of these workers are often constrained from switching employment to non-

poultry industries because of . . . the expense of moving and/or other obligations."  Compl. ¶ 235.

The Complaint itself emphasizes the "geographic proximity" of particular plants, Compl. ¶ 103,

alleging that competition for employees occurs when plants are "nearby":

> [E]ach Defendant Processor owns at least one chicken processing
> plant that is within 28 miles of a competitor's chicken processing
> plant. *For that reason*, each Defendant Processor has risked the loss
> of processing plant employees to, and in fact did lose processing
> plant employees to a competitor's *nearby* chicken processing plant.

Compl. ¶ 103 (emphasis added).  By contrast, the Complaint does not allege that any Defendant

risked losing employees to processors located hundreds or thousands of miles away.

The internal contradictions in Plaintiffs' pleading aside, such a national geographic market

defies common sense.  As a court recently observed in discussing the geographic market for fast-

food employees, the relevant geographic market is *not* national:

> The relevant market for employees to do the type of work alleged in
> this case is likely to cover a relatively-small geographic area.  Most
> employees who hold low-skill retail or restaurant jobs are looking
> for a position in the geographic area in which they already live and
> work, not a position requiring a long commute or a move . . . . [M]ost
> people do not search long distances for a low-skill job with the idea
> of moving closer to the job.

*Ogden v. Little Caesar Enters., Inc.*, 393 F. Supp. 3d 622, 631–32 (E.D. Mich. 2019) (citation

omitted).  That reasoning applies with equal force here.

Against this backdrop, Plaintiffs offer only allegations that are not relevant under the

applicable legal standard.   For example, Plaintiffs allege that each Defendant provides

compensation to employees at "nearly" identical levels, regardless of the region in which the

company's plants are located.  Compl. ¶ 187.  Apart from the vagueness of the allegation, it does

not speak to the relevant question: the interchangeability, from the perspective of the *employee*, of

jobs at plants located hundreds or thousands of miles from one another.  In fact, the Complaint is

25

silent on the point.  Plaintiffs' geographic market allegations are defective and insufficient to state an information exchange claim.

### B. Plaintiffs Have Failed to Allege that the Putative Information Exchange Agreement Has Anticompetitive Effects.

Plaintiffs fail to allege anticompetitive effects in the market *resulting from* the putative information exchange.  *See Advanced Health–Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 144 (4th Cir. 1990) (Plaintiffs must allege that a "conspiracy produced adverse, anticompetitive effects within the relevant product and geographic market" to successfully bring a Section 1 violation.).  "The exchange of [wage] data and other information among competitors does not invariably have anticompetitive effects . . . ."  *U.S. Gypsum*, 438 U.S. at 441 n. 16.

Plaintiffs allege no facts to support their conclusory allegation that the purported information sharing caused anticompetitive effects in any relevant market.  As discussed above, apart from the industry average for one year and the "fully loaded wage" for a single position at a single plant, Plaintiffs plead no facts about wages for chicken-processing plants, nor any facts about prevailing wages in an appropriately defined product market.  Similarly, Plaintiffs allege no facts showing an actual causal relationship between information sharing and actual wages. Plaintiffs instead simply assert in conclusory terms both that Defendants exchanged "disaggregated" wage data, Compl. ¶¶ 239-41, and that the exchange diminished incentives to increase compensation.  Those diminished incentives, in turn, supposedly caused compensation of non-supervisory production and maintenance workers to be lower than it otherwise would have been.  *Id.*  ¶¶ 242, 248.  Plaintiffs, however, allege no facts or data supporting those conclusions. Indeed, the Complaint is bereft of any factual allegations linking the exchange of information with actual effects in their alleged relevant market at all.

## V.     PLAINTIFFS FAIL TO ALLEGE ACTUAL INJURY TO THEMSELVES OR ANTITRUST INJURY

Plaintiffs fail to plead two additional elements required to survive a motion to dismiss: (1) actual injury, which confers standing through Article III of the Constitution; and (2) antitrust injury, a necessary condition for antitrust standing. *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 99 F. Supp. 3d 610, 628 (D. Md. 2015); *see also Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986) (antitrust injury is a "necessary, but not always sufficient," condition for antitrust standing).

### A.     The Complaint Fails to Allege Actual Injury.

For constitutional standing, Plaintiffs' allegations must demonstrate, among other things, "an injury in fact that is (a) concrete and particularized[,] and (b) actual or imminent, not conjectural or hypothetical." *BNLfood Invs. Ltd. SARL v. Martek Biosciences Corp.*, No. WDQ-11-0446, 2011 WL 6439451, at *5 (D. Md. Dec. 14, 2011) (quoting *Lux v. Judd*, 651 F.3d 396, 400 (4th Cir. 2011)). A particularized injury is an actual or imminent harm affecting the plaintiff in an individualized, personal, and distinct way. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547-48 (2016). "[E]ach plaintiff must demonstrate that it has suffered injury in order to establish standing." *Oxbow Carbon & Minerals LLC v. Union Pac. Ry. Co.*, 926 F. Supp. 2d 36, 43 (D.D.C. 2013) (*Oxbow I*). In this class action suit, ***each named Plaintiff*** is required to "allege and show that [he or she] personally has been injured." *Mayor and City Council of Baltimore v. Actelion Pharm., Ltd.*, No. GLR-18-3560, 2019 WL 4805677, at *8 (D. Md. Sept. 30, 2019) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). Plaintiffs here have failed to meet this constitutional obligation.

