**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

JUDY JIEN,
2007 Keith Circle, Apt. 8
Springdale, AR 72764

KIEO JIBIDI, and
317 Berry Street, Apt. 203
Springdale, AR 72764

ELAISA CLEMENT,
2781 Alton Avenue, Apt. B
Springdale, AR 72764.

GLENDA ROBINSON, and
979 Oliver Drive
Forest, MS 39074

EMILY EARNEST,
2417 Shady Brook Lane
Haleyville, AL 35565

on behalf of themselves and all others similarly
situated,

        Plaintiffs,

v.

PERDUE FARMS, INC,
31149 Old Ocean City Road
Salisbury, MD 21804
County of Residence: Wicomico County

PERDUE FOODS LLC,
31149 Old Ocean City Road
Salisbury, MD 21804
County of Residence: Wicomico County

TYSON FOODS, INC.,
2200 West Don Tyson Parkway
Springdale, AR 72762

TYSON PREPARED FOODS, INC.,
2200 West Don Tyson Parkway
Springdale, AR 72762

CIVIL ACTION NO. 1:19-CV-2521

AMENDED CONSOLIDATED
COMPLAINT

JURY TRIAL DEMANDED

**Style Definition:** List Number: Indent: Left: 0.75", Tab stops: Not at 1"

**Style Definition:** TOC 1: Line spacing: 1.5 lines, Tab stops: 0.38", Left

**Formatted:** Left, Line spacing: single

**Formatted:** Not Highlight

THE HILLSHIRE BRANDS COMPANY,
2200 West Don Tyson Parkway
Springdale, AR 72762

TYSON FRESH MEATS, INC.,
2200 West Don Tyson Parkway
Springdale, AR 72762

TYSON PROCESSING SERVICES, INC.,
2200 West Don Tyson Parkway
Springdale, AR 72762

TYSON REFRIGERATED MEATS, INC.,
2200 West Don Tyson Parkway
Springdale, AR 72762

KEYSTONE FOODS, LLC,
905 Airport Road, Suite 400
West Chester, Pennsylvania 19380

EQUITY GROUP EUFAULA DIVISION,
LLC,
57 Melvin Clark Road
Bakerhill, AL 36027

EQUITY GROUP - GEORGIA DIVISION,
LLC,
7200 Highway 19
P.O. Box 369
Camilla, GA 31730

EQUITY GROUP KENTUCKY DIVISION,
LLC,
2294 KY Highway 90 W
Albany, KY 42602

PILGRIM'S PRIDE CORPORATION,
1770 Promontory Circle,
Greeley, CO 80634

PILGRIM'S PRIDE CORPORATION OF
WEST VIRGINIA, INC.,
129 Potomac Avenue
Moorfield, WV 26836

JFC LLC (D/B/A GNP COMPANY),
4150 2nd Street South
Suite 200
St. Cloud, MN 56301

SANDERSON FARMS, INC.,
127 Flynt Road
Laurel, MS 39443

SANDERSON FARMS, INC.
(PROCESSING DIVISION),
127 Flynt Road
Laurel, MS 39443

SANDERSON FARMS, INC. (FOODS
DIVISION),
127 Flynt Road
Laurel, MS 39443

KOCH FOODS, INC.,
1300 West Higgins Rd.,
Suite 100
Park Ridge, IL 60068

JCG FOODS OF ALABAMA, LLC,
1300 West Higgins Rd.,
Suite 100
Park Ridge, IL 60068

JCG FOODS OF GEORGIA, LLC,
1300 West Higgins Rd.,
Suite 100
Park Ridge, IL 60068

JCG INDUSTRIES, INC.,
1300 West Higgins Rd.,
Suite 100
Park Ridge, IL 60068

KOCH FOODS LLC,
1835 Kerr Street
Chattanooga, TN 37408-2017

KOCH FOODS OF ALABAMA, LLC,
3500 West Boulevard
Montgomery, AL 36108

KOCH FOODS OF ASHLAND, LLC,
515 Tyson Road
Ashland, AL 36251

KOCH FOODS OF GADSDEN, LLC,
501 Paden Road
Gadsden, AL 35903

KOCH FOODS OF CUMMING, LLC,
221 Meadow Drive
Cumming, GA 30040-2691

KOCH FOODS OF GAINESVILLE, LLC,
950 Industrial Blvd.
Gainesville, GA 30501-6746

KOCH FOODS OF MISSISSIPPI, LLC,
4688 Highway 80 East
Morton, MS 39117

WAYNE FARMS, LLC,
4110 Continental Drive
Oakwood, Georgia 30566

WFSP FOODS, LLC,
112 Plugs Drive
Decatur, AL 35601

MOUNTAIRE FARMS, INC.,
29005 John J. Williams Hwy.
Millsboro, DE 19966

MOUNTAIRE FARMS OF DELAWARE,
INC.,
29005 John J. Williams Hwy.
Millsboro, DE 19966

PECO FOODS, INC.,
1101 Greensboro Avenue
Tuscaloosa, AL 35401

SIMMONS FOODS, INC.,
601 North Hico Street
Siloam Springs, AR 72761

SIMMONS PREPARED FOODS, INC.,
601 North Hico Street
Siloam Springs, AR 72761

FIELDALE FARMS CORPORATION,
555 Broiler Blvd.
Baldwin, GA 30511

GEORGE'S, INC.,
402 West Robinson Ave.
Springdale, AR 72764

OZARK MOUNTAIN POULTRY, INC.,
1000 North 2nd ~~Sreet~~Street
Rogers, AR 72756

GEORGE'S CHICKEN, LLC,
19992 Senedo Road
Edinburg, VA 22824

GEORGE'S FOODS, LLC,
19992 Senedo Road
Edinburg, VA 22824

GEORGE'S PROCESSING, INC.,
402 West Robinson Ave.
Springdale, AR 72764

~~HOUSE OF RAEFORD FARMS, INC.,~~
~~3425 U.S. Hwy 117 South~~
~~Rose Hill, NC 28458~~

~~HOUSE OF RAEFORD FARMS OF~~
~~LOUISIANA~~BUTTERBALL, LLC,
~~3867 2nd Street~~
~~Shreveport, LA 71101~~

One Butterball Lane
Garner, NC 27529

HORMEL~~O.K.~~ FOODS~~, INC.,~~
CORPORATION,
~~4601 North Sixth Street~~
~~Fort Smith, AR 72904~~

HARRISON POULTRY1 Hormel Place
Austin, MN 55912

JENNIE-O TURKEY STORE, INC.,
107 East Star Street
Bethlehem, GA 30620

MAR-JAC POULTRY, INC.,
1020 Aviation Blvd.
Gainesville, GA 30501

MAR-JAC POULTRY MS1 Hormel Place
Austin, MN 55912

JENNIE-O TURKEY STORE, LLC,
1301 James Street
Hattiesburg, MS 39401

MAR-JAC POULTRY AL1 Hormel Place
Austin, MN 55912

JENNIE-O TURKEY STORE SALES, LLC,
1020 Aviation Blvd.
Gainesville, GA 30501

MAR-JAC POULTRY, LLC,
1020 Aviation Blvd.
Gainesville, GA 30501

MAR-JAC HOLDINGS1 Hormel Place
Austin, MN 55912

CARGILL, INC.,
1020 Aviation Blvd.
Gainesville, GA 30501

AMICK FARMS, LLC,
2079 Batesburg Highway
Batesburg, SC 29006

CASE FOODS, INC.,
385 Pilch15407 McGinty Road West

~~Troutman, NC 28166~~

~~CASE FARMS PROCESSING, INC.,~~
~~385 Pilch Road~~
~~Troutman, NC 28166~~

~~ALLEN HARIM FOODS, LLC,~~
~~29984 Pinnacle Way~~
~~Millsboro, DE 19966~~
Wayzata, MN 55391

CARGILL MEAT SOLUTIONS
CORPORATION,
825 East Douglas Ave.
9th Floor
Wichita, KS 67202

AGRI STATS, INC., and
6510 Mutual Drive
Fort Wayne, IN 46825

WEBBER, MENG, SAHL AND
COMPANY, INC. d/b/a WMS &
COMPANY, INC.
1200 E. High Street, Suite 104
Pottstown, PA 19464

Defendants.

**Formatted:** Indent: First line:  0.5", Widow/Orphan control, Adjust space between Latin and Asian text, Adjust space between Asian text and numbers

**Formatted:** Not Highlight

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................................. 1

II.  JURISDICTION AND VENUE ............................................................................ 4

III. PARTIES .............................................................................................................. 6

A.   Plaintiffs ...................................................................................................... 6

B.   Defendants ................................................................................................... 6

1.   Perdue Defendants ............................................................................. 6

2.   Tyson Defendants .............................................................................. 7

3.   Pilgrim's Defendants ......................................................................... 9

4.   Sanderson Farms Defendants ........................................................... 10

5.   Koch Foods Defendants .................................................................... 11

6.   Wayne Farms Defendants .................................................................. 13

7.   Mountaire Farms Defendants ............................................................ 14

8.   Peco Foods, Inc. ................................................................................. 14

9.   Simmons Foods Defendants .............................................................. 15

10.  Fieldale Farms Corporation ............................................................... 15

11.  George's Defendants .......................................................................... 15

12.  House of Raeford Defendants ............................................................ 16

13.  O.K. Foods, Inc. ................................................................................. 17

14.  Harrison Poultry, Inc. ........................................................................ 17

15.  Mar-Jac Poultry Defendants .............................................................. 17

16.  Amick Farms, LLC ............................................................................ 18

17.  Case Foods Defendants ...................................................................... 18

18.  Allen Harim Foods, LLC ................................................................... 19

i

19.  Agri Stats, Inc. ........................................................................................ 19

20.  Webber, Meng, Sahl and Company, Inc. ................................................ 19

IV.  AGENTS AND CO-CONSPIRATORS ......................................................... 20

V.  TRADE AND COMMERCE ........................................................................... 21

VI.  FACTUAL ALLEGATIONS ........................................................................... 22

A.  Background ......................................................................................... 22

1.  Chicken Industry ................................................................... 22

2.  Chicken Processing Plants .................................................... 23

3.  Chicken Processing Plant Workers ....................................... 24

4.  Compensating Chicken Processing Plant Workers ............... 25

5.  Limited Role of Labor Unions ............................................... 27

6.  Demographics of Chicken Processing Plant Workers ........... 27

B.  Conspiracy to Fix Wages ................................................................... 30

1.  "Off the Books" In-Person Meetings to Fix Compensation ........... 32

2.  Exchanging Detailed Wage Data Through Agri Stats ........... 37

3.  Plant-to-Plant Communications About Compensation .......... 43

4.  Plus Factors that Render the Chicken Industry Susceptible to Collusion ................... 46

C.  Market Power of Defendant Processors .............................................. 49

D.  Anticompetitive Effects and Injury Suffered by Class Members ........... 50

VII.  STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS ........... 53

A.  Continuing Violation ........................................................................... 53

B.  Fraudulent Concealment ..................................................................... 53

1.  Plaintiffs Did Not and Could Not Have Discovered Defendants' Misconduct ............. 53

2.  Defendants Actively Concealed the Conspiracy .................... 54

VIII.  CLASS ACTION ALLEGATIONS ................................................................. 56

ii

IX.  CAUSES OF ACTION ................................................................................ 59

X.   PRAYER FOR RELIEF ............................................................................. 66

XI.  JURY TRIAL DEMAND ........................................................................... 67


I.    INTRODUCTION .......................................................................................... 1

II.   JURISDICTION AND VENUE ..................................................................... 5

III.  PARTIES ....................................................................................................... 7

   A.   Plaintiffs ................................................................................................... 7

   B.   Defendants ................................................................................................ 8

      1.   Perdue Defendants .............................................................................. 8

      2.   Tyson Defendants ............................................................................... 8

      3.   Pilgrim's Defendants ........................................................................ 10

      4.   Sanderson Farms Defendants ........................................................... 12

      5.   Koch Foods Defendants .................................................................... 13

      6.   Wayne Farms Defendants ................................................................. 15

      7.   Mountaire Farms Defendants ........................................................... 15

      8.   Peco Foods, Inc. ............................................................................... 16

      9.   Simmons Foods Defendants .............................................................. 16

      10.  Fieldale Farms Corporation .............................................................. 17

      11.  George's Defendants ......................................................................... 17

      12.  Butterball, LLC ................................................................................ 18

      13.  Jennie-O Turkey Store Defendants ................................................... 18

      14.  Cargill Defendants ............................................................................ 20

      15.  Agri Stats, Inc. ................................................................................. 22

      16.  Webber, Meng, Sahl and Company, Inc. .......................................... 22

iii

IV.  AGENTS AND CO-CONSPIRATORS ............................................................. 22

V.   TRADE AND COMMERCE ............................................................................ 28

VI.  FACTUAL ALLEGATIONS ........................................................................... 29

   A.  Background ........................................................................................... 29

     1.  Poultry Industry ............................................................................ 29

     2.  Poultry Processing Plants .............................................................. 31

     3.  Poultry Processing Plant Workers ................................................. 33

     4.  Compensating Poultry Processing Plant Workers .......................... 34

     5.  Centralized Determination of Compensation for Poultry Processing Plant Workers ................................................................ 37

     6.  Limited Role of Labor Unions ....................................................... 39

     7.  Demographics of Hourly-Paid Poultry Processing Plant Workers ......... 39

     8.  Demographics of Salary-Paid Poultry Processing Plant Employees ........... 42

   B.  Conspiracy to Fix Compensation ........................................................... 43

     1.  "Off the Books" In-Person Meetings to Fix Compensation ............... 45

     2.  Exchanging Detailed Compensation Data Through Agri Stats ........... 55

     3.  Plant-to-Plant Communications About Compensation ..................... 64

     4.  Plus Factors that Render the Poultry Industry Susceptible to Collusion ........ 68

   C.  Market Power of Defendant Processors .................................................. 73

     1.  Direct Evidence of Market Power .................................................. 73

     2.  Indirect Evidence of Market Power ............................................... 75

       a.  Product or Services Market .................................................... 75

       b.  Geographic Market ................................................................ 79

       c.  High Collective Market Share and Monopsony Power ............. 81

   D.  Anticompetitive Effects and Injury Suffered by Class Members ............. 81

VII. STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS ............ 84

iv

A.   Continuing Violation ................................................................................ 84

B.   Fraudulent Concealment .......................................................................... 85

1.   Plaintiffs Did Not and Could Not Have Discovered Defendants'
     Misconduct .......................................................................................... 85

2.   Defendants Actively Concealed the Conspiracy ................................. 86

VIII. CLASS ACTION ALLEGATIONS ..................................................................... 88

IX.  CAUSES OF ACTION ......................................................................................... 91

X.   PRAYER FOR RELIEF ....................................................................................... 99

XI.  JURY TRIAL DEMAND...................................................................................... 100

**Formatted:** Line spacing:  1.5 lines

v

Based on the investigation of counsel, including interviews with industry participants, consultation with economists, and a review of public statements, Plaintiffs Judy Jien, Kieo Jibidi ~~and,~~ Elaisa Clement, Glenda Robinson and Emily Earnest (collectively, "Plaintiffs") bring this action on behalf of themselves individually and on behalf of a class (the "Class") consisting of all persons employed by Defendants[1] ~~as non-supervisory production and maintenance employees at chicken~~at poultry processing plants in the continental United States from January 1, 2009 until the present (the "Class Period").

## I.   INTRODUCTION

1.   For more than a decade, Defendants have conspired and combined to fix and depress the compensation paid to ~~non-supervisory production and maintenance~~ employees at ~~chicken~~poultry processing plants in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.   Defendants consist of ~~18 chicken~~14 poultry processors and many of their subsidiaries and affiliates ("Defendant Processors"), which process and produce ~~more than 90~~approximately 80 percent of the ~~chicken~~poultry sold to consumers in the United States, and two

---

[1] The term "Defendants" herein refers to the following companies: Perdue Farms, Inc.; Perdue Foods LLC; Tyson Foods, Inc.; Tyson Prepared Foods, Inc.; The Hillshire Brands Company; Tyson Fresh Meats, Inc.; Tyson Processing Services, Inc.; Tyson Refrigerated Processed Meats, Inc.; Keystone Foods, LLC; Equity Group Eufaula Division, LLC; Equity Group—Georgia Division, LLC; Equity Group Kentucky Division, LLC; Pilgrim's Pride Corporation; Pilgrim's Pride Corporation of West Virginia, Inc.; JFC LLC (d/b/a GNP Company); Sanderson Farms, Inc.; Sanderson Farms, Inc. (Foods Division); Sanderson Farms, Inc. (Processing Division); Koch Foods, Inc.; JCG Foods of Alabama, LLC; JCG Foods of Georgia, LLC; JCG Industries, Inc.; Koch Foods LLC; Koch Foods of Alabama, LLC; Koch Foods of Ashland, LLC; Koch Foods of Gadsden LLC; Koch Foods of Cumming LLC; Koch Foods of Gainesville LLC; Koch Foods of Mississippi LLC; Wayne Farms, LLC; WFSP Foods, LLC; Mountaire Farms, Inc.; Mountaire Farms of Delaware, Inc.; Peco Foods, Inc.; Simmons Foods, Inc.; Simmons Prepared Foods, Inc.; Fieldale Farms Corporation; George's, Inc.; Ozark Mountain Poultry, Inc.; George's Chicken, LLC; George's Foods, LLC; George's Processing, Inc.; ~~House of Raeford Farms, Inc.; House of Raeford Farms of Louisiana~~Butterball, LLC; ~~O.K.~~Hormel Foods, ~~Inc.; Harrison Poultry, Inc.; Mar-Jac Poultry, Inc.; Mar-Jac Poultry MS Corporation; Jennie-O Turkey Store, Inc.; Jennie-O Turkey Store,~~ LLC; ~~Mar-Jac Poultry AL,~~Jennie-O Turkey Store Sales, LLC; ~~Mar-Jac Poultry, LLC; Mar-Jac Holdings, Inc.; Amick Farms, LLC; Case Foods, Inc.; Case Farms Processing, Inc.; Allen Harim Foods, LLC~~Cargill, Inc.; Cargill Meat Solutions Corporation; Agri Stats, Inc.; and Webber, Meng, Sahl and Company, Inc.

1

consulting companies that facilitate the exchange of competitively sensitive compensation data, Agri Stats, Inc. ("Agri Stats") and Webber, Meng, Sahl and Company, Inc. d/b/a WMS and Company, Inc. ("WMS").

3.      Defendant Processors own and operate approximately 200 ~~chicken~~poultry processing plants in the continental United States.  These ~~chicken~~poultry processing plants have employed hundreds of thousands of Class Members who ~~have processed~~facilitate the processing of live chickens and turkeys into poultry products sold to retailers and consumers.  Class Members have occupied various positions ~~along~~in poultry processing ~~lines~~plants, from hanging live ~~chickens to slaughtering the~~ birds to slicing meat from their bones to repairing the ~~processing~~ machines to supervising processing lines.

4.      Defendant Processors have compensated Class Members with hourly wages or annual salaries and employment benefits.  Each Defendant Processor has established a schedule for hourly wage rates, annual salaries and employment benefits based on the specific position and years of experience of the Class Members.  At each Defendant Processor, those hourly wage rates, annual salaries and employment benefits were established and approved ~~during the Class Period~~ by senior executives at corporate headquarters during the Class Period.

5.      Since January 1, 2009, Defendants have conspired to fix and depress the ~~hourly wages and benefits~~compensation paid to Class Members.  Defendants have engaged in this unlawful conspiracy to maximize their profits by reducing labor costs, which have comprised a substantial share of each Defendant Processor's total operating costs.

6.      Defendants formed, implemented, monitored and enforced the conspiracy in three ways.  First, senior executives of the Defendant Processors, including human resources executives and directors of compensation, held recurring "off the books" in-person meetings at the Hilton

2

Sandestin Resort Hotel & Spa in Destin, Florida, during which they exchanged information about, discussed, agreed upon and ultimately fixed the wages, salaries and benefits of Class Members at artificially depressed levels. These "off the books" meetings between senior executives of the Defendant Processors ~~responsible for determining the compensation of Class Members~~ involved such brazen ~~wage~~compensation-fixing that at least one Defendant Processor ~~recently~~ stopped attending a couple of years ago because of concerns that antitrust enforcers would hold it to account for actions at the meetings.

