UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| JUDY JIEN, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> PERDUE FARMS, INC., *et al.*, <br><br> Defendants. | Case No. 1:19-cv-2521-SAG |

**DEFENDANTS HORMEL FOODS CORPORATION; JENNIE-O TURKEY STORE, INC.; JENNIE-O TURKEY STORE, LLC; AND JENNIE-O TURKEY STORE SALES, LLC'S MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED COMPLAINT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................... 1

SUMMARY OF ALLEGATIONS REGARDING THE JOTS DEFENDANTS .......................... 2

ARGUMENT .................................................................................................................................. 3

I.  THE RECENT ADDITION OF THE JOTS DEFENDANTS UNDERSCORES THE IMPLAUSIBILITY OF PLAINTIFFS' ALLEGED NATIONAL GEOGRAPHIC MARKET, AND THEIR RULE-OF-REASON CLAIM SHOULD BE DISMISSED...... 3

    A.  *JOTS's Plants Are Located in Minnesota and Wisconsin, and Employment at Those Plants Is Not a Practical Alternative for Plant Workers Located Throughout the Continental United States* ............................................................. 4

    B.  *With a Single Exception, There Are No Defendant Plants Within 50 Miles of a JOTS Plant* ........................................................................................................ 9

II.  PLAINTIFFS FAIL TO ALLEGE A PLAUSIBLE *PER SE* CONSPIRACY CLAIM AGAINST JOTS ................................................................................................ 11

    A.  *The Facial Implausibility of Plaintiffs' Alleged Geographic Market Also Undermines the Plausibility of Their Per Se Conspiracy Claim* .......................... 11

    B.  *The JOTS-Specific Allegations in the ACC Do Not Plausibly State a Per Se Claim of Conspiracy to Restrain Wages* ........................................................... 11

III.  AT A MINIMUM, CLAIMS AGAINST THE TURKEY-PROCESSOR DEFENDANTS PRIOR TO 2015 SHOULD BE DISMISSED ................................................................ 14

CONCLUSION ............................................................................................................................. 15

## PRELIMINARY STATEMENT

Plaintiffs' original complaint focused on the chicken industry, asserting that the chicken-processor Defendants conspired with two consulting companies "to fix and depress the compensation paid to . . . employees at *chicken* processing plants in violation of Section 1 of the Sherman Act." (Dkt. No. 196, Consolid. Compl. ¶¶ 1-2 (emphasis added)) In response to one of the myriad arguments presented in the chicken-processor Defendants' motion to dismiss,[1] however, Plaintiffs now allege in their Amended Consolidated Complaint ("ACC") that "Defendants have conspired and combined to fix and depress the compensation paid to employees at *poultry* processing plants in violation of Section 1 of the Sherman Act." (Dkt. No. 258, ACC ¶ 1 (emphasis added)) They replaced "chicken" with "poultry" over 150 times, and added new turkey-processor Defendants—including Jennie-O Turkey Store, Inc. ("JOTS," and together with Hormel Foods Corporation; Jennie-O Turkey Store, LLC; and Jennie-O Turkey Store Sales, LLC, the "JOTS Defendants").

As described in Defendants' joint brief, the addition of allegations related to the turkey industry renders the supposed conspiracy more implausible. (Defs.' Joint Br., Part I.B.2) But, the addition of the JOTS Defendants, in particular, shows the fallacy of Plaintiffs' putative national geographic market for poultry-processing-plant workers. And there is no basis—and Plaintiffs have failed to assert any basis—to sue JOTS as a participant in the industry-wide conspiracy alleged. All claims against the JOTS Defendants[2] should be dismissed with prejudice.

---

[1] Defendants pointed out that the original complaint's narrowly defined product market was implausible, in part, because the pleading itself "concedes that chicken processing plant employees could, at the very least, switch to processing jobs for other types of poultry, like turkey." (Dkt. No. 247-1, Defs.' Mem. 23 (citing Dkt. No. 196, Consolid. Compl. ¶ 235))

[2] Defendants Jennie-O Turkey Store, LLC and Jennie-O Turkey Store Sales, LLC must be dismissed for the independent and additional reason that the ACC does not allege that they took any action related to the supposed conspiracy. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801

