**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

JUDY JIEN, *et al.*,

Plaintiffs,

v.

PERDUE FARMS, INC., *et al.*,

Defendants.

Case No. 1:19-cv-2521-SAG

**MEMORANDUM IN SUPPORT OF DEFENDANT AGRI STATS, INC.'S**
**MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION .....1

STATEMENT OF FACTS .....3

LEGAL STANDARD.....5

ARGUMENT.....6

I. Plaintiffs Allege No Facts Plausibly Suggesting that Agri Stats Agreed to Fix Processing Employee Compensation .....6

II. On Their Putative Rule of Reason Claim Plaintiffs Allege No Facts Suggesting that Agri Stats Reports Have Adversely Affected Employee Compensation .....10

CONCLUSION.....13

# TABLE OF AUTHORITIES

**Page(s)**

***CASES***

*Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*,
910 F.2d 139 (4th Cir.1990) ....................6, 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................2, 12

*Bank of Am., N.A. v. Knight*,
725 F.3d 815 (7th Cir. 2013) ....................5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................5, 8

*Brown v. Pro Football, Inc.*,
518 U.S. 231 (1996)....................11

*Clarett v. Nat'l Football League*,
369 F.3d 124 (2d Cir. 2004)....................11

*Doe v. Walker*,
746 F. Supp. 2d 667 (D. Md. 2010) .................... 3-4

*Five Smiths v. Nat'l Football League Players Ass'n*,
788 F. Supp. 1042 (D. Minn. 1992)....................10, 12

*Hall v. Virginia*,
385 F.3d 421 (4th Cir. 2004) ....................3

*In re Brand Name Prescription Drugs Antitrust Litig.*,
288 F.3d 1028 (7th Cir. 2002) .................... 5-6

*In re Broiler Chicken Antitrust Litig.,*
2019 WL 1003111 (N.D. Ill., Feb. 28, 2019) ....................9

*In re Ins. Brokerage Antitrust Litig.*,
618 F. 3d 300 (3d Cir. 2010)....................8

*Jung v. Ass'n of Amer. Med. Colleges*,
300 F. Supp. 2d 119 (D.D.C. 2004)....................10, 12

*Maple Flooring Mfrs.' Ass'n v. United States*,
268 U.S. 563 (1925)....................2

*Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129 (2d Cir. 2013)....7

*SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412 (4th Cir. 2015) ....5

*Sherr v. HealthEast Care Sys.*, 262 F. Supp. 3d 869 (D. Minn. 2017).... 7-8

*United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86 (1975)....6

*United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978)....2, 6, 8

***RULES***

Fed. R. of Civ. P. 8....2

Fed. R. of Civ. P. 12(b)(6) ....3, 4

***OTHER AUTHORITIES***

United States Department of Agriculture, Economic Research Service, *Inflation-Adjusted Supermarket Prices Are Up for Some Foods, and Down for Others*, (Aug. 14, 2013) available at https://www.ers.usda.gov/data-products/chart-gallery/gallery/chart-detail/?chartId=76880 ....3

United States Department of Agriculture, National Agricultural Statistics Service, Farm Labor Report, (Nov. 21, 2019) available at https://downloads.usda.library.cornell.edu/usda-esmis/files/x920fw89s/c821h164m/fq9788943/fmla1119.pdf ....4

United States Department Of Agriculture, National Agricultural Statistics Service, Farm Labor Report (Nov. 19, 2012), available at https://www.nass.usda.gov/Publications/Todays_Reports/reports/fmla1112.pdf ....12

United States Department Of Agriculture, National Agricultural Statistics Service, Statistics By Subject Database, available at https://www.nass.usda.gov/Statistics_by_Subject/index.php?sector=ANIMALS%20&%20PRODUCTS (last visited Nov. 20, 2019) ....4

United States Department of Labor, Bureau Of Labor Statistics, Occupational Employment Statistics (May 2018) Slaughterers and Meat Packers, available at https://www.bls.gov/oes/current/oes513023.htm....4, 12

