**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| Judy Jien, et al., | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) **CIVIL ACTION** |
| v. | ) **No. 1:19-CV-2521** |
| | ) |
| Perdue, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR JOINT MOTION**
**TO DISMISS AMENDED CONSOLIDATED COMPLAINT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT .......................................................................................................... 4

I.    PLAINTIFFS FAIL TO ALLEGE A *PER SE* CLAIM FOR A CONSPIRACY TO
FIX COMPENSATION.................................................................................. 4

    A.    Plaintiffs Do Not Allege Direct Evidence of an Agreement to Fix
Compensation. .............................................................................. 4

    B.    Plaintiffs Do Not Allege Circumstantial Evidence of an Agreement to Fix
Compensation. .............................................................................. 6

        1.    Plaintiffs Do Not Allege Parallel Conduct.................................. 7

        2.    Plaintiffs' "Plus Factors" Do Not Support an Inference of
Agreement.............................................................................. 9

II.    PLAINTIFFS FAIL TO ALLEGE AN UNLAWFUL INFORMATION
EXCHANGE............................................................................................. 16

    A.    Plaintiffs Do Not Plead a Plausible Relevant Market. ......................... 18

        1.    Plaintiffs' Product Market Definition is Facially Implausible................. 18

        2.    Plaintiffs' Rationales for Their Product Market Definition Do Not
Withstand Scrutiny................................................................... 22

        3.    Plaintiffs Fail to Allege a Plausible Geographic Market. ......................... 24

    B.    Plaintiffs Fail to Allege that Any Information Exchange Had
Anticompetitive Effects. ................................................................. 27

III.    PLAINTIFFS' CLAIMS ARE TIME-BARRED............................................. 28

    A.    Plaintiffs Fail to Allege Affirmative Acts of Concealment by Defendants. ......... 29

    B.    Plaintiffs Fail to Allege Due Diligence................................................. 31

IV.    PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE................... 33

V.    CONCLUSION.......................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*42nd Parallel N. v. E Street Denim Co.*,
   286 F.3d 401 (7th Cir. 2002) ...........................................................................22

*Advanced Health–Care Servs., Inc. v. Radford Cmty. Hosp.*,
   910 F.2d 139 (4th Cir. 1990) ...........................................................................26

*Akers v. Maryland State Educ. Ass'n*,
   376 F. Supp. 3d 563 (D. Md. 2019) ..................................................................8

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
   367 F.3d 212 (4th Cir. 2004) .............................................................................4

*Am. Dental Ass'n v. Cigna Corp.*,
   605 F.3d 1283 (11th Cir. 2010) .......................................................................11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................... 3, 8, 30

*In re Baby Food Antitrust Litig.*,
   166 F.3d 112 (3d Cir. 1999) .............................................................................27

*Bank of America, N.A. v. Knight*,
   725 F.3d 815 (7th Cir. 2013) ..............................................................................8

*Belifore v. New York Times Co.*,
   826 F.2d 177 (2d Cir. 1987), *cert denied*, 108 S. Ct. 1030 (1988) .................22

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 554 (2007) ................................................................................ *passim*

*Boland v. Consolidated Multiple Listing Serv., Inc.*,
   868 F. Supp. 2d 506 (D.S.C. 2011), *aff'd sub nom. Robertson v. Sea Pines
   Real Estate Cos.*, 679 F.3d 278 (4th Cir. 2012) ...............................................29

*In re Broiler Chicken Antitrust Litig.*,
   290 F. Supp. 3d 772 (N.D. Ill. 2017) .................................................................8

*Burtch v. Milberg Factors, Inc.*,
   662 F.3d 212 (3d Cir. 2011) ...............................................................................6

*In re California Title Ins. Antitrust Litig.*,
   No. 08-01341-JSW, 2009 WL 1458025 (N.D. Cal. May 21, 2009) ..................15

*Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.*,
 546 F.2d 570 (4th Cir. 1976) ...................................................................30

*In re Citric Acid Litig.*,
 191 F.3d 1090 (9th Cir. 1999) ..............................................................13

*Cozzarelli v. Inspire Pharms., Inc.*,
 549 F.3d 618 (4th Cir. 2008) ................................................................33

*Davis v. Complete Auto Recovery Servs., Inc.*,
 No. JKB-16-3079, 2017 WL 6501761 (D. Md. Dec. 18, 2017) (Bredar, C.J.) ......................23

*Doe v. Walker*,
 746 F. Supp. 2d 667 (D. Md. 2010) ........................................................20

*E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc.*,
 637 F.3d 435 (4th Cir. 2011) ........................................................3, 18, 21

*Edmonson v. Eagle Nat'l Bank*,
 922 F.3d 535 (4th Cir. 2019) ........................................................28, 29, 30

*Eichorn v. AT & T Corp.*,
 248 F.3d 131 (3d Cir. 2001).................................................................20

*In re Elevator Antitrust Litig.*,
 502 F.3d 47 (2d Cir. 2007)..................................................................14

*In re Graphics Processing Units Antitrust Litig.*,
 527 F. Supp. 2d 1011 (N.D. Cal. 2007) ..................................................14

*Hall v. United Air Lines, Inc.*,
 296 F. Supp. 2d 652 (E.D.N.C. 2003).................................................11, 14

*Hall v. Virginia*,
 385 F.3d 421 (4th Cir. 2004) ...............................................................20

*Hanger v. Berkley Grp., Inc.*,
 Civil Action No. 5:13–cv–113, 2015 WL 3439255 (W.D. Va. May 28, 2015) ...............18, 20

*In re Hawaiian & Guamanian Cabotage Antitrust Litig.*,
 647 F. Supp. 2d 1250 (W.D. Wash. 2009)...............................................15

*Hirschler v. GMD Investments Ltd. Partnership*,
 Civ. A. No. 90-1289-N, 1990 WL 263438 (E.D. Va. Dec. 18, 1990) ....................32

*Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*,
 231 F. Supp. 2d 1253 (N.D. Ga. 2002) ..................................................14

*Hughes v. J.P. Morgan Chase Bank, N.A.*,
   No. RDB-16-2311, 2016 WL 7012278 (D. Md. Nov. 29, 2016)............................................33

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010)...............................................................................................6

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
   432 F. Supp. 2d 571 (E.D. Va. 2006) ...............................................................................33

*Lansdowne on the Potomac Homeowners Ass'n Inc. v. Openband at Landsdowne
   LLC,* No. 1:11-cv-972 (AJT/TCB), 2011 WL 5872885 (E.D. Va. Nov. 22,
   2011) ....................................................................................................................................18

*LLM Bar Exam, LLC v. Barbri, Inc.*,
   271 F. Supp. 3d 547 (S.D.N.Y. 2017)...............................................................................7, 9

*In re LTL Shipping Servs. Antitrust Litig.*,
   No. 08-MD-01895-WSD, 2009 WL 323219 (N.D. Ga. Jan. 28, 2009)...................................15

*In re Managerial, Prof. and Tech. Employees*,
   No. MDL 1471, 02–CV–2924 (GEB), 2006 WL 38937 (D.N.J. Jan. 5, 2006) .......................26

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013)................................................................................................5

*In re Mexican Gov't Bonds Antitrust Litig.*,
   No. 18-CV-2830, 2019 WL 4805854 (S.D.N.Y. Sept. 30, 2019)...........................................9

*Molinari v. Consol Energy Inc.*,
   No. 12cv1085, 2012 WL 5932979 (W.D. Pa. Nov. 27, 2012) ...............................................23

*Moore v. Boating Indus. Ass'n*,
   819 F.2d 693 (7th Cir.1987) ...............................................................................................11

*Muigai v. IB Prop. Holdings, LLC*,
   No. 08:09-CV-01623-AW, 2010 WL 5173313 (D. Md. Dec. 14, 2010)..................................6

*In re Musical Instruments and Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ............................................................................................11

*Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*,
   419 F.3d 462 (6th Cir. 2005) .............................................................................................18

*Ogden v. Little Caesar Enters., Inc.*,
   393 F. Supp. 3d 622 (E.D. Mich. 2019)..............................................................................25

*Palm Beach Strategic Income v. Salzman*,
   457 F. App'x 40 (2d Cir. 2012) ..........................................................................................23

v

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
   911 F.3d 505 (8th Cir. 2018) ...................................................................................9

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
   828 F.2d 211 (4th Cir. 1987) ....................................................................27, 29, 30

*In re Pork Antitrust Litig.*,
   No. 18-1776, 2019 WL 3752497 (D. Minn. Aug. 8, 2019) .................................7, 9

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997)....................................................................................18

*In re Railway Indus. Employee No-Poach*,
   395 F. Supp. 3d 464 (W.D. Pa. 2019)....................................................................26

*Robinson v. Tyson Foods, Inc.*,
   No. 19-CV-02960-ELH (D. Md. Filed Oct. 9, 2019) ECF No. 1 .....................24, 25

*Rx.com v. Medco Health Solutions, Inc.*,
   322 Fed. Appx. 394 (5th Cir. 2009)........................................................................29

*SD3 II LLC v. Black & Decker (U.S.) Inc.*,
   888 F.3d 98 (4th Cir. 2018) .....................................................................28, 29, 32

*SD3, LLC v. Black & Decker (U.S.), Inc.*,
   215 F. Supp. 3d 486 (E.D. Va. 2016), *aff'd sub nom. SD3 II*, 888 F.3d...............29

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) ...................................................................... *passim*

*Shaev v. Baker*,
   No. 16-cv-05541-JST, 2017 WL 1735573 (N.D. Cal. May 4, 2017) .....................20

*Simpson v. Sanderson Farms, Inc.*,
   744 F.3d 702 (11th Cir. 2014) ...............................................................................25

*Somerville v. West Town Bank & Trust*,
   No. PJM 19-0490, 2019 WL 6131288 (D. Md. Nov. 19, 2019)..............................29

*SunTrust Mortg., Inc. v. Nationwide Equities, Corp.*,
   No. 3:12CV330–JRS, 2012 WL 4953120 (E.D. Va. Oct. 16, 2012).......................16

*Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*,
   71 F.3d 119 (4th Cir. 1995) ...................................................................................28

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001)..............................................................17, 21, 24 26

*United States v. Citizens & S. Nat'l Bank*,
  422 U.S. 86 (1975).................................................................................................16

*United States v. E.I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956).............................................................................................17

*United States v. U.S. Gypsum Co.*,
  438 U.S. 422 (1978).................................................................................13, 16, 27

*Wahoo Int'l, Inc. v. Phix Doctor, Inc.*,
  No. 13cv1395-GPC (BLM), 2015 WL 3872343 (S.D. Cal. June 23, 2015)...........16

*Waters v. Electrolux Home Prods., Inc.*,
  No. 5:13CV151(STAMP), 2016 WL 3926431 (N.D. W. Va. July 18, 2016) ........26

*Williamson Oil Co. v. Philip Morris USA*,
  346 F.3d 1287 (11th Cir. 2003) ............................................................................10

**Statutes**

15 U.S.C. § 1............................................................................................... *passim*

15 U.S.C. § 15b.....................................................................................................27

**Other Authorities**

9 C.F.R. § 301.2 ....................................................................................................20

Ioana Marinescu, Herbert Hovenkamp, *Anticompetitive Mergers in Labor
  Markets*, 94 Ind. L.J. 1031, 1048 (2019) ............................................................25

## PRELIMINARY STATEMENT

Plaintiffs originally alleged that, starting in 2009 and continuing to the present, defendant chicken processors conspired to reduce the hourly wages of certain workers at chicken processing plants. Defendants moved to dismiss because that complaint did not state a claim. Two business days later, Plaintiffs asked for a do-over and ultimately filed an amended complaint that expands what was an already implausible conspiracy theory into an untenable one. Specifically, Plaintiffs broaden the originally pled putative conspiracy to include not only chicken processors, but also turkey processors. Plaintiffs also expand the purported conspiracy to cover not just non-supervisory and maintenance employees, but plant employees at all levels; and not only hourly workers, but also salaried employees. Plaintiffs bring two claims: Count I alleges Defendants expressly agreed to fix wages and salaries, and Count II alleges Defendants agreed to participate in third-party services that benchmark wage information with the alleged purpose and effect of keeping wages and salaries low. Neither comes close to stating a claim.

