# UNITED STATES DISTRICT COURT

# DISTRICT OF MARYLAND

| | |
|---|---|
| JUDY JIEN, et al., | C.A. No. 1:19-CV-2521-SAG |
| Plaintiffs, | **OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |
| v. | |
| PERDUE FARMS, INC., et al., | |
| Defendants. | |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 2

I.   THERE IS A LARGE POWER GAP BETWEEN DEFENDANT PROCESSORS
     AND THEIR PLANT WORKERS. ............................................................................ 3

II.  DEFENDANT PROCESSORS WERE MOTIVATED TO FIX COMPENSATION. ........... 5

III. THE POULTRY PROCESSING INDUSTRY IS SUSCEPTIBLE TO FIXING
     COMPENSATION. ..................................................................................................... 6

IV.  DEFENDANT PROCESSORS CONSPIRED AT "OFF THE BOOKS" MEETINGS
     AND USED WMS SURVEYS TO FIX COMPENSATION. ............................................ 7

V.   DEFENDANT PROCESSORS TRACKED EACH OTHER'S COMPENSATION
     ON AT LEAST A MONTHLY BASIS THROUGH AGRI STATS. ................................. 10

VI.  MANAGERS OF DEFENDANT PROCESSORS' PLANTS EXCHANGED
     INFORMATION REGARDING FUTURE WAGES AND SALARIES. ............................ 13

VII. THE CONSPIRACY DEPRESSED COMPENSATION TO POULTRY PLANT
     WORKERS EMPLOYED BY DEFENDANT PROCESSORS. ......................................... 14

LEGAL STANDARDS ..................................................................................................... 15

ARGUMENT ................................................................................................................... 16

I.   PLAINTIFFS HAVE ADEQUATELY ALLEGED A PER SE UNLAWFUL
     CONSPIRACY TO FIX AND DEPRESS COMPENSATION. ......................................... 17

     A. Plaintiffs Have Alleged Substantial Direct Evidence of the Conspiracy. ......................... 18

        1. Plaintiffs Present Direct Evidence of Compensation-Fixing at In-Person
           Meetings. ...................................................................................................... 19

        2. Plaintiffs Present Direct Evidence of Agri Stats Information-Sharing and
           Monitoring of the Conspiracy. .................................................................... 20

        3. Plaintiffs Present Direct Evidence of Plant-to-Plant Sharing of Current
           and Future Compensation Data. ................................................................... 21

B. Plaintiffs Have Alleged Substantial Circumstantial Evidence of the Conspiracy. .......... 22

    1. Defendants Misrepresent the Law Regarding Circumstantial Evidence. .................... 23

    2. The Complaint Alleges the Who, What, Where, When and Why. ............................... 25

    3. The Complaint Adequately Alleges Parallel Conduct and Plus Factors. .................... 29

        a. Plaintiffs Allege Defendant Processors Engaged in Parallel Conduct. .................. 29

            (i) Plaintiffs Allege Parallel Compensation Suppression. ...................................... 29

            (ii) Plaintiffs Allege Other Parallel Conduct, Such as Attending Secret
                Meetings and Sharing Compensation Data. ........................................................ 32

        b. Plaintiffs Allege Compelling Plus Factors. .......................................................... 34

            (i) First Plus Factor: The Poultry Processing Industry Is Conducive to
                Compensation-Fixing. ......................................................................................... 35

            (ii) Second Plus Factor: Defendants Acted Contrary to Their Interests. ................. 36

            (iii) Third Plus Factor: There Is Substantial Non-Economic Evidence that
                Suggests a Traditional Conspiracy. ..................................................................... 39

    4. The Evolving Roles of Butterball, Cargill, and JOTS Do Not Undermine the
       Plausibility of the Conspiracy. ................................................................................. 42

II.     PLAINTIFFS HAVE PLAUSIBLY ALLEGED A RULE OF REASON CLAIM. ............. 44

  A. Plaintiffs Have Plausibly Alleged an Agreement to Exchange Information. ................... 44

  B. Plaintiffs Have Plausibly Alleged that Defendants' Information Exchange Had
    Anticompetitive Effects. ................................................................................................ 45

    1. Plaintiffs Directly Plead Anticompetitive Effects. ................................................... 45

    2. Plaintiffs Indirectly Plead Anticompetitive Effects. ................................................. 47

        a. Plaintiffs Properly Plead a Relevant Market. ........................................................ 48

            (i) Plaintiffs Properly Plead a Product Market. ...................................................... 49

            (ii) Plaintiffs Properly Plead a Geographic Market ................................................ 56

        b. Plaintiffs Allege Market Power. ........................................................................... 60

      c.  Plaintiffs Allege a Highly Suspect Information Exchange. ...................................... 60

III.  PLAINTIFFS CLAIMS ARE NOT TIME BARRED. .......................................................... 62

  A.  Plaintiffs Have Adequately Pled a Continuing Violation. ................................................ 62

  B.  Plaintiffs Have Adequately Pled Fraudulent Concealment. ............................................ 63

    1. Plaintiffs Have Alleged Numerous Affirmative Acts of Concealment
       by Defendants.. ............................................................................................................. 65

      a.  Defendants Kept Compensation Committee Meetings Secret. ............................... 65

      b.  Defendants Concealed the WMS Survey and Agri Stats Information
         Exchanges…. .......................................................................................................... 67

      c.  Defendant Processors Made Affirmative Misstatements Regarding
         "Competitive" Pay and Benefits. ........................................................................... 69

    2. Plaintiffs Have Exercised Reasonable Diligence. ........................................................ 71

IV.  DEFENDANTS' ARGUMENTS DO NOT COUNSEL DISMISSAL OF ANY
    INDIVIDUAL ENTITIES. .................................................................................................. 73

  A.  Plaintiffs' Allegations Against Agri Stats Are Sufficient. ................................................ 73

    1. Agri Stats Participated in the Conspiracy by Distributing and Decoding Reports
       Containing Current and Disaggregated Compensation Information. .......................... 73

    2. Agri Stats' Arguments Regarding the Per Se Claim Are Unpersuasive. .................... 76

    3. Agri Stats' Arguments Regarding the Rule of Reason Claim Are Unpersuasive. ....... 78

  B.  Plaintiffs Sufficiently Plead Each Defendant Processor's Participation in the
    Conspiracy. ....................................................................................................................... 80

    1. Plaintiffs' Allegations of Specific Conduct by All Defendant Processors Are
       Sufficiently Pled Against Each Defendant Processor. ................................................ 80

    2. Plaintiffs' Allegations Against Peco Foods Are Sufficient. ........................................ 84

    3. Plaintiffs' Allegations Against Mountaire Are Sufficient. .......................................... 86

    4. Plaintiffs' Allegations Against Koch Foods and Simmons Foods Are Sufficient. ...... 87

5. Plaintiffs' Allegations Against Sanderson Farms Are Sufficient. ................................ 88

6. Plaintiffs' Allegations Against Cargill Are Sufficient. ................................................. 91

7. Plaintiffs' Allegations Against Tyson Are Sufficient. .................................................. 95

8. Plaintiffs' Allegations Against JOTS Are Sufficient. .................................................. 102

V.   THE COMPLAINT SHOULD NOT BE DISMISSED WITH PREJUDICE. .................... 106

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Akers v. Md. State Educ. Ass'n*,
   376 F. Supp. 3d 563 (D. Md. 2019) ................................................................. 84

*Allen v. Dairy Farmers of Am., Inc.*,
   748 F. Supp. 2d 323 (D. Vt. 2010) ................................................................. 56

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
   367 F.3d 212 (4th Cir. 2004) ........................................................................ 18

*Am. Tobacco Co. v. United States*,
   328 U.S. 781 (1946) ....................................................................................... 87

*Amchem Prods. v. Windsor*,
   521 U.S. 591 (1997) ..................................................................................... 100

*In re Animation Workers Antitrust Litig.*,
   123 F. Supp. 3d 1175 (N.D. Cal. 2015) ................................................ *passim*

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ....................................................................................... 15

*In re Auto. Parts Antitrust Litig.*,
   No. 12-md-02311, 2014 WL4209588 (E.D. Mich. Aug. 26, 2014) ................ 25

*In re Baby Food Antitrust Litig.*,
   166 F.3d 112 (3d Cir. 1999) ..................................................................... 17, 31

*Baehr v. Creig Northrop Team, P.C.*,
   No. RDB-13-0933, 2018 WL 643502 (D. Md. Dec. 7, 2018) ........................ 68

*Bailey v. Glover*,
   88 U.S. 342 (1874) ......................................................................................... 64

*Baker v. United States*,
   21 F.2d 903 (4th Cir. 1927) ........................................................................... 43

*Barry's Cut Rate Stores, Inc. v. Visa, Inc.*,
   No. 05-MD-1720 (MKB) (JO), 2019 WL 7584728 (E.D.N.Y. Nov. 20, 2019) ......... 94

*Bausch v. Philatelic Leasing*,
   728 F. Supp. 1201 (D. Md. 1989) .................................................................. 70

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .................................................................................. *passim*

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n,*
  620 F.2d 1360 (9th Cir. 1980) ..........................................................................75

*Bennett v. GoDaddy.com LLC,*
  No. CV-16-03908-PHX-ROS, 2019 WL 1552911 (D. Ariz. Apr. 8, 2019) .........................53

*Bernard v. Gulfoil Corp.,*
  841 F.2d 547 (5th Cir. 1988) ..........................................................................99

*Blanton v. Domino's Pizza Franchising LLC,*
  No. 18-13207, 2019 WL 2247731 (E.D. Mich. May 24, 2019) .............................................25

*In re Bldg. Materials Corp. of Am. Asphalt Roofing Shingle Prods. Liab. Litig.,*
  No. 8:11-mn-02000-JMC, 2013 WL 169289 (D.S.C. Jan. 16, 2013)....................................69

*In re Blood Reagents Antitrust Litig.,*
  756 F. Supp. 2d 623 (E.D. Pa. 2010) .........................................................................31

*Boland v. Consol. Multiple Listing Serv.,*
  868 F. Supp. 2d 506 (D.S.C. 2011)................................................................25, 31, 66

*In re Broiler Chicken Antitrust Litig.,*
  290 F. Supp. 3d 772 (N.D. Ill. 2017) .............................................................. *passim*

*In re Broiler Chicken Antitrust Litig.,*
  No. 1:16-cv-08637, 2018 WL 10550500 (N.D. Ill. Jan. 31, 2018)....................................85, 87

*In re Broiler Chicken Antitrust Litig.,*
  No. 16 C 8637, 2019 WL 1003111 (N.D. Ill. Feb. 28, 2019)....................................76, 77, 78

*Brooks v. Ross,*
  578 F.3d 574 (7th Cir. 2009) ..........................................................................81, 82

*Brown Shoe Co. v. United States,*
  370 U.S. 294 (1962)........................................................................................59

*Burgess v. Baltimore Police Dep't,*
  No. RDB-15-0834, 2016 WL 795975 (D. Md. Mar. 1, 2016)................................................81

*Burton v. Chrysler Grp. LLC,*
  No. 8:10-00209-JMC, 2012 WL 831843 (D.S.C. Mar. 12, 2012)........................................100

*In re Capacitors Antitrust Litig.,*
  106 F. Supp. 3d 1051 (N.D. Cal. 2015) ................................................................97

*Carrier Corp. v. Outokumpu Oyj,*
  673 F.3d 430 (6th Cir. 2012) ..........................................................................25, 68, 69

*Cason-Merenda v. Detroit Med. Ctr.*,
862 F. Supp. 2d 603 (E.D. Mich. 2012)..........................................................*passim*

*In re Cathode Ray Tube (CRT) Antitrust Litig*,
738 F. Supp. 2d 1011 (N.D. Cal. 2010) ......................................................97

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
No. 07-5944 SC, 2010 WL 9543295 (N.D. Cal. Feb. 5, 2010) .............................96

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
No. C-07-5944-SC, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013)......................54

*City of Moundridge v. Exxon Mobil Corp.*,
No. 04-940 (RWR), 2009 WL 5385975 (D.D.C. Sept. 30, 2009) ........................31

*In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*,
No. 11 Md 2213(RPP), 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012) ..................85

*Conmar Corp. v. Mitsui & Co.*,
858 F.2d 499 (9th Cir. 1988) ...................................................................70

*Consul Ltd v. Transco Energy Co.*,
805 F.2d 490 (4th Cir. 1986) ...................................................................57

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962)..................................................................73, 79, 84, 85

*In re Coordinated Pretrial Proceedings in Petroleum Pros. Antitrust Litig.*,
906 F.2d 432 (9th Cir. 1990) ...................................................................18

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984)................................................................................97

*In re Cotton Yarn Antitrust Litig.*,
505 F.3d 274 (4th Cir. 2007) ...................................................................62

*In re Credit Default Swaps Antitrust Litig.*,
No. 13md2476 (DLC), 2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014)....................82

*In re Currency Conversion Fee Antitrust Litig.*,
264 F.R.D. 100 (S.D.N.Y. 2010) ...............................................................43

*In re Currency Conversion Fee Antitrust Litig.*,
No. 05 Civ. 7116 (WHP), 2012 WL 401113 (S.D.N.Y. Feb. 8, 2012) .................33

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
767 F. Supp. 2d 880 (N.D. Ill. 2011) .........................................................96

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   313 F. Supp. 3d 931 (N.D. Ill. 2018) ...............................................................18

*Deiter. Kjessler v. Zaappaaz, Inc.*,
   No. CV 4:18-0430, 2019 WL 3017132 (S.D. Tex. Apr. 24, 2019) .......................99

*Deiter v. Microsoft Corp.*,
   436 F.3d 461 (4th Cir. 2006) ............................................................................99

*Deslandes v. McDonald's USA, LLC*,
   No. 17 C 4857, 2018 WL 3105955 (N.D. Ill. June 25, 2018) ...............................58

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002) ............................................................................44

*Doll v. Ford Motor Co.*,
   814 F. Supp. 2d 526 (D. Md. 2011) ...................................................................69

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
   637 F.3d 435 (4th Cir. 2011) ................................................................... *passim*

*Edmonson v. Eagle Nat'l Bank*,
   922 F.3d 535 (4th Cir. 2019) ...........................................................65, 68, 71, 72

*In re EDPM Antitrust Litig.*,
   681 F. Supp. 2d 141 (D. Conn. 2009) ................................................................24

*Eleven Line, Inc. v. N. Tex. State Soccer Ass'n*,
   213 F.3d 198 (5th Cir. 2000) ............................................................................54

*Encana Oil & Gas, Inc. v. Zaremba Family Farms, Inc.*,
   No. 1:12-CV-369, 2015 WL 12883545 (W.D. Mich. Sept. 18, 2015) ...................49

*English v. Pabst Brewing Co.*,
   828 F.2d 1047 (4th Cir. 1987) ..........................................................................63

*Erickson v. Pardus*,
   551 U.S. 89 (2007)............................................................................................81

*Fangman v. Genuine Title, LLC*,
   No. RDB-14-0081, 2015 WL 8315704 (D. Md. Dec. 9, 2015)............................72

*Five Smiths Inc. v. Nat'l Football League Players Ass'n*,
   788 F. Supp. 1042 (D. Minn. 1992) ...................................................................80

*In re Flat Glass Antitrust Litig.*,
   385 F.3d 350 (3d Cir. 2004)..............................................................................34

*Fleischman v. Albany Medical Center*,
  728 F. Supp. 2d 130 (N.D.N.Y. 2010) ............................................................24

*In re Fresh & Process Potatoes Antitrust Litig.*,
  834 F. Supp. 2d 1141 (D. Idaho 2011) ...........................................................26

*FTC v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986) .........................................................................................48

*In re Generic Pharm. Pricing Antitrust Litig.*,
  338 F. Supp. 3d 404 (E.D. Pa. 2018) .......................................................32, 94

*Giuliano v. SanDisk Corp.*,
  No. C 10-02787 SBA, 2014 WL 4685012 (N.D. Cal. Sept. 19, 2014)..................100

*GO Comput., Inc. v. Microsoft Corp.*,
  437 F. Supp. 2d 497 (D. Md. 2006) ................................................................62

*GO Comput., Inc. v. Microsoft Corp.*,
  508 F.3d 170 (4th Cir. 2007) ..........................................................................72

*Goff v. AAMCO Automatic Transmissions, Inc.*,
  313 F. Supp. 667 (D. Md. 1970) .....................................................................95

*In re GSE Bonds Antitrust Litig.*,
  396 F. Supp. 3d 354, 361 (S.D.N.Y. 2019)......................................................83

*Harrison v. E.I. du Pont de Nemours & Co.*,
  No. 13-cv-01180-BLF, 2016 WL 3231535 (N.D. Cal. June 13, 2016)................102

*Heckler & Koch, Inc. v. German Sport Guns GmbH*,
  No. 1:11-cv-01108-SEB-TAB, 2014 WL 12756372 (S.D. Ind. May 15, 2014) ....38

*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002) ..........................................................................22

*In re High-Tech Emp. Antitrust Litig.*,
  856 F. Supp. 2d 1103 (N.D. Cal. 2012) ..........................................................49

*Hinds Cty., Miss. v. Wachovia Bank N.A.*,
  620 F. Supp. 2d 499 (S.D.N.Y. 2009)..............................................................84

*Horsetail Techs., LLC v. Del. State Police Fed. Credit Union*,
  No. ELH-18-556, 2020 WL 3402302 (D. Md. June 19, 2020)...........................63

*Hosp. Bldg. Co. v. Rex Hosp.*,
  425 U.S. 738 (1976).........................................................................................97

*Houck v. Substitute Tr. Servs., Inc.*,
  791 F.3d 473 (4th Cir. 2015) ................................................................15, 16, 77

*In re Ins. Brokerage Antitrust Litig.*,
  No. 04-5184 (CCC), 2016 WL 5219456 (D.N.J. Sept. 20, 2016) ..........................26

*In re Interest Rate Swaps Antitrust Litig.*,
  261 F. Supp. 3d 430 (S.D.N.Y. 2017) ......................................................32, 84, 96

*In re Interest Rate Swaps Antitrust Litig.*,
  No. 16-MC-2704 (PAE), 2018 WL 2332069 (S.D.N.Y. May 23, 2018) ...............84

*In re Interior Molded Doors Antitrust Litig.*,
  No. 3:18-cv-00718-JAG, 2019 WL 4478734 (E.D. Va. Sept. 18, 2019) ....................... *passim*

*InterVest, Inc. v. Bloomberg, L.P.*,
  340 F.3d 144 (3d Cir. 2003)................................................................................25

*Johnson v. Oroweat Foods Co.*,
  785 F.2d 503 (4th Cir. 1986) ............................................................................106

*Jones v. Micron Tech. Inc.*,
  400 F. Supp. 3d 897 (N.D. Cal. 2019) ................................................................96

*Jung v. Ass'n of Am. Med. Colls.*,
  300 F. Supp. 2d 119 (D.D.C. 2004) ........................................................76, 79, 80

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997)............................................................................................62

*Laber v. Harvey*,
  438 F.3d 404 (4th Cir. 2006) ............................................................................106

*Law v. NCAA*,
  134 F.3d 1010 (10th Cir. 1998) ..........................................................................47

*Leyse v. Bank of Am. N.A.*,
  804 F.3d 316 (3d Cir. 2015)................................................................................95

*In re Linerboard Antitrust Litig.*,
  305 F.3d 145 (3d Cir. 2002)................................................................................54

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-MD-2420 YGR, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014) ...................97

*In re Live Concert Antitrust Litig.*,
  247 F.R.D. 98 (C.D. Cal. 2007) ..................................................................59, 103

*Loren Data Corp. v. GXS, Inc.*,
  501 F. App'x 275 (4th Cir. 2012) ........................................................................22

*Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co*.,
  No. 13-CV-01180-BLF, 2015 WL 4755335 (N.D. Cal. Aug. 11, 2015)..............................102

*Maple Flooring Mfrs. Ass'n v. United States*,
  268 U.S. 563 (1925)........................................................................................61

*Marsh v. United States*,
  No. TDC-14-3559, 2016 WL 247563 (D. Md. Jan. 20, 2016) .............................................16

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013)...............................................................................77

*McCleary-Evans v. Maryland Dep't of Transp.*,
  780 F.3d 582 (4th Cir. 2015) ...............................................................................15

*Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*,
  No. DKC 12-0954, 2015 WL 4597529 (D. Md. July 6, 2015).................................................18

*In re Mexican Gov't Bonds Antitrust Litig.*,
  412 F. Supp. 3d 380 (S.D.N.Y. 2019).....................................................................84

*Microbix Biosystems, Inc. v. Biowhittaker, Inc.*,
  172 F. Supp. 2d 680 (D. Md. 2000)........................................................................16

*In re Minh Vu Hoang*,
  No. DKC 12-0593, 2014 WL 937949 (D. Md. Mar. 10, 2014).............................................103

*Molinari v. Consol. Energy Inc.*,
  No. 12CV1085, 2012 WL 5932979 (W.D. Pa. Nov. 27, 2012).............................................53

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984)........................................................................................40

*Morton's Mkt., Inc. v. Gustafson's Dairy, Inc*.,
  198 F.3d 823 (11th Cir. 1999) .............................................................................71

*In re Mushroom Direct Purchaser Antitrust Litig.*,
  No. 06-0620, 2015 WL 5767415 (E.D. Pa. July 29, 2015) ..................................................57

*N.C. State Bd. of Dental Exam'rs v. FTC*,
  717 F.3d 359 (4th Cir. 2013) ...............................................................................33

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984)..........................................................................................103

*Nat'l Elec. Benefit Fund v. Arlington Park Racecourse, LLC*,
  No. 8:11-CV-0090-RWT, 2011 WL 2712742 (D. Md. July 8, 2011) .................................... 71

*Nitsch v. Dreamworks Animation SKG Inc*,
  315 F.R.D. 270 (N.D. Cal. 2016). .......................................................................................... 56

*Ogden v. Little Caesar Enters., Inc.*,
  393 F. Supp. 3d 622 (E.D. Mich. 2019) .................................................................................. 58

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ....................................................................................................... 16, 48

*In re Packaged Ice Antitrust Litig.*,
  723 F. Supp. 2d 987 (E.D. Mich. 2010) .................................................................................. 25

*In re Parcel Tanker Shipping Servs. Antitrust Litig.*,
  541 F. Supp. 2d 487 (D. Conn. 2008) ..................................................................................... 84

*Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*,
  998 F.2d 1224 (3d Cir. 1993) .................................................................................................. 33

*Phillips v. Crown Cent. Petroleum Corp.*,
  426 F. Supp. 1156 (D. Md. 1977) ........................................................................................... 54

*Pinney Dock & Transp. Co. v. Penn Cent. Corp.*,
  838 F.2d 1445 (6th Cir. 1988) ................................................................................................ 66

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
  764 F. Supp. 2d 991 (N.D. Ill. 2011) ........................................................................... 18, 33, 75

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
  828 F.2d 211 (4th Cir. 1987) ..................................................................................... 65, 70, 71

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
  No. 84-5380, 1986 WL 957 (S.D. W. Va. May 13, 1986) ....................................................... 71

*In re Polyester Staple Antitrust Litig.*,
  No. 3:03CV1516, 2004 WL 7345007 (W.D.N.C. Aug. 5, 2004) ..................................... 97, 98

*In re Polyurethane Foam Antitrust Litig.*,
  799 F. Supp. 2d 777 (N.D. Ohio 2011) ............................................................................ 43, 105

*In re Polyurethane Foam Antitrust Litig.*,
  No. 1:10 MD 2196, 2015 WL 12747961 (N.D. Ohio Mar. 6, 2015) ...................................... 75

*In re Polyurethane Foam Antitrust Litigation*,
  No. 1:10 MD 2196, 2011 WL 13133853 (N.D. Ohio July 27, 2011) ..................................... 82

*In re Pork Antitrust Litig.*,
   No. 18-1776, 2019 WL 3752497 (D. Minn. Aug. 8, 2019) ......................................24, 31, 106

*Princo Corp. v. ITC*,
   616 F.3d 1318 (Fed. Cir. 2010)............................................................................................47

*In re Processed Egg Prod. Antitrust Litig.*,
   821 F. Supp. 2d 709, 732 (E.D. Pa. 2011). ...........................................................................86

*In re Processed Egg Prod. Antitrust Litig.*,
   902 F. Supp. 2d 704 (E.D. Pa. 2012) ....................................................................................76

*Proctor v. Metro. Money Store Corp.*,
   579 F. Supp. 2d 724 (D. Md. 2008) ......................................................................................81

*In re Publ'n Paper Antitrust Litig.*,
   690 F.3d 51 (2d Cir. 2012).....................................................................................................22

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
   173 F.3d 995 (6th Cir. 1999) .................................................................................................25

*Reed v. Advocate Health Care*,
   268 F.R.D. 573 (N.D. Ill. 2009).............................................................................................51

*In re Reformulated Gasoline (RFG) Antitrust & Patent Litig.*,
   No. CV-05-01671 CAS, 2007 WL 8056980 (C.D. Cal. Mar. 27, 2007) ...........................54, 55

*Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*,
   9 F. Supp. 3d 1032 (D. Minn. 2014)......................................................................................96

*Riddell v. Riddell Wash. Corp.*,
   866 F.2d 1480 (D.C. Cir. 1989).......................................................................................65, 66

*Robertson v. Sea Pines Real Estate Cos.*,
   679 F.3d 278 (4th Cir. 2012) ..................................................................................... *passim*

*Robles v. City of Chicago*,
   354 F. Supp. 3d 873 (N.D. Ill. 2019) ....................................................................................82

*Sageworks, Inc. v. Creatore*,
   No. 5:16-CV-367-BO, 2017 WL 633359 (E.D.N.C. Feb. 15, 2017).......................................95

*Schlesinger v. Reservists Comm. to Stop the War*,
   418 U.S. 208 (1974).............................................................................................................101

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) ..................................................................................... *passim*

*SD3, LLC v. Black & Decker (U.S.), Inc.*,
    215 F. Supp. 3d 486, 495 (E.D. Va. 2016) ............................................................70

*In re Se. Milk Antitrust Litig.*,
    555 F. Supp. 2d 934 (E.D. Tenn. 2008)..........................................................49, 81

*In re Se. Milk Antitrust Litig.*,
    No. 2:08-MD-1000, 2010 WL 8228839 (E.D. Tenn. Dec. 8, 2010)................49, 50

*Sears, Roebuck & Co. v. Riggs Distler & Co.*,
    No. SKG-11-2203, 2012 WL 1391838 (D. Md. Apr. 20, 2012) .........................103

*Sec'y of State for Defence v. Trimble Navigation Ltd.*,
    484 F.3d 700 (4th Cir. 2007) ................................................................................16

*Sherr v. HealthEast Care Sys.*,
    262 F. Supp. 3d 869 (D. Minn. 2017) ...................................................................77

*Simpson v. Sanderson Farms, Inc.*,
    744 F.3d 702 (11th Cir. 2014) ..................................................................58, 89, 90

*Smith v. Reddy*,
    101 F.3d 351 (4th Cir. 1996) ................................................................................18

*Speakes v. Taro Pharm. Indus.*,
    No. 16-cv-08318, 2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018) .........................40

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016)..........................................................................................98

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
    No. 1:09-cv-00560-LJO-BAM, 2013 U.S. WL 595122 (E.D. Cal. Feb. 15,
    2013) .....................................................................................................................18

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010)..................................................................................94

*Stephen Jay Photo., Ltd. v. Olan Mills, Inc.*,
    713 F. Supp. 937 (E.D. Va. 1989) ........................................................................90

*Sugar Inst., Inc. v. United States*,
    297 U.S. 553 (1936)..............................................................................................61

*Superior Offshore Int'l, Inc. v. Bristow Grp. Inc*,
    738 F. Supp. 2d 505 (D. Del. 2010).......................................................................86

*Supermarket of Marlinton v. Meadow Gold Dairies*,
    71 F.3d 119 (4th Cir. 1995) ........................................................................64, 71, 73

*TCF Nat'l Bank v. Mkt. Intelligence, Inc.*,
  812 F.3d 701 (8th Cir. 2016) ............................................................71

*Texas v. Allan Constr. Co.*,
  851 F.2d 1526 (5th Cir. 1988) ..........................................................70

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (2d Cir. 2001)..............................................................41

*Therapearl, LLC v. Rapid Aid Ltd.*,
  No. CCB-13-2792, 2014 WL 4794905 (D. Md. Sept. 25, 2014)...........48

*In re Titanium Dioxide Antitrust Litig.*,
  959 F. Supp. 2d 799 (D. Md. 2013) ............................................. *passim*

*Tivoli LLC v. Sankey S.P.A.*,
  No. SA CV 14-1285-DOC, 2015 WL 12683801 (C.D. Cal. Feb. 3, 2015)............................96

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001).......................................................... *passim*

*In re Travel Agent Comm'n Antitrust Litig.*,
  583 F.3d 896 (6th Cir. 2009) ............................................................82

*U.S. ex rel. Ahumada v. NISH*,
  756 F.3d 268 (4th Cir. 2014) ............................................................64

*United States v. A-A-A Elec. Co.*,
  788 F.2d 242 (4th Cir. 1986) ............................................................62

*United States v. Charlotte-Mecklenburg Hosp. Auth.*,
  248 F. Supp. 3d 720 (W.D.N.C. 2017) ..........................................45, 46

*United States v. Container Corp. of Am.*,
  393 U.S. 333 (1969)..............................................................61, 79, 91

*United States v. Patten*,
  226 U.S. 525 (1913)..............................................................73, 79, 84

*United States v. Rea*,
  958 F.2d 1206 (2d Cir. 1992)............................................................43

*United States v. Triple Canopy, Inc.*,
  775 F.3d 628 (4th Cir. 2015) ............................................................16

*United States v. U.S. Gypsum Co.*,
  438 U.S. 422 (1978)..........................................................60, 61, 77, 90

*United States v. Wilkinson*,
754 F.2d 1427 (2d Cir. 1985) ...................................................................................73, 74

*In re Urethane Antitrust Litig.*,
913 F. Supp. 2d 1145 (D. Kan. 2012) ...............................................................................22

*Van Buren v. Walmart, Inc.*,
No. DKC 19-0911, 2020 WL 1064823 (D. Md. Mar. 5, 2020) ........................................100

*Vance v. Potter*,
No. 5:05CV00013, 2006 WL 467981 (W.D. Va. Feb. 28, 2006) .......................................95

*Wagner v. Gen. Nutrition Corp.*,
No. 16-CV-10961, 2017 WL 3070772 (N.D. Ill. July 19, 2017) ...............................99, 100

*Wall v. Fruehauf Trailer Servs.*,
123 F. App'x 572 (4th Cir. 2005) ...................................................................................106

*Walls v. Sierra Pac. Mortg. Co.*,
No. GLR-19-595, 2020 WL 1528626 (D. Md. Mar. 31, 2020) ..........................................68

*Wilcox v. First Interstate Bank of Or.*,
815 F.2d 522 (9th Cir. 1987) ...........................................................................................61

*Wright v. City of Philadelphia*,
229 F. Supp. 3d 322 (E.D. Pa. 2017) ...............................................................................82

*Zachair, Ltd. V. Driggs*,
141 F.3d 1162, 1998 WL 211943 (4th Cir. 1998) .............................................................97

*Zaycer v. Sturm Foods, Inc.*,
896 F. Supp. 2d 399 (D. Md. 2012) ........................................................................101, 102

*Zenith Radio Corp. v. Hazeltine Research*,
401 U.S. 321 (1971) ..................................................................................................62, 65

*In re Zetia (Ezetimibe) Antitrust Litig.*,
No. 2:18-md-2836, 2019 WL 1397228 (E.D. Va. Feb. 6, 2019) .....................................100

## RULES

Fed. R. Civ. P. 15(a) ......................................................................................................106

## OTHER AUTHORITIES

1 Newberg on Class Actions § 2:2 (5th ed.) ............................................................100, 101

6 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1425 (2d ed. 2003) ..................................32

7 P. Areeda, Antitrust Law ¶ 1511 (1986) ..................................................................48

13 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 2112 (4th ed. 2020) ........................61

David L. Faigman, *et al.*, *Damage calculations in class action antitrust cases—
    Benchmarks used to calculate class* damages, 5 Mod. Sci. Evidence § 43:35
    (2019-20 ed.)..........................................................................................................54

U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines For
    Collaborations Among Competitors* (2000), available at
    http://www.ftc.gov/os/2000/04/ftcdojguidelines.pdf ..............................................61

U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines*
    (2010)...........................................................................................................49, 50, 57

U.S. Dep't of Justice & Fed. Trade Comm'n, Statements of Antitrust Enforcement
    Policy in Health Care (Aug. 1996 rev.), available at
    https://www.justice.gov/atr/page/file/1197731/download ......................................93

William Holmes & Melissa Mangiaracina, Antitrust Law Handbook § 9:14 (2014
    supp.)......................................................................................................................25

## INTRODUCTION

Defendants conspicuously ignore the fact that, without discovery, Plaintiffs have already obtained compelling evidence of Defendants' misconduct, including statements from multiple confidential witnesses who observed or participated in Defendants' illegal activities. Such evidence is extraordinary at the pleading stage and far more than sufficient to defeat a motion to dismiss.

