IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **JUDY JIEN, et al.,** | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Case No. 1:19-CV-2521-SAG |
| | * | |
| **PERDUE FARMS, INC., et al.,** | * | |
| | * | |
| Defendants. | * | |
| | * | |

************

## MEMORANDUM OPINION

Plaintiffs Judy Jien, Kieo Jibidi, Elaisa Clement, Glenda Robinson, and Emily Earnest (collectively "Plaintiffs"), on behalf of themselves individually and on behalf of a class of former and current employees, filed suit against fourteen poultry processors, plus two data consulting companies (collectively "Defendants"). The Second Amended Complaint ("SAC") alleges two violations of Section 1 of the Sherman Antitrust Act. ECF 386. Specifically, Plaintiffs allege 1) a conspiracy among Defendants to fix and depress poultry workers' compensation, and 2) an unlawful exchange of compensation data. *Id.* Presently pending are Defendants' Motions to Dismiss the Second Amended Complaint ("the Motions"). ECF 398, 399, 400, 401. Plaintiffs filed an Omnibus Opposition, ECF 408, and Defendants filed a number of Replies, ECF 410, 411, 412, 413. For the reasons stated below, I shall deny the Motions.[1]

I.    **LEGAL STANDARD**

Under Rule 12(b)(6), a defendant may test the legal sufficiency of a complaint by way of a motion to dismiss. *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty.*

---

[1] A comprehensive factual background is provided in this Court's decision on Defendants' previous motions to dismiss, ECF 378, and will not be reiterated herein. Relevant new factual allegations will be referenced in the analysis section of this opinion.

1

*Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in Twombly expounded the pleading standard for 'all civil actions' . . . ."); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken

as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

## II.    ANALYSIS

Defendants have filed four motions to dismiss. The first seeks to narrow the scope of the action because the named plaintiffs have only ever worked as hourly employees at chicken processing plants, and thus allegedly lack standing to pursue claims related to salaried positions or workers in turkey processing plants. The remaining three are filed on behalf of individual Defendants Jennie-O Turkey Store Inc., Mountaire Farms Inc., and Sanderson Farms Inc., respectively, arguing, among other things, that the SAC does not provide sufficient details about

how the companies were involved in the alleged conspiracy to state a claim. Those arguments will be addressed in turn.

### A. Standing

Standing requires that a plaintiff have suffered (1) an injury in fact, (2) caused by the defendant, and (3) redressable by a favorable decision of the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Here, Defendants argue that the SAC partially fails on prong one— because the named plaintiffs are exclusively hourly workers in chicken processing plants, they lack standing to pursue class claims relating to salaried workers and turkey processing workers. ECF 398-1 at 4-7. This contention epitomizes a longstanding tension between Article III standing and the class certification process, termed "the disjuncture problem." 1 William B. Rubenstein, Newberg on Class Actions § 2:6 (5th ed. June 2019 update). As summarized by another court in this District, the disjuncture problem is as follows:

> [W]hile there is a fundamental principle of justiciability that "[t]here cannot be a disjuncture between the harm that the plaintiff suffered and the relief that she seeks," a proposed "class representative may seek to litigate harms not precisely analogous to the ones she suffered but harms that were nonetheless suffered by other class members." *Id.* Confronted with this situation, some courts follow a "standing approach," under which a proposed representative lacks standing to pursue relief for injuries suffered by proposed class members that may differ from the named plaintiff's own . . . Other courts follow the "class certification" approach, holding that "once the named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded, and the court proceeds to consider whether the Rule 23(a) prerequisites for class certification have been met." *Id.*

*Williams v. Potomac Family Dining Grp. Operating Co.*, LLC, No. GJH-19-1780, 2019 WL 5309628, at *4 (D. Md. Oct. 21, 2019).

This tension is exacerbated by competing case law handed down by the Supreme Court. On the one hand, "[t]hat a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which

they belong and which they purport to represent.'" *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 40, n. 20 (1976), quoting *Warth v. Seldin*, 422 U.S. 490, 502 (1975). On the other hand, the Court has held that class certification "is logically antecedent to the existence of Article III [standing] issues, [thus] it is appropriate to reach them first[.]" *Amchem Products v. Windsor*, 521 U.S. 591, 612 (1997). The Fourth Circuit, meanwhile, has not addressed this issue directly, and the parties have cited district court cases pointing in both directions. *Compare In re Interior Molded Doors Antitrust Litig.*, No. 3:18-CV-00718-JAG, 2019 WL 4478734, at *11 (E.D. Va. Sept. 18, 2019) *with Singh v. Lenovo (United States) Inc.*, No. CV CCB-20-1082, 2021 WL 37660, at *2 (D. Md. Jan. 4, 2021).

