**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| JUDY JIEN, *et al.*<br><br>         *Plaintiffs*,<br><br>v.<br><br>PERDUE FARMS, INC., *et al*.<br><br>         *Defendants*. | No. 1:19-CV-2521-SAG<br><br>ANSWERS AND DEFENSES OF WAYNE FARMS LLC TO SECOND AMENDED CONSOLIDATED COMPLAINT |

**TABLE OF CONTENTS**

<u>Page</u>

I.      INTRODUCTION ................................................................................................. 2

II.     JURISDICTION AND VENUE ......................................................................... 5

III.    PARTIES ............................................................................................................. 7

      A.      Plaintiffs ................................................................................................... 7
      B.      Defendants ................................................................................................ 8

            1.      Perdue Defendants ....................................................................... 8
            2.      Tyson Defendants ...................................................................... 10
            3.      Pilgrim's Pride Corporation ...................................................... 12
            4.      Sanderson Farms, Inc. ............................................................... 14
            5.      Koch Foods, Inc. ....................................................................... 15
            6.      Wayne Farms, LLC .................................................................... 16
            7.      Mountaire Farms, Inc. ............................................................... 18
            8.      Peco Foods, Inc. ........................................................................ 19
            9.      Simmons Foods, Inc. ................................................................. 19
            10.     Fieldale Farms Corporation ...................................................... 20
            11.     George's Defendants .................................................................. 21
            12.     Butterball, LLC ......................................................................... 23
            13.     Jennie-O Turkey Store, Inc. ...................................................... 25
            14.     Cargill Meat Solutions Corporation .......................................... 26
            15.     Agri Stats, Inc. .......................................................................... 27
            16.     Webber, Meng, Sahl and Company, Inc. ................................... 28

IV.     AGENTS AND CO-CONSPIRATORS ........................................................... 29

V.      TRADE AND COMMERCE ............................................................................ 44

VI.     FACTUAL ALLEGATIONS ........................................................................... 45

      A.      Background ............................................................................................. 45

            1.      Poultry Industry ........................................................................ 45
            2.      Poultry Processing Plants .......................................................... 46
            3.      Poultry Processing Plant Workers ............................................. 48
            4.      Compensating Poultry Processing Plant Workers ..................... 49
            5.      Centralized Determination of Compensation for Poultry Processing
                 Plant Workers ........................................................................... 51
            6.      Limited Role of Labor Unions .................................................. 53
            7.      Demographics of Hourly-Paid Poultry Processing Plant Workers ........... 53
            8.      Demographics of Salary-Paid Poultry Processing Plant Employees ........ 56

      B.      Conspiracy to Fix Compensation ........................................................... 57

            1.      "Off the Books" In-Person Meetings to Fix Compensation ..................... 58

i

|   |   | 2. | Exchanging Detailed Compensation Data Through Agri Stats | 67 |
|   |   | 3. | Plant-to-Plant Communications About Compensation | 76 |
|   |   | 4. | Plus Factors that Render the Poultry Industry Susceptible to Collusion | 79 |
|   | C. | | Market Power of Defendant Processors | 84 |
|   |   | 1. | Direct Evidence of Market Power | 84 |
|   |   | 2. | Indirect Evidence of Market Power | 86 |
|   |   | | a. Product or Services Market | 86 |
|   |   | | b. Geographic Market | 90 |
|   |   | | c. High Collective Market Share and Monopsony Power | 90 |
|   | D. | | Anticompetitive Effects and Injury Suffered by Class Members | 91 |

| VII. | | | STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS | 94 |
|   | A. | | Continuing Violation | 94 |
|   | B. | | Fraudulent Concealment | 94 |
|   |   | 1. | Plaintiffs Did Not and Could Not Have Discovered Defendants' Misconduct | 94 |
|   |   | 2. | Defendants Actively Concealed the Conspiracy | 95 |

| VIII. | | | CLASS ACTION ALLEGATIONS | 100 |

| IX. | | | CAUSES OF ACTION | 104 |

| PRAYER FOR RELIEF | | | | 111 |

| JURY TRIAL DEMAND | | | | 112 |

Defendant Wayne Farms LLC ("Wayne Farms") hereby answers the Second Amended Consolidated Complaint of Judy Jien, *et al.* filed on November 20, 2020.  Except where otherwise indicated, the answers herein are identified by the paragraph numbers in the Complaint and respond to the corresponding paragraph of the Complaint.  To the extent that any paragraph in the Complaint incorporates by reference or re-alleges allegations contained in another paragraph, Wayne Farms incorporates by reference its answer to that other paragraph. Pursuant to Rule 8(b)(3), Wayne Farms "generally denies" all allegations of the Complaint "except those specifically admitted."  Fed. R. Civ. P. 8(b)(3).  Wayne Farms answers the Complaint as follows:

### Unnumbered Paragraph:

Based on the investigation of counsel, including interviews with industry participants, consultation with economists, and a review of public statements, Plaintiffs Judy Jien, Kieo Jibidi, Elaisa Clement, Glenda Robinson and Emily Earnest (collectively, "Plaintiffs") bring this action on behalf of themselves individually and on behalf of a class (the "Class") consisting of all persons employed by Defendants,[1] their subsidiaries, and related entities at poultry processing plants in the continental United States from January 1, 2009 until the present (the "Class Period").

**Answer to Unnumbered Paragraph:**   In   response   to   Plaintiffs'   opening, unnumbered paragraph, Wayne Farms admits that Plaintiffs have filed a putative class action suit under the antitrust laws of the United States against a number of Defendants, including Wayne Farms, but denies that Wayne Farms is liable, denies Plaintiffs can satisfy the requirements of Federal Rule of Civil Procedure 23, and denies that Plaintiffs are entitled to any relief.

---

[1]   The term "Defendants" herein refers to the following companies:  Perdue Farms, Inc.; Perdue Foods LLC; Tyson Foods, Inc.; Keystone Foods, LLC; Pilgrim's Pride Corporation; Sanderson Farms, Inc.; Koch Foods, Inc.; Wayne Farms, LLC; Mountaire Farms, Inc.; Peco Foods, Inc.; Simmons Foods, Inc.; Fieldale Farms Corporation; George's, Inc.; George's Foods, LLC; Butterball, LLC; Jennie-O Turkey Store, Inc.; Cargill Meat Solutions Corporation; Agri Stats, Inc.; and Webber, Meng, Sahl and Company, Inc.
**Answer to Footnote 1**:  This footnote is definitional, and therefore does not require a response.

## I.     INTRODUCTION

1.      For more than a decade, Defendants have conspired and combined to fix and depress the compensation paid to employees at poultry processing plants in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Answer to Paragraph 1:**     Wayne Farms denies the allegations in this paragraph.

2.      Defendants consist of 14 poultry processors and several of their subsidiaries ("Defendant Processors"), which process and produce approximately 80 percent of the poultry sold to consumers in the United States, and two consulting companies that facilitate the exchange of competitively sensitive compensation data, Agri Stats, Inc. ("Agri Stats") and Webber, Meng, Sahl and Company, Inc. d/b/a WMS and Company, Inc. ("WMS").

**Answer to Paragraph 2:**     This paragraph contains factual allegations to which no response is required.  To the extent a response is required, Wayne Farms admits that the paragraph includes Plaintiffs' purported definition of the term "Defendant Processors."  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

3.      Defendant Processors, their subsidiaries, and related entities own and operate approximately 200 poultry processing plants in the continental United States.  These poultry processing plants have employed hundreds of thousands of Class Members who facilitate the processing of live chickens and turkeys into poultry products sold to retailers and consumers.  Class Members have occupied various positions in poultry processing plants, from hanging live birds to slicing meat from their bones to repairing the machines to supervising processing lines.

**Answer to Paragraph 3:**     Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

4.      Defendant Processors have compensated Class Members with hourly wages or annual salaries and employment benefits.  Each Defendant Processor has established a schedule for hourly wage rates, annual salaries and employment benefits based on the specific position and years of experience of the Class Members.  At each Defendant Processor, those hourly wage rates, annual salaries and employment benefits were established and approved by senior executives at corporate headquarters during the Class Period.

**Answer to Paragraph 4:** Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

5. Since January 1, 2009, Defendants have conspired to fix and depress the compensation paid to Class Members. Defendants have engaged in this unlawful conspiracy to maximize their profits by reducing labor costs, which have comprised a substantial share of each Defendant Processor's total operating costs.

**Answer to Paragraph 5:** Wayne Farms denies the allegations in this paragraph.

6. Defendants formed, implemented, monitored and enforced the conspiracy in three ways. First, senior executives of the Defendant Processors, including human resources executives and directors of compensation, held recurring "off the books" in-person meetings at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, during which they exchanged information about, discussed, agreed upon and ultimately fixed the wages, salaries and benefits of Class Members at artificially depressed levels. These "off the books" meetings between senior executives of the Defendant Processors involved such brazen compensation-fixing that at least one Defendant Processor stopped attending a couple of years ago because of concerns that antitrust enforcers would hold it to account for actions at the meetings.

**Answer to Paragraph 6:** From time to time, Wayne Farms attended meetings in Destin, Florida. Wayne Farms denies the remaining allegations in this paragraph.

7. Second, on a highly frequent basis, Defendant Processors exchanged detailed, current and non-public compensation information through surveys conducted by Agri Stats and WMS. Each Defendant Processor subscribed to and partnered with Agri Stats to exchange and receive—on a monthly basis—effective wage rates regarding categories of poultry processing plant workers from each Defendant Processor's plants. Similarly, WMS conducted a detailed annual survey of the hourly wages, annual salaries and employment benefits paid by each Defendant Processor to each category of poultry processing plant worker and circulated the survey results to senior executives of the Defendant Processors during in-person meetings. While both Agri Stats and WMS have claimed that the exchanged compensation data was anonymous, the data was sufficiently granular and disaggregated that executives of Defendant Processors could and did easily match much of the distributed compensation data to poultry processing plants operated by specific Defendant Processors. Defendant Processers used the data obtained from Agri Stats and WMS to fix and depress the compensation paid to Class Members and ensure and confirm that no conspirator deviated from the conspiracy.

**Answer to Paragraph 7:** Wayne Farms admits that it has transferred to and received data from Agri Stats on a confidential basis. Wayne Farms lacks sufficient knowledge or

information to form a belief about the truth of the remaining allegations in this paragraph and

therefore denies them.

8.      Third, managers located at Defendant Processors' poultry processing plants
engaged in bilateral and regional exchanges of wage, salary and benefits information.  Those
managers frequently reached out directly to their counterparts at competitors' poultry processing
plants to request and exchange compensation data, including data regarding plans for *future* wages,
salaries and benefits.  Those plant-to-plant exchanges of compensation information were
conducted through various mediums, including telephone calls and electronic surveys.  The
compensation data obtained from these plant-to-plant information exchanges was provided to
executives of the Defendant Processors at corporate headquarters, who used the data to facilitate
the fixing of compensation.

**Answer to Paragraph 8:**      To the extent the allegations relate to Wayne Farms, Wayne

Farms admits that it has gathered competitive market information regarding wage rates from local

processors.  Wayne Farms lacks knowledge or information sufficient to form a belief about the

truth of the remaining allegations in this paragraph and therefore denies them.

9.      Numerous characteristics of the poultry processing industry have facilitated the
formation and implementation of the conspiracy, including but not limited to, the following:
(a) vertical integration; (b) high barriers to entry; (c) industry concentration; (d) fungibility of
poultry processing plant workers; (e) inelastic labor supply; (f) a history of government
investigations into collusive actions; (g) personal relationships between executives at competing
poultry processors; and (h) numerous opportunities to collude.

**Answer to Paragraph 9:**      This paragraph contains Plaintiffs' legal conclusions and

allegations subject to proof by expert testimony, to which no response is required.  To the extent a

response is required, Wayne Farms denies the allegations in this paragraph to the extent they relate

to Wayne Farms.  Wayne Farms lacks sufficient knowledge or information to form a belief about

the truth of the remaining allegations in this paragraph and therefore denies them.

10.      The intended and actual effect of Defendants' conspiracy to fix compensation has
been to reduce and suppress the wages, salaries and benefits paid to Class Members since
January 2009 to levels materially lower than they would have been in a competitive market.
During the Class Period, even while worker productivity and processing line speeds increased
significantly, increases in compensation provided to Class Members were highly restrained and

limited. Economic analysis conducted by expert economists retained by Plaintiffs shows that compensation of plant workers employed by non-poultry food manufacturers was higher, and increased at a materially more rapid rate, than compensation paid by Defendant Processors to Class Members during the Class Period.

      **Answer to Paragraph 10:**    Wayne Farms denies the allegations in this paragraph.

11.    The agreement entered by Defendants to fix and depress compensation to employees of poultry processing plants has unreasonably restrained trade in violation of the Sherman Act, 15 U.S.C. § 1. Plaintiffs, on their own behalf and on behalf of the Class, bring this antitrust action to enjoin Defendants from continuing their unlawful agreement and to recover actual, compensatory and treble damages, as well as costs, attorneys' fees and interest. Plaintiffs demand a trial by jury.

      **Answer to Paragraph 11:**    Wayne Farms denies the allegations in this paragraph.

## II.    JURISDICTION AND VENUE

12.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

      **Answer to Paragraph 12:**    This paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Wayne Farms denies the allegations in this paragraph.

13.    This Court has personal jurisdiction over each of the Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and the long-arm statute of the forum state. Defendants Perdue Farms, Inc. and Perdue Foods LLC reside in this District and used their headquarters in Salisbury, Maryland to implement and coordinate the restraints of trade described below. In addition, Defendants: (1) transacted substantial business in the United States, including in this District; (2) transacted with, and caused injury to, Class Members located throughout the United States, including in this District; and (3) committed substantial acts in furtherance of the unlawful scheme in the United States, including in this District. For example:

- Each of the Defendants regularly sold poultry products in the state of Maryland during the Class Period and continues to sell poultry products in the state of Maryland;

- Defendants Perdue Farms, Inc. and Perdue Foods LLC are headquartered and incorporated in the state of Maryland;

- Defendants Perdue Farms, Inc. and Perdue Foods LLC operated poultry processing plants in the state of Maryland during the Class Period and provided compensation to Class Members in those plants at suppressed rates as a result of the conspiracy between all the Defendants alleged herein;

- Defendants Perdue Farms, Inc.; Perdue Foods LLC; Mountaire Farms, Inc.; and Tyson Foods, Inc. had employees located in the state of Maryland and/or contracted with poultry growers in the state of Maryland during the Class Period;

- Defendants Agri Stats and WMS regularly provided services to Defendant Processors in the state of Maryland during the Class Period, including to Perdue Farms, Inc. and Perdue Foods LLC;

- A leading trade associations representing the poultry processing industry—the National Chicken Council—held at least eight meetings in the state of Maryland during the Class Period that were attended by many of the Defendants, such as the three-day "Chicken Media Summit" that was held in Cambridge, Maryland in April 2015;

- Another leading trade association representing the poultry processing industry-the Delmarva Poultry Industry, Inc.—held at least 11 meetings in the state of Maryland during the Class Period that were attended by many of the Defendants.

**Answer to Paragraph 13:**   Wayne Farms admits that it has transacted business in Maryland and in this district at certain points in time, and that the Court has personal jurisdiction over it.  To the extent a further response is required, Wayne Farms denies the remaining allegations in this paragraph.

14.    Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. §1391(b), (c), and (d) because one or more of the Defendants transacted business, was found, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

**Answer to Paragraph 14:**     Wayne Farms admits that venue is proper in this district for this matter only but otherwise denies the remaining allegations in this paragraph.

## III.   PARTIES

### A.   Plaintiffs

15.     Judy Jien was employed as a deboner at a poultry processing plant operated by George's Processing, Inc. in Springdale, Arkansas and at a poultry processing plant operated by Tyson Foods, Inc. in Springdale, Arkansas during the Class Period.  She is a resident of the state of Arkansas.

**Answer to Paragraph 15:**     Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

16.     Kieo Jibidi was employed as a deboner at a poultry processing plant operated by Simmons Prepared Foods, Inc. in Decatur, Arkansas and at a poultry processing plant operated by Tyson Foods, Inc. in Springdale, Arkansas during the Class Period.  She is a resident of the state of Arkansas.

**Answer to Paragraph 16:**     Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

17.     Elaisa Clement was employed as a deboner at a poultry processing plant operated by George's Processing, Inc. in Springdale, Arkansas during the Class Period.  He is a resident of the state of Arkansas.

**Answer to Paragraph 17:**     Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

18.     Glenda Robinson was employed in the day pack department at a poultry processing plant operated by Tyson Foods, Inc. in Forest, Mississippi during the Class Period.  She is a resident of the state of Mississippi.

**Answer to Paragraph 18:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

19.     Emily Earnest was employed as a deboner at a poultry processing plant operated by Pilgrim's Pride Corporation in Russellville, Alabama during the Class Period.  She is a resident of the state of Alabama.

**Answer to Paragraph 19:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### B.      Defendants

#### 1.      Perdue Defendants

20.     Perdue Farms, Inc. ("Perdue Farms") is a privately held Maryland corporation headquartered in Salisbury, Maryland.  During the Class Period, Perdue Farms and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 20:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

21.     During the Class Period, Perdue Farms directly participated in the conspiracy to fix and depress compensation to poultry processing plant workers by, among other things, doing the following:

- Employees of Perdue Farms attended annual "off the books" in-person meetings of a secret Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon and ultimately fix the wages, salaries and benefits of Class Members at artificially depressed levels.  For example, employees of Perdue Farms attended the "off-the-books" meeting of the Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida in April 2017.  According to former employees of Defendants, employees of Perdue Farms regularly attended such meetings.

- In advance of, and for discussion at, the "off-the-books" meetings of the Compensation Committee, employees of Perdue Farms submitted highly detailed and current compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other attendees of the meetings.  For example, employees of Perdue Farms completed and submitted a WMS survey immediately before, and for distribution at, the April 2017 meeting

of the Compensation Committee in Destin, Florida.  A former employee of Perdue Farms noted that attendees at the "off-the-books" meetings could determine which company reported which compensation data in the WMS survey because "you're sitting in a meeting and the person across from you [from a competing processor] is reporting on what they do."

- Perdue Farms subscribed to Agri Stats to exchange current, disaggregated, readily decodable and plant-specific compensation data with competing poultry processors on a monthly basis.  A former employee of Perdue Farms said that the company spent "enormous effort analyzing Agri Stats" and that its CEO was an "Agri Stats guru and nut" who had an "absolute understanding" of the reported Agri Stats data. According to a former employee of Perdue Farms, the company even brought in Agri Stats personnel to teach management "how to extract information" from Agri Stats data.

- Employees of Perdue Farms analyzed current and future compensation data that was obtained directly from competing poultry processing plants by managers of Perdue plants.

- As a consequence of the conspiracy, Perdue Farms established compensation schedules for Class Members employed at Perdue plants throughout the country at artificially depressed, wage fixed rates.

**Answer to Paragraph 21:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.


22.    Perdue Foods LLC ("Perdue Foods") is a privately held Maryland limited liability company headquartered in Salisbury, Maryland.  Perdue Foods is a subsidiary of Perdue Farms. Perdue Foods owns poultry processing plants in multiple states, including California, Delaware, Georgia, Indiana, Maryland, Michigan, North Carolina, South Carolina, Tennessee, Virginia, and Washington.  During the Class Period, Perdue Foods employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 22:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.


23.    During the Class Period, Perdue Foods directly participated in the conspiracy to fix and depress compensation to poultry processing plant workers by, among other things, doing the following:

- Employees of Perdue Foods routinely exchanged current and future wage rates with human resources managers at competing poultry processing plants.

- For example, on an annual basis, a former employee of Perdue Foods contacted managers of rival poultry processing plants operated by Pilgrim's Pride Corporation, Cargill Meat Solutions Corporation, and Virginia Poultry Growers Cooperative, Inc. and requested their *current* hourly wage rates for plant workers as well as any planned *future* increases to those hourly wage rates. The former human resources manager said, "We would collaborate. We would talk among each other to see what they were doing for pay." The former human resources manager provided the compensation data obtained from those rival poultry processing plants to employees of Perdue Farms at corporate headquarters.

- Similarly, employees of Perdue Foods at a poultry processing plant in Cromwell, Kentucky regularly exchanged current compensation data with managers of a rival poultry processing plant owned by Pilgrim's Pride Corporation in Mayfield, Kentucky.

- Employees of Perdue Foods also reviewed disaggregated Agri Stats wage data at monthly or quarterly meetings that were held at the company's poultry processing plants.

**Answer to Paragraph 23:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

24.   Defendants Perdue Farms and Perdue Foods are collectively referred to as "Perdue."

**Answer to Paragraph 24:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

## 2.   Tyson Defendants

25.   Tyson Foods, Inc. ("Tyson Foods") is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. During the Class Period, Tyson Foods, Inc. and its predecessors, wholly owned or controlled subsidiaries, and/or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 25:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

26.   During the Class Period, Tyson Foods directly participated in the conspiracy to fix and depress compensation to poultry processing plant workers by, among other things, doing the following:

- Employees of Tyson Foods attended annual "off the books" in-person meetings of a secret Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon and ultimately fix the wages, salaries and benefits of Class Members at artificially depressed levels. For example, employees of Tyson Foods attended the "off-the-books" meeting of the Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida in April 2017. According to former employees of Defendants, employees of Tyson Foods regularly attended such meetings.

- In advance of, and for discussion at, the "off-the-books" meetings of the Compensation Committee, employees of Tyson Foods submitted highly detailed and current compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other attendees of the meetings. For example, employees of Tyson Foods completed and submitted a WMS survey immediately before, and for distribution at, the April 2017 meeting of the Compensation Committee in Destin, Florida.

- During several years of the Class Period, Tyson Foods fully paid WMS to conduct the detailed compensation survey of competing poultry processors and to host the "off the books" meetings of the Compensation Committee.

- Tyson Foods subscribed to Agri Stats to exchange current, disaggregated, readily decodable and plant-specific compensation data with competing poultry processors on a monthly basis.

- Employees of Tyson Foods routinely exchanged current and future wage rates with human resources managers at competing poultry processing plants. For example, in the fall of 2017, employees of a plant owned by Tyson Foods in Union City, Tennessee exchanged future wage rates with managers of a poultry plant owned by Pilgrim's Pride Corporation in Mayfield, Kentucky.

- As a consequence of the conspiracy, Tyson Foods established compensation schedules for, and made payments directly to, Class Members employed at Tyson plants around the country at artificially depressed, wage fixed rates.

**Answer to Paragraph 26:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

27.    Keystone Foods, LLC ("Keystone") is a Delaware corporation located in West Chester, Pennsylvania, and is a wholly owned subsidiary of Tyson Foods. During the Class Period, Keystone employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 27:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

28.   During the Class Period, Keystone directly participated in the conspiracy to fix and depress compensation to poultry processing plant workers by, among other things, doing the following:

- Employees of Keystone attended annual "off the books" in-person meetings of a secret Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon and ultimately fix the wages, salaries and benefits of Class Members at artificially depressed levels.   For example, employees of Keystone attended the "off-the-books" meetings of the Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida that were held in April 2015 and April 2017.

- In advance of, and for discussion at, the "off-the-books" meetings of the Compensation Committee, employees of Keystone submitted highly detailed and current compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other attendees of the meetings.   For example, employees of Keystone completed and submitted WMS surveys immediately before, and for distribution at, both the April 2015 and April 2017 meetings of the Compensation Committee in Destin, Florida.

