# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

JUDY JIEN, et al.,

Plaintiffs,

vs.

PERDUE FARMS, INC. et al.,

Defendants.

C.A. No. 1:19-cv-02521-SAG

**JOINT LETTER ON CUSTODIANS AND OBJECTIONS TO RULE 34 REQUESTS**

**REDACTED**

## TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................. 2
     A.   PLAINTIFFS' POSITION:........................................................................ 2
     B.   DEFENDANTS' POSITION:...................................................................... 3

II.  PLAINTIFFS' REQUESTS FOR PRODUCTION – GLOBAL ISSUES.......................... 3
     A.   Relevant Time Period ........................................................................ 3
     B.   Scope ("Compensation and benefits, or hiring or recruiting of
          Employees")................................................................................... 22
     C.   Definition of "Employee" .................................................................. 27

III. PLAINTIFFS' REQUESTS FOR PRODUCTION – DISPUTES OVER
     SPECIFIC REQUESTS ................................................................................. 30
     A.   Request No. 3 .................................................................................. 30
     B.   Request No. 4 .................................................................................. 36
     C.   Request No. 11 ................................................................................ 43
     D.   Request No. 19 ................................................................................ 43
     E.   Request No. 20 ................................................................................ 48

IV.  CUSTODIANS .............................................................................................. 52
     A.   Introduction ................................................................................... 52
     B.   Custodian Disputes with Individual Defendants..................................... 62
          1.   Tyson and Keystone..................................................................... 62
          2.   Sanderson ................................................................................. 91
          3.   JOTS ....................................................................................... 99
          4.   Butterball................................................................................ 108
          5.   Simmons ................................................................................. 116

V.   REQUEST FOR HEARING............................................................................ 122

## I.   __INTRODUCTION__

### A.   __PLAINTIFFS' POSITION__:

While Plaintiffs have reached agreements on document custodians with nine of the fifteen non-settling Defendants,[1] others are outstanding. Tyson, Keystone, and JOTS in particular have not engaged meaningfully in custodian negotiations. Tyson—by far the largest non-settling Defendant—has only agreed to 15 custodians, despite the fact that it has an entire corporate division dedicated to compensation and 77 poultry processing plants. By contrast, Perdue, which has just 16 plants, has agreed to 29 custodians and Wayne, with 10 plants, has agreed to 26 custodians. Tyson's offer of 15 custodians is also dramatically out of line with the custodian count in *In re Broiler Chicken Antitrust Litigation*, where Tyson has at least 51 custodians (given its enormous market share). The Court should order Tyson, Keystone, JOTS, and others to produce an adequate number of custodians commensurate with the other Defendants and their size.

Several Defendants have refused to designate key corporate executives with direct involvement in the conspiracy, including those who discussed compensation with rival poultry processors, analyzed competitors' compensation data, and recommended and set compensation schedules. Tyson, Keystone, and JOTS have also refused to produce *any* plant-level custodians, despite the fact that a key component of the conspiracy is "collaborat[ion]" among plant-level human resources managers. *Jien v. Perdue Farms, Inc.*, No. 19-CV-2521, 2020 WL 5544183, at *5-6 (D. Md. Sept. 16, 2020) (finding plausible "the 'plant-to-plant communications' portion of the conspiracy" and noting that "[t]he word 'collaborate' is particularly damning, connoting a cozy relationship in which the ostensible competitors worked together to share wage levels at their respective plants"). Sanderson, Simmons, and Butterball also have inadequate plant-level custodian offers. By contrast, nine Defendants have agreed to produce a number of plant-level employees proportionate to the size of their companies. For example, Koch operates 12 plants and agreed to 11 plant-level custodians; Wayne has ten plants and agreed to eight plant-level custodians; Fieldale operates three plants and agreed to five plant-level custodians. The Court should order these Defendants to produce a number of plant-level custodians commensurate with the other Defendants and their size.

On Plaintiffs' requests for production, Plaintiffs have already reached agreement on five of the seven issues presented below (all except Relevant Time Period and the scope of RFP No. 3) with anywhere from a significant minority of the Defendants to all of them except a single holdout Defendant. This plainly demonstrates the reasonableness of Plaintiffs' positions and their willingness to compromise over more than two months of negotiations, including the elimination of three more issues for decision by the Court in the day before this filing. Nevertheless, Defendants argue that Plaintiffs are requesting too much—documents and data over too many years, documents regarding too many facets of the conspiracy, or documents from too many sources. Plaintiffs' requests, however, are modest considering the length of Defendants' decade-plus conspiracy and the many elements of Defendants' scheme, including clandestine meetings, participation in Agri Stats, and plant-to-plant communications. The Court should allow Plaintiffs to take discovery that is proportionate to the sustained harm Defendants have caused.

---

[1] For purposes of custodian negotiations, Plaintiffs are counting Tyson and Keystone separately because they were separate entities for most of the Class Period.

### B.      DEFENDANTS' POSITION:

Defendants set forth in this Joint Letter objections to Plaintiffs' Requests for Production and demands for additional custodians from certain Defendants.  These disputes are significant in number and scope, as the sheer length of this joint submission demonstrates.  The disputes, however, follow two basic themes: (1) Plaintiffs' attempt to expand discovery well-beyond the claims that they pleaded in the Second Amended Consolidated Complaint ("SAC"); and (2) Plaintiffs' expansive view of proportionality that eviscerates any limits on the expansive discovery that they seek.  The present disputes are an important inflection point for managing the scope of this case and ensuring that discovery proceeds in an orderly, proportionate, and efficient manner.

Plaintiffs brought this case with "sparse" allegations, Mem. Op. at n.2, ECF No. 414, focused on a claim of compensation suppression involving an incredibly broad alleged class.  The alleged class period spans over ten years and includes any person who was "employed by Defendant Processors, their subsidiaries and/or related entities at poultry processing plants in the continental United States."  Now, Plaintiffs repeatedly seek discovery well beyond the boundaries of the already broad SAC.  Among other things, they seek to impose an extraordinarily lengthy "Relevant Time Period" for both structured and unstructured data; they attempt to broaden discovery to cover employees that are "non-poultry plant workers" and "non-class workers;" they seek to expand discovery beyond Defendants' poultry processing business; and they want discovery on multiple topics, including employee productivity and other speculative and unpled conspiracies, even if there is no connection to compensation.  Plaintiffs' discovery in this case should be focused on the claims that they brought; they are not entitled to limitless expansion of discovery into unrelated issues and persons.

Moreover, Plaintiffs attempt to impose extraordinary burdens on Defendants that are disproportionate to the needs of the case.  The proportionality factors of Rule 26(b)(1) apply to all civil cases, including antitrust.  Plaintiffs would have this Court relegate the proportionality factors to an irrelevant footnote because this case is already so large, and because it involves allegations of antitrust.  But, the cases Plaintiffs cite and the concepts they argue do not speak to such a result.  The burden and breadth of the discovery they seek is remarkable.  By way of example, Plaintiffs seek access to, among other things, every custodian's entire electronic calendars, expense reports and travel logs with only limited redactions of obviously personal information and no use of search terms to cull responsive materials, which will result in the production of irrelevant documents.  They seek to expand the time periods in the case without regard to cost.  Taken individually, each of these issues presents substantial and significant cost issues; taken as a whole, the impact on the size and burden of discovery is enormous.

The breadth and burdens of Plaintiffs' discovery raise serious question of Plaintiffs' underlying purpose, and whether Plaintiffs are trying to prepare the current case or go on a fishing expedition to find new cases or claims.  As the record shows, Defendants have worked diligently and in good faith to resolve their disputes with Plaintiffs.  The parties were able to resolve many of those disputes, but the following ones remain along the themes described above.

## II.      PLAINTIFFS' REQUESTS FOR PRODUCTION – GLOBAL ISSUES

### A.      Relevant Time Period

1. **PLAINTIFFS' POSITION**:

The Relevant Time Period for document production should be January 1, 2007 to August 30, 2020. The Relevant Time Period for structured data production should be January 1, 2000 to August 30, 2020. Plaintiffs will not, however, require Defendants to restore any legacy systems solely to obtain data inputted before January 1, 2005.

Agreement: None

Dispute:[2] Koch, Fieldale, Sanderson, Mountaire, Peco, Wayne, Simmons, Tyson/Keystone, Agri Stats, Perdue, JOTS, CMS, Butterball, WMS

Argument: ***Relevant Time Period for Document Production.*** The Relevant Time Period for document production[3] should begin on January 1, 2007 (two years before the Class Period begins) and end on August 30, 2020 (one year after Plaintiffs filed the initial Complaint).[4]

*Document Production Pre-Period.* "In antitrust cases, courts generally take an expansive view of relevance and permit broad discovery." *Kleen Prods. LLC v. Packaging Corp. of Am.*, No. 10 C 5711, 2012 WL 4498465, at *13 (N.D. Ill. Sept. 28, 2012) (collecting cases). Plaintiffs in such cases are entitled to reasonable discovery both before and during the entire period of the alleged conspiracy. *See, e.g.*, Order Resolving Disc. Disps. at 3, *In re Int. Rate Swaps Antitrust Litig.*, No. 16-md-2704 (S.D.N.Y. Jan. 8, 2018), ECF No. 322 (authorizing document discovery "more than two years before the start date of the cognizable conspiracy"). Even "[i]nformation concerning events that *substantially* preceded the occurrence of the incident[s] that [are] the basis for the suit . . . may be relevant for discovery purposes." 6 Moore's Federal Practice § 26.45[5] (3d ed. 2021) (emphasis added). Discovery of pre-conspiracy documents "may illuminate the background to the . . . conspiracy[,] . . . shed light on the relationships between defendants and their key personal during [the conspiracy period, and] . . . reveal experiences and information of such persons that informed their motivations and conduct during [the conspiracy period]." Order Resolving Disc.

---

[2] Plaintiffs request that the Court rule on each issue herein as to the Defendants listed under "Dispute" so as to not disturb the agreements made between Plaintiffs and the Defendants listed under "Agreement." We believe that doing so provides a strong incentive for the parties to reach agreement in discovery disputes without judicial intervention.

[3] The Relevant Time Period for document production would apply to all RFPs except for those concerning structured data—RFP No. 11 for the Defendant Processors and RFP No. 8 for WMS and Agri Stats. We use RFP No. 11 as shorthand for all the structured data requests.

[4] Each Defendant other than JOTS, CMS, and Butterball (collectively, the "Turkey Defendants") argue that the Relevant Time Period should begin on January 1, 2008 (permitting only one year of pre-Class Period discovery), January 1, 2009 (barring *any* pre-Class Period discovery), or somewhere in between. The Turkey Defendants assert that the Relevant Time Period should begin several years after the start of the Class Period, on either January 1, 2014 or January 1, 2015. Defendants have also universally taken the position that the Relevant Time Period for document production should cut off on August 30, 2019—more than a year before the filing of the operative Complaint.

Disps. at 3, *In re Int. Rate Swaps Antitrust Litig.*, No. 16-md-2704 (S.D.N.Y. Jan. 8, 2018), ECF No. 322.

For those reasons, in complex antitrust cases, courts routinely permit several years of discovery preceding the date the anticompetitive conduct is alleged to have commenced. *See, e.g.*, *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, No. 15-cv-3183, 2016 WL 7042117, at *7 (D. Minn. July 25, 2016) (ordering a discovery period of "January 1, 2002, to the present" even though "the specific instances of anti-competitive conduct . . . are alleged to have occurred in 2013 and 2014"); *In re Domestic Air Transp. Antitrust Litig.*, 141 F.R.D. 556, 566 (N.D. Ga. 1992) (compelling document production "for . . . 1978 forward" where plaintiffs alleged "a conspiracy . . . as early as 1988" (emphasis omitted)); *In re ATM Fee Antitrust Litig.*, No. C 04-2676, 2006 WL 2061300, at *4-5, 7 (N.D. Cal. July 24, 2006) (ordering discovery of documents predating class period by over two years). In fact, obtaining discovery before the class period is often not disputed in antitrust matters. For example, Agri Stats, Tyson, Perdue, Butterball, and CMS agreed and stipulated to produce two years of pre-class period discovery in the currently pending turkey price-fixing case. *See* Order Regarding Produc. of Electronically Stored Info. & Paper Docs. at 10-11, *Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, No. 19-cv-8318 (N.D. Ill. Dec. 18, 2020), ECF No. 202. And yet, here, these very same Defendants now refuse to produce the same.

Discovery into those earlier years would provide critical insight into the formation of Defendants' conspiracy. Plaintiffs allege that specific events in the 2007-2008 timeframe, including Tyson's decision to re-subscribe to Agri Stats and Pilgrim's Chapter 11 bankruptcy filing, "facilitated the formation and implementation of the conspiracy." Second Am. Consol. Compl. ("SAC") ¶¶ 32, 170, 173, 200, 214, Nov. 2, 2020, ECF No. 386. As is often the case at this early stage, however, Plaintiffs do not yet have a crystal-clear picture of the conspiracy's origins. *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 788 (N.D. Ill. 2017) (explaining that "details about the formation" of a conspiracy are often unavailable to plaintiffs "without discovery"). Evidence of the conspiracy's inception would help Plaintiffs establish the core of their Sherman Act claims. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002). Such "evidence of [the alleged conspiracy's] formation" is therefore discoverable even if that evidence "is from a time long past." 6 Moore's Federal Practice § 26.45[5] (3d ed. 2021).

Defendants contend that Plaintiffs' allegations of the conspiracy's formation are insufficiently specific to warrant discovery going back to 2007. But Plaintiffs have alleged that a complex conspiracy involving dozens of poultry processors was in place by January 2009. *See* SAC ¶ 169. Such a sophisticated undertaking did not develop overnight. Indeed, the WMS Sandestin meetings could be planned out nearly a year in advance. *See* PX001, PITMAN00667 (August 2019 email from Kim Huerta—Perdue's Senior Director of Compensation—scheduling the April/May 2020 meeting). Moreover, Plaintiffs allege that a key moment in the conspiracy's development was Tyson's decision to re-subscribe to Agri Stats around January 2008. *See* SAC ¶¶ 170, 200. Documents relating to that important decision, including any conspiratorial planning with other poultry processors, would surely stretch back to 2007.

Additionally, Plaintiffs have recently received phone records (in response to third-party subpoenas to phone carriers) revealing *thousands* of potentially conspiratorial, inter-Defendant phone calls in

2007 and 2008. Plaintiffs' phone records investigation is in its infancy.[5] Nevertheless, the records Plaintiffs have received to date—all of which have been produced to Defendants—support Plaintiffs' document production pre-period. The table below summarizes the approximate number of phone calls exchanged between certain Defendants and other Defendants and Co-Conspirators in 2007 and 2008.[6]

| Approximate Number of Phone Calls Exchanged With Other Defendants or Co-Conspirators in 2007-2008 | | |
|---|---|---|
| **Defendant** | **2007** | **2008** |
| **Fieldale** | **more than 1,400 calls** (including 500+ with HRF, 240+ with Pilgrim's, 170+ with Peco, 140+ with Mar-Jac, 120+ with Koch, and 90+ with Wayne) | **more than 1,000 calls** (including 300+ with HRF, 240+ with Pilgrim's, 140+ with Mar-Jac, 90+ with Koch, and 65+ with Wayne) |
| **Koch** | **more than 900 calls** (including 150+ with Peco, 120+ with Fieldale, 70+ with Pilgrim's, 55+ with Tyson, and 55+ with Sanderson) | **more than 700 calls** (including 120+ with Sanderson, 90+ with Fieldale, 55+ with Pilgrim's, and 55+ with Peco) |
| **Mountaire** | **more than 300 calls** (including 160+ with Perdue) | **more than 600 calls** (including 200+ with Perdue, 150+ with HRF, and 80+ with Tyson) |
| **Peco** | **more than 1,300 calls** (including 170+ with Fieldale, 150+ with Sanderson, 150+ with Koch, 65+ with Wayne, 65+ with Pilgrim's, and 50+ with Perdue) | **more than 1,200 calls** (including 400+ with Keystone, 70+ with Sanderson, 55+ with Wayne, and 55+ with Pilgrim's) |

---

[5] For example, Plaintiffs have received very limited document productions from Defendants, thereby precluding Plaintiffs from identifying phone numbers for the vast majority of custodians. Moreover, Defendants have not yet produced any phone records to Plaintiffs. To date, nearly all of the phone records Plaintiffs have received are for "company main" lines identified from public sources. As Plaintiffs obtain cell phone numbers and office "direct dial" numbers, the inter-Defendant call totals will grow.

[6] These totals are for phone records produced and reviewed through August 10, 2021. *See* PX002, Decl. of Stephen J. Teti. These totals also exclude the very small number of cell phone calls Plaintiffs have been able to identify and review at this stage of the litigation.

| Approximate Number of Phone Calls Exchanged With Other Defendants or Co-Conspirators in 2007-2008 | | |
|---|---|---|
| **Defendant** | **2007** | **2008** |
| **Perdue** | **more than 270 calls** (including 160+ with Mountaire and 50+ with Peco) | **more than 280 calls** (including 200+ with Mountaire) |
| **Sanderson** | **more than 500 calls** (including 220+ with Wayne, 150+ with Peco, and 55+ with Koch) | **more than 280 calls** (including 120+ with Koch, 70+ with Peco, and 70+ with Wayne) |
| **Wayne** | **more than 575 calls** (including 220+ with Sanderson, 90+ with Fieldale, and 65+ with Peco) | **more than 220 calls** (including 70+ with Sanderson, 65+ with Fieldale, and 55+ with Peco) |

Defendants have not cited a single antitrust case denying plaintiffs two years of discovery before the damages period, and the cases they do cite support Plaintiffs' position. In *Food Lion, LLC v. Dairy Farmers of America, Inc.*, No. 20-CV-442, 2020 WL 6947921 (M.D.N.C. Sept. 29, 2020), the court granted the plaintiffs discovery predating the anticompetitive conduct at issue because "showing . . . anticompetitive conduct logically involves an investigation of [the defendant's] past actions." *Id.* at *5. *Food Lion* also recognized that the "plaintiff is ordinarily permitted to discover defendant's activities for a reasonable period of time antedating the earliest possible date of the actionable wrong." *Id.* (citation omitted). Defendants also rely on *Cyntegra, Inc. v. IDEXX Laboratories, Inc.*, No. CV 06-4170, 2007 WL 9701999 (C.D. Cal. June 29, 2007). But there, the court recognized that "the scope of discovery should not be defined by . . . plaintiff's alleged damages" and awarded discovery "five years prior to the plaintiff's entry into the industry." *Id.* at *4-5. And in *Kleen Products LLC v. Packaging Corp. of America*, No. 10 C 5711, 2013 WL 120240 (N.D. Ill. Jan. 9, 2013), also cited by Defendants, the court granted plaintiffs two years of pre-conspiracy documents—exactly what Plaintiffs request here. *Id.* at *9. The court recognized that there "very well may be relevance in the stage-setting events" of that period. *Id.*[7]

---

[7] Defendants also rely on *Hawkins v. Kroger Co.*, No. 15cv2320, 2019 WL 4416132 (S.D. Cal. Sept. 16, 2019), and *CX Reinsurance Co. v. B&R Management, Inc.*, No. 15-3364, 2017 WL 2729075 (D. Md. June 23, 2017), in support of an abbreviated discovery period. But *Hawkins* and *CX Reinsurance* are not antitrust conspiracy cases, and the courts there said nothing about the discoverability of information relating to the formation of a conspiracy. Other cases cited by Defendants are not discovery time period cases at all. *See Halim v. Balt. City Bd. of Sch. Comm'rs*, No. 11-2265, 2012 WL 2366338, at *2 (D. Md. June 20, 2012) (denying a request for "very sensitive private information" where the requesting party's rationale consisted of one conclusory sentence); *Heaney v. Bank of Am., N.A.*, No. 16-CV-3538, 2017 WL 1476117, at *2-3 (D. Md. Apr. 24, 2017) (denying an interrogatory aimed only at probing an entirely different theory of defendant's motive than the one alleged, where motive was not even an element of the claims at issue).

*Document Production Post-Complaint Period.* Plaintiffs' request for one year of discovery after the original Complaint filing date is likewise modest and reasonable. The operative Complaint, filed in November of 2020, specifically alleges that Defendants' conspiracy continued through the filing date and, indeed, continues "to the present." SAC ¶ 169. Nonetheless, in the spirit of compromise, Plaintiffs have offered to cut off the Relevant Time Period on August 30, 2020—one year after the filing of the original Complaint and more than two months *before* the filing of the operative Complaint. No Defendant accepted Plaintiffs' proposal.

Where, as here, "the complaint alleges that the defendants are involved in a continuing conspiracy in restraint of trade, it is commonplace for the courts to permit discovery of information concerning events that occurred after the complaint was filed." 6 Moore's Federal Practice § 26.46[1] (3d ed. 2021) (collecting cases); *United States v. Capitol Serv., Inc.*, 89 F.R.D. 578, 586-87 (E.D. Wis. 1981) (compelling post-complaint discovery in antitrust case alleging a continuing violation: "as a matter of commonsense, the information and documents produced during the period of the conspiracy are relevant"); *Charvat v. Valente*, 82 F. Supp. 3d 713, 717 (N.D. Ill. 2015) ("Post–Complaint discovery is relevant to Plaintiff's claims *and* reasonably likely to lead to discovery of admissible evidence. . . . It is commonsense that information and documents created after filing the Complaint can be relevant and must be produced."). As a case cited by Defendants suggests, in continuing antitrust conspiracy cases, courts have been willing to order post-complaint discovery for a year even when plaintiffs do not allege any specific facts during that period. *See In re Diisocyanates Antitrust Litig.*, No. 18-1001, 2020 WL 7427040, at *2-3 (W.D. Pa. Dec. 18, 2020) (noting, in a case first filed in June of 2018, that plaintiff "does not allege any facts of a conspiracy after 2018" but nevertheless ordering discovery through the end of 2019). Moreover, in the turkey price-fixing case cited above, some of the same Defendants agreed to a discovery period extending one year after the alleged end date of the conspiracy. *See* Order Regarding Produc. of Electronically Stored Info. & Paper Docs. at 10-11, *Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, No. 19-cv-8318 (N.D. Ill. Dec. 18, 2020), ECF No. 202.

Documents created between August 30, 2019 and August 30, 2020 are uniquely valuable to Plaintiffs' case because, after the lawsuit was filed, Defendants may have changed their policies, procedures, or practices relating to poultry processing plant employee compensation, benefits, hiring, or recruiting. Moreover, Defendant employees may have had non-privileged (internal or external) communications about the very issues at the heart of this litigation. Plaintiffs should be permitted to discover these documents.

Already produced third-party discovery supports Plaintiffs' post-Complaint period. The Complaint alleges a senior Tyson executive claimed that the off-the-books compensation meetings in Florida "were so inappropriate and improper that that the company would no longer attend them." SAC ¶ 191. The Court termed this statement: "precisely the sort of 'smoking gun' that makes Plaintiffs' *per se* antitrust claim plausible." *Jien*, 2020 WL 5544183, at *5. Discovery reveals other Defendants shared the same concerns. In mid-2019, a WMS PowerPoint presentation sent to Defendants on the Poultry Compensation Committee notes that a number of poultry processors stopped participating in the WMS survey and/or meetings in the prior two years, including George's, Simmons, and Keystone (which was bought by Tyson the previous fall). PX003, PITMAN00613 at '614. WMS's response to the recent dropouts was communicated to the

remaining participants: "The first thing we do, *let's kill all the lawyers*." *Id.* (emphasis added) (quoting William Shakespeare, The Second Part of King Henry the Sixth act 4, sc. 2.).



Thus, Defendants responded to major warning signs of their legal exposure, not by clamming up, but by engaging in conspiratorial, non-privileged communications about that very same legal exposure. While the WMS presentation briefly predates Plaintiffs' original August 2019 Complaint, Plaintiffs believe that the filing of the initial Complaint likely engendered similar communications. Such correspondence would of course be strong evidence of Plaintiffs' claims.

Despite this evidence, Defendants contend that there is no basis for Plaintiffs' contention that the conspiracy continued after August of 2019. In addition, only weeks before the Complaint was filed, Defendants were scheduling Compensation Committee meetings to take place in April of 2020. *See* PX001, PITMAN00667 (August 6, 2019 email from Kim Huerta—Perdue's Senior Director of Compensation).[8]

---

[8] Defendants' reliance on *United States ex rel. Spay v. CVS Caremark Corp.*, No. 09-4672, 2013 WL 4525226 (E.D. Pa. Aug. 27, 2013), which is not an antitrust conspiracy case, is also misplaced. There, plaintiffs nominally alleged a continuing violation covering seven-plus years, but all of their specific allegations only related to two years of that period. *See id.* at *2. But the court concluded that "in . . . context," the complaint alleged that the conspiracy "span[ned] only from January 1, 2006 to January 1, 2008." *Id.* Unlike in *CVS Caremark*, Plaintiffs have alleged that the conspiracy continued past the original filing date, and their allegations are consistent with that claim. Moreover, as indicated, specific conspiratorial events were scheduled to take place after the Complaint was filed. *See* PX001, PITMAN00667.

*Defendants' Failure to Show Burden.* Puzzlingly, Defendants do not attempt to quantify the burden of an additional two years of discovery beyond what Defendants have offered.[9] Instead, they complain about hit counts generated by Plaintiffs' proposed search terms for four Tyson custodians for years the parties *have* already agreed to. This is telling. If Tyson believed that disclosing the additional hit counts from 2007 or 2020 would help their case, they would have; they have the data. One can only conclude that those hit counts were too low to be compelling on the years at issue.[10] Defendants have thus failed to satisfy their basic obligation to "allege specific facts that indicate the nature and extent of the burden" of the two years of additional production, much less provide "affidavit[s] or other reliable evidence" of that burden. *Hake v. Carroll Cnty.*, No. 13-1312, 2014 WL 3974173, at *4 (D. Md. Aug. 14, 2014) (quoting *Tucker v. Ohtsu Tire & Rubber Co.*, 191 F.R.D. 495, 498 (D. Md. 2000)). Indeed, based on Butterball's hit count information, discussed below, and the fact that many Defendants have already deleted former employees' documents, the additional two years of discovery will be proportionally much less burdensome than the agreed-upon ten years.

The fundamental premise behind Defendants' burden argument is also flawed; they do not have to review every document in custodial files. To avoid "the high cost of reviewing . . . documents for privileged or responsive information," the "more practical approach is . . . entry of a court order with a clawback provision that protects against a claim of waiver by production of a privileged document." *Adair v. EQT Prod. Co.*, No. 10cv00037, 2012 WL 1965880, at *4 (W.D. Va. May 31, 2012) (citing *Hopson v. Mayor of Balt.*, 232 F.R.D. 228, 232, 239 (D. Md. 2005) (Grimm, M.J.)). The parties have already agreed to such an order. *See* Stipulated Protective & Clawback Order, Apr. 26, 2021, ECF No. 450. With that in place, "Defendants need no[t] . . . bear the cost of reviewing the ESI for responsiveness and privilege." *In re Coventry Healthcare, Inc., ERISA Litig.*, 290 F.R.D. 471, 475-76 (D. Md. 2013). Another option is to use technology-assisted review, or TAR, a process noted in the ESI order and at least considered by some Defendants. *See Hyles v. N.Y. City*, No. 10CIV3119, 2016 WL 4077114, at *2 (S.D.N.Y. Aug. 1, 2016) ("[Plaintiff] absolutely is correct that in general, TAR is cheaper, more efficient and superior to keyword searching."); *Sinclair Wyo. Refin. Co. v. A&B Builders, Ltd.*, No. 15-CV-91, 2016 WL 11494744, at *8 (D. Wyo. Nov. 4, 2016) (describing how a producing party can "employ a number of techniques for limiting costs," including TAR and clawback provisions (citing Maura R. Grossman

---

[9] Defendants request a second opportunity to brief undue burden once the parties' disputes over search terms have been resolved. But Defendants have already agreed to a briefing schedule for all of these issues. They are briefing undue burden in this letter, and they will in the joint letter on search terms. The Court need not offer any additional opportunity to do so.

[10] Defendants' estimate is also severely flawed. First, it used Plaintiffs' proposed search terms, which Defendants termed "entirely unworkable." Aug. 3, 2021 Email from I. Hall (Defendants' counsel) to Plaintiffs' counsel. But Plaintiffs have committed to revising those terms based on "hit count reports derived from actual tests of the search terms." June 24, 2021 Letter from Z. Glubiak (Plaintiffs' counsel) to Defendants' counsel at 2. Defendants have refused to commit to providing hit count reports; they should do so to help the parties reduce their burden. Second, Defendants did not disclose how they selected the Tyson custodians and could have selected those with the highest hit counts. Many agreed-upon custodians, however, only worked for a portion of the Class Period. Many others were plant-level employees for whom Plaintiffs have offered a more limited set of search terms.

& Gordon V. Cormack, *Technology-Assisted Review in E-Discovery Can Be More Effective and More Efficient Than Exhaustive Manual Review*, 17 RICH. J.L. & TECH. 11 (2011))); *Zimmer, Inc. v. Beamalloy Reconstructive Med. Prod., LLC*, No. 16-cv-00355, 2019 WL 1318094, at *5 (N.D. Ind. Mar. 22, 2019) (rejecting a claim of undue burden where "the Court is confident that counsel can avoid" read[ing] every email for relevance and privilege "by using a TAR protocol"); *In re Mercedes-Benz Emissions Litig.*, No. 16-cv-881, 2020 WL 103975, at *2 (D.N.J. Jan. 9, 2020) (Order & Op. of Special Master, Dennis M. Cavanaugh, U.S.D.J. (Ret.)) (refusing to "look favorably on . . . arguments related to burden of discovery requests, specifically cost and proportionality, when Defendants have chosen" to use search terms and not TAR). In sum, incurring such costs for their attorneys is not inevitable for Defendants; it's a choice.

***Relevant Time Period for Turkey Defendants.*** Attempting a second bite of the apple, the Turkey Defendants contend that an even narrower Relevant Time Period should apply to them. They argue that Plaintiffs do not allege that the Turkey Defendants joined the conspiracy until 2015, when Plaintiffs allege that they began attending WMS meetings in Florida. Not so. Plaintiffs allege that JOTS, CMS, and Butterball joined the conspiracy before 2015. Furthermore, in denying Defendants' motions to dismiss, the Court has already rejected the argument that the Turkey Defendants should not be liable for pre-2015 conduct.

Plaintiffs allege, *inter alia*, that JOTS, CMS, and Butterball participated (along with Tyson and Perdue) in another compensation survey conducted by the National Turkey Federation, which, like the WMS survey, was used to "restrain the compensation of workers in poultry processing plants in the United States prior to 2015." SAC ¶ 194. Indeed, Plaintiffs allege—per a former Butterball employee—that the Turkey Defendants "reported salaried and hourly wages of 'fairly specific' positions within their turkey processing plants to the National Turkey Federation each year, which compiled the information and distributed the combined survey results to those turkey processors." *Id.* Plaintiffs also allege that the human resources committees of the National Turkey Federation, National Chicken Council, and the U.S. Poultry & Egg Association merged to form the Joint Poultry Industry Human Resources Council in April 2009, which expedited coordination of compensation among chicken and turkey processors. *Id.* ¶ 170(d). Moreover, Plaintiffs allege that the Turkey Defendants participated in other means of the conspiracy since its onset in 2009, including the regular exchange of current and future compensation data through both Agri Stats and plant-to-plant communications, thereby allowing them to align their compensation practices with those of the other Defendants. *Id.* ¶¶ 7-8, 54, 56, 58; *see also* Omnibus Opp'n to Defs.' Mots. to Dismiss at 61, July 17, 2020, ECF No. 359. Plaintiffs also allege that Butterball's Mount Olive (NC) plant "would regularly exchange hourly wages for specific positions with other nearby poultry processors . . . so that the companies could 'compare' their compensation schedules." SAC ¶ 230. This occurred *before* 2012 as the Butterball Vice President of Human Resources supporting this allegation left the company in 2012, according to Butterball.[11]

The Turkey Defendants seek to limit their discovery obligations—and hence, their liability—by withholding documents before January 1, 2015 (or January 1, 2014 for Butterball). The Court

---

[11] *See* July 23, 2021 Letter from D. Hamilton (Butterball's counsel) to C. Enders (Plaintiffs' counsel) at 4 (indicating that Gary Lenaghan was Butterball's Vice President of Human Resources from January 2004 to February 2012).

rejected this exact argument in denying Defendants' motions to dismiss. *See* Mem. Op. on Mots. to Dismiss, Mar. 10, 2021, ECF No. 414. Specifically, JOTS argued that "[b]ecause [JOTS] is alleged to have only begun attending the secret compensation meetings in 2015, [JOTS] should not be held liable for the pre-2015 conduct of the other alleged conspirators." *Id.* at 15. The Court rejected this argument for multiple reasons:

- "Co-conspirators in antitrust cases are jointly and severally liable for the entire amount of the resulting damages, even if injury did not arise from a single conspirator's own conduct. . . . This is true even where co-conspirators are not aware of the existence of other conspirators or of other conspirators' actions. . . . [C]o-conspirators generally need not be aware of other conspirators' conduct to be held liable for it." *Id.* at 15-16 (citations and internal quotation marks omitted);

- The Turkey Defendants are "'specifically alleged to have participated in the secret meetings' and therefore [they are] 'appropriately alleged to have . . . fraudulently concealed [those meetings]' for the reasons outlined in this Court's previous opinion. . . . Plaintiffs may seek recovery for alleged harms incurred throughout the class period irrespective of the four-year limitations period." *Id.* at 16-17 (citation omitted); and

- Indeed, the Court specifically rejected JOTS' argument that the Court "should order the development of a 'focused and phased discovery plan' to determine whether [JOTS] should remain in the case." *Id.* at 16 n.6. "*[T]here does not presently exist a compelling difference between the allegations against [JOTS] and the other Defendants warranting a special discovery process.* . . . [JOTS] *is treated much the same as the other Defendants in terms of being alleged to have attended multiple secrete compensation meetings and to have received poultry data (encompassing both turkey and chicken wages).*" *Id.* (emphasis added).

It is inappropriate for the Turkey Defendants to seek to resurrect their Court-rejected argument on pre-2015 liability in the context of discovery. Plaintiffs respectfully submit that the Court compel JOTS, CMS, and Butterball to produce discovery for the full proposed Relevant Time Period of January 1, 2007 to August 30, 2020.[12]

***Relevant Time Period for Structured Data.*** With respect to RFP No. 11 regarding structured data, Plaintiffs believe that the Relevant Time Period should be January 1, 2000 to August 30, 2020. Plaintiffs do not demand otherwise responsive structured data if those data are stored in any legacy

---

[12] For the reasons expressed above, Butterball's burden calculation is flawed. Unlike Tyson, however, Butterball discloses hit counts produced by both Butterball's and Plaintiffs' proposed timeframes. They show the reasonableness of Plaintiffs' proposed Relevant Time Period. Even though Plaintiffs' proposed timeframe is 142% longer than Butterball's, it only generates a 45% increase in documents to review. Indeed, the disputed years contain, on a per-year basis, less than one-third of the documents found in the agreed-upon years.

data system that only contains data inputted before January 1, 2005. Although every Chicken Defendant has recognized that Plaintiffs are entitled to data that covers most of the Class Period—and all have now agreed to produce two years of pre-Class Period data—none have agreed to produce data from before 2007. The Turkey Defendants have taken an even more hardline position, refusing to produce data except from January 1, 2014 to August 30, 2019. While some Defendants previously offered to produce data until August 20, 2020, all have now refused to do so, even though that period falls within the Class Period.

Because antitrust cases can rise and fall based on plaintiffs' ability to paint "an accurate economic picture" of a given market, courts frequently recognize the importance of granting plaintiffs a "larger window of economic data (as opposed to conduct documents)." *Kleen Prods.*, 2013 WL 120240, at *9. In particular, one well-accepted approach for determining the economic effects of anticompetitive conspiracies is to compare market conditions in the conspiracy period with conditions before and after that period. This "before-during-after" or "before-and-after" method requires "data from before, after, or both before and after the conspiracy" to establish a "benchmark . . . time period where there was no conspiracy." *In re Pressure Sensitive Labelstock Antitrust Litig.*, No. 03-MDL-1556, 2007 WL 4150666, at *20 (M.D. Pa. Nov. 19, 2007). The anticompetitive effects of the conspiracy can then be inferred by comparing "[t]he difference in prices," or wages, "during the benchmark and conspiracy periods." *Id.* "[B]y analyzing this difference, an expert can determine the amount of profit during the conspiracy period had the antitrust violation not occurred." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 524 (6th Cir. 2008). "[T]his method is broadly accepted for proving antitrust damages." *Id.* at 529; *see also In re Elec. Books Antitrust Litig.*, No. 11 MD 2293, 2014 WL 1282293, at *25 (S.D.N.Y. Mar. 28, 2014) (collecting authorities).

In complex antitrust cases, courts have thus recognized the importance of data that cover a pre-conspiracy period close or "equal in time . . . to the conspiracy period." *Kleen Prods.*, 2013 WL 120240, at *9; *see also Arrowpac Inc. v. Sea Star Line, LLC*, No. 12-cv-1180-J-32, 2014 WL 12617575, at *3 (M.D. Fla. Sept. 11, 2014). For example, in *Kleen Products*, a case involving an alleged five-year conspiracy, the court granted plaintiffs' motion to compel five years of pre-class period data discovery. 2013 WL 120240, at *9. Similarly, in the previously cited turkey-price fixing antitrust case involving many of the same defendants as this case, the defendants agreed and stipulated to produce six years of pre-class period structured data discovery (2004-2010), a time period that nearly matched the seven-year conspiracy period itself (2010-2017). *See* Order Regarding Produc. of Electronically Stored Info. & Paper Docs. at 10-11, *Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, No. 19-cv-08318 (N.D. Ill. Dec. 18, 2020), ECF No. 202. And in *Arrowpac*, the court granted the defendants eight years of data outside the bounds of the six-year conspiracy period—two years before and six years after—and specifically noted that the "[p]re and post conspiracy information" was "directly relevant" to the plaintiffs' "'before and after' method" for calculating damages. 2014 WL 12617575, at *3.

In this case, which involves a multi-pronged conspiracy spanning over twelve years, Plaintiffs' request for nine years of pre-Class Period data stretching back to 2000 is reasonable. To the extent some Defendants have offered to produce pre-Class Period data at all, their offer would cover 2007-2009—the beginning of the Great Recession. Slightly further back, in 2005, Congress enacted the ethanol mandate in the Energy Policy Act of 2005. The chicken industry claims that

mandate caused a spike in the price of corn, a primary input cost of the poultry business, thus negatively impacting the industry.[13] Although Plaintiffs are confident that their experts can effectively control for any impact of these events, they anticipate that Defendants will claim that the volatility of the years immediately preceding the Class Period render them an inadequate "benchmark" period on their own. Access to a greater range of data will assist Plaintiffs in rebutting these criticisms.[14]

Although Plaintiffs believe nine years of pre-Class Period data is reasonable, they recognize that not all Defendants may be similarly situated for data production. If a Defendant possesses a legacy data system containing responsive structured data that was not used after January 1, 2005, Plaintiffs are willing to forgo requesting data from that system, even if it means the Defendant produces no data for the time period that system was operative. *See The (2004) Sedona Principles: Best Practices, Recommendations & Principles for Addressing Electronic Document Production,* 5 SEDONA CONF. J. 151, 202 (2004) (describing the concept of "legacy data"). This concession will minimize the burden imposed on Defendants who stopped using an old data system several years before the Class Period began.

With that protection in place, any burden placed on Defendants is easily proportionate to the needs of this litigation. For legacy data systems that were used after January 1, 2005—and thus contain some data for the four years immediately preceding the Class Period—the additional burden of producing prior years of data is minimal. If a Defendant must collect *some* data from a system, collecting additional years of data from that same system generally requires little, if any, additional effort. Defendants' burden arguments on this point are only generic assertions; they have not articulated with the requisite specificity why Plaintiffs' requests would impose anything beyond a *de minimis* burden, much less a disproportionate one. *See Innovative Therapies, Inc. v. Meents*, 302 F.R.D. 364, 377 (D. Md. 2014) ("[T]he movant must set forth specific and particular facts, rather than broad conclusory statements . . . ."), *quoted in CX Reinsurance Co. v. Johnson*, No. 15-3132, 2018 WL 4863640, at *2 (D. Md. Mar. 27, 2018) (Gallagher, M.J.) (noting that the objecting party failed to "proffer[] the number of records that would need to be searched, reviewed, or produced, or the costs associated therewith"); *Lynn v. Monarch Recovery Mgmt., Inc.*, 285 F.R.D. 350, 360 (D. Md. 2012). These threadbare objections are wholly inadequate. *See, e.g.*, *Inline Packaging*, 2016 WL 7042117, at *9 (ordering production of older data in spite of counsel's assertion that responsive data from an earlier period was "stored on 'legacy' computer systems that are difficult and expensive to access"); *Schultz v. Sentinel Ins. Co.*, No. 15-CV-04160, 2016 WL 3149686, at *13 (D.S.D. June 3, 2016) (ordering production of six years of data from an older,

---

[13] *See About Ethanol,* National Chicken Council, https://www.nationalchickencouncil.org/policy/ethanol/ (last visited Aug. 13, 2021).

[14] For the same reason, Turkey Defendants' more limited offer of structured data is inadequate, even assuming, incorrectly, that their participation in the conspiracy began in 2015. As an economic matter, the wage-fixing conspiracy could have affected the wages paid by Turkey Defendants during the Class Period regardless of whether they actively participated in it. That makes pre-2009 data especially useful to establish a benchmark period. And it means post-2009 data from Turkey Defendants will help Plaintiffs quantify the impact of Defendants' conspiracy on the larger market for poultry processing workers.

archived database where the producing party merely "cast[] doubt on whether the data is still searchable or accessible").[15]

Separately, Defendants contend that the discovery period for structured data should terminate on August 30, 2019. That position is unreasonable, and Defendants have not even attempted to justify it. *See Hake*, 2014 WL 3974173, at *5 (Gallagher, M.J.) ("The burden rests with the [resisting party] to establish that the information is not relevant . . . ."). The year-long period between that date and Plaintiffs' proposed end date, August 30, 2020, is part of the Class Period, and Plaintiffs seek damages for Defendants conspiratorial conduct during that period. *See* SAC ¶¶ 169, 267. Data from the latter part of the Class Period is just as relevant, and for the same reasons, as earlier data. Data production for the entire conspiracy period is frequently an area of agreement in antitrust cases. *See, e.g.*, *Arrowpac*, 2014 WL 12617575, at *3.

## 2. **DEFENDANTS' POSITION:**

Defendants object to the 12-year Relevant Time Period for unstructured data and 20-year Relevant Time Period for structured data proposed by Plaintiffs on the grounds that the periods are overbroad, disproportionate to the needs of this case, and impose an unjustified burden on the Defendants. A significant portion of the Relevant Time Periods that Plaintiffs request are neither relevant nor proportionate because even though Plaintiffs allege a purported conspiracy beginning on January 1, 2009 and first filed their complaint in this action on August 19, 2019 (the "Filing Date"), Plaintiffs seek unstructured data two years before the purported conspiracy began and one year after the Filing Date. And Plaintiffs seek 10 years of structured data from beyond when the purported conspiracy began and the Filing Date. Plaintiffs seek to utilize such broad time periods even though nothing in the SAC even hints at conspiratorial conduct pre-class period or after the Filing Date. *See Heaney v. Bank of Am., N.A.*, 2017 WL 1476117, at *3 (D. Md. Apr. 24, 2017) (denying motion to compel responses to interrogatories seeking information "[ir]relevant to Plaintiffs' . . . claim as pleaded"); s*ee also Halim v. Baltimore City Bd. of Sch. Comm'rs*, 2012 WL 2366338, at *2 (D. Md. June 20, 2012) (Gallagher, J.) ("In the absence of any articulated reason to believe that information in the personnel files will be relevant to Plaintiff's case . . . the motion to compel . . . is denied.").

Defendants maintain that the Relevant Time Period for discovery should be as follows.

- For structured data:

---

[15] The cases Defendants cite provide no support for their position. Defendants claim that the court in *In re Diisocyanates Antitrust Litigation*, No. 18-1001, 2020 WL 7427040 (W.D. Pa. Dec. 18, 2020), ordered production of only one year of pre-conspiracy structured data. But the issue decided there "relate[d] only to *unstructured* document discovery"; the parties had agreed to three years of pre-conspiracy structured data. *Id.* at *3 (emphasis added). Defendants likewise claim that the court in *In re Peanut Farmers Antitrust Litigation*, No. 19cv00463, 2020 WL 9216019, at *2 (E.D. Va. July 24, 2020), ordered only two years of pre-conspiracy data. But the court there ordered three full years of pre-conspiracy data—"from January 1, 2010 through December 31, 2012"— because the data would "establish[] a benchmark period to estimate overcharges and damages." *Id.* at *2. In other words, Defendants have yet to cite a single case in which a court denied a reasonable request for pre-conspiracy structured data.

- o January 1, 2007 to August 30, 2019 as to WMS, Agri Stats, and the Chicken Defendants.[16]

- o January 1, 2014 to August 30, 2019 as to the Turkey Defendants.[17]

• For unstructured data:

- o January 1, 2008 to August 30, 2019 as to WMS, Agri Stats, and the Chicken Defendants

- o January 1, 2014 to August 30, 2019 as to Butterball and CMS.

- o January 1, 2015 to August 30, 2019 as to JOTS.

In determining proportionality, a district court must consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Heaney*, 2017 WL 1476117, at *2 (quoting Fed. R. Civ. P. 26(b)(1)). Courts have recognized that "defendant[s] should not be subjected to discovery for an unreasonably remote time period" in an antitrust case, especially when such discovery would lead to cumulative evidence. *Cyntegra, Inc. v. IDEXX Lab'ys, Inc.*, 2007 WL 9701999, at *5 (C.D. Cal. June 29, 2007) (finding that discovery period of twenty-two years was unreasonable because Plaintiffs sought information well before their entry into the market); *Cf. Food Lion, LLC v. Dairy Farmers of Am., Inc.*, 2020 WL 6947921, at *5 (M.D.N.C. Sept. 29, 2020) (a plaintiff ordinarily is entitled to discovery "for a reasonable period of time antedating the earliest possible date of the actionable wrong").

Further, courts widely recognize that discovery in any class action, but particularly an antitrust class action, "represents civil litigation's largest cost." *In re Zetia (Ezetimibe) Antitrust Litig.*, 2021 WL 3379035, at *8 (4th Cir. Aug. 4, 2021) (Niemeyer, *J.*, concurring); *see also DSM Desotech Inc. v. 3D Sys. Corp.*, 2008 WL 4812440, at *2 (N.D. Ill. Oct. 28, 2008) ("[D]iscovery in any antitrust case can quickly become enormously expensive and burdensome to defendants.") (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546 (2007)).

Courts evaluating discovery objections based on burden often look for evidence as to the time, cost, and effort required to respond to the request. *See In re C. R. Bard, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2014 WL 12703776, at *3 (S.D.W. Va. June 30, 2014) (noting that to prevail on grounds of burden, oppression, or breadth, the opposing party must offer more than conclusory arguments). Such a showing requires the moving party to have testable discovery parameters, including custodians, non-custodial sources, and search terms (which, in this case, have not yet been agreed-upon). Defendants have illustrated the burden of Plaintiffs' proposed Relevant Time

---

[16] For the purposes of the Relevant Time Period dispute, Chicken Defendants is defined to include Mountaire Farms Inc., Fieldale Farms Corporation, Tyson Foods, Inc., Keystone Foods, LLC, Peco Foods, Inc., Koch Foods, Inc., Sanderson Farms, Inc., Wayne Farms, LLC, Simmons Foods, Inc., Perdue Farms Inc., and Perdue Farms LLC.

[17] Because the Turkey Defendants (together, Jennie-O Turkey Store, Inc. ("JOTS"), Cargill Meat Solutions Corporation ("CMS"), and Butterball, LLC ("Butterball")) are uniquely impacted by Plaintiffs' overbroad definition of Relevant Time Period, their arguments are identified separately.

Period to the extent possible at this early stage but, should it be necessary, Defendants request an opportunity to brief the issue of undue burden with supporting evidence when the disputes over the scope of Plaintiffs' requests, custodians, and search terms have been resolved.

### a) *Structured Data—Request 11*

As to Request 11, Plaintiffs request structured data for a twenty-year period beginning January 1, 2000 and ending August 30, 2020.  The Chicken Defendants, WMS, and Agri Stats maintain that the Relevant Time Period for structured data should begin on January 1, 2007 and end on the Filing Date.  The Turkey Defendants maintain that the Relevant Time Period for structured data from the Turkey Defendants should begin on January 1, 2014 and end on the Filing Date.

<u>WMS, Agri Stats, and the Chicken Defendants' Position</u>

The collection, review, and production of structured data is not, as Plaintiffs may contend, as simple as exporting a file from a computer system.  Rather, the process involves significant manual review to ensure the accuracy and completeness of the data, and often requires costly and burdensome undertakings to collect data from multiple systems or legacy databases that are no longer active or maintained, particularly when older data is sought.  Plaintiffs' structured data requests call for the production of employee-level information between January 1, 2000, to August 30, 2020—over twenty years of data ***specific to every poultry processing employee*** that each Defendant employed during this period.[18]  Put differently, Plaintiffs seek structured data for nine years before they allege the conspiracy involving chicken processors began, and for a year after the Filing Date.  Further adding to the complexity of the structured data requests, many of the fields requested by Plaintiffs—including job title and level, compensation, benefits, raises and promotions, and manager ID—can change over time for an individual employee, which multiplies the amount of data to be collected and reviewed.

Plaintiffs have asserted that they need this information to conduct a regression analysis but have not explained how data from such an incredibly long period of time is relevant or necessary for this analysis, other than pointing to general world events that could have, in some unspecified way, impacted the poultry processing industry.  Notably, Plaintiffs do not even explain how these general events impacted compensation poultry processing plant employee.  But Plaintiffs could play this game endlessly to argue for more and more data.  By contrast, other courts deciding this issue in antitrust litigation have found one or two years of pre-class period data sufficient for regression analysis.  *See In re Diisocyanates Antitrust Litig.*, 2020 WL 7427040, at *3 (W.D. Pa. Dec. 18, 2020) (requiring production of structured data one year prior to the alleged start of an antitrust conspiracy); *In re Peanut Farmers Antitrust Litig.*, 2020 WL 9216019, at *2 (E.D. Va. July 24, 2020) (granting plaintiffs' motion to compel two years of pre-period structured data). Plaintiffs should therefore, as they themselves suggest, rely on their experts' abilities to control for

---

[18] Plaintiffs state that they do not demand otherwise responsive structured data if those data are stored in any legacy data system that only contains data inputted before January 1, 2005.  This offer was not presented to Defendants during the meet and confer process, but in any event, it would not meaningfully reduce the burden on all Defendants, particularly those who have legacy databases that were taken offline and archived over a decade ago but after 2005.

external events that could impact employee compensation rather than placing the burden on Defendants to provide years of additional data.

In the interest of compromise, the Chicken Defendants, WMS, and Agri Stats are amenable to a Relevant Time Period beginning on January 1, 2007, which provides two years of pre-Class Period structured data. Because Plaintiffs have offered no justification for seeking structured data following the Filing Date, Defendants adhere to an end date of August 30, 2019. This compromise would give Plaintiffs twelve years of structured data, which should be more than sufficient for their analysis.

Turkey Defendants' Position

According to Plaintiffs, "[w]hile most of the Defendant Processors have participated in the WMS surveys and related 'off-the-books' meetings of the Compensation Committee since the onset of the Class Period . . . Butterball, JOTS, and CMS . . . joined the annual WMS survey and 'off the books' meetings for the first time in or around 2015." SAC ¶ 194. Plaintiffs' allegations concerning the Turkey Defendants' conduct prior to 2015 are not relevant to their claims against the Turkey Defendants, nor has this Court held otherwise. More particularly, Turkey Defendants' alleged activities prior to 2015 regarding the National Turkey Federation are not "germane to the subject matter of this case," *i.e.* whether the Turkey Defendants "conspired and combined with" the chicken-processing Defendants "to fix and depress the compensation paid to employees at poultry processing plants" by sharing information through Agri Stats and WMS. SAC ¶ 1. In addition, Plaintiffs argue that they need discovery from the Turkey Defendants from 2007 and 2008 solely based on their allegations of unrelated conduct by other Chicken Defendants that purportedly "facilitated" the alleged conspiracy—namely, Tyson purportedly re-subscribing to Agri Stats and Pilgrim's Chapter 11 bankruptcy filing. SAC ¶¶ 309, 315. Plaintiffs' allegations have absolutely nothing to do with, and in no way justify, the overly broad, hyper-generalized discovery that Plaintiffs now seek from the Turkey Defendants between 2007 and at least January 1, 2014.

Plaintiffs rely upon the Court's denial of the Turkey Defendants' motion to dismiss pre-2015 claims against them, but the Court's holding that the Turkey Defendants' exposure may extend to pre-conspiracy conduct relates to joint-and-several liability—and *not* to allegations that the Turkey Defendants engaged in any conduct prior to 2015 justifying Plaintiffs' attempt to vastly expand discovery. *See* Mem. Op. at 15–16, ECF No. 414. The possible legal consequence of joint-and-several liability does not render Turkey Defendants' documents pre-dating 2015 relevant to Plaintiffs' claims.

With respect to JOTS, early discovery has already confirmed that JOTS's participation in the WMS survey and meeting was limited to a single year in 2015. *See, e.g.*, Exhibit DX001 at 9–10 (setting forth JOTS's certified answer to Interrogatory No. 2 and stating that JOTS attended "the 2015 Poultry Industry Meeting on May 4 and 5, 2015 at the Hilton Sandestin," and that agreed-upon document custodian Carol Westaby "collected and provided certain historical information regarding the compensation of employees at JOTS's turkey-processing plants to WMS in or around February 2015, and received information from WMS and compiled by WMS for the 2015 Poultry Industry Compensation and Benefits Survey at the May 4 and 5, 2015 meeting"); Exhibit DX002 (omitting JOTS from WMS's list of attendees at the 2017 and 2019 meetings). Neither the pleadings nor discovery to date suggest that JOTS shared wage information with any Chicken Defendant before 2015, and Plaintiffs cannot now claim otherwise.

18

On balance, it is not proportionate to require the Turkey Defendants to collect, review, and produce structured data for a period of fourteen years prior to their alleged engagement in the alleged conspiracy. Accordingly, the Court should limit the Relevant Time Period for the structured data called for in Request 11 to January 1, 2014 through August 30, 2019.

### b)  *Unstructured Data*

The remainder of Plaintiffs' Requests seek unstructured data for a fourteen-year period from January 1, 2007 through August 30, 2020. The Chicken Defendants, WMS, and Agri Stats maintain that the Relevant Time Period for non-structured data should begin on January 1, 2008 and end on August 30, 2019. Of the Turkey Defendants, Butterball and CMS maintain that the Relevant Time Period for unstructured data should be restricted to January 1, 2014 through August 30, 2019; JOTS maintains that the Relevant Time Period for unstructured data should begin on January 1, 2015 and end on August 30, 2019.

<u>WMS, Agri Stats, and the Chicken Defendants' Position</u>

Plaintiffs seek two years of pre-Class Period discovery based on vague assertions that this additional time period is relevant to show the formation of the alleged conspiracy. Even though the SAC is clear that the alleged conspiracy began in 2009, most Defendants offered some pre-Class Period discovery in the interest of reaching a compromise. Plaintiffs rejected these offers and refused all compromises to their proposed January 1, 2007 start date. Plaintiffs also seek a year of post-Filing Date discovery, but did not allege any facts supporting the continuation of the alleged conspiracy between the filing of the first complaint on August 30, 2019 and the SAC on November 2, 2020.

To justify their position during negotiations, Plaintiffs generally pointed to two pre-Class Period events that purportedly "facilitated the formation and implementation of the conspiracy: Pilgrim's December 2008 bankruptcy filing and Tyson's 2008 subscription to Agri Stats. SAC ¶ 170. Neither of these events indicates any misconduct, let alone a conspiracy involving other Defendants. They do not justify an additional year of pre-Class Period discovery in 2008, and certainly do not justify discovery into 2007, which is *before* either event occurred. *See CX Reinsurance Co. Ltd. v. B&R Mgmt., Inc.*, 2017 WL 2729075, at *3 (D. Md. June 23, 2017) (Gallagher, *J.*) (refusing to permit discovery based upon "impermissible speculation"); *see also Kleen Prod. LLC v. Packaging Corp. of Am.*, 2013 WL 120240, at *9 (N.D. Ill. Jan. 9, 2013) (limiting temporal scope to years in which plaintiffs allege conspiratorial events because "Plaintiffs must be at least somewhat constrained by the allegations in their Complaint" and "Plaintiffs have pointed to no events whatsoever that occurred in [the first year of the discovery sought]," three years prior to the alleged conspiracy); *Hawkins v. Kroger Co.*, 2019 WL 4416132, at *7 (S.D. Cal. Sept. 16, 2019) (denying plaintiff's request to start discovery four years prior to the class period and designating the start of the class period as the start date for discovery upon finding that plaintiff had sought "the early start date to discovery on a wide range of issues without explanation").

Plaintiffs similarly point to phone records that show "potentially conspiratorial" calls between Defendants' employees in 2007 and 2008 as justification for discovery during this period. But Plaintiffs' unabashed conjecture based on the mere fact of phone calls from in 2007 and 2008 cannot compensate for the lack of allegations in the SAC relating to these pre-class period years—

especially where they fail to show any connection between these purported calls and any subject matter related to the Plaintiffs' allegations. *Cf. Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 227 (4th Cir. 2004) ("[M]ere contacts and communications, or the mere opportunity to conspire, among antitrust defendants is insufficient evidence [of] an anticompetitive conspiracy.") (citation omitted).   Moreover, it goes without saying that there are countless legitimate reasons for these calls that have nothing to do with employee compensation, much less a conspiracy or other misconduct related to compensation.   For example, Plaintiffs cite approximately 400 calls between main company lines of Peco and Keystone but ignore that Keystone became a significant customer of Peco starting in October 2007.   Simply plucking routine business conduct out of the air and labeling it "potentially conspiratorial" cannot make that conduct relevant, let alone manufacture relevance or justify the substantial tremendous burden of two additional years of document collection, review, and production.

As to post-Filing Date discovery, Plaintiffs speculate that such materials are relevant and that the alleged conspiracy continued after the filing of this lawsuit.   But the SAC does not allege any facts regarding conspiratorial conduct between August 30, 2019 and November 2, 2020, and therefore Plaintiffs' claims that the alleged conspiracy continued are unsupported and do not justify the extension of the relevant time frame for discovery.   *See U.S. ex rel. Spay v. CVS Caremark Corp.*, 2013 WL 4525226, at *4 (E.D. Pa. Aug. 27, 2013) (finding that post-complaint discovery was warranted when there were "well-pled and plausible claims of continuing violations," but not justified when the relevant complaint made "only cursory and speculative references to conduct continuing to the present").

Even now, Plaintiffs cannot point to any post-Filing Date facts evidencing a continuing violation.   Plaintiffs quote language in a PowerPoint presentation related to the 2019 WMS survey, but acknowledge that the presentation pre-dates the Filing Date and therefore would be included in Defendants' proposed Relevant Time Period. [19]   Plaintiffs continue to offer nothing more than speculation that Defendants *may* have changed their policies or *may* have had communications related to their legal exposure.   Assuming that this type of evidence exists, it is likely to be privileged or inadmissible under Federal Rule of Evidence 407, and its relevance is outweighed by the burden on Defendants to collect, search, and review such documents for relevance and privilege.

Beyond Plaintiffs' failure to adequately explain the relevance of pre-Class Period and post-Filing Date discovery, the burden of such discovery does not outweigh its likely benefit.   Given the significant number of custodians sought and the breadth of Plaintiffs' requests, even an incremental expansion to the already significant time period will unduly burden the Defendants. Because the parties have yet to agree on a set of search terms, Defendants used Plaintiffs' initial proposed search terms to assess the burden of expanding the relevant time frame for discovery. Applying Plaintiffs' proposed search terms to **just four** agreed-upon Tyson custodians' emails resulted in hits on over 1.2 million documents belonging to these custodians between the January 1, 2009 and August 30, 2019 time period, even after de-duplication.   Assuming that document

---

[19] And even if the WMS presentation had relevance to post Filing Date conduct, it cannot justify the expansion of discovery against Peco and Agri Stats, two Defendants that Plaintiffs have acknowledged did not participate in WMS.

reviewers completed a review of 50 documents per hour at a rate of \$35 per hour,[20] the cost to review the document hits for just these four custodians is \$840,000.  Though these figures also speak to Plaintiffs' overbroad search terms, the extremely costly results demonstrate the excessive burden to Defendants if the timeframe for discovery is expanded based solely on Plaintiffs' conjecture.  Plaintiffs complain that this example is flawed.  But Defendants are not required to collect years of additional custodial data just for the sake of demonstrating Plaintiffs' overreach.  Further, their arguments further demonstrate the likelihood that the Defendants will need to address undue burden at a later time when custodians, relevant time frame, and search terms have been resolved—at which point Defendants can fully assess the burden of Plaintiffs' demands.

Moreover, Plaintiffs' requests for non-structured discovery are not limited to custodian emails, but instead call for the search of a wide array of sources including hard copy documents, calendars, expense reports, travel logs and records, diaries, appointment books, notebooks, to-do lists, Day Timers, day planners, appointment notes, entertainment reports, Outlook contact information, Rolodex cards, and records and statements of telephone and video calls.  Thus, the expansion of the Relevant Time Period will further burden Defendants by requiring them to search for and review each of these sources, to the extent these sources are agreed-to or ordered by the Court.

<u>Turkey Defendants' Position</u>

For the reasons described above, information dating back eight years prior to the Turkey Defendants' purported 2015 entry into the conspiracy with the Chicken Defendants is not "germane to the subject matter" of Plaintiffs' claims against the Turkey Defendants.

Moreover, requiring the Turkey Defendants to collect, review, and produce unstructured data for Plaintiffs' other twenty-two Requests in its First Set of Requests for Production dating back to 2007 imposes an undue burden and is disproportionate.  For example, Butterball ran Plaintiffs' proposed search terms on the five custodians listed in Butterball's Rule 26(a)(1) initial disclosures for Plaintiffs' proposed Relevant Time Period (1/1/2007-8/30/2020), which yielded more than 1.6 million documents.  Restricting the time period for these custodial test searches to January 1, 2014 to August 23, 2019, on the other hand, reduced the volume of documents to just over 1.1 million.[21]  Plaintiffs' proposed time frame results in a 50 percent increase in the documents that would need to be reviewed.  The magnitude of documents that Butterball must search and review will only increase given Plaintiffs' demand for additional custodians.  During the Parties' pre-filing meet-and-confer sessions, Butterball agreed to produce up to another thirteen custodians (three custodians are contingent on the Court's ruling on the Relevant Time Frame), and Plaintiffs seek an additional seven custodians, which would result in up to twenty-five document custodians for Butterball.  Although Butterball has not yet undertaken the burden of processing the documents

---

[20] Defendants' assumptions here are more conservative than would be expected for an actual review, based on quotations received from document review companies in the ordinary course of business; review pace is typically slower and hourly cost is typically higher in antitrust-related reviews.

[21] The Turkey Defendants note that due to ongoing negotiations regarding search terms, custodians, and non-custodial sources, the full extent of the burden of Plaintiffs' requests cannot be completely quantified at this time.  Turkey Defendants reserve all rights with respect to undue burden pending the outcome of these related negotiations.

for all twenty-five proposed custodians—a task that would require significant cost and effort, much of which would likely be wasted since the Parties have not yet agreed on the appropriate Document Custodians—it is inevitable that the 1.6 million identified documents would explode to many times that number if the Court accepts Plaintiffs' proposed time period.

JOTS has agreed to produce unstructured data that will include, *inter alia*, documents related to its participation in the WMS survey and meeting and any implications of that participation. Plaintiffs' demand that JOTS produce custodians and documents for eight years prior to its alleged participation in any supposed agreements related to compensation cannot be justified. The burden entailed in collecting and reviewing an additional eight years' worth of irrelevant documents is extreme. JOTS has calculated, based on information available at this time, that one custodian has approximately 14,000 documents per year. Applying that number, ten custodians would equate to 140,000 documents per year. And, ten custodians over eight years would total 1,120,000 documents. This burden is not proportional to the established fact that JOTS attended a single WMS meeting in 2015.

For these reasons, the Turkey Defendants respectfully maintain that the Court should restrict the Relevant Time Period for unstructured data as provided herein.

## B.   Scope ("Compensation and benefits, or hiring or recruiting of Employees")

### 3.   PLAINTIFFS' POSITION:

For RFP Nos. 3 and 7, Plaintiffs seek all responsive documents related to "hiring or recruiting."

RFP No. 3 (revised): All Documents Relating to any Communications, Meetings, or agreements between You and any other Defendant, Co-Conspirator, or Poultry Processor Relating to Compensation or benefits, or the hiring or recruiting of Employees.

RFP No. 7 (revised): All Documents Relating to, created by or for, or transmitted or exchanged between members of, the Compensation Committee (as referenced in the Complaint) or any other official or unofficial committee, organization, or group that focuses on Compensation or benefits, or the hiring or recruiting of Employees.

Agreement: Agri Stats, Peco, Butterball, JOTS, WMS, Fieldale, Wayne, Simmons

Dispute: Sanderson, Perdue, Koch, Mountaire, Tyson/Keystone, CMS

Argument: RFP Nos. 3 and 7 seek conspiratorial communications among the Defendants—the key evidence in any antitrust conspiracy case. Recognizing the importance of such conspiratorial communications, Defendants have agreed to produce all documents relating to communications, meetings, or agreements with competitors concerning "compensation and benefits." Roughly a third of Defendants, however, are refusing to produce conspiratorial communications concerning "hiring and recruiting." These Defendants argue they should only have to produce documents related to hiring and recruiting if those documents "have a connection to compensation and

22

benefits."[22] As Plaintiffs have explained to Defendants, however, documents related to hiring and recruiting are connected to the alleged conspiracy to suppress compensation and benefits for several reasons.

First, the goal of Defendants' agreement was to suppress compensation for processing plant workers. Both the Complaint and the law recognize that agreements to suppress compensation can be carried out by multiple mechanisms. The Second Amended Complaint does not simply allege a conspiracy to "fix" compensation; instead, it alleges a broad conspiracy to "fix *and depress* the compensation paid to employees at poultry processing plants in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1." SAC ¶ 1 (emphasis added). Thus, in addition to discussing and agreeing upon the compensation for poultry processing workers, Defendants could have carried out their conspiracy to depress poultry processing worker compensation by promising not to recruit, hire, poach, or solicit one another's employees. *See Robinson v. Jackson Hewitt, Inc.*, No. 19-9066, 2019 WL 5617512, at *3 (D.N.J. Oct. 31, 2019) (recognizing the possibility that employers can "suppress[] compensation" with a no-poach arrangement).

Courts in antitrust cases have recognized that agreements to suppress compensation can be carried out by multiple mechanisms, including restrictions on hiring and recruiting. For example, in *In re Animation Workers Antitrust Litigation*, No. 14-cv-04062 (N.D. Cal.), the court held that plaintiffs had plausibly alleged a "single overarching conspiracy" to suppress compensation for animation and visual effects workers, which was carried out with both an exchange of compensation data and an agreement not to poach each other's workers. 123 F. Supp. 3d 1175, 1212-13 (N.D. Cal. 2015). Similarly, in *Fleischman v. Albany Medical Center*, No. 06-cv-765 (N.D.N.Y.), the plaintiffs alleged that the defendants suppressed compensation for registered nurses through an exchange of compensation data, and the court held that the data exchange raised an inference that they agreed not to poach one another's employees: Absent an agreement not to compete on hiring, "it would be against [d]efendants' best interests to exchange wage information because . . . rivals would use the information to 'poach' [employees] and compete against each other." *Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 162 (N.D.N.Y. 2010). Notably, the court reached this conclusion despite the fact that the plaintiffs did not allege a "no poach" arrangement in their complaint. *See* Second Am. Compl., *Fleischman v. Albany Med. Ctr.*, No. 06-cv-00765 (N.D.N.Y. Mar. 2, 2007), ECF No. 114.

Thus, contrary to Defendants' suggestion, Plaintiffs' request for documents related to no-poach arrangements (among other hiring and recruiting documents) is *not* a request for documents related to a *separate*, "unpled" antitrust claim. Plaintiffs are merely seeking to understand all the mechanisms Defendants used to implement their conspiracy to suppress compensation.

Defendants' desire to use a scalpel to carefully cut out hiring and recruiting documents from their production therefore runs afoul of black letter antitrust law that "[i]n [conspiracy cases], plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various

---

[22] Notably, all of these Defendants have agreed to produce documents relating to hiring and recruiting policies, practices, and procedures in response to *other* RFPs, regardless of whether those policies, practices, and procedures mention compensation. The *only* RFPs for which these Defendants are unwilling to produce even high-level documents related to hiring and recruiting are RFP Nos. 3 and 7, which concern conspiratorial communications.

factual components and wiping the slate clean after scrutiny of each. The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (internal quotation marks omitted). This is true even if Plaintiffs did not discover all facets of Defendants' conspiracy in their pre-filing investigation or describe them in the Second Amended Complaint. *Freedom Med., Inc. v. Premier Purchasing Partners, L.P.*, No. 09CV152, 2011 WL 13196168, at *2 (E.D. Tex. Apr. 29, 2011) ("Discovery in antitrust cases is broad and not limited to the allegation of the pleadings").[23]

Furthermore, even if Defendants did not have a specific agreement regarding hiring and recruiting, their agreement to suppress compensation necessarily had an *effect* on hiring and recruiting, and Plaintiffs are entitled to discover their communications concerning that topic. The Complaint explains:

> In a competitive market, Defendant Processors would have competed to *recruit, hire and retain* workers during the Class Period by offering higher wages, higher salaries and superior benefits, and many Class Members would have switched employment to different poultry processors as a result of that competition for labor. Yet, by entering into the alleged conspiracy, Defendant Processors were able to reduce and stabilize turnover rates.

SAC ¶ 273 (emphasis added); *see also id.* ¶ 128 ("The conspiracy restrained competition between Defendant Processors for the payment of wages, salaries and benefits to, *and hiring of*, Class Members . . . ." (emphasis added)); *id.* ¶ 312 ("The combination and conspiracy alleged herein has had the following effects, among others: a. *Competition for the hiring and retaining* of workers . . . has been restrained. . . ." (emphasis added)). Documents discussing the effect of a conspiracy to suppress compensation on Defendants' hiring and recruiting practices are clearly relevant. For example, Defendants may have been able to scale back their hiring and recruiting efforts given the stabilization of compensation from their conspiracy. If a Pilgrim's employee emailed a Tyson employee: "Looks like our discussions have successfully reduced hiring costs for all of us," that would be a highly relevant conspiratorial communication, even though it does not expressly mention "compensation" or "benefits."

---

[23] Contrary to Defendants' suggestion, the 2015 amendments to the Federal Rules of Civil Procedure still allow Plaintiffs to gather evidence of transactions and events that are "relevant to any claim" asserted in the Complaint, even if those transactions and events were not described in the pleadings. *Lifeguard Licensing Corp. v. Kozak*, No. 15 Civ. 8459, 2016 WL 3144049, at *2 (S.D.N.Y. May 23, 2016) (quoting Fed. R. Civ. P. 26(b)(1)); *see also* Fed. R. Civ. P. 26(b)(1) advisory committee note to 2015 amendment ("The present amendment restores the proportionality factors to their original place in defining the scope of discovery. . . . Restoring the proportionality calculation to Rule 26(b)(1) *does not change the existing responsibilities of the court and the parties to consider proportionality*, and the change does not place on the party seeking discovery the burden of addressing all proportionality considerations. Nor is the change intended to permit the opposing party to refuse discovery simply by making a boilerplate objection that it is not proportional." (emphasis added)).

Notwithstanding their clear relevance, Plaintiffs sought to reduce the burden Defendants may face in collecting hiring and recruiting documents. Plaintiffs compromised on several RFPs, and agreed to accept only those responsive documents that are related to "company-wide or plant-wide hiring or recruiting policies, procedures, or practices." But Plaintiffs cannot make this concession for documents related to conspiratorial communications about compensation, benefits, hiring, or recruiting, which constitute crucial and possibly direct conspiracy evidence.

Some Defendants told Plaintiffs that producing all inter-Defendant communications concerning hiring and recruiting would be burdensome because such communications include "run-of-the-mill reference checks." In the spirit of compromise, Plaintiffs have offered to work with Defendants to filter reference checks out of their production using search terms. In addition, if there are other categories of hiring and recruiting communications among Defendants that Defendants consider non-conspiratorial, Plaintiffs will consider excluding those documents through search terms as well. None of the five Defendants with a dispute on this global issue have accepted this reasonable proposal.

Sanderson, Perdue, and Mountaire have agreed to produce "hiring or recruiting" documents for RFP No. 7 but not for RFP No. 3. Koch, CMS, and Tyson/Keystone have refused to produce as to both RFP Nos. 3 and 7. Plaintiffs request that the Court rule that these Defendants will not withhold documents as to these two requests on the basis that they only concern hiring or recruiting.

### 4. **DEFENDANTS' POSITION**:

Plaintiffs allege a conspiracy to suppress compensation and benefits for poultry processing workers. SAC ¶ 10. They have never alleged a "no poach" agreement among Defendants to refrain from hiring each other's employees. Nevertheless, Plaintiffs admit that they want to expand the scope of Requests 3 and 7 to include hiring and recruiting documents "regardless of whether they explicitly" involve compensation or benefits in order to find evidence of unpled no-poach agreements and expand the scope of their case.[24] July 25, 2021 Letter from A. Deich to M. Samels; August 5, 2021 Letter from A. Deich to M. Samels at 2 (explaining that Plaintiffs are seeking documents where Defendants are "assuring one another that they were not going to 'poach' certain employees"). The Court should not allow this improper fishing expedition seeking materials beyond the scope of the complaint.

"The role of discovery . . . is to find support for properly pleaded claims, not to find the claims themselves." *Torch Liquidating Tr. ex rel. Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 392 (5th Cir. 2009). Here, Plaintiffs have alleged a "conspiracy to fix and depress compensation to poultry processing plant workers." SAC ¶ 35. Hiring and recruiting is relevant to their claim insofar as "Defendants did not compete to *hire or recruit workers* from one another's plants *by offering better wages or benefits*." July 8, 2021 Letter from A. Deich to M. Samels at 4 (emphasis added); SAC ¶ 273 (alleging that, absent the conspiracy, Defendants "would have competed to recruit, hire and retain workers . . . by offering higher wages, higher salaries and superior benefits"). What Plaintiffs have not alleged, however, is that Defendants struck a *separate* no-

---

[24] Requests 3 and 7 relate to communications between poultry processors and communications with the "Compensation Committee" alleged in the complaint.

poach agreement to refrain from hiring each other's processing plant workers, beyond the alleged wage suppression. Thus, hiring and recruiting documents have no independent relevance without some nexus to compensation or benefits.

Rule 26 does not permit the sort of fishing expedition that Plaintiffs seek here. The Advisory Committee Notes to Rule 26 dictate "that the parties and the court [should] ***focus on the actual claims*** and defenses involved in the action" when determining relevance for discovery. Fed. R. Civ. P. 26(b)(1) advisory committee note to 2000 amendment (emphasis added). Courts have "authority to confine discovery to the claims and defenses asserted in the pleadings, and [should] signal to the parties that they have ***no entitlement to discovery to develop new claims*** or defenses that are not already identified in the pleadings." *Id.* (emphasis added). *Accord Lifeguard Licensing Corp. v. Kozak*, 2016 WL 3144049, at *2 (S.D.N.Y. May 23, 2016) ("[I]t [is] well-established that information relevant only to claims not yet pled [are] beyond the scope of discovery."); *Altman v. Ho Sports Co., Inc.*, 2010 WL 4977761, at *2 (E.D. Cal. Dec. 2, 2010) (noting that there is "no obligation to conduct discovery on unpled causes of action [and] the federal rules would prohibit such discovery"). In fact, the 2000 and 2015 amendments to Rule 26 foreclosed Plaintiffs' position when they narrowed the focus of discovery to ***pled*** allegations. *See Lifeguard Licensing Corp.*, 2016 WL 3144049, at *2. Thus, Plaintiffs improperly rely on *Freedom Med., Inc. v. Premier Purchasing Partners, L.P.*, which cites to only pre-amendment cases from the 1960s, 70s, 80s, and 90s. *See* 2011 WL 13196168, at *2 (E.D. Tex. Apr. 29, 2011).

Plaintiffs argue that "agreements to suppress compensation can be carried out by multiple mechanisms," but they have pled only one mechanism—wage suppression agreements. The *In re Animation Workers* case on which plaintiffs rely—critically—involved both a wage-fixing conspiracy and a separate no-poach agreement that the plaintiffs ***had pled in their complaints***. *See In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1181 (N.D. Cal. 2015) ("Plaintiffs allege that Defendants conspired to suppress compensation in two ways. First, Defendants allegedly entered into a scheme not to actively solicit each other's employees. . . . . Second, Defendants allegedly engaged in [a conspiracy to] . . . limit compensation offered to Defendants' current and prospective employees."); *see also Kelsey K. v. NFL Enterprises LLC*, 2017 WL 3115169, at *2 (N.D. Cal. 2017) (conducting separate analyses where plaintiffs sought to allege "an overarching conspiracy of two *per se* illegal agreements: a No Poaching Agreement and a Wage Fixing Agreement"). Here, in contrast, Plaintiffs did not include any no-poach allegations. Defendants strenuously deny that any such no-poach agreements exist—but in any event Plaintiffs should not be allowed to expand their burdensome discovery to support this speculative and unpled claim.

It is not enough that an unpled "no-poach" claim may be "tangentially related" to the pled compensation and benefits claim. As the court explained in *Lifeguard Licensing Corp.*, Rules 11 and 26 do not "permit[] a party to file one plausible claim and then take discovery on any tangentially related potential claims before deciding whether to actually assert them." 2016 WL 3144049, at *3–4. The Federal Rules thus "prohibit" exactly the kind of speculative discovery that Plaintiffs seek here. *See Altman*, 2010 WL 4977761, at *2.

Finally, Plaintiffs' request for extra discovery into unpled claims fails Rule 26's basic proportionality, relevance, and burden tests. Plaintiffs speculate that some document may exist along the lines of, "Looks like our annual Florida meetings have successfully reduced hiring costs for all of us"—and that without separate searching for hiring and recruiting, this document could be missed. But Defendants have offered to provide hiring and recruiting documents if those

documents have a nexus compensation or benefits.  Thus, if Defendants had entered separate hiring and recruiting agreements to support the alleged wage-suppression conspiracy, that plan would almost certainly be discussed in the universe of documents that Defendants are willing to provide. Discovery is not designed to find and "[p]laintiffs are not entitled to every single document." *Blackrock Allocation Target Shares*, 2018 WL 2215510, at *10 (S.D.N.Y. May 15, 2018) (quotations omitted).  Rather, discovery is proper only when "proportional to the needs of the case." Fed. R. Civ. Proc. 26(b)(1).  Any additional searches are likely to have "no marginal utility," and will create burdens that are not reasonable or proportional in light of the discovery that Defendants are already providing.  *Blackrock*, 2018 WL 2215510, at *7; Fed. R. Civ. Proc. 26(b)(1).

The Court should therefore limit Requests 3 and 7 to only documents related to hiring and recruiting with a connection to compensation and benefits.  To allow otherwise would be to condone a fishing expedition in support of unpled claim, which is inconsistent with Rule 26.

## C.   Definition of "Employee"

### 5.   PLAINTIFFS' POSITION:

The term "Employee" includes any Person who performs work on behalf of any Poultry Processor at any Poultry Processing Plant, regardless of whether that Person is classified as an employee under applicable labor laws and tax laws.

Agreement (except as to RFP No. 3, *see infra*): Tyson/Keystone, Agri Stats, Fieldale, Wayne, Perdue, Sanderson, Peco, Mountaire, CMS, WMS

Dispute: JOTS, Butterball, Simmons, Koch

Argument: A supermajority of Defendants have agreed to Plaintiffs' position that the term "Employee" includes workers such as independent contractors, joint employees, or temporary workers. Only four Defendants seek to exclude those workers from the definition of "Employee," claiming that such workers are excluded from the Class Definition, and therefore they need not produce documents related to those workers in the multitude of requests that refer to Employees. The four Defendants in dispute should produce these documents for at least two reasons.

First, the flawed premise behind Defendants' position is that the scope of discovery here is defined by the exact contours of the Class. It is not. Nevertheless, the proposed Class includes these workers. It is defined as: "All persons employed by Defendant Processors, their subsidiaries and/or related entities at poultry processing plants in the continental United States from January 1, 2009 until the present." SAC ¶ 294. The plain meaning of the verb *employ* does not require a worker to be classified as an employee under applicable labor laws and tax laws as Defendants contend. Black's Law Dictionary defines the verb *employ* broadly as: "1. To make use of. 2. To hire. 3. To use as an agent or substitute in transacting business. 4. To commission and entrust with the performance of certain acts or functions or with the management of one's affairs." *Employ*, *Black's Law Dictionary* (11th ed. 2019). Merriam-Webster likewise defines the verb *employ* as: "(1): to

27

use or engage the services of [or] (2): to provide with a job that pays wages or a salary." *Employ*, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/employ (last visited Aug. 18, 2021). Plaintiffs deliberately chose *not* to limit the Proposed Class to "employees"—as that term is used in tax or labor laws. Since these workers are in the Class, discovery concerning them is relevant and Defendants should produce it.

Plaintiffs accordingly also requested information regarding these workers as they defined the term "Employees" in their RFPs: "any Person that You, any Defendant, Co-Conspirator, or Poultry Processor employ or employed during the Relevant Time Period, including contract workers and workers jointly employed with other entities. The term 'Employee' includes any Person who performs work on behalf of any Poultry Processor at any Poultry Processing Plant, regardless of whether that Person is classified as an employee under applicable labor laws and tax laws." The definition cannot be more plain.

And to be clear, antitrust law applies equally whether companies conspire about employees or independent contractors. For example, the first criminal wage fixing case brought by the Department of Justice concerns a conspiracy between therapist staffing agencies to lower the rate paid to independent contractor therapists.[25]

Thus, the Class includes these workers, the definition of Employees includes them, and the law applies to them. They are included regardless of how they are classified for tax purposes. The fact that four Defendants would have preferred that Plaintiffs explicitly mention them in the Class Definition is not a basis for denying discovery about them.

Second, even if the Court decides at this early stage that independent contractors, joint employees, and temporary workers[26] are not included in the Class, the scope of discovery is not defined by the exact contours of the Class. Plaintiffs allege a poultry worker labor market that spans the continental United States. SAC ¶ 249. Processing plant workers are active participants in the poultry labor market regardless of how they are characterized by tax or labor laws. Therefore, discovery of documents showing (1) suppressed compensation to these workers during the Class Period (*id.* ¶ 244); (2) exchange of compensation data via Agri Stats regarding them as "processing plant workers" (*id.* ¶ 245); and (3) bilateral exchanges of wage data for them (*id.* ¶ 246) would be direct evidence of Defendants' use of their collective market power to suppress compensation for all processing plant workers.

---

[25] *See* Indictment, *United States v. Jindal*, No. 4:20-cr-00358 (E.D. Tex. Dec. 9, 2020), ECF No. 1, https://www.justice.gov/opa/press-release/file/1344191/download.

[26] Certain Defendants claim that they do not have records of compensation or benefits for temporary workers recruited and hired by third-party companies or temp agencies, and therefore claim those records are not relevant or responsive to Plaintiffs' requests. This defies logic. Plaintiffs agree that Defendants cannot produce documents they do not possess or control, but if Defendants have them, they are relevant, and Defendants should produce them.

Simply put, these documents concern workers doing the same tasks at the same plants run by the same Defendant Processors at the same time. They concern whether Defendants agreed to suppress their compensation and potentially meetings and communications about the same. They concern the amount and types of compensation paid to those workers or, alternatively, the fees paid to third-party companies or temp agencies that supply those workers to Defendants. They are directly relevant to Plaintiffs' analysis of the levels of compensation in this alleged labor market.

And finally, documents and data concerning the types of workers Defendants sought from staffing agencies would help Plaintiffs define the relevant labor market for their rule of reason claim. For example, communications with temp agencies concerning "unique poultry skillset[s]" would go directly to the heart of market definition. *Jien*, 2020 WL 5544183, at *11. This is also true of communications from temp agencies regarding what wages will be necessary to attract and recruit new hires, how those agencies go about recruiting those workers, and where geographically they intend to seek new hires. Communications between Processors and temp agencies concerning the necessary training for new hires would also be relevant. Thus, these documents are highly probative of Plaintiffs' rule of reason claim.

The four Defendants contesting this issue rest their arguments on the flawed premises that (1) these poultry processing plant workers are not in the Class (they are) and (2) discovery must be strictly limited to the contours of the Class (it does not). Plaintiffs therefore request that the Court order JOTS, Butterball, Simmons, and Koch to produce documents related to all poultry processing workers, regardless of how the workers are classified for tax and labor law purposes.

## 6.  <u>DEFENDANTS' POSITION:</u>

Through the parties' meet-and-confer process, Plaintiffs have agreed to limit the term "Employees" to Class Members for all Requests, except for Request 3, which asks for all documents related to communications between Defendants regarding compensation, hiring and recruiting, and other employment practices.  The SAC defines Class Members as "[a]ll persons employed by Defendant Processors, their subsidiaries and/or related entities at poultry processing plants in the continental United States . . . ."  SAC ¶ 294; *see also id*. ¶¶ 15–19 (alleging that each named Plaintiff "was employed as a deboner" or "in the day pack department" at a Defendants' poultry-processing plants).    Additionally, the very first paragraph of the SAC alleges that "Defendants have conspired and combined to fix and depress the compensation paid to employees at poultry processing plants in violation of Section 1 of the Sherman Act."  *Id.* ¶ 1; *see also id*. ¶¶ 11, 169 (similarly alleging that Defendants agreed or conspired "to fix and depress [the] compensation [paid] to employees" at poultry-processing plants).  Notably, Plaintiffs make no allegations that Defendants conspired to fix the price they pay to third parties for contract-labor services, or that the Defendants ever exchanged any information regarding contracts or pricing for labor supplied by third parties.  Thus, JOTS, Butterball, Simmons, and Koch have reasonably agreed to interpret the term "Employee" to include any person who is classified as an employee under applicable labor and tax laws.

Plaintiffs, however, now seek to (1) expand the class definition beyond the allegations in the SAC and the plain meaning of the term "employee" to anyone "who performs work" at a poultry-processing plant, including non-employees like independent contractors; and (2) obtain discovery

related to non-employees in a case alleging that "Defendants have conspired to fix and depress the compensation paid to employees" and defining Class Members as "[a]ll persons employed by Defendant Processors" at poultry-processing plants. *See id.* ¶¶ 1 & 294 (emphasis added). JOTS, Butterball, Simmons, and Koch object to any extra-pleading expansion of the class definition and to any discovery related to non-employees—who are not Class Members—as not relevant or proportionate.

## III.   PLAINTIFFS' REQUESTS FOR PRODUCTION – DISPUTES OVER SPECIFIC REQUESTS

### A.   Request No. 3

#### 7.   PLAINTIFFS' POSITION:

Under RFP No. 3, Defendants should produce conspiratorial documents for all of Defendants' Employees.

RFP No. 3 (revised): All Documents Relating to any Communications, Meetings, or agreements between You and any other Defendant, Co-Conspirator, or Poultry Processor Relating to Compensation or benefits, or the hiring or recruiting of Employees.

Agreement: None

Dispute: Koch, Fieldale, Mountaire, Peco, Butterball, JOTS, Sanderson, Wayne, Simmons, Tyson/Keystone, Perdue, CMS, Agri Stats, WMS

Argument: The parties generally agree that Defendants must produce documents relating to communications, meetings, and agreements between different poultry processors that relate to the compensation for (and, in many cases, the hiring and recruiting of, *see supra*) workers at poultry processing plants. This is unsurprising as these documents are the core request of any antitrust conspiracy case. Defendants, however, refuse to produce documents that relate to conspiratorial contacts regarding the compensation, benefits, hiring, and recruiting of other individuals they employ. Defendants thus insist on withholding from their production any document relating to workers at feed mills, hatcheries, corporate offices, and other non-processing plant facilities, merely because those workers fall outside the Plaintiffs' proposed Class. *See* SAC ¶ 294 (defining proposed Class).

Defendants' position is untenable. Plaintiffs are entitled to "circumstantial" "evidence of invidious design, pattern, or intent," not just "direct evidence" of the precise "anticompetitive conspiracy" alleged in the Complaint. *In re Urethane Antitrust Litig.*, 261 F.R.D. 570, 573 (D. Kan. 2009) (citations omitted).[27] The conspiratorial documents encompassed by this RFP are drawn from the

_____

[27] As explained above, the 2015 amendments to the Federal Rules of Civil Procedure still allow Plaintiffs to gather evidence of transactions and events that are "relevant to any claim" asserted in

files of the *same custodians* from the *same time period* and concern the *same goal* as the conspiracy alleged in the Complaint—suppressing the compensation of workers through an agreement not to compete. They concern, for example, workers at feed mills and hatcheries that are located right next to processing plants in the same Defendant-owned properties known commonly as complexes. They are plainly probative of whether Defendants reached an agreement regarding workers in the Class.

Plaintiffs are not on a fishing expedition here. Preliminary third-party discovery shows that WMS collected and disseminated detailed data not just on workers at poultry processing plants but on employees up and down the poultry industry. For instance, WMS reported data on a number of positions located on feed mills, hatcheries, and growers, including: Feed Mill Head, Feed Mill Supervisor, Feed Mill QA/QC [Quality Assurance/Quality Control] Head, Hatchery Head, Hatchery Supervisor, Breeder Growout Head, Breeder Technical Adviser, Broiler Growout Head, and Broiler Technical Adviser. *See* PX003, PITMAN00613 at '626-29; PX004, PITMAN00377 at '397-407. Its reports, which were based on data submitted by Defendant Processors, also capture a number of corporate or complex-level roles, including Sales Director and other sales staff, Food/Ingredient Buyer, and certain corporate HR positions. *See* PX003, PITMAN00613 at '626-29; PX004, PITMAN00377 at '427-28, '433-35, '439, '446. The information exchange for all these positions was extremely detailed. For each position, WMS reported, among other things, the average base salary, bonus, and total compensation, as well as the equivalent figures for pay levels at the 10th, 25th, 50th, 75th, and 90th percentiles and a weighted average. *See* PX004, PITMAN00377 at '391; *see also, e.g., id.* at '399 (data for feed mill supervisor). If Defendants were sharing data for those other positions in the same reports that included data for plant processing workers, it's hardly a stretch that other inter-Defendant documents, meetings, and communications may have concerned all of these types of workers and may reflect Defendants' suppression of compensation for all of them. That information would surely be relevant to Plaintiffs' claims.

Any evidence supporting a broader conspiracy not to compete and to suppress compensation for a broader set of workers, or a parallel conspiracy for another set of workers, would support Plaintiffs' claims. "[I]f two markets are sufficiently similar or adjacent and the relevant activities therein are sufficiently linked or tied in some way, e.g., the people involved in the conspiracies are the same or overlapping, it may be reasonable to use evidence of [one] conspiracy to support an inference of a [different] conspiracy." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 403 (3d Cir. 2015). Such evidence "may help [Plaintiffs] prove [D]efendants' joint commitment to fix [wages] . . . (i.e., the existence of the conspiracy), the ability of defendants to engage in . . . [wage] fixing, and the mechanisms employed by defendants in [wage] fixing." *In re Urethane*, 261 F.R.D. at 574.

Conspiratorial contacts between the Defendants about, for example, the wages of corporate sales staff or feed mill workers, would provide strong support for Plaintiffs' allegations that those same Defendants conspired regarding the compensation of processing plant employees. In similar

---

the Complaint. *Lifeguard Licensing*, 2016 WL 3144049, at *2 (quoting Fed. R. Civ. P. 26(b)(1)). The *Urethane* court explained how evidence of a second compensation-suppressing conspiracy among Defendants could be relevant to—indeed probative of—the compensation-suppressing conspiracy described in the Complaint. *See In re Urethane*, 261 F.R.D. at 574-75.

situations, courts have repeatedly held that evidence of one conspiracy is relevant to prove another, closely related conspiracy. *See, e.g., In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1011 (E.D. Mich. 2010) (holding that "[p]articularly where . . . there is a significant overlap in identity of interest of the alleged co-conspirators in both markets . . . and where the claims are based upon the same anticompetitive conduct," "the 'if there, then here' argument certainly can have merit"); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) (holding that defendants' guilty pleas for antitrust violations in one industry "support an inference of a conspiracy" in a different industry); *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696, 711 (E.D. La. 2013) (listing "involvement in other conspiracies" as relevant plus factor in assessing existence of antitrust conspiracy (citing ABA Section of Antitrust Law, Proof of Conspiracy Under Federal Antitrust Laws 69-91 (2010))).

Meetings or communications about these non-Class workers would be prime "opportunities" for the same Defendant employees to also conspire about Class Members' compensation, and thus would "bolster the plausibility of a conspiracy." *In re Packaged Ice*, 723 F. Supp. 2d at 1017. Plaintiffs do not have to take at face value the purported purpose of a meeting between two alleged co-conspirators. *See In re Urethane*, 261 F.R.D. at 574-75 ("[A] document showing a foreign meeting between representatives of two defendants held shortly before defendants each announced a U.S. price increase of . . . products could be used by plaintiffs as circumstantial evidence of the conspiracy, even if the face of the document indicates that the subject of the meeting was a discussion of . . . sales to markets in Africa."). The same is true here; if Defendants' HR employees had a meeting about setting executive compensation, it's an opportunity for them to discuss Class Member compensation. The requested documents might also reveal how Defendants conducted business with each other about personnel issues generally, i.e., the existence of conferences concerning particular types of workers, the extent of the relationships among Defendant HR employees, and how the Defendants negotiated and recorded their agreements over personnel. *See Callahan v. A.E.V. Inc.*, 947 F. Supp. 175, 179 (W.D. Pa. 1996) ("Discovery in an antitrust case is necessarily broad because allegations involve improper business conduct. Such conduct is generally covert and must be gleaned from records, conduct, and business relationships." (citations omitted)).

Defendants emphasize the various ways that the Complaint limits the scope of the proposed Class, but this misses the point. Plaintiffs of course agree that this request seeks documents concerning employees outside the Class. As explained, these documents are nevertheless highly probative of the claims belonging to the Class. To demonstrate otherwise, Defendants bear the burden of showing that the documents will not "make a fact of consequence more or less probable than it would be without the [documents]." *Hastings v. OneWest Bank, FSB*, No. 10-3375, 2013 WL 1502008, at *1 (D. Md. Apr. 11, 2013) (Gallagher, M.J.) (citing Fed. R. Evid. 401). They have not done so. *See Hake*, 2014 WL 3974173, at *3 (Gallagher, M.J.) ("[D]iscovery is not limited to issues raised by the pleadings . . . ." (citation omitted)).

Plaintiffs have narrowly limited their request to maximize the likelihood that any responsive documents will be probative of the compensation-fixing scheme alleged in the Complaint. First, precisely because these documents are core conspiracy documents, this is the only request where Plaintiffs have pursued the broader definition of "Employees" to include those beyond processing plant workers. Second, this request only includes documents relating to meetings,

communications, or agreements between different processors. Third, this request only covers compensation, benefits, hiring, and recruiting of employees. So limited, this request only seeks the sliver of non-Class Member documents that are most likely to be probative of Plaintiffs' case.

Defendants cite a case not even addressing discovery to paint Plaintiffs' argument as "if it happened there, it could have happened here." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007). *In re Elevator* addressed plausibility on a motion to dismiss, not the lower relevance standard in discovery.[28] *Id.* Nevertheless, as the Third Circuit has explained, where "two markets are sufficiently similar or adjacent," *In re Elevator*'s holding against "if it happened there, it could have happened here" does not apply. *In re Chocolate Confectionary*, 801 F.3d at 403 (adopting the "sensible approach" of *In re Elevator* but recognizing that its holding depended on the lack of a "link" between the two conspiracies); *see also In re Elevator*, 502 F.3d at 52 (relying on the lack of "evidence of linkage between" the two sets of conspiratorial documents). Here, the set of documents sought by Plaintiffs concern the same poultry processors, custodians, interactions, and topics that are at the core of the Complaint. In other words, they concern "illegal behavior" in the same "time [and] place." *See In re Chocolate Confectionary*, 801 F.3d at 402 (quoting 6 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1421a, at 160 (3d ed. 2010)). Any conspiratorial contacts revealed by this request will be highly probative of the conspiracy alleged in the Complaint.

Defendants assert that the work of most non-Class employees is "far removed" from that of workers at poultry processing plants. But this is simply false. Poultry processors frequently locate their processing plants in highly integrated "complexes" along with feed mills and hatcheries.[29] More importantly, Plaintiffs have alleged that compensation for Class Members was set in a rigid, centralized manner by senior executives at Defendants' corporate headquarters. *See* SAC ¶¶ 153-57. These C-suite executives have company-wide responsibilities and likely have similar compensation-setting authority for non-Class employees. If they colluded over the compensation of one category of their employees, it is more likely they did so for another.

Plaintiffs are not expanding Defendants' burden with the request for documents concerning these non-poultry processing plant workers. Plaintiffs' request is merely that Defendants not withhold documents concerning those workers that are otherwise returned from the *same custodians* and by the *same search terms* that the parties agree to (or the Court orders) concerning the Class Members.

---

[28] For the same reason, Defendants' reliance on *In re Zinc Antitrust Litigation*, 155 F. Supp. 3d 337 (S.D.N.Y. 2016), another motion to dismiss opinion, is misplaced. Defendants also err in relying on *Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253 (N.D. Ga. 2002). There, the court concluded that plaintiffs with domestic price-fixing claims could obtain discovery on a foreign price-fixing conspiracy so long as the foreign laws, like the domestic ones, actually barred price-fixing. *Id.* at *1312. Here, the same standards under the Sherman Act apply no matter the class of worker, so *Holiday Wholesale Grocery* poses no bar to discovery.

[29] *See, e.g.*, Gary Thornton, *USA's top broiler companies: profiles*, WATT PoultryUSA (June 23, 2009), https://www.wattagnet.com/articles/116-usa-s-top-broiler-companies-profiles (identifying 34 integrated complexes for Pilgrim's Pride, 32 for Tyson, eight for Sanderson, eight for Wayne, three for Mountaire, six for House of Raeford, two for O.K. Foods, three for Foster Farms, two for George's, four for Peco, two for Simmons, and more).

Plaintiffs have not requested any additional custodians solely relevant to these workers nor any search terms specific to them. Thus, Defendants will have to review *zero* additional documents for responsiveness as a result of this request; they will just have to produce some more.

## 8.  **DEFENDANTS' POSITION:**

Defendants object to Request 3 to the extent that the information sought is not limited to the Alleged Class.  The SAC's allegations are **solely** about poultry processing plant employees, covering "All persons employed by Defendants. . . **at poultry processing plants** . . ." (the "**Alleged Class**").  SAC ¶ 294 (emphasis added); *see also id.* ¶ 138 (defining a "poultry processing plant as slaughter facilities and facilities in which poultry is further processed").  Plaintiffs admit as much, noting that "workers at poultry processing plants" form the "core of their allegations." Defendants have offered to produce documents responsive to Request 3 that involve members of the Alleged Class, but in another example of the Plaintiffs extending the reach of discovery well beyond the bounds of the allegations in the SAC, Plaintiffs have rejected that offer.

Plaintiffs seek to expand discovery beyond employees at "poultry processing plant" and instead include "all" workers, which would include other (and obviously) completely unrelated classes of employees, such as Information Technology employees, in-house counsel, accounting and finance employees, and officers and high-ranking managers that serve in completely different roles with far different job responsibilities than members of the Alleged Class.  Consider how different the following three classes of employees alone are from the Alleged Class:

- "***hatcheries***": the Plaintiffs specifically seek documents relating to workers at the hatcheries, where the eggs laid by the breeder hens are hatched and the resulting chicks are shipped to the grow houses to be grown into broilers;

- "***feed mill workers***": the Plaintiffs call for documents related to feed mills, even though these workers process feed ingredients for shipment to the live farms where the chicks are grown; and

- ***Other Proteins***: the Plaintiffs could pull in documents related to processing plant employees for other non-poultry products, such as beef and pork, for those Defendants that have other protein businesses.

Most non-class members work at separate facilities than the poultry processing plants and are involved in very distinct roles far removed from the operations, work environment, and other circumstances of a poultry processing plant.

Remarkably, the Plaintiffs even seek documents from employee classes that they affirmatively excluded from the proposed class.  Plaintiffs plead in the SAC that the "following persons are excluded from the proposed Class": "complex managers, plant managers, human resources managers, human resources staff, office clerical staff, guards, watchmen, and salesmen; Defendants, co-conspirators, and any of their subsidiaries, predecessors, officers, or directors; and federal, state or local governmental entities" ("**Excluded Employees**").  SAC ¶ 295.  Regardless, Plaintiffs' argument make clear that their demands encompass these positions.  For example: [1] Plaintiffs specifically seek documents from the "corporate offices" and pertaining to "executive compensation" even though they exclude "clerical staff…[and] officers, or directors" from the Alleged Class; [2] Plaintiffs exclude "salesmen" from the class, but seek documents relating to the

"wages of corporate sales staff"; and [3] Plaintiffs exclude "human resource managers" and "human resources staff" from the class, but rely on their allegation that WMS included "certain corporate HR positions."

Communications among processors regarding workers outside of the Alleged Class—or specifically excluded from the Alleged Class—are not probative of Plaintiffs' claims of an alleged conspiracy pertaining to workers in the Alleged Class. The SAC makes no such conspiracy allegations with respect to nonclass members. In fact, the WMS document that Plaintiffs cite actually underscores this point: Plaintiffs alleged in their pleading that the WMS survey included employees "up and down" the poultry producers, and, yet chose to only include claims that included poultry processing plant workers. Furthermore, Plaintiffs presumably knew the location of the plants when they made their allegations, but limited their claims regardless, undercutting their arguments about the proximity of the different complexes.

Indeed, the only relevance justification Plaintiffs have provided for their attempt to include non-class members is rooted in the wholly insufficient speculation that "if it happened [to other employees' compensation], it could have happened [to Processing Plant Employee Compensation]." Such speculation does not support their argument. *See, e.g., In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (rejecting plaintiffs' attempt to prove an alleged domestic conspiracy with evidence of a foreign conspiracy and noting "[a]llegations of anticompetitive wrongdoing in Europe—absent any evidence of linkage between such foreign conduct and conduct here—is merely to suggest (in defendants' words) that 'if it happened there, it could have happened here'"); *see also CX Reinsurance Co. Ltd. v. B&R Mgmt., Inc.*, 2017 WL 2729075, at *2-3 (D. Md. June 23, 2017) (Gallagher, *J.*) (refusing to permit discovery based on "impermissible speculation" and observing "[plaintiff] is correct that documents relating to the underwriting review of insureds other than [defendant] are not relevant to this case."); *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 373 (S.D.N.Y. 2016) (noting that defendants' alleged involvement in a related conspiracy carries little weight without any finding of liability having been made in a related case); *Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253, 1312 (N.D. Ga. 2002) (explaining reasoning in rejecting discovery into an alleged related conspiracy).

The cases Plaintiffs cite to support this fishing expedition are distinguishable. The majority of the cases Plaintiffs cite address the "if here, then there" arguments in the context of summary judgment or other dispositive motions. For example, the *In re Chocolate Confectionary Antitrust Litig.*, the plaintiffs asserted allegations regarding a contemporaneous Canadian conspiracy and the Canadian chocolate market's integration with the U.S. chocolate market. 801 F.3d 383, 393 (3d Cir. 2015). The Third Circuit Court of Appeals quoted the Areeda[30] treatise, in relevant part, regarding what inference may be permissibly drawn from evidence of a foreign antitrust conspiracy about the existence of a domestic antitrust conspiracy:

> Illegal behavior elsewhere in time or place does not generally allow the inference of an immediate conspiracy. If the immediately challenged behavior would not imply a conspiracy among firms that are similar to the defendants [but that are not involved in a conspiracy elsewhere], then a distinct conspiracy in the past or in a different market has little power to explain the present behavior.

---

[30] 2B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 404a, at 10 (4th ed. 2014).

801 F. 3d at 402.  In affirming the district court's granting of summary judgment, the Third Circuit concluded that the plaintiffs had failed to adequately link the Canadian conspiracy to the purported U.S. conspiracy to justify using the former to support an inference of the latter. *Id.* at 403.  Here, Plaintiffs have not alleged any conspiracy regarding the workers outside the Alleged Class to justify obtaining and using information related to those individuals.

Similarly, in *Packaged Ice*, the plaintiffs asserted that the guilty pleas of various defendants and their corporate executives supported the plausibility of a nationwide conspiracy, sufficient to defeat an *Iqbal/Twombly* motion to dismiss. *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1003 (E.D. Mich. 2010).  Notably, however, in that case, the alleged conduct of the guilty pleas was the same conduct as the alleged conspiracy in the complaint.  *See id*.

Furthermore, in one of the two motion to compel cases cited by Plaintiffs, *Callahan v. A.E.V. Inc.*, 947 F. Supp. 175 (W.D. Pa. 1996), the discovery sought related to a concluded grand jury investigation and the extent to which the grand jury privilege applied.  This case is not probative of the issue here.  And, while Plaintiffs rely on *In re Urethane Antitrust Litig.*, 261 F.R.D. 570 (D. Kan. 2009), that case did not undertake any proportionality analysis because it predated the amendments to Rule 26.  The court in that case considered the same claim, on the same product, with just a difference in the geographical scope of the alleged conspiracy.  Here, the Plaintiffs here go well beyond that pre-proportionality holding.

Even if such information could be considered relevant, the burden of searching and producing information outside of the Alleged Class with respect to Request 3 is not proportional to the needs of the case for the same reasons discussed above.  Plaintiffs' broad request would require Defendants to review a vast amount of information that relates to workers who are excluded from the purported class or who do not even work in poultry processing plants.  This burden extends to the many non-class members described above.  Including such workers greatly expands the scope of the request.  Indeed, Plaintiffs seem to recognize this burden/proportionality problem by agreeing to narrow the definition of "Employees" in their other Requests.

Moreover, while Plaintiffs claim that responding to the request will not increase Defendants' burdens because the response will involve the same custodians and same search terms, search terms remain to be negotiated and many disagreements remain on custodians.  Should Defendants prevail on their present objection to Request 3, Defendants may be able to reduce their burdens in responding to Request 3 by negotiating search terms that would exclude documents about feed mills and hatcheries and corporate executives, for instance, while capturing only the poultry processing plants employees.

For all of the foregoing reasons, the scope of Request 3 should be limited to members of the Alleged Class, consistent with all the other requests focused on employees.

    **B.    Re**quest No. 4

        **9.  PLAINTIFFS' POSITION:**

Defendants should produce custodians' entire calendars except for redactions for personal information.

RFP No. 4 (revised): All Document custodians' physical or electronic calendars, contact lists, travel logs, and expense reports capable of showing potential contacts between each Document Custodian and any Defendant, Co-Conspirator, or Poultry Processor other than the Document Custodian's employer.

Agreement: Wayne, Simmons, Agri Stats, Perdue, JOTS, WMS

Dispute: CMS, Mountaire, Butterball, Fieldale, Peco, Tyson/Keystone

Continuing Discussions: Koch, Sanderson

Argument: The dispute concerning RFP No. 4 centers on the production of calendar entries.[31] Work calendars maintained by Defendants' document custodians are highly relevant evidence that will identify anticompetitive contacts among Defendants and Co-Conspirators. Defendants do not dispute the relevance of these documents, but they propose to produce only the entries that: (1) hit upon agreed-upon search terms (CMS, Fieldale, Peco, Mountaire, Koch, Tyson/Keystone); (2) reflect a meeting on their face between a custodian and an employee of another Defendant or Co-Conspirator (Butterball, CMS); and (3) concern compensation, hiring, or recruiting (Mountaire). These proposals are impracticable given the limited text included in calendar entries and will cause highly relevant calendar entries—including entries reflecting inter-Defendant contacts—to be withheld from production.

***Plaintiffs' proposal: production of calendars with redactions for personally sensitive information.*** Plaintiffs propose that Defendants produce calendars for agreed-upon or Court-ordered custodians, without the application of search terms or subject matter limitations, but be permitted to redact any privileged or sensitive personal information. Plaintiffs' proposal acknowledges the reality of how electronic calendars are used, specifically that: calendar entries (1) are typically each separate electronic documents for each appointment or meeting, (2) may only include minimal information or abbreviations, which makes application of search terms inappropriate; and (3) may include sensitive or potentially embarrassing personal information.

---

[31] Butterball asserts that the parties have not reached agreement or impasse concerning the other categories of documents encompassed within RFP No. 4 apart from calendars. Butterball's representation elides its failure to state a clear position concerning production of such documents despite Plaintiffs' efforts to squarely address these documents. July 16, 2021 Letter from C. Enders (Plaintiffs' counsel) to D. Hamilton (Butterball's counsel) at 6 ("Plaintiffs asked on our June 15 meet and confer in our June 18 letter whether Butterball intends to withhold certain sources of information related to potential contacts between document custodians and Poultry Processors, including diaries, appointment books, notebooks, to-do lists, Day Timers, day planners, appointment notes, travel logs, travel records, and expense and entertainment information. June 18 Letter at 5. Plaintiffs are still awaiting a response to this inquiry."). Plaintiffs look forward to Butterball's eventual response as to whether it intends to produce such documents and reserve all rights concerning these documents. And while Plaintiffs disagree with Mountaire that the parties have not reached impasse as to this overall request, Plaintiffs are nevertheless willing to continue to negotiate with Mountaire as to these three categories of documents.

Plaintiffs' proposal ensures that all calendar entries residing in the files of custodians reflecting contacts with other Defendants or Co-Conspirators will be produced. This approach will also enable Plaintiffs to analyze the calendar entries in the context of other evidence and connect-the-dots to show that employees of different Defendants were at the same place at the same time. At bottom, Plaintiffs' common-sense proposal represents an effort to balance Plaintiffs' need for discovery of contacts between Defendants and Co-Conspirators with the privacy concerns and burden on Defendants to make such productions. Indeed, half of the Defendants have already agreed to this practical approach.

Plaintiffs' proposed approach has also been endorsed by courts. The court in *In re Rail Freight Fuel Surcharge Antitrust Litigation* eloquently explained its reasoning for ordering production of calendars in full with redaction of personal information:

> [T]he result of the proliferation of portable and web-based electronic calendars is that Americans no longer keep records that differentiate between their business and their family and social obligations. To the contrary, their Outlook files and their Blackberries contain a glorious mishmash of everything in their lives from business meetings to picking up the kids after soccer. The commingling of activities plus *the fact that most calendar entries contain only brief descriptions of the activity will make separating what is relevant from what is not daunting*. Nevertheless, the defendants' desire to eliminate what is unnecessary and nobody's business is understandable. I fear, however, that using defendants' formulation of what is relevant may lead to more fights. Instead, *I will require the defendant only to redact entries in calendars that would appear to a reasonable person to be purely personal and unrelated to any business or professional obligation whatsoever.*

MDL No. 1869, 2009 WL 10703132, at *4 (D.D.C. July 13, 2009) (emphasis added). *See also La. Proteins, Inc. v. City of Shreveport*, No. 08-cv-0334, 2009 WL 348379, at *1 (W.D. La. Feb. 11, 2009) (ordering defendants to produce "all (1) appointment books, (2) day planners, (3) notes of appointments, and (4) calendars (whether maintained on paper or on computer)" but permitting defendants to "redact from the documents any notations regarding birthdays, anniversaries, and medical information (such as doctor appointments) relating to them or their families" and also ordering that "[n]o other redactions shall be made except by agreement of the parties or further order of the court"); *McMullen v. Reserves Network, Inc.*, No. 12 CV 2140, 2013 WL 395501, at *2 (N.D. Ohio Jan. 31, 2013) (ordering party to produce calendar "in full" but permitting redactions for family birthdays and material protected by attorney client privilege).

Conversely, Defendants seek to apply various limitations on the production of custodians' calendars.[32] These proposed restrictions on production fail to recognize the realities of the text

---

[32] Defendants obliquely refer to the use of TAR with respect to calendar entries, although no Defendant has explicitly stated an intention to do so. For the same reasons that application of search terms to calendars is inappropriate—including limited text and idiosyncratic descriptions, application of TAR should also be rejected.

contained in calendar entries and will result in information about inter-Defendant contacts being withheld. Specifically:

**Application of search terms (Butterball, Fieldale, Peco, Tyson/Keystone).**[33] Applying search terms to calendars is unworkable. Employees may use shorthand, abbreviations, or initials in their calendar entries—all of which is highly idiosyncratic and varied—making it not conductive to the application of search terms. For example, "mtg w/joe," "JS meeting," or "meeting with Joe Sanderson" could share the same meaning. The application of search terms would unfairly limit the production of calendar entries and would result in relevant, accessible, non-privileged information being unfairly withheld.

**Limitation to meetings with Defendants and Co-Conspirators (Butterball and CMS).**[34] Restricting production to calendar entries reflecting meetings with other Defendants and Co-Conspirators is also problematic and will result in highly relevant information about contacts being withheld. Once again, the text of a calendar entry may be very limited, and Butterball and CMS have refused to produce ambiguous calendar entries, like "lunch with Jim," "meeting with JB," or "dinner at Capital Grille." Such entries may relate to inter-Defendant contacts, or they may not, but Plaintiffs should be permitted to analyze the information and connect-the-dots to establish meetings with other Defendants and Co-Conspirators. Butterball's and CMS's proposal also increases its burden to manually review each calendar and identify those reflecting meetings with Defendants and Co-Conspirators.

**Subject matter limitation (Mountaire and CMS).** Adopting a subject matter limitation is also unacceptable because it too will deprive Plaintiffs from discovering inter-Defendant contacts and contacts with Co-Conspirators. Calendar entries often just provide the basic information about a contact—who, when, and where. Calendar entries often do not indicate *why* a meeting is occurring or mention its subject matter. Under Mountaire's proposed approach, a calendar entry reflecting an inter-Defendant contact that did not specify the purpose of the meeting would be withheld. For instance, a calendar entry reflecting a lunch between a Mountaire plant employee and a plant employee of another Defendant would never be seen by Plaintiffs. Both Mountaire and CMS propose to withhold calendar entries that reflect inter-Defendant contacts for purposes *other than* compensation, hiring, or recruiting would also be withheld. For instance, a calendar entry reflecting an inter-Defendant meeting regarding safety issues would not be produced even though it is from the files of a custodian with responsibilities related to the case. Mountaire and CMS ignore that subject matter descriptors in a calendar entry do not foreclose the possibility that other

---

[33] At the eleventh hour, hours before the midnight filing deadline, Butterball proposed limiting its production to calendar entries that involve other Defendants and Co-Conspirators as well as those that hit upon search terms. This proposal still does not resolve Plaintiffs' concerns.

[34] CMS proposes limiting its production to calendar entries reflecting "reasonably identifiable" meetings with Defendants and Co-Conspirators with the subject matter limitation that such meetings also relate to "turkey processing" or have no identifiable subject. This does not resolve Plaintiffs' concerns.

subjects were discussed. This proposal also will require it to conduct a more burdensome manual review and will result in highly relevant, non-privileged, accessible information being withheld.[35]

Plaintiffs request that the Court order CMS, Mountaire, Butterball, Fieldale, Peco, and Koch to produce calendars without the use of search terms or the other limitations above and with redactions for only personally sensitive information only, i.e., what would appear to a reasonable person to be purely personal and unrelated to any business or professional obligation whatsoever. Plaintiffs request that the Court order Tyson/Keystone to produce calendars without the use of search terms.[36]

## 10. **DEFENDANTS' POSITION:**

The "RFP 4 Defendants"[37] deny that Plaintiffs have accurately framed both this dispute and the negotiations between the parties to date.  Notably, although Plaintiffs focus solely on the production of calendars, by their own description, revised Request 4 seeks "All Document custodians' physical or electronic calendars, **contact lists, travel logs, and expense reports** capable of showing potential contacts between each Document Custodian and any Defendant, Co-Conspirator, or Poultry Processor other than the Document Custodian's employer."[38]  *Id*.  In

_____

[35] The cases cited by Defendants do not involve conspiracy allegations and thus are inapposite. *Benjamin v. Sparks*, No. 14-CV-186, 2017 WL 1497930 (E.D.N.C. Apr. 26, 2017) (alleging breach of employment contract, discrimination, and retaliation); *Eshelman v. Puma Biotech., Inc.*, No. 16-CV-18, 2017 WL 4079398 (E.D.N.C. Sept. 14, 2017) (a libel action); *Weber Design Grp., Inc. v. U.S. Wrecking & Land Clearing, Inc.*, No. 08–10019-CIV, 2008 WL 4888825 (S.D. Fla. Nov. 10, 2008) (copyright infringement). Here, Plaintiffs must be able to make connections between custodians' calendars to show that they were at the same place at the same time. Such contacts are routinely cited as evidence supportive of conspiracy allegations. *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 432 (4th Cir. 2015) ("communications and meetings among conspirators can support an inference of agreement because they provide the means and opportunity to conspire"), *as amended on reh'g in part* (Oct. 29, 2015).

[36] Plaintiffs and Tyson/Keystone have negotiated an agreement as to the scope of the production, but not as to the use of search terms.

[37] The "RFP 4 Defendants" are CMS, Mountaire, Butterball, Fieldale, Tyson, Keystone, and Peco. Koch and Sanderson have deferred resolution of this dispute until the deadline for search terms passes, and therefore they are not at impasse as to this request at this time, but reserve all rights to raise these and additional arguments at the search terms deadline.

[38] Mountaire and Butterball note that the parties never met and conferred on "contact lists, travel logs, and expense reports." Specifically, during the meet and confer process with RFP 4 Defendant Mountaire, Plaintiffs' final offer on Request 4 sought "diaries, calendars, to do lists, day timers, day planner and appointment notes."  August 2, 2021 Letter from L. Katz to B. Reynolds.  The parties did not reach agreement or impasse as to "contact lists, travel logs, and expense reports." Butterball is similarly situated as to a lack of impasse or agreement as to Plaintiffs' requested categories before the Court.  On August 5, 2021, Plaintiffs proposed in an email that Butterball

negotiations with CMS, for instance, Plaintiffs explicitly stated that they were seeking all such documents. In light of Plaintiffs' position, the Court should evaluate Rule 26's factors with an eye toward the totality of what Plaintiffs seek, *i.e.*, the wholesale production calendars, contact lists, travel logs, and expense reports without regard to relevance, responsiveness, the use of search terms, or the procedures offered by the ESI Protocol.

To begin, Plaintiffs' request for contact lists, travel logs, and expenses reports is extremely overbroad. Plaintiffs have suggested that the production of these types of documents might show relevant contacts between Defendants if, for instance, two Defendants traveled to the same city at the same time. But Plaintiffs' explanation—and demand for the wholesale production of these documents—only illustrates that Plaintiffs' request is not reasonably calculated to lead to the discovery of relevant and admissible information.

To obscure the breadth of their revised Request, Plaintiffs' submission to the Court focuses solely on the production of calendars. Plaintiffs ask that the Court compel production of custodial calendars in their entirety, with redactions only for personally sensitive information. This request, however, is overly broad and unduly burdensome in both theory and practice and is explicit in its pursuit of irrelevant information. This is because Plaintiffs seek every custodial calendar entry over a period of at least ten years, regardless of content. Although Plaintiffs suggest that they will allow Defendants to withhold documents of a purely personal nature, it is not difficult to imagine that this request will still sweep in entries that are completely irrelevant, such as an internal sales team meeting, deposition preparation sessions with lawyers, and other meetings about business units that have nothing to do with poultry products and/or compensation of employees.

Plaintiffs' negotiations with CMS are informative of the overbroad nature of Plaintiffs' revised Request. CMS was willing to produce diaries, calendars, to-do-lists, day timers, and day planner and appointment notes for custodians that show scheduled calls or meetings with individuals that are reasonably identifiable as another Defendant or other Poultry Processor. However, CMS wanted to limit its production to documents showing relevant contacts between those parties—i.e., documents for which the topic of the meeting or conversation is related to turkey processing or is not reasonably discernible or identifiable. In other words, CMS wanted to limit the production of documents that on their face relate to other business units or proteins of CMS's business or otherwise state that the purpose of the meeting is not relevant to Plaintiffs' claims. By way of example, CMS explained to plaintiffs that a calendar invite titled "Meeting with Jim re: corn processing"—or any of CMS's other business units, such as pork, beef, salt, etc.—is not relevant to plaintiffs' claims. Plaintiffs' only justification for seeking these irrelevant calendar entries is that they might be "capable of showing" a "potential contact" relevant to their claims because Defendants might not have only discussed the topic of conversation listed on the calendar invitation. Plaintiffs' explanation speaks to the significant overbreadth of their request and betrays

---

produce "diaries, calendars, to-do lists, day timers, day planner and appointment notes for each agreed or Court-ordered Document Custodian that show contact(s) with any other Defendant or alleged Co-Conspirator during the Relevant Time Period. Butterball reserves all rights as to other documents referenced in RFP No. 4. By contrast, Plaintiffs explicitly requested that CMS produce contact lists, travel logs, and expense reports and CMS explicitly noted that it was not willing to produce any categories of documents beyond diaries, calendars, to-do-lists, day timers, and day planner and appointment notes.

that they are on a fishing expedition into every aspect of Defendants' businesses and business practices, regardless of how relevant they are to Plaintiffs' claims.

Plaintiffs compound the overbreadth and relevancy dilemma of their proposal by taking the unreasonable position that RFP 4 Defendants not be permitted to use search terms.[39]  In support of their position, Plaintiffs speculate that search terms *might* not pick up a hypothetical relevant document.  Courts, however, including those in this district, routinely require the use of search terms to reduce the burden on the party searching for and producing electronic documents. *See E.E.O.C. v. McCormick & Schmick's Seafood Restaurants, Inc.*, 2012 WL 380048, at *4 (D. Md. Feb. 3, 2012) ("Common practice governing the discovery of electronically stored information requires the use of search terms to make an extraordinarily burdensome search comply with the tenets of Fed. R. Civ. P. 26(b)(2)(C).").  And this Court's goal is to ensure "the just, speedy and inexpensive conduct of discovery, in light of what is relevant to any party's claim or defense, proportional to what is at issue in a case and not excessively burdensome or expensive compared to the likely benefit of obtaining the discovery being sought." Local Rules, Appendix A, Guideline 1; *see also* Principles for the Discovery of Electronically Stored Information in Civil Case, p. 1 ("The purpose of these ESI Principles is to encourage reasonable electronic discovery, in cases where it is appropriate to conduct such discovery, with the goal of reducing cost, burden, and delay and to 'secure the just, speedy, and inexpensive determination of every action and proceeding' pursuant to Fed. R. Civ. P. 1.").  This goal is not served by a proposal that on the one hand requires significant additional time and expense to implement, and on the other aims squarely at swaths of irrelevant information.

Finally, Plaintiffs' proposal runs afoul of the ESI Protocol in this case, which allows for the use of search terms and TAR when searching for and producing electronically stored information. ECF No. 457.  Plaintiffs also noted that their ESI proposals, which included proposals for both search terms and TAR, "are fully consistent with . . . transparency and cooperation between the parties," the "core tenant of the Sedona Principles."  Joint Letter, ECF No. 449 at 11.  Yet Plaintiffs' proposal completely removes search terms[40] and TAR from the document review process for this request.  Instead, Plaintiffs' proposal creates a separate track of review in a manner far more burdensome than is permitted under the Court's ESI Order.

A more reasonable approach is to allow the RFP 4 Defendants to use search terms, utilize the tools already available to them through the ESI Protocol, and produce documents relevant to Plaintiffs' claims and responsive to their request.  One court in this circuit recently endorsed such an approach. In *Benjamin v. Sparks*, the defendants sought "all diaries, journals, or calendars that Plaintiff has maintained since January 1, 2012." 2017 WL 1497930, at *4 (E.D.N.C. Apr. 26, 2017) (citation omitted).  The plaintiff argued, as RFP 4 Defendants do here, that such a request was overbroad to the extent it sought irrelevant information, instead offering to produce documents concerning the allegations in the complaint.  *Id.*  The court found the plaintiff's proposal to be a

---

[39] It should be noted that this position is at odds with Plaintiffs' prior position as to the use of search terms during document review, too. *See* April 23, 2021 Joint Letter to the Court, ECF No. 449 at 9, ("Plaintiffs' proposal recognizes the 'need for careful thought, quality control, testing, and cooperation with opposing counsel in designing search terms or "keywords" to be used to produce emails or other electronically stored information.'").

[40] This despite the fact that Plaintiffs proposed 110 separate search terms in their most recent counterproposal.

"reasonable compromise," and limited the scope of the production to all diary, journal, or calendar entries concerning allegations in the complaint. *Id.* The court noted that "if Defendants are unsatisfied after receipt of the relevant portions of any diary, journal, or calendar entries disclosed by Plaintiffs, then they can file a request for in camera review and accompanying motion to compel." *Id.* Other courts have followed a similar approach. *See Eshelman v. Puma Biotechnology, Inc.*, 2017 WL 4079398, at *3 (E.D.N.C. Sept. 14, 2017) (finding that "the marginal value of producing the calendars in their entirety is outweighed by the overbreadth of such a production, which would include matters of a confidential, personal, and otherwise irrelevant nature" where the requesting party received other discovery relevant to the plaintiff's claims); *Weber Design Group, Inc. v. U.S. Wrecking and Land Clearing, Inc.*, 2008 WL 4888825, at *3 (S.D. Fla. Nov. 10, 2008) (noting that "not every entry in the calendars is discoverable, rather only those entries reflecting meetings or activities related to the instant action are relevant").

Moreover, *In re Rail Freight Fuel Surcharge Antitrust Litigation* does not extend nearly as far Plaintiffs suggest–and does not stand for the proposition that a party is entitled to unfettered access to every document custodians' calendar. There, the court struck a careful balance between the requesting parties' right to relevant information and the incredible burden the request imposed on the producing party. 2009 WL 10703132, at *3 (D.D.C. July 13, 2009). The court ordered the defendants to produce calendars and expense reports. *Id.* Its order, however, extended to those documents that were relevant, as it determined that the defendants need only produce calendars and reports for its "employees who had the authority to influence, recommend or adopt a fuel surcharge," as "meetings would be relevant only if the attendees" had such authority. *Id.* According to the court, this compromise struck "a balance between utility and burden." *Id.*

For the foregoing reasons, the Court should altogether decline Plaintiffs' request the production of contact lists, travel logs, and expense reports in response to Request 4; decline Plaintiffs' request for a wholesale production of calendar-type documents without any culling through search terms or review for relevance; and should instead limit Request 4 to relevant and responsive calendar-type documents that directly relate to Plaintiffs' claims.

  **C.**  **R**equest No. 11

   **11. <u>JOINT POSITION:</u>**

Plaintiffs and Defendants have agreed to brief any issues with respect to structured data (RFP No. 11), other than the Relevant Time Period, four weeks after the Court rules on the parties' August 19, 2021 discovery disputes, and the Court so ordered.

  **D.**  **R**equest No. 19

   **12. <u>PLAINTIFFS' POSITION:</u>**

Defendants should produce management-level analyses that are sufficient to show the productivity of poultry processing plant employees.

<u>RFP No. 19 (revised)</u>: Management-level reports, analyses, presentations, or studies sufficient to show the productivity of Employees, including changes in processing line speeds, birds per hour, or labor hours per pound.

<u>Agreement</u>: Peco, Mountaire, Sanderson, JOTS, Simmons, Agri Stats, WMS

<u>Dispute</u>: Butterball, Koch, CMS, Fieldale, Wayne, Perdue, Tyson/Keystone

<u>Argument</u>: Defendants contend that documents analyzing worker productivity can only be relevant if they also specifically mention compensation. Not so. Employee productivity (i.e., the value the employee provides to the employer per hour of work) is relevant in at least two ways to the claims and defenses in this litigation. First, productivity is potentially a relevant variable affecting compensation. *See* Gregory Day, *Anticompetitive Employment*, 57 Am. Bus. L.J. 487, 528 (2020) (The control variable "[p]roductivity is important because wages could ebb and flow based on whether the industry's productivity is declining or accelerating."). In a competitive market, one would expect that as productivity increases over time (for example, because each plant processes more birds per labor-hour), compensation would increase commensurately. For this reason, rising productivity levels that do not correspond to an increase in compensation may reflect that wages are being artificially suppressed as a result of the alleged collusion. Productivity is thus probative of antitrust impact and damages. Documents related to productivity are thus relevant to compensation even if they do not specifically mention compensation on their face. The Court should order their production without Defendants' proposed limitation.

Citing no authority, Defendants argue against relevance here by claiming that "productivity improvements are more likely attributable to advances in technology and investment by the processors." Defendants' Letter ("D.Ltr."). First, Defendants' argument clearly does not apply to changes in line speeds: it is common sense that a worker working on a faster line is not producing more because of "investment by the processor[]" but rather is expending more effort per hour of work. D.Ltr. More importantly, whether or not Defendants' claim is correct, it has no bearing on the relevance of the requested documents. Under basic models of labor market competition, firms pay their workers their "marginal revenue product" which is defined as the additional revenue the marginal worker generates for the employer firm, and is clearly related to the employees' productivity, even if that productivity is also at least partially the result of advances in technology or investment by the employer. *See* Suresh Naidu et. al., *Antitrust Remedies for Labor Market Power*, 132 Harv. L. Rev. 536, 556 (2018) ("In a competitive labor market, firms equate the going wage of workers to their 'marginal revenue product,' the amount of additional revenue the worker can generate."); *see also Morris v. Tyson Chicken, Inc.*, No. 15-CV-00077, 2020 WL 6331092, at *5 (W.D. Ky. Oct. 28, 2020) (holding, in a case against Tyson brought by poultry growers, that calculating the difference between increasing marginal revenue product and decreasing or stagnant actual wages was a reliable way to prove damages for suppressed wages in a "but for" world).

Productivity is not only germane to Plaintiffs' claims; it is also relevant to potential defenses to Plaintiffs' claims. If productivity goes down, it would be unsurprising to see Defendants argue that justifies lower wages (or slower wage increases).

Second, productivity is relevant to market definition and market power. For example, documents that demonstrate a significant difference in productivity between trained and untrained workers may reflect evidence of a "unique poultry skillset" that is not easily transferred to another line of work, as Plaintiffs have alleged. *Jien v. Perdue Farms, Inc.*, No. 19-CV-2521, 2020 WL 5544183, at *11 (D. Md. Sept. 16, 2020); *see also* SAC ¶ 253 (alleging that poultry workers have "industry . . . specific skills" and that "unskilled and low-skilled jobs are not reasonable economic substitutes for employment in the Relevant Market"). Defendants state without support that such documents "would not be useful to show the transferability of workers' skills," but do not rebut Plaintiffs' argument that disparities in productivity between trained and untrained workers are plainly relevant to transferability. D.Ltr.

Defendants then argue that all relevant documents would be covered by other requests. First, this argument assumes (but does not expressly represent) that such documents exist. Second, while evidence of recruiting and hiring practices (RFP Nos. 11 and 13) and compensation (RFP Nos. 2, 3, 5, 10, 11, 14-16) may *also* be relevant to market definition, that does not undermine the *independent* relevance of the productivity documents being requested here. While some of the documents produced in response to requests referencing "information about employees'" compensation may also include information about productivity, none of them necessarily calls for the production of, for example, a spreadsheet listing monthly employee productivity on a company- or plant-wide basis. Defendants do not seem to contest the potential relevance of such a document, despite contesting the conclusions that Plaintiffs might draw from it. Such disagreements about the interpretation of the evidence have no bearing on its relevance to the issues in this case, and thus its discoverability.

Finally, in claiming overbreadth and undue burden, Defendants ignore their burden under the Rules and instead argue for limitations that either have already been agreed to or were not requested during the course of months-long negotiations, such as:

- *Productivity of janitors, human resources employees, and managers*: Plaintiffs have already agreed to limit this request to Class Members, as discussed above. Defendants' argument that this request is not limited to putative Class Members is mistaken.

- *Limiting to "management-level" documents*: Defendants criticize Plaintiffs' limitation to "management-level" documents as impractical and further claim that Plaintiffs must identify which documents qualify for this limitation. But this limitation was initially proposed by *Defendants*—including Purdue and Wayne—in their Responses and Objections to Plaintiffs' Requests for Production. And in any case, Plaintiffs have made it amply clear in negotiations over this limitation that this language limits the applicable requests to company- or plant-wide policies, procedures, and practices and documents relating to them. So, for example, an email concerning overall line speed increases at a plant relative to other plants would be included, but an e-mail addressing the productivity of an individual worker would not. This is a practical and meaningful limitation on Defendants' purported burden.

- *Limitation to annual or quarterly reports*: None of the Defendants that are disputing the scope of this request have provided any basis for a limitation to annual or quarterly reports (at least none beyond their speculation that the failure to so limit this request would lead to the production of "millions" of pages, a claim that appears to ignore the other limitations Plaintiffs have agreed to, such as limiting to "management-level" documents "sufficient to show" productivity). D.Ltr. Had Defendants made and supported such a request with evidence of burden during negotiations over this request, Plaintiffs would have readily engaged in a discussion over limiting this request to *monthly*, annual, and quarterly reports.[41] (Plaintiffs allege the exchange of competitively sensitive compensation data occurred at least monthly, SAC ¶ 276.) As it stands, however, there is no reason for such a limitation because there is no competent evidence of undue burden in the record.

Plaintiffs have already agreed to limit this RFP to documents that are "sufficient to show" productivity levels and those that are related to a management-level analysis. The relevance of these documents does not depend on whether they *also* discuss compensation, benefits, hiring, or recruiting. Indeed, a chart showing nothing but worker productivity in each month over the past twenty years would be highly relevant to both Plaintiffs' claims as well as potential defenses, despite not mentioning compensation, benefits, hiring, or recruiting. These documents are narrowly targeted to be probative of the claims and defenses in this litigation, and the Court should order their production.

## 13. <u>DEFENDANTS' POSITION:</u>

Plaintiffs originally requested that Defendants produce "All Documents Relating to the productivity of Employees, including changes in processing line speeds." Plaintiffs now request that the Defendants in dispute produce "[m]anagement-level reports, analyses, presentations, or studies sufficient to show the productivity of Employees, including changes in processing line speeds, birds per hour, or labor hours per pound." Although Plaintiffs' revised request is limited to documents that are "sufficient to show" and "management-level" analyses, it remains overbroad, unduly burdensome, and not proportionate to the needs of the case because: 1) Plaintiffs' theories for why documents regarding productivity are relevant are without merit, and in any event are addressed by other discovery requests; and 2) Plaintiffs' revised request remains overly broad and unduly burdensome as worded.

First, Plaintiffs offer two justifications for seeking discovery on plant-level productivity; both are unavailing. Plaintiffs first theorize that "if employees' productivity increases over time (for example, because each employee processes more birds per hour), compensation would increase commensurately." Setting aside the obvious flaws with this logic (it ignores, for example, that productivity improvements are more likely attributable to advances in technology and investment by the processors), Plaintiffs' attempt to capture evidence addressing that theory is already covered by requests for information about employees' compensation. *See, e.g.*, Request 2 (seeking documents relating to policies, procedures, and practices relating to compensation), Request 3

---

[41] This limitation would require that Defendants also produce documents discussing the relationship between productivity and compensation in response to other requests, as they suggest they will.

(seeking documents relating to agreements between defendants relating to compensation); Request 5 (seeking documents relating to compensation surveys, which Plaintiffs allege contain information about employee productivity); Request 10 (seeking documents relating to public announcements concerning compensation); Request 11 (seeking documents relating to on-going job title and level, compensation, and raises); Request 14 (seeking documents relating to the characterization of and comparisons between categories of employees, including by qualifications, skill, and experience level); Request 15 (seeking documents relating to the setting and changing of compensation, including factors for compensation increases); and Request 16 (seeking documents relating to compensation relationships among different types of employees, including employees with different qualifications and levels of experience); *see also* Fed. R. Civ. P. 26(b)(2)(C)(i) ("Discovery requests that are otherwise reasonable may also be limited [if] the discovery sought is unreasonably cumulative or duplicative[.]").

Plaintiffs next theorize that productivity is "relevant to market definition and market power" because a "difference in productivity between trained and untrained workers could be used to show that a trained poultry worker may not be able to easily transfer their skills to another line of work." Contrary to Plaintiffs' suggestion, documents about productivity would not be useful to show the transferability of workers' skills. Instead, documents that show employees' previous and subsequent employers and Defendants' recruiting and hiring policies, which Plaintiffs have already requested, would reveal the extent to which workers can and do move around the relevant market. *See* Request 11 and 13. In the alternative, Plaintiffs should seek third-party discovery to discover how other employees compete with Defendants for labor.

Second, even if Plaintiffs' theories are valid, and their request is not duplicative of discovery already sought, Plaintiffs' request is overbroad. To begin, the only management-level analyses regarding productivity that are relevant to Plaintiffs' claims are those that also relate to compensation. Plaintiffs admit as much when they contend that the requested documents are relevant because productivity "is a relevant variable potentially affecting compensation." Indeed, Plaintiffs' Complaint alleges only that productivity increased during the Class Period and that increased productivity should have resulted in higher wages for Class members. *See* SAC ¶¶ 10, 203, 256, 272. In light of such allegations, Plaintiffs' refusal to limit their request to documents that relate to compensation renders their request overbroad and unworkable. For instance, Plaintiffs seek a hypothetical "chart showing nothing but worker productivity in each month over the past 20 years." But even if that document exists, it cannot show that a relationship exists between productivity and wages for any particular Defendant. The *only* types of documents that could establish whether and how each Defendant tied compensation to productivity are documents that explicitly mention compensation.

Moreover, Plaintiffs' request is overbroad because it is not limited to documents related to putative class members—hourly and salaried employees at chicken and turkey processing plants, excluding complex managers, plant managers, human resources managers, and human resources staff. Instead, plaintiffs seek information regarding the productivity of *all* Defendants' workers, regardless of employee type or work location, including for example independent contractors, temporary workers, executives, human resources employees, and managers. And even if Plaintiffs' request is limited only to Class members, it is still overbroad because it would require Defendants to produce documents about the productivity of every one of Defendants' Class member employees regardless of job function or title. For example, as written, Plaintiffs' request would require the production of management-level analyses regarding the productivity of

employees like janitors and maintenance staff when Plaintiffs' allegations and their own justification for the request focuses on the types of employees that are actively involved in processing birds. *See* SAC ¶¶ 144–45 (identifying the "limited set of discrete job positions" at issue to include live hangers, eviscerators, deboners, and first line supervisors.).

Finally, Plaintiffs' request is overbroad insofar as it seeks *all* "management-level" reports, analyses, presentations, and studies. Although Plaintiffs frame their focus on "management-level" documents as a reasonable limitation, it is not in practice. Putting aside that Plaintiffs do not identify what types of documents qualify as "management level,"[42] Plaintiffs fail to limit their request to annual or quarterly reports. For any Defendant that produces daily, weekly, or monthly reports for each of its processing plants, Plaintiffs' failure to accept a reasonable limitation results in an obligation to produce potentially millions of pages of reports. Plaintiffs also do not limit their request to documents regarding overall plant-level productivity, thus resulting in an obligation to produce what could be millions of pages of analysis regarding productivity at the individual, line, or department level. To the extent Plaintiffs' need for management-level analyses of productivity is relevant and not duplicative of other requests—though for the reasons stated above, they are not—the Court should impose reasonable limitations on the types of documents Defendants must produce.

Accordingly, the Court should order that Defendants need not produce any documents in response to Request 19. In the alternative, the Court should order that the Defendants must produce only "documents that constitute annual or quarterly management-level reports, analyses, presentations, or studies that are sufficient to show, at the overall plant level, how employees that are engaged in processing poultry products are compensated, if at all, based on their productivity."

      E.     **R**equest No. 20

      **14.  <u>PLAINTIFFS' POSITION:</u>**

Under RFP No. 20, in addition to current document retention policies, Defendants should produce all past versions of document retention policies from the Relevant Time Period.

<u>RFP No. 20:</u> Documents sufficient to show Your Document retention Policies.

<u>Agreement:</u> Tyson/Keystone, Perdue, Mountaire, Peco, Wayne, Butterball, Koch, Fieldale, JOTS, CMS, Simmons, Agri Stats, WMS

<u>Dispute:</u> Sanderson

<u>Argument:</u> Sanderson is the *only* Defendant refusing to produce past document retention policies, which it asserts to be disfavored "discovery on discovery." Not so. Courts nationwide regularly require the production of such past policies. Their production here will enable Plaintiffs to (1)

---

[42] *See Gaske v. Crabcake Factory Seafood House, LLC*, 2021 WL 3188007, at *7 (D. Md. July 28, 2021) ("With regard to requests for production in particular, FRCP 34(b) further requires the requesting party to describe the items to be produced with 'reasonable particularity,' such that the responding party is under reasonable notice as to what is, or is not, called for in its response.").

identify the nature and timing of changes to Sanderson's retention policies during the Relevant Time Period, (2) understand and explain why certain conspiratorial documents may not exist, and (3) assess whether further discovery is needed. Sanderson has represented to Plaintiffs that it has no documents for certain proposed custodians who departed the company,[43] making their past policies relevant to understanding potential gaps in the evidence. The policies' production has little to no burden for Sanderson. It should produce them—as all other Defendants have agreed to do.

"Document retention polic[ies] are generally discoverable." *PCS Phosphate Co. v. Am. Home Assurance Co.*, No. 14-cv-99, 2015 WL 8490976, at *5 (E.D.N.C. Dec. 10, 2015). Courts regularly require the production of such past policies. For example, the court in *Montgomery v. Wal-Mart Stores, Inc.* ordered the production of document retention policies going back almost twenty years. No. 12-cv-3057, 2015 WL 11233390, at *2-3 (S.D. Cal. Sept. 4, 2015).

> The Court agrees with [p]laintiff that document retention policies are relevant in light of [defendant]'s claim that it cannot locate certain documents because they do not exist. Plaintiff does not seek these documents to show that compliance or non-compliance with the policies caused his injuries, but to assist in his investigation into the existence of potentially relevant information. Although the policies may ultimately not be admissible, the standard for discovery is more broad than the standard for admissibility.

*Id.* at *3. In *Sharma v. BMW of N. Am. LLC*, the court compelled production of document retention policies in effect during 2008, 2013 (when the case was filed), and the current policy. No. 13-cv-02274, 2016 WL 1019668, at *3-4, *8 (N.D. Cal. Mar. 15, 2016).

> The document retention policies may help [p]laintiffs determine the universe of responsive documents and evaluate any gaps in document production. Requiring production of this information is also proportional to the needs of this case. [Defendant] does not refute [p]laintiffs' assertion that the document retention policies they seek are contained within a modest number of pages, and in light of this, the burden or expense of producing this information is likely minimal, while the benefit of such information would be substantial. Knowledge of [defendant]'s document retention policies will allow [p]laintiffs to assess the company's document production, determine whether any relevant documents are lacking, and evaluate whether additional discovery is necessary in this case.

---

[43] *See* July 23, 2021 Letter from M. Samels (Sanderson's counsel) to A. Deich (Plaintiffs' counsel) at 7 ("Plaintiffs' custodian demand also includes numerous former employees for whom Sanderson Farms is unlikely to have unique responsive documents in its possession, custody, or control."). Indeed, Plaintiffs dropped several proposed custodians on the sole basis of Sanderson's representation that it no longer possessed their documents— ██████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████ PX005, Sanderson's Resps. & Objs. to Pls.' First Set of Interrogs. at 2.

*Id.* at *4.[44] Even if the Court credits Sanderson's assertion that its past document retention policies "have nothing to do" with the alleged conspiracy, D.Ltr., Plaintiffs are still entitled to discover these policies. Like the plaintiff in *Montgomery*, Plaintiffs here do "not seek these documents to show that [Sanderson's] compliance or non-compliances with the policies caused [Plaintiffs'] injuries, but to assist in [Plaintiffs'] investigation into the existence of potentially relevant information." *Montgomery*, 2015 WL 11233390, at *2-3. This is a permissible rationale under the broad federal discovery rules. Additionally, "the burden or expense [to Sanderson] of producing this information is likely minimal, while the benefit [to Plaintiffs] of such information would be substantial." *Sharma*, 2016 WL 1019668, at *3-4. For example, even if Sanderson amended its policy annually, the requested production would consist of thirteen documents.

Sanderson has cited *Fish v. Air & Liquid Systems Corp.*, No. 16-cv-496, 2017 WL 697663 (D. Md. Feb. 21, 2017). But the *Fish* plaintiffs sought document retention policies *dating back to the 1930s*—"over an 85-year time period." *Id.* at *15. Here, however, Plaintiffs merely seek all operative document retention policies over thirteen years. The *Fish* plaintiffs also failed to establish that the policies were "relevant or proportional to the needs of [the] case." *Id.* In contrast, Plaintiffs have already articulated that they want to identify the nature and timing of changes to Sanderson's policies and understand and explain why certain conspiratorial documents may not exist.[45]

---

[44] *See also Bourne-Miller v. BMW of N. Am.*, No. 11-6909, 2012 WL 7984646, at *2 (D.N.J. Aug. 15, 2012) (ordering defendant to produce "documents sufficient to reflect its document retention policy for the class period through the present"); *Fellner v. Tri-Union Seafoods, L.L.C.*, No. 06-cv-688, 2011 WL 13340570, at *4-5 (D.N.J. Mar. 11, 2011) (ordering defendant to "produce its document retention policies in effect from 1993 through 2004" in case alleging misconduct between 1993 and 2004); *Newman v. Borders, Inc.*, 257 F.R.D. 1, 3 (D.D.C. 2009) ("That a party's document retention policies, including its policies as to electronically stored information, may be a fit subject of discovery cannot be gainsaid."); Fed. R. Civ. P. 26(b)(1) advisory committee's note ("A variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action. For example . . . [i]nformation about organizational arrangements or filing systems of a party could be discoverable if likely to yield or lead to the discovery of admissible information.").

[45] Sanderson's citations to *Banks v. St. Francis Health Center, Inc.*, No. 15-cv-2602, 2015 WL 7451174 (D. Kan. Nov. 23, 2015), and *Commins v. NES Rentals Holdings, Inc.*, No. 16CV-00608, 2018 WL 3186983 (W.D. Ky. June 28, 2018), are likewise inapposite. Neither *Banks* nor *Commins* even involved a motion to compel production of document retention policies. Rather, the *Banks* plaintiff sought an order compelling defendant's answers to interrogatories about the thoroughness of its ESI preservation, collection, and search efforts, 2015 WL 7451174, at *7, and the *Commins* plaintiffs sought authorization to take an early Rule 30(b)(6) deposition, 2018 WL 3186983, at *9.

Sanderson also claims that it "presented the above case law to Plaintiffs and sought 'further justification' for their request for discovery on discovery . . . [b]ut instead of providing justification, Plaintiffs declared an impasse." D.Ltr. Not so. In their July 23, 2021 correspondence, Sanderson never expressly requested that Plaintiffs provide further justification—instead, Sanderson concluded that it "is not willing to search for and produce a decade's worth of policies *absent further justification*." *See* July 23, 2021 Letter from M. Samels (Sanderson's counsel) to A.

The Court should order Sanderson to produce all document retention policies for the Relevant Time Period.

### 15. <u>DEFENDANTS' POSITION:</u>

"'Discovery on discovery' is not an appropriate topic of discovery." *Fish v. Air & Liquid Systems Corp.*, 2017 WL 697663, at *15 (D. Md. Feb. 21, 2017). Yet, Plaintiffs insist on it here, demanding that Sanderson Farms produce "every operative version" of its document retention policy over an approximately 15-year period. June 17, 2021 Letter from A. Deich to M. Samels at 10. While Sanderson Farms has agreed to produce its current document retention policy, *see id.*, Plaintiffs insist that Sanderson Farms conduct a separate search and review to gather more than a decade worth of prior versions. This request is not relevant or proportional to their claims, and it is certainly not supported by case law.

Federal Rule of Civil Procedure 26 permits discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). To begin, Plaintiffs' request for every operative version of Sanderson Farms' document retention policy is plainly not relevant to their allegations of a conspiracy to fix wages. Indeed, Plaintiffs concede as much, and instead rely on hypothetical discovery disputes to justify their request: "To the extent that Sanderson represents that it has no or very few documents for certain proposed custodians who departed Sanderson more recently during the Relevant Time Period, Sanderson's past document retention policies are highly relevant discovery for Plaintiffs." July 8, 2021 Letter from A. Deich to M. Samels at 9. Plaintiffs also say document retention policies could explain why they may be unable to find "certain conspiratorial documents." But these theoretical concerns are not enough to justify the additional discovery that Plaintiffs request. With few exceptions, courts have allowed discovery of document retention policies when the requesting party can identify specific concerns about missing documents, but Plaintiffs have not made that showing here. *See Burd v. Ford Motor Co.*, 2015 WL 4137915, at *9 (S.D.W. Va. July 8, 2015) (allowing discovery on discovery only after "repeated concerns voiced by Plaintiffs regarding the thoroughness of Ford's document search, retrieval, and production"); *Montgomery v. Wal-Mart Stores, Inc.*, 2015 WL 11233390, at *3 (S.D. Cal. Sept. 4, 2015) (emphasizing that the court was granting discovery of retention policies because of the defendant's "claim that it cannot locate certain documents because they do not exist"). Even when courts grant discovery into document retention policies, they require plaintiffs to narrow their request in order to reduce the burden of gathering every possible version, which Plaintiffs have not done here. *See Sharma v. BMW of N. Am. LLC*, 2016 WL 1019668, at *3 (N.D. Cal. Mar. 15, 2016) (granting discovery of document retention policies because "Plaintiffs have now proposed to narrow [the scope of their request] to include only the document retention policy currently in effect, the policy in effect in 2008, and the policy in effect at the time this case was filed in 2013"). Plaintiffs' hypothetical concerns about Sanderson Farms' future discovery conduct do not justify more than a decade of discovery on discovery into its documents retention policies.

---

Deich (Plaintiffs' counsel) at 7 (emphasis added). In light of Sanderson's *three written objections* (on June 1, July 2, and July 23) and ongoing resistance in meet and confers to producing past retention policies, Plaintiffs' suggestion of impasse on July 29 was reasonable.

Courts have denied similar requests where parties seek discovery of document retention policies absent any connection to the claims at issue. *Fish*, 2017 WL 697663, at *15 (finding that "the manner in which [movant] maintains documents for document retention purposes is not relevant to the allegations" in the complaint and "simply has nothing to do with" the claims in the case). While the *Fish* court also noted the massive breadth of that plaintiffs' request for document retention policies (stretching over an 80-year time period), it separately emphasized the irrelevance of any retention policies to the plaintiff's claim. *Id.* This reasoning has equal force here. Requiring every single operative version of Sanderson Farms' document retention policy over a decade or more has nothing to do with whether Sanderson Farms conspired to fix wages. Accordingly, the request is simply not relevant, nor is it proportional. *See Banks v. St. Francis Health Center, Inc.*, 2015 WL 7451174, at *7 (D. Kan. Nov. 23, 2015) ("Discovery concerning the preservation and collection efforts of another party, if used unadvisedly, can contribute to unnecessary expense and delay and may inappropriately implicate work product and attorney-client privileged matter. Routine discovery into such matters is therefore strongly discouraged and may be in violation of Fed. R. Civ. P 26(g)'s requirement that discovery be 'neither unreasonable nor unduly burdensome or expensive.'").

Sanderson Farms presented the above case law to Plaintiffs and sought "further justification" for their request for discovery on discovery during the parties' negotiations. 7/23/21 July 23, 2021 Letter from M. Samels to A. Deich at 7. But instead of providing justification, Plaintiffs declared an impasse. July 29, 2021 Letter from A. Deich to M. Samels at 6. At bottom, Plaintiffs lack an "adequate factual basis to justify" this irrelevant discovery, and their request should be denied. *Commins v. NES Rentals Holdings, Inc.*, 2018 WL 3086983 at *9 (W.D. Ky. June 28, 2018) ("When discovery sought is collateral to the relevant issues (*i.e.*, discovery on discovery), the party seeking the discovery must provide an 'adequate factual basis' to justify the discovery and the Court must closely scrutinize the request 'in light of the danger of extending the already costly and time-consuming discovery process *ad infinitum.*'" (citation omitted)); *id.* ("A number of courts look upon collateral discovery 'with skepticism' or 'strongly discourage' it."); *Fish*, 2017 WL 697663 at *15; *Banks*, 2015 WL 7451174 at *7.

## IV.  **CUSTODIANS**

### A.  **Introduction**

#### 1.  **PLAINTIFFS' POSITION**:

A. Document Custodians for the Multi-Pronged Conspiracy

Plaintiffs allege that Defendant Processors used a three-pronged strategy to carry out their conspiracy to depress compensation. *First*, Defendant Processors formed a secret Compensation Committee that held annual "off-the-books" meetings at which participants discussed the results of a compensation survey conducted by WMS and fixed the wages, salaries, bonuses, and benefits paid to their workers. *Second*, Defendant Processors relied on monthly reports prepared by Agri Stats to track their competitors' compensation and ensure that all conspirators were adhering to their agreement. *Third*, Defendant Processors' plant managers exchanged current and future compensation schedules with their counterparts at rival poultry plants, and Defendant Processors then used that data to further monitor the conspiracy and harmonize compensation.

To prove this decade-plus conspiracy, Plaintiffs seek a select number of custodians from each Defendant. After more than two months of extensive negotiations, Plaintiffs reached agreements regarding custodians with nine of the Defendants. Unfortunately, the Court's intervention is needed to resolve disputes with six Defendants.

"[T]he selection of custodians is more than a mathematical count," and "[t]he selection of custodians must be designed to respond *fully* to document requests and to produce responsive, nonduplicative documents during the relevant period." *Kleen Prods.*, 2012 WL 4498465, at *15 (emphasis added). In considering the number of custodians, courts consider the size of the defendants and the "number of issues involved in [the] case." *Navajo Nation v. Urban Outfitters, Inc.*, No. 12cv195, 2014 WL 11511092, at *4 (D.N.M. Nov. 21, 2014). Where many different employees and departments are involved, and many issues are at stake, courts have allowed a high number of custodians. *See City of Sterling Heights Gen. Emps. Ret. Sys. v. Prudential Fin., Inc.*, No. 12–05275, 2015 WL 5055241, at *3 (D.N.J. Aug. 21, 2015) ("[a]lthough the number of agreed custodians is already substantial, the resources and personnel at [defendant] devoted to [relevant] issues also seem to have been immense" and it was "[t]herefore . . . not surprising that more than 66 . . . employees may have been heavily involved in the issues relating to this case and may thus have relevant, noncumulative information").

B. <u>Custodian Agreements to Date</u>

Plaintiffs have reached agreements on custodians with the following nine Defendants:

| Defendant | Number of Agreed-Upon Custodians | Number of Poultry Processing Plants[46] | Number of Poultry Processing Employees[47] |
|---|---|---|---|
| Perdue | 29 | 16 | about 20,000 |
| Koch | 24 | 12 | about 13,000 |
| Wayne | 26 | 10 | about 9,000 |
| CMS | 23 | 12 | about 8,000 |
| Mountaire | 18 | 4 | about 7,000 |
| Fieldale | 18 | 3 | about 5,000 |
| Peco[48] | 13 | 7 | about 7,000 |
| Agri Stats[49] | 16 | -- | -- |

---

[46] The number of poultry processing plants listed in the chart for each Defendant reflects the number of such plants that are currently being operated by those Defendants.

[47] The number of poultry processing employees listed in the chart for each Defendant is an approximation of how many such workers are currently employed by those Defendants.

[48] Plaintiffs do not allege that Peco participated in WMS meetings; accordingly, Plaintiffs have only alleged an information-exchange claim against Peco. For that reason, Peco has fewer custodians than other Defendant Processors of comparable size.

[49] Agri Stats is a consulting company. It does not itself operate any poultry processing plants or employ any poultry processing workers.

| Defendant | Number of Agreed-Upon Custodians | Number of Poultry Processing Plants[46] | Number of Poultry Processing Employees[47] |
|---|---|---|---|
| WMS[50] | 3 | -- | -- |

Those agreements are instructive in four ways. *First*, they indicate that Plaintiffs have been reasonable in the negotiations. The fact that Plaintiffs reached *complete agreement* with nine of the 15 non-settling Defendants indicates that the six other Defendants have taken unreasonable positions that are inconsistent with the law. Indeed, during negotiations with those six Defendants, Plaintiffs significantly narrowed their original requests and made substantial concessions, but received plainly inadequate counter-offers in return.

*Second*, the agreements show that the number of agreed-upon custodians for a Defendant Processor is largely proportional to the number of that Defendant's poultry processing plants and the size of its poultry processing workforce.[51] Not surprisingly, more custodians are necessary for Defendant Processors that operate more poultry processing plants and have larger workforces. For example, Mountaire employed a daily average of approximately 6,500 processing plant workers during the Class Period, and it agreed to 18 custodians; meanwhile, Wayne employed approximately 9,000 workers per day on average (about 40% more than Mountaire) and agreed to 26 custodians (about 45% more than Mountaire). Larger Defendant Processors employed comparatively more individuals—at both the corporate level and plant level—who were involved in the conspiracy to suppress compensation. This truism is important in assessing the appropriate number of custodians for other Defendants, especially Tyson, by far the largest poultry processor in the country. Tyson employs more than 70,000 poultry processing workers and operates more than 75 poultry processing plants. These totals are substantially more than all the workers employed by, and all the plants operated by, *the combined seven* Defendant Processors with which Plaintiffs have reached agreement on custodians. Due to its size, Tyson had to accept **51 custodians** in another antitrust case—*In re Broiler Chicken Antitrust Litigation*—alleging antitrust violations against many of the same Defendant Processors. *See* Pls.' Mot. Concerning the Number of Deps. of Pilgrim's and Tyson Witnesses at 9, *In re Broiler Chicken Antitrust Litig.*, No. 16-cv-08637 (N.D. Ill. Feb. 22, 2019), ECF No. 1914.

*Third*, all the agreed and disputed custodians proposed by Plaintiffs fall into one of four categories:

- <u>Senior executives</u> (such as CEOs, Presidents, CFOs, and COOs) who made, or influenced, decisions about compensation, benefits, hiring, and recruiting.

- <u>Corporate human resources staff</u> who supervised human resources departments, attended WMS meetings, provided compensation data to Agri Stats or WMS, recommended compensation schedules, implemented compensation policies across regions or multiple plants, and/or managed recruiting operations.

---

[50] WMS is a consulting company with three current employees. WMS does not itself operate any poultry processing plants or employ any poultry processing workers.

[51] The number of agreed-upon custodians for Koch is lower than expected as Koch's leadership experienced unusually low turnover during the Relevant Time Period.

54

- Compensation analysts who collected, evaluated, discussed, harmonized, and/or made recommendations based on compensation data, including data obtained from WMS, Agri Stats and competing poultry processors.

- Plant managers who implemented plant-wide human resources and compensation policies, supervised recruiting and hiring procedures, and/or exchanged compensation data with rival poultry processing plants.

Each of these employees actively participated in one or more of the conspiracy's three prongs and/or materially facilitated the implementation of the conspiracy.

*Fourth*, for most of the Defendant Processors that reached agreement with Plaintiffs, the parties agreed to *at least* as many plant-level custodians as the number of plants operated by the Defendant Processor. For example, Fieldale operates three poultry processing plants and agreed to five plant-level custodians; Mountaire operates four poultry processing plants and agreed to six plant-level custodians. The parties recognized that Plaintiffs' allegations of unlawful plant-to-plant communications entitle Plaintiffs to sufficient plant-level custodians.

C.  Disputed Custodians

Plaintiffs seek a select number of corporate-level custodians, as well as a sampling of plant-level custodians, from the six Defendants with which Plaintiffs have not agreed (hereinafter, "Disputing Defendants").

| Defendant | Agreed-Upon Custodians | Disputed Custodians | Poultry Processing Plants | Poultry Processing Employees[52] |
|---|---|---|---|---|
| Tyson | 15 | 36 | 77 | about 72,000 |
| Sanderson | 15 | 6 | 13 | about 17,000 |
| JOTS | 11 | 10 | 7 | about 7,000 |
| Butterball | 18 | 7 | 6 | about 7,000 |
| Simmons | 18 | 6 | 6 | about 7,000 |
| Keystone | 6 | 7 | 5 | about 6,000 |

All of the disputed custodians requested by Plaintiffs fall into one of the four categories of employees described above. In other words, other Defendants have already implicitly conceded the relevance of the disputed custodians by agreeing to designate their employees with the same titles and functions as custodians.

Courts regularly add custodians on top of those agreed upon by the parties. *See, e.g.*, *Mt. Hawley Ins. Co. v. Felman Prod., Inc.*, 269 F.R.D. 609, 617 (S.D. W. Va. 2010) (compelling defendant to include nine additional custodians, all of whom were involved in the alleged misconduct); *Philips*

---

[52] The number of poultry processing employees listed in the chart is an approximation of how many such workers are currently employed by the Defendants, with the exception of Keystone, which was acquired by Tyson in late 2018. The Keystone figures reflect an approximation of how many poultry processing workers were employed by Keystone at the time of its acquisition.

*Med. Sys. Nederland B.V. v. TEC Holdings, Inc.*, No. 20-CV-021, 2021 WL 1234596, at *10 (W.D.N.C. Mar. 31, 2021)  (ordering production from twelve new custodians on top of the agreed fourteen); *City of Sterling Heights*, 2015 WL 5055241, at *3 (allowing ten additional custodians, on top of the agreed 66, as "more than 66 . . . employees may have been heavily involved in the issues relating to this case and may thus have relevant, noncumulative information," and "allowing plaintiffs a moderate number of additional custodians does not seem disproportionate to the size and scale of this action").

Courts also routinely hold that both upper-level and lower-level employees are fair game for discovery. *See, e.g.*, *In re Arby's Rest. Grp. Inc. Litig.*, No. 17-MI-55555, 2018 WL 8666473, at *3 (N.D. Ga. Aug. 16, 2018) ("[T]he search of some mid or lower-level custodians may provide relevant, discoverable material, as information does not always rise to the attention of the most senior employees in stratified organizations."); *Kleen Prods.*, 2012 WL 4498465, at *15 (Even if a conspiracy itself is "among higher-level executives, lower-level employees may *possess* important, relevant information which could reasonably lead to admissible evidence.").

The six Disputing Defendants ignore this law, and they make four sweeping arguments to reject highly relevant custodians.

*First*, Disputing Defendants claim that absent agreement among the parties, the party responding to document requests—e.g., Defendants themselves—may identify custodians most likely to possess responsive documents, and that the Court should not intervene unless their choice is "manifestly unreasonable."[53] D.Ltr. This is incorrect. Under Federal Rule 26, "[p]arties may obtain discovery regarding any nonprivileged matter that is *relevant* to any party's claim or defense and *proportional* to the needs of the case." Fed. R. Civ. P. 26(b)(1) (emphasis added). "If relevant and proportional, then the party that objects to the discovery must establish that the request should be denied." *Thomas v. City of N.Y.*, 336 F.R.D. 1, 2, 4 (E.D.N.Y. 2020) (granting plaintiffs' request for five additional custodians). Fourth Circuit "[c]ourts have long held that . . . the burden of persuasion remains at all times with the objecting party." *Blankenship v. Fox News Network, LLC*, No. 19-cv-00236, 2020 WL 9718873, at *13-14 (S.D. W. Va. Sept. 21, 2020) (citation omitted) (granting plaintiffs' motion to compel information from six additional custodians); *see also Desrosiers v. MAG Indus. Automation Sys., LLC*, 675 F. Supp. 2d 598, 601 (D. Md. 2009) ("The

_____

[53] Disputing Defendants heavily rely upon *In re EpiPen (Epinephrine Injection, USP) Marketing., Sales Practices & Antitrust Litigation*, No. 17-md-1785, 2018 WL 1440923 (D. Kan. Mar. 15, 2018), suggesting this single out-of-district case sets forth "the core principles governing the selection of custodians" D.Ltr. Yet, nothing in the reasoning of *In re Epipen* abrogates the time-tested caselaw on Rule 26 which governs custodian disputes—on the contrary, the case firmly acknowledges this. *See e.g.* id. at *12. And Disputing Defendants ignore that the reasoning of *In re Epipen* is supportive of Plaintiffs' position: that court added most of the requested custodians, finding the opposing party's "proportionality argument unpersuasive" regarding contested executives, especially given the resisting party had "designated [other] executive-level custodians." *Id*. at  *18. The court also added an executive-level custodian where the "senior executive in the parent [....] entity" appeared to be "involved in discussions and decision" related to the allegations—just as Plaintiffs allege for many disputed executive-level custodians below. *Id*. at *17.

burden is on the party resisting discovery to explain specifically why its objections, including those based on irrelevance, are proper given the broad and liberal construction of federal discovery rules."); *Hake*, 2014 WL 3974173, at *5 (Gallagher, M.J.); *Gross v. Morgan State Univ.*, No. 17-448, 2018 WL 9880053, at *5 (D. Md. Feb. 9, 2018) (Gallagher, M.J.). And a party "must articulate and provide evidence of its burden," rather than rely on generalizations. *Kleen Prods.*, 2012 WL 4498465, at *15.

*Second*, Disputing Defendants argue that they have selected the few key custodians that are *most* likely to have relevant information. But this is yet again the wrong standard. The Federal Rules allow Plaintiffs discovery on "*any* nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1) (emphasis added); *Kleen Prods.*, 2012 WL 4498465, at *15 ("[t]he selection of custodians must be designed to respond *fully* to document requests" (emphasis added)). Further, in antitrust cases, "courts generally take an expansive view of relevance and permit broad discovery," *Kleen Products*, 2012 WL 4498465, at *13, and "[w]here there is doubt over relevance, the rule indicates that the court should be permissive." *Am. Health Sys., Inc. v. Liberty Health Sys.*, No. 90-3112, 1991 WL 30726, at *2 (E.D. Pa. Mar. 5, 1991).

*Third*, Disputing Defendants argue that Plaintiffs' proposed custodians are duplicative. Specifically, those Defendants claim that proposed custodians' documents will be duplicative of their subordinate's (or, at other times, their supervisor's) documents. This argument is flawed in several respects.[54] To begin, Disputing Defendants again articulate the wrong standard. For a court to limit otherwise relevant and proportional discovery requests under Rule 26, the information sought "must be <u>unreasonably</u> cumulative." *OptoLum, Inc. v. Cree, Inc.*, No. 17CV687, 2018 WL 6834608, at *7 (M.D.N.C. Dec. 28, 2018) (citing Fed. R. Civ. P. 26(b)(2)(C)). The "mere existence of overlap and some duplication is insufficient to preclude the discovery sought." *Thomas*, 336 F.R.D. at 2. Disputing Defendants have made no such showing here—on the contrary, they have presented *no evidence* in support of their assertions, nor do they address why de-duplication technologies would not address their purported concerns. *See, e.g.*, *Ramirez v. U.S. Immigr. & Customs Enf't*, 331 F.R.D. 194, 197 (D.D.C. 2019) (rejecting defendant's arguments that additional custodians would be "unnecessarily cumulative" when they failed to "articulate[] specific facts to support [their] request" (citations omitted)).

Disputing Defendants also fail to recognize that custodians from a different "time period, responsibility, position" or "location or field office," by their nature, provide non-duplicative information. *See id.*, *see also In re Broiler Chicken Antitrust Litig.*, No. 16 C 8687, 2018 WL 3586183, at *6 (N.D. Ill. July 26, 2018) ("The Court does not agree that searching for and producing documents for a time frame outside the [initial] parameters . . . necessarily is cumulative or duplicative."). Indeed Disputing Defendants generally *do not deny* that proposed custodians

---

[54] As the Disputing Defendants themselves concede, "determining relevant and proportionate document custodians is a fact-specific inquiry." D.Ltr. No authority cited by those Defendants (or that Plaintiffs are aware of) suggests that custodians are unreasonably cumulative merely because custodians have a hierarchical relationship. On the contrary, as discussed *infra* § IV.A.D, a wealth of case law holds that lower-level employees are appropriate custodians when they may have facilitated, or possess some knowledge of, the alleged misconduct.

would have relevant and responsive documents: instead, Disputing Defendants improperly suggest that Plaintiffs are entitled to some conspiratorial communications and not others. Courts routinely reject such attempts to unilaterally cabin the scope of discovery. *See, e.g.*, *MariCal, Inc. v. Cooke Aquaculture, Inc.*, No. 14-cv-00366, 2016 WL 9459260, at *2 (D. Me. Aug. 9, 2016) (adding CEO as custodian, despite defendants' argument that such documents were "unreasonably cumulative and duplicative discovery" of CEO's subordinates, reasoning that the CEO "maintained a position of prominence in Defendants' management and likely was involved in discussions" related to the allegations); *Mt. Hawley Ins.*, 269 F.R.D. at 620 (compelling additional custodians likely to "have additional, highly relevant materials" regardless of whether they also are likely to have "duplicates of previously produced materials").[55]

*Fourth*, Disputing Defendants argue that the proposed custodians are not proportional to the needs of the case. They are wrong. In evaluating proportionality, courts consider these factors in Rule 26(b)(1): "(1) the importance of the issues at stake in the action, (2) the amount in controversy, (3) the parties' relative access to relevant information, (4) the parties' resources, (5) the importance of the discovery in resolving the issues, and (6) whether the burden or expense of the discovery outweighs its likely benefit." These factors, both individually or together, support the inclusion of the below corporate-level and plant-level personnel.

**Importance of the issues at stake:** The Sherman Act protects the public policy interest that all Americans share in free competition and open markets. *United States v. Topco Assocs.*, 405 U.S. 596, 610 (1972) ("Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms."). The Complaint describes an effort of over a decade to suppress compensation for hundreds of thousands of poultry processing workers, who are some of the country's most vulnerable workers. "[C]laims of collusion" across an industry "raise important, vital issues of public importance." *Kleen Prods.*, 2012 WL 4498465, at *14. Indeed, "[t]he issues at stake in this litigation impact not just the financial prospects of the Defendants but the rights of [workers] to a competitive market. . . . Thus resolution of the matter on the merits and with full information available to the parties to the case gains an additional level of importance." *United States v. AT&T Inc.*, No. 11–cv–01560, 2011 WL 5347178, at *7 (D.D.C. Nov. 6, 2011) (citation omitted).

**Amount in controversy:** This litigation has an exceptional amount at stake. Defendant Pilgrim's recently paid a $29 million settlement in the infancy of discovery. Potential damages are measured in at least the hundreds of millions of dollars in lost compensation—*before trebling*. This substantial amount strongly suggests that including the disputed custodians is appropriate and proportionate to the needs of the case. *See City of Sterling Heights*, 2015 WL 5055241, at *3

---

[55] Several Disputing Defendants erroneously rely on *U.S. Home Corp. v. Settlers Crossing, L.L.C.*, No. 08-1863, 2012 WL 13014153 (D. Md. Oct. 24, 2012). In that case, the court denied the addition of custodians who had "duplicative" documents insofar as the proposed custodians' documents had already been produced in discovery. Indeed, the court specifically rejected arguments that a proposed custodian would be duplicative merely due to being a subordinate that "served a supportive role," as the individual had received "a directive, and may have receive[d] other directives" relevant to the allegations in the case. *See id.* at *4-5.

(stating that "allowing plaintiffs a moderate number of additional custodians does not seem disproportionate to the size and scale of this action").

**Parties' relative access to relevant information:** For obvious reasons, antitrust defendants typically conceal their illegal conspiratorial conduct. Because antitrust plaintiffs' "allegations involve improper business conduct" that is "generally covert and must be gleaned from records," courts permit "necessarily broad" discovery. *Callahan*, 947 F. Supp. at 179. Here, the relevant information is contained in Defendants' files.

**Parties' resources:** Defendant Processors have racked up hundreds of billions of dollars of revenue during this decade-plus conspiracy. *See* SAC ¶¶ 136, 162, 223. Even the smallest Defendant Processors earn annual revenues in excess of $1 billion.[56] Defendants have the financial resources to collect, search for, and produce documents for the additional custodians. *See Blankenship*, 2020 WL 9718873, at *16 n.10 ("With respect to the resources available to either Plaintiff or to [defendant Fox News Network], and given the amount in controversy, the costs and other burdens described by FNN . . . are far from substantial."); *see also Kleen Prods.*, 2012 WL 4498465, at *14 (court was able to "presume, given the nature of the antitrust claims and the size of the companies involved, . . . that Defendants' resources are greater than Plaintiffs'").

**Importance of the discovery in resolving the issues:** Documents from both corporate-level and plant-level custodians are crucial to establishing the existence of and operation of Defendants' conspiracy. The proposed custodians are relevant to each of the three conspiracy prongs. *See supra* § IV.A.A.

**Whether the burden or expense of the proposed discovery outweighs its likely benefit:** Weighed against the benefit of obtaining valuable additional evidence, the potential burden of producing additional custodians is reasonable and proportionate. Disputing Defendants argue that additional custodians would only have information duplicative of agreed-upon custodians. But the parties have agreed to use de-duplication to remove duplicate ESI during the production process. *See* Proposed Order Re Produc. of Elec. Stored Info. and Paper Docs. § IV.E, Nov. 2, 2020, ECF No. 454-2 (explaining the de-duplication process and ordering that "[t]he producing Party *shall* use reasonable efforts to produce only one document image or native file for duplicate emails within the duplicate group to the extent practicable" (emphasis added)). Further, Plaintiffs have agreed to propose a more limited set of search terms for plant-level employees to reduce the burden. *See Family Wireless #1, LLC v. Auto. Techs., Inc.*, No. 15CV01310, 2016 WL 2930887, at *3 (D. Conn. May 19, 2016) (holding that additional custodians would not be unduly burdensome as "limitations on search parameters can be implemented so as to exclude the production of duplicative emails"); *Williams v. Apple, Inc.*, No. 19-cv-04700, 2020 WL 5107639,

---

[56] Laura Remington, *How Analytics Saved Fieldale Farms $170K Per Year*, Dimensional Insight (Aug. 16, 2018), https://www.dimins.com/blog/2018/08/16/how-analytics-saved-fieldale-farms-170k-per-year/ (describing Fieldale earning $1 billion in revenue); Jeff Della Rosa, *Poultry producer Simmons tops private companies list in Northwest Arkansas, Fort Smith areas*, Talk Business & Politics (July 3, 2017), https://talkbusiness.net/2017/07/poultry-producer-simmons-tops-private-companies-list-in-northwest-arkansas-fort-smith-areas/ (noting that Simmons Foods earned $1.45 billion in revenue in 2016).

59

at *2 (N.D. Cal. Aug. 31, 2020) ("where the key objection is unnecessarily duplicative discovery, [defendant's] burden can be substantially mitigated by application of appropriately narrow search terms and de-duplication of ESI across custodians").

D.  Including Plant-Level Custodians

Ten of the 13 non-settling Defendant Processors have agreed to designate plant-level employees as custodians. Only three Defendant Processors—Tyson, Keystone, and JOTS—improperly refuse to do so.

Defendants' unlawful exchange of compensation information both facilitated their *per se* unlawful agreement to suppress compensation and also violated the rule of reason. *See* SAC ¶¶ 314-33. In other words, Defendants' unlawful exchange of compensation information *is its own freestanding claim* in this antitrust litigation. *Id.*

One prong of the alleged information exchange involves plant-to-plant communications about poultry processing workers' compensation levels,  with "[h]uman resource managers at some plants . . . call[ing] their closest competitors to share information about pay rates, planned increases, and benefits." *Jien*, 2020 WL 5544183, at *3. Indeed, in denying Defendants' first motion to dismiss, this Court found that Plaintiffs had alleged *direct evidence* of the plant-to-plant component of the conspiracy, noting  Plaintiffs' "specific factual allegation makes plausible the 'plant-to-plant communications' portion of the conspiracy." *Id.* at *5-6. The Complaint contains many other detailed allegations of how these plant-to-plant exchanges of information took place. *See, e.g.*, SAC ¶¶ 225-30, 233, 243, 246. One common thread: it is plant-level personnel, not corporate-level personnel, who are charged with performing this aspect of the conspiracy. *See id.* Indeed, the Complaint alleges that "*the individual plants* . . . engaged in bilateral exchanges of compensation information with competing poultry processing plants," with "[t]he information obtained from these data exchanges [then] provided to the corporate headquarters of the respective Defendant Processors, which used this regional information to facilitate the setting of artificially depressed compensation." *Id.* ¶ 225 (emphasis added); *see also id.* ¶ 8 ("[M]anagers located at Defendant Processors' poultry processing plants engaged in bilateral and regional exchanges of wage, salary and benefits information.").

Thus, when some Defendant Processors argue that plant-level employees are duplicative of higher-level custodians, they are mistaken. *Only* the plant-level employees engaged in aspects of the illicit information exchange, and they did so through *completely separate* communications from their superiors. While plant managers likely shared the actual compensation data they received from competitors with their corporate superiors, as the Complaint expressly alleges—it is unlikely that plant managers provided corporate-level employees with the *actual communications* that were engaged with rival plant managers that, in and of themselves, constitute direct evidence of an antitrust violation. (And in those instances when they did share such documents with corporate-level employees, those documents will be de-duplicated before first-level review to minimize the burden on Defendant Processors.)

Courts have held that lower-level employees are appropriate witnesses when they may have facilitated, or possess knowledge about, the alleged misconduct. In antitrust wage-fixing cases, there is "no reason for concluding that" improper "information gathering cannot be delegated to

subordinates," and the fact that an employee does not themselves "have authority to make . . . [compensation] decisions is not dispositive." *In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 453 (9th Cir. 1990). "Middle–level—and indeed lower–level— employees can, by actions within the scope of their employment, embroil the corporation in serious legal difficulties . . . ." *Upjohn Co. v. United States*, 449 U.S. 383, 391 (1981); *see also Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 456 (7th Cir. 1982) (Posner, J.) (remarking that "many a corporation has paid heavy damages for antitrust violations committed by low-level sales managers who thought they were acting in the company's best interests as well as their own").

This principle extends to the discovery arena: courts have found that "the search of some mid or lower-level custodians may provide relevant, discoverable material, as information does not always rise to the attention of the most senior employees in stratified organizations." *In re Arby's*, 2018 WL 8666473, at *3. Even if a conspiracy itself is "among higher-level executives, lower-level employees may *possess* important, relevant information which could reasonably lead to admissible evidence." *Kleen Prods.*, 2012 WL 4498465, at *15. In keeping, if a plaintiff alleges that lower-level employees participated in a wider conspiracy, that is grounds to include those employees as custodians, even if "the Complaint alleges a conspiracy mostly *among* higher-level executives." *Id.* Indeed, "[i]t is reasonable to believe that discussions and transmissions of potentially relevant information could transpire below the highest echelon of management" and that "lower-level employees may discuss execution of policies amongst themselves and with third parties other than their superiors. These communications may be particularly revealing." *Family Wireless*, 2016 WL 2930887, at *3. When dealing with stratified corporations like the Defendant Processors, "it . . . may be true that employees at [a senior] level took care not to say anything incriminating and that lower-level employees were less guarded in their email communications." *Capitol Recs., Inc, v. MP3tunes, LLC*, 261 F.R.D. 44, 50-51 (S.D.N.Y. 2009) (directing defendant to search the files of six "low-level employees").

This is particularly true in antitrust price-fixing or wage-fixing conspiracies, where higher-ups often charge lower-level employees with the duty of exchanging price or wage information with their competitors. *See In re Korean Ramen Antitrust Litig.*, 281 F. Supp. 3d 892, 913 (N.D. Cal. 2017); *Motorola, Inc. v. AU Optronics Corp. (In re TFT-LCD (Flat Panel) Antitrust Litig.)*, 785 F. Supp. 2d 835, 838 (N.D. Cal. 2011). As such, courts have found that commentary from plant managers on "an understanding within the industry not to undercut each other's prices" was admissible evidence of a price-fixing conspiracy. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002).

Here, Plaintiffs expressly allege that plant managers unlawfully exchanged compensation data in furtherance of the conspiracy. Given those allegations, "Plaintiffs are *at least* entitled to a sample of lower-level and plant-level employees to determine if they possess significant and nonduplicative information." *Kleen Prods.*, 2012 WL 4498465, at *15 (emphasis added). Plaintiffs have requested such a sampling of Disputing Defendants' plant-level custodians, and Plaintiffs have agreed to propose a more limited set of search terms for them. Accordingly, the Court should designate those disputed plant-level employees as custodians.

## 2.  **DEFENDANTS' POSITION:**

The scope and number of disputes over document custodians arises from Plaintiffs' consistent failure to abide by the basic principle that they bear the burden to "demonstrate [that each of these additional] custodian[s] would provide 'unique relevant information not already obtained.'" *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2020 WL 3100016, at *1 (N.D. Fla. June 11, 2020) (quoting *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 107 (S.D.N.Y. 2013)). Given Plaintiffs' extreme demands for discovery of each custodian, it is particularly necessary for Plaintiffs to meet their burden to show a clear, non-duplicative nexus between the custodians they demand and the claims they seek to prove.

Moreover, Plaintiffs cite—but largely ignore—the case law setting forth the core principles governing the selection of custodians. Plaintiffs repeatedly rely on *Blankenship v. Fox News Network, LLC*, 2020 WL 9718873 (S.D.W.Va. Sept. 21, 2020), *objections overruled*, 2021 WL 2345972 (S.D.W. Va. June 8, 2021), while neglecting that court's requirement for "good cause to increase the number of designated custodians because [the custodians] had some direct knowledge about important aspects of the case." Indeed, *Blankenship* relied on *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 2018 WL 1440923, at *2 (D. Kan. Mar. 15, 2018), which established several key principles for the designation of custodians. First, determining relevant and proportionate document custodians is a highly fact-specific inquiry. *Id.* Second, absent agreement among the parties, the party responding to document requests may identify custodians most likely to possess responsive documents and information. *Id.* Third, unless the responding party's choice is "manifestly unreasonable or the requesting party demonstrates that the resulting production is deficient," the Court should not dictate the designation of ESI custodians. *Id.* Fourth, the party seeking production has the initial threshold burden of showing that the disputed custodians are likely to have information relevant to the claims or defenses because "the party responding to discovery requests is typically in the best position to know and identify those individuals within its organization likely to have information relevant to the case." *Id.* Fifth, "mere speculation that one's position as a senior executive might increase the relevance of that individual's files is not a basis for designating that individual as a custodian." *Id.*

As described in detail below, Defendants' positions are grounded in diligent efforts to identify and offer custodians responsible for compensation of employees who work in their poultry-processing plants. Plaintiffs repeatedly overreach by demanding custodians based on assumption and speculation, refusing to accept Defendants' representations that disputed custodians did not have responsibilities relevant to a purported conspiracy to fix compensation, and declining to recognize that relevant documents are to be found in the files of the proffered custodians responsible for compensation.

## B. Custodian Disputes with Individual Defendants

### 1. Tyson and Keystone

#### a) *PLAINTIFFS' POSITION*:

**Tyson**

Tyson Agreed-Upon Custodians: Linda Wray, Rodney Nagel, Hector Gonzales, Susan Jones, Noel White, Raymond "Lee" Kid, Tina Foster, Elizabeth Farmer, Dominica Fleming (deceased), Charla Hendrix, Donnie King, Chad Martin, Dan Serrano, Kristi Jackson, and Doug Ramsey.

As one of the 100 largest companies in the world and the largest poultry producer in the United States, Tyson is, by far, the largest Defendant. It operates 77 poultry processing plants—more than *ten other Defendant Processors combined*. It employs about 72,000 poultry processing workers— more than *nine other Defendant Processors combined*. And the Complaint is replete with allegations that Tyson played an outsized role in the conspiracy, including by organizing and paying for "off the books" conspiratorial meetings. *See, e.g.*, SAC ¶¶ 173-94.

Yet remarkably, Tyson has only agreed to 15 custodians—fewer than virtually any other Defendant. Only JOTS—a Defendant Processor that has less than 10% of the poultry processing workforce and plants as Tyson—and Tyson's own subsidiary, Keystone, have proposed fewer custodians. Other Defendant Processors that have only a fraction of Tyson's market share have proposed many more custodians. For example, Perdue, which operates just 16 plants and employs roughly 28% as many Class Members as Tyson, has agreed to 29 custodians. Wayne, which operates just ten plants and employs approximately 13% as many Class Members as Tyson, has agreed to 26 custodians. Even Fieldale, which operates just three plants and employs approximately 7% as many Class Members as Tyson, has agreed to 18 custodians.

In another antitrust case alleging anticompetitive conduct in the poultry industry against many of the same Defendant Processors—*In re Broiler Chicken Antitrust Litigation*—the parties recognized that Tyson's size and centrality compelled a comparatively higher number of custodians. In that case, where Tyson likewise has a disproportionate market share and played a key role in the conspiracy, Tyson had 51 custodians.[57] *See* Pls.' Mot. Concerning the Number of Deps. of Pilgrim's and Tyson Witnesses at 9, *In re Broiler Chicken Antitrust Litig.*, No. 16-cv-08637 (N.D. Ill. Feb. 22, 2019), ECF No. 1914 ("The two largest Defendants, Tyson and Pilgrim's Pride, have complex and complicated corporate histories that resulted in the parties agreeing on over 50 document custodians each for Tyson and Pilgrim's. This is far more document custodians than for other Defendants."). In this case, which alleges a longer class period than in the *Broilers* case, Plaintiffs have similarly proposed a total of 51 custodians for Tyson.[58] This is a reasonable

---

[57] Tyson argues that the *Broilers* litigation "involved different allegations and different custodians, and has no bearing on the appropriate number of custodians here." D.Ltr. While the *Broilers* case concerns different allegations, Tyson misses the point. *Broilers* involves another multifaceted conspiracy over many years with roughly the same group of defendants encompassing nearly the entire industry. And Tyson's number of custodians in that case was proportional to its size and market share when it is compared to other defendants in that case. It should be no different here, no matter how much Tyson obfuscates.

[58] It is a mere coincidence that Plaintiffs are proposing the exact same number of Tyson custodians in this case as in the *Broilers* litigation. Plaintiffs did *not* aim to arrive at any pre-determined

number given Tyson's size and significance (especially given that Tyson has a larger market share in this case than in the *Broilers* case). *See, e.g.*, *City of Sterling Heights*, 2015 WL 5055241, at *3 ("[a]lthough the number of agreed custodians is already substantial, the resources and personnel at [defendant] devoted to [relevant] issues also seem to have been immense" and it was "[t]herefore . . . not surprising that more than 66 . . . employees may have been heavily involved in the issues relative to this case and may thus have relevant, noncumulative information").

Plaintiffs respectfully urge the Court not to reward Tyson's intransigence by selecting a number of Tyson custodians that is roughly halfway between Plaintiffs' proposal and Tyson's proposal. Unlike every other Defendant Processor, Tyson has not made any reasonable offers. Instead, it may hope that by agreeing to so few custodians, it can establish a lower midpoint between the parties' positions and thus persuade the Court to choose a lesser number. But Plaintiffs are confident that an examination of each of the carefully selected disputed custodians below will reveal that each possesses information that is highly relevant to Plaintiffs' claims.

Tyson Disputed Custodians:

Thirty-six custodians remain in dispute. These custodians fall into six categories: (1) senior executives, (2) vice-presidents of HR, (3) compensation analysts, (4) benefits specialists, (5) HR Directors of Operations, and (6) plant-level employees.

Tyson has rejected these custodians because they "had no personal involvement with" or "had no direct responsibility for setting wages" for Class Members. D.Ltr. But just because custodians did not set compensation does not mean they did not have relevant information under Rule 26. Plaintiffs allege a multi-faceted conspiracy to depress compensation that involved wage-fixing meetings, inter-Defendant communications, the exchange of competitively-sensitive data through WMS and Agri Stats, and the harmonization of compensation. Accordingly, Tyson employees who engaged in the following are appropriate custodians: discussed compensation with competing poultry processors, monitored competing poultry processors' compensation, exchanged wage data with rival poultry processors (including through WMS or Agri Stats), analyzed compensation data or labor costs, recommended compensation schedules or modifications, reached agreements regarding compensation with other poultry processors, set compensation schedules for poultry processing workers, and implemented those compensation schedules.[59]

Additionally, Tyson argues that nearly all of the 36 disputed custodians are "duplicative" because some of their bosses have already been designated custodians—even though it is clear that the disputed custodians and their bosses perform different functions. Tyson's position is plainly

number and, instead, are only advocating for those particular custodians that possess non-duplicative, highly relevant information.

[59] The language Tyson uses to describe the agreed-upon custodians implicitly acknowledges that other relevant custodians exist. Tyson writes that the agreed-upon custodians are "individuals *most relevant* to the claims and defenses in this case"; "*likely to have the most relevant* and responsive documents and information"; and "the *most involved* in the core allegations in Plaintiffs' Complaint." D.Ltr. (emphasis added).

inconsistent with the law. *Supra* § IV.A.C. Each of the 36 disputed custodians has relevant unique knowledge that should not be withheld from Plaintiffs merely because those custodians' bosses *also* possess relevant information.

*Tyson Senior Executives*

Tyson has refused to designate the following eight senior executives as custodians:[60]

| NAME | TITLE AND DESCRIPTION OF DUTIES |
|---|---|
| Mary Oleksiuk | • Executive Vice President of HR and Chief HR Officer, July 2014-Dec. 2020 |
| Kenneth Kimbro | • Executive Vice President, Chief HR Officer, 2011-2014<br>• Senior Vice President of Human Resources, 2001-2011 |
| Mikki Sud | • Senior Director of Global Compensation, Oct. 2017-Dec. 2019.<br>  - Her LinkedIn profile describes the position as being: "Accountable for global compensation (strategy, infrastructure, governance, operations, etc.) for entire company (except CEO and twelve direct reports) - 140,000 employees spanning 20+ countries. Lead team of 20+ over multiple locations. Key areas of impact: $4B+ compensation and recognition spend oversight and optimization, global compensation team transformation, increased company profitability . . . ."[61]<br>• Senior Director, Total Rewards, Global BUs and Functions, May 2016-Sept. 2017 |
| Doug Seipel | • Senior Vice President, Total Rewards, Nov. 2015-Apr. 2020<br>  - His LinkedIn profile describes the position as being: "Responsible for compensation and benefits for entire firm. Integrating Tyson and Hillshire C&B into one firm Total Rewards offering to accelerate continued transformation of Tyson."[62] |

---

[60] Here, and in the other tables of proposed custodians prepared by Plaintiffs, if a disputed custodian maintains an online LinkedIn profile that describes their relevant job duties, excerpts of that LinkedIn profile have been included the chart.

[61] *See* https://www.linkedin.com/in/mikkisud/ ("Sud LinkedIn Profile").

[62] *See* https://www.linkedin.com/in/doug-seipel-07367614/ ("Seipel LinkedIn Profile").

| NAME | TITLE AND DESCRIPTION OF DUTIES |
|------|--------------------------------|
| Donnie Smith | • CEO, Nov. 2009-Dec. 2016 |
| Thomas P. Hayes | • CEO, Dec. 2016-Nov. 2018<br>• President, June 2016-Dec. 2016 |
| Stewart F. Glendinning | • CFO and Executive Vice President, Dec. 2017-Present |
| Dennis Leatherby | • CFO, 2008-Feb. 2018 |

Tyson argues that "Plaintiffs seek to add further high-level executive custodians based on speculation that they may have relevant materials." D.Ltr. This is incorrect.

Two of the eight proposed custodians were the most senior HR executives at Tyson and exercised substantial influence over compensation and implementation of compensation policies. Mary Oleksiuk was the head of Tyson's HR department from 2014 until 2020. Kenneth Kimbro held that same position from 2011 until 2014. Remarkably, Tyson argues these former senior HR executives "did not have personal involvement with setting compensation rates for poultry processing employees." D.Ltr. This assertion is contradicted by publicly available facts. In summarizing testimony of Kenneth Kimbro that was provided in a wage-and-hour lawsuit against Tyson, the United States District Court for the District of Nebraska wrote:

> Kenneth Kimbro is Executive Vice-President and Chief Human Resources Officer at Tyson. He is in charge of recruiting, compliance, labor relations, contract relations, benefits, training, diversity, inclusion and payroll. . . . Kimbro testified that he reports to Donny Smith, the President and Chief Executive Officer (CEO) of Tyson, and is one of five executives who directly report to the CEO. He testified he is the person responsible for company decisions on pay practices.

*Acosta v. Tyson Foods, Inc.*, No. 08CV86, 2013 WL 7849473, at *13 (D. Neb. May 31, 2013) (citations omitted), *rev'd on other grounds*, 800 F.3d 468 (8th Cir. 2015). In his deposition in that case, Mr. Kimbro said that he was responsible for "the classic HR function[s]" including "health benefits, financial benefits, salary administration and compensation." Jan. 29, 2013 Trial Tr. at 143, *Acosta v. Tyson Foods, Inc.*, No. 08-cv-86 (D. Neb. Feb. 7, 2013), ECF No. 295. Ms. Oleksiuk took over Mr. Kimbro's position when he retired and assumed his responsibilities, so she is just as worthy a custodian as he is.

Another two of the eight proposed custodians were senior HR executives whose entire positions involved addressing compensation: Mikki Sud, Tyson's former Senior Director of Global Compensation, and Doug Seipel, Tyson's former Senior Vice President of Total Rewards. In describing her responsibilities as former Senior Director of Global Compensation, Mikki Sud wrote that she was "accountable for global compensation (strategy, infrastructure, governance, operations, etc.) for entire company (except CEO and twelve direct reports) - 140,000 employees" and noted that her "key areas of impact" include "$4B+ compensation and "increased company profitability." *See supra* (Table), Sud LinkedIn Profile. Similarly, as Senior Vice President of Total

Rewards, Doug Seipel described his role at Tyson as being "responsible for compensation and benefits for entire firm." *See supra* (Table), Seipel LinkedIn Profile. When profiling Seipel, *Crain's Chicago Business* wrote, "At Tyson, Seipel is responsible for the company's compensation, benefits and recognition programs."

Two of the eight proposed custodians—Thomas Hayes and Donnie Smith—are former Tyson CEOs. That they exercised final authority over compensation is not disputed; this alone renders them material and important custodians. *See In re Apple Iphone Antitrust Litig.*, No. 11-cv-06714, 2021 WL 485709, at *3 (N.D. Cal. Jan. 26, 2021) ("The antitrust claims presented here implicate the competition the company faces and important aspects of its business model. The CEO's understanding of these subjects is almost by definition unique and non-repetitive.").

Moreover, Tyson CEOs routinely focused on and addressed labor costs, including compensation and benefits provided to Class Members. For example, during an earnings call held just days ago, Tyson CEO Donnie King said the following:

> [L]abor is our number one challenge. . . . Labor is our single biggest issue we face. Not only in Chicken, but also in our other businesses. We've increased wages and created flexible shifts, child care on-site clinics. . . . We are more inefficient than we have historically been. Certainly, a big part of what we have to solve, but essentially it takes us six days to get five days worth of work. . . .[63]

Former CEO and proposed custodian Thomas Hayes said the following during an earnings call in August 2017:

> We continually strive to improve efficiency and sustainability and stay ahead of potential labor shortages, and our automation and technology innovations are becoming increasingly important in tightening labor markets. . . . Some of the areas we've addressed include robotic loading and weighing, automating cutting, trimming, scaling and packaging, visual sorting and grading, and automatic transfers. . . . We have added a lot of our operations double-digit increases on labor costs and wages that we're paying. And we see that as something that we have to do and we're happy to do it to make sure that we have the turnover levels lower than we've had in the past, and we do.[64]

Another former CEO and proposed custodian Donnie Smith focused much of his attention on labor costs. During an interview in 2009, he said: "We had to quickly learn where our big rocks were and not focus on the pebbles in the sand. The cost structure in our chicken business really needed

---

[63] *Tyson Foods, Inc. Q3 2021 Earnings Call Tr.* (Aug. 9. 2021), https://www.fool.com/earnings/call-transcripts/2021/08/09/tyson-foods-inc-tsn-q3-2021-earnings-call-transcri/.

[64] *Tyson Foods, Inc. Q3 2017 Earnings Call Tr.* (Aug. 7, 2017), https://seekingalpha.com/article/4096005-tyson-foods-tsn-q3-2017-results-earnings-call-transcript.

to be fixed. It was labor deficiencies, line deficiencies, plant yield, plant spend, logistics and transportation efficiencies."[65]

In fact, Tyson's top human resources executive—the Chief HR Officer—reported *directly to the CEO*—not to the lower-level heads of the Poultry division, which Tyson has incorrectly argued are adequate custodians in lieu of CEOs.

Additionally, Tyson has already agreed to designate two other CEOs as custodians: Noel White, who was CEO from 2018 through 2020, and current CEO Donnie King. If CEOs who ran Tyson during the tail end of the conspiracy are appropriate and fitting custodians, then their predecessors who occupied the CEO position for nine years of the Class Period are also key custodians.

The final two of the eight executives are the current and former CFOs—Stewart Glendinning and Dennis Leatherby. They are appropriate custodians because they are responsible for analyzing Tyson's labor costs and providing input to CEOs regarding wages and benefits. The Complaint alleges that Defendants formed and implemented the conspiracy "to reduce labor costs and maximize profits," and the evaluation of both labor costs and profits are within the CFO's jurisdiction. SAC ¶ 171. For example, during an earnings call held ten days ago, CFO Glendinning said to investors:

> [Earnings-per-share] was up 61% on a year-to-date basis. We performed well despite a challenging operating environment that span tough labor availability. . . . Production inefficiencies and low labor availability resulted in total Company volumes roughly flat to the comparable period a year ago. . . . Raw material cost, logistics, ingredients, packaging and labor are all challenging our cost of production.[66]

In addition, the Complaint alleges that the Compensation Committee specifically discussed and agreed upon "bonus budgets" at WMS meetings; such budgets are evaluated by CFOs. SAC ¶ 189. Due to the relevancy of CFOs to Plaintiffs' allegation, seven of the 13 Defendant Processors have already agreed to designate their CFOs as custodians.

*Tyson Vice President of HR*

Tyson has refused to designate the following Vice President of HR Operations:

| NAME | TITLE AND DESCRIPTION OF DUTIES |
| --- | --- |
| Deanna Wiedner | • Vice President HR Operations, 2014-Present<br>• Director of HR Operations, 2009-2014 |

---

[65] Kim Souza, *Tyson Foods CEO Donnie Smith reflects on company turnaround, talks succession plans*, Talk Business & Politics (Sept. 15, 2016), https://talkbusiness.net/2016/09/tyson-foods-ceo-donnie-smith-reflects-on-company-turnaround-talks-succession-plans/.

[66] *Tyson Foods, Inc. Q3 2021 Earnings Call Tr.* (Aug. 9, 2021), https://www.fool.com/earnings/call-transcripts/2021/08/09/tyson-foods-inc-tsn-q3-2021-earnings-call-transcri/.

Tyson has not agreed to make Deanna Wiedner a custodian, despite acknowledging the key compensation-setting responsibilities of her position. In response to Plaintiffs' first interrogatory to Defendant Processors, which requested the names of requested current or former employees who "participated in analyzing, recommending, setting, modifying, and/or approving Compensation," ███████████████████████████. *See* PX006, Tyson's Resps. & Objs. to Pls.' First Set of Interrogs. at 11-13. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████████ Accordingly, Tyson has already conceded the relevance of the Vice President of HR Operations position held by Deanna Wiedner.

Tyson argues that Deanna Wiedner oversaw HR Operations in the Prepared Foods division, which Tyson claims involves plants and workers that fall outside of the case. This is incorrect. The Class is defined as: "All persons employed by Defendant Processors, their subsidiaries and/or related entities at poultry processing plants . . . ." SAC ¶ 294. The Complaint explains:

> There are two kinds of poultry processing plants. The first—slaughterhouse facilities—kill birds and convert the carcasses into raw poultry products fit for human consumption. The second—further processing facilities—convert the raw chicken and turkey into value-added forms by cutting, deboning, breading, cooking or otherwise engaging in additional processing. The Class is comprised of workers employed by Defendant Processors, their subsidiaries, and related entities in both slaughterhouse facilities and further processing facilities.

*Id.* ¶ 138. Notably, the USDA's Food Safety and Inspection Service, which conducts inspections of food processing plants, expressly designates many Prepared Foods plants operated by Tyson as "Poultry Processing" plants in their directory.[67] The Tyson workers at the plants Wiedner oversaw are in the Class, and she is a relevant custodian.

### Tyson HR Directors of Operations

Although Tyson operates *more than 75* poultry processing plants, Plaintiffs have proposed *just three* plant-level employees as custodians to minimize the burden on Tyson. This is an enormous concession. For the other Defendant Processors, Plaintiffs agreed to an average of one plant-level custodian per plant.

In their stead, Plaintiffs have modestly requested just 11 HR Directors of Operations. Each of these HR Directors of Operations are responsible for overseeing HR operations at multiple plants:

---

[67] *See Meat, Poultry and Egg Product Inspection Directory*, USDA, https://www.fsis. usda.gov/inspection/establishments/meat-poultry-and-egg-product-inspection-directory   (last visited Aug. 18, 2021)

| NAME | TITLE AND DESCRIPTION OF DUTIES |
|---|---|
| Travis Fredricksen | • Director of HR Operations, June 2018-Present<br>  - His LinkedIn profile states the following for this position: "Responsible for the HR functions at eight (8) facilities in 3 states. . . . Involved in HR decision-making and provide advice to Operations VP's regarding HR matters including company policies/procedures, compensation, benefits issues and HR administration."[68]<br>• Senior HR Operations Manager, Oct. 2017-May 2018<br>  - His LinkedIn profile states the following for this position: "Responsible for the HR functions at four (4) facilities in 3 states (GA, NC, VA)"<br>• Director of HR Operations, Oct. 2013-Sept. 2017<br>  - His LinkedIn profile states the following for this position: "Responsible for the HR functions at six (6) facilities in 3 states."<br>• Complex HR Manager, Oct. 2011-Oct. 2013<br>• HR Manager, Apr. 2001-Oct. 2011 |
| John Cebuhar | • Director of HR, Jan 1998-Aug. 2015<br>  - His LinkedIn profile states the following for this position: "Directly responsible for the overall human resource effort for 12 facilities located in 7 states with over sixty five hundred team members."[69] |
| Kurt Schrock | • Director of Prepared Foods HR, May 2017-July 2018<br>  - His LinkedIn profile states the following for this position: "I am responsible for the HR functions for . . . twelve Prepared Foods Plants across the country."[70]<br>• Director of Corporate HR, Mar. 2014-July 2018<br>• Director of HR Operations, Apr. 2001-Mar. 2014 |

---

[68] *See* https://www.linkedin.com/in/tfredricksen/ ("Fredricksen LinkedIn Profile").

[69] *See* https://www.linkedin.com/in/johncebuhar/ ("Cebuhar LinkedIn Profile").

[70] *See* https://www.linkedin.com/in/kurt-schrock-5a091044/ ("Schrock LinkedIn Profile").

| NAME | TITLE AND DESCRIPTION OF DUTIES |
|---|---|
| Robert Barragan | • Director of HR Operations, Nov. 2015-Present<br>  - His LinkedIn profile states the following for this position: "Direct the full scope of human resources functions for a business unit consisting of 13 multi-state operations and corporate personnel with over 14,000 team members. . . . Oversee the execution of the company's performance management process and compensation strategy for the business unit."[71] |
| Fred Wood | • Complex HR Manager, 2007-2010<br>• Director of HR Operations, 2010-Present |
| Lisa Barnett | • Director of HR Operations, 2014-Present |
| Gabe Kimbro | • Director of HR Operations, 2013-Present<br>• Complex HR Manager, 2010-2013<br>• Senior Employment Compliance Specialist, 2006-2010 |
| Gary Denton | • Director of HR Operations, 2014-2017<br>• Complex HR Manager, 2001-2014 |
| Eric Sorensen | • Director of HR Operations, 2015-2019 |
| Arturo Towns | • Senior Director of HR, June 2010-Dec. 2017 |
| Dale Cook | • Complex HR Manager, Aug. 2017-Aug. 2018<br>• Director of HR Operations, June 2014-Aug. 2017<br>• Complex HR Manager, Aug. 2010-June 2014<br>• HR Manager, Nov. 2007-Aug. 2010 |

HR Directors of Operations have broad and significant HR responsibilities that span multiple plants and regions, and they serve as key liaisons between the 77 poultry plants and corporate executives. For example, Robert Barragan claims that he "[d]irect[ed] the full scope of human resources functions for a business unit consisting of 13 multi-state operations"; Travis Frederickson wrote that he was "Responsible for the HR functions at eight (8) facilities in 3 states"; and John Cebuhar wrote that he was "directly responsible for the overall human resource effort for 12 facilities located in 7 states with over sixty-five hundred team members." *See supra* (Table), Barragan LinkedIn Profile, Frederickson LinkedIn Profile, Cebuhar LinkedIn Profile.

HR Directors of Operations also develop recommendations for compensation and implement compensation policies. Tyson does not dispute this. In its interrogatory response, Tyson wrote that

---

[71] *See* https://www.linkedin.com/in/robertbarragan/ ("Barragan LinkedIn Profile").

███████████████████████████████████████████████████

████████████████████████████████ PX006, Tyson's Resps. & Objs. to Pls.'
First Set of Interrogs. at 10. ███████████████████████████████████████

████     For example, Robert Barragan wrote that he "oversee[s] execution" of "compensation strategy for the business unit." *See supra* (Table), Barragan LinkedIn Profile. Similarly, Travis Fredricken wrote that he was "[i]nvolved in HR decision-making and provide[d] advice to Operations VP's regarding HR matters including company policies/procedures, compensation, benefits issues and HR administration." *See supra* (Table), Frederickson LinkedIn Profile.

These executives played key roles in the conspiracy to ensure compensation was harmonized with competitors. For example, when Tyson plant managers engaged in improper exchanges of compensation data with competing poultry plants, they often sent that data to HR Directors of Operations, who reviewed the data to make compensation recommendations to corporate executives. As another example, HR Directors of Operations often handled union negotiations, and they ensured that collective bargaining agreements contained depressed compensation schedules. *Id.* Indeed, the Complaint specifically alleges that Defendant Processors used Agri Stats figures to set compensation rates during collective bargaining negotiations. SAC ¶¶ 214-15.

Notably, Tyson does not object to designating HR Directors of Operations on the basis of relevance. It merely argues that they are duplicative because Tyson has agreed to two of their bosses—Hector Gonzalez and Dan Serrano. Yet, the HR Directors of Operations have unique personal knowledge and experiences that their bosses do not have. They, for example, implemented compensation and recruiting policies at particular plants—not their bosses. They communicated on a day-to-day basis directly with, and received competitors compensation data directly from, HR plant managers—not their bosses. They engaged in particular collective bargaining negotiations with local unions—not their bosses. They conducted their own separate analyses of compensation data, as well as made their own recommendations regarding compensation schedules, that are distinct from any analysis or recommendations their bosses made. *See supra* (Table), Barragan LinkedIn Profile, Frederickson LinkedIn Profile, Cebuhar LinkedIn Profile.

The 11 proposed HR Directors of Operations are also distinct from each other. They either oversaw different poultry processing plants in different regions, or they covered overlapping plants at entirely different time periods during the Relevant Time Period.

Tyson specifically objects to Gabe Kimbro as a custodian because his position was an HR Director in Tyson's Prepared Foods segment. Yet, as discussed above, employees in plants in that segment are part of the Class. SAC ¶ 294. Additionally, prior to becoming an HR Director, Gabe Kimbro was a complex HR manager at a Tyson poultry complex, where he was the top HR manager overseeing a chicken processing plant.

Tyson also specifically objects to Robert Barragan as a custodian because he became an HR Director in the Poultry segment in August 2019, just weeks before the Complaint was filed. Yet according to Tyson, for four years prior to assuming that position, Mr. Barragan was the HR Director of Operations in the Specialty Products segment, which produces a wide range of poultry

products. In other words, he oversaw a range of poultry processing plants across multiple states during the Class Period.

Finally, Tyson specifically objects to the designation of Arturo Towns as a custodian because Tyson claims his focus was on training. Yet, he was training Class Members, and documents about that training process are highly relevant to Plaintiffs' claims. For example, documents concerning the types of skills Tyson provided to and expected from poultry processing employees would help Plaintiffs define the relevant labor market for their rule of reason claim. Such documents would reflect evidence of a "unique poultry skillset" that is not easily transferred to another line of work, as Plaintiffs have alleged. *Jien*, 2020 WL 5544183, at *11; *see also* SAC ¶ 253 (alleging that poultry workers have "industry . . . specific skills" and that "unskilled and low-skilled jobs are not reasonable economic substitutes for employment in the Relevant Market").

In sum, HR Directors of Operations were materially involved in recommending and implementing compensation policies and schedules as well as hiring and recruiting Class Members. Accordingly, the Court should order Tyson to designate the 11 proposed HR Directors of Operations as custodians—especially in light of Plaintiffs' willingness to relinquish so many plant-level custodians. The 11 proposed HR Directors of Compensation constitute efficient custodian proxies for HR managers at 77 plants, and designating those HR Directors as custodians in lieu of plant HR managers greatly minimizes the burden on Tyson.

*Tyson Compensation Analysts*

Tyson has refused to designate *any* of its Compensation Analysts as custodians, including the following 12 proposed by Plaintiffs:

| NAME | TITLE AND DESCRIPTION OF DUTIES |
|------|-------------------------------|
| Thomas Niles | • Senior Compensation Analyst and Manager of Compensation, May 2002-Present |
| Beckey Center | • Senior Compensation Analyst, Labor Compensation, Sept. 2016-Present<br>• HRIS/Labor Compensation Analyst, Sept. 2013-Sept. 2016<br>• Labor Compensation Specialist, 1994-Aug. 2013 |
| Tofia Tousant | • Compensation Associate, Dec. 2016-Present<br> - Her LinkedIn profile describes the position as follows: "Consult, implement and administer compensation programs, and practices for salary, management support and hourly related jobs. . . . Serve as subject-matter expert on compensation related issues and provides consultative guidance and support to HR Business Partners and various levels of management on compensation philosophies, increase |

| NAME | TITLE AND DESCRIPTION OF DUTIES |
|---|---|
|  | recommendations, pay structures, job analysis and market pricing."[72] <br> • Labor Compensation Analyst, 2013-Dec. 2016 <br>   - Her LinkedIn profile describes the position as follows: "Responsible for Labor Compensation practices and methodology while maintaining system integrity through various mass data audits and statistical reports." <br> • HRIS/Labor Compensation Specialist/Rep, 2003-2013 |
| Stephen Jones | • Compensation Analyst, Apr. 2016-Mar. 2018 <br>   - His LinkedIn profile describes the position as entailing: "• Implement compensation programs for both hourly and management positions <br> • Provide guidance to management and HR business partners <br> • Create efficient pay structures and knowledgeable job analysis"[73] <br> • HR Supervisor, Mar. 2013-Apr. 2016 |
| Anne Capdeville | • Senior HR Analyst, June 2018-Dec. 2020 <br> • Senior Compensation Analyst, Jan. 2015-June 2018 <br> • Compensation Analyst, Feb. 2013-Jan. 2015 |
| Cathie Vasiliou | • Compensation Analyst, Feb. 2014-Present <br>   - Her LinkedIn profile describes the position as entailing: "Complete Compensation market survey requests by third party consultants . . . . Compile market data to provide competitive pay grades and ranges . . . . Prepare various wage and salary reports"[74] <br> • Associate Compensation Analyst, July 2011-Feb. 2014 <br> • Compensation Coordinator, July 2007-July 2011 <br>   - Her LinkedIn profile describes the position as entailing: "Assist Vice President of Compensation with all aspects of the department . . . . Analyze and complete salary surveys for Tyson Benchmark positions" |
| Stephen King | • Director of Training & Development - Poultry, Apr. 2018-Present <br> • Complex HR Manager, July 2017-Apr. 2018 <br> • Training and Development Manager, Nov. 2015-July 2017 <br> • Senior Compensation Analyst, Nov. 2014-Nov. 2015 |

---

[72] *See* https://www.linkedin.com/in/tofia-tousant-30120271/ ("Tousant LinkedIn Profile").

[73] *See* https://www.linkedin.com/in/stephen-jones-mba-b4909a156/ ("Jones LinkedIn Profile").

[74] *See* https://www.linkedin.com/in/cathie-snipan-750a3a1/ ("Vasiliou LinkedIn Profile").

| NAME | TITLE AND DESCRIPTION OF DUTIES |
|---|---|
| | - His LinkedIn profile describes the position as entailing: "Analyzed data for 40,000+ job positions to ensure company stayed competitive in salaries and employee benefits. Benchmarked jobs against survey data and other market intelligence to determine competitive compensation ranges for each position."[75] |
| Heather Spencer | • Complex HR Manager, Mar. 2019-Present<br>• Plant HR Manager, Oct. 2017-Feb. 2019<br>• Senior Compensation Analyst - Labor Compensation, June 2014-Mar. 2017<br>  - Her LinkedIn profile describes the position as entailing: "Subject Matter Expert for Piece Rate and Incentives for our hourly Team Members across the country . . . . Salary survey participation and analysis . . . . Provide market data wage analysis to HR Directors on request Management and analysis of HR Survey used to gather pay rules from locations"[76] |
| Roger Penny Moore | • Compensation Manager, June 2018-Apr. 2019<br>• Senior Compensation Consultant, Jan. 2016-June 2018<br>• HR Business Partner, Dec. 2014-Jan. 2016<br>• Compensation Analyst, Mar. 2009-Dec. 2014 |
| Agnes Kumwenda | • Senior Compensation Analyst, Mar. 2015-Present<br>• Labor Compensation Analyst, Sept. 2013-Present<br>• Labor Compensation Specialist, Oct. 2012-Aug. 2013<br>• HR Specialist, Mar. 2010-Sept. 2012 |
| Cody Standridge | • Senior Training Manager, Feb. 2016-Dec. 2018<br>• Labor Compensation Analyst, Feb. 2015-Dec. 2018 |
| Gregory Lopez | • Compensation Specialist, Mar. 2016-Present<br>  - His LinkedIn profile describes the position as entailing: "Conducting market and trend analyses through wage survey input and market intelligence/research on an ad hoc and annual basis. . . . Examining compensation practices, compiling statistical data, analyzing data, and conducting other data audits."[77] |

---

[75] *See* https://www.linkedin.com/in/stephen-king-mba-65ab6361/ ("King LinkedIn Profile").

[76] *See* https://www.linkedin.com/in/heather-spencer-b6796b34/ ("Spencer LinkedIn Profile").

[77] *See* https://www.linkedin.com/in/gregory-lopez-ba1aa721/ ("Lopez LinkedIn Profile").

As evident from their titles, Compensation Analysts had key input into compensation for Class Members. Tyson's response to Interrogatory 1 states that ██████████████████████████████████████████████████████ ██████████████████████████████ PX006, Tyson's Resps. & Objs. to Pls.' First Set of Interrogs. at 10. Compensation Analysts used competitive intelligence, Agri Stats, and WMS surveys to make recommendations about and help set Tyson's wages and benefits. In fact, the Complaint expressly alleges (and other Defendant Processors have conceded) that "Compensation Analysts" often attended conspiratorial WMS meetings where compensation was fixed. *See* SAC ¶ 174.

The proposed Compensation Analysts' own descriptions of their job duties confirm their importance to this case. For example, Cathie Vasiliou said she completed "[c]ompensation market survey requests by third party consultants" and "[a]nalyze[d] and complete[d] salary surveys for Tyson Benchmark positions." *See supra* (Table), Vasiliou LinkedIn Profile. Gregory Lopez conducted "market and trend analyses through wage survey input and market intelligence/research on an ad hoc and annual basis." *See supra* (Table), Lopez LinkedIn Profile. Tofia Tousant served as a "subject-matter expert on compensation related issues" and provided "consultative guidance and support to HR Business Partners and various levels of management on compensation philosophies, increase recommendations, pay structures, job analysis and market pricing." *See supra* (Table), Tousant LinkedIn Profile. Stephen Jones "implement[ed] compensation programs for both hourly and management positions" and "create[d] efficient pay structures and knowledgeable job analysis." *See supra* (Table), Jones LinkedIn Profile.

The relevance of these Compensation Analysts cannot be understated. The lifeblood of the alleged conspiracy was the exchange, comparison, and harmonization of compensation data. Compensation Analysts who participated in or facilitated these key tasks have important insight into the way Defendants reached and implemented their anticompetitive agreement.

Tyson makes two broad arguments against the 12 proposed Compensation Analysts. First, Tyson argues that it has already agreed to custodians from the Compensation division "who attended WMS meetings on behalf of Tyson." D.Ltr. But that leaves out Compensation Analysts who analyzed competitor data—including data obtained from WMS, Agri Stats, or directly from rival poultry plants—and recommended wages based on that data. Tyson cannot offer witnesses to just one component of the multi-faceted conspiracy.

Second, Tyson argues that the proposed Compensation Analysts "either 1) held a role that was not substantially involved with the setting of compensation for poultry processing plant employees during the Class Period, or 2) reported to already agreed-upon custodians Linda Wray, Dominica Fleming, Charla Hendrix, Susan Jones, and Elizabeth Farmer, and is therefore duplicative." D.Ltr. Thus, any Compensation Analyst who reported to their boss is disqualified from being a custodian—even if they played a central role in determining compensation. As discussed above, *supra* § IV.A.C, no law forces Plaintiffs to choose between discovery from senior executives with decision-making authority and discovery from individuals carrying out those decisions. Considering the unique role that Compensation Analysts play in analyzing competitor data to recommend compensation schedules, they will possess unique, non-duplicative documents.

Tyson specifically objects to four Compensation Analysts—Stephen King, Heather Spencer, Agnes Kumwenda, and Cody Standridge—on the grounds that they were "primarily responsible for implementing and managing systems for attendance, time cards, and database pay adjustments." D.Ltr. "Primarily" does not mean exclusively. And these analysts' own job descriptions on LinkedIn suggest they performed tasks related to the conspiracy. King wrote that his work as a Compensation Analyst involved "[b]enchmark[ing] jobs against survey data and other market intelligence to determine competitive compensation ranges for each position." *See supra* (Table), King LinkedIn Profile. Spencer wrote that her Compensation Analyst position involved "[s]alary survey participation and analysis" and providing "market data wage analysis to HR Directors on request." *See supra* (Table), Spencer LinkedIn Profile. In light of the role WMS surveys and Agri Stats data played in the conspiracy, these job duties render both worthy custodian.

The LinkedIn profiles of Kumwenda and Standridge contain no descriptions of their duties. But both of them were "Labor" Compensation Analysts, which indicates their duties specifically involved analyzing compensation provided to Class Members. Both also held their positions for multiple years during the heart of the Class Period; Kumwenda has been a Compensation Analyst for the past eight years and Standridge served as a Labor Compensation Analyst for nearly four years. Kumwenda serves as a "Senior" Compensation Analyst, indicating that she plays a particularly prominent role.

*Tyson Benefits Specialist*

Tyson has refused to designate the following benefits specialist as a custodian:

| NAME | TITLE AND DESCRIPTION OF DUTIES |
|---|---|
| Kelle Christian (formerly Langston) | • Director, Financial Benefits, 1990-Present |

As Tyson stated in its interrogatory responses, ███████████████████████████ ████████████████████████████████████████████████ PX006, Tyson's Resps. & Objs. to Pls.' First Set of Interrogs. at 10. ███████████████████, proposed custodian Kelle Christian, has served as Director of Financial Benefits for 31 years.

Christian should be designated as a custodian because fixing and depressing benefits was a key component of the conspiracy. The Complaint details how annual WMS compensation surveys "provided exhaustive data" about benefits. *See* SAC ¶¶ 180, 185. WMS surveys specifically addressed financial benefits, including "(1) the value of contributions made to pension plans; (2) the amount of life insurance coverage; (3) the amount of insurance coverage for accidental death and dismemberment; (4) the amount of coverage for long-term disability insurance; (5) the amount and duration of short-term disability insurance." *Id.* ¶ 185. Such competitively-sensitive financial benefits data was exchanged between Defendant Processors and discussed at conspiratorial WMS meetings. Accordingly, Christian should be a custodian.

*Tyson Plant-Level Custodians*

Tyson has refused to designate the following three plant-level employees as custodians:

| NAME | TITLE AND DESCRIPTION OF DUTIES |
|------|--------------------------------|
| Gregory Winston | <ul><li>Complex HR Manager, Mar. 2010-Oct. 2015</li><li>Plant HR Manager, Jan. 2007-Mar. 2010<ul><li>His LinkedIn profile states the following for this position: "Responsible for performing a variety of administrative, technical and professional work in administering and managing plant personnel functions including compensation, recruitment, selection, labor relation . . . ."[78]</li></ul></li></ul> |
| Kent Massey | <ul><li>Plant Manager, Sept. 2010-Dec. 2012</li></ul> |
| Misti Lance | <ul><li>HR Specialist, Apr. 2015-Apr. 2016</li><li>Benefits Counselor</li></ul> |

To lessen Tyson's burden, Plaintiffs have not proposed plant-level custodians for the vast majority of Tyson's 77 plants. ██████████████████████████████████████████████████████ . *See* PX007, PWPLTFS0000000302.

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
█████████████████████████████████████████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████████████████████████████ .

**<u>Keystone</u>**

<u>Keystone Agreed-Upon Custodians</u>: Bill Griffith, Karen Mooney, Don Wisdom, Shannon Morgan, Laurel Moulden, and Jamison Smith.

Tyson acquired Keystone in 2018. Prior to the acquisition, Keystone fully participated in each of the prongs of the conspiracy—i.e., it attended WMS meetings where compensation was fixed, obtained Agri Stats reports detailing compensation, and conducted plant-to-plant communications.

---

[78] *See* https://www.linkedin.com/in/gregory-winston-b585562b/ ("Winston LinkedIn Profile").

Keystone—now a subsidiary of Tyson and represented by Tyson's counsel—has only agreed to six custodians. This is a strikingly low number, especially considering that several Defendant Processors with fewer employees and fewer poultry plants have already agreed to more than twice as many custodians.

Keystone Disputed Custodians:

As a result of Tyson's acquisition, Keystone has only retained the documents of a handful of the custodians proposed by Plaintiffs. Neither Tyson nor Keystone claim to have documents for the vast majority of the Keystone custodians sought by Plaintiffs, including Sofia Forgione (Keystone's former Compensation Manager), Stacey Wilkinson (Keystone's former Senior Compensation Analyst), Erica Collins (Keystone's former Senior Benefits Specialist), and Sarah Hendricks (Keystone's former Vice-President of HR). All four of these individuals attended conspiratorial WMS meetings—but none of them can be named as custodians because none of their documents exist.

For that reason, Plaintiffs are only requesting seven additional Keystone custodians, which would bring the total to just 13. In light of the absence of documents associated with other key former employees, Plaintiffs believe these custodians are of particular importance.

The seven disputed custodians fall into two categories: (1) corporate-level custodians and (2) plant-level custodians.

*Keystone Corporate-Level Custodians*

Keystone has refused to designate the following two corporate-level former employees as custodians:

| NAME | TITLE AND DESCRIPTION OF DUTIES |
|------|--------------------------------|
| HJ Ingram | • Director, HR Business Partner & Talent, Feb. 2018-Oct. 2020 |
| Don McFarland | • Director of Further Processing, Mar. 2015-Dec. 2020 |

Because Keystone has not retained documents from most of its human resources department, obtaining documents from these two senior executives is especially important for Plaintiffs. As HR executives, their files may be the only files that reflect communications with other Keystone employees concerning the conspiratorial WMS meetings.

As a former Director of HR in charge of recruitment, HJ Ingram will likely have unique, non-duplicative documents that address Keystone's recruiting and compensation strategies, including the hiring and recruiting of Class Members. Her communications regarding hiring and recruiting likely included comments regarding both sought-after skills that are relevant to Plaintiffs' market definition and optimal compensation schedules to secure adequate employees.

The other proposed corporate-level custodian—Don McFarland—oversaw operations at Keystone's further processing plants and thus will likely have documents addressing compensation and recruiting at those plants. His documents will shed light on how Keystone implemented compensation strategies at its further processing plants and reduced labor competition with rival poultry plants in accordance with the conspiracy.

*Keystone Plant-Level Custodians*

Keystone has refused to designate the following five plant-level former employees as custodians:

| NAME | TITLE AND DESCRIPTION OF DUTIES |
|---|---|
| Clay Banks | • Complex General Manager, May 2002-Present |
| Wanda Moody | • Complex HR Manager, 2012-Present |
| Greg Claborn | • Complex HR Manager, Apr. 2004-Present |
| Michael Wilkerson | • Complex HR Manager, Apr. 2018-Present |
| Tim Esslinger | • Director-Fresh Operations, Feb. 2017-Mar. 2017<br>• Complex GM, Nov. 2007-May 2015 |

Like Tyson, Keystone improperly refuses to identify any of its plant-level employees as custodians. Keystone argues that Plaintiffs are not entitled to this discovery because they did not *specifically* allege that Keystone engaged in plant-to-plant communications. But Plaintiffs have alleged that Defendant Processors engaged in plant-to-plant communications in furtherance of the conspiracy. SAC ¶ 225 ("the individual plants owned and operated by the Defendant Processors, their subsidiaries, and related entities often engaged in bilateral exchanges of compensation information with competing poultry processing plants in the same region"). In any event, a former Keystone employee referenced in the Complaint conceded that communications between rival plants regarding compensation were widespread. Specifically, the former Keystone employee said that human resources staff at poultry processing plants would often contact their counterparts at competitor plants and exchange information about starting pay rates, pay increases, and employment benefits, noting that this "type of thing happened all the time." *Id.* ¶ 227.[79]

Keystone operated five poultry processing plants during the Class Period. The five proposed custodians served as managers at most of those plants during the Relevant Period. As a result, each likely possesses unique, non-duplicative documents that show how Keystone's compensation strategy was implemented and whether the plants exchanged wage and benefits information with competitors. Accordingly, the Court should order that they be designated as custodians.

---

[79] The Complaint notes that the person who made these statements is a former employee of Peco. He is also a former employee of Keystone.

## b) *DEFENDANTS' POSITION*:

Tyson and Keystone object to the designation of thirty-six additional custodians for Tyson and seven additional custodians for Keystone proposed by Plaintiffs because the employees sought as custodians are not relevant to the claims and defenses in this case, and/or are not proportionate to the needs of a case where Plaintiffs have alleged a centralized compensation structure managed by only a few corporate individuals at each Defendant.

As an initial matter, Plaintiffs accuse Tyson and Keystone of refusing to engage in meaningful discussions regarding custodian. Tyson and Keystone have engaged in multiple meet and confer sessions with Plaintiffs to attempt to reach a reasonable compromise. Plaintiffs began their negotiations by requesting 180 Tyson and Keystone custodians in addition to the custodians proposed by Tyson and Keystone, and have refused to accept Tyson and Keystone's reasonable compromises. Tyson and Keystone informed the Plaintiffs that they were willing to agree to additional custodians in the HR Operations, Compensation, and Benefits functions if they would agree to withdraw their requests for irrelevant executives and other employees for which Tyson and Keystone have principled objections. Plaintiffs have refused to any compromises to reduce their request for an additional thirty-six custodians.  Tyson and Keystone do not seek some "midpoint" number of custodians, but instead argue for a principled approach in which only employees who are likely to have relevant and responsive documents are selected as custodians, as opposed to selection by speculation.

In arguing for additional Tyson custodians, Plaintiffs contend that the number of custodians for each Defendant should somehow be proportional to the Defendants' number of plants or employees, but this position is nonsensical in the context of a centralized wage-fixing conspiracy, as Plaintiffs have alleged here.  Plaintiffs pled that compensation decisions "were made by and exclusively at each Defendants Processors' corporate headquarters"; they allege that "local plant managers sometimes made recommendations" but that compensation was "ultimately determined and approved by senior executives." SAC ¶ 154.  Tyson has accordingly agreed to custodians who had the authority to approve compensation rates for poultry processing plant employees. Plaintiffs offer no justification as to why such an employee-to-custodian ratio is warranted or even makes sense.

Plaintiffs similarly argue that Tyson should designate more custodians because they had more custodians in the *Broilers* litigation.  The *Broilers* litigation involved different allegations and different custodians, and has no bearing on the appropriate number of custodians here.

The principles set forth in *In re EpiPen* regarding the designation of custodians have been found persuasive in other Fourth Circuit courts and are instructive here.  *See In re EpiPen,* 2018 WL 1440923, at *2.  First, determining relevant and proportionate document custodians is a highly fact-specific inquiry.  *Id*.  Second, absent agreement among the parties, the party responding to document requests may identify custodians most likely to possess responsive documents and information.  *Id*.  Third, unless the responding party's choice is "manifestly unreasonable or the requesting party demonstrates that the resulting production is deficient," the Court should not dictate the designation of ESI custodians.  *Id*.  Fourth, the party seeking production has the initial threshold burden of showing that the disputed custodians are likely to have information relevant to the claims or defenses because "the party responding to discovery requests is typically in the best position to know and identify those individuals within its organization likely to have information relevant to the case."  *Id*.  Fifth, "mere speculation that one's position as a senior

executive might increase the relevance of that individual's files is not a basis for designating that individual as a custodian." *Id.*

a. *Tyson Custodians*

In their Rule 26 disclosures, Tyson proposed five custodians who were employed in Compensation, Human Resources Operations, and Benefits positions, all of whom were employed by Tyson for the entire Class Period.  Plaintiffs agreed to these custodians in their June 18, 2021 letter, but went on to propose an additional 110 current and former employees as Tyson custodians without any explanation as to why such an expansive and overbroad list is justified.  The parties reached agreement as to fifteen Tyson custodians, but reached impasse on an additional thirty-six custodians sought by Plaintiffs.

Tyson's agreed-to custodians include:

1.  Three senior Human Resources Operations employees who had responsibilities related to developing recommendations regarding compensation and negotiating compensation with unions for the full Class Period.  As discussed below, these two custodians sat at the top of the Human Resources Operations organization for hourly and salaried poultry plants workers.

2.  Five senior Compensation employees who had responsibilities related to the analysis of poultry processing plant employee compensation for the full Class Period.  These custodians had responsibilities related to the participation in and analysis of compensation benchmarking surveys, and some attended WMS survey meetings related to the compensation of poultry processing plant employees.

3.  Three senior Benefits employees who had responsibilities related to the analysis, recommendation, and approval of non-wage compensation for the full Class Period.

4.  Four senior executives who had responsibilities related to approving compensation for poultry processing plant employees for the full Class Period. As discussed below, these senior executive custodians held the highest position in the Poultry business segment during the Class Period.

As reflected in Tyson's Responses and Objections to Plaintiffs' First Set of Interrogatories, these custodians include the primary individuals involved in analyzing, recommending, negotiating and approving compensation with putative class members and the unions that the putative class members are part of.  *See* Exhibit PX006 at 10.  Tyson's Interrogatory Responses are consistent with this Court's Order holding that Plaintiffs have alleged that compensation was set in a centralized manner.  *See* Mem. Op. at 10, ECF No. 378 (dismissing Tyson affiliates for lack of allegations linking them to the conspiracy).

Thus, Tyson's agreed-to custodians include the individuals most relevant to the claims and defenses in this case.

Moreover, each of Tyson's agreed-to-custodians has significant experience and familiarity with Tyson's business.  Indeed, the shortest-tenured custodian has been employed by Tyson for 16 years and, combined, Tyson's agreed-to custodians have over 300 years of employment with Tyson.  Further, Tyson has agreed to all custodians who, based on investigation to date, attended

WMS survey meetings related to the compensation of hourly and salaried workers at poultry processing plants. *See* Exhibit PX006 at 14. Tyson has thus identified and agreed to those custodians who are likely to have the most relevant and responsive documents and information. *See In re EpiPen*, 2018 WL 1440923, at *2.[80]

### i.    Additional Senior Executive Custodians

Tyson has agreed to designate as custodians four senior executives who had decision-making authority over the compensation of poultry processing plant employees: Donnie King (former Senior Group VP, Poultry and Prepared Foods) and Noel White (former President, Poultry), both of whom have also served as CEOs of Tyson, and Doug Ramsey (former Group President, Poultry) and Chad Martin (former Group President, Poultry). As the most senior executive in Tyson's Poultry business segment in his respective position, each of these executives had decision-making authority to set compensation for employees at poultry processing plants during the Class Period.

Despite Tyson's agreement to designate as custodians the senior executives who have the most relevance to the claims and defenses in this case, Plaintiffs seek to add further high-level executive custodians based on speculation that they may have relevant materials, and because they had had responsibilities related to high-level, enterprise-wide issues such as labor costs. Courts have rejected similar attempts to list a high-level executive as custodians because the executive held a senior positions and the requesting party speculates that they may have relevant documents. *See Mortg. Resol. Servicing, LLC v. JPMorgan Chase Bank, N.A.*, No. 15CIV0293LTSJCF, 2017 WL 2305398, at *3 (S.D.N.Y. May 18, 2017) ("[S]peculation that his position as a senior executive might increase the relevance of his files is not a basis for designating him as a custodian" [because] it is equally plausible to assume that because of his senior position, he would have less information about specific transactions than employees lower in the hierarchy."); *Lutzeier v. Citigroup Inc.*, No. 4:14-CV-00183-RLW, 2015 WL 430196, at *7 (E.D. Mo. Feb. 2, 2015) ("At this stage of the litigation, Plaintiff has not satisfied his burden to show that these high level executives have unique or personal knowledge of the subject matter that warrants their information.").

Plaintiffs' proposed additional custodians are:

- Stewart Glendinning and Dennis Leatherby, a current and former Chief Financial Officer, respectively.

Neither Mr. Glendinning nor Mr. Leatherby have had responsibilities related to the setting of compensation for poultry processing plant employees, and therefore are not relevant to the claims and defenses in this case. Plaintiffs' claims that CFOs should be designated as custodians simply

---

[80]    Plaintiffs argue that because Tyson is the largest defendant it should have a disproportionately larger number of custodians. This is incorrect for at least two reasons. First, the Complaint alleges that compensation-related activities are conducted at each Defendant in a centralized manner. SAC ¶ 154. That Tyson's corporate family may therefore have more processing plants is irrelevant to Plaintiffs' theory of this case. Second, as described herein, Tyson has agreed to custodians that are the most involved in the core allegations in Plaintiffs' Complaint (e.g., the WMS survey and related meetings), and there is no basis to compare Tyson's total number of custodians to any other Defendant's custodian total when Tyson has already agreed to the core custodians relevant to the Plaintiffs' claims.

because they held this title and because CFOs typically have responsibilities related to enterprise-wide labor costs are too speculative to warrant their designation as custodians. *See In re EpiPen*, 2018 WL 1440923, at *2; *Mortg. Resol. Servicing LLC v. JPMorgan Chase Bank N.A.*, No. 15 Civ. 0293 (LTS) (JCF), 2017 WL 2305398, at *3 (S.D.N.Y May 18, 2017) (finding that the requesting party must show that the executive sought is likely to have had substantive responsibilities relevant to the claims in the case).

- Donnie Smith and Thomas Hayes, both former Chief Executive Officer.

As former CEOs, Mr. Smith and Mr. Hayes had enterprise-wide responsibilities, but had no personal involvement with setting compensation rates for poultry processing plant workers, as this role was delegated to the head of the Poultry business segment. Because Tyson has already agreed to designate as custodians the head of the Poultry business segment during the Class Period, the designation of former CEOs is totally unjustified and without merit. Moreover, two of these agreed-upon custodians (Noel White and Donnie King) have also held the role of CEO, meaning that Plaintiffs will have an opportunity to obtain discovery related to the CEO's role in compensation-setting. To be clear, Tyson did not agree to these custodians because they held the role of CEO; Tyson designated Mr. White and Mr. King as custodians because they held the most senior role in the Poultry business segment. The automatic designation of additional CEO custodians on the sole basis of their position is therefore unjustified.

- Kenneth Kimbro and Mary Oleksiuk, both former Chief Human Resource Officers.

Similar to the CFO and CEO roles, the Chief Human Resource Officer position within Tyson's organization is an enterprise-wide role that encompasses responsibility for many non-compensation functions such as training, diversity and performance, strategy and branding, and HR data systems, as well as internal enabling functions. Moreover, CHROs did not have personal involvement with setting compensation rates for poultry processing employees. Tyson has already agreed to designate employees below the CHROs in the organizational chain that did have substantive responsibilities for analyzing and setting compensation for poultry processing employees. For example, Mary Oleksiuk's direct reports in 2014 included Linda Wray (then-Vice President, Compensation/HRIS/Labor Compensation), whose direct reports included custodian Charla Hendrix (then-Director, Compensation Rewards & Recognition) and Dominica Fleming (then-Director, Labor Compensation)—both of whom have been agreed to as custodians. The designation of CHROs as custodians is therefore unlikely to lead to relevant and non-duplicative information. *See Sugg v. Virtusa*, No. 18-8036, 2020 WL 6585872, at *2 (D.N.J. Nov. 10, 2020) (declining to compel the president and CEO as ESI custodians where defendant already designated the top employees and their direct reports in each of the departments with the most relevant knowledge about the issues in the case).

- Doug Seipel, former Senior Vice President of Total Rewards, and Mikki Sud, Senior Director of Global Compensation, Total Rewards.

Mr. Seipel and Ms. Sud are also inappropriate custodians as senior executives with no responsibility for setting compensation rates for poultry processing plant employees. Mr. Seipel and Ms. Sud were senior executives in Tyson's Total Rewards Consulting department, which was responsible for enterprise-wide consulting and support for other business segments. Plaintiffs cite to generic statements on Mr. Seipel and Ms. Sud's LinkedIn profiles to warrant their inclusion as

custodians, and Tyson does not contend that they had no role in "compensation" as a general concept, which as noted on Ms. Sud's profile, includes compensation "strategy, infrastructure, governance, operations, etc."  *See* August 8, 2021 Letter from B. Van Engelen to J. Terzaken et. al.  However, because these employees had no direct responsibility for setting wages for the class members, their remote relevance to compensation does not warrant designation as custodians. Further, Ms. Sud reported to Mr. Seipel during the Class Period, and therefore they are likely to be duplicative custodians.

ii.   Plant-Level Custodians

Tyson objects to the designation of plant-level employees on the basis of relevance because they have no decision-making authority to set compensation, and because they are duplicative of agreed-upon custodians.

Plaintiffs assert that plant-level custodians are necessary to show exchanges of compensation information with competitors, but fail to demonstrate how plant-level custodians are the most relevant and appropriate source of this purported evidence.  Plaintiffs have specifically pled that the alleged conspiratorial wages were set in a centralized manner by each Defendants' corporate headquarters.  SAC ¶ 154 ("Decisions regarding the compensation of workers at poultry processing plants owned by Defendant Processors, their subsidiaries, and related entities were made **exclusively** by and at each Defendant Processors' corporate headquarters during the Class Period.") (emphasis added).  They further allege that "[t]he information obtained from [data exchanged with competitor plants] was provided to the corporate headquarters of the respective Defendant Processors," which used the information to set wages.  *Id.* at 76.  Thus, based on Plaintiffs' own pleadings, plant-level employees who engaged in exchanges of compensation information are duplicative of the corporate-level custodians that they sent the information to. Tyson has already agreed to the relevant corporate-level custodians, making the alleged plant-level who provided information to the corporate headquarters duplicative.  *See U.S. Home Corp. v. Settlers Crossing, L.L.C.*, 2012 WL 13014153, at *4 (D. Md. Oct. 24, 2012) (denying request for custodian with "duplicative" documents).  Curiously, Plaintiffs also argue that "it is unlikely that plant managers provided corporate-level employees with the *actual* communications that were engaged with rival plant managers," suggesting that corporate-level decision-makers were not actually aware of how plant-level employees allegedly obtained information.  Without this awareness at the corporate-level, it is hard to imagine how such a conspiracy is even plausible. Thus, it is corporate-level employees who are relevant as custodians.



Finally, any argument that Tyson should agree to plant-level custodians because other Defendants have done so is unavailing. The fact that another Defendant—which has a different corporate structure and a different process for setting compensation—has agreed to designate plant-level custodians has no bearing on whether Tyson's plant-level employees are relevant.

iii.   Additional Benefits, HR Operations, and Compensation Custodians

Tyson objects to the designation of Plaintiffs' twenty-five additional requested Benefits, HR Operations, and Compensation employees as unduly burdensome and not proportional to the needs of the case. To be clear, Tyson is not asserting that all of the proposed custodians in this category have no involvement in the analyzing, recommending, approving or negotiating compensation; rather, Tyson maintains that Plaintiffs have not justified the need for twenty-five additional custodians who are duplicative of each other and of agreed-to custodians. *See Houston v. Papa John's Int'l, Inc.*, No. 3:18-CV-00825-CHB, 2020 WL 6588505, at \*2-3 (W.D. Ky. Oct. 30, 2020) (rejecting request for additional custodians where plaintiffs failed to satisfy "their initial burden of demonstrating that [the proposed custodians'] ESI files contain unique information relevant to the issues in this case"); *see also Victor Stanley, Inc. v. Creative Pipe, Inc*., 269 F.R.D. 497, 523 (D. Md. 2010) ("[A]ll permissible discovery must be measured against the yardstick of proportionality.").

iv.   Benefits

Employees in Tyson's Benefits organization have responsibilities related various financial and non-financial benefits. As to compensation, some Benefits employees have responsibilities related to the analysis, recommendation, and approval of non-wage compensation for poultry processing plant employees. *See* Exhibit PX006 at 10. Tyson has already agreed to designate Lee Kidd (Vice President, Benefits), Tina Foster (former Director, Benefits), and Kristi Jackson (Manager, Benefits, Managed Care Programs) as custodians.

Tyson objects to the designation of Kelle Christian as custodians as duplicative of already agreed-upon custodians; she reported to Lee Kidd (Vice President, Benefits), an agreed-upon custodian. Ms. Christian did not attend the WMS surveys on behalf of Tyson, and Plaintiffs have not pointed to any evidence that she was involved with the WMS survey. Plaintiffs have provided no basis to believe that Ms. Christian has relevant, non-duplicative materials in her possession.

| BENEFITS | |
|---|---|
| **Proposed Custodian** | **Positions during the Class Period** |

| Kelle Christian (Langston) | 2002-2016: Director, Financial Benefits<br>2016-Present: Director, Benefits |
|---|---|

v.    <u>HR Operations</u>

Under Tyson's Human Resources Operations structure, plant HR Managers at poultry processing plants report to corporate-level HR Directors, who in turn report to the Vice President of HR Operations.  In relation to compensation, employees in Tyson's HR Operations organization have responsibilities related to developing recommendations regarding compensation for poultry processing plant employees, and negotiating compensation with unions. *See* Exhibit PX006 at 10. Plaintiffs' arguments that HR Directors "played key roles in the conspiracy to ensure compensation was harmonized with competitors" is nothing more than baseless speculation.  Indeed, they point to no evidence supporting their claims.

Tyson has agreed to designate Hector Gonzalez and Dan Serrano, who were the Vice Presidents of HR Operations during the Class Period, and Rod Nagel, the Senior Vice President of HR Operations during the Class Period, as custodians.  Tyson objects to the designation of the twelve additional HR Operations employees proposed by Plaintiffs as cumulative, duplicative and burdensome.

Each of Plaintiffs' remaining proposed custodians held positions as HR Directors. In Tyson's organizational structure, HR Directors held roles between poultry processing plants and Hector Gonzalez and Dan Serrano, both agreed-upon custodian.  Gonzalez and Serrano reported to Rod Nagel (former Senior Vice President, HR Operations), who is also an agreed-upon custodian. Tyson objects to the designation of each of these twelve employees as a custodian, as they are duplicative of each other and of agreed-upon custodians Hector Gonzalez and Dan Serrano.

Plaintiffs argue that Deanna Wiedner, who held a peer role to Hector Gonzalez and Dan Serrano as Vice President of HR Operations, should be designated as a custodian.  But this role was over Tyson's Prepared Foods segment.  Despite raising this point to Plaintiffs and confirming that all of Plaintiffs' alleged class members would have been employees in the Poultry segment, over which Gonzalez and Serrano were Vice Presidents of HR Operations, Plaintiffs have refused to accept Tyson's representation and instead rely on third-party sources to argue for her relevance. For this reason, Wiedner's role as Vice President is not relevant to this case.  Tyson has therefore grouped Wiedner with other eleven Directors of HR Operations, as this role was actually in the Poultry segment.

Tyson specifically objects to the designation of Gabe Kimbro and Arturo Towns as custodians because their positions were not relevant to the claims and defenses in this case.  As with Ms. Wiedner's role, Kimbro's position as an HR Director was in Tyson's Prepared Foods segment, and therefore is not relevant to the claims and defenses in this case.  To the extent Plaintiffs seek his designation as a plant-level employee in his position as Complex HR Manager, Tyson objects on the basis of relevance, as explained above.  Towns's position as an HR Director was an Operations Training position. Thus neither are relevant to the claims and defenses here.

Tyson specifically objects to the designation of Robert Barragan as a custodian because the burden of collecting and reviewing his data greatly outweighs his relevance: Barragan became an HR Director in the Poultry segment on August 11, 2019, just weeks before the complaint in this case was filed.

87

| HR OPERATIONS | |
|---|---|
| **Proposed Custodian** | **Positions during the Class Period** |
| Schrock, Kurt | 2001-2014: HR Director, Poultry<br>2014-2018: HR Director, Corporate, Strategy and New Ventures, Corporate Affairs, Legal, Distribution<br>2017-2018: HR Director, Prepared Foods |
| Barragan, Robert | 2015-2016: Director, HR Operations, HR Specialty Products<br>2016-2019: Director, HR, HR Specialty Products<br>2019: Director, HR, Poultry Operations |
| Wiedner, Deanna | 2009-2014: Director, HR Operations, Poultry<br>2014-Present: VP, HR Operations, Prepared Foods |
| Wood, Fred | 2007-2010: Complex HR Manager,<br>2010-Present: Director, HR Operations |
| Kimbro, Gabe | 2006-2010: Senior Employment Compliance Specialist<br>2010-2013: Complex HR Manager<br>2013-Present: Director, HR Operations, Prepared Foods |
| Fredricksen, Travis | 2001-2011: HR Manager<br>2011-2013: Complex HR Manager<br>2013-2017: Director, HR Operations<br>2017-2018: Senior HR Operations Manager<br>2017-Present: Director, HR Operations, Poultry |
| Barnett, Lisa | 2014-Present -Director, HR Operations, Poultry |
| Denton, Gary | 2001-2014: Complex Manager, HR, Goodlettsville Plant<br>2014-2017: Director, HR Operations, Poultry<br>2017-Present: HR Specialty Production / Case Ready |
| Sorensen, Eric | 2009-2013: Manager, Talent Development<br>2013-2014: Director, Leadership & Org Development<br>2015-2016: Director, HR Operations, Prepared Foods<br>2016-2019 Director, HR Operations, Poultry |
| Cebuhar, John | 2002-2015: Dir HR Operations, Poultry |
| Towns, Arturo | 2010-2017: Senior Director HR, Operations Training |
| Cook, Dale | 2007-2010: Human Resources Manager<br>2010-2013: Complex HR Manager |

| | 2014-2017: Director, HR Operations, Poultry<br>2017-Present: Mgr HR II |
|---|---|

vi.   <u>Compensation</u>

Some Tyson employees in the Compensation organization had responsibilities related to the analysis of compensation for poultry processing plant employees. *See* Exhibit PX006 at 10. But the Compensation organization, which is now a subdivision of Total Rewards, also encompasses a wide range of other roles and activities.

Moreover, Tyson has agreed to designate as custodians the Compensation employees who attended WMS meetings on behalf of Tyson. *See id.* at 14. Thus, Tyson has already identified and agreed to designate the individuals most likely to have materials relevant to the claims and defenses in this case.

Tyson objects to the designation of the additional twelve Compensation employees proposed by Plaintiffs as cumulative, duplicative, and burdensome. Each of Plaintiffs' proposed additional Compensation custodians either 1) held a role that was not substantially involved with the setting of compensation for poultry processing plant employees during the Class Period, or 2) reported to already agreed-upon custodians Linda Wray, Dominica Fleming, Charla Hendrix, Susan Jones, and Elizabeth Farmer, and is therefore duplicative.

Tyson specifically objects to the designation of Stephen King, Agnes Kumwenda, Cody Standridge, and Heather Spencer, as custodians because their positions were not relevant to the claims and defenses in this case. King, Kumwenda, Standridge, and Spencer held the title of "Compensation Analyst," but their roles were in Time & Attendance, which is primarily responsible for implementing and managing systems for attendance, time cards, and database pay adjustments. These roles do not relate to the analysis or setting of compensation for poultry processing plant employees, and therefore are not relevant to the claims and defenses in this case.

| COMPENSATION | |
|---|---|
| **Proposed Custodian** | **Positions during the Class Period** |
| Thomas, Niles | 2002-Present: Senior Compensation Analyst |
| Capdeville, Anne | 2013-2015: Labor Compensation Analyst<br>2015-2018: Senior Compensation Analyst<br>2018-2020: Senior Analyst, HR Connect |
| Center, Beckey | 1994-2013: Labor Compensation Specialist<br>2013-2016: HR Information Systems/Labor Compensation Analyst<br>2016-Present: Senior Compensation Analyst, Labor Compensation |
| Tousant, Tofia | 2003-2013: HR Information Systems/Labor Compensation Specialist/Representative, Total Rewards<br>2013-2016: Labor Compensation Analyst, Total Rewards |

| | |
|---|---|
| | 2016-2018: Compensation Specialist, Total Rewards<br>2018-Present: Compensation Associate, Total Rewards |
| Jones, Stephen | 2005-2013: Production Supervisor<br>2013-2016: HR Supervisor<br>2016-2018: Labor Compensation Analyst |
| Kumwenda, Agnes | 2010-2012: HR Specialist<br>2012-2013: Labor Compensation Specialist<br>2013-Present: Labor Compensation Analyst, SAP and Time & Attendance |
| Vasiliou, Cathie | 2007-2011: Compensation Coordinator, Total Rewards<br>2011-2014: Associate Compensation Analyst, Total Rewards<br>2014-Present: Compensation Analyst, Compensation & Recognition |
| King, Stephen | 2014: EIM Coordinator, Prepared Foods and Distribution<br>2014-2015: Compensation Analyst/Senior Compensation Analyst, HR Enabling Functions<br>2015-2016: Training and Development Manager, Poultry<br>2017-2018: Present Complex HR Manager, Poultry Operations<br>2018-Present: Director, Training & Development, Poultry Operations |
| Spencer, Heather | 2014-2017: Senior Compensation Analyst, SAP and Time & Attendance<br>2017: Employment Manager<br>2017-2019: Plant HR Manager<br>2019-Present: Complex HR Manager |
| Moore, Roger Penny | 2009-2014: Compensation Representative, Total Rewards<br>2014: Compensation Analyst, Total Rewards<br>2014-2016: HR Generalist, HR Prepared Foods<br>2016: Compensation Specialist, Total Rewards<br>2017: Senior Compensation Specialist, Total Rewards<br>2018-Present: Compensation Manager, Total Rewards |
| Standridge, Cody | 2012: Operations Associate<br>2012: Processing Supervisor<br>2013: Transportation Supervisor<br>2014: Fleet Supervisor<br>2014: EIM Coordinator<br>2015: Labor Compensation Analyst, Time & Attendance<br>2016: Training Coordinator Manager<br>2016: Senior Specialist Training |
| Lopez, Gregory | 2018-2019: Compensation Specialist<br>2019-Present: Compensation Manager |

b.    *Keystone*

In their Rule 26 disclosures, Keystone proposed four custodians who held relevant Human Resources and Benefits positions during the Class Period.[81]  Plaintiffs responded by requesting an additional 70 custodians for Keystone.  Because Keystone has limited custodial data available, Keystone does not have custodial data for many of Plaintiffs' requested custodians.  But this does not entitle Plaintiffs to custodians who are irrelevant to the claims and defenses in this suit for the sake of meeting some arbitrary quota.  Keystone has agreed to six of the eight corporate-level custodians requested by Plaintiffs.  Keystone objects to the designation of two additional corporate-level custodians and five plant-level custodians as irrelevant.

Keystone objects to the designation of HJ Ingram and Don McFarland, two former corporate-level employees.  As the former Director of HR Business Partner & Talent, Ms. Ingram's responsibilities related to recruiting strategy, succession planning and talent development; negotiation of third party staffing contracts; hiring, training and development for multiple business segments; development and implementation of trainee programs; and efforts to update company policies and HR information systems.  Because Ms. Ingram did not have responsibilities related to setting compensation for poultry processing plant employees, her role was not relevant to the claims in this case.  Similarly, Mr. McFarland, formerly the Director of Further Processing, held an operations role that was unrelated to compensation-setting or other HR-related activities; indeed, Plaintiffs have not requested any other operations custodians.

Plaintiffs have not provided any justification for designating any plant-level Keystone employees as custodians, and there are no allegations in the SAC that Keystone engaged in any plant-to-plant communications.  Moreover, as with Tyson, Keystone plant-level employees did not have decision-making authority for compensation of poultry processing plant employees.  Plaintiffs thus have no basis to request Keystone plant-level custodians, and are not entitled to embark on a fishing expedition because they have alleged that other Defendants engaged in plant-to-plant communications. *See In re Am. Kidney Fund, Inc.*, No. TDC-17-1787, 2019 WL 1894248, at *7 (D. Md. Apr. 29, 2019) (citing Fed. R. Civ. P. 26) ("[D]iscovery is guided by relevance to the claims and defenses in the underlying litigation; it is not to be used for fishing expeditions seeking to build a fire where one claims to see smoke.").

2.  **Sanderson**

a)  *PLAINTIFFS' POSITION*:

Agreed-Upon Custodians: Joe F. Sanderson, Jr., Brian Williams, Bob Rosa, Randall Buckhaults, Delecia Clayton, Jennifer Buster, Hilary Burroughs, Brian Romano, Mike Cockrell, Linda McMinn, and Administrative Assistant for Joe F. Sanderson, Jr.

Disputed Custodians:

---

[81]    Keystone later determined that it had no available custodial data for two of these individuals.

Considering the size of Sanderson's poultry processing workforce at its 13 plants, Plaintiffs' proposal of just 21 total Sanderson custodians is very modest. Sanderson has more plants and employs more Class Members than nine of the other Defendant Processors. Smaller Defendants have agreed to larger custodian lists, including Wayne (10 plants, 26 custodians) and Koch (12 plants, 24 custodians). Each of the 21 individuals Plaintiffs have proposed as custodians are highly likely to have key information about alleged conspiracy.

The disputed Sanderson custodians fall into one of two categories: (1) corporate-level employees and (2) plant-level employees.

_Corporate-Level Custodians_

Sanderson has refused to designate the following two corporate-level employees as custodians:

| NAME | TITLE AND DESCRIPTION OF DUTIES |
|---|---|
| Lampkin Butts | • President and COO, 2004-Present |
| Brenda Gatlin | • Senior Human Resources Coordinator, Human Resources Coordinator beginning in 2009 |

The titles of these two proposed custodians alone make clear that they are worthy custodians. Lampkin Butts has served as both President and COO of Sanderson for the past 17 years. The entire HR division reports to him (via the Director of Administration), as do the Directors of Production and Processing, who oversee the poultry plants. It is clear that, as both President and COO, Butts has exerted substantial influence over compensation and recruiting at Sanderson.[82] For example, in a June 3, 2019 press release issued by Sanderson, Butts said, "Sanderson Farms has always taken pride in employing the best people the workforce has to offer. We recognize that if we are to continue competing for and retaining these exceptional people, our compensation package must also be among the best available."[83]

Moreover, the Complaint specifically alleges that "[i]n April 2013, the CEO of Pilgrim's, Bill Lovette; the Chairman of the Board of Perdue Farms, Jim Perdue; and _the President of Sanderson Farms, Lampkin Butts_, attended a 'Chicken Media Summit' in North Carolina that included visits by attendees to a local Sanderson Farms poultry processing plant. . . . Upon information and belief, these and other plant tours included discussion of labor practices." SAC ¶ 234 (emphasis added). Butts is the only Sanderson employee with information about that particular conspiratorial meeting.

---

[82] In fact, Plaintiffs informed Sanderson that they would consider withdrawing Lampkin Butts as a custodian if Sanderson would represent that he does not play a role in setting poultry processing compensation, but Sanderson was unwilling to make that representation.

[83] _See Sanderson Farms Increases Pay Rates for Hourly Employees_, Sanderson Farms (June 3, 2019), https://sandersonfarms.com/press-releases/sanderson-farms-increases-pay-rates-hourly-employees/.

Sanderson suggests that it should not have to produce documents from Lampkin Butts in light of the "apex doctrine." The apex doctrine, however, "has not been adopted by the Fourth Circuit." *Rosinbaum v. Flowers Foods, Inc.*, 238 F. Supp. 3d 738, 749 (E.D.N.C. 2017); *see also Blankenship v. Fox News Network, LLC*, No. 19-cv-00236, 2021 WL 2345972, at *3 n.5 (S.D.W. Va. June 8, 2021). And even in jurisdictions that have adopted the doctrine, it "typically applies only to protect senior executives from attending costly and distracting depositions rather than from merely collecting and producing documents." *Blankenship*, 2021 WL 2345972, at *3 n.5; *see also Rosinbaum*, 238 F. Supp. 3d at 749 ("In no case of which the court is aware has the apex doctrine successfully been invoked to shield an executive from a request for production of documents.").

The other disputed corporate-level custodian—Brenda Gatlin—almost certainly possesses relevant information relating to poultry processing compensation, benefits, hiring, and recruiting by virtue of her position as a "Senior Human Resources Coordinator." She supervised other Human Resource Coordinators, such as Tracy Hall, who described her duties as involving "Compensation & Benefits"[84]; none of Gatlin's employees are designated as custodians themselves. She reported directly to agreed-upon custodian Jennifer Buster, the head of Sanderson's HR division, who attended multiple WMS meetings. The Complaint expressly alleges that, following conspiratorial WMS meetings, Defendants would perform the labor-intensive task of aligning their wages with competitors' wages. *See* SAC ¶ 187. It is reasonable to expect that Buster relied on her "Senior Human Resources Coordinator" to help with this task.

Indeed, Sanderson concedes that Gatlin was involved in the "day-to-day mechanics of administering compensation and benefits." D.Ltr. Sanderson simply asserts that such mechanics are not relevant to the alleged conspiracy. To the contrary, the "mechanics" of poultry processing compensation—including the steps Defendants took to ensure poultry processing workers were compensated within specific pay bands—show how the conspiracy was implemented. In addition, details about the "mechanics" of poultry processing compensation can help Plaintiffs show the class-wide impact of Defendants' anticompetitive conduct.

Defendants argue that any relevant materials in Gatlin's possession are also within the possession of more senior Sanderson custodians. But that is not likely the case. Gatlin is unlikely to have forwarded all documents regarding the mechanics of poultry processing compensation to her superiors. And even if she had forwarded those documents, Plaintiffs cannot be sure that the documents would have been retained, given Sanderson's refusal to produce all document retention policies from the Relevant Time Period.

*Plant-Level Custodians*

Sanderson refers to plant HR managers as "Field Employee Relations Managers." Plaintiffs have proposed the inclusion of the following eight Field Employee Relations Managers as custodians:

| NAME | TITLE AND DESCRIPTION OF DUTIES |
|------|--------------------------------|
| Yesenia Coronado Luna | • Field Employee Relations Manager, Aug. 2015-Present |

---

[84] *See* https://www.linkedin.com/in/tracy-hall-b6929436/

| NAME | TITLE AND DESCRIPTION OF DUTIES |
|------|--------------------------------|
| Clelia Alejandro | • Field Employee Relations Manager, Dec. 2008-Present |
| Katie Griffith | • Field Employee Relations Manager, July 2017-Present |
| Hope Rendon | • Field Employee Relations Manager, Mar. 2014-Present |
| Shelan McCullum | • Field Employee Relations Manager, Dec. 2014-Present |
| Yolanda Jackson | • Field Employee Relations Manager, 2017-Present |
| Phyllis Bogan | • Field Employee Relations Manager, Oct. 2015-Present.<br>  - Her LinkedIn profile states the following for this position: "Responsible for developing, implementing and coordinating policies and programs covering: recruiting employee relations, training, benefits administration, wage and salary administration, safety and health and community relations"[85] |
| Kimberly White | • Field Employee Relations Manager, Nov. 2015-Present |

Sanderson does not dispute the relevance of plant-level custodians. To the contrary, Sanderson has agreed to accept any four of the above eight Field Employee Relations Managers as custodians. The only dispute involves a question of volume. Sanderson argues that four such custodians provide a sufficient sampling; Plaintiffs argue that at least eight constitutes an adequate sampling.

Dozens of Field Employee Relations Managers have been employed by Sanderson during the Class Period, as most only occupied that position at a particular plant for a portion of that period. Indeed, a cursory search of LinkedIn turns up 32 individuals who were employed as Field Employee Relations Managers at Sanderson plants during the course of the Class Period. Plaintiffs have limited their selection to a reasonable sample of Field Employee Relations Managers, designed to be the smallest collection of individuals that: (a) cover the Class Period with their tenure; and (b) cover most of Sanderson's geographic footprint.

A comparison with other Defendant Processors illustrates the reasonableness of Plaintiffs' proposal for eight plant-level custodians. Sanderson operates 13 poultry processing plants. Koch operates 12 plants and agreed to 11 plant-level custodians; CMS operates 12 plants and agreed to nine plant-level custodians; Wayne only has ten plants and agreed to eight plant-level custodians. Accordingly, the Court should order that the eight proposed Sanderson plant-level custodians should be deemed document custodians.

Sanderson contends that it should not have to produce the same sample of plant-level custodians as other Defendants because "Plaintiffs allege that [conspiratorial] plant-to-plant communications

---

[85] *See* https://www.linkedin.com/in/phyllis-bogan-09199a11/ ("Bogan LinkedIn Profile").

involved a number of other Defendants, but not Sanderson Farms." D.Ltr. Not so. Plaintiffs allege that *all* Processor Defendants participated in plant-to-plant communications (though the Complaint does not contain confidential witness statements from every Defendant's former employees). SAC ¶¶ 172, 225-34.

### b) *DEFENDANTS' POSITION*:

<u>Background</u>

In its initial disclosures, Sanderson Farms proposed eight custodians, including its CEO, Director of Processing, Director of Administration, Chief Financial Analyst, and Manager of Corporate Human Resources. *See* Sanderson Farms' Rule 26(a)(1)(A) Initial Disclosures at 3–5.

This initial proposal included the individuals believed to have primary responsibility for determining Sanderson Farms' processing plant employee compensation and benefit. For example, CEO Joe Sanderson plays a central role in determining compensation and benefits changes for Sanderson Farms' processing plant workers each year. He reaches this decision in consultation with the Sanderson Farms Executive Committee, which includes Director of Administration Brian Romano, Chief Financial Analyst Bob Rosa, and Director of Processing Brian Williams. Human Resources Manager Jennifer Buster provides compensation and benefits analysis to the Executive Committee. This initial proposal thus included the logical custodians given Plaintiffs' claims.

Plaintiffs proceeded to propose *37* additional custodians based on limited information gleaned from LinkedIn searches, including a number of "Trainees" with no responsibility for determining compensation or benefits for processing plant workers. *See* June 23, 2021 Email from A. Deich to M. Samels. After two months of good-faith negotiations, Sanderson Farms agreed to nearly double its initial proposal by adding seven additional custodians. Among others, Sanderson Farms agreed to add Mike Cockrell, Sanderson Farms' Treasurer, CFO, and Chief Legal Officer, who also serves on the Executive Committee, and Linda McMinn, a Benefits Manager in the Human Resources Department.

Plaintiffs have also argued that they need a sample of plant level employees to support their allegations that other Defendants (not Sanderson) engaged in plant-to-plant communications about compensation and benefits. SAC at ¶¶ 225–234. In an attempt at compromise, Sanderson Farms offered to allow Plaintiffs to pick four plant-level human resources managers (known as Field Employee Relations Managers, or "FERMs"), and search their emails with search terms based on the names of the alleged co-conspirators. This offer gives Plaintiffs a reasonable opportunity to investigate the validity of their "plant-to-plant communication" allegations as to Sanderson Farms.

Despite Sanderson Farms' offer of compromise, Plaintiffs insist on six more duplicative custodians who are unlikely to maintain uniquely relevant documents and information—Lampkin Butts (another member of the Executive Committee), Brenda Gatlin (another human resources administrator), and four additional FERMs. Plaintiffs cannot meet their burden to "demonstrate [that each of these additional] custodian[s] would provide 'unique relevant information not already obtained.'" *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2020 WL 3100016, at *1.

<u>Lampkin Butts</u>

Lampkin Butts is President and COO of Sanderson Farms.  He is a member of the Executive Committee, along with five other agreed-upon custodians.  The Executive Committee oversees Sanderson Farms' overall operations, including annual decisions to change processing plant worker compensation and benefit levels.  Based on Sanderson Farms' current investigations, Butts did not have specific additional job functions related to compensation and benefits for processing plant employees.

Butts's role on the Executive Committee does not justify making him a document custodian.  The agreed-upon custodians already includes five other Executive Committee members who would have received the same Executive Committee meeting preparation materials and attended the same Executive Committee meetings as Butts.  Thus, Plaintiffs cannot show "that there are unique responsive documents being missed in the current search scheme." *Fort Worth*, 297 F.R.D. at 107; *see also In re Morgan Stanley Mortgage Pass-Through Certificates Litig.*, 2013 WL 4838796, at *2 (S.D.N.Y. Sept. 11, 2013) (rejecting custodian request because "the Court cannot discern any specialized documents or information that the rejected custodians will hold that is not likely to be held by defendants' proposed (or agreed to) custodians"); *Enslin v. Coca-Cola Co.*, 2016 WL 7042206, at *3 (E.D. Pa. June 8, 2016) (denying request to add executives as custodians because the plaintiff had "not pointed to any evidence to suggest that a search of either of their ESI would produce responsive information that has not already been captured").

Sanderson Farms' reasonable investigation has not identified any compensation-and-benefits specific job functions for Butts, and Plaintiffs present no indication otherwise.  Plaintiffs' "mere suspicion" that Butts may have had responsibility for compensation and benefits issue at some point during the relevant time period "does not justify" a full-blown search and review of ten years' or more worth of documents and emails.  *MGA Ent., Inc. v. Nat'l Prod. Ltd.*, 2011 WL 4550287, at *2 (C.D. Cal. Oct. 3, 2011).

Nor does Butts's senior position make him an automatic custodian as Plaintiffs claim.  Courts regularly reject attempts to name senior executives as document custodians when the requesting party cannot "show that these high level executives have unique or personal knowledge of the subject matter that warrants their information.  *Lutzeier v. Citigroup Inc.*, 2015 WL 430196, at *6–7 (E.D. Mo. Feb. 2, 2015) (rejecting request to name CEOs of defendant and its affiliates as document custodians); *Mortg. Resol. Servicing, LLC v. JPMorgan Chase Bank, N.A.*, 2017 WL 2305398, at *3 (S.D.N.Y. May 18, 2017) ("[S]peculation that his position as a senior executive might increase the relevance of his files is not a basis for designating him as a custodian.").  Furthermore, Sanderson Farms has already offered Butts's boss, CEO Joe Sanderson, as a custodian, as well as his peer (and CFO/CLO) Mike Cockrell.  In a similar vein, courts in this circuit have denied depositions of "a corporate defendant's high ranking officer" when, as here, the plaintiff cannot show that the officer's "knowledge is unique or special."  *Smithfield Bus. Park, LLC v. SLR Int'l Corp.*, 2014 WL 547078, at *2 (E.D.N.C. Feb. 10, 2014) ("According to the apex doctrine, before a plaintiff may depose a corporate defendant's high ranking officer, the plaintiff must show '(1) the executive has unique or special knowledge of the facts at issue and (2) other less burdensome avenues for obtaining the information sought have been exhausted.'"  (citation omitted)).

Finally, Plaintiffs claim that Butts should be a custodian because in 2013 he "attended a 'Chicken Media Summit' in North Carolina" with other chicken executives, including agreed-upon document custodian Jim Perdue of Perdue Farms.  But attending a single industry meeting with no apparent relation to the wage-suppression conspiracy alleged in the complaint cannot justify the

expense of collecting and reviewing over a decade's worth of Butts's documents, particularly where at least one other attendee is already a custodian. *See Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 523 (D. Md. 2010) ("[A]ll permissible discovery must be measured against the yardstick of proportionality."). This one irrelevant meeting eight years ago is not enough to make Butts an appropriate document custodian.

### Brenda Gatlin

Brenda Gatlin is a Senior Human Resources Coordinator at Sanderson Farms. Gatlin's manager, Jennifer Buster, is already an agreed-to document custodian. Based on Sanderson Farms' reasonable investigation, Gatlin's responsibilities do not include compensation and benefits decisions making. Rather, she is involved in the administration of human resources benefits.

As with Butts, Gatlin is unlikely to have any "unique relevant" information. *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2020 WL 3100016, at *1. Plaintiffs have alleged a conspiracy "to reduce and suppress the wages, salaries and benefits." SAC ¶ 10. They do not allege that the day-to-day mechanics of administering compensation and benefits were part of that conspiracy. Sanderson Farms has agreed to add Corporate Benefits Manager Linda McMinn because she may have had some role in determining benefits for processing plant workers, but the same is not true of Gatlin.

Plaintiffs claim Gatlin should be a document custodian because her "position," *i.e.*, her job title, suggests that she "almost certainly possess relevant information." That is simply not true given Sanderson Farms' understanding of Gatlin's job function, and Plaintiffs' unsupported claim is not enough to overcome Sanderson Farms' informed judgment that Gatlin will not possess relevant and non-duplicative documents. *See Enslin*, 2016 WL 7042206, at *3 ("Asking a court to compel a party to search the ESI of additional custodians is similar to asking a court to compel a party to undertake additional efforts to search for paper documents . . . in either case, the burden appropriately lies with the requesting party to show that the responding party's search was inadequate"). Plaintiffs simply speculate that a "Senior Human Resources Coordinator" must have "perform[ed] the labor-intensive task of aligning [Sanderson's] wages with competitors' wages." They have no evidence that any such "aligning" took place, let alone that Gatlin was involved or would have non-duplicative documents to justify making her a custodian in addition to the two other human resources professionals that Sanderson Farms has already agreed to offer.

Additionally Gatlin should not be a custodian because any relevant documents in her possession would almost certainly be "duplicative of ESI collected from other custodians." *Enslin*, 2016 WL 7042206, at *3; *U.S. Home Corp. v. Settlers Crossing, L.L.C.*, 2012 WL 13014153, at *4 (D. Md. Oct. 24, 2012) (denying request for custodian with "duplicative" documents). As Plaintiffs recognize, Gatlin "reported directly to [custodian] Jennifer Buster." If Gatlin ever created materials analyzing Sanderson Farms' compensation and benefits levels, it was likely at Buster's direction, and would be in her possession as well. Similarly, if Gatlin ever received data regarding compensation and benefits, that information will likely be in the structured data that Sanderson Farms intends to produce (or it went to Jennifer Buster). Simply put, Plaintiffs have made no showing that Gatlin is likely to possess unique relevant data, and the Court should therefore deny this custodian request.

Finally, Plaintiffs take the position that they should be able to turn even the most administrative human resources employee into a custodian because the general "mechanics" of compensation "show how the conspiracy was implemented." This position proves too much. Plaintiffs are not entitled to add custodians without "point[ing] to any evidence" that the custodian specifically possesses "responsive information that has not already been captured." *Enslin*, 2016 WL 7042206, at *3. Plaintiffs' broad claims that compensation "mechanics" are relevant cannot satisfy this standard. This pure speculation cannot overcome Sanderson Farms' informed belief that the two human resources professionals it has already agreed to offer as custodians are adequate to the needs of the case. *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 2018 WL 1440923, at *2 (D. Kan. Mar. 15, 2018) ("[U]nless the party's choice is 'manifestly unreasonable or the requesting party demonstrates that the resulting production is deficient,' the court should not dictate the designation of ESI custodians." (citation omitted)).

### Field Employee Relations Managers ("FERMs")

Finally, Plaintiffs seek to include eight FERMs as custodians. Each Sanderson Farms processing plant has a FERM who is responsible for day-to-day human resource administration. Plaintiffs seek to add these FERMS as custodians in order to have a "sample of . . . plant-level employees" so that they can investigate their allegations of "plant-to-plant communication" regarding compensation and benefits. Notably, Plaintiffs allege that these plant-to-plant communications involved a number of other Defendants, but not Sanderson Farms. SAC at ¶¶ 225–234.

Notwithstanding the questionable basis for this request, Sanderson Farms has offered Plaintiffs their pick of four FERMs from a list of eight potential candidates. Sanderson Farms asked to limit this search to each FERMs' email communications and to use search terms limited to co-defendant names, because those emails are most likely to contain the plant-to-plant communications that Plaintiffs seek. Despite this compromise offer, Plaintiffs insist on all eight FERMs, and to search all document sources, not just email.

There is no reason why Plaintiffs need eight custodians to investigate their plant-to-plant communication allegations when four would easily suffice. Plaintiffs are not entitled to every last relevant document, only those that are "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1); *Brown v. Mountainview Cutters, LLC*, 2016 WL 3045349, at *4 (W.D. Va. May 27, 2016) ("Despite the relevance of such discovery, the court is of the opinion that the subpoenas are disproportionate to the needs of the case."). Plaintiffs have not specifically alleged that Sanderson Farms' employees engaged in these "plant-to-plant communications." Thus, Sanderson Farms' offer of emails for four FERMs is more than proportional to Plaintiffs' needs. Doubling this number would not only add a substantial burden to Sanderson Farms' collection efforts, but would also do little to increase the likelihood that Plaintiffs can substantiate their allegations. *See Updike v. Clackamas Cty.*, 2016 WL 111424, at *1 (D. Or. Jan. 11, 2016) ("[A]t some point, discovery yields only diminishing returns and increasing expenses."). Plaintiffs' request for eight FERMs seems especially arbitrary since Plaintiffs are willing to accept three plant-level custodians for Tyson, which is even larger than Sanderson Farms, and five plant-level custodians for Butterball. If Plaintiffs cannot prove their claims with four FERMS, there is no reason to think they can do any better with eight.

Plaintiffs justify their position by incorrectly stating that "[d]ozens of [FERMs] have been employed by Sanderson during the class period." In fact, each of Sanderson Farms' 13 potentially

relevant plants have only one FERM at a time, some of whom have held their positions for more than a decade.  Sanderson Farms explained this system to Plaintiffs during the meet-and-confer process, yet Plaintiffs rely on their overstatement to justify their request for eight FERMs.  *See* July 23, 2021 Letter from M. Samels to A. Deich ("[T]here is only one Field Employee Relations Manager per plant at any given point in time").  Given this limited pool of potential FERM custodians, Sanderson Farms' offer of four FERMs of Plaintiffs' choice is more than proportionate to the needs of the case.

### 3. **JOTS**

#### a) *PLAINTIFFS' POSITION*:

Agreed-Upon Custodians: Patricia Solheid, Carol Westaby, Steve Williams, Lori Tjaden, Gary Jamison, Paul Kuehneman, Glenn Leitch, Steve Lykken, Kimberly Lint, Melanie Faust, and Robin Kopel.

JOTS has agreed to only 11 custodians, less than any other Defendant Processor. JOTS has subsequently disclosed that it does not have documents for one of the four key custodians it originally proposed to Plaintiffs, Patricia Solheid, who directed JOTS' HR department during more than ten years of the Class Period. Further, JOTS has only agreed to designate its custodians for the time period January 1, 2015 to August 30, 2019, except for Faust, who JOTS had designated as custodian for the time period April 1, 2019 through August 30, 2019. As such, JOTS has agreed to fewer custodians over a shorter time period than any other Defendant Processor has agreed to— despite the fact that JOTS employs more poultry processing workers than several other Defendant Processors of a similar market share.

Disputed Custodians:

Plaintiffs seek an additional ten custodians from JOTS. Plaintiffs have narrowly tailored their request to seek documents that are uniquely relevant to their allegations. Further, the number of additional custodians Plaintiffs request is proportional to agreements Plaintiffs have reached with Defendant Processors of similar market share.

The disputed JOTS custodians fall into three categories:

1. *Hormel employees: Jacob Zimmerli, Katie Larson, Brent Banwart*

Plaintiffs seek custodial documents from three employees of Hormel, JOTS' parent company and an alleged Co-Conspirator in the Complaint. *See* SAC ¶ 97. The three proposed custodians are described below.

| NAME | TITLE AND DESCRIPTION OF DUTIES |
|------|-------------------------------|
| Jacob Zimmerli | • Head of Compensation & HRIS, Mar. 2014-Present<br>  - His LinkedIn profile states the following regarding this position: "Lead Compensation and HRIS for a Fortune 300 company, with $10B in revenue and 20,000 employees. Drive the design, development, and implementation of company-wide compensation programs . . . ."[86]<br>• Supervisor of Compensation, Mar. 2008-Aug. 2010<br>• Sr. Compensation Analyst, Apr. 2005-Mar. 2008 |
| Katie Larson | • Director of HR, Oct. 2018-Present<br>  - Her LinkedIn profile states the following regarding this position:<br>  "Provide strategic leadership for human resource activities for all entities and locations for a Fortune 300 company. . . . Drive HR strategy for employee relations, labor relations, safety, and HR Business Partner support for the organization. . . . Lead a team of 80 HR professionals in the corporate headquarters and across our plant and subsidiary organizations to implement initiatives supporting the company's aggressive key results."[87]<br>• Director of Organizational Development, Mar. 2014-Oct. 2018<br>• HR Manager, Sept. 2010-Mar. 2014<br>• Corporate Manager of HR, Oct. 2008-Sept. 2010 |
| Brent Banwart | • HR Business Partner, Jan. 2018-July 2019<br>• Senior Compensation Analyst, Feb. 2016-Jan. 2018[88]<br>• HR Manager, Jan. 2014-Feb. 2016<br>• HR Generalist, Apr. 2012-Jan. 2014<br>• Corporate Recruiter, Mar. 2010-Apr. 2012 |

These three individuals likely have unique documents relevant to Plaintiffs' allegations. For example, as Jacob Zimmerli's LinkedIn profile (excerpted above) makes clear, while serving as Hormel's Head of Compensation for the past seven years, he has "[led] Compensation" for the company's entire "20,000 employees," which includes employees of subsidiary JOTS, and drove "the design, development, and implementation of company-wide compensation programs." *See supra* (Table), Zimmerli LinkedIn Profile. Similarly, according to Katie Larson's LinkedIn profile, while serving as Hormel's Director of HR since 2018, she provided "strategic leadership for human resource activities for *all entities and locations* for a Fortune 300 company" and "[led] a team of 80 HR professionals in the corporate headquarters and *across our plant and subsidiary*

---

[86] *See* https://www.linkedin.com/in/jacob-zimmerli-839a431a/ ("Zimmerli LinkedIn Profile").

[87] *See* https://www.linkedin.com/in/katie-larson-b7236537/ ("Larson LinkedIn Profile").

[88] *See* https://www.linkedin.com/in/brent-banwart-68a5a822/ ("Banwart LinkedIn Profile").

*organizations*," which thus includes JOTS. *See supra* (Table), Larson LinkedIn Profile. Finally, according to Brent Banwart's Linkedin profile, he served as "Senior Compensation Analyst" for two key years of the Class Period and thus likely analyzed and made recommendations concerning compensation to Class Members. *See supra* (Table), Banwart LinkedIn Profile. These descriptions suggest, at the very least, that Zimmerli, Banwart, and Larson exercised influence over and provided input into employee compensation, hiring, and retention at JOTS. As such, they are likely to have documents relevant to Plaintiffs' allegations that are not captured by the agreed-upon custodian list.

JOTS has taken the position that it will not offer Zimmerli, Banwart, and Larson as custodians because they were employees of Hormel during the Relevant Time Period. This argument falls short. "It is well established that a district court may order the production of documents in the possession of a related nonparty entity under Rule 34(a) if those documents are under the custody or control of a party to the litigation." *Steele Software Sys., Corp. v. DataQuick Info. Sys., Inc.*, 237 F.R.D. 561, 564 (D. Md. 2006). Courts within the United States District Court for the District of Maryland and the Fourth Circuit "broadly" construe "control" within the meaning of Rule 34, such that it encompasses the right or even the "practical ability" of the corporate party to obtain the requested documents or files on demand from the related corporate non-party. *Id.* "The specific form of the corporate relative involved does not matter . . . . Courts are able to disregard corporate form to prevent . . . 'misleading actions whereby corporations try to hide documents or make discovery of them difficult.'" *Id.* (citation omitted). "[V]irtually all of the published decisions have required production by the nonparty corporation." *Mt. Hawley Ins.*, 269 F.R.D. at 617 (citing numerous cases in support of this point and compelling production of documents from the files of nine proposed non-party custodians).

Here, Hormel is the parent company of JOTS and an alleged Co-Conspirator. Further, the relationship between Hormel and JOTS is close, particularly as it pertains to the issues germane to this litigation. For example, JOTS' public website for current job openings links directly to Hormel Foods Family of Companies' "Join Our Team" career opportunities site.[89] Further, on Hormel's webpage entitled "Meet Our Recruiting Team," one of the identified individuals is Robin Kopel— Manager of Corporate Office Human Resources and Staffing at JOTS and one of the individuals JOTS offered to Plaintiffs as a custodian.[90] The aforementioned connection between JOTS and Hormel specifically ties JOTS to its corporate parent Hormel on issues of employee compensation. JOTS is not entitled to use corporate form to hide relevant documents or make discovery of them difficult. *See Mt. Hawley Ins.*, 269 F.R.D. at 617. Plaintiffs request that the Court not permit JOTS to do that here.

Finally, these proposed custodians are not Hormel C-suite or other senior executives, but individuals who hold or held specific positions related to Plaintiffs' allegations. As such, Plaintiffs' request here is procedurally and substantively distinguishable from the situation addressed by the

---

[89] *Jennie-O Turkey Store, Inc.: Join Our Team*, Hormel Foods, https://ekkh.fa.us2.oraclecloud.com/hcmUI/CandidateExperience/en/sites/CX/requisitions?keyword=jennie-o%20turkey%20store (last visited Aug. 16, 2021).

[90] *Meet Our Recruiting Team*, Hormel Foods, https://www.hormelfoods.com/careers/meet-our-recruiting-team/ (last visited Aug. 16, 2021).

*Blankenship* court, and Defendants' reliance on that case is inapposite. *Blankenship*, 2020 WL 9718873, at *18 (denying motion to compel where "there ha[d] been no demonstration whatsoever that these individuals had anything to do with the events surrounding Plaintiff's claims"). Accordingly, the Court should order JOTS to designate Zimmerli, Banwart, and Larson as custodians.

2. *Plant-Level HR Managers*

Plaintiffs have requested that JOTS include the following six of its plant-level human resources managers as custodians:

| NAME | TITLE AND DESCRIPTION OF DUTIES |
|------|------|
| Peggy Moline | • HR Manager, 2013-2021 |
| Shirley Drentlaw | • HR Manager, 2009-2020 |
| Jeremy Miller | • HR Manager, 2009-2020 |
| Allen Anderson | • HR Manager, 2009-2021 |
| Ana Santana | • HR Manager, 2017-2021 |
| Robyn Brown | • HR Manager, 2009-2017 |

As discussed earlier, JOTS is only one of three Defendants that have refused to offer any plant-level employees as custodians, despite Plaintiffs' express allegations that Defendant Processors engaged in unlawful plant-to-plant communications in furtherance of the conspiracy. In support of designating these six current or former plant HR manager as custodians, Plaintiffs refer the Court to the above detailed argument addressing the relevancy and legal basis for including plant-level custodians herein, *supra* § IV.A.D.

JOTS operates seven turkey processing plants. Requesting six plant-level custodians, who collectively worked at six different plants during the Class Period, is reasonable and proportional and in line with what other Defendant Processors have accepted. In their custodian agreements with seven Defendant Processors, Plaintiffs agreed to an average of one plant-level custodian per plant.

3. *Custodian Melanie Faust, while Vice President of Operations at JOTS*

| NAME | TITLE AND DESCRIPTION OF DUTIES |
|------|--------------------------------|
| Melanie Faust | • VP Human Resources, June 2019-2021<br>• VP of Operations, Aug. 2017-June 2019<br> - Her LinkedIn profile states the following regarding this position: "tasked to transform operations, capture greater cost savings, and drive operational efficiencies." [91] |

JOTS has only agreed to designate Melanie Faust as a custodian from April 1, 2019 through August 30, 2019, when she was Vice President of HR, claiming that this is the "only relevant title" to Plaintiffs' allegations. This is untrue. Plaintiffs have requested that JOTS also designate Faust as a custodian from July 17, 2017 to March 31, 2019, when she held the title of Vice President of Operations. ███████████████████████████████████████████████████████████████ *See, e.g.*, PX008, ████████████████████████████████████████████████████████████████████████████████ JOTSWages0000000038. Further, Faust's LinkedIn profile states that she was "tasked to transform operations, capture greater cost savings, and drive operational efficiencies." *See supra* (Table), Faust LinkedIn Profile. As such, Plaintiffs consider it likely that Faust likely has unique custodial documents relevant to Plaintiffs' allegations regarding employee compensation, hiring, and retention during the period July 17, 2017 to March 31, 2019.[92]

### b) *DEFENDANTS' POSITION:*

JOTS in its initial disclosures or in subsequent negotiations has offered eleven custodians—including those involved in setting the compensation of employees in its turkey-processing plants during the time period relevant to JOTS's participation in the alleged conspiracy. The agreed-upon custodians are as follows: Patricia Solheid, Carol Westaby, Steve Williams, Lori Tjaden, Gary Jamison, Paul Kuehneman, Glenn Leitch, Steve Lykken, Kimberly Hanson Lint, Melanie Faust,[93] and Robin Kopel.

Although Plaintiffs quote case law for the proposition that "the selection of custodians is more than a mathematical count," *see Kleen Prods. LLC v. Packaging Corp. of Am.*, No. 10 C 5711, 2012 WL 4498465, at *15 (N.D. Ill. Sept. 28, 2012), Plaintiffs appear to have predetermined that

---

[91] *See* https://www.linkedin.com/in/melanie-faust/ ("Faust LinkedIn Profile").

[92] Plaintiffs withdrew their request for Donald Cole (Faust's predecessor in the role of VP of Operations at JOTS) to be included as a custodian based on JOTS' representation that it had no custodial documents for Cole. *See* July 12, 2021 Letter from E. Chow (JOTS' counsel) to S. Morbey (Plaintiffs' counsel). Plaintiffs did not concede that the role of VP of Operations at JOTS is irrelevant to their allegations in this case.

[93] As with all of the other agreed-upon custodians, JOTS has agreed to produce Ms. Faust as a custodian for the time period during which she held a relevant title between January 1, 2015 and August 30, 2019—which JOTS believes should be the Relevant Time Period for unstructured data. (*See supra* Part II.A) The only relevant title that Ms. Faust held during that time was Vice President of HR, from April 1, 2019 through August 30, 2019. Plaintiffs now seek Ms. Faust's files during the time she served as Vice President of Operations, and that time period is disputed because she did not have responsibility for compensation in that position.

JOTS should have at least twenty custodians.  Plaintiffs have previously suggested that double-digit plant-level custodians for a company of JOTS's size with multiple plants would be "appropriate."  And they now complain that JOTS "has only agreed to 11 custodians"—which "is materially fewer custodians than any other Defendant Processor has agreed to" and "despite the fact that JOTS employs more poultry processing workers than several other Defendant Processors."  JOTS's size, the number of custodians agreed upon by other Defendants with different organizational structures and facing different allegations, and the number of employees at JOTS's turkey-processing plants, however, have no bearing on how many JOTS custodians are appropriate in this litigation.

JOTS understands, based upon the August 13 draft of Plaintiffs' joint letter, that the ten individuals outlined in the table below are in dispute.  For the reasons that follow, these persons should not be added as custodians.

| **Name** | **Title and Description of Duties[94]** |
|---|---|
| Jacob Zimmerli | ▪ 1/1/15 – 4/2/17: Corporate Manager of Compensation, Hormel Foods Corporation ("Hormel Foods")<br>▪ 4/3/17 – 8/30/19: Director of Compensation, Hormel Foods |
| Brent Banwart | ▪ 1/1/15 – 2/28/15: HR Manager – Progressive Processing,[95] Hormel Foods<br>▪ 2/29/16 – 12/31/17: Senior Compensation Analyst, Hormel Foods<br>▪ 1/1/18 – 7/31/19: HR Business Partner – Administration, Hormel Foods |
| Katie Larson | ▪ 1/1/15 – 8/30/19: Corporate Manager of HR, Diversity & Inclusion, Hormel Foods |
| Melanie Faust | ▪ 7/17/17 – 3/31/19: Vice President of Operations, JOTS |
| Peggy Moline | ▪ 1/1/15 – 9/17/16: HR Manager, Melrose Plant, JOTS<br>▪ 9/18/16 – 8/30/19: HR Manager, Willmar Avenue Plant, JOTS |

---

[94] Consistent with its discovery responses and prior correspondence with Plaintiffs, JOTS has supplied the titles held by each disputed custodian for JOTS's proposed Relevant Time Period of January 1, 2015 through August 30, 2019.

[95] Progressive Processing is a further-processing facility located in Dubuque, Iowa, where Hormel Foods products such as bacon toppings and SPAM® are produced. *See* Hormel Foods, Progressive Processing – Plant Production Jobs, https://www.hormelfoods.com/careers/career-center/plant-production-jobs/progressive-processing/ (last visited Aug. 17, 2021).

| Shirley Drentlaw | ▪ 1/1/15 – 8/30/19: HR Manager, Faribault Plant, JOTS |
|---|---|
| Jeremy Miller | ▪ 1/1/15 – 8/30/19: HR Manager, Barron Plant, JOTS |
| Allen Anderson | ▪ 1/1/15 – 8/30/19: HR Manager, Benson Avenue Plant, JOTS |
| Ana Santana | ▪ 1/1/15 – 9/17/16 – HR Representative, Barron Plant, JOTS<br><br>▪ 9/18/16 – 8/30/19: HR Manager, Melrose Plant, JOTS |
| Robyn Brown | ▪ 1/1/15 – 4/10/17: HR Manager, Montevideo Plant, JOTS |

Rule 26 "cautions that all permissible discovery must be measured against the yardstick of proportionality." *Lynn v. Monarch Recovery Mgmt., Inc.*, 285 F.R.D. 350, 355 (D. Md. 2012) (quotation omitted). Custodian disputes are governed by Rule 26(b)(2)(C), with a particular focus on whether the requested discovery is unique and whether the burden of the requested discovery outweighs its likely benefit. *See generally Blankenship*, 2020 WL 9718873, at * 13; *see also, e.g., Houston*, 2020 WL 6588505, at *2-3 (denying request to add additional custodians where plaintiffs failed to satisfy "their initial burden of demonstrating that [those proposed custodians'] ESI files contain unique information relevant to the issues in this case"); *True Freight Logistics LLC v. Global Tranz Enters., Inc.*, No. CV-18-01472-PHX-JGZ, 2019 WL 4169004, at *3-4 (D. Ariz. Sept. 3, 2019) (denying motion to compel additional custodial data where plaintiff was unable to explain why requested additional custodian would result in the return of information important to the issues in the case, the anticipated cost of the search would be disproportionate, and plaintiffs would have access to relevant information through agreed-upon custodians); *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19-md-2885, 2020 WL 4501794, at *1-2 & n.2 (N.D. Fla. Aug. 5, 2020) (discussing and collecting cases for the "unique relevant information" standard to designate additional custodians).

According to the Second Amended Consolidated Complaint, "Defendants have conspired and combined to fix and depress the compensation paid to employees at poultry processing plants in violation of Section 1 of the Sherman Act." (SAC ¶ 1) JOTS is alleged to have joined the poultry-industry-wide conspiracy by participating in "the annual WMS survey and 'off the books' meetings for the first time in or around 2015." (*Id.* ¶ 194) The decision-making authority for setting compensation for employees at JOTS's turkey-processing plants resided with JOTS's President, CFO, and Vice President of HR, and JOTS only participated in a single WMS meeting and survey in 2015. *See, e.g.*, Exhibit DX001 at 8-10. JOTS's eleven agreed-upon custodians listed above include all persons who held decision-making authority for setting compensation at JOTS between January 1, 2015 and August 30, 2019 and the only person who attended the only WMS meeting attended by JOTS.

The agreed-upon custodians ensure that Plaintiffs will obtain exhaustive discovery regarding their claims and allegations. A conspiracy to fix and depress the compensation paid to employees at JOTS's turkey-processing plants could not have existed without the involvement of the persons responsible for setting compensation. Plaintiffs' attempt to add an additional *nine* custodians will

impose extreme burden that serves no purpose, particularly because none of the disputed custodians has responsibility for setting compensation for JOTS's employees.

The nine disputed custodians listed above fall into two categories: (a) three were Hormel Foods employees (Zimmerli, Banwart, and Larson); and (b) six were plant HR managers (Moline, Drentlaw, Miller, Anderson, Santana, and Brown). Because none of these disputed custodians have unique or relevant information related to Plaintiffs' allegations against JOTS, the burden of collecting, reviewing, and producing their data greatly outweighs any potential benefit.

Hormel Foods Employees – Jacob Zimmerli, Brent Banwart, and<br>Katie Larson

Jacob Zimmerli, Brent Banwart, and Katie Larson have never been employed by JOTS. Between January 1, 2015 and August 30, 2019, each was an employee of Hormel Foods—JOTS's non-party[96] corporate parent. JOTS's participation in this lawsuit does not open the door to discovery against its parent—especially given that the proposed Hormel Foods custodians have no connection to the allegations in Plaintiffs' Complaint. *See, e.g.*, *Blankenship*, 2020 WL 9718873, at *18 (rejecting plaintiff's argument that defendant had the "'practical ability' to obtain communications from the[] proposed custodians" from its nonparty corporate parent, and denying motion to compel where "there ha[d] been no demonstration whatsoever that these individuals had anything to do with the events surrounding Plaintiff's claims"). None of the cases cited by Plaintiffs required the production of a nonparty custodian who was not relevant to the claims and defenses of the parties in the action. *See, e.g.*, *Mt. Hawley Ins. Co. v. Felman Prod., Inc.*, 269 F.R.D. 609, 617 (S.D.W. Va. 2010) (excluding a proposed nonparty custodian who was not relevant to the litigation, based upon "the extensive exhibits submitted by" the requesting party); *Steele Software Sys., Corp. v. DataQuick Info.*, 237 F.R.D. 561, 564 (D. Md. 2006) (adjudicating a dispute over Rule 34 "control" of undisputedly responsive documents sought by a judgment creditor in aid of collection of its judgment against a debtor and its successor corporation).

Relying upon LinkedIn profiles, instead of the organizational charts produced by JOTS in compliance with Scheduling Order No. 1, ECF No. 456—none of which mention Messrs. Zimmerli or Banwart or Ms. Larson—Plaintiffs have insisted that these three Hormel Foods employees are "plainly relevant individuals involved in HR and Compensation." But, while they have held HR roles at *Hormel Foods*, they were not responsible for setting compensation for employees at *JOTS*. JOTS—through its President, CFO, and Vice President of HR—set compensation for the employees at JOTS's plants. Despite JOTS having made this clear throughout the parties' discussions, Plaintiffs have continued to press JOTS for multiple differently worded representations about these Hormel Foods employees, apparently unsatisfied with prior variations. In response to Plaintiffs' latest requested representation, JOTS confirms that "these Hormel employees lacked influence over compensation, hiring, or retention at JOTS." Plaintiffs have pointed to nothing other than the fact that Hormel Foods is JOTS's corporate parent to demand the inclusion of Hormel Foods employees as document custodians. Even if Plaintiffs'

---

[96] Indeed, in its September 16, 2020 memorandum opinion, the Court dismissed Hormel Foods from this litigation, finding that "Plaintiffs have lumped the various subsidiaries of many of the Defendant Processors together, without alleging any facts specific to each entity or each corporate family" and that "there are no factual allegations specific enough to each individual corporate subsidiary to plausibly tie each entity to the alleged conspiracy." Mem. Op. 8-9, ECF No. 378.

unsubstantiated speculation that Hormel Foods was directing compensation decisions at JOTS were true, the documents of the agreed-upon custodians—which include the President of JOTS—would address any such activity.

<u>Plant HR Managers – Peggy Moline, Shirley Drentlaw, Jeremy Miller, Allen Anderson, Ana Santana, and Robyn Brown</u>

Plaintiffs have requested that JOTS add six current or former plant HR Managers as custodians. But, JOTS's "plant-level" employees do not have any decision-making authority for compensation of employees at JOTS's turkey-processing plants, and therefore have no relevance to Plaintiffs' allegations of a supposed conspiracy to fix and depress compensation. See Exhibit DX001 at 8-9.

According to Plaintiffs, they are entitled to plant-level custodians based upon group-pleading allegations that "Defendants engaged in plant-to-plant communications in furtherance of the conspiracy, including inter-plant communications between Defendants . . . ." (Letter from Stephen J. Teti, Lockridge Grindal Nauen PLLP, to Jonathan H. Todt et al., Faegre Drinker Biddle & Reath LLP (July 21, 2021) (on file with undersigned counsel for JOTS))  But, the Complaint is devoid of any allegations that *JOTS* engaged in plant-to-plant communications, perhaps due to the "regional" nature of the alleged exchanges. (*See* Mem. Op. 6, ECF No. 378 ("[T]he final prong of the alleged conspiracy involves *regional* data exchanges between Defendant Processors, to further enable the depression of employee compensation.") (emphasis added))  In fact, Plaintiffs actually call out JOTS's relative geographic isolation from other Defendants, because, but for JOTS, Plaintiffs could have alleged that every Defendant Processor owned a plant within thirteen miles of another Defendant Processor.  *See* SAC ¶¶ 140, 171.  And the absence of allegations about plant-to-plant communications involving JOTS is consistent with the fact that JOTS's plant-level HR staff have limited roles and are not involved in compensation decisions.

Plaintiffs' insistence on including six individuals who have no relation to their claims against JOTS represents nothing more than a blind fishing expedition.  *See, e.g.*, *Blankenship*, 2020 WL 9718873, at *15 ("Discovery is a fishing expedition that goes beyond the pleadings' allegations to attempt finding additional violations or claims.") (citation omitted); *In re Am. Kidney Fund, Inc.*, No. TDC-17-1787, 2019 WL 1894248, at *7 (D. Md. Apr. 29, 2019) (citing Fed. R. Civ. P. 26) ("[D]iscovery is guided by relevance to the claims and defenses in the underlying litigation; it is not to be used for fishing expeditions seeking to build a fire where one claims to see smoke."); *Maron v. United States*, 126 F.3d 317, 327-28 (4th Cir. 1997) ("The district court was under no legal duty to allow [plaintiff] to go on an open-ended fishing expedition in hope of finding evidence which links the defendants to several events which, had they in fact occurred as [plaintiff] asserted, may have been outside the scope of employment.").  *Cf. Delgado v. Prudential Ins. Cos. of Am.*, No. 97-2593, 1998 WL 738564, at *3 (4th Cir. Oct. 22, 1998) ("[D]iscovery should not be used for fishing expeditions. [Plaintiff] has not made this court aware of any claims she might have against [Defendant], and mere speculation and conjecture are insufficient grounds for discovery.").

To the extent Plaintiffs are fishing for plant-to-plant communications involving JOTS's plant HR Managers—even though there are no allegations (or other basis to believe) that such communications exist—JOTS has agreed to include Kimberly Hanson Lint and Steve Williams as custodians.  As is discernible from JOTS's organizational charts, Ms. Lint had a dotted-line-reporting relationship with JOTS's plant HR Managers, providing support and strategic supervision, and serving as the plant HR Managers' connection to the corporate office.  Ms. Lint reported to Mr. Williams, who reported to JOTS's Vice President of HR. In other words, the plant

HR managers are three levels below the decisionmakers setting compensation for JOTS employees, and, for any plant-to-plant communications to be "provided to executives of [JOTS] at corporate headquarters [to use] to facilitate the fixing of compensation" (SAC ¶ 8), those communications would have necessarily flowed through Ms. Lint and Mr. Williams.

JOTS Corporate-Level Employees Without Decision-Making
Authority for Setting Compensation – Melanie Faust

*Melanie Faust, while Vice President of Operations at JOTS.* JOTS has agreed to include Ms. Faust as a document custodian for the five-month period leading up to August 30, 2019 when she held the title of Vice President of HR at JOTS—even though all 2019 compensation had been finalized by Patricia Solheid (Ms. Faust's predecessor) before Ms. Solheid retired on May 31, 2019. Apparently still unsatisfied, Plaintiffs demand that JOTS also include Ms. Faust as a document custodian from July 17, 2017 to March 31, 2019 when she held the title of Vice President of Operations. As has been made clear to Plaintiffs, however, the decision-making authority for setting compensation for employees as JOTS's turkey-processing plants resides with JOTS's President, CFO, and Vice President of HR. Thus, JOTS's Vice President of Operations—whether Donald Cole (originally proposed as an additional custodian by Plaintiffs, but subsequently withdrawn) or Ms. Faust was in that role—is not a proper custodian. *See, e.g.*, *Houston*, 2020 WL 6588505, at *2 (citing *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, MDL No. 2785, 2018 WL 1440923, at *2 (D. Kan. Mar. 15, 2018)) ("Mere speculation that an individual's high-ranking position within an organization might increase the relevance of that individual's files is not a basis for designating that individual as a custodian.").

### 4. **Butterball**

#### a) *PLAINTIFFS' POSITION*:

Deleted Files

During the course of custodian negotiations, Butterball represented that the files of at least 17 proposed custodians have been "deleted." This is of concern for two reasons. First, many of those individuals were individuals likely to possess highly relevant and important documents. For example, in response to an interrogatory, Butterball represented that two of those individuals— Beverly Hinson, the former Director of Human Resources for the Eastern Division, and Brenda Smith, the former Compensation Manager—"(i) provided information or data to WMS about Compensation paid to Butterball employees at turkey-processing plants; (ii) received a WMS survey related to employee compensation directly from WMS; or (iii) attended a meeting hosted by WMS in which attendees discussed Compensation paid to employees at poultry processing plants." PX009, Butterball's Resps. & Objs. to Pls.' First Set of Interrogs. at 7-8. Walter Davis is another key former Butterball employee whose records were ostensibly deleted; he served as HR Director for much of the Class Period, and each HR manager at Butterball's six poultry plants reported to him.

The second concern is that some of the proposed custodians for which Butterball claims to have deleted documents only departed Butterball in mid-to-late 2019. For example, Beverly Hinson left

Butterball in May 2019, approximately three months before Plaintiffs filed their first Complaint and approximately seven months before that Complaint was amended to add Butterball as a defendant. Butterball stated that "it is very unlikely that data is available for any persons who left Butterball's employment more than 3-6 months prior to the Amended Complaint due to Butterball's document retention policies implemented in the ordinary course of business."[97]

After Butterball made this assertion, Plaintiffs immediately requested the expedited production of the document retention policies in place during the Relevant Time Period (which Butterball had already agreed to eventually produce) as well as information concerning when each policy took effect and whether it was applicable company-wide.[98] Butterball refused.[99] Plaintiffs also repeatedly asked whether the "deleted" documents were still accessible on Butterball's systems, including in an archive.[100] Butterball again declined to answer. On August 10, 2021, Plaintiffs served an interrogatory on Butterball seeking information concerning its document retention policies and the availability of "deleted" documents. Plaintiffs await Butterball's response.

It is unacceptable that Butterball refuses to disclose whether it retains copies of any documents for proposed custodians that it claims were deleted. Obviously, the refusal to disclose such information materially impedes Plaintiffs' ability to request and pursue the optimal custodians for their claims. If, for example, Butterball had retained files associated with Beverly Hinson and Brenda Smith, Plaintiffs would have insisted on their inclusion in the list of custodians.

Accordingly, Plaintiffs request that the Court order Butterball to disclose whether it retains any files anywhere in its system or on its equipment related to the custodians originally proposed by Plaintiffs. Notably, in a different case involving compensation of poultry processing plant workers for time spent donning and doffing, Butterball agreed to search archived emails and was compelled by the court to search laptops and hard drives for responsive documents. *Helmert v. Butterball*, No. 08CV00342, 2010 WL 2179180, at *7 (E.D. Ark. May 27, 2010).

At a bare minimum, Butterball's representation that files are unavailable for certain proposed custodians provides significant additional support for adding the custodians discussed below.

Agreed-Upon Custodians:

---

[97] Aug. 4, 2021 Letter from D. Hamilton (Butterball's counsel) to C. Enders (Plaintiffs' counsel) at 2.

[98] Aug. 4, 2021 Email from C. Enders (Plaintiffs' counsel) to Butterball's counsel; Aug. 6, 2021 Letter from C. Enders (Plaintiffs' counsel) to D. Hamilton (Butterball's counsel).

[99] Aug. 5, 2021 Letter from D. Hamilton (Butterball's counsel) to C. Enders (Plaintiffs' counsel) at 1 (writing that Butterball has "provided more than enough information . . . all of which should be sufficient at this point in the case").

[100] Aug. 4, 2021 Email from C. Enders (Plaintiffs' counsel) to Butterball's counsel (asking whether "deleted" documents reside in an archive); Aug. 6, 2021 Letter from C. Enders (Plaintiffs' counsel) to D. Hamilton (Butterball's counsel) at 2 (reiterating Plaintiffs' "request for information regarding the accessibility of 'deleted' documents of former employees").

Butterball has fully agreed to designate the following individuals as custodians: Ron Tomaszewski, Beth Gurley, Karen Ingram, Lori Bassett, Barry Gum, Carey Howerton, David Fryar, Steve Swan, George (Bill) Folk, Andrew Lekwa, John Lenahan, Steve Lawson, Randy Reed, Kerry Doughty, and Jay Jandrian.

Furthermore, in the event that the Court rejects Butterball's argument (addressed above, *see supra* § II.A.) to limit the applicable Relevant Time Period to post-2014, Butterball has agreed to the following three additional custodians: Rod Brenneman, Gary Lenaghan and James Ponce de Leon.

Disputed Custodians:

The contested Butterball custodians fall into two categories: (1) corporate HR personnel and (2) plant HR managers.

1. *Corporate HR Personnel*

Plaintiffs have requested that Butterball include the following two corporate HR personnel as custodians:

| NAME | TITLE AND DESCRIPTION OF DUTIES |
|------|-------------------------------|
| Denise Davis | • Senior Benefits Analyst, 2008-Present |
| Debra Samuels | • Corporate HR Operations Program Development Lead, Mar. 2021- Present<br>• HR Mid-West Onboarding Program Supervisor, Oct. 2019-Mar. 2021<br>  - Her LinkedIn profile states the following regarding this position: "Creating and documenting a structured onboarding/training program for all the plants to follow . . . . Partnered with local Recruiters to understand processes at all locations and help identify opportunity with hiring challenges."[101]<br>• HR Generalist and Acting HR Manager, Jan. 2017-Oct. 2019<br>  - Her LinkedIn profile states the following regarding this position: "Strong relationships have been established with Senior Management team to enable systematic decision making for workgroups. . . . Perform all aspects of management recruitment and onboarding . . . . Create and provide leadership with necessary reporting to make decisions in staffing, retention, and action plans." |

---

[101] *See* https://www.linkedin.com/in/debra-samuels-117a693/ ("Samuels LinkedIn Profile").

Butterball has improperly rejected two custodians that serve in its corporate HR division. The first, Denise Davis, is a Senior Benefits Analyst in Butterball's HR department. She is the only proposed Butterball custodian who focused primarily on benefits. As the Complaint makes clear, the fixing and depressing of benefits was a key component of the alleged conspiracy. *See* SAC ¶¶ 180, 185 ("The WMS survey results also provided exhaustive data about the benefits provided to both salaried and hourly-paid employees at poultry processing plants operated by Defendant Processors, their subsidiaries, and related entities."). Davis also reports directly to Beth Gurley, the Director of Compensation, who (as Butterball has acknowledged) attended WMS meetings. Additionally, Davis has held her position during the entire Class Period, thus making her a particularly important custodian.

The other corporate HR employee, Debra Samuels, has steadily risen through the ranks of the HR divisions at Butterball. She worked with all six of Butterball's processing plants to assist with recruiting and training, and she served as a liaison between those plants and corporate executives. For example, her LinkedIn profile describes her responsibilities during the Class Period as encompassing "all aspects of management recruitment and onboarding" and "provid[ing] leadership with necessary reporting to make decisions in staffing, retention, and action plans." *See supra* (Table), Samuels LinkedIn Profile. Accordingly, Samuels is a relevant and worthy custodian.

   2.  *Plant-Level HR Managers*

Plaintiffs have requested that Butterball include the following five plant HR managers as custodians:

| NAME | TITLE AND DESCRIPTION OF DUTIES |
|---|---|
| Mishlee Fernandez | • HR Manager, Sept. 2004-Present |
| Khary Gaylord | • HR Manager, Mar. 2014-Present |
| Ray Saturnio | • HR Manager, May 2015-Present |
| April Bucholz | • HR Manager, Nov. 2010-Present |
| Mark Graham | • Complex HR Manager, Feb 2016-Present |

Plant-level custodians are especially appropriate with respect to Butterball. The Complaint specifically alleges improper data exchanges between a Butterball plant and competing plants. The Complaint alleges, "A former employee of Butterball explained that the company's poultry processing plant in Mount Olive, North Carolina would regularly exchange hourly wages for specific positions with other nearby poultry processors. The former Butterball employee explained that when the Butterball plant requested hourly wage data from a rival poultry processing plant, the Butterball plant would share its own wage data with that rival processor so that the companies could 'compare' their compensation schedules." SAC ¶ 230.

Butterball does not dispute that plant-level custodians are appropriate. Rather, when Plaintiffs have insisted on the inclusion of particular HR managers as plant-level custodians, Butterball has responded by pivoting to offer only complex level managers, i.e., the individuals tasked with managing the entire plant. No other Defendant Processor has insisted on this approach. ███████ ████████████████████████████████████████████████████ Furthermore, Plaintiffs' investigation has revealed that HR plant managers are often involved in actual improper plant-to-plant communications. For those reasons, Plaintiffs are entitled to HR managers from Butterball's six plants. Plaintiffs have limited their proposal to just five plant HR managers, designed to be the smallest collection of individuals that cover Butterball's six plants during parts of the Class Period. At a bare minimum, Mishlee Fernandez, who has served as HR manager of Butterball's Mount Olive plant since 2004, should be designated a custodian in light of the Complaint's allegations. *See id.* ¶ 246.



Last, Butterball's suggestion that Plaintiffs defer their request for additional plant-level custodians until some unspecified later date when Butterball *may* agree to add them should be rejected. Butterball's proposal fails to recognize the nature of discovery in antitrust conspiracy cases, where assembling the pieces of the puzzle gives a full picture of the conspiracy. Butterball is essentially saying it should be permitted to withhold important puzzle pieces until Plaintiffs demonstrate a "legitimate need" for them—but Plaintiffs have already demonstrated that need, including by alleging that Butterball engaged in improper plant-to-plant communications.

### b) *DEFENDANTS' POSITION*:

Butterball identified five custodians in its initial disclosures who were likely to possess responsive information:

- Ron Tomaszewski, Butterball's Vice President of Human Resources;

- Carey Howerton, Butterball's Director of Human Resources, Midwest Operations;

- Karen Ingram, Butterball's Senior Human Resources Director;

---

[102] PX010, BBWages0000000283.

[103] PX010, BBWages0000000283.

[104] PX011, BBWages0000000328 at '339.

[105] PX010, BBWages0000000283.

- Beth Gurley, Butterball's Director of Compensation & Benefits; and

- Lori Bassett, Butterball's Employment Risk and Compliance Manager.

Butterball believed, based on its investigation of the relevant facts, that these five individuals were most likely to have responsive documents and information. In response, Plaintiffs claimed—based on a purported "extensive investigation"—that 59 additional former and current Butterball officers and employees were also necessary document custodians. Plaintiffs' proposal included four current and former Butterball Presidents and CEOs, two former and one current COOs, two former CFOs, various corporate employees, and numerous plant-level human resources managers. After a series of meet-and-confer sessions, Butterball agreed to another ten document custodians:

- David Fryar, Complex Manager in Carthage, MO from June 10, 2013, to December 12, 2016;

- Steve Swan, Complex Manager in Mt. Olive, NC from September 8, 2014, to April 22, 2019;

- George W. Folk, Complex Manager in Huntsville, AR from October 1, 1996, to April 21, 2019, and Complex Manager in Mt. Olive, NC, from April 21, 2019, to December 28, 2020;

- Andrew Lekwa, Complex Manager in Ozark, AR from 2014 to 2019;

- John Lenahan, Complex Manager in Carthage, MO, from December 4, 2007, to June 10, 2013; Montgomery, IL from June 10, 2013, to January 3, 2016; Jonesboro, AR from January 4, 2016, to December 5, 2016; and Carthage, MO from December 5, 2016, to February 21, 2021;

- Steve Lawson, Complex Manager in Jonesboro, AR from November 11, 2016, to present;

- Randy Reed, Complex Manager in Mt. Olive, NC from April 22, 2019, to present; and

- Barry Gum, Chief Financial Officer from April 2013 to present.

- Jay Jandrain, current President and CEO of Butterball; and

- Kerry Doughty, former President and CEO of Butterball from May 2014 to December 2018.

Butterball has also agreed that Gary Lenaghan (former Vice President of Human Resources), James Ponce de Leon (former HR Director), and Rod Brenneman (former President and CEO) are appropriate document custodians *if* the Court adopts the Relevant Time Period proposed by Plaintiffs.

Despite Butterball's significant concessions during the parties' extensive meet-and-confer sessions, Plaintiffs insist on the following additional document custodians:

1. Corporate-Level HR Employees

   a. Denise Davis, Senior Benefits Analyst

113

        b.  Debra Samuels, Corporate HR Operations Program Development Lead/Onboarding Program Supervisor/HR Generalist and Acting Manager from 2017 to the present

  2.  Plant-level Employees

        a.  Mark Graham, HR Manager, Huntsville, AR Plant, 2016 – present

        b.  April Buchholz, HR Manager, Ozark, AR Plant, 2011 – present

        c.  Ray Saturnio, HR Manager, Jonesboro, AR Plant, 2015 – present

        d.  Khary Gaylord, HR Manager, Carthage, MO and Raeford, NC Plants, 2015 – present

        e.  Mishlee Fernandez, HR Manager, Mount Olive, NC Plant, 2004 – present

Court apply several general principles to disputes between parties on appropriate document custodians. First, determining relevant and proportionate document custodians is a fact-specific inquiry. *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.,* No. 17-MD-2785-DDC-TJJ, 2018 WL 1440923, at *2 (D. Kan. Mar. 15, 2018). Second, Butterball—the party responding to document requests—may identify custodians most likely to possess responsive documents and information. *Id.* Third, unless Butterball's choice is "manifestly unreasonable or [Plaintiffs] demonstrate[] that the resulting production is deficient," the Court should not dictate the designation of ESI custodians. *Id.* Fourth, Plaintiffs have the initial threshold burden of showing that the disputed custodians are likely to have information relevant to the claims or defenses because "the party responding to discovery requests is typically in the best position to know and identify those individuals within its organization likely to have information relevant to the case." *Id.* Fifth, "mere speculation that one's position as a senior executive might increase the relevance of that individual's files is not a basis for designating that individual as a custodian." *Id.* Based on these principles, all of the additional custodians proposed by Plaintiffs should be rejected.

***Other Corporate-Level Employees (Denise Davis and Debra Samuels)***. Denise Davis is a Senior Benefits Analyst and Debra Samuels is an HR Operations Analyst who also served as a Senior HR Representative and HR Onboarding Program Supervisor. Neither employee has decision-making authority over compensation, hiring, or recruiting employees in Butterball turkey-processing plants. Thus, Plaintiffs cannot satisfy their burden of showing that these additional custodians will have unique relevant information related to Plaintiffs claims, which at their core, focuses on Butterball's decision-making concerning compensating, recruiting, and hiring employee in turkey-processing plants.

***Plant-Level Employees (Mishlee Fernandez, Khary Gaylord, Ray Saturnio, Mark Graham, April Bucholz)***. Plaintiffs do not dispute that plant-level employees lack decision-making authority over compensation. Plaintiffs instead claim that the five listed plant-level employees are proper custodians because Plaintiffs alleged that plant-level employees performed so-called "plant-to-plant" information exchanges. Plaintiffs' request should be denied.

First, Plaintiffs have not disputed that plant-level employees lack decision-making authority over compensation, and thus any "plant-to-plant exchange" documents would only be relevant ***if*** the plant-level employees reported that information to corporate headquarters, including the agreed-upon document custodians. Indeed, Plaintiffs alleged that "[t]he information obtained from these data exchanges was provided to the corporate headquarters of the respective Defendant

Processors, which used this regional information to facilitate the setting of artificially depressed compensation."  SAC ¶ 225; *see also* ¶ 154 ("While local plant managers sometimes made recommendations for wage adjustments, the hourly wages, annual salaries and employment benefits were ultimately determined and approved by senior executives at each Defendant Processor's corporate headquarters."); ¶ 155 ("Multiple former human resources employees of the Defendant Processors have explained that senior executives at corporate headquarters exclusively set the wages, salaries and benefits of processing plant employees across the country in a centralized fashion.").  Because plant employee documents would only be relevant *if* the plant employee reported the information to one of the agreed-upon document custodians with decision-making authority, Plaintiffs cannot show that the plant employees have "unique relevant information."  *See In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19-md-2885, 2020 WL 4501794, at *1-2 & n.2 (N.D. Fla. Aug. 5, 2020) (discussing and collecting cases for the "unique relevant information" standard to designate additional custodians).

Second, even though Plaintiffs rely heavily on their allegation that Butterball's Mt. Olive processing plant "regularly exchanged hourly wages for specific positions with nearby rival poultry processing plants in order to compare compensation schedules," Plaintiffs have not disclosed the identity of the individuals supposedly involved the alleged exchanges, nor have Plaintiffs made similar allegations about other Butterball turkey processing plants.

Third, Butterball stated throughout the meet-and-confer process that it would consider additional plant-level document custodians if Plaintiffs identified a legitimate need for the data of specific custodians after reviewing documents produced by Butterball from the proposed document custodians.  Yet Plaintiffs refused this reasonable proposal and demanded that Butterball collect, review, and produce data from the additional document custodians.  *See Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 107 (S.D.N.Y. 2013) (noting that "[i]f documents produced during discovery indicate that they were in close communication with the current custodians about the offerings' alleged shortcomings, or were otherwise involved in any wrongdoing, they may be added at a later time").

Finally, in the draft exchanged between the parties prior to this submission, Plaintiffs stated that Butterball "pivot[ed] to offer[ing] only complex level managers, i.e. the individuals tasked with managing the entire plant" but "[n]o other Defendant Processor has insisted on this approach." Although no other Defendant has proposed an identical solution, Butterball is not—as Plaintiffs insinuate—an outlier.  At least four other Defendants declined to list any plant-level employees as document custodians, while Butterball agreed to list complex managers because they have the most significant role in the compensation, recruiting, and hiring of plant-level employees.  Furthermore, Butterball is not bound by the agreements of other Defendants, nor does the agreement by another Defendant to include plant-level HR Managers as Document Custodians require Butterball to do the same.  Instead, each Defendant proposes custodians by deciding—based on facts specific to the Defendant such as, for example, corporate organization, the process for determining compensation, and the number of corporate and plant employees—which custodians are likely to have relevant, unique documents.

***"Deleted Files."***  Butterball informed Plaintiffs during the meet-and-confer process that it is very unlikely that Butterball will have data for former employees who left Butterball more than 3-6 months prior to Plaintiffs naming Butterball as a Defendant due to Butterball's document retention policies implemented in the ordinary course of business.  Plaintiffs responded by demanding that Butterball explain "exactly how Butterball handles/handled the documents

associated with former employees, including whether those documents are transferred to a successor or reside in an archive." As this Court has recognized, such "'discovery on discovery' is not an appropriate topic of discovery and numerous courts have disallowed such discovery." *Fish v. Air & Liquid Systems Corp.*, 2017 WL 697663, at *6 (D. Md. Feb. 21, 2017).

In the draft exchanged by the parties before this submission, Plaintiffs conceded that Butterball agreed to produce its document retention policies and that Plaintiffs served Butterball with an interrogatory on August 10, 2021, seeking information about Butterball's document retention policies and the availability of "deleted" documents. Thus, Plaintiffs acknowledge this issue is not ripe because (1) Butterball is not obligated to produce document retention policies or any other documents before the parties reach agreement on other discovery disputes, such as search terms; and (2) Butterball's response to Plaintiffs' interrogatory is not yet due.

Butterball thus objects to Plaintiffs request—as described in its draft submission—"that the Court order Butterball to disclose whether it retains any files anywhere in its system related to the custodians originally proposed by Plaintiffs." According to Rule 33, Butterball will respond to the nearly identical request in Plaintiffs' second set of interrogatories within 30 days of service on Butterball of the interrogatory.

Nonetheless, Butterball reiterates that it has fulfilled and will continue to fulfill its obligations under the Court's orders, the Local Rules, and the Federal Rules of Civil Procedure.

### 5. **Simmons**

#### a) *PLAINTIFFS' POSITION*:

<u>Agreed-Upon Custodians</u>: Lindsey Chaney, Dan Houston, Michael Denson, Steve Gardner, Todd Simmons, Gary Murphy, Pamela Phipps, Kristi Pianalto, Rachel McCone Davenport, Seritha Twist, David Jackson, Arturo Towns, Jaime Thieman, Josiah Wadsack, Stephen Jones, Michael Owens, Veronica Handcock, and Carrie DeBriyn.

<u>Disputed Custodians</u>:

Plaintiffs and Simmons are disputing six proposed custodians. Those custodians fall into two categories: (1) CFOs and (2) plant-level custodians.

Simmons argues, generally, that it should be compared to Peco and Mountaire for purposes of determining the appropriate number of custodians. Yet Simmons ignores that Plaintiffs' allegations against Peco are limited to a single information exchange claim (as it is the only Defendant Processor who did not attend WMS meetings) and that Mountaire has (unlike Simmons) agreed to provide their CFOs and several plant-level employees as custodians.

1. *Simmons CFOs*

Simmons has refused to designate the following two former CFOs as custodians:

116

| NAME | TITLE AND DESCRIPTION OF DUTIES |
|------|--------------------------------|
| Michael Jones | • Executive Vice President and CFO, Jan. 2002-Dec. 2012 |
| Wes Morris | • Executive Vice President and CFO, Aug. 2018-Jan. 2020 |

The only two corporate-level custodians in dispute are Simmons' former Chief Financial Officers, Michael Jones and Wes Morris. These executives are appropriate custodians because they are responsible for analyzing Simmons' labor budgets and providing input to CEOs regarding those budgets. Indeed, the Complaint alleges that the purpose of the conspiracy was to reduce labor costs, and it specifically alleges that the Compensation Committee discussed and agreed on "bonus budgets" at WMS meetings; evaluating such labor costs and budgets are within the purview of the CFO's responsibilities. SAC ¶ 189. Seven of the 13 Defendant Processors have agreed to designate their CFOs as custodians, and the Court should order that Simmons' CFOs be designated custodians as well.

2. *Plant-Level Custodians*

Simmons has refused to designate the following four plant-level employees as custodians:

| NAME | TITLE AND DESCRIPTION OF DUTIES |
|------|--------------------------------|
| Jeff Norman | • Senior Director of Operations, Apr. 2015-Present |
| Marcos Castro | • Senior Director of Plant Operations, June 2017-Present |
| Brian Burke | • Vice President of Further Processing, Nov. 1994-Present |
| Judi Bradshaw | • Plant HR Manager, May 1994-Present<br>  - Her LinkedIn profile describes her position as entailing: "Direct[ing] the Human Resources activities of Simmons Foods Further Processing Facility."[106] |

Simmons has only agreed to two custodians who worked at its poultry processing plants. This is a plainly inadequate number. Simmons operated six poultry processing plants during the Class Period. Plaintiffs are merely requesting four additional plant-level custodians who worked at, and held relevant supervisory roles, at most of those plants. For example, Judi Bradshaw wrote on LinkedIn that she "direct[s] the Human Resources activities of Simmons Foods Further Processing Facility." *See supra* (Table), Bradshaw LinkedIn Profile.

---

[106] *See* https://www.linkedin.com/in/judi-bradshaw-phr-89373013/ ("Bradshaw LinkedIn Profile").

Six plant-level custodians for six poultry processing plants is a reasonable and proportional number in line with what other Defendant Processors have agreed to. Fieldale, for instance, operates three plants and agreed to five plant-level custodians. Mountaire operates four plants and agreed to six plant-level custodians. Accordingly, the Court should order that the four proposed Simmons plant-level employees be deemed custodians.

### b) *DEFENDANTS' POSITION*:

In determining appropriate discovery custodians, it is crucial to consider the structure and management of the Defendant; there is no "one size fits all" rule. Some companies may make wage and benefit decisions at the plant level, while others make wage and benefits decisions only at the corporate level. Simmons falls into the latter category; Simmons' wages and benefits decisions are made at its corporate level by its senior management team. Corporate level human resources personnel are responsible for gathering information and presenting it to Simmons' senior management who then determine wages and benefits paid to Simmons' employees. Therefore, Simmons' senior management and corporate level human resources personnel are the appropriate discovery custodians in this case. Accordingly, Simmons' offered custodians include most, if not all, of its senior management team and corporate level human resources personnel from 2008 to 2020, including its CEO, COOs, Presidents, human resources senior leadership, compensation managers and analysts (one of whom also served as a plant level human resources employee), benefits director, benefits assistant, as well as an additional plant level human resources employee, for a total of 18 custodians. Simmons' agreed custodians also include all employees who attended a WMS meeting.

<u>Background</u>

Simmons and Plaintiffs have engaged in multiple negotiations concerning custodians, in which the goal posts have repeatedly shifted. Simmons initially offered six custodians. Plaintiffs sought an additional 36 custodians. *See* June 18, 2021 Letter from J. Thompson to V. Bronson.[107] Of those 36 proposed custodians, 6 are not involved in Simmons' poultry operations. In response, Simmons agreed to add ten additional custodians, for a total of 16. *See* July 14, 2021 Letter from V. Bronson to J. Thompson.

During a meet and confer on July 22, 2021, Plaintiffs' counsel discussed their requests to add Seritha Twist, Dana Soller, Rachel Davenport, Josiah Wadsack, Melissa Robrahn, Robin Rudisill, and Jessica Hill as custodians, three of whom are/were not in Simmons' poultry operations. No other custodians were discussed. It seemed the parties were in agreement concerning custodians other than Seritha Twist, Rachel Davenport, Josiah Wadsack, and potentially Melissa Robrahn.

A week later, things changed. Plaintiffs decided to "trade" Amy Rathbun, one of the plant-level human resources custodians Simmons proposed if Simmons agreed to add Josiah Wadsack, a lower-level corporate human resources employee. *See* August 2, 2021 Letter from J. Thompson to V. Bronson. In addition, Plaintiffs demanded to add as custodians Simmons' former CFOs (Mike Jones and Wes Morris) plus eight additional plant level employees, two of whom had never been mentioned previously. None of the persons listed in Plaintiffs' August 2, 2021, letter was

---

[107] Mistakenly dated "2020."

discussed during the previous meet and confer, other than Rachel Davenport, Seritha Twist, and Josiah Wadsack.

Simmons agreed to swap Amy Rathbun for Josiah Wadsack, and add Seritha Twist and Rachel Davenport as custodians, for a total of 18 custodians. *See* August 6, 2021 Letter from V. Bronson to J. Thompson. Simmons also pointed out that Plaintiffs' newest request included two people, Ernie Wilcox and Perla Nunez, whom had never been previously mentioned. Simmons also reminded Plaintiffs that two of its agreed custodians, Michael Owens and Veronica Handcock were or are plant level employees. Additionally, contrary to Plaintiffs' statements above, Simmons repeated that its CFOs were not involved in researching, recommending, or calculating the costs of wages or benefits paid to Simmons' employees. Simmons' CFO's sole involvement with wages and benefits is as a meeting attendee with Simmons' other executives during which Simmons' senior human resources managers present recommendations for yearly cost of living increases or enhanced benefits. The materials presented at those meetings, to the extent they exist, would be duplicative of documents of Simmons' other executives who are already agreed custodians.

In response to Simmons' August 6, 2021, letter, Plaintiffs agreed to withdraw their requests to add Simmons' CFOs as document custodians if Simmons would agree to add Jeff Norman (Senior Director of Prepared Foods), Marcos Castro (Senior Director of Plant Operations – plant manager), Brian Burke (former VP of Further Processing), Ernie Wilcox (plant level human resources employee), and Judi Bradshaw (plant level human resources employee), the latter of whom is another brand-new request. *See* August 9, 2021 Email from J. Thompson to V. Bronson.

Because Simmons does not view "swapping" two custodians for five as a compromise, Simmons agreed to add its former CFOs as custodians as Plaintiffs stated in their August 9, 2021, letter in lieu of adding an additional five custodians. *See* August 12, 2021 Letter from V. Bronson to J. Williams. Despite the fact that just three days prior Plaintiffs indicated the parties would have an agreement if Simmons agreed to add its CFOs, Plaintiffs rejected Simmons' agreement and insists Simmons add its CFOs as well as Jeff Norman, Marcos Castro, Brian Burke, Ernie Wilcox, and Judi Bradshaw, for a total of 25 custodians.

Courts apply several general principles in deciding disputes concerning custodians, all of which favor Simmons' position. One, the determination of relevant and proportionate custodians is a fact specific inquiry. *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, No-17-MD-2785-DDC-TJJ, 2018 WL 1440923, at *2 (D. Kan. March 15, 2018). Second, Simmons, as the party in the best position to know its structure and the role of its employees, is authorized to identify custodians most likely to possess responsive documents and information. *Id.* Third, unless Simmons' offer of custodians is "manifestly unreasonable or [Plaintiffs] demonstrate the resulting production is deficient," the Court should not disturb Simmons' offer of custodians. *Id.* Fourth, Plaintiffs have the burden of proving that Simmons' offer is not sufficient because Simmons is in the best position "to know and identify those individuals within its organization likely to have information relevant to the case." *Id.* And fifth, mere speculation that a person may have relevant information is not sufficient. *Id.* Plaintiffs cannot meet their burden of demonstrating that any of the additional custodians they seek would provide "unique relevant information not already obtained." *See In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2020 WL 3100016, at *1 (N.D. Fla. June 11, 2020) (quoting *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 107 (S.D.N.Y. 2013)).

Agreed Custodians

119

The parties have agreed to the following Simmons custodians:

| Name | Position |
| --- | --- |
| Todd Simmons | CEO |
| Gary Murphy | Former President and COO |
| David Jackson | President and COO |
| Steve Gardner | Former VP Human Resources |
| Dan Houston | Former Sr VP Human Resources |
| Mike Denson | Former compensation manager |
| Jaime Thieman | VP Human resources |
| Rachel Davenport | Former Senior VP Human Resources |
| Carrie DeBriyn Bingham | Former Director Human Resources |
| Arturo Towns | Former VP Human Resources |
| Kristi Pianalto | VP Benefits and Wellness |
| Seritha Twist | Former Sr. Director People Services, Compliance |
| Steven Jones | Compensation analyst |
| Michael Owens | Sr Director Human Resources Sr Director Benefits and Wellness Plant human resources manager |
| Lindsey Chaney | Former compensation analyst compensation manager |
| Veronica Handcock | Plant level human resources manager, recruiting manager |
| Pamela Phipps | Benefits assistant |
| Josiah Wadsack | Former compensation specialist |

<u>Plant-level Employees</u>

Plaintiffs seek to add Jeff Norman (Senior Director Prepared Foods), Marcos Casto (plant manager), Brian Burke (former Vice President of Further Processing), and Judi Bradshaw (plant level human resources employee) as custodians. [108]  Plaintiffs assert they are entitled to Simmons' plant level custodians because the complaint alleges plant-level human resources employees of other Defendants, located hundreds of miles away in states in which Simmons does not have operations, communicated with each other concerning compensation and benefits.  There are no allegations that any Simmons' plant level employees communicated with plant level human resources employees of another chicken producer.  Further, Simmons has already agreed to two custodians who are current or former plant-level human resources employees, Michael Owens and Veronica Handcock. Plaintiffs' request to add these additional plant level custodians is nothing more than an impermissible fishing expedition.

Furthermore, as stated previously, Simmons' plant level employees have no authority to set wages or benefits; instead, those decisions are made at the corporate level. Not only do plant level employees not have authority to set wages and benefits, neither are they responsible for researching

---

[108] Plaintiffs only agreed to drop their request to add Ernie Wilcox as a custodian today.

or recommending wages and benefits; that is the responsibility of Simmons' corporate level human resources department. Thus, in the highly unlikely event Simmons' plant level employees communicated with other poultry producers concerning compensation and benefits paid to employees in poultry processing plants, that information could not have had any impact on compensation and benefits provided to Simmons' employees in its poultry processing facilities unless it was transmitted to corporate level personnel, in which case, to the extent it exists, would be duplicative of documents of agreed custodians.

Plaintiffs assert Simmons' plant managers are appropriate custodians because the plant level human resources employees report to them. Plaintiffs are mistaken; Simmons' plant level human resources employees report to Simmons' corporate human resources employees. All of Simmons' corporate level senior human resources employees from 2007 to 2020 are agreed custodians. Plaintiffs cannot demonstrate the plant-level employees have any "unique responsive documents" that might be contained in their custodial files. *Enslin*, 2016 WL 7042206, at *3; *U.S. Home Corp. v. Settlers Crossing, L.L.C.*, 2012 WL 13014153, at *4 (D. Md. Oct. 24, 2012) (denying request for custodian with "duplicative" documents).

Plaintiffs' argument that they are entitled to plant-level custodians commensurate with the number of a Defendants' poultry processing plants is unavailing. The crucial issue is the identification of persons responsible for recommending and setting wages for Simmons' employees. As previously stated, that occurs at Simmons' corporate level, not at the plant level. Whether other Defendants have agreed to any number of plant level employee custodians is irrelevant to the issue of whether plant level employees are appropriate Simmons custodians.

Additionally, Plaintiffs' request for four (5) additional plant level custodians (in addition to the two already agreed custodians) is disproportionate and unreasonable. Plaintiffs have asked for just three (3) plant level custodians for Tyson and five (5) for Butterball, both of whom are substantially larger than Simmons. Simmons has already agreed to two current or former plant level custodians, which is more than sufficient.

<u>Simmons' Former CFOs</u>

Plaintiffs seek to add Mike Jones (CFO until January 2012) and Wes Morris (CFO August 2018 to January 2020) as custodians. Plaintiffs' justification for their request is based on two inaccuracies. First, Plaintiffs inaccurately and with no factual foundation state Simmons' CFOs are "responsible for analyzing Simmons' labor budgets and providing input to CEOs regarding these budgets." Plaintiffs simply made that up. As Simmons' August 6, 2021, letter states, Simmons' CFOs are *not* responsible for researching, recommending, or calculating the costs of wages or benefits paid to Simmons' employees. Simmons' CFO's sole involvement with wages and benefits is as a meeting attendee with Simmons' other executives during which Simmons' senior human resources managers present recommendations for yearly cost of living increases or enhanced benefits. The materials presented at those meetings, to the extent they exist, would be duplicative of documents of Simmons' other executives who are already agreed custodians.

Second, Plaintiffs seek to tie Simmons' CFOs to an alleged "Compensation Committee" that allegedly discussed "bonus budgets" at the WMS meetings. Neither Mike Jones nor Wes Morris ever attended a WMS meeting. In fact, Wes Morris was not employed by Simmons until August 2018, well after Simmons ceased attending the meetings. Plaintiffs are in possession of documents listing WMS meeting attendees and are well aware that neither Mike Jones nor Wes Morris is listed.

Plaintiffs additionally speculate that Simmons' CFOs "may be in possession of an email referencing the use of deanonymized Agri Stats data" used to compare Simmons' labor costs with other poultry producers.  Plaintiffs' mere speculation of the existence of a document and who may be in possession of it is not a sufficient basis for designating a person as a custodian. *MGA Ent., Inc. v. Nat'l Prod. Ltd.*, 2011 WL 4550287, at *2 (C.D. Cal. Oct. 3, 2011).  As stated previously, the persons responsible for researching, analyzing, and recommending wages and benefits for Simmons' employees are its senior human resources employees, all of whom are custodians.  Thus, the likelihood of Mike Jones or Wes Morris possessing an email comparing Agri Stats numbers that is not a duplicate of documents in the custodial files of Simmons' senior human resources managers or its President, COO, or CEO is slim to none.  As with the plant level custodians, Plaintiffs cannot demonstrate the CFOs have any "unique responsive documents" that might be contained in their custodial files. *Enslin*, 2016 WL 7042206, at *3; *U.S. Home Corp. v. Settlers Crossing, L.L.C.*, 2012 WL 13014153, at *4 (D. Md. Oct. 24, 2012) (denying request for custodian with "duplicative" documents).

Plaintiffs state there is no burden to Defendants for searching, collecting, and reviewing duplicative custodial documents because Plaintiffs will allow sorting and de-duplication of documents.  This argument ignores the burden of searching, collecting, processing, and reviewing duplicative custodial documents, as well as the cost of hosting duplicative documents.  Discovery must be proportionate; parties are not entitled to every possible relevant document. Fed. R. Civ. P. 26(b)(1); *Brown v. Mountainview Cutters, LLC*, 2016 WL 3045349, at *4 (W.D. Va. May 27, 2016); *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 523 (D. Md. 2010) ("[A]ll permissible discovery must be measured against the yardstick of proportionality.").  Discovery is expensive and burdensome.  Simmons is one of the smallest Defendants and all its poultry processing facilities are located within 60 miles of Siloam Springs, Arkansas.  Simmons has already agreed to 18 custodians.  Plaintiffs agreed to accept only 13 Peco[109] custodians, despite the fact that Peco is a much larger company than Simmons.  Plaintiffs agreed to accept 18 Mountaire custodians, another company larger than Simmons.  There is no justification for demanding more than 18 Simmons custodians.

More importantly, however, the custodial issue is not just a numbers game; instead, it involves providing custodians who are the most likely persons to have knowledge or documents that are relevant and responsive to Plaintiffs' allegations.  That is exactly what Simmons has proposed. Its agreed custodians are those persons who were involved in reviewing, recommending, and approving wages and benefits paid to its employees in its poultry processing facilities, including executives at the highest level of the company.

## V.    REQUEST FOR HEARING

Pursuant to Local Rule 105.6, Defendants hereby request a hearing. Given the variety of issues addressed in this Joint Letter Brief and the complexity of the case, Defendants believe that a hearing would aid the Court in its ruling.

---

[109]  Plaintiffs state they agreed to fewer Peco custodians because they do not allege Peco attended any WMS meetings. That may be true, however, Simmons' agreed custodians include all Simmons employees who attended a WMS meeting.

Dated: August 19, 2021                          Respectfully submitted,

/s/ Brent W. Johnson                            /s/ Julia E. McEvoy
Daniel A. Small (D. Md. Bar # 20279)            Julia E. McEvoy (admitted *pro hac vice*)
Benjamin D. Brown (admitted *pro hac vice*)     Christopher N. Thatch (Bar No. 29097)
Brent W. Johnson (admitted *pro hac vice*)      JONES DAY
Daniel H. Silverman (admitted *pro hac vice*)   51 Louisiana Avenue, N.W.
Alison S. Deich (admitted *pro hac vice*)       Washington, D.C. 20001-2113
Louis Katz (admitted *pro hac vice*)            (202) 879-3867
COHEN MILSTEIN SELLERS & TOLL                   jmcevoy@jonesday.com
PLLC                                            cnthatch@jonesday.com
1100 New York Avenue NW
5th Floor                                       Faris Rashid (admitted *pro hac vice*)
Washington, DC 20005                            Davida S. Williams (admitted *pro hac vice*)
Telephone: (202) 408-4600                       GREENE ESPEL PLLP
Fax: (202) 408-4699                             222 South Ninth Street, Suite 2200
dsmall@cohenmilstein.com                        Minneapolis, MN 55402
bbrown@cohenmilstein.com                        (612) 373-0830
bjohnson@cohenmilstein.com                      khibbard@greeneespel.com
dsilverman@cohenmilstein.com
adeich@cohenmilstein.com                        *Attorneys for Defendant Cargill Meat*
lkatz@cohenmilstein.com                         *Solutions Corporation*

Steven W. Berman (admitted *pro hac vice*)
Breanna Van Engelen (admitted *pro hac vice*)   /s/ Steven F. Barley
HAGENS BERMAN SOBOL SHAPIRO                      Steven F. Barley (Bar No. 10049)
LLP                                             HOGAN LOVELLS US LLP
1301 Second Avenue, Suite 2000                  100 International Drive,
Seattle, Washington 98101                       Baltimore, MD 21202
Tel: (206) 623-7292                             Tel: (410) 659-2700
steve@hbsslaw.com                               Fax: (410) 659-2701
breannav@hbsslaw.com                            Steve.barley@hoganlovells.com

Shana E. Scarlett (admitted *pro hac vice*)     William L. Monts III (admitted *pro hac vice*)
Rio R. Pierce (admitted *pro hac vice*)         Justin W. Bernick (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO                      HOGAN LOVELLS US LLP
LLP                                             555 Thirteenth Street, N.W.
715 Hearst Avenue, Suite 202                    Washington, D.C. 20004
Berkeley, CA 94710                              Tel: (202) 637-5600
Tel: (510) 725-3000                             Fax: (202) 637-5910
shanas@hbsslaw.com                              William.monts@hoganlovells.com
riop@hbsslaw.com                                Justin.bernick@hoganlovells.com

Elaine T. Byszewski (*pro hac vice*             *Attorneys for Defendant Agri Stats, Inc.*
forthcoming)

HAGENS BERMAN SOBOL SHAPIRO
LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Tel: (213) 330-7150
elaine@hbsslaw.com

Matthew K. Handley (D. Md. Bar # 18636)
Rachel E. Nadas (admitted *pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
777 6th Street, NW, Eleventh Floor
Washington, DC 20001
Telephone: (202) 559-2433
mhandley@hfajustice.com
rnadas@hfajustice.com

George F. Farah (admitted *pro hac vice*)
Rebecca P. Chang (admitted *pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
81 Prospect Street
Brooklyn, NY 11201
Telephone: (212) 477-8090
gfarah@hfajustice.com
rchang@hfajustice.com

William H. Anderson (admitted *pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
4730 Table Mesa Drive
Suite G-200
Boulder, CO 80305
Telephone: (202) 559-2433
wanderson@hfajustice.com

*Co-Lead Counsel for Plaintiffs and the
Proposed Class*

Brian D. Clark (admitted *pro hac vice*)
Stephen J. Teti (admitted *pro hac vice*)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel:  (612) 339-6900
Fax:  (612) 339-0981
bdclark@locklaw.com
steti@locklaw.com

*/s/ David B. Hamilton*
David B. Hamilton (Bar No. 04308)
Hillary V. Colonna (Bar No. 19704)
WOMBLE BOND DICKINSON (US) LLP
100 Light Street, 26th Floor
Baltimore, MD 21202
Tel: (410) 545-5850
Fax: (410) 545-5801
David.Hamilton@wbd-us.com
Hillary.Colonna@wbd-us.com

Hayden J. Silver III (admitted *pro hac vice*)
Jonathon D. Townsend (admitted *pro hac
vice*)
WOMBLE BOND DICKINSON (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Tel: (919) 755-2188
Fax: (919) 755-7099
Jay.Silver@wbd-us.com
Jonathon.Townsend@wbd-us.com

*Attorneys for Defendant Butterball, LLC*

*/s/ Brian D. Frey*
Brian D. Frey (Bar No. 17592)
ALSTON & BIRD LLP
The Atlantic Building 950 F Street, N.W.
Washington, D.C. 20004
Tel: (202) 239-3067
Fax: (202) 239-3333
Brian.Frey@alston.com

B. Parker Miller (admitted *pro hac vice*)
Valarie Williams (admitted *pro hac vice*)
Raechel J. Bimmerle (admitted *pro hac vice*)
ALSTON & BIRD LLP
1201 West Peachtree St.
Atlanta, GA 30309
Tel: (404) 881-7000
Fax: (404) 881-7777
Parker.Miller@alston.com
Valarie.Williams@alston.com
Raechel.Bimmerle@alston.com

124

Candice J. Enders (admitted *pro hac vice*)
Julia R. McGrath (admitted *pro hac vice*)
BERGER MONTAGUE PC
1818 Market St., Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215)-875-4604
cenders@bm.net
jmcgrath@bm.net

*Additional Counsel for Plaintiffs and the Proposed Class*

*Attorneys for Defendant Fieldale Farms Corporation*

/s/ Steven K. White
Steven K. White (Bar No. 04274)
STINSON LLP
1775 Pennsylvania Avenue, N.W., Suite 800
Washington, D.C. 20006
Tel: (202) 785-91000
Fax: (202) 572-9963
Steven.white@stinson.com

William L. Greene (admitted *pro hac vice*)
Peter J. Schwingler (admitted *pro hac vice*)
Jon M. Woodruff (admitted *pro hac vice*)
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 335-1500
Fax: (612) 335-1657
William.greene@stinson.com
Peter.schwingler@stinson.com
Jon.woodruff@stinson.com

J. Nicci Warr (admitted *pro hac vice*)
STINSON LLP
7700 Forsyth Blvd., Suite 1100
St. Louis, MO 63105
Tel: (314) 259-4570
Nicci.warr@stinson.com

Lauren T. Fleming (admitted *pro hac vice*)
STINSON LLP
1201 Walnut St., Suite 2900
Kansas City, MO 64105
Tel: (816) 842-8600
Lauren.fleming@stinson.com

Gary V. Weeks (admitted *pro hac vice*)
K.C. Dupps Tucker (admitted *pro hac vice*)
Kristy E. Boehler (admitted *pro hac vice*)
THE LAW GROUP OF NW. ARKANSAS LLP
1830 Shelby Lane
Fayetteville, AR 72704

Tel: (479) 316-3760
Gary.weeks@lawgroupnwa.com
Kc.tucker@lawgroupnwa.com
Kristy.boehler@lawgroupnwa.com

*Attorneys for Defendants George's, Inc. and
George's Foods, LLC*

*/s/ Jonathan H. Todt*
Jonathan H. Todt (Bar No. 07166)
FAEGRE DRINKER BIDDLE & REATH
LLP
1500 K Street, N.W., Suite 1100
Washington, D.C. 20005-1209
Tel: (202) 230-5823
Fax: (202) 842-8465
Jonathan.todt@faegredrinker.com

Richard A. Duncan (admitted *pro hac vice*)
Craig S. Coleman (admitted *pro hac vice*)
Emily E. Chow (admitted *pro hac vice*)
Isaac B. Hall (admitted *pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH
LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Tel: (612) 766-7000
Fax: (612) 766-1600
Richard.duncan@faegredrinker.com
Craig.coleman@faegredrinker.com
Emily.chow@faegredrinker.com
Isaac.hall@faegredrinker.com

Christopher A. Kreuder (admitted *pro hac
vice*)
FAEGRE DRINKER BIDDLE & REATH
LLP
801 Grand Avenue, 33rd Floor
Des Moines, IA 50309
Tel: (515) 248-4733
Fax: (515) 248-9010
Christopher.kreuder@faegredrinker.com

*Attorneys for Defendant Jennie-O Turkey
Store, Inc.*

126

*/s/ James E. Edwards, Jr.*
James E. Edwards, Jr. (MDB No. 02360)
Ty Kelly Cronin (MDB No. 27166)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
100 Light Street
Baltimore, MD 21202
Tel: (410) 685-1120
Fax: (410) 547-0699
jedwards@bakerdonelson.com
tykelly@bakerdonelson.com

*Pro hac vice:*
John G. Calender (DCB No. 939124)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
901 K Street, N.W., Suite 900
Washington, D.C. 20001
Tel: (202) 508-3474
Fax: (202) 220-2274
jcalendar@bakerdonelson.com

Scott W. Pedigo (MSB No. 10735)
Amy L. Champagne (MSB No. 102447)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
Mailing: P.O. Box 14167
Jackson, Mississippi 39236-4167
Physical: One Eastover Center
100 Vision Drive, Suite 400
Jackson, Mississippi 39211
Tel: (601) 351-2400
Fax: (601) 251-2424
spedigo@bakerdonelson.com
achampagne@bakerdonelson.com

Russell W. Gray (TNB No. 16120)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
1800 Republic Centre
633 Chestnut Street
Chattanooga, Tennessee 37450-1801
Tel: (423) 209-4218
Fax: (423) 752-9563
rgray@bakerdonelson.com

127

*Attorneys for Defendant Koch Foods, Inc.*

/s/ *J. Douglas Baldridge*
J. Douglas Baldridge (Bar No. 11023)
Lisa Jose Fales (Bar No. 08141)
Danielle R. Foley (Bar No. 21113)
Andrew T. Hernacki (Bar No. 21107)
VENABLE LLP
600 Massachusetts Ave, N.W.
Washington, DC 20001
Tel: (202) 344-4000
jbaldridge@venable.com
ljfales@venable.com
drfoley@venable.com
athernacki@venable.com

*Attorneys for Defendants Perdue Farms, Inc.*
*and Perdue Foods, LLC*

/s/ *Kristin A. Knapp*
Kristin A. Knapp (Bar No. 21169)
SIDLEY AUSTIN LLP
1501 K Street, N.W. #600
Washington, D.C. 20005
Tel: (202) 736-8219
Fax: (202) 736-8711
kknapp@sidley.com

Colleen M. Kenney (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Tel: (312) 853-4166
Fax: (312) 853-7036
ckenney@sidley.com

John W. Treece (admitted *pro hac vice*)
1135 West Montana St.
Chicago, IL 60614
Tel: (312) 961-7808
jtreece@jwtreece.com

Amanda Wofford (admitted *pro hac vice*)
Bourgon Reynolds (admitted *pro hac vice*)
ROSE LAW FIRM

128

A Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201
Tel: (501) 375-9131
Fax: (501) 375-1309
awofford@roselawfirm.com
breynolds@roselawfirm.com

*Attorneys for Defendant Mountaire Farms Inc.*

*/s/ Daniel E. Laytin*
Daniel E. Laytin, P.C. (admitted *pro hac vice*)
Christa C. Cottrell, P.C. (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Tel: (312) 862-2000
dlaytin@kirkland.com
ccottrell@kirkland.com

Joseph W. Hovermill (Bar No. 22446)
Alexander P. Creticos (Bar No. 30199)
Miles & Stockbridge P.C.
100 Light Street
Baltimore, Maryland 21202
Tel: (410) 385-3442
Fax: (410) 385-3700
jhovermill@milsstockbridge.com
acreticos@milsstockbridge.com

*Attorneys for Defendant Sanderson Farms, Inc.*

*/s/ Cary Silverman*
Cary Silverman (Bar No. 15137)
SHOOK HARDY & BACON LLP
1880 K Street, N.W., Suite 1000
Washington, D.C. 20006
Tel: (202) 783-8400
Fax: (202) 783-4211
csilverman@shb.com

Lynn H. Murray (admitted *pro hac vice*)
SHOOK HARDY & BACON LLP

129

111 S. Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7700
Fax: (312) 558-1195
lhmurray@shb.com

Laurie A. Novion (admitted *pro hac vice*)
SHOOK HARDY & BACON LLP
2555 Grand Blvd.
Kansas City, MO 64108
Tel: (816) 474-6550
Fax: (816) 421-5547
lnovion@shb.com

John R. Elrod (admitted *pro hac vice*)
Vicki Bronson (admitted *pro hac vice*)
CONNER & WINTERS
4375 N. Vantage Drive, Suite 405
Fayetteville, AR 72703
Tel: (479) 582-5711
jelrod@cwlaw.com
vbronson@cwlaw.com

*Attorneys for Defendant Simmons Foods, Inc.*

/s/ Eric Pelletier
Eric Pelletier (Bar No. 12716)
OFFIT KURMAN, P.A.
4800 Montgomery Lane, 9th Floor
Bethesda, Maryland 20814
Tel: (240) 507-1739
Fax: (240) 507-1735
epelletier@offitkurman.com

John F. Terzaken
Abram J. Ellis
Elizabeth H. French
SIMPSON THACHER & BARTLETT LLP
900 G Street, N.W.
Washington, D.C. 20001
Tel: (202) 636-5500
Fax: (202) 636-5502

*Attorneys for Defendants Tyson Foods, Inc.*
*and Keystone Foods, LLC*

130

/s/ Christopher E. Ondeck
Christopher E. Ondeck
Stephen R. Rhuk
Rucha A. Desai
PROSKAUER ROSE LLP
1011 Pennsylvania Ave., N.W.
Suite 600 South
Washington, D.C. 20004
Tel: (202) 416-6800
Fax: (202) 416-689
condeck@proskauer.com
schuk@proskauer.com
rdesai@proskauer.com

*Attorneys for Defendant Wayne Farms LLC*

/s/ Gerard P. Martin
Gerard P. Martin (Bar No. 00691)
Jeffrey M. Lichtstein (Bar No. 20731)
ROSENBERG MARTIN GREENBERG,
LLP
25 S. Charles Street, 21st Floor
Baltimore, Maryland 21201
Tel: (410) 727-6600
Fax: (410) 727-1115
gmartin@rosenbergmartin.com
jlichtstein@rosenbergmartin.com

*Attorneys for Defendant Webber, Meng, Sahl and Company*

/s/ Edward J. Baines
Edward J. Baines (USDC Bar No. 06776)
Geoffrey M. Gamble (USDC Bar No. 28919)
Gregory L. Waterworth (USDC Bar No. 20938)
SAUL EWING ARNSTEIN & LEHR LLP
500 E. Pratt Street, 8th Floor
Baltimore, MD 21202-3133
Tel: (410) 332-8600
Fax: (410) 332-8862
Ted.baines@saul.com
Geoff.gamble@saul.com
Greg.waterworth@saul.com

Patrick Fitzgerald (admitted *pro hac vice*)

131

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
144 N. Wacker Drive
Chicago, IL 60606
Tel: (312) 407-0700
Fax: (312) 407-0411
Patrick.fitzgerald@skadden.com

Boris Bershteyn (admitted *pro hac vice*)
Lara Flath (admitted *pro hac vice*)
Sam Auld (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
Fax: (212) 735-2000
Boris.bershteyn@skadden.com
Lara.flath@skadden.com
Sam.auld@skadden.com

*Attorneys for Defendant Peco Foods, Inc.*