# EXHIBIT D

## DECLARATION OF G. JONATHAN MENG

I, Jonathan Meng, declare as follows:

    1.      I have personal knowledge of all the facts stated herein.

    2.      Since 1988, I have been employed at Webber, Meng, Sahl & Company, Inc.— also known as "WMS." Since 1991, I have been a shareholder at WMS. In 2000, I became President of WMS and have occupied that position since.

**<u>Background on WMS</u>**

    3.      WMS is a Pennsylvania-based consulting company that specializes in providing compensation services. Since its founding, WMS has provided compensation consulting services to over one hundred companies across a broad range of industries. Clients have included toy manufacturers, steel processors, specialty chemical producers, agricultural companies, municipalities, and non-profit organizations.

    4.      WMS has provided two kinds of compensation consulting services to its clients. First, WMS has assisted certain clients with the development of compensation plans, including determining the value of particular job positions and conducting analyses to improve internal equity. Second, WMS has conducted compensation surveys of employers competing in local, regional, and/or nationwide labor markets. During the past two decades, most of WMS's services have consisted of conducting these compensation surveys for clients.

    5.      Since 2007, WMS has only had three employees: myself, Scott Ramsey, and Cindy Porter. My role has primarily focused on interfacing with prospective and existing clients, designing industry-specific compensation surveys, collecting survey data from clients, presenting survey results to clients, and obtaining payment from clients. Mr. Ramsey has primarily focused

on performing quantitative analyses of compensation data obtained from clients. Ms. Porter's role has been largely administrative.

## WMS Markets that It Conducts Surveys that Comply with Safe Harbor Guidelines

6.     Since its inception, WMS has marketed its compensation consulting services to prospective clients across a range of industries. WMS engaged in that marketing through, among other avenues, its website, advertising, brochures, presentations, letters, and other written and oral communications with prospective clients.

7.     One of the ways in which WMS has marketed its compensation survey services is by stating that it conducts and designs surveys in a manner that adheres to specific guidelines that were jointly issued by the United States Department of Justice and the Federal Trade Commission in 1996 as well as to principles set forth in *Todd v. Exxon*.

8.     WMS's website explains that, in general, the Department of Justice and the Federal Trade Commission will not bring antitrust cases against competitors exchanging compensation data through a survey if that survey meets specific "safe harbor" criteria. WMS's website identifies those particular criteria as follows:

- "The survey must be managed by a third-party (i.e. consulting firm);"

- "The information provided by participants is based on data more than three months old;"

- "There have to be at least five providers offering data and no individual provider's data should represent more than 25% on a weighted basis of that statistic; and lastly;"

- "Any information disseminated must be sufficiently aggregated so participants are not able to identify the compensation paid by any particular provider."

These criteria are commonly referred to (including by WMS) as the "Safe Harbor Guidelines."

9.      Since the 1990s, WMS has marketed itself as providing compensation survey services that are compliant with the Safe Harbor Guidelines. Specifically, WMS has marketed to prospective clients that—as an independent, third-party consulting firm—it can and does conduct compensation surveys that comply with each of the criteria identified in the Safe Harbor Guidelines. Indeed, when WMS submitted written proposals to prospective clients, it often marketed its ability to comply with the Safe Harbor Guidelines in the very first paragraph. A true and accurate copy of one such proposal is attached as Exhibit 1, which is bates stamped WMS-PW0000000121 - 22 and was created and maintained in the ordinary course of WMS's business.

10.     This marketing pitch has been central to WMS's business for a key reason: if the Safe Harbor Guidelines and antitrust laws did not exist, companies that competed for labor and were willing to share their compensation information could just exchange their compensation schedules and plans directly with each other and thus obviate the need for the survey services of WMS and other compensation consultants.

11.     WMS regularly worked with existing clients to help structure compensation surveys in a manner that complies with the Safe Harbor Guidelines. WMS would, among other things, routinely tell existing clients that the compensation surveys should employ formats that both exclude future compensation information and aggregate results to prevent the participants from identifying the individual sources of particular data. Most of WMS's clients consistently heeded those recommendations; as described in greater below, the poultry processors that retained WMS did not.

12.     Unlike those poultry processors, many of WMS's clients were determined to comply with, and strictly adhered to, the Safe Harbor Guidelines. For example, for many years, WMS provided compensation survey services to Occidental Chemical Corporation and often

communicated with Ian Strathern, its Compensation Analyst, when doing so. Over the years, Mr.

Strathern wrote the following emails to me:

- On September 26, 2013, Mr. Strathern emailed me: "Regarding the General Laborer position only 4 sites returned data so it would appear to me that the minimum # of companies (5) required to make the data reportable for this position has not been met. In your opinion is this reportable data based on the safe harbor guidelines?" In response, I removed the General Laborer position from the survey results.

- On December 9, 2015, Mr. Strathern emailed me: "We have some updated data that is a few weeks away from being safe harbor if any results are released before January of next year. Based on the email it looks like you are targeting mid January with when the results are released via hard copy and I wanted to be sure that nothing would be released prior to the end of the year electronically so that we remain safe harbor with respect to the data we provide."

- On December 15, 2016, Mr. Strathern emailed me: "Regarding the shift differentials (previously mentioned concern) I would like to not report any data when less than 5 companies report information of a $ value on these questions. I just don't feel comfortable reporting the information or having the information. I understand you feel that it is okay to have the way it is right now, but I just don't have that same comfort level."

- On December 12, 2017, Mr. Strathern emailed me: "Regarding both copies of the Niagara PVC surveys I see a couple of potential concerns: For both survey documents I see that two companies have listed specific pay rates in the Supervisor Step-Up Pay on page 22. As these are individual pay rates and not aggregated I think we have to change what is listed on the documents. ... I am going to shred and delete the copy that I had as I don't feel comfortable with the specific hourly rate on the results."

True and accurate copies of these emails are attached as Exhibits 2, 3, 4, and 5, which are bates

stamped WMS-PW0000000086 - 88, WMS-PW0000000393 - 94, WMS-PW0000000001, and

WMS-PW0000000002, respectively, and were each maintained in the ordinary course of WMS's

business.

**Providing Compensation Consulting Services to the Poultry Industry**

13.    WMS provided compensation consulting services to leading processors in the

poultry industry from 2000 until 2019. Specifically, WMS conducted one or more industry-wide

compensation surveys, and provided analyses of those survey results, for clients in the poultry processing industry during every year between 2000 and 2019.

14.     WMS began conducting and analyzing surveys for the poultry processing industry after submitting, and winning, a bid in response to a Request for Proposal ("RFP") in 2000. Tyson was involved in issuing the RFP. In 2000, Robert Sahl, a founding partner of WMS, sent WMS's bid to Karen Percival, then Tyson's Vice President of Compensation.

15.     WMS never executed a contract or retainer agreement with any poultry processor to provide compensation consulting services in response to the RFP or otherwise. Instead, after winning the RFP, WMS began conducting compensation surveys for a group of poultry processors without a formal written agreement.

16.     The processors that participated in the annual compensation survey referred to themselves as the "Poultry Industry Survey Group." The composition of the Poultry Industry Survey Group sometimes changed; new members sometimes joined the Group, and existing members sometimes withdrew from the Group.

17.     Each year from 2000 through 2019, the compensation consulting services provided by WMS to the Poultry Industry Survey Group included two steps. First, WMS conducted an industry-wide compensation survey (hereafter "Poultry Industry Compensation Survey"). The Poultry Industry Compensation Survey sought detailed compensation data—including wages, salaries, benefits, and bonuses—regarding dozens of positions at poultry complexes, including processing plants, hatcheries, and feed mills. At the beginning of each year, WMS sent the Survey to each member of the Poultry Industry Survey Group for completion. Once WMS received the Survey results from each participant, WMS combined the individualized results into a single Survey report (hereafter "Survey Results Report"). WMS then distributed the Survey Results

Report to each of the member of the Poultry Industry Survey Group. From 2000 until 2003, Robert Sahl distributed the Survey Results Reports to the Poultry Industry Survey Group; from 2004 until 2019, I did so.

18.    Second, a WMS executive summarized the results of the Poultry Industry Compensation Survey during an annual, in-person meeting (hereafter "Poultry Industry Compensation Meeting") that was held by the members of the Poultry Industry Survey Group. A WMS executive attended the annual Meeting each year from 2001 through 2019, with the exception of the year 2003. The annual Meeting typically consisted of between six or seven in-person sessions, during which the members of the Poultry Industry Survey Group engaged in roundtable discussions regarding compensation. Until 2018, WMS was only invited to attend two or fewer of those roundtable sessions, and WMS was excluded from the remaining roundtable sessions held during the annual Meetings. During the period 2000 through 2002, only Robert Sahl (and I on one occasion) attended any roundtable sessions at annual Meetings on behalf of WMS. From 2004 through 2019, only I attended roundtable sessions on behalf of WMS.

19.    At the roundtable sessions I attended, I would customarily make a PowerPoint presentation addressing the results of the Poultry Industry Compensation Survey. Following that presentation, the attendees would discuss the Survey results and the structure of the Survey itself with me. Periodically, an attendee would also seek to discuss optimal compensation rates, future compensation plans, or a particular processor's compensation practices, but I prohibited those discussions from proceeding whenever I was present. From 2004 through 2016, after the sessions that I attended concluded, the members of the Poultry Industry Survey Group held multiple, additional roundtable sessions from which I was excluded. According to documents that I received,

the members of the Poultry Industry Survey Group discussed their compensation practices, including the Survey results, during the private roundtable discussions that excluded me.

20.     Throughout the year, the members of the Poultry Industry Survey Group frequently communicated with each other via email. Those email discussions on which I was copied often involved management of the Poultry Industry Compensation Survey (such as recruitment of participants and modifications to the Survey) and preparations for the Poultry Industry Compensation Meeting (such as hotel bookings and meeting agendas). As detailed further below, those email communications on which I was copied also sometimes involved discussions between members of the Poultry Industry Survey Group regarding specific benefits, during which individual poultry processors disclosed their own company's particular benefits practices to competitors. During some of those email discussions, the members even polled each other about specific benefits practices. Although I was copied on some of those emails addressing optimal benefits practices, I typically did not participate in those discussions.

**WMS Was Hired by Poultry Processors to Conceal Their Misconduct**

21.     Jonathan Allen, then Corporate Human Resources Director of Fieldale Farms, repeatedly informed me that, prior to retaining WMS as an independent consultant to perform compensation surveys in 2000, multiple members of the Poultry Industry Survey Group regularly conducted in-person meetings to directly exchange and discuss compensation data with one another. Mr. Allen explained that executives from each of those poultry processors would meet in a private room and bring enough copies of their salary and wage data to distribute to all the other attendees. He explained that the attendees would then exchange and discuss their compensation schedules.

22.     Mr. Allen typically introduced me at annual Poultry Industry Compensation Meetings as an independent third-party consultant whose company was retained to conduct the Poultry Industry Compensation Survey. During many of those introductions, Mr. Allen also mentioned that before members of the Poultry Industry Survey Group retained WMS in 2000 to conduct the Poultry Industry Compensation Surveys, those poultry processors directly exchanged and discussed compensation schedules with each other.

23.     When the Poultry Industry Survey Group first hired WMS to conduct the Poultry Industry Compensation Survey, I believed that the participating poultry processors were, in good faith, seeking to halt their improper direct exchanges of compensation data and, instead, obtain industry-wide compensation information in an appropriate manner. At the time, I believed that those poultry processors were genuinely seeking to ensure that their behavior was compliant with the Safe Harbor Guidelines and the antitrust laws.

24.     Over time, however, I came to believe that the members of the Poultry Industry Survey Group were not actually seeking to comply with the Safe Harbor Guidelines or antitrust law. Rather, I ultimately concluded that the members of the Poultry Industry Survey Group likely hired WMS as an independent consultant to establish the *appearance* of compliance with the Safe Harbor Guidelines and antitrust law and obtain compensation data in a manner that sometimes *seemed* permissible. I came to believe that, even while retaining WMS to conduct surveys, the members of the Poultry Industry Survey Group were (1) exchanging compensation data in a manner that allowed them to identify the wages, salaries, and benefits that each poultry processor was providing to poultry complex workers and (2) discussing both future and optimal compensation practices and rates during meetings and communications that excluded WMS. I ultimately reached this conclusion for four reasons.

25.     First, unlike other clients with which I have worked, decisions regarding the content of each Poultry Industry Compensation Survey and each Survey Results Report, as well as the participants in each Survey, were made *exclusively* and *collaboratively* by a group of competing poultry processors. As described in more detail below, those competing poultry processors reached agreements regarding what positions to cover in the Survey, which compensation data to seek in the Survey, how to structure the questions in the Survey, how to revise the Survey, how often to conduct the Survey, which participants to include in the Survey, and what information to display in the Survey Results Reports. By contrast, the compensation surveys created by WMS for other clients were customarily either designed by WMS and/or a single client.

26.     Second, the members of the Poultry Industry Survey Group collaborated to design and implement compensation surveys that were inconsistent with the Safe Harbor Guidelines, including in the following ways:

o   The Poultry Industry Survey Group directed WMS to include future salary data in the Poultry Industry Compensation Surveys and Survey Results Reports. Specifically, they insisted that the Surveys contain questions regarding future plans for salary increases and salary range increases and that the Survey Results Reports summarize the answers to these questions. I removed all references to future salary data from the Surveys and Reports in 2017 because those references (which involved non-unionized labor) were not compliant with the Safe Harbor Guidelines.

o   From at least 2001 through 2004, the Poultry Industry Survey Group directed WMS to display disaggregated, raw compensation data regarding salaries, hourly wages, and benefits in the annual Survey Results Reports. Although those Reports ostensibly concealed the identity of the sources of the individualized data by associating each set of reported data with a unique letter code, the contents of those Reports readily allowed the members of the Poultry Industry Survey Group to match each participating processor with its letter code. I halted the practice of including such content in the Reports in 2005 because doing so was not compliant with the Safe Harbor Guidelines.

o   From 2013 through 2016, the Poultry Industry Survey Group directed WMS to display raw and disaggregated compensation data concerning hourly paid workers, broken down by plant, in conjunction with the annual Survey Results Reports. Although the results of those Surveys did not explicitly disclose which plant belonged to which poultry processor, I had warned members of the Poultry Industry Survey Group in 2012 that the format of the Reports could potentially allow participants to determine which

plant—and which raw compensation data—belonged to which of their rivals. I halted the practice of distributing this raw and disaggregated data in 2017 because it was not compliant with the Safe Harbor Guidelines.

o   From 2013 through 2015, Tyson sponsored and financed, and the members of the Poultry Industry Survey Group participated in, another compensation survey conducted by WMS that also provided processors with the raw, disaggregated data regarding the compensation of hourly paid workers at their respective poultry plants. Compared to the Poultry Industry Compensation Survey, this Tyson-sponsored survey provided even more plant-level information that could facilitate the deanonymization of the results.

All of the above examples are addressed in greater detail below.