***First***, this Complaint lacks any factual allegations concerning how the named Plaintiffs—Jien, Jibidi, and Clement—have been injured personally. In fact, each of their names appears ***only***

27

*once* in the Complaint to identify each of them as a named Plaintiff. Compl. ¶¶ 15-17. Plaintiffs do not identify a *single* compensation rate received by *any* of the named Plaintiffs at *any* time.[7] The "lack[ of] adequate facts concerning how any individual plaintiff was harmed by the alleged conspiracy," thus requires the Complaint's dismissal. *Oxbow I*, 926 F. Supp. 2d at 43.

*Second*, the Complaint contains no factual allegations from which the Court may plausibly infer that any named Plaintiff's compensation was *actually* depressed. This case is analogous to *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702 (11th Cir. 2014),[8] in which the Eleventh Circuit affirmed dismissal of a complaint alleging a wage-suppression conspiracy because the plaintiffs "offered no market data that might permit [the court] plausibly to infer a gap between the wages they *actually* received" and "the wages they *would have* received" but for the alleged misconduct. *See Simpson*, 744 F.3d at 709 (emphasis added). So too here: this Complaint fails to "state or even suggest that the [P]laintiffs' wages decreased—or even increased at a slower rate—after" the putative conspiracy was formed. *Id.* Without this information, Plaintiffs' conclusory assertions of "suppress[ed]" or "fix[ed]" wages and benefits are mere conjecture. *See* Compl. ¶ 143.

## B. The Complaint Fails to Allege an Antitrust Injury.

Plaintiffs must also plead *antitrust* injury—that is, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atl.*

---

[7] Paragraph 113 of the Complaint references a "fully loaded wage" allegedly provided by one Defendant for one unspecified job at one of its plants during one year of the Class Period, but does not allege that this rate was paid to any of the named Plaintiffs or that any Plaintiff ever worked for that Defendant. *See* Compl. ¶¶ 15-17.

[8] The *Simpson* plaintiffs filed suit under federal and state Racketeer Influenced and Corrupt Organizations (RICO) laws. Guided by the Supreme Court of the United States' "repeated[] observat[ions] that Congress modeled [the RICO Act] on the civil-action provision of the federal antitrust laws," the court applied antitrust precedent and analysis to determine whether allegations of a wage-suppression conspiracy could survive a motion to dismiss. *Simpson*, 744 F.3d at 710 (citations omitted).

*Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (citation omitted).[9]   To plead

antitrust injury, claimants must allege

> (1) the causal connection between an antitrust violation and harm to
> the plaintiffs, and whether that harm was intended; [and] (2) whether
> the harm was of a type that Congress sought to redress in providing
> a private remedy for violations of the antitrust laws.

*Kloth v. Microsoft Corp.*, 444 F.3d 312, 324 (4th Cir. 2006) (internal citations omitted).  Plaintiffs

do not meet these requirements.

Plaintiffs do not (and cannot) allege a causal connection between the purported antitrust

violation and any harm they supposedly suffered because the Complaint does not allege either the

constitutional injury in fact or the requisite elements of a Section 1 violation.  Their Complaint

should be dismissed for this reason alone.  *See Simpson*, 744 F.3d at 712 (affirming dismissal of a

putative class action wage-suppression suit for failure to establish a "'direct relation' between the

injury and the injurious conduct"); *In re: McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 139

(D.D.C. 2016) (higher prices plaintiffs supposedly paid did not constitute an antitrust injury

because plaintiffs failed to allege that increased price resulted from anticompetitive conduct).

Moreover, Plaintiffs cannot plead a causal relationship through conclusory assertions of

harm to competition.  As discussed above, Plaintiffs do not allege a plausible product or geographic

market or any harm to competition.  These fatal flaws also defeat their attempt to plead antitrust

injury.  *See DataCell v. Visa, Inc.*, No.  14–cv–1658, 2015 WL 4624714, at *7 (E.D. Va. July 30,

2015) (plaintiff failed to allege harm to competition, and thus antitrust injury, because he failed to

allege a relevant product or geographic market).  Accordingly, because Plaintiffs fail to plead harm

to themselves, a causal connection between such harm and the putative anticompetitive conduct,

---

[9] The antitrust injury requirement applies to both per se and rule of reason claims.  *See*, *e.g.*, *Atl. Richfield Co.*, 495 U.S. at 344.

or even the contours of a plausible market, Plaintiffs do not allege antitrust injury as they must to state a claim.

## VI.   PLAINTIFFS' CLAIMS ARE TIME-BARRED

Plaintiffs' claims fail for another, independent reason: they are time-barred.  The four-year limitations period for private antitrust actions starts when a defendant commits an act that causes economic harm to a plaintiff.  15 U.S.C. § 15b; *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 217 (4th Cir. 1987) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)).  Here, the alleged conspiracy purportedly began in 2009—more than *ten years* before Plaintiffs filed the Complaint in August 2019.  *See* Compl. ¶ 5.  Accordingly, this case should be dismissed because the four-year statute of limitations period expired long before Plaintiffs filed this Complaint.