7.     Second, on a highly frequent basis, Defendant Processors exchanged detailed, current and non-public ~~wage and benefits~~compensation information through surveys conducted by Agri Stats and WMS. Each Defendant Processor subscribed to and partnered with Agri Stats to exchange and receive—on a monthly basis—effective ~~hourly~~ wage rates regarding categories of ~~chicken~~poultry processing plant workers from each Defendant Processor's plants. Similarly, WMS conducted a detailed annual survey of the hourly wages, annual salaries and employment benefits paid by each Defendant Processor to each category of ~~chicken~~poultry processing plant worker and circulated the survey results to senior executives of the Defendant Processors during in-person meetings. While both Agri Stats and WMS have claimed that the exchanged compensation data was anonymous, the data was sufficiently granular and disaggregated that executives of Defendant Processors could and did easily match much of the distributed ~~wage~~compensation data to ~~chicken~~poultry processing plants operated by specific Defendant Processors. Defendant Processers used the data obtained from Agri Stats and WMS to fix and depress the compensation paid to Class Members and ensure and confirm that no conspirator deviated from the conspiracy.

8.     Third, managers located at Defendant Processors' ~~chicken~~poultry processing plants

3

engaged in bilateral and regional exchanges of wage, salary and benefits information. Those managers frequently reached out directly to their counterparts at competitors' ~~chicken~~poultry processing plants to request and exchange ~~wage and benefits~~compensation data, including data regarding plans for *future* wages, salaries and benefits. Those plant-to-plant exchanges of ~~wage and benefits~~compensation information were conducted through various mediums, including telephone calls and ~~surveys disseminated through~~ electronic ~~listservs~~surveys. The ~~wage~~compensation data obtained from these plant-to-plant information exchanges was provided to executives of the Defendant Processors at corporate headquarters, who used the data to facilitate the fixing of compensation.

9.  Numerous characteristics of the ~~chicken~~poultry processing industry have facilitated the formation and implementation of the conspiracy, including but not limited to, the following: (a) vertical integration; (b) high barriers to entry; (c) industry concentration; (d) fungibility of ~~chicken~~poultry processing plant workers; (e) inelastic labor supply; (f) ~~numerous opportunities to collude~~a history of government investigations into collusive actions; (g) personal relationships between executives at competing ~~chicken~~poultry processors; and (h) ~~a history of government investigations into collusive actions~~numerous opportunities to collude.

10.  The intended and actual effect of Defendants' conspiracy to fix compensation has been to reduce and suppress the wages, salaries and benefits paid to Class Members since January 2009 to levels materially lower than they would have been in a competitive market. During the Class Period, even while worker productivity and processing line speeds increased significantly, ~~wage~~ increases in compensation provided to Class Members were highly restrained and limited. Economic analysis conducted by expert economists retained by Plaintiffs shows that ~~the~~ ~~wages~~compensation of plant workers employed by non-poultry food manufacturers ~~were~~was

4

higher, and increased at a materially more rapid rate, than ~~those~~compensation paid by Defendant Processors to Class Members during the Class Period.

11.     The ~~agreements~~agreement entered by Defendants to fix and depress ~~wages and benefits have~~compensation to employees of poultry processing plants has unreasonably restrained trade in violation of the Sherman Act, 15 U.S.C. § 1.  Plaintiffs, on their own behalf and on behalf of the Class, bring this antitrust action to enjoin Defendants from continuing their unlawful ~~agreements~~agreement and to recover actual, compensatory and treble damages, as well as costs, attorneys' fees and interest.  Plaintiffs demand a trial by jury.

**II.     JURISDICTION AND VENUE**

12.     ~~This Court has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because the classes contain more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of each class is a citizen of a state different from Defendants.~~  The Court ~~also~~ has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

13.     This Court has personal jurisdiction over ~~Defendants.~~each of the Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and the long-arm statute of the forum state.  Defendants Perdue Farms, Inc. and Perdue Foods LLC reside in this District and used their headquarters in Salisbury, Maryland to implement and coordinate the restraints of trade described below.  In addition, Defendants: (1) transacted substantial business in the United States, including in this District; (2) transacted with, and caused injury to, Class Members located throughout the United States, including in this District; and (3) committed substantial acts in furtherance of the unlawful scheme in the United States, including

5

in this District.  For example:

- Each of the Defendants regularly sold ~~chicken~~poultry products in the state of Maryland during the Class Period and continues to sell ~~chicken~~poultry products in the state of Maryland;

- Defendants Perdue Farms, Inc. and Perdue Foods LLC are headquartered and incorporated in the state of Maryland;

- Defendant The Hillshire Brands Company is incorporated in Maryland;

- Defendants ~~Amick Farms, LLC;~~ Perdue Farms, Inc.~~;~~, and Perdue Foods LLC~~; and Allen Harim Foods, LLC~~ operated ~~chicken~~poultry processing plants in the state of Maryland during the Class Period and provided compensation to Class Members in those plants at suppressed rates as a result of the conspiracy between all the Defendants alleged herein;

- Defendants ~~Amick Farms, LLC;~~ Perdue Farms, Inc.; Perdue Foods LLC; Mountaire Farms, Inc.; and Tyson Foods, Inc.~~; Case Foods, Inc.; and Allen Harim Foods, LLC have~~ had employees located in the state of Maryland and/or contracted with poultry growers in the state of Maryland during the Class Period;

- Defendants Agri Stats and WMS regularly provided services to Defendant Processors in the state of Maryland during the Class Period, including to Perdue Farms, Inc. and Perdue Foods LLC; ~~and~~

- ~~the~~A leading trade associations representing the ~~chicken~~poultry processing industry—the National Chicken Council ~~and the U.S. Poultry & Egg Association~~—held ___ held at least eight meetings in the state of Maryland during the Class Period that were attended by many of the Defendants, such as the three-day "Chicken Media Summit" that was held in Cambridge, Maryland in April 2015~~.~~;

6

- Another leading trade association representing the poultry processing industry—the Delmarva Poultry Industry, Inc.—held at least 11 meetings in the state of Maryland during the Class Period that were attended by many of the Defendants.

14.      Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. §1391(b), (c), and (d) because one or more of the Defendants transacted business, was found, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

III.   PARTIES

A. Plaintiffs

15.      Judy Jien was employed as a deboner at a chickenpoultry processing plant operated by George's, Inc. in Springdale, Arkansas and at a chickenpoultry processing plant operated by Tyson Foods, Inc. in Springdale, Arkansas during the Class Period.  She is a resident of the state of Arkansas.

16.      Kieo Jibidi was employed as a deboner at a chickenpoultry processing plant operated by Simmons Foods, Inc. in Decatur, Arkansas and at a chickenpoultry processing plant operated by Tyson Foods, Inc. in Springdale, Arkansas during the Class Period.  She is a resident of the state of Arkansas.

17.      Elaisa Clement was employed as a deboner at a chickenpoultry processing plant operated by George's, Inc. in Springdale, Arkansas during the Class Period.  He is a resident of the state of Arkansas.

18.      Glenda Robinson was employed in the day pack department at a poultry processing plant operated by Tyson Foods, Inc. in Forest, Mississippi during the Class Period.  She is a

7

resident of the state of Mississippi.

19.    Emily Earnest was employed as a deboner at a poultry processing plant operated by Pilgrim's Pride Corporation in Russellville, Alabama, during the Class Period.  She is a resident of the state of Alabama.

**B.  Defendants**

**1.    Perdue Defendants**

18.20.  Perdue Farms, Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland.  During the Class Period, Perdue Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

19.21.  Perdue Foods LLC is a privately held Maryland limited liability company headquartered in Salisbury, Maryland. Perdue Foods LLC is a subsidiary of Perdue Farms, Inc. During the Class Period, Perdue Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

20.22.   Defendants Perdue Farms, Inc. and Perdue Foods LLC are collectively referred to as "Perdue."

**2.    Tyson Defendants**

21.23.  Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas.  During the Class Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

22.24.  Tyson Prepared Foods, Inc. is a Delaware corporation located in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods, Inc.  During the Class Period, Tyson

8

Prepared Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

23.25.  The Hillshire Brands Company is a Maryland corporation located in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods, Inc.  During the Class Period, Hillshire Brands Company and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

24.26.  Tyson Fresh Meats, Inc. is a Delaware corporation located in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods, Inc.  During the Class Period, Tyson Fresh Meats, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

25.27.  Tyson Processing Services, Inc. is a Delaware corporation located in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods, Inc.  During the Class Period, Tyson Processing Services, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

26.28.  Tyson Refrigerated Processed Meats, Inc. is a Delaware corporation located in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods, Inc.  During the Class Period, Tyson Refrigerated Processed Meats, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

27.29.  Keystone Foods, LLC ("Keystone") is a Delaware corporation located in West Chester, Pennsylvania, and is a wholly owned subsidiary of Tyson Foods, Inc.  During the Class Period, Keystone Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or

9

other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

28.30. Equity Group Eufaula Division, LLC is a Delaware corporation located in Bakerhill, Alabama, and is a wholly owned subsidiary of Tyson Foods, Inc.  During the Class Period, Equity Group Eufaula Division, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

29.31. Equity Group—Georgia Division, LLC is a Delaware corporation located in Camilla, Georgia, and is a wholly owned subsidiary of Tyson Foods, Inc.  During the Class Period, Equity Group—Georgia Division, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

30.32. Equity Group Kentucky Division, LLC is a Delaware corporation located in Albany, Kentucky, and is a wholly owned subsidiary of Tyson Foods, Inc.  During the Class Period, Equity Group Kentucky Division, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

31.33. Defendants Tyson Foods, Inc.; Tyson Prepared Foods, Inc.; The Hillshire Brands Company; Tyson Fresh Meats, Inc.; Tyson Processing Services, Inc.; Tyson Refrigerated Processed Meats, Inc.; Keystone Foods, LLC; Equity Group Eufaula Division, LLC; Equity Group—Georgia Division, LLC; and Equity Group Kentucky Division, LLC are collectively referred to as "Tyson."

### 3.   Pilgrim's Defendants

32.34. Pilgrim's Pride Corporation is a Delaware corporation headquartered in Greeley,

10

Colorado.  JBS USA Holdings, Inc. holds a 75.3% controlling interest in Pilgrim's Pride Corporation.  JBS USA Holdings and Pilgrim's Pride Corporation are subsidiaries of JBS SA, a Brazilian corporation headquartered in Sao Paulo, Brazil.  During the Class Period, Pilgrim's Pride Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

33.35.  Around December 1, 2008, Pilgrim's Pride Corporation filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Northern District of Texas.  Effective December 28, 2009, Pilgrim's Pride Corporation was discharged from bankruptcy under a plan of reorganization that paid all creditors in full.  Pilgrim's Pride Corporation participated in the conspiracy alleged herein throughout the Class Period, including before and after its discharge from bankruptcy.

34.36.  Regardless of whether Pilgrim's Pride Corporation participated in the conspiracy throughout the Class Period, this Complaint seeks to recover damages from Pilgrim's Pride Corporation only for Pilgrim's Pride Corporation's post-discharge conduct, and in no way seeks to violate any orders of the above referenced Bankruptcy Court.  However, by operation of law, the damages arising from Pilgrim's Pride Corporation's post-discharge conduct include damages incurred by Plaintiffs and the other Class Members throughout the Class Period.  This Complaint also seeks to recover damages from the other Defendants for Pilgrim's Pride Corporation's pre-discharge conspiratorial conduct.

35.37.  Pilgrim's Pride Corporation of West Virginia, Inc. is a West Virginia corporation located in Moorefield, West Virginia, and is a wholly owned subsidiary of Pilgrim's Pride Corporation.  During the Class Period, Pilgrim's Pride Corporation of West Virginia, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid

11

wages, salaries and/or benefits to Class Members in the United States.

38.    JFC LLC (d/b/a GNP Company) is a Minnesota company located in St. Cloud, Minnesota and is a wholly owned subsidiary of Pilgrim's Pride Corporation.  During the Class Period, JFC LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

36.39.  Defendants Pilgrim's Pride Corporation and, Pilgrim's Pride Corporation of West Virginia, Inc., and JFC LLC are collectively referred to as "Pilgrim's."

       **4.**       **Sanderson Farms Defendants**

37.40.  Sanderson Farms, Inc. is a publicly held Mississippi corporation headquartered in Laurel, Mississippi.  During the Class Period, Sanderson Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

38.41.  Sanderson Farms, Inc. (Foods Division) is a Mississippi corporation located in Laurel, Mississippi, and is a wholly owned subsidiary of Sanderson Farms, Inc.  During the Class Period, Sanderson Farms, Inc. (Foods Division) and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

39.42.  Sanderson Farms, Inc. (Processing Division) is a Mississippi corporation located in Laurel, Mississippi, and is a wholly owned subsidiary of Sanderson Farms, Inc.  During the Class Period, Sanderson Farms, Inc. (Processing Division) and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

40.43.  Defendants Sanderson Farms, Inc.,.; Sanderson Farms, Inc. (Foods Division),.); and Sanderson Farms, Inc. (Processing Division) are collectively referred to as "Sanderson Farms."

**5.** **Koch Foods Defendants**

41.44. Koch Foods, Inc. is a privately held Delaware corporation with its corporate headquarters in Park Ridge, Illinois. During the Class Period, Koch Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

42.45. JCG Foods of Alabama, LLC is an Alabama corporation with its headquarters in Park Ridge, Illinois, and is a wholly owned subsidiary of Koch Foods, Inc. During the Class Period, JCG Foods of Alabama, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

43.46. JCG Foods of Georgia, LLC is a Georgia corporation with its headquarters in Park Ridge, Illinois, and is a wholly owned subsidiary of Koch Foods, Inc. During the Class Period, JCG Foods of Georgia, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

44.47. JCG Industries, Inc. is an Illinois corporation with its headquarters in Park Ridge, Illinois, and is a wholly owned subsidiary of Koch Foods, Inc. During the Class Period, JCG Industries, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

45.48. Koch Foods LLC is a Tennessee corporation with its headquarters in Chattanooga, Tennessee, and is a wholly owned subsidiary of Koch Foods, Inc. During the Class Period, Koch Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

46.49. Koch Foods of Alabama, LLC is an Alabama corporation with its headquarters in

13

Montgomery, Alabama, and is a wholly owned subsidiary of Koch Foods, Inc.  During the Class Period, Koch Foods of Alabama, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

47.50.  Koch Foods of Ashland, LLC is an Alabama corporation with its headquarters in Montgomery, Alabama, and is a wholly owned subsidiary of Koch Foods, Inc.  During the Class Period, Koch Foods of Ashland, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

48.51.  Koch Foods of Gadsden, LLC is an Alabama corporation with its headquarters in Montgomery, Alabama, and is a wholly owned subsidiary of Koch Foods, Inc.  During the Class Period, Koch Foods of Gadsden, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

49.52.  Koch Foods of Cumming LLC is a Georgia corporation with its headquarters in Cumming, Georgia, and is a wholly owned subsidiary of Koch Foods, Inc.  During the Class Period, Koch Foods of Cumming LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

50.53.  Koch Foods of Gainesville LLC is a Georgia corporation with its headquarters in Gainesville, Georgia, and is a wholly owned subsidiary of Koch Foods, Inc.  During the Class Period, Koch Foods of Gainesville LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class

14

Members in the United States.

51.54.  Koch Foods of Mississippi LLC is a Mississippi corporation with its headquarters in Morton, Mississippi, and is a wholly owned subsidiary of Koch Foods, Inc.  During the Class Period, Koch Foods of Mississippi LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

52.55.  Defendants Koch Foods, Inc.; JCG Foods of Alabama, LLC; JCG Foods of Georgia, LLC; JCG Industries, Inc.; Koch Foods LLC; Koch Foods of Alabama, LLC; Koch Foods of Ashland, LLC; Koch Foods of Gadsden, LLC; Koch Foods of Cumming LLC; Koch Foods of Gainesville LLC; and Koch Foods of Mississippi LLC are collectively referred to as "Koch Foods."

### 6.   Wayne Farms Defendants

53.56.  Wayne Farms, LLC is a Delaware corporation headquartered in Oakwood, Georgia. It is an affiliate of its parent company, Continental Grain Company, which is a privately held company in Arlon, Belgium.  During the Class Period, Wayne Farms, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

54.57.  WFSP Foods, LLC is a Georgia corporation with its headquarters in Decatur, Alabama, and is a wholly owned subsidiary of Wayne Farms, LLC.  During the Class Period, WFSP Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

55.58.  Defendants Wayne Farms, LLC and WFSP Foods, LLC are collectively referred to as "Wayne Farms."

### 7.   Mountaire Farms Defendants

15

56.59.  Mountaire Farms, Inc. is a privately held Delaware corporation with its headquarters in Millsboro, Delaware.  During the Class Period, Mountaire Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

57.60.  Mountaire Farms of Delaware, Inc. is a privately held Delaware corporation located in Millsboro, Delaware, and is a wholly owned subsidiary of Mountaire Farms, Inc.  During the Class Period, Mountaire Farms of Delaware, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

58.61.  Defendants Mountaire Farms, Inc. and Mountaire Farms of Delaware, Inc. are collectively referred to as "Mountaire."

**8.      Peco Foods, Inc.**

59.62.  Peco Foods, Inc. ("Peco Foods") is a privately held Alabama corporation headquartered in Tuscaloosa, Alabama.  During the Class Period, Peco Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

**9.      Simmons Foods Defendants**

60.63.  Simmons Foods, Inc. is a privately held Arkansas corporation headquartered in Siloam Springs, Arkansas.  During the Class Period, Simmons Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

61.64.  Simmons Prepared Foods, Inc. is a privately held Arkansas company headquartered in Siloam Springs, Arkansas, and is a wholly owned subsidiary of Simmons Foods, Inc.  Simmons Prepared Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other

16

affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

62.65.  Defendants Simmons Foods, Inc. and Simmons Prepared Foods, Inc. are collectively referred to as "Simmons" or "Simmons Foods."

### 10.    Fieldale Farms Corporation

63.66.  Fieldale Farms Corporation ("Fieldale Farms") is a privately held Georgia corporation headquartered in Baldwin, Georgia.  During the Class Period, Fieldale Farms Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

### 11.    George's Defendants

64.67.  George's, Inc. is a privately held Arkansas corporation headquartered in Springdale, Arkansas.  During the Class Period, George's, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

65.68.  Ozark Mountain Poultry, Inc. is an Arkansas corporation headquartered in Rogers, Arkansas, and is a wholly owned subsidiary of George's, Inc.  During the Class Period, Ozark Mountain Poultry, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

66.69.  George's Chicken, LLC is a Virginia corporation headquartered in Edinburg, Virginia, and is a wholly owned subsidiary of George's, Inc.  During the Class Period, George's Chicken, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

67.70.  George's Foods, LLC is a Virginia corporation headquartered in Edinburg, Virginia, and is a wholly owned subsidiary of George's, Inc.  During the Class Period, George's Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates

17

employed and paid wages, salaries and/or benefits to Class Members in the United States.

68.71.  George's Processing, LLC is an Arkansas corporation headquartered in Springdale, Arkansas, and is a wholly owned subsidiary of George's, Inc.  During the Class Period, George's Processing, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

69.72.  Defendants George's, Inc.; Ozark Mountain Poultry, Inc.; George's Chicken, LLC; George's Foods, LLC; and George's Processing, LLC are collectively referred to as "George's."

### 12.   House of Raeford Defendants

### 12.   Butterball, LLC

70.   Butterball, LLC ("Butterball") House of Raeford Farms, Inc. is a privately held North Carolina corporation headquarteredcompany with its corporate headquarters in Rose HillGarner, North Carolina.  During the Class Period, House of Raeford Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, divisions, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

71.73.  House of Raeford Farms of Louisiana, LLC is a Louisiana corporation headquartered in Shreveport, Louisiana, and is a wholly owned subsidiary of House of Raeford Farms, Inc.  During the Class Period, House of Raeford Farms of Louisiana, LLCButterball and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

72.   Defendants House of Raeford Farms, Inc. and House of Raeford Farms of Louisiana, LLC are collectively referred to as "House of Raeford."