## SUMMARY OF ALLEGATIONS REGARDING THE JOTS DEFENDANTS

Apart from five paragraphs of corporate descriptions (*see* ACC ¶¶ 74-78), the JOTS Defendants are mentioned by name in only three of the ACC's 284 paragraphs:

| Paragraph(s) | Allegations |
| --- | --- |
| 74-78 | Corporate descriptions |
| 100, 131 | Except for JOTS, each Defendant Processor has a plant that is within 13 miles of another Defendant Processor's plant. |
| 154 | JOTS (along with Butterball and Cargill) "joined the annual WMS survey and 'off the books' meetings for the first time in or around 2015," and "exchanged compensation data through another annual survey that was conducted by the National Turkey Federation" prior to 2015. |

The 2019 WATT PoultryUSA data used by Plaintiffs to allege the locations of chicken and turkey processing plants (*see id.* ¶ 102) confirms that JOTS has seven "Turkey plants"—and only turkey plants[3]—in Minnesota and northwestern Wisconsin.[4] JOTS's geographic footprint is limited to the heart of the Upper Midwest. The image to the left is a screen capture from a zoomed-in view of the 2019 WATT PoultryUSA map of chicken and turkey plants from paragraph 102 of the ACC; the image to the right is the same screen capture, modified to identify plant ownership, and to circle the locations of JOTS's seven[5] turkey plants:

---

F.3d 412, 423 (4th Cir. 2015) ("The fact that two separate legal entities may have a corporate affiliation does not alter the pleading requirement to separately identify each defendant's involvement in the conspiracy.") (cleaned up). Plaintiffs allege that these LLCs are wholly owned subsidiaries of Defendant Jennie-O Turkey Store, Inc., but direct no specific allegations to their conduct. (*See* ACC ¶¶ 76-78)

[3] The JOTS Defendants are not defendants in *In re Broiler Chicken Antitrust Litigation*, No. 1:16-cv-08637 (N.D. Ill.).

[4] *See* WATT PoultryUSA 2019, Broiler and Turkey Plants, https://batchgeo.com/map/wattpoultryusa-2019-plants (last visited Feb. 28, 2020) [hereinafter, WATT]; *see also* ACC ¶ 102 (containing screen capture of the WATT PoultryUSA 2019 map).

[5] Because two JOTS plants are located in Willmar, Minnesota, there are only six circles.



The ACC is devoid of any allegations regarding what the wages or salaries for workers at JOTS's plants—or any of the other plants displayed above—were during the alleged conspiracy.

### ARGUMENT

I. **THE RECENT ADDITION OF THE JOTS DEFENDANTS UNDERSCORES THE IMPLAUSIBILITY OF PLAINTIFFS' ALLEGED NATIONAL GEOGRAPHIC MARKET, AND THEIR RULE-OF-REASON CLAIM SHOULD BE DISMISSED**

As described in the Defendants' joint brief, Plaintiffs' failure to allege plausible product and geographic markets requires dismissal of their Second Claim for Relief—the amended information-exchange claim. (Defs.' Joint Br., Part II.A) Indeed, the addition of the JOTS Defendants only accentuates the implausibility of Plaintiffs' putative national geographic market. (*See* ACC ¶ 208 ("The relevant market is the labor market for employment at poultry processing plants *in the continental United States* ('Relevant Market').") (emphasis added))

"The relevant geographic market in antitrust cases is defined by the 'area within which the defendant's customers . . . can practically turn to alternative supplies if the defendant were to raise its prices.'" *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 682 (4th Cir. 2016) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir.

3

2011)). In an alleged wage-reduction case like this one, the relevant geographic market is the area within which workers can practically turn for alternative employment. *See Ogden v. Little Caesar Enters., Inc.*, 393 F. Supp. 3d 622, 631 (E.D. Mich. 2019) (quoting *Deslandes v. McDonald's USA, LLC*, No. 17 C 4857, 2018 WL 3105955, at *8 (N.D. Ill. June 25, 2018), for the proposition that a geographic market for even managerial-level employees at fast-food restaurants "is likely to cover a relatively-small geographic area" and that such employees are "not [looking for] a position requiring a long commute or a move"). In considering a geographic market, courts look to the "area of effective competition" and determine "the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product." *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006) (citations omitted), *overruled on other grounds by Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196 (2d Cir. 2008); *see also Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506, 529 (W.D. Pa. 2019) ("[A] market's geographic scope must 'correspond to the commercial realities of the industry' being considered and 'be economically significant.'" (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 336-37 (1962))). A complaint must be dismissed where, as here, a plaintiff "fail[s] to allege a coherent relevant geographic market[.]" *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 598 (8th Cir. 2009).