United States Department of Labor, Bureau Of Labor Statistics, Occupational Employment Statistics (May 2018) Meat, Poultry, and Fish Cutters and Trimmers, available at https://www.bls.gov/oes/current/oes513022.htm....................................................4, 12

## INTRODUCTION

Despite having an opportunity to review Defendant Agri Stats, Inc.'s ("Agri Stats") motion to dismiss their original consolidated complaint, Plaintiffs have done nothing to remedy the defects in that pleading. Agri Stats neither owns nor operates any poultry processing plants; it does not employ any individual who processes poultry. Agri Stats is a small agricultural data company that does not compete with any other Defendant for poultry processing employees. It gets nothing from a reduction in poultry processing labor costs and therefore has no incentive to participate in a putative conspiracy to fix compensation that it does not pay. Plaintiffs' Amended Consolidated Complaint ("ACC") does not allege otherwise.

Plaintiffs' first purported claim alleging a *per se* unlawful agreement to reduce poultry processing employee compensation (the "*per se* claim") has no connection to Agri Stats. Plaintiffs have not – and cannot – allege that Agri Stats participated in various supposed "off the books" meetings that "senior executives of the Defendant Processors," ACC ¶ 6, purportedly attended. Agri Stats has only provided a range of data reporting and consulting services that help its customers make their respective businesses more efficient. It has done so since 1985 – long before any putative conspiracy began. Plaintiffs' few factual allegations regarding Agri Stats' anonymized reports do not show that Agri Stats knew of – much less participated in – any purported compensation-fixing conspiracy. In fact, the allegations of purported "off the books" meetings and "bilateral" communications among unidentified Defendant Processors do not even refer to Agri Stats or its reports. ACC ¶¶ 6, 133-54, 184-93. According to Plaintiffs, the only information facilitating the putative agreement supposedly came either from an independent survey unaffiliated with Agri Stats or from direct "bilateral" exchanges of information between Defendant Processors without Agri Stats' involvement. ACC ¶¶ 133-54, 184-93. Plaintiffs' first claim should be dismissed against Agri Stats because there are *zero* factual allegations

connecting Agri Stats to any supposed conspiracy to fix poultry processing employee compensation.

Plaintiffs' second putative claim alleging an information exchange agreement (the "rule of reason claim") also fails against Agri Stats. Mere information exchanges do not violate the antitrust laws. *United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978); *Maple Flooring Mfrs.' Ass'n v. U.S.*, 268 U.S. 563, 582-83 (1925) (holding "[c]ompetition does not become less free merely because the conduct of commercial operations becomes more intelligent through the free distribution of knowledge of all the essential factors entering into the commercial transaction."). Instead, Plaintiffs must allege that the information exchange had anticompetitive effects in a properly defined relevant market. *Id.* On that element, Plaintiffs rely entirely on conclusory assertions that Agri Stats reports somehow resulted in lower employee compensation and could not possibly "further any procompetitive purpose." ACC ¶ 282. These conclusions are entitled to no presumption of truth, *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions"), particularly when the Bureau of Labor Statistics ("BLS") and United States Department of Agriculture ("USDA") both publish poultry processing employee compensation information, among other data, to enhance the efficiency of agricultural businesses – the same procompetitive objective that Agri Stats' reports further. Indeed, the only "fact" Plaintiffs allege about the employee compensation data in Agri Stats' reports is that Defendant Pilgrim's Pride Corp. ("Pilgrim's") supposedly used that data to verify it was paying competitive wages "within the Agri Stats average range." ACC ¶¶ 173-74.[1] Such allegations suggest that, if anything, Agri Stats reports result in *higher* employee compensation. They do not plead anticompetitive harm.

[1] Plaintiffs allege that the effect of the supposed wage fixing conspiracy was to "reduce and suppress the wages, salaries and benefits paid," ACC ¶ 10, and that Agri Stats participated in the

For the reasons set forth in this memorandum and that in support of the motion to dismiss filed by all Defendants ("Joint Motion"), which Agri Stats incorporates by reference, the Court should dismiss Plaintiffs' claims against Agri Stats with prejudice.