*First*, the Amended Consolidated Complaint ("ACC") offers no facts about wages and salary depression. With one exception (the alleged "fully loaded wage" for the lowest paid worker at one Defendant's processing plant for an unspecified job on an unspecified date in 2016, ACC ¶ 110), Plaintiffs allege nothing about any Defendant's compensation levels at any time. They do not claim that any two Defendants' wages or salaries were the same or moved in parallel. They do not plead, because they cannot, that plant compensation levels changed in 2009 (the alleged start of the conspiracy) or stagnated since then. These are basic, foundational factual allegations that are wholly absent, without which neither of Plaintiffs' claims can proceed.

*Second*, Count I alleges that chicken and turkey processors conspired—along with two benchmarking companies—to fix and depress compensation at poultry processing plants in the

United States. ACC ¶ 260. But, to state such a claim, Plaintiffs must allege either direct evidence of a conspiracy or facts sufficient to infer the existence of a conspiracy. Plaintiffs do neither. They allege no direct evidence of an agreement, and, instead, rely on assertions that courts have found insufficient: participation in trade association meetings and information exchanges. Despite their own knowledge and apparent access to various "confidential" witnesses, the details of any purported agreement are non-existent.

Plaintiffs also do not allege facts from which a conspiratorial agreement can be inferred. For a Sherman Act § 1, 15 U.S.C. § 1, claim resting on circumstantial pleading, Plaintiffs must plausibly allege facts demonstrating (1) "parallel conduct," and (2) "plus factors," i.e., "further circumstance[s] pointing toward a meeting of the minds." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 424-25 (4th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 554, 557 (2007)) (internal quotation marks omitted). Plaintiffs' amendments continue to fail at the first step: they do not allege parallel conduct. Indeed, Plaintiffs say nothing about when or to what extent any given Defendant changed its wages or salaries—much less that this conduct was "parallel" to changes made by any other Defendant. For this reason alone, Plaintiffs' Count I must be dismissed. Furthermore, the Plaintiffs' alleged plus factors are merely legal buzzwords without sufficient factual allegations to support them or explain how they make a conspiracy plausible.

***Third***, Plaintiffs' Count II alleges an unlawful agreement by Defendants to exchange compensation information. Such benchmarking, as decades of cases confirm, is analyzed under the "rule of reason," and thus requires pleadings to allege both a plausible relevant market and anticompetitive effects within that market. Plaintiffs now allege that the relevant product market includes hourly wage ***and salaried*** workers at chicken ***and turkey*** processing plants. ACC ¶ 208. But, once again, these allegations are illogical. Plaintiffs purport to allege an agreement affecting

labor, not poultry. They contend that tens of thousands of different poultry processing plant employees, regardless of their title or job functions, do not view jobs in ***any other*** industry as alternatives—an outlandish position that defies common sense. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (courts rely on "common sense," among other things, to determine whether a complaint states a plausible claim.). Plaintiffs similarly allege the implausibly broad geographic market as the whole of the "continental United States." ACC ¶¶ 223, 267.

> Plaintiffs' amended pleading asks the Court to accept the following farfetched assertions:

- A janitor at an Arkansas poultry plant would consider a comparable job opening at a poultry plant across the country in Oregon, but not a similarly paying job at a Walmart in the same town.

- A safety coordinator at a poultry plant would not view a similarly paying job at a beef plant in the same town as a realistic alternative.

- A poultry plant worker, who loads poultry products into cartons for shipment, would not take a similar paying position loading other products into cartons for shipment at a nearby Amazon fulfillment center.

No facts in the ACC warrant such conclusions, and these "glaring deficiencies" are fatal to Plaintiffs' claims. *E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 444 (4th Cir. 2011).

> ***Finally***, Plaintiffs' claims are time-barred. Plaintiffs assert that the purported conspiracy began in January 2009—well before the four-year limitations period that applies to private antitrust claims—but fail to plead valid reasons for waiting more than a decade to file. Plaintiffs' allegations of fraudulent concealment still fall short: Plaintiffs offer only conclusory statements that the alleged conduct was concealed; general characterizations of "off the books" or "secret" conduct; and general, unsupported assertions that Defendants falsely represented their wages as competitive. None of these allegations warrants tolling the statute of limitations. Indeed, Plaintiffs' own allegations demonstrate that the alleged conduct was anything but concealed.

## ARGUMENT

### I. PLAINTIFFS FAIL TO ALLEGE A *PER SE* CLAIM FOR A CONSPIRACY TO FIX COMPENSATION

Plaintiffs allege that Defendants entered into a *per se* unlawful agreement to fix and suppress compensation for poultry plant workers but offer no supporting factual allegations. To advance such a claim, antitrust plaintiffs "must plead 'enough factual matter (taken as true) to suggest that [the requisite] agreement was made.'" *SD3,* 801 F.3d at 424 (quoting *Twombly,* 550 U.S. at 556). Plaintiffs fail to do so. They plead no facts plausibly showing *direct* evidence of any conspiracy to suppress compensation, nor do they allege a conspiracy through *circumstantial* evidence, because they have pled neither parallel conduct nor plus factors. *See id*. Remarkably, Plaintiffs do not even plead the basic foundational facts to establish an agreement to fix compensation, such as:

- what compensation or wage levels were for any Defendant at any point in time;

- whether any compensation or wages of any Defendants moved in parallel;

- how wages or compensation levels changed after the supposed agreement was entered into; or

- any instance in which wage or compensation levels decreased or did not increase as expected.

Accordingly, Plaintiffs' Count I fails and must be dismissed.

### A. Plaintiffs Do Not Allege Direct Evidence of an Agreement to Fix Compensation.

Plaintiffs allege no direct evidence of an agreement among Defendants to fix compensation. The Fourth Circuit has held "that direct evidence in this context is 'explicit and requires no inferences to establish the proposition or conclusion being asserted.'" *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004) (quoting *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003)). "Direct evidence is

extremely rare in antitrust cases and is usually referred to as the 'smoking gun.'" *Id.* (quoting *Intervest*, 340 F.3d at 159). For example, "a recorded phone call in which two competitors agreed to fix prices at a certain level" is direct evidence of a conspiracy. *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). Plaintiffs do not meet this demanding burden: they plead no facts directly establishing the formation, or existence of, the alleged unlawful agreement.

*First*, Plaintiffs fail to plead any facts in support of the purported agreement to fix compensation. Every mention of this alleged agreement in the ACC is entirely devoid of facts about its purported content or structure, such as how wages were supposedly fixed, or what the parties agreed to do. For example, Plaintiffs allege that, "[b]eginning on or before 2009, senior executives of Defendant Processors conducted regular in person meetings to exchange information about, discuss and ultimately fix the wages, salaries and benefits." ACC ¶ 133. Such conclusory pleadings with no actual factual support are throughout the ACC. *See, e.g.*, *id.* ¶¶ 6, 137, 148-49, 152, 205. But, "a court is not required to accept" terms like "'conspiracy,' or even 'agreement' . . . as a sufficient basis for a complaint." *DM Research, Inc. v. College of Am. Pathologists*, 170 F.3d 53, 56 (1st Cir. 1999), *accord Twombly*, 550 U.S. at 557. Such conclusory assertions are not, and have never been, direct evidence of an agreement.

Plaintiffs do not allege which executives entered the purported agreement to fix compensation, the date of the agreement, or any of its supposed terms or mechanics. An assertion that an agreement began "on or before" a particular year is not a well-pleaded fact, nor is an allegation lumping unidentified executives together and insisting that they agreed to fix wages solely because they attended an industry conference. *See Twombly* at 557 ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show

illegality."); *SD3* 801 F.3d at 422 (pleadings cannot rely on "'indeterminate assertions'") (quoting *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (4th Cir. 2015)); *Muigai v. IB Prop. Holdings, LLC*, No. 08:09-CV-01623-AW, 2010 WL 5173313, at *4 (D. Md. Dec. 14, 2010) (dismissing complaint that included "no specific facts as to how or when [the defendant] conspired," and in which "Plaintiff ma[de] mere legal conclusions . . . based on ambiguous behavior").

*Second*, Plaintiffs' allegations that Defendants participated in industry surveys and attended industry meetings are not direct evidence of an agreement to fix compensation. No allegations identify any "document[s] or conversation[s] explicitly manifesting the existence of the agreement . . . in question." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 n.23 (3d Cir. 2010), *accord Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 226 (3d Cir. 2011). Nor are allegations that a Defendant shared wage information with another, even if true, direct evidence of an agreement to fix compensation. These allegations, at best, suggest only that some Defendants collected data about wages. They say nothing about an agreement to fix wage or compensation levels, let alone the agreement pleaded here—a sprawling ten-year conspiracy involving all Defendants.

In short, Plaintiffs simply do not plead facts establishing any "independent allegation of actual agreement among" Defendants to fix compensation. *Twombly*, 550 U.S. at 564. Each and every allegation regarding such an agreement merely states the conclusion that one existed and fails to plead any facts in support. Plaintiffs' *per se* conspiracy claim fails for this reason.

## B.   Plaintiffs Do Not Allege Circumstantial Evidence of an Agreement to Fix Compensation.

Plaintiffs also fail to allege **circumstantial** evidence of a compensation-fixing agreement. In order to support an inference of conspiracy, Plaintiffs must allege both (1) parallel conduct by

6

Defendants, and (2) "plus factors" suggesting that the parallel conduct resulted from concerted action. *Twombly*, 550 U.S. at 567; *SD3*, 801 F.3d at 424. They do neither.