The Amended Consolidated Complaint ("Complaint") describes Defendants' conspiracy to suppress plant workers' compensation in rich detail: Rival poultry processors formed a secret Compensation Committee that organized annual "off the books" meetings at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida. Before each meeting, the consulting firm WMS sent a lengthy survey to the rival processors, asking about their wages, salaries, and benefits for each plant position. At the start of each meeting, WMS staff distributed the survey results and summarized them in a PowerPoint presentation. Then, according to Defendants' former employees, meeting participants held a roundtable discussion, where they considered whether it was reasonable to pay "particular position[s] less or more than the WMS survey average." During that discussion, meeting participants ultimately fixed the wages, salaries, and benefits paid to their poultry plant workers. Meeting participants also evaluated each other's compliance with the compensation-fixing agreement reached the previous year and chastised participants who had overcompensated workers. Around 2018, a senior executive from Tyson confessed that the "discussions about wages, salaries and benefits at the 'off the books' meetings . . . were so inappropriate and improper" that Tyson would not attend them in the future.

The Complaint further explains how Agri Stats, a statistics company, helped poultry processors implement and monitor their conspiracy by facilitating the exchange of detailed and current compensation information in monthly reports (which were kept secret from the public).

1

Defendants' former employees explained that, while Agri Stats redacted the names of individual poultry processors in its monthly reports, poultry processors easily identified which company provided which compensation information to Agri Stats. In fact, Agri Stats' staff helped poultry processors with this deanonymization process. As one former employee of a Defendant candidly admitted, Agri Stats was responsible for "collusion in the poultry industry."

Multiple confidential witnesses also confirmed that Defendants' poultry plant managers regularly compared current and *future* compensation schedules with their counterparts at competitors' poultry plants. Those plant managers transmitted the comparison wage data to their superiors at corporate headquarters to help Defendants harmonize their compensation to poultry plant workers and monitor the conspiracy. As one former plant manager bluntly put it: "[w]e would collaborate."

Unable to escape the facts, Defendants argue that the Complaint fails to satisfy several technical requirements. These arguments fall flat. The Complaint paints a complete and compelling picture of Defendants' antitrust violations, far exceeding the showings Plaintiffs are required to make at the pleading stage.[1]

## STATEMENT OF FACTS

Multiple confidential witnesses confirmed the existence and scope of Defendants' agreement to fix compensation paid to poultry processing workers. As explained further below, this agreement had three primary, mutually-reinforcing components: (1) a secret committee that organized annual off-the-books meetings at a Florida resort, where senior executives of poultry processors discussed the results of a wage survey and fixed compensation for the upcoming year;

---

[1] Plaintiffs have submitted an index to accompany this brief. *See* Exhibit 1. It is organized by topic so that the reader can easily locate Plaintiffs' responses to each of Defendants' arguments.

(2) a monthly exchange of current and confidential compensation data through Agri Stats, which allowed poultry processors to continuously harmonize their compensation and monitor the conspiracy; and (3) direct plant-to-plant exchanges of compensation practices, including future increases to hourly wages, which executives at corporate headquarters used to facilitate their compensation-fixing.

## I.   THERE IS A LARGE POWER GAP BETWEEN DEFENDANT PROCESSORS AND THEIR PLANT WORKERS.

Defendant Processors[2] are 14 poultry processors that produce and control approximately 80 percent of the poultry sold to consumers in the United States.[3] ¶ 2. Together with their co-conspirators, Defendant Processors control more than 90% of poultry plants, ¶ 222, and earn more than $30 billion in annual revenue. ¶ 96. Collectively, Defendant Processors own approximately 200 poultry plants in the continental United States and employ approximately 220,000 workers at those plants who process live chickens and turkeys into poultry products. ¶¶ 99, 103.

Defendant Processors and their co-conspirators use their financial clout to recruit hourly workers who are powerless to push back against inadequate compensation and unfair working conditions. A 2015 report from Oxfam America observed that "[t]he poultry industry has a complicated history of tapping marginalized populations for its workforce." ¶ 125. These populations include "migrant workers, refugees, asylum-seekers, immigrants employed under EB3 visas, prison laborers, and participants in court-ordered substance abuse programs," *id.*, who are

---

[2] Throughout this brief, the term "Defendant Processors" refers to the following entities: Perdue Defendants, Tyson Defendants, Pilgrim's Defendants, Sanderson Farms Defendants, Koch Foods Defendants, Wayne Farms Defendants, Mountaire Farms Defendants, Peco Foods, Inc., Simmons Foods Defendants, Fieldale Farms Corporation, George's Defendants, Butterball, LLC, Cargill Defendants, and Jennie-O Turkey Store Defendants ("JOTS").

[3] Throughout this brief, paragraph numbers refer to paragraphs in the Complaint, unless otherwise specified.

"economically desperate and socially isolated," ¶ 124. Many of them have few alternatives for employment because they lack sufficient education or language skills. ¶ 123.

Debbie Berkowitz, a former Senior Policy Adviser in the United States Occupational Safety and Health Association ("OSHA"), explained that the poultry processing industry "targets" these "most vulnerable group[s] of workers," and "when one group gets too powerful and stands up for their rights, they figure out who's even more vulnerable and move them in." ¶ 124. For example, Norman Beecher, a former human resources manager for co-conspirator Case Farms, actively recruited refugees from the Guatemalan civil war, noting "'Guatemalans can't go back home. They're here as political refugees. If they go back home, they get shot.'" ¶ 126. When Guatemalan workers began to organize, however, Case Farms turned to "'Burmese refugees,'" then to "'Nepalis expelled from Bhutan,'" and eventually to "'inmates from the local prison.'" ¶ 127.

Desperate to work, Defendant Processors' hourly employees accept unsafe working conditions and poor compensation. Most hourly workers hang, slaughter, treat, cut, and package birds, or serve as technicians to maintain processing machines and refrigerators. ¶ 143. These jobs are some of the most dangerous in the country: Oxfam America called the rate of injury in poultry processing plants "shockingly high," and OSHA classifies poultry processing as "a hazardous industry." ¶ 121.

While shouldering a substantial risk of physical injury, hourly-paid workers rarely earn enough to lift their families out of poverty. A 2015 report by Oxfam America observed that wages for these employees "average around $11 per hour; annual income for most is between $20,000 and $25,000. … An average poultry worker supporting two children qualifies for Head Start, SNAP (food stamps), and the National School Lunch Program. In addition, workers often turn to

local charities and food banks to supplement their income; in many poultry towns, thrift stores and food banks dominate local storefronts." ¶ 120.

Approximately 10% of employees at Defendant Processors' poultry plants, who mostly occupy supervisory positions, receive salaries instead of hourly wages, and generally earn more than their hourly paid coworkers. ¶ 108. Salaried employees, however, are likewise trapped in the industry: because they have spent their careers gathering skills and experience that are not as valuable outside of the poultry processing world, it would be difficult for them to find work as lucrative in a different industry. ¶ 216.

## II.   DEFENDANT PROCESSORS WERE MOTIVATED TO FIX COMPENSATION.

In addition to a largely captive workforce, several features of the poultry processing industry made it tempting for Defendant Processors to fix wages below competitive market levels. First, poultry plant labor is the second largest cost of producing poultry for consumption in the United States. Compensating workers in poultry processing plants accounts for approximately 16 percent of Defendant Processors' total operating costs. ¶ 113.

Moreover, because poultry plants are located near the farmers who raise poultry for slaughter, the vast majority of Defendant Processors' plants are clustered together in groups in rural areas. ¶ 100. Indeed, each Defendant Processor owns at least one poultry plant that is within 32 miles of another Defendant Processor's poultry plant. *Id.* Thus, in a competitive labor market, Defendant Processors would have to compete with each other for nearby poultry processing labor by offering higher wages, higher salaries and/or superior benefits. ¶ 101. But if Defendant Processors all agreed to forego this competition, they could keep labor costs low.

The temptation to forego that competition was heightened when, in December 2008, the second largest poultry processor, Pilgrim's, filed for bankruptcy. ¶ 130. The bankruptcy filing spurred competing poultry processors to consider methods of managing costs—including labor

costs—to avoid the same fate. *Id.*

## III.   THE POULTRY PROCESSING INDUSTRY IS SUSCEPTIBLE TO FIXING COMPENSATION.

Several characteristics of the poultry processing industry made it easy for Defendant Processors to act on the temptation and enter into a compensation-fixing agreement. To begin, Defendant Processors have close personal relationships with each other and serve together on multiple boards of trade associations. ¶¶ 201-02. A former employee of Perdue said that management in the poultry processing industry formed a "tight-knit circle" and exchanged information frequently. ¶ 201.

That circle drew even closer in April 2009, when the human resources committees of the three leading poultry trade associations—the National Chicken Council, the U.S. Poultry & Egg Association, and the National Turkey Federation—merged to form the Joint Poultry Industry Human Resources Council. Uniting the different human resources departments of poultry processors under a single umbrella, the Council facilitated coordination on compensation issues throughout the industry. *Id.*

In addition, the way Defendant Processors compensate their employees made it easy to compare and ultimately fix wages, salaries, and benefits. Because Defendant Processors made commodity poultry products using nearly identical operations, they sorted their workers into a limited set of discrete positions that were the same across their plants. ¶¶ 103-04. Defendant Processors determined compensation of plant employees in each of these positions in a highly centralized and regimented way: senior executives at each Defendant Processor's corporate headquarters would establish wage, salary, and benefit schedules for all employees based on their positions and years of experience. ¶¶ 114-17. Defendant Processors could readily compare and "align" these compensation schedules to ensure that they were paying the same or highly similar

amounts to each type of employee. ¶ 147. As explained below, the Defendants did precisely that.

## IV.  DEFENDANT PROCESSORS CONSPIRED AT "OFF THE BOOKS" MEETINGS AND USED WMS SURVEYS TO FIX COMPENSATION.

Multiple confidential witnesses confirmed that Defendant Processors used three strategies to suppress poultry processing compensation. The first was a secret "Compensation Committee" that organized an annual off-the-books meeting at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, where Defendant Processors' senior executives gathered to discuss and ultimately fix wages, salaries, and benefits for poultry processing workers. ¶¶ 133-54.

Despite its secrecy, the Compensation Committee had a formal structure, and Defendant Processors took turns leading the Committee's efforts. ¶ 135. For example, in 2015, the Committee was co-chaired by Jon Allen, Corporate Human Resources Director of Fieldale Farms, and Bert Neuenschwander, Manager of Compensation for Foster Farms. *Id.*

Each year, the Committee organized a compensation-fixing meeting around the same time as the U.S. Poultry & Egg Association's well-publicized annual Human Resources Seminar. ¶ 136. According to a former senior executive of Perdue, however, the compensation-fixing meetings were "off the books" because they involved such sensitive discussions. *Id.* The meetings were attended by executives from each of the Defendant Processors who had the ability to determine employee compensation: Directors of Compensation, Directors of Benefits, Compensation Analysts and/or Vice-Presidents of Human Resources. ¶ 134.

The Compensation Committee insisted that Defendant Processors' executives attend these meetings in person. A former employee of co-conspirator Keystone explained that a poultry processor would be expelled from the Compensation Committee if its executives failed to attend the meetings in person for two years in a row. ¶ 152. This threat ensured that a critical mass of executives was present at each meeting for in-person discussions. For example, the April 2017

meeting included participants from the following poultry processors: Tyson, Pilgrim's, Perdue, Koch Foods, Wayne Farms, George's, Keystone, Fieldale Farms, Simmons, Butterball, Cargill, Cooper Farms, Foster Farms, Amick Farms, Case Foods, OK Foods, and Allen Harim. ¶ 153.

A compensation survey conducted by WMS, a consulting firm, guided the conversations at these secret meetings. ¶¶ 139-140. Before each meeting, Defendant Processors reported detailed, current compensation data to WMS, including the wages, salaries, bonuses, and benefits paid to each type of employee at their poultry processing plants. ¶¶ 142-145. According to a former Pilgrim's employee, the three largest poultry processors—including Tyson and Pilgrim's—took turns financing both the annual WMS survey and the "off the books" meeting. ¶ 138.

At the secret meetings, WMS circulated the results of the surveys, which provided granular compensation data, broken down on both a national basis and state-by-state basis. ¶¶ 142-145. The survey results included the entry level wage rate, entry level base rate, weighted average base rate, highest base rate, evening shift premium, night shift premium, and any raises for all hourly positions. ¶¶ 143-44. Similarly, the survey results included the base salary, average salary, median salary, bonus pay, total compensation, and any raises for salaried workers. ¶¶ 142, 144.

Additionally, the WMS survey results provided exhaustive, disaggregated data about the benefits provided to both salaried and hourly-paid employees. ¶ 145. For example, the survey results identified: the amount of health care costs per employee; the premiums charged to employees for health insurance; the size of deductibles for health insurance; the value of contributions to pension plans; the amount of life insurance coverage; the number of permitted sick leave days; and the number of annual vacation days. *Id.*

After WMS circulated the survey results at the "off the books" meetings, it delivered a PowerPoint presentation to the attendees that emphasized the average and median wage rates and

salaries for each poultry plant position. ¶ 141.

Following the PowerPoint presentation, the meeting attendees engaged in roundtable discussions to review the results of the WMS survey and to determine and agree upon the optimal compensation for poultry plant workers. ¶¶ 6, 146-51. A former employee of Pilgrim's explained that attendees at the in-person meetings specifically discussed with each other whether and why they paid a particular position less or more than the WMS survey average. ¶ 146.

 While WMS purportedly anonymized this data by replacing Defendant Processor names with a number, ¶ 141, it was blatantly apparent which processor had provided which compensation information. ¶ 153. A former employee of Perdue explained that it was not difficult to determine what each participating processor had reported when "you're sitting in a meeting and the person across from you [from a competing processor] is reporting on what they do." *Id.*

During their roundtable discussions, Defendant Processors agreed upon and fixed the wages, salaries, and benefits that they would provide to Class Members. ¶¶ 146-51. The attendees also chastised any Defendant Processor that had deviated—by making unauthorized increases in compensation—from the wages, salaries, and benefits that had been fixed at prior in-person meetings. ¶ 148. A senior Tyson executive noted during a private conversation in or around 2018 that the discussions about compensation at the "off the books" meetings were so inappropriate and improper that the company would no longer attend them. ¶ 151.

While risky, the WMS surveys and "off the books" meetings were effective in harmonizing the compensation systems of Defendant Processors. ¶ 147. A former employee of a poultry processor that regularly attended the meetings explained that the company used the WMS survey results to align its wages with those of other poultry processors. *Id.* Similarly, a former employee of Pilgrim's said she used the hourly wage and annual salary data from the WMS survey to help

establish the hourly wages and annual salaries at Pilgrim's. *Id.*

## V.   DEFENDANT PROCESSORS TRACKED EACH OTHER'S COMPENSATION ON AT LEAST A MONTHLY BASIS THROUGH AGRI STATS.

Between their annual compensation-fixing meetings, Defendant Processors used monthly Agri Stats reports to track their competitors' compensation and ensure they were adhering to their agreement. Agri Stats is a company that facilitates data exchanges among poultry processors to "[i]mprove the[ir] bottom line profitability." ¶ 158. In October 2009, the then-president of Agri Stats explained that the company's "whole goal is to support the [poultry] industry." ¶ 161. A former executive of Perdue provided a blunter assessment of Agri Stats' operations: Agri Stats was responsible for "collusion in the poultry industry." ¶ 157.

Approximately 95 percent of poultry processors in the United States, including each of the Defendant Processors, subscribed to Agri Stats during the Class Period (and paid millions of dollars for those subscriptions). ¶¶ 161, 180. All of these subscribers adhered to Agri Stats' give-data-to-get-data policy: in order to obtain Agri Stats' reports, subscribers had to provide terabytes of competitively sensitive compensation data to Agri Stats. ¶¶ 156, 159, 180, 274. Those Agri Stats reports were only available to poultry processors; they were *not* available to workers or members of the general public. *Id.*

Every month, Agri Stats collected the *current* salaries and hourly wages paid to the workers at *each* subscriber's domestic poultry processing plants. ¶¶ 163, 170. Agri Stats then compiled that compensation data and distributed the compilation to its subscribers in monthly reports. ¶¶ 163, 170. While Agri Stats claimed the data was reported anonymously, the data compilations were sufficiently granular and disaggregated that executives of Defendant Processors could, and did, easily match the distributed compensation data to specific poultry processing plants owned by specific Defendant Processors in specific regions. ¶¶ 164-69. A former Perdue executive said that,

although Agri Stats data was "supposedly confidential," he knew from the "good old boy system" that Perdue and every other poultry processor knew precisely which company reported which data. ¶ 165. He said it is "just bullshit" to suggest that processors did not know which company reported which compensation data to Agri Stats. *Id.* Similarly, a former Pilgrim's employee explained that it was "totally" possible to determine which poultry processor provided specific information in Agri Stats reports. Indeed, during meetings to review Agri Stats data, colleagues at Pilgrim's would point out that certain compensation data was associated with a particular competitor's plant in a particular location. ¶ 166.

Moreover, representatives from Agri Stats would often assist Defendant Processors to identify the sources of compensation data in Agri Stats' monthly reports. ¶¶ 167-69. A former Perdue employee said that Perdue brought in Agri Stats personnel to teach management "how to extract information" from the data distributed by Agri Stats. ¶ 167. Similarly, a former Butterball employee explained that "you could figure out" which company reported which compensation data by speaking with Agri Stats representatives. ¶ 168. Notably, Agri Stats met with each Defendant Processor and its executives on (at least) a quarterly basis during the Class Period. ¶ 169.

Defendant Processors regularly reviewed and analyzed Agri Stats compensation data at corporate headquarters and at each individual plant. ¶ 172. Joe Sanderson, then-CEO and Chairman of Sanderson Farms, stated that "we live and die by Agri Stats." *Id.* Similarly, a former employee of Perdue said the company spent "enormous effort analyzing Agri Stats" and that the CEO was an "Agri Stats guru and nut." *Id.* A former Butterball employee likewise said that "Agri Stats was big" at the company. *Id.*

Defendant Processers used the exchange of current compensation data through Agri Stats to harmonize compensation paid to plant workers. ¶ 173. For example, a former Pilgrim's

employee said that a Pilgrim's corporate officer visited each of the company's plants on a quarterly basis to review Agri Stats data with plant management and ensure that each Pilgrim's plant was paying wages that were "exactly in the middle" of the reported Agri Stats data. *Id.* According to confidential witnesses, both Pilgrim's and Butterball insisted that compensation for poultry plant workers be within the Agri Stats average range when engaging in collective bargaining negotiations with unions. ¶¶ 174-75. Thus, as a former employee of Perdue observed, it would be "stupid to think" that Agri Stats did not have "an influence on" wages paid to poultry plant workers. ¶ 170.

The monthly dissemination of compensation data through Agri Stats also allowed Defendant Processors to ensure compliance with the compensation-fixing conspiracy. Defendant Processors were able to *constantly* monitor each other's compensation levels to ensure that no Defendant Processor offered materially more in compensation than another. ¶ 171. A former Butterball employee confirmed that there was "no question" that Agri Stats was used by Defendant Processors to monitor each other's behavior. *Id.*

Agri Stats also ensured there was no cheating on the conspiracy. Agri Stats helped Defendant Processors standardize the way they reported compensation data so they could make apples-to-apples comparisons, and Agri Stats audited any aberrant raw data reported by a Defendant Processor. ¶¶ 176-77. Such auditing ensured that no Defendant Processor could cheat on the compensation-fixing scheme by covertly providing higher wages, salaries, or benefits. *Id.*

There is no plausible, non-conspiratorial justification for Defendant Processors to have exchanged through Agri Stats, on a monthly basis, highly confidential data about their *current* compensation to poultry workers, broken down in disaggregated form by company, plant and position. ¶ 178. In a genuinely competitive market for poultry plant labor, such sensitive

compensation information would remain a closely guarded secret. *Id.*

## VI. MANAGERS OF DEFENDANT PROCESSORS' PLANTS EXCHANGED INFORMATION REGARDING FUTURE WAGES AND SALARIES.

In addition to verifying their competitors' compensation practices through Agri Stats, managers at Defendant Processors' plants routinely monitored competitors' compensation plans by contacting managers at rival plants and asking about their current and *future* plans for wages, salaries, and benefits. ¶¶ 184-93. Multiple confidential witnesses confirmed this information-sharing network. A former Peco employee said that human resources managers at rival poultry processing plants "shared" compensation information—including pay rates, pay increases, and employment benefits—"all the time." ¶ 186. Similarly, a former Pilgrim's employee explained that corporate headquarters would regularly ask each plant to collect information about current and future compensation at competing poultry plants, and that such information was often obtained directly from the competing plants themselves. ¶ 185.

By way of example, a former human resources manager who worked at both a Perdue plant and a George's plant said that both plants routinely exchanged data with rival plants. *Id.* ¶ 192. She explained that managers of the Perdue plant and the George's plant contacted managers of rival poultry plants operated by Pilgrim's, Cargill and Virginia Poultry Growers Cooperative and requested both the *current* hourly wage rates for plant workers as well as any planned *future* increases to those wage rates. *Id.* The former human resources manager said, "We would collaborate. We would talk among each other to see what they were doing for pay." *Id. See also* ¶¶ 188-92 (confidential witnesses describing plant-to-plant information exchanges involving multiple plants, including some belonging to Pilgrim's, Tyson, Perdue, and Wayne Farms).

Defendant Processors' plant managers who systematically exchanged this competitively sensitive compensation data provided the data to executives at their respective corporate

headquarters, who in turn used the information to facilitate the setting of artificially depressed compensation. ¶ 184.

## VII.   THE CONSPIRACY DEPRESSED COMPENSATION TO POULTRY PLANT WORKERS EMPLOYED BY DEFENDANT PROCESSORS.

Defendants' carefully orchestrated, multi-pronged conspiracy was successful. As a result of the conspiracy, each Defendant Processor systematically aligned its compensation of poultry plant workers with the artificially depressed compensation paid by other Defendant Processors. ¶¶ 111-12, 224-25. As a consequence, those poultry plant workers received materially lower wages, salaries, and benefits during the Class Period than they would have in a competitive market. ¶ 226.

Indeed, an analysis conducted by expert economists retained by Plaintiffs shows that compensation of plant workers employed by non-poultry food manufacturers increased at a materially more rapid rate than compensation paid by Defendant Processors to their plant employees during the Class Period. ¶ 228. According to this analysis, the difference between the weekly earnings of workers employed by food manufacturers broadly and the weekly earnings of workers employed by poultry processors specifically was, on average, $103.79 during the ten-year period prior to the Class Period and subsequently increased to, on average, $127.30 during the Class Period. *Id.*

In fact, as a result of the conspiracy, the hourly wages of poultry plant workers employed by Defendant Processors often only increased 25 cents a year during the Class Period. ¶ 229. A former Tyson human resources manager explained that, in practice, these limited annual "raises" to hourly wages rarely increased total compensation because they were offset by annual increases to health insurance premiums. ¶ 230. The former Tyson human resources manager noted that poultry plant workers "really never get ahead" of their starting wage. *Id.*

14

Defendant Processors imposed these severe restraints on hourly wage increases even though their poultry plant employees were working harder during the Class Period. For example, between 1999 and 2015, processing line speeds *increased* by 54% and poultry production *increased* by nearly 35%. ¶ 231. Nonetheless, inflation-adjusted hourly wages for poultry plant workers *decreased* by more than 1% during that same time period. *Id.*

## LEGAL STANDARDS

When evaluating a motion to dismiss under Rule 12(b)(6), courts consider whether the complaint "contain[s] sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *McCleary-Evans v. Maryland Dep't of Transp.*, 780 F.3d 582, 583 (4th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). This plausibility standard "does not impose a probability requirement at the pleading stage." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). Rather, this "standard requires only that the complaint's factual allegations 'be enough to raise a right to relief above the speculative level.'" *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015) (quoting *Twombly*, 550 U.S. at 555). A complaint can be plausible "even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (citation omitted).

Indeed, the Fourth Circuit has urged district courts to "be careful" at the motion to dismiss stage "not to subject the complaint's allegations to the familiar 'preponderance of the evidence' standard." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 425 (4th Cir. 2015). "When a court confuses probability and plausibility, it inevitably begins weighing the competing inferences that can be drawn from the complaint. But it is not our task at the motion-to-dismiss stage to determine 'whether a lawful alternative explanation appear[s] more likely' from the facts of the complaint." *Id.* (quoting *Houck*, 791 F.3d at 484). If a plaintiff's "explanation is plausible, her complaint survives a motion to dismiss under Rule 12(b)(6), regardless of whether there is a more

15

plausible alternative explanation." *Houck*, 791 F.3d at 484 (reversing grant of a motion to dismiss because district court inquired "whether an alternative explanation was more probable").