  Against this murky backdrop, the Court ultimately finds the "class certification" approach most persuasive in the context of this case, where the interests of the named hourly chicken employees are not "significantly different" than those of the salaried and turkey employees. *See Gratz v. Bollinger*, 539 U.S. 244, 265 (2003) (finding that a transfer student plaintiff had standing to sue on behalf of prospective freshmen, too, because "the [Defendant] University's use of race in undergraduate transfer admissions does not implicate a significantly different set of concerns than does its use of race in undergraduate freshman admissions"); *see also In re Asacol Antitrust Litigation*, 907 F.3d 42, 49 (1st Cir. 2018) ("Nothing in . . . precedent . . . suggests that the claims of the named plaintiffs must in all respects be identical to the claims of each class member. Requiring that the claims of the class representative be in all respects identical to those of each class member in order to establish standing would confuse the requirements of Article III and Rule 23. Indeed, such an approach would render superfluous the Rule 23 commonality and predominance requirements because any case that survived such a strict Article III analysis would by definition present only common issues. So the question of standing is not: Are there differences

between the claims of the class members and those of the class representative? Rather, the pertinent question is: Are the differences that do exist the type that leave the class representative with an insufficient personal stake in the adjudication of the class members' claims?") (internal quotation marks and citations omitted). This Court has already determined that plaintiffs have sufficiently pled the existence of a singular poultry labor market, irrespective of whether the workers are salaried or hourly, or work with chicken or turkey. ECF 378 at 23-25. Crucially, the SAC alleges how that poultry labor market was impacted by the same exact anticompetitive conduct; namely secret meetings, plant-to-plant communication, and extensive data sharing via WMS and Agri Stats. ECF 386 ¶¶ 3-4, 10, 151-152, 264-69. These allegations—consistent across all members of the class, named and otherwise—constitute the heart of the case and suggest that, as in *Gratz* and *In re Asacol*, the named plaintiffs have a sufficient personal stake in the adjudication of the class members' claims to establish standing, even for those class members from slightly different backgrounds.

As such, the Court holds that plaintiffs have standing to pursue their claims and Defendants' Motion, ECF 398-1, will be denied. Defendants will remain free, of course, to challenge Plaintiffs' ability to satisfy the commonality, typicality, and predominance requirements for class certification pursuant to Fed. R. Civ. P. 23.

### B. The Individual Motions to Dismiss

Jennie-O Turkey Store Inc., Mountaire Farms Inc., and Sanderson Farms Inc. challenge the SAC's sufficiency as it pertains to both its *per se* and "rule of reason" antitrust claims, and also

suggest that the SAC engages in impermissible group pleading. For the reasons outlined below, each of these challenges falls short.[2]

### a. Group Pleadings

All three individual Defendants make similar arguments regarding the SAC's alleged failure to cure the "group pleading" defects the Court identified in its initial dismissal opinion. Jennie-O suggests that this improper group pleading manifests by virtue of the SAC's "barely mention[ing] JOTS" in connection with specific facts and otherwise seeking to "broadly lump unidentified Defendants together." ECF 399-1 at 3-6. However, the SAC links Jennie-O specifically to the secret compensation meetings and the WMS data exchange process in advance of those meetings, and additionally outlines its use of Agri Stats, all of which provides sufficient specificity. ECF 386 ¶ 56. That factual allegations against Jennie-O are the same or similar to those made against other Defendants is not evidence that the allegations are insufficient or vague, but rather reflects instead Plaintiffs' specific assertion that it engaged in the same conduct as its competitors.

Mountaire and Sanderson, meanwhile, suggest that merely naming certain corporate subsidiaries as "co-conspirators" instead of "defendants" is insufficient to provide the sort of specificity this Court deemed necessary in its original opinion. ECF 400-1 at 4-5; ECF 401-1 at 7-8. However, the SAC now specifies single Sanderson and Mountaire entities as Defendants,

---

[2] As a general point related to these issues, the Court wishes to briefly reiterate that, as it expressed in its initial opinion, it is well aware that Plaintiffs' allegations are sparse in many respects. *See, e.g.*, ECF 378 at 9, 16, 25. At this early stage of the litigation, however, Plaintiffs need only clear the low plausibility bar and need not provide the sort of detailed factual explication that Defendants seek. *See Twombly*, 550 U.S. at 555. Should the threads that tie Plaintiffs' case together—in particular those that link each individual Defendant to the various elements of the alleged conspiracy—remain tenuous in later stages of this litigation, they will undoubtedly face an uphill battle as the standard of proof they must clear increases.