- As a consequence of the conspiracy, Keystone made payments directly to Class Members at artificially depressed, wage fixed rates.

**Answer to Paragraph 28:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

29.   Defendants Tyson Foods and Keystone are collectively referred to as "Tyson."

**Answer to Paragraph 29:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### 3.   Pilgrim's Pride Corporation

30.   Pilgrim's Pride Corporation ("Pilgrim's") is a Delaware corporation headquartered in Greeley, Colorado.  JBS USA Holdings, Inc. holds a 75.3% controlling interest in Pilgrim's. JBS USA Holdings and Pilgrim's are subsidiaries of JBS SA, a Brazilian corporation headquartered in Sao Paulo, Brazil.  During the Class Period, Pilgrim's and its predecessors,

wholly owned or controlled subsidiaries, and/or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 30:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

31.   During the Class Period, Pilgrim's directly participated in the conspiracy to fix and depress compensation to poultry processing plant workers by, among other things, doing the following:

- Employees of Pilgrim's attended annual "off the books" in-person meetings of a secret Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon and ultimately fix the wages, salaries and benefits of Class Members at artificially depressed levels. For example, employees of Pilgrim's attended the "off-the-books" meeting of the Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida in April 2017. According to former employees of Defendants, employees of Pilgrim's regularly attended such meetings.

- In advance of, and for discussion at, the "off-the-books" meetings of the Compensation Committee, employees of Pilgrim's submitted highly detailed and current compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other attendees of the meetings. For example, employees of Pilgrim's completed and submitted a WMS survey immediately before, and for distribution at, the April 2017 meeting of the Compensation Committee in Destin, Florida.

- During several years of the Class Period, Pilgrim's fully paid WMS to conduct the detailed compensation survey of competing poultry processors and to hold "off the books" meetings of the Compensation Committee.

- Pilgrim's subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- Employees of Pilgrim's reviewed disaggregated Agri Stats wage data during recurrent meetings at the company's poultry processing plants. During such meetings, those employees would reverse engineer the Agri Stats data to match which company's plant was associated with which reported compensation data.

- Executives of Pilgrim's requested that managers of Pilgrim's plants obtain information about current and future compensation directly from managers of competing poultry processing plants.

13

- Employees of Pilgrim's routinely exchanged current and future wage rates with managers of competing poultry processing plants. For example, in the fall of 2017, managers of the poultry processing plant owned by Pilgrim's in Mayfield, Kentucky requested and obtained future wage rates from a poultry processing plant owned by Tyson Foods in Union City, Tennessee and current wage rates from a poultry processing plant owned by Perdue Foods in Cromwell, Kentucky.

- As a consequence of the conspiracy, Pilgrim's established compensation schedules for, and made payments directly to, Class Members employed at Pilgrim's plants around the country at artificially depressed, wage fixed rates.

**Answer to Paragraph 31:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

32.     Around December 1, 2008, Pilgrim's filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Northern District of Texas. Effective December 28, 2009, Pilgrim's was discharged from bankruptcy under a plan of reorganization that paid all creditors in full. Pilgrim's participated in the conspiracy alleged herein throughout the Class Period, including before and after its discharge from bankruptcy.

**Answer to Paragraph 32:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

33.     Regardless of whether Pilgrim's participated in the conspiracy throughout the Class Period, this Complaint seeks to recover damages from Pilgrim's only for the post-discharge conduct of Pilgrim's, and in no way seeks to violate any orders of the above referenced Bankruptcy Court. However, by operation of law, the damages arising from the post-discharge conduct of Pilgrim's include damages incurred by Plaintiffs and other Class Members throughout the Class Period. This Complaint also seeks to recover damages from the other Defendants for the pre-discharge conspiratorial conduct of Pilgrim's.

**Answer to Paragraph 33:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### 4.     Sanderson Farms, Inc.

34.     Sanderson Farms, Inc. ("Sanderson Farms") is a publicly held Mississippi corporation headquartered in Laurel, Mississippi. During the Class Period, Sanderson Farms and its predecessors, wholly owned or controlled subsidiaries, and/or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 34:**     Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

35.     During the Class Period, Sanderson Farms directly participated in the conspiracy to fix and depress compensation to poultry processing plant workers by, among other things, doing the following:

- Employees of Sanderson Farms attended annual "off the books" in-person meetings of a secret Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon and ultimately fix the wages, salaries and benefits of Class Members at artificially depressed levels.  According to a former Pilgrim's employee, employees of Sanderson Farms attended the annual meetings of the Compensation Committee in Destin, Florida.

- In advance of, and for discussion at, the "off-the-books" meetings of the Compensation Committee, employees of Sanderson Farms submitted highly detailed and current compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other attendees of the meetings.

- Sanderson Farms subscribed to Agri Stats to exchange current, disaggregated, readily decodable and plant-specific compensation data with competing poultry processors on a monthly basis.  Joe Sanderson, then-CEO and Chairman of Sanderson Farms, stated that "we live and die by Agri Stats."

- As a consequence of the conspiracy, Sanderson Farms established compensation schedules for, and made payments directly to, Class Members employed at Sanderson plants around the country at artificially depressed, wage fixed rates.

**Answer to Paragraph 35:**     Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### 5.     Koch Foods, Inc.

36.     Koch Foods, Inc. ("Koch Foods") is a privately held Delaware corporation with its corporate headquarters in Park Ridge, Illinois.  During the Class Period, Koch Foods and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 36:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

37.   During the Class Period, Koch Foods directly participated in the conspiracy to fix and depress compensation to poultry processing plant workers by, among other things, doing the following:

- Employees of Koch Foods attended annual "off the books" in-person meetings of a secret Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon and ultimately fix the wages, salaries and benefits of Class Members at artificially depressed levels.   For example, employees of Koch Foods attended the "off-the-books" meeting of the Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida in April 2017.

- In advance of, and for discussion at, the "off-the-books" meetings of the Compensation Committee, employees of Koch Foods submitted highly detailed and current compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other attendees of the meetings.   For example, employees of Koch Foods completed and submitted a WMS survey immediately before, and for distribution at, the April 2017 meeting of the Compensation Committee in Destin, Florida.

- Koch Foods subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- As a consequence of the conspiracy, Koch Foods established compensation schedules for Class Members employed at Koch plants around the country at artificially depressed, wage fixed rates.

**Answer to Paragraph 37:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### 6.   Wayne Farms, LLC

38.   Wayne Farms, LLC ("Wayne Farms") is a Delaware corporation headquartered in Oakwood, Georgia.   It is a subsidiary of Continental Grain Company, which is a privately held company in Arlon, Belgium.   Wayne Farms operates poultry processing plants in multiple states, including Georgia, Arkansas, Alabama, Mississippi and North Carolina.   During the Class Period, Wayne Farms and its predecessors, wholly owned or controlled subsidiaries, and/or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 38:**    Wayne Farms admits that it is a Delaware corporation headquartered in Oakwood, Georgia.  Wayne Farms further admits that, at times during the alleged Class Period, Continental Grain Company, Inc. held membership interests in Wayne Farms LLC. Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

39.    During the Class Period, Wayne Farms directly participated in the conspiracy to fix and depress compensation to poultry processing plant workers by, among other things, doing the following:

- Employees of Wayne Farms attended annual "off the books" in-person meetings of a secret Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon and ultimately fix the wages, salaries and benefits of Class Members at artificially depressed levels.  For example, employees of Wayne Farms attended the "off-the-books" meeting of the Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida in April 2017.

- In advance of, and for discussion at, the "off-the-books" meetings of the Compensation Committee, employees of Wayne Farms submitted highly detailed and current compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other attendees of the meetings.  For example, employees of Wayne Farms completed and submitted a WMS survey immediately before, and for distribution at, the April 2017 meeting of the Compensation Committee in Destin, Florida.

- Wayne Farms subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- Wayne Farms distributed compensation surveys directly to multiple competing poultry processors in the Southeast region.  Those surveys requested information regarding the compensation paid to poultry processing plant workers.  Multiple rival poultry processors returned the completed surveys to Wayne Farms.

- As a consequence of the conspiracy, Wayne Farms established compensation schedules for, and made payments directly to, Class Members employed at Wayne Farms plants at artificially depressed, wage fixed rates.

17

**Answer to Paragraph 39:**     Wayne Farms admits that, from time to time, a Wayne Farms employee gathered competitive market information regarding wage rates from local processors. Wayne Farms further admits that, from time to time, it attended meetings to discuss salaries and benefits of employees.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

### 7.     Mountaire Farms, Inc.

40.     Mountaire Farms, Inc. ("Mountaire Farms") is a privately held Delaware corporation with its headquarters in Millsboro, Delaware.  During the Class Period, Mountaire Farms and its predecessors, wholly owned or controlled subsidiaries, and/or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 40:**     Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

41.     During the Class Period, Mountaire Farms directly participated in the conspiracy to fix and depress compensation to poultry processing plant workers by, among other things, doing the following:

- Employees of Mountaire Farms attended annual "off the books" in-person meetings of a secret Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon and ultimately fix the wages, salaries and benefits of Class Members at artificially depressed levels.  A former employee of a coconspirator indicated that employees of Mountaire Farms attended such meetings.

- In advance of, and for discussion at, the "off-the-books" meetings of the Compensation Committee, employees of Mountaire Farms submitted highly detailed and current compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other attendees of the meetings.

- Mountaire Farms subscribed to Agri Stats to exchange current, disaggregated, readily decodable and plant-specific compensation data with competing poultry processors on a monthly basis.

- As a consequence of the conspiracy, Mountaire Farms established compensation schedules for, and made payments directly to, Class Members employed at Mountaire plants around the country at artificially depressed, wage fixed rates.

**Answer to Paragraph 41:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### 8.    Peco Foods, Inc.

42.    Peco Foods, Inc. ("Peco Foods") is a privately held Alabama corporation headquartered in Tuscaloosa, Alabama.  Peco Foods owns and operates poultry processing plants in several states, including Mississippi, Arkansas, and Alabama.  During the Class Period, Peco Foods employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 42:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

43.    During the Class Period, Peco Foods directly participated in the conspiracy to fix and depress compensation to poultry processing plant workers by, among other things, doing the following:

- Peco Foods subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- Employees of Peco Foods routinely exchanged current and future wage rates with human resources managers at competing poultry processing plants.  A former employee of Peco Foods explained that human resources staff at the company would often contact their counterparts at competitor poultry processing plants and exchange information about starting pay rates, pay increases, and employment benefits.  He explained that this "type of thing happened all the time."

- As a consequence of the conspiracy, Peco Foods established compensation schedules for, and made payments directly to, Class Members employed at Peco Foods plants around the country at artificially depressed, wage-fixed rates.

**Answer to Paragraph 43:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### 9.    Simmons Foods, Inc.

44.    Simmons Foods, Inc. ("Simmons Foods") is a privately held Arkansas corporation headquartered in Siloam Springs, Arkansas.  During the Class Period, Simmons Foods and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 44:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

45.   During the Class Period, Simmons Foods directly participated in the conspiracy to fix and depress compensation to poultry processing plant workers by, among other things, doing the following:

- Employees of Simmons Foods regularly attended annual "off the books" in-person meetings of a secret Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon and ultimately fix the wages, salaries and benefits of Class Members at artificially depressed levels. For example, representatives from Simmons Foods attended the "off-the-books" meeting of the Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida in April 2017.

- In advance of, and for discussion at, the "off-the-books" meetings of the Compensation Committee, employees of Simmons Foods submitted highly detailed and current compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other attendees of the meetings.   For example, employees of Simmons Foods completed and submitted a WMS survey immediately before, and for distribution at, the April 2017 meeting of the Compensation Committee in Destin, Florida.

- During the Class Period, Simmons Foods subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- As a consequence of the conspiracy, Simmons Foods established compensation schedules for Class Members employed at Simmons Foods plants around the country at artificially depressed, wage fixed rates.

**Answer to Paragraph 45:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### 10.     Fieldale Farms Corporation

46.   Fieldale Farms Corporation ("Fieldale Farms") is a privately held Georgia corporation headquartered in Baldwin, Georgia.   During the Class Period, Fieldale Farms and its predecessors, wholly owned or controlled subsidiaries, and/or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 46:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

47.     During the Class Period, Fieldale Farms directly participated in the conspiracy to fix and depress compensation to poultry processing plant workers by, among other things, doing the following:

- Employees of Fieldale Farms attended annual "off the books" in-person meetings of a secret Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon and ultimately fix the wages, salaries and benefits of Class Members at artificially depressed levels. For example, employees of Fieldale Farms attended the "off-the-books" meetings of the Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida in April 2015 and April 2017.

- Jon Allen, Corporate Human Resources Director of Fieldale Farms, co-chaired the secret Compensation Committee in 2015.

- In advance of, and for discussion at, the "off-the-books" meetings of the Compensation Committee, employees of Fieldale Farms submitted highly detailed and current compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other attendees of the meetings. For example, employees of Fieldale Farms completed and submitted WMS surveys immediately before, and for distribution at, both the April 2015 and April 2017 meetings of the Compensation Committee in Destin, Florida.

- Fieldale Farms subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- As a consequence of the conspiracy, Fieldale Farms established compensation schedules for, and made payments directly to, Class Members employed at Fieldale Farms plants around the country at artificially depressed, wage-fixed rates.

**Answer to Paragraph 47:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### 11.    George's Defendants

48.     George's, Inc. is a privately held Arkansas corporation headquartered in Springdale, Arkansas.  During the Class Period, George's, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 48:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

49.    During the Class Period, George's, Inc. directly participated in the conspiracy to fix and depress compensation to poultry processing plant workers by, among other things, doing the following:

- Employees of George's, Inc. attended annual "off the books" in-person meetings of a secret Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon and ultimately fix the wages, salaries and benefits of Class Members at artificially depressed levels.  For example, employees of George's, Inc. attended the "off-the-books" meeting of the Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida in April 2017.

- In advance of, and for discussion at, the "off-the-books" meetings of the Compensation Committee, employees of George's, Inc. submitted highly detailed and current compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other attendees of the meetings.  For example, employees of George's, Inc. completed and submitted a WMS survey immediately before, and for distribution at, the April 2017 meeting of the Compensation Committee in Destin, Florida.

- George's, Inc. subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- According to a former employee of George's, Inc., Agri Stats data was reviewed during quarterly meetings at the company's poultry processing plants to assess performance.

- As a consequence of the conspiracy, George's, Inc. established compensation schedules for Class Members employed at George's plants around the country at artificially depressed, wage fixed rates.

**Answer to Paragraph 49:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

50.    George's Foods, LLC is a Virginia corporation headquartered in Edinburg, Virginia, and is a wholly owned subsidiary of George's, Inc. George's Foods, LLC operates a poultry processing plant in Harrisonburg, Virginia.  During the Class Period, George's Foods, LLC employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 50:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

51.    During the Class Period, George's Foods, LLC directly participated in the conspiracy to fix and depress compensation to poultry processing plant workers by, among other things, doing the following:

- Employees of George's Foods, LLC routinely exchanged current and future wage rates with human resources managers at competing poultry processing plants.

- For example, on an annual basis, a former employee of George's Foods, LLC contacted managers of rival poultry processing plants operated by Pilgrim's, Cargill Meat Solutions Corporation, and Virginia Poultry Growers Cooperative, Inc. and requested the *current* hourly wage rates for plant workers as well as any planned *future* increases to those hourly wage rates.  The former human resources manager said, "We would collaborate.  We would talk among each other to see what they were doing for pay."   The former human resources manager provided the compensation data obtained from rival poultry plants to employees of George's, Inc. at corporate headquarters.

- As a consequence of the conspiracy, George's Foods, LLC made payments to Class Members at artificially depressed, wage fixed rates.

**Answer to Paragraph 51:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

52.    Defendants George's, Inc. and George's Foods, LLC are collectively referred to as "George's."

**Answer to Paragraph 52:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### 12.    Butterball, LLC

53.    Butterball, LLC ("Butterball") is a North Carolina company with its corporate headquarters in Garner, North Carolina.  During the Class Period, Butterball and its predecessors, wholly owned or controlled subsidiaries, and/or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 53:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

54.    During the Class Period, Butterball directly participated in the conspiracy to fix and depress compensation to poultry processing plant workers by, among other things, doing the following:

- Employees of Butterball attended annual "off the books" in-person meetings of a secret Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon and ultimately fix the wages, salaries and benefits of Class Members at artificially depressed levels. For example, employees of Butterball attended the "off-the-books" meetings of the Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida that were held in April 2015 and April 2017.

- In advance of, and for discussion at, the "off-the-books" meetings of the Compensation Committee, employees of Butterball submitted highly detailed and current compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other attendees of the meetings. For example, employees of Butterball completed and submitted WMS surveys immediately before, and for distribution at, both the April 2015 and April 2017 meetings of the Compensation Committee in Destin, Florida.

- Butterball subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- Employees of Butterball identified which competing poultry processors reported which compensation data to Agri Stats in part by speaking with, and requesting that information from, Agri Stats representatives.

- According to a former Butterball employee, Butterball and other poultry processors used Agri Stats to monitor each other's performance.

- Employees of Butterball routinely exchanged current and future wage rates with human resources managers employed at competing poultry processing plants. For example, Butterball's poultry processing plant in Mount Olive, North Carolina regularly exchanged hourly wages for specific positions with nearby rival poultry processing plants in order to compare compensation schedules.

- As a consequence of the conspiracy, Butterball established compensation schedules for, and made payments directly to, Class Members employed at Butterball plants around the country at artificially depressed, wage-fixed rates.

**Answer to Paragraph 54:**     Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### 13.     Jennie-O Turkey Store, Inc.

55.     Jennie-O Turkey Store, Inc. ("Jennie-O Turkey Store") is a Minnesota corporation with its corporate headquarters in Austin, Minnesota.  During the Class Period, Jennie-O Turkey Store and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 55:**     Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

56.     During the Class Period, Jennie-O Turkey Store directly participated in the conspiracy to fix and depress compensation to poultry processing plant workers by, among other things, doing the following:

- Employees of Jennie-O Turkey Store attended annual "off the books" in-person meetings of a secret Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon and ultimately fix the wages, salaries and benefits of Class Members at artificially depressed levels.  For example, employees of Jennie-O Turkey Store attended the "off-the-books" meeting of the Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida in April 2015.

- In advance of, and for discussion at, the "off-the-books" meetings of the Compensation Committee, employees of Jennie-O Turkey Store submitted highly detailed and current compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other attendees of the meetings.  For example, employees of Jennie-O Turkey Store completed and submitted a WMS survey immediately before, and for distribution at, the April 2015 meeting of the Compensation Committee in Destin, Florida.

- Jennie-O Turkey Store subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- As a consequence of the conspiracy, Jennie-O Turkey Store established compensation schedules for Class Members employed at Jennie-O Turkey Store plants around the country at artificially depressed, wage-fixed rates.

**Answer to Paragraph 56:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### 14.    Cargill Meat Solutions Corporation

57.    Cargill Meat Solutions Corporation ("Cargill") is a Delaware company with its headquarters in Wichita, Kansas.  During the Class Period, Cargill and its predecessors, wholly owned or controlled subsidiaries, and/or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 57:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

58.    During the Class Period, Cargill directly participated in the conspiracy to fix and depress compensation to poultry processing plant workers by, among other things, doing the following:

- Employees of Cargill attended annual "off the books" in-person meetings of a secret Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon and ultimately fix the wages, salaries and benefits of Class Members at artificially depressed levels.  For example, employees of Cargill attended the "off-the-books" meeting of the Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida in April 2017.

- In advance of, and for discussion at, the "off-the-books" meetings of the Compensation Committee, employees of Cargill submitted highly detailed and current compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other attendees of the meetings.  For example, employees of Cargill completed and submitted a WMS survey immediately before, and for distribution at, the April 2017 meeting of the Compensation Committee in Destin, Florida.

- Cargill subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- Employees of Cargill exchanged current and future wages with human resources managers at competing poultry processing plants.  For example, on an annual basis, employees of Cargill exchanged *current* hourly wage rates for poultry processing plant workers as well as any planned *future* increases to those hourly wage rates with managers of rival poultry processing plants operated by Perdue Foods and George's Foods, LLC.

- As a consequence of the conspiracy, Cargill established compensation schedules for, and made payments directly to, Class Members employed at Cargill's plants around the country at artificially depressed, wage-fixed rates.

**Answer to Paragraph 58:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### 15.   Agri Stats, Inc.

59.   Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana. Throughout the Class Period, Agri Stats facilitated the exchange of confidential, proprietary, and competitively sensitive compensation data among Defendant Processors and their co-conspirators.

**Answer to Paragraph 59:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

60.   During the Class Period, Agri Stats directly participated in the conspiracy to fix and depress compensation to poultry processing plant workers by, among other things, doing the following:

- At the request of the Defendant Processors, Agri Stats uploaded each Defendant Processor's salary and wage data for each of their, and their subsidiaries', respective poultry processing plants and then exchanged that proprietary compensation data between each of the Defendant Processors on a monthly basis.

- The compensation data exchanged by Agri Stats between the Defendant Processors each month was non-public, disaggregated, plant-specific, current, and readily decodable.  Indeed, a former employee of Perdue Farms said that Agri Stats compensation data was "supposedly confidential" but Perdue Farms and every other poultry processor participating in Agri Stats knew precisely which company reported which data.

- If a Defendant Processor desired assistance to decode exchanged compensation data, Agri Stats would and did assist those Defendant Processors in identifying the source of that exchanged data.  A former employee of Butterball explained that "you could figure out" which company reported which compensation data to Agri Stats by speaking with Agri Stats representatives who provided the data. Perdue Farms, for example, brought in Agri Stats personnel to teach its management "how to extract information" from Agri Stats data.

- During the Class Period, Agri Stats met with each Defendant Processor's executives on a quarterly basis and, during those meetings, discussed the nonpublic data that Agri Stats had collected from poultry processors each month.

- Defendant Processors knew that they could rely on Agri Stats data to set compensation and monitor the conspiracy because Agri Stats carefully audited the raw compensation data that it collected from each Defendant Processor. Indeed, a former Butterball employee said there was "no question about it" that Agri Stats was used by poultry processors to monitor each other's performance.

**Answer to Paragraph 60:**   Wayne Farms lacks knowledge or information sufficient to

form a belief about the truth of the allegations in this paragraph and therefore denies them.

### 16.   Webber, Meng, Sahl and Company, Inc.

61.   Webber, Meng, Sahl and Company, Inc. d/b/a WMS and Company, Inc. is a Pennsylvania corporation located in Pottstown, Pennsylvania. Throughout the Class Period, WMS facilitated the exchange of confidential, proprietary, and competitively sensitive compensation data among Defendant Processors and their co-conspirators.

**Answer to Paragraph 61:**   Wayne Farms lacks knowledge or information sufficient to

form a belief about the truth of the allegations in this paragraph and therefore denies them.

62.   During the Class Period, WMS directly participated in the conspiracy to fix and depress compensation to poultry processing plant workers by, among other things, doing the following:

- WMS conducted a detailed annual survey of the current hourly wages, annual salaries and employment benefits paid by each Defendant Processor and their subsidiaries to each category of poultry processing plant worker and circulated the survey results to senior executives of the Defendant Processors during annual in-person "off the books" meetings.

- At the "off-the-books" meetings, WMS delivered a PowerPoint presentation that emphasized the average and median wage rates and salaries for each poultry processing plant position based on the survey data provided by the Defendant Processors, thereby establishing benchmarks that facilitated compensation-fixing discussions. Indeed, a former employee of Pilgrim's said that attendees at the in-person meetings discussed with each other whether they paid a particular position less or more than the WMS survey average.