27.   Third, over the years, I witnessed many instances when members of the Poultry Industry Survey Group sought to engage in direct and improper communications about compensation—often until I put a stop to those communications. For example:

o   During the sessions at the annual Poultry Industry Compensation Meetings that I attended, executives representing members of the Poultry Industry Survey Group sometimes asked each other questions about a particular processor's compensation practices or sought to discuss future compensation plans or optimal compensation rates. Whenever a participant attempted to have such a conversation in my presence, I would instruct the participant to halt the conversation. However, nothing prevented those same participants from re-asking improper questions of, or discussing future or optimal compensation rates with, their competitors in the roundtable sessions I did not attend.

o   At the annual Poultry Industry Compensation Meetings that I attended, the executives of the participating poultry processors sometimes disclosed that they had agreed to contact each other directly—and without the presence of WMS—to discuss the compensation of particular positions at poultry complexes. Whenever a participant raised these plans in my presence, I informed the participants that engaging in such communications would be improper.

o   In group emails on which I was copied, members of the Poultry Industry Survey Group frequently asked each other questions about their respective compensation practices and often conducted on-the-spot, non-anonymized email surveys regarding particular compensation practices, including specific benefits that were not covered by the Poultry Industry Compensation Survey. I did not participate in those emails or surveys.

All of the above examples are addressed in greater detail below.

28.   Fourth, I was excluded from in-person meetings between members of the Poultry Industry Survey Group that, among other things, involved discussions about compensation. Until

2017, immediately after the roundtable sessions that I attended at the Poultry Industry Compensation Meetings with executives representing the members of the Poultry Industry Survey Group, the same executives conducted several other private roundtable sessions from which I was excluded. During those roundtable sessions that excluded me, the executives specifically discussed compensation, including the results of the Poultry Industry Compensation Survey. I know this to be true for several reasons, including:

- o Many of the written agendas for the Poultry Industry Compensation Meetings specify that the results of the Poultry Industry Compensation Survey will be further discussed during the private roundtable sessions that excluded me.

- o I received emails from members of the Poultry Industry Survey Group indicating that the private roundtable sessions that excluded me involved discussions about the compensation of workers at poultry complexes—including discussions regarding particular processors' compensation practices as well as future plans for compensation rates and wage increases.

- o Members of the Poultry Industry Survey Group routinely referred to the Poultry Industry Compensation Meetings as "Compensation Meetings."

All of the above reasons are addressed in greater detail below.

29.     Until I stopped them, executives of members of the Poultry Industry Survey Group attempted to engage in communications about future compensation rates, optimal compensation rates, and particular processors' compensation practices during roundtable sessions that I attended. Accordingly, I believe those same executives had those improper discussions during the roundtable sessions that excluded me. That belief is further supported by, among other things, the fact that members of the Poultry Industry Survey Group often structured the Poultry Industry Compensation Surveys in a manner that facilitated deanonymization of the Survey results.

30.     As a result, I believe that—even while contracting with WMS, which marketed itself as seeking to comply with the Safe Harbor Guidelines—the members of the Poultry Industry

Survey Group revealed and discussed their particular compensation practices, future compensation plans, and optimal compensation rates with each other behind closed doors.

31.     I believe the Poultry Industry Survey Group retained WMS to create the appearance of compliance with the Safe Harbor Guidelines while its members continued to exchange disaggregated and deanonymized compensation data and continued to discuss and harmonize their compensation practices. I believe the members of the Poultry Industry Survey Group used WMS as an unwitting tool to conceal their misconduct.

32.     These beliefs are supported by the Poultry Industry Survey Group's varying statements about my attendance at the Poultry Industry Compensation Meetings, which depended on the Group's level of concern with antitrust litigation. On January 15, 2009, Jonathan Allen, then Corporate Human Resources Director of Fieldale Farms, emailed the Poultry Industry Survey Group: "I need some input about this years meeting. It is my plan to communicate with WMS that we do not need them to attend this year, thus reducing the costs to each of us. This was discussed at last years meeting and agreed upon." Lori Layfield, then Perdue's **Director of Compensation**, responded: "I also agree with *not* having WMS participate. We have talked about that for a couple years now. I think the survey and group has matured to a level that we can manage the discussion of the survey. I also assume that there is not a concern of violation of safe harbor if they do not attend the meeting." True and accurate copies of these emails are attached as Exhibit 6, which is bates stamped WMS-PW0000001661 - 62 and was maintained in the ordinary course of WMS's business.

33.     These emails make clear that members of the Poultry Industry Survey Group did not attend the annual Poultry Industry Compensation Meetings primarily to hear my PowerPoint presentation. Rather, my participation at some of the roundtable sessions was incidental to the

primary purpose of those meetings: an opportunity for executives from participating poultry processors to privately discuss compensation *with each other* and without me. I was just an additional guest that the Poultry Industry Survey Group would have likely excluded had my presence not enhanced the *appearance* of legality.

34.     Members of the Poultry Industry Survey Group expressed heightened concern about the possibility of being sued following the filing in September 2016 of a separate lawsuit alleging the price-fixing of broilers (hereafter "Broilers Antitrust Lawsuit"). The Broilers Antitrust Lawsuit alleged that leading poultry processors—including most of the members of the Poultry Industry Survey Group—had inflated the prices of broilers in violation of the antitrust laws. Following the filing of that lawsuit, the Poultry Industry Survey Group ensured that I attended all the roundtable sessions to avoid the appearance of collusion.

35.     On April 17, 2018, Bert Neuenschwander, then Manager of Compensation and HRIS at poultry processor Foster Farms, sent an email to the Poultry Industry Survey Group introducing the schedule for the coming Poultry Industry Compensation Meeting. In the email, Mr. Neuenschwander notes: "Reminder that Jon Meng will be in attendance for the duration of the meetings (he has normally been present only the first morning). This will help those in our respetive [sic] legal departments at our home offices feel more at ease to know that we [sic] not antitrust-ing, if you will." To my understanding, Mr. Neuenschwander was indicating that the legal departments of each member of the Poultry Industry Survey Group preferred an independent, third-party consultant to be present at the roundtable discussions related to the Poultry Industry Compensation Survey. A true and accurate copy of this email is attached as Exhibit 7, which is bates stamped WMS-PW0000000435 - 36 and was maintained in the ordinary course of WMS's business.

**Purpose of the Poultry Industry Compensation Surveys and Meetings**

36.     I had an exchange with Simmons, a participant in the Poultry Industry Compensation Survey, concerning wage pressures. In addition to processing poultry, Simmons manufactures pet food. ████████████████████████████████████████ ████████████████████████████████████████████, but Simmons was ultimately unsuccessful in recruiting sufficient participants for the survey. ████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ responded: ████████████████ ████████████████████ A true and accurate copy of the email exchange is attached as Exhibit 8, which is bates stamped WMS-PW0000000395 - 97 and was created and maintained in the ordinary course of WMS's business.

37.     I believe that poultry processors participated in the Poultry Industry Compensation Survey and the Poultry Industry Compensation Meetings to limit their wage and salary increases. I believe that poultry processors' interest in the Survey and Meetings was due in large part to wage pressures that those poultry processors faced.

**The Steering Committee**

38.     Typically, when WMS performs a compensation survey for multiple competitors in a particular industry, WMS primarily determines how to structure the survey and display the survey results. Additionally, if there is an in-person meeting held regarding those survey results, WMS typically sets the agenda for that meeting and presents the aggregated survey results at that

meeting; in my experience, it would be highly unusual for there to be a subsequent in-person meeting between the survey participants regarding compensation that excluded WMS.

39.     Poultry Industry Compensation Surveys and Meetings were governed very differently. Members of the Poultry Industry Survey Group—not WMS—determined the structure and contents of both the Poultry Industry Compensation Survey and the Survey Results Reports, as well as the agendas of the Poultry Industry Compensation Meetings. Specifically, a "Steering Committee" comprised of executives from several poultry processors was primarily responsible for managing and coordinating both the Survey and the Meetings.

40.     From 2000 through 2019, the Steering Committee was typically comprised of between three and five executives of members of the Poultry Industry Survey Group. The composition of the Steering Committee varied from year-to-year, but only employees of the five poultry processors listed below ever served on it. Each of the following five poultry processors was represented on the Steering Committee during much of the period from 2000 through 2019:

- o   <u>Tyson</u>: Tyson executives that served on the Steering Committee include Linda Wray, who served as Director of Compensation and then Vice President of Compensation, and Dominica Fleming, who was Tyson's Senior Manager of Compensation.

- o   <u>Perdue</u>: Perdue executives that served on the Steering Committee include Lori Layfield, who served as Senior Compensation Analyst, Compensation Manager, and then Director of Compensation; Kim Huerta, who served as Senior Director of Compensation; and Lindsey Chaney, who served as Senior Compensation Analyst.

- o   <u>Foster Farms</u>: Foster Farms was represented on the Steering Committee by Bert Neuenschwander, Manager of Compensation and HRIS.

- o   <u>Fieldale</u>: Fieldale was represented on the Steering Committee by Jonathan Allen, Vice President of Human Resources.

- o   <u>Gold Kist/Pilgrim's/JBS:</u> Gold Kist was represented on the Steering Committee from 2000 until it was acquired in 2007 by Pilgrim's, which in turn was acquired by JBS in 2009. Pilgrim's or JBS executives then replaced Gold Kist executives on the Steering Committee. Executives of Gold Kist, Pilgrim's, and JBS that served on the Steering Committee include Linda Smith, who served as Senior Director of Total Rewards and

Corporate Human Resources, and Tracy Barger, who served as a Human Resources Generalist for JBS.

41.     Mr. Allen and Mr. Neuenschwander assumed particularly active positions on the Steering Committee. Mr. Allen often ran the Poultry Industry Compensation Meetings and made opening remarks at the Meeting each year. Mr. Neuenschwander often organized the logistics of those Meetings and set the Meeting agendas. In 2019, Ms. Huerta and Ms. Chaney took over the responsibilities that Mr. Neuenschwander had previously held.

42.     In October 2009, the Steering Committee created a set of "Operating Standards." On October 14, 2009, Linda Smith, then Senior Director of Total Rewards and Corporate Human Resources for Pilgrim's, distributed the document to the Poultry Industry Survey Group and explained that it "describes the operating standards of our survey group which was developed by the steering committee." The document states that the "survey exists to provide the organized sharing of pay and benefits data between participating companies." The document further explains: "The group leadership / oversight will be the responsibility of the 'Steering Committee'. The Steering Committee will consist of not less than three (3) representatives each from different participating companies." The document defines the Steering Committee's responsibilities as including the following:

- o   Oversight of the process.
- o   Call for votes or discussions on location, new members, company participation removal.
- o   Communication / coordination with the data consultant.
- o   Maintain the original intent and integrity of the survey and process.
- o   Assist / consult with 'hosting' organization for each annual meeting.

The email from Linda Smith and the Operating Standards are attached as Exhibits 9 and 10, which are bates stamped WMS-PW0000001857 and WMS-PW0000001860 - 62, respectively, and were each maintained in the ordinary course of WMS's business.

16

43.     The Steering Committee made all the important decisions regarding: the design and contents of the Poultry Industry Compensation Survey and Survey Results Reports; the structure and topics addressed at the Poultry Industry Compensation Meetings; which poultry processors were invited to participate in the Survey and Meetings; and which were excluded.

44.     The Steering Committee—not WMS—determined all the job positions, compensation metrics, and specific benefits to include in the Poultry Industry Compensation Survey and Survey Results Reports. The Steering Committee also provided WMS with detailed descriptions of the specific job titles to provide Survey participants. Steering Committee members, along with other members of the Poultry Industry Survey Group, would engage in substantial back and forth regarding the optimal breakouts and descriptions of the various positions to include in the Surveys and Reports, both over email and at the Poultry Industry Compensation Meetings. The Steering Committee carefully designed the Poultry Industry Compensation Survey to ensure that each salaried position, each category of hourly rate, and each benefit substantially matched across each participating processor's compensation structure.

45.     The Steering Committee—not WMS—determined the structure and agendas of the Poultry Industry Compensation Meetings. The Steering Committee scheduled and organized the Meetings, including by selecting their location and reserving the hotel room blocks. The Steering Committee also set the schedule for the roundtable sessions at the Meetings and the subject matters to be covered at them.

46.     The Steering Committee—not WMS—determined which poultry processors could participate in the Poultry Industry Survey Group. The Steering Committee established the criteria that a poultry processor must meet to qualify for the Group, and the Steering Committee actively recruited poultry processors that satisfied the criteria. Before inviting a particular processor to join

the Group, the Steering Committee would typically conduct a vote of all the Group's members. I believe the Steering Committee sought to include as many poultry processors that satisfied the criteria as possible.

47.    Notably, the Steering Committee excluded me and other WMS personnel from the solicitations of prospective additions to the Poultry Industry Survey Group. I was typically provided the contact information for new members only after the Steering Committee had already successfully recruited them.

48.    The Steering Committee conducted meetings and phone calls without the involvement of WMS. For example, I sometimes saw the members of the Steering Committee meeting at restaurants and bars when I checked into hotels to attend Poultry Industry Compensation Meetings.

49.    The level of control that the Steering Committee exerted over the Poultry Industry Compensation Survey is reflected in an email exchange in October 2014 between the Steering Committee and me. On October 20, 2014, I wrote to the Steering Committee to (1) confirm that WMS should make five changes to the Survey that were previously agreed upon by the Steering Committee at the prior Poultry Industry Compensation Meeting and (2) to inquire about the status of three prospective additions to the Poultry Industry Survey Group. In response, the Steering Committee held a private conference call and subsequently emailed me specific instructions for how to implement each of the five proposed Survey modifications. The Steering Committee also informed me that: one particular processor (Cooper Farms) would be joining the Survey; that the Committee would be reaching out to two other processors (Keystone Foods and Amick Farms) to determine their interest; and that the full Poultry Industry Survey Group would be voting on whether to add two other poultry processors (Butterball and Jennie-O Turkey Store). True and

accurate copies of these emails are attached as Exhibit 11, which is bates stamped WMS-PW0000004822 - 23 and was created and maintained in the ordinary course of WMS's business.

**Criteria for, and Recruitment of, New Participants**

50.    The Steering Committee established specific criteria for poultry processors to qualify to join the Poultry Industry Survey Group.

51.    The "Operating Standards" created by the Steering Committee and attached as Exhibit 10 spells out the participation criteria. It states that processors "that wish to participate in the survey must meet the following guidelines":

- Have a minimum of three plants (or complexes).
- Must have (or be actively pursuing) a formal compensation structure complete with pay grades and ranges.
- Be voted on and approved by the existing participants.
- Agree to be active by participating each year and meeting survey data submission deadlines.
- Send a knowledgeable representative to each annual meeting. Companies who have a significant reason that causes them to be unable to have a responsible representative attend the annual meeting must report the reason to one of the steering committee members prior to the meeting. The year following the absence, the company must notify the steering committee of their intent to participate in the survey and meeting. Failure to do so will result in submission materials not being sent to the company. The steering committee will not follow up.
- Full participation in the survey concerning both data sharing (pay and benefits sections) and costs are required. Participating companies must purchase the survey as the expense is shared equally. The survey results are not available for purchase outside the participant group.
- Agree and ensure that shared survey data or other information from discussions will be used and treated in a "confidential" manner and definitely should not be shared with companies not participating in the survey. Failure to meet these requirements will result in immediate removal from the survey group.

52.    In practice, the requirement that a processor must operate multiple poultry plants or complexes was more stringently implemented than reflected in the Operating Standards document. It was insufficient for a poultry processor to merely operate poultry processing plants;

the processors were also required to manage live bird operations, including by operating hatcheries and feed mills.