Plaintiffs attempt to circumvent the statute of limitations in two ways: by claiming that (1) Plaintiffs were precluded from discovering the violations they allege began in 2009 until "shortly before filing" because Defendants fraudulently concealed the putative violation; and (2) Defendants' conduct constituted a "continuing violation."  Compl. ¶¶ 200-209.  Plaintiffs' conclusory allegations fail to establish that either theory applies.[10]

### A.   Plaintiffs Fail to Allege Fraudulent Concealment.

Plaintiffs fail to allege facts that warrant tolling the limitations period under the doctrine of fraudulent concealment.  To adequately plead fraudulent concealment, Plaintiffs must allege that Defendants "fraudulently concealed facts that are the basis" of their claims, and that Plaintiffs "failed to discover those facts within the statutory period, despite the exercise of due diligence."

---

[10] Sufficiently alleging a continuing violation by itself, which Plaintiffs have not done, would not entitle Plaintiffs to recover damages for the entire alleged conspiracy period in any event.

*Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 548 (4th Cir. 2019) (internal numbering and citations omitted).   These allegations must include "fraud by the [Defendants]," and be stated "with particularity," including "the time, place, and contents of [any alleged] false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Id.* at 553 (internal citation omitted); *see also SD3 II LLC v. Black & Decker (U.S.) Inc.*, 888 F.3d 98, 108 (4th Cir. 2018) ("*SD3 II*"); Fed. R. Civ. P. 9(b).   The Complaint does not meet these requirements.

### 1.   Plaintiffs Fail to Allege Affirmative Acts of Concealment by Defendants.

To show that Defendants "fraudulently concealed facts that are the basis" of their claims, Plaintiffs must allege with particularity "affirmative acts of concealment" by Defendants. *Edmonson*, 922 F.3d at 548, 553 (citing *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 126 (4th Cir. 1995)).   To do so here, Plaintiffs must allege conduct by Defendants "affirmatively directed at deflecting litigation," *Pocahontas*, 828 F.2d at 219, such as "some trick or contrivance intended to exclude suspicion and prevent inquiry."   *Edmonson*, 922 F.3d at 553 (internal quotations and citation omitted).[11]   Plaintiffs are required to show Defendants took "affirmative steps to mislead" them; mere allegations that Defendants failed to admit wrongdoing, or engaged in "secret" meetings and communications, do not suffice.   *See Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 291 n.2 (4th Cir. 2012); *Pocahontas*, 828 F.2d at 218-219; *see also SD3, LLC v. Black & Decker (U.S.), Inc.*, 215 F. Supp. 3d 486, 497 (E.D. Va. 2016), *aff'd sub*

---

[11] Though Plaintiffs allege that the purported conspiracy "by its very nature[] was self-concealing," Compl. ¶ 203, "[t]he self-concealing standard is only even arguably proper when deception or concealment is a necessary element of the antitrust violation, *i.e.*, when the antitrust violation is truly self-concealing."   *Marlinton,* 71 F.3d at 123.   The allegations of conspiracy here do not fall under such a standard.   *See Pocahontas*, 828 F.2d at 218-219.

*nom. SD3 II*, 888 F.3d at 98.   The Complaint falls far short of pleading "affirmative acts of concealment."   *See* Compl. ¶¶ 202-209.

**First**, Plaintiffs' allegation that Defendants' conspiracy was "fraudulently concealed" through "various means and methods," Compl. ¶ 206, is a legal conclusion.[12]   It lacks the requisite factual particularity to show that Defendants took affirmative steps to mislead and conceal their alleged conspiracy.   *See, e.g.*, *Iqbal*, 556 U.S. at 678.   Indeed, it is devoid of "the time, place, and contents of [any alleged] false representations" purportedly made to conceal the alleged conspiracy.   *Edmonson*, 922 F.3d at 553-54 (finding the plaintiffs sufficiently alleged "affirmative acts of concealment" by pleading the names of the sham entities employed, the name of the broker or loan officer connected to each entity, and the dates the defendant allegedly funneled the kickback payments to the entities).

**Second**, Plaintiffs' allegations that Defendants held "secret" or "off the books" meetings are not allegations of "affirmative acts of concealment."   *See* Compl. ¶ 206; *SD3*, 215 F. Supp. 3d at 497.   In fact, courts routinely reject claims of fraudulent concealment based on alleged "secret" activities.   *See SD3*, 215 F. Supp. 3d at 497.   ("[C]hoosing not to publicize a meeting is neither fraudulent nor concealment"); *Boland v. Consolidated Multiple Listing Serv., Inc.*, 868 F. Supp. 2d 506, 518 (D.S.C. 2011) (rejecting fraudulent concealment claim based on allegations that the defendants "used means and methods designed to avoid detection such as … meeting secretly … [and] agreeing not to discuss publicly the nature of their communications in furtherance of their illegal scheme"), *aff'd sub nom. Robertson*, 679 F.3d at 278; *see also Rx.com v. Medco Health*

---

[12] Furthermore, Plaintiffs admit that about "one-third of chicken processing plant workers are members of unions."   Compl. ¶ 115.   It is not plausible that Defendants were able to conceal a larger, wage-setting conspiracy and at the same time conduct open negotiations with unions about wages on a regular basis.