### 13.   O.K. Foods, Inc.

**13.**   Defendant O.K. Foods, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas.  O.K.**Jennie-O Turkey Store Defendants**

18

74. Hormel Foods Corporation is a Delaware corporation with its corporate headquarters in Austin, Minnesota.  During the Class Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

73.75. Jennie-O Turkey Store, Inc. is a Minnesota corporation with its corporate headquarters in Austin, Minnesota, and is a wholly owned subsidiary of Hormel Foods, Inc. is a subsidiary of Industrias Bachoco S.A., a Brazilian corporation headquartered in Sao Paulo, Brazil. Corporation.  During the Class Period, Jennie-O.K. Foods Turkey Store, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

14. Harrison Poultry, Inc.

74. Harrison Poultry, Inc. is a Georgia corporation located in Bethlehem, Georgia. Jennie-O Turkey Store, LLC is a Minnesota company with its headquarters in Austin, Minnesota, and is a wholly owned subsidiary of Jennie-O Turkey Store, Inc. During the Class Period, Harrison Poultry, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

15. Mar-Jac Poultry Defendants

75.76. Jennie-O Turkey Store, LLC Mar-Jac Poultry, Inc. is a Georgia corporation located in Gainesville, Georgia. During the Class Period, Mar-Jac Poultry, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

76. Mar-Jac Poultry MS, LLC is a Mississippi limited liability corporation located in Hattiesburg, Mississippi.  During the Class Period, Mar-Jac Poultry MS, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages

and/or benefits to Class Members in the United States.

77.   Mar-Jac Poultry AL, LLC is an Alabama limited liability corporation located in Gainesville, Georgia. During the Class Period, Mar-Jac Poultry AL, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

78.77.   Mar-Jac PoultryJennie-O Turkey Store Sales, LLC is a Delaware corporation located in Gainesville, Georgia.company with its headquarters in Austin, Minnesota, and is a wholly owned subsidiary of Jennie-O Turkey Store, Inc. During the Class Period, Mar-Jac PoultryJennie-O Turkey Store Sales, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

78.   Mar-Jac HoldingsDefendants Hormel Foods Corporation; Jennie-O Turkey Store, Inc.; Jennie-O Turkey Store, LLC; and Jennie-O Turkey Store Sales, LLC are collectively referred to as "Jennie-O."

**14.   Cargill Defendants**

79.   Cargill, Inc. is a Delaware corporation located in Gainesville, Georgia and is the parent company of Mar-Jac Poultry, Inc.; Mar-Jac Poultry, MS LLC; Mar-Jac Poultry AL, LLC; and Mar-Jac Poultry, Inc.with its corporate headquarters in Wayzata, Minnesota. During the Class Period, Mar-Jac Holdings, LLCCargill, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

80.   Defendants Mar-Jac Poultry, Inc.; Mar-Jac Poultry MS, LLC; Mar-Jac Poultry AL, LLC; Mar-Jac Poultry, LLC; and Mar-Jac Holdings, Inc. are collectively referred to as "Mar-Jac Poultry."

20

**16.    Amick Farms, LLC**

~~81.~~80.    ~~Amick Farms, LLC~~Cargill Meat Solutions Corporation is a ~~privately held~~ Delaware ~~limited liability~~ company with its ~~corporate~~ headquarters in ~~Batesburg, South Carolina.   Amick Farms, LLC~~Wichita, Kansas, and is a wholly owned subsidiary of ~~OSI Group, LLC, a privately held Delaware corporation with its corporate headquarters in Aurora, Illinois.~~Cargill, Inc.   During the Class Period, ~~Amick Farms, LLC~~Cargill Meat Solutions Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

**17.    Case Foods Defendants**

~~82.    Case Foods, Inc. is a privately held Delaware corporation with its corporate headquarters in Troutman, North Carolina.   During the Class Period, Case Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.~~

~~83.    Case Farms Processing, Inc. is a privately held North Carolina corporation with its corporate headquarters in Troutman, North Carolina, and is a wholly owned subsidiary of Case Foods, Inc.   During the Class Period, Case Farms Processing, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.~~

~~84.~~81.   Defendants ~~Case Foods~~Cargill, Inc. and Cargill Meat Solutions Corporation~~Case Farms Processing, Inc.~~ are collectively referred to as "~~Case Foods~~Cargill."

**18.    Allen Harim Foods, LLC**

~~85.    Allen Harim Foods, LLC is a Delaware company with its corporate headquarters in Millsboro, Delaware.   During the Class Period, Allen Harim Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or~~

benefits to Class Members in the United States.

19.15.  **Agri Stats, Inc.**

86.82.  Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana and is a subsidiary of Eli Lilly & Co. Eli Lilly & Co. is an Indiana corporation located in Indianapolis, Indiana.  Throughout the Class Period, Agri Stats facilitated the exchange of confidential, proprietary, and competitively sensitive compensation data among Defendant Processors and their co-conspirators.

20.16.  **Webber, Meng, Sahl and Company, Inc.**

87.83.  Webber, Meng, Sahl and Company, Inc. d/b/a WMS and Company, Inc. is a Pennsylvania corporation located in Pottstown, Pennsylvania.  Throughout the Class Period, WMS facilitated the exchange of confidential, proprietary, and competitively sensitive compensation data among Defendant Processors and their co-conspirators.

IV.    **AGENTS AND CO-CONSPIRATORS**

88.84.  The following named entities have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy to fix and depress compensation alleged herein:

    a.  Claxton Poultry Farms, Inc. is a Georgia corporation located in Claxton, Georgia. During the Class Period, Claxton Poultry Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to non-supervisory production and maintenance workers at chicken processing plants in the continental United States.

    b.  Norman W. Fries, Inc., d/b/a Claxton Poultry Farms, Inc. is a Georgia corporation located in Claxton, Georgia. During the Class Period, Norman W. Fries, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates

22

~~employed and paid wages and/or benefits to non-supervisory production and maintenance workers at chicken processing plants in the continental United States.~~

~~c.~~**a.** Foster Farms, LLC ("Foster Farms") is a privately held California corporation headquartered in Modesto, California.  During the Class Period, Foster Farms, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid ~~wages and/or benefits~~compensation to ~~non-supervisory production and maintenance~~ workers at ~~chicken~~poultry processing plants in the continental United States.

**b.** Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California.  ~~Foster Poultry Farms is a related entity of Foster Farms, LLC.~~  During the Class Period, Foster Poultry Farms and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**c.** House of Raeford Farms, Inc. is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina.  During the Class Period, House of Raeford Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, divisions, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**d.** House of Raeford Farms of Louisiana, LLC is a Louisiana corporation headquartered in Shreveport, Louisiana.  During the Class Period, House of Raeford Farms of Louisiana, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to

23

workers at poultry processing plants in the continental United States.

e.   Case Foods, Inc. ("Case Foods") is a privately held Delaware corporation with its corporate headquarters in Troutman, North Carolina.  During the Class Period, Case Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

f.   Case Farms Processing, Inc. ("Case Farms") is a privately held North Carolina corporation with its corporate headquarters in Troutman, North Carolina.  During the Class Period, Case Farms Processing, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

d.g.    Mar-Jac Poultry, Inc. is a Georgia corporation located in Gainesville, Georgia. During the Class Period, Mar-Jac Poultry, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefitscompensation to non-supervisory production and maintenance workers at chickenpoultry processing plants in the continental United States.

h.   Mar-Jac Poultry MS, LLC is a Mississippi limited liability corporation located in Hattiesburg, Mississippi.  During the Class Period, Mar-Jac Poultry MS, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

24

i.   Mar-Jac Poultry AL, LLC is an Alabama limited liability corporation located in Gainesville, Georgia.  During the Class Period, Mar-Jac Poultry AL, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

j.   Mar-Jac Poultry, LLC is a Delaware corporation located in Gainesville, Georgia. During the Class Period, Mar-Jac Poultry, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

k.   Mar-Jac Holdings, Inc. is a Delaware corporation located in Gainesville, Georgia. During the Class Period, Mar-Jac Holdings, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

l.   O.K. Foods, Inc. ("O.K. Foods") is an Arkansas corporation headquartered in Fort Smith, Arkansas.  During the Class Period, O.K. Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

m.   Amick Farms, LLC ("Amick Farms") is a privately held Delaware limited liability company with its corporate headquarters in Batesburg, South Carolina.  During the Class Period, Amick Farms, LLC and/or its predecessors, wholly owned or

25

controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**n.** Harrison Poultry, Inc. is a Georgia corporation located in Bethlehem, Georgia. During the Class Period, Harrison Poultry, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**o.** Allen Harim Foods, LLC ("Allen Harim") is a Delaware company with its corporate headquarters in Millsboro, Delaware. During the Class Period, Allen Harim Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**p.** Claxton Poultry Farms, Inc. is a Georgia corporation located in Claxton, Georgia. During the Class Period, Claxton Poultry Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**q.** Norman W. Fries, Inc., d/b/a Claxton Poultry Farms, Inc. is a Georgia corporation located in Claxton, Georgia. During the Class Period, Norman W. Fries, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**r.** Cooper Hatchery, Inc. d/b/a Cooper Farms is an Ohio corporation with its corporate

headquarters in Oakwood, Ohio.  During the Class Period, Cooper Hatchery, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

s.   Farbest Foods, Inc. is an Indiana company with its corporate headquarters in Jasper, Indiana.  During the Class Period, Farbest Foods and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

t.   Virginia Poultry Growers Cooperative, Inc. ("Virginia Poultry Growers Cooperative") is a Virginia corporation with its corporate headquarters in Hinton, Virginia.  During the Class Period, Virginia Poultry Growers Cooperative and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

u.   VPGC, LLC is a Virginia corporation with its corporate headquarters in Hinton, Virginia.  During the Class Period, VPGC, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

v.   Turkey Valley Farms, LLC is a Minnesota corporation with its corporate headquarters in Willmar, Minnesota.  During the Class Period, Turkey Valley Farms, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or

27

other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**w.** The U.S. Poultry & Egg Association is a nonprofit trade association headquartered in Tucker, Georgia that advocates for poultry processors.

**x.** The National Chicken Council is a nonprofit trade association headquartered in Washington, D.C. that advocates for chicken processors.

**y.** The National Turkey Federation is a nonprofit trade association headquartered in Edgefield, South Carolina that advocates for turkey processors.

89.85. Various other persons, firms and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.  Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

90.86. Each Defendant and co-conspirator named herein acted as the agent or joint-venturer of, or for, the other Defendants and co-conspirators with respect to the acts, violations and common course of conduct alleged herein.

**V.    TRADE AND COMMERCE**

91.87. The conspiracy formed, implemented and enforced by Defendants and co-conspirators was intended to depress, and did in fact depress, the wages and benefitscompensation of Class Members nationwide.

92.88. The conspiracy restrained competition between Defendant Processors for the payment of wages, salaries and benefits to, and hiring of, Class Members nationwide, including Class Members who were located in states other than the states in which the chickenpoultry processing plants that employed them were located.

28

93.89.  Defendant Processors and co-conspirators made payments to Class Members by mailing or transmitting funds across state lines.

94.90.  Defendant Processors and co-conspirators employed Class Members to process chickenpoultry for sale in interstate and foreign commerce.

95.91.  Defendants Agri Stats and WMS provided services to Defendant Processors located in multiple different states and exchanged confidential, proprietary, and competitively sensitive data among Defendant Processors across state lines.

96.92.  The activities of Defendants and co-conspirators were within the flow of interstate commerce of the United States, and were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

## VI.    FACTUAL ALLEGATIONS

### A. Background

#### 1.    ChickenPoultry Industry

97.    Chickens raised for meat consumption are typically slaughtered and processed before the age of 13 weeks.[2]  According to a 2012 report by Focus Management Group, such chickens "are a commodity product with little or no product differentiation based on the processors."

93.    ChickensThe United States Department of Agriculture defines "poultry" to mean

---

[2]. As used in this Complaint, the term "chicken" does not encompass spent hens (i.e., chickens raised to lay eggs and only slaughtered after the age of 15 weeks).

"any domesticated bird used for food."  The poultry industry in the United States is the world's largest producer of poultry meat.

94.    Meat from chicken and turkey account for more than 99% of the poultry meat produced in the United States.  Chicken meat accounts for approximately 89% of the poultry meat produced in the United States.  Turkey meat accounts for approximately 11% of the poultry meat produced in the United States.

98.95.  Poultry processed for consumption may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value-added product. The poultry processed by Defendant Processors are commodity products with little or no differentiation between processors.

99.96.  ChickenPoultry processing is concentrated in the hands of the Defendant Processors, which control more than 90approximately 80 percent of the production of processed chickenpoultry in the United States.  Defendant Processors earn more than $30 billion in annual revenue from the sale of processed chickenpoultry.

100.97.    Defendant Processors are vertically integrated companies that control nearly every aspect of chickenpoultry production.  When commercial chickenpoultry production first emerged, different companies owned businesses involved in the different stages of chickenpoultry production.  Specifically, different companies owned: hatcheries, where eggs are hatched; growers, which raise the hatched chickensbirds; feed mills, which produce and supply food products for the chickensthose birds; and processing plants, where live chickensbirds are slaughtered and turned into poultry products for sale and consumption. Today, approximatelymore than 90 percent of chickenspoultry for consumption areis produced by vertically integrated companies, such as Defendant Processors, that each own or controllcontrol their own hatcheries,

30

feed mills, growers, and processing plants.

    **2.** ~~Chicken~~**Poultry Processing Plants**

~~101.~~98.    Once chickens and turkeys for consumption reach maturity, they are typically processed in ~~chicken~~poultry processing plants.  There are two kinds of ~~chicken~~poultry processing plants.  The first—slaughterhouse facilities—kill ~~chickens~~birds and convert the carcasses into raw ~~chicken~~poultry products fit for human consumption.  The second—further processing facilities—convert the raw chicken and turkey into value-added forms by cutting, deboning, breading, cooking or otherwise engaging in additional processing.  The Class is comprised of workers employed by Defendant Processors in both slaughterhouse facilities and further processing facilities.

~~102.~~99.    Collectively, Defendant Processors currently own approximately 200 ~~chicken~~poultry processing plants in the continental United States.  A majority of those ~~chicken~~poultry processing plants are located in the South and Upper Midwest.

100.    ~~Chicken~~Poultry processing plants are typically located near the growers with which they contract. As a result, the vast majority of Defendant Processors' ~~chicken~~poultry processing plants are clustered in groups in rural areas.  In fact, each Defendant Processor owns at least one ~~chicken~~poultry processing plant that is within ~~28~~32 miles of ~~a competitor's chicken~~another Defendant Processor's poultry processing plant.  Indeed, with the exception of Defendant Jennie-O, each Defendant Processor has a plant that is within 13 miles of another Defendant Processor's plant.

~~103.~~101.    The geographic proximity of poultry processing plants means that, in a competitive labor market, many employees of poultry processing plants could and would switch their employment to rival poultry processing plants when offered higher wages, higher salaries

31

and/or superior benefits.   For that reason, each Defendant Processor has risked the loss of processing plant employees to, and in fact did lose processing plant employees to, ~~a competitor's nearby chicken processing plant.   The geographic proximity of chicken processing plants means that, in a competitive labor market, many chicken processing plant workers could and would switch their employment to rival chicken processing plants when offered higher wages and/or superior benefits.   The following map identifies the locations of the chicken processing plants currently operating in the continental United States:~~another Defendant Processor's nearby poultry processing plant.



102.    ~~Chicken~~The following map identifies the locations of the chicken and turkey processing plants currently operating in the continental United States; chicken processing plants are represented by red pins, and turkey processing plants are represented by blue pins[3]:

---

[3] Some of the pins on the map reflect more than one poultry processing plant.



### 3. **Poultry** Processing Plant Workers

~~104.~~103.        Each year during the Class Period, Defendant Processors collectively employed approximately ~~250~~220,000 workers at their ~~chicken~~poultry processing plants.

~~105.~~104.        Because Defendant Processors produce commodity ~~chicken~~poultry products in a similarly efficient and vertically integrated manner, their ~~chicken~~poultry processing facilities were and are characterized by highly similar operations and thus highly similar labor requirements.  Accordingly, the ~~non-supervisory production and maintenance~~ workers employed by Defendant Processors at each of their approximately 200 ~~chicken~~poultry processing plants in the continental United States during the Class Period, *i.e.* Class Members, were easily categorized into a limited set of discrete job positions.

~~106.~~105.        For example, in their ~~chicken~~poultry processing plants, each Defendant Processor employs "live hangers," who hang live ~~chicken~~birds by their feet onto fast-moving metal hooks; "eviscerators," who remove the internal organs from ~~chicken~~bird carcasses; ~~and~~ "deboners," who remove bones from ~~chicken~~bird carcasses~~.~~; and "first line supervisors," who

33

supervise workers on the processing lines.

    **4.  Compensating ~~Chicken~~Poultry Processing Plant Workers**

107.  Compensation of chicken processing plant workers comprises a significant share of the total operating costs of each Defendant Processor.  The second largest cost component of producing chickens for consumption is the cost of chicken processing plant labor, which on average comprises approximately 16 percent of Defendant Processors' total operating costs.

108.  Decisions regarding the compensation of chicken processing plant workers during the Class Period were made by and at each Defendant Processors' corporate headquarters.  This reflects the significance of labor costs to Defendant Processors' overall profitability.  While local plant managers sometimes made recommendations for wage adjustments, hourly wages and benefits were ultimately determined and approved by senior executives at each Defendant Processor's corporate headquarters.  The fact that decision-making regarding wages and benefits was centralized in the hands of senior corporate executives materially facilitated the formation and implementation of the wage-fixing conspiracy alleged herein.

109.  Multiple former human resources employees of the Defendant Processors have explained that senior executives at corporate headquarters exclusively set the wages and benefits of processing plant workers in a centralized fashion.  For example, a former human resources manager who worked at three different chicken processing plants owned by Tyson, Pilgrim's and Perdue during the Class Period stated that compensation to chicken processing plant workers at all three companies was exclusively determined at and by each of the company's corporate offices. Another former Tyson employee explained that Tyson's corporate office established a "wage scale" for all of Tyson's chicken processing plant workers consisting of a starting hourly rate for each position and incremental increases for that starting hourly rate up to the maximum wage.

~~110.    During the Class Period, senior executives of the Defendant Processers determined the hourly wages and benefits for Class Members.  When those corporate executives set hourly wages, they established a wage schedule that compensated workers according to their position in the processing plant.~~

~~111.    Some chicken processing plant positions were paid more wages by Defendant Processors than other positions, largely due to the greater skill required by those positions.  For example, "deboners" are typically paid more than many other non-supervisory workers on the processing line.  Effectively deboning a chicken requires some experience and training, and Defendant Processors earn more money when a chicken is deboned effectively, *i.e.* cut closest to the bone to maximize the amount of meat obtained.  Nonetheless, the compensation for all chicken processing plant positions was determined in a systematic way using compensation schedules within each Defendant Processor that were aligned with the compensation for the same positions at other Defendant Processors.~~

106.    ~~During the Class Period, the compensation provided by~~<u>Employees at Defendant Processors' poultry processing plants were paid either hourly wages or annual salaries, depending on their position.</u>

107.    <u>Approximately 90 percent of employees at those poultry processing plants were either production workers who physically worked on processing lines to process poultry, or maintenance workers who maintained and repaired processing line machines and/or refrigeration systems.  Those production and maintenance workers were paid hourly wages according to their specific position and experience.</u>

108.    <u>Approximately 10 percent of employees at Defendant Processors' poultry processing plants were paid annual salaries.  These employees include supervisory positions such</u>

35

as first line supervisors who supervised hourly-paid production workers, and plant maintenance supervisors who supervised hourly-paid maintenance workers.

112.109.    Both hourly-paid and salary-paid employees at Defendant Processors to Class Members was comprised of an hourly wage rate plusProcessors' poultry processing plants also received employment benefits.  Those benefits typically included health careinsurance, paid time off, a retirement savings plan, disability insurance and life insurance.  Each Defendant Processor calculated a specific dollar value for the benefits paid to each Class Member.

113.110.    The total compensation provided to hourly-paid to Class Members, inclusive of benefits, was referred to within the industry as the "fully loaded wage."  For example, according to Perdue, the "fully loaded wage" at the company's Delmarva processing plants in 2016 was $17.12 for the lowest paid plant worker.  That particular "fully loaded wage" was comprised of a $12 hourly wage plus a benefits package equal to $5.12 per hour.

114.    At times, when Defendants increased hourly wages for Class Members, they simultaneously decreased the value of benefits to offset the hourly wage increase.  For example, a former employee of Tyson explained that annual increases in hourly wages at a Tyson plant were effectively eliminated each year by charging the plant workers higher insurance premiums.