      **A.**    ***JOTS's Plants Are Located in Minnesota and Wisconsin, and Employment at Those Plants Is Not a Practical Alternative for Plant Workers Located Throughout the Continental United States***

Headquartered in Minnesota, JOTS owns and operates six turkey processing plants in Minnesota and one in northwestern Wisconsin. (*See* ACC ¶¶ 75, 102; WATT, *supra* note 4) Plaintiffs' putative national geographic market for poultry labor supposes that a deboner at a poultry processing plant in Alabama could practically turn to a job at a Minnesota plant "when offered higher wages, higher salaries and/or superior benefits." (*See* ACC ¶¶ 19, 101) The ACC

4

contains no factual allegations supporting this premise, however, and, in fact, publicly available data from the U.S. Bureau of Labor Statistics ("BLS")—"relied on" by Plaintiffs' economists and a research paper cited by Plaintiffs (*see id.* ¶¶ 218, 228)—definitively disproves it.[6] The very same economic data upon which Plaintiffs base their allegations of a national labor market for poultry-plant employees conclusively disprove the existence of any such market.

The BLS and other federal agencies use the Standard Occupational Classification ("SOC") system "to classify workers and jobs into occupational categories for the purpose of collecting, calculating, analyzing, or disseminating data."[7] The SOC is tiered and organized into four levels, ranging from "major groups" to "detailed occupations":

> There are, at the highest level of specification, 867 detailed occupations. *Detailed occupations with similar job duties, and in some cases, similar skills, education, and/or training, are grouped together in the SOC.* Each worker is classified into only one of the 867 detailed occupations based on the tasks he or she performs.[8]

One such detailed occupation is SOC 51-3022 Meat, Poultry, and Fish Cutters and Trimmers, who "[u]se hands or hand tools to perform routine cutting and trimming of meat, poultry, and seafood," and expressly includes "Poultry Eviscerator."[9] In 2018, the mean hourly wages for

---

[6] In ruling on a motion to dismiss, a court may take judicial notice of matters of public record—including publicly available government statistics. *See Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) ("In reviewing a Rule 12(b)(6) dismissal, we may properly take judicial notice of matters of public record."); *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (taking judicial notice of population statistics available from a state agency because they were "publicly available on the official redistricting website"); *Kravitz v. U.S. Dep't of Commerce*, 336 F. Supp. 3d 545, 552 n.3 (D. Md. 2018) ("The Court may also take judicial notice of matters of public record and consider documents attached to the Amended Complaint or Motion to Dismiss, to the extent that they are integral to the Amended Complaint and authentic."). Plaintiffs' reliance on BLS data concedes that they do not challenge the data's authenticity.

[7] Office of Mgmt. & Budget, 2018 Standard Occupational Classification Manual 1, https://www.bls.gov/soc/2018/soc_2018_manual.pdf.

[8] *Id.* (emphasis added).

[9] *Compare id.* at 184; *with* ACC ¶ 105 (alleging that Defendant Processors employ "'eviscerators,' who remove the internal organs from bird carcasses").

5

Meat, Poultry, and Fish Cutters and Trimmers in the Animal Slaughtering and Processing[10] industry varied greatly across the continental United States, ranging from $10.47 per hour in Louisiana to $16.37 in Nebraska.[11] (*But see* ACC ¶ 220 ("[E]ach Defendant Processor pays the same, or nearly the same, compensation to its employees at poultry processing plants regardless of geographic region, state, county or locality . . . .")) Comparing Minnesota wages for such workers to those in the states where the named Plaintiffs live shows wide disparities:

**Mean Hourly Wages and Comparison to MN Mean Hourly Wages Per SOC 2018 Data**

| Party | State | Mean Hourly Wage | Wage-MN Wage | Wage/MN Wage |
|---|---|---|---|---|
| Named Plaintiff (*see* ACC ¶¶ 15-19) | Alabama | $10.77 | ($4.33) | 71.3% |
| | Arkansas | $12.64 | ($2.46) | 83.7% |
| | Mississippi | $12.77 | ($2.33) | 84.6% |
| JOTS | Minnesota | $15.10 | --- | --- |
| | Wisconsin | $14.00 | ($1.10) | 92.7% |