## STATEMENT OF FACTS

Agri Stats has provided reporting and consulting services to its chicken company customers since 1985. Agri Stats chicken and turkey reporting services are independent of one another, and the only data with any crossover between chicken and turkey customers relates to information about feed mill operations that are the same for both. Part of Agri Stats' business involves receiving data from individual poultry producers on various aspects of their respective operations, anonymizing the information, and issuing reports allowing each subscriber to benchmark its operational efficiencies and costs. ACC ¶¶ 155, 158. Agri Stats also assists poultry plant managers in analyzing performance data to help them identify inefficiencies in their respective production processes. *Id.* ¶¶ 169, 173. In part as a result of the substantial efficiency gains realized with Agri Stats' assistance, poultry prices for American consumers have dropped dramatically over the past 30 years. *See, e.g.,* United States Department of Agriculture, Economic Research Service, *Inflation-Adjusted Supermarket Prices Are Up for Some Foods, and Down for Others* (Aug. 14, 2013), https://www.ers.usda.gov/data-products/chart-gallery/gallery/chart-detail/?chartId=76880 (reviewing retail chicken prices for period ending in 2012 and noting "[i]n real terms, . . . chicken [is] cheaper today than . . . in 1984").[2] In addition

supposed conspiracy by facilitating the exchange of "non-public compensation information through surveys conducted by Agri Stats." *Id.* ¶ 7. Agri Stats reports contain "wages per pound," an averaged number comprised of hourly wages rates and benefits.

[2] On a Rule 12(b)(6) motion, the Court may take judicial notice of the public information contained on the BLS and USDA websites. *See Hall v. Virginia*, 385 F.3d 421, 424 (4th Cir. 2004) (court "may properly take judicial notice of 'items in the public record . . . on a motion to dismiss under Federal Rule of Civil Procedure 12(b),'"); *Doe v. Walker*, 746 F. Supp. 2d 667,

to numerous other cost categories (such as feed costs, feed formulation, and mortality rates), Agri Stats reports contain the labor cost per pound of meat produced as well as aggregated and anonymized employee pay divided by hours worked. *See* ACC ¶ 163.

Other entities also provide detailed benchmarking data for poultry producers. For example, USDA provides detailed statistics[3] on (1) egg sets, (2) chickens and turkeys placed in houses, (3) production levels broken down by headcount and total pounds, and (4) the volume of chickens and turkeys slaughtered. Both BLS and USDA report chicken processing employee compensation data. BLS publishes wage data for animal slaughtering and processing employees broken down by the total number of workers, the hourly mean wage, and the annual mean wage.[4] USDA publishes average wages for livestock and poultry workers by region.[5]

Given their business experience, some Agri Stats employees speak at industry meetings and events. *Id.* ¶ 202. But Plaintiffs never allege that any Agri Stats employee has attended any putative "off the books" meeting in Destin, Florida or anywhere else. *See id.* ¶¶ 6, 134, 137, 151, 153-54. Plaintiffs do assert that some "participating" Defendant Producers commissioned a survey of employee compensation information through Webber, Meng, Sahl and Company, Inc.

---

678 (D. Md. 2010) ("Court may take judicial notice of matters of public record from sources – such as . . . the Government Accountability Office – whose accuracy cannot be reasonably questioned.").

[3] United States Department of Agriculture, National Agricultural Statistics Service, Statistics by Subject Database, available at https://www.nass.usda.gov/Statistics_by_Subject/index.php?sector=ANIMALS%20&%20PRODUCTS (last visited Jan. 29, 2019).

[4] United States Department of Labor, Bureau of Labor Statistics, Occupational Employment Statistics, Meat, Poultry, and Fish Cutters and Trimmers (May 2018), https://www.bls.gov/oes/current/oes513022.htm; United States Department of Labor, Bureau of Labor Statistics, Occupational Employment Statistics, Slaughterers and Meat Packers (May 2018), available at https://www.bls.gov/oes/current/oes513023.htm.