### 1.    Plaintiffs Do Not Allege Parallel Conduct.

To allege parallel conduct, Plaintiffs must "plead[] facts indicating that the defendants acted 'similarly'," *SD3*, 801 F.3d at 427 (quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1243 (3d Cir. 1993), or that their "actions were 'uniform'." *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 320 (6th Cir. 2014), *accord*, *SD3*, 801 F.3d at 427; *see In re Pork Antitrust Litig.*, No. 18-1776 (JRT/LIB), 2019 WL 3752497, at *7 (D. Minn. Aug. 8, 2019) (granting motions to dismiss for failure to allege parallel conduct); *LLM Bar Exam, LLC v. Barbri, Inc.*, 271 F. Supp. 3d 547, 589 (S.D.N.Y. 2017) (Parallel conduct is "a basic building block of an antitrust conspiracy," but is "insufficient on its own"). Plaintiffs' complaint fails this threshold requirement. No facts in the ACC state whether compensation went up or down or stayed the same, much less that two or more Defendants decided or adjusted wages in parallel, as required for this claim's survival.

Indeed, the only specific allegation about employee compensation is that the "fully loaded wage" for the lowest-paid worker at one Defendant's processing plant for an unspecified job on an unspecified date in 2016 "was $17.12 . . . [and] was comprised of a $12 hourly wage plus a benefits package equal to $5.12 per hour." ACC ¶ 110. This says nothing about parallel conduct. The ACC is bereft of other factual allegations regarding hourly wages or any other element of compensation for any poultry plant employee, including any named Plaintiff. Further, Plaintiffs' amended class definition now includes salaried workers, but nowhere do they allege even a single salary for any position for any Defendant. At best, Plaintiffs offer conclusory allegations, e.g., that each Defendant "pays the same, or nearly the same wages and benefits." ACC ¶ 220. These

generalities are legal conclusions and group pleadings that do not survive a motion to dismiss. *See, e.g.*, *Iqbal*, 556 U.S. at 679; *SD3*, 801 F.3d at 422-23 ("A plaintiff in a § 1 case cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group.").

Plaintiffs' few allegations about ***average*** industry compensation cannot save their complaint. The Fourth Circuit, like other courts across the country, rejects sweeping assertions about all defendants based on averages or generic allegations: a "complaint must 'specify how . . . defendants [were] involved in the alleged conspiracy,' without relying on 'indeterminate assertions against all 'defendants.'" *SD3*, 801 F.3d at 422 (quoting *Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 905 (6th Cir. 2009)). "[I]f [the complaint] fails to allege particular facts against a particular defendant, then the defendant must be dismissed." *Id*.; *see also Bank of America, N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) ("Each defendant is entitled to know what he or she did that is asserted to be wrongful. A complaint based on a theory of collective responsibility must be dismissed. That is true even for allegations of conspiracy."); *Akers v. Maryland State Educ. Ass'n,* 376 F. Supp. 3d 563, 573 (D. Md. 2019) ("Importantly, the complaint must contain sufficient factual allegations regarding each defendant; '[a] plaintiff in a § 1 case cannot assemble some collection of defendants and then make vague, nonspecific allegations against all of them as a group.'") (quoting *SD3*, 801 F.3d at 422). Asserting that "[w]ages average[d] around $11 per hour" in 2015, ACC ¶ 120, says nothing about any Defendant's ***actual*** hourly wages, or any other form of compensation, and whether any Defendant's compensation moved in parallel with that of any other.[1]

---

[1] Even decisions ultimately denying motions to dismiss demonstrate the inadequacy of Plaintiffs' allegations of parallel conduct here. The "civil class action" that Plaintiffs reference, ACC ¶ 200,

In short, Plaintiffs fail to plead any facts concerning compensation amounts, parallel movement of any wages or compensation, or any post-agreement shift in industry compensation trends. Because Plaintiffs fail to allege "even this basic building block of an antitrust conspiracy," their purported compensation-fixing conspiracy claim must be dismissed. *LLM Bar Exam*, 271 F. Supp. 3d at 589; *see also SD3*, 801 F.3d at 424 (requiring parallel conduct to allege circumstantial case of conspiracy); *Pork Antitrust Litig.*, 2019 WL 3752497, at *7 (granting motion to dismiss for failure to allege parallel conduct).

### 2.    Plaintiffs' "Plus Factors" Do Not Support an Inference of Agreement.

"Because [Plaintiffs] fail[] to plausibly plead parallel conduct, no discussion of any 'plus factors' is necessary," and the ACC should simply be dismissed. *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 517 (8th Cir. 2018); *See Pork Antitrust Litig.*, 2019 WL 3752497, at *7 ("[P]lus factors without plausible allegations of parallel conduct are insufficient to establish an inference of an agreement."). Plaintiffs' compensation-fixing claim, however, also fails for the independent reason that Plaintiffs do not plead the requisite plus factors. As the

---

concerns a purported conspiracy to restrain chicken supply. *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 781 (N.D. Ill. 2017). As a more recent decision observed in distinguishing that case, the plaintiffs in *Broiler Chicken* alleged "specific production cuts from specific individual defendants." *See Pork Antitrust Litig.*, 2019 WL 3752497, at *8 (distinguishing *Broiler Chicken* and dismissing an antitrust claim asserting an agreement to reduce pork output). The *Pork* Court explained that industry-wide data "does nothing to indicate how any of the individual Defendants acted." *Id.* at *8. Without "specific information regarding each Defendant, the Court has no basis to analyze which, how many, or when any of the individual Defendants may have affirmatively acted to reduce the supply of pork. And that type of information is vital to pleading parallel conduct." *Id.* The Plaintiffs here do not allege facts comparable to those in *Broiler Chicken*. Likewise, in *SD3*, in which the Fourth Circuit permitted a group boycott claim to proceed against some but not all defendants, the plaintiffs alleged specific conduct by specific defendants in parallel. 801 F.3d at 420. Indeed, aggregated statistics are merely "group pleading in another form" that "obscure any given Defendant's contribution to an observed trend." *In re Mexican Gov't Bonds Antitrust Litig.*, No. 18-CV-2830, 2019 WL 4805854, at *7 (S.D.N.Y. Sept. 30, 2019).

Supreme Court has explained, allegations of parallel conduct, without more, do not suggest a conspiracy. *See Twombly*, 550 U.S. at 556-57. Plus factors are necessary because "[d]etail in a complaint of 'further circumstances pointing toward a meeting of the minds' allays the suspicion that the plaintiff is merely speculating a conspiracy into existence from coincidentally similar actions." *SD3*, 801 F.3d at 430 (quoting *Twombly*, 550 U.S. at 557). The complaint fails to meet this clear obligation.

Plaintiffs first allege in conclusory fashion that the poultry industry is "particularly susceptible to collusion" due to "vertical integration," "high barriers to entry," and high concentration. ACC ¶¶ 194, 197. As an initial matter, industry characteristics are not plus factors. *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1317 (11th Cir. 2003) (rejecting allegations of high barriers to entry and industry structure as plus factors because they "are simply indicia that the . . . industry is an oligopoly, which is perfectly legal"). Moreover, Plaintiffs use these buzzwords to describe the market for ***poultry***, not ***labor***. For example, even assuming that it is "expensive and logistically complex for new poultry processors to emerge and compete with Defendant[s]," as Plaintiffs allege, such an assertion relates to competition for ***poultry***, not ***labor***. ACC ¶ 196. Similarly, since Plaintiffs claim that Defendants depressed compensation at ***poultry processing plants***, allegations that Defendants "own and operate" other "*stage[s] of poultry production*" are irrelevant. *Id.* ¶ 195 (emphasis added); *see id*. ¶ 1.

Plaintiffs also allege that the "poultry processing industry is highly concentrated." *Id.* ¶ 197. But, Plaintiffs identify no fewer than 16 processors—this is hardly suggestive of a "highly concentrated" market and makes a conspiracy among them quite implausible. In any event, the important issue here is the size and number of employers in the relevant market, which is a labor market that goes far beyond poultry processors, as discussed below in Part II. As to "fungibility of

poultry processing plant labor" and "inelastic labor supply," *id.* ¶ 9, Plaintiffs offer only generalizations and conclusory allegations, with no specific facts or explanation as to why these criteria make a compensation conspiracy more likely.

Plaintiffs next allege that Defendants had "numerous opportunities to collude" at industry meetings sponsored by the National Chicken Council, the U.S. Poultry & Egg Association, and other industry organizations, and allege that certain industry executives have close personal relationships with each other. *Id.* ¶¶ 9, 194, 201-02. Courts, however, have made clear that mere attendance at trade association or other events does not suggest collusive behavior. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295 (11th Cir. 2010) ("It was well-settled [even] before *Twombly* that participation in trade organizations provides no indications of conspiracy."); *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) ("[P]articipation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement."); *Moore v. Boating Indus. Ass'n*, 819 F.2d 693, 712 (7th Cir.1987) ("Mere memberships in a trade association [and] attendance at trade association meetings . . . are not, in and of themselves, condemned or even discouraged by the antitrust laws."), *accord Hall v. United Air Lines, Inc.*, 296 F. Supp. 2d 652, 664 (E.D.N.C. 2003).[2]

Perhaps more importantly, Plaintiffs' allegations again show only the incongruity between Plaintiffs' central conspiracy allegation—a purported wage-fixing agreement among all Defendants—and their newly expanded allegations against turkey processors. Plaintiffs must now plead facts to "suggest that an agreement was made" among many additional companies. *Twombly*,

---

[2] Similarly, abstract references to relationships between executives, such as executives of two Defendants "attending church together," ACC ¶ 201, and "senior executives" of three other unnamed Defendants who "knew each other well," *id.*, do not indicate that those executives conspired to violate the antitrust laws.

550 U.S. at 556. Their allegations do not meet that threshold. According to Plaintiffs, "[b]eginning on or before 2009," the alleged conspirators met each year in Destin, Florida to "discuss and ultimately fix the wages, salaries and benefits provided to their employees at ***poultry*** processing plants in the continental United States." ACC ¶ 133 (emphasis added). Plaintiffs concede, however, that "Butterball, Jennie-O and Cargill . . . joined the annual WMS survey and [these] meetings for the first time in or around 2015." ACC ¶ 154. As implausible as the conspiracy was that Plaintiffs described in the previous complaint, it is even less plausible that a group of chicken processors meeting among themselves fixed the wages paid by turkey processors not in attendance.

Furthermore, the expansion of the conspiracy to include turkey processors undermines Plaintiffs' own theory about how the alleged conspiracy was monitored and enforced. The previous complaint charged a conspiracy among ***chicken*** processors and alleged that ***chicken*** processors were able to monitor and enforce the purported agreements because they received Agri Stats reports showing wages paid by all other ***chicken*** processors.[3] Tellingly, however, Plaintiffs do not specifically allege in the ACC that Agri Stats' chicken reports contain information about wages paid by turkey processors, or that turkey reports contain information about wages paid by chicken processors. As a result, in expanding the supposed market to include both chicken and turkey plant employees, Plaintiffs have undercut their own enforcement theory.