When assessing the plausibility of plaintiffs' allegations, courts "accept as true all well-pled facts in the complaint and construe them in the light most favorable to [plaintiffs]." *United States v. Triple Canopy, Inc.*, 775 F.3d 628, 632 n.1 (4th Cir. 2015). In addition, courts "generally consider[] only the complaint, any attached documents 'integral to the complaint,' and any 'matters of public record' of which the court may take judicial notice. *Marsh v. United States*, No. TDC-14-3559, 2016 WL 247563, at *2 (D. Md. Jan. 20, 2016) (quoting *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)).

## ARGUMENT

The Complaint alleges two violations of Section 1 of the Sherman Act, which proscribes "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. The first cause of action alleges a conspiracy to fix and depress compensation, which is a *per se* violation of the antitrust laws and thus "so plainly anticompetitive that no elaborate study of the industry is needed to establish [its] illegality." *Microbix Biosystems, Inc. v. Biowhittaker, Inc.*, 172 F. Supp. 2d 680, 691 (D. Md. 2000). The second cause of action alleges a conspiracy to exchange compensation data, which is judged under the "rule of reason" analysis and thus "requires courts to conduct a fact-specific assessment of market power and market structure . . . to assess the restraint's actual effect on competition." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283–84 (2018) (internal quotation marks, brackets and citation omitted). As this brief makes clear below, both causes of action alleged in the Complaint are more than "plausible" and "raise a right to relief above the speculative level," and accordingly Defendants' motions to dismiss must be denied. *Twombly*, 550 U.S. at 555.

First, in Section I, Plaintiffs demonstrate that, in reliance on both direct evidence and circumstantial evidence, they have alleged a plausible *per se* claim against Defendants for conspiring to fix and depress compensation. Next, in Section II, Plaintiffs establish that they have alleged a plausible rule of reason claim against Defendants for agreeing to exchange compensation information that generated anticompetitive effects. Then, in Section III, Plaintiffs explain why Defendants' statute of limitations arguments are without merit, as the Complaint properly alleges fraudulent concealment and continuing violations. Finally, in Section IV, Plaintiffs rebut each Defendant's individual motion to dismiss, explaining how the Complaint adequately alleges each Defendant's participation in the compensation-fixing conspiracy.

## I.    PLAINTIFFS HAVE ADEQUATELY ALLEGED A *PER SE* UNLAWFUL CONSPIRACY TO FIX AND DEPRESS COMPENSATION.

Plaintiffs allege a horizontal agreement between Defendant Processors to fix the compensation of poultry plant workers. Such an agreement to fix compensation is "considered a per se violation of the Sherman Act." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999).[4]

Plaintiffs' *per se* antitrust claim can survive Defendants' motions to dismiss if the Complaint alleges plausible "direct" or "circumstantial" evidence that the Defendants forged an unlawful compensation-fixing agreement. *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278,

---

[4] *See also In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1213 (N.D. Cal. 2015) ("Plaintiffs have alleged sufficient facts to support a plausible *per se* claim that Defendants allegedly conspired to suppress the compensation of the putative class"); *Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 624 (E.D. Mich. 2012) ("a conspiracy among competing hospitals to fix wages, like an analogous horizontal price-fixing conspiracy, would be subject to *per se* treatment.").

289 (4th Cir. 2012).[5] The Complaint does just that, presenting exceptionally strong direct and circumstantial evidence that Defendants engaged in a multifaceted conspiracy to fix and depress compensation for poultry processing workers. The Court should therefore deny Defendants' motions to dismiss.

### A.    Plaintiffs Have Alleged Substantial Direct Evidence of the Conspiracy.

The Complaint is replete with direct evidence that Defendants fixed compensation. Direct evidence is "explicit and requires no inferences to establish the proposition or conclusion being asserted." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004). Crucially, direct evidence includes "eyewitness accounts." *Smith v. Reddy*, 101 F.3d 351, 356 (4th Cir. 1996). Thus, "an admission by an insider" with knowledge of conspiratorial meetings constitutes "direct evidence of agreement" that violates Section 1 of the Sherman Act. *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 998 (N.D. Ill. 2011). In fact, courts regard "admissions by employees . . . of the conspirators" as "textbook examples of adequate direct-evidence allegations" to defeat a motion to dismiss. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 951 (N.D. Ill. 2018) (internal quotation marks and brackets omitted). "Such evidence is sufficient in [and] of itself to defeat summary judgment," let alone a motion to dismiss. *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, No. 1:09-cv-00560-LJO-BAM, 2013 U.S. WL 595122, at *24 (E.D. Cal. Feb. 15, 2013) (citing *In re Coordinated Pretrial Proceedings in Petroleum Pros. Antitrust Litig.*, 906 F.2d 432, 441 (9th Cir. 1990)).

Defendants' claim that the Complaint does not contain direct evidence is inaccurate. *See* Defs.' Mem. of Law in Supp. of Their Joint Mot. to Dismiss Pls.' Am. Consolidated Compl. at 4-

---

[5] *See also Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, No. DKC 12-0954, 2015 WL 4597529, at *6 (D. Md. July 6, 2015) ("A party may demonstrate an agreement by direct evidence or circumstantial evidence, or a combination of the two.").

6, Mar. 2, 2020, ECF No. 344-1 (hereafter "Joint MTD"). The Complaint presents statements from multiple eyewitnesses, confirming all three prongs of Defendants' compensation-fixing agreement.

1. <u>Plaintiffs Present Direct Evidence of Compensation-Fixing at In-Person Meetings.</u>

Former employees of Defendants confirmed that Defendant Processors participated in the WMS survey and used those results to guide annual compensation-fixing discussions at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida. Most notably, in a "private conversation," around 2018, a senior executive from Tyson confessed that the "discussions about wages, salaries and benefits at the 'off the books' meetings . . . were so inappropriate and improper" that Tyson would not attend them in the future. ¶ 151. Other confidential witnesses corroborated the existence and function of these highly "improper" meetings of the Compensation Committee. Among other admissions:

- **The meetings were secret:** A former senior executive of Perdue admitted that the in-person meetings of the Compensation Committee in Florida were "off the books" because the conversations and subjects discussed at them were so sensitive. ¶ 136.

- **Confidential information was submitted in advance:** A former Pilgrim's employee admitted that Defendant Processors submitted highly detailed and current compensation data to WMS in advance of, and for discussion at, the meetings. ¶ 140.

- **In-person attendance was mandatory:** A former Keystone employee explained that if a Defendant Processor failed to attend the in-person meetings for two years in a row, the Defendant Processor would be expelled from the Compensation Committee. ¶ 156.

- **High level executives attended:** Former Perdue and Pilgrim's employees admitted that the meetings were attended by executives with the authority to set compensation, including Directors of Compensation, Directors of Benefits, Compensation Analysts and/or Vice-Presidents of Human Resources from each of the leading poultry processors. ¶ 134.

- **Defendants used sham anonymization techniques**: While WMS purported to conceal what each processor had reported when it distributed the survey results, a former employee of Perdue confessed that it was blatantly apparent which company had reported which

19

compensation data when "you're sitting in a meeting and the person across from you [from a competing processor] is reporting on what they do.'" ¶ 146.

- **Defendant Processors discussed wages:** A former Pilgrim's employee confessed that, during the roundtable discussions at the meetings, Defendant Processors "discussed with each other whether they paid a particular position less or more than the WMS survey average and also discussed why they paid certain positions higher or lower wages depending upon the responsibility assigned to that position." ¶ 146.

- **Defendant Processors discussed benefits:** "According to a former employee of Perdue, the executives at the off-the-books meetings discussed specific 'benefit information' such as health insurance deductibles, paid time off and 401(k) plans." ¶ 148.

- **The information was used to set compensation**: A former Pilgrim's employee admitted that she used WMS survey data to "help establish the hourly wages and annual salary rates at Pilgrim's. Similarly, a former employee of another poultry processor that attended the off-the-books meetings . . . explained that the company used the WMS survey results to align its wages with those of other poultry processors . . ." ¶ 147.

Together, these confessions thoroughly document an illegal scheme to fix the compensation of poultry processing workers.

2.   Plaintiffs Present Direct Evidence of Agri Stats Information-Sharing and Monitoring of the Conspiracy.

The Complaint also contains detailed admissions that Defendant Processors used Agri Stats data to implement and monitor their compensation-fixing scheme. Most notably, a former Perdue employee unequivocally stated that Agri Stats was responsible for "collusion in the poultry industry." ¶ 157. Among other admissions:

- **Agri Stats data was easily deanonymized:** While Agri Stats claims it only distributed anonymized data, a former Perdue employee confessed that he knew, from being around the "good old boy system," that "Perdue and every other poultry processor participating in Agri Stats knew precisely which company reported which data." ¶ 165. A former Pilgrim's employee similarly admitted that it was easy to match Agri Stats compensation data to specific rival plants and that Pilgrim's did so on a regular basis. ¶ 166. And a former Butterball employee acknowledged that "you could figure out" which company reported which compensation data by simply speaking with Agri Stats representatives. ¶ 168.

- **Defendant Processors used Agri Stats to monitor each other's compensation:** A former Butterball employee said there was "no question about it" that Agri Stats was regularly used by poultry processors to monitor each other's performance. ¶ 171.

- **Agri Stats data was used to harmonize compensation:** A former Pilgrim's employee explained that a department at corporate headquarters "was specifically tasked with visiting each poultry processing plant operated by Pilgrim's to ensure that their compensation rates were exactly in the middle of reported Agri Stats data." ¶ 173. Similarly, a former Butterball employee noted that company wages "would have to be within the parameters" contained in Agri Stats. ¶ 175.

These statements confirm the role of Agri Stats in Defendants' compensation-fixing scheme.

3.     <u>Plaintiffs Present Direct Evidence of Plant-to-Plant Sharing of Current and Future Compensation Data.</u>

Finally, multiple witnesses admitted that Defendant Processors would keep their wages coordinated through agreements between their respective plants to exchange current and future compensation data. ¶¶ 184-93. For example, a former human resources manager who worked at both a Perdue poultry plant and a George's poultry plant admitted that that both plants regularly exchanged current and future compensation data with rival plants, including plants operated by Pilgrim's and Cargill. The former human resources manager confessed, "*We would collaborate. We would talk among each other to see what they were doing for pay.*" *Id.* (emphasis added)." ¶ 192 (emphasis added). Likewise, former employees of Tyson, Perdue, Butterball, George's, Cargill, Peco, and Wayne Farms admitted to plant-to-plant exchanges of competitively sensitive compensation data with rival poultry processors. ¶¶ 184-93.

Former employees of Defendant Processors also admitted that they would use the compensation data obtained from plant-to-plant exchanges to compare and align their compensation schedules. For example, a former Butterball employee confessed that the company's plant in Mount Olive, North Carolina regularly exchanged hourly wage rates for specific positions with rival poultry plants so that the poultry processors could "compare" their compensation schedules. ¶ 189.

In sum, the Complaint alleges compelling direct evidence—obtained from multiple former employees with personal knowledge of Defendants' conspiratorial conduct—that Defendant Processors agreed to align and suppress the compensation they paid to poultry plant workers. For that reason alone, Defendants' motions to dismiss should be denied.[6]

**B.    Plaintiffs Have Alleged Substantial Circumstantial Evidence of the Conspiracy.**

The Complaint also presents powerful circumstantial evidence of Defendants' compensation-fixing conspiracy. "Conspiracies are often tacit or unwritten in an effort to escape detection, thus necessitating resort to circumstantial evidence to suggest that an agreement took place." *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 280 (4th Cir. 2012) (quoting *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 290 (4th Cir. 2012)). Indeed, "most cases are constructed out of a tissue of [ambiguous] statements and other circumstantial evidence . . ." *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 823 (D. Md. 2013) (quoting *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002)) (brackets in original). Where a plaintiff relies on circumstantial evidence "to prove its claim, the existence of a conspiracy must be a reasonable inference that the jury could draw from that evidence; it need not be the *sole* inference." *Id.* at 821 (quoting *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012). "[T]he interpretation and weighing of conflicting circumstantial evidence is a role assigned to the jury at trial." *Id.* at 823.

Plaintiffs have pled extraordinary circumstantial evidence of the conspiracy between Defendants to fix and depress compensation, including "off the books" meetings of a secret

---

[6] When direct evidence of a conspiracy is sufficiently pled, circumstantial evidence is unnecessary. *See In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1154 (D. Kan. 2012) ("direct evidence is sufficient by itself to create a question of fact for trial concerning the existence of an agreement").

compensation committee, the recurrent exchange of competitively sensitive confidential wage data, economic evidence of wage suppression, and a labor market characterized by high concentration, high barriers to entry and a commoditized labor force.[7] Like the Complaint's direct evidence of a conspiracy, the circumstantial evidence is sufficient—by itself—to defeat Defendants' motions to dismiss.[8] Taken together, the direct and circumstantial evidence paint a comprehensive portrait of Defendants' misconduct, raising far more than a "reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 545.

  1. <u>Defendants Misrepresent the Law Regarding Circumstantial Evidence.</u>

Throughout the Joint Motion, Defendants misrepresent the requirements for pleading an antitrust claim based on circumstantial evidence. Citing *Twombly*, Defendants assert that for "a Sherman Act § 1, 15 U.S.C. § 1, claim resting on circumstantial pleading, Plaintiffs must plausibly allege facts demonstrating (1) 'parallel conduct,' and (2) 'plus factors.'" Joint MTD at 2. Defendants then argue that Plaintiffs "purported compensation-fixing conspiracy claim must be dismissed" because Plaintiffs "fail at the first step: they do not allege parallel conduct." *Id.* at 2, 9.

Yet the law is not so limiting: *Twombly* held that allegations of parallel conduct alone are *insufficient* to plead a conspiracy claim, *not* that parallel conduct is *required* to plead a claim. *See*

---

[7] Indeed, the circumstantial evidence here is considerably stronger than in two recent cases where courts declined to dismiss antitrust complaints against poultry processors—many of which are named as defendants in the instant matter. *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 788 (N.D. Ill. 2017) ("*In re Broiler Antitrust I*") (plaintiffs plausibly alleged a conspiracy to inflate the price of chicken meat, despite a lack of "alleged details about the formation, operation, and communications constituting the conspiracy"); Transcript of Motion Hearing at 48, *Haff Poultry, Inc. v. Tyson Foods, Inc.*, No. CIV-17-33-RJS (E.D. Okla. Jan. 6, 2020) ("*Haff Poultry* Tr.") (attached as Exhibit 2) (plaintiffs plausibly alleged a conspiracy to depress compensation paid to contract farmers, despite an absence of allegations about "in person" meetings).

[8] Accordingly, even if the Court declines to credit the existence of direct evidence of the conspiracy, it must deny Defendants' motions to dismiss due to the compelling circumstantial evidence alleged in the Complaint.

*Twombly*, 550 U.S. at 557 ("An allegation of parallel conduct . . . gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility . . . .").[9]

Several courts have expressly held that plaintiffs need *not* allege parallel conduct when relying on circumstantial evidence to plead conspiracies to depress compensation. For example, in *Fleischman v. Albany Medical Center*, 728 F. Supp. 2d 130 (N.D.N.Y. 2010), a wage-fixing case, the defendants argued that "in order to rely on circumstantial evidence to prove a Section 1 conspiracy claim [Plaintiffs] 'must first demonstrate that the defendants' actions were parallel.'" *Id.* at 158 (brackets in original). The district court flatly rejected the argument, noting that "[p]arallel pricing is merely 'one such form of circumstantial evidence.' Accordingly, Plaintiffs need not prove parallel pricing in order to prevail on per-se claim based on circumstantial evidence." *Id.* (quoting *In re EDPM Antitrust Litig.*, 681 F. Supp. 2d 141, 166 (D. Conn. 2009)).

Similarly, in another wage-fixing case, *Cason-Merenda v. Detroit Medical Center,* 862 F. Supp. 2d 603 (E.D. Mich. 2012), defendants argued that plaintiffs "'cannot even get to first base' on their claim of a *per se* violation of § 1 without proof that" defendants "engaged in parallel conduct in their setting of . . . wages." *Id.* at 626. The district court squarely rejected that argument in a heading: "There Is No Inflexible Requirement that Plaintiffs Must Produce Evidence of Parallel Conduct in Order to Establish a Conspiracy Through Circumstantial Evidence." *Id.* at 625. The court explained that it "is aware of no case law—nor have Defendants identified any—that

---

[9] Likewise, *In re Pork Antitrust Litigation*, cited repeatedly in Defendants' Joint Motion, does not assert that allegations of parallel conduct are *required* to plead a Section 1 claim predicated on circumstantial evidence. No. 18-1776, 2019 WL 3752497 (D. Minn. Aug. 8, 2019). Rather, the opinion merely states that "Plaintiffs that lack smoking gun evidence *often* highlight 'parallel conduct' between defendants . . . to demonstrate that an agreement is plausible." *Id.* at *6 (emphasis added).

mandates that a plaintiff's portfolio of circumstantial evidence in a § 1 case **must** include proof of

parallel conduct. . . . Rather, circumstantial evidence of any sort will do . . . ." *Id.* at 626-27.[10]

Thus, contrary to Defendants' unsupported assertions, parallel conduct and plus factors are

not the only types of circumstantial evidence Plaintiffs can use to allege a plausible conspiracy to

depress compensation.

> 2.    The Complaint Alleges the Who, What, Where, When and Why.

The appropriate way to evaluate the circumstantial evidence in the Complaint is to ask

whether it tells a sufficiently detailed story to be plausible: The Fourth Circuit has recognized that

complaints "that include detailed fact allegations as to the 'who, what, when and where' of the

claimed antitrust misconduct not surprisingly survive dismissal." *SD3, LLC v. Black & Decker*

*(U.S.) Inc.*, 801 F.3d 412, 430 (4th Cir. 2015) (quoting William Holmes & Melissa

Mangiaracina, *Antitrust Law Handbook* § 9:14 (2014 supp.)).[11] Because Plaintiffs "not only

---

[10] *See also Boland v. Consol. Multiple Listing Serv.*, 868 F. Supp. 2d 506, 514 (D.S.C. 2011) (denying motion to dismiss where plaintiffs "do not rest their section one claims on descriptions of parallel business conduct. Instead, the Plaintiffs allege that the Defendant board members actually met and reached agreements to adopt certain by-laws and regulations."); *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999) (characterizing parallel conduct as merely one of several "[i]mportant factors" a court should evaluate in determining the sufficiency of a plaintiff's circumstantial evidence); *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 163-65 (3d Cir. 2003) (considering parallel conduct only after determining there was insufficient other circumstantial evidence of the alleged antitrust conspiracy); *In re Auto. Parts Antitrust Litig.*, No. 12-md-02311, 2014 WL4209588, at *3 (E.D. Mich. Aug. 26, 2014) (denying motion to dismiss "[a]lthough Plaintiffs in this case do not allege parallel conduct"); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1007 (E.D. Mich. 2010) ("[T]his is not a parallel conduct/bare assertion of conspiracy case. In the instant case, viewing the CAC in its entirety, there is sufficient factual content alleged to put the Plaintiffs' allegations in a context suggestive of a plausible conspiracy.").

[11] *See also Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 445 (6th Cir. 2012) (allegations describing the "who, what, where, when, how or why" of an antitrust conspiracy constitute sufficient circumstantial evidence to allege a per se Section 1 claim); *Blanton v. Domino's Pizza Franchising LLC*, No. 18-13207, 2019 WL 2247731, at *5 (E.D. Mich. May 24, 2019) (denying motion to dismiss antitrust complaint that alleged the "relevant 'who, what, where, when, how, or why'"); *In re Ins. Brokerage Antitrust Litig.*, No. 04-5184 (CCC), 2016 WL 5219456, at *6 (D.N.J.

allege[] the 'who, what, when, and where' in [their] complaint, but also the 'why,'" the Court should deny Defendants' motions to dismiss. *Id.* at 431.

**The who:** The Complaint identifies exactly which entities and executives participated in the compensation-fixing conspiracy:

- Fourteen named Defendant Processors attended "off the books" in-person meetings of the Compensation Committee during the Class Period to fix and depress the compensation of their poultry plant workers, ¶¶ 153, 159;

- Executives from those Defendant Processors with the authority to set compensation— including Directors of Compensation, Directors of Benefits, Compensation Analysts and Vice-Presidents of Human Resources—attended those in-person meetings, ¶ 134;

- Eleven Defendant Processors and six identified co-conspirators attended the particular "off the books" meeting held in April 2017, ¶ 153;

- The Compensation Committee was co-chaired by Jon Allen, Corporate Human Resources Director of Fieldale Farms, and Bert Neuenschwander, Manager of Compensation for Foster Farms, in 2015, ¶ 135;

- All 14 named Defendant Processors have participated in surveys conducted by Defendant WMS to exchange confidential compensation data, ¶¶ 139-40, 154;

- All 14 named Defendant Processors subscribed to Defendant Agri Stats during the Class Period to exchange confidential compensation data, ¶¶ 7, 130, 155; and

- Processing plant managers employed by all 14 named Defendant Processors exchanged confidential compensation data directly with rival poultry plants ostensibly competing for the same pool of labor, ¶¶ 8, 185-93.

**The what:** The Complaint indisputably alleges Defendants' conspiracy to fix and depress compensation to poultry plant workers, including the mechanisms for implementing it:

- Defendant Processors fixed and depressed the wages, salaries, and benefits paid to poultry processing plant workers in the continental United States during the period January 1, 2009 through the present, ¶¶ 132, 152, 244;

---

Sept. 20, 2016) (complaint "sufficiently alleges the 'who,' 'what,' 'where,' 'when,' and 'how' of the excess-casualty-based conspiracy"); *In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1163 (D. Idaho 2011) ("This complaint does answer the basic who-what-where-when question.").

- Defendant Processors reached agreements to fix and depress those wages, salaries, and benefits at recurring "off the books" in-person meetings of a secret Compensation Committee, ¶ 133;

- Defendant Processors regularly exchanged confidential and current compensation data through WMS and Agri Stats in order to harmonize their compensation schedules and monitor compliance with the conspiracy, ¶¶ 147, 170-1, 180, 232; and

- Defendant Processors' plants routinely exchanged data regarding current and future compensation of poultry plant workers to ensure the alignment of wages and enforce the conspiracy, ¶¶ 8, 132, 185-87, 188, 192, 205.

**The when:** The Complaint alleges that Defendants' conspired from January 1, 2009 through the present, *i.e.* the Class Period. Additionally, the Complaint specifically alleges the time period and frequency with which each of the conspiratorial acts occurred:

- The "off the books" meetings of the Compensation Committee during which Defendant Processors fixed and depressed compensation were held in April of each year of the Class Period, around the same time as the U.S. Poultry & Egg Association's annual Human Resources Seminar, ¶ 136;

- WMS exchanged compensation data between Defendant Processors through a survey that was conducted on an annual basis immediately prior to the in-person meetings of the Compensation Committee, and WMS distributed the results of that survey at the in-person meetings, ¶ 140;

- Agri Stats obtained compensation data from, and exchanged compensation data between, the Defendant Processors on a monthly basis during the Class Period, ¶¶ 7, 162, 171-73; and

- Managers at poultry plants owned by Defendant Processors exchanged compensation data with their counterparts at competing poultry plants "all the time" according to a former Peco Foods employee, "regularly" according to a former Butterball employee, and at least on annual basis according to a former Perdue employee. ¶¶ 186, 189.

**The where:** The Complaint alleges the precise locations where the Defendant Processors reached agreements to fix and depress compensation and where they implemented those agreements:

- The "off the books" in-person meetings between Defendant Processors took place each year at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, ¶¶ 6, 134;

27

- Defendant Processors set compensation schedules that were aligned with each other at their respective corporate headquarters, ¶¶ 8, 114-17, 172;

- Agri Stats visited the corporate headquarters of each Defendant Processor to establish a system for regularly uploading and auditing current compensation data, ¶ 177;

- Defendant Processors sent officers to their individual poultry processing plants to ensure that wages at those plants were aligned with Agri Stats figures, ¶ 173; and

- Defendant Processors' poultry plants exchanged compensation data with each other in multiple states, including in Kentucky, Tennessee, North Carolina, and Virginia, ¶¶ 187-93.

**The why:** Finally, the Complaint explains that employee compensation was a major driver of Defendant Processors' operating costs, providing ample motive for a conspiracy to depress compensation:

- Compensating poultry plant employees is the second largest cost to Defendant Processors when producing poultry, accounting for approximately 16 percent of Defendant Processors' total operating costs, ¶ 113;

- In the absence of the conspiracy, given that each Defendant Processor owns a poultry plant located within 32 miles of another Defendant Processor's poultry plant, Defendant Processors would have competed with each other for labor by offering higher compensation to Class Members, causing labor costs to rise, ¶¶ 100, 131; and

- In December 2008, the second largest poultry processor, Pilgrim's, filed for bankruptcy, prompting competing poultry processors to consider methods of managing costs, including labor costs, in order to avoid the same fate. ¶¶ 35, 130.

These exceptionally detailed allegations belie Defendants' claim that the Complaint is "entirely devoid of facts about [the conspiracy's] purported content or structure, such as how wages were supposedly fixed, or what the parties agreed to do." Joint MTD at 5. Indeed, the

Complaint thoroughly alleges *all* the characteristics of an antitrust conspiracy contemplated by the Fourth Circuit at the motion to dismiss stage, and thus Defendants' motions must be denied.[12]

        3.      <u>The Complaint Adequately Alleges Parallel Conduct and Plus Factors.</u>

As explained above, the Complaint need *not* allege "parallel conduct and plus factors" to adequately plead a Section 1 agreement with circumstantial evidence. Because the Complaint alleges actual evidence of anticompetitive agreement—including conspiratorial meetings—the Court has no reason to evaluate whether parallel conduct and plus factors are sufficient to *imply* the existence of such an agreement. Yet, even if the Court holds otherwise, Plaintiffs easily satisfy that alternative pleading standard. The Complaint pleads both "parallel conduct" by Defendant Processors and a multitude of compelling "plus factors."

        a.      *Plaintiffs Allege Defendant Processors Engaged in Parallel Conduct.*

The Complaint alleges two forms of parallel conduct: 1) parallel alignment of compensation; and 2) parallel information exchanges through in-person meetings and other mechanisms.

        (i)      Plaintiffs Allege Parallel Compensation Suppression.

In the Joint Motion, Defendants argue that Plaintiffs "do not claim that any two Defendants' wages or salaries were the same or moved in parallel." Joint MTD at 1. Yet, the Complaint *repeatedly* states that Defendant Processors aligned their compensation with each other

---

[12] In another antitrust class action against several of the Defendant Processors for depressing compensation to farmers who raised chickens, the Eastern District of Oklahoma denied a motion to dismiss because: "Plaintiffs allege the who; the defendants and other conspiring companies identified in the consolidated amended complaint. They identify the what; the exchange of sensitive, detailed, current nonpublic information with the expectation that they would receive and they do receive the same in return. They describe the when; since at least 2008. And the why; to reduce their costs, including grower compensation." Ex. 2, *Haff Poultry* Tr. at 47.

during the Class Period. For example, the Complaint specifically alleges that Defendant Processors aligned the compensation they provided to *both* hourly paid workers and salaried workers:

- "[T]he compensation for all *hourly paid* positions at poultry processing plants was determined in a systematic way using compensation schedules within each Defendant Processor that were aligned with the compensation for the same positions at other Defendant Processors." ¶ 111 (emphasis added).

- "[T]he compensation for all *salary-paid* positions at poultry processing plants was determined in a systematic way using compensation schedules within each Defendant Processor that were aligned with the compensation for the same positions at other Defendant Processors." ¶ 112 (emphasis added).

Additionally, the Complaint alleges that "Defendant Processors used the WMS survey results to modify and harmonize their compensation systems." ¶ 147. The Complaint bolsters this statement with admissions from confidential witnesses, such as a former Pilgrim's employee who said she used the wage and salary data from the WMS survey to establish compensation rates at Pilgrim's. *Id.*

The Complaint also alleges that "Defendant Processers used the Agri Stats exchange of current compensation data in combination with the [annual Florida] meetings to harmonize the compensation paid to Class Members . . . ." ¶ 170. The Complaint provides several specific examples of Defendant Processors aligning their compensation with Agri Stats figures. A former Pilgrim's employee explained that an entire department at the company "was specifically tasked with visiting each poultry processing plant operated by Pilgrim's to ensure that their compensation rates were exactly in the middle of reported Agri Stats data." ¶ 173. A former Butterball employee likewise explained that, during collective bargaining negotiations with unions, the company would insist that wages "be within the parameters" contained in Agri Stats.[13]

---

[13] In their Joint Motion, Defendants cite to *In re Pork Antitrust Litigation* to argue that Plaintiffs fail to adequately allege parallel conduct. Yet, in that supply restriction case, the court held that

The Complaint further alleges that, as a consequence of the compensation-fixing conspiracy, Defendant Processors simultaneously restrained their annual wage increases. For example, the Complaint alleges that during "the Class Period, as a result of the conspiracy to restrain and depress compensation, the hourly wages of poultry processing plant workers employed by Defendant Processors often only increased approximately 25 cents a year." ¶ 229.