eliminating the need for guesswork.  It is now clearly alleged that it was Sanderson Farms, Inc. and Mountaire Farms, Inc., respectively, that engaged in each relevant part of the conspiracy.  ECF 386 ¶¶ 34-35; 40-41.  To the extent that the two Defendants suggest that it was not Sanderson Farms, Inc. or Mountaire Farms, Inc. that engaged in the relevant conduct—and that it instead was another distinct corporate subsidiary through which liability does not attach—they are free to raise that argument at later stages of the litigation.  The inquiry here requires only that the pleadings be specific as to which entity is alleged to have engaged in which conduct.  *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015).  The SAC sufficiently clarifies which Sanderson and Mountaire entities are alleged to have conspired.

### b.  *Per Se* Conspiracy

#### i.  Jennie-O

Jennie-O suggests that the SAC only specifically alleges its attendance at one "off the books" compensation meeting in 2015, and thus fails to tie the company to the key 2018 Tyson executive statement specifically or the alleged antitrust conspiracy generally.  ECF 399-1 at 7-8.  This Court already determined that allegations stating that Jennie-O "first started attending the 'off the books' meetings in or around 2015" sufficiently tied the company to Plaintiffs' direct evidence of the *per se* conspiracy.  ECF 378 at 14.  Indeed, inherent in this "first started attending" language is an allegation that that attendance in 2015 was the first of multiple meetings attended, *not* the single instance of attendance that Jennie-O seeks to portray in its Motion.  This is further demonstrated by the SAC's use of the plural "meetings" when describing Jennie-O's attendance.  ECF 386 ¶ 56.  That the SAC suggests that Jennie-O did not attend every single meeting (and specifically did not attend the 2017 compensation committee meeting that many other Defendants

did) does not undercut the fact that it is unmistakably alleged to have attended *some* of these meetings, thus making plausible its participation in the antitrust conspiracy.

### ii. Mountaire Farms

Mountaire alleges that the *per se* claims against it fail because 1) the SAC improperly relies on boilerplate statements substantiated only by unidentified individuals, 2) the SAC fails to specifically allege that Mountaire actually participated in wage fixing while in attendance at the secret compensation meetings, and 3) the SAC fails to allege specific secret compensation meetings Mountaire attended. ECF 400-1 at 5-8. These concerns are unfounded at this initial pleading stage. Unlike the Complaint's previous iteration, the SAC includes a specific allegation that Mountaire attended at least some of the secret compensation meetings at which Defendants allegedly agreed to conspire to fix poultry wages. ECF 386 ¶ 41. It would be (and, in previous iterations of the complaint, was) conclusory to generally allege that Mountaire engaged in a wage-fixing conspiracy without any factual allegations to support it. By contrast, there is nothing conclusory about specifically alleging that Mountaire attended some of the secret compensation meetings that the Court has already determined make plausible the allegations of a wage-fixing conspiracy. Alleging attendance at a meeting cannot be mistaken for a legal conclusion. Such allegations of attendance, even absent any supplemental specific details, are factual allegations that must be credited at this early stage of the proceeding. *See E.I. du Pont de Nemours & Co.*, 637 F.3d at 440.

As this Court determined in its initial dismissal opinion, a plaintiff may rely on unnamed confidential witnesses. *See* ECF 378 at 12-14; *see also Hinds Cty., Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 397 (S.D.N.Y. 2010). Mountaire suggests that such anonymity, combined with the SAC's lack of detail about specific meetings it is alleged to have attended, make it

9

impossible for the Court and Mountaire to "meaningfully assess[] the allegation," ECF 413 at 3, but the only "assessment" the Court is permitted to undertake at the motion to dismiss stage is to determine whether Plaintiffs have provided a plausible claim for relief.  To the extent Mountaire is suggesting that the Court should assess the veracity of the SAC's factual allegations regarding meeting attendance, that exceeds the scope of its inquiry here.  *See E.I. du Pont de Nemours & Co.*, 637 F.3d at 440.  The Court already determined that the 2018 Tyson executive statement made plausible wage-fixing conspiracy allegations arising out of secret compensation meetings, ECF 378 at 12, and now the SAC provides factual allegations claiming that Mountaire attended some of those meetings and engaged in the conspiracy through them, ECF ¶ 41.  All of this unquestionably leaves Mountaire with "fair notice" of the claims and the "grounds" for entitlement to relief—particularly its alleged attendance at these secret compensation meetings.  *See Twombly*, 550 U.S. at 555-56.