- WMS prohibited Defendant Processors from *remotely* exchanging compensation data. Rather, WMS required Defendants Processors to attend the in-person meetings in order to receive the compensation survey results, thus ensuring the confidentiality of the data and providing the means for Defendant Processors to discuss and fix compensation

**Answer to Paragraph 62:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

## IV.   AGENTS AND CO-CONSPIRATORS

63.   The entities named below have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy to fix and depress compensation alleged herein.

**Answer to Paragraph 63:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

64.   Defendants are jointly and severally liable for the acts of the co-conspirators named below whether or not named as defendants in this Complaint.

**Answer to Paragraph 64:**   Wayne Farms denies the allegations in this paragraph.

65.   Each Defendant and co-conspirator named below acted as the agent or joint-venturer of, or for, the other Defendants and co-conspirators with respect to the acts, violations and common course of conduct alleged herein.

**Answer to Paragraph 65:**   Wayne Farms denies the allegations in this paragraph.

**Tyson Agents and Co-Conspirators**

66.   Tyson Prepared Foods, Inc. is a Delaware corporation located in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods.  Tyson Prepared Foods, Inc. operates several poultry processing plants in multiple states.  During the Class Period, Tyson Prepared Foods, Inc. employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 66:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

67.   The Hillshire Brands Company is a Maryland corporation located in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods.  The Hillshire Brands Company operates several poultry processing plants in multiple states.  During the Class Period, The Hillshire Brands Company employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 67:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

68.   Tyson Fresh Meats, Inc. is a Delaware corporation located in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods.  Tyson Fresh Meats, Inc. operates several poultry processing plants in multiple states.  During the Class Period, Tyson Fresh Meats, Inc. employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 68:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

69.   Tyson Processing Services, Inc. is a Delaware corporation located in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods.  Tyson Processing Services, Inc. operates a poultry processing plant in Nebraska.  During the Class Period, Tyson Processing Services, Inc. employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 69:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

70.   Tyson Refrigerated Processed Meats, Inc. is a Delaware corporation located in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods.  Tyson Refrigerated Processed Meats, Inc. operates two poultry processing plants in Texas.  During the Class Period, Tyson Refrigerated Processed Meats, Inc. employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 70:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

71.   Tyson Farms, Inc. is a North Carolina corporation located at the headquarters address of Tyson Foods in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods.  Tyson Farms, Inc. operates one or more poultry processing plants.  During the Class Period, Tyson Farms, Inc. employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 71:**   Wayne Farms lacks knowledge or information sufficient to

form a belief about the truth of the allegations in this paragraph and therefore denies them.


72.    Tyson Sales and Distribution, Inc. is a Delaware corporation located at the headquarters address of Tyson Foods in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods.  Tyson Sales and Distribution, Inc. operates one or more poultry processing plants. During the Class Period, Tyson Sales and Distribution, Inc. employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 72:**   Wayne Farms lacks knowledge or information sufficient to

form a belief about the truth of the allegations in this paragraph and therefore denies them.


73.    Equity Group Eufaula Division, LLC is a Delaware corporation located in Bakerhill, Alabama, and is a wholly owned subsidiary of Tyson Foods.  Equity Group Eufaula Division, LLC operates one or more poultry processing plants in Alabama.  During the Class Period, Equity Group Eufaula Division, LLC employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 73:**   Wayne Farms lacks knowledge or information sufficient to

form a belief about the truth of the allegations in this paragraph and therefore denies them.


74.    Equity Group—Georgia Division, LLC is a Delaware corporation located in Camilla, Georgia, and is a wholly owned subsidiary of Tyson Foods.  Equity Group—Georgia Division, LLC operates one or more poultry processing plants in Georgia.  During the Class Period, Equity Group—Georgia Division, LLC employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 74:**   Wayne Farms lacks knowledge or information sufficient to

form a belief about the truth of the allegations in this paragraph and therefore denies them.


75.    Equity Group Kentucky Division, LLC is a Delaware corporation located in Albany, Kentucky, and is a wholly owned subsidiary of Tyson Foods.  Equity Group Kentucky Division, LLC operates one or more poultry processing plants in Kentucky.  During the Class Period, Equity Group Kentucky Division, LLC employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 75:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### Pilgrim's Pride Agents and Co-Conspirators

76.    Pilgrim's Pride Corporation of West Virginia, Inc. is a West Virginia corporation located in Moorefield, West Virginia, and is a wholly owned subsidiary of Pilgrim's.  Pilgrim's Pride Corporation of West Virginia, Inc. shares the same principal office address as its parent corporation, Pilgrim's, in Greeley, Colorado.  Pilgrim's Pride Corporation of West Virginia, Inc. operates a poultry processing plant in West Virginia.  During the Class Period, Pilgrim's Pride Corporation of West Virginia, Inc. employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 76:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

77.    JFC LLC (d/b/a GNP Company) is a Minnesota company located in St. Cloud, Minnesota and is a wholly owned subsidiary of Pilgrim's.  JFC LLC operated one or more poultry processing plants during the Class Period.  During the Class Period, JFC LLC employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 77:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### Sanderson Farms Agents and Co-Conspirators

78.    Sanderson Farms, Inc. (Foods Division) is a Mississippi corporation located in Laurel, Mississippi, and is a wholly owned subsidiary of Sanderson Farms.  Sanderson Farms, Inc. (Foods Division) operates one or more poultry processing plants.  During the Class Period, Sanderson Farms, Inc. (Foods Division) employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 78:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

79.    Sanderson Farms, Inc. (Processing Division) is a Mississippi corporation located in Laurel, Mississippi, and is a wholly owned subsidiary of Sanderson Farms.  Sanderson Farms, Inc. (Processing Division) operates multiple poultry processing plants in several states.  During the Class Period, Sanderson Farms, Inc. (Processing Division) employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 79:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### Koch Foods Agents and Co-Conspirators

80.    JCG Foods of Alabama, LLC is an Alabama corporation with its headquarters in Park Ridge, Illinois, and is a wholly owned subsidiary of Koch Foods.  JCG Foods of Alabama, LLC operates a poultry processing plant in Alabama.  During the Class Period, JCG Foods of Alabama, LLC employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 80:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

81.    JCG Foods of Georgia, LLC is a Georgia corporation with its headquarters in Park Ridge, Illinois, and is a wholly owned subsidiary of Koch Foods.  JCG Foods of Georgia, LLC operates a poultry processing plant in Georgia.  During the Class Period, JCG Foods of Georgia, LLC employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 81:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

82.    JCG Industries, Inc. is an Illinois corporation with its headquarters in Park Ridge, Illinois, and is a wholly owned subsidiary of Koch Foods.  JCG Industries, Inc. operates two poultry processing plants in Illinois.  During the Class Period, JCG Industries, Inc. employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 82:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

83.    Koch Foods LLC is a Tennessee corporation with its headquarters in Chattanooga, Tennessee, and is a wholly owned subsidiary of Koch Foods.  Joseph Grendys, President and CEO of Koch Foods, is the Chief Manager of Koch Foods LLC.  Koch Foods LLC operates two poultry processing plants in Tennessee.  During the Class Period, Koch Foods LLC employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 83:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

84.    Koch Foods of Alabama, LLC is an Alabama corporation with its headquarters in Montgomery, Alabama, and is a wholly owned subsidiary of Koch Foods.  Joseph Grendys, President and CEO of Koch Foods, is the Manager of Koch Foods of Alabama, LLC.  Koch Foods of Alabama, LLC operates a poultry processing plant in Alabama.  During the Class Period, Koch Foods of Alabama, LLC employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 84:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

85.    Koch Foods of Ashland, LLC is an Alabama corporation with its headquarters in Montgomery, Alabama, and is a wholly owned subsidiary of Koch Foods.  Koch Foods of Ashland, LLC operates a poultry processing plant in Alabama.  During the Class Period, Koch Foods of Ashland, LLC employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 85:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

86.    Koch Foods of Gadsden, LLC is an Alabama corporation with its headquarters in Montgomery, Alabama, and is a wholly owned subsidiary of Koch Foods.  Koch Foods of Gadsden, LLC operates a poultry processing plant in Alabama.  During the Class Period, Koch Foods of Gadsden, LLC employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 86:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

87.    Koch Foods of Cumming LLC is a Georgia corporation with its headquarters in Cumming, Georgia, and is a wholly owned subsidiary of Koch Foods.  Joseph Grendys, President and CEO of Koch Foods, is the Manager of Koch Foods of Cumming LLC.  Koch Foods of Cumming LLC operates a poultry processing plant in Georgia.  During the Class Period, Koch Foods of Cumming LLC employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 87:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

88.    Koch Foods of Gainesville LLC is a Georgia corporation with its headquarters in Gainesville, Georgia, and is a wholly owned subsidiary of Koch Foods. Joseph Grendys, President and CEO of Koch Foods, is the Manager of Koch Foods of Gainesville LLC. Koch Foods of Gainesville LLC operates a poultry processing plant in Georgia. During the Class Period, Koch Foods of Gainesville LLC employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 88:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

89.    Koch Foods of Mississippi LLC is a Mississippi corporation with its headquarters in Morton, Mississippi, and is a wholly owned subsidiary of Koch Foods. Joseph Grendys, President and CEO of Koch Foods, is the Manager of Koch Foods of Mississippi LLC. Koch Foods of Mississippi LLC operates poultry processing plants in Mississippi. During the Class Period, Koch Foods of Mississippi LLC employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 89:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

90.    Koch Foods of Cincinnati, LLC is an Ohio corporation with its headquarters in Fairfield, Ohio, and is a wholly owned subsidiary of Koch Foods. Koch Foods of Cincinnati, LLC operates a poultry processing plant in Fairfield, Ohio. During the Class Period, Koch Foods of Cincinnati, LLC employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 90:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

**Wayne Farms Agent and Co-Conspirator**

91.    WFSP Foods, LLC is a Georgia corporation with its headquarters in Decatur, Alabama, and is a joint venture between Wayne Farms and Salm Partners, LLC. During the Class Period, WFSP Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 91:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### Mountaire Farms Agent and Co-Conspirator

92.    Mountaire Farms of Delaware, Inc. is a privately held Delaware corporation located in Millsboro, Delaware.  Both Mountaire Farms and Mountaire Farms of Delaware, Inc. are wholly-owned subsidiaries of Mountaire Corporation, and Phillip Plylar is the current President of both Mountaire Farms and Mountaire Farms of Delaware, Inc. Mountaire Farms of Delaware, Inc. operates one or more poultry processing plants.  During the Class Period, Mountaire Farms of Delaware, Inc. employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 92:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### Simmons Foods Agents and Co-Conspirators

93.    Simmons Prepared Foods, Inc. is a privately held Arkansas company headquartered in Siloam Springs, Arkansas, and is a wholly owned subsidiary of Simmons Foods.  Simmons Prepared Foods, Inc. is controlled by the same corporate officers as Simmons Foods.  Simmons Foods and Simmons Prepared Foods, Inc. are located at the same location and share the same mailing address.  Simmons Prepared Foods, Inc. operates multiple poultry processing plants. Simmons Prepared Foods, Inc. employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 93:**    Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### George's Agents and Co-Conspirators

94.    Ozark Mountain Poultry, Inc. is an Arkansas corporation headquartered in Rogers, Arkansas, and is a wholly owned subsidiary of George's, Inc. Carl George, the co-CEO of George's, Inc., is the president of Ozark Mountain Poultry, Inc. Ozark Mountain Poultry, Inc. operates one or more poultry processing plants.  During the Class Period, Ozark Mountain Poultry, Inc. employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 94:**     Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

95.    George's Processing, Inc. is an Arkansas corporation headquartered in Springdale, Arkansas, and is a wholly owned subsidiary of George's, Inc. Carl George, the co-CEO of George's, Inc., is the president of George's Processing, Inc.. George's Processing, Inc. operates several poultry processing plants.  During the Class Period, George's Processing, Inc. employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 95:**     Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

96.    George's Chicken, LLC is a Virginia corporation headquartered in Edinburg, Virginia, and is a wholly owned subsidiary of George's, Inc. George's Chicken, LLC operates a poultry processing plant in Virginia.  During the Class Period, George's Chicken, LLC employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 96:**     Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

**Jennie-O Turkey Agents and Co-Conspirators**

97.    Hormel Foods Corporation is a Delaware corporation with its corporate headquarters in Austin, Minnesota.  Hormel Foods Corporation is the parent of Jennie-O Turkey Store.  Hormel Foods Corporation operates several poultry processing plants.  During the Class Period, Hormel Foods Corporation employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 97:**     Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

98.    Jennie-O Turkey Store, LLC is a Minnesota company with its headquarters in Austin, Minnesota, and is a wholly owned subsidiary of Jennie-O Turkey Store.  During the Class Period, Jennie-O Turkey Store, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 98:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

99.     Jennie-O Turkey Store Sales, LLC is a Delaware company with its headquarters in Austin, Minnesota, and is a wholly owned subsidiary of Jennie-O Turkey Store.  Jennie-O Turkey Store Sales, LLC operates four poultry processing plants in Minnesota and Wisconsin.  During the Class Period, Jennie-O Turkey Store Sales, LLC employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 99:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### Cargill Agent and Co-Conspirator

100.    Cargill, Inc. is a Delaware corporation with its corporate headquarters in Wayzata, Minnesota.  Cargill is a wholly owned subsidiary of Cargill, Inc. During the Class Period, Cargill, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

**Answer to Paragraph 100:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### Other Agents and Co-Conspirators

101.    Foster Farms, LLC is a privately held California corporation headquartered in Modesto, California.  During the Class Period, Foster Farms, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**Answer to Paragraph 101:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

102.    Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California.  During the Class Period, Foster Poultry Farms and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**Answer to Paragraph 102:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

103.   House of Raeford Farms, Inc. is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina.  During the Class Period, House of Raeford Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, divisions, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**Answer to Paragraph 103:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

104.   House of Raeford Farms of Louisiana, LLC is a Louisiana corporation headquartered in Shreveport, Louisiana.  During the Class Period, House of Raeford Farms of Louisiana, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**Answer to Paragraph 104:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

105.   Case Foods, Inc. is a privately held Delaware corporation with its corporate headquarters in Troutman, North Carolina.  During the Class Period, Case Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**Answer to Paragraph 105:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

106.   Case Farms Processing, Inc. ("Case Farms") is a privately held North Carolina corporation with its corporate headquarters in Troutman, North Carolina.  During the Class Period, Case Farms and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**Answer to Paragraph 106:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

107.    Mar-Jac Poultry, Inc. is a Georgia corporation located in Gainesville, Georgia. During the Class Period, Mar-Jac Poultry, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**Answer to Paragraph 107:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

108.    Mar-Jac Poultry MS, LLC is a Mississippi limited liability corporation located in Hattiesburg, Mississippi.  During the Class Period, Mar-Jac Poultry MS, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**Answer to Paragraph 108:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

109.    Mar-Jac Poultry AL, LLC is an Alabama limited liability corporation located in Gainesville, Georgia.  During the Class Period, Mar-Jac Poultry AL, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**Answer to Paragraph 109:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

110.    Mar-Jac Poultry, LLC is a Delaware corporation located in Gainesville, Georgia. During the Class Period, Mar-Jac Poultry, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**Answer to Paragraph 110:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

111.    Mar-Jac Holdings, Inc. is a Delaware corporation located in Gainesville, Georgia. During the Class Period, Mar-Jac Holdings, LLC and/or its predecessors, wholly owned or

controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**Answer to Paragraph 111:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

112.   O.K.   Foods, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas.  During the Class Period, O.K.  Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**Answer to Paragraph 112:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

113.   Amick Farms, LLC is a privately held Delaware limited liability company with its corporate headquarters in Batesburg, South Carolina.  During the Class Period, Amick Farms, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**Answer to Paragraph 113:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

114.   Harrison Poultry, Inc. is a Georgia corporation located in Bethlehem, Georgia. During the Class Period, Harrison Poultry, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**Answer to Paragraph 114:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

115.   Allen Harim Foods, LLC is a Delaware company with its corporate headquarters in Millsboro, Delaware.  During the Class Period, Allen Harim Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**Answer to Paragraph 115:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

116.    Claxton Poultry Farms, Inc. is a Georgia corporation located in Claxton, Georgia. During the Class Period, Claxton Poultry Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**Answer to Paragraph 116:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

117.    Norman W. Fries, Inc., d/b/a Claxton Poultry Farms, Inc. is a Georgia corporation located in Claxton, Georgia.  During the Class Period, Norman W. Fries, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**Answer to Paragraph 117:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

118.    Cooper Hatchery, Inc. d/b/a Cooper Farms is an Ohio corporation with its corporate headquarters in Oakwood, Ohio.  During the Class Period, Cooper Hatchery, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**Answer to Paragraph 118:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

119.    Farbest Foods, Inc. is an Indiana company with its corporate headquarters in Jasper, Indiana.  During the Class Period, Farbest Foods and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**Answer to Paragraph 119:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

120.    Virginia Poultry Growers Cooperative, Inc. is a Virginia corporation with its corporate headquarters in Hinton, Virginia.  During the Class Period, Virginia Poultry Growers Cooperative, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other

affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**Answer to Paragraph 120:**  Wayne Farms lacks knowledge or information sufficient to

form a belief about the truth of the allegations in this paragraph and therefore denies them.

121.    VPGC, LLC is a Virginia corporation with its corporate headquarters in Hinton, Virginia.  During the Class Period, VPGC, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**Answer to Paragraph 121:**  Wayne Farms lacks knowledge or information sufficient to

form a belief about the truth of the allegations in this paragraph and therefore denies them.

122.    Turkey Valley Farms, LLC is a Minnesota corporation with its corporate headquarters in Willmar, Minnesota.  During the Class Period, Turkey Valley Farms, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

**Answer to Paragraph 122:**  Wayne Farms lacks knowledge or information sufficient to

form a belief about the truth of the allegations in this paragraph and therefore denies them.

123.    The U.S. Poultry & Egg Association is a nonprofit trade association headquartered in Tucker, Georgia that advocates for poultry processors.

**Answer to Paragraph 123:**  Wayne Farms lacks knowledge or information sufficient to

form a belief about the truth of the allegations in this paragraph and therefore denies them.

124.    The National Chicken Council is a nonprofit trade association headquartered in Washington, D.C. that advocates for chicken processors.

**Answer to Paragraph 124:**  Wayne Farms lacks knowledge or information sufficient to

form a belief about the truth of the allegations in this paragraph and therefore denies them.

125.    The National Turkey Federation is a nonprofit trade association headquartered in Edgefield, South Carolina that advocates for turkey processors.

**Answer to Paragraph 125:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

126.    Various other persons and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.

**Answer to Paragraph 126:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

## V.    TRADE AND COMMERCE

127.    The conspiracy formed, implemented and enforced by Defendants and co-conspirators was intended to depress, and did in fact depress, the compensation of Class Members nationwide.

**Answer to Paragraph 127:**  Wayne Farms denies the allegations in this paragraph.

128.    The conspiracy restrained competition between Defendant Processors for the payment of wages, salaries and benefits to, and hiring of, Class Members nationwide, including Class Members who were located in states other than the states in which the poultry processing plants that employed them were located.

**Answer to Paragraph 128:**  Wayne Farms denies the allegations in this paragraph.

129.    Defendant Processors made payments to Class Members by mailing or transmitting funds across state lines.

**Answer to Paragraph 129:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

130.    Defendant Processors employed Class Members to process poultry for sale in interstate and foreign commerce.

**Answer to Paragraph 130:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

131.    Defendants Agri Stats and WMS provided services to Defendant Processors located in multiple different states and exchanged confidential, proprietary, and competitively sensitive data among Defendant Processors across state lines.

**Answer to Paragraph 131:**  Wayne Farms admits that, from time to time, it transferred to and received data from Agri Stats and WMS on a confidential basis.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

132.    The activities of Defendants and co-conspirators were within the flow of interstate commerce of the United States, and were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

**Answer to Paragraph 132:**  This paragraph does not contain factual allegations to which a response is required.  To the extent a response is required, Wayne Farms denies the allegations in this paragraph.

## VI.    FACTUAL ALLEGATIONS

### A.    Background

#### 1.    Poultry Industry

133.    The United States Department of Agriculture defines "poultry" to mean "any domesticated bird used for food."  The poultry industry in the United States is the world's largest producer of poultry meat.

**Answer to Paragraph 133:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

134.    Meat from chicken and turkey account for more than 99% of the poultry meat produced in the United States.  Chicken meat accounts for approximately 89% of the poultry meat produced in the United States.  Turkey meat accounts for approximately 11% of the poultry meat produced in the United States.

**Answer to Paragraph 134:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

135.    Poultry processed for consumption may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value-added product. The poultry processed by Defendant Processors are commodity products with little or no differentiation between processors.

**Answer to Paragraph 135:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

136.    Poultry processing is concentrated in the hands of the Defendant Processors, which control approximately 80 percent of the production of processed poultry in the United States. Defendant Processors earn more than $30 billion in annual revenue from the sale of processed poultry.

**Answer to Paragraph 136:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

137.    Defendant Processors are vertically integrated companies that control nearly every aspect of poultry production.  When commercial poultry production first emerged, different companies owned businesses involved in the different stages of poultry production.  Specifically, different companies owned:  hatcheries, where eggs are hatched; growers, which raise the hatched birds; feed mills, which produce and supply food products for those birds; and processing plants, where live birds are slaughtered and turned into poultry products for sale and consumption.  Today, more than 90 percent of poultry for consumption is produced by vertically integrated companies, such as Defendant Processors, that each own or control their own hatcheries, feed mills, growers, and processing plants.

**Answer to Paragraph 137:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

## 2.    Poultry Processing Plants

138.    Once chickens and turkeys for consumption reach maturity, they are typically processed in poultry processing plants.  There are two kinds of poultry processing plants.  The first—slaughterhouse facilities—kill birds and convert the carcasses into raw poultry products fit for human consumption.  The second—further processing facilities—convert the raw chicken and turkey into value-added forms by cutting, deboning, breading, cooking or otherwise engaging in additional processing.  The Class is comprised of workers employed by Defendant Processors,

their subsidiaries, and related entities in both slaughterhouse facilities and further processing facilities.

**Answer to Paragraph 138:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

139.    Collectively, Defendant Processors, their subsidiaries, and related entities currently own approximately 200 poultry processing plants in the continental United States.  A majority of those poultry processing plants are located in the South and Upper Midwest.

**Answer to Paragraph 139:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

140.    Poultry processing plants are typically located near the growers with which they contract.  As a result, the vast majority of poultry processing plants owned by Defendant Processors and their subsidiaries are clustered in groups in rural areas.  In fact, each Defendant Processor or its subsidiaries owns at least one poultry processing plant that is within 32 miles of a poultry processing plant owned by another Defendant Processor or another Defendant Processor's subsidiary.  Indeed, with the exception of Defendant Jennie-O, each Defendant Processor or its subsidiaries owns a plant that is within 13 miles of a poultry processing plant owned by another Defendant Processor or another Defendant Processor's subsidiary.

**Answer to Paragraph 140:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

141.    The geographic proximity of poultry processing plants means that, in a competitive labor market, many employees of poultry processing plants could and would switch their employment to rival poultry processing plants when offered higher wages, higher salaries and/or superior benefits.  For that reason, each Defendant Processor has risked the loss of processing plant workers to, and in fact did lose processing plant workers to, another Defendant Processor's nearby poultry processing plant.