53.     For example, on November 29, 2018, Lindsey Chaney emailed the Steering Committee regarding her efforts to recruit additional Survey participants. She noted that both KraftHeinz and Sysco Corporation were interested in joining and inquired, "Is there anything we ask for specifically when considering new companies other than being in our industry and benefiting the group?" Mr. Neuenschwander responded that the requirements are:

- Must be a multi complex poultry organization chicken or turkey
  - The math being 1 turkey = 6 chickens when dealing with bird volume questions
- Must have a bona fide salary grade/bracket structure in practice
- Must attend annual meetings

Mr. Neuenschwander further explained in the email that "multi-complex means they have either company owned or third party owned ranches under their direction, including management of and labor for tech advisors, feed/formulations, in addition to hatcheries, breeders, and so on." True and accurate copies of these emails are attached as Exhibit 12, which is bates stamped WMS-PW0000000439 - 43 and was maintained in the ordinary course of WMS's business.

54.     The requirement that poultry processors must attend the Poultry Industry Compensation Meetings was enforced. A poultry processor could not participate in the Poultry Industry Compensation Survey but elect to skip the Meetings; members of the Poultry Industry Survey Group were prohibited from just remotely exchanging compensation data through the Poultry Industry Compensation Survey. Each member of the Group was obligated to attend the in-person roundtable Meetings where compensation practices were discussed as a condition of receiving the Survey results.

55.     On March 1, 2016, Bert Neuenschwander of Foster Farms emailed five members of the Poultry Industry Survey Group that had not yet booked their lodging for the upcoming Poultry Industry Compensation Meeting. In that email, Mr. Neuenschwander wrote: "Reminder that to remain a participant in the survey, attendance each year is not optional, but rather a requirement." A true and accurate copy of this email is attached as Exhibit 13, which is bates stamped WMS-PW0000001291 - 93 and was maintained in the ordinary course of WMS's business.

56.     In the event a poultry processor failed to participate in a single Poultry Industry Compensation Meeting, Jonathan Allen of Fieldale would typically convey a warning to that processor that attendance at the Meeting during the following year was necessary to avoid expulsion. If a processor failed to participate in the Poultry Industry Compensation Meetings for two years in a row, they would typically be expelled from the Poultry Industry Survey Group.

57.     For example, when Simmons chose not to participate in the 2019 Poultry Industry Compensation Survey, Bert Neuenschwander emailed the following to Mike Denson, Simmons's Director of Compensation: "As Simmons will have not attended for 2 years in a row, (and not participated this year), Simmons will not receive an invite to participate in 2020. One of the basics of the survey group is consistent participation and the avoidance of adverse impact from companies that are in, then out, then in. Unfortunately you will have to reapply to join the group in 2021." A true and accurate copy of this email is attached as Exhibit 14, which is bates stamped WMS-PW0000000446 - 49 and was maintained in the ordinary course of WMS's business.

58.     The Steering Committee included the following criterion for participation in the Operating Standards in order to ensure optimal matching among the participants in the Poultry Industry Compensation Survey: "Must have (or be actively pursuing) a formal compensation

structure complete with pay grades and ranges." This requirement helped ensure that Survey participants would provide comparable compensation data for similar positions within their companies.

59.     When the Poultry Industry Survey Group was evaluating a prospective addition to the Group, the members would consider the participation criteria. For example, on October 6, 2009, Linda Smith of Pilgrim's asked the other members of the Poultry Industry Survey Group to review material information about Simmons and OK Foods and vote as to whether they should be included in the Group. With respect to Simmons, the email states that the company has "3 complexes consisting of 6 plants in total, 3 hatcheries, 3 feed mills, and a rendering plant. Their operations are in AR, MO, and OK. With their recent acquisition of Peterson Farms they are in the Top 10 largest broiler companies according to Meat & Poultry magazine. They clearly meet our size requirements. Likewise, they have a structured pay system with pay ranges and have agreed to have a person at the meeting each year." With respect to OK Foods, the email states that the company "has 3 complexes – 2 plants in Ft. Smith, 1 plant in Hevener, OK and 1 plant in Muldrow, OK. They have hatcheries, feed mills, etc. as well. They meet our size requirements and also have a structured compensation system with pay ranges. They also have committed to sending a representative to the meeting each year." In response to these descriptions, the Poultry Industry Survey Group unanimously voted to include Simmons and OK Foods in the Group. A true and accurate copy of the email from Linda Smith is attached as Exhibit 15, which is bates stamped WMS-PW0000001855 - 56 and was maintained in the ordinary course of WMS's business.

**Payment for Poultry Industry Compensation Surveys and Meetings**

60.     Each year, WMS charged each member of the Poultry Industry Survey Group a flat rate for participating in the Poultry Industry Compensation Survey. From 2004 to 2017, the fee

was $995. From 2018 to 2019, the fee was $1,100.

61.     Each year, the costs of the Poultry Industry Compensation Meeting were split evenly on a pro rate basis across all the attending poultry processors. My expenses for traveling to the Poultry Industry Compensation Meeting (including costs for food, lodging, and travel) were also split evenly among the attending processors.

62.     Each year from 2003 through 2018, Bert Neuenschwander of Foster Farms booked the meeting room, luncheon services, beverage services, and other affiliated costs for the Poultry Industry Compensation Meeting. Each year from 2011 to 2018, after the Meeting, Mr. Neuenschwander sent me a spreadsheet, which directed me to collect a specified amount of money from each participating poultry processor to recover Foster Farms's costs.

63.     For 2019, Lindsay Chaney of Perdue assumed responsibility for booking the meeting room, luncheon services, beverage services, and other affiliated costs for the Poultry Industry Compensation Meeting. Ms. Chaney subsequently sent me a spreadsheet that directed me to collect a specified amount of money from each participating poultry processor to recover Perdue's costs.

64.     Each year since 2004, WMS billed each member of the Poultry Industry Survey Group the cost of participating in the Survey (i.e. $995 or, later, $1,100), and a pro-rata share of WMS's expenses for attending the Poultry Industry Compensation Meeting (if such expenses existed). Beginning in 2011, WMS also billed each member of the Poultry Industry Survey Group for a pro-rata share of the other expenses associated with the Meetings that had been incurred by Foster Farms or by Perdue. Once I received all of those payments from the members of the Poultry Industry Survey Group, I sent Mr. Neuenschwander or Ms. Chaney a reimbursement for the

expenses incurred by Foster Farms or by Perdue in organizing the Poultry Industry Compensation Meeting.

65.     As examples, each of the invoices that were sent to members of the Poultry Industry Survey Group in 2009 are attached as Exhibit 16, which is bates stamped WMS-PW0000001671 - 83 and was created and maintained in the ordinary course of WMS's business. Each of those invoices charged each member of the Poultry Industry Survey Group $995 for the cost of the Poultry Industry Compensation Survey and $53.62 for a pro rata share of my travel expenses to attend the Poultry Industry Compensation Meeting.

**Implementation of the Poultry Industry Compensation Survey**

66.     For each year from 2004 through 2019, the timeline for the implementation of the Poultry Industry Compensation Survey typically proceeded as follows.

67.     In November, I would begin assembling the Poultry Industry Compensation Survey. In assembling the Survey, the prior year's Survey would be revised based upon feedback received at the Poultry Industry Compensation Meeting held earlier that year. Any revisions would be sent to the Steering Committee for their review and approval.

68.     In December, once the Steering Committee had approved the updated Survey, I would send the Survey to the members of the Poultry Industry Survey Group for completion. The survey document, as designed and approved by the Steering Committee, would request that each member report relevant compensation data covering the first week of the forthcoming January in order to reflect any year-end bonuses that would be distributed.

69.     In February of the following year, WMS would begin receiving completed Surveys from members of the Poultry Industry Survey Group. For poultry processors that had not yet responded, reminder emails would be sent by WMS.

70.     Once completed Surveys were received from all participating poultry processors, Scott Ramsey of WMS would conduct quantitative analyses of all participants' reported compensation data. If particular compensation information was missing from a participating processor, either Cindy Porter or I would request it directly from the processor.

71.     After Mr. Ramsey completed his quantitative analysis, I would compare each participating poultry processor's results to its Survey responses from the prior year. If significant discrepancies emerged, I would contact the poultry processor by email to verify that the reported compensation data was accurate.

72.     After confirming the compensation data's accuracy, WMS would assemble the Survey Results Report. The Survey Results Report was then distributed to each participating poultry processor in the spring, on the eve of that year's Poultry Industry Compensation Meeting.

**Contents of the Poultry Industry Compensation Surveys and Survey Results Reports**

73.     The Poultry Industry Compensation Survey was designed for and directed to both chicken processors and turkey processors. Members of the Poultry Industry Survey Group said, and I believe, that chicken and turkey processing operations compete in the same market for labor. That is why the Poultry Industry Survey Group invited both chicken and turkey processors to join the Group.

74.     At the direction of the Steering Committee, each Poultry Industry Compensation Survey focused on workers throughout poultry complexes—not just the processing plants. The Survey covered many of the workers employed in hatcheries and feed mills.

75.     At the direction of the Steering Committee, each Poultry Industry Compensation Survey covered salaried positions employed at poultry complexes. Members of the Poultry Industry Survey Group expressed a significant interest in obtaining compensation data regarding

particular salaried positions. Each Poultry Industry Compensation Survey covered between 25 and 40 distinct salaried positions.

76.     The members of the Poultry Industry Survey Group said, and I believe, that they competed on a nationwide basis for salaried positions at their poultry complexes, including at their processing facilities, hatcheries, and feed mills.

77.     For each specific salaried position covered by the Poultry Industry Compensation Surveys, each Survey Results Report provided the following pay metrics:

- Base salary
- Bonus pay (average bonus paid for the last 12 months, whether bonus eligible or not)
- Bonus eligible pay (the average bonus paid for the last 12 months for those actually receiving a bonus).
- Target opportunity percent (target opportunity as a percent of base compensation)
- Maximum opportunity percent (maximum opportunity as a percent of base compensation)
- Base salary policy (including the minimum, midpoint, and maximum policy)

78.     In 2005, at the direction of the Steering Committee, the Survey Results Reports were expanded to display "total compensation" (base salary plus average bonus) and "actual incentive percent" (average bonus paid as a percent of base compensation) for each specific salaried position in the Reports.

79.     For each of the above pay metrics for salaried positions, each of the Survey Results Reports identified the values at the 75th percentile, median, average, weighted average, and 25th percentile. In 2005, the Reports were expanded to include the values at the 90th and 10th percentiles.

80.     The pay metrics for each specified salaried position were displayed in each Survey Results Report in aggregated form. For example, ███████████████████████████████

████████████████████



A true and accurate copy of the ████████████████ is attached as Exhibit 17, which is bates stamped WMS-PW0000000523 - 706 and was created and maintained in the ordinary course of WMS's business.

81.     The Survey Results Reports also contained two other categories of compensation data related to salaried workers: (1) plans for future increases to salaries and salary ranges (which are described in more detail in the next section below) and (2) starting salaries for workers with a college degree. For both categories of compensation data, the Survey Results Reports identified values at the 75th percentile, median, average, weighted average, and 25th percentile.

82.     From 2005 through 2019, the compensation data contained in the Survey Results Reports relating to future salary increases and starting salaries were displayed in aggregated form. However, these two categories of data related to salaried employees were displayed in disaggregated form prior to 2005. As discussed in detail below, while the Survey Results Reports prior to 2005 did not explicitly disclose which disaggregated data was reported by which poultry processor, the Reports replaced the names of the poultry processor with letter codes that members of the Poultry Industry Survey Group could deanonymize.

83.     Since 2008, each PowerPoint presentation that I made at the Poultry Industry Compensation Meetings, and electronically distributed to the Survey participants, identified for each salaried position, how much the base salary, midpoint salary, and total compensation had increased, by percentage, since the previous year.

84.     At the direction of the Steering Committee, each Poultry Industry Compensation Survey covered hourly-paid workers at poultry complexes around the country. The Survey initially addressed two categories of hourly-paid workers: processing plant workers and maintenance workers. In 2005, the Survey was expanded to add a third category of hourly workers: refrigeration technicians. In 2017, the Survey was expanded again to add a fourth category: quality technicians.

85.     At first the compensation data for hourly-paid workers was presented solely on a national basis, but beginning in 2005, at the Steering Committee's request, the compensation data for hourly-paid workers was also broken down by state in the Survey Results Reports.

86.     For each category of hourly-paid workers covered by the Poultry Industry Compensation Survey, each Survey Results Report provided the following pay metrics:

- Entry level start rate (wage rate when worker is hired)
- Entry level base rate (rate attained within 6-12 months for lowest production scale)
- Average hourly rate
- Highest level base rate (or "top rate") (rate attained within 6-12 months for highest production scale)
- Annual turnover percentage

87.     In 2008, the Survey Results Reports were expanded to include shift differentials for hourly-paid employees, and in 2017, the Reports were expanded to include the weighted average base rate for hourly-paid employees. True and accurate copies of documents reflecting these changes are attached as Exhibits 18 and 19, which are bates stamped WMS-PW0000001607 and

WMS-PW0000003400 - 49, respectively, and were created and maintained in the ordinary course of WMS's business.

88.     For each of the above pay metrics for hourly workers, each Survey Results Report identified the values at the 75th percentile, median, average, weighted average, and 25th percentile. In 2005, the Reports were expanded to include the values at the 90th and 10th percentiles.

89.     The hourly compensation data contained in the Survey Results Reports was displayed in disaggregated form prior to 2005 and again from 2013 through 2016. As discussed in detail below, while the Survey Results Reports during those years did not explicitly disclose which hourly data was reported by which poultry processor, the Reports employed formats that would facilitate the deanonymization of the data by members of the Poultry Industry Survey Group. From 2005 through 2011 and again from 2017 through 2019, the hourly compensation data in the Survey Results Reports was displayed in aggregated form.

90.     Since 2008, each PowerPoint presentation that I made at the Poultry Industry Compensation Meetings, and electronically distributed to the Survey participants, identified for each hourly-paid category, how much the entry level start rate, weighted average base rate, and highest level base rate had increased, by percentage, since the previous year.

91.     Each Survey Results Report also provided data about many of the benefits provided to both salaried and hourly-paid employees at poultry complexes operated by members of the Poultry Industry Survey Group. For example, the Survey Results Reports provided detailed information about:

- o   value of contributions made to pension plans;
- o   amount of life insurance coverage;
- o   amount of insurance coverage for accidental death and dismemberment;
- o   amount of coverage for long-term disability insurance;
- o   amount and duration of short-term disability insurance;
- o   provision of sick leave days;

- o  number of annual holidays;
- o  number of annual vacation days (based on the duration of employment);
- o  amount of health care costs per employee;
- o  amount of cost-sharing for medical insurance plans;
- o  size of deductibles for medical insurance plans;
- o  scope of prescription drug coverage;
- o  scope and cost of dental plans; and
- o  parental leave policies.

92.    The Survey Results Reports did not aggregate some of the benefits data obtained from members of the Poultry Industry Survey Group. Rather, the Reports displayed some of the specific benefits information that each participating poultry processor submitted to the Survey in disaggregated form. Instead of explicitly identifying which processor reported which benefits data, the Survey Results Reports replaced each processor's name with a letter code.

93.    Each Survey Results Report distributed to the Poultry Industry Survey Group contained a directory of the poultry processors that participated in the Poultry Industry Compensation Survey as well as the primary contacts at those processors who submitted compensation data. As a result, the members of the Poultry Industry Survey Group were aware of the sources of compensation data in each Survey Results Report.