*Solutions, Inc.*, 322 Fed. Appx. 394, 397-98 (5th Cir. 2009) ("secret communications" are not enough to show "affirmative acts of concealment").

**Finally**, Plaintiffs' allegations that some Defendants "falsely represented that [Defendants] paid wages and benefits reflective of a competitive market for labor" do not salvage their fraudulent concealment theory. *See* Compl. ¶¶ 207-208. Courts have repeatedly rejected such allegations because they show no "affirmative act of concealment." *See Pocahontas*, 828 F.2d at 215, 218 (allegation that defendant's statement that putatively anticompetitive prices were the result of "market conditions" does not allege fraudulent concealment); *Robertson*, 679 F.3d at 291 n.2 (allegations amounting "to no more than a failure to admit wrongdoing" do not allege fraudulent concealment); *see also SD3,* 215 F. Supp. 3d at 497 (rejecting a fraudulent concealment claim when defendants allegedly gave "pretextual justifications that amount[ed] no more than a failure to admit wrongdoing….").

## 2. Plaintiffs Fail to Allege Due Diligence.

Plaintiffs also fail to allege their inability to discover facts supporting their claims "despite the exercise of due diligence." *Edmonson* F.3d at 544. **First**, Plaintiffs offer no detail whatsoever—and certainly no "distinct averments"—regarding when and how they supposedly discovered the alleged conspiracy. Instead, they assert only that they "did not discover" "the existence of the conspiracy alleged … until shortly before filing [their] complaint." Compl. ¶ 202. That conclusory statement does not enable the Court to "clearly see, whether, by the exercise of ordinary diligence, the discovery might not have been before made." *Charlotte Telecasters v. Jefferson Pilot Corp.,* 546 F.2d 570, 574 (4th Cir. 1976) (quoting *Stearns v. Page*, 48 U.S. 818, 829 (1849)). **Second**, Plaintiffs' assertions that they "could not have discovered through the exercise of reasonable diligence," Compl. ¶ 202, the existence of the alleged conspiracy earlier are unsupported legal conclusions. They are also belied by Plaintiffs' own reliance on ***public***

33

statements, articles, and books published *years before* they filed suit, such as a book published *in 2004* (Compl. ¶ 120, describing chicken processors as allegedly recruiting "economically desperate" people) and a USDA report from *2013* (*id.* ¶ 175, describing consolidation in the Broiler industry "during *the past 16 years*") (emphasis added)).

Plaintiffs further allege that:

- Wages for non-supervisory chicken processing plant employees increasingly lagged behind wages for other food processing plant employees since *at least 2009*. *Id.* ¶ 195;

- They were aware that Agri Stats received submissions of chicken processing plants' input costs *years before the limitations period* lapsed. *Id.* ¶ 126;[13] and

- Wages for one-third of the putative class were negotiated with unions during collective bargaining. *Id.* ¶¶ 115-16.

These allegations contradict any notion that Plaintiffs "just" discovered this alleged conspiracy, and instead show that Plaintiffs were on notice, and thus obligated "to investigate," for "the information at hand would have prompted a reasonable person to do so." *SD3 II*, 888 F.3d at 113 (quoting *GO Comput., Inc. v. Microsoft Corp.*, 508 F.3d 170, 179 (4th Cir. 2007)) ("Where a plaintiff knows of a pattern of particular actions that a defendant has taken against him, though the pattern's precise scope might be unclear and its exact legal ramifications uncertain, the plaintiff is on inquiry notice of his claim.").

Plaintiffs have not alleged the elements of fraudulent concealment with particularity. There is no basis for tolling the Clayton Act's four-year statute of limitations as it applies to their case. Their claims are time-barred and should be dismissed. *See, e.g., Hirschler v. GMD Investments*

---

[13] Moreover, several of the same law firms that filed this Complaint alleged in another antitrust conspiracy case three years ago that poultry-producer defendants engaged in a conspiracy by sharing Agri Stats data, including "pay for processing plant workers." *See* Complaint, *Monahan et al. v. Koch Foods, Inc. et al.*, Case No. 1:16-cv-09490, ECF No. 1 at ¶ 102(e) (N.D. Ill. Oct. 4, 2016) (filed by the law firm of Hagens Berman Sobol Shapiro LLP).

*Ltd. Partnership*, Civ. A. No. 90-1289-N, 1990 WL 263438, at *10 (E.D. Va. Dec. 18, 1990) (granting motion to dismiss, where "[p]laintiffs in this case have introduced no evidence nor have they alleged anything in their complaint from which this Court could infer any exercise of diligence….").