111.    Some hourly-paid positions at Defendant Processors' poultry processing plants were paid higher wages than other hourly-paid positions at the same poultry processing plants, largely due to the greater skill and experience required by those higher-paying positions.  For example, "deboners" were typically paid more than many other non-supervisory workers at poultry processing plants.  Effectively deboning a chicken or turkey requires some experience and training, and Defendant Processors earn more money when a bird is deboned effectively, *i.e.* cut closest to the bone to maximize the amount of meat obtained.  Nonetheless, the compensation for all hourly-

36

paid positions at poultry processing plants was determined in a systematic way using compensation schedules within each Defendant Processor that were aligned with the compensation for the same positions at other Defendant Processors.

112.    Similarly, some salary-paid positions at Defendant Processors' poultry processing plants were paid higher salaries than other salary-paid positions, largely due to the greater skill and experience required by those higher paying salaried positions.  For example, a processing shift manager, who directs a production operation for an entire section of a poultry processing plant, receives a higher salary than a first line supervisor, who reports to the processing shift manager.  Nonetheless, the compensation for all salary-paid positions at poultry processing plants was determined in a systematic way using compensation schedules within each Defendant Processor that were aligned with the compensation for the same positions at other Defendant Processors.

**5.  Centralized Determination of Compensation for Poultry Processing Plant Workers**

113.    Compensation of poultry processing plant employees comprises a significant share of the total operating costs of each Defendant Processor.  The second largest cost component of producing poultry for consumption is the cost of poultry processing plant labor, which on average comprises approximately 16 percent of Defendant Processors' total operating costs.

114.    Decisions regarding the compensation of poultry processing plant employees across the country were made by and at each Defendant Processors' corporate headquarters during the Class Period.  This reflects the significance of labor costs to Defendant Processors' overall profitability.    While local plant managers sometimes made recommendations for wage adjustments, the hourly wages, annual salaries and employment benefits were ultimately determined and approved by senior executives at each Defendant Processor's corporate headquarters.  The fact that decision-making regarding wages, salaries and benefits was centralized

37

in the hands of senior corporate executives materially facilitated the formation and implementation of the compensation-fixing conspiracy alleged herein.

115.    Multiple former human resources employees of the Defendant Processors have explained that senior executives at corporate headquarters exclusively set the wages, salaries and benefits of processing plant employees across the country in a centralized fashion.  For example, a former human resources manager who worked at three different poultry processing plants owned by Tyson, Pilgrim's and Perdue during the Class Period stated that compensation paid to poultry processing plant workers at all three companies was exclusively determined at and by each of the company's corporate offices.  Similarly, a former human resources manager who worked at poultry processing plants owned by Perdue and George's stated that wages, salaries and benefits paid to all poultry processing plant employees by both companies were determined at and by each of the company's corporate headquarters.

116.    During the Class Period, senior executives of the Defendant Processers determined the hourly wages, annual salaries, bonuses and employment benefits for Class Members across the country in a formulaic way, establishing schedules that compensated employees according to their specific positions in the poultry processing plants.

117.    For example, a former Tyson employee stated that hourly wages set by Tyson's corporate headquarters were "very tightly structured."  The former Tyson employee explained that Tyson's corporate office established a "wage scale" for all of Tyson's hourly-paid poultry processing plant workers consisting of a starting hourly rate for each position and incremental increases for that starting hourly rate up to the maximum wage.  The former Tyson employee noted that the wage structure was determined at the corporate level "before" individual plant managers "even started talking about it."  A former Tyson employee also noted that, under Tyson's wage

38

scale, hourly production workers received "consistent" wages within divisions, regardless of the location of the poultry processing plant.

### 5.6. Limited Role of Labor Unions

115.118.    Approximately one-third of chickenhourly-paid workers at poultry processing plant workersplants are members of unions.  The United Food and Commercial Workers International Union represents approximately 90% of those unionized workers.

116.119.    There is not a significant disparity between the compensation provided to unionized and non-unionized workers in chickenDefendant Processors' poultry processing plants. Collective bargaining agreements often specify a particular wage increase for year one and then often require that, in subsequent years of the agreements, unionized workers are entitled to the average wages per position paid by the Defendant Processor.  Those average wages are calculated based on what is paid to both unionized and non-unionized workers.

### 6.7. Demographics of ChickenHourly-Paid Poultry Processing Plant Workers

117.120.    During the Class Period, the compensation provided to hourly-paid to Class Membersworkers in Defendant Processors' poultry processing plants was artificially depressed and left many of those workers in poverty.  A 2015 report by the nonprofit Oxfam America titled "Lives on the Line" states, "Most workers on the poultry processing line earn wages that place them near or below the poverty line.  Wages average around $11 per hour; annual income for most is between $20,000 and $25,000.  The federal poverty level for a family of three in 2015 is $20,090; for a family of four it's $24,250.  An average poultry worker supporting two children qualifies for Head Start, SNAP (food stamps), and the National School Lunch Program.  In addition, workers often turn to local charities and food banks to supplement their income; in many poultry towns, thrift stores and food banks dominate local storefronts."

118.121.    Despite the poor compensation, working in on a chicken processing line in a poultry plant is one of the most dangerous jobs in the United States.  The 2015 report by Oxfam America states that "the rates of injuries and illness" in chickenpoultry processing plants "are shockingly high."  The Occupational Safety and Health Administration ("OSHA") and the United States Department of Labor classify poultry as "a hazardous industry."  In February 2015, OSHA acknowledged that "the incidence rate of occupational illness cases, including musculoskeletal disorders, reported in the poultry industry in 2011 and 2012 has remained high—at more than five times the average for all US industries."  In April 2015, the Centers for Disease Control and the National Institute for Occupational Safety and Health reported the results of an evaluation of 191 poultry workers at a plant in Maryland: 76 percent had abnormal results from a nerve conduction test (indicating damage to nerves), and 34 percent had evidence of carpal tunnel syndrome.  In 2004, Human Rights Watch reported that poultry workers are 14 times more likely than other workers to suffer debilitating injuries stemming from repetitive trauma—like "claw hand" (in which the injured fingers lock in a curled position) and ganglion cysts (fluid deposits under the skin).

119.122.    In a 2016 report titled "No Relief," Oxfam America wrote, "While the poultry industry today enjoys record profits and pumps out billions of chickens, the reality of life inside the processing plant remains grim and dangerous.  Workers earn low wages, suffer elevated rates of injury and illness, toil in difficult conditions, and have little voice in the workplace."

123.    Due to the poor compensation, grueling work and high risk of physical injury, many Americans have no interest in employment as an hourly-paid worker in a chickenpoultry processing plant worker.  For that reason, Defendant Processors often recruit workers who have limited alternative options for employment.  Many of the hourly-paid workers recruited and hired

40

by Defendant Processors in poultry processing plants do not speak English and lack significant education.

120.124.    Christopher Cook, author of the book "Diet for a Dead Planet: Big Business and the Coming Food Crisis," said that chickenpoultry processors recruit "a variety of economically desperate and socially isolated populations."  Debbie Berkowitz, OSHA's former Senior Policy Adviser, said, "It's an industry that targets the most vulnerable group of workers and brings them in.  And when one group gets too powerful and stands up for their rights, they figure out who's even more vulnerable and move them in."

121.125.    Many of the hourly-paid workers recruited and hired by Defendant Processors are migrant workers, refugees, asylum-seekers, immigrants employed under EB3 visas, prison laborers, and participants in court-ordered substance abuse programs.  In a 2015 report, Oxfam America wrote, "The poultry industry has a complicated history of tapping marginalized populations for its workforce. … Of the roughly 250,000 poultry workers in the US, most are minorities, immigrants, or refugees, and a significant percentage is female."

122.126.    For example, Norman Beecher, a former Human Resources manager for Defendantco-conspirator Case Farms LLC, actively recruited refugees from the Guatemalan civil war.  Mr. Beecher explained to historian Leon Fink, "I didn't want [Mexicans].  Mexicans will go back home at Christmastime.  You're going to lose them for six weeks.  And in the poultry business you can't afford that.  You just can't do it.  But Guatemalans can't go back home.  They're here as political refugees.  If they go back home, they get shot."

123.127.    In a 2017 article titled "Exploitation and Abuse at the Chicken Plant," *The New Yorker* reported that Defendant Case Farms LLC "finds new ways to keep labor costs down. For a time, after the Guatemalan workers began to organize, Case Farms recruited Burmese

41

refugees.  Then it turned to ethnic Nepalis expelled from Bhutan, who today make up nearly 35 percent of the company's employees in Ohio. … Recently, Case Farms has found a more captive workforce.  One blazing morning last summer in Morganton, an old yellow school bus arrived at Case Farms and passed through the plant's gates, pulling up to the employee entrance.  Dozens of inmates from the local prison filed off, ready to work at the plant."

124.   Many chicken processing plant workers do not speak English and lack significant education.  Accordingly, many chicken processing plant workers cannot easily obtain stable employment outside the chicken industry.  A former employee of Pilgrim's during the Class Period explained that many chicken processing plant workers never graduated from high school and did not speak English and thus were limited from pursuing work outside a chicken processing plant.  Similarly, a former employee of George's during the Class Period explained that chicken processors "catered" to workers who did not speak English and lacked a strong educational background and that it would be difficult for chicken processing plant workers to find work outside a chicken processing plant because of "communication issues."

**8.  Demographics of Salary-Paid Poultry Processing Plant Employees**

128.   To obtain a salaried position at Defendant Processors' poultry processing plants, an applicant must satisfy certain education and experience requirements and also speak fluent English.  For example, to obtain a position as a first line supervisor at a Defendant Processor, which is one of the *lowest* paid salaried positions in a poultry processing plant, an applicant must ordinarily have obtained a high school diploma or GED, is strongly preferred to have a Bachelor's degree in a related field (e.g. Poultry Science, Animal Science, Agriculture or Business Management), must have a minimum of 1-3 years of supervisory experience, must possess strong written and verbal communication skills, and is expected to be proficient with computers.

42

Accordingly, only educated, skilled and experienced individuals can obtain salaried positions at Defendant Processors' poultry processing plants.

**B. Conspiracy to Fix ~~Wages~~Compensation**

~~125.~~129.     Beginning in January 2009 and continuing to the present, Defendants have conspired with each other to fix and depress the compensation paid to ~~non-supervisory production and maintenance workers at Defendant Processor's chicken~~employees of Defendant Processors at poultry processing plants in the continental United States.

~~126.~~130.     Multiple events took place in the ~~chicken~~poultry industry in 2008 and 2009 that facilitated the formation and implementation of the conspiracy, including:

a.  In 2008, Tyson, the largest ~~chicken~~poultry processor in the United States, re-subscribed to Agri Stats.  Tyson had previously terminated its relationship with, and subscription to, Agri Stats, but the company resumed exchanging detailed and proprietary ~~wage~~compensation information with other Defendant Processors through Agri Stats in 2008.

b.  In December 2008, the second largest ~~chicken~~poultry processor, Pilgrim's Pride Corporation, filed for bankruptcy.  The bankruptcy resulted from total costs—including labor costs—exceeding the revenue earned by the company.  The bankruptcy of Pilgrim's Pride Corporation triggered competing ~~chicken~~poultry processors to consider methods of managing costs in order to avoid the same fate.

c.  In 2009, following the bankruptcy filing of Pilgrim's Pride Corporation, the multinational JBS S.A, which is the largest meat processing company in the world, acquired a majority stake in Pilgrim's Pride Corporation.  The acquisition resulted in a change in the leadership of the human resources department at Pilgrim's Pride

43

Corporation.

    **d.** In April 2009, the human resources committees of the ~~two~~three leading trade associations representing the interests of Defendant Processors—the National Chicken Council ~~and,~~ the U.S. Poultry & Egg Association and the National Turkey Federation—merged to form the Joint Poultry Industry Human Resources Council.

~~127.~~131.    Defendants formed and implemented the conspiracy to reduce labor costs and maximize profits.  In the absence of the conspiracy, Defendant Processors would have competed with each other for labor during the Class Period by offering higher wages, higher salaries and superior benefits to Class Members.  This is particularly true given that each Defendant Processor owns and operates a ~~chicken~~poultry processing plant that is within ~~28~~32 miles of ~~a competitor's~~another Defendant Processor's poultry processing plant, (and each Defendant Processor other than Jennie-O has a plant that is within 13 miles of another Defendant Processor's plant), meaning that many workers could easily switch to rival ~~chicken~~poultry processing plants offering better compensation in a competitive market.  The conspiracy permitted Defendant Processors to restrain competition for ~~chicken~~poultry processing plant workers and thus reduce labor costs and increase profits.

~~128.~~132.    In furtherance of the formation, implementation and enforcement of the conspiracy, Defendants have engaged in the following misconduct:

    **a.** Conducted "off the books" in-person meetings between senior executives of Defendant Processors during which they fixed and depressed the wages, salaries and benefits paid to ~~chicken~~workers at poultry processing ~~plant workers~~plants;

    **b.** Exchanged detailed, timely and competitively sensitive ~~wage~~compensation data through Agri Stats and WMS, thereby permitting Defendants to continuously

44

identify how much each Defendant Processor was paying ~~chicken~~poultry processing plant workers;

c. Conducted ~~bilateral~~direct plant-to-plant exchanges of compensation data, including data regarding anticipated future increases ~~into hourly~~ wages.

**1. "Off the Books" In-Person Meetings to Fix Compensation**

~~129.~~133. Beginning on or before 2009, senior executives of Defendant Processors conducted regular in-person meetings to exchange information about, discuss and ultimately fix the wages, salaries and benefits provided to ~~non-supervisory production and maintenance workers~~their employees at ~~chicken~~poultry processing plants in the continental United States.

~~130.~~134. ~~For example, during~~During each year of the Class Period, senior executives from the Defendant Processors who were responsible for determining the compensation of ~~chicken~~workers at poultry processing ~~plant workers~~plants conducted an in-person meeting at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida. According to former employees of Perdue and Pilgrim's, those meetings were attended by Directors of Compensation, Directors of Benefits, Compensation Analysts and/or Vice-Presidents of Human Resources from each of the leading ~~chicken~~poultry processors.

135. These annual meetings were spearheaded and conducted by a secretive "Compensation Committee." During the Class Period, the leadership of the Compensation Committee rotated among the Defendant Processors. For example, in 2015, the Compensation Committee was co-chaired by Jon Allen, Corporate Human Resources Director of Fieldale Farms, and Bert Neuenschwander, Manager of Compensation for Foster Farms.

~~131.~~136. While these meetings of the Compensation Committee often occurred around the same time as the U.S. Poultry & Egg Association's well-publicized annual Human

45

Resources Seminar, the meetings were *not* part of the association's published schedule (or any

other association's published schedule ).  According to a former ~~employees~~senior executive of

Perdue, the meetings were "off the books" because of the confidential nature of the

communications.

~~132.~~137.      During ~~these~~the annual "off the books" meetings of the Compensation

Committee held at the Hilton Sandestin Resort Hotel & Spa during the Class Period, the senior

executives of Defendant Processors engaged in two procedures to fix and depress the

~~wages~~compensation of Class Members.  First, the executives exchanged timely data regarding

wages, salaries and benefits paid to Class Members through a comprehensive and detailed survey.

Second, the executives held roundtable discussions to agree on and fix ~~wages and

benefits~~compensation paid to Class Members.

~~133.~~138.      A former employee of Pilgrim's explained that, each year, both the

commission of the annual survey and the off-the-books meeting attended by senior executives of

Defendant Processors were *fully paid* by one of the three largest ~~chicken~~poultry processors.  Those

three largest ~~chicken~~poultry processors—which included Tyson and Pilgrim's—would alternate

payment of the survey and roundtable meeting each year.  For example, Tyson would pay for the

survey and meeting one year; Pilgrim's would pay for the survey and meeting the next year; a third

Defendant Processor ~~paid~~would pay for the survey and meeting the following year; and the cycle

would renew.

~~134.~~139.      During the Class Period, the comprehensive survey was conducted by

WMS, a compensation consulting firm based in Pottstown, Pennsylvania.  WMS states on its

website that it "offers many types of surveys from industry-specific compensation surveys to

company-specific job content surveys.  Unlike traditional surveys that yield ambiguous answers

46

Formatted: Font: Italic

to generic questions, our company or industry-tailored assessments are based on real programs and issues within your organization or industry that result in answers based on real-time data."

135.140. Prior to each annual "off-the-books" meeting of the Compensation Committee held during the Class Period, each Defendant Processor provided detailed information to WMS regarding wages, salaries and benefits paid to Class Members, including *current* hourly rates and *current* salaries for specific chickenpoultry processing positions. A former employee of Pilgrim's explained that each participating Defendant Processor submitted detailed wage, salary and benefits information to WMS for "all positions within the facilities." She explained that the wagecompensation data submitted to WMS included average hourly wages or annual salaries for each processing line position as well as the number of people employed in each such position. She further explained that the benefits data submitted to WMS included identifying which health insurance plans were offered, the price of health insurance premiums, how much of that premium was paid by the employer, the value of health insurance deductibles, the number of paid time-off allowances, and the value of 401(k) retirement plan contributions. A former employee of Tyson explained that the survey also requested "detailed" information about health plan deductibles and whether the provided health insurance plan involved an open or closed network.

136.141. At the annual "off-the-books" in person meetings of the Compensation Committee, WMS randomly assigned a number to each attending Defendant Processor and subsequently circulated the wage and benefits data obtained through theresults of the compensation survey to the attendees of the in-person meeting, with the names of the Defendant Processors replaced by their randomly assigned number. At the "off-the-books" meetings, WMS also circulateddelivered a PowerPoint presentation that emphasized the average and median wage rates and salaries for each chickenpoultry processing plant position based on the survey data

47

provided by the Defendant Processors, thereby establishing a benchmarkbenchmarks that facilitated wagecompensation-fixing discussions.

142.   DespiteThe results of the WMS survey's superficial attempt to conceal the identitiessurvey that were distributed at the "off-the-books" meetings of the Compensation Committee provided detailed compensation data for both salaried employees and hourly-paid employees. The section covering salaried employees provided substantial data regarding the salaries and bonuses paid to approximately 40 positions by Defendant Processors. For each of those approximately 40 salaried positions, the annual WMS survey results provided the following information, aggregated from each of the participating Defendant Processors:

- Base salary

- Bonus pay (the average bonus paid for the last 12 months)

- Total compensation (base salary plus average bonus)

- Actual incentive percent (the average bonus paid as a percent of base compensation)

- Target opportunity percent (the target opportunity as a percent of base compensation)

- Maximum opportunity percent (the maximum opportunity as a percent of base compensation)

- Base salary policy (including the minimum midpoint and maximum policy)

The WMS PowerPoint presentation that accompanied the distribution of the survey results also identified, for each of the approximately 40 salaried positions, how much the following values had increased, by percentage, since the previous year: base salary, midpoint salary and total compensation.

143.   Another section of the WMS survey results specifically addressed hourly-paid workers at Defendant Processors' poultry processing plants. The survey results organized those hourly-paid workers into the following three categories: processing workers, maintenance

48

workers, and refrigeration technicians.  For each of those three categories of hourly-paid workers, the annual WMS survey provided the following information, aggregated from each of the participating Defendant Processors:

- Entry level start rate (wage rate when worker is hired)

- Entry level base rate (rate attained within 6-12 months for lowest production scale)

- Weighted average base rate

- Highest level base rate (rate attained within 6-12 months for highest production scale)

- Amount of 2nd Shift Premium (premium paid for working the evening shift)

- Amount of 3rd Shift Premium (premium paid for working the night shift)

- Annual turnover percentage

The WMS survey results organized this wage data on both a national basis and state-by-state basis. The WMS PowerPoint that accompanied the distribution of the survey results also identified how much each of the following increased by percentage since the previous year: entry level start rate, weighted average base rate, and highest level base rate.

144.    For each and every annual salary and hourly wage reported in the WMS survey results, which covered approximately 45 positions at Defendant Processors' poultry plants, the following details were provided:

- 90th Percentile: Ninety percent of participants pay below the 90th percentile.

- 75th Percentile: Seventy-five percent of participants pay below the 75th percentile.

- Median

- Average

- Weighted Average: The data weighted by the number of employees associated with each participating processor.

- 25th Percentile: Twenty-five percent of participants pay below the 25th percentile.

49

- 10th Percentile: Ten percent of participants pay below the 10th percentile.