Although Plaintiffs claim that "many employees of poultry processing plants could and would switch their employment to *rival* poultry processing plants when offered higher wages, higher salaries and/or superior benefits," (ACC ¶ 101 (emphasis added)), they concede that "rival

---

[10] The Animal Slaughtering and Processing industry—captured under NAICS 311600—has "the highest level[] of employment" in SOC 51-3022. *See* U.S. Bureau of Labor Statistics, Occupational Employment & Wages, May 2018: 51-3022 Meat, Poultry, and Fish Cutters and Trimmers, https://www.bls.gov/oes/current/oes513022.htm (Feb. 28, 2020); U.S. Bureau of Labor Statistics, May 2018 National Industry-Specific Occupational Employment and Wage Estimates: NAICS 311600 – Animal Slaughtering and Processing, https://www.bls.gov/oes/current/naics4_311600.htm (last visited Feb. 28, 2020).

NAICS 311615 – Poultry Processing, referenced by Plaintiffs (*see* ACC ¶ 228), is one of four NAICS codes under Animal Slaughtering and Processing. *See* North American Industry Classification System, 2017 NAICS Definition: 31-33 Manufacturing, https://www.census.gov/cgi-bin/sssd/naics/naicsrch?chart_code=31&search=2017%20NAICS%20Search (last visited Feb. 28, 2020).

[11] U.S. Bureau of Labor Statistics, OES Research Estimates by State and Industry, https://www.bls.gov/oes/current/oes_research_estimates.htm (last visited Feb. 28, 2020) (follow "Sectors 31, 32, & 33: Manufacturing" hyperlink under May 2018).

poultry processing plants" are plants located "nearby." (*See, e.g.*, *id.* ¶ 188 (characterizing a Tyson plant in "nearby" Union City, Tennessee and a Perdue plant in "nearby" Bowling Green, Kentucky as "rival plants" of a Pilgrim's plant in Mayfield, Kentucky[12])) Not surprisingly, there are no allegations that the named Plaintiffs could or would move several hundred miles to the Upper Midwest to work for JOTS, even though on average a Meat, Poultry, and Fish Cutter and Trimmer in Alabama would earn 40% more per hour in Minnesota. *See Deslandes*, 2018 WL 3105955, at *8 ("[M]ost people do not search long distances for a low-skill job with the idea of then moving close to the job."); *Ogden*, 393 F. Supp. 3d at 631 (same).

Even the conclusions set forth in the "recent paper" cited by Plaintiffs confirm the implausibility of the alleged nationwide market for poultry processing plant workers. (*See* ACC ¶ 218 & n.5) According to Plaintiffs, the paper

> analyzed low-skilled labor markets defined by the 6-digit [SOCs] tracked by the [BLS] and found that for each such occupation, a hypothetical monopsonist would find it profitable to decrease wages by at least 5% or more.[13] The paper demonstrates economically that low-skilled occupations can be relevant antitrust markets and thus supports the plausibility of the Relevant Market.

---

[12] Mayfield, Kentucky is a 35.5-mile drive from Union City, Tennessee; a 134-mile drive from Bowling Green, Kentucky; and a 684-mile drive from Faribault, Minnesota—the location of JOTS's southern-most plant.

[13] Plaintiffs' "hypothetical monopsonist" test reflects the methodology used in the Horizontal Merger Guidelines. *See* U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines (2010), https://www.justice.gov/atr/horizontal-merger-guidelines-08192010. Specifically, Section 4.2.2 of the Guidelines sets forth the hypothetical-monopolist test for geographic markets based on the location of customers, and provides that "[a] region forms a relevant geographic market if [a small but significant and non-transitory increase in price of at least 5 percent by a hypothetical monopolist] would not be defeated by substitution away from the relevant product or by . . . customers in the region travelling outside it to purchase the relevant product." *Id.* In labor markets where monopsony is alleged, as Plaintiffs describe it (*see* ACC ¶ 218), the equivalent analysis would look at whether a hypothetical monopsonist could profit by imposing a decrease in wages of at least 5%, or whether such a decrease would result in workers leaving that labor market, by moving or changing occupations, in which case the relevant labor market must be expanded to include other substitute geographies or occupations.