[5] United States Department of Agriculture, National Agricultural Statistics Service, Farm Labor Report (Nov. 21, 2019), https://downloads.usda.library.cornell.edu/usda-esmis/files/x920fw89s/c821h164m/fq9788943/fmla1119.pdf.

("WMS") as part of those meetings, but they allege no connection between WMS and Agri Stats. *Id*. ¶¶ 137-50. Likewise, they fail to allege that Agri Stats participated in any "bilateral" meeting supposedly occurring between individual Defendant Processors. *Id*. ¶¶ 184-93. Thus, the only potential connection between Agri Stats and a putative compensation-fixing agreement is its reports, and even then, Plaintiffs allege no connection between those reports and the putative meetings or WMS survey. *Id*. ¶¶ 6-8.

At bottom, Plaintiffs assert that Agri Stats conspired: (1) with companies with which it does not compete; (2) to fix the compensation of workers it does not employ; (3) in a business in which it does not operate; (4) through meetings that it did not attend. The ACC does not state a claim against Agri Stats.

## LEGAL STANDARD

To plead a Sherman Act violation, Plaintiffs must allege "enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). In other words, a plaintiff must provide "allegations plausibly suggesting (not merely consistent with) agreement." *Id.* at 557. In multi-defendant cases, the allegations must "show that a particular defendant joined the conspiracy and knew of its scope." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) (Easterbook, C.J.) (affirming lower court dismissal of claims). A complaint must plausibly allege that *each* defendant has "a conscious commitment to a common scheme designed to achieve an unlawful objective." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 424 (4th Cir. 2015) (internal quotes omitted). When antitrust plaintiffs assert that a non-competitor participates in a horizontal agreement, they must plead facts, taken as true, plausibly suggesting that the non-competitor both knew of the supposed conspiracy and agreed to join it. *In re Brand Name Prescription Drugs Antitrust Litig.*, 288 F.3d 1028, 1033 (7th Cir. 2002) (Posner, J.) (dismissing antitrust conspiracy claims; permitting plaintiff to

proceed without allegations that non-competitor knew of and agreed to participate "would amount to basing an inference of conspiracy on negligence").

To state an unlawful information exchange claim under Section 1, Plaintiffs must, in addition to alleging an agreement to exchange information, plead facts plausibly suggesting (1) a properly defined relevant market, and (2) anticompetitive harm in that relevant market resulting from the information exchange. *See Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 144 (4th Cir.1990) (plaintiffs must allege a "conspiracy produced adverse, anticompetitive effects within the relevant product and geographic market" to state a Section 1 claim). Information exchanges are evaluated under the rule of reason because they can "increase economic efficiency and render markets more, rather than less, competitive." *U.S. Gypsum Co*., 438 U.S. at 443; *see also United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975) ("[T]the dissemination of price information is not itself a *per se* violation of the Sherman Act.").

**ARGUMENT**

On their *per se* claim Plaintiffs have not plausibly alleged that Agri Stats participated in a conspiracy to fix poultry processing employee compensation. On their rule of reason claim, they have not alleged that the Agri Stats reports harmed competition in any way. Both, therefore, are defective.

## I. PLAINTIFFS ALLEGE NO FACTS PLAUSIBLY SUGGESTING THAT AGRI STATS AGREED TO FIX PROCESSING EMPLOYEE COMPENSATION.

Plaintiffs do not plead that Agri Stats knew of any purported conspiracy to fix the compensation of poultry processing employees, much less participated in it. Rather, they assert that "Defendants" generally conspired in "three ways": (1) "off the books" meetings among unidentified Defendant Producers; (2) "bilateral" meetings between unidentified Defendant Producers; and (3) the exchange of information through entities such as Agri Stats. ACC ¶¶ 6-8.