Plaintiffs' allegations regarding "off the books meetings between senior executives of Defendant Processors," ACC ¶¶ 132-33, and "bilateral and regional exchanges of wage, salary and

---

[3] "Agri-Stats gathers information from, and exchanges information between . . . ***chicken*** processors." Consolidated Compl. at ¶ 147, ECF No. 196 (emphasis added); *see also id.* ¶ 156 (Using information from Agri-Stats, the defendant chicken processors "were able to constantly monitor each other's compensation levels to ensure that no Defendant [chicken] Processor offered materially more compensation than another").

benefit information," *id.* ¶ 8, do not plead a plus factor. In *SD3*, the Fourth Circuit identified and discussed the types of meeting allegations that could be considered plus factors, finding that a complaint survived a Rule 12(b)(6) motion because it alleged "a particular meeting on a particular day with particular participants making a particular agreement that generated the conspiracy at issue." 801 F.3d at 430; *see also id.* at 439-40 (Wynn, C.J., concurring) (reciting two pages of allegations regarding who attended the meeting, what was said, and the specific actions that each defendant took consistent with the meeting discussion). Here, the absence of facts about alleged meeting attendees, the content of their discussions, and actions taken as a result leaves these allegations short of stating plus factors.

Plaintiffs' allegations about industry benchmarking surveys and purported information exchanges likewise do not "allay[] the suspicion" of independent conduct. *SD3*, 801 F.3d at 430. As noted by the Supreme Court, information exchanges can "increase economic efficiency and render markets more, rather than less, competitive." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978). Participating in industry surveys and information exchanges are thus consistent with independent conduct; indeed, "gathering information about pricing and competition in the industry is standard fare for trade associations." *In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999). Finally, Plaintiffs concede that Defendants subscribed to Agri Stats before the alleged conspiracy, ACC ¶ 130, and do not allege facts to support an inference that this information exchange all of a sudden became against each Defendant's self-interest at a later date. Similarly, Plaintiffs concede that turkey processors did not use WMS until 2015, *id.*

¶ 154, and allege no facts to suggest how WMS participation would function as a plus factor when it was not used by an entire group of Defendants until six years into the alleged conspiracy.[4]

Next, Plaintiffs allege that "[t]he history of the poultry processing industry is replete with government investigations and collusive actions."[5] *Id.* ¶ 200. They cite a nearly 50-year-old civil antitrust suit against the National Broiler Marketing Association in 1973 and note that the DOJ is currently "investigating the chicken industry for engaging in anti-competitive conduct," *id.*, without ever explaining how these allegations bear on the purported compensation-fixing arrangement. Courts routinely reject such allegations of "if it happened there, it could have happened here." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007); *see also Hall*, 296 F. Supp. 2d at 663 (finding "no case law . . . where 'history of collusion' is used as a plus factor courts consider in cases alleging illegal collusion in an oligopolistic market") (quoting *Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253, 1305 (N.D. Ga. 2002)); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (holding that a DOJ investigation "carries no weight in pleading an antitrust conspiracy claim," especially when "[i]t is unknown whether the investigation will result in indictments or nothing at all"); *Holiday Wholesale Grocery*, 231 F. Supp. 2d at 1305 ("The law generally disfavors use of such 'historical' evidence.").

---

[4] Plaintiffs also allege that Defendant Tyson did not participate in Agri Stats for two years of the alleged conspiracy, between 2014 and 2016, ACC ¶ 160, but fail to plead how alleged use of Agri Stats to facilitate an alleged conspiracy would function absent participation by "the largest poultry processor in the United States." *Id*. ¶ 130.

[5] This allegation is one of the more egregious results of the Plaintiffs' search-and-replace style of amendment, in which they take terms previously applied to chicken processors and replace them with references to "poultry" with no further factual enhancement. *Compare* Consolidated Compl. ¶ 180–81, ECF No. 196 *with* ACC ¶ 200.

Most telling, however, is what Plaintiffs fail to allege. Their case claims that Defendants conspired in 2009 and depressed compensation levels from that time forward. Yet, Plaintiffs do not allege that industry compensation changed after the purported conspiracy began. Courts consistently recognize that when a complaint fails to allege a price change at the start of the alleged conspiracy, an agreement to fix those prices is not plausible. *See In re California Title Ins. Antitrust Litig.*, No. 08-01341-JSW, 2009 WL 1458025, at *7 (N.D. Cal. May 21, 2009) ("Plaintiffs, however, do not [put] forth facts regarding the Defendants' pricing behavior prior to the alleged conspiracy, although Plaintiffs allege that pricing in California has remained stable since at least 1998. Thus, there are no allegations suggesting an 'unprecedented change' in the Defendants' behavior."); *In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d 1250, 1259-60 (W.D. Wash. 2009) ("[P]laintiffs supply no data concerning pricing practices predating the alleged anticompetitive agreement, and they fail to link the lockstep fuel surcharge fluctuations to anything other than the type of parallel conduct generally present in a homogeneous market." (footnote omitted)); *In re LTL Shipping Servs. Antitrust Litig.*, No. 08-MD-01895-WSD, 2009 WL 323219, at *17 (N.D. Ga. Jan. 28, 2009) (granting motion to dismiss when "Defendants' fuel surcharges are not alleged to be either historically unprecedented or enacted at the same time").[6]

---

[6] The closest Plaintiffs come is their allegation that, according to their own "preliminary analysis," the "difference between the weekly earnings of workers employed by food manufacturers broadly and the weekly earnings of workers employed by poultry processors was, on average, $103.79 during the ten-year period prior to the Class Period, and subsequently increased to, on average, $127.30 during the Class Period." ACC ¶ 228. Setting aside the impropriety of citing unsupported numbers from an unidentified "preliminary analysis" apparently prepared for litigation, the allegation only emphasizes the lack of any 2009-and-onward change in compensation. Chicken and turkey workers were, according to Plaintiffs, paid less at the start of the class period—and that gap merely persisted. A $23.50 increase in that gap over ten years is essentially accounted for by inflation. *See* Bureau of Labor Statistics for the U.S. Dep't of Labor, "CPI Inflation Calculator," https://www.bls.gov/data/inflation_calculator.htm (last visited Mar. 1, 2020) (showing that $103 in December 2008 would "ha[ve] the same buying power as" $125.90 in December 2019).

Indeed, Plaintiffs' prior complaint admits the exact opposite—that the "real value" of chicken workers' wages began falling by the 1980s, long before the alleged class period. Consolidated Compl. ¶ 196, ECF No. 196. Plaintiffs deleted this allegation when amending, but the original version serves as an admission by Plaintiffs, by which they are bound. "A complaint can be amended to cure deficiencies in the complaint but it must be consistent with the challenged pleading and must not contradict the allegations in the original complaint." *Wahoo Int'l, Inc. v. Phix Doctor, Inc.*, No. 13cv1395-GPC (BLM), 2015 WL 3872343, at *6 (S.D. Cal. June 23, 2015); *see also SunTrust Mortg., Inc. v. Nationwide Equities, Corp.*, No. 3:12CV330–JRS, 2012 WL 4953120, at *4 (E.D. Va. Oct. 16, 2012) ("[A] party . . . cannot advance one version of the facts in its pleadings, *conclude that its interests would be better served by a different version*, and amend its pleadings to incorporate that version.") (quoting *Cananwill, Inc. v. Emar Group, Inc.*, Nos. 2:96CV00558, 2:96CV00560, 2:97CV00338, 1999 WL 1939255, at *9 (M.D. N.C. March 5, 1999)).

In sum, Plaintiffs' proffered "plus factors" fail to "allay[] the suspicion that the plaintiff is merely speculating a conspiracy into existence from coincidentally similar actions," and thus cannot support any inference that chicken and turkey processors actually reached an agreement to fix compensation. *SD3*, 801 F.3d at 430. Count I should be dismissed.

## II.   PLAINTIFFS FAIL TO ALLEGE AN UNLAWFUL INFORMATION EXCHANGE

Plaintiffs' Count II offers an alternate theory of liability that Defendants unlawfully exchanged information concerning poultry plant employee compensation through third-party benchmarking services and industry meetings. The ACC, however, is deficient on this theory as well.

Information exchanges are not *per se* unlawful. *See U.S. Gypsum,* 438 U.S. at 441 n.16 ("The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive. For this reason, we have held that such exchanges of information do not constitute a *per se* violation of the Sherman Act."); *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975) ("[T]he dissemination of price information is not itself a *per se* violation of the Sherman Act."); *see also* U.S. Dep't of Justice & Fed. Trade Comm'n, *Statements of Antitrust Enforcement Policy in Health Care*, "Stmt. 6: Enforcement Policy on Provider Participation in Exchanges of Price and Cost Information" https://www.ftc.gov/sites/default/files/attachments/competition-policy-guidance/statements_of_antitrust_enforcement_policy_in_health_care_august_1996.pdf (Aug. 1996 rev.) ("Providers can use information derived from price and compensation surveys to price their services more competitively and to offer compensation that attracts highly qualified personnel."). Rather, they are evaluated under the "rule of reason," which requires Plaintiffs to establish that the putative information exchange has an overall anticompetitive effect on the relevant labor market. *Todd v. Exxon Corp.*, 275 F.3d 191, 198-99 (2d Cir. 2001). Specifically, to plead a Sherman Act § 1 claim for information exchange, Plaintiffs must allege: (1) an agreement to exchange information, (2) a relevant market, and (3) anticompetitive effects in that market resulting from the information exchange. *See id*. Here, Plaintiffs' amended allegations fail to plead the essential elements of the relevant antitrust market and anticompetitive effects in that market directly flowing from the information exchange.[7] *See id*.

---

[7] Defendants do not concede that Plaintiffs have properly alleged the remaining elements of an anticompetitive agreement to exchange information.

A.      **Plaintiffs Do Not Plead a Plausible Relevant Market.**

Plaintiffs first must plead a relevant market, which, in this case, is the universe of potential jobs to which poultry plant workers might turn if wages decreased--in other words, job opportunities that are reasonably interchangeable with their current jobs. *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). Plaintiffs' alleged relevant market fails for three reasons: (1) Plaintiffs' product market is facially implausible because it is limited to jobs in poultry processing plants and does not account for many alternative jobs that are reasonable substitutes; (2) Plaintiffs' rationales for excluding alternative jobs do not reflect reality; and (3) Plaintiffs' proposed geographic market implausibly encompasses the entire continental United States. These "glaring deficiencies" require dismissal of Plaintiffs' Count II. *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 444 (4th Cir. 2011); *see also Lansdowne on the Potomac Homeowners Ass'n Inc. v. Openband at Landsdowne LLC,* No. 1:11-cv-972 (AJT/TCB)*,* 2011 WL 5872885, at *3 (E.D. Va. Nov. 22, 2011) ("[T]he sufficiency of the [c]omplaint . . . depends . . . on whether the plaintiff has sufficiently alleged a market [because] the existence *vel non* of anti-competitive effects . . . must be measured by the relevant market.").