Contrary to Defendants' suggestion, compensation suppression "need not be exactly simultaneous and identical in order to give rise to an inference of agreement." *SD3*, 801 F.3d at 429 (citation omitted).[14] Thus, "Plaintiffs are not required to plead simultaneous [compensation restraints]—or that the [compensation restraints] were identical—in order to demonstrate parallel conduct. . . . Nor are they required to plead with specificity the price" that Defendant Processors paid for poultry processing labor. *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010). Rather, it is sufficient for Plaintiffs to allege facts suggesting that Defendant Processors set compensation "within an agreed upon range . . ." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 132 (3d Cir. 1999).[15] Accordingly, Plaintiffs easily plead parallel conduct with numerous allegations that Defendant Processors aligned their compensation schedules.

---

"none" of the alleged "statements indicate that any individual Defendant was making cuts . . . ." No. 18-1776, 2019 WL 3752497 at *9 (D. Minn. Aug. 8, 2019). By contrast here, multiple witnesses state that Defendant Processors aligned their wages.

[14] The Fourth Circuit case on which Defendants rely, *SD3*, specifically rejects the argument that "parallel conduct" only exists "when defendants move in relative lockstep, achieving their common anticompetitive ends (exclusion) only by substantially identical means," noting "[s]o far as we can tell, this standard finds no support in any existing authority." 801 F.3d at 428-29.

[15] *See also Boland*, 868 F. Supp. 2d at 517 ("although the Plaintiffs do not allege specific price-fixing numbers, they do allege, for instance, that the complained-of rules and regulations preclude brokerages from offering less than the full array of services"); *City of Moundridge v. Exxon Mobil Corp.*, No. 04-940 (RWR), 2009 WL 5385975, at *5 (D.D.C. Sept. 30, 2009) ("Price-fixing can occur even though the price increases are not identical in absolute or relative terms."); *In re Animation*, 123 F. Supp. 3d at 1213 (denying motion to dismiss wage-fixing claim where

(ii)    Plaintiffs Allege Other Parallel Conduct, Such as Attending Secret Meetings and Sharing Compensation Data.

In addition to alleging that Defendant Processors harmonized and aligned their compensation schedules with each other and simultaneously restrained their wage increases, Plaintiffs have pled multiple others forms of parallel conduct by Defendant Processors. Indeed, allegations of parallel conduct require "only evidence that defendants 'acted similarly,' and not evidence that they charged the same prices . . ." *In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 441-42 (E.D. Pa. 2018).

Courts have consistently recognized that a broad range of concurrent anticompetitive behavior constitutes parallel conduct. For instance, in *SD3*, the Fourth Circuit held that a plaintiff can plead parallel conduct by alleging any "facts indicating that the defendants acted 'similarly,'" such as, in that particular case, defendants' refusal to use plaintiff's technology. 801 F.3d at 412, 427. Likewise, another court recently concluded that a broad range of actions—from behavior at meetings to statements to competitors—constitute parallel conduct. *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 472-81 (S.D.N.Y. 2017) ("*In re Interest Rate Swaps Antitrust I*"). In fact, *Twombly* itself contemplates various forms of parallel conduct, stating, "[c]ommentators have offered several examples of parallel conduct allegations that would state a § 1 claim under this standard." *Twombly*, 550 U.S. at 556 n.4 (citing 6 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1425, at 167-85 (2d ed. 2003), which describes an array of parallel conduct including: simultaneous cancellations of subscriptions to a publication; simultaneous removal by

---

"Defendants frequently exchanged information about salary *ranges*, benefits, and other HR matters.") (emphasis added).

rival gasoline retailers of price signs; and distributors refusing to grant first-run exhibition rights to a drive-in theater).[16]

Here, Plaintiffs allege a host of concurrent, anticompetitive behavior by Defendant Processors that constitutes "parallel conduct." For example, the Complaint alleges that each Defendant Processor simultaneously:

- attended annual "off the books" meetings of the secretive Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida during which they discussed and fixed compensation, ¶¶ 133-36;

- participated in annual confidential WMS surveys, through which they exchanged detailed compensation data, ¶¶ 140, 154;

- subscribed to, and exchanged disaggregated compensation data through, Agri Stats each month, ¶¶ 7, 155-83; and

- obtained current and future wage data through plant-to-plant communications and provided such data to their respective corporate headquarters. ¶¶ 184-93.

This is precisely the kind of parallel conduct that gives rise to an inference of conspiracy. Indeed, in another antitrust class action against several of the Defendant Processors for depressing compensation to farmers who raised chickens, the Eastern District of Oklahoma held that

---

[16] *See also N.C. State Bd. of Dental Exam'rs v. FTC*, 717 F.3d 359, 373 (4th Cir. 2013) (parallel conduct includes allegations that dentists "engaged in a consistent practice of discouraging non-dentist teeth whitening services' through their cease-and-desist letters and other efforts."); *Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*, 998 F.2d 1224, 1243 (3d Cir. 1993) ("While it may be true that the defendants did not use the same prices or run their internal business operations identically, the evidence shows that they acted similarly by refraining from competing on existing accounts, while at the same time competing actively for new accounts."); *In re Currency Conversion Fee Antitrust Litig.*, No. 05 Civ. 7116 (WHP), 2012 WL 401113, at *5-6 (S.D.N.Y. Feb. 8, 2012) (holding that defendants' concurrent adoption of arbitration clauses constitutes parallel conduct); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 996 (N.D. Ill. 2011) (finding sufficient allegations of parallel conduct where the defendants made "production cuts, strategic acquisitions, and plant closures" over the course of two years).

simultaneous subscriptions to Agri Stats constitute parallel conduct. *See* Ex. 2, *Haff Poultry* Tr. at 37-38.

                b.       *Plaintiffs Allege Compelling Plus Factors.*

Plus factors "consist of circumstantial or contextual evidence that substantiates an otherwise speculative conspiracy claim." *In re Interior Molded Doors Antitrust Litig.*, No. 3:18-cv-00718-JAG, 2019 WL 4478734, at *4 (E.D. Va. Sept. 18, 2019) (citing *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 289 (4th Cir. 2012)). "Courts evaluate plus factors holistically and weigh them together with the allegations of parallel conduct." *Id.* "Allegations that alone seem neutral 'can take on a different shape when considered in conjunction with other surrounding circumstances.'" *Id.* (citation omitted). Importantly, plus factors "need not 'compel an inference of conspiracy,' but need only render the allegations plausible." *Id.* (citation omitted).

The District of Maryland has identified three plus factors "on which courts most often rely to determine whether an inference of conspiracy is permissible: (1) 'evidence that the defendant had a motive to enter into a price fixing conspiracy,' (2) 'evidence that the defendant acted contrary to its interests,' and (3) 'evidence implying a traditional conspiracy,' such as 'non-economic evidence that there was an actual manifest agreement not to compete.'" *Titanium Dioxide*, 959 F. Supp. 2d at 822 (quoting *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360-61 (3d Cir. 2004)).[17]

---

[17] This opposition brief substantially cites *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799 (D. Md. 2013), which is the most recent opinion by the District of Maryland that expansively addresses plus factors in an antitrust class action. Notably, the opinion resolves a motion for summary judgment, which requires much more of plaintiffs than a motion to dismiss. *See SD3*, 801 F.3d at 425 ("courts must be careful not to import the summary-judgment standard into the motion-to-dismiss stage"). It is a testament to the extraordinary evidence in the Complaint that Plaintiffs satisfy not only the motion to dismiss standard, but also the summary judgment requirements articulated in *Titanium Dioxide*, even at this nascent stage of the litigation.

(i)    First Plus Factor: The Poultry Processing Industry Is Conducive to Compensation-Fixing.

The first plus factor, *i.e.* "evidence that the defendant had a motive to enter into a price fixing conspiracy," refers to "evidence that the industry is conducive to oligop[sonistic] price fixing, either independently or through a more express form of collusion." *Id.* (citation omitted). Indicators "that a market is conducive to collusion include the homogeneous and highly standardized, or commodity-like nature, of the product; a concentrated market dominated by a few sellers; [and] high barriers to new players' entry, such as high investment or fixed costs . . ." *Id. See also In re Interior Molded Doors*, 2019 WL 4478734, at *5. The poultry processing labor market is marked by all these features.

The Complaint alleges that the market for poultry processing labor is "commodity like" because poultry processors "view the plant workers that comprise the Class as fungible" and "generally interchangeable" within the same positions, "permitting Defendant Processors to readily compare and match each other's compensation levels." ¶¶ 198, 271. At the same time, the market for poultry processing workers is "characterized by inelastic labor supply" such that "changes in compensation rates do not substantially affect the rate of participation in poultry processing positions." ¶¶ 199, 218. The "commodity like" nature of the labor market for poultry processing plants, coupled with the inelasticity of supply for that market, renders it particularly susceptible to compensation-fixing. *Id.*

Furthermore, the poultry processing industry is "highly concentrated." ¶¶ 196-97. Defendant Processors and co-conspirators account for more than 90% of poultry processing jobs in the United States. Given this extremely high market share, "[i]t cannot be credibly disputed" that the market is sufficiently concentrated for Defendant Processors and their co-conspirators to control it. *In re Broiler Antitrust I,* 290 F. Supp. 3d at 796.

The Complaint also describes how the poultry processing labor market is "characterized by high entry barriers." The cost of constructing a poultry processing complex exceeds $100 million, and operating one requires "establishing and operating a distribution network capable of delivering poultry products to grocery chains or wholesalers; developing and investing in a skilled contract-farmer base; and ensuring compliance with onerous federal and state government mandates and regulations." ¶ 196.

Finally, the Complaint identifies three closely-timed structural changes that enhanced Defendant Processors' motive for—and the industry's conduciveness to—the compensation-fixing conspiracy. First, in December 2008, the second largest poultry processor, Pilgrim's, filed for bankruptcy, prompting competing poultry processors to consider methods of managing labor costs in order to avoid the same fate. ¶ 130. Second, around the same time, the largest poultry processor in the United States, Tyson, re-subscribed to Agri Stats, thus resuming the monthly exchange of compensation information with other Defendant Processors. *Id.* Third, in April 2009, the human resources committees of the three leading industry trade associations—the National Chicken Council, the U.S. Poultry & Egg Association, and the National Turkey Federation—merged to form the Joint Poultry Industry Human Resources Council, which expedited industry-wide coordination of compensation. *Id.*

(ii)     Second Plus Factor: Defendants Acted Contrary to Their Interests.

This Court has explained that the "second plus factor, evidence that defendants acted contrary to economic self-interest, means actions that are inconsistent with competition in the industry." *Titanium Dioxide*, 959 F. Supp. 2d at 822. Here, Defendant Processors regularly shared highly detailed information about their current and future compensation practices through annual surveys conducted by WMS, ¶¶ 139-47, monthly reports provided by Agri Stats, ¶¶ 155-81, and frequent plant-to-plant information exchanges. ¶¶ 184-93. Such sharing of "confidential and

36

commercially sensitive information" would be extremely dangerous in a competitive market and is an action "inconsistent with competition in the industry." *Titanium Dioxide*, 959 F. Supp. 2d at 822. Indeed, the fact that Agri Stats requires each Defendant Processor to "give data to get data" indicates that sharing such sensitive compensation data with rivals would be against a firm's independent economic self-interest *absent* an agreement. ¶¶ 156, 159, 180, 274.

According to the Complaint, "each Defendant Processor owns at least one poultry plant that is within 32 miles of another Defendant Processor's poultry plant. This geographic proximity means that, in a competitive labor market, many employees of Defendant Processors' plants could and would switch their employment to rival poultry plants when offered higher wages, higher salaries and/or superior benefits." ¶ 101. Thus, a Defendant Processor armed with a competitor's current or future compensation data would know exactly how much compensation to offer in order to lure away their rival's existing and prospective employees. Accordingly, in a competitive market, no Defendant Processor would risk losing employees by regularly sharing such sensitive compensation data with rival poultry processors. ¶ 232. Indeed, in another antitrust action against several of the Defendant Processors for depressing compensation to farmers, the Eastern District of Oklahoma denied motions to dismiss on the basis that the information exchanged through Agri Stats was "of the very kind and quality that troubles courts considering these claims." Ex. 2, *Haff Poultry* Tr. at 46.

Moreover, this Court has held that "price [changes] that are not correlated with principles of supply and demand may be especially probative of behavior contrary to self-interest." *Titanium Dioxide*, 959 F. Supp. 2d at 828. The Complaint alleges just such an absence of correlation between supply and demand in the poultry processing labor market. For instance, according to the Complaint, the productivity of poultry processing workers greatly increased before and during the

Class Period, largely because processing line speeds substantially increased. ¶ 231. Between 1999 and 2015, "line speeds increased by 54%, poultry production increased by nearly 35%." *Id.* In a competitive market, this increase in worker productivity would have increased demand for the workers' labor, ultimately driving up compensation; yet inflation-adjusted hourly wages for poultry processing workers during this time period *decreased* by more than 1%. *Id.*

Furthermore, Plaintiffs offer a preliminary expert economic analysis (far beyond what is required at the pleading stage) showing that, in the non-poultry food processing industry, compensation for workers was higher and increased at a materially faster rate over the Class Period. ¶¶ 10, 213, 270. More specifically, "the difference between the weekly earnings of workers employed by food manufacturers broadly and the weekly earnings of workers employed by poultry processors was, on average, $103.79 during the ten-year period prior to the Class Period, and subsequently increased to, on average, $127.30 during the Class Period."[18] ¶ 228. This economic analysis provides further confirmation that poultry processing compensation was not correlated with the principles of supply and demand during the Class Period.[19]

---

[18] Defendants contend that inflation explains this growing gap. Joint MTD at 15. Not so. Plaintiffs' model compares poultry processing wages with other food manufacturing wages *over time*, and therefore accounts for inflation. In any event, quarreling with an expert's methodology is inappropriate at this stage of the litigation, where Plaintiffs' factual allegations are presumed true. *See, e.g.*, *Heckler & Koch, Inc. v. German Sport Guns GmbH*, No. 1:11-cv-01108-SEB-TAB, 2014 WL 12756372, at *11 (S.D. Ind. May 15, 2014) ("calling into question [an expert's] qualifications . . . or his methodology . . . [would be] premature at the motion to dismiss stage").

[19] In their Joint Motion, Defendants assert that the Complaint fails "to plead . . . any post-agreement shift in industry compensation trends." Joint MTD at 9. Yet, the economic analysis included in the Complaint does exactly that; it shows that, post-agreement, compensation provided to Class Members increased at a materially lower rate than compensation provided to non-poultry food processing plant workers. ¶ 228.

(iii)   Third Plus Factor: There Is Substantial Non-Economic Evidence that Suggests a Traditional Conspiracy.

This Court has held that "the third plus factor—non-economic evidence that suggests a traditional conspiracy" is "the most important plus factor." *Titanium Dioxide*, 959 F. Supp. 2d at 823, 829. Even without the benefit of discovery, the Complaint alleges remarkable traditional conspiracy evidence.

Statements and actions "revealing the Defendants' awareness of the potential appearance of collusion" is one form of "non-economic evidence that suggests a traditional conspiracy." *Id.* at 829. The Complaint pleads multiple examples of such statements and actions, including:

- A senior executive from Tyson stated that the secret annual meetings of the Compensation Committee in Florida were "so inappropriate and improper that that the company would no longer attend them." ¶ 151.

- "[A] former employee of Perdue during the Class Period stated that Agri Stats was responsible for 'collusion in the poultry industry.'" ¶ 157.

- A former human resources manager who worked at both a Perdue poultry plant and a George's poultry plant during the Class Period said that managers of plants operated by Perdue, George's, Pilgrim's, Cargill and Virginia Poultry Growers Cooperative "would collaborate" and exchange current and future compensation schedules. ¶ 198.

This Court has also held that "meetings, industry conferences and informal contacts" among defendants constitute "non-economic evidence that suggests a traditional conspiracy." *Titanium Dioxide*, 959 F. Supp. 2d at 830. Describing a particularly compelling form of such evidence, the Complaint alleges that executives of Defendant Processors conducted annual, in-person "off the books" meetings of a secret Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida where they: reviewed the results of the detailed WMS compensation survey, ¶¶ 140-48; discussed whether and why to pay "a particular position less or more than the WMS survey average," ¶ 146; "discuss[ed], and agree[d] upon, plans for salary

raises and bonus budgets for the upcoming year," ¶ 149; "present[ed] detailed comparisons about how actual salary changes and bonus budgets from the preceding year compared with the *planned* salary changes and bonus budgets that had been collectively devised at the previous year's meeting," ¶ 150; and "chastised any Defendant Processor that had deviated—by making unauthorized increases to worker compensation—from wages, salaries and benefits that had been fixed at prior in-person meetings."[20] ¶ 148. Accepting these allegations as true (as the Court must at this stage of the proceedings), there is simply no way these meetings were consistent with lawful behavior.[21]

Despite these detailed allegations, Defendants contend that an "absence of facts about alleged meeting attendees, the content of their discussions, and actions taken as a result leaves these allegations short of stating plus factors." Joint MTD at 13. Clearly, this is factually incorrect. It is also legally incorrect; the allegations in this Complaint go above and beyond what is required by the Fourth Circuit, which has clarified that even in the absence of any allegations about the content of discussions between defendants, "[a]llegations of communications and meetings among conspirators can support an inference of agreement because they provide the means and opportunity to conspire." *SD3*, 801 F.3d at 432. The Fourth Circuit has explained that such "allegation[s] identif[y] a practice, not illegal in itself, that facilitates [an antitrust conspiracy] that

---

[20] In addition to the annual "off the books" meetings of the Compensation Committee in Florida, Defendant Processors' senior executives responsible for determining compensation also attended multiple other in-person meetings during the Class Period, including meetings of the U.S. Poultry & Egg Association, The National Chicken Council, The National Turkey Federation, Joint Poultry Industry Human Resources Council, Georgia Poultry Federation, North Carolina Poultry Federation, and The Poultry Federation. ¶ 202.

[21] *See, e.g., Speakes v. Taro Pharm. Indus.*, No. 16-cv-08318, 2018 WL 4572987, at *9-10 (S.D.N.Y. Sept. 24, 2018) (denying motion to dismiss where complaint describes rival executives' "attendance at pricing meetings" and "communications with the confidential witnesses regarding pricing"); *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 765 (1984) (allegations that conspirators retaliated against deviants from price-fixing scheme constituted direct evidence).

would be difficult for the authorities to detect." *Id.* (brackets in original) (quoting *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (2d Cir. 2001)). *See also In re Interior Molded Doors*, 2019 WL 4478734, at *2 (holding that the fact defendants "regularly attend the same trade association meetings, trade shows, and investor conferences" constitutes a plus factor).[22]

This Court has also held that examples of "non-economic evidence that suggests a traditional conspiracy" include an "industry consultant" serving "as a conduit in the alleged price-fixing conspiracy" through "which the Defendants shared sensitive information and coordinated price increases." *Titanium Dioxide*, 959 F. Supp. 2d at 829. The Complaint alleges that WMS and Agri Stats played precisely this role. WMS served as a "conduit" in the conspiracy by conducting an annual compensation survey of Defendant Processors, distributing the results of that survey at "off the books" in-person meetings, and delivering a PowerPoint presentation at those meetings that identified the average compensation for each plant position. ¶¶ 141-43. Agri Stats also served as a "conduit" in the conspiracy by exchanging non-public, current, and disaggregated wage data between Defendant Processors during each month of the Class Period. ¶ 155. The Complaint alleges that Defendant Processors used both WMS and Agri Stats to harmonize their compensation and monitor and enforce the conspiracy. ¶¶ 147, 170.

Finally, the fact that Defendants have been credibly accused of other anticompetitive conduct is also "non-economic evidence that suggests a traditional conspiracy." *See In re Interior Molded Doors*, 2019 WL 4478734, at *6 (finding Defendants' behavior "especially troubling in

---

[22] In fact, the Complaint alleges sufficient detail about those in-person meetings to constitute a plus factor even *at the summary judgment stage*. When defendants in the *Titanium Dioxide* case argued that alleged conspiratorial meetings merely constituted innocuous "opportunities to conspire," this Court denied defendants' motion for summary judgment, noting that those meetings "often involved the subjects of pricing" and thus indicated "cartel behavior." *Titanium Dioxide*, 959 F. Supp. 2d at 830. As noted above, that is so here too. ¶¶ 134-50.

light of the history of antitrust violations in the industry"). In June 2019, the Department of Justice ("DOJ") disclosed that it had launched a criminal investigation into whether poultry processors had fixed the prices of broilers, and the agency issued grand jury subpoenas to several of the Defendant Processors as part of that investigation. ¶ 200. On June 3, 2020, the DOJ indicted four executives from Pilgrim's and Claxton Poultry Farms for engaging in a price-fixing conspiracy, and the indictment explains that *at least* seven poultry processors participated in the conspiracy. These indictments indicate that Defendants have built the trust and communications network necessary to support an antitrust conspiracy, including one to suppress poultry processing wages.

    4.   <u>The Evolving Roles of Butterball, Cargill, and JOTS Do Not Undermine the Plausibility of the Conspiracy.</u>

Despite the overwhelming conspiracy evidence presented in the Complaint, Defendants argue that the alleged conspiracy is "implausible" because three of the Defendant Processors who produce turkey—*i.e.* Butterball, JOTS, and Cargill—joined the WMS survey and off the books meetings in 2015, rather than 2009. Joint MTD at 12. Defendants assert that it is implausible "that a group of chicken processors meeting among themselves fixed the wages paid by turkey processors not in attendance." *Id.* This argument is without merit for multiple reasons.

First, the Complaint alleges that two other Defendant Processors—Tyson and Perdue— who produce substantial amounts of *both* chicken *and* turkey participated in the WMS survey and off the books meetings between 2009 and 2015 (and beyond) to depress compensation at *all* their poultry plants (including both chicken and turkey plants). ¶¶ 87, 101-2, 220, 245. Second, the Complaint alleges that, prior to 2015, Butterball, Cargill, and JOTS participated—along with Tyson and Perdue—in another compensation survey conducted by the National Turkey Federation, which like the WMS survey was used to "restrain the compensation of workers in poultry processing plants in the United States prior to 2015." ¶ 154. Third, the human resources

committees of the National Turkey Federation, National Chicken Council, and the U.S. Poultry & Egg Association merged to form the Joint Poultry Industry Human Resources Council in April 2009, which expedited coordination of compensation among chicken and turkey processors. ¶ 130. The Council, for example, may have facilitated the harmonization of results from both the WMS survey and National Turkey Federation survey. ¶ 154. Fourth, the Complaint alleges that Butterball, Cargill, and JOTS have participated in other dimensions of the conspiracy since its onset in 2009, such as the regular exchange of current and future compensation data through both Agri Stats and plant-to-plant communications, thereby allowing them to align their compensation practices with those of other Defendant Processors. ¶¶ 7-8, 162, 169, 184, 189, 192.

In addition, the law is well established that co-conspirators may join, and become liable for, antitrust conspiracies long after they have commenced. *Baker v. United States*, 21 F.2d 903, 905 (4ᵗʰ Cir. 1927) ("one may join a conspiracy after it has been formed, and, if he participates knowingly, he becomes a party thereto just as though he conceived the plot.") (citation omitted).[23]

\* \* \*

In sum, Plaintiffs have adequately pled a *per se* claim to fix and depress the compensation of poultry processing plant workers. The Complaint alleges incriminating direct evidence in the form of testimony from former employees indicating that Defendants entered into a conspiracy to depress compensation; compelling circumstantial evidence in the form of the "who, what, where,

---

[23] *See also United States v. Rea*, 958 F.2d 1206, 1214 (2d Cir. 1992) ("A defendant need not have joined a conspiracy at its inception in order to incur liability for the unlawful acts of the conspiracy committed both before and after he or she became a member."); *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 114 (S.D.N.Y. 2010) ("[I]t is well settled . . . that the law does not require every defendant to participate in the conspiracy by identical means throughout the entire class period.") (citation omitted); *In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 800 (N.D. Ohio 2011) ("a fundamental tenant of conspiracy law [] holds one participating conspirator liable for all his co-conspirators' prior acts").

43

when and why" of the compensation-fixing conspiracy; and compelling circumstantial evidence in the form of parallel conduct and persuasive plus factors. Accordingly, Defendants' motions to dismiss the *per se* claim must be denied.

## II.     PLAINTIFFS HAVE PLAUSIBLY ALLEGED A RULE OF REASON CLAIM.

Plaintiffs have plausibly alleged both elements of their rule of reason claim: (1) an agreement to exchange information; and (2) "anticompetitive effect[s]" flowing from that agreement. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002); *accord Robertson v. Sea Pines Real Estate Cos., Inc.*, 679 F.3d 278, 290 (4th Cir. 2012).

### A.     Plaintiffs Have Plausibly Alleged an Agreement to Exchange Information.

Plaintiffs have plausibly alleged an agreement to exchange compensation information among Defendant Processors. Although Defendants refuse to "concede" this, they offer no arguments in response. Joint MTD at 17 n.7. Their strained silence is understandable. The Complaint presents compelling evidence that Defendants agreed to exchange current and future information about compensation for poultry processing workers, including statements from confidential witnesses about the scope and nature of the agreement. For instance, confidential witnesses confirmed that Defendant Processors formed a secret "Compensation Committee" with a rotating leadership team, ¶ 135; expelled members of the Compensation Committee who failed to attend in-person meetings in Florida for two years in a row, ¶ 152; took turns paying for both an annual WMS compensation survey and annual Florida meetings, ¶ 138; supplied highly detailed compensation data for the WMS surveys, which were reviewed and discussed at the Florida meetings, ¶¶ 140-43; followed a meeting agenda that included PowerPoint presentations and roundtable conversations to fix compensation, ¶¶ 141-43, 148; subscribed to Agri Stats to receive monthly reports that contain each other's current, plant-specific compensation data, ¶¶ 155-83;

and routinely participated in plant-to-plant exchanges of current and future compensation data, ¶¶ 184-93. Such formal, complex arrangements constitute agreements to exchange information.

### B. Plaintiffs Have Plausibly Alleged that Defendants' Information Exchange Had Anticompetitive Effects.

Plaintiffs have also satisfied the second element of a rule of reason claim—alleging that that Defendant Processors' agreement to exchange compensation information had anticompetitive effects. Antitrust plaintiffs can plead anticompetitive effects directly or indirectly. *See United States v. Charlotte-Mecklenburg Hosp. Auth.*, 248 F. Supp. 3d 720, 728 (W.D.N.C. 2017); *Todd v. Exxon Corp.*, 275 F.3d 191, 206-07 (2d Cir. 2001). Here, Plaintiffs have done both.

#### 1. Plaintiffs Directly Plead Anticompetitive Effects.

Plaintiffs can plead anticompetitive effects *directly* by alleging that Defendants' agreement had an "actual adverse effect on competition," such as lower compensation for poultry processing workers. *Charlotte-Mecklenburg*, 248 F. Supp. 3d at 728; *see also Todd*, 275 F.3d at 206-07. In the Fourth Circuit, the bar for pleading actual adverse effects on competition is low. For example, in *Robertson*, the Fourth Circuit held that a plaintiff adequately pleaded adverse effects on competition by identifying "anticompetitive effects resulting from defendants' conspiracy" and explaining how the defendants' agreement was "designed to achieve these anticompetitive results." 679 F.3d at 290. In that case, defendants protested that such allegations were insufficient "because they contain[ed] no facts 'tending to show what the prices for [the relevant] services were before, during, or after what is alleged as the class period.'" *Id.* at 291. The Fourth Circuit disagreed: A "complaint need not 'make a case' against a defendant or '*forecast evidence* sufficient to *prove* an element' of the claim. It need only '*allege facts* sufficient to *state* elements' of the claim." *Id.* (citations omitted). Thus, the Fourth Circuit concluded that, to defeat a motion to

dismiss a rule of reason claim, it is sufficient to allege "anticompetitive effects [that] are economically plausible in light of the [conspiracy] recounted in the complaint."[24] *Id.*

The Complaint describes the actual harm Defendant Processors inflicted on their employees with a level of detail and precision that far exceeds the Fourth Circuit's pleading requirements. Here, as in *Robertson*, the Complaint explains that Defendants "designed" their agreement to achieve specific anticompetitive effects (decreased compensation for poultry processing workers) and alleges that those anticompetitive effects actually "result[ed] from [D]efendants' conspiracy." 679 F.3d at 290. But the Complaint goes much further, alleging that, despite poultry plant workers' increased productivity during the Class Period, they did not receive the higher pay an economist would expect; rather, "increases in compensation provided to Class Members were highly restrained and limited." ¶ 10. Between 1999 and 2015, poultry processing "line speeds increased by 54%, poultry production increased by nearly 35%, but inflation-adjusted hourly wages for poultry processing workers, in fact, decreased by more than 1%." ¶ 231. While some poultry processing workers received "cost-of-living adjustments" of "approximately 25 cents a year," the adjustments "rarely increased total compensation for poultry processing workers because th[e] raises were effectively offset by annual increases [in employee contributions to] health insurance." ¶ 230. Thus, a confidential witness explained, during the Class Period, poultry plant workers "'really never g[ot] ahead' of their starting wage." ¶ 229-30.