### iii.  Sanderson Farms

Sanderson claims that the SAC does not sufficiently link it to the direct evidence of *per se* conspiracy because 1) Sanderson was not pled to have specifically attended meetings around the time the Tyson executive made his critical statement and 2) because the SAC fails to allege Sanderson's attendance at any specific secret compensation meeting.  ECF 401-1 at 9-12.  First, the alleged 2018 statement by a Tyson executive, which the Court deemed to constitute direct evidence, colors *all* of the alleged secret compensation committee meetings before it, at least for the purposes of this motion to dismiss analysis.  Nothing in the statement suggests that the impropriety it referenced was cabined to 2018.  *See* ECF 386 ¶ 191.  As such, the Court declines to interpret it in such a restrictive way at this early stage of the proceedings, where Plaintiffs' burden is merely to show plausibility and where all reasonable inferences—such as this inference

as to the relevant time period to which the Tyson executive's statement is applicable—must be drawn in their favor.

Furthermore, the SAC *does* allege Sanderson's attendance at secret compensation meetings and thus ties the company to the direct evidence the Court identified in its initial dismissal opinion. *Id.* at ¶ 35. While Sanderson calls this allegation of meeting attendance a "generic allegation . . . unsupported by any factual detail and directly contradicted by the facts of attendance they do plead," ECF 412 at 18, that improperly reformulates the motion to dismiss inquiry into something more rigorous than it is. The allegation that Sanderson attended some of the secret wage meetings *is* the "factual detail" necessary. While Plaintiffs may not baselessly speculate, there is no indication that the allegation in question is speculative, particularly given the inclusion of a source for the information. ECF 386 ¶ 35 (citing "a former Pilgrim's employee"). It would inappropriately heighten Plaintiffs' burden at this stage of proceedings to require them to provide supplemental specifics beyond their underlying factual allegation. Moreover, there is plainly nothing contradictory about claiming that Sanderson attended secret compensation meetings, but not necessarily the specific 2015 and 2017 meetings mentioned elsewhere in the SAC. Thus, assuming, as the Court must, the truth of Sanderson's alleged attendance at some of the secret compensation meetings, that alone "allow[s] the court to reasonably infer" that it engaged in the alleged wage suppression conspiracy in light of the Court's previous conclusion regarding those secret meetings and the Tyson executive's 2018 statements about them. *See A Society Without a Name*, 655 F.3d at 346.

### c. Rule of Reason Conspiracy

#### i. Jennie-O

Jennie-O alleges that the SAC's "rule of reason" claim fails because it does not sufficiently allege 1) that it agreed to participate in the exchange of compensation information, and 2) that any such agreement had anticompetitive effects. ECF 399-1 at 9-13. The first argument falls short because, as previously decided above, the SAC sufficiently alleges attendance at multiple secret meetings in which extensive poultry processing wage data was exchanged via WMS. ECF 386 ¶ 56. It also alleges Jennie-O's participation in the poultry wage data sharing portion of the scheme via Agri Stats. *Id.* These factual allegations are sufficient at this early stage to make plausible Jennie-O's agreement to participate in an exchange of poultry compensation information. Jennie-O's arguments regarding its status as a turkey, not chicken, processor is similarly unavailing, since the SAC alleges that compensation data was shared via Agri Stats for the entire poultry industry—in other words, across both chicken *and* turkeys.[3] *See* ECF 386 ¶ 7. The Court must accept such factual allegations as true at this phase of the litigation, though Jennie-O of course remains free to argue in the future that it never received chicken data via Agri Stats or otherwise.

The SAC sufficiently alleges anticompetitive effects, too, for much the same reason. As Jennie-O itself notes, the Court previously found that Plaintiffs pleaded anticompetitive effects through allegations that Defendants engaged in three types of interrelated conduct:

---

[3] Jennie-O points to the original complaint's failure to include any reference to turkey processing wages at all as reason why the Court should disregard the subsequent amendments' use of "poultry" to encompass both turkey and chicken wages. ECF 410 at 7. Short of actual inconsistency or outright contradiction, however, it is not the Court's role at the motion to dismiss phase to interrogate why Plaintiffs made certain amendments or why certain factual allegations were not made earlier—and there is nothing inherently contradictory about first alleging the sharing of chicken data and then later alleging the sharing of chicken *and* turkey data.