**Answer to Paragraph 141:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

142.    The following map identifies the locations of the chicken and turkey processing plants currently operating in the continental United States; chicken processing plants are represented by red pins, and turkey processing plants are represented by blue pins[2]:



**Answer to Paragraph 142:**  Wayne Farms admits that this paragraph appears to depict – and attempts to characterize – a map that speaks for itself.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

### 3.    Poultry Processing Plant Workers

143.    Each year during the Class Period, Defendant Processors, their subsidiaries, and related entities collectively employed approximately 220,000 workers at their poultry processing plants.

---

[2]    Some of the pins on the map reflect more than one poultry processing plant.
**Answer to Footnote 2**:  Wayne Farms lacks sufficient knowledge or information to form a belief about the truth of the allegations in this footnote and therefore denies them.

**Answer to Paragraph 143:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

144.    Because Defendant Processors, their subsidiaries, and related entities produce commodity poultry products in a similarly efficient and vertically integrated manner, their poultry processing facilities were and are characterized by highly similar operations and thus highly similar labor requirements.  Accordingly, the workers employed by Defendant Processors, their subsidiaries, and related entities at each of their approximately 200 poultry processing plants in the continental United States during the Class Period, *i.e.* Class Members, were easily categorized into a limited set of discrete job positions.

**Answer to Paragraph 144:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

145.    For example, in their poultry processing plants, each Defendant Processor or its subsidiaries employs "live hangers," who hang live birds by their feet onto fast-moving metal hooks; "eviscerators," who remove the internal organs from bird carcasses; "deboners," who remove bones from bird carcasses; and "first line supervisors," who supervise workers on the processing lines.

**Answer to Paragraph 145:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### 4.     Compensating Poultry Processing Plant Workers

146.    Employees at poultry processing plants owned by Defendant Processors, their subsidiaries, and related entities were paid either hourly wages or annual salaries, depending on their position.

**Answer to Paragraph 146:**  Wayne Farms admits the allegations in this paragraph to the extent they relate to Wayne Farms.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

147.    Approximately 90 percent of employees at those poultry processing plants were either production workers who physically worked on processing lines to process poultry, or maintenance workers who maintained and repaired processing line machines and/or refrigeration

systems.  Those production and maintenance workers were paid hourly wages according to their specific position and experience.

**Answer to Paragraph 147:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

148.    Approximately 10 percent of employees at poultry processing plants owned by Defendant Processors, their subsidiaries, and related entities were paid annual salaries.  These employees include supervisory positions such as first line supervisors who supervised hourly-paid production workers, and plant maintenance supervisors who supervised hourly-paid maintenance workers.

**Answer to Paragraph 148:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

149.    Both hourly-paid and salary-paid employees at poultry processing plants owned by Defendant Processors, their subsidiaries, and related entities received employment benefits.  Those benefits typically included health insurance, paid time off, a retirement savings plan, disability insurance and life insurance.  Each Defendant Processor calculated a specific dollar value for the benefits paid to each Class Member.

**Answer to Paragraph 149:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

150.    The total compensation provided to hourly-paid Class Members, inclusive of benefits, was referred to within the industry as the "fully loaded wage."  For example, according to Perdue Farms, the "fully loaded wage" at the company's Delmarva processing plants in 2016 was $17.12 for the lowest paid plant worker.  That particular "fully loaded wage" was comprised of a $12 hourly wage plus a benefits package equal to $5.12 per hour.

**Answer to Paragraph 150:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

151.    Some hourly-paid positions at poultry processing plants owned by Defendant Processors, their subsidiaries, and related entities were paid higher wages than other hourly-paid positions at the same poultry processing plants, largely due to the greater skill and experience required by those higher-paying positions.  For example, "deboners" were typically paid more than many other non-supervisory workers at poultry processing plants.  Effectively deboning a chicken or turkey requires some experience and training, and Defendant Processors earn more money when a bird is deboned effectively, *i.e.* cut closest to the bone to maximize the amount of meat obtained.

50

Nonetheless, the compensation for all hourly-paid positions at poultry processing plants owned by Defendant Processors, their subsidiaries, and related entities was determined in a systematic way using compensation schedules within each Defendant Processor that were aligned with the compensation for the same positions established by other Defendant Processors.

**Answer to Paragraph 151:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

152.    Similarly, some salary-paid positions at poultry processing plants owned by Defendant Processors, their subsidiaries, and related entities were paid higher salaries than other salary-paid positions, largely due to the greater skill and experience required by those higher paying salaried positions.  For example, a processing shift manager, who directs a production operation for an entire section of a poultry processing plant, receives a higher salary than a first line supervisor, who reports to the processing shift manager.  Nonetheless, the compensation for all salary-paid positions at poultry processing plants owned by Defendant Processors, their subsidiaries, and related entities was determined in a systematic way using compensation schedules within each Defendant Processor that were aligned with the compensation for the same positions established by other Defendant Processors.

**Answer to Paragraph 152:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### 5.      Centralized Determination of Compensation for Poultry Processing Plant Workers

153.    Compensation of poultry processing plant employees comprises a significant share of the total operating costs of each Defendant Processor.  The second largest cost component of producing poultry for consumption is the cost of poultry processing plant labor, which on average comprises approximately 16 percent of Defendant Processors' total operating costs.

**Answer to Paragraph 153:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

154.    Decisions regarding the compensation of workers at poultry processing plants owned by Defendant Processors, their subsidiaries, and related entities were made exclusively by and at each Defendant Processors' corporate headquarters during the Class Period.  This reflects the significance of labor costs to Defendant Processors' overall profitability.  While local plant managers sometimes made recommendations for wage adjustments, the hourly wages, annual salaries and employment benefits were ultimately determined and approved by senior executives at each Defendant Processor's corporate headquarters.  The fact that decision-making regarding wages, salaries and benefits was centralized in the hands of senior corporate executives materially

facilitated the formation and implementation of the compensation-fixing conspiracy alleged herein.

**Answer to Paragraph 154:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

155.    Multiple former human resources employees of the Defendant Processors have explained that senior executives at corporate headquarters exclusively set the wages, salaries and benefits of processing plant employees across the country in a centralized fashion.  For example, a former human resources manager who worked at three different poultry processing plants owned by Tyson, Pilgrim's and Perdue during the Class Period stated that compensation paid to poultry processing plant workers at all three companies was exclusively determined at and by each of the company's corporate offices.  Similarly, a former human resources manager who worked at poultry processing plants owned by Perdue and George's stated that wages, salaries and benefits paid to all poultry processing plant employees by both companies were determined at and by each of the company's corporate headquarters.

**Answer to Paragraph 155:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

156.    During the Class Period, senior executives of the Defendant Processers determined the hourly wages, annual salaries, bonuses and employment benefits for Class Members across the country in a formulaic way, establishing schedules that compensated employees according to their specific positions in the poultry processing plants.

**Answer to Paragraph 156:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

157.    For example, a former Tyson Foods employee stated that hourly wages set by Tyson Foods' corporate headquarters were "very tightly structured."  The former Tyson Foods employee explained that Tyson Foods' corporate office established a "wage scale" for all hourly-paid workers at Tyson poultry processing plants consisting of a starting hourly rate for each position and incremental increases for that starting hourly rate up to the maximum wage.  The former Tyson Foods employee noted that the wage structure was determined at the corporate level "before" individual plant managers "even started talking about it."  The former Tyson Foods employee also noted that, under the company's wage scale, hourly production workers received "consistent" wages within divisions, regardless of the location of the poultry processing plant.

**Answer to Paragraph 157:** Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – statements that speak for themselves.

Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the

remaining allegations in this paragraph and therefore denies them.

### 6.   Limited Role of Labor Unions

158.   Approximately one-third of hourly-paid workers at poultry processing plants are members of unions.  The United Food and Commercial Workers International Union represents approximately 90% of those unionized workers.

**Answer to Paragraph 158:**  Wayne Farms lacks knowledge or information sufficient to

form a belief about the truth of the allegations in this paragraph and therefore denies them.

159.   There is not a significant disparity between the compensation provided to unionized and non-unionized workers in poultry processing plants owned by Defendant Processors, their subsidiaries, and related entities.  Collective bargaining agreements often specify a particular wage increase for year one and then often require that, in subsequent years of the agreements, unionized workers are entitled to the average wages per position set by the Defendant Processor.  Those average wages are calculated based on what is paid to both unionized and non-unionized workers.

**Answer to Paragraph 159:**  Wayne Farms lacks knowledge or information sufficient to

form a belief about the truth of the allegations in this paragraph and therefore denies them.

### 7.   Demographics of Hourly-Paid Poultry Processing Plant Workers

160.   During the Class Period, the compensation provided to hourly-paid workers in poultry processing plants owned by Defendant Processors, their subsidiaries, and related entities was artificially depressed and left many of those workers in poverty.  A 2015 report by the nonprofit Oxfam America titled "Lives on the Line" states, "Most workers on the poultry processing line earn wages that place them near or below the poverty line.  Wages average around $11 per hour; annual income for most is between $20,000 and $25,000.  The federal poverty level for a family of three in 2015 is $20,090; for a family of four it's $24,250.  An average poultry worker supporting two children qualifies for Head Start, SNAP (food stamps), and the National School Lunch Program.  In addition, workers often turn to local charities and food banks to supplement their income; in many poultry towns, thrift stores and food banks dominate local storefronts."

**Answer to Paragraph 160:** Wayne Farms admits that this paragraph appears to

selectively quote from – and attempts to characterize – a document that speaks for itself.  Wayne

Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining

allegations in this paragraph and therefore denies them.

161.    Despite the poor compensation, working on a processing line in a poultry plant is one of the most dangerous jobs in the United States.  The 2015 report by Oxfam America states that "the rates of injuries and illness" in poultry processing plants "are shockingly high."  The Occupational Safety and Health Administration ("OSHA") and the United States Department of Labor classify poultry as "a hazardous industry."  In February 2015, OSHA acknowledged that "the incidence rate of occupational illness cases, including musculoskeletal disorders, reported in the poultry industry in 2011 and 2012 has remained high—at more than five times the average for all US industries."  In April 2015, the Centers for Disease Control and the National Institute for Occupational Safety and Health reported the results of an evaluation of 191 poultry workers at a plant in Maryland:  76 percent had abnormal results from a nerve conduction test (indicating damage to nerves), and 34 percent had evidence of carpal tunnel syndrome.  In 2004, Human Rights Watch reported that poultry workers are 14 times more likely than other workers to suffer debilitating injuries stemming from repetitive trauma—like "claw hand" (in which the injured fingers lock in a curled position) and ganglion cysts (fluid deposits under the skin).

**Answer to Paragraph 161:**  Wayne Farms admits that this paragraph appears to

selectively quote from – and attempts to characterize – a document that speaks for itself.  Wayne

Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining

allegations in this paragraph and therefore denies them.

162.    In a 2016 report titled "No Relief," Oxfam America wrote, "While the poultry industry today enjoys record profits and pumps out billions of chickens, the reality of life inside the processing plant remains grim and dangerous.  Workers earn low wages, suffer elevated rates of injury and illness, toil in difficult conditions, and have little voice in the workplace."

**Answer to Paragraph 162:**  Wayne Farms admits that this paragraph appears to

selectively quote from – and attempts to characterize – a document that speaks for itself.  Wayne

Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining

allegations in this paragraph and therefore denies them.

163.    Due to the poor compensation, grueling work and high risk of physical injury, many Americans have no interest in employment as an hourly-paid worker in a poultry processing plant. For that reason, Defendant Processors, their subsidiaries, and related entities often recruit workers who have limited alternative options for employment.  Many of the hourly-paid workers recruited

and hired by Defendant Processors, their subsidiaries, and related entities in poultry processing plants do not speak English and lack significant education.

**Answer to Paragraph 163:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

164.    Christopher Cook, author of the book "Diet for a Dead Planet: Big Business and the Coming Food Crisis," said that poultry processors recruit "a variety of economically desperate and socially isolated populations."  Debbie Berkowitz, OSHA's former Senior Policy Adviser, said, "It's an industry that targets the most vulnerable group of workers and brings them in.  And when one group gets too powerful and stands up for their rights, they figure out who's even more vulnerable and move them in."

**Answer to Paragraph 164:**  Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – a document that speaks for itself.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

165.    Many of the hourly-paid workers recruited and hired by Defendant Processors, their subsidiaries, and related entities are migrant workers, refugees, asylum-seekers, immigrants employed under EB3 visas, prison laborers, and participants in court-ordered substance abuse programs.  In a 2015 report, Oxfam America wrote, "The poultry industry has a complicated history of tapping marginalized populations for its workforce.  ...  Of the roughly 250,000 poultry workers in the US, most are minorities, immigrants, or refugees, and a significant percentage is female."

**Answer to Paragraph 165:**  Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – a document that speaks for itself.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

166.    For example, Norman Beecher, a former Human Resources manager for co-conspirator Case Farms, actively recruited refugees from the Guatemalan civil war. Mr. Beecher explained to historian Leon Fink, "I didn't want [Mexicans].  Mexicans will go back home at Christmastime.  You're going to lose them for six weeks.  And in the poultry business you can't afford that.  You just can't do it.  But Guatemalans can't go back home.  They're here as political refugees.  If they go back home, they get shot."

**Answer to Paragraph 166:** Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – statements that speak for themselves. Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

167. In a 2017 article titled "Exploitation and Abuse at the Chicken Plant," *The New Yorker* reported that Case Farms "finds new ways to keep labor costs down.  For a time, after the Guatemalan workers began to organize, Case Farms recruited Burmese refugees.  Then it turned to ethnic Nepalis expelled from Bhutan, who today make up nearly 35 percent of the company's employees in Ohio.  . Recently, Case Farms has found a more captive workforce.  One blazing morning last summer in Morganton, an old yellow school bus arrived at Case Farms and passed through the plant's gates, pulling up to the employee entrance.  Dozens of inmates from the local prison filed off, ready to work at the plant."

**Answer to Paragraph 167:** Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – a document that speaks for itself.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

## 8.    Demographics of Salary-Paid Poultry Processing Plant Employees

168.    To obtain a salaried position at poultry processing plants owned by Defendant Processors, their subsidiaries, and related entities, an applicant must satisfy certain education and experience requirements and also speak fluent English.  For example, to obtain a position as a first line supervisor, which is one of the *lowest* paid salaried positions in a poultry processing plant, an applicant must ordinarily have obtained a high school diploma or GED, is strongly preferred to have a Bachelor's degree in a related field (e.g. Poultry Science, Animal Science, Agriculture or Business Management), must have a minimum of 1-3 years of supervisory experience, must possess strong written and verbal communication skills, and is expected to be proficient with computers.  Accordingly, only educated, skilled and experienced individuals can obtain salaried positions at poultry processing plants owned by Defendant Processors, their subsidiaries, and related entities.

**Answer to Paragraph 168:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### B.    Conspiracy to Fix Compensation

169.    Beginning in January 2009 and continuing to the present, Defendants have conspired with each other to fix and depress the compensation paid to employees of Defendant Processors, their subsidiaries, and related entities at poultry processing plants in the continental United States.

**Answer to Paragraph 169:**  Wayne Farms denies the allegations in this paragraph.

170.    Multiple events took place in the poultry industry in 2008 and 2009 that facilitated the formation and implementation of the conspiracy, including:

   a.    In 2008, Tyson Foods, the largest poultry processor in the United States, re-subscribed to Agri Stats.  Tyson Foods had previously terminated its relationship with, and subscription to, Agri Stats, but the company resumed exchanging detailed and proprietary compensation information with other Defendant Processors through Agri Stats in 2008.

   b.    In December 2008, the second largest poultry processor, Pilgrim's, filed for bankruptcy.  The bankruptcy resulted from total costs—including labor costs— exceeding the revenue earned by the company.  The bankruptcy of Pilgrim's triggered competing poultry processors to consider methods of managing costs in order to avoid the same fate.

   c.    In 2009, following the bankruptcy filing of Pilgrim's, the multinational JBS S.A, which is the largest meat processing company in the world, acquired a majority stake in Pilgrim's.  The acquisition resulted in a change in the leadership of the human resources department at Pilgrim's.

   d.    In April 2009, the human resources committees of the three leading trade associations representing the interests of Defendant Processors—the National Chicken Council, the U.S. Poultry & Egg Association and the National Turkey Federation—merged to form the Joint Poultry Industry Human Resources Council.

**Answer to Paragraph 170:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

171.    Defendants formed and implemented the conspiracy to reduce labor costs and maximize profits.  In the absence of the conspiracy, Defendant Processors, their subsidiaries, and

related entities would have competed with each other for labor during the Class Period by offering higher wages, higher salaries and superior benefits to Class Members. This is particularly true given that each Defendant Processor or its subsidiaries owns and operates a poultry processing plant that is within 32 miles of a poultry processing plant owned by another Defendant Processor or another Defendant Processor's subsidiary (and, other than Jennie-O Turkey Store, each Defendant Processor or its subsidiaries owns a plant that is within 13 miles of a poultry processing plant owned by another Defendant Processor or another Defendant Processor's subsidiary), meaning that many workers could easily switch to rival poultry processing plants offering better compensation in a competitive market. The conspiracy permitted Defendant Processors to restrain competition for poultry processing plant workers and thus reduce labor costs and increase profits.

**Answer to Paragraph 171:**  Wayne Farms denies the allegations in this paragraph.

172.    In furtherance of the formation, implementation and enforcement of the conspiracy, Defendants have engaged in the following misconduct:

a.    Conducted "off the books" in-person meetings between senior executives of Defendant Processors during which they fixed and depressed the wages, salaries and benefits paid to workers at poultry processing plants;

b.    Exchanged detailed, timely and competitively sensitive compensation data through Agri Stats and WMS, thereby permitting Defendants to continuously identify how much each Defendant Processor, its subsidiaries, and related entities were paying poultry processing plant workers;

c.    Instructed their poultry processing plants to engage in direct plant-to-plant exchanges of compensation data, including data regarding anticipated future increases to hourly wages.

**Answer to Paragraph 172:**  Wayne Farms admits that, from time to time, it attended meetings to discuss salaries and benefits of employees.  Wayne Farms further admits that it transferred to and received data from Agri Stats and WMS on a confidential basis.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

### 1.    "Off the Books" In-Person Meetings to Fix Compensation

173.    Beginning on or before 2009, senior executives of Defendant Processors conducted regular in-person meetings to exchange information about, discuss and ultimately fix the wages, salaries and benefits provided to workers at poultry processing plants in the continental United States.

**Answer to Paragraph 173:**  Wayne Farms admits that, from time to time, it attended meetings to discuss salaries and benefits of employees.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

174.    During each year of the Class Period, senior executives from the Defendant Processors who were responsible for determining the compensation of workers at poultry processing plants conducted an in-person meeting at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida.  According to former employees of Perdue and Pilgrim's, those meetings were attended by Directors of Compensation, Directors of Benefits, Compensation Analysts and/or Vice-Presidents of Human Resources from each of the leading poultry processors.

**Answer to Paragraph 174:**  Wayne Farms admits that, from time to time, it attended meetings to discuss salaries and benefits of employees.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

175.    These annual meetings were spearheaded and conducted by a secretive "Compensation Committee."   During the Class Period, the leadership of the Compensation Committee rotated among the Defendant Processors.  For example, in 2015, the Compensation Committee was co-chaired by Jon Allen, Corporate Human Resources Director of Fieldale Farms, and Bert Neuenschwander, Manager of Compensation for Foster Farms, LLC.

**Answer to Paragraph 175:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

176.    While these meetings of the Compensation Committee often occurred around the same time as the U.S. Poultry & Egg Association's well-publicized annual Human Resources Seminar, the meetings were *not* part of the association's published schedule (or any other association's published schedule).  According to a former senior executive of Perdue Farms, the meetings were "off the books" because of the confidential nature of the communications.

**Answer to Paragraph 176:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

177.    During the annual "off the books" meetings of the Compensation Committee held at the Hilton Sandestin Resort Hotel & Spa during the Class Period, the senior executives of Defendant Processors engaged in two procedures to fix and depress the compensation of Class Members.  First, the executives exchanged timely data regarding wages, salaries and benefits paid to Class Members through a comprehensive and detailed survey.  Second, the executives held roundtable discussions to agree on and fix compensation paid to Class Members.

**Answer to Paragraph 177:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

178.    A former employee of Pilgrim's explained that, each year, both the commission of the annual survey and the off-the-books meeting attended by senior executives of Defendant Processors were *fully paid* by one of the three largest poultry processors.  Those three largest poultry processors—which included Tyson Foods and Pilgrim's—would alternate payment of the survey and roundtable meeting each year.  For example, Tyson Foods would pay for the survey and meeting one year; Pilgrim's would pay for the survey and meeting the next year; a third Defendant Processor would pay for the survey and meeting the following year; and the cycle would renew.

**Answer to Paragraph 178:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

179.    During the Class Period, the comprehensive survey was conducted by WMS, a compensation consulting firm based in Pottstown, Pennsylvania.  WMS states on its website that it "offers many types of surveys from industry-specific compensation surveys to company-specific job content surveys.  Unlike traditional surveys that yield ambiguous answers to generic questions, our company or industry-tailored assessments are based on real programs and issues within your organization or industry that result in answers based on real-time data."

**Answer to Paragraph 179:**  Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – a document that speaks for itself.  Wayne

Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

180.    Prior to each annual "off-the-books" meeting of the Compensation Committee held during the Class Period, each Defendant Processor provided detailed information to WMS regarding wages, salaries and benefits paid to Class Members, including *current* hourly rates and *current* salaries for poultry processing positions.  A former employee of Pilgrim's explained that each participating Defendant Processor submitted detailed wage, salary and benefits information to WMS for "all positions within the facilities."  She explained that the compensation data submitted to WMS included average hourly wages or annual salaries for each processing line position as well as the number of people employed in each such position.  She further explained that the benefits data submitted to WMS included identifying which health insurance plans were offered, the price of health insurance premiums, how much of that premium was paid by the employer, the value of health insurance deductibles, the number of paid time-off allowances, and the value of 401(k) retirement plan contributions.

**Answer to Paragraph 180:**  Wayne Farms admits that, from time to time, it transferred data to WMS on a confidential basis.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

181.    At the annual "off-the-books" meetings of the Compensation Committee, WMS randomly assigned a number to each attending Defendant Processor and subsequently circulated the results of the compensation survey to the attendees of the in-person meeting, with the names of the Defendant Processors replaced by their randomly assigned number.  At the "off-the-books" meetings, WMS also delivered a PowerPoint presentation that emphasized the average and median wage rates and salaries for each poultry processing plant position based on the survey data provided by the Defendant Processors, thereby establishing benchmarks that facilitated compensation-fixing discussions.

**Answer to Paragraph 181:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

182.    The results of the WMS survey that were distributed at the "off-the-books" meetings of the Compensation Committee provided detailed compensation data for both salaried employees and hourly-paid employees.  The section covering salaried employees provided substantial data regarding the salaries and bonuses paid to approximately 40 positions.  For each of those approximately 40 salaried positions, the annual WMS survey results provided the following information, aggregated from each of the participating Defendant Processors:

- Base salary

- Bonus pay (the average bonus paid for the last 12 months)

- Total compensation (base salary plus average bonus)

- Actual incentive percent (the average bonus paid as a percent of base compensation)

- Target opportunity percent (the target opportunity as a percent of base compensation)

- Maximum opportunity percent (the maximum opportunity as a percent of base compensation)

- Base salary policy (including the minimum midpoint and maximum policy)

The WMS PowerPoint presentation that accompanied the distribution of the survey results also identified, for each of the approximately 40 salaried positions, how much the following values had increased, by percentage, since the previous year: base salary, midpoint salary and total compensation.