**Future Compensation in the Poultry Industry Compensation Survey**

94.    At the direction of the Steering Committee, from at least 2001 until 2017, the Poultry Industry Compensation Survey addressed plans for future salary increases. (It is unclear whether such data was included in the 2000 Survey Results Report because WMS no longer has a copy of it.) Specifically, those Surveys collected data from, and the Survey Results Reports distributed data to, each member of the Poultry Industry Survey Group regarding two future salary metrics: "salary merit increases" and "salary range movement."

95.    I believe that I warned the Steering Committee that the inclusion of future compensation information, including plans for future salary increases, would be inconsistent with

the Safe Harbor guidelines if that future compensation information was not part of a publicly disclosed union contract. The Steering Committee ignored my warnings and insisted on the inclusion of the forward-looking salary increase information in the Survey Results Reports.

96.     The metric "salary merit increases" measured planned increases in salary. From at least 2001 until 2017, each Poultry Industry Compensation Survey distributed to members of the Poultry Industry Survey Group asked each processor to identify four values related to salary increases: (1) the average salary increase that had been planned for the prior year; (2) the average salary increase that had actually been paid during the prior year; (3) the average salary increase anticipated for the next year or two years; and (4) which month the processor plans to increase those salaries during the next year or two years. For example,



A true and accurate copy of the ████████ is attached as Exhibit 20, which is bates stamped WMS-PW0000004392 - 430 and was created and maintained in the ordinary course of WMS's business.

97.     From at least 2001 until 2017, each Survey Results Report presented the Survey results for the following three salary increase measures: (1) the average salary increase that had

been planned for the prior year; (2) the average salary increase that had actually been paid during the prior year; and (3) the average salary increase anticipated for the next year or two years.

98.     As detailed in the next section, these three salary increase measures were displayed in disaggregated form from at least 2001 through 2004. While the annual Survey Results Reports during those years did not explicitly disclose which salary increase data was reported by which poultry processor, the Reports replaced the names of the poultry processor with letter codes that members of the Poultry Industry Survey Group could readily deanonymize.

99.     From 2005 through 2017, the annual Survey Results Reports displayed the three salary increase measures in aggregated form. During those years, for each of the three salary increase measures, the Survey Results Reports identified the average amount, the median amount, the highest amount, the 75th percentile, the 25th percentile, and the lowest amount. For example,

████████████████████████████████████████ which is attached as Exhibit 17:



100.    From at least 2001 through 2007, the Poultry Industry Compensation Survey requested the average salary increase anticipated for the next two years. From 2008 through 2017, the Poultry Industry Compensation Survey requested the average salary increase anticipated for the next year.

101.    From at least 2001 until 2017, each Survey Results Report also identified when the members of the Poultry Industry Survey Group planned to increase their salaries during the next year or two years. For example, ███████████████████████████████████████ ██████ which is attached as Exhibit 17:



102.    The metric "salary range movement" measured planned increases in salary ranges. From at least 2001 until 2017, each Poultry Industry Compensation Survey distributed to members of the Poultry Industry Survey Group asked the processor to identify three values related to salary range increases: (1) the planned increase in the salary range for the current budget year; (2) the planned increase in the salary range for the next budget year; and (3) what month the processor plans to increase the salary ranges. For example, ████████████████████████████████

████████████████████████████████████████████████ which is attached as Exhibit

20:



103.    From at least 2001 until 2017, each Survey Results Report identified the aggregated Survey results for the following salary range increase measures: (1) the planned increase in the salary range for the current budget year, and (2) the planned increase in the salary range for the next budget year.

104.    As detailed in the next section, these two salary range increase measures were displayed in disaggregated form from at least 2001 through 2004. While the annual Survey Results Reports during those years did not explicitly disclose which salary range increase data was reported by which poultry processor, the Reports replaced the names of the poultry processor with letter codes that members of the Poultry Industry Survey Group could deanonymize.

105.    From 2005 through 2017, the annual Survey Results Reports displayed the two salary range increase measures in aggregated form. During those years, for both salary range increase measures, the Survey Results Reports identified the average amount, the median amount, the highest amount, the 75th percentile, the 25th percentile, and the lowest amount. For example,

████████████████████████████████████████████████

████████████████████████ which is attached as Exhibit 17:



106.    From at least 2001 until 2017, each Survey Results Report also identified when the

members of the Poultry Industry Survey Group planned to increase their salary ranges during the

current and subsequent budget years. For example, █████████████████████████

█████████████ which is attached as Exhibit 17:



107.    The Steering Committee instructed WMS to include the data regarding future salary increases and future salary range increases in the Survey Results Reports because members of the Poultry Industry Survey Group said they wanted to know how much and when their competitors were planning to increase salaries and salary ranges.

108.    The inclusion of metrics regarding future salary increases and future salary ranges in the Poultry Industry Compensation Survey and Survey Results Reports could allow the members of the Poultry Industry Survey Group to limit and reduce their salary increases and salary range increases.

109.    In 2017, members of the Poultry Industry Survey Group expressed heightened concern about the possibility of antitrust liability following the filing of the Broilers Antitrust Lawsuit. As a result, I again advised the Steering Committee in 2017 that the inclusion of metrics regarding future salary increases in the Poultry Industry Compensation Survey and Survey Results Reports was not compliant with the Safe Harbor Guidelines. Those forward-looking metrics were subsequently removed from the 2018 and 2019 versions of the Poultry Industry Compensation Survey and Survey Results Reports.

110.    On October 31, 2017, I emailed the Steering Committee to present the "revisions to the survey based upon my notes from the" Poultry Industry Compensation Meeting that had been held in May. I explained in the email that revisions included: "Merit Budget/Salary Range questions have been revised to exclude future increase data." A true and accurate copy of this email is attached as Exhibit 21, which is bates stamped WMS-PW0000000003 - 04 and was created and maintained in the ordinary course of WMS's business.

111.    The ████████████████████████████████████████ and included the following disclaimer: ████████████████████████████████

████████████████████████████████████████████████ A true and accurate copy of the

████████████████████████ is attached as Exhibit 22, which is bates stamped WMS-

PW0000003950 - 4175 and was created and maintained in the ordinary course of WMS's business.

**Raw Data in the Poultry Industry Compensation Survey from 2001 to 2004**

112.    From at least 2001 until 2004, the Survey Results Report distributed to the Poultry

Industry Survey Group contained disaggregated and raw compensation data regarding salaries,

wages, and benefits. (It is unclear whether such disaggregated, raw data was included in the 2000

Survey Results Report because WMS no longer has a copy of it.)

113.    Each Survey Results Report distributed from 2001 until 2004 contained

disaggregated, raw data regarding future increases to salaries and salary ranges. In detailed charts,

each of those Reports would identify, if available, what each member of the Poultry Industry

Survey Group reported to WMS for projected average increases to salaries and salary ranges, both

for the coming year and the following year. In those charts, WMS would replace the identity of

each participating poultry processor with a letter code. ███████████████████████████████

██████████████████████████████████



A true and accurate copy of excerpts of the ████████████████████ is attached as Exhibit 23, which is bates stamped WMS-PW0000001558 - 85 and was created and maintained in the ordinary course of WMS's business.

114.    Each Survey Results Report distributed from 2001 until 2004 contained disaggregated, raw data regarding starting salaries for hires with a bachelor's degree. In a chart, each of those Reports would identify what each member of the Poultry Industry Survey Group reported to WMS for average starting salaries for hires with a bachelor's degree. Again, in the charts, WMS would replace the identity of each participating poultry processor with a letter code. ████████████████████████████████████████████████████ which is attached as Exhibit 23:



115.    Each Survey Results Report distributed from 2001 until 2004 contained disaggregated, raw data regarding categories of benefits provided by each member of the Poultry Industry Survey Group. Again, in the charts, WMS would replace the identity of each participating poultry processor with a letter code.

116.    Each Survey Results Report distributed from 2001 until 2004 contained disaggregated, raw data regarding the average hourly wages for poultry processing plant workers. Each of those Reports would identify what each member of the Poultry Industry Survey Group paid, on average, in hourly wages to poultry processing workers at each of their processing plants. The Reports also identified the amount of the shift differentials and average turnover rate at each

of those poultry plants. Again, in the charts, WMS would replace the identity of each participating

poultry processor with a letter code. ████████████████████████████████████████████████████

████████████████████████████████████████████████ excerpts of which are attached

as Exhibit 23:

117.     As the above images illustrate, the charts of disaggregated hourly-wage data would allow Poultry Industry Survey Group members to deanonymize the data. For each letter code, the charts identified how many poultry processing plants were operated by the company, how many workers were employed at each plant, the state in which each plant was located, and whether the workers at each plant were unionized. With that information, the members of the Poultry Industry Survey Group could match each participating processor with each letter code. And once the processors associated with each letter code was determined from the hourly-wage charts, the Poultry Survey Group members could also deanonymize some of the salary and benefits information contained in the Survey Results Reports, as the letter codes remained consistent throughout the Reports.

118.     The Survey Results Reports distributed from 2001 through 2004 also provided another method for members of the Poultry Industry Survey Group to deanonymize the compensation data. Each Survey Results Report contained, in effect, a key for identifying the identity of each poultry processor associated with each letter code. From 2001 through 2004, each Survey Results Report contained a section titled "Employment Demographics by Company." That Section provided, for each company identified by letter code, the total number of employees employed by that company ██████████████████████████████████████████████

████████████████████████



A true and accurate copy of ████████████████████████ is attached as Exhibit 24, which is bates stamped WMS-PW0000001493 - 1520 and was created and maintained in the ordinary course of WMS's business.

119.    To be clear, the inclusion of such detailed information about each letter code—which greatly facilitated deanonymization of the compensation data—in the Survey Results Reports distributed from 2001 through 2004 was a highly unusual practice.  For that reason, WMS would have only done so at the explicit instruction of the Steering Committee.

120.    The format for the Survey Results Reports created from 2001 through 2004 were not compliant with the Safe Harbor Guidelines. In 2005, I significantly modified the Survey Results Report format to remove the raw and disaggregated data regarding salaries and wages, so that the Reports were more compliant with the Safe Harbor Guidelines. I continued presenting disaggregated, raw data for some benefits using letter codes—but I deleted the charts disclosing the number of employees for each company identified by letter code.

**Raw Hourly Data in the Poultry Industry Compensation Survey from 2013 to 2016**

121.    From 2013 to 2016, disaggregated raw data regarding the compensation of hourly-paid workers was distributed to the members of the Poultry Industry Survey Group as part of the Survey Results Reports. That disaggregated, raw data covered poultry processing plant workers—including production, maintenance, and refrigeration workers—and it was broken down by plant and location.

122.    My conversations with members of the Poultry Industry Survey Group indicated that they wanted this disaggregated, raw, plant-level data because they sought to know how much their competitors were paying to hourly-paid workers at particular plants. While the names of the poultry processors that operated the plants was not disclosed in the disaggregated raw data, it is evident that Poultry Industry Survey Group members could ascertain which poultry processor operated which plant by analyzing the data.

123.    The decision to distribute disaggregated raw data regarding hourly workers was first made in August 2012 by the Steering Committee, which was then represented by Linda Wray of Tyson, Lori Layfield of Perdue, Jonathan Allen of Fieldale, and Tracy Barger of Pilgrim's.

124.    I warned the Steering Committee that distributing disaggregated, raw wage data—especially in a format that would allow members of the Poultry Industry Survey Group to deanonymize—would be violative of the Safe Harbor Guidelines. Nonetheless, the Steering Committee insisted that WMS modify the Poultry Industry Compensation Survey to collect and present disaggregated, raw, plant-level, hourly-wage data.

125.    Notably, other clients heeded similar warnings. ███████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ A true and accurate copy of this email is attached as Exhibit 25, which is bates stamped WMS-PW0000001254 - 55 and was created and maintained in the ordinary course of WMS's business.

126.    On September 11, 2012, I emailed the Steering Committee two sample spreadsheets illustrating how the raw data could be presented. In that email, I wrote: "As we discussed on August 30, attached are the spreadsheets for production worker [sic] for two states - Arkansas and Tennessee. … Please let me know if you feel the data is identifiable in any way or if certain columns need to be removed. The number of employees column as well as the union column may be ones that permit identification." A true and accurate copy of this email is attached as Exhibit

26, which is bates stamped WMS-PW0000002355 - 56 and  was created and maintained in the ordinary course of WMS's business.

127.    In response, as indicated in Exhibit 26, Tracy Barger, who had only recently been hired by Pilgrim's and had joined both the Poultry Industry Survey Group and Steering Committee just a few months earlier, wrote: "I have a few concerns with the possible identifiers as they relate to the employee count and union status. I am currently reviewing with our VP of HR. Thanks for the work on this and the examples, helps me get familiar with the survey a bit."

128.    In an October 18, 2012 e-mail to me, Linda Wray of Tyson confirmed that the Steering Committee was "in agreement" with adding the raw hourly-wage data to the Poultry Industry Compensation Survey, but the Committee wanted to "poll the poultry survey participants about the average hourly rate format change." Linda Wray further wrote that "[w]e believe it would be most appropriate to come from you so you can reiterate that it will meet the safe harbor guidelines." A true and accurate copy of the email is part of Exhibit 27, which is bates stamped WMS-PW0000002357 and was maintained in the ordinary course of WMS's business.

129.    In response, I prepared a draft email to send to members of the Poultry Industry Survey Group to ask for their agreement to the collection and distribution of disaggregated, raw, plant-level data regarding hourly-paid workers. To the draft email, I attached a sample of how the raw data would be displayed in Survey Results Reports. Notably, the draft email states: "I feel that the 'Union' column should not be included as it may be possible to identify the non-union sites. (Disclosing the union wages is not as problematic since the contracts eventually end up in the public domain.) You may also wish to eliminate the 'No. of Employees' column as this may also be an identifier." A true and accurate copy of the draft email is attached as Exhibit 28, which is

bates stamped WMS-PW0000002362 and was created and maintained in the ordinary course of WMS's business.

130.    On October 25, 2012, I emailed Linda Wray of Tyson a copy of the draft email described above and noted: "Please let me know if it is ok to send and feel free to make any changes. Also, I need to know if I should include the 'Union' and 'No. of Employees' columns." A true and accurate copy of this email is attached as Exhibit 29, which is bates stamped WMS-PW0000002358 - 59 and was created and maintained in the ordinary course of WMS's business.

131.    That same day, Ms. Wray responded: "Jon, I think your message is fine to send to the group. Please reiterate that this is sample data in the message and not real since we haven't approved the change yet. Just ask them to reply with their 'vote' on including this data. In regards to the employee and union data-- what about just letting them respond as to any concerns as opposed to calling it out?" A true and accurate copy of this email is attached as Exhibit 30, which is bates stamped WMS-PW0000002363 - 66 and was maintained in the ordinary course of WMS's business.

132.    I complied with Ms. Wray's requests. In late October 2012, I separately emailed each member of the Poultry Industry Survey Group to ask for their agreement to the collection and distribution of disaggregated, raw, plant-level data regarding hourly workers. In an email titled "Poultry 2013 Survey – Hourly Raw Data – Need Your Response," I wrote that "the steering committee has requested that the hourly wage information included in the report be expanded to include the raw data for each state. There will not be an additional fee for this charge." I further stated: "The steering committee needs to know if you are in agreement with the proposed changes. Please let me know your vote and any comments or suggestions whether displaying any data as shown is capable of determining the identity of a particular company." Per Ms. Wray's request,

the email made no reference to the "union" or "no. of employees" columns or the possibility that those particular columns could be used to identify particular processors. To the email, ███████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████ True and accurate copies of the email and attachment are attached as Exhibits 31 and 32, which are bates stamped WMS-PW0000002368 - 69 and WMS-PW0000002370 - 71, respectively, and were each created and maintained in the ordinary course of WMS's business.