### B.    Plaintiffs Fail to Plead a "Continuing Violation."

Plaintiffs also fail to allege a continuing violation.  To invoke a "continuing violation," Plaintiffs must establish that the challenged violation "was a fixed and continuing practice" and that "the same alleged violation" was repeatedly committed during the limitations period.  *See A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 348 (4th Cir. 2011); *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 290-91 (4th Cir. 2007).  Plaintiffs cannot establish a continuing violation with "[g]eneral allegations of a pattern or practice" of some wrongdoing.  *Maisha v. Univ. of N.C.*, 641 Fed. Appx. 246, 249 (4th Cir. 2016) (internal quotations omitted).  Nor can they satisfy this standard by alleging actions occurring outside the limitations period, and then asserting in conclusory fashion that the conduct "continued" into the limitations period.  *See A Soc'y Without A Name*, 655 F.3d at 348.

Here, Plaintiffs' allegations fail to show that Defendants engaged in a "fixed and continuing" practice during the limitations period.  Instead, Plaintiffs assert that Defendants entered into a conspiracy in January 2009, and then make conclusory allegations that Defendants continued their unlawful "pattern or practice" into the limitations period through various and unspecified "meetings" and "monthly exchange[s]" of wage data.  Plaintiffs fail to allege any facts about the information supposedly exchanged at these meetings or by whom, or about what actual agreements were reached through these "meetings" or "exchanges," and fail to plead facts showing that Defendants reached the same alleged agreement ***during*** the limitations period.

Further, Plaintiffs fail to allege ***even a single instance***—either before or during the four-

35

year limitations period—in which an individual Defendant lowered, raised, or changed wages, much less an instance in which two or more Defendants did so in tandem.  Moreover, Plaintiffs have not even alleged that the named Plaintiffs were employed by any Defendant during the four-year period preceding the filing of the Complaint or facts to show how the named Plaintiffs' wages were purportedly "depressed" as a result of the Defendants' conduct, let alone that the Defendants' conduct injured any named Plaintiff ***during*** the limitations period.  Compl. ¶¶ 15-17.  Plaintiffs' generic assertions "lack[] the specificity necessary to describe an ongoing pattern" of conduct, with specific separate acts that caused any injury, ***during*** the limitations period.  *Fleming v. United States*, 200 F. Supp. 3d 603, 610 (D. Md. 2016).  Therefore, Plaintiffs have failed to plausibly allege a continuing violation that could save any aspect of their claims.

## VII.   CONCLUSION

For these reasons, Defendants' Joint Motion to Dismiss should be granted, and the Complaint dismissed with prejudice.

Respectfully submitted on the 22nd of November, 2019,

/s/ Aaron L. Casagrande
Aaron L. Casagrande (Bar # 28518)
WHITEFORD, TAYLOR & PRESTON
L.L.P.
Seven Saint Paul Street, Suite 1500
Baltimore, Maryland 21202
Tel: (410) 347-8714
Fax: (410) 234-2326
acasagrande@wtplaw.com

Carrie C. Mahan
Christopher J. Abbott
WEIL, GOTSHAL & MANGES LLP
2001 M Street N.W., Suite 600
Washington, D.C. 20036
Tel: 202-682-7000
Fax: 202-857-0940
carrie.mahan@weil.com
christopher.abbott@weil.com

Adam C. Hemlock
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Tel: 212-310-8000
Fax: 212-310-8007
adam.hemlock@weil.com

*Attorneys for Defendants Pilgrim's Pride
Corporation and Pilgrim's Pride Corporation
of West Virginia, Inc.*

/s/ J. Douglas Baldridge
J. Douglas Baldridge (Bar No. 11023)
Lisa Jose Fales (Bar No. 08141)
Danielle R. Foley (Bar No. 2113)
Andrew T. Hernacki (Bar No. 21107)
VENABLE LLP
600 Massachusetts Ave, N.W.
Washington, DC 20001
Tel:  (202) 344-4000
jdbaldridge@venable.com
ljfales@venable.com
drfoley@venable.com
athernacki@venable.com

*Attorneys for Perdue Foods, LLC and Perdue
Farms, Inc.*

/s/ Edward J. Baines
Edward J. Baines (USDC Bar No. 06776)
Geoffrey M. Gamble (USDC Bar No. 28919)
Gregory L. Waterworth (USDC Bar No. 20938)
SAUL EWING ARNSTEIN & LEHR LLP
500 E. Pratt Street, 8th Floor
Baltimore, MD  21202-3133
Tel: (410) 332-8600
Fax: (410) 332-8862
Ted.Baines@saul.com
Geoff.Gamble@saul.com
Greg.Waterworth@saul.com

Patrick Fitzgerald
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 N. Wacker Drive
Chicago, IL 60606
Tel: (312) 407-0700
Fax: (312) 407-0411
patrick.fitzgerald@skadden.com

Boris Bershteyn
Lara Flath
Sam Auld
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
Tel: (212) 735-3000
Fax: (212) 735-2000
boris.bershteyn@skadden.com
lara.flath@skadden.com
sam.auld@skadden.com

*Attorneys for Defendant Peco Foods, Inc.*

/s/ David McAloon
David McAloon (*Bar No. 13150*)
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
Telephone: (202) 736-8316
Facsimile: (202) 736-8711
dmcaloon@sidley.com