145.    The WMS survey results also provided exhaustive data about the benefits provided to both salaried and hourly-paid employees at poultry processing plants operated by Defendant Processors.  For example, the WMS survey results provided information about: (1) the value of contributions made to pension plans; (2) the amount of life insurance coverage; (3) the amount of insurance coverage for accidental death and dismemberment; (4) the amount of coverage for long-term disability insurance; (5) the amount and duration of short-term disability insurance; (6) the number of permitted sick leave days; (7) the number of annual holidays; (8) the number of annual vacation days (based on the duration of employment); (9) the amount of health care costs per employee; (10) the amount of cost-sharing for medical insurance plans; (11) the size of deductibles for medical insurance plans; (12) the scope of prescription drug coverage; (13) the scope and cost of dental plans; and (14) parental leave policies.

137.146.    Despite WMS's superficial attempts to conceal the sources of specific data in the survey results, it was made apparent to each attendeeattendees of the off-the-books meetings—by the nature of the data and related conversations between attendees—exactly which company had provided which wage and benefits information.  According to a former employee of Pilgrim's, WMS distributed a list of all survey participants to the attendees of the in-person meetingsDefendant Processor had provided which compensation information.  A former employee of Perdue explained that it was not difficult to determine which company reported which compensation data in the WMS survey when "you're sitting in a meeting and the person across from you [from a competing processor] is reporting on what they do."  AIndeed, a former employee of Pilgrim's said that attendees at the in-person meetings discussed with each other whether they paid a particular position less or more than the WMS survey average and also discussed why they

50

paid certain positions higher or lower wages depending upon the responsibility assigned to that position.

138. 147.    Defendant Processors used the WMS survey data results to modify and harmonize their compensation systems.  For example, a former employee of Pilgrim's said she used the hourly wage  and annual salary data from the WMS survey to help determine wage establish the hourly wages and annual salary rates at Pilgrim's.  Similarly, a former employee of another poultry processor that attended the off-the-books meetings of the Compensation Committee explained that the company used the WMS survey results to align its wages with those of other poultry processors that participated in the WMS survey.

139. 148.    After WMS had circulated the survey data results to senior executives of the Defendant Processors at the annual "off-the-books" meetings  of the Compensation Committee during the Class Period, those executives engaged in roundtable discussions to review the results of the WMS survey and to determine and agree upon the optimal compensation for chicken poultry processing plant workers, including the optimal benefits.  According to a former employee of Perdue, the executives at the off-the-books meetings specifically discussed "competitive specific "benefit information" including such as health insurance deductibles, paid time off and 401(k) plans.  During these roundtable discussions, the senior executives of the Defendant Processors agreed upon and fixed the wages, salaries and benefits that they would provide to non-supervisory production and maintenance workers employees at chicken poultry processing plants in the continental United States, *i.e.* Class Members.  During those discussions, the senior executives of the Defendant Processors also chastised any Defendant Processor that had deviated—by making unauthorized increases to worker compensation—from agreed-upon wages, salaries and benefits that had been fixed at prior in-person meetings.

51

149.    At the "off the books" meetings of the Compensation Committee, executives of the Defendant Processors would specifically discuss, and agree upon, plans for salary raises and bonus budgets for the upcoming year.  Such discussions and agreement had the predictable effect of limiting raises and bonuses paid to Defendant Processors' employees at poultry processing plants.

150.    Similarly, at those "off the books" meetings, executives of the Defendant Processors would present detailed comparisons about how actual salary changes and bonus budgets from the preceding year compared with the *planned* salary changes and bonus budgets that had been devised at the previous year's meeting.  Such discussions facilitated the enforcement of the conspiracy to fix the compensation of Defendant Processors' employees at poultry processing plants.

140.151.    A senior executive from Tyson noted during a private conversation in or around 2018 that the discussions about wages, salaries and benefits at the "off the books" meetings held at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida were so inappropriate and improper that that the company would no longer attend them.  At the time of that decision, Tyson had been named as a defendant in a different antitrust class action case.

152.    The "off-the-books" meetings at which During the Class Period, representatives from the Defendant Processors exchanged regularly attended and participated in the annual "off-the-books" meetings of the Compensation Committee at which competitively sensitive compensation data was exchanged and fixed the wages, salaries and benefits of Class Members, occurred during each year of the Class Period were discussed and fixed.  Indeed, Defendants Processors were prohibited from using the WMS survey to just *remotely* exchange compensation data.  According to a former employee of Keystone who attended some of the meetings, a poultry

processor would be expelled from the Compensation Committee if it failed to attend the annual in-person meeting two years in a row.

141.153.    As an example of the scope of participation in the annual Compensation Committee meeting, the following Defendants and co-conspirators attended the particular "off-the-books" in-person meeting in April 2017 at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida.: Tyson, Pilgrim's, Perdue, Koch Foods, Wayne Farms, George's, Keystone, Fieldale Farms, Simmons, Butterball, Cargill, Cooper Farms, Foster Farms, Amick Farms, Case Foods, OK Foods, and Allen Harim.  Other Defendants and co-conspirators attended other "off-the-books" annual meetings of the Compensation Committee during the Class Period.

142.1.  In addition to the above meetings held at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, there were many other in-person meetings during the Class Period between senior executives of the Defendant Processors who had responsibility for determining wages and benefits paid to Class Members.  Many of those meetings were sponsored by trade associations that advocate for the interests of the Defendant Processors.  Upon information and belief, during many of those meetings, the senior executives discussed and agreed on wages and benefits to be paid to Class Members.  Those meetings include:

a.  Seminars and Meetings of the U.S. Poultry & Egg Association.  The U.S. Poultry & Egg Association describes itself as the world's largest and most active poultry organization, and each Defendant Processor is a member.  Each year of the Class Period, the Association held a Human Resources Seminar, often at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida.  The Defendant Processors' employees responsible for setting plant worker wages  including senior executives, Vice Presidents of Human Resources, Directors of Compensation, Directors of Benefits, and Compensation Analysts  routinely attended the Human Resources Seminar.  A former employee who worked at three different chicken processing plants operated by Tyson, Pilgrim's and Perdue, said that the attendees at the Association's annual Human Resources Seminar knew each other very well and could have readily discussed wages of processing plant workers over dinner. In addition, senior executives of the Defendant Processors serve on the board of directors of the Association, and that board conducted in-person meetings four

times a year during the Class Period.

b.   Board meetings of the National Chicken Council.  The National Chicken Council exclusively represents chicken processors, and its members account for approximately 95 percent of the chicken sold in the United States.  Each Defendant Processor is a member of the National Chicken Council.  The CEOs of the Defendant Processors serve on the board of directors of the National Chicken Council, and that board of directors met at least four times a year during the Class Period.  In conjunction with some of these meetings, executives from Agri Stats made presentations, and the CEOs of the Defendant Processors held private dinners.

**Formatted:** Underline

**Formatted:** Indent: Left:  0.5", Space After:  8 pt, Line spacing:  Multiple 1.08 li, Widow/Orphan control, Adjust space between Latin and Asian text, Adjust space between Asian text and numbers

c.   Meetings of the Joint Poultry Industry Human Resources Council.  This Council was formed by merging the human resources committees of the U.S. Poultry & Egg Association, National Chicken Council and the National Turkey Federation.  The Council is comprised of senior human resources executives, including executives of the Defendant Processors who formed and implemented the wage-fixing conspiracy.  The Council exclusively focuses on labor issues, such as wages and benefits, and it held an in-person meeting on an annual basis during the Class Period, often at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida.

d.   Meetings of the Georgia Poultry Federation.  The Georgia Poultry Federation "is a non-profit trade association which represents the poultry industry in Georgia, the nation's leading broiler⁴ producing state."  Many of the Defendant Processors are members of the Georgia Poultry Federation.  It held meetings at least three times a year during the Class Period, which were attended by executives from those Defendant Processors.

e.a. Meetings of the North Carolina Poultry Federation.  The mission of the North Carolina Poultry Federation "is to create a favorable climate for business success for everyone involved in the poultry industry in North Carolina."  Many of the Defendant Processors are members of the North Carolina Poultry Federation.  It conducted several meetings during each year of the Class Period, which were attended by executives of those Defendant Processors.

f.   Meetings of The Poultry Federation.  The Poultry Federation is a non-profit trade organization that represents the poultry and egg industries in Arkansas, Missouri, and Oklahoma.  Many of the Defendant Processors are members of The Poultry Federation, and it conducted several meetings each year of the Class Period, which were attended by the executives of those Defendant Processors.

154.   While most of the Defendant Processors have participated in the WMS surveys and

related "off-the-books" meetings of the Compensation Committee since the onset of the Class

⁴ The term "broiler" means chicken raised for meat consumption.

**Formatted:** Justified

54

Period, the Defendant Processors that process more turkey than chicken in the United States—i.e. Butterball, Jennie-O and Cargill—joined the annual WMS survey and "off the books" meetings for the first time in or around 2015.  Prior to joining the WMS survey and related meetings in or around 2015, these Defendant Processors that substantially process turkey exchanged compensation data through another annual survey that was conducted by the National Turkey Federation.  According to a former employee of Butterball, the leading turkey processors in the country reported salaried and hourly wages of "fairly specific" positions within their turkey processing plants to the National Turkey Federation each year, which compiled the information and distributed the combined survey results to those turkey processors.  The compensation survey conducted by the National Turkey Federation, which only covered turkey processors, helped restrain the compensation of workers in poultry processing plants in the United States prior to 2015.

       **2.   Exchanging Detailed ~~Wage~~Compensation Data Through Agri Stats**

    ~~143.~~155.     In addition to conducting "off the books" in-person meetings during which they discussed and fix wages, salaries and benefits, Defendant Processors also exchanged detailed and competitively sensitive ~~wage information~~compensation data each month in furtherance of the conspiracy through a subscription to Agri Stats.  The agreement to exchange, and the actual exchange of, detailed ~~wage information~~compensation data through Agri Stats itself restrained ~~wage~~compensation competition for processing plant workers in the ~~chicken~~poultry industry, and greatly facilitated the formation, implementation and enforcement of the conspiracy to depress compensation.

    156.   Agri Stats provided an unparalleled ability for Defendant Processors to implement, and monitor each other's compliance with, their collusive agreement to depress compensation.

During the Class Period, Agri Stats facilitated the electronic exchange of *terabytes* of competitively sensitive compensation data between the Defendant Processors. Agri Stats also monitored and audited this data to ensure it was accurate. By providing this service, Agri Stats became a central part of Defendants' collusion to suppress compensation.

157. Indeed, a former employee of Perdue during the Class Period stated that Agri Stats was responsible for "collusion in the poultry industry."

~~144.~~158. Agri Stats is a ~~self-described~~small company, headquartered in Fort Wayne, Indiana. Agri Stats describes itself as a "management reporting and benchmarking company" that "provides consultation on data analysis, action plan development and management practices of participating companies." Agri ~~Stats'~~Stats's mission is to "[i]mprove the bottom line profitability for our participants by providing accurate and timely comparative data while preserving confidentiality of individual companies."

~~145. On February 15, 2017, in an article titled "Is the Chicken Industry Rigged?,"~~ ~~*Bloomberg Businessweek* reported, "Agri Stats provides chicken producers with a rare level of~~ ~~detail, in uncommonly timely fashion. The company's reports, portions of which Bloomberg~~ ~~Businessweek reviewed, contain exhaustive data about the internal operations of the nation's~~ ~~biggest poultry corporations, including bird sizes, product mixes, and financial returns at~~ ~~participating plants. … Today, at Agri Stats' headquarters in Fort Wayne, dozens of software~~ ~~engineers, data specialists, and marketing managers oversee one of the largest private storehouses~~ ~~of information ever compiled about a single sector of the agricultural economy. According to Cox,~~ ~~clients submit their sales invoices in real time—when someone sells a truck of chicken to the~~ ~~Kroger grocery chain, for example, the invoice goes to Agri Stats soon after."~~

159. ~~A former employee of Perdue during~~To the outside world, the role of Agri Stats is

56

almost invisible.  No uninitiated poultry processing worker could realize the profound anticompetitive impact Agri Stats has had on the poultry processing industry.  Agri Stats services are not for the public, and its reports are not publicly available.  Agri Stats refuses to sell its information and reports to just any customer.  Blair Snyder, the former president of Agri Stats, said in 2009, "Agri Stats has always been kind of a quiet company.  There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect.  We don't advertise.  We don't talk about what we do.  It's always kind of just in the background, and really our specialty is working directly with companies about their opportunities and so forth."

146.   During the Class Period noted that Agri Stats was responsible for "collusion in the poultry industry."

147.   Agri Stats gathers information from, and exchanges information between, more than 95 percent of U.S. chicken processors.  , Agri Stats partnered with each of the Defendant Processors to obtainelectronically collect and exchange timely and competitively sensitive compensation information regarding non-supervisory production and maintenance workerscompensation of their employees at chickenpoultry processing plants.

148.160.   Every Defendant Processor and co-conspirator participated in Agri Stats during the Class Period and provided and received the detailed information described hereinUnited States.  Upon information and belief, in the wake of a $1.3 billion jury verdict in 2004 against Tyson for a conspiracy to manipulate pay tocompensation for cattle farmers, increased fears of antitrust liability led Tyson to withdraw from Agri Stats.  However, in or around January 2008, Tyson resumed its subscription with and participation in Agri Stats.  Upon information and belief, on or around 2014, Tyson again withdrew from Agri Stats but then again resumed its subscription with and partnership in Agri Stats in or around 2016.

57

161.    During the Class Period, Agri Stats gathered compensation information from, and exchanged information between, more than 95 percent of U.S. poultry processors.  Agri Stats's full-market coverage of the poultry processing industry afforded Defendant Processors the power to coordinate and suppress compensation through the use of the internet.  During an October 2009 earnings calls for Defendant Sanderson, the former president of Agri Stats, Blair Snyder, said, "All right, who is at Agri Stats?  As we talked about, it's a parent company for subsidiary companies that support the industry.  The whole goal is to support the industry.  We do have 97% of the broiler industry participating, about 95% of the turkey industry. . . .The fact that we've got high 90 percentage of both broilers and turkeys, this pretty much represents about anybody that's out there in the broiler industry. . . .[For t]urkey participants, pretty much it's a list of who's who in the turkey business."

149.162.     During the Class Period, on a monthly basis, each Defendant Processor provided the effective hourlysalary and wage rates regarding each category of chicken processing categories of plant workerworkers from each of their chickenpoultry processing plants in the continental United States to Agri Stats.  Upon information and belief, thatThat information was transmitted to Agri Stats through direct electronic submissions by the Defendant Processors.  Agri Stats utilized an audit process to verify the accuracy of data regarding each plant, sometimes directly contacting Defendant Processors to verify data.

150.163.     Agri Stats subsequently compiled the wagecompensation data that it received from the Defendant Processors and, each and every month during the Class Period, distributed that disaggregated compilation to each of the subscribing Defendant Processors.  The compilation containedincluded *current* effective salaries and hourly wage rates for categories of non-supervisory production and maintenance workerworkers at chickenpoultry processing plants

58

throughout the continental United States ~~owned and~~ operated by Defendant Processors.  The compilation also ~~contained~~included average salary and hourly wage rates for ~~chicken~~poultry processing plant positions, both nationwide and broken down by region.  Additionally, the compilation ~~also~~ identified the productivity of particular processing plant positions, such as birds per ~~man~~person hour and labor hours per pound.

~~151.~~164.       While Agri Stats claims the distributed data is anonymous, the data is sufficiently granular and disaggregated that executives of Defendant Processors could and did easily and precisely match ~~all~~ the distributed ~~wage~~compensation data ~~with~~to specific ~~chicken~~poultry processing plants owned by specific Defendant Processors in specific regions.

~~152.~~165.       A former employee of Perdue during the Class Period said that Agri Stats data was "supposedly confidential" but he knew from being in the industry and around the "good old boy system" that Perdue and every other poultry processor participating in Agri Stats knew precisely which company reported which data.  He added that it is "just bullshit" to suggest that ~~each~~ Defendant ~~Processor~~Processors did not know which company was reporting which compensation data to Agri Stats and explained that~~the~~ Defendant Processors had "been looking at the same numbers for years so they've figured out who is who."

~~153.~~166.       A former employee of Pilgrim's during the Class Period explained that Agri Stats data could "totally" be reverse engineered to determine which company's plant was associated with which reported data and that, during meetings at processing plants to review Agri Stats data, colleagues would specifically point out that certain compensation data was associated with a particular competitor's plant in a specific location.

167.       A former employee of Perdue said that Perdue brought in Agri Stats personnel to teach management "how to extract information" from Agri Stats data.

59

168.    Similarly, a former employee of Butterball explained that "you could figure out" which company reported which data to Agri Stats, including compensation data, by speaking with Agri Stats representatives who provided the data.  Agri Stats representatives would often assist Defendant Processors in identifying the sources of Agri Stats data, including compensation data.

154.169.    During the Class Period, Agri Stats met with each Defendant Processor and its executives quarterly.  Since Agri Stats travelled between each Defendant Processor regularly and discussed the nonpublic, proprietary data at those meetings, Agri Stats was in a unique position to share information among Defendant Processors to enforce the agreement.  Additionally, during each year of the Class Period, Agri Stats and its subsidiary Express Markets Inc. held "Broiler Outlook Conferences" that were attended by senior executives of the Defendant Processors and which addressed some of the data collected by Agri- Stats from Defendant Processors.

155.170.    As a result of their subscriptions to Agri Stats, during each month of the Class Period, Defendant Processors could determine and knew how much each subscribing Defendant Processor was paying in wagescompensation to Class Members at their chickenpoultry processing plants.  Defendant Processers used the Agri Stats exchange of current wagecompensation data in combination with the previously discussed meetings to fix and harmonize the wagescompensation paid to Class Members and to monitor, and confirm that no conspirator deviated from, the wagecompensation-fixing conspiracy.  A former employee of Perdue said that it would be "stupid to think" that Agri Stats did not have "an influence on" chickenpoultry processing worker wages.

156.171.    Agri Stats exchanged detailed wagecompensation information between Defendant Processors on a monthly basis during the Class Period.  This monthly dissemination of hourly wagecompensation data from each of the Defendant Processors allowed the Defendants to

**Formatted:** Font: Not Italic

efficiently implement the ~~wage~~compensation-fixing scheme and systematically monitor and enforce compliance with it.   Defendants were able to *constantly* monitor each other's compensation levels to ensure that no Defendant Processor offered materially more in compensation than another.  A former Butterball employee said there was "no question about it" that Agri Stats was used by poultry processors to monitor each other's performance.

Formatted: Font: Italic

~~157.~~172.        During the Class Period, Defendant Processors regularly reviewed Agri Stats ~~wage~~compensation data at corporate headquarters and ~~on a regular basis~~ at each individual plant.  For example, at ~~chicken~~poultry processing plants operated by Perdue, Agri Stats data was reviewed at monthly or quarterly plant meetings during the Class Period.   Similarly, a former employee of George's said that Agri Stats data was reviewed during quarterly plant meetings during the Class Period to assess ~~plant~~ performance.  Joe Sanderson, then-CEO and Chairman of Sanderson Farms, stated publicly that "we live and die by Agri Stats."   A former employee of Perdue said that Perdue spent "enormous effort analyzing Agri Stats" and that the CEO was an "Agri Stats guru and nut" who had an "absolute understanding" of the reported Agri Stats data.  A former Butterball employee said that "Agri Stats was big" at the company.

~~158.~~173.        Defendant Processors regularly relied upon Agri Stats data to ~~determine~~set the ~~wages~~compensation of workers at ~~chicken~~poultry processing plants.  For example, a former employee at a Pilgrim's plant said that a Pilgrim's corporate officer visited the plant every quarter to review Agri Stats data with plant management; that during those meetings, Agri Stats wage data regarding processing plant workers was extensively compared with the plant's own wage figures; and that, when the Agri Stats data was being reviewed, the shared goal of the corporate officer and the plant managers was to ensure that the Pilgrim's plant was paying wages that were exactly in the middle of the reported Agri Stats wage data.  The former employee of Pilgrim's explained that

a department at Pilgrim's corporate office was specifically tasked with visiting each ~~chicken~~poultry processing plant operated by Pilgrim's to ensure that their compensation rates were exactly in the middle of reported Agri Stats data.

~~159.~~174.    In 2009, shortly after Pilgrim's had filed for bankruptcy in December 2008, the company engaged in collective bargaining negotiations with United Food and Commercial Workers International Union as part of a reorganization plan.   During the course of those negotiations, Pilgrim's executives insisted that labor costs be within the Agri Stats average range in each of the company's ~~chicken~~domestic poultry processing plants.