(*Id.* (citing José Azar et al., Estimating Labor Market Power (Sept. 18, 2019) (unpublished paper, attached as Chow Decl. Ex. 1, filed herewith) (the "Azar Paper"))

The Azar Paper, however, does not contemplate a national labor market for six-digit SOCs, and instead considered labor markets "defined by a SOC6 occupation *and* a commuting zone." (Chow Decl. Ex. 1, at 21 (emphasis added)) Commuting zones were developed based upon the recognition that "[a] local economy and its labor market are bounded . . . by interrelationships between buyers and sellers of labor," and are "spatial measure[s] of the local labor market[s]."[14] The most recent survey, conducted by the USDA's Economic Research Service in 2000, found that there were 709 commuting zones in the United States.[15] Applying the hypothetical-monopsonist test, the Azar Paper found a low elasticity within the commuting-zone labor markets, indicating an unwillingness of workers to look for work outside of the commuting zone. For example, the low market-level elasticities of truck drivers "suggest[s] that there are few suitable job substitutes for truckers in other labor markets (other occupation[s] and/or other commuting zone[s])." (Chow Decl. Ex. 1, at 17)

Similarly, applying the 5-percent hypothetical-monopsonist test to SOC 51-3022 Meat, Poultry, and Fish Cutters and Trimmers demonstrates the lack of a national market for poultry processing plant workers. (*See* ACC ¶ 218) If there were a relevant national antitrust market for SOC 51-3022, then a Minnesota plant would not need to pay 40.2% more than an Alabama plant to attract workers. Or, stated another way, an Alabama plant can attract workers with an hourly

---

[14] USDA, Econ. Research Serv., Commuting Zones and Labor Market Areas, https://www.ers.usda.gov/data-products/commuting-zones-and-labor-market-areas/documentation/ (last visited Feb. 28, 2020).

[15] *Id.*; *cf. Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 710 (11th Cir. 2014) (suggesting that a broad geographic market for chicken processing plant workers could be "a series of contiguous counties").

wage of $10.77 while a Minnesota plant pays $4.33 more per hour because Alabama plants are not in the same labor market as Minnesota plants.

Even Minnesota and Wisconsin, despite sharing a border, do not constitute a common labor market for Meat, Poultry, and Fish Cutters and Trimmers according to the Azar Paper's hypothetical-monopsonist test. Minnesota plants pay 7.8% more than Wisconsin plants,[16] and there are 28 commuting zones in Minnesota and 19 in Wisconsin. With a single exception described below (*see infra* Part I.B), none of Defendants' poultry processing plants are located within the same commuting zone as those operated by JOTS. Due to the vast distance between JOTS's plants in the Upper Midwest and virtually all other Defendants' plants, there is no plausible allegation that JOTS's plants compete for workers with the other Defendants' plants, and hence no plausible basis to allege that the sharing of wage-rate information by and with JOTS could have any anticompetitive impact on the labor markets in which JOTS operates—dooming Plaintiffs' rule-of-reason information-exchange claim.

### B. With a Single Exception, There Are No Defendant Plants Within 50 Miles of a JOTS Plant

The ACC acknowledges JOTS's geographic isolation vis-à-vis the other Defendants: "[E]ach Defendant Processor owns at least one poultry processing plant that is within 32 miles of another Defendant Processor's poultry processing plant. Indeed, *with the exception of Defendant Jennie-O*, each Defendant Processor has a plant that is within 13 miles of another Defendant Processor's plant." (ACC ¶ 100 (emphasis added)) The only other Defendant's poultry processing plant "within 32 miles" of a JOTS plant is a Pilgrim's Pride Corporation ("Pilgrim's")

---

[16] Applying the 5-percent test, a statewide hypothetical monopsonist in meat, poultry, and fish cutting and trimming in Minnesota could impose a 5-percent wage reduction, and workers would not travel even to Wisconsin to defeat it.

chicken processing plant in Cold Spring, Minnesota, a 33-mile drive from JOTS's Melrose, Minnesota plant. (*See id.* ¶¶ 38, 102) The Pilgrim's Cold Spring plant and the JOTS Melrose plant are both located in Stearns County—where, according to BLS data, there have been more than 260 manufacturing establishments since 2009. (*See* Chow Decl. Ex. 2 (containing extracted BLS data)) The next closest poultry processing plant owned by a Defendant[17] is Cargill's turkey packaging plant in Albert Lea, Minnesota, a 52-mile drive from JOTS's Faribault, Minnesota processing plant. (*See* ACC ¶ 102) It is facially implausible that JOTS's plants fall within the same geographic market as those of other Defendants in the alleged industry-wide conspiracy—most of whom do not have a plant within hundreds of miles of a JOTS plant.