While Plaintiffs suggest that Defendant Producers supposedly hatched a conspiracy at the putative "off the books" and "bilateral" meetings, *id*. ¶ 148, they plead nothing concerning Agri Stats with respect to either. Their *per se* claim against Agri Stats, therefore, rests solely on its benchmarking reports. That is not enough.

Notably, Plaintiffs do not allege that Agri Stats data or reports affected actual employee compensation or were discussed at any purported Producer meetings. Instead, Plaintiffs assert that "participating" Defendant Producers required different information – a "survey . . . conducted by WMS" – to facilitate their putative agreement at the alleged "off the books" meetings. *Id*. ¶ 139-140. They allege no link between Agri Stats and WMS or that Agri Stats knew of any such "survey." Similarly, Plaintiffs allege that Defendants required different information – exchanged through "plant-to-plant communications" – for the alleged "bilateral" meetings. *Id*. ¶ 187. Again, the ACC does not allege that Agri Stats knew of, or participated in, any purported "plant-to-plant communications" or "bilateral" meetings. *Id.* On Plaintiffs' telling, Agri Stats' benchmarking reports were neither necessary nor sufficient for any compensation-fixing agreement. Their allegations, therefore, fall far short of pleading Agri Stats' knowing participation in any such agreement. That alone warrants dismissal of the *per se* claim against Agri Stats.

Five other points sound the death knell for the *per se* claim. ***First***, Agri Stats has no motive to conspire. *See, e.g., Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 138-39 (2d Cir. 2013) (affirming dismissal because "[p]laintiffs' factual allegations do not plausibly suggest a common motive to conspire") (internal quotes omitted). Agri Stats does not produce poultry and does not hire poultry processing employees, and therefore would not benefit from the alleged conspiracy. *See, e.g., Sherr v. HealthEast Care Sys.*, 262 F. Supp. 3d 869, 883

(D. Minn. 2017) (dismissing antitrust claim "[e]ntirely lacking [in] factual allegations to explain why, how, or for what purpose [defendants] – who are not alleged to compete against each other – would need to conspire together").

***Second***, Agri Stats' only alleged conduct (disseminating reports) has a clear procompetitive and *unilateral* objective, rendering an inference of conspiracy implausible. *See Twombly*, 550 U.S. at 567-68 (noting relevance of alternative unilateral explanations for conduct). Agri Stats reports, like the BLS and USDA data, contain benchmarking data to improve the efficiency of its customers. Such benchmarking promotes competition and benefits consumers. *See, e.g., U.S. Gypsum Co.*, 438 U.S. at 441 n.16 ("The exchange of price data and other information among competitors . . . can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive."). When, as here, the factual allegations are facially consistent with a defendant's participation in a legitimate business, antitrust plaintiffs state a claim only by pleading some context plausibly suggesting unlawful agreement. *See In re Ins. Brokerage Antitrust Litig.*, 618 F. 3d 300, 323 (3d Cir. 2010) (noting that "*Twombly* aligns the pleading standard with the summary judgment standard in at least one important way: Plaintiffs relying on circumstantial evidence of an agreement must make a showing at both stages (with well-pled allegations and evidence of record, respectively) of . . . something 'plausibly suggest[ive of] (not merely consistent with) agreement'") (quoting *Twombly*, 550 U.S. at 557). Plaintiffs have not done that.

***Third***, Plaintiffs' allegation that the conspiracy began in 2009 undermines their claim against Agri Stats. ACC ¶ 260. Agri Stats began operations in 1985, nearly a quarter-century before the conspiracy supposedly began. Plaintiffs allege no facts showing that that Agri Stats'

reports or business activities changed in 2009 in order to facilitate a compensation-fixing agreement.