1.      **Plaintiffs' Product Market Definition is Facially Implausible.**

Plaintiffs cannot plausibly allege a market limited to employment at poultry processing plants, not only because it defies common sense, but also because, as even Plaintiffs themselves suggest, substitutable jobs exist. To survive a motion to dismiss, the "proposed relevant market . . . [must] encompass all interchangeable substitute products . . . ." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 436 (3d Cir. 1997) (affirming dismissal because plaintiffs' market definition on its face excluded substitute products); *see also Hanger v. Berkley Grp., Inc*., No. 5:13–cv–113, 2015 WL 3439255, at *9 (W.D. Va. May 28, 2015) (dismissing antitrust

18

complaint brought by sales personnel because plaintiffs failed to allege that "timeshare sales personnel could not look elsewhere for employment"). When, as here, Plaintiffs allege a conspiracy among employers, the relevant market definition must consider whether other "employment positions are reasonably interchangeable with those offered by defendant[s]." *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 472 (6th Cir. 2005). Plaintiffs fail to allege that either hourly or salaried workers lack reasonable substitute job opportunities outside the poultry industry, and their amended market allegations are now more implausible as they include both salaried and hourly wage jobs at chicken and turkey processing plants.

*First*, as to hourly wage workers, Plaintiffs' "relevant product market" implausibly excludes jobs that are reasonably interchangeable in industries other than poultry. The minimal references in the ACC touching on job substitutability for hourly workers do not plausibly suggest that their employment prospects were restricted to poultry processing plants. The ACC alleges that non-supervisory poultry workers receive "poor compensation"-between $20,000 and $25,000-and lacked "significant education." ACC ¶¶ 120, 124. But these conditions do not explain why other jobs with minimal education requirements are not reasonable options. For example, Plaintiffs suggest that all "food manufactur[ing] jobs (including manufacturers of grain, sugar, dairy, seafood and other foods)" are sufficiently similar to poultry processing plant jobs, such that wages for the latter should be benchmarked against the former. *Id*. ¶ 228. If these jobs are a suitable benchmark for poultry employee compensation, they are, perforce, a reasonable substitute.

Plaintiffs' implicit concession that other food processing jobs are similar to poultry processing jobs is consistent with the reality of the labor market—that workers at any level in a poultry plant will view many other positions as alternatives, if not more desirable. For example,

even focusing just on other protein processing plant employment—beef, pork, and fish—those jobs require the same "skills, education and/or training" as poultry processing plant jobs. Bureau of Labor Statistics for the U.S. Dep't of Labor ("BLS"), "2018 Standard Occupational Classification System," https://www.bls.gov/soc/2018/major_groups.htm (last updated June 20, 2018);[8] *see also Eichorn v. AT & T Corp.*, 248 F.3d 131, 147–48 (3d Cir. 2001) ("[T]he relevant market . . . includes all companies . . . who actively compete for employees with the skills and training possessed by plaintiffs."); *Hanger*, 2015 WL 3439255, at *10 (W.D. Va. 2015) ("[P]laintiffs . . . wholly fail to account for competition posed by purchasers of salespersons' services generally."). In fact, many of the plants Plaintiffs identify in the ACC process both poultry products and "meat" products, which include products derived from cattle and swine. *See* Food, Safety, and Inspection Service for the U.S. Dep't of Agriculture ("FSIS"), "FSIS Meat, Poultry and Egg Product Inspection Directory," (July 8, 2013) https://www.fsis.usda.gov/shared/PDF/MPI_Directory_Establishment_Number.pdf (listing, meat, poultry, and egg processing companies inspected by the FSIS); 9 C.F.R. § 301.2 (defining "meat" as coming from "cattle, sheep, swine, or goats"). Plaintiffs offer no reason why the workers at "poultry" plants that also process "meat" products could not find work at the hundreds of other plants that process "meat" products. *Id.*

---

[8] The court "may properly take judicial notice" of "items in the public record" on a 12(b) motion to dismiss. *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004); *Doe v. Walker*, 746 F. Supp. 2d 667, 678 n.14 (D. Md. 2010) ("Court may take judicial notice of matters of public record from sources—such as . . . the Government Accountability Office—whose accuracy cannot be reasonably questioned."). BLS statistics are among those records whose accuracy cannot be reasonably questioned. *Shaev v. Baker*, No. 16-cv-05541-JST, 2017 WL 1735573, at *7 (N.D. Cal. May 4, 2017) (taking judicial notice of documents from government websites, including the BLS).

Beyond non-poultry processing plant jobs, Alabama, Arkansas, Georgia, North Carolina, Minnesota, and Mississippi—the states with the highest alleged volume of poultry processing plants, ACC ¶ 103—have millions of other low-skilled manual labor jobs, including over 200,000 landscaping and farm worker jobs alone, that pay the same wages as poultry processing plants. *See* BLS, "May 2017 State Occupational Employment and Wage Estimates," https://www.bls.gov/oes/2017/may/oessrcst.htm (last updated Mar. 8, 2018) (showing occupational employment and wage estimates by state). Those jobs are not merely theoretical substitutes—Plaintiffs' own cited materials establish that workers routinely leave poultry processing plant jobs to take some of these other jobs. *See* Christopher Cook, *Diet for a Dead Planet: Big Business and the Coming Food Crisis*, 210 (2006) (cited at ACC ¶ 124).

**Second**, as to salaried workers, the ACC does not assert any facts to support Plaintiffs' allegation that these workers cannot find substitute employment outside poultry plants. *See, e.g.*, *Kolon Indus.*, 637 F.3d at 443 (quoting *Todd,* 275 F.3d at 200) ("Cases in which dismissal on the pleadings is appropriate frequently involve . . . [a] failure even to attempt a plausible explanation as to why a market should be limited in a particular way."). This absence is unsurprising, as logic dictates that a salaried worker in a poultry processing plant would find similar (or higher) paying positions in other industries to be reasonable job alternatives. Moreover, in their attempt to justify the alleged market, Plaintiffs highlight the implausibility of their purported product market by lumping together lower paying, production line work and supervisory jobs. This ignores reality: nothing in the ACC suggests that plant managers or safety officers--who "must satisfy certain education and experience requirements" and **are** "strongly preferred to have a Bachelor's degree," ACC ¶ 128—would be limited to poultry processing plant jobs for the same reasons that apply to unskilled hourly workers. Indeed, every allegation suggesting that poultry

processing plants are a stand-alone labor market applies only to hourly, unskilled positions. For example, Plaintiffs allege that hourly workers' limited English skills prevent them from working outside of poultry processing plants, *id.* ¶ 210, a limitation that does not apply to supervisors, whom Plaintiffs allege are required to be fluent in English, *id.* ¶ 128.

### 2. Plaintiffs' Rationales for Their Product Market Definition Do Not Withstand Scrutiny

Plaintiffs' allegations purporting to justify the exclusion of non-poultry processing plants do not reflect reality and should therefore be disregarded. In determining the sufficiency of product market allegations, a court is "not required to don blinders and ignore the commercial reality." *42nd Parallel N. v. E Street Denim Co.*, 286 F.3d 401, 405 (7th Cir. 2002) (quoting *Car Carriers Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1110 (7th Circ. 1984)); *see also Belfiore v. New York Times Co.*, 826 F.2d 177, 179 (2d Cir. 1987), *cert. denied*, 108 S. Ct. 1030 (1988) (rejecting plaintiffs' proposed market definition as "an awkward attempt to conform their theory to the facts they allege"). Plaintiffs attempt to salvage their market definition with three rationales: (1) some workers do not speak English; (2) some workers have "unique skills," for which poultry processors pay a premium; and (3) there are "transaction costs" associated with switching jobs. ACC ¶¶ 210-15. All collapse under even the lightest scrutiny.

Plaintiffs, for example, fail to allege how some workers' purportedly limited English skills prevent them from working many other low-skill jobs where English is not required. It is implausible that English fluency is a prerequisite for a job as, say, a landscaper or farmworker, but not for a poultry processing plant job. Indeed, Plaintiffs quote materials suggesting that many

manual laborers outside the poultry industry also have limited English skills. Cook, *Diet for a Dead Planet*, 187-88 (2006).[9]

Similarly, characterizing the poultry industry as unique does not make it so. Here, Plaintiffs allege that these workers are "fungible" because any able-bodied person could perform these jobs with no skills or training—including "inmates from the local prison[s]" and "participants in court-ordered substance abuse programs." ACC ¶¶ 120-21. Moreover, Plaintiffs conceded in their original complaint that the very same workers have "limited job skills." Consolidated Compl. ¶ 235. ECF No. 196. Given that stark contradiction, Plaintiffs' newfound assertion that these workers have "unique" skills is not entitled to the presumption of truth. *See Davis v. Complete Auto Recovery Servs., Inc.*, No. JKB-16-3079, 2017 WL 6501761, at *2 (D. Md. Dec. 18, 2017) (Bredar, C.J.) (refusing to credit plaintiffs' "turnabout from the premise of her prior amended complaint"); *see also Palm Beach Strategic Income v. Salzman*, 457 F. App'x 40, 42 (2d Cir. 2012) (affirming dismissal when complaint "directly contradicted" prior complaints). Further, Plaintiffs do not even allege that all plant workers were paid a premium; they instead allege that line and maintenance workers received "poor compensation" that landed them "near or below the poverty line." ACC ¶¶ 120-21. Plaintiffs once again contradict themselves—they claim that poultry plant jobs are low-paying and undesirable, yet poultry plant workers will not view jobs outside of the poultry business as alternatives.

**Finally**, Plaintiffs' claim of unspecified job "transition costs" is unsupported. Courts consistently reject attempts to limit labor markets to just one industry for low-skill workers based

---

[9] Even if the lack of English skills somehow briefly limited plant workers to only the poultry industry, poultry processors allegedly offered English language training. ACC ¶ 211. The training these employees received during their poultry plant employment would make non-poultry jobs even *more* accessible, thus further demonstrating that the alleged relevant market is implausible.

upon unspecified work-transition costs. *See Molinari v. Consol Energy Inc.*, No. 12cv1085, 2012 WL 5932979, at *6 (W.D. Pa. Nov. 27, 2012) (rejecting general conclusory allegations "that working as a landscaper . . . for a company in a different industry would result in economic harm to the employees"). Such a limitation would segregate every low-skill industry into its own relevant labor market because some transition cost exists virtually every time a worker switches jobs (even within the same industry). *See id*. Furthermore, Plaintiffs cannot escape their previous admission that transition costs are ***not*** barriers to switching jobs because employee "turnover [reached] as high as 100 percent at some plants." Complaint, *Robinson v. Tyson Foods, Inc.*, No. 19-CV-02960-ELH (D. Md. Filed Oct. 9, 2019) ECF No. 1, ¶ 125.[10]

### 3.    Plaintiffs Fail to Allege a Plausible Geographic Market.

In an antitrust case brought by employees, the geographic market is the area within which those employees can practicably turn for alternative employment. *Todd*, 275 F.3d at 202. Plaintiffs' putative national geographic market defies common sense because it rests on the facially implausible premise that workers in Alabama earning less than $25,000 annually would view a job at a California poultry plant as a practical alternative. ACC ¶ 120. Not one factual allegation supports that premise. To sustain the asserted geographic market definition, the Court would have to conclude that Plaintiffs have alleged facts plausibly suggesting that poultry plant employees

---

[10] It is worth noting that Plaintiffs' claimed relevant labor market is inconsistent with their class definition. While Plaintiffs define the relevant market as "the labor market for employment at poultry processing plants in the continental United States," ACC ¶ 208, their putative class consists of "[a]ll persons employed by Defendant Processors at poultry processing plants in the contintental United States from January 1, 2009 until the present," but excludes "complex managers, plant managers, human resources managers, human resources staff, office clerical staff, guards, watchmen, and salesmen . . . ." *Id*. ¶¶ 245-46. That Plaintiffs' putative class affirmatively excludes many employees in their alleged relevant market is baffling and reflects yet another defect in their information-exchange claim.

would overlook equivalent jobs in other businesses near where they live, but would consider moving across the country to take other poultry plant jobs.