A preliminary economic analysis also supports Plaintiffs' allegations that Defendants'

---

[24] Similarly, in *Charlotte-Mecklenburg*, the court held that the plaintiff adequately alleged a "direct anticompetitive effect" by simply listing the consequences of the defendant's misconduct: "higher prices for health insurance coverage," "fewer insurance plans from which to choose," "denied access to consumer comparison shopping," and "higher out-of-pocket costs for their healthcare." 248 F. Supp. 3d at 729. This description was sufficient for the pleading stage, where a plaintiff is not required to "prove competitive harm." *Id.* at 728.

collusive conduct depressed wages in the market for poultry processing labor. Plaintiffs' economic experts determined that, in other analogous labor markets, wages rose at a "materially" faster pace. ¶ 10. In fact, "the difference between the weekly earnings of workers employed by food manufacturers broadly and the weekly earnings of workers employed by poultry processors was, on average, $103.79 during the ten-year period prior to the Class Period, and subsequently increased to, on average, $127.30 during the Class Period." ¶ 228.

Despite the Complaint alleging evidence of anticompetitive effects that far exceeds the Fourth Circuit's pleading requirements, Defendants argue that Plaintiffs' allegations are deficient because they do not include the exact wages paid by Defendants during the Class Period. Joint MTD at 27; Sanderson MTD 8-9. The Fourth Circuit, however, squarely rejected this argument in *Robertson*, holding that plaintiffs need not "show what the prices for [the relevant] services were before, during, or after what is alleged as the class period" to allege competitive harm. 679 F.3d at 291.

## 2.   Plaintiffs Indirectly Plead Anticompetitive Effects.

A complaint alleging a rule of reason claim can also plead anticompetitive effects *indirectly*. A complaint does so by showing "that the defendant possessed the requisite market power within a defined market." *Princo Corp. v. ITC*, 616 F.3d 1318, 1353 n.17 (Fed. Cir. 2010). *See also Law v. NCAA*, 134 F.3d 1010, 1019 (10th Cir. 1998). In information exchange cases, courts also consider the "nature of the information exchanged" when evaluating the plausibility of anticompetitive effects. *Todd*, 275 F.3d at 211.

Contrary to Defendants' suggestion, Joint MTD at 17, it is not necessary for the Court to even consider Plaintiffs' allegations concerning market definition, market power and the nature of the information exchanged: Because Plaintiffs alleged anticompetitive effects directly, there is no

47

need for the Court to determine whether Plaintiffs *also* alleged those effects indirectly. As the Supreme Court explained, "[s]ince the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the *potential* for genuine adverse effects on competition, 'proof of *actual* detrimental effects, such as a reduction of output' can obviate the need for [such] an inquiry . . . ." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) (quoting 7 P. Areeda, Antitrust Law ¶ 1511, at 429 (1986)) (emphasis added)).[25]

Nonetheless, the Complaint defines a plausible labor market and alleges that Defendant Processors exercised enough power within that market for their exchange of sensitive compensation data to plausibly result in anticompetitive effects.

### a.   Plaintiffs Properly Plead a Relevant Market.

A relevant antitrust market has two components: a product market and a geographic market. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011). Here, the relevant product market is the market for poultry processing labor, and the relevant geographic market is the continental United States. ¶ 267. "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market" or geographic market. *Kolon Indus.*, 637 F.3d at 443 & n.3 (citations omitted); *accord Therapearl, LLC v. Rapid Aid Ltd.*, No. CCB-13-2792, 2014 WL 4794905, at *7 (D. Md. Sept. 25, 2014). Indeed, "[t]he fact that defendants suggest, at this [motion to dismiss] stage of the

---

[25] *See also Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 n.7 (2018) (where, as here, plaintiffs allege a horizontal agreement among competitors and show that the agreement had actual adverse effects on competition, plaintiffs do "not need to precisely define the relevant market"); *Robertson*, 679 F.3d at 291 (holding that plaintiffs adequately pleaded anticompetitive effects without considering whether plaintiffs defined a relevant market); *Cason-Merenda*, 862 F. Supp. 2d at 648 (holding that plaintiffs did not need to provide a "detailed analysis" of the relevant labor market because their experts presented evidence that defendants actually suppressed wages within that market).

litigation, that other relevant markets may likewise exist is of no consequence." *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 946 (E.D. Tenn. 2008). "An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012) (citation omitted). Plaintiffs' alleged market easily clears this low hurdle.

(i)      Plaintiffs Properly Plead a Product Market.

As noted above, the standard for pleading an adequate product market is extremely forgiving. *Kolon Indus.*, 637 F.3d at 443 & n.3. The definition need only be "plausible" and bear a "rational relation" to the market definition inquiry that courts conduct at later stages of the litigation. *Todd*, 275 F.3d at 200. One way to assess the issue is to ask whether it is plausible that Plaintiffs will pass the economic test they will face at summary judgment concerning a product market: is it plausible that Plaintiffs' product market definition will pass the hypothetical monopsonist test?[26]

The hypothetical monopsonist test asks what would happen if a single hypothetical firm controlling all poultry processing plants in the United States decided to implement a small but significant non-transitory decrease in compensation ("SSNDC") for all workers.[27] More

---

[26] *See* Defs. Hormel Foods Corp.; Jennie-O Turkey Store, Inc.; Jennie-O Turkey Store, LLC; and Jennie-O Turkey Store Sales, LLC's Mem. In Supp. Of Their Mot. To Dismiss Pls.' Am. Consolidated Compl. at 7 n.13, Mar. 2, 2020, ECF No. 341-1 (hereafter "JOTS MTD") (Defendants conceding that this is the appropriate test for defining a labor market). *See also* U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 4.1.1 (2010) (noting that the DOJ and FTC routinely use the hypothetical monopolist/monopsonist test to define product markets); *In re Se. Milk Antitrust Litig.*, No. 2:08-MD-1000, 2010 WL 8228839, at *2 (E.D. Tenn. Dec. 8, 2010); *Encana Oil & Gas, Inc. v. Zaremba Family Farms, Inc.*, No. 1:12-CV-369, 2015 WL 12883545, at *4 (W.D. Mich. Sept. 18, 2015).

[27] The SSNDC test is the compensation corollary to the common "significant non-transitory increase in price" ("SSNIP") test used to assess product markets in cases where the defendants conspire in ways that increase the price of a commodity. *In re Se. Milk Antitrust Litig.*, 2010 WL 8228839 at *1-2.

specifically, if a hypothetical firm controlling all poultry processing plants reduced compensation by five percent below the competitive level, would enough workers keep their jobs that the reduction in compensation would be profitable?[28] If it is plausible that the answer is yes, then Plaintiffs have adequately defined a product market.

For several reasons, it is plausible that a hypothetical monopsonist in the alleged market could profitably implement a SSNDC. Plaintiffs allege that workers have some poultry-specific skills (*e.g.*, hanging live birds; carving meat off the bones of birds; cleaning and repairing poultry slaughtering equipment; supervising poultry plant operations). ¶¶ 105, 111-12, 212-16. It is plausible that they earn a premium (above minimum wage) for these skills and would lose this premium if they took a job outside the poultry processing industry. Thus, it is plausible that, even if a hypothetical monopsonist implemented a SSNDC, sufficient poultry processing workers would stay at their jobs to make such a compensation decrease profitable. *See Todd*, 275 F.3d at 203 (noting that both technical and non-technical workers "develop industry-specific expertise that affects their value in [a] labor market"). This is particularly true for salaried workers, who hold some of the highest skilled jobs in the industry. ¶ 112.

At the same time, "poultry processing work is extremely dangerous" and individuals who "choose to work in a poultry processing plant prefer to receive extra pay for dangerous labor, instead of accepting lower wages at safer positions." ¶ 212. While there may be other jobs that

---

[28] *See* U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 4.1.2 (2010) (explaining that the DOJ and FTC "most often use a SSNIP of five percent of the price paid by customers for the products or services").

offer this kind of hazard pay, the relative scarcity of (and demand for) those jobs would make it difficult for a critical mass of workers to leave in response to a SSNDC.[29]

Moreover, limited education and language skills would make it difficult for many poultry plant workers to find alternative jobs in response to a SSNDC. ¶¶ 210-11. The Complaint alleges that Defendant Processors deliberately recruited hourly employees who did not speak English or who lacked formal education because they knew it would be difficult for such employees to find "stable employment at a similar level of compensation outside the poultry industry." *Id.* For example, a former Pilgrim's employee explained that "many poultry processing plant workers never graduated from high school and did not speak English and thus were limited from pursuing work outside a poultry processing plant." ¶ 211. Likewise, a former George's employee said that "poultry processors 'catered' to workers who did not speak English and lacked a strong educational background and that it would be difficult for poultry processing plant workers to find employment outside a poultry processing plant because of 'communication issues.'" *Id.* And a "former human resources manager at a Tyson poultry processing plant explained that poultry processors recruited and thrived from an 'underprivileged' workforce that had difficulty communicating in English and had a very limited ability to obtain jobs outside the poultry industry." *Id.*

*Taken together*, the skills required to process poultry, workers' desire for hazard pay, and workers' limited education make it likely that a critical mass of poultry processing workers would keep their jobs in response to a SSNDC. Consistent with this view, recent economic literature suggests that many low-skilled labor markets would satisfy the hypothetical monopsonist test. "One recent paper analyzed low-skilled labor markets… and found that for *each* such occupation,

---

[29] *Cf. Reed v. Advocate Health Care*, 268 F.R.D. 573, 589 (N.D. Ill. 2009) (holding that the market for hospital nurse labor was a distinct product market because there was "insufficient capacity in non-hospital settings to accommodate [hospital nurses]" if they left their jobs).

a hypothetical monopsonist would find it profitable to decrease wages by at least 5%." ¶ 218. These findings bolster the plausibility of Plaintiffs' claim that "the low-skilled market for poultry processing labor is a relevant antitrust market." *Id.*

In addition, Defendants' own anticompetitive behavior supports the plausibility of the alleged market. Defendant Processors would only seek to control wages in a distinct market for poultry processing labor if they collectively had the power to affect wages in such a relevant market. As the Second Circuit explained in *Todd*, the fact that "[D]efendants have gone to considerable lengths to compile the data" about a particular labor market suggests that the market is a distinct one because "economic actors usually have accurate perceptions of economic realities." 275 F.3d at 205 (citations omitted). As the Complaint alleges in robust detail, Defendant Processors regularly compiled compensation data about the poultry processing labor market, through in-person meetings, annual WMS surveys, monthly Agri Stats reports, and frequent plant-to-plant information exchanges. ¶¶ 133-93. Accordingly, Plaintiffs have, at the very least, defined a plausible product market.

Defendants' eight arguments to the contrary are flawed. First, Defendants argue that there is not a distinct market for poultry processing labor as plant workers could easily find other semi-skilled work that paid them a comparable amount (such as processing other meat or landscaping). Joint MTD at 21-23. But learning new skills for a new industry would take time, and while workers were learning those skills, they would not be paid the same kind of premium for their skills that they earn at poultry processing plants. Lost wages during a learning period would be significant enough that many workers would keep their jobs in response to a SSNDC. The Second Circuit accepted a similar argument in *Todd*, finding it plausible that employees in "less technical jobs" still acquire "industry-specific experience," and holding that the extent to which switching jobs

52

would result in a pay cut "involves a question of fact not resolvable on a Rule 12(b)(6) motion." 275 F.3d at 203.

Second, Defendants argue that the Complaint fails to allege that it would be difficult for salaried workers to find alternative employment outside of a poultry processing plants. Joint MTD at 21. To the contrary, the Complaint alleges that salaried workers, who often supervise other skilled employees, have "even more training and skills specific to poultry processing that would not be transferable to occupations outside of the [poultry industry]." ¶ 216; *see also* ¶ ¶ 108, 112.

Third, Defendants analogize this case to *Molinari*, but it is readily distinguishable. Joint MTD at 23-24. That case involved a "failed attempt[] to limit a product market to a single brand, franchise, institution, or comparable entity," which is one of the very few ways in which a market definition can fail at the pleading stage. *Molinari v. Consol. Energy Inc.*, No. 12CV1085, 2012 WL 5932979, at *5-7 (W.D. Pa. Nov. 27, 2012) (citation omitted). But Plaintiffs do not argue that a single defendant processor or brand (*e.g.*, Tyson) constitutes the sole market for Plaintiffs' labor.

Fourth, Defendants note that *many* poultry processing workers left their jobs *eventually*. See Joint MTD at 24 (suggesting that transition costs cannot be real "barriers to switching jobs because employee 'turnover [reached] as high as 100 percent at some plants.'"). But the fact that most or even all workers at poultry processing plants left their jobs *eventually* does not mean that enough workers would leave *immediately* in response to a SSNDC so as to render it unprofitable.

Fifth, Defendants argue that the relevant market is inconsistent with the class definition because the class excludes certain poultry processing job types. Joint MTD at 24 n.10. But Plaintiffs are free to define the class to be narrower than the relevant market. *Cf. Bennett v. GoDaddy.com LLC*, No. CV-16-03908-PHX-ROS, 2019 WL 1552911, at *12 (D. Ariz. Apr. 8,

2019) ("Defendant does not cite any authority requiring certification of the broadest possible class.").

Sixth, Defendants argue that because Plaintiffs compare wages of poultry processors to wages paid in other food manufacturing jobs, Plaintiffs have somehow conceded that other food manufacturing jobs are part of the same labor market. *See* Joint MTD at 19. Not so. Antitrust economists regularly compare a "studied" product market affected by anticompetitive conduct to a similar "yardstick" market without anticompetitive conduct. By examining the yardstick market, economists can observe what would have happened in the studied market without anticompetitive conduct.[30] But that comparison does not somehow show that the two markets are the same. In fact, the premise of the analysis is that they are *different markets* that fared differently during the relevant time period. Defendants' argument flies in the face of a standard manner of proving antitrust impact and damages. *See, e.g.*, *In re Reformulated Gasoline (RFG) Antitrust & Patent Litig.*, No. CV-05-01671 CAS (VBKx), 2007 WL 8056980, at *8-9 (C.D. Cal. Mar. 27, 2007) (granting class certification where plaintiffs provided an analysis to "measure the impact of [defendant]'s conduct using comparison markets as control groups in a 'differences-in-differences' regression").[31]

---

[30] *See* David L. Faigman, *et al.*, *Damage calculations in class action antitrust cases—Benchmarks used to calculate class damages*, 5 Mod. Sci. Evidence § 43:35 (2019-20 ed.); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2013 WL 5391159, at *4 (N.D. Cal. Sept. 24, 2013).

[31] *See, e.g.*, *Phillips v. Crown Cent. Petroleum Corp.*, 426 F. Supp. 1156, 1166 (D. Md. 1977) (holding "yardstick" method for computing class wide damages in price-fixing conspiracy appropriate); *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n*, 213 F.3d 198, 207 (5th Cir. 2000) (noting that "the two most common methods of quantifying antitrust damages are the 'before and after' and 'yardstick' measures"); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 153-55 (3d Cir. 2002) (accepting use of yardstick method for antitrust damages).

The Complaint also contains compelling evidence that other types of meat processing are distinct from poultry processing. For example, beef processing plants pay 25% to 35% higher compensation to plant workers than employers pay in the Relevant Market. ¶ 213. As alleged, "[t]he fact that such a significant wage differential can be maintained indicates that such jobs require skills and/or worker attributes that cannot be readily obtained by workers in the Relevant Market, or that beef processing jobs are more dangerous and thus less appealing to workers in the Relevant Market." *Id.* These differences indicate that beef processing jobs are not functionally interchangeable with jobs in the Relevant Market. At the motion to dismiss stage, the Court must accept these allegations as true.

Seventh, according to Defendants, there cannot be a distinct market for poultry processing labor because the Complaint alleges that Defendant Processors viewed Class Members as "fungible." Joint MTD at 23. But the Complaint alleges that "[w]orkers *within the same positions*" are viewed by Defendant Processors as "generally interchangeable." ¶ 271 (emphasis added). The fungibility of Class Members with each other is not a relevant factor. As the Second Circuit observed, "[w]e agree with plaintiff that the interchangeability of these employees [from the perspective of their employer] is not part of defining the relevant market." *Todd*, 275 F.3d at 201. Indeed, the fungibility of Class Members *with each other* has no bearing on the relevant question: whether work outside of the relevant market is reasonably interchangeable *from the perspective of the employees*. *Id.* at 202 ("[t]he proper focus is… the commonality and interchangeability of the buyers, not the commonality or interchangeability of the sellers.").

Eighth, contrary to Defendants' suggestion, it is not a problem that various hourly and salaried workers are "lumped together" as part of the same class if they were all affected by the same misconduct. Joint MTD at 21. For example, in *Todd*, the Second Circuit held that the district

court improperly dismissed a complaint alleging that defendants fixed wages of a diverse group of employees in the oil industry, including accountants, lawyers, and engineers. 275 F.3d at 201. Similarly, in *Nitsch v. Dreamworks Animation SKG Inc.*, the court certified a class that consisted of "artists and engineers" who occupied different positions and were compensated differently, *i.e.* some received wages and others received salaries. 315 F.R.D. 270, 275, 277 (N.D. Cal. 2016).

(ii)    Plaintiffs Properly Plead a Geographic Market

Plaintiffs plausibly allege that the relevant geographic market is the United States. ¶ 267. The Fourth Circuit has cautioned that dismissals of a complaint for failure to plead a geographic market are "generally limited to instances in which the complaint either: (1) fails to allege a geographic market or the boundaries of a relevant geographic market; (2) defines a geographic market in an unreasonably and implausibly *narrow* manner; or (3) alleges a contradictory and vague delineation of the relevant geographic market." *E. I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 444 (4th Cir. 2011) (quoting *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 339 (D. Vt. 2010)) (emphasis added). Plaintiffs' geographic market allegations have none of these deficiencies.

First, Plaintiffs have alleged "the relevant geographic market is the continental United States." ¶ 267.

Second, Plaintiffs have not alleged an "implausibly narrow" geographic market. To the contrary, Defendants insist that Plaintiffs' geographic market is too broad. *See, e.g.,* JOTS MTD at 8 (arguing that *narrower* geographic markets, such as "commuting zones," are more plausible); Joint MTD at 24-26. An overbroad geographic market, however, is not a basis to dismiss a

complaint.[32] The purpose of the geographic market inquiry is to gauge whether the Defendant Processors controlled a *large* enough swath of territory that they could profitably collude to suppress compensation without too many of their workers leaving their territory to find other poultry processing work. If, as Defendants suggest, a sufficient number of workers would not leave narrow commuting zones in response to artificially depressed compensation, even fewer would leave the continental United States and seek work abroad. Thus, if commuting zones are plausible relevant geographic markets, then *a fortiori*, the continental United States is a plausible relevant market as well.[33]

By alleging that the relevant geographic market is not just specific commuting zones near Plaintiffs, but the entire continental United States, Plaintiffs have taken a *conservative* (*i.e.*, defendant-friendly) approach to market definition and market power. This is because to the extent that the United States is "too large" a geographic market, that would "only *understate* [Defendants'] market power in the relevant market." *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 5767415, at *19 (E.D. Pa. July 29, 2015) (emphasis added).

Defendants offer no authority suggesting that allegations of an overbroad geographic market are a basis for dismissal. In each case they cite, the court determined that the plaintiffs had

---

[32] *See Consul Ltd v. Transco Energy Co.*, 805 F.2d 490, 495 (4th Cir. 1986) (explaining that the geographic market test guards against "market[s] drawn *too tightly* . . . creat[ing] the illusion of market power where none may exist") (emphasis added).

[33] As the DOJ and FTC Horizontal Merger Guidelines explain, the geographic market test "ensures *that markets are not defined too narrowly, but it does not lead to a single relevant market*"; it is therefore appropriate to use "*any relevant market satisfying the test* . . ." U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 4.1.1 (2010).

failed to plead *any* geographic market at all, leaving the court to guess what the relevant geographic market might be. *See* Joint MTD at 24-26.[34] That is not the case here.

Third, Plaintiffs' relevant market allegations are neither vague nor contradictory. Defendants suggest that Plaintiffs' allegations that Defendant Processors have "rival plants" that are "nearby" other Defendant Processors' plants undermines Plaintiffs' allegation of a national market. Joint MTD at 25; JOTS MTD at 6-7. As explained above, however, the fact that nearby plants compete with each other for workers is in no way inconsistent with the allegation that a hypothetical cartel covering the *entire continental United States* could suppress compensation by a small but significant amount without losing so many employees to other countries so as to make the wage suppression unprofitable. It simply means that Plaintiffs have taken a conservative approach to assessing Defendant Processors' combined market power.

Defendant Processors' own conduct confirms that Plaintiffs' alleged geographic market is plausible. The commercial realities considered when defining the relevant geographic market include "the area within which the [defendants] view themselves as competing." *Kolon Indus.*, 637 F.3d at 442-43. Here, the Complaint is replete with allegations that Defendant Processors perceived themselves to be competing in a national geographic market. To begin, Defendant Processors set the wages, salaries and benefits of processing plant employees across the country

---

[34] *See Deslandes v. McDonald's USA, LLC*, No. 17 C 4857, 2018 WL 3105955, at *8 (N.D. Ill. June 25, 2018) (noting that the plaintiff had not even "attempted to plead a claim under the rule of reason," and hypothesizing that if the plaintiff *had* alleged a geographic market, it would "likely cover a relatively small geographic area"); *Ogden v. Little Caesar Enters., Inc.*, 393 F. Supp. 3d 622, 631 (E.D. Mich. 2019), *appeal dismissed*, No. 19-1986, 2020 WL 948507 (6th Cir. Jan. 28, 2020) (noting that the plaintiff had "not even attempted to advance allegations or arguments supporting any claim under the rule-of-reason standard"); *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 710 (11th Cir. 2014) (RICO case noting that "the plaintiffs have failed even to identify the relevant *geographic* market, leaving [the court] with no frame of reference . . . [to determine] whether their claims implicate the market across the entire county, some subset of the county, or some larger geographic region—say, a series of contiguous counties").

in a centralized and formulaic fashion; compensation for all poultry plant workers was determined at each Defendant Processor's corporate headquarters, not by individual plant managers. ¶¶ 115-17. Moreover, Defendant Processors maintained "internal equity" when setting that worker compensation nationwide, providing compensation at identical or near identical levels for the same types of employees, regardless of the region. ¶¶ 220, 233. In doing so, Defendant Processors ensured that suppression of compensation to "employees in one poultry processing plant location would necessarily suppress compensation to employees in all of the Defendant Processor's poultry processing plants throughout the continental United States." ¶ 220. Finally, Defendant Processors risked antitrust liability by sharing compensation information (via "off the books" meetings and via Agri Stats and WMS) that was reported on both a national and regional basis. ¶¶ 133-83. Defendant Processors relied upon that nationwide data to set the compensation of workers at poultry processing plants. ¶ 173. "[T]he very fact that defendants rely on data" regarding nation-wide compensation of poultry processing workers "suggests that this is the relevant market." *Todd*, 275 F.3d at 205-06.[35]

In sum, Plaintiffs allege a plausible geographic market.[36]

---

[35] "While *Todd* focused on [a] relevant product market definition, the Supreme Court has recognized that '[t]he criteria to be used in determining the appropriate geographic market are essentially similar to those used to determine the relevant product market.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 443 n.3 (4th Cir. 2011) (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962)).

[36] Defendants also argue that "Plaintiffs' failure to plead a plausible labor market" also warrants "striking Plaintiffs' class allegations." Joint MTD at 26 n.11. Defendants are wrong. First, Plaintiffs have pled a plausible labor market. *See supra*, section II(B)(2)(a). However, even if Defendants' criticisms of Plaintiffs' alleged relevant markets were correct, that would not warrant striking Plaintiffs' class allegations. *See In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 130-31 (C.D. Cal. 2007) (granting class certification and denying defendant's motion to dismiss where defendant argued that plaintiffs alleged market was too broad because defining the "[r]elevant market is a factual issue which is decided by the jury" and "the process of defining the product market will be predominated by common questions.").

### b. *Plaintiffs Allege Market Power.*

The Complaint also alleges that Defendant Processors had enough market power in the relevant antitrust market to implement an anticompetitive information exchange. *Todd*, 275 F.3d at 206-08. When conducting a market power inquiry in the context of an information exchange, courts have considered defendants' market share and the extent to which the market is susceptible to collusion. Defendant Processors and their co-conspirators control more than 90% of poultry processing jobs, ¶ 222, "an extremely high market share by any measure[.]" *Todd*, 275 F.3d at 208. This gives them sufficient market power to suppress compensation. *See id.* Defendants do not contest this point.

Furthermore, as noted above, several other features of the market for poultry processing labor make it susceptible to collusion. *See supra*, section I(B)(3)(b)(i). A few of those features bear repeating. First, the barriers to entry are high; the cost of constructing a single poultry processing complex exceeds $100 million. *Compare* ¶ 222 *with Todd*, 275 F.3d at 208. Second, Defendant Processors' perceive their employees within the same positions as fungible and interchangeable, making it easy for Defendant Processors to compare the amount paid for those tasks. *Compare* ¶ 198 *with Todd*, 275 F.3d at 209-10. Finally, the supply of poultry processing labor is inelastic. *Compare* ¶ 199 *with Todd*, 275 F.3d at 211.

### c. *Plaintiffs Allege a Highly Suspect Information Exchange.*

"Alongside the 'structure of the industry involved,' the other major factor for courts to consider" when evaluating the potential anticompetitive effects in "a data exchange case is the 'nature of the information exchanged.'" *Todd*, 275 F.3d at 211 (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)). Defendants do not contest that several features of their information exchange make it particularly likely that it was used to suppress compensation.

First, Defendant Processors exchanged information about the *current* prices they paid for poultry processing labor. The Supreme Court has held that "[e]xchanges of current price information, of course, have the greatest potential for generating anticompetitive effects and although not *per se* unlawful have consistently been held to violate the Sherman Act." *Gypsum*, 438 U.S. at 441 n.16.[37]

Second, Defendant Processors exchanged information about their *future* compensation plans. *See Todd*, 275 F.3d at 211 ("exchanges of future price information are considered especially anticompetitive"); DOJ Guidelines at 15 ("[O]ther things being equal, the sharing of information on . . . future business plans is more likely to raise concerns than the sharing of historical information.").

Third, Defendant Processors' information exchanges were not made available to the public. "Public dissemination is a primary way for data exchange to realize its procompetitive potential. . . . A court is therefore more likely to approve a data exchange where the information is made public." *Todd*, 275 F.3d at 213.[38]

*        *        *

---

[37] *See also* 13 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 2112 (4th ed. 2020) ("The most sensitive information, of course, is that which pertains to price or output."); U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines For Collaborations Among Competitors*, 15 (2000), available at http://www.ftc.gov/os/2000/04/ftcdojguidelines.pdf (hereafter "DOJ Guidelines") ("other things being equal, the sharing of information on current operating . . . plans is more likely to raise concerns than the sharing of historical information.").

[38] *See, e.g., Maple Flooring Mfrs. Ass'n v. United States,* 268 U.S. 563, 573–74 (1925) (finding no violation where exchanged information was widely disseminated to the public); *Sugar Inst., Inc. v. United States*, 297 U.S. 553, 604–05 (1936) (affirming district court's remedial decree requiring public dissemination of the information gathered); *Wilcox v. First Interstate Bank of Or.*, 815 F.2d 522, 526 (9th Cir. 1987) (finding no violation and distinguishing *Container Corp.* on the basis that the information dissemination was public).

In sum, Plaintiffs have properly alleged a rule of reason claim for an unlawful information exchange. The Complaint plausibly alleges both an agreement between Defendant Processors to exchange compensation information and "anticompetitive effects" flowing from that agreement. Accordingly, Defendants' motions to dismiss the rule of reason claim must be denied.

## III.   PLAINTIFFS CLAIMS ARE NOT TIME BARRED.

For multiple, independent reasons, Plaintiffs' claims are not time barred.

### A.   Plaintiffs Have Adequately Pled a Continuing Violation.

In general, antitrust claims must be brought within four years of the defendants' illegal conduct.[39] A continuing violation of the antitrust laws occurs, however, when an "overt act that is part of the violation and that injures the plaintiff" continues into the statutory period: in such cases, each overt act "starts the statutory period running again." *GO Comput., Inc. v. Microsoft Corp.*, 437 F. Supp. 2d 497, 504 (D. Md. 2006) (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)).[40] Plaintiffs have alleged numerous overt acts during the four years prior to the date of the filing of the first complaint, *i.e.* October 30, 2019, each of which restarted the statutory period and allow Plaintiffs to seek damages for the four years prior to that date.