- "secret meetings . . . in which extensive poultry processing wage data was exchanged via WMS, and in which industry compensation was agreed upon;"
- using Agri Stats to "monitor competitors' adherence to this plan," and to "chastise[] processors who deviated from this set compensation level;"
- "in conjunction with the plethora of specific allegations regarding detailed and highly sensitive present and future wage data exchanged among ostensible competitor Defendant Processors."

ECF 378 at 26. As outlined above, Plaintiffs have sufficiently alleged that Jennie-O engaged in this conduct via attendance at the secret compensation meetings and use of Agri Stats. This means that, contrary to Jennie-O's assertions, it is alleged to have had the opportunity to chastise and be "chastised" by other Defendant processors to keep it in line with alleged agreements, as well as to monitor the business metrics of other poultry-processing Defendants. Jennie-O's geography arguments are unavailing, too, because this Court already determined that "Plaintiffs [] allege a geographic market, the continental United States, which is neither vague nor contradictory" *id.* at 22, and held that "the geographic market has been plausibly alleged," *id.* at 23. Plaintiffs have therefore sufficiently pled a "rule of reason" claim against Jennie-O.

### ii. Mountaire

Mountaire focuses its arguments on an alleged failure to allege "that the way in which Mountaire used the information it received through these services plausibly had anticompetitive effects." ECF 400-1 at 12. This argument is predicated on the notion that Plaintiffs have not sufficiently linked Mountaire to the secret compensation meetings. *Id.* at 13. However, as explained above, the SAC *does* sufficiently link Mountaire to the secret compensation meetings in Florida. Therefore, there *is* a factual predicate to support the inference that its use of exchanged

data makes the alleged anticompetitive effects plausible. *See* ECF 378 at 26 (outlining how Plaintiffs adequately alleged anticompetitive effects based in part on the secret compensation meetings at which wage data was exchanged and industry compensation agreed upon). Plaintiffs have therefore sufficiently articulated a "rule of reason" claim against Mountaire.

### iii. Sanderson

Sanderson's core assertion is that the SAC fails to plead that the company agreed to exchange or actually exchanged information with any other Defendant. ECF 401-1 at 15-16. As with Mountaire, this argument is predicated on the conclusion that the SAC failed to allege "***any*** fact that supports that Sanderson Farms actually participated in any 'secret meeting.'" *Id.* at 15. This assertion falls short in light of Plaintiffs' allegation that "a former Pilgrim's employee" indicated that "employees of Sanderson Farms attended the annual meetings of the Compensation Committee in Destin, Florida," ECF 386 ¶ 35, and that it "subscribed to Agri Stats to exchange current, disaggregated, readily decodable and plant-specific compensation data with competing poultry processors on a monthly basis," *id.* The Court already determined that such alleged attendance at secret meetings, combined with alleged use of Agri Stats as a tool to monitor and enforce wage suppression agreements allegedly made at those meetings, is sufficient to state a "rule of reason" claim. *See* ECF 378 at 27. There thus is no "rimless wheel" problem, either, despite Sanderson's contentions to the contrary, because Defendants including Sanderson are alleged to have engaged in wage fixing agreements directly with one another at those secret meetings (as opposed to simply providing their data to Agri Stats or WMS without ever engaging

14

with other processors directly).[4]  Plaintiffs have thus plausibly alleged a "rule of reason" claim against Sanderson.

### d. Claims Against Jennie-O for Pre-2015 Conduct

Because Jennie-O is alleged to have only begun attending the secret compensation meetings in 2015, it asserts that it should not be held liable for the pre-2015 conduct of the other alleged conspirators.  ECF 399-1 at 13-15.  This argument falls short.  Co-conspirators in antitrust cases are "jointly and severally liable for the entire amount of the resulting damages," even if injury did not arise from a single conspirator's own conduct.  *See Burlington Indus. v. Milliken & Co.*, 690 F.2d 380, 391 (4th Cir. 1982); *Dee-K Enterprises, Inc. v. Heveafil Sdn. Bhd.*, 982 F. Supp. 1138, 1155 (E.D. Va. 1997) ("As co-conspirators, [Defendants] are jointly and severally liable for any injury caused by the conspiracy, even if that injury did not result from a sale of their own product.").  This is true even where co-conspirators are not aware of the existence of other conspirators or of other conspirators' actions.  *See, e.g.*, *Att'y Gen. of Maryland v. Dickson*, 717 F. Supp. 1090, 1097 (D. Md. 1989) ("Dickson's statement that he was unaware of all the transactions imputed to the conspiracy is of little moment. As a co-conspirator who knowingly participated in the conspiracy, he is imputed with the acts of his conspirators undertaken in furtherance of the conspiracy."); *Thomas v. United States*, No. 1:13-CR-00135, 2015 WL 6690355, at *4 (E.D. Va. Oct. 28, 2015) (stating that the "law of conspiracy" holds that defendant is liable for co-