**<u>Answer to Paragraph 182:</u>**   Wayne Farms lacks knowledge or information sufficient to

form a belief about the truth of the allegations in this paragraph and therefore denies them.

183.   Another section of the WMS survey results specifically addressed hourly-paid workers at poultry processing plants owned by Defendant Processors, their subsidiaries, and related entities.  The survey results organized those hourly-paid workers into the following three categories: processing workers, maintenance workers, and refrigeration technicians.  For each of those three categories of hourly-paid workers, the annual WMS survey provided the following information, aggregated from each of the participating Defendant Processors:

- Entry level start rate (wage rate when worker is hired)

- Entry level base rate (rate attained within 6-12 months for lowest production scale)

- Weighted average base rate

- Highest level base rate (rate attained within 6-12 months for highest production scale)

- Amount of 2nd Shift Premium (premium paid for working the evening shift)

- Amount of 3rd Shift Premium (premium paid for working the night shift)

- Annual turnover percentage

The WMS survey results organized this wage data on both a national basis and state-by-state basis. The WMS PowerPoint that accompanied the distribution of the survey results also identified how much each of the following increased by percentage since the previous year: entry level start rate, weighted average base rate, and highest level base rate.

**Answer to Paragraph 183:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

184.    For each and every annual salary and hourly wage reported in the WMS survey results, which covered approximately 45 positions at poultry processing plants, the following details were provided:

- 90th Percentile: Ninety percent of participants pay below the 90th percentile.

- 75th Percentile:  Seventy-five percent of participants pay below the 75th percentile.

- Median

- Average

- Weighted Average:  The data weighted by the number of employees associated with each participating processor.

- 25th Percentile:  Twenty-five percent of participants pay below the 25th percentile.

- 10th Percentile:  Ten percent of participants pay below the 10th percentile.

**Answer to Paragraph 184:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

185.    The WMS survey results also provided exhaustive data about the benefits provided to both salaried and hourly-paid employees at poultry processing plants operated by Defendant Processors, their subsidiaries, and related entities.  For example, the WMS survey results provided information about:  (1) the value of contributions made to pension plans; (2) the amount of life insurance coverage; (3) the amount of insurance coverage for accidental death and dismemberment; (4) the amount of coverage for long-term disability insurance; (5) the amount and duration of short-term disability insurance; (6) the number of permitted sick leave days; (7) the number of annual holidays; (8) the number of annual vacation days (based on the duration of employment); (9) the amount of health care costs per employee; (10) the amount of cost-sharing for medical insurance plans; (11) the size of deductibles for medical insurance plans; (12) the scope of prescription drug coverage; (13) the scope and cost of dental plans; and (14) parental leave policies.

**Answer to Paragraph 185:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

186.    Despite WMS's superficial attempts to conceal the sources of specific data in the survey results, it was made apparent to attendees of the off-the-books meetings—by the nature of the data and related conversations between attendees—which Defendant Processor had provided which compensation information.  A former employee of Perdue Farms explained that it was not difficult to determine which company reported which compensation data in the WMS survey when "you're sitting in a meeting and the person across from you [from a competing processor] is reporting on what they do."  Indeed, a former employee of Pilgrim's said that attendees at the in-person meetings discussed with each other whether they paid a particular position less or more than the WMS survey average and also discussed why they paid certain positions higher or lower wages depending upon the responsibility assigned to that position.

**Answer to Paragraph 186:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

187.    Defendant Processors used the WMS survey results to modify and harmonize their compensation systems.  For example, a former employee of Pilgrim's said she used the hourly wage and annual salary data from the WMS survey to help establish the hourly wages and annual salary rates at Pilgrim's.  Similarly, a former employee of another poultry processor that attended the off-the-books meetings of the Compensation Committee explained that the company used the WMS survey results to align its wages with those of other poultry processors that participated in the WMS survey.

**Answer to Paragraph 187:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

188.    After WMS had circulated the survey results to executives of the Defendant Processors at the annual "off-the-books" meetings of the Compensation Committee during the Class Period, those executives engaged in roundtable discussions to review the results of the WMS survey and to determine and agree upon the optimal compensation for poultry processing plant workers, including the optimal benefits.  According to a former employee of Perdue Farms, the executives at the off-the-books meetings discussed specific "benefit information" such as health insurance deductibles, paid time off and 401(k) plans.  During these roundtable discussions, the senior executives of the Defendant Processors agreed upon and fixed the wages, salaries and benefits that they would provide to employees at poultry processing plants in the continental United States, *i.e.* Class Members.  During those discussions, the senior executives of the Defendant Processors also chastised any Defendant Processor that had deviated—by making unauthorized increases to worker compensation—from wages, salaries and benefits that had been fixed at prior in-person meetings.

**Answer to Paragraph 188:** Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – a statement that speaks for itself. Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

189. At the "off the books" meetings of the Compensation Committee, executives of the Defendant Processors would specifically discuss, and agree upon, plans for salary raises and bonus budgets for the upcoming year. Such discussions and agreement had the predictable effect of limiting raises and bonuses paid to employees at poultry processing plants owned by Defendant Processors, their subsidiaries, and related entities.

**Answer to Paragraph 189:** Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

190. Similarly, at those "off the books" meetings, executives of the Defendant Processors would present detailed comparisons about how actual salary changes and bonus budgets from the preceding year compared with the *planned* salary changes and bonus budgets that had been devised at the previous year's meeting. Such discussions facilitated the enforcement of the conspiracy to fix the compensation of employees at poultry processing plants owned by Defendant Processors, their subsidiaries, and related entities.

**Answer to Paragraph 190:** Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

191. A senior executive from Tyson Foods noted during a private conversation in or around 2018 that the discussions about wages, salaries and benefits at the "off the books" meetings held at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida were so inappropriate and improper that that the company would no longer attend them. At the time of that decision, Tyson Foods had been named as a defendant in a different antitrust class action case.

**Answer to Paragraph 191:** Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

192. During the Class Period, representatives from the Defendant Processors regularly attended and participated in the annual "off-the-books" meetings of the Compensation Committee at which competitively sensitive compensation data was exchanged and the wages, salaries and benefits of Class Members were discussed and fixed. Indeed, Defendants Processors were

prohibited from using the WMS survey to just *remotely* exchange compensation data. According to a former employee of Keystone who attended some of the meetings, a poultry processor would be expelled from the Compensation Committee if it failed to attend the annual in-person meeting two years in a row.

**Answer to Paragraph 192:**   Wayne Farms lacks knowledge or information sufficient to

form a belief about the truth of the allegations in this paragraph and therefore denies them.


193.    As an example of the scope of participation in the annual Compensation Committee meeting, the following Defendants and co-conspirators attended the particular "off-the-books" in-person meeting in April 2017 at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida: Tyson Foods, Pilgrim's, Perdue Farms, Koch Foods, Wayne Farms, George's, Inc., Keystone, Fieldale Farms, Simmons Foods, Butterball, Cargill, Cooper Farms, Foster Farms, LLC, Amick Farms, LLC, Case Foods, Inc., OK Foods, Inc., and Allen Harim Foods, LLC. Other Defendants and co-conspirators attended other "off-the-books" annual meetings of the Compensation Committee during the Class Period.

**Answer to Paragraph 193:**   Wayne Farms lacks knowledge or information sufficient to

form a belief about the truth of the allegations in this paragraph and therefore denies them.


194.    While most of the Defendant Processors have participated in the WMS surveys and related "off-the-books" meetings of the Compensation Committee since the onset of the Class Period, the Defendant Processors that process more turkey than chicken in the United States—i.e. Butterball, Jennie-O, and Cargill—joined the annual WMS survey and "off the books" meetings for the first time in or around 2015. Prior to joining the WMS survey and related meetings in or around 2015, these Defendant Processors that substantially process turkey exchanged compensation data through another annual survey that was conducted by the National Turkey Federation. According to a former employee of Butterball, the leading turkey processors in the country reported salaried and hourly wages of "fairly specific" positions within their turkey processing plants to the National Turkey Federation each year, which compiled the information and distributed the combined survey results to those turkey processors. The compensation survey conducted by the National Turkey Federation, which only covered turkey processors, helped restrain the compensation of workers in poultry processing plants in the United States prior to 2015.

**Answer to Paragraph 194:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### 2.    Exchanging Detailed Compensation Data Through Agri Stats

195.    In addition to conducting "off the books" in-person meetings during which they discussed and fix wages, salaries and benefits, Defendant Processors also exchanged detailed and competitively sensitive compensation data each month in furtherance of the conspiracy through a subscription to Agri Stats.  The agreement to exchange, and the actual exchange of, detailed compensation data through Agri Stats itself restrained compensation competition for processing plant workers in the poultry industry, and greatly facilitated the formation, implementation and enforcement of the conspiracy to depress compensation.

**Answer to Paragraph 195:**  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

196.    Agri Stats provided an unparalleled ability for Defendant Processors to implement, and monitor each other's compliance with, their collusive agreement to depress compensation. During the Class Period, Agri Stats facilitated the electronic exchange of *terabytes* of competitively sensitive compensation data between the Defendant Processors.  Agri Stats also monitored and audited this data to ensure it was accurate.  By providing this service, Agri Stats became a central part of Defendants' collusion to suppress compensation.

**Answer to Paragraph 196:**  Wayne Farms denies the allegations in this paragraph.

197.    Indeed, a former employee of Perdue Farms during the Class Period stated that Agri Stats was responsible for "collusion in the poultry industry."

**Answer to Paragraph 197:** Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – a statement that speaks for itself.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

198.    Agri Stats is a small company, headquartered in Fort Wayne, Indiana.  Agri Stats describes itself as a "management reporting and benchmarking company" that "provides

consultation on data analysis, action plan development and management practices of participating companies." Agri Stats's mission is to "[i]mprove the bottom line profitability for our participants by providing accurate and timely comparative data while preserving confidentiality of individual companies."

**Answer to Paragraph 198:** Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – a statement that speaks for itself. Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

199.    To the outside world, the role of Agri Stats is almost invisible. No uninitiated poultry processing worker could realize the profound anticompetitive impact Agri Stats has had on the poultry processing industry. Agri Stats services are not for the public, and its reports are not publicly available. Agri Stats refuses to sell its information and reports to just any customer. Blair Snyder, the former president of Agri Stats, said in 2009, "Agri Stats has always been kind of a quiet company. There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of just in the background, and really our specialty is working directly with companies about their opportunities and so forth."

**Answer to Paragraph 199:** Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – a statement that speaks for itself. Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

200.    During the Class Period, Agri Stats partnered with each of the Defendant Processors to electronically collect and exchange timely information regarding compensation of workers at poultry processing plants owned by Defendant Processors, their subsidiaries, and related entities in the United States. Upon information and belief, in the wake of a $1.3 billion jury verdict in 2004 against Tyson Foods for a conspiracy to manipulate compensation for cattle farmers, increased fears of antitrust liability led Tyson Foods to withdraw from Agri Stats. However, in or around January 2008, Tyson Foods resumed its subscription with and participation in Agri Stats. Upon information and belief, on or around 2014, Tyson Foods again withdrew from Agri Stats but then again resumed its subscription with and partnership in Agri Stats in or around 2016.

**Answer to Paragraph 200:** Wayne Farms admits that, from time to time, it transferred data to Agri Stats on a confidential basis. Wayne Farms lacks knowledge or information sufficient

to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

201.    During the Class Period, Agri Stats gathered compensation information from, and exchanged information between, more than 95 percent of U.S. poultry processors.  Agri Stats's full-market coverage of the poultry processing industry afforded Defendant Processors the power to coordinate and suppress compensation through the use of the internet.  During an October 2009 earnings calls for Defendant Sanderson Farms, the former president of Agri Stats, Blair Snyder, said, "All right, who is at Agri Stats? As we talked about, it's a parent company for subsidiary companies that support the industry.  The whole goal is to support the industry.  We do have 97% of the broiler[3] industry participating, about 95% of the turkey industry. . . .The fact that we've got high 90 percentage of both broilers and turkeys, this pretty much represents about anybody that's out there in the broiler industry. . . .[For t]urkey participants, pretty much it's a list of who's who in the turkey business."

**Answer to Paragraph 201:**  Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – a statement that speaks for itself.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

202.    During the Class Period, on a monthly basis, each Defendant Processor provided to Agri Stats the effective salary and wage rates for categories of workers employed at each poultry processing plant owned by the Defendant Processor, its subsidiaries, and related entities in the continental United States.  That information was transmitted to Agri Stats through direct electronic submissions by the Defendant Processors.  Agri Stats utilized an audit process to verify the accuracy of data regarding each plant.

**Answer to Paragraph 202:**   Wayne Farms admits that, from time to time, it transferred data to Agri Stats on a confidential basis.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

203.    Agri Stats subsequently compiled the compensation data that it received from the Defendant Processors and, each and every month during the Class Period, distributed that

---

[3]    The term "broiler" means chicken raised for meat consumption.
**Answer to Footnote 3**:   This footnote is definitional, and therefore does not require a response.

disaggregated compilation to each of the subscribing Defendant Processors.  The compilation included *current* effective salaries and hourly wage rates for categories of workers at poultry processing plants throughout the continental United States operated by Defendant Processors, their subsidiaries, and related entities.  The compilation also included average salary and hourly wage rates for poultry processing plant positions, both nationwide and broken down by region.  Additionally, the compilation identified the productivity of particular processing plant positions, such as birds per person hour and labor hours per pound.

**Answer to Paragraph 203:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

204.    While Agri Stats claims the distributed data is anonymous, the data is sufficiently granular and disaggregated that executives of Defendant Processors could and did easily and precisely match the distributed compensation data to specific poultry processing plants owned by specific Defendant Processors and their subsidiaries in specific regions.

**Answer to Paragraph 204:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

205.    A former employee of Perdue Farms during the Class Period said that Agri Stats data was "supposedly confidential" but he knew from being in the industry and around the "good old boy system" that Perdue Farms and every other poultry processor participating in Agri Stats knew precisely which company reported which data.  He added that it is "just bullshit" to suggest that Defendant Processors did not know which company was reporting which compensation data to Agri Stats and explained that Defendant Processors had "been looking at the same numbers for years so they've figured out who is who."

**Answer to Paragraph 205:**  Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – a statement that speaks for itself.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

206.    A former employee of Pilgrim's during the Class Period explained that Agri Stats data could "totally" be reverse engineered to determine which company's plant was associated with which reported data and that, during meetings at processing plants to review Agri Stats data, colleagues would specifically point out that certain compensation data was associated with a particular competitor's plant in a specific location.

**Answer to Paragraph 206:** Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – a statement that speaks for itself. Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

207.    A former employee of Perdue Farms said that Perdue Farms brought in Agri Stats personnel to teach management "how to extract information" from Agri Stats data.

**Answer to Paragraph 207:** Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – a statement that speaks for itself. Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

208.    Similarly, a former employee of Butterball explained that "you could figure out" which company reported which data to Agri Stats, including compensation data, by speaking with Agri Stats representatives who provided the data. Agri Stats representatives would often assist Defendant Processors in identifying the sources of Agri Stats data, including compensation data.

**Answer to Paragraph 208:** Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – a statement that speaks for itself. Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

209.    During the Class Period, Agri Stats met with each Defendant Processor and its executives quarterly. Since Agri Stats travelled between each Defendant Processor regularly and discussed the nonpublic, proprietary data at those meetings, Agri Stats was in a unique position to share information among Defendant Processors to enforce the agreement. Additionally, during each year of the Class Period, Agri Stats and its subsidiary Express Markets Inc. held "Broiler Outlook Conferences" that were attended by senior executives of the Defendant Processors and which addressed some of the data collected by Agri Stats from Defendant Processors.

**Answer to Paragraph 209:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

210.    As a result of their subscriptions to Agri Stats, during each month of the Class Period, Defendant Processors could determine and knew how much each subscribing Defendant Processor and co-conspirator was paying in compensation to Class Members at their poultry processing plants.  Defendant Processers used the Agri Stats exchange of current compensation data in combination with the previously discussed meetings to harmonize the compensation paid to Class Members and to monitor and confirm that no conspirator deviated from the compensation-fixing conspiracy.  A former employee of Perdue Farms said that it would be "stupid to think" that Agri Stats did not have "an influence on" poultry processing worker wages.

**Answer to Paragraph 210:**  Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – a statement that speaks for itself.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

211.    Agri Stats exchanged detailed compensation information between Defendant Processors on a monthly basis during the Class Period.   This monthly dissemination of compensation data from each of the Defendant Processors allowed the Defendants to efficiently implement the compensation-fixing scheme and systematically monitor and enforce compliance with it.  Defendants were able to *constantly* monitor each other's compensation levels to ensure that no Defendant Processor offered materially more in compensation than another.  A former Butterball employee said there was "no question about it" that Agri Stats was used by poultry processors to monitor each other's performance.

**Answer to Paragraph 211:**  Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – a statement that speaks for itself.  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

212.    During the Class Period, Defendant Processors regularly reviewed Agri Stats compensation data at corporate headquarters and at each individual plant.  For example, at poultry processing plants operated by Perdue, Agri Stats data was reviewed at monthly or quarterly plant meetings during the Class Period.  Similarly, a former employee of George's Foods, LLC said that

Agri Stats data was reviewed during quarterly plant meetings during the Class Period to assess performance. Joe Sanderson, then-CEO and Chairman of Sanderson Farms, stated publicly that "we live and die by Agri Stats." A former employee of Perdue Farms said that the company spent "enormous effort analyzing Agri Stats" and that the CEO was an "Agri Stats guru and nut" who had an "absolute understanding" of the reported Agri Stats data. A former Butterball employee said that "Agri Stats was big" at the company.

**Answer to Paragraph 212:** Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – a statement that speaks for itself. Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

213.    Defendant Processors regularly relied upon Agri Stats data to set the compensation of workers at poultry processing plants. For example, a former employee at a Pilgrim's plant said that a Pilgrim's corporate officer visited the plant every quarter to review Agri Stats data with plant management; that during those meetings, Agri Stats wage data regarding processing plant workers was extensively compared with the plant's own wage figures; and that, when the Agri Stats data was being reviewed, the shared goal of the corporate officer and the plant managers was to ensure that the Pilgrim's plant was paying wages that were exactly in the middle of the reported Agri Stats wage data. The former employee of Pilgrim's explained that a department at Pilgrim's corporate office was specifically tasked with visiting each poultry processing plant operated by Pilgrim's to ensure that their compensation rates were exactly in the middle of reported Agri Stats data.

**Answer to Paragraph 213:** Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

214.    In 2009, shortly after Pilgrim's had filed for bankruptcy in December 2008, the company engaged in collective bargaining negotiations with United Food and Commercial Workers International Union as part of a reorganization plan. During the course of those negotiations, Pilgrim's executives insisted that labor costs be within the Agri Stats average range in each of the company's domestic poultry processing plants.

**Answer to Paragraph 214:** Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

215.    Similarly, a former employee of Butterball explained that the company relied on Agri Stats when engaging in collective bargaining negotiations with unions that represented poultry processing workers. The former Butterball employee explained that the company would

73

use Agri Stats to "show unions the average pay in the industry" and insisted during negotiations that wages "would have to be within the parameters" contained in Agri Stats.

**Answer to Paragraph 215:**  Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – a statement that speaks for itself.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

216.    Notably, Pilgrim's and Butterball only disclosed "average" industrywide pay figures obtained from Agri Stats to the unions when engaging in collective bargaining negotiations—*not* disaggregated, company-specific or plant-specific Agri Stats wage data or any actual Agri Stats written reports.  Because Agri Stats will only sell its reports to processors who also provide data for inclusion in those reports, unions and their members were not able to obtain the Agri Stats reports themselves.

**Answer to Paragraph 216:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

217.    Defendant Processors knew that they could rely on Agri Stats data to set compensation and enforce the conspiracy because Agri Stats audited the raw data collected from each Defendant Processor.  Such auditing ensured that no Defendant Processor or co-conspirator could cheat on the compensation-fixing agreement by covertly providing higher wages, salaries or benefits.

**Answer to Paragraph 217:**  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

218.    To ensure the accuracy of its reports, Agri Stats physically visited each Defendant Processor to collect data.  Specifically, Agri Stats would establish an initial data collection process, wherein staff would conduct on-site meetings for approximately one week to identify data locations, files, and formats.  Agri Stats staff would then spend approximately three weeks inputting and converting data from the Defendant Processor and preparing auditors for monthly analysis of that data.  Moving forward, the Defendant Processor would upload data in real-time to Agri Stats, and internal auditors would examine the uploaded data and perform monthly audits.

**Answer to Paragraph 218:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

219.    There is no plausible, non-conspiratorial justification for Defendant Processors, with Agri Stats' agreement and participation, to have shared, on a monthly basis, highly confidential and proprietary information about their *current* compensation rates for poultry processing plant workers, as broken down by position.  In a competitive market, such proprietary, competitively sensitive information would remain a closely guarded secret.

**Answer to Paragraph 219:**  Wayne Farms denies the allegations in this paragraph.

220.    Sharing the detailed compensation data contained in the Agri Stats reports between Defendant Processors was unnecessary for controlling costs.  If a Defendant Processor sought to lower its costs, it was free to do so without first exchanging disaggregated, current, granular, competitively sensitive compensation data with rival poultry processors.

**Answer to Paragraph 220:**  Wayne Farms denies the allegations in this paragraph.

221.    The data exchanged between Defendant Processors through Agri Stats bears all the hallmarks of an enforcement mechanism for an anticompetitive compensation scheme.  The information contained in Agri Stats reports was current and specific to individual poultry processors and their plants.  The information about each Defendant Processor's compensation rates was detailed, including average salary and hourly wage rates for each poultry processing plant position, both nationwide and broken down by region.  Moreover, none of the Agri Stats information exchanged between Defendant Processors was publicly available.  Indeed, Defendant Processors were required to pay millions of dollars over the Class Period to access the compensation data, and Agri Stats only allowed a Defendant Processor to receive compensation data if that processor reciprocated and shared detailed compensation data.  Accordingly, Agri Stats's collection and dissemination of such competitively sensitive compensation data allowed the Defendant Processors to compare and coordinate their compensation decisions and police each other for any violations of the conspiracy as they occurred.

**Answer to Paragraph 221:**  Wayne Farms denies the allegations in this paragraph.

222.    Defendant Processors' monthly exchange of detailed, current, and disaggregated information regarding the compensation of poultry processing workers was anticompetitive.  It resulted in lower compensation for all Class Members than each would have received in a competitive market, and it materially increased the profits of Defendants Processors.

**Answer to Paragraph 222:**  Wayne Farms denies the allegations in this paragraph.

223.    On February 15, 2017, in an article titled "Is the Chicken Industry Rigged?," *Bloomberg Businessweek* reported, "Armed with Agri Stats data, the biggest chicken producers have been enjoying an unprecedented era of stability and profitability.  At Tyson Foods, operating margins in the chicken division have risen sharply since 2009, when they were 1.6 percent, according to SEC filings.  The next year they were up to 5.2 percent.  After a brief dip, they climbed to 7.9 percent in 2014, an astounding 12 percent in 2015, and 11.9 percent in 2016.  A similar trend has been under way at Pilgrim's Pride, where operating margins went from 3.08 percent in 2012 to 14.02 percent in 2014 and 12.77 percent in 2015, according to data compiled by Bloomberg.  The recovery from recession accounts for some of the gains, but the poultry industry's profit margins still have been abnormally fat and long-lasting by historical standards."