133.   Each member of the Poultry Industry Survey Group expressly consented; none made any objections; and none addressed or mentioned my concerns about identifying the sources of the disaggregated compensation. As a result, disaggregated, raw, plant-level data regarding hourly-paid workers was included in the Survey Results Report received by members of the Poultry Survey Group in April 2013. ████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████ Below is a chart containing ███████

█████████████████████████████████████████████████████████



A true and accurate copy of ███████████████████ is attached as Exhibit 33, which is bates stamped WMS-PW0000002375 - 634 and was created and maintained in the ordinary course of WMS's business.

134. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ A true and accurate copy of the ██████████████ is attached as Exhibit 34, which is bates stamped WMS-PW0000000137 - 387 and was created and maintained in the ordinary course of WMS's business.

135. ████████████████████████████████████

Due to the addition of six poultry processors to the Poultry Industry Survey Group, I raised

concerns with the Steering Committee that it would be easy to determine the sources of newly-added raw data provided by these six new members.  So, I requested, and the Steering Committee agreed, that the Poultry Industry Survey Group members first discuss whether to distribute the raw hourly-wage data at the upcoming Poultry Industry Compensation Meeting. If the participants at the Meeting ultimately agreed to the distribution of the raw hourly-wage data, it would be provided to the Poultry Industry Survey Group after the Meeting. Accordingly, ███████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████ A true and accurate copy of the ███████████████ is attached as Exhibit 35, which is bates stamped WMS-PW0000002663 - 906 and was created and maintained in the ordinary course of WMS's business.

136.    During the Poultry Industry Compensation Meeting held on May 12, 2015, the topic of whether to distribute disaggregated, raw, plant-level data concerning hourly-paid workers was discussed at a roundtable session that I attended. I raised my concerns that newly added raw data from the six new additions to the Poultry Industry Survey Group could be easily deanonymized and, in turn, that the distribution of such data would be inconsistent with the Safe Harbor Guidelines. As a result, I recommended that the Poultry Industry Survey Group halt the circulation of disaggregated, raw, plant-level data concerning hourly-paid workers. None of the members of the Group followed my recommendation. Instead, all the members of the Poultry Survey Industry Group in attendance at the Meeting agreed to the continued distribution of such data.

137.    Later that same day, I emailed a copy of the disaggregated, raw, plant-level, hourly-wage data to the Poultry Industry Survey Group. My email states: "It was a pleasure meeting with you last week in Destin. As we discussed during the meeting, attached are the following: . . . ███ ████████████████████████████████████████████████████████ This is the same breakout as supplied last year." ████████████████████████████

████████████████████████████████████████████████████████████

███████████████ True and accurate copies of that email and the enclosed supplement are attached as Exhibits 36, 37, 38, and 39, which are bates stamped WMS-PW0000001262, WMS-PW0000001282 – 90, WMS-PW0000001270 – 77, and WMS-PW0000001263 – 69, respectively, and were each created and maintained in the ordinary course of WMS's business.

138.    In 2016, the format for the collection of raw, hourly-wage data from members of the Poultry Industry Survey Group changed. Instead of using the same spreadsheet previously used in 2013, 2014 and 2015, WMS distributed a spreadsheet that was normally used in a separate Tyson-sponsored survey focused on raw plant-level data. (That Tyson-sponsored survey is described in more detail in the next section below.) On April 1, 2016, I emailed Bert Neuenschwander of Foster Farms, asking him how the raw data collected via the "Tyson spreads[h]eet" should be displayed in the 2016 Survey Results Report. A true and accurate copy of the email is attached as Exhibit 40, which is bates stamped WMS-PW0000000398 - 401 and was created and maintained in the ordinary course of WMS's business.

139.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████ A true and accurate copy of the ████████████████████ is attached as Exhibit 41, which is bates stamped WMS-PW0000002919 - 3156 and was created and maintained in the ordinary course of WMS's business.

140.    However, when I distributed the 2016 Survey Results Report to each member of the Poultry Industry Survey Group on April 27, 2016, I simultaneously emailed those members a separate Excel file that contained ███████████████████████████████████████

████████ For example, I wrote the following in an email to Bobby Elrod, Vice President of Human Resources at Koch Foods, on April 27, 2016: "Attached is your personalized survey report for the 2016 Poultry Industry Compensation & Benefits Survey. The Processing Plant Average Rates data is in a separate Excel spreadsheet. Please verify receipt and make sure you can open the files with no problems." The email and enclosed Excel spreadsheet are attached as Exhibits 42 and 43, which are bates stamped WMS-PW0000003157 and WMS-PW0000003158, respectively, and were each created and maintained in the ordinary course of WMS's business.

141.    Because the Excel spreadsheet distributed to the Poultry Industry Survey Group in

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ and is attached as Exhibit 43:



142.    In 2017, disaggregated raw data for hourly-wage workers was collected for the Poultry Industry Compensation Survey using the "Tyson Format." A supplement to the Survey Results Report containing the disaggregated raw data was also prepared by WMS, but it was never distributed. Due to the filing of the Broilers Antitrust Lawsuit, I urged members of the Poultry Industry Survey Group to halt the inclusion of disaggregated raw compensation data in the Poultry

Industry Compensation Survey. This time, they listened to me, and the supplement containing the disaggregated raw data was never distributed to the Poultry Industry Survey Group.

143.    On May 11, 2017, Dominica Fleming, then Associate Director of Compensation at Tyson, inquired about the status of the raw, hourly-wage supplement to the Survey Results Report. Later that day, I responded to Ms. Fleming: "The raw data hourly report was not sent this year. The report was prepared but the group decided at the meeting on May 1 that in light of the concerns over Safe Harbor, the raw data report does not meet Safe Harbor Guidelines and would not be distributed." True and accurate copies of these emails are contained in Exhibit 44, which is bates stamped WMS-PW0000000423 - 425 and was created and maintained in the ordinary course of WMS's business. Ms. Fleming verbally expressed frustration to me about not being able to obtain the disaggregated, raw, hourly-wage data that she had requested.

**Tyson-Sponsored Hourly Plant Maintenance and Production Survey**

144.    In 2013, 2014, and 2015, most members of the Poultry Industry Survey Group also received additional disaggregated, raw, plant-level, compensation data regarding hourly workers as part of a second compensation survey sponsored and financed by Tyson.

145.    In 2013, Linda Wray, then Tyson's Vice President of Compensation, asked WMS to conduct a second, more detailed survey of disaggregated, raw data that identified how much individual poultry plants were paying three categories of hourly-paid workers: production, maintenance, and refrigeration.

146.    Tyson scheduled a call with me to discuss Ms. Wray's request for February 1, 2013. Multiple human resources executives from Tyson were on the call: Ms. Wray; Rodney Nagel, Senior Vice President of Human Resources; Hector Gonzales, Vice President of Operations; and Susan Jones, Director of Labor Compensation. A true and accurate copy of a conference call

invitation to discuss the "Tyson poultry hourly survey" with those executives on February 1, 2013 is attached as Exhibit 45, which is bates stamped WMS-PW0000002372 - 73 and was maintained in the ordinary course of WMS's business.

147.    During the conference call, I told the Tyson executives that I had concerns about collecting and exchanging disaggregated, raw, plant-level data regarding hourly workers between Tyson and its competitors. For that reason, I explained that WMS would only agree to provide such data if each of the participating poultry processors expressly agreed to the survey and its format.

148.    I also explained to the Tyson executives that, while WMS was willing to assemble the raw data survey of hourly workers that Tyson was requesting, the survey would not be compliant with the Safe Harbor Guidelines because the data would be shared in raw, disaggregated form. I raised concerns that while the owners of the plants would not be disclosed in the survey reports, the participating processors would likely be able to identify which processor operated which plant based on disclosed plant characteristics, such as the number of employees at each plant and the state or region in which the plant was located.

149.    Despite my warning, the Tyson executives requested that WMS proceed and conduct the additional compensation survey, which was titled the "Hourly Plant Maintenance and Production Survey."

150.    Ultimately, each member of the Poultry Industry Survey Group agreed to participate in, and receive the results of, one or more of the Tyson-sponsored Hourly Plant Maintenance and Production Surveys. Poultry Industry Survey Group members sometimes referred to the Tyson-sponsored survey as the "Tyson Format."

151.     As discussed above, disaggregated, raw compensation data regarding hourly-paid workers was already part of the Poultry Industry Compensation Survey between 2013 and 2016. However, the information requested by the Tyson-sponsored Hourly Plant Maintenance and Production Survey was even more detailed and informative than the raw hourly-wage data that was part of the Poultry Industry Compensation Survey.

152.     Tyson specifically requested that the raw, disaggregated data in the Hourly Plant Maintenance and Production Survey be organized by Agri Stats Subregion. And Tyson agreed to provide information about those Agri Stats Subregions so that WMS could comply with that request.

153.     On February 11, 2013, I sent a letter to Linda Wray memorializing the scope of WMS's work for the Hourly Plant Maintenance and Production Survey. The letter states:

> It was a pleasure speaking with your team on February 1, 2013. As we discussed, WMS will gather data for plant maintenance and production positions. The data will be displayed in a spreadsheet by AgriStat region.
>
> WMS will develop the survey document for your approval based upon the templates provided earlier by Tyson.  Tyson will provide WMS a list of the desired companies to be invited to participate that includes the contact name, address, phone number and email address.  Prior to conducting the survey, Tyson should contact each company to personally invite their participation.
>
> Each participating company will receive a copy of the survey results, by AgriStat region. Tyson will also receive the results with their data excluded from the spreadsheet.  The data will be formatted to protect the identity of the company, but will display the actual raw data.  We will work with Tyson to ensure the data is displayed in an acceptable format.

A true and accurate copy of the February 11, 2013 letter is attached as Exhibit 46, which is bates stamped WMS-PW0000002374 and was created and maintained in the ordinary course of WMS's business.

154.     Following Tyson's retention of WMS to conduct the Hourly Plant Maintenance and Production Survey, Susan Jones sent me an internal Tyson survey to use as a guide. On February 13, 2013, Ms. Jones sent me an email noting that "attached is a version of the CHIWI results we use here at Corporate."

True and accurate copies of the email and attachment are attached as Exhibits 47 and 48, which are bates stamped WMS-PW0000004807 and WMS-PW0000004808, respectively and were each maintained in the regular course of WMS's business.

155.    Linda Wray also sent me an email containing "an updated contact list for our poultry hourly survey." The title of the attachment was "CHIWI contacts." True and accurate copies of this email and the attachment are attached as Exhibits 49 and 50, which are bates stamped WMS-PW0000002643 and WMS-PW0000002644 – 46, respectively, and were each maintained in the regular course of WMS's business.

156.    ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████ The attached spreadsheet ████████████████████████

████████████████████████████████████████████

██████████████████████████████ The following is an excerpt of that spreadsheet:



True and accurate copies of the email from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ are enclosed as Exhibits 51 and 52, which are bates stamped WMS-PW0000004809 and

WMS-PW0000004810, respectively, and were each created and maintained in the ordinary course

of WMS's business.

157.    The format of the Tyson-sponsored Hourly Plant Maintenance and Production Survey facilitated the ability of members of the Poultry Industry Survey Group to identify the sources of plant-level compensation data in that survey. It provided another numerical characteristic—Agri Stats Subregion—for each plant that only corresponded to a limited number of plants.

158.    On April 3, 2013, I emailed Linda Wray a draft of the Hourly Plant Maintenance and Production Survey for her review and approval. In response, she wrote that "we have contacted the companies and all but 3 or 4 have committed to participating. We are working on the remaining ones and will let you know very soon when we can proceed." True and accurate copies of these emails are contained in Exhibit 53, which is bates stamped WMS-PW0000004815 and was maintained in the ordinary course of WMS's business.

159.    On May 13, 2013, I separately emailed each of the participants in Tyson's Hourly Plant Maintenance and Production Survey and requested that they complete the enclosed survey. The email stated that "[a]s we discussed during the poultry meeting on April 29th, Tyson Foods, Inc. is sponsoring a Plant Maintenance and Production Hourly Survey and would like to extend an invitation to you to participate." In the email, I did not include an assurance that Tyson's Hourly Plant Maintenance and Production Survey met the Safe Harbor Guidelines because I did not believe the survey did and had warned Tyson of the same. The Excel spreadsheet enclosed with that email █████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████ A copy of such an email, along with the enclosed Excel spreadsheet, are attached as Exhibits 54 and 55, which are bates-stamped WMS-PW0000002647 and WMS-PW0000002648, respectively, and were each created and maintained in the ordinary course of WMS's business.

160.    Before the final report for Tyson's Hourly Plant Maintenance and Production Survey was distributed to the members of the Poultry Industry Survey Group, ███████████
███████████████████████████████████████████████████████████████
████████████████ I did not comply with that request. I believe I did not comply with that request because I did not want the Poultry Industry Survey Group to conclude that WMS approved of the format of the Tyson-sponsored survey. A true and accurate copy of the email ████████
████████ is attached as Exhibit 56, which is bates stamped WMS-PW0000000084 - 85 and was maintained in the ordinary course of WMS's business.

161.    █████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
████████████████████████████████████████████ A true and accurate copy of the final report of ████████████████████████████████████████ is attached as Exhibit 57, which is bates stamped WMS-PW0000002650 and was created and maintained in the ordinary course of WMS's business.

162.   ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████ A true and accurate copy of this

email is attached as Exhibit 58, which is bates stamped WMS-PW0000000113 and was maintained

in the ordinary course of WMS's business.

163.   On January 16, 2014, I separately emailed Tyson's Hourly Plant Maintenance and

Production Survey to each member of the Poultry Industry Survey Group for their completion. The

survey ██████████████████████████████ True and accurate copies of

one of those emails, along with the enclosed spreadsheet, are attached as Exhibits 59 and 60, which

are bates stamped WMS-PW0000002651 and WMS-PW0000002652, respectively, and were each

created and maintained in the ordinary course of WMS's business.

164.   On June 4, 2014, the results of Tyson's Hourly Plant Maintenance and Production

Survey were distributed to participating members of the Poultry Industry Survey Group. Those

results ███████████████████████████████████████████

████████████████████ True and accurate copies of one of those emails, along

with the enclosed spreadsheet, are attached as Exhibits 61 and 62, which are bates stamped WMS-

PW0000002653 and WMS-PW0000002654, respectively, and were each created and maintained

in the ordinary course of WMS's business.

165.   On January 29, 2015, I emailed Tyson's Hourly Plant Maintenance and Production

Survey to each member of the Poultry Industry Survey Group. In that email, I note that the survey

would "supply greater detail on hourly wages and supplement the current Poultry survey," and that Tyson "would like to invite you to participate and benefit from the results." A true and accurate copy of that email is attached as Exhibit 63, which is bates-stamped WMS-PW0000002655 and was created and maintained in the ordinary course of WMS's business.

166.    On May 1, 2015, the results of Tyson's Hourly Plant Maintenance and Production Survey were emailed to all participating poultry processors. The results contained ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████ True and accurate copies of one of those emails, along with the enclosed survey results, are attached as Exhibits 64 and 65, which are bates stamped WMS-PW0000002915 and WMS-PW0000002916, respectively, and were each created and maintained in the ordinary course of WMS's business.