John W. Treece
SIDLEY AUSTIN LLP
1 S. Dearborn Street
Chicago, Illinois 60603
Tel: (312) 853-7000
Fax: (312) 853-7036
jtreece@sidley.com

Amanda K. Wofford
ROSE LAW FIRM
120 East Fourth Street
Little Rock, Arkansas 72201
Tel: (501) 377-0334
Fax: (501) 375-1309
awofford@roselawfirm.com

Bourgon B. Reynolds
ROSE LAW FIRM
120 East Fourth Street
Little Rock, Arkansas 72201
Tel: (501) 377-0433
Fax: (501) 375-1309
breynolds@roselawfirm.com

*Attorneys for Defendants Mountaire Farms, Inc. and Mountaire Farms of Delaware, Inc.*

/s/ Cary Silverman
Cary Silverman (Bar # 15137)
SHOOK HARDY & BACON LLP
1800 K Street NW, Ste. 1000
Washington, D.C. 20006
Tel: (202) 783-8400|
Fax: (202) 783-4211
csilverman@shb.com

Lynn H. Murray
SHOOK HARDY & BACON LLP
111 S. Wacker Dr., Ste. 4700
Chicago IL 60606
Tel: (312) 704-7700
Fax: (312) 558-1195
lhmurray@shb.com

Laurie A. Novion
SHOOK HARDY & BACON LLP
2555 Grand
Kansas City, MO 64108
Tel: (816) 474-6550
Fax: (816) 421-5547
lnovion@shb.com

John R. Elrod
Vicki Bronson
CONNER & WINTERS
4375 N. Vantage Drive, Ste. 405
Fayetteville, AR 72703
Tel: (479) 582-5711
jelrod@cwlaw.com
vbronson@cwlaw.com

*Attorneys for Defendants Simmons Foods,*
*Inc. and Simmons Prepared Foods Inc.*

/s/ Brian D. Frey
Brian D. Frey (Bar # 17592)
ALSTON & BIRD LLP
The Atlantic Building
950 F Street, NW
Washington, D.C. 20004-1404
Tel:  (202) 239-3067
Fax:  (202) 239-3333
brian.frey@alston.com

B. Parker Miller
Valarie C. Williams
Raechel J. Bimmerle
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309
Tel:  (404) 881-7000
Fax:  (404) 881-7777
parker.miller@alston.com
valarie.williams@alston.com
raechel.bimmerle@alston.com

*Attorneys for Fieldale Farms Corporation*

/s/ Steven K. White
Steven K. White (Bar No. 04274)
STINSON LLP
1775 Pennsylvania Ave., NW, Suite 800
Washington, DC 20006
Tel: (202) 785-9100
Fax: (202) 572-9963
steven.white@stinson.com

William L. Greene
Peter J. Schwingler
Jon M. Woodruff
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 335-1500
Fax: (612) 335-1657
william.greene@stinson.com
peter.schwingler@stinson.com
jon.woodruff@stinson.com

Gary V. Weeks
K.C. Dupps Tucker
Kristy E. Boehler
THE LAW GROUP OF NW. ARKANSAS
LLP
1830 Shelby Lane
Fayetteville, AR 72704
Tel: (479) 316-3760
Fax: (844) 325-6603
gary.weeks@lawgroupnwa.com
kc.tucker@lawgroupnwa.com
kristy.boehler@lawgroupnwa.com

*Attorneys for Defendants George's Inc.;
Ozark Mountain Poultry, Inc.; George's
Chicken, LLC; George's Foods, LLC; and
George's Processing, Inc.*

/s/ Brian K. McCalmon
Brian K. McCalmon (Bar #14737)
VEDDER PRICE P.C.
1401 I Street NW #1100
Washington, D.C. 20005
Tel: (202) 312-3334
Fax: (202) 312-3322
bmccalmon@vedderprice.com

Gregory G. Wrobel
VEDDER PRICE P.C.
222 North LaSalle Street
Chicago, Illinois 60601
Tel: (312) 609-7500
Fax: (312) 609-5005
gwrobel@vedderprice.com

Henry W. Jones, Jr.
JORDAN PRICE WALL GRAY JONES
& CARLTON, PLLC
1951 Clark Avenue
Raleigh, North Carolina 27605
Tel: (919) 828-2501
Fax: (919) 834-8447
hjones@jordanprice.com

*Attorneys for Defendants House of Raeford
Farms, Inc., House of Raeford Farms of
Louisiana, LLC*

/s/   Jennifer M. Blunt
Jennifer M. Blunt (D. Md. Bar #09496)
KUTAK ROCK LLP
1625 Eye Street, #800,
Washington, DC 20006
Tel: (202) 828-2400
Fax: (202) 828-2488
jennifer.blunt@kutakrock.com

John P. Passarelli
James M. Sulentic
KUTAK ROCK LLP
1650 Farnam Street
Omaha, NE  68102
Tel: (402) 346-6000
Fax: (402) 346-1148
john.passarelli@kutakrock.com
james.sulentic@kutakrock.com