175.    Similarly, a former employee of Butterball explained that the company relied on Agri Stats when engaging in collective bargaining negotiations with unions that represented poultry processing workers.  The former Butterball employee explained that the company would use Agri Stats to "show unions the average pay in the industry" and insisted during negotiations that wages "would have to be within the parameters" contained in Agri Stats.

176.    Defendant Processors knew that they could rely on Agri Stats data to set compensation and enforce the conspiracy because Agri Stats audited the raw data collected from each Defendant Processor. Such auditing ensured that no Defendant Processor could cheat on the compensation-fixing agreement by covertly providing higher wages, salaries or benefits.

177.    To ensure the accuracy of its reports, Agri Stats physically visited each Defendant Processor to collect data.  Specifically, Agri Stats would establish an initial data collection process, wherein staff would conduct on-site meetings for approximately one week to identify data locations, files, formats.  Agri Stats staff would then spend approximately three weeks inputting and converting data from the Defendant Processor and preparing auditors for monthly analysis of that data.  Moving forward, the Defendant Processor would upload data in real-time to Agri Stats,

and internal auditors would examine the uploaded data and perform monthly audits.

160.178.     There is no plausible, non-conspiratorial justification for Defendant Processors, with Agri Stats' agreement and participation, to have secretly shared, on a monthly basis, highly confidential and proprietary information about their *current* compensation to chickenpoultry processing plant workers, as broken down by worker position.  In a competitive market, such proprietary, competitively sensitive information would remain a closely guarded secret.

179.    Sharing the detailed compensation data contained in the Agri Stats reports between Defendant Processors was unnecessary for controlling costs.  If a Defendant Processor sought to lower its costs, it was free to do so without first exchanging disaggregated, current, granular, competitively sensitive compensation data with rival poultry processors.

180.    The data exchanged between Defendant Processors through Agri Stats bears all the hallmarks of an enforcement mechanism for an anticompetitive compensation scheme.  The information contained in Agri Stats reports was current and specific to individual poultry processors and their plants.  The information about each Defendant Processor's compensation was detailed, including average salary and hourly wage rates for each poultry processing plant position, both nationwide and broken down by region.  Moreover, none of the Agri Stats information exchanged between Defendant Processors was publicly available.  Indeed, Defendant Processors were required to pay millions of dollars over the Class Period to access the compensation data, and Agri Stats only allowed a Defendant Processor to receive compensation data if that processor reciprocated and shared detailed compensation data.  Accordingly, Agri Stats's collection and dissemination of such competitively sensitive compensation data allowed the Defendant Processors to compare and coordinate their compensation decisions and police each other for any

63

violations of the conspiracy as they occurred.

161.181.    Defendant Processors' monthly exchange of detailed, current, and disaggregated information regarding the wagescompensation of chickenpoultry processing workers was anticompetitive.  It resulted in lower compensation for all Class Members than each would have received in a competitive market, and it materially increased the profits of Defendants Processors.

162.182.    On February 15, 2017, in an article titled "Is the Chicken Industry Rigged?," *Bloomberg Businessweek* reported, "Armed with Agri Stats data, the biggest chicken producers have been enjoying an unprecedented era of stability and profitability.  At Tyson, operating margins in the chicken division have risen sharply since 2009, when they were 1.6 percent, according to SEC filings.  The next year they were up to 5.2 percent.  After a brief dip, they climbed to 7.9 percent in 2014, an astounding 12 percent in 2015, and 11.9 percent in 2016.  A similar trend has been under way at Pilgrim's Pride, where operating margins went from 3.08 percent in 2012 to 14.02 percent in 2014 and 12.77 percent in 2015, according to data compiled by Bloomberg.  The recovery from recession accounts for some of the gains, but the poultry industry's profit margins still have been abnormally fat and long-lasting by historical standards."

163.183.    Agri Stats has profited from collecting and reporting Defendants Processors' confidential business information, including by charging substantial fees of hundreds of thousands of dollars annually to each Defendant Processor.  During the Class Period, the Defendant Processors paid millions of dollars to Agri Stats.

**3.  Plant-to-Plant Communications About Compensation**

164.184.    In furtherance of the wagecompensation-fixing conspiracy, the individual plants owned and operated by the Defendant Processors often engaged in bilateral exchanges of

64

~~wage~~compensation information with competing ~~chicken~~poultry processing plants in the same region.  The information obtained from these data exchanges was provided to the corporate headquarters of the respective Defendant Processors, which used this regional information to facilitate the setting of artificially depressed ~~wages~~compensation.

~~165.~~185.    A former employee of a Pilgrim's ~~chicken~~poultry processing plant said that corporate headquarters would ask each plant to obtain information about current and future ~~wages~~compensation at competing ~~chicken~~poultry processing plants.  That information was often obtained *directly* from those competing ~~chicken~~poultry processing plants through information-sharing channels.

~~166.~~186.    A former employee of Peco Foods said that human resources managers at local ~~chicken~~poultry processing plants "shared [~~wage~~compensation information] within the industry" all the time.  He explained that "local plants talk" and "knew what competitors are doing and how much they are paying."  He said that human resources staff would often contact their counterparts at a competitor plant and share information about starting pay rates, pay increases and employment benefits.  He explained that this "type of thing happened all the time."

~~167.~~187.    These plant-to-plant communications often involved the exchange of detailed ~~wage~~compensation data regarding *future* wages (which are not part of Agri Stats reports).  For example, these exchanges were sometimes initiated by a Defendant Processor's plant if a competing ~~chicken~~poultry processing plant was expanding and thus intended to hire a large number of new workers.  In that situation, the plant initiating the exchange of ~~wage~~ ~~information~~compensation data is seeking to ensure that its wages will be like those at the newly expanded plant, in order to avoid turnover and wage competition for labor.

~~168.~~188.    For example, a Pilgrim's ~~chicken~~poultry processing plant in Mayfield,

65

Kentucky requested and obtained the pay rates of plant workers from competitor ~~chicken~~poultry processing plants in the fall of 2017.  A rival Tyson ~~chicken~~poultry processing plant in nearby Union City, Tennessee was planning to expand its "live hang" operation.  As a result, a plant manager at Pilgrim's Mayfield plant reached out to a counterpart at Tyson's Union City plant and obtained *future* pay rates for processing line positions at the newly expanded plant.  During the same time period, another manager at Pilgrim's Mayfield plant contacted a counterpart at a nearby Perdue poultry processing plant in Bowling Green, Kentucky and obtained that rival plant's pay rates for processing line workers.  These and other pay rates obtained from competing poultry processing plants were compiled into a single document and transmitted to senior executives at Pilgrim's corporate headquarters.  A former employee of Pilgrim's explained that these kinds of exchanges of ~~wage~~compensation data between regional Pilgrim's, Tyson and Perdue plants had been occurring for years.

189.   A former employee of Butterball explained that the company's poultry processing plant in Mount Olive, North Carolina would regularly exchange hourly wages for specific positions with other nearby poultry processors.  The former Butterball employee explained that when the Butterball plant requested hourly wage data from a rival poultry processing plant, the Butterball plant would share its own wage data with that rival processor so that the companies could "compare" their compensation schedules.

~~169.~~190.     A former employee of Wayne Farms, who worked out of the company's corporate offices, was tasked with developing pay bands for processing plant workers.  To assist with that project, the former employee distributed surveys to multiple ~~chicken~~poultry processors in the Southeast region during the Class Period that requested information about ~~wages~~compensation paid to processing plant positions.  The survey was disseminated through an

email listserv to dozens of other ~~chicken~~poultry processing plants in the Southeast region. Multiple ~~processing plants~~poultry processors returned completed surveys to the former Wayne Farms employee.

170.191.     A former employee of Perdue during the Class Period stated that the company sometimes distributed wage surveys to competing ~~chicken~~poultry processors.

192.     A former human resources manager who worked at both a Perdue poultry processing plant and a George's poultry processing plant during the Class Period stated that both plants exchanged data with rival poultry processing plants on an annual basis. The former human resources manager explained that managers of the Perdue plant and the George's plant contacted managers of rival poultry processing plants operated by Pilgrim's, Cargill and Virginia Poultry Growers Cooperative and requested the *current* hourly wage rates for plant workers as well as any planned *future* increases to those hourly wage rates. The former human resources manager said, "We would collaborate. We would talk among each other to see what they were doing for pay." The former human resources manager provided the compensation data obtained from rival poultry plants to the corporate headquarters of Perdue or George's.

171.193.     Defendant Processors also arranged and conducted tours of each other's ~~chicken~~poultry processing plants as a means to exchange information. For example, in April ~~19-21,~~ 2013, Pilgrim's CEO Bill Lovette, Perdue Chairman of the Board Jim Perdue, and Sanderson Farms President Lampkin Butts attended a "Chicken Media Summit" in North Carolina that included visits by attendees to a local Sanderson Farms poultry processing plant. Similarly, in April ~~19-21,~~ 2015, another "Chicken Media Summit" was held on Maryland's Eastern Shore, and it included tours of one of Perdue's local poultry processing plant. Upon information and belief, these and other plant tours included discussion of labor practices.

67

**4. Plus Factors that Render the ~~Chicken~~Poultry Industry Susceptible to Collusion**

~~172.~~194.     The ~~chicken~~poultry processing industry is characterized by numerous features, or plus factors, that render the industry particularly susceptible to collusion and bolster the plausibility of the conspiracy alleged herein.  These include: (1) vertical integration; (2) high barriers to entry; (3) industry concentration; (4) fungibility of ~~chicken~~poultry processing plant labor; (5) inelastic labor supply; (6) ~~numerous opportunities to collude~~a history of government investigations into collusive actions; (7) personal relationships between executives at competing ~~chicken~~poultry processors;  and  (8)  ~~a  history  of  government  investigations  into  collusive actions~~numerous opportunities to collude.

~~173.~~195.     The ~~chicken~~poultry industry is, by far, the most vertically integrated segment of agriculture.   Defendant Processors own and operate nearly every stage of ~~chicken~~poultry production, from the feed mills to the hatcheries to the processing plants. Accordingly, Defendant Processors control the compensation of the vast majority of workers in the *entire* ~~chicken~~poultry industry.  Defendant Processors can and do leverage that power to form and    implement    ~~wage~~a    compensation-fixing    ~~conspiracies~~conspiracy    that    ~~preclude chicken~~precludes employees of poultry processing ~~workers~~plants from switching to alternate higher-paying positions within the ~~chicken~~poultry industry.

~~174.~~196.     The ~~chicken~~poultry processing industry is characterized by high entry barriers.   These barriers include the high costs of: constructing and operating a processing complex, including hatcheries, feed mills, and processing plants; establishing and operating a distribution network capable of delivering poultry products to grocery chains or wholesalers; developing and investing in a skilled contract-farmer base; and ensuring compliance with onerous

federal and state government mandates and regulations.  The cost of constructing a poultry processing complex alone is in excess of $100 million.  As a result, it is exceptionally expensive and logistically complex for new ~~chicken~~poultry processors to emerge and compete with Defendant Processors.

~~175.~~197.    The ~~chicken~~poultry processing industry is highly concentrated.  According to a November 2013 USDA report, "[d]uring the past 16 years, firms in the Broiler industry continued to decrease in number and grow in size, thereby gaining further economies of scale and scope in processing and marketing~~.~~." According to the National Chicken Council, 55 federally inspected Broiler companies operated in 1995, compared with ~~41 companies in 2010." Presently, there are only approximately~~just 30 such companies operating in 2019.  The chicken processing industry's top-eight-firms concentration ratio has increased from 53.1% in 1997 to 79.3% in 2013. Similarly, the turkey processing industry's top-eight-firms concentration ratio exceeds 75%.

~~176.~~198.    ~~Chicken~~Poultry processors view the ~~non-supervisory production and maintenance~~plant workers that comprise the Class as fungible.  Workers within the same positions are generally interchangeable, permitting Defendant Processors to readily compare and match each other's compensation levels.

~~177.~~199.    The market for ~~chicken~~poultry processing workers is characterized by inelastic labor supply.  ~~Due to the demographics and educational background of many chicken processing workers, industry~~Industry-wide changes in ~~wage~~compensation rates do not substantially affect the rate of participation in ~~chicken~~poultry processing positions.

~~178.    Defendants have had numerous opportunities to collude.  As noted above, the senior executives of Defendant Processors responsible for determining wages and benefits for chicken processing plant workers attended multiple in-person meetings during each year of the Class~~

~~Period.  Many of those meetings were sponsored by chicken industry trade associations, such as the U.S. Poultry & Egg Association, the National Chicken Council, the Joint Poultry Industry Human Resources Council, the Georgia Poultry Federation, the North Carolina Poultry Federation, and The Poultry Federation.  Other such in-person meetings were sponsored by Agri Stats and investment banks.~~

~~179.   Executives of Defendant Processors have close personal relationships with each other.  A former employee of Perdue said that management in the industry formed a "tight-knit circle" and exchanged information frequently.  The former Perdue employee noted that, for example, Jim Perdue, chairman of Perdue, and Ronald Cameron, the owner of Mountaire Farms, regularly attend church together.  Another former employee, who worked at three different chicken processing plants operated by Tyson, Pilgrim's and Perdue, said that the senior executives of those three companies knew each other very well.~~

~~180.~~   The history of the ~~chicken~~poultry processing industry is replete with government investigations and collusive actions.  For example, in April 1973, the United States Department of Justice ("DOJ") filed a civil antitrust action against the National Broiler Marketing Association ("NBMA") for conspiring to fix the prices of broilers in violation of Section 1 of the Sherman Act. The DOJ sought to enjoin the NBMA and its dozens of members, including many of the Defendant Processors, from continuing a conference call program whereby members coordinated the pricing and production of broilers.

~~181.~~200.      ~~The~~As for a more recent example, the DOJ is *currently* investigating the chicken industry for engaging in anti-competitive conduct.  In June 2019, the DOJ disclosed that the agency had launched a criminal investigation into whether chicken processors have violated the antitrust laws by fixing the prices of broilers.  Specifically, on June 21, 2019, the DOJ filed a

70

motion requesting that the U.S. District Court for the Northern District of Illinois stay discovery in a civil class action alleging price-fixing by many of the Defendant Processers and other chicken processors.   The DOJ explained that the stay was necessary "to protect the grand jury investigation" into anticompetitive conduct in the chicken industry.

201.   Executives of Defendant Processors have close personal relationships with each other.  A former employee of Perdue said that management in the industry formed a "tight-knit circle" and exchanged information frequently.   The former Perdue employee noted that, for example, Jim Perdue, chairman of Perdue, and Ronald Cameron, the owner of Mountaire Farms, regularly attend church together.   Another former employee, who worked at three different poultry processing plants operated by Tyson, Pilgrim's and Perdue, said that senior executives of those three companies knew each other very well.

202.   Defendants have had numerous opportunities to collude.   In addition to attending the annual "off-the-books" meetings of the Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, the senior executives of Defendant Processors responsible for determining compensation for poultry processing plant workers attended multiple other in-person meetings during the Class Period.   Many of those meetings were sponsored by trade associations that advocate for the interests of the Defendant Processors.  Those meetings include:

a.  Seminars and Meetings of the U.S. Poultry & Egg Association.  The U.S. Poultry & Egg Association describes itself as the world's largest and most active poultry organization, and each Defendant Processor is a member.  Each year of the Class Period, the Association held a Human Resources Seminar, often at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida.   Many of the Defendant Processors' employees responsible for setting plant worker compensation— including senior executives, Vice Presidents of Human Resources, Directors of Compensation, Directors of Benefits, and Compensation Analysts—regularly attended the Human Resources Seminar.  A former employee who worked at three different poultry processing plants operated by Tyson, Pilgrim's and Perdue, said that the attendees at the Association's annual Human Resources Seminar knew each other very well and could have readily discussed compensation of processing plant

71

workers over dinner.  In addition, senior executives of most of the Defendant Processors serve on the board of directors of the Association, and that board conducted in-person meetings four times a year during the Class Period.

b.  Meetings of the National Chicken Council.  The National Chicken Council exclusively represents chicken processors, and its members account for approximately 95 percent of the chicken sold in the United States.  Each Defendant Processor that processes chicken is a member of the National Chicken Council. Senior executives of those Defendant Processors serve on the board of directors of the National Chicken Council, and that board of directors met at least four times a year during the Class Period.  In conjunction with some of these meetings, executives from Agri Stats made presentations, and the CEOs of many Defendant Processors held private dinners.

c.  Meetings of The National Turkey Federation.  The National Turkey Federation represents turkey processors, and its members account for approximately 95 percent of the turkey sold in the United States.  Each Defendant Processor that processes turkey is a member of the National Turkey Federation.  Executives of Defendant Processors that process turkey serve on the board of directors of the National Turkey Federation, and that board of directors met at least twice a year during the Class Period.

d.  Meetings of the Joint Poultry Industry Human Resources Council.  The Joint Poultry Industry Human Resources Council was formed in 2009 by merging the human resources committees of the U.S. Poultry & Egg Association, National Chicken Council and the National Turkey Federation.  The Joint Poultry Industry Human Resources Council is comprised of senior human resources executives, including executives of the Defendant Processors who formed and implemented the compensation-fixing conspiracy.  The Joint Poultry Industry Human Resources Council exclusively focuses on labor issues, such as compensation, and it held an in-person meeting every year during the Class Period, often at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida.

e.  Meetings of the Georgia Poultry Federation.  The Georgia Poultry Federation "is a non-profit trade association which represents the poultry industry in Georgia, the nation's leading broiler[5] producing state."  Many of the Defendant Processors are members of the Georgia Poultry Federation.  It conducted meetings at least three times a year during the Class Period, which were attended by executives of those Defendant Processors.

f.  Meetings of the North Carolina Poultry Federation.  The mission of the North Carolina Poultry Federation "is to create a favorable climate for business success for everyone involved in the poultry industry in North Carolina."  Many of the Defendant Processors are members of the North Carolina Poultry Federation.  It

---

[5] The term "broiler" means chicken raised for meat consumption.

72

conducted several meetings during each year of the Class Period, which were attended by executives of those Defendant Processors.

g.   Meetings of The Poultry Federation.  The Poultry Federation is a non-profit trade organization that represents the poultry and egg industries in Arkansas, Missouri, and Oklahoma.  Many of the Defendant Processors are members of The Poultry Federation.  It conducted several meetings during each year of the Class Period, which were attended by the executives of those Defendant Processors.

**C.  Market Power of Defendant Processors**

   **1.   Direct Evidence of Market Power**

203.    The strongest evidence that Defendant Processors and co-conspirators collectively possessed the requisite *power* to suppress compensation for poultry plant workers is that they *actually* suppressed such compensation during the Class Period.[6]  As detailed above in section VI(B), numerous former employees confirmed that Defendants and co-conspirators used a three-pronged strategy to suppress salaries, wages, and benefits paid to poultry processing workers.  First, a secretive "Compensation Committee" convened annual "off the books" meetings in Florida, where executives of Defendant Processors and co-conspirators discussed the results of the highly detailed WMS survey and agreed what they would pay Class Members.  The Defendant Processors ensured that each member of the Compensation Committee adhered to the agreement.  For example, during the annual "off the books" meetings, executives of the Defendant Processors would present detailed comparisons about how actual salary changes and bonus budgets from the preceding year compared with the *planned* salary changes and bonus budgets that had been collectively devised at the previous year's meeting.  Defendants and co-conspirators could not

---

[6] Such "buyer" market power is also referred to as "monopsony power."

carry out such plans in the absence of collective market power.

204.   Second, Defendant Processors and co-conspirators exchanged detailed compensation information regarding processing plant workers through Agri Stats. Former employees of Defendant Processors and co-conspirators confirmed that those companies used Agri Stats data to ensure that they were depressing compensation for poultry processing plant workers. For instance, a former Pilgrim's employee explained that corporate officers would visit Pilgrim's processing plants quarterly to ensure that the plants were not compensating workers more than the "middle" amount reported to Agri Stats.  Similarly, a former employee of Butterball explained that, during union negotiations, the company would insist that wages "would have to be within the parameters" contained in Agri Stats.  The ability of Defendant Processors and co-conspirators to keep wages within Agri Stats "parameters" demonstrates their collective market power.