Plaintiffs suggest that a distance of 13 or 32 miles "mean[s] that many workers could easily switch to rival poultry processing plants offering better compensation in a competitive market." (*See id.* ¶ 131; *see also id.* ¶ 100) But, they have failed to allege the distance a poultry-processing-plant worker would be willing to commute to work at another poultry processing plant or the catchment area for workers for a poultry processing plant. *See Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) ("Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way."). Plaintiffs allege no facts that would support a conclusion that there is a national market for "poultry processing plant" labor—either hourly or salaried—that would lump JOTS's Minnesota and Wisconsin plants in with plants hundreds of miles away.

---

[17] Alleged co-conspirator Turkey Valley Farms owns a turkey processing plant in Marshall, Minnesota—a 40-mile drive from JOTS's Montevideo, Minnesota plant. (*See* ACC ¶ 84.v) But, no specific conduct by Turkey Valley Farms related to the supposed conspiracy is alleged.

10

## II. PLAINTIFFS FAIL TO ALLEGE A PLAUSIBLE *PER SE* CONSPIRACY CLAIM AGAINST JOTS

The same geographic- and product-market pleading deficiencies and an overall lack of any alleged conspiratorial conduct by JOTS also makes implausible Plaintiffs' First Claim for Relief for conspiracy in restraint of trade.

### A. *The Facial Implausibility of Plaintiffs' Alleged Geographic Market Also Undermines the Plausibility of Their Per Se Conspiracy Claim*

As evident from the map in the ACC, Plaintiffs must concede the geographic remoteness of the JOTS plants. (*See* ACC ¶ 102) They plead no plausible rationale for JOTS and the other processor Defendants to enter into a nationwide conspiracy spanning the chicken and turkey industries to fix or restrain poultry plant workers' wages when the vast distances between JOTS's plants and those of the other Defendants precludes them from being in the same labor market. And, even in the case of the Pilgrim's chicken plant in Cold Spring, there is no plausible basis to find a motive for conspiracy to restrain wages at the JOTS turkey plant in Melrose, where two manufacturers out of over 260 in Stearns County, Minnesota could not hope to affect wage competition. (*See supra* Argument, Part I.B; Chow Decl. Ex. 2)

### B. *The JOTS-Specific Allegations in the ACC Do Not Plausibly State a Per Se Claim of Conspiracy to Restrain Wages*

It is not enough for a Section 1 plaintiff to "assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015). Instead, a complaint "must forecast that factual showing, and if it fails to allege particular facts against a particular defendant, then the defendant must be dismissed. In other words, the complaint must 'specify how these defendants [were] involved in the alleged conspiracy,' without relying on 'indeterminate assertions' against

11

all 'defendants.'" *Id.* (alteration in original) (quoting *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009)).

Of the eight paragraphs in the ACC that mention the JOTS Defendants by name, only paragraph 154 asserts any activity by JOTS.[18] (*See supra* Summary of Allegations) That paragraph alleges that JOTS joined the annual WMS survey and attended the "off the books" meetings of the Compensation Committee for the "first," and only, time in 2015. (*See* ACC ¶ 154) JOTS is *not* alleged to have participated in a subsequent "off the books" meeting in 2017 (*see id.* ¶ 153), and failure to attend in 2016 and 2017 would, as Plaintiffs allege, result in JOTS's expulsion from the Compensation Committee. (*See id.* ¶ 152) No bilateral or other contact discussing or exchanging compensation information is specifically alleged between JOTS and any other Defendant.