***Fourth***, nothing in *In re Broiler Chicken Antitrust Litig*., 2019 WL 1003111 (N.D. Ill., Feb. 28, 2019), is to the contrary. There, plaintiffs supported their claim that Agri Stats reports might facilitate an agreement to reduce chicken output with (a) reasonably detailed allegations about the production-related contents of the reports and (b) specific facts about the processors' output levels that they asserted have some relationship to the reports. Here, Plaintiffs merely aver that the compensation data in Agri Stats' reports is "granular," ACC ¶¶ 7, 164, without pleading any facts about (a) the supposedly granular data or (b) how Defendant Processors could conceivably use them to facilitate some sprawling compensation-fixing agreement across the chicken, and now, turkey-processing industries.

***Fifth***, Plaintiffs fail to allege facts suggesting that Agri Stats' reports could be used in furtherance of an overarching conspiracy encompassing both chicken and turkey processing companies. Plaintiffs' assert that Agri Stats' dissemination of "compensation data from each of the Defendant Processors allowed the Defendants to efficiently implement the compensation-fixing scheme and systematically monitor and enforce compliance with it. Defendants were able to constantly monitor each other's compensation levels to ensure that no Defendant Processor offered materially more in compensation than another." *Id*. ¶ 171 (italics omitted). Aside from these bald assertions, Plaintiffs include no factual allegations linking Agri Stats chicken reports with its turkey reports. That is because Plaintiffs' theory relies on the false premise that recipients of Agri Stats' chicken reports also receive information about turkey processing costs and vice versa. That is not the case, and Plaintiffs do not allege that it is. The Agri Stats reports that chicken processors receive do not include any information about turkey processor employee

compensation, and the reports that turkey processors receive do not include any information about chicken processor employee compensation. Without such factual allegations, Plaintiffs cannot allege an overarching conspiracy.

## II. ON THEIR PUTATIVE RULE OF REASON CLAIM PLAINTIFFS ALLEGE NO FACTS SUGGESTING THAT AGRI STATS REPORTS HAVE ADVERSELY AFFECTED EMPLOYEE COMPENSATION.

Plaintiffs' rule of reason claim against Agri Stats is defective because it does not allege that any exchange of information in the Agri Stats reports has had anticompetitive effects – namely, a marketwide adverse effect on employee compensation. *Advanced Health–Care Servs.*, 910 F.2d at 144; *see also Five Smiths v. Nat'l Football League Players Ass'n,* 788 F. Supp. 1042, 1054 (D. Minn. 1992) (NFL clubs failed to allege that exchange of salary information among player agents harmed competition in the player services market).

Plaintiffs' allegations now claim the average difference between the weekly earnings of workers employed by food manufacturers and those employed by poultry processors increased by $23.51 during the Class Period, and that the annual 25-cent wage increases for poultry workers were merely cost-of-living adjustments offset by health insurance premiums. ACC ¶¶ 228-30. Yet Plaintiffs still fail to connect Agri Stats reports to any anticompetitive harm. Plaintiffs do little more than allege that the Agri Stats reports contain some compensation information. Access to wage information, however, is not enough to allege competitive harm. *See Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 168-69 (D.D.C. 2004), *see also Five Smiths*, 788 F. Supp. at 1054 (exchange to player-specific salary information among agents fails to allege harm to competition). Further, Plaintiffs cannot, on the one hand, claim that "there are no close economic and/or functional substitutes for employment at poultry processing plants from the perspective of workers at [poultry] plants," ACC ¶ 210, but then, on the other, compare the difference between poultry processing employee wages to wages for food manufacturer

workers, who they assert are in a different relevant market, in order to allege anticompetitive effects. ACC ¶¶ 228-30.

Plaintiffs' remaining assertions of competitive harm are conclusory and untethered to factual allegations. Plaintiffs aver, for example, that the exchange of information in Agri Stats reports is "anticompetitive" and "resulted in lower compensation" for employees, ACC ¶ 181, but they do not plead that the compensation that Defendant Processors pay is lower than it would be absent the Agri Stats reports.[6] In fact, the only factual allegations about any Defendant Processor's use of Agri Stats reports are as consistent with compensation *enhancement* as suppression. Plaintiffs allege that Pilgrim's used the reports "to ensure that [one of its] plant[s] was paying wages that were exactly in the middle of the reported Agri Stats wage data." *Id.* ¶ 173. But that fact is neutral at best; Plaintiffs do not allege that Pilgrim's actually *made employee compensation decisions* based on the reports. The same is true for their allegations that Pilgrim's and Butterball used Agri Stats data during collective bargaining negotiations.[7] *Id.* ¶¶ 174-75. Plaintiffs have not alleged facts plausibly suggesting that Agri Stats reports adversely affected compensation.