The few facts that Plaintiffs do allege undercut their conclusion. For example, Plaintiffs emphasize the "geographic proximity" of particular plants, alleging that competition for employees occurs when plants are "nearby." Plaintiffs allege "each Defendant Processor owns at least one poultry processing plant that is within 32 miles of another Defendant Processor's poultry processing plant." *Id.* ¶ 100. "*For that reason*," they further allege, "each Defendant Processor has risked the loss of processing plant employees to, and in fact did lose processing plant employees to a competitor's *nearby* chicken processing plant." *Id.* ¶ 101 (emphases added). By contrast, Plaintiffs do not allege that any Defendant risked losing employees to processors located hundreds or even thousands of miles away. And, try as they might, Plaintiffs once again cannot avoid their prior allegations that poultry processing plant labor markets are local in nature since wages vary significantly across states, *Robinson*, ECF No. 1 at ¶ 118 (alleging that wages in Arkansas were more than 10% higher than elsewhere in the country), and that "many of these workers . . . often" decline other jobs "because of . . . the expense of moving and/or other obligations." First Compl. (Filed Aug. 30, 2019), ECF No. 1, ¶ 235.

Internal contradictions in Plaintiffs' pleadings aside, a national geographic market for poultry processing workers is also legally flawed. As a court recently observed in discussing the geographic market for fast-food employees, the relevant geographic market is ***not*** national:

> The relevant market for employees to do the type of work alleged in this case is likely to cover a relatively-small geographic area. Most employees who hold low-skill . . . jobs are looking for a position in the geographic area in which they already live and work, not a position requiring a long commute or a move . . . . [M]ost people do not search long distances for a low-skill job with the idea of moving closer to the job.

25

*Ogden v. Little Caesar Enters., Inc.*, 393 F. Supp. 3d 622, 631-32 (E.D. Mich. 2019); *see also* Ioana Marinescu, Herbert Hovenkamp, *Anticompetitive Mergers in Labor Markets*, 94 Ind. L.J. 1031, 1048 (2019) ("Geographic markets are driven mainly by the location and mobility of current or prospective employees . . . more than 80% of job applications occur where the job applicant and prospective employer are within the same . . . clusters of counties."). That reasoning applies with equal force here. *See Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 710 (11th Cir. 2014) (suggesting that the broadest plausible geographic market for chicken processing plant workers is "a series of contiguous counties").

Against this backdrop, Plaintiffs offer irrelevant allegations in support of their implausible nationwide market. For example, Plaintiffs allege, "Defendant Processors set their compensation for poultry processing plant workers largely on a nationwide basis." ACC ¶ 220. Apart from the vagueness of this allegation, it says nothing about the relevant inquiry here: the interchangeability of jobs, from the perspective of the ***employee***, at plants located thousands of miles from one another.

For these reasons, Plaintiffs fail to plead a plausible relevant market, and accordingly their information exchange claim must be dismissed.[11]

---

[11] While Plaintiffs' failure to plead a plausible labor market here merits dismissal, it would also warrant striking Plaintiffs' class allegations. *Waters v. Electrolux Home Prods., Inc.*, No. 5:13CV151(STAMP), 2016 WL 3926431, at *4 (N.D. W. Va. July 18, 2016) (courts may strike class allegations if those allegations "are facially deficient"); *see also In re Railway Indus. Employee No-Poach*, 395 F. Supp. 3d 464, 506 (W.D. Pa. 2019) (striking class allegations in pleadings by a putative class of employees against railway equipment supplier employers for alleged violations of Sherman Act § 1). In *Todd*, oil & gas industry employees sued their employers alleging a wage-reducing information exchange. 275 F.3d 191. The court ***repeatedly*** denied class certification because, while all class members were oil & gas industry employees, each would have differing job opportunities *outside* of the oil & gas industry. The court explained the incurable class defect: "the employment opportunities that members of the class would consider interchangeable would differ in important respects, including salary, job requirements and

**B.** **Plaintiffs Fail to Allege that Any Information Exchange Had Anticompetitive Effects.**

Plaintiffs also fail to allege anticompetitive effects resulting from the claimed information exchange. *See Advanced Health–Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 144 (4th Cir. 1990) (Plaintiffs must allege that a "conspiracy produced adverse, anticompetitive effects within the relevant product and geographic market"). Plaintiffs must plead facts plausibly suggesting that an information exchange caused competitive harm, because "[t]he exchange of [wage] data and other information among competitors does not invariably have anticompetitive effects," and, indeed, can "increase economic efficiency and render markets more, rather than less, competitive." *U.S. Gypsum*, 438 U.S. at 441 n.16; *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999) ("Gathering competitors price information can be consistent with independent competitor behavior.").

Plaintiffs allege no facts supporting their conclusory allegation that the purported information sharing caused anticompetitive effects in any relevant market. Apart from the industry average for one year and the "fully loaded wage" for a single position at a single plant at a single point, Plaintiffs plead no facts about prevailing wages in an appropriately defined product market. Moreover, Plaintiffs fail to include allegations regarding the compensation of any named Plaintiff, how any named Plaintiff's compensation was depressed during the class period, or how any Defendant's actual wages changed following any alleged information exchange. Instead, Plaintiffs assert in conclusory terms that the alleged information exchanges "diminished incentives to increase compensation," and those diminished incentives, in turn, supposedly caused

---

industries in which they are offered." *In re Managerial, Prof. and Tech. Employees*, No. MDL 1471, 02–CV–2924 (GEB), 2006 WL 38937, at *6-7 (D.N.J. Jan. 5, 2006).

27

compensation of poultry processing plant workers to be lower than it otherwise would have been. ACC ¶¶ 277, 283.

Because Plaintiffs have not properly pled a relevant market or anticompetitive effects, Count II must be dismissed.

## III.   PLAINTIFFS' CLAIMS ARE TIME-BARRED

Plaintiffs' claims should also be dismissed because they are time-barred. The four-year limitations period for private antitrust actions starts when a defendant commits an act causing a plaintiff economic harm. 15 U.S.C. § 15b; *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 217 (4th Cir. 1987) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)). Here, Plaintiffs allege a conspiracy that purportedly began in January 2009—more than **ten years** before Plaintiffs filed this case. *See* ACC ¶ 5.

Recognizing this problem, Plaintiffs attempt to circumvent the statute of limitations by claiming that Plaintiffs were precluded from discovering the violations they allege began in 2009 until "shortly before filing" because Defendants fraudulently concealed the putative violation. ACC ¶ 236. However, Plaintiffs' conclusory allegations fail here as well.[12]

Plaintiffs fail to allege facts that warrant tolling the limitations period under the doctrine of fraudulent concealment. To plead fraudulent concealment, Plaintiffs must allege that Defendants "fraudulently concealed facts that are the basis" of their claims, and that Plaintiffs "failed to discover those facts within the statutory period despite the exercise of due diligence." *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995), *accord Edmonson*

---

[12] Defendants do not concede Plaintiffs have alleged a "continuing violation." Their attempt to invoke a continuing violation fails for the same pleading deficiencies discussed in the prior sections. In any event, sufficiently alleging a continuing violation by itself, which Plaintiffs have not done, would not entitle Plaintiffs to recover damages for the entire alleged conspiracy period.

*v. Eagle Nat'l Bank*, 922 F.3d 535, 548 (4th Cir. 2019). These allegations must include fraud by the Defendants, and be stated "with particularity," including "the time, place, and contents of the [alleged] false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Edmonson*, 922 F.3d at 553 (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999); Fed. R. Civ. P. 9(b)); *see also SD3 II LLC v. Black & Decker (U.S.) Inc.*, 888 F.3d 98, 108 (4th Cir. 2018) ("*SD3 II*"). Plaintiffs do not meet these requirements.

### A.  Plaintiffs Fail to Allege Affirmative Acts of Concealment by Defendants.

To plead that Defendants "fraudulently concealed facts that are the basis" of their claims, Plaintiffs must allege with particularity "affirmative acts of concealment" by Defendants. *Edmonson*, 922 F.3d at 548, 553 (citing *Meadow Gold Dairies*, 71 F.3d at 126). "Affirmative acts of concealment" is conduct "affirmatively directed at deflecting litigation," *Pocahontas*, 828 F.2d at 219, such as "some trick or contrivance intended to exclude suspicion and prevent inquiry," *Edmonson*, 922 F.3d at 553 (quoting *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 446-47 (6th Cir. 2012)) (affirmative acts of concealment include creation of sham entities to hide kickbacks, backdated sham service agreements designed to hide kickbacks "after regulators began investigating the kickback scheme," and failing to report payments for which governing regulations require disclosure); *see also Somerville v. West Town Bank & Trust*, No. PJM 19-0490, 2019 WL 6131288, at *2 (D. Md. Nov. 19, 2019) (fraudulent concealment requires a "type of trickery"). Plaintiffs fall far short of pleading any such "affirmative acts of concealment."

*First*, Plaintiffs' allegations that Defendants held "secret 'off the books' meetings," engaged in "surreptitious" or "nonpublic" communications, and that Agri Stats did not "advertise" or make its reports "publicly available," ACC ¶¶ 159, 240, 243, are not allegations of "affirmative acts of

29

concealment." In fact, courts routinely reject claims of fraudulent concealment based on alleged "secret" or "nonpublic" activities. *See SD3, LLC v. Black & Decker (U.S.), Inc.*, 215 F. Supp. 3d 486, 497 (E.D. Va. 2016), *aff'd sub nom. SD3 II*, 888 F.3d at 98 ("[C]hoosing not to publicize a meeting is neither fraudulent nor concealment."); *Boland v. Consolidated Multiple Listing Serv., Inc.*, 868 F. Supp. 2d 506, 518 (D.S.C. 2011) (rejecting fraudulent concealment claim based on allegations that the defendants "used means and methods designed to avoid detection such as . . . meeting secretly . . . [and] agreeing not to discuss publicly the nature of their communications in furtherance of their illegal scheme"), *aff'd sub nom. Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278 (4th Cir. 2012); *see also Rx.com v. Medco Health Solutions, Inc.*, 322 Fed. Appx. 394, 397-98 (5th Cir. 2009) ("secret communications" are not enough to show "affirmative acts of concealment").