The Complaint alleges that, from 2009 to the present, including the four years prior to the filing of the first complaint, Defendants have been engaged in a continuous scheme to suppress poultry processing compensation. In furtherance of this scheme, Defendants have taken regular overt acts which continue to present, including: the annual "off the books" meetings to discuss and fix compensation, ¶ 135, the annual exchange of highly detailed, confidential compensation data

---

[39] *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 287 (4th Cir. 2007) ("The Clayton Act, 15 U.S.C.A. § 15b (West 1997), establishes a four-year limitations period in which to bring a claim for a violation of the Sherman Act, 15 U.S.C.A. § 1 (West 1997).")

[40] *See also Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 338-39 (1971); *United States v. A-A-A Elec. Co.*, 788 F.2d 242, 245-46 (4th Cir. 1986).

prior to those meetings through the WMS surveys, ¶ 139, the monthly exchange of current and disaggregated compensation data through Agri Stats, ¶¶ 162-72, and the frequent exchange of current and future wage data through direct communications between Defendant Processors' poultry plants, ¶¶ 184-93. The Complaint alleges that each of these overt acts injured Class Members. ¶¶ 252, 264, 284.

Moreover, the Complaint specifically alleges that the following Defendant Processors and co-conspirators attended the particular "off the books" meeting held in Destin, Florida in April 2017: Tyson, Pilgrim's, Perdue, Koch Foods, Wayne Farms, George's, Keystone, Fieldale Farms, Simmons, Butterball, Cargill, Cooper Farms, Foster Farms, Amick Farms, Case Foods, OK Foods, and Allen Harim. ¶ 153. The Complaint also specifically alleges that, later in 2017, a Pilgrim's poultry plant in Mayfield, Kentucky requested and obtained the current and future pay rates of nearby Tyson and Perdue plants. ¶ 188.

Defendants fail to argue that Plaintiffs have insufficiently alleged continuing violations, merely noting in a footnote that the doctrine cannot be applied because of "the same pleading deficiencies discussed in the prior sections." Joint MTD at 28 n.12. Defendants cannot preserve an argument they do not make, as "[u]ndeveloped and perfunctory arguments are deemed waived." *Horsetail Techs., LLC v. Del. State Police Fed. Credit Union*, No. ELH-18-556, 2020 WL 3402302, at *20 (D. Md. June 19, 2020). Accordingly, the continuing violation doctrine tolls the statute of limitations for Plaintiffs' claims as to the four years prior to the filing of the first complaint.

### B.    Plaintiffs Have Adequately Pled Fraudulent Concealment.

In addition, Plaintiffs can seek damages incurred since the onset of the compensation-fixing conspiracy, *i.e.* from 2009 to the present, because Defendants "wrongfully deceived or misled the plaintiff[s] in order to conceal the existence of a cause of action[,]" *English v. Pabst Brewing Co.*,

828 F.2d 1047, 1049 (4th Cir. 1987). In light of this fraudulent concealment, the statute of limitations did not begin until Plaintiffs discovered Defendants' anticompetitive conduct. *See Supermarket of Marlinton v. Meadow Gold Dairies*, 71 F.3d 119, 122 (4th Cir. 1995), citing *Bailey v. Glover*, 88 U.S. 342, 349 (1874) ("when the fraud has been concealed . . . the limitations period does not begin to run until the plaintiff discovers the fraud.").

Defendants accurately state the basic standards for pleading fraudulent concealment: Plaintiffs must allege that Defendants "fraudulently concealed facts that are the basis" of their claims, that Defendants undertook "affirmative acts" to conceal their conspiracy, and that Plaintiffs "failed to discover those facts within the statutory period, despite the exercise of due diligence." *Marlinton*, 71 F.3d at 122. These allegations also must be pled with particularity to satisfy Rule 9(b), which requires that the Complaint name the "who, what, when, where and how of the alleged fraud." *U.S. ex rel. Ahumada v. NISH*, 756 F.3d 268, 280 (4th Cir. 2014) (citation omitted).

Defendants do not, however, accurately characterize Plaintiffs' factual allegations or their import to this analysis. In fact, Defendants simply *ignore* key factual allegations in the Complaint that establish fraudulent concealment, including: the Compensation Committee and their meetings to fix wages were actively kept "off the books" despite their proximity to industry conferences; compensation data exchanged by WMS and Agri Stats (as well as the existence of those data exchanges) were concealed from the public; and WMS and Agri Stats employed sham anonymization techniques to create the illusion of legality. Throughout the Class Period, Defendant Processors also repeatedly misrepresented to Class Members that they pay "competitive" wages and benefits. Accordingly, Plaintiffs have adequately alleged fraudulent concealment, and their claims are not time barred.

1.   Plaintiffs Have Alleged Numerous Affirmative Acts of Concealment by Defendants.

"Affirmative acts of concealment" include both steps taken to attempt "to minimize the appearance of collusion," *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 831-32 (D. Md. 2013), and conduct "affirmatively directed at deflecting litigation . . . ." *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 219 (4th Cir. 1987) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)). This may include "some trick or contrivance intended to exclude suspicion and prevent inquiry." *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 553 (4th Cir. 2019) (citation omitted). Any "affirmative acts of concealment by one or more of the conspirators can be imputed to their co-conspirators for purposes of tolling the statute of limitations." *Riddell v. Riddell Wash. Corp.*, 866 F.2d 1480, 1493 (D.C. Cir. 1989).

a.     *Defendants Kept Compensation Committee Meetings Secret.*

Contrary to Defendants' assertions, Plaintiffs have not simply pled that meetings of the Compensation Committee occurred and that Defendants passively chose not to publicize them. Rather, Plaintiffs have alleged multiple ways in which Defendants took active steps to *keep* the meetings—and the conspiracy as a whole—concealed.

To begin, the mere existence of the Compensation Committee was, itself, a secret. ¶ 135. As for their annual meetings at a resort in Florida, they were kept "off the books" due to the "confidential nature of communications," according to a former Perdue executive. ¶ 136. Indeed, while the Compensation Committee frequently met at the same time as the U.S. Poultry & Egg Association's well-publicized annual Human Resources Seminar, the meetings were *not* part of the association's schedule, departing from standard practice. *Id.*

Plaintiffs have also pled that Defendant Processors required in-person attendance at the Compensation Committee meetings, rather than permitting remote communication and exchange

of data, so as to ensure that attendees discussed and fixed compensation in a confidential setting without leaving a paper trail. The Complaint explains, "Defendant Processors were prohibited from using the WMS survey to just *remotely* exchange compensation data." ¶ 152. According to a former Keystone employee, "a poultry processor would be expelled from the Compensation Committee if it failed to attend the annual in-person meeting two years in a row." *Id.*

Plaintiffs have alleged these affirmative acts with adequate particularity. Plaintiffs have alleged that each of the Defendant Processors (the "who") attended "off the books" meetings of a secret Compensation Committee (the "what") on an annual basis in April around the time of a major industry conference (the "when") at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida (the "where") to implement and conceal their compensation-fixing conspiracy (the "why"). ¶¶ 134, 137, 153.

These facts alleged by Plaintiffs are readily distinguishable from the authority cited by Defendants, *Boland v. Consol. Multiple Listing Serv.*, where plaintiffs merely alleged that some sort of conspiratorial meetings occurred at some indeterminate point which were not otherwise publicized. 868 F. Supp. 2d 506, 514 (D.S.C. 2011) ("Plaintiffs do not allege any specific time or location for these meetings; nor do they allege which of the Defendants actually participated in these meetings."); Joint MTD at 30. Rather, these facts are analogous to the affirmative acts of concealment taken by antitrust defendants in *Titanium Dioxide* and *Pinney Dock*. In *Titanium Dioxide,* defendants refrained from making announcements in proximity to large industry conferences to minimize the appearance of "inappropriateness of interactions with competitors . . . ." 959 F. Supp. 2d at 832. Similarly, in *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, defendants instructed each other that their meetings to boycott competitors "should not be listed on the regular docket but handled informally after the regular meeting" of the related trade

association. 838 F.2d 1445, 1474 (6th Cir. 1988). In both cases, the courts held that these were affirmative acts that support application of the fraudulent concealment doctrine. *Id.*; *Titanium Dioxide,* 959 F. Supp. 2d at 832.

> b.   *Defendants Concealed the WMS Survey and Agri Stats Information Exchanges.*

The existence of the data exchanges between Defendant Processors through WMS surveys and Agri Stats, and the contents of that exchanged data, were carefully concealed from Plaintiffs and the public. WMS only released the compensation survey results at "off the books" in-person meetings attended exclusively by employees of Defendant Processors and co-conspirators. ¶¶ 140-41, 152. Similarly, only poultry processors willing to upload their own compensation data, and pay millions of dollars in fees, had access to the compensation data that Agri Stats maintained during the Class Period. ¶¶ 159, 180. Indeed, the President of Agri Stats, Bryan Snyder, commented in 2009: "We don't advertise. We don't talk about what we do." ¶ 159. Defendants' designations of the data exchanges as confidential and inaccessible constitute affirmative acts of concealment. *See, e.g., Titanium Dioxide*, 959 F. Supp. 2d at 832 (holding that keeping a statistics exchange program on production figures confidential was an affirmative act of concealment).

In addition, Plaintiffs have repeatedly pled that Defendants employed sham data anonymization techniques to create an illusion of legality, and to conceal the true nature of the data exchanges' purpose: to facilitate a compensation fixing scheme. For example, at the annual "off the books" meetings, WMS circulated the results of the annual survey with the names of Defendant Processors replaced by a randomly assigned number, ¶ 141, yet members could readily ascertain which processor had reported which compensation data, and could only access those surveys results in a setting where such decoding was possible. ¶¶ 146, 152. A former employee of Perdue explained that attendees could readily determine which company reported which

compensation data in the WMS survey because "you're sitting in a meeting and the person across from you [from a competing processor] is reporting on what they do." *Id.*

Agri Stats similarly used sham data anonymization to create the illusion of legality and conceal the conspiracy. While Agri Stats claimed the data distributed each month was anonymous, that data was sufficiently granular and disaggregated that executives of Defendant Processors could and did easily match the distributed compensation data to specific poultry processing plants in specific regions. ¶ 164. In fact, Agri Stats representatives *helped* Defendant Processors identify the sources of Agri Stats compensation data behind the scenes, teaching management "how to extract information." ¶¶ 167-68. A former employee of Perdue said that Agri Stats data was "supposedly confidential" but that Perdue and every other subscribing poultry processor knew precisely which company reported which data. ¶ 165.

Courts have routinely held that such actions taken to create the illusion of legality, or camouflage illicit activity, constitute affirmative acts of concealment. *See, e.g., Edmonson*, 922 F.3d at 553 (using sham marketing agencies to conceal kickback payments is an affirmative act of concealment); *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 447-48 (6th Cir. 2012) (using a coding-system to hide the identity of the producers in defendant documents related to price fixing scheme constitute affirmative acts of concealment).[41]

Moreover, Plaintiffs allege these affirmative acts with adequate particularity. Each Defendant Processor participated in the WMS survey (the "who"); through which they exchanged facially anonymized but readily decoded compensation data (the "what"); at in-person meetings

---

[41] *See also, e.g., Walls v. Sierra Pac. Mortg. Co.*, No. GLR-19-595, 2020 WL 1528626, at *4 (D. Md. Mar. 31, 2020) (using sham marketing agencies to conceal payments is an affirmative act); *Baehr v. Creig Northrop Team, P.C.*, No. RDB-13-0933, 2018 WL 643502, at *5 (D. Md. Dec. 7, 2018) (using sham employment and marketing agreements to hide illegal referral fees are affirmative acts), *vacated on other grounds*, 953 F.3d 244 (4th Cir. 2020).

in Destin, Florida (the "where"); during April of each year (the "when") for the purpose of depressing wages for Class Members and concealing the conspiracy (the "why"). *See, e.g.*, ¶¶ 140-48, 154, 207. Likewise, each Defendant Processor subscribed to Agri Stats (the "who"); through which they exchanged facially anonymized, but readily decoded compensation data (the "what"); at their corporate headquarters and individual poultry plants (the "where"); during each month of the Class Period (the "when") for the purpose of implementing, monitoring and concealing the conspiracy (the "why"). *See e.g.*, ¶¶ 130, 170-5, 287, 202, 204, 207.

> ### c. Defendant Processors Made Affirmative Misstatements Regarding "Competitive" Pay and Benefits.

Plaintiffs additionally plead that Defendant Processors have affirmatively concealed their scheme by repeatedly and publicly misstating that they provided "competitive" compensation to employees. During the Class Period, each of the Defendant Processors publicly advertised to potential and current plant employees that they offered and paid "competitive" wages and "competitive" benefits. ¶¶ 241-42. Each of these advertisements falsely indicated that Defendant Processors' compensation for poultry plant workers was determined through genuine competition in the labor market. *Id.* Courts have held that such public misstatements are affirmative acts that toll statutes of limitations. *See, e.g., In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1199-200 (N.D. Cal. 2015) (holding that statements to employee class members describing compensation as "competitive"—in combination with allegations that defendants ensured the secrecy of the wage fixing conspiracy—constitute "affirmative acts").[42]

---

[42] *See also Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 539 (D. Md. 2011) (statute of limitations tolled because defendant concealed defect in vehicles through, among other acts, the public advertisement of the vehicles); *In re Bldg. Materials Corp. of Am. Asphalt Roofing Shingle Prods. Liab. Litig.*, No. 8:11-mn-02000-JMC, 2013 WL 169289, at *5 (D.S.C. Jan. 16, 2013) (statute of limitation tolled because defendant publicly marketed a defective product as code compliant).

Additionally, in October 2015, in response to a report from Oxfam America about low compensation at poultry processing plants (but making no mention of anticompetitive behavior), Perdue said in a statement that the company provides "competitive wages." ¶ 241. That same month, the National Chicken Council and U.S. Poultry & Egg Association—the two leading trade associations that are entirely controlled by Defendant Processors—issued a joint statement that provides: "Poultry processing plants compete for the local workforce and therefore must pay competitive wages and offer competitive benefits." *Id.* Courts have held that such denials constitute affirmative acts of concealment. In *Conmar Corp. v. Mitsui & Co.*, for example, the court held a "direct public denial of any wrongdoing before sufficient facts existed to make [Plaintiff] suspicious" constitutes an affirmative act. 858 F.2d 499, 505 (9th Cir. 1988). The *Conmar* court further noted that such denials are readily distinguishable from a situation where a defendant "fail[ed] to own up to illegal conduct upon [a] . . . timid inquiry [from the already suspicious plaintiff]," *id.* (brackets in original), citing *Pocahontas*, 828 F.2d at 218.[43]

Defendants' authorities are readily distinguishable from Plaintiffs' allegations. In both cases cited by Defendants, the plaintiff already knew, or certainly should have known, of the misconduct at the time it occurred, and thus any alleged affirmative acts of concealment were immaterial. In *SD3, LLC v. Black & Decker (U.S.), Inc.*, a company alleged an illegal boycott stemming from conduct dating to a decade prior to the commencement of the case. 215 F. Supp. 3d 486, 495 (E.D. Va. 2016). The court noted that the plaintiff "was not only aware of its claimed injury" when the boycott began, but it "also had an awareness of sufficient facts to identify a

---

[43] *See also Texas v. Allan Constr. Co.*, 851 F.2d 1526, 1532-33 (5th Cir. 1988) (noting "many courts have recognized, and so now do we, that a denial may constitute concealment"); *Bausch v. Philatelic Leasing*, 728 F. Supp. 1201, 1207 (D. Md. 1989) ("[T]he affirmative act of denying illegal conduct may constitute fraudulent concealment if the plaintiff's reliance on that denial was reasonable.").

particular cause of action." *Id.* Similarly, in *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp*, a company alleged an antitrust violation stemming from a refusal to deal that occurred six years prior to commencement of their case. 828 F.2d at 215, 218. The district court held that all the information necessary for plaintiff to pursue its antitrust claim "has been a matter of public record for over four years[.]" *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, No. 84-5380, 1986 WL 957, at *9 (S.D. W. Va. May 13, 1986). The Fourth Circuit affirmed. *Pocahontas*, 828 F.2d at 218.

2. <u>Plaintiffs Have Exercised Reasonable Diligence.</u>

The Fourth Circuit has plainly stated that "whether a plaintiff exercised due diligence is a jury issue not amenable to resolution on the pleadings or at summary judgment." *Edmonson*, 922 F.3d at 554.[44] Defendants' focus on Plaintiffs' alleged lack of diligence is thus inappropriate at this stage and should be rejected on that basis alone. Joint MTD at 31-32.

Furthermore, the Fourth Circuit "long has held" that plaintiffs may "satisfy [the due diligence requirement] without demonstrating that it engaged in any specific inquiry." *Edmonson*, 922 F.3d at 554 (brackets in original) (quoting *Marlinton*, 71 F.3d at 128). "'If the plaintiff establishes that it was not (and should not have been) aware of facts that should have excited further inquiry on its part'—if the plaintiff was not on inquiry notice—'then there is nothing to

---

[44] *See e.g.*, *Nat'l Elec. Benefit Fund v. Arlington Park Racecourse, LLC*, No. 8:11-CV-0090-RWT, 2011 WL 2712742, at *4 (D. Md. July 8, 2011) (concluding that whether the plaintiff "ought to have made a prompter inquiry" was "a fact-intensive inquiry that the court cannot resolve at this stage"); *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 711 (8th Cir. 2016) ("Generally, fraudulent concealment and a plaintiff's due diligence are questions of fact unsuited for summary judgment.") (internal quotation marks omitted); *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc*., 198 F.3d 823, 832 (11th Cir. 1999) ("[T]he issue of when a plaintiff in the exercise of due diligence should have known of the basis of his claims is not an appropriate question for summary judgment.").

provoke inquiry.'" *Id.*[45] This is precisely what the Complaint establishes, *i.e.* that as a result of Defendants' total and active concealment of the compensation-fixing conspiracy, there was nothing to "provoke" Plaintiffs' "inquiry."

Defendants' arguments to the contrary are without merit. First, Defendants argue that there are no "distinct averments" as to how the conspiracy was discovered. Joint MTD at 31. Yet, the Complaint explains that Defendants' collusion came to light "based on the investigation of counsel" and only after interviews with multiple confidential witnesses and consultation with economists. ¶¶ 1, 115, 117, 136, 151, 157, 172, 191-92. This Court has found that the discovery of claims through the investigation of counsel merits equitable tolling. *Fangman v. Genuine Title, LLC*, No. RDB-14-0081, 2015 WL 8315704, at *7-8 (D. Md. Dec. 9, 2015) (abrogated on other grounds by *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 255 (4th Cir. 2020)).

Second, Defendants argue that Plaintiffs, who are poultry plant workers, should have been on inquiry notice of the scheme "long ago." Joint MTD at 33. Defendants emphasize the Complaint's mention of public information stating that poultry plant workers are paid poorly, and that Agri Stats was referenced during the negotiation of two union contracts and during one Defendant's earnings call.[46] *Id.* at 31-33. Yet, *none* of this information would have put any Plaintiff or any Class Member on inquiry notice of the possibility of an unlawful agreement between any

---

[45] *See also GO Comput., Inc. v. Microsoft Corp.*, 508 F.3d 170, 178 (4th Cir. 2007) (inquiry notice "charges a person to investigate when the information at hand would have prompted a reasonable person to do so").

[46] The references to Agri Stats during the negotiations of union contracts only noted *average*, industry-wide compensation figures published by Agri Stats, ¶¶ 174-75, and the reference to Agri Stats during the earnings call only noted that the vast majority of poultry processors subscribed to the service. ¶ 161. *None* of those references indicate that, each month, Defendant Processors exchanged current, disaggregated, company-specific and plant-specific compensation data through Agri Stats, or that such ostensibly anonymous data was actually deanonymized by Defendant Processors and with the assistance of Agri Stats.

Defendants to fix or depress compensation. Specifically, none of this information indicates or reveals *any* of the three prongs of Defendants' conspiracy: the annual in-person meetings to fix compensation; the exchange of disaggregated and decodable compensation data; and plant-to-plant communications about current and future compensation. Because Plaintiffs were "not (and should not have been) aware of facts that should have excited further inquiry on [their] part, then there [was] nothing to provoke [their] inquiry." *Marlinton*, 71 F.3d at 128.

## IV.   DEFENDANTS' ARGUMENTS DO NOT COUNSEL DISMISSAL OF ANY INDIVIDUAL ENTITIES.

Nine Defendants move individually to dismiss the Complaint. None of their arguments fare any better than Defendants' Joint Motion. In arguing to the contrary, these nine Defendants are improperly "dismembering" the Complaint and "viewing its separate parts," instead of "looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (quoting *United States v. Patten*, 226 U.S. 525, 544 (1913)). At the same time, they are ignoring the well settled rule that, "once a conspiracy is shown, only slight evidence is needed to link another defendant with it." *United States v. Wilkinson*, 754 F.2d 1427, 1436 (2d Cir. 1985).

### A.   Plaintiffs' Allegations Against Agri Stats Are Sufficient.

#### 1.   Agri Stats Participated in the Conspiracy by Distributing and Decoding Reports Containing Current and Disaggregated Compensation Information.

The Complaint alleges that "Agri Stats facilitated the electronic exchange of *terabytes* of competitively sensitive compensation data between the Defendant Processors," allowing them "to implement, and monitor each other's compliance with, their collusive agreement to depress compensation." ¶ 156. "[O]n a monthly basis, each Defendant Processor provided the effective salary and wage rates [for various] categories of plant workers from each of their poultry processing plants in the continental United States to Agri Stats." ¶ 162. Then Agri Stats "distributed that disaggregated compilation to each of the subscribing Defendant Processors." ¶

163. And "Agri Stats only allowed a Defendant Processor to receive compensation data if that processor reciprocated and shared detailed compensation data." ¶ 180.

Moreover, while "Agri Stats claims the distributed data is anonymous," the company's "representatives would often assist Defendant Processors in identifying the sources of Agri Stats data, including compensation data." ¶¶ 164, 168-69. A former Butterball employee confirmed that "you could figure out" which company reported which compensation data to Agri Stats by speaking with Agri Stats representatives. ¶¶ 168-69. Likewise, a former Perdue employee said that Perdue brought in Agri Stats personnel to teach management "how to extract information" from the data distributed by Agri Stats. ¶ 167.

The data in Agri Stats reports was also, by design, sufficiently granular and disaggregated that executives of Defendant Processors could and did match the distributed compensation data "to specific poultry processing plants owned by specific Defendant Processors in specific regions." ¶ 164. A former Perdue employee said that, while Agri Stats data was "supposedly confidential," he knew from being in the industry and around the "good old boy system" that poultry processors participating in Agri Stats knew precisely which company reported which data. ¶165. Likewise, a former Pilgrim's employee explained that it was effortless to determine which company's plant was associated with which Agri Stats data and that colleagues did so routinely. ¶166.

Thus, Agri Stats enabled Defendant Processors "to *constantly* monitor each other's compensation levels to ensure that no Defendant Processor offered materially more in compensation than another." ¶ 171. A former Butterball employee said there was "no question about it" that poultry processors used Agri Stats to monitor one another's performance. *Id.* And a former Pilgrim's employee said that the poultry processor ensured that each of its plants was paying wages that were exactly in the middle of Agri Stats wage data. ¶ 173. Aptly summarizing

the function of Agri Stats, a former Perdue employee asserted that Agri Stats was responsible for "collusion in the poultry industry." ¶ 157.

Agri Stats' knowing collection and dissemination of disaggregated and current data among competing poultry processors is an overt act in furtherance of the conspiracy that is sufficient to deny its motion to dismiss. *See In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2015 WL 12747961, at *14 (N.D. Ohio Mar. 6, 2015) (holding allegations that a defendant was a "conduit to feed [other defendants] price information" sufficient to overcome a motion to dismiss).[47]

Agri Stats' primary response to these allegations is two-fold. Mem. in Supp. of Def. Agri Stats, Inc.'s Mot. to Dismiss Pls.' Am. Consolidated Compl. at 6-7, Mar. 2, 2020, ECF No. 343-1 ("hereafter Agri Stats MTD"). First, Agri Stats argues that it did not participate in "off the books" meetings of the Compensation Committee or plant-to-plant information exchanges. But "participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." *In re Broiler Antitrust I*, 290 F. Supp. 3d at 803 (quoting *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980)). Agri Stats was a major player in one prong of the conspiracy. That is sufficient.

Second, Agri Stats argues that there is no allegation that it "knew of any purported conspiracy to fix the compensation of poultry processing employees." Agri Stats MTD at 6-7. But in *In re Broiler Antitrust II,* where Agri Stats was accused of facilitating a price-fixing conspiracy by exchanging data between poultry processors, the district court flatly rejected this very same

---

[47] *See also In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1001, 1003 (N.D. Ill. 2011) (denying a trade association's motion to dismiss where it argued it was "not a market participant" because plaintiffs adequately alleged its involvement in the conspiracy).

argument, concluding that it is "at least plausible (if not likely) that a person who facilitates a conspiracy knows about the conspiracy and engages in the facilitation knowing of its consequences." *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2019 WL 1003111, at *2 (N.D. Ill. Feb. 28, 2019) ("*In re Broiler Antitrust II*"). The court explained that "the information and data in Agri Stats reports includes detail that is not generally advantageous for companies to divulge to their competitors" and thus "should have at least raised Agri Stats' suspicions regarding Defendants' motives for agreeing to divulge" it. *Id.*[48]

2.   Agri Stats' Arguments Regarding the *Per Se* Claim Are Unpersuasive.

Agri Stats' five other arguments against Plaintiffs' *per se* claim are equally unconvincing. First, Agri Stats says that it has "no motive to conspire" because it "does not hire poultry processing employees." Agri Stats MTD at 7-8. But Agri Stats had a clear financial motive to support the conspiracy: Agri Stats "profited from collecting and reporting" confidential compensation data from Defendant Processors, who "paid millions of dollars to Agri Stats" during the Class Period. ¶ 183. While this motive may not have been precisely the same as the motive driving Defendant Processors, "[a]ntitrust law has never required identical motives among conspirators, and even reluctant participants have been held liable for conspiracy." *In re Processed Egg Prod. Antitrust Litig.*, 902 F. Supp. 2d 704, 710 (E.D. Pa. 2012). For that reason, the court in *In re Broiler Antitrust II* rejected this argument as well, noting that it "is plausible to infer that Agri Stats is motivated to

---

[48] *See also Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 166-67 (D.D.C. 2004) (holding that it is "reasonable to infer from the facts and circumstances detailed in the complaint that" the defendant "annually collects and disseminates compensation information to its members in order to facilitate the alleged compensation-fixing agreement").

serve its clients' demands, and that in serving its clients, Agri Stats understood its clients' motivations for making those demands." 2019 WL 1003111, at *2.[49]

Second, Agri Stats claims that its actions are consistent with a legitimate business merely seeking "to improve the efficiency of its customers." Agri Stats MTD at 8. But this argument is belied by the *type* of information exchanged here. Indeed, the Complaint specifically alleges that if a Defendant Processor sought to improve efficiency, it could do so "without first exchanging disaggregated, current, granular, competitively sensitive compensation data with rival poultry processors." ¶ 179. Agri Stats misleadingly cites *Gypsum* for a passing reference that the exchange of pricing data can "in certain circumstances increase economic efficiency." Agri Stats MTD at 8 (citing 438 U.S. at 441-43 & n.16). But that court specifically went on to say that "[e]xchanges of current price information, of course, have the greatest potential for generating anticompetitive effects." 438 U.S. at 441 n.16. In any event, the Fourth Circuit instructs courts not to "determine 'whether a lawful alternative explanation appear[s] more likely' from the facts of the complaint . . . at the motion-to-dismiss stage." *SD3*, 801 F.3d at 425 (quoting *Houck*, 791 F.3d at 484.)

Third, Agri Stats suggests that its participation in the conspiracy is implausible because the company began operations "nearly a quarter century before the conspiracy supposedly began." Agri Stats MTD at 8. But Plaintiffs allege that, in the wake of a $1.3 billion jury verdict in 2004 for a conspiracy to manipulate pay to cattle farmers, the largest poultry processor—Tyson— withdrew from Agri Stats. ¶ 160. And then in 2008, on the eve of the Class Period, Tyson re-subscribed to Agri Stats." ¶ 130. Because Tyson is the largest poultry processor in the United

---

[49] The cases cited by Agri Stats cases are inapposite because no defendant in them had a plausible motive for supporting the conspiracy. *See* Agri Stats MTD at 7-8 (citing *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129 (2d Cir. 2013), and *Sherr v. HealthEast Care Sys.*, 262 F. Supp. 3d 869 (D. Minn. 2017)).

States, including its data in Agri Stats' monthly reports provided Defendant Processors a much clearer view of how the entire industry was compensating workers, allowing Agri Stats to achieve its full anticompetitive potential. The court in *In re Broiler Antitrust II* found that this "change certainly supports Plaintiffs' claims." 2019 WL 1003111, at *3.