---

[4] Sanderson raises several additional concerns that ultimately rehash the specificity and group pleading concerns already addressed in the Court's original dismissal opinion. ECF 17-18. It suggests, for example, that the lack of details regarding date ranges, specific data received, and how Agri Stats data was deanonymized are all fatal to the SAC's "rule of reason" allegations because the remaining allegations "plead only that Sanderson Farms participated in [benchmarking] services . . . ." *Id.* at 18.  The Court rejected that contention previously in the context of other similarly situated Defendants as to Count I, *see* ECF 378 at 13-14, and that rationale holds true for Sanderson on Count II as well.  Notice pleading does not require the level of factual specificity that Sanderson seeks.

conspirators' actions even if "he lacked knowledge of [those] actions"). Against this backdrop, Jennie-O's primary case, *In re Mid-Atl. Toyota Antitrust Litig.*, 525 F. Supp. 1265, 1281 n.16 (D. Md. 1981), stands for little more than the common sense proposition that when a co-conspirator has "knowledge of what has gone on before" then it can, of course, be charged with preceding acts of its co-conspirators. Nowhere, however, does it dictate that such knowledge is a *mandatory* prerequisite.[5] Its permissive construction fails to overcome the aforementioned conspiracy case law, in both civil and criminal contexts, establishing that co-conspirators generally need not be aware of other conspirators' conduct to be held liable for it.

Jennie-O also argues that Plaintiffs' Count II rule of reason claims against it should be limited to conduct occurring within four years prior to the filing of the Amended Consolidated Complaint that first named Jennie-O as a Defendant.[6] However, Jennie-O is a Defendant who is "specifically alleged to have participated in the secret meetings" and therefore it is "appropriately alleged to have . . . fraudulently concealed [those meetings]" for the reasons outlined in this Court's

---

[5] To the extent that Jennie-O relies on persuasive case law from other Circuits, the precedent cuts in both directions. *Compare In re Packaged Seafood Prods. Antitrust Litig.*, 277 F. Supp. 3d 1167, 1186 (S.D. Cal. 2017) (dismissing an antitrust claim because "a defendant must enter the conspiracy 'with knowledge of what has gone before'") *with Myzel v. Fields*, 386 F.2d 718, 739 n.12 (8th Cir. 1967) ("[I]t is well settled even under civil or criminal conspiracy that one who knowingly joins a conspiracy even at a later date takes the conspiracy as he finds it, with or without knowledge of what has gone on before.").

[6] In its Reply, Jennie-O also argues for the first time that, if the Court allows Plaintiffs' claims to proceed against it, the Court should order the development of a "focused and phased discovery plan" to determine whether Jennie-O should remain in the case. ECF 410 at 8-10. Jennie-O's rationale for this suggestion centers on its contention that its treatment in the SAC differs in important respects from the majority of Defendants. *Id.* While the Court does have broad discretion in managing discovery, there does not presently exist a compelling difference between the allegations against Jennie-O and the other Defendants warranting a special discovery process. As outlined extensively in this opinion, Jennie-O is treated much the same as the other Defendants in terms of being alleged to have attended multiple secret compensation meetings and to have received poultry data (encompassing both turkey and chicken wages).

previous opinion. ECF 378 at 28-32. In light of this fraudulent concealment, Plaintiffs may seek recovery for alleged harms incurred throughout the class period irrespective of the four-year limitations period. See *Supermarket of Marlinton v. Meadow Gold Dairies*, 71 F.3d 119, 122 (4th Cir. 1995), citing *Bailey v. Glover*, 88 U.S. 342, 349 (1874) ("[W]hen the fraud has been concealed . . . the limitations period does not begin to run until the plaintiff discovers the fraud.").

## IV.   CONCLUSION

For the reasons set forth above, Defendants' Motions to Dismiss, ECF 398, 399, 400, 401 are DENIED. A separate Order is filed herewith.


Dated: March 10, 2021

/s/
Stephanie A. Gallagher
United States District Judge