**Answer to Paragraph 223:** Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – a document that speaks for itself.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

224.    Agri Stats has profited from collecting and reporting Defendants Processors' confidential business information, including by charging substantial fees of hundreds of thousands of dollars annually to each Defendant Processor.  During the Class Period, the Defendant Processors paid millions of dollars to Agri Stats.

**Answer to Paragraph 224:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

3.    **Plant-to-Plant Communications About Compensation**

225.    In furtherance of the compensation-fixing conspiracy, the individual plants owned and operated by the Defendant Processors, their subsidiaries, and related entities often engaged in bilateral exchanges of compensation information with competing poultry processing plants in the same region.  The information obtained from these data exchanges was provided to the corporate headquarters of the respective Defendant Processors, which used this regional information to facilitate the setting of artificially depressed compensation.

**Answer to Paragraph 225:**  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms.  Wayne Farms lacks knowledge or information sufficient to

form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

226.    A former employee of a Pilgrim's poultry processing plant said that corporate headquarters would ask each plant to obtain information about current and future compensation at competing poultry processing plants.  That information was often obtained *directly* from those competing poultry processing plants through information-sharing channels.

**Answer to Paragraph 226:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

227.    A former employee of Peco Foods said that human resources managers at local poultry processing plants "shared [compensation information] within the industry" all the time. He explained that "local plants talk" and "knew what competitors are doing and how much they are paying."  He said that human resources staff would often contact their counterparts at a competitor plant and share information about starting pay rates, pay increases and employment benefits.  He explained that this "type of thing happened all the time."

**Answer to Paragraph 227:**  Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – statements that speak for themselves. Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

228.    These plant-to-plant communications often involved the exchange of detailed compensation data regarding *future* wages (which are not part of Agri Stats reports).  For example, these exchanges were sometimes initiated by a Defendant Processor's plant if a competing poultry processing plant was expanding and thus intended to hire a large number of new workers.  In that situation, the plant initiating the exchange of compensation data is seeking to ensure that its wages will be like those at the newly expanded plant, in order to avoid turnover and wage competition for labor.

**Answer to Paragraph 228:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

229.    For example, a Pilgrim's poultry processing plant in Mayfield, Kentucky requested and obtained the pay rates of plant workers from competitor poultry processing plants in the fall of 2017.  A rival Tyson Foods poultry processing plant in nearby Union City, Tennessee was

planning to expand its "live hang" operation.  As a result, a plant manager at Pilgrim's Mayfield plant reached out to a counterpart at Tyson Foods' Union City plant and obtained *future* pay rates for processing line positions at the newly expanded plant.  During the same time period, another manager at Pilgrim's Mayfield plant contacted a counterpart at a nearby Perdue poultry processing plant in Cromwell, Kentucky and obtained that rival plant's pay rates for processing line workers.  These and other pay rates obtained from competing poultry processing plants were compiled into a single document and transmitted to senior executives at Pilgrim's corporate headquarters.  A former employee of Pilgrim's explained that these kinds of exchanges of compensation data between regional Pilgrim's, Tyson and Perdue plants had been occurring for years.

**Answer to Paragraph 229:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

230.    A former employee of Butterball explained that the company's poultry processing plant in Mount Olive, North Carolina would regularly exchange hourly wages for specific positions with other nearby poultry processors.  The former Butterball employee explained that when the Butterball plant requested hourly wage data from a rival poultry processing plant, the Butterball plant would share its own wage data with that rival processor so that the companies could "compare" their compensation schedules.

**Answer to Paragraph 230:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

231.    A former employee of Wayne Farms, who worked out of the company's corporate office, was tasked with developing pay bands for processing plant workers.  To assist with that project, the former employee distributed surveys to multiple poultry processors in the Southeast region during the Class Period that requested information about compensation paid to processing plant positions.  The survey was disseminated through an email listserv to dozens of other poultry processing plants in the Southeast region.  Multiple poultry processors returned completed surveys to the former Wayne Farms employee.

**Answer to Paragraph 231:**  Wayne Farms admits that, from time to a time, a Wayne Farms  employee gathered competitive market information regarding wage rates from local processors.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

232.    A former employee of Perdue Foods during the Class Period stated that the company sometimes distributed wage surveys to competing poultry processors.

**Answer to Paragraph 232:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

233.   A former human resources manager who worked at both a Perdue poultry processing plant and a George's poultry processing plant during the Class Period stated that both plants exchanged data with rival poultry processing plants on an annual basis.  The former human resources manager explained that managers of the Perdue plant and the George's plant contacted managers of rival poultry processing plants operated by Pilgrim's, Cargill, and Virginia Poultry Growers Cooperative, Inc. and requested the *current* hourly wage rates for plant workers as well as any planned *future* increases to those hourly wage rates.  The former human resources manager said, "We would collaborate.  We would talk among each other to see what they were doing for pay."  The former human resources manager provided the compensation data obtained from rival poultry plants to the corporate headquarters of Perdue or George's.

**Answer to Paragraph 233:**   Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – statements that speak for themselves. Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

234.   Defendant Processors also arranged and conducted tours of each other's poultry processing plants as a means to exchange information.  For example, in April 2013, the CEO of Pilgrim's, Bill Lovette; the Chairman of the Board of Perdue Farms, Jim Perdue; and the President of Sanderson Farms, Lampkin Butts, attended a "Chicken Media Summit" in North Carolina that included visits by attendees to a local Sanderson Farms poultry processing plant.  Similarly, in April 2015, another "Chicken Media Summit" was held on Maryland's Eastern Shore, and it included tours of one of Perdue's local poultry processing plants.  Upon information and belief, these and other plant tours included discussion of labor practices.

**Answer to Paragraph 234:**   Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

4.      **Plus Factors that Render the Poultry Industry Susceptible to Collusion**

235.   The poultry processing industry is characterized by numerous features, or plus factors, that render the industry particularly susceptible to collusion and bolster the plausibility of the conspiracy alleged herein.  These include:  (1) vertical integration; (2) high barriers to entry; (3) industry concentration; (4) fungibility of poultry processing plant labor; (5) inelastic labor

supply; (6) a history of government investigations into collusive actions; (7) personal relationships between executives at competing poultry processors; and (8) numerous opportunities to collude.

**Answer to Paragraph 235:**  This paragraph contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions, to which no response is required.  To the extent a response is required, Wayne Farms denies the allegations in this paragraph.

236.    The poultry industry is, by far, the most vertically integrated segment of agriculture. Defendant Processors, their subsidiaries, and related entities own and operate nearly every stage of poultry production, from the feed mills to the hatcheries to the processing plants.  Accordingly, Defendant Processors control the compensation of the vast majority of workers in the *entire* poultry industry.  Defendant Processors can and do leverage that power to form and implement a compensation-fixing conspiracy that precludes employees of poultry processing plants from switching to alternate higher-paying positions within the poultry industry.

**Answer to Paragraph 236:**  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

237.    The poultry processing industry is characterized by high entry barriers.  These barriers include the high costs of:  constructing and operating a processing complex, including hatcheries, feed mills, and processing plants; establishing and operating a distribution network capable of delivering poultry products to grocery chains or wholesalers; developing and investing in a skilled contract-farmer base; and ensuring compliance with onerous federal and state government mandates and regulations.  The cost of constructing a poultry processing complex alone is in excess of $100 million.  As a result, it is exceptionally expensive and logistically complex for new poultry processors to emerge and compete with Defendant Processors.

**Answer to Paragraph 237:**  This paragraph contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions, to

which no response is required.  To the extent a response is required, Wayne Farms denies the

allegations in this paragraph.

238.    The poultry processing industry is highly concentrated.  According to a November 2013 USDA report, "[d]uring the past 16 years, firms in the Broiler industry continued to decrease in number and grow in size, thereby gaining further economies of scale and scope in processing and marketing."  According to the National Chicken Council, 55 federally inspected Broiler companies operated in 1995, compared with just 30 such companies operating in 2019.  The chicken processing industry's top-eight-firms concentration ratio has increased from 53.1% in 1997 to 79.3% in 2013.  Similarly, the turkey processing industry's top-eight-firms concentration ratio exceeds 75%.

**Answer to Paragraph 238:**  Wayne Farms admits that this paragraph appears to

selectively quote from – and attempts to characterize – a document that speaks for itself.  Wayne

Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining

allegations in this paragraph and therefore denies them.

239.    Poultry processors view the plant workers that comprise the Class as fungible. Workers within the same positions are generally interchangeable, permitting Defendant Processors to readily compare and match each other's compensation levels.

**Answer to Paragraph 239:**  This paragraph contains Plaintiffs' characterization of their

claims, allegations subject to proof, including by expert testimony, and/or legal conclusions, to

which no response is required.  To the extent a response is required, Wayne Farms denies the

allegations in this paragraph.

240.    The market for poultry processing workers is characterized by inelastic labor supply.  Industry-wide changes in compensation rates do not substantially affect the rate of participation in poultry processing positions.

**Answer to Paragraph 240:**  This paragraph contains Plaintiffs' characterization of their

claims, allegations subject to proof, including by expert testimony, and/or legal conclusions, to

which no response is required.  To the extent a response is required, Wayne Farms denies the allegations in this paragraph.

241.    The history of the poultry processing industry is replete with government investigations and collusive actions.  For example, in April 1973, the United States Department of Justice ("DOJ") filed a civil antitrust action against the National Broiler Marketing Association ("NBMA") for conspiring to fix the prices of broilers in violation of Section 1 of the Sherman Act. The DOJ sought to enjoin the NBMA and its dozens of members, including many of the Defendant Processors, from continuing a conference call program whereby members coordinated the pricing and production of broilers.  As for a more recent example, the DOJ is *currently* investigating the poultry industry for engaging in anti-competitive conduct.  In June 2019, the DOJ disclosed that the agency had launched a criminal investigation into whether poultry processors have violated the antitrust laws by fixing the prices of broilers, and the agency issued grand jury subpoenas to several of the Defendant Processors as part of that investigation.  On June 3, 2020, the DOJ indicted four executives from Pilgrim's and Claxton Poultry Farms for engaging in a price-fixing conspiracy, and the indictment explains that *at least* seven poultry processors participated in the conspiracy.

**Answer to Paragraph 241:**  Wayne Farms admits that this paragraph appears to reference – and attempts to characterize – investigations unrelated to the allegations of this Complaint. Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

242.    Executives of Defendant Processors have close personal relationships with each other.  A former employee of Perdue Farms said that management in the industry formed a "tight-knit circle" and exchanged information frequently.  The former Perdue Farms employee noted that, for example, Jim Perdue, chairman of Perdue Farms, and Ronald Cameron, the owner of Mountaire Farms, regularly attend church together.  Another former employee, who worked at three different poultry processing plants operated by Tyson, Pilgrim's and Perdue, said that senior executives of those three companies knew each other very well.

**Answer to Paragraph 242:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

243.    Defendants have had numerous opportunities to collude.  In addition to attending the annual "off-the-books" meetings of the Compensation Committee at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, the senior executives of Defendant Processors responsible for determining compensation for poultry processing plant workers attended multiple other in-person meetings during the Class Period.  Many of those meetings were sponsored by trade associations that advocate for the interests of the Defendant Processors.  Those meetings include:

82

a.    Seminars and Meetings of the U.S. Poultry & Egg Association.  The U.S. Poultry & Egg Association describes itself as the world's largest and most active poultry organization, and each Defendant Processor is a member.  Each year of the Class Period, the Association held a Human Resources Seminar, often at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida.  Many of the Defendant Processors' employees responsible for setting plant worker compensation—including senior executives, Vice Presidents of Human Resources, Directors of Compensation, Directors of Benefits, and Compensation Analysts—regularly attended the Human Resources Seminar.  A former employee who worked at three different poultry processing plants operated by Tyson, Pilgrim's and Perdue, said that the attendees at the Association's annual Human Resources Seminar knew each other very well and could have readily discussed compensation of processing plant workers over dinner.  In addition, senior executives of most of the Defendant Processors serve on the board of directors of the Association, and that board conducted in-person meetings four times a year during the Class Period.

b.    Meetings of the National Chicken Council.  The National Chicken Council exclusively represents chicken processors, and its members account for approximately 95 percent of the chicken sold in the United States.  Each Defendant Processor that processes chicken is a member of the National Chicken Council.  Senior executives of those Defendant Processors serve on the board of directors of the National Chicken Council, and that board of directors met at least four times a year during the Class Period.   In conjunction with some of these meetings, executives from Agri Stats made presentations, and the CEOs of many Defendant Processors held private dinners.

c.    Meetings of The National Turkey Federation.   The National Turkey Federation represents turkey processors, and its members account for approximately 95 percent of the turkey sold in the United States.  Each Defendant Processor that processes turkey is a member of the National Turkey Federation.  Executives of Defendant Processors that process turkey serve on the board of directors of the National Turkey Federation, and that board of directors met at least twice a year during the Class Period.

d.    Meetings of the Joint Poultry Industry Human Resources Council.  The Joint Poultry Industry Human Resources Council was formed in 2009 by merging the human resources committees of the U.S. Poultry & Egg Association, National Chicken Council, and the National Turkey Federation.  The Joint Poultry Industry Human Resources Council is comprised of senior human resources executives, including executives of the Defendant Processors who formed and implemented the compensation-fixing conspiracy.  The Joint Poultry Industry Human Resources Council exclusively focuses on labor issues, such as

83

compensation, and it held an in-person meeting every year during the Class Period, often at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida.

e. Meetings of the Georgia Poultry Federation. The Georgia Poultry Federation "is a non-profit trade association which represents the poultry industry in Georgia, the nation's leading broiler producing state." Many of the Defendant Processors are members of the Georgia Poultry Federation. It conducted meetings at least three times a year during the Class Period, which were attended by executives of those Defendant Processors.

f. Meetings of the North Carolina Poultry Federation. The mission of the North Carolina Poultry Federation "is to create a favorable climate for business success for everyone involved in the poultry industry in North Carolina." Many of the Defendant Processors are members of the North Carolina Poultry Federation. It conducted several meetings during each year of the Class Period, which were attended by executives of those Defendant Processors.

g. Meetings of The Poultry Federation. The Poultry Federation is a non-profit trade organization that represents the poultry and egg industries in Arkansas, Missouri, and Oklahoma. Many of the Defendant Processors are members of The Poultry Federation. It conducted several meetings during each year of the Class Period, which were attended by the executives of those Defendant Processors.

**Answer to Paragraph 243:** Wayne Farms admits that, from time to time, it attended certain industry events and meetings. Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

## C. Market Power of Defendant Processors

### 1. Direct Evidence of Market Power

244. The strongest evidence that Defendant Processors and co-conspirators collectively possessed the requisite *power* to suppress compensation for poultry plant workers is that they *actually* suppressed such compensation during the Class Period.[4] As detailed above in section VI(B), numerous former employees confirmed that Defendants and co-conspirators used a three-pronged strategy to suppress salaries, wages, and benefits paid to poultry processing workers. First, a secretive "Compensation Committee" convened annual "off the books" meetings in Florida, where executives of Defendant Processors and co-conspirators discussed the results of the

[4] Such "buyer" market power is also referred to as "monopsony power."

**Answer to Footnote 4**: This footnote is definitional, and therefore does not require a response.

highly detailed WMS survey and agreed what they would pay Class Members. The Defendant Processors ensured that each member of the Compensation Committee adhered to the agreement. For example, during the annual "off the books" meetings, executives of the Defendant Processors would present detailed comparisons about how actual salary changes and bonus budgets from the preceding year compared with the *planned* salary changes and bonus budgets that had been collectively devised at the previous year's meeting. Defendants and co-conspirators could not carry out such plans in the absence of collective market power.

**Answer to Paragraph 244:** Wayne Farms denies the allegations in this paragraph.


245. Second, Defendant Processors and co-conspirators exchanged detailed compensation information regarding processing plant workers through Agri Stats. Former employees of Defendant Processors and co-conspirators confirmed that those companies used Agri Stats data to ensure that they were depressing compensation for poultry processing plant workers. For instance, a former Pilgrim's employee explained that corporate officers would visit Pilgrim's processing plants quarterly to ensure that the plants were not compensating workers more than the "middle" amount reported to Agri Stats. Similarly, a former employee of Butterball explained that, during union negotiations, the company would insist that wages "would have to be within the parameters" contained in Agri Stats. The ability of Defendant Processors and co-conspirators to keep wages within Agri Stats "parameters" demonstrates their collective market power.

**Answer to Paragraph 245:** Wayne Farms denies the allegations in this paragraph.


246. Third, Defendant Processors and co-conspirators frequently engaged in bilateral exchanges of current and future wage data. For example, a former employee of Butterball explained that the company's processing plant in Mount Olive, North Carolina would regularly exchange hourly wages for specific positions with other nearby poultry processors. The former Butterball employee explained that when the Butterball plant requested hourly wages from a rival poultry processing plant, the Butterball plant would share its own wage data with that rival processor so that the companies could "compare" their compensation. Similarly, former employees of Wayne Farms and Perdue explained that those companies disseminated wage surveys directly to other poultry processors during the Class Period. As one former human resources manager of poultry processing plants operated by Perdue and George's put it, "We would collaborate." This collaboration could not have been effective if Defendant Processors and co-conspirators did not have the power to suppress wages as a group.

**Answer to Paragraph 246:** Wayne Farms denies the allegations in this paragraph.


247. More broadly, if the Defendant Processors' and co-conspirators' long-running three-pronged conspiracy to suppress wages was unworkable because they lacked collective market power, they would not have conspired in the first place, and certainly would not have continued doing so.

**Answer to Paragraph 247:**  Wayne Farms denies the allegations in this paragraph.

248.    Defendant Processors' and co-conspirators' meetings and data exchanges were costly:  they paid for the WMS survey and Agri Stats reports, spent time and money answering detailed survey questions, paid for senior human resource executives to attend in-person meetings in Florida, and exposed themselves to legal liability.  Defendant Processors and co-conspirators would not have continued to incur these annual expenses for the entire Class Period—a solid decade—unless their compensation-fixing and information exchanges were paying dividends in the form of reduced salaries, wages, and/or benefits for poultry processing plant workers.  This indicates that Defendant Processors and co-conspirators believed and acted as though they had the market power to profitably suppress wages.

**Answer to Paragraph 248:**  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

### 2.    Indirect Evidence of Market Power

### a.    Product or Services Market

249.    The relevant market is the labor market for employment at poultry processing plants in the continental United States ("Relevant Market").

**Answer to Paragraph 249:**  This paragraph contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions, to which no response is required.  To the extent a response is required, Wayne Farms denies the allegations in this paragraph.

250.    A hypothetical cartel that controlled a large share of the Relevant Market, as Defendant Processors and co-conspirators collectively do here, could profitably suppress compensation paid to workers at poultry processing plants below competitive levels.  In such circumstances, poultry processing workers would not be able to defeat such artificial compensation suppression by switching employment to other non-conspiring poultry processors.

**Answer to Paragraph 250:**  This paragraph contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions, to

which no response is required.  To the extent a response is required, Wayne Farms denies the allegations in this paragraph.

251.    There are no close economic and/or functional substitutes for employment at poultry processing plants from the perspective of workers at those plants.  As discussed above, many hourly-paid workers in poultry processing plants do not speak English and lack significant education.  Accordingly, many hourly-paid workers in poultry processing plants cannot easily obtain stable employment at a similar level of compensation outside the poultry industry.

**Answer to Paragraph 251:**  This paragraph contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions, to which no response is required.  To the extent a response is required, Wayne Farms denies the allegations in this paragraph.

252.    Employees in the industry have continually noted these language and educational challenges that many poultry processing workers face.  A former employee of Pilgrim's during the Class Period explained that many poultry processing plant workers never graduated from high school and did not speak English and thus were limited from pursuing work outside a poultry processing plant.  A former employee of George's Foods, LLC during the Class Period explained that poultry processors "catered" to workers who did not speak English and lacked a strong educational background and that it would be difficult for poultry processing plant workers to find employment outside a poultry processing plant because of "communication issues."  Similarly, a former human resources manager at a Tyson Foods poultry processing plant explained that poultry processors recruited and thrived from an "underprivileged" workforce that had difficulty communicating in English and had a very limited ability to obtain jobs outside the poultry industry. Indeed, Tyson Foods has formally recognized this challenge faced by its workforce by instituting a program to "enable hourly employees to access English as a second language."  Thus, many unskilled or low-skilled jobs such as retail sales, fast food or some manual labor jobs—which require proficiency in English—are not a reasonable substitute for the majority of workers in the Relevant Market.

**Answer to Paragraph 252:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

253.    In addition, unskilled and low-skilled jobs are not reasonable substitutes for work at poultry processing plants because those jobs rarely pay more than the minimum wage.  By contrast, poultry plant workers earn significantly more than most minimum wages.  In part, this is because poultry processing workers have some industry and employer-specific skills, and employers in the poultry processing industry are willing to pay for those skills.  Additionally, as

explained above, poultry processing work is extremely dangerous.  The types of workers who choose to work in a poultry processing plant prefer to receive extra pay for dangerous labor, instead of accepting lower wages at safer positions.  This indicates that unskilled and low-skilled jobs are not reasonable economic substitutes for employment in the Relevant Market, which mostly pays hourly wages well above the minimum wage (but at the same time, less than what poultry processing plant workers would make in a competitive market).

**Answer to Paragraph 253:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.


254.    Similarly, employment at non-poultry meat processing plants is not a reasonable substitute for employment in the Relevant Market.  For example, beef processing plants pay processing plant workers substantially more than employers in the Relevant Market—on average beef processing plants pay 25% to 35% higher compensation to plant workers than employers pay in the Relevant Market.  This indicates that workers in the Relevant Market cannot readily switch to a job at a beef processing plant because, if such a switch were readily available, employers in the Relevant Market would have had to substantially increase their compensation so as not to lose too many employees to beef processors.  The fact that such a significant wage differential can be maintained indicates that beef processing jobs require skills and/or worker attributes that cannot be readily obtained by workers in the Relevant Market, or that beef processing jobs are more dangerous and thus less appealing to workers in the Relevant Market.  These differences indicate that beef processing jobs are not functionally interchangeable with jobs in the Relevant Market.

**Answer to Paragraph 254:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.


255.    There are also significant lock-in effects that result from developing skills and experience specific to the Relevant Market.  For example, once on the job for an appreciable period, poultry processing plant workers learn new skills, such as those necessary for effectively deboning birds on processing lines.  Wayne Farms recognizes this on its website where the company advertises to potential workers that they can "develop new skills on the job."  Defendant Processors value these skills in experienced poultry processing plant workers and recognize that such skills are differentiated from those necessary for other jobs.  For example, Tyson Foods' "Talent Strategy" seeks to hire poultry workers with "the differentiated capabilities and skills that we need for the future."  Perdue Farms notes its poultry workers' "unique talents."

**Answer to Paragraph 255:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.


256.    Those skills are not transferrable to other jobs even if those other jobs may be generally termed as low-skilled.  For example, the skill of deboning a chicken or turkey makes a

poultry processing plant worker a more valuable employee for poultry processing companies, but not for other companies seeking low-skilled manual labor.  As a result, workers in the Relevant Market receive higher wages as they gain more experience working in poultry processing plants (even if those wages are suppressed by the conspiracy).  Indeed, each Defendant Processor materially increases wages to processing plant workers according to their level of experience, which correlates to their skill level and productivity.  Those higher wages received for greater skill and experience reduce the substitutability of jobs outside of the Relevant Market and make remaining in poultry processing plant positions more attractive to plant workers.  In other words, those higher wages increase the switching or transaction costs of seeking a position outside the Relevant Market that would not value the skills obtained by the poultry processing plant worker.