167.    I did not conduct a separate Tyson-sponsored Hourly Plant Maintenance and Production Survey in 2016. Instead, as discussed above, the Poultry Industry Survey Group utilized the Tyson Format when conducting the Poultry Industry Compensation Survey in 2016, and the disaggregated, raw, plant-level, hourly-wage data was circulated in the Tyson Format in a separate Excel spreadsheet with the 2016 Survey Results Report. ███████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████

168.    Before the filing of the Broiler Antitrust Litigation, the members of the Poultry Industry Survey Group failed to heed my warnings that the Tyson-sponsored Hourly Plant Maintenance and Production Survey violated the Safe Harbor Guidelines. After the filing of the Broiler Antitrust Litigation lawsuit in 2016, the Group's members finally listened to me and agreed to my strong recommendation that they stop exchanging any survey results in the Tyson Format. I made this recommendation clear at the Poultry Industry Compensation Meeting held in 2017. At the meeting, I again explained to the Poultry Industry Survey Group that I was concerned because the Tyson Format provided disaggregated and raw compensation data in a manner that was not compliant with the Safe Harbor Guidelines.

169.    Tyson paid the entirety of the cost of ▮▮▮ the ▮▮ Hourly Plant Maintenance and Production Surveys that WMS conducted in 2013, ▮▮▮▮▮▮ Specifically, Tyson paid $2,400 for the survey in 2013, ▮▮▮▮▮ and ▮▮▮▮▮ True and accurate copies of invoices are attached as Exhibits 66 and 67, which are bates stamped WMS-PW0000000083 and WMS-PW0000001299 – 1303, respectively, and were each created and maintained in the ordinary course of WMS's business.

170.    On February 26, 2014, Lindsey Chaney, then a Compensation Analyst for Simmons Foods, wrote me: "I am new at this survey and the Poultry industry survey you support. Will Simmons be charged for the results of these surveys?"  I responded three days later, "You are not charged for the Plant Maintenance & Production Hourly Survey. That survey is sponsored by Tyson. There is a charge for the Poultry Industry survey. The fee is $995 plus expenses and the total usually approximates $1,075. This is the same for all the companies." True and accurate copies of these emails are contained in Exhibit 68, which is bates stamped WMS-PW0000000126 - 131 and was created and maintained in the ordinary course of WMS's business.

**Deanonymization of Compensation Survey Data**

171.     Members of the Poultry Industry Survey Group, as discussed above and below, requested that the results of compensation surveys conducted by WMS be displayed in formats that could allow deanonymization of their content, and they also posed questions of WMS and each other about the survey results that could aid such deanonymization.

172.     Members of the Poultry Industry Survey Group had a number of ways to identify the sources of compensation data in the results of both the Poultry Industry Compensation Survey and the Tyson-sponsored Hourly Plant Maintenance and Production Survey.

173.     First, as discussed further below, members of the Poultry Industry Survey Group had many opportunities to disclose their particular processor's compensation data during roundtable sessions that excluded me at the annual Poultry Industry Compensation Meetings. In fact, those members were instructed by the Steering Committee to bring their compensation data to those Meetings.

174.     Second, as discussed above, the Survey Results Reports for years 2001 through 2004 contained disaggregated salary, wage, and benefits data that was organized by processor using letter codes to ostensibly conceal each processor's data—but those same reports also contained data that could allow Poultry Industry Survey Group members to identify which processor was associated with which letter code.

175.     Third, as discussed above, the Survey Results Reports for years 2013 through 2016 contained disaggregated, raw, plant-level, hourly wage data that contained plant characteristics (such as the number of employees and unionization status) that could allow Poultry Industry Survey Group members to identify which processor owned which plant.

176.    Fourth, as discussed above, Tyson required that the results of its Hourly Plant Maintenance and Production Surveys conducted in 2013, 2014, and 2015 display disaggregated, raw, plant-level, hourly-wage data by Agri Stats Subregion, which could allow Poultry Industry Survey Group members to identify which processor owned which plant.

177.    Fifth, members of the Poultry Industry Survey Group sometimes posed questions to WMS about the Poultry Industry Compensation Survey or Tyson-sponsored Hourly Plant Maintenance and Production Survey that could aid the deanonymization of data contained in survey results.

178.    For example, on October 30, 2014, Dominica Fleming, then a Compensation Analyst for Tyson, wrote in an email to me, "We need to know the number of Pilgrim locations that participated in our last Hrly Prod Maint survey. Can you provide this as soon as you get a chance?" Later that day, my colleague Scott Ramsey wrote to Ms. Fleming: "29 locations were reported by Pilgrims." A true and accurate copy of this email exchange is attached as Exhibit 69, which is bates stamped WMS-PW0000004824 - 25 and was created and maintained in the ordinary course of WMS's business.

179.    Sixth, members of the Poultry Industry Survey Group sometimes requested "special cuts" of the results of the Poultry Industry Compensation Survey or Tyson-sponsored Hourly Plant Maintenance and Production Survey that could facilitate deanonymization. These "special cuts" typically consisted of a subset of survey data or the presentation of survey data in a different way.

180.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████      ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████ True and

accurate copies of those emails, as well as the attachments to those emails, are attached as Exhibits

70, 71, 72 and 73, which are bates stamped WMS-PW0000003397 - 98, WMS-PW0000003399,

WMS-PW0000004826 – 27, and WMS-PW0000004828, respectively, and were each created and

maintained in the ordinary course of WMS's business.

181.    After the Broilers Antitrust Lawsuit was filed, changes were made to the Poultry

Industry Compensation Surveys and Meetings that made deanonymization more difficult. For

example, I stopped distributing disaggregated, raw, hourly-wage data, and the Poultry Industry

Survey Group eliminated in-person roundtable sessions that excluded me. These changes

frustrated some members of the Poultry Industry Survey Group. In 2019, for example, Bert

Neuenschwander sent an email to the rest of the Steering Committee lamenting that the

information about hourly workers was less valuable now that it was only reported in aggregated

form. He wrote that "the bigger question from my part is: how useful is the 'average rate report'

now anyway? It has suffered significant obscuring of results due to aggregating, and I would ask

– Is it still useful information any longer?" A true and accurate copy of this email is part of Exhibit

74, which is bates stamped WMS-PW0000000450 - 52 and was maintained in the ordinary course

of WMS's business.

**Roundtable Sessions that I Attended at Poultry Industry Compensation Meetings**

182.    Each year from at least 2001 until 2019, the Poultry Industry Survey Group held a

Poultry Industry Compensation Meeting. The Meeting was usually held in May in a place of the

Steering Committee's choosing. Per the Steering Committee's requirements, each member of the

Poultry Industry Survey Group was required to send a knowledgeable representative to each

Meeting. Poultry Industry Survey Group members typically sent one or two representatives to each Meeting.

183.    The schedule of the Poultry Industry Compensation Meetings was typically announced to participants by Bert Neuenschwander of Foster Farms via email. In that email, Mr. Neuenschwander would indicate that the Meeting had been scheduled for a particular date, time, and location, and ask participants to book their lodging. He would also distribute a general agenda for the Meeting in the same electronic communication.

184.    The Poultry Industry Compensation Meeting lasted only one day from 2001 until 2003. From 2004 until 2019, each Meeting lasted two days.

185.    Each Poultry Industry Compensation Meeting consisted of between six and seven roundtable sessions, which each lasted between 45 minutes and two hours. During such sessions, executives from the members of the Poultry Industry Survey Group would sit around a table and engage in discussions related to both compensation practices and human resources practices.

186.    The attendees at the Poultry Industry Compensation Meetings were expected to bring their compensation data to the roundtable sessions. In earlier years, the attendees typically brought this data to the roundtable sessions in hard-copy form using large binders. In later years, the attendees brought their laptop computers, which contained all the compensation data in electronic form.

187.    Each year until 2017, representatives from WMS were only invited to attend the first one or two of those roundtable sessions (which were always held during the first half of the first day) to present the results of the Poultry Industry Compensation Survey. As a result, at each Poultry Industry Compensation Meeting held until 2017, WMS was entirely excluded from

multiple, private roundtable sessions during which executives from the participating poultry processors discussed both compensation practices and human resources practices.

188.    On March 26, 2007, Annette Gilbert, then Compensation Representative from Pilgrim's, wrote to me regarding the 2007 Poultry Industry Compensation Meeting: "While the meeting is scheduled for 1 1/2 days, we ask that you be available through lunch on the first day to discuss the survey results. You will not need to attend the remainder of the meeting, as this time will be spent discussing future meetings and best practices between the poultry companies." A true and accurate copy of the email is attached as Exhibit 75, which is bates stamped WMS-PW0000001591 - 93 and was maintained in the ordinary course of WMS's business.

189.    Since 2004, I have attended the first session of each Poultry Industry Compensation Meeting held each year. During each of those sessions, I made a PowerPoint presentation that addressed the results of the Poultry Industry Compensation Survey.

190.    Typically, before I delivered my PowerPoint presentation at the first roundtable session held at each annual Meeting since 2004, Jonathan Allen of Fieldale would open that first session with introductory remarks. In those remarks, Mr. Allen would introduce me as the representative of an independent, third-party consulting firm that was retained to conduct compensation surveys for the Poultry Industry Survey Group.

191.    My PowerPoint presentations primarily focused on year-to-year changes in the compensation data reported in Poultry Survey Results. Specifically, those PowerPoint presentations focused on how the compensation data reported in the current year for both salaried and hourly-paid workers compared to the prior year or prior two years.

192.    Most of my PowerPoint presentations identified how the number of reported employees for each salaried position covered by the Poultry Industry Compensation Survey had

changed compared to the prior year. ████████████████████████████████████

██████████████████████



A true and accurate copy of the ████████████████████ is attached as Exhibit 76, which is bates stamped WMS-PW0000002641 and was created and maintained in the ordinary course of WMS's business.

193.   For each salaried position covered by the Poultry Industry Compensation Survey, most PowerPoint presentations identified how much the base salary, midpoint salary, and total compensation had increased, by percentage, since the previous year. ████████████████████

████████████████████████████████████████████████

194.    Most PowerPoint presentations identified how, for each salaried position covered by the Poultry Industry Compensation Survey, the percentage of employees that received a bonus in the current year compared to the percentage that had received a bonus during the prior two years. which is attached as Exhibit 76,

195.    For the hourly-paid positions covered by the Poultry Industry Compensation Survey, most PowerPoint presentations identified how much the entry level start rate, weighted average base rate, highest level base rate, and shift differentials had increased since the prior year. ████████████████████████████████████████████████ which is attached as Exhibit 76, reflects part of this ████████████.



196.    Most PowerPoint presentations addressed each of the benefits covered by the Poultry Industry Compensation Survey and, for most of them, identified whether the benefit amounts or policies had changed since the prior year.

197.    Many PowerPoint presentations addressed how health insurance deductibles covered by the Poultry Industry Compensation Survey had changed since the prior year.



198.     Most PowerPoint presentations specifically addressed salary increases and salary range increases. In particular, most PowerPoint presentations compared the prior year's projections with actual implemented salary increases to assess whether those projections were accurate. ███████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████ and ████████████████████████████████████████████████████

199.     Some PowerPoint presentations addressed projections for future salary increases.

██████████████████████████████████████████████████████████████████████████

█████████████████████████ A true and accurate copy of the █████████████████████ is attached as Exhibit 77, which is bates stamped WMS-PW0000001668 and was created and maintained in the ordinary course of WMS's business.

200.     Most PowerPoint presentations identified how plant turnover had, on average, changed since the prior year. Those PowerPoint presentations typically identified the specific turnover changes for all plants, unionized plants, non-unionized plants, processing workers,

maintenance workers, and refrigeration technicians. ███████████████████



201.    In ████████████  the PowerPoint presentations ████████████████

202.    During many of my PowerPoint presentations, I raised whether the inclusion of particular compensation data in Survey Results Reports was still useful to the members of the Poultry Industry Survey Group. In each of these three instances, the members of the Poultry Industry Survey Group informed me during the roundtable

sessions that the information was, in fact, useful, which is why those three distinct categories of information continued to be collected as part of the Poultry Industry Compensation Survey after each of those presentations. The ▮▮▮▮▮▮▮▮▮▮ PowerPoint presentations are attached as Exhibits 78, 79, and 80, which are bates stamped WMS-PW0000004389, WMS-PW0000001652, and WMS-PW0000000410, respectively, and were each created and maintained in the ordinary course of WMS's business.

203.    During many of the PowerPoint presentations, I reminded the attendees of the Safe Harbor Guidelines. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



A true and accurate copy of the ▮▮▮▮▮▮▮▮▮▮▮▮ is attached as Exhibit 81, which is bates stamped WMS-PW0000000075 and was created and maintained in the ordinary course of WMS's business.

204.    At the roundtable sessions that I attended at the Poultry Industry Compensation Meetings, the attendees would typically discuss the results of the Poultry Industry Compensation Survey as well as the structure of the Survey itself, following my PowerPoint presentation. I did not believe these conversations were improper. However, on many occasions, during the roundtable sessions that I attended, the attendees also attempted to engage in inappropriate conversations that I believed were violative of the Safe Harbor Guidelines, and I halted those discussions.

205.    Specifically, sometimes the attendees at the roundtable sessions that I attended sought to discuss future compensation plans, optimal compensation rates, or a particular processor's compensation practices. I promptly halted those discussions when they occurred.

206.    Sometimes the attendees at the roundtable sessions that I attended discussed how they needed to, and were actually going to, have private conversations with each other—and without me—to discuss specific compensation practices or directly exchange additional compensation data for particular positions. On such occasions, I informed the attendees that such private conversations would be improper.

**Roundtable Sessions at Poultry Industry Compensation Meetings that Excluded Me**

207.    At each Poultry Industry Compensation Meeting held until 2017, the Poultry Industry Survey Group conducted multiple, private roundtable sessions that excluded me. The first of these sessions typically began immediately after the conclusion of the session or sessions that I attended; I was asked and expected to leave the Meeting to allow for these private roundtable sessions to proceed. I believe now that the Steering Committee asked me to leave so that the attendees could engage in improper discussions about the Survey results and compensation practices without my halting or witnessing those discussions.

208.    For these additional, private roundtable sessions that excluded me, the attendees prepared separate agenda items, which were never disclosed to me. So, while I was typically provided a copy of the general agenda for Poultry Industry Compensation Meetings, which listed the basic schedule of the roundtable sessions and meals, I was never provided a copy of a more detailed agenda for the roundtable sessions that excluded me.

209.    At the Poultry Industry Compensation Meetings, the private roundtable sessions that excluded me involved discussions between members of the Poultry Industry Survey Group regarding their compensation practices. Those discussions addressed, among other issues, the results of the Poultry Industry Compensation Survey, the compensation data that particular individual processors had reported to the Survey, and plans for future compensation rates for salaried and hourly-paid workers. I know the foregoing to be true for several reasons.

210.    First, most of the general agendas for the Poultry Industry Compensation Meetings provided a very brief description of the topics to be covered at some of the private roundtable sessions that excluded me. For example, each of the general agendas for the annual Meetings held in 2010 and 2012-2016 described at least one of the private roundtable sessions that excluded me as covering "Continued discussion of survey submissions and Group discussion topics."