J.R. Carroll
Jeff Fletcher
Scott Jackson
Stephen Dacus
KUTAK ROCK LLP
234 East Millsap Road, Suite 200
Fayetteville, AR  72703-4099
Tel: (479) 973-4200
Fax: (479) 973-0007
jr.caroll@kutakrock.com
jeff.fletcher@kutakrock.com
scott.jackson@kutakrock.com
stephen.dacus@kutakrock.com

*Attorneys for Defendants O.K. Foods, Inc.*

/s/ Patricia A. Gorham
Patricia A. Gorham
James R. McGibbon
Peter M. Szeremeta
Kaitlin A. Carreno
EVERSHEDS SUTHERLAND (US) LLP
999 Peachtree Road, N.E.
Suite 2300
Atlanta, Georgia  30309-3996
Tel:  (404) 853-8000
Fax:  (404) 853-8006
patriciagorham@eversheds-sutherland.com
jimmcgibbon@eversheds-sutherland.com
peterszeremeta@eversheds-sutherland.com
kaitlincarreno@eversheds-sutherland.com

Gail L. Westover (Bar No. 13752)
EVERSHEDS SUTHERLAND (US) LLP
700 Sixth Street, N.W., Suite 700
Washington, DC 20001-3980
Tel: (202) 383-0100
Fax: (202) 637-3593
gailwestover@eversheds-sutherland.com

*Attorneys for Defendant Harrison Poultry,
Inc.*

/s/ Edward C. Konieczny
Edward C. Konieczny
EDWARD C. KONIECZNY LLC
400 Colony Square, Ste 1501
1201 Peachtree Street, NE
Atlanta, GA 30361
Tel: (404) 380-1430
Fax:  (404) 382-6011
ed@koniecznylaw.com

David C. Newman
Dana Richens
W. Parker Sanders
SMITH, GAMBRELL & RUSSELL, LLP
1230 Peachtree Street, N.E.
Promenade, Ste 3100
Atlanta, GA  30309
Tel:  (404) 815-3500
Fax:  (404) 815-3509
dnewman@sgrlaw.com
drichens@sgrlaw.com
psanders@sgrlaw.com

Edward A. Pennington (Bar No. 29080)
SMITH, GAMBRELL & RUSSELL, LLP
1055 Thomas Jefferson Street, N.W., Suite 400
Washington, DC 20007
Tel: (202) 263-4300
Fax: (202) 263-4329
Email:  epennington@sgrlaw.com

*Attorneys for Defendants Mar-Jac Poultry, Inc., Mar-Jac Poultry, LLC, Mar-Jac Poultry MS, LLC, Mar-Jac Poultry AL, LLC, and Mar-Jac Holdings, Inc.*

/s/ Terri S. Reiskin
Terri S. Reiskin (Bar # 05256)
DYKEMA GOSSETT PLLC
1301 K Street N.W., Suite 1100 West
Washington, D.C. 20005
Tel: 202-906-8609
Fax: 855-216-7884
treiskin@dykema.com

Howard B. Iwrey
DYKEMA GOSSETT PLLC
39577 Woodward Ave, Ste. 300
Bloomfield Hills, MI 48304
Tel: 248-203-0526
Fax: 248-203-0763
hiwrey@dykema.com

Steven H. Gistenson
DYKEMA GOSSETT PLLC
10 South Wacker Drive, Ste. 2300
Chicago, IL 60606
Tel: 312-627-2267
Fax: 312-876-1155
sgistenson@dykema.com

*Attorneys for Defendant Amick Farms, LLC*

/s/ Joseph D. Carney
Joseph D. Carney
JOSEPH D. CARNEY & ASSOCIATES,
LLC
1540 Peach Drive
Avon, OH 44044
Tel: (440) 289-5161
Fax: (866) 270-1221
jdc@jdcarney.com

Thomas M. Staunton
Daniel M. Feeney
MILLER SHAKMAN LEVINE &
FELDMAN LLP
180 North LaSalle Street, Suite 3600
Chicago, IL 60601
Tel: (312) 263-3700
Fax: (312) 263-3270
dfeeney@millershakman.com
tstaunton@millershakman.com

Deborah A. Klar
D. KLAR LAW
2934 1/2 Beverly Glen Circle, Suite 761
Bel Air, California 90077-1724
Tel: (310) 858-9500
dklar@dklarlaw.com

Mark S. Saudek (Fed Bar # 23963)
Meghan K. Casey (Fed Bar # 28958)
GALLAGHER EVELIUS & JONES LLP
218 North Charles Street, Suite 400
Baltimore, MD 21201
Tel: (410) 727-7702
Fax: (410) 468-2786
msaudek@gejlaw.com
mcasey@gejlaw.com

*Attorneys for Defendants Case Foods, Inc.
and Case Farms Processing, Inc.*

/s/ James H. West
James H. West (Bar No. 25773)
WEST, EDWARDS & AITKEN, LLC
409 Washington Avenue, Suite 1010
Towson, Maryland  21204
Tel: 410-842-0574
Fax: 410-296-6654
jay.west@wealaw.com