205.   Third, Defendant Processors and co-conspirators frequently engaged in bilateral exchanges of current and future wage data. For example, a former employee of Butterball explained that the company's processing plant in Mount Olive, North Carolina would regularly exchange hourly wages for specific positions with other nearby poultry processors.  The former Butterball employee explained that when the Butterball plant requested hourly wages from a rival poultry processing plant, the Butterball plant would share its own wage data with that rival processor so that the companies could "compare" their compensation.   Similarly, former employees of Wayne Farms and Perdue explained that those companies disseminated wage surveys directly to other poultry processors during the Class Period.  As one former human resources manager of poultry processing plants operated by Perdue and George's put it, "We would collaborate."  This collaboration could not have been effective if Defendants and co-conspirators did not have the power to suppress wages as a group.

74

206.   More broadly, if the Defendant Processors' and co-conspirators' long-running three-pronged conspiracy to suppress wages was unworkable because they lacked collective market power, they would not have conspired in the first place, and certainly would not have continued doing so.

207.   Defendant Processors' and co-conspirators' meetings and data exchanges were costly: they paid for the WMS survey and Agri Stats reports, spent time and money answering detailed survey questions, paid for senior human resource executives to attend in-person meetings in Florida, and exposed themselves to legal liability. Defendant Processors and co-conspirators would not have continued to incur these annual expenses for the entire Class Period—a solid decade—unless their compensation-fixing and information exchanges were paying dividends in the form of reduced salaries, wages, and/or benefits for poultry processing plant workers. This indicates that Defendant Processors and co-conspirators believed and acted as though they had the market power to profitably suppress wages.

**2.   Indirect Evidence of Market Power**

**a.   Product or Services Market**

~~182.~~208.     The relevant market is the labor market for employment ~~of non-supervisory production and maintenance workers at chicken~~at poultry processing plants in the continental United States ("Relevant Market").

~~183.   The relevant geographic market is the continental United States.~~

~~184.~~209.     A hypothetical cartel that controlled a large share of the Relevant Market, as Defendant Processors and co-conspirators collectively do here, could profitably suppress ~~wages and benefits~~compensation paid to ~~non-supervisory production and maintenance~~ workers at ~~chicken~~poultry processing plants below competitive levels.  In such circumstances, ~~chicken~~poultry

processing workers would not be able to defeat such artificial ~~wage and benefits~~compensation suppression by ~~mobilizing organized opposition or~~ switching employment to other non-conspiring ~~chicken~~poultry processors.

~~185.   Defendant Processors possess market power in the Relevant Market.  Defendant Processors pay compensation to non-supervisory production and maintenance workers at chicken processing plants that comprise more than 90 percent of the Relevant Market.~~

210.   There are no close economic and/or functional substitutes for ~~non-supervisory production and maintenance~~employment at poultry processing plants from the perspective of workers at those plants. As discussed above, many hourly-paid workers ~~at chicken~~in poultry processing plants ~~do not speak English and lack significant education.  Accordingly, many hourly-paid workers in poultry processing plants cannot easily obtain stable employment at a similar level of compensation outside the poultry industry.

211.   Employees in the industry have continually noted these language and educational challenges that many poultry processing workers face.  A former employee of Pilgrim's during the Class Period explained that many poultry processing plant workers never graduated from high school and did not speak English and thus were limited from pursuing work outside a poultry processing plant.  A former employee of George's during the Class Period explained that poultry processors "catered" to workers who did not speak English and lacked a strong educational background and that it would be difficult for poultry processing plant workers to find employment outside a poultry processing plant because of "communication issues."  Similarly, a former human resources manager at a Tyson poultry processing plant explained that poultry processors recruited and thrived from an "underprivileged" workforce that had difficulty communicating in English and had a very limited ability to obtain jobs outside the poultry industry.  Indeed, Tyson has

76

formally recognized this challenge faced by its workforce by instituting a program to "enable hourly employees to access English as a second language." Thus, many unskilled or low-skilled jobs such as retail sales, fast food or some manual labor jobs—which require proficiency in English—are not a reasonable substitute for the majority of workers in the Relevant Market.

212.    In addition, unskilled and low-skilled jobs are not reasonable substitutes for work at poultry processing plants because those jobs rarely pay more than the minimum wage.  By contrast, poultry plant workers earn significantly more than most minimum wages.  In part, this is because poultry processing workers have some industry and employer-specific skills, and employers in the poultry processing industry are willing to pay for those skills.  Additionally, as explained above, poultry processing work is extremely dangerous.  The types of workers who choose to work in a poultry processing plant prefer to receive extra pay for dangerous labor, instead of accepting lower wages at safer positions.  This indicates that unskilled and low-skilled jobs are not reasonable economic substitutes for employment in the Relevant Market, which mostly pay hourly wages well above the minimum wage (but at the same time, less than what poultry processing plant workers would make in a competitive market).

213.    Similarly, employment at non-poultry meat processing plants is not a reasonable substitute for employment in the Relevant Market.  For example, beef processing plants pay processing plant workers substantially more than employers in the Relevant Market—on average beef processing plants pay 25% to 35% higher compensation to plant workers than employers pay in the Relevant Market.  This indicates that workers in the Relevant Market cannot readily switch to a job at a beef processing plant because, if such a switch was readily available, employers in the Relevant Market would have had to substantially increase their compensation so as not to lose too many employees to beef processors.  The fact that such a significant wage differential can be

77

maintained indicates that beef processing jobs require skills and/or worker attributes that cannot be readily obtained by workers in the Relevant Market, or that beef processing jobs are more dangerous and thus less appealing to workers in the Relevant Market.  These differences indicate that beef processing jobs are not functionally interchangeable with jobs in the Relevant Market.

214.   There are also significant lock-in effects that result from developing skills and experience specific to the Relevant Market.  For example, once on the job for an appreciable period, poultry processing plant workers learn new skills, such as those necessary for effectively deboning birds on processing lines. Wayne Farms recognizes this on its website where the company advertises to potential workers that they can "develop new skills on the job."  Defendant Processors value these skills in experienced poultry processing plant workers and recognize that such skills are differentiated from those necessary for other jobs.  For example, Tyson's "Talent Strategy" seeks to hire poultry workers with "the differentiated capabilities and skills that we need for the future."  Perdue notes its poultry workers' "unique talents."

215.   Those skills are not transferrable to other jobs even if those other jobs may be generally termed as low-skilled.  For example, the skill of deboning a chicken or turkey makes a poultry processing plant worker a more valuable employee for poultry processing companies, but not for other companies seeking low-skilled manual labor.  As a result, workers in the Relevant Market receive higher wages as they gain more experience working in poultry processing plants (even if those wages are suppressed by the conspiracy).  Indeed, each Defendant Processor materially increases wages to processing plant workers according to their level of experience, which correlates to their skill level and productivity.  Those higher wages received for greater skill and experience reduce the substitutability of jobs outside of the Relevant Market and make remaining in poultry processing plant positions more attractive to plant workers.  In other words,

78

those higher wages increase the switching or transaction costs of seeking a position outside the Relevant Market that would not value the skills obtained by the poultry processing plant worker.

216.    These lock-in affects arising from the development of job-specific skills apply with additional force to salaried poultry processing workers in the Class.  These salaried positions require even more training and skills specific to poultry processing that would not be transferable to occupations outside of the Relevant Market and therefore make it even more difficult for salaried poultry processing workers to switch to occupations outside of the Relevant Market.

186.217.    Poultry processing plant workers, like most laborers, cannot withhold their services until a later date as a means of negotiating for higher compensation.  They depend on a regular income.  This weakens their negotiating position with poultry processing employers and enhances the Defendant Processors require such workers to process chickensProcessors' market power.

218.    Recent empirical econometric work has found that many low-skilled occupations face sufficiently inelastic labor supply curves that the occupation would be considered a relevant antitrust market that would satisfy the hypothetical monopsonist test.  One recent paper analyzed low-skilled labor markets defined by the 6-digit Standard Occupational Classifications (SOC) tracked by the Bureau of Labor Statistics and found that for each such occupation, a hypothetical monopsonist would find it profitable to decrease wages by at least 5% or more.[7]  The paper demonstrates economically that low-skilled occupations can be relevant antitrust markets and thus supports the plausibility of the Relevant Market.

**b.  Geographic Market**

219.    The relevant geographic market is the continental United States.  A slight decrease

---

[7] Jose Azar, Steven Berry, and Iona Marinescu, *Estimating Labor Market Power* (Sep. 18, 2019) *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3456277.

in compensation from the competitive level could be imposed collectively by the poultry processors in the continental United States without causing too many poultry workers to leave the country or move to a different occupation.

187.220.    Defendant Processors set their compensation and recruiting policies for poultry processing plant workers largely on a nationwide basis, and therefore treat such workers as if the they were participating in a nationwide labor market. Each Defendant Processor provides compensation to non-supervisory production and maintenance employees at its chickenpoultry processing plants at identical or near identical levels, regardless of the region of the country, state, county or locality in which the company's plants are located.  Because each Defendant Processor pays the same, or nearly the same, wages and benefitscompensation to its to non-supervisory production and maintenance employees at chickenpoultry processing plants regardless of geographic region, state, county or locality, conduct that suppresses compensation to those non-supervisory production and maintenance workers employees in one chickenpoultry processing plant location would necessarily suppress compensation to non-supervisory production and maintenance workers employees in all of the Defendant Processor's chickenpoultry processing plants in all the geographic regions ofthroughout the continental United States.

188.    Absent the conduct challenged in this Complaint, Defendant Processors would consider each other to be competitors for non-supervisory production and maintenance workers at chicken processing plants, given that Defendant Processors (a) each own and operate at least one chicken processing plant that is within 28 miles of another Defendant Processor's chicken processing plant; (b) could open or acquire chicken processing plants in areas where another Defendant Processor already operates; and (c) compete with each other on a nation-wide basis to recruit and incentivize non-supervisory production and maintenances workers to move to areas

80

where the Defendant Processors operate chicken processing plants.

### c.   ~~Defendants~~High Collective Market Share and Monopsony Power

~~189.~~221.     Defendant Processors and co-conspirators collectively possess market and monopsony power in the Relevant Market in that they have the power, collectively, and through the challenged conduct, to profitably suppress compensation to ~~non-supervisory production and maintenance~~ workers at ~~chicken~~poultry processing plants below competitive levels.

222.     Defendant Processors and co-conspirators pay compensation to workers at poultry processing plants that comprise more than 90 percent of the Relevant Market.

### D. Anticompetitive Effects and Injury Suffered by Class Members

~~190.~~223.     As a result of Defendants' anticompetitive conduct alleged herein, competition between Defendant Processors over ~~wages and benefits~~compensation was restrained or eliminated in the market for ~~non-supervisory production and maintenance~~ workers in ~~chicken~~poultry processing plants in the continental United States during the Class Period.

~~191.~~224.     As a result of Defendants' anticompetitive conduct alleged herein, the ~~wages and benefits~~compensation of ~~non-supervisory production and maintenance~~ workers in ~~chicken~~poultry processing plants in the continental United States were fixed, stabilized, or maintained at artificially depressed levels during the Class Period.

~~192.~~225.     The purpose of the conspiratorial conduct of the Defendants was to depress, fix, or maintain the ~~wages and benefits~~compensation of ~~non-supervisory production and maintenance~~ workers in ~~chicken~~poultry processing plants in the continental United States and, as a direct and foreseeable result of the conspiratorial conduct, Plaintiffs and the Class received ~~wages and benefits~~compensation at artificially-depressed rates during the Class Period.

~~193.~~226.     By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their businesses or property, having received lower ~~wages and~~

81

benefitscompensation during the Class Period than they would have received in the absence of Defendants' illegal contract, combination, or conspiracy.  As a result, Plaintiffs and the Class have suffered damages.

194.227.   This is an injury of the type that the antitrust laws were meant to punish and prevent.

195.228.   An analysis conducted by economists retained by Plaintiffs shows that the discrepancy between the wagesearnings of workers employed by food manufacturers broadly (including manufacturers of grain, sugar, dairy, seafood and other foods) and the wagesearnings of workers employed by chicken processing plantspoultry processors materially increased during the Class Period.  To conduct the analysis, the economists relied on publicly available data obtained from the U.S. Bureau of Labor Statistics, which maintains distinct compensation data for poultry processing workers (i.e. NAICS Code 311615).  According to the preliminary economic analysis, that discrepancy sharply expanded at the onset of the difference between the weekly earnings of workers employed by food manufacturers broadly and the weekly earnings of workers employed by poultry processors was, on average, $103.79 during the ten-year period prior to the Class Period., and subsequently increased to, on average, $127.30 during the Class Period.

196.   A 2015 report published by Oxfam America about chicken processing plant workers titled "Lives on the Line" states, "Over the last 30 years or so, the real value of wages has declined dramatically—almost 40 percent since the 1980s.  Meanwhile, compensation for poultry executives is soaring: In just the last four years, compensation for Tyson's chairman rose 260 percent to $8.8 million; compensation for Pilgrim's president and chief executive officer rose 290 percent to $9.3 million."

229.   During the Class Period, as a result of the conspiracy to restrain and depress

compensation, the hourly wages of poultry processing plant workers employed by Defendant Processors often only increased approximately 25 cents a year.  These annual "raises" for poultry processing plant workers were perceived by Defendant Processors to be merely cost-of-living adjustments, rather than material increases to compensation.

230.    A former human resources manager at a Tyson poultry processing plant explained that, in practice, these limited annual raises to hourly wages rarely increased total compensation for poultry processing workers because those raises were effectively offset by annual increases to health insurance premiums.  According to the former Tyson human resources manager, poultry processing plant workers "really never get ahead" of their starting wage.

197.231.    While wages and benefitscompensation paid to Plaintiffs and the Class werewas artificially depressed during the Class Period, the productivity of those workers greatly increased.  A primary reason for that increase in productivity is that processing line speeds were substantially increased.  Between 1999 and 2015, line speeds increased by 54%, poultry production increased by nearly 35%, but inflation-adjusted hourly wages for poultry processing workers, in fact, decreased by more than 1%.  As a result, even while Plaintiffs and the Class worked harder during the Class Period, the wages and benefitscompensation received by them werewas artificially depressed.  Thus, while labor productivity in Defendant Processors' chickenpoultry processing plants has substantially increased over the past two decades, labor costs have declined for Defendant Processors during that same period.

198.232.    In a competitive market, Defendant Processors would have competed to recruit, hire and retain non-supervisory production and maintenance workers during the Class Period by offering higher wages, higher salaries and superior benefits, and many Class Members would have switched employment to different Defendant Processors as a result of that competition

for labor.  Yet, by entering into the alleged conspiracy, Defendant Processors were able to reduce and stabilize turnover rates.  Defendants' scheme ~~to fix and depress wages and benefits~~ harmonized compensation to Class Members across the poultry processing industry and thus reduced the incentive for Class Members to switch employment between Defendant Processors.

233.   The effects and injuries caused by Defendants' ~~agreements~~anticompetitive agreement commonly impacted all ~~non-supervisory production and maintenance~~ workers at ~~their chicken~~Defendant Processors' poultry processing plants in the continental United States because Defendant Processors valued internal equity, i.e. the idea that similarly situated employees should be compensated similarly.  Each Defendant Processor established a pay structure to accomplish internal equity.  ~~For example, a former employee of Perdue explained that hourly wage increases for chicken processing plant workers were made company-wide.~~  Defendant Processors fixed narrow ~~wage~~compensation ranges for their ~~chicken~~poultry processing plant workers in the continental United States with similar job positions and similar levels of experience and also maintained certain ~~wage differentials between different chicken processing plant positions.~~compensation differentials between different poultry processing plant positions.  For example, a former employee of Perdue explained that hourly wage increases for positions in processing plants were made company-wide.  Similarly, a former employee of Tyson explained that the company paid poultry processing plant workers "consistently" within each division and position, regardless of the plant's location.

~~199.~~

**VII.    STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS**

**A. Continuing Violation**

~~200.~~234.    During the Class Period, Defendants' conspiracy was a continuing violation

84

in which Defendants repeatedly invaded Plaintiffs' and Class Members' interests by adhering to, enforcing, and reaffirming the anticompetitive ~~agreements~~agreement described herein.  Indeed, Defendants continue to exchange competitively sensitive information regarding, and to discuss and ~~agree~~reach agreement on, ~~wages and benefits~~compensation to pay Class Members through the present.

~~201.~~235.    Defendants' continuing adherence to, enforcement of and reaffirmation of the anticompetitive ~~agreements~~agreement throughout the Class Period was and is consummated through, among other conspiratorial acts, "off the books" in-person meetings conducted each year to discuss and fix compensation to Class Members, the monthly exchange of competitively sensitive ~~wage~~compensation data through Agri Stats, the renewal of subscriptions to Agri Stats, participation in annual ~~wage and benefits~~compensation surveys operated by WMS, and other communications between Defendants.

**B. Fraudulent Concealment**

**1. Plaintiffs Did Not and Could Not Have Discovered Defendants' Misconduct**

~~202.~~236.    Plaintiffs and other Class Members had neither actual nor constructive knowledge of the facts constituting their claim for relief.  Plaintiffs and Class Members did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint.  Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy to fix and depress ~~wages and benefits~~compensation paid to ~~non-supervisory production and maintenance~~ workers in ~~chicken~~poultry processing plants.

~~203.~~237.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing.  ~~Neither chicken~~Poultry processors ~~nor compensation to chicken processing plant~~

85

workers are~~are not~~ exempt from antitrust regulation, and thus, Plaintiffs reasonably considered ~~it~~ the poultry processing industry to be ~~a~~ competitive ~~industry~~ until recently.   Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of wages ~~and~~, salaries or benefits paid by Defendant Processors to ~~non-supervisory production and maintenance~~ workers in ~~chicken~~poultry processing plants in the continental United States.

~~204.~~238.      Plaintiffs exercised reasonable diligence.   Plaintiffs and the other Class Members could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and co-conspirators to conceal their combination.

**2.   Defendants Actively Concealed the Conspiracy**

~~205.~~239.      Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and the other Class Members.

~~206.~~240.      The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to conducting secret "off the books" meetings, engaging in surreptitious communications that do not create or involve written records, exchanging competitively sensitive ~~wage~~compensation data through a nonpublic and proprietary system, and concealing the existence and results of commissioned ~~wage~~compensation surveys.  Defendants formed and implemented the combination and conspiracy in a manner specifically designed to avoid detection.

~~207.~~241.      During the Class Period, Defendants affirmatively and falsely represented that they paid wages, salaries and benefits reflective of a competitive market for labor.   For

example, in October 2015, in response to a report from Oxfam America decrying compensation and working conditions in chicken processing plants in the United States, ~~Tysons~~Tyson said in a statement, "We believe in fair compensation, a safe and healthy work environment and in providing workers with a voice." Perdue also responded to the Oxfam America report by stating in October 2015 that the company provides "competitive wages" above minimum wage. That same month, the National Chicken Council and U.S. Poultry & Egg Association—the two leading trade associations that are controlled by and represent the interests of Defendant Processors— issued a joint statement that provides~~,~~: "Poultry processing plants compete for the local workforce and therefore must pay competitive wages and offer competitive benefits. … Poultry processing companies offer competitive insurance benefits that includes family and dependent coverage." These false representations were used to conceal the conspiracy.

242. Defendant Processors also advertised to potential processing plant employees that ~~their wages~~the compensation offered and ~~benefits were~~provided was "competitive," *i.e.* the result of competition in the labor market for ~~chicken~~poultry processing plant employees. For example, Tyson claims in public advertisements that its compensation is "competitive." The company further states on its website, under the title "Fair Compensation": "We offer employees competitive pay and benefits…" ~~These representations falsely indicate that Tyson's compensation is determined through competition in the labor market with other Defendant Processors.~~ Similarly, Perdue advertises on its website: "We offer competitive wages and a comprehensive benefits package…" ~~This statement~~Wayne Farms advertises on its website that it offers "comprehensive and competitive" benefits. Sanderson Farms' Chief Operating Officer called the company's wages and benefits "among the most comprehensive offered in the poultry industry, or for that matter, any industry." Indeed, all Defendant Processors have made similar statements that falsely

87

indicates that Perdue's~~indicated Defendant Processors'~~ compensation ~~is~~for poultry processing plant workers was determined through genuine competition in the labor market with other Defendant Processors.

~~208.~~243.     Agri Stats also has taken affirmative steps to conceal its involvement in the compensation-fixing conspiracy alleged herein.  In 2009, the President of Agri Stats, Bryan Snyder, commented on the secretive nature of Agri Stats: "Agri Stats has always been kind of a quiet company.  There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect.  We don't advertise.  We don't talk about what we do."  Indeed, only qualified entities willing to pay millions of dollars in fees to Agri Stats could have accessed the compensation data maintained by the company during the Class Period.  In fact, it was not until 2017 that the poultry industry's use of Agri Stats was even widely known or reported.