Indeed, while Plaintiffs do not allege any specific facts (such as actual wage rates at JOTS plants or at other Defendants' plants) to support the conclusory allegation that JOTS "used the WMS survey results to modify and harmonize [its] compensation systems" with other Defendant Processors (*id.* ¶ 147), the mean hourly wages for SOC 51-3022 Meat, Poultry, and Fish Cutters and Trimmers in the Animal Slaughtering and Processing industry in Minnesota has steadily increased since 2014—the year before JOTS allegedly joined the WMS survey and

---

[18] Although JOTS is not mentioned by name, the ACC also alleges that "[e]ach Defendant Processor subscribed to and partnered with Agri Stats to exchange and receive . . . effective wage rates regarding categories of poultry processing plant workers from each Defendant Processor's plants." (ACC ¶ 7) While Plaintiffs replaced "chicken" with "poultry" in their allegations related to Agri Stats in the ACC, they do not—and cannot—allege that subscribers to Agri Stats chicken reports received any data on the operations of subscribers to Agri Stats turkey reports. Therefore, no agreement to exchange information via Agri Stats is pled that could enable chicken processors to "enforce" any conspiracy involving turkey processors, and vice versa. JOTS and the chicken-processor Defendants lack both the motive and the ability to use Agri Stats reports in an anticompetitive manner.

attended its only "off the books" meeting—and by significantly more than the "25 cents a year . . . raises" described in the ACC.[19]

| Year | MN Mean Hourly Wages for SOC 51-3022 | Increase YoY |
|---|---|---|
| 2014 | $12.31 | --- |
| 2015 | $13.18 | $0.87 |
| 2016 | $13.65 | $0.47 |
| 2017 | $14.11 | $0.46 |
| 2018 | $15.10 | $0.99 |

The behavior of wages for workers at meat and poultry processing plants in Minnesota provides no plausible basis upon which to allege a wage-fixing conspiracy against the JOTS Defendants,[20] and Plaintiffs allege no specific conduct by JOTS that would suggest participation in and action in accordance with a conspiracy to suppress the wages of its primarily Minnesota workforce.

Paragraph 154 also alleges that, before 2015, JOTS and the other Defendant turkey processors exchanged compensation data through an annual survey conducted by the National Turkey Federation ("NTF"), which "compiled the information" regarding "salaried and hourly wages of 'fairly specific' positions within the[] turkey plants" and "distributed the combined survey results to those turkey processors." (ACC ¶ 154) This does not evidence any conspiracy. Plaintiffs fail to allege how "the combined survey results" were reported, or how such survey results contributed to an alleged poultry-industry-wide wage-suppression conspiracy that JOTS and the other turkey-processor Defendants are not even alleged to have joined until 2015. *See Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 223, 225-26 (3d Cir. 2011). Indeed, because the

---

[19] *Compare* U.S. Bureau of Labor Statistics, OES Research Estimates by State and Industry, https://www.bls.gov/oes/current/oes_research_estimates.htm (last visited Feb. 28, 2020) (follow "Sectors 31, 32, & 33: Manufacturing" hyperlinks under May 2014, May 2015, May 2016, May 2017, and May 2018); *with* ACC ¶ 229.

[20] And, in general, citations to average compensation levels cannot plausibly state a claim of conspiracy against a particular Defendant. (*See* Defs.' Joint Br., Part I.B.1)

National Turkey Federation surveys "*only* covered turkey processors" (ACC ¶ 154 (emphasis added)), JOTS would not have had even an opportunity to conspire with the chicken-processor Defendants, based on those surveys, and could not have "restrain[ed] the compensation of workers in *poultry* processing plants in the United States prior to 2015" as alleged. (*Compare id.* (emphasis added); *with supra* Argument, Part I.B; *see also* Defs.' Joint Br., Part I.B.2 (explaining that even allegations of "opportunities to collude" are insufficient to state a *per se* conspiracy claim).)