Plaintiffs also baldly assert that "[t]here is no plausible, non-conspiratorial justification" for the information exchange. *Id.* ¶ 178. That unadorned legal conclusion is not presumed true,

---

[6] While Plaintiffs assert that poultry processing employee compensation is low, ACC ¶ 120, they do not plead that compensation would have been greater absent the Agri Stats reports.

[7] Conduct during collective bargaining negotiations is exempt from antitrust attack under the non-statutory labor exemption. *See Brown v. Pro Football, Inc.*, 518 U.S. 231 (1996) (NFL teams' imposition of fixed wage after reaching bargaining impasse with players' union not subject to challenge under the Sherman Act); *Clarett v. Nat'l Football League*, 369 F.3d 124 (2d Cir. 2004) (restrictions on amateur player eligibility contained in collective bargaining agreement immune from antitrust scrutiny under the non-statutory labor exemption).

*Iqbal*, 556 U.S. at 678, and, in any event is belied by the United States government's reporting of chicken processing employee compensation.[8]

Finally, Plaintiffs' assertion that various Defendants might be able to match data with the submitting Producer (and thus defeat Agri Stats' efforts to anonymize its reports), ACC ¶¶ 164-65, does not overcome Plaintiffs' failure to allege harm to competition. Even crediting that speculation, anonymity is not the measure of competitive harm. Rather, the measure is some deleterious effect on marketwide compensation, and on that issue, Plaintiffs' ACC is bereft of facts. *Jung,* 300 F. Supp. 2d 119 (conclusory allegations concerning AMA's exchange of disaggregated, employer-specific data not enough to survive a motion to dismiss); *Five Smiths*, 788 F. Supp. at 1054 (exchange of player-specific compensation information does not itself allege harm to competition). Plaintiffs' rule of reason claim against Agri Stats should be dismissed.

---

[8] United States Department of Labor, Bureau Of Labor Statistics, Occupational Employment Statistics, Meat, Poultry, and Fish Cutters and Trimmers (May 2018), https://www.bls.gov/oes/current/oes513022.htm; United States Department of Labor, Bureau Of Labor Statistics, Occupational Employment Statistics, Slaughterers and Meat Packers (May 2018), https://www.bls.gov/oes/current/oes513023.htm; United States Department Of Agriculture, National Agricultural Statistics Service, Farm Labor Report (Nov. 19, 2019), https://www.nass.usda.gov/Publications/Todays_Reports/reports/fmla1112.pdf.

**CONCLUSION**

For the foregoing reasons and those stated in Joint Motion, Agri Stats respectfully requests that the Court dismiss Plaintiffs' claims against it with prejudice.

Respectfully submitted,

Dated: March 2, 2020

*/s/ Steven F. Barley*

Steven F. Barley (Bar No. 10049)
HOGAN LOVELLS US LLP
100 International Drive,
Baltimore, MD 21202
Tel: (410) 659-2700
Fax: (410) 659-2701
steve.barley@hoganlovells.com

William L. Monts III (*Pro Hac Vice*)
Justin W. Bernick (*Pro Hac Vice*)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

*Counsel for Defendant Agri Stats, Inc.*

**CERTIFICATE OF SERVICE**

I certify that on March 2, 2020, I caused a copy of the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANT AGRI STATS, INC.'S MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED COMPLAINT** to be served on all counsel of record via the CM/ECF filing system of the District of Maryland.

Dated: March 2, 2020

*/s/ Steven F. Barley*
Steven F. Barley (Bar No. 10049)