*Second*, Plaintiffs' allegations that some Defendants "falsely represented that [Defendants] paid wages, salaries and benefits reflective of a competitive market for labor," ACC ¶ 241, do not salvage their fraudulent concealment theory. *See id*. ¶ 242. Courts have repeatedly rejected such allegations because they show no "affirmative act of concealment." *See Pocahontas*, 828 F.2d at 215, 218 (allegation that defendant's statement that putatively anticompetitive prices were the result of "market conditions" does not allege fraudulent concealment); *Robertson*, 679 F.3d at 291 n.2 (allegations amounting "to no more than a failure to admit wrongdoing" do not suffice to allege "affirmative acts of concealment"); *see also SD3*, 215 F. Supp. 3d at 497 (rejecting a fraudulent concealment claim when defendants allegedly gave "pretextual justifications that amount[ed] to no more than a failure to admit wrongdoing . . . .").

*Finally*, Plaintiffs' broad allegation that Defendants' putative conspiracy was "fraudulently concealed" through "various means and methods," including unspecified meetings, communications, data exchanges, and "conceal[ed]" compensation surveys, ACC ¶ 240, is a bare

legal conclusion. It lacks any factual allegations that Defendants took affirmative action to conceal their alleged conspiracy. *See, e.g.*, *Iqbal*, 556 U.S. at 678. Indeed, it is devoid of "the time, place, and contents of [any alleged] false representations" purportedly made to conceal the alleged conspiracy, and thus does not establish any "affirmative acts of concealment." *Edmonson*, 922 F.3d at 553-54.

### B.     Plaintiffs Fail to Allege Due Diligence.

Plaintiffs also fail to allege an inability to discover facts supporting their claims "despite the exercise of due diligence." *Edmonson*, 922 F.3d at 544.

***First***, Plaintiffs offer no detail whatsoever—and certainly no "distinct averments"—regarding when and how they supposedly discovered the alleged conspiracy. *Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.*, 546 F.2d 570, 574 (4th Cir. 1976) (quoting *Stearns v. Page*, 48 U.S. (7 How.) 818, 829 (1849)). Instead, they assert only that they "did not discover . . . the existence of the conspiracy alleged . . . until shortly before filing [their] complaint." ACC ¶ 236. That conclusory statement does not enable the Court to "clearly see, whether, by the exercise of ordinary diligence, the discovery might not have been before made." *Charlotte Telecasters,* 546 F.2d at 574.

***Second***, Plaintiffs' assertions that they "could not have discovered through the exercise of reasonable diligence" the facts upon which they now rely, ACC ¶ 236, are belied by Plaintiffs' own reliance on ***public*** statements, articles, and books published ***years before*** they filed suit. For example, Plaintiffs' own allegations rely upon the contents of a book published ***in 2004***, *id.* ¶ 124, describing poultry processors as allegedly recruiting "economically desperate" people, and a public USDA report ***from 2013*** describing consolidation in the chicken industry "during ***the past 16 years***," *id.* ¶ 197 (emphasis added). Plaintiffs even allege that their own undisclosed economic "analysis" of the "difference between the weekly earnings of workers employed by food

manufacturers broadly and the weekly earnings of workers employed by poultry processors," both before and during the Class Period, rests "on *publicly available data* obtained from the U.S. Bureau of Labor Statistics." *Id.* ¶ 228 (emphasis added).

Plaintiffs' allegations also belie any contention that Agri Stats' purported "involvement" in the alleged conspiracy was somehow was concealed. *See, e.g.*, *id.* ¶ 243. Plaintiffs allege that *as early as 2009* at least two Defendants specifically referenced and used Agri Stats data in their collective bargaining negotiations with unions representing some workers that Plaintiffs now purport to represent. *See id.* ¶ 174 ("In 2009," during "collective bargaining negotiations with United Food and Commercial Workers International Union . . . Pilgrim's executives insisted that labor costs be within the Agri Stats average range in each of the company's domestic poultry processing plants"); *id.* ¶ 175 ("[W]hen engaging in collective bargaining negotiations with unions that represented poultry processing workers . . . [Butterball] would use Agri Stats to 'show unions the average pay in the industry' and insisted during negotiations that wages 'would have to be within the parameters' contained in Agri Stats").[13] Similarly, Plaintiffs' contention that "it was not until 2017 that the poultry industry's use of Agri Stats was even widely known or reported" is directly contradicted by Plaintiffs' reliance upon and quotations from an *October 2009* public earnings call, in which Agri Stats' former president stated that "97% of the broiler industry" and "about 95% of the turkey industry" subscribed to Agri Stats' reports. *Compare id*. ¶ 243 *with id.* ¶ 161.

---

[13] Similarly, Plaintiffs admit that about "one-third of hourly-paid workers at poultry processing plants are members of unions." ACC ¶ 118. It is not plausible that Defendants were able to conceal a larger, compensation-setting conspiracy and, at the same time, conduct open negotiations about compensation on a regular basis with experienced and sophisticated union negotiators.

Plaintiffs' own allegations expose that they were on notice long ago of the facts upon which they now rely. If, as they now claim, these facts even suggested conspiracy, then Plaintiffs were obligated "to investigate" because "the information at hand would have prompted a reasonable person to do so." *SD3 II*, 888 F.3d at 113 (quoting *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 178 (4th Cir. 2007)) ("Where a plaintiff knows of a pattern of particular actions that a defendant has taken against him, though the pattern's precise scope might be unclear and its exact legal ramifications uncertain, the plaintiff is on inquiry notice of his claim."). Plaintiffs cannot simply ignore the obligation to investigate and now claim that the alleged conspiracy was "well-disguised." *SD3 II*, 888 F.3d at 113 (quoting *GO Computer*, 508 F.3d at 179).

For all of these reasons, Plaintiffs have not alleged with particularity the elements of fraudulent concealment. Their claims, therefore, are time-barred and should be dismissed. *See, e.g.*, *Hirschler v. GMD Investments Ltd. Partnership*, Civ. A. No. 90-1289-N, 1990 WL 263438, at *10 (E.D. Va. Dec. 18, 1990) (granting motion to dismiss, when "[p]laintiffs . . . have introduced no evidence [or] alleged anything in their complaint from which this Court could infer any exercise of diligence . . . .").

## IV.  PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE

Plaintiffs' amended complaint should be dismissed with prejudice for two reasons. First, where plaintiffs have had "two full opportunities to state a claim and fail[] to do so," courts should dismiss the resulting amended complaint with prejudice. *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 579 (E.D. Va. 2006). In this case, Plaintiffs have had two full opportunities. Plaintiffs originally filed multiple separate complaints, and then filed a consolidated complaint. Then, days after Defendants moved to dismiss for failure to state a claim, Plaintiffs amended their complaint. *See Hughes v. J.P. Morgan Chase Bank, N.A.*, No.

RDB-16-2311, 2016 WL 7012278, at *7 (D. Md. Nov. 29, 2016) (dismissing complaints with prejudice when, "having already had the opportunity to see the bases for defendants' Motion to Dismiss, plaintiff filed a second Complaint based on the same subject matter"). Accordingly, Plaintiffs' failure to state a claim after two full opportunities to do so merits dismissal with prejudice.

Second, when "amendment would be futile" the Fourth Circuit supports dismissal with prejudice. *Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 630 (4th Cir. 2008) (affirming dismissal of ***first*** complaint with prejudice rather than granting plaintiffs leave to amend). Here, not only have Plaintiffs already amended their pleadings, but also, with the benefit of Defendants' first motion to dismiss, the amended complaint still fails to state a claim. It is clear that further "amendment would be futile in light of the fundamental deficiencies in plaintiffs' theory of liability." *Id*. Therefore, the Court should dismiss Plaintiffs' claims with prejudice.

## V.    CONCLUSION

For these reasons, Defendants' Joint Motion to Dismiss should be granted, and the ACC dismissed with prejudice.

Date: March 2, 2020

Respectfully submitted,

/s/ Aaron L. Casagrande
Aaron L. Casagrande (Bar # 28518)
WHITEFORD, TAYLOR & PRESTON
L.L.P.
Seven Saint Paul Street, Suite 1500
Baltimore, Maryland 21202
Tel: (410) 347-8714
Fax: (410) 234-2326
acasagrande@wtplaw.com

Carrie C. Mahan
Christopher J. Abbott
WEIL, GOTSHAL & MANGES LLP
2001 M Street N.W., Suite 600
Washington, D.C. 20036
Tel: 202-682-7000
Fax: 202-857-0940
carrie.mahan@weil.com
christopher.abbott@weil.com

Adam C. Hemlock
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Tel: 212-310-8000
Fax: 212-310-8007
adam.hemlock@weil.com

*Attorneys for Defendants Pilgrim's Pride
Corporation, Pilgrim's Pride Corporation of
West Virginia, Inc., and JFC LLC (d/b/a GNP
Company)*

/s/ J. Douglas Baldridge
J. Douglas Baldridge (Bar No. 11023)
Lisa Jose Fales (Bar No. 08141)
Danielle R. Foley (Bar No. 21113)
Andrew T. Hernacki (Bar No. 21107)
VENABLE LLP
600 Massachusetts Ave, N.W.
Washington, DC 20001
Tel: (202) 344-4000
jdbaldridge@venable.com
ljfales@venable.com
drfoley@venable.com
athernacki@venable.com

*Attorneys for Perdue Foods, LLC and Perdue
Farms, Inc.*

35

/s/ Edward J. Baines
Edward J. Baines (USDC Bar No. 06776)
Geoffrey M. Gamble (USDC Bar No. 28919)
Gregory L. Waterworth (USDC Bar No.
20938)
SAUL EWING ARNSTEIN & LEHR LLP
500 E. Pratt Street, 8th Floor
Baltimore, MD 21202-3133
Tel: (410) 332-8600
Fax: (410) 332-8862
Ted.Baines@saul.com
Geoff.Gamble@saul.com
Greg.Waterworth@saul.com

Patrick Fitzgerald
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
155 N. Wacker Drive
Chicago, IL 60606
Tel: (312) 407-0700
Fax: (312) 407-0411
patrick.fitzgerald@skadden.com

Boris Bershteyn (admitted *pro hac vice*)
Lara Flath (admitted *pro hac vice*)
Sam Auld (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
boris.bershteyn@skadden.com
lara.flath@skadden.com
sam.auld@skadden.com

*Attorneys for Defendant Peco Foods, Inc.*

/s/ Kristen Knapp
Kristen A. Knapp (Bar No. 21169)
SIDLEY AUSTIN LLP
1501 K Street NW #600
Washington, DC 20005
Telephone: (202) 736-8219
Facsimile: (202) 736-8711
kknapp@sidley.com

John W. Treece *(admitted pro hac vice)*
1135 West Montana Street
Chicago, Illinois 60614
Tel: (312) 961-7808
jtreece@jwtreece.com

Amanda K. Wofford *(admitted pro hac vice)*
Bourgon B. Reynolds *(admitted pro hac vice)*
ROSE LAW FIRM
120 East Fourth Street
Little Rock, Arkansas 72201
Tel: (501) 377-0349
Fax: (501) 375-1309
awofford@roselawfirm.com
breynolds@roselawfirm.com