Fourth, Agri Stats argues that Plaintiffs fail to plead how the compensation data it distributed was useable by Defendant Processors to fix wages. Agri Stats MTD at 9. Yet, this argument ignores extraordinary direct evidence of how Defendant Processors did just that. ¶¶ 157, 163-64, 171-75. For example, a former Perdue employee said that Agri Stats was responsible for "collusion in the poultry industry" and that it would be "stupid to think" Agri Stats did not "influence" poultry plant worker wages. ¶¶ 157, 170. Likewise, a former Butterball employee said there was "no question" that Agri Stats was used by poultry processors to monitor each other's compensation. ¶ 171.

Finally, Agri Stats argues that its reports could not be used to facilitate a conspiracy "encompassing both chicken and turkey processing companies." Agri Stats MTD at 9. But the Complaint alleges that 95% of all poultry processors in the United States subscribe to Agri Stats, ¶ 161, including Defendant Processors who process chicken (*e.g.* Pilgrim's, Sanderson Farms), turkey (*e.g.*, Butterball, JOTS), and both (*e.g.* Perdue, Tyson).

3.      Agri Stats' Arguments Regarding the Rule of Reason Claim Are Unpersuasive.

Agri Stats wrongly argues that the Complaint "does not allege that any exchange of information in the Agri Stats reports has had anticompetitive effects." Agri Stats MTD at 10. As addressed in substantial detail in section II(B), *supra*, the Complaint both directly and indirectly alleges anticompetitive effects on compensation stemming from Agri Stats' information exchange. The Complaint alleges that despite poultry plant workers' increased productivity, inflation-

adjusted hourly wages paid to them decreased; that annual raises to hourly wages were often only 25 cents; and that a preliminary analysis by expert economists demonstrates that, in other analogous labor markets, hourly wages rose at a "materially" faster pace. ¶¶ 228-31.

Agri Stats further argues that Plaintiffs "do not plead that compensation would have been greater absent the Agri Stats reports." Agri Stats MTD at 11 n.6. Yet, the Complaint contains statements from multiple former employees of Defendant Processors regarding how they used Agri Stats to depress compensation.[50] For example, a former Pilgrim's employee said that corporate headquarters ensured that each plant's wages were exactly in the middle of Agri Stats wage data. ¶ 173. Similarly, during union negotiations, both Pilgrim's and Butterball insisted that labor costs be within the Agri Stats average range. ¶¶ 174-75. The exchange of current pricing information that "seemed to have the effect of keeping prices within a fairly narrow ambit" states an antitrust claim. *Jung,* 300 F. Supp. 2d at 167-68 (quoting *United States v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969)).

Agri Stats also claims that Plaintiffs "baldly assert" the absence of a non-conspiratorial justification. Agri Stats MTD at 11-12. But, as discussed *supra*, section II(B)(2)(c) and alleged in the Complaint, the type of information exchange here—involving current and disaggregated plant-specific compensation data subject to "reverse engineering"—has no plausible, non-conspiratorial justification. ¶¶ 163-69, 178.

Finally, the cases cited by Agri Stats do not support any of its arguments. For example, the basis for the dismissal in *Jung* was the "paucity of detail in plaintiffs' complaint concerning the

---

[50] Plaintiffs need not plead that compensation was depressed *solely* due to the exchange of Agri Stats data. As the Supreme Court has cautioned, the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore*, 370 U.S. at 699 (quoting *United States v. Patten*, 226 U.S. at 544).

AMA." 300 F. Supp. 2d at 169. And the court explicitly contrasted these inadequate allegations with those concerning AAMC's data exchange, which sufficiently described how its "database information is utilized and distributed in furtherance of the conspiracy." *Id.* The court ultimately concluded that it was "reasonable to infer that the annual nature of the [AAMC] survey provides the institutional defendant co-conspirators the information they need to keep compensation levels depressed." *Id.* at 167 (denying AAMC's motion to dismiss). Here, the data exchanged by Agri Stats is, of course, even more current (*i.e.* monthly).

In the other case cited by Agri Stats, *Five Smiths Inc. v. National Football League Players Ass'n*, the information exchange ensured that *both sides* in a negotiation (plaintiff NFL clubs and defendant NFL players) had equal access to salary information. 788 F. Supp. 1042 (D. Minn. 1992). So "the dissemination of salary information ha[d] no anticompetitive effect and may actually benefit competition because it provide[d] players with the same type of information concerning other players' salaries that [the NFL clubs] already possess[ed]." *Id.* Here, conversely, Defendants are using their *exclusive* access to compensation information to Plaintiffs' detriment. In short, the Complaint states plausible antitrust claims against Agri Stats.

### B. Plaintiffs Sufficiently Plead Each Defendant Processor's Participation in the Conspiracy.

#### 1. Plaintiffs' Allegations of Specific Conduct by All Defendant Processors Are Sufficiently Pled Against Each Defendant Processor.

Eight individual Defendant Processors—Peco Foods, Mountaire Farms, Koch Foods, Simmons Foods, Sanderson Farms, Cargill, Tyson and JOTS—wrongly invite the Court to "parse and dismember" the Complaint, arguing that allegations specific to them *alone* are insufficient to

state a claim.[51] *In re Se. Milk*, 555 F. Supp. 2d at 943. At the same time, they discount allegations that all Defendant Processors engaged in specific misconduct, despite the well settled rule that plaintiffs are free to direct "allegation[s] at all of the defendants," so long as the allegations put defendants on "notice of what exactly they might have done" illegally. *Brooks v. Ross*, 578 F.3d 574, 582 (7th Cir. 2009). This rule embodies the common-sense principal that, when an allegation is true as to all defendants, that does not mean that each gets to ignore it in seeking dismissal.

Indeed, many courts, including this one, have held that allegations need not *name* each individual defendant each time an allegation applies to all of the defendants in the group. "Specific facts are not necessary; [plaintiffs' allegations] need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). Accordingly, in *Burgess v. Baltimore Police Department*, this Court rejected defendants' contention that plaintiff's use of "Officer Defendants" amounted to improper group pleading because the complaint "alleges that a definite subgroup of Defendants—the Officer Defendants—committed the alleged acts" and thus "use of the collective noun is not an effort to name 'everyone that *could* have been involved', but rather a calculated decision to accuse all named parties." No. RDB-15-0834, 2016 WL 795975, at *10 (D. Md. Mar. 1, 2016) (quoting *Proctor v. Metro. Money Store Corp.*, 579 F. Supp. 2d 724, 744 (D. Md. 2008)). Likewise, in *In re Polyurethane Foam*

---

[51] *See* Mem. of Law in Supp. of Peco Foods, Inc.'s Mot. to Dismiss the Am. Consolidated Compl. at 1-2, Mar. 2, 2020, ECF No. 350-1 (hereafter "Peco MTD"); Mountaire Defs.' Suppl. Br. In Supp. of Mot. to Dismiss at 2-3, Mar. 2, 2020, ECF No. 345 (hereafter "Mountaire MTD"); Mem. of Law in Supp. of Koch & Simmons' Mot. to Dismiss Am. Consolidated Compl. at 3-4, 8-9, Mar. 2, 2020, ECF No. 349-1 (hereafter "Koch and Simmons MTD"); Suppl. Mem. in Supp. of Sanderson Farms Defs.' Mot. to Dismiss at 1, 3-4, 7-8, Mar. 3, 2020, ECF No. 353-1 (hereafter "Sanderson MTD"); Defs. Cargill, Inc. & Cargill Meat Solutions Corp.'s Joint Mem. of Law in Supp. of Their Mot. to Dismiss Pls.' Am. Consolidated Compl. at 1-3, Mar. 2, 2020, ECF No. 342-1 (hereafter "Cargill MTD"); Mem. in Support of Defs. Tyson Foods, Inc., et al.'s Mot. to Dismiss, Mar. 2, 2020, ECF No. 351-1 (hereafter "Tyson MTD"); and JOTS MTD.

*Antitrust Litigation*, the district court "fail[ed] to see the talismanic quality of substituting a list of the individual Defendants for the supposedly conclusory term 'Defendants' when the relevant Complaint paragraphs clearly state that *each* Defendant stands accused of the same conduct." No. 1:10 MD 2196 (JZ), 2011 WL 13133853, at *3 (N.D. Ohio July 27, 2011).[52]

Contrary to Defendants' arguments, *SD3* does not hold otherwise. In that case, the plaintiff failed to allege *any* facts pertaining to some of the defendants. *SD3*, 801 F.3d at 423. For that reason, the Fourth Circuit cautioned that plaintiffs cannot make "*vague, non-specific* allegations against all [defendants] as a group." *Id.* at 422 (emphasis added). Instead, the complaint must "'specify how these defendants [were] involved in the alleged conspiracy,' without relying on '*indeterminate* assertions' against all 'defendants.'" *Id.* (emphasis added) (quoting *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009)).

In contrast, the Complaint here alleges exactly how *each* of the Defendant Processors knowingly participated in the conspiracy during the Class Period with extraordinary detail:

- Each year, executives from **each Defendant Processor** attended "off the books" compensation-fixing meetings at a resort in Florida, ¶ 134;

- Prior to each "off the books" meeting, **each Defendant Processor** provided data for the WMS survey regarding wages, salaries and benefits paid to Class Members, ¶ 140;

- **Each Defendant Processor** subscribed to Agri Stats to exchange—on a monthly basis—current compensation paid to categories of poultry plant workers, ¶¶ 7, 162;

---

[52] *See also Wright v. City of Philadelphia*, 229 F. Supp. 3d 322, 338 (E.D. Pa. 2017) (complaint's use of "sub-groups of defendants" was "not a basis for this Court to dismiss for failure to state a claim" where the "allegations provide[d] more than enough to detail to give [those defendants] notice of the nature and basis of the claims against them"); *Robles v. City of Chicago*, 354 F. Supp. 3d 873, 875 (N.D. Ill. 2019) ("the complaint in this case does not employ ambiguous formulations of collective action by multiple defendants that fail to 'adequately connect specific defendants to illegal acts'") (quoting *Brooks*, 578 F.3d at 580); *In re Credit Default Swaps Antitrust Litig.*, No. 13md2476 (DLC), 2014 WL 4379112, at *10 (S.D.N.Y. Sept. 4, 2014) (rejecting the argument that "references to 'Dealer-Defendants' as a group [we]re insufficiently particular to render the allegations plausible" where the complaint alleged that "senior-level employees of *each* [Dealer-Defendant] participated" in conspiratorial conduct).

- Agri Stats met with **each Defendant Processor** and its executives quarterly to facilitate the sharing of compensation information among Defendant Processors, ¶ 169; and

- Compensation for plant positions at **each Defendant Processor's** poultry plants was determined in a systematic way using compensation schedules that were aligned with the compensation for the same positions at other Defendant Processors, ¶¶ 111-12.

These are just some of many well-pled allegations that require denial of the individual motions to dismiss filed by eight Defendant Processors.[53]

In their arguments to the contrary, Defendants cite several inapposite cases. In *In re GSE Bonds Antitrust Litigation*, for example, there was "smoking gun" evidence that, in virtual chatrooms, traders acting on behalf of the "Chatroom Defendants" agreed to fix prices. 396 F. Supp. 3d 354, 361 (S.D.N.Y. 2019). But as to the remaining defendants not mentioned in the chatroom transcripts, the complaint stated only that "all of the various defendants were directly implicated in conspiratorial multi-bank chats." *Id.* at 364 (internal quotation marks omitted). The district court found that this "unadorned allegation, without any specifics, cannot salvage the pleading against these defendants" and that there "must be something in the complaint that ties each defendant to the conspiracy." *Id.* at 363-64. Here, by contrast, **each Defendant Processor** is specially alleged to have engaged in specific conspiratorial acts at specific times. ¶¶ 7, 111-12, 114, 132, 140, 148, 152, 162, 169, 177, 180, 183, 274, 278-79.

Similarly, while *In re Interest Rate Swaps Antitrust II* refused a request to amend a complaint because the proposed allegations were so "generalized" as to amount to "impermissible group pleading," the district court referred to its previous ruling finding other group pleading

---

[53] As the district court stated in *In re Broiler Antitrust I*: "Allegations that each defendant participated in the parallel conduct, participated in the meetings that provided the opportunity to collude, participated in Agri Stats, and participated in variable contracts or exports, are sufficient to allege participation in the agreement [to cut production]." 290 F. Supp. 3d at 803-04 (denying motion to dismiss).

satisfactory. *In re Interest Rate Swaps Antitrust Litig.*, No. 16-MC-2704 (PAE), 2018 WL 2332069, at *15 (S.D.N.Y. May 23, 2018). In that previous ruling, *In re Interest Rate Swaps Antitrust I,* the court found that "many references" in the complaint "to the 'Dealer Defendants' **are proper**." 261 F. Supp. 3d at 478 (emphasis added). Indeed, "[g]iven plaintiffs' thesis that the Dealers participated in a collective boycott, it is natural that the [complaint] express some factual allegations collectively." *Id.*[54] So too here.

## 2. Plaintiffs' Allegations Against Peco Foods Are Sufficient.

Peco Foods focuses solely on the allegations that single it out, rather than considering those allegations together with the extensive evidence that *all* Defendant Processors—including Peco Foods—participated in "off the books" compensation-fixing meetings, WMS compensation surveys, and Agri Stats information exchanges. *See supra*, section IV(B)(1). In other words, Peco Foods inappropriately "dismember[s]" the Complaint and considers specific allegations in isolation, instead of "looking at it as a whole." *Cont'l Ore*, 370 U.S. at 699 (quoting *Patten*, 226 U.S. at 544).

Considered as a whole, the allegations against Peco Foods are more than sufficient. In addition to the incriminating allegations against all Defendant Processors, the Complaint alleges that poultry plants operated by Peco Foods regularly "shared compensation information" with

---

[54] Other cited cases are equally inapposite. *See Akers v. Md. State Educ. Ass'n*, 376 F. Supp. 3d 563, 573-74 (D. Md. 2019) ("vague, nonspecific allegations" that "unions have violated federal antitrust laws" amounted to "failure to plead the requisite elements of an antitrust claim") (quoting *SD3*, 801 F.3d at 422)); *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019) (plaintiffs "have not alleged anything that would 'plausibly suggest that the *particular* defendants named in this suit were part of that conspiracy'") (citation omitted); *In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d 487, 491 (D. Conn. 2008) ("Despite repetition of some general terms of conspiracy throughout, the complaint never alleges specific facts tending to support the alleged theories of conspiracy."); *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 512, 516 (S.D.N.Y. 2009) (dismissing claims against joint defendants that have no "factual connection to the alleged conspiracy").

competing poultry plants. ¶ 186. "A former employee of Peco Foods" explained that "local plants talk" and "knew what competitors are doing and how much they are paying." *Id.* He said that human resources staff would often contact their counterparts at a competitor plant and share information about starting pay rates, pay increases and employment benefits. *Id.* And he explained that this "type of thing happened all the time." *Id.*

Even viewing these plant-to-plant information exchanges alone (as Peco Foods improperly does), they are sufficient to plead Peco Foods' participation in the compensation-fixing conspiracy. "[E]xchanging competitively sensitive information," as here, can serve "as evidence of an implicit illegal agreement." DOJ & FTC Antitrust Guidance at 4. *See supra*, section II(A). Indeed, given the direct statements of Peco Foods' co-conspirators, *e.g.*, ¶¶ 151, 157, the only plausible inference here is that Peco Foods was talking to other local competitor plants about pay and benefits *in order to stabilize and depress wages*. As stated in *In re Broiler Antitrust III*—which denied Peco Foods' motion for reconsideration of its individual motion to dismiss there—"in the larger context of Plaintiffs' allegations regarding the Broiler industry during the relevant time period, these allegations against Peco in particular are sufficient to plausibly include it as a defendant . . . ." *In re Broiler Chicken Antitrust Litig.*, No. 1:16-cv-08637, 2018 WL 10550500, at *1 (N.D. Ill. Jan. 31, 2018) ("*In re Broiler Antitrust III*").

Peco Foods argues that the allegations of its former employee are "too vague to credit." Peco MTD at 3. But it relies on *In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.* where an unidentified market professional failed to tie his allegation to a defendant, and where an unnamed whistleblower only "assert[ed] conclusory and speculative allegations" of price suppression. No. 11 Md 2213(RPP), 2012 WL 6700236, at *17 (S.D.N.Y. Dec. 21, 2012). Peco Foods also relies on *Superior Offshore International, Inc. v. Bristow Group Inc.* where it was

unclear whether an unidentified "operator" was even an employee of one of the defendants. 738 F. Supp. 2d 505, 513 (D. Del. 2010). Here, by contrast, Peco Foods' former employee describes particular categories of information—starting pay rates, pay increases, and employment benefits—that human resources managers at competing plants shared with each other "all the time." ¶ 186.

Finally, Peco Foods notes that is not included in a list of attendees at one specific Compensation Committee meeting held in April 2017. Peco MTD at 3. Yet, the Complaint makes clear that Peco Foods attended other "off the books" Compensation Committee meetings during the Class Period where compensation was fixed. ¶¶ 134, 140. *See In re Processed Egg Prod. Antitrust Litig.*, 821 F. Supp. 2d 709, 732 (E.D. Pa. 2011) (plaintiffs are "not obliged to have the same quality or quantity of allegations as to one defendant as unto another"). In short, the allegations against Peco Foods are sufficient.

### 3.   Plaintiffs' Allegations Against Mountaire Are Sufficient.

Mountaire attempts to reduce the allegations against it to single statement that Ronald Cameron, the owner of Mountaire Farms, attended church with Jim Perdue, chairman of Perdue. ¶ 201. But this allegation merely sets the stage for the detailed story that unfolds in the rest of the Complaint, where a "tight-knit" circle of executives from *all* Defendant Processors—including Mountaire—participated in "off the books" compensation-fixing meetings, WMS compensation surveys, Agri Stats information exchanges, and plant-to-plant information exchanges. *See supra*, section IV(B)(1). Considered as a whole (as they must be), the allegations against Mountaire are sufficient to plead its commitment to and participation in the wage-fixing conspiracy.

Mountaire argues that allegations of a "mere opportunity to conspire" are insufficient. Mountaire MTD at 4. But Plaintiffs allege not "mere opportunity" but actual collusion in conjunction with opportunity.

Mountaire also argues that the Noerr-Pennington doctrine immunizes the exercise of First Amendment rights—such as going to church—from antitrust scrutiny. Mountaire MTD at 5 & n.2. This argument is entirely beside the point: Even if the discussion of church-going were omitted from the Complaint, the allegations against Mountaire would be more than sufficient to plead an antitrust violation. Moreover, as Mountaire acknowledges, it cannot escape antitrust liability simply because its executives were conspiring with friends from church. *Id.* at 5 n.2. As the Supreme Court stated in *American Tobacco Co. v. United States,* "[i]t is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful . . . if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition." 328 U.S. 781, 809 (1946).

4.    Plaintiffs' Allegations Against Koch Foods and Simmons Foods Are Sufficient.

Koch Foods and Simmons Foods combined forces to file a motion to dismiss that makes two meritless arguments. First, they argue that the Complaint fails to plead parallel conduct. Koch and Simmons MTD at 5-6. Yet, as discussed extensively in sections I(B)(1) and I(B)(3)(a) *supra*, Plaintiffs need not allege parallel conduct to establish a *per se* claim and, in any event, have sufficiently pled multiple forms of parallel conduct. In particular, the Complaint alleges that each Defendant Processor, including Koch Foods and Simmons Foods, aligned their hourly wages and salaries with each other, ¶¶ 111-12; attended annual "off the books" Compensation Committee meetings, ¶ 152; and exchanged competitively sensitive compensation data via Agri Stats (on a monthly basis) and via the WMS wage survey (on an annual basis), ¶¶ 154, 162-64. Indeed, the Complaint alleges that executives of both Koch Foods and Simmons Foods attended a particular "off the books" meeting of the Compensation Committee in April 2017 in Florida, where the "wages, salaries and benefits of Class Members were discussed and fixed." ¶ 152-53.

Koch and Simmons also argue that the rule of reason claim fails because "Plaintiffs have not pleaded any allegations that Koch or Simmons agreed to exchange compensation information." Koch and Simmons MTD at 7-8. But this simply ignores allegations that **each Processor Defendant**—including Koch and Simmons—exchanged competitively sensitive data via the WMS wage survey and subscriptions to Agri Stats. ¶¶ 7, 140, 162. Similarly, Koch and Simmons contend that there are no allegations that they were "able to determine the compensation paid by others through these surveys." Koch and Simmons MTD at 8. But, again, this ignores that multiple former employees of Defendant Processors have confessed that they could and did identify precisely which poultry processors reported which data to WMS and Agri Stats. ¶¶ 146, 164-68. In short, Plaintiffs sufficiently allege Koch Foods' and Simmons Foods' participation in the compensation-fixing conspiracy.

     5.     <u>Plaintiffs' Allegations Against Sanderson Farms Are Sufficient.</u>

In its individual motion to dismiss, Sanderson Farms makes five unfounded arguments. First, Sanderson Farms argues that its participation in a North Carolina "Chicken Media Summit" with Pilgrim's and Perdue provides "no indications of conspiracy" because there "are no allegations that compensation was discussed at that event." Sanderson MTD at 6. In so doing, Sanderson Farms improperly attempts to reduce the allegations against it to attendance at a single conference referenced in a single paragraph in the Complaint, rather than acknowledge the remainder of the Complaint, which squarely alleges in incriminating detail that Sanderson Farms participated with other Defendant Processors in "off the books" compensation-fixing meetings, WMS compensation surveys, Agri Stats information exchanges, and plant-to-plant information exchanges. *See supra*, section IV(B)(1). Considered as a whole (as they must be), the allegations are sufficient to plead Sanderson Farms' participation in the compensation-fixing conspiracy.

Additionally, the allegation that the president of Sanderson Farms participated in a Chicken Media Summit (which included a tour of a Sanderson Farm poultry plant) with Pilgrim's CEO and Perdue's Chairman of the Board, is circumstantial evidence that supports an inference of a conspiracy. ¶ 193. As discussed *supra*, section I(B)(3)(b)(iii), this Court has held that such "industry conferences" constitute an important plus factor, *i.e.* "non-economic evidence of a traditional conspiracy." *Titanium Dioxide*, 959 F. Supp. 2d at 830. The Fourth Circuit has explained that even in the absence of any allegations about the content of discussions between defendants, allegations of "meetings among conspirators can support an inference of agreement because they provide the means and opportunity to conspire." *SD3*, 801 F.3d at 432.

Second, like Koch Foods and Simmons Foods, Sanderson improperly argues that no parallel conduct is alleged in the Complaint. Sanderson MTD at 5. Yet, as discussed extensively in sections I(B)(1) and I(B)(3)(a) *supra*, Plaintiffs need not allege parallel conduct to establish a per se claim and, in any event, have sufficiently pled multiple forms of parallel conduct. In particular, the Complaint alleges that each Defendant Processor, including Sanderson Farms, aligned their hourly wages and salaries with each other, ¶¶ 111-12; attended annual "off the books" Compensation Committee meetings, ¶ 152; and exchanged competitively sensitive compensation data via Agri Stats and WMS, ¶¶ 154, 162-64.

Third, Sanderson erroneously argues that its wages could not have moved in tandem with the depressed wages of the poultry industry as whole, relying on the Eleventh Circuit's decision *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702 (11th Cir. 2014), which dismissed a RICO claim. Sanderson MTD at 5-6. Yet, the court in *Simpson* merely concluded that the *hourly wages* of *two individuals* had increased during 2008 to 2010, which overlaps with only the very start of the Class Period, 744 F.3d at 707, and is consistent with the Complaint's allegation that Defendant

Processors compensated workers based on their years of experience, ¶ 107. Thus, *Simpson* does not undercut the Complaint's allegations that Sanderson Farms conspired with other Defendant Processors to depress industry-wide compensation—which encompasses hourly wages, salaries, and benefits—over the last decade. In fact, as the Court in *Simpson* expressly noted: "Of course, the mere fact that their wages increased does not preclude the plaintiffs from showing depressed wages." *Id.* at 709. If anything, *Simpson* indicates wages may have been rising prior to and at the start of the Class Period, thus motivating Defendant Processors to reign in compensation during the subsequent decade.

Fourth, Sanderson claims that its subscription to Agri Stats was "unremarkable" because such services can "increase economic efficiency." Sanderson MTD at 7. For this proposition, Sanderson Farms relies on *Stephen Jay*, which in turn quotes *Gypsum*, which asserts that the exchange of current data has the "the greatest potential for generating anticompetitive effects." *Id.* (citing *Stephen Jay Photo., Ltd. v. Olan Mills, Inc.*, 713 F. Supp. 937, 944 (E.D. Va. 1989) (citing *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978))). As discussed extensively *supra*, section II(B)(2)(c), the type of information exchange conducted by Agri Stats—involving current and disaggregated plant-specific compensation data that is decodable—has no plausible, non-conspiratorial justification.[55] ¶¶ 163-69, 178. This is particularly true where, as here, multiple co-conspirators have confirmed using Agri Stats data to harmonize and monitor industry-wide compensation, including a former Perdue executive admitting that Agri Stats was responsible for "collusion in the poultry industry." ¶ 157.

---

[55] Sanderson Farms states that Plaintiffs "offer no factual allegations" to support the conclusion that the "anonymous" Agri Stats data could be matched. Sanderson MTD at 2-3. But multiple former employees of Defendant Processors confirm as much, stating that the data "totally" can be, and was, "reverse engineered" and it is "just bullshit" to suggest otherwise. ¶¶ 152, 154, 162-64.

Finally, Sanderson Farms unpersuasively argues that, to plead a rule of reason claim, Plaintiffs must plead specific anticompetitive effects on the employees of Sanderson Farms—as opposed to anticompetitive effects to the labor market as a whole stemming from the information exchange agreement in which Sanderson Farms participated.[56] Sanderson MTD at 8-9. Sanderson Farms cites to no authority for this novel and baseless argument; to be sure, the case law is to the contrary. *See*, *e.g., Todd*, 275 F.3d at 214 (anticompetitive effects from information exchange sufficiently pled by alleging anticompetitive effects to the market as a whole).[57] Moreover, the Complaint specifically alleges that employees of Sanderson Farms (and other Defendant Processors) "received lower compensation during the Class Period than they would have received in the absence of" Defendants' misconduct. ¶¶ 224-26, 245.[58]

6.     Plaintiffs' Allegations Against Cargill Are Sufficient.

Like other Defendant Processors, Cargill is alleged to have participated in "off the books" compensation-fixing meetings in Florida and exchanged current, disaggregated, and competitively sensitive information through the annual WMS compensation surveys and monthly Agri Stats information exchanges. *See supra*, section II(A). Indeed, the Complaint specifically alleges that Cargill joined the annual WMS survey and "off the books" Compensation Committee meetings in or around 2015, ¶ 154, and that Cargill attended the particular "off the books" Compensation

---

[56] Those anticompetitive effects to the labor market as a whole stemming from the information exchange are described in detail in *supra*, section II(B).

[57] *See e.g. Container Corp.*, 393 U.S. at 337 (reversing dismissal claim where the inference supported that the "exchange of price information has had an anticompetitive effect in the industry" as a whole); *Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 648 (E.D. Mich. 2012) (holding that plaintiffs sufficiently allege anticompetitive effects from an information exchange on the relevant labor market as a whole).

[58] Sanderson's arguments regarding the geographic and product markets, *see* Sanderson MTD at 9-10, are addressed above. *See supra*, section II(B)(2)(a) (responding to the Joint MTD).

Committee meeting in April 2017 at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, where the "wages, salaries and benefits of Class Members were discussed and fixed." ¶ 153.

The Complaint also alleges that Cargill engaged in plant-to-plant communications about compensation with Defendant Processors in furtherance of the conspiracy. Specifically, a former human resources manager who worked at both a Perdue plant and a George's plant during the Class Period stated that both plants routinely exchanged data with rival poultry plants operated by Cargill and other Defendant Processors. ¶ 192. She explained that managers of the Perdue plant and the George's plant contacted managers of rival poultry plants operated by Cargill, among others, and requested *current* hourly wages for plant workers as well as any planned *future* increases to those hourly wages. *Id.* The former human resources manager said, "We would collaborate. We would talk among each other to see what they were doing for pay." *Id.*

Cargill argues that Plaintiffs allege only that compensation data was *requested* from Cargill's plants, not that "Cargill actually provided any data, much less that Cargill received compensation information." Cargill MTD at 7. But the former human resources manager for Perdue and George's said that she would "collaborate" with competitors such as Cargill and "talk among each other" about compensation. Such collaboration certainly creates the inference that "Cargill tracked the wages of other Defendants." Cargill MTD at 3.