**Answer to Paragraph 256:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.


257.    These lock-in affects arising from the development of job-specific skills apply with additional force to salaried poultry processing workers in the Class.  These salaried positions require even more training and skills specific to poultry processing that would not be transferable to occupations outside of the Relevant Market and therefore make it even more difficult for salaried poultry processing workers to switch to occupations outside of the Relevant Market.

**Answer to Paragraph 257:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.


258.    Poultry processing plant workers, like most laborers, cannot withhold their services until a later date as a means of negotiating for higher compensation.  They depend on a regular income.  This weakens their negotiating position with poultry processing employers and enhances the Defendant Processors' market power.

**Answer to Paragraph 258:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.


259.    Recent empirical econometric work has found that many low-skilled occupations face sufficiently inelastic labor supply curves that the occupation would be considered a relevant antitrust market that would satisfy the hypothetical monopsonist test.  One recent paper analyzed low-skilled labor markets defined by the 6-digit Standard Occupational Classifications (SOC) tracked by the Bureau of Labor Statistics and found that for each such occupation, a hypothetical monopsonist would find it profitable to decrease wages by at least 5% or more.[5]  The paper

---

[5] Jose Azar, Steven Berry, and Iona Marinescu, *Estimating Labor Market Power* (Sep. 18, 2019) *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3456277.

demonstrates economically that low-skilled occupations can be relevant antitrust markets and thus supports the plausibility of the Relevant Market.

**Answer to Paragraph 259:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

### b.      Geographic Market

260.     The relevant geographic market is the continental United States.  A slight decrease in compensation from the competitive level could be imposed collectively by the poultry processors in the continental United States without causing too many poultry workers to leave the country or move to a different occupation.

**Answer to Paragraph 260:**  This paragraph contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions, to which no response is required.  To the extent a response is required, Wayne Farms denies the allegations in this paragraph.

261.     Defendant Processors set their compensation and recruiting policies for poultry processing plant workers largely on a nationwide basis, and therefore treat such workers as if they were participating in a nationwide labor market.  Each Defendant Processor establishes compensation for workers at poultry processing plants at identical or near identical levels, regardless of the region, state, county or locality in which those plants are located.  Because each Defendant Processor establishes the same, or nearly the same, compensation for workers at poultry processing plants regardless of geographic region, state, county or locality, conduct that suppresses compensation to those workers in one poultry processing plant location would necessarily suppress compensation to workers employed in all of the poultry processing plants owned by the Defendant Processor, its subsidiaries, and related entities throughout the continental United States.

**Answer to Paragraph 261:**  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

### c.      High Collective Market Share and Monopsony Power

262.     Defendant Processors and co-conspirators collectively possess market and monopsony power in the Relevant Market in that they have the power, collectively, and through

the challenged conduct, to profitably suppress compensation to workers at poultry processing plants below competitive levels.

**Answer to Paragraph 262:**  Wayne Farms denies the allegations in this paragraph.

263.    Defendant Processors and co-conspirators pay compensation to workers at poultry processing plants that comprise more than 90 percent of the Relevant Market.

**Answer to Paragraph 263:**  Wayne Farms lacks knowledge or information sufficient to

form a belief about the truth of the allegations in this paragraph and therefore denies them.

### D.    Anticompetitive Effects and Injury Suffered by Class Members

264.    As a result of Defendants' anticompetitive conduct alleged herein, competition between Defendant Processors over compensation was restrained or eliminated in the market for workers in poultry processing plants in the continental United States during the Class Period.

**Answer to Paragraph 264:**  Wayne Farms denies the allegations in this paragraph.

265.    As a result of Defendants' anticompetitive conduct alleged herein, the compensation of workers in poultry processing plants in the continental United States were fixed, stabilized, or maintained at artificially depressed levels during the Class Period.

**Answer to Paragraph 265:**  Wayne Farms denies the allegations in this paragraph.

266.    The purpose of the conspiratorial conduct of the Defendants was to depress, fix, or maintain the compensation of workers in poultry processing plants in the continental United States and, as a direct and foreseeable result of the conspiratorial conduct, Plaintiffs and the Class received compensation at artificially-depressed rates during the Class Period.

**Answer to Paragraph 266:**  Wayne Farms denies the allegations in this paragraph.

267.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their businesses or property, having received lower compensation during the Class Period than they would have received in the absence of Defendants' illegal contract, combination, or conspiracy.  As a result, Plaintiffs and the Class have suffered damages.

**Answer to Paragraph 267:**  Wayne Farms denies the allegations in this paragraph.

268.    This is an injury of the type that the antitrust laws were meant to punish and prevent.

**Answer to Paragraph 268:**  Wayne Farms denies the allegations in this paragraph.

269.    An analysis conducted by economists retained by Plaintiffs shows that the discrepancy between the earnings of workers employed by food manufacturers broadly (including manufacturers of grain, sugar, dairy, seafood and other foods) and the earnings of workers employed by poultry processors materially increased during the Class Period.  To conduct the analysis, the economists relied on publicly available data obtained from the U.S. Bureau of Labor Statistics, which maintains distinct compensation data for poultry processing workers (i.e. NAICS Code 311615).  According to the preliminary economic analysis, the difference between the weekly earnings of workers employed by food manufacturers broadly and the weekly earnings of workers employed by poultry processors was, on average, $103.79 during the ten-year period prior to the Class Period, and subsequently increased to, on average, $127.30 during the Class Period.

**Answer to Paragraph 269:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

270.    During the Class Period, as a result of the conspiracy to restrain and depress compensation, the hourly wages of poultry processing plant workers employed by Defendant Processors, their subsidiaries, and related entities often only increased approximately 25 cents a year.  These annual "raises" for poultry processing plant workers were perceived by Defendant Processors to be merely cost-of-living adjustments, rather than material increases to compensation.

**Answer to Paragraph 270:**  Wayne Farms denies the allegations in this paragraph.

271.    A former human resources manager at a Tyson Foods poultry processing plant explained that, in practice, these limited annual raises to hourly wages rarely increased total compensation for poultry processing workers because those raises were effectively offset by annual increases to health insurance premiums.  According to the former Tyson Foods human resources manager, poultry processing plant workers "really never get ahead" of their starting wage.

**Answer to Paragraph 271:**  Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – statements that speak for themselves. Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

272.    While compensation paid to Plaintiffs and the Class was artificially depressed during the Class Period, the productivity of those workers greatly increased.  A primary reason for that increase in productivity is that processing line speeds were substantially increased.  Between

1999 and 2015, line speeds increased by 54%, poultry production increased by nearly 35%, but inflation-adjusted hourly wages for poultry processing workers, in fact, decreased by more than 1%.  As a result, even while Plaintiffs and the Class worked harder during the Class Period, the compensation received by them was artificially depressed.  Thus, while labor productivity in poultry processing plants owned by Defendant Processors, their subsidiaries, and related entities has substantially increased over the past two decades, labor costs have declined for Defendant Processors during that same period.

**Answer to Paragraph 272:**  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

273.    In a competitive market, Defendant Processors would have competed to recruit, hire and retain workers during the Class Period by offering higher wages, higher salaries and superior benefits, and many Class Members would have switched employment to different poultry processors as a result of that competition for labor.  Yet, by entering into the alleged conspiracy, Defendant Processors were able to reduce and stabilize turnover rates.  Defendants' scheme harmonized compensation to Class Members across the poultry processing industry and thus reduced the incentive for Class Members to switch employment between Defendant Processors.

**Answer to Paragraph 273:**  Wayne Farms denies the allegations in this paragraph.

274.    The effects and injuries caused by Defendants' anticompetitive agreement commonly impacted all workers at poultry processing plants owned by Defendant Processors, their subsidiaries, and related entities in the continental United States because Defendant Processors valued internal equity, i.e. the idea that similarly situated employees should be compensated similarly. Each Defendant Processor established a pay structure to accomplish internal equity. Each Defendant Processor established narrow compensation ranges for poultry processing plant workers in the continental United States with similar job positions and similar levels of experience and also maintained certain compensation differentials between different poultry processing plant positions.  For example, a former employee of Perdue Foods explained that hourly wage increases for positions in processing plants were made company-wide.  Similarly, a former employee of Tyson Foods explained that the company paid poultry processing plant workers "consistently" within each division and position, regardless of the plant's location.

**Answer to Paragraph 274:**  Wayne Farms denies the allegations in this paragraph.

## VII.   STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.   Continuing Violation

275.   During the Class Period, Defendants' conspiracy was a continuing violation in which Defendants repeatedly invaded Plaintiffs' and Class Members' interests by adhering to, enforcing, and reaffirming the anticompetitive agreement described herein.  Indeed, Defendants continue to exchange competitively sensitive information regarding, and to discuss and reach agreement on, compensation to pay Class Members through the present.

**Answer to Paragraph 275:**  Wayne Farms denies the allegations in this paragraph.

276.   Defendants' continuing adherence to, enforcement of, and reaffirmation of the anticompetitive agreement throughout the Class Period was and is consummated through, among other conspiratorial acts, "off the books" in-person meetings conducted each year to discuss and fix compensation to Class Members, the monthly exchange of competitively sensitive compensation data through Agri Stats, the renewal of subscriptions to Agri Stats, participation in annual compensation surveys operated by WMS, and other communications between Defendants.

**Answer to Paragraph 276:**  Wayne Farms denies the allegations in this paragraph.

### B.   Fraudulent Concealment

#### 1.   Plaintiffs Did Not and Could Not Have Discovered Defendants' Misconduct

277.   Plaintiffs and other Class Members had neither actual nor constructive knowledge of the facts constituting their claim for relief.  Plaintiffs and Class Members did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint.  Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy to fix and depress compensation paid to workers in poultry processing plants.

**Answer to Paragraph 277:**  Wayne Farms denies the allegations in this paragraph.

278.   Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Poultry processors are not exempt from antitrust regulation, and thus, Plaintiffs reasonably considered the poultry processing industry to be competitive until recently.  Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of wages, salaries or benefits paid by Defendant Processors to workers in poultry processing plants in the continental United States.

**Answer to Paragraph 278:**  Wayne Farms denies the allegations in this paragraph.

279.    Plaintiffs exercised reasonable diligence.  Plaintiffs and the other Class Members could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and co-conspirators to conceal their combination.

**Answer to Paragraph 279:**  Wayne Farms denies the allegations in this paragraph.

## 2.    Defendants Actively Concealed the Conspiracy

280.    Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and the other Class Members.

**Answer to Paragraph 280:**  Wayne Farms denies the allegations in this paragraph.

281.    The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to conducting secret "off the books" meetings, engaging in surreptitious communications that do not create or involve written records, exchanging competitively sensitive compensation data through a nonpublic and proprietary system, and concealing the existence and results of commissioned compensation surveys.  Defendants formed and implemented the combination and conspiracy in a manner specifically designed to avoid detection.

**Answer to Paragraph 281:**  Wayne Farms denies the allegations in this paragraph.

282.    During the Class Period, Defendants affirmatively and falsely represented that they paid wages, salaries and benefits reflective of a competitive market for labor.  For example, in October 2015, in response to a report from Oxfam America decrying compensation and working conditions in chicken processing plants in the United States, Tyson Foods said in a statement, "We believe in fair compensation, a safe and healthy work environment and in providing workers with a voice."  Perdue Farms also responded to the Oxfam America report by stating in October 2015 that the company provides "competitive wages" above minimum wage.  That same month, the National Chicken Council and U.S. Poultry & Egg Association—the two leading trade associations that are controlled by and represent the interests of Defendant Processors—issued a joint statement that provides:  "Poultry processing plants compete for the local workforce and therefore must pay competitive wages and offer competitive benefits.  Poultry processing companies offer competitive insurance benefits that includes family and dependent coverage."  These false representations were used to conceal the conspiracy.

**Answer to Paragraph 282:** Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – statements that speak for themselves.

Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms.

Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the

remaining allegations in this paragraph and therefore denies them.

283.    Defendant Processors also advertised to potential processing plant employees that
the compensation offered and provided was "competitive," *i.e.* the result of competition in the
labor market for poultry processing plant employees.  For example, Tyson Foods claims in public
advertisements that its compensation is "competitive."  The company further states on its website,
under the title "Fair Compensation": "We offer employees competitive pay and benefits…"
Similarly, Perdue Farms advertises on its website:  "We offer competitive wages and a
comprehensive benefits package…"  Wayne Farms advertises on its website that it offers
"comprehensive and competitive" benefits.  The Chief Operating Officer of Sanderson Farms
called the company's wages and benefits "among the most comprehensive offered in the poultry
industry, or for that matter, any industry."  Indeed, all Defendant Processors have made similar
statements that falsely indicated Defendant Processors' compensation for poultry processing plant
workers was determined through genuine competition in the labor market with other Defendant
Processors.

**Answer to Paragraph 283:**  Wayne Farms admits that this paragraph appears to

selectively quote from – and attempts to characterize – statements that speak for themselves.

Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms.

Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the

remaining allegations in this paragraph and therefore denies them.

284.    Defendants took affirmative and specific steps to fraudulently conceal each
component of the compensation-fixing conspiracy.  As to the in-person meetings of the
Compensation Committee, Defendants engaged in several actions to keep those meetings
concealed.  First, the mere existence of the Compensation Committee was secret.  Second,
according to a former executive of Perdue Farms, the annual meetings of the Compensation
Committee were kept "off the books" due to the "confidential nature of communications."  While
the Compensation Committee frequently met at the same time as the U.S. Poultry & Egg
Association's well-publicized annual Human Resources Seminar, the meetings were *not* part of
the association's schedule, departing from standard practice.  Third, Defendant Processors required
in-person attendance at Compensation Committee meetings, rather than permitting the remote
exchange and discussion of compensation data, thus ensuring that attendees discussed and fixed
compensation in a confidential setting without leaving a paper trail.

**Answer to Paragraph 284:**  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

285.    As to the WMS surveys, Defendants concealed their existence and contents from the Plaintiffs and the public.  WMS only released the compensation survey results at the "off the books" in-person meetings of the Compensation Committee, which were attended exclusively by employees of Defendant Processors and co-conspirators.  Furthermore, Defendant Processors and WMS employed sham data anonymization techniques to create the illusion of legality and conceal the true purpose of the data exchanges:  to facilitate a compensation fixing scheme.  At the annual "off the books" meetings, WMS circulated the results of the annual survey with the names of Defendant Processors replaced by a randomly assigned number, yet attendees could readily ascertain which poultry processor had reported which compensation data.  A former Perdue Farms executive explained that attendees could determine which company reported which compensation data in the WMS survey because "you're sitting in a meeting and the person across from you [from a competing processor] is reporting on what they do."

**Answer to Paragraph 285:**  Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – statements that speak for themselves.  Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms.  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

286.    Defendants concealed their exchange of compensation data through Agri Stats, as well as the nature and contents of that exchanged data, from Plaintiffs and the public in multiple ways.  First, Agri Stats concealed its work on behalf of the poultry industry.  In 2009, the President of Agri Stats, Blair Snyder, commented on the secretive nature of Agri Stats:  "There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect.  We don't advertise.  We don't talk about what we do."  Indeed, when *Businessweek* sought to interview the President of Agri Stats for an article published in February 2017, he responded by email, "We view our operations and strategy as confidential and proprietary information and not appropriate to discuss in a public forum."  The *Businessweek* article notes that the data maintained by Agri Stats is "remarkable not only for its size but also for the secrecy with which it's kept."

**Answer to Paragraph 286:**  Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – statements that speak for themselves.

Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms.

Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the

remaining allegations in this paragraph and therefore denies them.

287.    Second, only poultry processors willing to upload their own detailed and disaggregated compensation data, and willing to pay millions of dollars in fees to Agri Stats, could access the compensation data collected and distributed by Agri Stats during the Class Period. Accordingly, Plaintiffs and other processing plant workers could not possibly have obtained access to the data that Agri Stats provided to Defendant Processors during the Class Period.  In 2019, *The Guardian* obtained a "leaked" copy of a Agri Stats report and described some of its contents; the article, which was published in August 2019, describes Agri Stats as "a secretive data-sharing firm" and notes that "none of the information in Agri Stats' reports is available to the farmers" which "puts them at a severe disadvantage when they try to negotiate contracts or ask for pay rises."

**Answer to Paragraph 287:**  Wayne Farms admits that this paragraph appears to

selectively quote from – and attempts to characterize – a document that speaks for itself.  Wayne

Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms.  Wayne

Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining

allegations in this paragraph and therefore denies them.

288.    Third, Agri Stats employed sham anonymization techniques to create the illusion of anonymity and of legality.  While Agri Stats claimed the data distributed each month was anonymous, that data was sufficiently granular and disaggregated that executives of Defendant Processors could and did easily match the distributed compensation data to specific poultry processing plants in specific regions.  A former Perdue Farms employee said that Agri Stats data was "supposedly confidential" but that Perdue Farms and every other subscribing poultry processor knew precisely which company reported which data.  These sham anonymization techniques assured that if an Agri Stats report was ever leaked to the public or government enforcement authorities, the report would on its surface appear to be anonymized.

**Answer to Paragraph 288:**  Wayne Farms admits that this paragraph appears to

selectively quote from – and attempts to characterize – statements that speak for themselves.

Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms.

Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

289.    Fourth, Agri Stats fraudulently concealed and expressly denied that the data it exchanged between poultry processors could be reverse engineered by those companies' executives.  According to an article published in *The Guardian* in August 2019, Agri Stats has denied that "the data in its reports were identifiable to industry insiders," claiming that "it preserves confidentiality among processors by masking the sources of the data it reports" and thus "couldn't be used by competitors in an anti-competitive manner."  Agri Stats knew these statements to be false.  According to the same 2019 article, Rita Korn, a former senior executive assistant and office manager for Agri Stats, stated that executives of poultry processors could readily determine which poultry plant had reported which data: "Anybody that followed those numbers and had a brain in their head—if they were in top management at one of those places—they knew who was who in those books.  Your job is to figure out who was who in this book.  I think they cared more about that than they did their own numbers."

**Answer to Paragraph 289:**  Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – a document that speaks for itself.  Wayne Farms denies the remaining allegations in this paragraph.

290.    Fifth, when engaging in collective bargaining negotiations, Defendant Processors did *not* disclose disaggregated, plant-specific Agri Stats wage data to unions or their members.  A former employee of a co-conspirator poultry processor explained that Agri Stats data was "extremely confidential" and only accessed by "executives and Agri Stats themselves" and that the processor would not disclose Agri Stats reports to union members because then those members would know "how profitable the company is" and how it is maximizing yield at the lowest cost.  Accordingly, when Defendants Processors mentioned Agri Stats during collective bargaining negotiations, they only cited average, industrywide Agri Stats figures.

**Answer to Paragraph 290:**  Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – statements that speak for themselves.  Wayne Farms denies the remaining allegations in this paragraph.

291.    Disclosures during union negotiations of the mere "average" industrywide pay figures did not and could not put those unions or their members on any type of notice of the possibility that Defendant Processors were unlawfully exchanging disaggregated compensation data.  Rather, at most, the disclosures could only inform the unions and their members of the fact that poultry processors were using a benchmarking company's data to inform their wages, which is insufficient to permit a circumstantial inference of collusion.

**Answer to Paragraph 291:**  Wayne Farms denies the allegations in this paragraph.

292.    Finally, Defendant Processors also concealed the exchanges of current and future compensation data between rival poultry processing plants from the Plaintiffs and the public. When managers of poultry processing plants operated by Defendant Processors or their subsidiaries collected current or future wage rates from managers of competing poultry processing plants, that exchanged data was *not* disclosed to processing plant workers.  Indeed, multiple Class Members have made clear that they were never informed by their employers of wage rates at rival poultry processing plants, let alone provided copies of compensation schedules comparing those rates.  Instead, plant managers who exchanged such compensation data transmitted that data directly to, and only to, their respective corporate headquarters, where executives used the information to facilitate the setting of company-wide wages.

**Answer to Paragraph 292:**  Wayne Farms denies the allegations in this paragraph.

293.    By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and the other Class Members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

**Answer to Paragraph 293:**  Wayne Farms denies the allegations in this paragraph.

## VIII.   CLASS ACTION ALLEGATIONS

294.    Plaintiffs bring this action on behalf of themselves, and on behalf of the members of the following class, under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3):

> All persons employed by Defendant Processors, their subsidiaries and/or related entities at poultry processing plants in the continental United States from January 1, 2009 until the present.

**Answer to Paragraph 294:**  This paragraph contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions, to which no response is required.  To the extent a response is required, Wayne Farms denies the allegations in this paragraph.

295.    The following persons and entities are excluded from the proposed Class: complex managers, plant managers, human resources managers, human resources staff, office clerical staff, guards, watchmen, and salesmen; Defendants, co-conspirators, and any of their subsidiaries, predecessors, officers, or directors; and federal, state or local governmental entities.

**Answer to Paragraph 295:**  This paragraph contains factual allegations to which no response is required.  To the extent a response is required, Wayne Farms denies the allegations in this paragraph.

296.    The Class definition provides clear, objective criteria understood by Class Members and Defendants, and it allows the parties to identify the members of the Class.

**Answer to Paragraph 296:**  This paragraph contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions, to which no response is required.  To the extent a response is required, Wayne Farms denies the allegations in this paragraph.

297.    Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed.

**Answer to Paragraph 297:**  This paragraph contains factual allegations to which no response is required.  To the extent a response is required, Wayne Farms denies the allegations in this paragraph.

298.    The Class is so numerous that joinder of all members in this action is impracticable. Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contains hundreds of thousands of similarly situated workers.

**Answer to Paragraph 298:**  This paragraph contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions, to which no response is required.  To the extent a response is required, Wayne Farms denies the allegations in this paragraph.

299.    The Class is readily identifiable and is one for which records should exist.

**Answer to Paragraph 299:**  Wayne Farms denies the allegations in this paragraph.

300.    Plaintiffs' claims are typical of those of the Class.  Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

**Answer to Paragraph 300:**  Wayne Farms denies the allegations in this paragraph.

301.    Plaintiffs and Class Members were injured by the same unlawful conduct, which resulted in them receiving less in compensation for working in poultry processing plants than they would have in a competitive market.

**Answer to Paragraph 301:**  Wayne Farms denies the allegations in this paragraph.

302.    Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are aligned with, and not antagonistic, to the Class.

**Answer to Paragraph 302:**  Wayne Farms lacks knowledge or information sufficient to

form a belief about the truth of the allegations in this paragraph and therefore denies them.

303.    Questions of law and fact common to the Class Members predominate over questions, if any, that may affect only individual members because Defendants have acted and refused to act on grounds generally applicable to the Class Members.

**Answer to Paragraph 303:**  This paragraph contains factual allegations to which no

response is required.  To the extent a response is required, Wayne Farms denies the allegations in

this paragraph.

304.    Questions of law and fact common to the Class include:

  a. Whether Defendants engaged in an agreement, combination, or conspiracy to fix, depress, maintain, or stabilize the compensation paid to Class Members;

  b. Whether Defendants' exchange of nonpublic, competitively sensitive information about compensation paid to Class Members constitutes, or furthered, an agreement, combination, or conspiracy in restraint of trade;

  c. Whether such agreements constituted violations of the Sherman Antitrust Act;

  d.  The identity of the participants of the alleged conspiracy;

  e.  The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

  f.  Whether Defendants fraudulently concealed their misconduct;

  g.  Whether and to what extent Defendants' anticompetitive scheme suppressed compensation paid to Class Members below competitive levels;

  h.  The nature and scope of injunctive relief necessary to restore competition; and

  i.  The measure of damages suffered by Plaintiffs and the Class.