211.    Second, the attendees frequently referred to the Poultry Industry Compensation Meetings as "Compensation Meetings," "Poultry Compensation Survey Meetings," or "Poultry Industry Compensation/Benefits Survey Meetings." So, I concluded that roundtable sessions at those Meetings that excluded me covered compensation issues. True and accurate copies of emails in which members of the Poultry Industry Survey Group used the above titles are attached as Exhibits 82, 83, 84, 85 and 86. Those exhibits are bates stamped WMS-PW0000000392, WMS-

PW0000001660, WMS-PW0000004816 - 17, WMS-PW0000002109, and WMS-PW0000002112 and were each maintained in the ordinary course of WMS's business.

212.     Third, I learned from written communications with members of the Poultry Industry Survey Group that they addressed specific compensation issues during the roundtable sessions that excluded me. For example, on April 20, 2015, Linda Wray, then Tyson's Vice President of Compensation, wrote the following to the Steering Committee and me:

> Jon & steering committee, we are working on our budget for FY16 budget planning. As you know the survey results do not provide hourly production projected budgets and this is typically a discussion item during the roundtable sessions. Due to some internal timeline challenges do you think it would be a problem for me to send out the following:
>
> In anticipation of our FY16 budget planning we are compiling average industry data for our non-union hourly production budgeting process. If available, please provide your projected FY16 increase percentage for hourly production non-union. All information will remain confidential and the results will be compiled in aggregate format and provided to all participants.

This email makes clear that future projected increases to hourly production wage rates is "typically a discussion item during the roundtable sessions." Notably, two members of the Steering Committee—Lori Layfield of Perdue and Jonathan Allen of Fieldale—immediately signed off on Ms. Wray's request, subject to my approval. In response to Ms. Wray's email, I advised the Steering Committee not to request such future data by written Survey, writing: "Safe Harbor allows future increase information to be sought if pre-negotiated or known in advance by the employees. My advice is to not formally distribute a question pertaining to 2016 increases unless it refers specifically to union contracts that are in place for 2016." True and accurate copies of these email exchanges are contained in Exhibits 87 and 88, which are bates stamped WMS-PW0000000388 - 89 and WMS-PW0000000390 – 91, respectively, and were each created and maintained in the ordinary course of WMS's business.

213.     On April 29, 2009, Jonathan Allen of Fieldale sent an email to the Poultry Industry Survey Group in anticipation of the Poultry Industry Compensation Meeting scheduled for May 4-5. In that email, he wrote: "Hope all are planning to be there for the meeting. Just a reminder to bring you [sic] Data manual in case others have questions for you concerning your data. Please be prepared to discuss survey issues, questions, and details with WMS. We will also be sharing information in a round table discussion. These discussions are expected to be kept confidential. Look forward to seeing you there!!!" This email shows that members of the Poultry Industry Survey Group answered questions about their individualized compensation data and shared compensation information during the roundtable discussions that excluded me. A true and accurate copy of this email is attached as Exhibit 89, which is bates stamped WMS-PW0000001666 and was maintained in the ordinary course of WMS's business.

214.     On March 29, 2010, Cyndi Hudspeth, then Corporate Benefits Coordinator at Case Foods, emailed the Poultry Industry Survey Group to provide instructions for booking hotels for the forthcoming Meeting scheduled for May 3-4 and to circulate the Meeting agenda. In that email, Ms. Hudspeth also wrote: "Just a reminder, please bring your 2010 Survey Manual. Please be prepared to discuss survey issues, questions, and details with WMS. We will also be sharing information in the Round Table discussion. (As in the past, these discussions are expected to be kept confidential.)" A true and accurate copy of the email is attached as Exhibit 90, which is bates stamped WMS-PW0000001865 - 66 and was maintained in the ordinary course of WMS's business.

215.     On April 17, 2015, Bert Neuenschwander of Foster Farms emailed the Poultry Industry Survey Group to circulate the agenda for the forthcoming Poultry Industry Compensation Meeting scheduled for May 4 and 5. In that email, Mr. Neuenschwander writes: "Attached is our

standard agenda template. Please remember to bring your any [sic] discussion points you've been holding back in anticipation of our meetings. Jon from WMS will email you your survey results prior to the meetings." A true and accurate copy of the email is attached as Exhibit 91, which is bates stamped WMS-PW0000001259 and was maintained in the ordinary course of WMS's business.

216.    As noted above, whenever members of the Poultry Industry Survey Group attempted to discuss a particular processor's compensation practices, future compensation plans, or optimal compensation rates in my presence at Poultry Industry Compensation Meetings, I halted those discussions and warned the members that such discussions were violative of Safe Harbor Guidelines. But nothing prevented them from conducting such improper discussions during the private roundtable sessions that excluded me.

217.    In 2017, the Poultry Industry Compensation Meetings changed: no roundtable sessions were held following my PowerPoint presentation. Based on my conversations with members of the Poultry Industry Survey Group, I understood that the reason the roundtable sessions were removed from the agenda that year was due to concerns about antitrust liability, which were significantly heightened when the Broilers Antitrust Lawsuit was filed in September 2016.

218.    In 2017, en route to the Poultry Industry Compensation Meeting, I ran into Bert Neuenschwander at baggage claim in the Destin, Florida airport. Mr. Neuenschwander asked me whether I had "heard the news" and noted there was a major antitrust action alleging price-fixing against many poultry processors. Mr. Neuenschwander said he believed there would be a lot of "fallout." At that 2017 Poultry Industry Compensation Meeting, Mr. Neuenschwander only attended to make brief opening remarks; he noted that Foster Farms' general counsel had

prohibited him from participating in the Meeting that year and that he only showed up to explain why he could not participate in the remaining sessions. He left the room right after these remarks, but he did attend a dinner with other members of the Poultry Industry Survey Group later that night.

219.    In 2018, the roundtable sessions resumed at the Poultry Industry Compensation Meeting. Mr. Neuenschwander attended the roundtable sessions in 2018. However, unlike in previous years, the Steering Committee asked me to attend *all* roundtable sessions in 2018. As a result, I was present for all the roundtable sessions held during the Poultry Industry Compensation Meeting in 2018.

220.    In 2019, I was again asked to attend all the roundtable sessions at the Poultry Industry Compensation Meeting. During those sessions, at least one participant attempted to raise questions about the compensation practices of other individual competitors. I interrupted the participant to note that the question was inappropriate, and that particular discussion was immediately halted.

221.    I believe the Poultry Industry Survey Group asked me to join all the roundtable sessions in 2018 and 2019 to ensure that, in the event of antitrust litigation alleging the depression of compensation, I would be able to attest that no improper conversations occurred during those particular sessions.

222.    At each Poultry Industry Compensation Meeting, there were several opportunities for the members of the Poultry Industry Survey Group to discuss compensation without me, in addition to the roundtable sessions that excluded me. These other opportunities included dinners, drinks, and other outings.

223.     On April 29, 2019, Lindsey Chaney, then Senior Compensation Analyst for Perdue, wrote to the Poultry Industry Survey Group and me to discuss options for a group activity at the coming Poultry Industry Compensation Meeting. She asked recipients to "let us know if you are still willing to join a group activity and vote for your favorite option." The options included a 5-hour party fishing trip, a tiki bar boat ride, and a dolphin boat cruise. In response, I informed Ms. Chaney that "I will not be attending the group activity the afternoon of May 7." True and accurate copies of these emails are attached as Exhibit 92, which is bates stamped WMS-PW0000000457-58 and was created and maintained in the ordinary course of WMS's business.

**Year-to-Year Summary of Poultry Industry Compensation Surveys and Meetings**

224.     Below is a chart summarizing some of the facts associated with each year's Poultry Industry Compensation Survey and Poultry Industry Compensation Meeting. The chart contains information derived from my current knowledge and the WMS documents cited therein.







86













**Concealing Poultry Industry Compensation Surveys and Meetings**

225.    Members of Poultry Industry Survey Group took steps, as outlined below, to conceal both the existence of, and their participation in, the Poultry Industry Compensation Surveys and the Poultry Industry Compensation Meetings.

226.    The Poultry Industry Survey Group's Operating Standards, which were created by the Steering Committee and are attached as Exhibit 10, state that each member of the Poultry Industry Survey Group must: "Agree and ensure that shared survey data or other information from discussions will be used and treated in a 'confidential' manner and definitely should not be shared with companies not participating in the survey. Failure to meet these requirements will result in immediate removal from the survey group."

227.    Each of the Poultry Industry Compensation Surveys provided to members of the Poultry Industry Survey Group, as well as each of the Survey Results Reports provided to those members, contained the following statement: █████████████████████████████████████ ████████████████████████████████

228.    Before the filing of this lawsuit, I never shared any of the Poultry Industry Compensation Surveys or Survey Results Reports with anyone outside of WMS other than the Poultry Industry Survey Group, unless I had the permission of the Steering Committee. And I never gave anyone outside of WMS copies of my PowerPoint presentations summarizing the results of the Poultry Industry Compensation Survey, other than members of the Poultry Industry Survey Group.

229.    In September 2014, Simmons contracted with a third-party vendor, MarketPay, to process compensation surveys, including the Poultry Industry Compensation Survey and the Tyson-Sponsored Hourly Plant Maintenance and Production Survey. MarketPay's employee,

Gerard Smith, asked me for access to that survey data. I "told him any decisions regarding survey disclosure must be decided by the Poultry Survey Steering Committee," and he agreed to sign a nondisclosure agreement. A true and accurate copy of email communications between the Steering Committee and me describing that interaction with MarketPay is attached as Exhibit 141, which is bates stamped WMS-PW0000001256 - 58 and was created and maintained in the ordinary course of WMS's business.

230. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ A true and accurate copy of that non-disclosure agreement is attached as Exhibit 142, which is bates stamped WMS-PW0000002659 - 61 and was maintained in the ordinary course of WMS's business.

**Emails Between Poultry Processors About Individual Compensation Practices**

231. The members of the Poultry Industry Survey Group frequently emailed each other about their compensation practices. In these emails, the members would often conduct flash compensation surveys, in which a processor electronically surveys all the other participating processors—on the spot—to inquire about a particular compensation practice. The participating processors routinely responded to these flash surveys by disclosing their particular compensation practice. These flash surveys often addressed benefits that were not covered in the Poultry Industry Compensation Survey.

232. On June 18, 2008, Linda Wray, then Tyson's Vice-President of Compensation, emailed the Poultry Industry Survey Group: "In the May survey meeting we discussed companies that are now charging higher insurance premiums for smokers. Please reply if your company is doing this or some form of this and if you could share some brief information about your plan that

would be great." Multiple poultry processors promptly provided substantive responses and copied the entire Group on those email responses. For example, Doug Freeman, Director of Compensation and Benefits of Allen Harim, responded that same day: "We will be charging a higher amount for smokers effective 7/1/08. Weekly contributions for smokers will be $5.50 higher than for non-smokers." True and accurate copies of these emails are attached as Exhibit 143, which is bates stamped WMS-PW0000001658 - 59 and was maintained in the ordinary course of WMS's business.

233.    On January 28, 2010, Linda Wray emailed the Poultry Industry Group Survey with the following question: "Do any of you have a difference in benefits between your hourly production vs. production-related support jobs (i.e. QA & HACCP Techs, Wastewater Operators, etc.)? We have two classifications for our hourly-paid team members. Production workers on the line do not get quite the same as our technical support jobs, nurses and clerical. The difference is 5 days daily sick pay, better vacation schedule, higher short-term disability pay and the ability to utilize our flexible (pre-tax) benefits savings plan. We are considering a change that would convert some of the jobs to the hourly production classification. Your prompt response would be much appreciated." Multiple poultry processors responded immediately, copying the entire group. For example, Bert Neuenschwander wrote, "At Foster Farms they are the same between the jobs UNLESS the job is covered by a union contract – the benefits for non-union are better than the any of the union benefits. All of our non-exempt – non-union employees have the same benefits across the company." Doug Freeman, then Director of Compensation and Benefits of Allen Harim, responded to Mr. Neuenschwander's email: "Ditto for Allen's (Bert, I couldn't have said it any better myself)." True and accurate copies of these emails are attached as Exhibit 144, which is

bates stamped WMS-PW0000001863 - 64 and was maintained in the ordinary course of WMS's business.

234.     On September 16, 2016, Dan Watson, then Keystone's Director of Compensation and Benefits, wrote that he would "like to run a spot survey" regarding how poultry processors planned to comply with changes to the Fair Labor Standards Act ("FLSA") relating to overtime pay. Specifically, Mr. Watson asked: "How is your company dealing with exempt employees whose current base salary is below the new threshold?" Mr. Watson then offered two options for first-line supervisors and five options for other exempt employees:

- 1 – all employees are receiving base salary increases to bring them to the threshold salary.
- 2 – most employees are receiving base salary increases to bring them to the threshold salary; a smaller number will not receive a base increase but will receive overtime.
- 3 – about half of employees are receiving base salary increases, the other half will receive overtime.
- 4 – most employees will receive overtime; a smaller number will receive base salary increases to bring them to the threshold salary.
- 5 – all employees will become overtime-eligible

- First-line supervisors:
- 1 – are either above the salary threshold or will receive a base salary increase to the threshold.
- 2 – will receive overtime.

A true and accurate copy of the email is attached as Exhibit 145, which is bates stamped WMS-PW0000000414 - 16 and was maintained in the ordinary course of WMS's business.

235.     In less than a week, ten poultry processors responded by specifically disclosing which of the seven options provided by Mr. Watson they would be pursuing. Bert Neuenschwander of Foster Farms compiled those responses into an Excel spreadsheet, and he distributed it on September 22, 2016 to the Poultry Industry Survey Group, stating: "Attached are the responses received to-date from 10 companies. If more respond, I'll republish, but the target grouping pattern

already appears pretty tight." ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████ True and accurate copies of the email from Bert Neuenschwander, and

the enclosed survey results, are attached as Exhibit 146 and 147, which are bates stamped WMS-

PW0000000417 - 19 and WMS-PW0000000420, respectively, and were each maintained in the

ordinary course of WMS's business.

236.    On March 28, 2017, Brad Sievers, Human Resources Director of JBS, emailed the

following to the Poultry Industry Survey Group: "We have a few corporate departments that are

interested in utilizing part time workers for some entry level positions (e.g., AP clerks). We really

have not utilized a part time model in the past for any roles, and I was wondering if any of you

utilize a significant number of part time employees in corporate roles. If you could let me know if

you do, and if so, if it's successful, that would be great! I can summarize responses and get them

back to the group." A true and accurate copy of this email is attached as Exhibit 148, which is

bates stamped WMS-PW0000000421 and was maintained in the ordinary course of WMS's

business.

**The Poultry Processors' Behavior Was Unusually Improper Among WMS's Clients**

237.    In its 44-year history, WMS has provided compensation consulting services to over

100 clients across a range of industries. For many of those clients, WMS conducted compensation

surveys. The behavior of the members of the Poultry Industry Survey Group was improper as

compared to WMS's other clients.

238.    As compared to WMS's other clients, it was unusual that the members of the

Poultry Industry Survey Group were governed by a Steering Committee that collaborated to

determine the contents and structure of the compensation surveys, including the positions covered, questions asked, criteria for participants, and the actual participants.

239.    As compared to WMS's other clients, it was unusual that the members of the Poultry Industry Survey Group arranged for and conducted in-person roundtable discussions about their Survey responses and compensation practices from which all WMS representatives were excluded.

240.    As compared to WMS's other clients, it was unusual that the members of the Poultry Industry Survey Group conducted a nationwide survey of hourly-paid workers. Other clients of WMS typically only conducted nationwide surveys of salaried workers.

241.    As compared to WMS's other clients, it was unusual that members of the Poultry Industry Survey Group required the inclusion of disaggregated and raw data regarding salaries and wages in survey reports that were distributed to participants.