*Attorney for Defendant Allen Harim Foods,
LLC*

/s/ Gerard P. Martin
Gerard P. Martin, Bar No. 00691
Jeffrey M. Lichtstein, Bar No. 20731
ROSENBERG MARTIN GREENBERG,
LLP
25 S. Charles Street, 21st Floor
Baltimore, Maryland 21201
Tel: (410) 727-6600
Fax: (410) 727-1115
gmartin@rosenbergmartin.com
jlichtstein@rosenbergmartin.com

*Attorneys for Defendant Webber, Meng, Sahl
and Company, Inc. d/b/a WMS & Company,
Inc.*

/s/ Steven F. Barley
Steven F. Barley
HOGAN LOVELLS US LLP
100 International Drive, Suite 2000
Baltimore, Maryland
Tel:  (410) 659-2700
Fax:  (410) 659-2701
steve.barley@hoganlovells.com

William L. Monts III
Justin W. Bernick
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C.  20004-1109
Tel:  (202) 637-5910
Fax: (202) 637-5911
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

*Attorneys for Defendant Agri Stats, Inc.*

/s/ Marlynda L. Romero
Christopher E. Ondeck
Stephen R. Chuk
Marlynda L. Romero (MD Bar No. 20808)
PROSKAUER ROSE LLP
1001 Pennsylvania Ave, NW, Suite 600S
Washington, DC 20004
Tel: (202) 416-5865
Fax: (202) 416-6899
condeck@proskauer.com
schuk@proskauer.com
mromero@proskauer.com

*Attorneys for Defendant Wayne Farms, LLC*

/s/ Daniel E. Laytin
Daniel E. Laytin, P.C.
Christa C. Cottrell, P.C.
Stacy Pepper
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
dlaytin@kirkland.com
ccottrell@kirkland.com
stacy.pepper@kirkland.com

Joseph W. Hovermill (Bar No. 22446)
Alexander P. Creticos (Bar No. 30199)
MILES & STOCKBRIDGE P.C.
100 Light Street
Baltimore, Maryland 21202
Tel: 410-385-3442
Fax: 410-385-3700
jhovermill@milesstockbridge.com
acreticos@milesstockbridge.com

*Attorneys for Defendants Sanderson Farms,*
*Inc., Sanderson Farms, Inc. (Foods Division),*
*and Sanderson Farms, Inc. (Processing*
*Division)*

/s/ Eric Pelletier
Eric Pelletier (Bar # 12716)
OFFIT KURMAN, P.A.
4800 Montgomery Lane, 9th Floor
Bethesda, Maryland 20814
Tel: (240) 507-1739
Fax: (240) 507-1735
epelletier@offitkurman.com

/s/ John Terzaken
John Terzaken
Abram J. Ellis
Elizabeth French
SIMPSON THACHER & BARTLETT LLP
900 G Street, N.W.
Washington, D.C. 20001
Tel: (202) 636-5500
Fax: (202) 636-5502
john.terzaken@stblaw.com
aellis@stblaw.com
elizabeth.french@stblaw.com

*Attorneys for Tyson Foods, Inc., Tyson*
*Prepared Foods, Inc., Hillshire Brands*
*Company, Tyson Fresh Meats, Inc., Tyson*
*Processing Services, Inc., Tyson Refrigerated*
*Processed Meats, Inc., Keystone Foods, LLC,*
*Equity Group Eufaula Division, LLC, Equity*
*Group – Georgia Division, LLC, and Equity*
*Group Kentucky Division, LLC*

/s/ James E. Edwards, Jr.
James E. Edwards, Jr., (MDB No. 02360)
Ty Kelly Cronin, (MDB No. 27166)
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
100 Light Street
Baltimore, Maryland  21202
Tel: (410) 685-1120
Fax: (410) 547-0699
jedwards@bakerdonelson.com
tykelly@bakerdonelson.com

John G. Calender (DCB No. 939124)
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
901 K Street, N.W., Suite 900
Washington, D.C. 20001
Tel: (202)508-3474
Fax: (202) 220-2274
jcalender@bakerdonelson.com

Scott W. Pedigo (MSB No. 10735)
Amy L. Champagne (MSB No. 102447)
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
MAILING:  Post Office Box 14167
Jackson, Mississippi 39236-4167
PHYSICAL:  One Eastover Center
100 Vision Drive, Suite 400
Jackson, Mississippi  39211
Tel:  (601) 351-2400
Fax:  (601) 351-2424
spedigo@bakerdonelson.com
achampagne@bakerdonelson.com

Russell W. Gray (TNB No. 16120)
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
1800 Republic Centre
633 Chestnut Street
Chattanooga, Tennessee 37450-1801
Tel: (423) 209-4218
Fax: (423) 752-9563
rgray@bakerdonelson.com

*Attorneys for Defendants Koch Foods, Inc., JCG Foods of Alabama, Inc., JCG Foods of Georgia, LLC, JCG Industries, Inc., Koch Foods LLC, Koch Foods of Alabama, LLC, Koch Foods of Ashland, LLC, Koch Foods of Gadsden, LLC, Koch Foods of Cumming, LLC, Koch Foods of Gainesville, LLC and Koch Foods of Mississippi, LLC*

46