~~209.~~244.     By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and the other Class Members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

## VIII.   CLASS ACTION ALLEGATIONS

~~210.~~245.     Plaintiffs bring this action on behalf of themselves, and on behalf of the members of the following class, under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3):

All persons employed by Defendant Processors ~~as non-supervisory production and maintenance workers at chicken~~at poultry processing plants in the continental United States from January 1, 2009 until the present.

~~211.~~246.     The following persons and entities are excluded from the proposed Class: complex managers, plant managers, human resources managers, human resources staff, office

clerical ~~employees~~staff, guards, watchmen, and salesmen~~, foreman, supervisors and executives employed by Defendants~~; Defendants, co-conspirators, and any of their subsidiaries, predecessors, officers, or directors; and federal, state or local governmental entities.

~~212.~~247.      The Class definition ~~mirrors the definition of employees as used by the Defendants and in the industry, including in contracts between unions and the Defendant Processors and in Defendant Processors' own human resources records.  As such, it~~ provides clear, objective criteria understood by ~~class members~~ Class Members and Defendants, and it allows the parties to identify ~~class~~the members of the Class.

~~213.~~248.      Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed.

~~214.~~249.      The Class is so numerous that joinder of all members in this action is impracticable.  Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contains hundreds of thousands of similarly situated workers.

~~215.~~250.      The Class is readily identifiable and is one for which records should exist.

~~216.~~251.      Plaintiffs' claims are typical of those of the Class.  Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

~~217.~~252.      Plaintiffs and Class Members were injured by the same unlawful conduct, which resulted in them receiving less in compensation for working in ~~chicken~~poultry processing plants than they would have in a competitive market.

~~218.~~253.      Plaintiffs will fairly and adequately protect and represent the interests of the Class.  The interests of the Plaintiffs are aligned with, and not antagonistic, to the Class.

~~219.~~254.      Questions of law and fact common to the Class Members predominate over

89

questions, if any, that may affect only individual members because Defendants have acted and refused to act on grounds generally applicable to the Class Members.

~~220.~~255.     Questions of law and fact common to the Class include:

a. Whether Defendants engaged in an agreement, combination, or conspiracy to fix, depress, maintain, or stabilize the ~~wages and benefits~~compensation paid to Class Members;

**Formatted:** Numbered + Level: 2 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 0.75" + Indent at:  1"

b. Whether Defendants' exchange of nonpublic, competitively sensitive information about ~~wages and benefits~~compensation paid to Class Members constitutes, or furthered, an agreement, combination, or conspiracy in restraint of trade;

c. Whether such agreements constituted violations of the Sherman Antitrust Act;

d. The identity of the participants of the alleged conspiracy;

e. The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

f. Whether Defendants fraudulently concealed their misconduct;

g. Whether and to what extent Defendants' anticompetitive scheme suppressed ~~wages and benefits~~compensation paid to Class Members below competitive levels;

h. The nature and scope of injunctive relief necessary to restore competition; and

i. The measure of damages suffered by Plaintiff and the Class.

~~221.~~256.     Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

~~222.~~257.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum

90

simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.  The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged.  Further, individual joinder of all damaged members of the Class is impractical, and the prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.   Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that is not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

~~223.~~258.      Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## IX.     CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### CONSPIRACY TO DEPRESS COMPENSATION IN VIOLATION OF
### SECTION 1 OF SHERMAN ANTITRUST ACT

~~224.~~259.      Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

~~225.~~260.      Beginning in January 1, 2009, and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to fix, depress, maintain and stabilize the ~~wages and benefits~~compensation paid to ~~non-supervisory production and maintenance~~ workers at Defendant Processors' ~~chicken~~poultry processing plants in the continental United States, in violation of

Section 1 of the Sherman Act, 15 U.S.C. § 1.

226.261.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to:

    a.  Reached agreements—through in-person meetings, exchanges of information, and other communications—to fix, depress, maintain and stabilize the ~~wages and benefits~~compensation paid to ~~non-supervisory production and maintenance~~ workers at Defendant Processors' ~~chicken~~poultry processing plants in the continental United States;

    b.  Implemented, monitored and enforced that conspiracy to depress compensation through the regular exchange of competitively sensitive, nonpublic, and detailed ~~wage and benefits~~compensation data with the assistance of Agri Stats and WMS; and

    c.  Paid the fixed, depressed, maintained and stabilized ~~wages and benefits~~compensation to their ~~non-supervisory production and maintenance workers~~employees at ~~their chicken~~poultry processing plants in the continental United States.

227.262.    Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Act.

228.263.    The combination and conspiracy alleged herein has had the following effects, among others:

    a.  Competition for the hiring and retaining ~~and hiring of non-supervisory production and maintenance~~of workers at Defendant Processors' ~~chicken processors~~poultry

92

processing plants has been restrained, suppressed, and/or eliminated in the continental United States; and

b. ~~Wages and benefits~~Compensation paid to ~~non-supervisory production and maintenance workers employed~~employees at ~~Defendants' chicken processors~~Defendants Processors' poultry processing plants ~~have~~has been fixed, depressed, maintained and stabilized at artificially low, noncompetitive levels throughout the continental United States.

~~229.~~264.    Plaintiffs and the other Class Members have been injured and will continue to be injured in their businesses and property by receiving less ~~in wages and benefits~~compensation from Defendant Processors than they would have in the absence of the combination and conspiracy.

**SECOND CLAIM FOR RELIEF**
**CONSPIRACY TO EXCHANGE COMPENSATION INFORMATION**
**IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT**

~~230.~~265.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

~~231.~~266.    Beginning in January 1, 2009, and continuing through the present, Defendants and their co-conspirators have engaged in a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about the compensation being paid or to be paid to their ~~to non-supervisory production and maintenance workers~~employees at ~~chicken~~poultry processing plants in the continental United States.  This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

~~232.~~267.    The relevant market is the labor market for employment ~~of non-supervisory~~

93

~~production and maintenance workers at chicken~~at poultry processing plants in the continental United States, and the relevant geographic market is the continental United States.

~~233.~~268.    Defendant Processors and co-conspirators collectively possess market power in the Relevant Market.  Defendant Processors and co-conspirators together control more than 90 percent of the Relevant Market.  Defendant Processors' and co-conspirators' collective market power includes the power to jointly set compensation for ~~non-supervisory production and maintenance~~ workers at ~~chicken~~poultry processing plants in the continental United States below competitive levels.  This joint power clearly exists because it has been used by Defendant Processors and co-conspirators to pay Class Members sub-competitive compensation.

~~234.~~269.    Defendants could and did profitably suppress ~~wages and benefits~~compensation paid to ~~non-supervisory production and maintenance~~ workers at ~~chicken~~poultry processing plants in the continental United States below competitive levels.  In such circumstances, ~~chicken~~poultry processing workers would not be able, and were not able, to defeat such artificial ~~wage and benefits~~compensation suppression by switching their employment to non-conspiring ~~chicken~~poultry processors, as ~~Defendants~~Defendant Processors and co-conspirators control more than 90 percent of the ~~chicken~~poultry processing plants.

~~235.~~270.    A slight decrease in compensation to ~~non-supervisory production and maintenance~~ workers at ~~chicken~~poultry processing plants in the continental United States from a competitive level could be imposed collectively by the Defendant Processors without causing too many such workers to switch employment to non-~~chicken industries.  Many of these workers are often constrained from switching employment to non-poultry industries because of their limited education, their limited language skills, their limited job skills, the absence of job opportunities, their legal status, the expense of moving, and/or other obligations.~~poultry occupations.

94

236.271.    Defendant Processors view the non-supervisory production and maintenance workers that comprise the Class as fungible.  Workers within the same positions are generally interchangeable, permitting Defendant Processors to readily to compare and match each other's compensation.

237.272.    The information regularly exchanged by Defendants pursuant to the agreement has consisted of detailed, competitively sensitive and non-public information about current and future compensation to non-supervisory production and maintenance workers at chickenpoultry processing plants.  The information exchanges specifically included:

a. The exchange each month, through Agri-Stats, of effective hourly wagescurrent compensation for categories of non-supervisory production and maintenance workerworkers at chickenpoultry processing plants in the continental United States operated by Defendant Processors;

b. The exchange each year, through the WMS survey, of salaries, wages and benefits and hourly wages provided to each category of non-supervisory production and maintenance workerposition at chickenpoultry processing plants in the continental United States operated by Defendant Processors;

c. Frequent exchanges between plant managers—through telephone calls, emails and electronic listservs—of current and future wages and benefitscompensation paid to each categorycategories of non-supervisory production and maintenance workerworkers at particular chickenpoultry processing plants operated by Defendant Processors.

238.273.    Defendant Processors' regular compensation information exchanges, directly and through Agri Stats and WMS, reflected concerted action between horizontal

95

Formatted: Numbered + Level: 1 + Numbering Style: a, b, c, ... + Start at: 1 + Alignment: Left + Aligned at: 0.75" + Indent at: 1"

competitors in the ~~market for chicken processing plant labor~~Relevant Market.

239.274.    Each Defendant Processor furnished competitively sensitive information to other Defendant Processors with the understanding that it would be reciprocated.  That is, one Defendant Processor would not have provided information to Agri Stats or WMS or directly to another Defendant Processor's plants, without the understanding that they would receive comparable information from other Defendant Processors.

240.275.    The exchanging of such compensation information by Defendant Processors is inconsistent with the joint guidance provided by the DOJ and the Federal Trade Commission ("FTC").  In October 2016, the two agencies issued a joint "Antitrust Guidance for Human Resource Professionals."  That Antitrust Guidance states:

> Sharing information with competitors about terms and conditions of employment can also run afoul of the antitrust laws.  Even if an individual does not agree explicitly to fix compensation or other terms of employment, exchanging competitively sensitive information could serve as evidence of an implicit illegal agreement.  While agreements to share information are not per se illegal and therefore not prosecuted criminally, they may be subject to civil antitrust liability when they have, or are likely to have, an anticompetitive effect.  Even without an express or implicit agreement on terms of compensation among firms, evidence of periodic exchange of current wage information in an industry with few employers could establish an antitrust violation because, for example, the data exchange has decreased or is likely to decrease compensation. …

> However, not all information exchanges are illegal. It is possible to design and carry out information exchanges in ways that conform with the antitrust laws. For example, an information exchange may be lawful if:

> • a neutral third party manages the exchange,
> • the exchange involves information that is relatively old,
> • the information is aggregated to protect the identity of the underlying sources, and
> • enough sources are aggregated to prevent competitors from linking particular data to an individual source.

241.276.    The compensation information exchanges by Defendant Processors—through Agri Stats, WMS surveys, plant-to-plant communications, and other means—have not

96

complied with three of the four criteria established by the DOJ and FTC.  The exchanged ~~wage and benefits~~compensation information was not "relatively old" or historical; rather, the information concerned *current* and *future* ~~wages and benefits~~compensation, including current wages paid by Defendant Processors that were exchanged each month of the Class Period through Agri Stats.  The exchanged ~~wage and benefits~~compensation information was not "aggregated to protect the identity of the underlying sources"; rather, the information was *disaggregated*, as distinct compensation information was provided for ~~chicken~~poultry processing plants operated by~~, and categories of processing plant workers employed by,~~ each Defendant Processor.  The exchanged ~~wage and benefits~~compensation information was not "~~effectively aggregated~~ presented in a manner "to ~~conceal the underlying~~prevent competitors from linking particular data to an individual source"; rather, the information was shared in such a disaggregated manner that Defendant Processors' executives readily and predictably could and did reverse engineer the information to match specific ~~wage and benefits~~compensation data to individual ~~chicken~~poultry processing plants operated by ~~each of the Defendant Processors~~competitors.

~~242.~~277.     The agreement to exchange compensation information eliminated a major incentive for Defendant Processors to increase compensation to ~~non-supervisory production and maintenance~~ workers at their ~~chicken~~poultry processing plants in the continental United States during the Class Period.  The advantage of raising compensation is to retain and attract more such workers by exceeding the compensation paid by competing ~~chicken~~poultry processing plants.

~~243.~~278.     The agreement to regularly exchange detailed and non-public information about current and prospective compensation to ~~non-supervisory production and maintenance~~ workers at ~~chicken~~poultry processing plants in the continental United States assured that the provision of superior compensation by any Defendant Processor would be timely and specifically

Formatted: Font: Italic

Formatted: Font: Italic

known by its competitors.  Such an agreement, therefore, eliminated the incentive of each Defendant Processor to outbid its competitors during the Class Period.

244.279.    When ~~chicken~~poultry processors that are competing for the same workers exchange their compensation plans and levels, comfort replaces uncertainty and reduces incentives to raise wages, salaries or benefits.  Accordingly, each Defendant Processor used the compensation data obtained through the information exchanges to reduce the uncertainty that they should have faced from not knowing what their competitors were offering and providing in the labor market. This strategic information was a material factor in Defendant Processors' decisions to depress and stabilize ~~wages and benefits~~compensation paid to ~~non-supervisory production and maintenance~~ workers at their ~~chicken~~poultry processing plants in the continental United States during the Class Period.

245.280.    The exchange of compensation information between Defendant Processors during the Class Period increased their relative bargaining power in setting wages, salaries and benefits for ~~non-supervisory production and maintenance~~ workers at their ~~chicken~~poultry processing plants in the continental United States.  With such information, Defendant Processors knew what their competitors were paying comparable workers, while those workers and new applicants lacked access to most or all of such information and thus knew much less about the competitive landscape.

246.281.    The regularity and detail of the compensation information exchanged, the related communications about ~~wages and benefits~~compensation between individuals exchanging the information, the relationships of trust developed among the individuals exchanging the information, and the pervasive desire to control and restrain labor costs, encouraged Defendants and their co-conspirators to use the information to match (and not exceed) each other's

compensation levels for ~~non-supervisory production and maintenance~~ workers at their ~~chicken~~poultry processing plants in the continental United States during the Class Period.

247.282.    Defendants' unlawful ~~agreements~~agreement to exchange, and the actual exchanges of, nonpublic, timely and detailed compensation data, ~~were~~was not reasonably necessary to further any procompetitive purpose.  The information exchanged between Defendant Processors and their high-level executives was disaggregated, company-specific, current and forward-looking, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

248.283.    The information-exchange agreement has had the effect of (1) reducing and suppressing competition among Defendant Processors ~~in~~for the compensation of ~~non-supervisory production and maintenance~~ workers at their ~~chicken~~poultry processing plants in the continental United States and (2) depressing the compensation of such employees.

249.284.    As a result of the unlawful agreement alleged herein to exchange compensation information, Plaintiffs and the other Class Members have been injured in their business or property by receiving artificially depressed compensation during the Class Period.

X.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray that:

A.  The Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein, appoint plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.  Defendants' actions alleged herein be adjudged and decreed to be in violation of

Section 1 of the Sherman Act, 15 U.S.C. § 1;

C. Plaintiffs and the other Class Members recover their damages from each Defendant, jointly and severally, in an amount to be determined, and that this damages amount be trebled pursuant to 15 U.S.C. § 15(a);

D. Plaintiffs and the other Class Members be awarded pre- and post-judgment interest as allowed by law and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

E. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other entities or persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, ~~conspiracies~~conspiracy, or ~~combinations~~combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect;

F. Plaintiffs and the other Class Members recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

G. Plaintiffs and the other Class Members be granted such other relief as the case may require and deemed proper to this Court.

**XI.   JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury of all issues so triable in this case.

Dated: ~~November 14~~December 20, 2019                          Respectfully submitted,

                                                  _____/s/ Matthew K. Handley_____
                                                  Matthew K. Handley (D. Md. Bar # 18636)
                                                  Rachel E. Nadas (admitted *pro hac vice*)
                                                  HANDLEY FARAH & ANDERSON PLLC
                                                  777 6th Street, NW, Eleventh Floor
                                                  Washington, DC 20001

100

Telephone: (202) 559-2433
mhandley@hfajustice.com

George F. Farah (admitted *pro hac vice*)
Rebecca P. Chang (admitted *pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
81 Prospect Street
Brooklyn, NY 11201
Telephone: (212) 477-8090
gfarah@hfajustice.com

William AH. Anderson (admitted *pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
4730 Table Mesa Drive
Suite G-200
Boulder, CO 80305
Telephone: (202) 559-2433
wanderson@hfajustice.com

Daniel A. Small (D. Md. Bar # 20279)
Benjamin D. Brown (admitted *pro hac vice*)
Brent W. Johnson (admitted *pro hac vice*)
Alison S. Deich (admitted *pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW
5th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Fax: (202) 408-4699
dsmall@cohenmilstein.com
bbrown@cohenmilstein.com
bjohnson@cohenmilstein.com
adeich@cohenmilstein.com

Steven W. Berman (admitted *pro hac vice*)
Breanna Van Engelen (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, Washington  98101
Tel: (206) 623-7292
steve@hbsslaw.com
breannav@hbsslaw.com

Shana E. Scarlett (admitted *pro hac vice*)
Rio R. Pierce (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP

101

715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel: (510) 725-3000
shanas@hbsslaw.com
riop@hbsslaw.com

*Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*

W. Joseph Bruckner (*pro hac vice* forthcoming)
Brian D. Clark (*pro hac vice* forthcoming)
Maureen Kane Berg (*pro hac vice* forthcoming)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
wjbruckner@locklaw.com
bdclark@locklaw.com
mkberg@locklaw.com

Mark A. Griffin (*pro hac vice* forthcoming)
Raymond J. Farrow (*pro hac vice* forthcoming)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-2284
mgriffin@kellerrohrback.com
rfarrow@kellerrohrback.com

*Additional Counsel for the Plaintiffs and Proposed Class*

Eric L. Cramer (*pro hac vice* forthcoming)
Sarah Schalman-Bergen (*pro hac vice* forthcoming)
Patrick F. Madden (*pro hac vice* forthcoming)
David Langer (*pro hac vice* forthcoming)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Telephone: (215) 875-3000
ecramer@bm.net
sschalman-bergen@bm.net
pmadden@bm.net

102

dlanger@bm.net

Daniel J. Walker (*pro hac vice* forthcoming)
BERGER MONTAGUE PC
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Telephone: (202) 559-9745
dwalker@bm.net

James P. Ulwick (Fed. Bar No. 00536)
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202
Telephone: (410) 752-6030
julwick@kg-law.com

David Hughes (*pro hac vice* forthcoming)
Nicole Hughes (*pro hac vice* forthcoming)
HARDIN & HUGHES, LLP
2121 14th Street
Tuscaloosa, Alabama 35401
Telephone: (205) 523-0465
dhughes@hardinhughes.com
nhughes@hardinhughes.com

J. Dudley Butler (*pro hac vice* forthcoming)
BUTLER FARM & RANCH LAW GROUP, PLLC
499-A Breakwater Drive
Benton, Mississippi 39039
Telephone: (662) 673-0091
jdb@farmandranchlaw.com

*Counsel for Plaintiff Glenda Robinson*

Hollis Salzman (*pro hac vice* forthcoming)
Kellie Lerner (*pro hac vice* forthcoming)
Noni J. Nelson (*pro hac vice* forthcoming)
ROBINS KAPLAN LLP
399 Park Avenue
Suite 3600
New York, NY 10022
Tel: (212) 980-7400
Fax: (212) 980-7499
hsalzman@robinskaplan.com
klerner@robinskaplan.com
nnelson@robinskaplan.com

103

Aaron M. Sheanin (*pro hac vice* forthcoming)
ROBINS KAPLAN LLP
2440 W. El Camino Real, Suite 100
Mountain View, CA 94040
Tel:  (650) 784-4040
Fax:  (650) 784-4041
asheanin@robinskaplan.com

M. Stephen Dampier (*pro hac vice* forthcoming)
THE DAMPIER LAW FIRM, P.C.
11 N. Water Street, Suite 10290
Mobile, AL 36602
Tel.: (251) 929-0900
Fax: (888) 387-1930
stevedampier@dampierlaw.com

Paul Mark Sandler (Bar No. 00145)
Eric Harlan (Bar No. 23492)
SHAPIRO SHER GUINOT & SANDLER
250 West Pratt Street, Suite 2000
Baltimore, MD 21201
Tel.: (410) 385-0202
Fax: (410) 539-7611
pms@shapirosher.com
erh@shapirosher.com

*Counsel for Plaintiff Emily Earnest*

104