### III. AT A MINIMUM, CLAIMS AGAINST THE TURKEY-PROCESSOR DEFENDANTS PRIOR TO 2015 SHOULD BE DISMISSED

Although Plaintiffs concede that "the Defendant Processors that process more turkey than chicken" did *not* participate in the supposed conspiracy during its first six years (ACC ¶ 154), they nevertheless contend that *all* Defendants are liable for participating in a conspiracy that allegedly started in 2009. (*See, e.g.*, *id.* ¶¶ 260, 266) But Plaintiffs offer no explanation of how an incomplete cartel of employers could have operated for six years; why or how the JOTS Defendants, along with the other newly added turkey-processor Defendants Cargill, Inc. and Cargill Meat Solutions Corporation ("Cargill") and Butterball, LLC ("Butterball") (collectively, "Turkey Defendants"), suddenly joined the conspiracy midstream; or why they would have done so while not having full access to the Agri Stats information purportedly critical to the conspiracy's operation—wage rates at chicken plants. The Turkey Defendants' participation in the alleged conspiracy is implausible, and accordingly they should be dismissed. Certainly, they cannot be liable for any pre-2015 conduct in which they are not alleged to have participated.

First, Plaintiffs do not allege that the Turkey Defendants obtained any wage information related to the chicken industry prior to 2015. The Turkey Defendants are not alleged to have participated in the WMS survey or the "off the books" meetings until 2015. (*See id.* ¶ 154) And

14

Agri Stats is not alleged to have included information about the wages paid by chicken processors in reports provided to turkey processors. (*See id.* ¶ 161 (acknowledging that Agri Stats treated the "broiler [chicken] industry" and the "turkey industry" as separate industries))

Second, the only alleged information sharing among the Turkey Defendants before 2015 was via a wage survey conducted by the NTF "which *only* covered *turkey* processors"—and not chicken processors.[21] (*See id.* ¶ 154) Plaintiffs fail to plead a cause of action related to that survey. There are no allegations about the timeliness, anonymity, level of specificity or usability of any data exchanged, or any anticompetitive effects. In fact, Plaintiffs' allegations undermine the ostensible utility of the survey as a conspiratorial conduit, because the Turkey Defendants allegedly compete in the same labor market as all of the chicken-processor Defendants that were *not* included in the NTF survey. (*See, e.g.*, *id.* ¶ 198)

Plaintiffs' claims that the Turkey Defendants engaged in "poultry" industry collusion around worker compensation are not plausible, and in any event cannot be asserted against the Turkey Defendants for conduct that occurred prior to 2015.

## **CONCLUSION**

For the foregoing reasons, both Plaintiffs' First and Second Claims for Relief in the ACC against Defendants Hormel Foods Corporation; Jennie-O Turkey Store, Inc.; Jennie-O Turkey Store, LLC; and Jennie-O Turkey Store Sales, LLC should be dismissed with prejudice. In the alternative, if not dismissed in their entirety, all claims against the JOTS Defendants, Cargill, and Butterball predating 2015 should be dismissed with prejudice.

---

[21] Plaintiffs' allegations that "Executives of Defendant Processors that process turkey serve on the board" of the NTF, which "met at least twice a year" (ACC ¶ 202.c), provide no basis for inferring that any information was improperly exchanged or any conspiracy entered. (*See* Defs.' Joint Br., Part I.B.2 (collecting cases holding that mere attendance at trade-association meetings does not suggest collusive behavior))

Dated: March 2, 2020	Respectfully submitted,

 /s/ Jonathan H. Todt

Jonathan H. Todt (Bar No. 07166)
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street, N.W., Suite 1100
Washington, D.C. 20005-1209
Phone: (202) 230-5823
Fax: (202) 842-8465
jonathan.todt@faegredrinker.com

Richard A. Duncan (*pro hac vice*)
Craig S. Coleman (*pro hac vice*)
Emily E. Chow (*pro hac vice*)
Isaac B. Hall (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Phone: (612) 766-7000
Fax: (612) 766-1600
richard.duncan@faegredrinker.com
craig.coleman@faegredrinker.com
emily.chow@faegredrinker.com
isaac.hall@faegredrinker.com

Christopher A. Kreuder (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
801 Grand Avenue, 33rd Floor
Des Moines, IA 50309
Phone: (515) 248-4733
Fax: (515) 248-9010
christopher.kreuder@faegredrinker.com

*Attorneys for Hormel Foods Corporation; Jennie-O Turkey Store, Inc.; Jennie-O Turkey Store, LLC; and Jennie-O Turkey Stores Sales, LLC*

**CERTIFICATE OF SERVICE**

    I certify that, on March 2, 2020, the foregoing Memorandum of Law in Support of Motion to Dismiss was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record in this matter.

                                                                                      */s/ Jonathan H. Todt*
                                                                                     Jonathan H. Todt

US.126666023.06