*Attorneys for Defendants Mountaire Farms,
Inc. and Mountaire Farms of Delaware, Inc.*

/s/ Cary Silverman
Cary Silverman (Bar # 15137)
SHOOK HARDY & BACON LLP
1800 K Street NW, Ste. 1000
Washington, D.C. 20006
Tel: (202) 783-8400|
Fax: (202) 783-4211
csilverman@shb.com

Lynn H. Murray
SHOOK HARDY & BACON LLP
111 S. Wacker Dr., Ste. 4700
Chicago IL 60606
Tel: (312) 704-7700
Fax: (312) 558-1195
lhmurray@shb.com

Laurie A. Novion
SHOOK HARDY & BACON LLP
2555 Grand
Kansas City, MO
64108 Tel: (816) 474-6550
Fax: (816) 421-5547
lnovion@shb.com

John R. Elrod
Vicki Bronson
CONNER & WINTERS
4375 N. Vantage Drive, Ste. 405 Fayetteville,
AR 72703
Tel: (479) 582-5711
jelrod@cwlaw.com
vbronson@cwlaw.com

*Attorneys for Defendants Simmons Foods,
Inc. and Simmons Prepared Foods Inc.*

/s/ Brian D. Frey
Brian D. Frey (Bar # 17592)
ALSTON & BIRD LLP
The Atlantic Building 950 F Street, NW
Washington, D.C. 20004-1404
Tel: (202) 239-3067
Fax: (202) 239-3333
brian.frey@alston.com

B. Parker Miller
Valarie C. Williams
Raechel J. Bimmerle
ALSTON & BIRD LLP
1201 West Peachtree Street Atlanta, GA
30309
Tel: (404) 881-7000
Fax: (404) 881-7777
parker.miller@alston.com
valarie.williams@alston.com
raechel.bimmerle@alston.com

*Attorneys for Fieldale Farms Corporation*

/s/ Steven K. White
Steven K. White (Bar No. 04274)
STINSON LLP
1775 Pennsylvania Ave., NW, Suite 800
Washington, DC 20006
Tel: (202) 785-9100
Fax: (202) 572-9963
steven.white@stinson.com

William L. Greene
Peter J. Schwingler
Jon M. Woodruff
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 335-1500
Fax: (612) 335-1657
william.greene@stinson.com
peter.schwingler@stinson.com
jon.woodruff@stinson.com

Gary V. Weeks
K.C. Dupps Tucker
Kristy E. Boehler
THE LAW GROUP OF NW. ARKANSAS
LLP
1830 Shelby Lane Fayetteville, AR 72704
Tel: (479) 316-3760
Fax: (844) 325-6603
gary.weeks@lawgroupnwa.com
kc.tucker@lawgroupnwa.com
kristy.boehler@lawgroupnwa.com

*Attorneys for Defendants George's Inc.;
Ozark Mountain Poultry, Inc.; George's
Chicken, LLC; George's Foods, LLC; and
George's Processing, Inc.*

/s/ Gerard P. Martin
Gerard P. Martin, Bar No. 00691
Jeffrey M. Lichtstein, Bar No. 20731
ROSENBERG MARTIN GREENBERG,
LLP
25 S. Charles Street, 21st Floor
Baltimore, Maryland 21201
Tel: (410) 727-6600
Fax: (410) 727-1115
gmartin@rosenbergmartin.com
jlichtstein@rosenbergmartin.com

*Attorneys for Defendant Webber, Meng, Sahl
and Company, Inc. d/b/a WMS & Company,
Inc.*

/s/ Steven F. Barley
Steven F. Barley
HOGAN LOVELLS US LLP
100 International Drive, Suite 2000
Baltimore, Maryland  21202
Tel: (410) 659-2700
Fax: (410) 659-2701
steve.barley@hoganlovells.com

William L. Monts III
Justin W. Bernick
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C.  20004-1109
Tel: (202) 637-5600
Fax: (202) 637-5910
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

*Attorneys for Defendant Agri Stats, Inc.*

/s/ Marlynda L. Romero
Christopher E. Ondeck
Stephen R. Chuk
Marlynda L. Romero (MD Bar No. 20808)
PROSKAUER ROSE LLP
1001 Pennsylvania Ave, NW, Suite 600S
Washington, DC 20004
Tel: (202) 416-5865
Fax: (202) 416-6899
condeck@proskauer.com
schuk@proskauer.com
mromero@proskauer.com

*Attorneys for Defendant Wayne Farms, LLC*

/s/ Eric Pelletier
Eric Pelletier (Bar # 12716)
OFFIT KURMAN, P.A.
4800 Montgomery Lane, 9th Floor
Bethesda, Maryland 20814
Tel: (240) 507-1739
Fax: (240) 507-1735
epelletier@offitkurman.com

John F. Terzaken (DC 474015)
Abram J. Ellis (DC 497634)
Elizabeth H. French (DC 1030684)
SIMPSON THACHER & BARTLETT
900 G Street, N.W.
Washington, DC 20001
Phone: 202-636-5500
Facsimile: 202-636-5502

*Attorneys for Tyson Foods, Inc., Tyson Prepared Foods, Inc., Hillshire Brands Company, Tyson Fresh Meats, Inc., Tyson Processing Services, Inc., Tyson Refrigerated Processed Meats, Inc., Keystone Foods, LLC, Equity Group Eufaula Division, LLC, Equity Group – Georgia Division, LLC, and Equity Group Kentucky Division, LLC*

/s/ Daniel E. Laytin
Daniel E. Laytin, P.C. *(pro hac vice)*
Christa C. Cottrell, P.C. *(pro hac vice)*
Stacy Pepper *pro hac vice*
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
dlaytin@kirkland.com
ccottrell@kirkland.com
stacy.pepper@kirkland.com

Joseph C. Schroeder *(pro hac vice)*
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave N.W.
Washington, DC 20004
(202) 389-5118
joseph.schroeder@kirkland.com

Joseph W. Hovermill (Bar No. 22446)
Alexander P. Creticos (Bar No. 30199)
MILES & STOCKBRIDGE P.C.
100 Light Street
Baltimore, Maryland 21202
Tel: 410-385-3442
Fax: 410-385-3700
jhovermill@milesstockbridge.com
acreticos@milesstockbridge.com

*Attorneys for Defendants Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), and Sanderson Farms, Inc. (Processing Division)*

/s/ James E. Edwards, Jr.
James E. Edwards, Jr., (MDB No. 02360)
Ty Kelly Cronin, (MDB No. 27166)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
100 Light Street
Baltimore, Maryland 21202
Tel: (410) 685-1120
Fax: (410) 547-0699
jedwards@bakerdonelson.com
tykelly@bakerdonelson.com

John G. Calender (DCB No. 939124)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
901 K Street, N.W., Suite 900
Washington, D.C. 20001
Tel: (202)508-3474
Fax: (202) 220-2274
jcalender@bakerdonelson.com

Scott W. Pedigo (MSB No. 10735)
Amy L. Champagne (MSB No. 102447)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
MAILING: Post Office Box 14167
Jackson, Mississippi 39236-4167
PHYSICAL: One Eastover Center
100 Vision Drive, Suite 400
Jackson, Mississippi 39211
Tel: (601) 351-2400
Fax: (601) 351-2424
spedigo@bakerdonelson.com
achampagne@bakerdonelson.com

Russell W. Gray (TNB No. 16120)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
1800 Republic Centre
633 Chestnut Street
Chattanooga, Tennessee 37450-1801
Tel: (423) 209-4218
Fax: (423) 752-9563
rgray@bakerdonelson.com

*Attorneys for Defendants Koch Foods, Inc.,
JCG Foods of Alabama, Inc., JCG Foods of
Georgia, LLC, JCG Industries, Inc., Koch
Foods LLC, Koch Foods of Alabama, LLC,
Koch Foods of Ashland, LLC, Koch Foods of
Gadsden, LLC, Koch Foods of Cumming,
LLC, Koch Foods of Gainesville, LLC and
Koch Foods of Mississippi, LLC*

40

/s/ David B. Hamilton
David B. Hamilton (Bar No. 04308)
Hillary V. Colonna (Bar No. 19704)
WOMBLE BOND DICKINSON (US) LLP
100 Light Street, 26th Floor
Baltimore, MD 21202
Tel: (410) 545-5850
Fax: (410) 545-5801
David.Hamilton@wbd-us.com
Hillary.Colonna@wbd-us.com

Hayden J. Silver III (*Pro Hac Vice*)
Jonathon D. Townsend (*Pro Hac Vice*)
WOMBLE BOND DICKINSON (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Tel: (919) 755-2188
Fax: (919) 755-7099
Jay.Silver@wbd-us.com
Jonathon.Townsend@wbd-us.com

*Attorneys for Defendant*
*Butterball, LLC*

/s/ Julia E. McEvoy
Julia E. McEvoy *(Pro Hac Vice)*
Christopher N. Thatch (Bar No. 29097)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
(202) 879-3867
jmcevoy@jonesday.com

Kathryn N. Hibbard *(Pro Hac Vice)*
GREENE ESPEL PLLP
222 South Ninth Street, Suite 2200
Minneapolis, MN 55402
(612) 373-0830
khibbard@greeneespel.com

*Attorneys for Cargill, Incorporated and*
*Cargill Meat Solutions Corporation*

/s/ Jonathan H. Todt
Richard A. Duncan (pro hac vice)
Craig S. Coleman (pro hac vice)
Emily E. Chow (pro hac vice)
Isaac B. Hall (pro hac vice)
FAEGRE DRINKER BIDDLE & REATH
LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Phone: (612) 766-7000
Fax: (612) 766-1600
richard.duncan@faegredrinker.com
craig.coleman@faegredrinker.com
emily.chow@faegredrinker.com
isaac.hall@faegredrinker.com

Christopher A. Kreuder (pro hac vice)
FAEGRE DRINKER BIDDLE & REATH
LLP
801 Grand Avenue, 33rd Floor
Des Moines, IA 50309
Phone: (515) 248-4733
Fax: (515) 248-9010
christopher.kreuder@faegredrinker.com

Jonathan H. Todt (Bar No. 07166)
FAEGRE DRINKER BIDDLE & REATH
LLP
1500 K Street, N.W., Suite 1100
Washington, D.C. 20005-1209
Phone: (202) 230-5823
Fax: (202) 842-8465
jonathan.todt@faegredrinker.com

*Attorneys for Hormel Foods Corporation;*
*Jennie-O Turkey Store, Inc.; Jennie-O Turkey*
*Store, LLC; and Jennie-O Turkey Stores*
*Sales, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on this 2nd day of March 2020, Defendants' Joint Motion to Dismiss, Defendants' Memorandum of Law in Support thereof (including exhibits) and a proposed order were served via the Court's CM/ECF system on all counsel of record in accordance with the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Maryland.

*/s/ Aaron L. Casagrande*

Aaron L. Casagrande