Cargill's other attempts to downplay its role in the exchange of sensitive compensation information are equally unpersuasive. First, it mistakenly states that the Complaint does not indicate when Cargill subscribed to Agri Stats. Cargill MTD at 3. But the Complaint alleges that each Processor Defendant did so during the Class Period. ¶ 160. Second, Cargill argues that Agri Stats provided different data sets for chicken processors and turkey processors. Cargill MTD at 3, 6. But Defendant Processors who sell both chicken and turkey had access to the Agri Stats data

contributed by all poultry processors, and Cargill also exchanged compensation with both chicken and turkey processors through annual WMS surveys, annual "off the books" meetings of the Compensation Committee, annual National Turkey Federation surveys, and regular plant-to-plant communications. ¶ 154. *See supra,* section I(B)(4). Third, Cargill asserts there are no allegations demonstrating that Cargill in particular was able to reverse engineer the identities of the "anonymous" Agri Stats contributors. Cargill MTD at 3-4. But a former employee of Perdue said he knew from being in the industry and around the "good old boy system" that Perdue *and every other poultry processor participating in Agri Stats* knew precisely which company reported which data. ¶ 165. He added that it is "just bullshit" to suggest that Defendant Processors did not know which company was reporting which compensation data to Agri Stats. *Id.*

Cargill next inexplicably relies on language from a 1996 DOJ and FTC statement regarding the compensation of health care workers to argue that there is "nothing unlawful" about exchanging information derived from compensation surveys. Cargill MTD at 6 (citing U.S. Dep't of Justice & Fed. Trade Comm'n, Statements of Antitrust Enforcement Policy in Health Care (Aug. 1996 rev.), available at https://www.justice.gov/atr/page/file/1197731/download, at 49. But the 1996 statement says that such exchanges will fall within an "antitrust safety zone" *only if* the data is "aggregated such that it would not allow recipients to identify the . . . compensation paid by any particular provider." Without such aggregation and anonymization here, the Agri Stats and WMS surveys plainly facilitated the compensation-fixing conspiracy. ¶¶ 223-33.

Additionally, Cargill complains that "many" of the trade association meetings identified in the Complaint are "chicken-specific." Cargill MTD at 4. However, the "off the books" meetings of the Compensation Committee were attended by *all* Defendant Processors. The Complaint also identifies other trade association meetings, such as those of the U.S. Poultry & Egg Association

and the Joint Poultry Industry Human Resources Council, that were attended by *all* Defendant Processors. The Complaint even identifies meetings of the National Turkey Federation attended by Defendants *that process turkey*. ¶ 202.

Finally, Cargill argues that the history of collusive activity in the broiler chicken industry cannot serve as a plus factor. Cargill MTD at 4. Cargill ignores that Plaintiffs point to both historical and *ongoing* investigations of collusive activity, ¶ 202, and furthermore, "plus factors involving history of antitrust violations . . . point toward a meeting of the minds." *In re Interior Molded Doors*, 2019 WL 4478734, at *7.[59] Cargill then asserts that reliance on any collusive history in the *chicken* industry undermines Plaintiffs' rule of reason claim based on "a single 'poultry' processing labor market.'" Cargill MTD at 4. This argument confuses a product market (the market for chicken meat) with a labor market (the market for poultry processing labor). It is entirely plausible that chicken producers conspired with one another to raise the price of chicken meat (because consumers see chicken meat and turkey meat as different products), but conspired with turkey producers to suppress wages (because poultry processing workers consider chicken processing jobs and turkey processing jobs to be interchangeable). In short, Plaintiffs sufficiently allege Cargill's participation in the compensation-fixing conspiracy.[60]

---

[59] *See e.g. Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 319 (2d Cir. 2010) (considering government investigations into defendant conduct as plus factor); *Barry's Cut Rate Stores, Inc. v. Visa, Inc.*, No. 05-MD-1720 (MKB) (JO), 2019 WL 7584728, at *32 (E.D.N.Y. Nov. 20, 2019) (summarizing cases considering government investigations a plus factor); *In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 452 (E.D. Pa. 2018) (noting that history of government investigations appropriately considered as plus factor).

[60] Cargill's statute of limitations argument, *see* Cargill MTD at 6, is addressed above. *See supra*, section III.

7.     Plaintiffs' Allegations Against Tyson Are Sufficient.

Tyson makes two arguments in its individual motion to dismiss that no other Defendant Processor makes. First, Tyson argues that the allegations against the members of its corporate family are inadequate. As a preliminary matter, this argument is barred because Tyson failed to raise it in its first motion to dismiss (though Plaintiffs sued the same Tyson entities). Consolidated Complaint ¶¶ 21-31, Nov. 14, 2019, ECF No. 196. A defendant is "procedurally barred from raising subsequent 12(b)(6) defenses by the consolidation principle of Fed. R. Civ. P. 12(g)," which provides that "except in circumstances not applicable here, a party must assert all available defense or objections when making a motion under Rule 12." *Sageworks, Inc. v. Creatore*, No. 5:16-CV-367-BO, 2017 WL 633359, at *2 (E.D.N.C. Feb. 15, 2017). A second motion to dismiss does "not fall within the Rule 12(h)(2) exception." *Leyse v. Bank of Am. N.A.*, 804 F.3d 316, 320-21 (3d Cir. 2015). "This consolidation rule is intended to eliminate unnecessary delay at the pleading stage by encouraging the presentation of an omnibus pre-answer motion in which the defendant advances every available Rule 12 defense simultaneously rather than interposing these defenses and objections in piecemeal fashion." *Id.* (internal quotation marks and citation omitted). Accordingly, the Court should reject Tyson's piecemeal litigation tactic.[61]

In any event, in seeking to dismiss the Complaint, Tyson ignores that Plaintiffs explicitly define "Tyson" to include Tyson Foods, Inc. and its wholly owned subsidiaries, such that all allegations in the Complaint against "Tyson" are directed at each of them.[62] ¶ 33; *see also* ¶¶ 23-

---

[61] *See also Vance v. Potter*, No. 5:05CV00013, 2006 WL 467981, at *1 (W.D. Va. Feb. 28, 2006); *Goff v. AAMCO Automatic Transmissions, Inc.*, 313 F. Supp. 667, 668 (D. Md. 1970).

[62] The list of Tyson-specific allegations in its individual motion is incomplete and fails to address, for example, paragraphs 115, 117, 151, 182, 202, and 233—one of which is Tyson's stunning admission that the Compensation Committee meetings "were so inappropriate and improper that that the company would no longer attend them." ¶ 151. In similar circumstances, the district court

32. Thus, "the Complaint does not deprive each defendant of fair notice of the conduct attributed to them; instead, the Complaint can fairly be read to claim that each of the moving Defendants participated in the specific wrongful conduct alleged." *Tivoli LLC v. Sankey S.P.A.*, No. SA CV 14-1285-DOC (JCGx), 2015 WL 12683801, at *4 (C.D. Cal. Feb. 3, 2015). *See also supra*, sections IV(B)(1) and II(A). As in *In re Interest Rate Swaps Antitrust I*, group references to the defendants, "each a corporate family," are proper—and expected given "plaintiffs' thesis" of concerted action. 261 F. Supp. 3d at 478.

Moreover, contrary to Tyson's argument, the Fourth Circuit did not dismiss all members of a corporate family in *SD3,* but instead only those with "no factual allegations [] made against them." 801 F.3d at 423. So, for example, Hitachi Koki Co., Ltd.—the corporate parent of Hitachi Koki USA Ltd.—was dismissed while the subsidiary was not. But here, Plaintiffs allege that Tyson Foods, Inc. "actually engaged in anti-competitive conduct and not merely . . . served as parents to its [] subsidiary." *See Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*, 9 F. Supp. 3d 1032, 1044 (D. Minn. 2014).[63]

Furthermore, "allegations of individual defendant participation [a]re sufficient where the complaint alleged the corporate structure of the various defendants, that agents of the defendants acted on behalf of corporate families, and that co-conspirators did not distinguish between the specific corporate affiliations of other co-conspirators." *Jones v. Micron Tech. Inc.*, 400 F. Supp.

---

in *In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation* denied the defendants' motion to dismiss because "the individual defendants minimize the allegations against them in the complaint, completely omitting certain paragraphs from a list of quoted paragraphs that they suggest is exhaustive." 767 F. Supp. 2d 880, 898 (N.D. Ill. 2011). So too here.

[63] *See also In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-5944 SC, 2010 WL 9543295, at *6 (N.D. Cal. Feb. 5, 2010).

3d 897, 923 (N.D. Cal. 2019).[64] While the plaintiff in *SD3* had "alleged *no facts* suggesting the kind of unity of interests" required to plead "an alter ego theory," 801 F.3d at 423, the Complaint here does just that.[65] For example—with respect to one of the most compelling pieces of direct evidence alleged in the Complaint—a confidential witness refers only to a "senior executive from Tyson" who stated "that the discussions about wages, salaries and benefits at the 'off the books' meetings held at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida were so inappropriate and improper that that the company would no longer attend them." ¶ 151. This lack of specification for which particular Tyson entity the executive worked is factual support for the undifferentiated nature of the Tyson entities. The inference Plaintiffs ask the Court to draw—that such generic references to Tyson by those with whom they operated implicates the Tyson entities more broadly—is plausible, while the "inference[] that in informal communication defendants' employees carefully delineated between similarly branded corporate entities in the manner that an attorney might, is not." *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 4955377, at *34 (N.D. Cal. Oct. 2, 2014).

And if there "are more specific facts that support Plaintiffs' claims, or merely explain the relationship between these entities, it's unlikely Plaintiffs have ready access to them" and thus "it is proper to allow Plaintiffs to conduct discovery." *In re Polyester Staple Antitrust Litig.*, No. 3:03CV1516, 2004 WL 7345007, at *5 (W.D.N.C. Aug. 5, 2004) (citing *Hosp. Bldg. Co. v. Rex Hosp.*, 425 U.S. 738, 746 (1976) ("in antitrust cases, where the proof is largely in the hands of the

---

[64] *See also In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1072-73 (N.D. Cal. 2015); *In re Cathode Ray Tube (CRT) Antitrust Litig*, 738 F. Supp. 2d 1011, 1023-24 (N.D. Cal. 2010).

[65] The case *Zachair, Ltd. v. Driggs* cited by Tyson is inapposite. Tyson MTD at 2 n.2 (citing *Zachair, Ltd. V. Driggs*, 141 F.3d 1162, 1998 WL 211943 (4th Cir. 1998)). There, the Fourth Circuit held that a corporation and related entities that it fully owns or controls are not capable of conspiring together in violation of Section 1 of the Sherman Act. *Zachair*, 141 F.3d 1162, 1998 WL 211943, at *1-2 (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984)).

alleged conspirators, dismissals . . . should be granted very sparingly") (internal quotation marks and citation omitted)). As here, "Defendant's motions are more appropriate for resolution at summary judgment." *In re Polyester Staple Antitrust Litig.*, 2004 WL 7345007, at *5.

The other argument made by Tyson concerns Plaintiffs' standing. Tyson—alone among Defendants—wrongly argues that hourly employees and employees of chicken processors do not have standing to bring claims on behalf of salaried employees or employees of turkey processors. Tyson MTD at 4-6. Yet, Plaintiffs have Article III standing because they allege an economic "injury in fact" that is "fairly traceable" to Defendants' conspiracy to fix their wages and "likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). *See also In re Broiler Antitrust I*, 290 F. Supp. 3d at 809-10. Indeed, employees of both chicken and turkey processors are alleged to have suffered the same type of compensation suppression injury due to the conspiracy, just as salaried employees are alleged to have suffered the same type of compensation suppression injury due to the conspiracy as hourly employees. ¶¶ 111-12, 223-28.

In fact, the Complaint alleges that Tyson—which processes both chicken and turkey, and employs both hourly and salaried workers at all its poultry plants—sets compensation for *all* its poultry processing plant workers at its corporate headquarters, in part to ensure that those employees *around the country* are paid within narrow compensation ranges set according to their positions and experience. ¶¶ 115, 233. For example, the Complaint explains that, according to former Tyson employees, the wages of hourly workers were "consistent" within each position and "tightly structured" across poultry processing plants, and such workers "really never get ahead" of their starting wage due to limited annual raises. ¶ 230.

Moreover, the Complaint makes clear that the conspiracy to depress compensation targeted both hourly and salaried workers across poultry processing plants—a term that encompasses both chicken and turkey processing plants. ¶ 98. The Complaint alleges, in extraordinary detail, that the wages of *all* these plant employees were part of the WMS compensation survey and the subject of discussion and fixing at the "off the books" meetings of the Compensation Committee. ¶¶ 142-45. And the Complaint alleges that 95% of poultry processors, including both chicken and turkey processors, subscribed to Agri Stats, with Tyson having access to the data contributed by them all. ¶ 161. Thus, the alleged conspiracy by Defendant Processors to depress the compensation of all poultry processing plant workers (both hourly and salaried) necessarily means that an employee of a chicken processor is typical of an employee of a turkey processor (whether hourly or salaried). Indeed, while a named "plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim," typicality does not require "that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466-67 (4th Cir. 2006).[66] *See also Wagner v. Gen. Nutrition Corp.*, No. 16-CV-10961, 2017 WL 3070772, at *5 (N.D. Ill. July 19, 2017) ("the majority of courts that have considered the issue hold that a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar") (internal quotation marks and citation omitted).

Ultimately, whether the facts bear this out will be assessed at class certification. Put another way, Tyson's so called "standing" argument is wholly premature. In a very recent case in this

---

[66] Tyson's reliance on *Kjessler* is misplaced because that opinion relies on a Fifth Circuit case at odds with *Deiter*. *Kjessler v. Zaappaaz, Inc.*, No. CV 4:18-0430, 2019 WL 3017132, at *6 (S.D. Tex. Apr. 24, 2019) (citing *Bernard v. Gulfoil Corp.*, 841 F.2d 547, 550 (5th Cir. 1988)).

Court, *Van Buren v. Walmart, Inc.*, the defendant argued—much like Tyson does here—that the plaintiff "failed to establish standing to assert claims that relate to purchases made at Walmart stores rather than Sam's Club stores." No. DKC 19-0911, 2020 WL 1064823, at *3 (D. Md. Mar. 5, 2020). In rejecting the argument, this Court pointed out that "Defendant does not actually attack *Plaintiff's* standing, nor does Defendant suggest that Plaintiff has not suffered the constitutionally required 'injury in fact.'" *Id.* Instead, the defendant, like Tyson here, was "really attempting to litigate the appropriate bounds of a class at the motion to dismiss stage." *Id.* But "the United States Supreme Court has warned" in *Amchem* that class certification "is logically antecedent to the existence of Article III standing issues." *Id.* (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 612 (1997)). So rather than "conflating Article III standing with the commonality requirement of Fed. R. Civ. P. 23(a)" at the motion to dismiss stage, the "proper time to challenge the inclusion of putative class members injured at different stores" is at the class certification stage. *Id.* Other district courts in the Fourth Circuit have arrived at the same conclusion.[67] And so have other courts across the country.[68]

Tyson cites *Newberg on Class Actions* for the unremarkable proposition that "at least one named class representative must have standing with respect to each claim." Tyson MTD at 4. That is exactly what Plaintiffs allege here. ¶¶ 15-19, 264, 284. Elsewhere, *Newberg* states that "a 'growing consensus' among lower courts is that class certification should indeed be decided first where the "certification decision will itself shed light on the standing question." 1 Newberg on

---

[67] *See, e.g.*, *In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18-md-2836, 2019 WL 1397228, at *23 (E.D. Va. Feb. 6, 2019); *Burton v. Chrysler Grp. LLC*, No. 8:10-00209-JMC, 2012 WL 831843, at *6 (D.S.C. Mar. 12, 2012).

[68] *See, e.g.*, *Giuliano v. SanDisk Corp.*, No. C 10-02787 SBA, 2014 WL 4685012, at *3 (N.D. Cal. Sept. 19, 2014) (holding that "any concerns about the material differences between the products" purchased by plaintiffs "are better addressed at the class certification stage" because the injury to purchasers of both products was "predicated on the same alleged wrongful conduct").

Class Actions § 2:2 (5th ed.).Tyson cites to *Schlesinger* for the unremarkable proposition that a class representative "must be a part of that class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents." Tyson MTD at 4 (citing *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974)). That is exactly what Plaintiffs allege here. ¶¶ 15-19, 111-12, 223-28, 264, 284.

Likewise, Tyson cites to *Schlesinger* for the uncontentious proposition that a class representative "must be a part of that class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents." Tyson MTD at 4 (citing *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974)). Again, that is exactly what Plaintiffs allege here. ¶¶ 15-19, 111-12, 223-28, 264, 284. Tyson cites *Newberg on Class Actions* for the proposition that "at least one named class representative must have standing with respect to each claim." Tyson MTD at 4. Again, that is exactly what Plaintiffs allege here. ¶¶ 15-19, 264, 284. Elsewhere, *Newberg* states that "a 'growing consensus' among lower courts is that class certification should indeed be decided first where the "certification decision will itself shed light on the standing question." 1 Newberg on Class Actions § 2:2 (5th ed.).

Tyson also relies on *Zaycer v. Sturm Foods, Inc.* in arguing that the standing determination should be made at the motion to dismiss stage. 896 F. Supp. 2d 399, 409 (D. Md. 2012) (Bennett, J.). But in refusing to let the named plaintiff, a resident of Maryland, represent those suing under the consumer protection laws of other states, the court noted that the plaintiff "does not claim that there is a conspiracy or concerted scheme," such that the "plaintiffs as a group" would have

"suffered an identical injury at the hands of several parties." *Id.* at 406, 407 (citation omitted).[69] Of course, such a conspiracy is exactly what is alleged here.

Tyson also relies on *Los Gatos I* for the same argument. *See* Tyson MTD at 5 (citing *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co*., No. 13-CV-01180-BLF, 2015 WL 4755335, at *15 (N.D. Cal. Aug. 11, 2015)). But Tyson fails to note that the district court in *Los Gatos I* dismissed with leave to amend and then *denied* a subsequent motion to dismiss, stating: "The relevant question is whether the requisite case or controversy has been established between the named plaintiffs and the defendants, not between unidentified putative class members and the defendants." *Harrison v. E.I. du Pont de Nemours & Co.*, No. 13-cv-01180-BLF, 2016 WL 3231535, at *3 (N.D. Cal. June 13, 2016) ("*Los Gatos II*"). In short, Plaintiffs allege sufficient standing to represent the proposed Class.

8.     <u>Plaintiffs' Allegations Against JOTS Are Sufficient.</u>

JOTS makes two sets of unique arguments, neither of which are persuasive: market definition arguments and *per se* conspiracy arguments.

First, JOTS advances several arguments against Plaintiffs' alleged relevant market definition. For example, JOTS argues that variations in mean hourly wages for "Meat, Poultry, and Fish Cutters and Trimmers in the Animal Slaughtering and Processing industry" across the United States "definitively disproves" Plaintiffs' alleged geographic market. JOTS MTD at 5-6. Yet, it is inappropriate for JOTS to use this data from outside the four corners of the Complaint. "In deciding a motion to dismiss, the Court must consider the facts as alleged within the four

---

[69] Another case relied upon by Tyson, *In re Interior Molded Doors,* 2019 WL 4478734, at *13, also involved "standing under the laws of the states where no named plaintiff resides," unlike here where the Plaintiffs assert federal claims. ¶¶ 259-84.

corners of the pleadings, and accept them as true." *Sears, Roebuck & Co. v. Riggs Distler & Co.*, No. SKG-11-2203, 2012 WL 1391838, at *4 (D. Md. Apr. 20, 2012).[70]

   In any event, in no way does this data undermine the factual allegations in the Complaint. JOTS's analysis compares mean wages paid to *all* "Animal Slaughtering and Processing" workers, including those who worked in competitive labor markets outside the poultry processing industry. As JOTS admits, poultry processing is only one of *four* types of work that qualifies as "Animal Slaughtering and Processing." JOTS MTD at 6 n.10. Thus, wages paid in other industries could account for the trends JOTS identifies. The extent to which they do is precisely the type of question that cannot be resolved on a motion to dismiss with no discovery record, let alone expert analysis.[71]

   JOTS also suggests that its relative geographic isolation from the other Defendant Processors undermines the plausibility of Plaintiffs' alleged geographic market for the rule of reason claim. JOTS MTD at 9-10.[72] But the distance of JOTS's plants from the other Defendant Processors' plants has no bearing on the plausibility of Plaintiffs' alleged geographic market, and

---

[70] *See also In re Minh Vu Hoang*, No. DKC 12-0593, 2014 WL 937949, at *7 n.4 (D. Md. Mar. 10, 2014) ("this argument necessarily relates to issues outside the four corners of the amended complaint; thus, it could not be decided on a motion to dismiss").

[71] Even if JOTS's data accurately reflected differences in poultry processing wages across the country, differences in absolute prices do not prove the existence or lack thereof of a relevant market. *See In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 128 (C.D. Cal. 2007) (market definition depends on "the responsiveness of demand [for one product] to changes in the price of another product . . . the difference in price between the two products is irrelevant"). Furthermore, as explained *supra,* section II(B)(2)(a)(ii), even if JOTS is correct that there *also* exist plausible narrower relevant geographic markets than the United States, that provides no basis to reject Plaintiffs alleged market definition on a motion to dismiss.

[72] JOTS raises the same flawed geographic market argument in an attempt to undermine Plaintiffs' *per se* conspiracy claim. JOTS MTD at 11. When establishing a *per se* antitrust violation, however, Plaintiffs are not required to show a geographic market. *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100 (1984) (holding that where a *per se* rule applies, the challenged conduct is "presumed unreasonable without inquiry into the particular market context in which it is found").

JOTS cites no law suggesting otherwise. And JOTS' willingness to pay for a data exchange with other Defendant Processors suggests that it is not too isolated from other Defendant Processors to participate in the same labor market. *See Todd v. Exxon Corp.*, 275 F.3d 191, 205 (2d Cir. 2001).

In fact, the Complaint alleges that each Defendant Processor, including JOTS, "owns at least one poultry processing plant that is within 32 miles of another Defendant Processor's poultry processing plant." Indeed, JOTS itself admits that Defendant Pilgrim's has a plant 33 miles from a JOTS plant, that co-conspirator Turkey Valley Farms has a plant 40 miles from a JOTS plant, and that Defendant Cargill has a plant 52 miles from a JOTS plant. JOTS MTD at 9-10; 10 n.17. These plants are close enough to support Plaintiffs' allegations of anticompetitive effects, *even if* Defendants' proposed narrow geographic markets were ultimately adopted by the factfinder. Defendants point to no allegations in the Complaint which undermine that conclusion.[73]

JOTS also raises a handful of unpersuasive arguments that it cannot be liable for the *per se* conspiracy. First, JOTS argues that because the Standard Occupational Classification system provides that between 2014 and 2018, the mean hourly wages for meat, poultry, and fish cutters and trimmers in the Animal Slaughtering and Processing industry increased, JOTS did not engage in the compensation-fixing conspiracy. JOTS MTD at 12-13. As explained above, however, this argument relies on evidence outside the four corners of the Complaint and includes wage data from industries that are not involved in this litigation. Moreover, even if JOTS increased its wages during the Class Period, such wage increases would not undermine the plausibility of the conspiracy: it is certainly plausible that JOTS wages rose at a slower rate than they would have in

---

[73] The fact that Plaintiffs allege that "*with the exception of Defendant Jennie-O*, each Defendant processor has a plant that is within 13 miles of another Defendant Processor's plant" is not inconsistent with the idea that plants as far as 52 miles from each other also compete for labor. JOTS MTD at 9 (quoting ¶ 100).

the absence of the conspiracy. Indeed, the Complaint alleges that "the hourly wages of poultry processing plant workers employed by Defendant Processors often *only increased* approximately 25 cents a year" and, further, that "economic analysis conducted by expert economists retained by Plaintiffs shows that compensation of plant workers employed by non-poultry food manufacturers was higher, and *increased at a materially more rapid rate*, than compensation paid by Defendant Processors to Class Members during the Class Period." ¶¶ 10, 229 (emphasis added).

JOTS also argues that its participation in the survey conducted by the National Turkey Federation is not evidence of collusion. JOTS MTD at 13. But JOTS's participation in the National Turkey Federation survey demonstrates its willingness to exchange highly sensitive compensation data with competitors. Plaintiffs have presented evidence that, on an annual basis, rival turkey processors in the United States reported salaries and hourly wages for "fairly specific" positions within their turkey processing plants to the National Turkey Federation, which compiled this information and distributed the combined survey results to the participating turkey processors. *Id.*

Finally, JOTS suggests that because it did not participate in the WMS survey prior to 2015, it is not liable for the compensation-fixing conspiracy prior to 2015. However, as discussed *supra*, section I(B)(4), Plaintiffs have presented evidence that JOTS participated in the conspiracy by exchanging and receiving compensation data through Agri Stats prior to 2015. ¶ 161. Moreover, even if JOTS did not join the conspiracy until 2015, JOTS ratified the actions of its co-conspirators, thus becoming jointly and severally liable for all actions, including prior actions, of its co-conspirators in furtherance of the conspiracy. *See In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 800 (N.D. Ohio 2011) ("a fundamental tenant of conspiracy law [] holds one participating conspirator jointly liable for all his co-conspirators' prior acts").[74] The Complaint

---

[74] *See supra* note 23.

alleges that JOTS began participating in the WMS survey and "off the books" meetings of the Compensation Committee in 2015. Accordingly, JOTS is liable for all actions of the co-conspirators, including those actions taken prior to JOTS' formal participation in the conspiracy.

## V.    THE COMPLAINT SHOULD NOT BE DISMISSED WITH PREJUDICE.

In the event the Court decides that the Complaint should be dismissed, Plaintiffs respectfully request that the Court dismiss the Complaint without prejudice and allow Plaintiffs the opportunity to amend. *See* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given"); *see e.g.*, *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (*en banc*) (emphasizing Rule 15 is a "liberal rule" which "gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities").

Defendants argue that any dismissal should be with prejudice, as Plaintiffs have already amended in response to Defendants' prior motions to dismiss. Joint MTD at 33; Koch and Simmons MTD at 9. Yet, Plaintiffs exercising their right under Federal Rule 15(a) to amend in response to prior motions to dismiss has no bearing on whether they can do so in the event the court identifies a curable defect in the Complaint. As stated in *Pork*, "[w]hile it is true that Plaintiffs have amended their complaints before, this is the first time the Court has identified any deficiencies, and the Court does not believe that those deficiencies cannot be cured." *Pork Antitrust*, 2019 WL 3752497, at *10.[75]

---

[75] *See also Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509-10 (4th Cir. 1986) (noting that in the Fourth Circuit, "leave to amend a pleading should be denied only" with a showing of prejudice, bad faith, or futility); *Wall v. Fruehauf Trailer Servs.*, 123 F. App'x 572, 576 (4th Cir. 2005) ("[L]eave to amend is a liberal standard and will not be denied unless the amendment will cause actual prejudice to the adverse party.").

Dated: July 17, 2020                          Respectfully submitted,

                                      _____/s/ Matthew K. Handley_____
                                      Matthew K. Handley (D. Md. Bar # 18636)
                                      Rachel E. Nadas (admitted *pro hac vice*)
                                      HANDLEY FARAH & ANDERSON PLLC
                                      777 6th Street, NW, Eleventh Floor
                                      Washington, DC 20001
                                      Telephone: (202) 559-2433
                                      mhandley@hfajustice.com
                                      rnadas@hfajustice.com

                                      George F. Farah (admitted *pro hac vice*)
                                      Rebecca P. Chang (admitted *pro hac vice*)
                                      HANDLEY FARAH & ANDERSON PLLC
                                      81 Prospect Street
                                      Brooklyn, NY 11201
                                      Telephone: (212) 477-8090
                                      gfarah@hfajustice.com
                                      rchang@hfajustice.com

                                      William H. Anderson (admitted *pro hac vice*)
                                      HANDLEY FARAH & ANDERSON PLLC
                                      4730 Table Mesa Drive
                                      Suite G-200
                                      Boulder, CO 80305
                                      Telephone: (202) 559-2433
                                      wanderson@hfajustice.com

                                      Daniel A. Small (D. Md. Bar # 20279)
                                      Benjamin D. Brown (admitted *pro hac vice*)
                                      Brent W. Johnson (admitted *pro hac vice*)
                                      Daniel H. Silverman (*pro hac vice* forthcoming)
                                      Alison S. Deich (admitted *pro hac vice*)
                                      COHEN MILSTEIN SELLERS & TOLL PLLC
                                      1100 New York Avenue NW
                                      5th Floor
                                      Washington, DC 20005
                                      Telephone: (202) 408-4600
                                      Fax: (202) 408-4699
                                      dsmall@cohenmilstein.com
                                      bbrown@cohenmilstein.com
                                      bjohnson@cohenmilstein.com
                                      dsilverman@cohenmilstein.com
                                      adeich@cohenmilstein.com

Steven W. Berman (admitted *pro hac vice*)
Breanna Van Engelen (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Tel: (206) 623-7292
steve@hbsslaw.com
breannav@hbsslaw.com

Shana E. Scarlett (admitted *pro hac vice*)
Rio R. Pierce (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel: (510) 725-3000
shanas@hbsslaw.com
riop@hbsslaw.com

Elaine T. Byszewski (*pro hac vice* forthcoming)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Tel: (213) 330-7150
elaine@hbsslaw.com

*Interim Co-Lead Counsel for Plaintiffs and the
Proposed Class*