**Answer to Paragraph 304:**  This paragraph contains factual allegations to which no response is required.  To the extent a response is required, Wayne Farms denies the allegations in this paragraph.

305. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

**Answer to Paragraph 305:**  Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies them.

306. Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.  The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged.  Further, individual joinder of all damaged members of the Class is impractical, and the prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.  Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that is not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

**Answer to Paragraph 306:** This paragraph contains factual allegations to which no response is required. To the extent a response is required, Wayne Farms denies the allegations in this paragraph.

307. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

**Answer to Paragraph 307:** Wayne Farms denies the allegations in this paragraph.

## IX. CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### CONSPIRACY TO DEPRESS COMPENSATION IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT
### (Against All Defendants, except Peco Foods and Agri Stats)

308. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**Answer to Paragraph 308:** Wayne Farms incorporates and re-alleges each preceding answer.

309. Beginning in January 1, 2009, and continuing through the present, Defendants Perdue Farms, Perdue Foods, Tyson Foods, Keystone, Pilgrim's, Sanderson Farms, Koch Foods, Wayne Farms, Mountaire Farms, Simmons Foods, Fieldale Farms, George's, Inc., George's Foods, LLC, Butterball, Jennie-O Turkey Store, Cargill, and WMS, as well as their co-conspirators, entered into a continuing agreement, understanding, and conspiracy in restraint of trade to fix, depress, maintain and stabilize the compensation paid to workers at their poultry processing plants in the continental United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Answer to Paragraph 309:** Wayne Farms denies the allegations in this paragraph to the extent they relate to Wayne Farms. Wayne Farms lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore denies them.

310. In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants Perdue Farms, Perdue Foods, Tyson Foods, Keystone, Pilgrim's,

Sanderson Farms, Koch Foods, Wayne Farms, Mountaire Farms, Simmons Foods, Fieldale Farms, George's, Inc., George's Foods, LLC, Butterball, Jennie-O Turkey Store, Cargill, and WMS, as well as their co-conspirators, did those things that they combined and conspired to do, including but not limited to:

    a.    Reached agreements—through in-person meetings, exchanges of information, and other communications—to fix, depress, maintain and stabilize the compensation paid to workers at their poultry processing plants in the continental United States;

    b.    Implemented, monitored, and enforced that conspiracy to depress compensation through the regular exchange of competitively sensitive, nonpublic, and detailed compensation data with the assistance of Agri Stats and WMS; and

    c.    Paid the fixed, depressed, maintained, and stabilized compensation to their employees at poultry processing plants in the continental United States.

**Answer to Paragraph 310:**  Wayne Farms denies the allegations in this paragraph.

311.    This conspiracy to fix, depress, maintain, and stabilize compensation is a *per se* violation of Section 1 of the Sherman Act.

**Answer to Paragraph 311:**  Wayne Farms denies the allegations in this paragraph.

312.    The combination and conspiracy alleged herein has had the following effects, among others:

    a.    Competition for the hiring and retaining of workers at poultry processing plants operated by Defendant Processors, their subsidiaries, and/or related entities has been restrained, suppressed, and/or eliminated in the continental United States; and

    b.    Compensation paid to employees at poultry processing plants operated by Defendant Processors, their subsidiaries, and/or related entities has been fixed, depressed, maintained and stabilized at artificially low, noncompetitive levels throughout the continental United States.

**Answer to Paragraph 312:**  Wayne Farms denies the allegations in this paragraph.

313.    Plaintiffs and the other Class Members have been injured and will continue to be injured in their businesses and property by receiving less compensation from Defendant Processors, their subsidiaries, and/or related entities than they would have in the absence of the combination and conspiracy.

**Answer to Paragraph 313:**  Wayne Farms denies the allegations in this paragraph.

## SECOND CLAIM FOR RELIEF
## CONSPIRACY TO EXCHANGE COMPENSATION INFORMATION
## IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT
### (Against all Defendants)

314.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**Answer to Paragraph 314:**  Wayne Farms incorporates and re-alleges each preceding answer.

315.    Beginning in January 1, 2009, and continuing through the present, Defendants and their co-conspirators have engaged in a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and non-public information about the compensation being paid or to be paid to their employees at poultry processing plants in the continental United States.  This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Answer to Paragraph 315:**  Wayne Farms denies the allegations in this paragraph.

316.    The relevant market is the labor market for employment at poultry processing plants in the continental United States, and the relevant geographic market is the continental United States.

**Answer to Paragraph 316:**  This paragraph contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions, to which no response is required.  To the extent a response is required, Wayne Farms denies the allegations.

317.    Defendant Processors and co-conspirators collectively possess market power in the Relevant Market.  Defendant Processors and co-conspirators together control more than 90 percent of the Relevant Market.  Defendant Processors' and co-conspirators' collective market power includes the power to jointly set compensation for workers at poultry processing plants in the continental United States below competitive levels.  This joint power clearly exists because it has been used by Defendant Processors and co-conspirators to pay Class Members sub-competitive compensation.

**Answer to Paragraph 317:**   Wayne Farms denies the allegations in this paragraph.

318.   Defendants could and did profitably suppress compensation paid to workers at poultry processing plants in the continental United States below competitive levels.   In such circumstances, poultry processing workers would not be able, and were not able, to defeat such artificial compensation suppression by switching their employment to non-conspiring poultry processors, as Defendant Processors and co-conspirators control more than 90 percent of the poultry processing plants.

**Answer to Paragraph 318:**   Wayne Farms denies the allegations in this paragraph.

319.   A slight decrease in compensation to workers at poultry processing plants in the continental United States from a competitive level could be imposed collectively by the Defendant Processors without causing too many such workers to switch employment to non-poultry occupations.

**Answer to Paragraph 319:**   Wayne Farms denies the allegations in this paragraph.

320.   Defendant Processors view workers that comprise the Class as fungible.   Workers within the same positions are generally interchangeable, permitting Defendant Processors to readily to compare and match each other's compensation.

**Answer to Paragraph 320:**   Wayne Farms denies the allegations in this paragraph.

321.   The information regularly exchanged by Defendants pursuant to the agreement has consisted of detailed, competitively sensitive, and non-public information about current and future compensation to workers at poultry processing plants.   The information exchanges specifically included:

   a.   The exchange each month, through Agri-Stats, of *current* compensation for categories of workers at poultry processing plants in the continental United States operated by Defendant Processors and co-conspirators;

   b.   The exchange each year, through the WMS survey, of salaries, wages and benefits provided to each position at poultry processing plants in the continental United States operated by Defendant Processors and co-conspirators;

   c.   Frequent exchanges between plant managers—through telephone calls, emails and electronic listservs—of current and future compensation paid to categories of workers at particular poultry processing plants operated by Defendant Processors and co-conspirators.

**Answer to Paragraph 321:**   Wayne Farms denies the allegations in this paragraph.


322.     Defendant Processors' regular compensation information exchanges, directly and through Agri Stats and WMS, reflected concerted action between horizontal competitors in the Relevant Market.

**Answer to Paragraph 322:**   Wayne Farms denies the allegations in this paragraph.


323.     Each Defendant Processor furnished competitively sensitive information to other Defendant Processors with the understanding that it would be reciprocated.  That is, one Defendant Processor would not have provided information to Agri Stats or WMS or directly to another Defendant Processor's plants, without the understanding that they would receive comparable information from other Defendant Processors.

**Answer to Paragraph 323:**   Wayne Farms denies the allegations in this paragraph.


324.     The exchanging of such compensation information by Defendant Processors is inconsistent with the joint guidance provided by the DOJ and the Federal Trade Commission ("FTC").  In October 2016, the two agencies issued a joint "Antitrust Guidance for Human Resource Professionals."  That Antitrust Guidance states:

> Sharing information with competitors about terms and conditions of employment can also run afoul of the antitrust laws.  Even if an individual does not agree explicitly to fix compensation or other terms of employment, exchanging competitively sensitive information could serve as evidence of an implicit illegal agreement.  While agreements to share information are not per se illegal and therefore not prosecuted criminally, they may be subject to civil antitrust liability when they have, or are likely to have, an anticompetitive effect.  Even without an express or implicit agreement on terms of compensation among firms, evidence of periodic exchange of current wage information in an industry with few employers could establish an antitrust violation because, for example, the data exchange has decreased or is likely to decrease compensation. ...

> However, not all information exchanges are illegal.  It is possible to design and carry out information exchanges in ways that conform with the antitrust laws.  For example, an information exchange may be lawful if:

> - a neutral third party manages the exchange,

> - the exchange involves information that is relatively old,

> - the information is aggregated to protect the identity of the underlying sources, and

> - enough sources are aggregated to prevent competitors from linking particular data to an individual source.

**Answer to Paragraph 324:**  Wayne Farms admits that this paragraph appears to selectively quote from – and attempts to characterize – a document that speaks for itself.  Wayne Farms denies the remaining allegations in this paragraph.

325.    The compensation information exchanges by Defendant Processors—through Agri Stats, WMS surveys, plant-to-plant communications, and other means—have not complied with three of the four criteria established by the DOJ and FTC.  The exchanged compensation information was not "relatively old" or historical; rather, the information concerned *current* and *future* compensation, including current wages paid by Defendant Processors and co-conspirators that were exchanged each month of the Class Period through Agri Stats.  The exchanged compensation information was not "aggregated to protect the identity of the underlying sources"; rather, the information was *disaggregated*, as distinct compensation information was provided for poultry processing plants operated by each Defendant Processor and co-conspirator.  The exchanged compensation information was not presented in a manner "to prevent competitors from linking particular data to an individual source"; rather, the information was shared in such a disaggregated manner that Defendant Processors' executives readily and predictably could and did reverse engineer the information to match specific compensation data to individual poultry processing plants operated by competitors.

**Answer to Paragraph 325:**  Wayne Farms denies the allegations in this paragraph.

326.    The agreement to exchange compensation information eliminated a major incentive for Defendant Processors and co-conspirators to increase compensation to workers at their poultry processing plants in the continental United States during the Class Period.  The advantage of raising compensation is to retain and attract more such workers by exceeding the compensation paid by competing poultry processing plants.

**Answer to Paragraph 326:**  Wayne Farms denies the allegations in this paragraph.

327.    The agreement to regularly exchange detailed and non-public information about current and prospective compensation to workers at poultry processing plants in the continental United States assured that the provision of superior compensation by any Defendant Processor would be timely and specifically known by its competitors.  Such an agreement, therefore, eliminated the incentive of each Defendant Processor to outbid its competitors during the Class Period.

**Answer to Paragraph 327:**  Wayne Farms denies the allegations in this paragraph.

328.    When poultry processors that are competing for the same workers exchange their compensation plans and levels, comfort replaces uncertainty and reduces incentives to raise wages, salaries or benefits.  Accordingly, each Defendant Processor used the compensation data obtained

through the information exchanges to reduce the uncertainty that they should have faced from not knowing what their competitors were offering and providing in the labor market. This strategic information was a material factor in Defendant Processors' decisions to depress and stabilize compensation paid to workers at their and their related entities' poultry processing plants in the continental United States during the Class Period.

**Answer to Paragraph 328:**  Wayne Farms denies the allegations in this paragraph.

329.    The exchange of compensation information between Defendant Processors during the Class Period increased their relative bargaining power in setting wages, salaries, and benefits for workers at poultry processing plants owned by Defendants, their subsidiaries, and related entities in the continental United States. With such information, Defendant Processors knew what their competitors were paying comparable workers, while those workers and new applicants lacked access to most or all of such information and thus knew much less about the competitive landscape.

**Answer to Paragraph 329:**  Wayne Farms denies the allegations in this paragraph.

330.    The regularity and detail of the compensation information exchanged, the related communications about compensation between individuals exchanging the information, the relationships of trust developed among the individuals exchanging the information, and the pervasive desire to control and restrain labor costs, encouraged Defendants and their co-conspirators to use the information to match (and not exceed) each other's compensation levels for workers at their poultry processing plants in the continental United States during the Class Period.

**Answer to Paragraph 330:**  Wayne Farms denies the allegations in this paragraph.

331.    Defendants' unlawful agreement to exchange, and the actual exchanges of, nonpublic, timely and detailed compensation data, was not reasonably necessary to further any procompetitive purpose. The information exchanged between Defendant Processors and their high-level executives was disaggregated, company-specific, current, and forward-looking, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

**Answer to Paragraph 331:**  Wayne Farms denies the allegations in this paragraph.

332.    The information-exchange agreement has had the effect of (1) reducing and suppressing competition among Defendant Processors, their subsidiaries, and related entities for the compensation of workers at their poultry processing plants in the continental United States and (2) depressing the compensation of such employees.

**Answer to Paragraph 332:**  Wayne Farms denies the allegations in this paragraph.

333.    As a result of the unlawful agreement alleged herein to exchange compensation information, Plaintiffs and the other Class Members have been injured in their business or property by receiving artificially depressed compensation during the Class Period.

**Answer to Paragraph 333:**  Wayne Farms denies the allegations in this paragraph.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray that:

A.    The Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein, appoint plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.    Defendants' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    Plaintiffs and the other Class Members recover their damages from each Defendant, jointly and severally, in an amount to be determined, and that this damages amount be trebled pursuant to 15 U.S.C. § 15(a);

D.    Plaintiffs and the other Class Members be awarded pre- and post-judgment interest as allowed by law and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

E.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other entities or persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect;

F.    Plaintiffs and the other Class Members recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

G.    Plaintiffs and the other Class Members be granted such other relief as the case may require and deemed proper to this Court.

**Answer to Unnumbered Prayer for Relief Paragraph:**  This      paragraph      contains

Plaintiffs' characterization of their claims, allegations subject to proof, including by expert

testimony, and/or legal conclusions, to which no response is required.  To the extent a response is required, Wayne Farms denies the allegations in this paragraph.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable in this case.

**Answer to Unnumbered Jury Demand Paragraph:**     This     paragraph     contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions, to which no response is required.  To the extent a response is required, Wayne Farms denies the allegations in this paragraph.

## AFFIRMATIVE DEFENSES

In asserting these affirmative and other defenses, Wayne Farms does not assume any burden of proof, persuasion or production with respect to an issue where the applicable law places the burden upon Plaintiffs.  Wayne Farms reserves its right to assert other and additional defenses, cross claims and third party claims not asserted herein of which it becomes aware through discovery or other investigation.

## FIRST DEFENSE

1.     The Complaint fails to state a claim upon which relief can be granted.

## SECOND DEFENSE

2.     Plaintiffs' claims are barred, in whole or in part, because they lack standing to bring this action against Wayne Farms.

## THIRD DEFENSE

3.     Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations, and the doctrines of laches, waiver, and estoppel.  The statute of limitations for Plaintiffs' Sherman Act claims is four years.  *See* 15 U.S.C. § 15(b).  Accordingly, their claims

must be dismissed unless Plaintiffs can sufficiently allege that Plaintiffs could not have discovered the claimed offense within the limitations period exercising reasonable diligence.  Plaintiffs cannot satisfy this burden because the challenged conduct occurred more than ten years ago.  This timing also demonstrates an unreasonable lack of diligence in bringing Plaintiffs' claims.

## FOURTH DEFENSE

4.        Plaintiffs' claims are barred, in whole or in part, because Plaintiffs may not rely upon the doctrine of fraudulent concealment as they cannot show concealment, actual and reasonable reliance on such affirmative acts of concealment, and/or due diligence in discovery of their claim.

## FIFTH DEFENSE

5.        Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs rely upon the doctrine of fraudulent concealment because Plaintiffs have failed to plead fraudulent concealment with particularity, as required by Federal Rule of Civil Procedure 9(b).

## SIXTH DEFENSE

6.        Plaintiffs' claims are barred, in whole or in part, to the extent any of Plaintiffs' claims are subject to mandatory arbitration or other dispute resolution process.  For example, any unnamed members of the putative class who are members of a union may be subject to mandatory arbitration or other dispute-resolution processes pursuant to their collective-bargaining agreements.

## SEVENTH DEFENSE

7.        Plaintiffs' claims are barred, in whole or in part, because the conduct of Wayne Farms was procompetitive, reasonable, and permissible, and was based upon independent, legitimate, and self-interested business and economic justifications.  Even if the Plaintiffs could

prove any anticompetitive impacts from Wayne Farms' conduct—which Wayne Farms expressly denies—those procompetitive benefits outweighed any supposed anticompetitive impacts.

## EIGHTH DEFENSE

8.      Plaintiffs' claims are barred, in whole or in part, by the right of Wayne Farms to set off any amounts paid to Plaintiffs by Defendants other than Wayne Farms who settle Plaintiffs' claims against them in this action.

## NINTH DEFENSE

9.      Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs seek improper multiple damage awards, and damage awards duplicative of those sought in other actions, in violation of the Due Process guarantees of the Fifth and Fourteenth Amendments of the United States Constitution.

## TENTH DEFENSE

10.      Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have not suffered any injury in fact and/or any injury cognizable under the antitrust laws or Article III of the United States Constitution.

## ELEVENTH DEFENSE

11.      Plaintiffs' claims are barred, in whole or in part, because any alleged injuries and damages were not legally or proximately caused by any acts or omissions of Defendants and/or were caused, if at all, solely and proximately by the conduct of Plaintiffs themselves or third parties including, without limitations, the prior, intervening, or superseding conduct of such Plaintiffs or third parties.

## TWELFTH DEFENSE

12.    Plaintiffs' claims are barred, in whole or in part, because to the extent Plaintiffs suffered any injury or incurred any damages as alleged in the Complaint—which Wayne Farms denies—any such injury or damage was caused in fact and brought about by intervening or superseding events, factors, occurrences, conditions, or acts of others, including market forces, and not by the alleged wrongful conduct on the part of Wayne Farms.

## THIRTEENTH DEFENSE

13.    Wayne Farms adopts and incorporates by reference any and all other defenses asserted by any other Defendant to the extent Wayne Farms may share in such defenses.

## FOURTEENTH DEFENSE

14.    Plaintiffs' claims are barred, in whole or in part, because their alleged damages, if any, are too speculative, uncertain, and not of the nature of the extent alleged.

## FIFTEENTH DEFENSE

15.    Plaintiffs' claims are barred, in whole or in part, because Wayne Farms is not liable for the acts of any other defendant.  Wayne Farms did not enter into any conspiracy in restraint of trade, or otherwise violate the antitrust laws, and therefore there is no basis for joint and several liability against Wayne Farms.

## SIXTEENTH DEFENSE

16.    Plaintiffs' claims are barred, in whole or in part, because none of Wayne Farms' alleged actions or omissions substantially lessened competition within any properly defined market.  Plaintiffs' alleged product market is implausibly narrow because it is limited to jobs in poultry processing plants and does not account for alternative jobs that are reasonable substitutes, and Plaintiffs' alleged geographic market is implausibly broad because it is nationwide and not

limited to the effective area of competition for any particular jobs. Wayne Farms' conduct could not lessen competition in a nationwide labor market.

## SEVENTEENTH DEFENSE

17.     Plaintiffs cannot maintain this action as a class action under Rule 23 of the Federal Rules of Civil Procedure because Plaintiffs' individualized claims cannot meet the Rule's requirements for class certification.

## EIGHTEENTH DEFENSE

18.     Plaintiffs' claims are barred, in whole or in part, under the non-statutory labor exemption to the federal antitrust laws. The Supreme Court has "recognized . . . that a proper accommodation between the congressional policy favoring collective bargaining . . . and the congressional policy favoring free competition in business markets requires that some union-employer agreements be accorded a . . . nonstatutory exemption from antitrust sanctions" because "[u]nion success in organizing workers and standardizing wages ultimately will affect price competition among employers." *Connell Const. Co. v. Plumbers & Steamfitters Loc. Union No. 100*, 421 U.S. 616, 622 (1975). The exemption "exists . . . to allow meaningful collective bargaining to take place by protecting some restraints on competition imposed through the bargaining process from antitrust scrutiny." *Clarett v. Nat'l Football League*, 369 F.3d 124, 143 (2d Cir. 2004) (cleaned up). The nonstatutory labor exemption applies regardless of whether the employer is allegedly acting in concert with or in opposition to a labor organization. *See Local No. 189, Amalgamated Meat Cutters & Butcher Workmen v. Jewel Tea Co.*, 381 U.S. 676 (1965); *see also Brown v. Pro Football, Inc.*, 518 U.S. 231, 236 (1996).

19.     Plaintiffs admit that approximately one-third of hourly-paid workers at poultry processing plants are members of labor unions and that the United Food and Commercial Workers International Union represents approximately 90% of those unionized workers.  Compl. ¶ 158.

20.     Among other things, for poultry processing employees represented by a labor union, wages, hours, benefits, and other working conditions are mandatory subjects of bargaining between the worker and the employer.

21.     To the extent the exchange of wage data helped facilitate the collective bargaining process, some or all of Plaintiffs' claims are barred by the nonstatutory labor exemption to the antitrust laws.

**NINETEENTH DEFENSE**

22.     Wayne Farms has not knowingly or intentionally waived any applicable defenses, and it reserves the right to assert and rely upon other defenses as this action proceeds up to and including the time of trial.  Wayne Farms reserves the right to amend or seek to amend its answers and/or affirmative defenses.

Defenses that must be affirmatively stated in a pleading pursuant to Federal Rule of Civil Procedure 8 are affirmative defenses referenced in Rule 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including [identified defenses.]).")  Plaintiffs have not provided admissible evidence establishing the accuracy of the statements in the Complaint.  Plaintiffs have not yet responded to discovery seeking the basis for its claims, and Wayne Farms reserves all rights to identify defenses through discovery.  Finally, to the extent any of the defenses above are found to be defenses but not affirmative defenses, Wayne Farms identifies them as such.

## **PRAYER FOR RELIEF**

WHEREFORE, Wayne Farms respectfully requests that judgment be entered in favor of Wayne Farms and the other Defendants and against Plaintiffs, dismissing the Complaint in its entirety with prejudice. Wayne Farms further requests that this Court: (i) award Wayne Farms its costs and disbursements; and (ii) award such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Pursuant to the Federal Rules of Civil Procedure 38, Defendant Wayne Farms demands a trial by just on all claims so triable.

[*signature page to follow*]

Dated: April 7, 2021                    Respectfully submitted,


                                        By: */s/ Rucha A. Desai*

                                        Rucha A. Desai
                                        PROSKAUER ROSE LLP
                                        Eleven Times Square
                                        New York, NY 10036-8299
                                        Telephone:  (212) 969-3628
                                        Facsimile:   (212) 969-2900

                                        Christopher E. Ondeck
                                        Stephen R. Chuk
                                        PROSKAUER ROSE LLP
                                        1001 Pennsylvania Ave., NW
                                        Suite 600 South
                                        Washington, DC 20004
                                        Telephone: (202) 416-6800
                                        Facsimile: (202) 416-6899
                                        condeck@proskauer.com
                                        schuk@proskauer.com

                                        *Attorneys for Defendant Wayne Farms LLC*


119

**CERTIFICATE OF SERVICE**

I hereby certify that on April 7, 2021, a copy of the foregoing was filed via the Court's ECF system. Notice of this filing will be sent to the attorneys of record by operation of the ECF system. Parties may access this filing through the Court's system.

/s/ *Rucha A. Desai*
Rucha A. Desai

*Attorney for Defendant Wayne Farms LLC*