242.    As compared to WMS's other clients, it was unusual that members of the Poultry Industry Survey Group structured the formats of the compensation survey results in a manner that facilitated deanonymization of those results.

243.    As compared to WMS's other clients, it was unusual that the members of the Poultry Industry Survey Group frequently emailed each other to disclose and discuss their specific compensation practices, including by conducting flash surveys of each other's benefits practices without anonymizing the results.

244.    All of these practices were unusual and indicate to me that the members of the Poultry Industry Survey Group engaged in collaborative analysis and discussion of compensation in a manner that was not compliant with the Safe Harbor Guidelines.

**Withdrawals from the Poultry Industry Survey Group**

245.     Prior to 2017, only a handful of poultry processors withdrew from the Poultry Industry Survey Group.

246.     In 2012, for example, Sanderson Farms withdrew from the Poultry Industry Survey Group and informed all the Group's members that it was withdrawing on the advice of counsel. On February 14, 2012, Jennifer Buster, then Corporate Manager of Human Resources at Sanderson Farms, sent an email to the Poultry Industry Survey Group and me. In that email, Ms. Buster wrote that "Sanderson Farms will not be able to participate in the Compensation and Benefits Survey. On the advice of legal counsel, our Executives have decided that we can no longer participate in this type of survey." She noted that she was "very sorry to do this" and requested that she remain on the email distribution for the Poultry Industry Survey Group. A true and accurate copy of this email is attached as Exhibit 149, which is bates stamped WMS-PW0000002110 – 11 and was maintained in the ordinary course of WMS's business.

247.     Although Sanderson informed the Poultry Industry Survey Group that it was withdrawing for legal reasons, its withdrawal did not have a noticeable effect on how the Steering Committee operated the Poultry Industry Compensation Surveys and Poultry Industry Compensation Meetings.

248.     In September 2016, the Broilers Antitrust Lawsuit was filed against many of the poultry processors that were members of the Poultry Industry Survey Group. As discussed earlier, this filing precipitated significant changes to the Poultry Industry Compensation Survey and the Poultry Industry Compensation Meeting. Before the Broilers Antitrust Lawsuit was filed, Poultry Industry Survey Group members largely ignored my warnings regarding the risks of including future data and disaggregated raw data in the Survey Results Reports as well as conducting

roundtable discussions about compensation data and plans. But after the Broilers Antitrust Lawsuit was filed, Poultry Industry Survey Group members finally heeded my warnings and agreed to eliminate future compensation information and disaggregated raw data from the Survey Results Report and also required my attendance at all roundtable sessions at Poultry Industry Compensation Meetings.

249. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ A true and accurate copy of a draft of that PowerPoint presentation is attached as Exhibit 150, which is bates stamped WMS-PW0000000019 – 69 and was created and maintained in the ordinary course of WMS's business.

250. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ A true and accurate copy of the ████████████████████ is attached as Exhibit 151, which is bates stamped

WMS-PW0000000005 – 18 and was created and maintained in the ordinary course of WMS's business.

251.    In addition to instigating changes to the Poultry Industry Compensation Survey and Meetings, the filing of the Broilers Antitrust Lawsuit also triggered a wave of withdrawals by poultry processors from the Poultry Industry Compensation Survey and the Poultry Industry Compensation Meetings.

252.    The first processor to withdraw from a Survey or Meeting following the filing of the Broilers Antitrust Lawsuit was Pilgrim's. On April 28, 2017, Brad Sievers of Pilgrims emailed the following to the Steering Committee and me: "Unfortunately, due to some current legal proceedings, we've been advised by counsel not to attend our comp meeting next week. Best of luck and apologies for any inconvenience this may cause. Please bill us for any costs incurred the same as you would if we attended." A true and accurate copy of this email is attached as Exhibit 152, which is bates stamped WMS-PW0000000422 and was maintained in the ordinary course of WMS's business. Notably, Pilgrim's resumed participation in the Meetings in 2018 and 2019.

253.    The second processor to withdraw following the filing of the Broilers Antitrust Lawsuit was Mountaire. On February 8, 2018, I informed Bert Neuenschwander that Patrick Townsend, Mountaire's Director of Human Resources, had "told me that Mountaire will not be participating on instructions from their General Counsel. He feels the decision is wrong but his hands are tied." In response, Mr. Neuenschwander responded, "Thanks John. Keep us informed – let's hope this doesn't become a death spiral." True and accurate copies of these emails are attached as Exhibit 153, which is bates stamped WMS-PW0000004831 – 34 and was created and maintained in the ordinary course of WMS's business.

254.    The third processor to withdraw following the filing of the Broilers Antitrust Lawsuit was OK Foods. On February 23, 2018, Christy Terry of OK Foods wrote me and Bert Neuenschwander: "Regretfully, I will not be able to attend or participate in this year's survey." A true and accurate copy of this email is attached as Exhibit 154, which is bates stamped WMS-PW0000000432 – 33 and was maintained in the ordinary course of WMS's business.

255.    The fourth processor to withdraw following the filing of the Broilers Antitrust Lawsuit was Allen Harim. On April 26, 2018, Janet Phillips emailed me: "I will not be attending the meeting this year but I hope the weather is beautiful for everyone in Sandestin." A true and accurate copy of this email is attached as Exhibit 155, which is bates stamped WMS-PW0000004829 – 30 and was maintained in the ordinary course of WMS's business.

256.    As noted above and referenced in Exhibit 14, Mike Denson of Simmons informed Bert Neuenschwander of Foster Farms on February 8, 2019 that Simmons would not be participating in the 2019 Poultry Industry Compensation Survey due to "Budget restrictions."

257.    That same month, George's also withdrew from the Poultry Industry Survey Group. As indicated in Exhibit 74, on February 11, 2019, Lindsey Chaney, then Senior Compensation Analyst for Perdue, emailed the Steering Committee: "I spoke with Wayland at George's and they aren't attending this year due to their counsel's direction. I tried my best to make a case for everything we've changed in the group since the 'big scare' and nothing worked."

258.    At the 2019 Poultry Industry Compensation Meeting held on May 6-7 at the Hilton Sandestin Resort in Destin, Florida, I gave a PowerPoint presentation. The following slide from that PowerPoint presentation addresses how multiple poultry processors had recently withdrawn from the Poultry Industry Survey Group:



The top of the slide quotes Shakespeare: "The first thing we do, let's kill all the lawyers." This was my attempt at humor after legal concerns prompted many poultry processors to withdraw from the survey. A true and accurate copy of my 2019 PowerPoint presentation is attached as Exhibit 156, which is bates stamped WMS-PW0000000463 and was created and maintained in the ordinary course of WMS's business.

**The Labor Market for Poultry Complexes Is Different than the Labor Market for Red Meat Complexes**

259.    Several members of the Poultry Industry Survey Group also processed red meat, which includes both beef and pork. Those processors include Tyson, JBS, Perdue, Cargill, and Hormel.

260.    In 2014, those processors of both poultry and red meat briefly considered expanding the Poultry Industry Compensation Survey to include red meat processing complexes, but those

processors ultimately rejected that possibility. For example, attached as Exhibit 157 is a document

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ The document is bates stamped

WMS-PW0000001249 – 50 and was created and maintained in the ordinary course of WMS's

business.

261.    The reason why those processors declined to include the red meat processors in the

Poultry Industry Compensation Survey is because the poultry processing labor market is distinct

from the red meat processing labor market. Several of those processors told me this, and it is also

evident to me from my own review of the markets.

262.    One form of evidence that the poultry processing labor market is distinct from the

red meat processing labor market is that workers in red meat processing complexes are paid

materially higher wages and salaries than workers in poultry processing complexes.

**Neither I, Nor WMS, Served as a Lawyer for any Poultry Processor**

263.    Neither I, nor WMS, ever served as a lawyer for any poultry processor. As I have

occasionally explained to WMS's customers, "WMS is not a law firm and cannot practice law."

For example, attached as Exhibit 158 is a letter to the National Federation of Independent

Businesses, a WMS client, that states: "WMS is not a law firm and cannot practice law, and

accordingly, this letter does not contain any legal advice." This document is bates stamped WMS-

PW0000001251 – 53 and was created and maintained in the ordinary course of WMS's business.

264.    WMS has never been a law firm. It has always been a compensation consultancy.

The top of every page of WMS's website states: "Human Resource Management Consultants."

265.    I am the only lawyer who has ever worked at WMS, and I have never had sole

ownership of the company. WMS was founded in 1977 by my father, George Meng, and his two

partners, Carl Webber and Robert Sahl, none of whom were lawyers. In 1982, Mr. Webber relinquished his shares in WMS, leaving my father and Dr. Sahl as the lone partners at the time. Scott Ramsey, who is not a lawyer, began working at WMS in 1982, and he received his first equity shares in WMS on January 7, 1987. Another non-lawyer and WMS employee, Mary Hopkinson, received equity shares in WMS on May 18, 1989, and those shares were returned to the company when she exited on January 25, 1992. I received my first equity shares in WMS on April 1, 1991. On December 22, 2000, Dr. Sahl sold his WMS shares to Mr. Ramsey and me. On July 1, 2005, well after my father had retired, he gifted half of his WMS shares to my mother. On January 1, 2006, my father transferred half of his remaining shares to me and my wife and the other half of those shares to Mr. Ramsey and his wife; my mother did the same with her shares. On January 1, 2019, my wife gifted her WMS shares to me, and Mr. Ramsey's wife gifted his shares to him.

266.   While I am licensed to practice law in Pennsylvania and Colorado, I have not practiced since the early 1990s (with the exception of helping family members with their estates). Since that time, I have not maintained professional liability insurance, retained clients, billed for legal services, or regularly kept track of my time. Indeed, since the early 1990s, I have annually informed the Pennsylvania and Colorado state bars that I do not maintain professional liability insurance because I am not engaged in the private practice of law and do not have private clients. To my knowledge, that information has been made available to the public. For example, the Pennsylvania State Bar website discloses that: "I do not maintain professional liability insurance because I do not have private clients and have no possible exposure to malpractice actions . . ."

267.   Neither WMS nor I have ever had a retainer agreement for the provision of legal services with any individual poultry processor, the Poultry Processing Survey Group, or the

Steering Committee. Nor did we seek or obtain permission to provide joint legal representation to members of the Poultry Processing Survey Group or the Steering Committee. I have never billed any individual poultry processor, the Poultry Processing Survey Group, or the Steering Committee for providing legal services. I never received any compensation from any poultry processor that I understood to be payment for legal services. Nor have I ever offered to provide *pro bono* legal assistance to individual poultry processors, the Poultry Processing Survey Group, or the Steering Committee.

268.    Neither WMS nor I was never asked to provide legal services to an individual poultry processor, the Poultry Processing Survey Group, or the Steering Committee. Rather, when poultry processors first hired WMS in 2000, they asked for a survey consultant to help them exchange compensation information. For the first three years that poultry processors used WMS's services, they interacted with WMS executive Robert Sahl, who was not an attorney. In 2004, I began managing the poultry processing survey, providing the same type of consulting services as Dr. Sahl. There was no change in the scope or terms of the services provided by WMS when I took over from Dr. Sahl.

269.    In marketing my services, I told prospective and existing clients, including poultry processors, that WMS's surveys were valuable because they allowed industry participants to obtain compensation data without violating the Safe Harbor guidelines or antitrust law. In doing so, I understood myself to be advertising a product that complied with legal requirements; I did *not* understand myself to be creating an attorney-client relationship with any of WMS's customers.

270.    WMS employees who were *not* attorneys made similar representations when marketing WMS's services. For example, in advertising WMS's services to the cement industry in January 2004, Dr. Sahl sent industry members some samples of WMS's work and noted: "All

the materials presented herein is in full compliance with the Safe Harbor Guidelines, which we discussed at the meeting." A true and accurate copy of this letter is attached as Exhibit 159, which is bates stamped WMS-PW0000001557 and was created and maintained in the ordinary course of WMS's business.

271.    While working with existing clients, including poultry processors, I sometimes informed them that a survey should be structured in a particular manner to avoid violating the Safe Harbor Guidelines. In doing so, I understood myself to be ensuring that the survey complied with legal requirements; I did *not* understand myself to be creating an attorney-client relationship with any of WMS's customers.

272.    WMS employees who were *not* attorneys made similar representations when working with WMS's existing clients. For example, in a September 2000 letter regarding a compensation survey for the chemical industry, Dr. Sahl wrote: "I do recognize that our response is presented in a different format than you requested. It is essential that it be handled in this manner due to Department of Justice/Federal Trade Commission 'safe harbor' guidelines describing specifically how information may be exchanged to avoid challenge under the antitrust laws." A true and accurate copy of this letter is attached as Exhibit 160, which is bates stamped WMS-PW0000004847 and was created and maintained in the ordinary course of WMS's business. Similarly, in August 2002, Dr. Sahl sent a letter to multiple poultry processors (including Tyson, Cargill, Foster Farms, Gold Kist, Pilgrims, Sanderson Farms, and Townsends) inviting them to participate in a one-time survey regarding the compensation of veterinarians, explaining: "Our involvement as a third-party administrator will ensure all data remains confidential and in accordance with governmental guidelines." A true and accurate copy of the letter is attached as

Exhibit 161, which is bates stamped WMS-PW0000004957 – 58 and was created and maintained in the ordinary course of WMS's business.

273.    No poultry processor ever said anything that made me suspect they believed I was their attorney. To the contrary, the Poultry Industry Survey Group demonstrated an understanding that I discussed the Safe Harbor guidelines with them as a consultant (rather than an attorney). For example, as indicated in Exhibit 10, the Group's "Operating Standards" state: "The survey exists to provide the organized sharing of pay and benefits data between participating companies. An independent third party consultant receives the data from each company and compiles the results in aggregate. The consultant guarantees adherence to 'Safe Harbor' guidelines in data handling techniques including ensuring that a proper number of job matches are received in order to report on the data as well as observing the required reporting window." Similarly, in 2014, Fieldale's Jon Allen told a poultry processor who asked to participate in the survey: "I will be glad to bring up your request to participate to the group. It is a formal survey which is organized by a consultant to meet all the safe harbor guidelines." That statement is reflected in Exhibit 162, which is bates stamped WMS-PW0000004820 – 21 and was maintained in the ordinary course of WMS's business.

274.    Poultry processors also demonstrated an understanding that I was conducting their survey as an independent third party—*not* as an attorney with an obligation to advance their interests. On February 8, 2018, for example, Foster Farms's Bert Neuenschwander emailed David Rubenstein, Vice President of Pitman Farms, noting: "I've copied Jon Meng (third party that administers the survey)." Similarly, on May 6, 2019, Perdue's Kim Huerta introduced me to Jennifer Moriarty, Compensation Supervisor of Hormel, in an email as "our 3rd party for the survey." True and accurate copies of those two emails are attached as Exhibits 163 and 164, which

are bates stamped WMS-PW0000000428 – 31 and WMS-PW0000000521, respectively, and were each maintained in the ordinary course of WMS's business.

275.   In fact, in every Tyson-sponsored Hourly Plant Maintenance and Production Survey that was distributed to members of the Poultry Industry Survey Group for completion, the following statement was included in the instructions: ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ Notably, this survey was annually distributed to each member of the Poultry Industry Survey Group from 2013 through 2016.

I declare under penalty of perjury under the laws of the United States and the state of Colorado that the foregoing is true and correct. Executed on   11/12/2021   .

G. Jonathan Meng

109