# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

JUDY JIEN
2781 Alton Avenue, Apt. B
Springdale, AR 72764

KIEO JIBIDI
317 Berry Street, Apt. 203
Springdale, AR 72764

ELAISA CLEMENT
2007 Keith Circle, Apt. 8
Springdale, AR 72764

GLENDA ROBINSON
979 Oliver Drive
Forest, MS 39074

EMILY EARNEST
2417 Shady Brook Lane
Haleyville, AL 35565

KEVIN WEST
1301 Spring Lane W
Cordele, GA 31015

on behalf of themselves and all others
similarly situated,

                Plaintiffs,

    v.

PERDUE FARMS, INC.
31149 Old Ocean City Road
Salisbury, MD 21804
County of Residence: Wicomico County

PERDUE FOODS LLC
31149 Old Ocean City Road
Salisbury, MD 21804
County of Residence: Wicomico County

TYSON FOODS, INC.
2200 West Don Tyson Parkway
Springdale, AR 72762

CIVIL ACTION NO. 1:19-CV-2521-SAG

**THIRD AMENDED CONSOLIDATED COMPLAINT**

JURY TRIAL DEMANDED

KEYSTONE FOODS, LLC
905 Airport Road, Suite 400
West Chester, PA 19380

PILGRIM'S PRIDE CORPORATION
1770 Promontory Circle
Greeley, CO 80634

SANDERSON FARMS, INC.
127 Flynt Road
Laurel, MS 39443

KOCH FOODS, INC.
1300 West Higgins Road, Suite 100
Park Ridge, IL 60068

WAYNE FARMS, LLC
4110 Continental Drive
Oakwood, GA 30566

MOUNTAIRE FARMS, INC.
29005 John J. Williams Highway
Millsboro, DE 19966

PECO FOODS, INC.
1101 Greensboro Avenue
Tuscaloosa, AL 35401

SIMMONS FOODS, INC.
601 North Hico Street
Siloam Springs, AR 72761

FIELDALE FARMS CORPORATION
555 Broiler Boulevard
Baldwin, GA 30511

GEORGE'S, INC.
402 West Robinson Avenue
Springdale, AR 72764

GEORGE'S FOODS, LLC
19992 Senedo Road
Edinburg, VA 22824

FOSTER POULTRY FARMS
1000 Davis Street
Livingston, CA 95334

CASE FOODS, INC.
385 Pilch Road
Troutman, NC 28166-8782

CASE FARMS, LLC
385 Pilch Road
Troutman, NC 28166-8782

O.K. FOODS, INC.
4601 N 6th Street
Fort Smith, AR 72904

ALLEN HARIM FOODS, LLC
29984 Pinnacle Way
Millsboro, DE 19966

AMICK FARMS, LLC
2079 Batesburg Highway
Batesburg, SC 29006

MAR-JAC POULTRY, INC.
1020 Aviation Boulevard
Gainesville, GA 30501

BUTTERBALL, LLC
One Butterball Lane
Garner, NC 27529

JENNIE-O TURKEY STORE, INC.
1 Hormel Place
Austin, MN 55912

CARGILL MEAT SOLUTIONS
CORPORATION
825 East Douglas Avenue, 9th Floor
Wichita, KS 67202

AGRI STATS, INC.
6510 Mutual Drive
Fort Wayne, IN 46825

WEBBER, MENG, SAHL AND COMPANY,
INC. d/b/a WMS & COMPANY, INC.
1200 E. High Street, Suite 104
Pottstown, PA 19464

                    Defendants.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................1

II.    JURISDICTION AND VENUE .....................................................8

III.    PARTIES ..........................................................................................10

     A.    Plaintiffs ................................................................................10

     B.    Defendants .............................................................................11

         1.    Perdue Defendants ....................................................11

             a.    Perdue Farms, Inc. ......................................11

             b.    Perdue Foods LLC ......................................13

         2.    Tyson Defendants ......................................................14

             a.    Tyson Foods, Inc. .......................................14

             b.    Keystone Foods, LLC .................................16

         3.    Pilgrim's Pride Corporation ...................**Error! Bookmark not defined.**

         4.    Sanderson Farms, Inc. ...............................................19

         5.    Koch Foods, Inc. .......................................................20

         6.    Wayne Farms, LLC ...................................................22

         7.    Mountaire Farms, Inc. ...............................................23

         8.    Peco Foods, Inc. ........................................................24

         9.    Simmons Foods, Inc. .................................................25

         10.    Fieldale Farms Corporation ......................................26

         11.    George's Defendants ..................................................27

             a.    George's, Inc. ..............................................27

             b.    George's Foods, LLC ..................................29

         12.    Foster Poultry Farms .................................................30

         13.    Case Foods Defendants ..............................................31

             a.    Case Foods, Inc. .........................................31

|  |  | b. | Case Farms, LLC ................................................................ | 32 |
|  | 14. | O.K. Foods, Inc. ......................................................................... | 33 |
|  | 15. | Allen Harim Foods, LLC ............................................................ | 34 |
|  | 16. | Amick Farms, LLC ...................................................................... | 36 |
|  | 17. | Mar-Jac Poultry, Inc. .................................................................. | 37 |
|  | 18. | Butterball, LLC ........................................................................... | 38 |
|  | 19. | Jennie-O Turkey Store, Inc. ....................................................... | 40 |
|  | 20. | Cargill Meat Solutions Corporation ........................................... | 41 |
|  | 21. | Agri Stats, Inc. ........................................................................... | 42 |
|  | 22. | Webber, Meng, Sahl and Company, Inc. .................................... | 44 |

IV.   AGENTS AND CO-CONSPIRATORS ............................................................... 45

A.   Tyson Agents and Co-Conspirators ............................................................ 45

B.   Pilgrim's Agents and Co-Conspirators ....................................................... 47

C.   Sanderson Farms Agents and Co-Conspirators .......................................... 48

D.   Koch Foods Agents and Co-Conspirators ................................................... 48

E.   Wayne Farms Agent and Co-Conspirator ................................................... 51

F.   Mountaire Farms Agent and Co-Conspirator ............................................. 51

G.   Simmons Foods Agent and Co-Conspirator ................................................ 51

H.   George's Agents and Co-Conspirators ........................................................ 52

I.   Foster Farms Agent and Co-Conspirator .................................................... 52

J.   Case Foods Agent and Co-Conspirator ....................................................... 52

K.   Allen Harim Agents and Co-Conspirators .................................................. 53

L.   Mar-Jac Agents and Conspirators ............................................................... 53

M.   Jennie-O Turkey Agents and Co-Conspirators ........................................... 54

N.   Cargill Agent and Co-Conspirator .............................................................. 54

O.   Other Agents and Co-Conspirators ............................................................. 55

V.   TRADE AND COMMERCE ............................................................................... 57

VI.     FACTUAL ALLEGATIONS ...................................................................................58

        A.      Background .............................................................................................58

                1.      Poultry Industry ...........................................................................58

                2.      Poultry Processing Facilities........................................................59

                3.      Poultry Processing Workers..........................................................61

                4.      Compensating Poultry Processing Workers..................................62

                5.      Centralized Determination of Compensation for Poultry
                        Processing Workers ......................................................................64

                6.      Limited Role of Labor Unions .....................................................66

                7.      Demographics of Hourly-Paid Poultry Processing Workers .................66

                8.      Demographics of Salary-Paid Poultry Processing
                        Employees....................................................................................69

        B.      Conspiracy to Fix Compensation ...........................................................70

                1.      Defendant Processors Unlawfully Exchanged
                        Compensation Information Through Detailed Surveys that
                        They Designed ...............................................................................72

                        a.      The Poultry Industry Survey Group................................73

                        b.      Background on WMS ......................................................73

                        c.      WMS Was Retained by Defendant Processors to
                                Establish a Veneer of Legality.......................................75

                        d.      Defendant Processors' Control of the Poultry
                                Industry Compensation Survey......................................77

                        e.      Positions Covered in the Poultry Industry
                                Compensation Surveys...................................................81

                        f.      Future Compensation Data in the Poultry Industry
                                Compensation Survey.....................................................84

                        g.      Disaggregated Raw Data in the Poultry Industry
                                Compensation Survey.....................................................88

                        h.      The CHIWI ....................................................................94

                        i.      Tyson-Sponsored Hourly Plant Maintenance and
                                Production Survey...........................................................95

                        j.      Deanonymization of Compensation Survey Data...........99

k.    Effects of the Broiler Antitrust Lawsuit on the Compensation Surveys...............................................101

l.    Withdrawals from the Poultry Industry Survey Group .............................................................................103

2.    Defendant Processors Discussed and Fixed Compensation at Annual Roundtable Meetings............................................105

a.    Roundtable Sessions Attended by WMS ......................108

b.    Roundtable Sessions that Excluded WMS...................112

c.    Effect of the Broilers Antitrust Lawsuit on the Poultry Industry Compensation Meetings ...................116

3.    Direct Communications Between Defendant Processors' Executives Regarding Compensation .....................................117

4.    Exchanging Detailed Compensation Data Through Agri Stats.................................................................................124

5.    Communications About Compensation Between Defendant Processors' Complexes and Plants..................................133

6.    Plus Factors that Render the Poultry Industry Susceptible to Collusion........................................................................136

C.    Market Power of Defendant Processors........................................141

1.    Direct Evidence of Market Power.........................................141

2.    Indirect Evidence of Market Power ......................................144

a.    Product or Services Market..........................................144

b.    Geographic Market .......................................................148

c.    High Collective Market Share and Monopsony Power ............................................................................149

D.    Anticompetitive Effects and Injury Suffered by Class Members ........................149

VII.    STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS..................152

A.    Continuing Violation .....................................................................152

B.    Fraudulent Concealment ................................................................153

1.    Plaintiffs Did Not and Could Not Have Discovered Defendants' Misconduct ..................................................153

2.    Defendants Actively Concealed the Conspiracy....................154

VIII.   CLASS ACTION ALLEGATIONS ..................................................................162

IX.   CAUSES OF ACTION ....................................................................................165

X.   PRAYER FOR RELIEF ..................................................................................174

XI.   JURY TRIAL DEMAND ................................................................................175

Plaintiffs Judy Jien, Kieo Jibidi, Elaisa Clement, Glenda Robinson, Emily Earnest, and Kevin West (collectively, "Plaintiffs") bring this action on behalf of themselves individually and on behalf of a class (the "Class") consisting of all persons employed by Defendants,[1] their subsidiaries, and related entities at poultry processing complexes, plants, hatcheries, and feed mills in the continental United States from January 1, 2000 until July 20, 2021 (the "Class Period").[2]

## I.        INTRODUCTION

1.        For more than two decades, Defendants have conspired and combined to fix and depress the compensation paid to employees at poultry processing complexes, plants, hatcheries, and feed mills in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.        Defendants consist of 20 poultry processors and several of their subsidiaries or parents ("Defendant Processors"), which collectively process approximately 90 percent of the poultry sold to consumers in the United States, and two consulting companies that helped Defendant Processors exchange competitively sensitive compensation data, Agri Stats, Inc. ("Agri Stats") and Webber, Meng, Sahl and Company, Inc. d/b/a WMS and Company, Inc. ("WMS").

3.        Defendant Processors, their subsidiaries, and related entities own and operate hundreds of poultry processing complexes, plants, hatcheries, and feed mills in the continental

---

[1] The term "Defendants" herein refers to the following companies: Perdue Farms, Inc.; Perdue Foods LLC; Tyson Foods, Inc.; Keystone Foods, LLC; Pilgrim's Pride Corporation; Sanderson Farms, Inc.; Koch Foods, Inc.; Wayne Farms, LLC; Mountaire Farms, Inc.; Simmons Foods, Inc.; Fieldale Farms Corporation; George's, Inc.; George's Foods, LLC; Peco Foods, Inc.; Foster Poultry Farms; Case Foods, Inc.; Case Farms, LLC; O.K. Foods, Inc.; Allen Harim Foods, LLC; Amick Farms, LLC; Mar-Jac Poultry, Inc.; Butterball, LLC; Jennie-O Turkey Store, Inc.; Cargill Meat Solutions Corporation; Agri Stats, Inc.; and Webber, Meng, Sahl and Company, Inc.

[2] Plaintiffs Judy Jien, Kieo Jibidi, Elaisa Clement, Glenda Robinson, and Emily Earnest also bring this action on behalf of the members of a subclass ("Subclass") consisting of all persons employed by Defendant Processors, their subsidiaries, and/or related entities at poultry processing plants in the continental United States from January 1, 2009 until July 20, 2021 ("Subclass Period"). The claims of the Class are brought against all Defendants except Pilgrim's Pride Corporation, George's, Inc., and George's Foods, LLC, whereas the claims of the Subclass are brought solely against Pilgrim's Pride Corporation, George's, Inc., and George's Foods, LLC.

United States.[3] These poultry processing facilities have employed hundreds of thousands of Class Members who incubate chicken and turkey eggs, make feed for chicken and turkeys, or help slaughter and process live chickens and turkeys.

4.      Defendant Processors have compensated Class Members with hourly wages or annual salaries, as well as employment benefits. Each Defendant Processor has established a schedule for hourly wage rates, annual salaries, and employment benefits based on the specific position and years of experience of the Class Members. Senior executives of each Defendant Processor established and approved those hourly wage rates, annual salaries, and employment benefits at corporate headquarters during the Class Period. This highly regimented process for determining compensation allowed Defendant Processors to compare compensation practices— and collectively suppress compensation—across their workforces.

5.      At least since 2000, Defendants have conspired to fix and depress the compensation paid to Class Members. The intent and purpose of this conspiracy was to maximize Defendant Processors' profits by reducing labor costs, which comprise a substantial share of each Defendant Processor's total operating costs.

6.      Defendants implemented, monitored, and enforced their conspiracy to fix and depress compensation through a series of overt acts, including:

7.      *Secret Compensation Surveys.* Defendant Processors collectively designed, implemented, and concealed several compensation surveys. From 2000 to 2019, a secret "Steering Committee" of poultry processing executives designed a detailed annual "Poultry Industry Compensation Survey" for completion by Defendant Processors. The annual survey allowed

---

[3] The term "poultry processing facilities" refers to poultry processing complexes, poultry processing plants, poultry hatcheries, and poultry feed mills.

Defendant Processors to compare the hourly wages, annual salaries, and employment benefits paid to dozens of categories of workers. The surveys featured both current and future compensation data, such as projected increases to salary pay ranges and the timing of those increases. And for many years, Defendant Processors designed the survey in a format that made it easy for them to determine exactly how much each processor paid each worker at each of its plants.

8.      Defendant Processors hired WMS to administer the annual Poultry Industry Compensation Survey in order to impart a veneer of legality on Defendant Processors' illicit information exchange. During the Class Period, Jonathan Meng, the President of WMS, repeatedly warned the Defendant Processors that they were improperly exchanging compensation data in a manner that was inconsistent with federal antitrust law—but his warnings were regularly disregarded by Defendant Processors. Mr. Meng concluded that the Defendant Processors only hired WMS to "create an appearance of compliance" while they "continued to exchange disaggregated and deanonymized compensation data and continued to discuss and harmonize their compensation practices." Mr. Meng stated that Defendant Processors "used WMS as an unwitting tool to conceal their misconduct."

9.      In the fall of 2016, several Defendant Processors were sued for fixing the price of chicken in a separate lawsuit. In the wake of that lawsuit and the antitrust scrutiny it brought to the poultry processing industry, several Defendant Processors withdrew from the Poultry Industry Compensation Survey, telling Mr. Meng they were withdrawing on the advice of counsel. The remaining participants changed the survey's format—removing questions about future compensation and modifying the format to make it harder to deanonymize.

10.     In addition to the annual Poultry Industry Compensation Survey, Defendant Processors sent multiple supplemental surveys *directly* to one another, exchanging even more

granular compensation information on a non-anonymous basis. For example, ██████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████  For example, ████████████████████

████████████████  emailed ██████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

    11.   *Annual "Off the Books" Meetings.* Defendant Processors sent their executives, including vice-presidents of human resources and directors of compensation, to annual "off the books," in-person meetings (referred to hereafter as "Poultry Industry Compensation Meetings"). The purpose, intent and outcome of these annual Poultry Industry Compensation Meetings was to fix the wages, salaries, and benefits of Class Members at artificially depressed levels.

    12.   At the beginning of Poultry Industry Compensation Meetings, WMS's Jonathan Meng customarily gave a presentation summarizing the results of the Poultry Industry Compensation Survey. Mr. Meng explained that, during his presentations, he "witnessed many instances when" Defendant Processors "sought to engage in direct and improper communications about compensation—often until I put a stop to those communications." Then, Defendant Processors excused him from the room so they could have complete privacy while they held multiple, hours-long, "roundtable" discussions (often spanning two days) where they reached

agreements regarding optimal and future compensation rates and practices. Mr. Meng concluded that Defendant Processors "revealed and discussed their particular compensation practices, future compensation plans, and optimal compensation rates with each other behind closed doors."

13.     Defendant Processors' internal emails indicate that they had improper conspiratorial communications at the annual Poultry Industry Compensation Meetings. For example, in an April 2009 email, Jonathan Allen, then Corporate Human Resources Director of Fieldale Farms Corporation, urged other Defendant Processors' executives to bring their "[d]ata manuals" to the upcoming Poultry Industry Compensation Meeting so they could answer competitors' "questions concerning your data." He also reminded the executives that we will "be sharing information in a round table discussion" and that these discussions are "expected to be kept confidential." Similarly, in an April 2015 email to other Defendant Processors' executives, Linda Wray, then Tyson Foods's Vice President of Compensation, noted that "hourly production projected budgets" were "typically a discussion item during the roundtable sessions."

14.     The Poultry Industry Compensation Meetings involved such brazen compensation-fixing that several Defendant Processors stopped attending because of concerns that antitrust enforcers would hold them to account for their actions at the Meetings.

15.     *Direct Communications Among Executives*. Senior executives of Defendant Processors extensively discussed, compared, and further suppressed compensation through email and phone communications. Those conspiratorial communications included both group emails to senior executives for purposes of aligning Defendant Processors' compensation practices as well as bilateral communications aimed at securing time-sensitive plans for future compensation. Those communications between Defendant Processors' executives sometimes involved adjustments to

existing agreements to depress compensation, such as discussions regarding whether to collectively ███████ projected annual salary increases.

16.     For example, █████████████████████████████████████████

█████████████████████████ emailed ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████ Multiple recipients of the email ████████████

███████████████████████████████████████

17.     Around the same time, ████████████████████████████████████

███████████████ emailed ██████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████

18.     *Exchanging Compensation Data Through Agri Stats.* On a monthly basis, Defendant Processors exchanged detailed, current, and non-public compensation information through Agri Stats. Each Defendant Processor subscribed to and partnered with Agri Stats to exchange and receive—via monthly confidential reports—effective wage rates regarding categories of poultry processing workers employed by each Defendant Processor. While Agri Stats has claimed that the exchanged compensation data was anonymous, the data was sufficiently granular and disaggregated such that executives of Defendant Processors could and did easily

match the distributed compensation data to poultry processing facilities operated by specific Defendant Processors.

19.     Indeed, a former executive of Perdue Farms, Inc. stated that Agri Stats was responsible for "collusion in the poultry industry." He said that Agri Stats data was "supposedly confidential" but he knew from being in the industry and around the "good old boy system" that every poultry processor subscribing to Agri Stats knew precisely which company reported which data. He noted that Perdue Farms, Inc. brought in Agri Stats personnel to teach management "how to extract information" from Agri Stats data.

20.     Defendant Processors used the data obtained from Agri Stats to implement and monitor the conspiracy to suppress compensation and to ensure and confirm that no conspirator deviated from the conspiracy. A former executive of Butterball, LLC said there was "no question about it" that Agri Stats was used by poultry processors to monitor each other's performance.

21.     *Communications Between Managers of Complexes and Plants.* Managers of Defendant Processors' complexes and plants engaged in bilateral and regional exchanges of wage, salary, and benefits information. Those managers frequently reached out directly to their counterparts at competitors' poultry processing complexes and plants to request and exchange compensation data, including data regarding plans for future wages, salaries, and benefits. For example, a former human resources manager of both George's and Perdue plants said she would exchange current and future wage rates with managers of rival poultry processing plants. She explained, "We would collaborate. We would talk among each other to see what they were doing for pay." The compensation data obtained from these kinds of information exchanges was provided to executives of the Defendant Processors at corporate headquarters, who used that data to facilitate the fixing of compensation and monitoring of the conspiracy.

22.     Numerous characteristics of the poultry processing industry have facilitated the formation and implementation of the conspiracy, including but not limited to, the following: (a) vertical integration; (b) high barriers to entry; (c) industry concentration; (d) fungibility of poultry processing workers; (e) inelastic labor supply; (f) a history of government investigations into collusive actions; (g) personal relationships between executives at competing poultry processors; and (h) numerous opportunities to collude.

23.     The intended and actual effect of Defendants' conspiracy to fix compensation has been to reduce and suppress the wages, salaries, and benefits paid to Class Members since January 2000 to levels materially lower than they would have been in a competitive market. During the Class Period, even while worker productivity and processing line speeds increased significantly, increases in compensation provided to Class Members were highly restrained and limited.

24.     The agreement entered by Defendants to fix and depress compensation to Class Members has unreasonably restrained trade in violation of the Sherman Act, 15 U.S.C. § 1. Plaintiffs, on their own behalf and on behalf of the Class and Subclass, bring this antitrust action to enjoin Defendants from continuing their unlawful agreement and to recover actual, compensatory, and treble damages, as well as costs, attorneys' fees, and interest. Plaintiffs demand a trial by jury.

## II.     JURISDICTION AND VENUE

25.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

26.     This Court has personal jurisdiction over each of the Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and the long-arm statute of the forum state. Defendants Perdue Farms, Inc. and Perdue Foods LLC

reside in this District and used their headquarters in Salisbury, Maryland to implement and coordinate the restraints of trade described below. In addition, Defendants: (1) transacted substantial business in the United States, including in this District; (2) transacted with, and caused injury to, Class Members located throughout the United States, including in this District; and (3) committed substantial acts in furtherance of the unlawful scheme in the United States, including in this District. For example:

- Each of the Defendants regularly sold poultry products in the state of Maryland during the Class Period and continues to sell poultry products in the state of Maryland;

- Defendants Perdue Farms, Inc. and Perdue Foods LLC are headquartered and incorporated in the state of Maryland;

- Defendants Perdue Farms, Inc.; Perdue Foods LLC; Allen Harim Foods, LLC; and Amick Farms, LLC operated poultry processing plants in the state of Maryland during the Class Period and provided compensation to Class Members in those plants at suppressed rates as a result of the conspiracy between all the Defendants alleged herein;

- Defendants Perdue Farms, Inc.; Perdue Foods LLC; Mountaire Farms, Inc.; Tyson Foods, Inc.; Allen Harim Foods, LLC; Amick Farms, LLC; and Case Foods, Inc. had employees located in the state of Maryland and/or contracted with poultry growers in the state of Maryland during the Class Period;

- Defendants Agri Stats and WMS regularly provided services to Defendant Processors in the state of Maryland during the Class Period, including to Perdue Farms, Inc. and Perdue Foods LLC;

- A leading trade association representing the poultry processing industry—the National Chicken Council—held at least eight meetings in the state of Maryland during the Class

Period that were attended by many of the Defendants, such as the three-day "Chicken Media Summit" that was held in Cambridge, Maryland in May 2015;

- Another leading trade association representing the poultry processing industry—the Delmarva Chicken Association—held at least 11 meetings in the state of Maryland during the Class Period that were attended by many of the Defendants.

27.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c), and (d) because one or more of the Defendants transacted business, was found, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

### III.     PARTIES

**A.     Plaintiffs**

28.     Judy Jien was employed as a deboner at a poultry processing plant operated by George's Processing, Inc. in Springdale, Arkansas and at a poultry processing plant operated by Tyson Foods, Inc. in Springdale, Arkansas during the Class Period and Subclass Period. She is a resident of the state of Arkansas.

29.     Kieo Jibidi was employed as a deboner at a poultry processing plant operated by Simmons Prepared Foods, Inc. in Decatur, Arkansas and at a poultry processing plant operated by Tyson Foods, Inc. in Springdale, Arkansas during the Class Period and Subclass Period. She is a resident of the state of Arkansas.

30.     Elaisa Clement was employed as a deboner at a poultry processing plant operated by George's Processing, Inc. in Springdale, Arkansas during the Class Period and Subclass Period. He is a resident of the state of Arkansas.

31.     Glenda Robinson was employed in the day pack department at a poultry processing plant operated by Tyson Foods, Inc. in Forest, Mississippi during the Class Period and Subclass Period. She is a resident of the state of Mississippi.

32.     Emily Earnest was employed as a deboner at a poultry processing plant operated by Pilgrim's Pride Corporation in Russellville, Alabama during the Class Period and Subclass Period. She is a resident of the state of Alabama.

33.     Kevin West was employed by four different Defendant Processors during the Class Period and Subclass Period. Specifically, during the Class Period and Subclass Period, he was employed as a department supervisor at a poultry processing plant operated by Tyson Foods, Inc. in Vienna, Georgia; a debone and evisceration supervisor at a poultry processing plant operated by Koch Foods in Pine Mountain, Georgia; a debone and live receiving supervisor at a poultry processing plant operated by Pilgrim's Pride Corporation in Nacogdoches, Texas; and a line receiving supervisor at a poultry processing plant operated by Perdue Foods LLC in Perry, Georgia. He is a resident of the state of Georgia.

**B.     Defendants**

**1.     Perdue Defendants**

**a.     Perdue Farms, Inc.**

34.     Perdue Farms, Inc. ("Perdue Farms") is a privately held Maryland corporation headquartered in Salisbury, Maryland. During the Class Period, Perdue Farms and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

35.     During the Class Period, Perdue Farms directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- Employees of Perdue Farms regularly attended annual Poultry Industry Compensation Meetings, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of Class Members at artificially depressed levels. Employees of Perdue Farms attended every annual Poultry Industry Compensation Meeting that was held between 2001 and 2019.

- In advance of, and for discussion at, annual Poultry Industry Compensation Meetings, employees of Perdue Farms submitted annual Poultry Industry Compensation Surveys containing highly detailed current and future compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other Defendant Processors. Employees of Perdue Farms completed and submitted an annual Poultry Industry Compensation Survey during every year from 2000 through 2019.

- Perdue Farms subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis. A former employee of Perdue Farms said that the company spent "enormous effort analyzing Agri Stats" and that its CEO was an "Agri Stats guru and nut" who had an "absolute understanding" of the reported Agri Stats data. According to a former employee of Perdue Farms, the company even brought in Agri Stats personnel to teach management "how to extract information" from Agri Stats data.

- Employees of Perdue Farms analyzed current and future compensation data that was obtained directly from other Defendant Processors by managers of Perdue plants.

- As a consequence of the conspiracy, Perdue Farms established compensation schedules for, and directed payments to, Class Members around the country at artificially depressed and fixed rates.

  **b.**  **Perdue Foods LLC**

36. Perdue Foods LLC ("Perdue Foods") is a privately held Maryland limited liability company headquartered in Salisbury, Maryland. Perdue Foods is a subsidiary of Perdue Farms. Perdue Foods owns poultry processing plants in multiple states, including California, Delaware, Georgia, Indiana, Maryland, Michigan, North Carolina, South Carolina, Tennessee, Virginia, and Washington. During the Class Period, Perdue Foods employed and paid wages, salaries, and/or benefits to Class Members in the United States.

37. During the Class Period, Perdue Foods directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- Employees of Perdue Foods routinely exchanged current and future wage rates with human resources managers at competing poultry processing complexes and plants.

- For example, on an annual basis, a former employee of Perdue Foods contacted managers of rival poultry processing plants operated by Pilgrim's Pride Corporation, Cargill Meat Solutions Corporation, and Virginia Poultry Growers Cooperative, Inc. and requested their current hourly wage rates for plant workers as well as any planned future increases to those hourly wage rates. The former human resources manager said, "We would collaborate. We would talk among each other to see what they were doing for pay." The former human resources manager provided the compensation data

obtained from those rival poultry processing plants to employees of Perdue Farms at corporate headquarters.

- Similarly, employees of Perdue Foods at a poultry processing plant in Cromwell, Kentucky regularly exchanged current compensation data with managers of a rival poultry processing plant owned by Pilgrim's Pride Corporation in Mayfield, Kentucky.

- Employees of Perdue Foods also reviewed disaggregated Agri Stats wage data at monthly or quarterly meetings that were held at the company's poultry processing complexes and plants.

- As a consequence of the conspiracy, Perdue Foods established compensation schedules for, and made payments directly to, Class Members employed by Perdue Foods around the country at artificially depressed and fixed rates.

38.     Defendants Perdue Farms and Perdue Foods are collectively referred to as "Perdue."

### 2.     Tyson Defendants

#### a.     Tyson Foods, Inc.

39.     Tyson Foods, Inc. ("Tyson Foods") is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. During the Class Period, Tyson Foods and its predecessors, wholly owned or controlled subsidiaries, and/or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

40.     During the Class Period, Tyson Foods directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- Employees of Tyson Foods attended annual Poultry Industry Compensation Meetings, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of Class Members at artificially depressed levels. Employees of Tyson Foods attended most of the Poultry Industry Compensation Meetings held during the Class Period.

- In advance of, and for discussion at, annual Poultry Industry Compensation Meetings, employees of Tyson Foods submitted annual Poultry Industry Compensation Surveys containing highly detailed current and future compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other Defendant Processors. Employees of Tyson Foods completed and submitted an annual Poultry Industry Compensation Survey during every year from 2000 through 2019.

- Tyson Foods subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- Employees of Tyson Foods routinely exchanged current and future wage rates with human resources managers at competing poultry processing complexes and plants. For example, in the fall of 2017, employees of a plant owned by Tyson Foods in Union City, Tennessee exchanged future wage rates with managers of a poultry plant owned by Pilgrim's Pride Corporation in Mayfield, Kentucky.

- As a consequence of the conspiracy, Tyson Foods established compensation schedules for, and made payments directly to, Class Members employed by Tyson around the country at artificially depressed and fixed rates.

### b. Keystone Foods, LLC

41.    Keystone Foods, LLC ("Keystone") is a Delaware corporation located in West Chester, Pennsylvania and is a wholly owned subsidiary of Tyson Foods. During the Class Period, Keystone employed and paid wages, salaries, and/or benefits to Class Members in the United States.

42.    During the Class Period, Keystone directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- Employees of Keystone attended annual Poultry Industry Compensation Meetings, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and ultimately fix the wages, salaries, and benefits of Class Members at artificially depressed levels. For example, employees of Keystone attended many of the Poultry Industry Compensation Meetings held during the Class Period.

- In advance of, and for discussion at, annual Poultry Industry Compensation Meetings, employees of Keystone submitted annual Poultry Industry Compensation Surveys containing highly detailed current and future compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other Defendant Processors. Employees of Keystone completed and submitted an annual Poultry Industry Compensation Survey during multiple years of the Class Period.

- Keystone subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- Employees of Keystone routinely exchanged current and future wage rates with human resources managers at competing poultry processing complexes and plants. A former employee of both Keystone said that human resources managers at local poultry processing plants "shared [compensation information] within the industry" all the time.

- As a consequence of the conspiracy, Keystone established compensation schedules for, and made payments to, Class Members employed by Keystone at artificially depressed and fixed rates.

43. Defendants Tyson Foods and Keystone are collectively referred to as "Tyson."

**3.    Pilgrim's Pride Corporation**

44. Pilgrim's Pride Corporation ("Pilgrim's") is a Delaware corporation headquartered in Greeley, Colorado. JBS USA Food Company holds a 80.21% controlling interest in Pilgrim's. JBS USA Holdings and Pilgrim's are subsidiaries of JBS SA, a Brazilian corporation headquartered in Sao Paulo, Brazil. During the Class Period, Pilgrim's and its predecessors, wholly owned or controlled subsidiaries, and/or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

45. During the Class Period, Pilgrim's directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- Employees of Pilgrim's attended annual Poultry Industry Compensation Meetings, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of Class Members at artificially depressed levels. Employees of Pilgrim's attended many of the Poultry Industry Compensation Meetings held during the Class Period.

- In advance of, and for discussion at, annual Poultry Industry Compensation Meetings, employees of Pilgrim's submitted annual Poultry Industry Compensation Surveys containing highly detailed current and future compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other Defendant Processors. Employees of Pilgrim's completed and submitted an annual Poultry Industry Compensation Survey during many years of the Class Period.

- Pilgrim's subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- Employees of Pilgrim's routinely exchanged current and future wage rates with managers of competing poultry processing complexes and plants. For example, in the fall of 2017, managers of the poultry processing plant owned by Pilgrim's in Mayfield, Kentucky requested and obtained future wage rates from a poultry processing plant owned by Tyson Foods in Union City, Tennessee and current wage rates from a poultry processing plant owned by Perdue Foods in Cromwell, Kentucky.

- As a consequence of the conspiracy, Pilgrim's established compensation schedules for, and made payments directly to, Class and Subclass Members employed by Pilgrim's around the country at artificially depressed and fixed rates.

46.     During the Class Period, Pilgrim's acquired several companies that had participated in Poultry Industry Compensation Surveys and Poultry Industry Compensation Meetings. For example, in 2000, Pilgrim's acquired WLR Foods Inc.; between 2003 and 2005, Pilgrim's acquired ConAgra Foods, Inc.; and in 2007, Pilgrim's acquired Gold Kist Inc.

47.     Around December 1, 2008, Pilgrim's filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Northern District of Texas. Effective December 28, 2009, Pilgrim's was discharged from bankruptcy under a plan of reorganization that paid all creditors in full. Pilgrim's participated in the conspiracy alleged herein throughout the Class Period, including before and after its discharge from bankruptcy.

48.     Regardless of whether Pilgrim's participated in the conspiracy throughout the Class Period, this Complaint seeks to recover damages from Pilgrim's only for the post-discharge conduct of Pilgrim's, and in no way seeks to violate any orders of the above referenced Bankruptcy Court. However, by operation of law, the damages arising from the post-discharge conduct of Pilgrim's include damages incurred by Plaintiffs and other Class Members throughout the Subclass Period, including from before Pilgrim's discharge from bankruptcy. In addition, this Complaint also seeks to recover damages from the other Defendants for the pre-discharge conspiratorial conduct of Pilgrim's throughout the Class Period.

**4.      Sanderson Farms, Inc.**

49.     Sanderson Farms, Inc. ("Sanderson Farms") is a publicly held Mississippi corporation headquartered in Laurel, Mississippi. During the Class Period, Sanderson Farms and its predecessors, wholly owned or controlled subsidiaries, and/or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

50.     During the Class Period, Sanderson Farms directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- Employees of Sanderson Farms regularly attended annual Poultry Industry Compensation Meetings, where executives from competing poultry processors

gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of Class Members at artificially depressed levels. Employees of Sanderson Farms attended many annual Poultry Industry Compensation Meetings held during the Class Period.

- In advance of, and for discussion at, annual Poultry Industry Compensation Meetings, employees of Sanderson Farms submitted annual Poultry Industry Compensation Surveys containing highly detailed current and future compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other Defendant Processors. Employees of Sanderson Farms completed and submitted an annual Poultry Industry Compensation Survey during many years of the Class Period.

- Sanderson Farms subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis. Joe Sanderson, then-CEO and Chairman of Sanderson Farms, stated that "we live and die by Agri Stats."

- As a consequence of the conspiracy, Sanderson Farms established compensation schedules for, and made payments directly to, Class Members employed by Sanderson Farms around the country at artificially depressed and fixed rates.

**5.    Koch Foods, Inc.**

51.    Koch Foods, Inc. ("Koch Foods") is a privately held Delaware corporation with its corporate headquarters in Park Ridge, Illinois. During the Class Period, Koch Foods and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

52.     During the Class Period, Koch Foods directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- Employees of Koch Foods regularly attended annual Poultry Industry Compensation Meetings, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of Class Members at artificially depressed levels. Employees of Koch Foods attended many of the Poultry Industry Compensation Meetings held during the Class Period.

- In advance of, and for discussion at, annual Poultry Industry Compensation Meetings, employees of Koch Foods submitted annual Poultry Industry Compensation Surveys containing highly detailed current and future compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other Defendant Processors. Employees of Koch Foods completed and submitted an annual Poultry Industry Compensation Survey during multiple years of the Class Period.

- Koch Foods subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- As a consequence of the conspiracy, Koch Foods established compensation schedules for, and directed payments to, Class Members employed by Koch Foods around the country at artificially depressed and fixed rates.

### 6.     Wayne Farms, LLC

53.     Wayne Farms, LLC ("Wayne Farms") is a Delaware corporation headquartered in Oakwood, Georgia. During the Class Period, Wayne Farms and its predecessors, wholly owned or controlled subsidiaries, and/or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

54.     During the Class Period, Wayne Farms directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- Employees of Wayne Farms regularly attended annual Poultry Industry Compensation Meetings, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of Class Members at artificially depressed levels. Employees of Wayne Farms attended every annual Poultry Industry Compensation Meeting that was held between 2001 and 2019.

- In advance of, and for discussion at, annual Poultry Industry Compensation Meetings, employees of Wayne Farms submitted annual Poultry Industry Compensation Surveys containing highly detailed current and future compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other Defendant Processors. Employees of Wayne Farms completed and submitted an annual Poultry Industry Compensation Survey during every year from 2000 through 2019.

- Wayne Farms subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- As a consequence of the conspiracy, Wayne Farms established compensation schedules for, and made payments directly to, Class Members employed by Wayne Farms at artificially depressed and fixed rates.

### 7.    Mountaire Farms, Inc.

55.    Mountaire Farms, Inc. ("Mountaire Farms") is a privately held Delaware corporation with its headquarters in Millsboro, Delaware. During the Class Period, Mountaire Farms and its predecessors, wholly owned or controlled subsidiaries, and/or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

56.    During the Class Period, Mountaire Farms directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- In 2011, employees of Mountaire Farms attended an annual Poultry Industry Compensation Meeting, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of Class Members at artificially depressed levels.

- In advance of, and for discussion at, the Poultry Industry Compensation Meeting held in 2011, employees of Mountaire Farms submitted highly detailed current and future compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other Defendant Processors.

- Mountaire Farms subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- As a consequence of the conspiracy, Mountaire Farms established compensation schedules for, and made payments directly to, Class Members employed by Mountaire around the country at artificially depressed and fixed rates.

**8.  Peco Foods, Inc.**

57.    Peco Foods, Inc. ("Peco Foods") is a privately held Alabama corporation headquartered in Tuscaloosa, Alabama. During the Class Period, Peco Foods employed and paid wages, salaries, and/or benefits to Class Members in the United States.

58.    During the Class Period, Peco Foods directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- Peco Foods subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- Employees of Peco Foods routinely exchanged current and future wage rates with human resources managers at competing poultry processing plants. A former employee of Peco Foods explained that human resources staff at the company would often contact their counterparts at competitor poultry processing plants and exchange information about starting pay rates, pay increases, and employment benefits. He explained that this "type of thing happened all the time."

- As a consequence of the conspiracy, Peco Foods established compensation schedules for, and made payments directly to, Class Members employed by Peco Foods around the country at artificially depressed and fixed rates.

**9.  Simmons Foods, Inc.**

59.     Simmons Foods, Inc. ("Simmons Foods") is a privately held Arkansas corporation headquartered in Siloam Springs, Arkansas. During the Class Period, Simmons Foods and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

60.     During the Class Period, Simmons Foods directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- Employees of Simmons Foods regularly attended annual Poultry Industry Compensation Meetings, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of Class Members at artificially depressed levels. Employees of Simmons Foods attended many of the annual Poultry Industry Compensation Meetings that were held during the Class Period.

- In advance of, and for discussion at, annual Poultry Industry Compensation Meetings, employees of Simmons Foods submitted annual Poultry Industry Compensation Surveys containing highly detailed current and future compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other Defendant Processors. Employees of Simmons Foods completed

and submitted an annual Poultry Industry Compensation Survey during multiple years of the Class Period.

- During the Class Period, Simmons Foods subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- As a consequence of the conspiracy, Simmons Foods established compensation schedules for, and directed payments to, Class Members employed by Simmons Foods around the country at artificially depressed and fixed rates.

**10.    Fieldale Farms Corporation**

61.    Fieldale Farms Corporation ("Fieldale Farms") is a privately held Georgia corporation headquartered in Baldwin, Georgia. During the Class Period, Fieldale Farms and its predecessors, wholly owned or controlled subsidiaries, and/or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

62.    During the Class Period, Fieldale Farms directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- Employees of Fieldale Farms regularly attended annual Poultry Industry Compensation Meetings, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of Class Members at artificially depressed levels. Employees of Fieldale Farms attended every annual Poultry Industry Compensation Meeting that was held between 2001 and 2019.

- In advance of, and for discussion at, annual Poultry Industry Compensation Meetings, employees of Fieldale Farms submitted annual Poultry Industry Compensation Surveys containing highly detailed current and future compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other Defendant Processors. Employees of Fieldale Farms completed and submitted an annual Poultry Industry Compensation Survey during every year from 2000 through 2019.

- Fieldale Farms subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- As a consequence of the conspiracy, Fieldale Farms established compensation schedules for, and made payments directly to, Class Members employed by Fieldale Farms around the country at artificially depressed and fixed rates.

**11.**     **George's Defendants**

      **a.**     **George's, Inc.**

63.     George's, Inc. is a privately held Arkansas corporation headquartered in Springdale, Arkansas. During the Class Period, George's, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

64.     During the Class Period, George's, Inc. directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- Employees of George's, Inc. regularly attended annual Poultry Industry Compensation Meetings, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of Class Members at artificially depressed levels. Employees of George's, Inc. attended most of the annual Poultry Industry Compensation Meetings that were held during the Class Period.

- In advance of, and for discussion at, annual Poultry Industry Compensation Meetings, employees of George's, Inc. submitted annual Poultry Industry Compensation Surveys containing highly detailed current and future compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other Defendant Processors. Employees of George's, Inc. completed and submitted an annual Poultry Industry Compensation Survey during most years of the Class Period.

- George's, Inc. subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- According to a former employee of George's, Inc., Agri Stats data was reviewed during quarterly meetings at the company's poultry processing complexes to assess performance.

- As a consequence of the conspiracy, George's, Inc. established compensation schedules for, and made payments directly to, Class and Subclass Members employed at George's Inc. plants around the country at artificially depressed and fixed rates.

### b.    George's Foods, LLC

65.    George's Foods, LLC is a Virginia corporation headquartered in Edinburg, Virginia and is a wholly owned subsidiary of George's, Inc. George's Foods, LLC operates a poultry complex in Harrisonburg, Virginia. During the Class Period, George's Foods, LLC employed and paid wages, salaries and/or benefits to Class Members in the United States.

66.    During the Class Period, George's Foods, LLC directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- Employees of George's Foods, LLC routinely exchanged current and future wage rates with human resources managers at competing poultry processing plants.

- For example, on an annual basis, a former employee of George's Foods, LLC contacted managers of rival poultry processing plants operated by Pilgrim's, Cargill Meat Solutions Corporation, and Virginia Poultry Growers Cooperative, Inc. and requested the current hourly wage rates for plant workers as well as any planned future increases to those hourly wage rates. The former human resources manager said, "We would collaborate. We would talk among each other to see what they were doing for pay." The former human resources manager provided the compensation data obtained from rival poultry plants to employees of George's, Inc. at corporate headquarters.

- As a consequence of the conspiracy, George's Foods, LLC made payments to Class and Subclass Members at artificially depressed and fixed rates.

67.    Defendants George's, Inc. and George's Foods, LLC are collectively referred to as "George's."

### 12.    Foster Poultry Farms

68.    Foster Poultry Farms ("Foster Farms") is a California corporation headquartered in Livingston, California. During the Class Period, Foster Farms and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

69.    During the Class Period, Foster Farms directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- Employees of Foster Farms regularly attended annual Poultry Industry Compensation Meetings, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of Class Members at artificially depressed levels. Employees of Foster Farms attended every annual Poultry Industry Compensation Meeting that was held between 2001 and 2019.

- In advance of, and for discussion at, annual Poultry Industry Compensation Meetings, employees of Foster Farms submitted annual Poultry Industry Compensation Surveys containing highly detailed current and future compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other Defendant Processors. Employees of Foster Farms completed and submitted an annual Poultry Industry Compensation Survey during every year from 2000 through 2019.

- Foster Farms subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- As a consequence of the conspiracy, Foster Farms established compensation schedules for, and made payments directly to, Class Members employed by Foster Farms around the country at artificially depressed and fixed rates.

### 13.   Case Foods Defendants

#### a.   Case Foods, Inc.

70.     Case Foods, Inc. is a privately held Delaware corporation with its corporate headquarters in Troutman, North Carolina. During the Class Period, Case Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

71.     During the Class Period, Case Foods, Inc. directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- Employees of Case Foods, Inc. regularly attended annual Poultry Industry Compensation Meetings, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of Class Members at artificially depressed levels. Employees of Case Foods, Inc. attended most of the annual Poultry Industry Compensation Meetings that were held during the Class Period.

- In advance of, and for discussion at, annual Poultry Industry Compensation Meetings, employees of Case Foods, Inc. submitted annual Poultry Industry Compensation

Surveys containing highly detailed current and future compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other Defendant Processors. Employees of Case Foods, Inc. completed and submitted an annual Poultry Industry Compensation Survey during most of the years of the Class Period.

- Case Foods, Inc. subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- As a consequence of the conspiracy, Case Foods, Inc. established compensation schedules for, and made payments directly to, Class Members employed by Case Foods, Inc. around the country at artificially depressed and fixed rates.

        **b.**     **Case Farms, LLC**

72.     Case Farms, LLC is a privately held Delaware corporation with its corporate headquarters in Troutman, North Carolina. During the Class Period, Case Farms, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

73.     During the Class Period, Case Farms, LLC directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- Employees of Case Farms, LLC regularly attended annual Poultry Industry Compensation Meetings, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of Class Members at artificially depressed levels. Employees of

Case Farms, LLC attended most of the annual Poultry Industry Compensation Meetings that were held during the Class Period.

- In advance of, and for discussion at, annual Poultry Industry Compensation Meetings, employees of Case Farms, LLC submitted annual Poultry Industry Compensation Surveys containing highly detailed current and future compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other Defendant Processors. Employees of Case Farms, LLC completed and submitted an annual Poultry Industry Compensation Survey during most of the years of the Class Period.

- As a consequence of the conspiracy, Case Farms, LLC established compensation schedules for, and made payments directly to, Class Members employed by Case Farms, LLC around the country at artificially depressed and fixed rates.

74.    Defendants Case Foods, Inc. and Case Farms, LLC are collectively referred to as "Case Foods."

**14.    O.K. Foods, Inc.**

75.    O.K. Foods, Inc. ("O.K. Foods") is an Arkansas corporation with its corporate headquarters in Fort Smith, Arkansas. During the Class Period, O.K. Foods and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

76.    During the Class Period, O.K. Foods directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- Employees of O.K. Foods regularly attended annual Poultry Industry Compensation Meetings, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of Class Members at artificially depressed levels. Employees of O.K. Foods attended many of the annual Poultry Industry Compensation Meetings that were held during the Class Period.

- In advance of, and for discussion at, annual Poultry Industry Compensation Meetings, employees of O.K. Foods submitted annual Poultry Industry Compensation Surveys containing highly detailed current and future compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other Defendant Processors. Employees of O.K. Foods completed and submitted an annual Poultry Industry Compensation Survey during multiple years of the Class Period.

- O.K. Foods subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- As a consequence of the conspiracy, O.K. Foods established compensation schedules for, and made payments directly to, Class Members employed by O.K. Foods around the country at artificially depressed and fixed rates.

**15.    Allen Harim Foods, LLC**

77.    Allen Harim Foods, LLC ("Allen Harim") is a Delaware limited liability company with its corporate headquarters in Millsboro, Delaware. During the Class Period, Allen Harim

and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

78.     During the Class Period, Allen Harim directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- Employees of Allen Harim regularly attended annual Poultry Industry Compensation Meetings, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of Class Members at artificially depressed levels. Employees of Allen Harim attended most of the annual Poultry Industry Compensation Meetings that were held during the Class Period.

- In advance of, and for discussion at, annual Poultry Industry Compensation Meetings, employees of Allen Harim submitted annual Poultry Industry Compensation Surveys containing highly detailed current and future compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other Defendant Processors. Employees of Allen Harim completed and submitted an annual Poultry Industry Compensation Survey during most of the years of the Class Period.

- Allen Harim subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- As a consequence of the conspiracy, Allen Harim established compensation schedules for, and made payments directly to, Class Members employed by Allen Harim around the country at artificially depressed and fixed rates.

**16.     Amick Farms, LLC**

79.     Amick Farms, LLC ("Amick Farms") is a Delaware limited liability company with its corporate headquarters in Batesburg, South Carolina. During the Class Period, Amick Farms and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

80.     During the Class Period, Amick Farms directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- Employees of Amick Farms regularly attended annual Poultry Industry Compensation Meetings, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of Class Members at artificially depressed levels. Employees of Amick Farms attended multiple annual Poultry Industry Compensation Meetings during the Class Period.

- In advance of, and for discussion at, annual Poultry Industry Compensation Meetings, employees of Amick Farms submitted annual Poultry Industry Compensation Surveys containing highly detailed current and future compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other Defendant Processors. Employees of Amick Farms completed and submitted an annual Poultry Industry Compensation Survey during multiple years of the Class Period.

- Amick Farms subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- As a consequence of the conspiracy, Amick Farms established compensation schedules for, and made payments directly to, Class Members employed by Amick Farms around the country at artificially depressed and fixed rates.

### 17.   Mar-Jac Poultry, Inc.

81.     Mar-Jac Poultry, Inc. ("Mar-Jac Poultry") is a Georgia corporation with its corporate headquarters located in Gainesville, Georgia. During the Class Period, Mar-Jac Poultry and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries and/or benefits to Class Members in the United States.

82.     Mar-Jac Poultry wholly acquired the assets of poultry processor Marshall Durbin Food Corporation ("Marshall Durbin") in 2014.

83.     During the Class Period, Marshall Durbin directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- Employees of Marshall Durbin regularly attended annual Poultry Industry Compensation Meetings, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of Class Members at artificially depressed levels. Employees of Marshall Durbin attended multiple annual Poultry Industry Compensation Meetings during the Class Period.

- In advance of, and for discussion at, annual Poultry Industry Compensation Meetings, employees of Marshall Durbin submitted annual Poultry Industry Compensation Surveys containing highly detailed current and future compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other Defendant Processors. Employees of Marshall Durbin completed and submitted an annual Poultry Industry Compensation Survey during multiple years of the Class Period.

- Marshall Durbin subscribed to Agri Stats to exchange current, disaggregated, readily decodable and plant-specific compensation data with competing poultry processors on a monthly basis.

- As a consequence of the conspiracy, Marshall Durbin established compensation schedules for, and made payments directly to, Class Members employed by Marshall Durbin around the country at artificially depressed and fixed rates.

**18.    Butterball, LLC**

84.    Butterball, LLC ("Butterball") is a North Carolina company with its corporate headquarters in Garner, North Carolina. During the Class Period, Butterball and its predecessors, wholly owned or controlled subsidiaries, and/or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

85.    During the Class Period, Butterball directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- Employees of Butterball regularly attended annual Poultry Industry Compensation Meetings, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of

Class Members at artificially depressed levels. Employees of Butterball attended multiple annual Poultry Industry Compensation Meetings during the Class Period.

- In advance of, and for discussion at, annual Poultry Industry Compensation Meetings, employees of Butterball submitted annual Poultry Industry Compensation Surveys containing highly detailed current and future compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other Defendant Processors. Employees of Butterball completed and submitted an annual Poultry Industry Compensation Survey during multiple years of the Class Period.

- Butterball subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- Employees of Butterball identified which competing poultry processors reported which compensation data to Agri Stats in part by speaking with, and requesting that information from, Agri Stats representatives.

- According to a former Butterball employee, Butterball and other poultry processors used Agri Stats to monitor each other's performance.

- Employees of Butterball routinely exchanged current and future wage rates with human resources managers employed at competing poultry processing plants. For example, Butterball's poultry processing plant in Mount Olive, North Carolina regularly exchanged hourly wages for specific positions with nearby rival poultry processing plants in order to compare compensation schedules.

- As a consequence of the conspiracy, Butterball established compensation schedules for, and made payments directly to, Class Members employed by Butterball around the country at artificially depressed and fixed rates.

**19.     Jennie-O Turkey Store, Inc.**

86.     Jennie-O Turkey Store, Inc. ("Jennie-O Turkey Store") is a Minnesota corporation with its corporate headquarters in Austin, Minnesota. During the Class Period, Jennie-O Turkey Store and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

87.     During the Class Period, Jennie-O Turkey Store directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- Employees of Jennie-O Turkey Store regularly attended annual Poultry Industry Compensation Meetings, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of Class Members at artificially depressed levels. Employees of Jennie-O Turkey Store attended the 2015 annual Poultry Industry Compensation Meeting.

- In advance of, and for discussion at, the Poultry Industry Compensation Meeting held in 2015, employees of Jennie-O Turkey Store submitted a Poultry Industry Compensation Survey containing highly detailed current and future compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other Defendant Processors.

- Jennie-O Turkey Store subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- As a consequence of the conspiracy, Jennie-O Turkey Store established compensation schedules for, and made payments directly to, Class Members employed by Jennie-O Turkey Store around the country at artificially depressed and fixed rates.

**20.    Cargill Meat Solutions Corporation**

88.    Cargill Meat Solutions Corporation ("Cargill") is a Delaware company with its headquarters in Wichita, Kansas. During the Class Period, Cargill and its predecessors, wholly owned or controlled subsidiaries, and/or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

89.    During the Class Period, Cargill directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- Employees of Cargill regularly attended annual Poultry Industry Compensation Meetings, where executives from competing poultry processors gathered to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of Class Members at artificially depressed levels. Employees of Cargill attended every annual Poultry Industry Compensation Meeting that was held between 2001 and 2019.

- In advance of, and for discussion at, annual Poultry Industry Compensation Meetings, employees of Cargill submitted annual Poultry Industry Compensation Surveys containing highly detailed current and future compensation data to WMS, with the knowledge and expectation that such surveyed data would be distributed to, and examined by, other Defendant Processors. Employees of Cargill completed and

submitted an annual Poultry Industry Compensation Survey during every year from 2000 through 2019.

- Cargill subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

- Employees of Cargill exchanged current and future wages with human resources managers at competing poultry processing plants. For example, on an annual basis, employees of Cargill exchanged current hourly wage rates for poultry processing plant workers as well as any planned future increases to those hourly wage rates with managers of rival poultry processing plants operated by Perdue Foods and George's Foods, LLC.

- As a consequence of the conspiracy, Cargill established compensation schedules for, and made payments directly to, Class Members employed by Cargill around the country at artificially depressed and fixed rates.

**21.     Agri Stats, Inc.**

90.     Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana. Throughout the Class Period, Agri Stats facilitated the exchange of confidential, proprietary, and competitively sensitive compensation data among Defendant Processors and their co-conspirators.

91.     During the Class Period, Agri Stats directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- At the request of the Defendant Processors, Agri Stats uploaded each Defendant Processor's salary and wage data for each of their, and their subsidiaries', respective

poultry processing facilities and then exchanged that proprietary compensation data between each of the Defendant Processors on a monthly basis.

- The compensation data exchanged by Agri Stats between the Defendant Processors each month was non-public, disaggregated, plant-specific, current, and readily decodable. Indeed, a former employee of Perdue Farms said that Agri Stats compensation data was "supposedly confidential" but Perdue Farms and every other poultry processor participating in Agri Stats knew precisely which company reported which data.

- If a Defendant Processor desired assistance to decode exchanged compensation data, Agri Stats would and did assist those Defendant Processors in identifying the source of that exchanged data. A former employee of Butterball explained that "you could figure out" which company reported which compensation data to Agri Stats by speaking with Agri Stats representatives who provided the data. Perdue Farms, for example, brought in Agri Stats personnel to teach its management "how to extract information" from Agri Stats data.

- During the Class Period, Agri Stats met with each Defendant Processor's executives on a regular basis and, during those meetings, discussed the nonpublic data that Agri Stats had collected from poultry processors each month.

- Defendant Processors knew that they could rely on Agri Stats data to set compensation and monitor the conspiracy because Agri Stats carefully audited the raw compensation data that it collected from each Defendant Processor. Indeed, a former Butterball employee said there was "no question about it" that Agri Stats was used by poultry processors to monitor each other's performance.

22.   **Webber, Meng, Sahl and Company, Inc.**

92.   Webber, Meng, Sahl and Company, Inc. d/b/a WMS and Company, Inc. is a Pennsylvania corporation located in Pottstown, Pennsylvania. Throughout the Class Period, WMS facilitated the exchange of confidential, proprietary, and competitively sensitive compensation data among Defendant Processors and their co-conspirators.

93.   During the Class Period, WMS directly participated in the conspiracy to fix and depress compensation to poultry processing workers by, among other things, doing the following:

- WMS conducted detailed annual surveys of the hourly wages, salaries, bonuses, and employment benefits paid by Defendant Processors and their subsidiaries to multiple categories of poultry processing workers and circulated the survey results to senior executives of those Defendant Processors.

- WMS facilitated the exchange of detailed and plant-specific compensation data between Defendant Processors that was raw, disaggregated, current, future, and readily decodable.

- At annual Poultry Industry Compensation Meetings, WMS delivered a PowerPoint presentation that emphasized the average and median wage rates and salaries for poultry processing positions based on the survey data provided by the Defendant Processors, thereby establishing benchmarks that facilitated compensation-fixing discussions.

- As a third-party compensation consultancy, WMS was used by Defendant Processors to conceal their unlawful information exchanges and impart a veneer of legality to those exchanges.

## IV.    AGENTS AND CO-CONSPIRATORS

94.     The entities named below have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy to fix and depress compensation alleged herein.

95.     Defendants are jointly and severally liable for the acts of the co-conspirators named below whether or not named as defendants in this Complaint.

96.     Each Defendant and co-conspirator named below acted as the agent or joint-venturer of, or for, the other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged herein.

### A.     Tyson Agents and Co-Conspirators

97.     Tyson Prepared Foods, Inc. is a Delaware corporation located in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods. Tyson Prepared Foods, Inc. operates several poultry processing plants in multiple states. During the Class Period, Tyson Prepared Foods, Inc. employed and paid wages, salaries, and/or benefits to Class Members in the United States.

98.     The Hillshire Brands Company is a Maryland corporation located in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods. The Hillshire Brands Company operates several poultry processing plants in multiple states. During the Class Period, The Hillshire Brands Company employed and paid wages, salaries, and/or benefits to Class Members in the United States.

99.     Tyson Fresh Meats, Inc. is a Delaware corporation located in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods. Tyson Fresh Meats, Inc. operates several poultry processing plants in multiple states. During the Class Period, Tyson Fresh Meats, Inc. employed and paid wages, salaries, and/or benefits to Class Members in the United States.

100.    Tyson Processing Services, Inc. is a Delaware corporation located in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods. Tyson Processing Services, Inc. operates a poultry processing plant in Nebraska. During the Class Period, Tyson Processing Services, Inc. employed and paid wages, salaries, and/or benefits to Class Members in the United States.

101.    Tyson Refrigerated Processed Meats, Inc. is a Delaware corporation located in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods. Tyson Refrigerated Processed Meats, Inc. operates two poultry processing plants in Texas. During the Class Period, Tyson Refrigerated Processed Meats, Inc. employed and paid wages, salaries, and/or benefits to Class Members in the United States.

102.    Tyson Farms, Inc. is a North Carolina corporation located at the headquarters address of Tyson Foods in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods. Tyson Farms, Inc. operates one or more poultry processing plants. During the Class Period, Tyson Farms, Inc. employed and paid wages, salaries, and/or benefits to Class Members in the United States.

103.    Tyson Sales and Distribution, Inc. is a Delaware corporation located at the headquarters address of Tyson Foods in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods. Tyson Sales and Distribution, Inc. operates one or more poultry processing plants. During the Class Period, Tyson Sales and Distribution, Inc. employed and paid wages, salaries, and/or benefits to Class Members in the United States.

104.    Equity Group Eufaula Division, LLC is a Delaware corporation located in Bakerhill, Alabama, and is a wholly owned subsidiary of Tyson Foods. Equity Group Eufaula Division, LLC operates one or more poultry processing plants in Alabama. During the Class

Period, Equity Group Eufaula Division, LLC employed and paid wages, salaries, and/or benefits to Class Members in the United States.

105.    Equity Group—Georgia Division, LLC is a Delaware corporation located in Camilla, Georgia, and is a wholly owned subsidiary of Tyson Foods. Equity Group—Georgia Division, LLC operates one or more poultry processing plants in Georgia. During the Class Period, Equity Group—Georgia Division, LLC employed and paid wages, salaries, and/or benefits to Class Members in the United States.

106.    Equity Group Kentucky Division, LLC is a Delaware corporation located in Albany, Kentucky, and is a wholly owned subsidiary of Tyson Foods. Equity Group Kentucky Division, LLC operates one or more poultry processing plants in Kentucky. During the Class Period, Equity Group Kentucky Division, LLC employed and paid wages, salaries, and/or benefits to Class Members in the United States.

**B.    Pilgrim's Agents and Co-Conspirators**

107.    Pilgrim's Pride Corporation of West Virginia, Inc. is a West Virginia corporation located in Moorefield, West Virginia, and is a wholly owned subsidiary of Pilgrim's. Pilgrim's Pride Corporation of West Virginia, Inc. shares the same principal office address as its parent corporation, Pilgrim's, in Greeley, Colorado. Pilgrim's Pride Corporation of West Virginia, Inc. operates a poultry processing plant in West Virginia. During the Class Period, Pilgrim's Pride Corporation of West Virginia, Inc. employed and paid wages, salaries, and/or benefits to Class Members in the United States.

108.    JFC LLC (d/b/a GNP Company) is a Minnesota company located in St. Cloud, Minnesota, and is a wholly owned subsidiary of Pilgrim's. JFC LLC operated one or more poultry

processing plants during the Class Period. During the Class Period, JFC LLC employed and paid wages, salaries, and/or benefits to Class Members in the United States.

## C.   Sanderson Farms Agents and Co-Conspirators

109.   Sanderson Farms, Inc. (Foods Division) is a Mississippi corporation located in Laurel, Mississippi, and is a wholly owned subsidiary of Sanderson Farms. Sanderson Farms, Inc. (Foods Division) operates one or more poultry processing plants. During the Class Period, Sanderson Farms, Inc. (Foods Division) employed and paid wages, salaries, and/or benefits to Class Members in the United States.

110.   Sanderson Farms, Inc. (Processing Division) is a Mississippi corporation located in Laurel, Mississippi, and is a wholly owned subsidiary of Sanderson Farms. Sanderson Farms, Inc. (Processing Division) operates multiple poultry processing plants in several states. During the Class Period, Sanderson Farms, Inc. (Processing Division) employed and paid wages, salaries, and/or benefits to Class Members in the United States.

## D.   Koch Foods Agents and Co-Conspirators

111.   JCG Foods of Alabama, LLC is an Alabama corporation with its headquarters in Park Ridge, Illinois, and is a wholly owned subsidiary of Koch Foods. JCG Foods of Alabama, LLC operates a poultry processing plant in Alabama. During the Class Period, JCG Foods of Alabama, LLC employed and paid wages, salaries, and/or benefits to Class Members in the United States.

112.   JCG Foods of Georgia, LLC is a Georgia corporation with its headquarters in Park Ridge, Illinois, and is a wholly owned subsidiary of Koch Foods. JCG Foods of Georgia, LLC operates a poultry processing plant in Georgia. During the Class Period, JCG Foods of Georgia, LLC employed and paid wages, salaries, and/or benefits to Class Members in the United States.

113.    JCG Industries, Inc. is an Illinois corporation with its headquarters in Park Ridge, Illinois, and is a wholly owned subsidiary of Koch Foods. JCG Industries, Inc. operates two poultry processing plants in Illinois. During the Class Period, JCG Industries, Inc. employed and paid wages, salaries, and/or benefits to Class Members in the United States.

114.    Koch Foods LLC is a Tennessee corporation with its headquarters in Chattanooga, Tennessee, and is a wholly owned subsidiary of Koch Foods. Joseph Grendys, President and CEO of Koch Foods, is the Chief Manager of Koch Foods LLC. Koch Foods LLC operates two poultry processing plants in Tennessee. During the Class Period, Koch Foods LLC employed and paid wages, salaries, and/or benefits to Class Members in the United States.

115.    Koch Foods of Alabama, LLC is an Alabama corporation with its headquarters in Montgomery, Alabama, and is a wholly owned subsidiary of Koch Foods. Joseph Grendys, President and CEO of Koch Foods, is the Manager of Koch Foods of Alabama, LLC. Koch Foods of Alabama, LLC operates a poultry processing plant in Alabama. During the Class Period, Koch Foods of Alabama, LLC employed and paid wages, salaries, and/or benefits to Class Members in the United States.

116.    Koch Foods of Ashland, LLC is an Alabama corporation with its headquarters in Montgomery, Alabama, and is a wholly owned subsidiary of Koch Foods. Koch Foods of Ashland, LLC operates a poultry processing plant in Alabama. During the Class Period, Koch Foods of Ashland, LLC employed and paid wages, salaries, and/or benefits to Class Members in the United States.

117.    Koch Foods of Gadsden, LLC is an Alabama corporation with its headquarters in Montgomery, Alabama, and is a wholly owned subsidiary of Koch Foods. Koch Foods of Gadsden, LLC operates a poultry processing plant in Alabama. During the Class Period, Koch Foods of

Gadsden, LLC employed and paid wages, salaries, and/or benefits to Class Members in the United States.

118.    Koch Foods of Cumming LLC is a Georgia corporation with its headquarters in Cumming, Georgia, and is a wholly owned subsidiary of Koch Foods. Joseph Grendys, President and CEO of Koch Foods, is the Manager of Koch Foods of Cumming LLC. Koch Foods of Cumming LLC operates a poultry processing plant in Georgia. During the Class Period, Koch Foods of Cumming LLC employed and paid wages, salaries, and/or benefits to Class Members in the United States.

119.    Koch Foods of Gainesville LLC is a Georgia corporation with its headquarters in Gainesville, Georgia, and is a wholly owned subsidiary of Koch Foods. Joseph Grendys, President and CEO of Koch Foods, is the Manager of Koch Foods of Gainesville LLC. Koch Foods of Gainesville LLC operates a poultry processing plant in Georgia. During the Class Period, Koch Foods of Gainesville LLC employed and paid wages, salaries, and/or benefits to Class Members in the United States.

120.    Koch Foods of Mississippi LLC is a Mississippi corporation with its headquarters in Morton, Mississippi, and is a wholly owned subsidiary of Koch Foods. Joseph Grendys, President and CEO of Koch Foods, is the Manager of Koch Foods of Mississippi LLC. Koch Foods of Mississippi LLC operates poultry processing plants in Mississippi. During the Class Period, Koch Foods of Mississippi LLC employed and paid wages, salaries, and/or benefits to Class Members in the United States.

121.    Koch Foods of Cincinnati, LLC is an Ohio corporation with its headquarters in Fairfield, Ohio, and is a wholly owned subsidiary of Koch Foods. Koch Foods of Cincinnati, LLC operates a poultry processing plant in Fairfield, Ohio. During the Class Period, Koch Foods of

Cincinnati, LLC employed and paid wages, salaries, and/or benefits to Class Members in the United States.

**E.     Wayne Farms Agent and Co-Conspirator**

122.    WFSP Foods, LLC is a Georgia corporation with its headquarters in Decatur, Alabama, and is a joint venture between Wayne Farms and Salm Partners, LLC. During the Class Period, WFSP Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

**F.     Mountaire Farms Agent and Co-Conspirator**

123.    Mountaire Farms of Delaware, Inc. is a privately held Delaware corporation located in Millsboro, Delaware. Both Mountaire Farms and Mountaire Farms of Delaware, Inc. are wholly-owned subsidiaries of Mountaire Corporation, and Phillip Plylar is the current President of both Mountaire Farms and Mountaire Farms of Delaware, Inc. Mountaire Farms of Delaware, Inc. operates one or more poultry processing complexes. During the Class Period, Mountaire Farms of Delaware, Inc. employed and paid wages, salaries, and/or benefits to Class Members in the United States.

**G.     Simmons Foods Agent and Co-Conspirator**

124.    Simmons Prepared Foods, Inc. is a privately held Arkansas company headquartered in Siloam Springs, Arkansas, and is a wholly owned subsidiary of Simmons Foods. Simmons Prepared Foods, Inc. is controlled by the same corporate officers as Simmons Foods. Simmons Foods and Simmons Prepared Foods, Inc. are located at the same location and share the same mailing address. Simmons Prepared Foods, Inc. operates multiple poultry processing plants. Simmons Prepared Foods, Inc. employed and paid wages, salaries, and/or benefits to Class Members in the United States.

## H.     George's Agents and Co-Conspirators

125.     Ozark Mountain Poultry, Inc. is an Arkansas corporation headquartered in Rogers, Arkansas, and is a wholly owned subsidiary of George's, Inc. Carl George, the co-CEO of George's, Inc., is the president of Ozark Mountain Poultry, Inc. Ozark Mountain Poultry, Inc. operates one or more poultry processing plants. During the Class Period, Ozark Mountain Poultry, Inc. employed and paid wages, salaries, and/or benefits to Class Members in the United States.

126.     George's Processing, Inc. is an Arkansas corporation headquartered in Springdale, Arkansas, and is a wholly owned subsidiary of George's, Inc. Carl George, the co-CEO of George's, Inc., is the president of George's Processing, Inc. George's Processing, Inc. operates several poultry processing plants. During the Class Period, George's Processing, Inc. employed and paid wages, salaries, and/or benefits to Class Members in the United States.

127.     George's Chicken, LLC is a Virginia corporation headquartered in Edinburg, Virginia, and is a wholly owned subsidiary of George's, Inc. George's Chicken, LLC operates a poultry processing plant in Virginia. During the Class Period, George's Chicken, LLC employed and paid wages, salaries, and/or benefits to Class Members in the United States.

## I.     Foster Farms Agent and Co-Conspirator

128.     Foster Farms, LLC is a privately held California corporation with its headquarters in Livingston, California. During the Class Period, Foster Farms, LLC employed and paid wages, salaries, and/or benefits to Class Members in the United States.

## J.     Case Foods Agent and Co-Conspirator

129.     Case Farms Processing, Inc. is a privately held North Carolina corporation with its corporate headquarters in Troutman, North Carolina. Case Farms Processing, Inc. was previously known as Case Farms of North Carolina, Inc. During the Class Period, Case Farms Processing,

Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing facilities in the continental United States.

### K.  Allen Harim Agents and Co-Conspirators

130.    Harim USA, Ltd. is a privately held Delaware corporation with its corporate headquarters in Seaford, Delaware. During the Class Period, Harim USA, Ltd. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing complexes in the continental United States.

131.    Allen Harim Farms, LLC is a privately held Delaware limited liability company with its headquarters in Seaford, Delaware. During the Class Period, Allen Harim Farms, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing complexes in the continental United States.

### L.  Mar-Jac Agents and Conspirators

132.    Mar-Jac Poultry MS, LLC is a Mississippi limited liability corporation located in Hattiesburg, Mississippi. During the Class Period, Mar-Jac Poultry MS, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing complexes in the continental United States.

133.    Mar-Jac Poultry AL, LLC is an Alabama limited liability corporation located in Gainesville, Georgia. During the Class Period, Mar-Jac Poultry AL, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing complexes in the continental United States.

134.    Mar-Jac Poultry, LLC is a Delaware corporation located in Gainesville, Georgia. During the Class Period, Mar-Jac Poultry, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing complexes in the continental United States.

135.     Mar-Jac Holdings, Inc. is a Delaware corporation located in Gainesville, Georgia. During the Class Period, Mar-Jac Holdings, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing complexes in the continental United States.

**M.      Jennie-O Turkey Agents and Co-Conspirators**

136.     Hormel Foods Corporation is a Delaware corporation with its corporate headquarters in Austin, Minnesota. Hormel Foods Corporation is the parent of Jennie-O Turkey Store. Hormel Foods Corporation operates several poultry processing plants. During the Class Period, Hormel Foods Corporation employed and paid wages, salaries, and/or benefits to Class Members in the United States.

137.     Jennie-O Turkey Store, LLC is a Minnesota company with its headquarters in Austin, Minnesota, and is a wholly owned subsidiary of Jennie-O Turkey Store. During the Class Period, Jennie-O Turkey Store, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

138.     Jennie-O Turkey Store Sales, LLC is a Delaware company with its headquarters in Austin, Minnesota, and is a wholly owned subsidiary of Jennie-O Turkey Store. Jennie-O Turkey Store Sales, LLC operates four poultry processing plants in Minnesota and Wisconsin. During the Class Period, Jennie-O Turkey Store Sales, LLC employed and paid wages, salaries, and/or benefits to Class Members in the United States.

**N.      Cargill Agent and Co-Conspirator**

139.     Cargill, Inc. is a Delaware corporation with its corporate headquarters in Wayzata, Minnesota. Cargill is a wholly owned subsidiary of Cargill, Inc. During the Class Period, Cargill,

Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

**O.     Other Agents and Co-Conspirators**

140.    Pitman Family Farms, Inc. is a California corporation with its corporate headquarters in Sanger, California. During the Class Period, Pitman Family Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing complexes in the continental United States.

141.    House of Raeford Farms, Inc. is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina. During the Class Period, House of Raeford Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, divisions, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

142.    House of Raeford Farms of Louisiana, LLC is a Louisiana corporation headquartered in Shreveport, Louisiana. During the Class Period, House of Raeford Farms of Louisiana, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

143.    Harrison Poultry, Inc. is a Georgia corporation located in Bethlehem, Georgia. During the Class Period, Harrison Poultry, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

144.    Claxton Poultry Farms, Inc. is a Georgia corporation located in Claxton, Georgia. During the Class Period, Claxton Poultry Farms, Inc. and/or its predecessors, wholly owned or

controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

145.    Norman W. Fries, Inc., d/b/a Claxton Poultry Farms, Inc. is a Georgia corporation located in Claxton, Georgia. During the Class Period, Norman W. Fries, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

146.    Cooper Hatchery, Inc. d/b/a Cooper Farms is an Ohio corporation with its corporate headquarters in Oakwood, Ohio. During the Class Period, Cooper Hatchery, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

147.    Farbest Foods, Inc. is an Indiana company with its corporate headquarters in Jasper, Indiana. During the Class Period, Farbest Foods and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

148.    Virginia Poultry Growers Cooperative, Inc. is a Virginia corporation with its corporate headquarters in Hinton, Virginia. During the Class Period, Virginia Poultry Growers Cooperative, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

149.    VPGC, LLC is a Virginia corporation with its corporate headquarters in Hinton, Virginia. During the Class Period, VPGC, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

150.    Turkey Valley Farms, LLC is a Minnesota corporation with its corporate headquarters in Willmar, Minnesota. During the Class Period, Turkey Valley Farms, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid compensation to workers at poultry processing plants in the continental United States.

151.    The U.S. Poultry & Egg Association is a nonprofit trade association headquartered in Tucker, Georgia that advocates for poultry processors.

152.    The National Chicken Council is a nonprofit trade association headquartered in Washington, DC that advocates for chicken processors.

153.    The National Turkey Federation is a nonprofit trade association headquartered in Washington, DC that advocates for turkey processors.

154.    Various other persons and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.

## V.    TRADE AND COMMERCE

155.    The conspiracy formed, implemented, and enforced by Defendants and co-conspirators was intended to depress, and did in fact depress, the compensation of Class Members nationwide.

156.    The conspiracy restrained competition between Defendant Processors for the payment of wages, salaries, and benefits to, and hiring of, Class Members nationwide, including Class Members who were located in states other than the states in which the poultry processing complexes, plants, hatcheries, or feed mills that employed them were located.

157.    Defendant Processors made payments to Class Members by mailing or transmitting funds across state lines.

158.    Defendant Processors employed Class Members to process poultry for sale in interstate and foreign commerce.

159.    Defendants Agri Stats and WMS provided services to Defendant Processors located in multiple different states and exchanged confidential, proprietary, and competitively sensitive data among Defendant Processors across state lines.

160.    The activities of Defendants and co-conspirators were within the flow of interstate commerce of the United States, and were intended to, and did have, direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

## VI.    FACTUAL ALLEGATIONS

### A.    Background

#### 1.    Poultry Industry

161.    The United States Department of Agriculture defines "poultry" to mean "any domesticated bird used for food." The poultry industry in the United States is the world's largest producer of poultry meat.

162.    Meat from chicken and turkey account for more than 99% of the poultry meat produced in the United States. Chicken meat accounts for approximately 89% of the poultry meat produced in the United States. Turkey meat accounts for approximately 11% of the poultry meat produced in the United States.

163.    Poultry processed for consumption may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value-added product. The poultry processed by Defendant Processors are commodity products with little or no differentiation between processors.

164.    Poultry processing is concentrated in the hands of the Defendant Processors, which control approximately 90 percent of the production of processed poultry in the United States.

Defendant Processors earn more than $50 billion in annual revenue from the sale of processed poultry.

165.    Defendant Processors are vertically integrated companies that control nearly every aspect of poultry production. When commercial poultry production first emerged, different companies owned businesses involved in the different stages of poultry production. Specifically, different companies owned: hatcheries, where eggs are hatched; growers, which raise the hatched birds; feed mills, which produce and supply food products for those birds; and processing plants, where live birds are slaughtered and turned into poultry products for sale and consumption. Today, more than 90 percent of poultry for consumption is produced by vertically integrated companies, such as Defendant Processors, that each own or control their own hatcheries, feed mills, and processing plants.

### 2.      Poultry Processing Facilities

166.    Each Defendant Processor or its subsidiary owns and controls their own processing plants, hatcheries, and feed mills.

167.    For vertically integrated poultry processors such as Defendant Processors, processing plants, hatcheries, and feed mills are usually located in very close proximity, on a shared site. Collectively, these facilities are known as poultry processing complexes.

168.    Chickens and turkeys are hatched in hatchery facilities, then raised by contract growers. These hatcheries employ both hourly-paid and salaried workers, including hatchery supervisors, technical advisors, and breeder growout heads.

169.    Feed mills process and store grains to produce poultry feed. The feed is then given to chickens and turkeys at contract growers' farms. These feed mills employ both hourly-paid and salaried workers, including feed mill supervisors and feed mill heads.

170.    Once chickens and turkeys for consumption reach maturity, they are typically killed and processed in poultry processing plants. There are two kinds of poultry processing plants. The first—slaughterhouse facilities—kill birds and convert the carcasses into raw poultry products fit for human consumption. The second—further processing facilities—convert the raw chicken and turkey into value-added forms by cutting, deboning, breading, cooking, or otherwise engaging in additional processing. These processing plants employ both hourly-paid and salaried workers.

171.    The Class is comprised of workers employed by Defendant Processors, their subsidiaries, and related entities in their poultry processing plants, poultry hatcheries, poultry feed mills, and poultry complexes. The Class and Subclass include workers employed by Defendant Processors, their subsidiaries, and related entities in both kinds of poultry processing plants: slaughterhouse facilities and further processing facilities.

172.    Collectively, Defendant Processors, their subsidiaries, and related entities currently own hundreds of poultry processing plants, poultry hatcheries, poultry feed mills, and poultry complexes in the continental United States. A majority of those poultry processing facilities are located in the South and Upper Midwest.

173.    Poultry processing complexes, plants, hatcheries, and feed mills are typically located near the growers with which they contract. As a result, the majority of poultry processing facilities owned by Defendant Processors and their subsidiaries are clustered in groups in rural areas. In fact, each Defendant Processor or its subsidiaries owns at least one poultry processing plant that is within 47 miles of a poultry processing plant owned by another Defendant Processor, another Defendant Processor's subsidiary, or a co-conspirator.

174.    The geographic proximity of competing poultry processing facilities means that, in a competitive labor market, many employees of poultry processing facilities could and would

switch their employment to rival poultry processing facilities when offered higher wages, higher salaries, and/or superior benefits. For that reason, each Defendant Processor has risked the loss of poultry processing workers to, and in fact did lose poultry processing workers to, another Defendant Processor's nearby poultry processing facility.

175.    The following map identifies the locations of the chicken and turkey processing plants operating in the continental United States during 2019; chicken processing plants are represented by red pins, and turkey processing plants are represented by blue pins[4]:



3.    **Poultry Processing Workers**

176.    Each year during the Class Period, Defendant Processors, their subsidiaries, and related entities collectively employed approximately 250,000 workers at their poultry processing complexes, plants, hatcheries, and feed mills.

177.    Because Defendant Processors, their subsidiaries, and related entities produce commodity poultry products in a similarly efficient and vertically integrated manner, their poultry

---

[4] Some of the pins on the map reflect more than one poultry processing plant.

processing facilities were and are characterized by highly similar operations and thus highly similar labor requirements. Accordingly, the workers employed by Defendant Processors, their subsidiaries, and related entities at each of their poultry processing complexes, plants, hatcheries, and feed mills in the continental United States during the Class Period, *i.e.* Class Members, were easily categorized into a limited set of discrete job positions.

### 4.    Compensating Poultry Processing Workers

178.    Employees at poultry processing complexes, plants, hatcheries, and feed mills owned by Defendant Processors, their subsidiaries, and related entities were paid either hourly wages or annual salaries, depending on their position.

179.    Approximately 90 percent of employees at Defendant Processors' poultry processing facilities consisted of: production workers who physically worked on processing lines to process poultry; maintenance workers who maintained and repaired processing line machines; or refrigeration technicians who test and maintain refrigeration systems. Those production workers, maintenance workers, and refrigeration technicians were paid hourly wages according to their specific position and experience.

180.    Approximately 10 percent of employees at poultry processing facilities owned by Defendant Processors, their subsidiaries, and related entities were paid annual salaries. These salaried employees occupy positions such as: broiler advisor techs, who provided technical assistance to contract growers; feed mill supervisors, who supervised workers in feed mills; hatchery supervisors, who supervised workers in hatcheries; and first line supervisors who supervised production workers on processing lines.

181.    Both hourly-paid and salary-paid employees at poultry processing complexes, plants, hatcheries, and feed mills owned by Defendant Processors, their subsidiaries, and related

entities received employment benefits. Those benefits typically included health insurance, paid time off, a retirement savings plan, disability insurance, and life insurance. Each Defendant Processor calculated a specific dollar value for the benefits paid to each Class Member.

182.    The total compensation provided to hourly-paid Class Members, inclusive of benefits, was referred to within the industry as the "fully loaded wage." For example, according to Perdue Farms, the "fully loaded wage" at the company's Delmarva processing plants in 2016 was $17.12 for the lowest paid plant worker. That particular "fully loaded wage" was comprised of a $12 hourly wage plus a benefits package equal to $5.12 per hour.

183.    Some hourly-paid positions at poultry processing facilities owned by Defendant Processors, their subsidiaries, and related entities were paid higher wages than other hourly-paid positions at the same poultry processing facilities, largely due to the greater skill and experience required by those higher-paying positions. For example, "deboners" were typically paid more than many other non-supervisory workers at poultry processing plants. Effectively deboning a chicken or turkey requires some experience and training, and Defendant Processors earn more money when a bird is deboned effectively, *i.e.* cut closest to the bone to maximize the amount of meat obtained. Nonetheless, the compensation for all hourly-paid positions at poultry processing complexes, plants, hatcheries, and feed mills owned by Defendant Processors, their subsidiaries, and related entities was determined in a systematic way using compensation schedules within each Defendant Processor that were aligned with the compensation for the same positions established by other Defendant Processors.

184.    Similarly, some salary-paid positions at poultry processing complexes, plants, hatcheries, and feed mills owned by Defendant Processors, their subsidiaries, and related entities were paid higher salaries than other salary-paid positions, largely due to the greater skill and

experience required by those higher paying salaried positions. For example, a processing shift manager, who directs a production operation for an entire section of a poultry processing plant, receives a higher salary than a first line supervisor, who reports to the processing shift manager. Nonetheless, the compensation for all salary-paid positions at poultry processing complexes, plants, hatcheries, and feed mills owned by Defendant Processors, their subsidiaries, and related entities was determined in a systematic way using compensation schedules within each Defendant Processor that were aligned with the compensation for the same positions established by other Defendant Processors.

### 5.     Centralized Determination of Compensation for Poultry Processing Workers

185.     Compensation of poultry processing employees comprises a significant share of the operating costs of each Defendant Processor. Labor costs are, by far, the largest component of poultry plant operating expenses, accounting for an estimated 60-70% of Defendant Processors' average plant operating expenses.

186.     Decisions regarding the compensation of workers at poultry processing complexes, plants, hatcheries, and feed mills owned by Defendant Processors, their subsidiaries, and related entities were made exclusively by and at each Defendant Processor's corporate headquarters during the Class Period. This reflects the significance of labor costs to Defendant Processors' overall profitability. While local complex and plant managers sometimes gathered information and made recommendations for wage adjustments, workers' hourly wages, annual salaries, and employment benefits were ultimately determined and approved by senior executives at each Defendant Processor's corporate headquarters. The fact that decision-making regarding wages, salaries, and benefits was centralized in the hands of senior corporate executives materially

facilitated the formation and implementation of the compensation-fixing conspiracy alleged herein.

187.    Multiple former human resources employees of the Defendant Processors have explained that senior executives at corporate headquarters exclusively set the wages, salaries, and benefits of processing employees across the country in a centralized fashion. For example, a former human resources manager who worked at three different poultry processing plants owned by Tyson, Pilgrim's, and Perdue during the Class Period stated that compensation paid to poultry processing plant workers at all three companies was exclusively determined at and by each of the company's corporate offices. Similarly, a former human resources manager who worked at poultry processing plants owned by Perdue and George's stated that wages, salaries, and benefits paid to all poultry processing plant employees by both companies were determined at and by each of the company's corporate headquarters.

188.    During the Class Period, senior executives of the Defendant Processors determined the hourly wages, annual salaries, bonuses, and employment benefits for Class Members across the country in a formulaic way, establishing schedules that compensated employees according to their specific positions in poultry processing complexes, plants, hatcheries, and feed mills.

189.    For example, a former Tyson Foods employee stated that hourly wages set by Tyson Foods' corporate headquarters were "very tightly structured." The former Tyson Foods employee explained that Tyson Foods' corporate office established a "wage scale" for all hourly-paid workers at Tyson poultry processing plants consisting of a starting hourly rate for each position and incremental increases for that starting hourly rate up to the maximum wage. The former Tyson Foods employee noted that the wage structure was determined at the corporate level "before" individual plant managers "even started talking about it." The former Tyson Foods

employee also noted that, under the company's wage scale, hourly production workers received "consistent" wages within divisions, regardless of the location of the poultry processing plant.

### 6. Limited Role of Labor Unions

190.    Approximately one-third of hourly-paid workers at poultry processing plants are members of unions. The United Food and Commercial Workers International Union represents approximately 90% of those unionized workers.

191.    There is not a significant disparity between the compensation provided to unionized and non-unionized workers in poultry processing plants owned by Defendant Processors, their subsidiaries, and related entities. Collective bargaining agreements often specify a particular wage increase for year one and then often require that, in subsequent years of the agreements, unionized workers are entitled to the average wages per position set by the Defendant Processor. Those average wages are calculated based on what is paid to both unionized and non-unionized workers.

### 7. Demographics of Hourly-Paid Poultry Processing Workers

192.    During the Class Period, the compensation provided to hourly-paid workers in poultry processing complexes, plants, hatcheries, and feed mills owned by Defendant Processors, their subsidiaries, and related entities was artificially depressed and left many of those workers in poverty. A 2015 report by the nonprofit Oxfam America titled "Lives on the Line" states, "Most workers on the poultry processing line earn wages that place them near or below the poverty line. Wages average around $11 per hour; annual income for most is between $20,000 and $25,000. The federal poverty level for a family of three in 2015 is $20,090; for a family of four it's $24,250. An average poultry worker supporting two children qualifies for Head Start, SNAP (food stamps), and the National School Lunch Program. In addition, workers often turn to local charities and food banks to supplement their income; in many poultry towns, thrift stores and food banks dominate local storefronts."

193.     Despite the poor compensation, working on a processing line in a poultry plant is one of the most dangerous jobs in the United States. The 2015 report by Oxfam America states that "the rates of injuries and illness" in poultry processing plants "are shockingly high." The Occupational Safety and Health Administration ("OSHA") and the United States Department of Labor classify poultry as "a hazardous industry." In February 2015, OSHA acknowledged that "the incidence rate of occupational illness cases, including musculoskeletal disorders, reported in the poultry industry in 2011 and 2012 has remained high—at more than five times the average for all US industries." In April 2015, the Centers for Disease Control and the National Institute for Occupational Safety and Health reported the results of an evaluation of 191 poultry workers at a plant in Maryland: 76 percent had abnormal results from a nerve conduction test (indicating damage to nerves), and 34 percent had evidence of carpal tunnel syndrome. In 2004, Human Rights Watch reported that poultry workers are 14 times more likely than other workers to suffer debilitating injuries stemming from repetitive trauma—like "claw hand" (in which the injured fingers lock in a curled position) and ganglion cysts (fluid deposits under the skin).

194.     In a 2016 report titled "No Relief," Oxfam America wrote, "While the poultry industry today enjoys record profits and pumps out billions of chickens, the reality of life inside the processing plant remains grim and dangerous. Workers earn low wages, suffer elevated rates of injury and illness, toil in difficult conditions, and have little voice in the workplace."

195.     Due to the poor compensation, grueling work, and high risk of physical injury, many Americans have no interest in employment as an hourly-paid worker in a poultry processing complex, plant, hatchery, or feed mill. For that reason, Defendant Processors, their subsidiaries, and related entities often recruit workers who have limited alternative options for employment. Many of the hourly-paid workers recruited and hired by Defendant Processors, their subsidiaries,

and related entities for poultry processing complexes, plants, hatcheries, and feed mills do not speak English and lack significant education.

196.    Christopher Cook, author of the book "Diet for a Dead Planet: Big Business and the Coming Food Crisis," said that poultry processors recruit "a variety of economically desperate and socially isolated populations." Debbie Berkowitz, OSHA's former Senior Policy Adviser, said: "It's an industry that targets the most vulnerable group of workers and brings them in. And when one group gets too powerful and stands up for their rights, they figure out who's even more vulnerable and move them in."

197.    Many of the hourly-paid workers recruited and hired by Defendant Processors, their subsidiaries, and related entities are migrant workers, refugees, asylum-seekers, immigrants employed under EB3 visas, prison laborers, and participants in court-ordered substance abuse programs. In a 2015 report, Oxfam America wrote, "The poultry industry has a complicated history of tapping marginalized populations for its workforce. ... Of the roughly 250,000 poultry workers in the US, most are minorities, immigrants, or refugees, and a significant percentage is female."

198.    For example, Norman Beecher, a former Human Resources manager for Defendant Case Foods, actively recruited refugees from the Guatemalan civil war. Mr. Beecher explained to historian Leon Fink, "I didn't want [Mexicans]. Mexicans will go back home at Christmastime. You're going to lose them for six weeks. And in the poultry business you can't afford that. You just can't do it. But Guatemalans can't go back home. They're here as political refugees. If they go back home, they get shot."

199.    In a 2017 article titled "Exploitation and Abuse at the Chicken Plant," *The New Yorker* reported that Case Farms "finds new ways to keep labor costs down. For a time, after the Guatemalan workers began to organize, Case Farms recruited Burmese refugees. Then it turned to

ethnic Nepalis expelled from Bhutan, who today make up nearly 35 percent of the company's employees in Ohio. ... Recently, Case Farms has found a more captive workforce. One blazing morning last summer in Morganton, an old yellow school bus arrived at Case Farms and passed through the plant's gates, pulling up to the employee entrance. Dozens of inmates from the local prison filed off, ready to work at the plant."

### 8.   Demographics of Salary-Paid Poultry Processing Employees

200.    To obtain a salaried position at poultry processing complexes, plants, hatcheries, and feed mills owned by Defendant Processors, their subsidiaries, and related entities, an applicant must satisfy certain education and experience requirements, and also speak fluent English.

201.    For example, when recruiting applicants for a position as a first line supervisor, which is one of the *lowest* paid salaried positions in a poultry processing plant, Defendant Processors often seek, at minimum, the following qualifications: a high school diploma or GED, a minimum of 1-3 years of supervisory experience, strong written and verbal communication skills, and proficiency with computers. Defendant Processors have also indicated that applicants for the first line supervisor positions are strongly preferred to have a Bachelor's degree in a related field (*e.g.* Poultry Science, Animal Science, Agriculture, or Business Management).

202.    Similarly, when recruiting applicants for a position as a live production manager in a poultry processing complex, Defendant Processors often seek, at minimum, the following qualifications: a Bachelor's degree in a related field, a minimum of seven years of directly related experience (such as working in daily live haul operations), prior managerial or supervisory experience, strong written and verbal communication skills, and proficiency with computers.

203.    Several salaried positions at poultry processing complexes, plants, hatcheries, and feed mills also require a specialized technical background, certifications, or degrees. For example,

plant quality assurance supervisors must generally have training and proficiency in the Hazard Analysis Critical Control Points system – a specific program designed to ensure the safety of processed foods.

204.    Accordingly, Defendant Processors seek skilled and experienced individuals for salaried positions at poultry processing complexes, plants, hatcheries, and feed mills.

**B.      Conspiracy to Fix Compensation**

205.    During the period 2000 through the present, Defendants have conspired with each other to fix and depress the compensation paid to employees of Defendant Processors, their subsidiaries, and related entities at poultry processing complexes, plants, hatcheries, and feed mills in the continental United States.

206.    Defendant Processors carried out the conspiracy to depress compensation through many mutually reinforcing overt acts, including:

- Collaboratively designing and implementing detailed surveys, including through WMS, to exchange both current and future compensation data, often in a transparent, non-anonymous manner or in a format that facilitated deanonymization of the survey results;

- Conducting annual, in-person Poultry Industry Compensation Meetings between senior executives of Defendant Processors during which they reviewed compensation survey results and fixed and depressed the wages, salaries, bonuses, and benefits paid to Class Members;

- Engaging in direct email and telephonic communications between senior executives of Defendant Processors about the compensation of Class Members, including the magnitude and timing of any future changes to that compensation;

- Exchanging competitively sensitive compensation data on a monthly basis through Agri Stats, thereby permitting Defendant Processors to continuously monitor how much each of them was paying poultry processing workers;

- Directing the managers of Defendant Processors' poultry processing complexes and plants to exchange current and future compensation schedules with their counterparts at rival complexes and plants.

207.    Defendants formed and implemented this conspiracy to reduce labor costs and maximize profits. Jonathan Meng is the President of WMS, and he was the primary point of contact at WMS for Defendant Processors when they retained his company to conduct annual Poultry Industry Compensation Surveys from 2000 through 2019. Over that nearly twenty-year period, Mr. Meng exchanged thousands of emails with Defendant Processors' executives, fielded phone calls from them, and met with them annually in person for hours. Based on these interactions, Mr. Meng concluded: "I believe that poultry processors participated in the Poultry Industry Compensation Survey and the Poultry Industry Compensation Meetings to limit their wage and salary increases. I believe that poultry processors' interest in the Survey and Meetings was due in large part to wage pressures that those poultry processors faced."

208.    In the absence of the conspiracy, Defendant Processors, their subsidiaries, and related entities would have competed with each other for labor during the Class Period by offering higher wages, higher salaries, and superior benefits to Class Members. This is particularly true given that each Defendant Processor or one of its subsidiaries owns and operates a poultry processing plant that is within 47 miles of a poultry processing plant owned by another Defendant Processor, another Defendant Processor's subsidiary, or a co-conspirator, meaning that many

workers could easily switch to rival poultry processing plants offering better compensation in an unrestrained competitive market.

1.    **Defendant Processors Unlawfully Exchanged Compensation Information Through Detailed Surveys that They Designed**

209.    During the Class Period, Defendant Processors conducted and participated in multiple compensation surveys of each other, including: the annual Poultry Industry Compensation Survey administered by WMS; the CHIWI survey administered directly by Tyson; and a survey administered by WMS and financed by Tyson called the "Hourly Plant Maintenance and Production Survey." Defendant Processors operated and participated in these compensation surveys to exchange detailed current and future information about, and facilitate the fixing of, wages, salaries, bonuses, and benefits provided to their workers at poultry processing facilities in the continental United States.

210.    These surveys involved the unlawful exchange of current and future compensation rates between Defendant Processors. Some of these compensation surveys were conducted *directly* by Defendant Processors without any attempt to conceal the source of any individual Defendant Processor's data; other compensation surveys were implemented by a third-party in a manner that permitted deanonymization of survey results through the survey format itself or through discussion at subsequent in-person meetings. In combination, these compensation surveys permitted Defendant Processors to accurately determine how much their competitors were paying, and planned to pay, workers at their poultry processing facilities.

211.    Defendant Processors and co-conspirators used the results of the compensation surveys to inform their agreements to depress compensation, align their wages, and monitor the conspiracy. For example, a former employee of Norbest, now owned by Pitman, explained that the company used the results of the Poultry Industry Compensation Survey to align its wages with

those of other poultry processors that participated in the Survey. Similarly, a former employee of Pilgrim's said she used the hourly wage and annual salary data from the Poultry Industry Compensation Survey to help establish the hourly wages and annual salary rates at Pilgrim's.

### a.      The Poultry Industry Survey Group

212.    Participants in the annual Poultry Industry Compensation Survey referred to themselves as the "Poultry Industry Survey Group." The Poultry Industry Survey Group consisted exclusively of poultry processors. During the Class Period, each Defendant Processor except for Peco Foods was a member of the Poultry Industry Survey Group at some point and, in turn, participated in the annual Poultry Industry Compensation Survey.

213.    To carry out their conspiracy to suppress compensation, members of the Poultry Industry Survey Group designed and implemented the Poultry Industry Compensation Survey in a manner that flagrantly violated federal antitrust law, including by featuring both current and future compensation data and by ensuring that such data was readily deanonymized.

### b.      Background on WMS

214.    During the Class Period, the Poultry Industry Compensation Survey was administered by WMS, a compensation consulting firm based in Pottstown, Pennsylvania. Jonathan Meng has been President of WMS since 2000. Mr. Meng has been the primary administrator of the Poultry Industry Compensation Survey since 2004.

215.    WMS has marketed its compensation survey services by claiming that it conducts and designs surveys in a manner that complies with "Safe Harbor" guidelines issued by the United States Department of Justice ("DOJ") and the Federal Trade Commission ("FTC"). First published in 1996, the Safe Harbor Guidelines describe information exchanges that the DOJ and FTC "will

not challenge under the antitrust laws, absent extraordinary circumstances."[5] Information exchanges that fall within the Safe Harbor can still violate the antitrust laws if their anticompetitive effects outweigh their procompetitive effects, but the federal government has exercised its prosecutorial discretion not to challenge data exchanges that fully comply with the Safe Harbor Guidelines.

216.     The Safe Harbor Guidelines provide that the federal government will "not challenge, absent extraordinary circumstances, [competitors'] participation in written surveys of … wages, salaries, or benefits … if the following conditions are satisfied: (1) the survey is managed by a third-party (e.g., a purchaser, government agency, health care consultant, academic institution, or trade association); (2) the information provided by survey participants is based on data more than three months old; and (3) there are at least five [competitors] reporting data upon which each disseminated statistic is based, no individual [competitor's] data represents more than 25 percent on a weighted basis of that statistic, and any information disseminated is sufficiently aggregated such that it would not allow recipients to identify the prices charged or compensation paid by any particular [competitor]."[6]

217.     To comply with these Safe Harbor Guidelines and federal antitrust law, WMS advised clients that, among other things, compensation surveys should exclude future compensation information and should aggregate results to prevent competitors from readily identifying the individual sources of data. According to Mr. Meng, "[m]ost of WMS's clients consistently heeded those recommendations."

---

[5] U.S. Dep't of Justice & Fed. Trade Comm'n, *Statements of Antitrust Enforcement Policy in Health Care* 5 (1996), https://www.justice.gov/atr/page/file/1197731/download#CONTNUM_49.

[6] *Id.* at 50.

218.    However, Mr. Meng explained that "the poultry processors that retained WMS did not" heed such recommendations. On the contrary, as described below, Defendant Processors repeatedly and knowingly structured and operated the Poultry Industry Compensation Survey in a manner that did not comply with the Safe Harbor Guidelines and violated the federal antitrust laws.

        c.    **WMS Was Retained by Defendant Processors to Establish a Veneer of Legality**

219.    Defendant Processors hired WMS to provide a veneer of legality while directly exchanging information about, discussing, and ultimately agreeing to fix and depress the wages, salaries, bonuses, and benefits provided to workers at their poultry processing complexes, plants, hatcheries, and feed mills throughout the Class Period.

220.    On multiple occasions, Jonathan Allen, then Corporate Human Resources Director of Fieldale Farms, told Mr. Meng that prior to retaining WMS in 2000, many of the Defendants Processors "regularly conducted in-person meetings to directly exchange and discuss compensation data with one another." Mr. Allen further explained to Mr. Meng "that executives from each of those poultry processors would meet in a private room and bring enough copies of their salary and wage data to distribute to all the other attendees" and "then exchange and discuss their compensation schedules."

221.    In fact, when Mr. Allen introduced Mr. Meng to executives of other Defendant Processors at annual Poultry Industry Compensation Meetings, Mr. Allen often mentioned that before Defendant Processors retained WMS in 2000 to conduct the first Poultry Industry Compensation Survey, those poultry processors directly exchanged and discussed compensation schedules with each other.

222.    When the Poultry Industry Survey Group first hired WMS to conduct the Poultry Industry Compensation Survey in 2000, Mr. Meng "believed that the participating poultry

processors were, in good faith, seeking to halt their improper direct exchanges of compensation data and, instead, obtain industry-wide compensation information in an appropriate manner." At the time, he believed "that those poultry processors were genuinely seeking to ensure that their behavior was compliant with the Safe Harbor Guidelines and the antitrust laws."

223.   Over time, however, Mr. Meng "came to believe that the members of the Poultry Industry Survey Group were not actually seeking to comply with the Safe Harbor Guidelines or antitrust law." Rather, Mr. Meng "ultimately concluded that the members of the Poultry Industry Survey Group likely hired WMS as an independent consultant to establish the *appearance* of compliance with the Safe Harbor Guidelines and antitrust law and obtain compensation data in a manner that sometimes *seemed* permissible."

224.   Specifically, Mr. Meng "came to believe that, even while retaining WMS to conduct surveys, the members of the Poultry Industry Survey Group were (1) exchanging compensation data in a manner that allowed them to identify the wages, salaries, and benefits that each poultry processor was providing to poultry complex workers and (2) discussing both future and optimal compensation practices and rates during meetings and communications that excluded WMS."

225.   Mr. Meng "believe[s] the Poultry Industry Survey Group retained WMS to create the appearance of compliance with the Safe Harbor Guidelines while its members continued to exchange disaggregated and deanonymized compensation data and continued to discuss and harmonize their compensation practices" and that "the members of the Poultry Industry Survey Group used WMS as an unwitting tool to conceal their misconduct."

226.   Indeed, during the Class Period, Mr. Meng repeatedly warned the Defendant Processors that they were improperly exchanging compensation data in a manner that was wholly

inconsistent with the Safe Harbor Guidelines and federal antitrust law. His warnings were regularly disregarded by Defendant Processors as they violated the antitrust laws.

> **d.      Defendant Processors' Control of the Poultry Industry Compensation Survey**

227.    During each year from 2000 to 2019, WMS sent the Poultry Industry Compensation Survey to members of the Poultry Industry Survey Group and compiled survey responses in a report (hereafter "Survey Results Report"). WMS then distributed the detailed Survey Results Report to each member of the Poultry Industry Survey Group in April or May, on the eve of the annual in-person Poultry Industry Compensation Meeting.

228.    Each member of the Poultry Industry Survey Group paid a flat, annual rate to WMS to participate in the Poultry Industry Compensation Survey and receive the Survey Results Reports.

229.    Despite hiring WMS to conduct the Poultry Industry Compensation Survey, Defendant Processors themselves retained *complete control* over the Surveys. As Mr. Meng described: "unlike other clients with which I have worked, decisions regarding the content of each Poultry Industry Compensation Survey and each Survey Results Report, as well as the participants in each Survey, were made *exclusively* and *collaboratively* by a group of competing poultry processors." Mr. Meng explained that Defendant Processors "reached agreements regarding what positions to cover in the Survey, which compensation data to seek in the Survey, how to structure the questions in the Survey, how to revise the Survey, how often to conduct the Survey, which participants to include in the Survey, and what information to display in the Survey Results Reports."

230.    Specifically, the Poultry Industry Compensation Survey was governed and operated by a "Steering Committee" that consisted of between three and five executives of different

Defendant Processors. Each of the following five poultry processors was represented on the Steering Committee during most of the period from 2000 through 2019: Tyson, Perdue, Foster Farms, Fieldale, and Pilgrim's.

231.    The Steering Committee often conducted its own in-person and telephonic meetings and reached its own agreements in private, without WMS's involvement. For example, Mr. Meng "sometimes saw the members of the Steering Committee meeting at restaurants and bars when [he] checked into hotels to attend Poultry Industry Compensation Meetings."

232.    The Steering Committee developed specific "Operating Standards" for the Poultry Industry Survey Group. The Operating Standards note that the "survey exists to provide the organized sharing of pay and benefits data between participating companies," and that "[t]he group leadership / oversight will be the responsibility of the 'Steering Committee.'"

233.    According to Mr. Meng, the Steering Committee, with input from other members of the Poultry Industry Group, "determined all the job positions, compensation metrics, and specific benefits to include in the Poultry Industry Compensation Survey and Survey Results Reports." Steering Committee members, along with other members of the Poultry Industry Survey Group, would engage in substantial back and forth regarding the optimal breakouts and descriptions of the various positions to include in the Surveys and Reports. Mr. Meng explained that the Steering Committee "carefully designed the Poultry Industry Compensation Survey to ensure that each salaried position, each category of hourly rate, and each benefit substantially matched across each participating processor's compensation structure."

234.    The Steering Committee determined which poultry processors could participate in the Poultry Industry Survey Group. The Steering Committee established the criteria that a poultry processor must meet to qualify for the Group and actively recruited poultry processors that

satisfied the criteria. Before inviting a particular processor to join the Group, the Steering Committee would conduct a vote of all the Group's members.

235.    In the Operating Standards, the Steering Committee established the following criteria for a processor to join the Poultry Industry Survey Group:

- "Have a minimum of three plants (or complexes).

- Must have (or be actively pursuing) a formal compensation structure complete with pay grades and ranges.

- Be voted on and approved by the existing participants.

- Agree to be active by participating each year and meeting survey data submission deadlines.

- Send a knowledgeable representative to each annual meeting. …

- Full participation in the survey concerning both data sharing (pay and benefits sections) and costs are required. Participating companies must purchase the survey as the expense is shared equally. The survey results are not available for purchase outside the participant group.

- Agree and ensure that shared survey data or other information from discussions will be used and treated in a 'confidential' manner and definitely should not be shared with companies not participating in the survey."

236.    In practice, a poultry processor was also required to manage live bird operations, including by operating hatcheries and feed mills, to join the Poultry Industry Survey Group. For example, on November 29, 2018, Mr. Bert Neuenschwander, then Manager of Compensation and HRIS at Foster Farms, reiterated to other Steering Committee members that the requirements to join the Group include:

- "Must be a multi complex poultry organization chicken or turkey

    ▪ The math being 1 turkey = 6 chickens when dealing with bird volume question

- Must have a bona fide salary grade/bracket structure in practice

- Must attend annual meetings"

Mr. Neuenschwander further explained in the email that "multi-complex means they have either company owned or third party owned ranches under their direction, including management of and labor for tech advisors, feed/formulations, in addition to hatcheries, breeders, and so on."

237.     The Steering Committee enforced the requirement that Defendant Processors attend the annual Poultry Industry Compensation Meeting as a condition of participating in the Poultry Industry Survey Group. As Jonathan Meng of WMS observed: "Each member of the Group was obligated to attend the in-person roundtable Meetings where compensation practices were discussed as a condition of receiving the Survey results." On March 1, 2016, for example, Bert Neuenschwander of Foster Farms emailed members of the Poultry Industry Survey Group that had not yet booked their lodging for the Meeting: "Reminder that to remain a participant in the survey, attendance each year is not optional, but rather a requirement." As a result, members of the Poultry Industry Survey Group were prohibited from simply remotely exchanging compensation data through the Poultry Industry Compensation Survey.

238.     Mr. Meng noted that as "compared to WMS's other clients, it was unusual that the members of the Poultry Industry Survey Group were governed by a Steering Committee that collaborated to determine the contents and structure of the compensation surveys, including the positions covered, questions asked, criteria for participants, and the actual participants."

239.     Members of the Poultry Industry Survey Group exercised their full control over the Poultry Industry Compensation Survey to design and structure it in an unlawful manner that facilitated their conspiracy to depress compensation. Mr. Meng stated that "the members of the Poultry Industry Survey Group collaborated to design and implement compensation surveys that were inconsistent with the Safe Harbor Guidelines."

**e.     Positions Covered in the Poultry Industry Compensation Surveys**

240.     Throughout the entire Class Period, the Poultry Industry Compensation Survey covered employees of both chicken and turkey processors. As Jonathan Meng of WMS recalled, "[m]embers of the Poultry Industry Survey Group said, and I believe, that chicken and turkey processing operations compete in the same market for labor. That is why the Poultry Industry Survey Group invited both chicken and turkey processors to join the Group."

241.     During the entire Class Period, the Poultry Industry Compensation Survey focused on workers employed throughout poultry processing complexes, plants, hatcheries, and feed mills.

242.     In each year of the Class Period, the Poultry Industry Compensation Survey covered 25 to 40 distinct salaried positions employed at poultry processing complexes, plants, hatcheries, and feed mills. As Mr. Meng recalled, "[m]embers of the Poultry Industry Survey Group expressed a significant interest in obtaining compensation data regarding particular salaried positions. … The members of the Poultry Industry Survey Group said, and I believe, that they competed on a nationwide basis for salaried positions at their poultry complexes, including at their processing facilities, hatcheries, and feed mills."

243.     For each specific salaried position covered by the Poultry Industry Compensation Surveys, the Survey provided the following metrics:

- Base salary

- Bonus pay (average bonus paid for the last 12 months, whether bonus eligible or not)

- Bonus eligible pay (the average bonus paid for the last 12 months for those actually receiving a bonus)

- Target opportunity percent (target opportunity as a percent of base compensation)

- Maximum opportunity percent (maximum opportunity as a percent of base compensation)

- Base salary policy (including the minimum, midpoint, and maximum policy)

244.   In 2005, the Survey Results Reports were expanded to display "total compensation" (base salary plus average bonus) and "actual incentive percent" (average bonus paid as a percent of base compensation) for each specific salaried position in the Reports.

245.   For each of these pay metrics for salaried positions, each of the Survey Results Reports identified the values at the 75th percentile, median, average, weighted average, and 25th percentile. In 2005, the Reports were expanded to include the values at the 90th and 10th percentiles.

246.   For example,



247.   Each Poultry Industry Compensation Survey also covered hourly paid positions at poultry plants around the country. The Survey initially addressed two categories of hourly-paid workers: processing plant workers and maintenance workers. The Survey was expanded to add refrigeration technicians in 2005 and quality technicians in 2017.

248.   For each category of hourly-paid workers covered by the Poultry Industry Compensation Survey, each Survey Results Report provided the following metrics:

- Entry level start rate (wage rate when worker is hired)

- Entry level base rate (rate attained within 6-12 months for lowest production scale)

- Average hourly rate

- Highest level base rate (or "top rate") (rate attained within 6-12 months for highest production scale)

- Annual turnover percentage

249.    For each of these metrics for hourly workers, each Survey Results Report identified the values at the 75th percentile, median, average, weighted average, and 25th percentile. In 2005, the Reports were expanded to include the values at the 90th and 10th percentiles. In 2008, the Survey Results Reports were expanded to include shift differentials for hourly-paid employees, and in 2017, the Reports were expanded to include the weighted average base rate for hourly-paid employees.

250.    Each Survey Results Report also provided data about many of the benefits provided to both salaried and hourly-paid employees at poultry complexes, plants, hatcheries, and feed mills operated by members of the Poultry Industry Survey Group. For example, the Survey Results Reports provided detailed information about:

- value of contributions made to pension plans;

- amount of life insurance coverage;

- amount of insurance coverage for accidental death and dismemberment;

- amount of coverage for long-term disability insurance;

- amount and duration of short-term disability insurance;

- provision of sick leave days;

- number of annual holidays;

- number of annual vacation days (based on the duration of employment);

- amount of health care costs per employee;

- amount of cost-sharing for medical insurance plans;

- size of deductibles for medical insurance plans;

- scope of prescription drug coverage;

- scope and cost of dental plans; and

- parental leave policies.

251.    Each Survey Results Report distributed to the Poultry Industry Survey Group also contained a directory of the other Defendant Processors that were participating in the Survey, as well as the primary personnel contacts (including names, addresses and phone numbers) at those Processors. As a result, each member of the Poultry Industry Survey Group was aware of the sources of compensation data in each Survey Results Report.

> **f.    Future Compensation Data in the Poultry Industry Compensation Survey**

252.    From 2000 through 2017, the Poultry Industry Compensation Survey included detailed data regarding *future* salary increases. Specifically, those Poultry Industry Compensation Surveys collected data from, and the Survey Results Reports distributed data to, each member of the Poultry Industry Survey Group regarding two future salary metrics: "salary merit increases" and "salary range movement." Defendant Processors exchanged data regarding future salary increases through the Poultry Industry Compensation Survey in furtherance of their conspiracy to depress the compensation of Class Members.

253.    Members of the Poultry Industry Survey Group included this future compensation data in the Poultry Industry Compensation Survey despite knowing that doing so fell outside the Safe Harbor Guidelines and violated the antitrust laws. Mr. Meng recalled that he "warned the

Steering Committee that the inclusion of future compensation information, including plans for future salary increases, would be inconsistent with the Safe Harbor guidelines if that future compensation information was not part of a publicly disclosed union contract." Yet, Mr. Meng stated that the Steering Committee blatantly "ignored" his warnings and "insisted on the inclusion of the forward-looking salary increase information in the Survey Results Reports." According to Mr. Meng, the Steering Committee "instructed WMS to include the data regarding future salary increases and future salary range increases in the Survey Results Reports because members of the Poultry Industry Survey Group said they wanted to know how much and when their competitors were planning to increase salaries and salary ranges."

254.    The metric "salary merit increases" in the Poultry Industry Compensation Survey measured planned increases in salary. Each Poultry Industry Compensation Survey distributed to members of the Poultry Industry Survey Group until 2018 requested four values related to salary range increases: (1) the average salary increase that had been planned for the prior year; (2) the average salary increase that had actually been paid during the prior year; and (3) the average salary increase anticipated for the next year or two years; and (4) which month the processor plans to increase those salaries during the next year or two years.

255.    For example, ██████████████████████████████████
████████████████████████████████████████████████████



256.    The four salary increase metrics requested by the Poultry Industry Compensation Survey were displayed in the Survey Results Reports. For example, ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ regarding ▇▇▇▇▇▇▇▇▇▇▇▇▇



257.    The metric "salary range movement" in the Poultry Industry Compensation Survey measured planned increases in salary ranges. Throughout the Class Period, each Poultry Industry Compensation Survey distributed to members of the Poultry Industry Survey Group requested three values related to salary range increases: (1) the planned increase in the salary range for the current budget year; (2) the planned increase in the salary range for the next budget year; and

(3) what month the processor plans to increase the salary ranges. For example, ███████

███████████████████████████████████████████████████████

████████



    258.    The three salary range metrics requested by the Poultry Industry Compensation

Survey were displayed in the Survey Results Reports. For example, ████████████

████████████████████████████ regarding ██████████████████████

████████

    259.    Mr. Meng concluded that "[t]he inclusion of metrics regarding future salary

increases and future salary ranges in the Poultry Industry Compensation Survey and Survey

Results Reports could allow the members of the Poultry Industry Survey Group to limit and reduce their salary increases and salary range increases."

260.   In sum, the Survey Results Report presented multiple measures of *future* compensation data that allowed Defendant Processors to assess their own planned compensation increases against their competitors' planned increases, and also assess precisely *when* other members of the Poultry Industry Survey Group planned to implement such increases. These exchanges of future compensation data in furtherance of their conspiracy to suppress compensation fell outside the Safe Harbor Guidelines and violated antitrust law.

> **g.     Disaggregated Raw Data in the Poultry Industry Compensation Survey**

261.   At times during the Class Period, the Poultry Industry Survey Group shared disaggregated, raw data regarding various compensation metrics through surveys conducted by WMS. This disaggregated, raw compensation data allowed Defendant Processors to deanonymize results of the Poultry Industry Compensation Survey and identify precisely what each participant was paying to categories of its poultry processing workers. The exchange of such disaggregated, raw compensation data fell outside the Safe Harbor Guidelines and violated antitrust law.

262.   From 2001 through 2004, each Survey Results Report distributed to Poultry Industry Survey Group members contained disaggregated, raw data regarding the following compensation metrics:

- starting salaries for hires with a bachelor's degree

- future increases to salaries and salary ranges

- average hourly wages for processing workers

- shift differentials for processing workers

263.    Specifically, from 2001 to 2004, each Survey Results Report displayed charts identifying (1) the starting salaries and future salary increases reported by each participating poultry processor and (2) the average hourly wages and shift differentials reported for each individual poultry plant operated by each participating poultry processor.

264.    In those charts, WMS replaced the identity of each participating poultry processor with a letter code, ostensibly to anonymize the raw data. Yet, the anonymization in these charts was a sham. Defendant Processors could readily, and did, deanonymize the disaggregated raw data contained in the Survey Results Reports distributed from 2001 through 2004.

265.    First, the charts containing disaggregated hourly wage data identified—for each letter code—precisely how many poultry processing plants were operated by the company, the number of workers in each plant, the state each plant was located in, and whether workers at the plant were unionized. As Mr. Meng stated, this data "would allow Poultry Industry Survey Group members to deanonymize the data." Because the *same letter code* was used for all compensation metrics, Poultry Industry Survey Group members could use these letter codes to de-anonymize *all* the disaggregated information contained in the Survey Results Reports.

266.    The following image is an example of a ████████████████████████ ████████████████ and ████████████████████████



267.    Second, each Survey Results Report distributed from 2001 through 2004 also included an additional section titled "Employment Demographics by Company." That section provided, for each company identified by letter code, the total number of employees employed by that company. As Mr. Meng stated, this data served as a "key" for Defendant Processors to ascertain the actual identity of each poultry processor associated with each letter code.

268.    █████████████████████████████████████████████████

██████████████████ and ████████████████████████████████

███████████████████████████████████████████████████████

269.     These sham anonymization techniques were included in each Survey Results Report distributed from 2001 through 2004 at the express request of the Defendant Processors in order to present a façade of legality and conceal their misconduct. Mr. Meng explained that "the inclusion of such detailed information about each letter code—which greatly facilitated deanonymization of the compensation data—in the Survey Results Reports distributed from 2001 through 2004 was a highly unusual practice. For that reason, WMS would have only done so at the explicit instruction of the Steering Committee."

270.     In 2005, according to Mr. Meng, WMS "significantly modified" the Survey Results Reports to be "more compliant with the Safe Harbor Guidelines" by removing the disaggregated, raw data regarding salaries and hourly wages.

271.     Yet, despite knowing that the distribution of disaggregated, raw data violated the Safe Harbor Guidelines, the Poultry Industry Survey Group insisted on WMS collecting and circulating such data again from 2013 to 2016. Specifically, at the direction of the Poultry Industry Survey Group, disaggregated, raw data regarding the compensation of hourly paid workers was distributed in the Survey Results Reports from 2013 through 2016. This disaggregated, raw data covered poultry processing workers—including production, maintenance, and refrigeration workers—and it was broken down by both plant and location.

272.     The components of this disaggregated, raw data (such as the number of employees at each plant) allowed Defendant Processors to deanonymize the data and determine the hourly wages paid by their competitors at poultry processing plants. As Mr. Meng recalled, "[w]hile the names of the poultry processors that operated the plants was not disclosed in the disaggregated raw data, it is evident that Poultry Industry Survey Group members could ascertain which poultry processor operated which plant by analyzing the data."

273.    Defendant Processors insisted on receiving granular, plant level data to more effectively implement and monitor their conspiracy to depress wages. Mr. Meng recalled that his "conversations with members of the Poultry Industry Survey Group indicated that they wanted this disaggregated, raw, plant-level data because they sought to know how much their competitors were paying to hourly-paid workers at particular plants."

274.    The decision to distribute disaggregated raw data regarding hourly workers in 2013 was first made in August 2012 by the Steering Committee. At the time, Mr. Meng specifically "warned the Steering Committee that distributing disaggregated, raw wage data—especially in a format that would allow members of the Poultry Industry Survey Group to deanonymize—would be violative of the Safe Harbor Guidelines." It also violated federal antitrust law.

275.    Mr. Meng specifically raised, in emails, concerns that "[t]he number of employees column as well as the union column" in the displayed raw wage data may "permit identification." Yet Mr. Meng was overridden by Linda Wray, then Tyson's Director of Compensation, and other Steering Committee members, who instructed Mr. Meng to convey the Steering Committee's decision to include this disaggregated, raw data to the rest of the Poultry Industry Survey Group. Mr. Meng explained that "the Steering Committee insisted that WMS modify the Poultry Industry Compensation Survey to collect and present disaggregated, raw, plant-level, hourly-wage data."

276.    Mr. Meng subsequently wrote each member of the Poultry Industry Survey Group to confirm their agreement with the inclusion of this disaggregated, raw data in the forthcoming Survey Results Reports. Each member of the Poultry Industry Survey Group expressly consented, and none made any objections or raised any concerns.

277.    As a result, disaggregated, raw, plant-level data regarding hourly paid workers was included in the Survey Results Report received by members of the Poultry Survey Group in 2013,

2014, 2015, and 2016. ██████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████

278.     In 2015, six new poultry processors joined the Poultry Industry Survey Group. At the time, Mr. Meng raised concerns with the Steering Committee that de-anonymizing the disaggregated, raw data of these six new members would be particularly "easy," and accordingly, he advocated halting the distribution of the disaggregated, raw data as a result. And during a subsequent Poultry Industry Compensation Meeting held on May 12, 2015, Mr. Meng raised his concerns to the entire Poultry Industry Survey Group, recommending that the Group "halt circulation of the disaggregated, raw, plant-level data regarding hourly paid workers." His recommendation, however, was disregarded, and instead, all members of the Poultry Industry Survey Group agreed to the continued distribution of such raw data.

279.     In 2016, the Poultry Industry Survey Group not only continued to distribute disaggregated, raw data for hourly paid workers in flagrant violation of antitrust law and the Safe Harbor Guidelines: it changed the collection format of the data to include even *more* information, making their violation even more blatant. For example, the disaggregated, raw data distributed in 2016 ████████████████████████████████████████████

280.     In 2016, the disaggregated, raw data was also circulated separately from the Survey Results Report to conceal its distribution. ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

However, when WMS distributed the 2016 Survey Results Report to each member of the Poultry

Industry Survey Group, it simultaneously emailed those members a *separate* Excel file that contained █████████████████████████████████████████████████████████████████

### h.   The CHIWI

281.    As explained above, Mr. Meng revised the Poultry Industry Compensation Survey in 2005 to eliminate disaggregated, raw data regarding salaries and wages that made it easy for participants to identify their competitors and their competitors' plants by name. As explained above, WMS did not distribute such raw, disaggregated data that facilitated deanonymization to Defendant Processors again until 2013.

282.    ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████

283.    ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████

284.    ████████████████████████████████████████████
████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████

285.    Tyson executives would also routinely call CHIWI survey participants to obtain

updates regarding their compensation rates and wage review dates for individual processing plants.

286.    ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██

        i.    **Tyson-Sponsored Hourly Plant Maintenance and Production Survey**

287.    ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

288.   This ████████ began in early 2013, when Linda Wray, then Tyson's Vice President of Compensation, requested that WMS collect and distribute disaggregated, raw data that identified how much individual poultry plants were paying three categories of hourly paid workers: production, maintenance, and refrigeration.

289.   Tyson scheduled a call to discuss this request with WMS on January 28, 2013. Multiple human resources executives from Tyson were on the call, including Ms. Wray; Rodney Nagel, Senior Vice President of Human Resources; Hector Gonzales, Vice President of Operations; and Susan Jones, Director of Labor Compensation.

290.   On this call, Mr. Meng of WMS specifically warned Tyson that the requested survey "would not be compliant with the Safe Harbor Guidelines because the data would be shared in raw, disaggregated form," and he raised concerns that the participating processors would likely be able to deanonymize the data due to the survey's format. Mr. Meng noted WMS would only conduct the survey if each participating poultry processor expressly agreed to the survey and its format.

291.   Nevertheless, in violation of the law and with the knowledge that doing so would fall outside the Safe Harbor Guidelines, Tyson requested that WMS proceed and conduct the additional compensation survey, which was titled the "Hourly Plant Maintenance and Production Survey" and modeled after the CHIWI. To inform WMS about how to structure and what information to include in the Hourly Plant Maintenance and Production Survey, Tyson's Susan Jones sent WMS a copy of one of the CHIWI results spreadsheets on February 13, 2013.

292.    Tyson directly contacted members of the Poultry Industry Survey Group to recruit them to participate in its Hourly Plant Maintenance and Production Surveys. Members of the Poultry Industry Survey Group agreed to participate in, and receive the results of, one or more of the Tyson-sponsored Hourly Plant Maintenance and Production Surveys. Mr. Meng stated that "members of the Poultry Industry Survey Group failed to heed my warnings that the Tyson-sponsored Hourly Plant Maintenance and Production Survey violated the Safe Harbor Guidelines."

293.    From 2013 to 2015, Tyson alone paid for the Hourly Plant Maintenance and Production Survey and determined its contents.

294.    The Tyson-sponsored Hourly Plant Maintenance and Production Survey provided even more disaggregated, raw, plant-level data than the Poultry Industry Compensation Survey in two respects. ██████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

295.    Second, unlike the Poultry Industry Compensation Survey, ████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

296.    ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████ The following is an excerpt of that spreadsheet:



297.    The inclusion of the ███████████████ for each plant in the results of the Tyson-sponsored Hourly Plant Maintenance and Production Survey substantially increased the ease of deanonymizing those results. As Mr. Meng concluded: "The format of the Tyson-sponsored Hourly Plant Maintenance and Production Survey facilitated the ability of members of the Poultry Industry Survey Group to identify the sources of plant-level compensation data in that survey. ████████████████████████████████████ ███████████████████████████.

298.    The results of the Tyson-sponsored Hourly Plant Maintenance and Production Survey—██████████████████████████████████ ████████—were distributed to participating members of the Poultry Industry Survey Group in 2013, 2014, and 2015.

### j.    Deanonymization of Compensation Survey Data

299.    In furtherance of their conspiracy to depress compensation to Class Members, Defendant Processors designed their compensation surveys to be readily deanonymized in several ways. They also posed questions to WMS—and to one another directly—that also further aided the deanonymization process.

300.    Mr. Meng stated that "members of the Poultry Industry Survey Group often structured the Poultry Industry Compensation Surveys in a manner that facilitated deanonymization of the Survey results."

301.    First, as discussed in the next section below, members of the Poultry Industry Survey Group disclosed and discussed their particular processor's survey results and compensation data during roundtable sessions at the annual Poultry Industry Compensation Meetings. Those members brought their survey results and compensation data to those Meetings.

302.     Second, as Mr. Meng explained: "the Survey Results Reports for years 2001 through 2004 contained disaggregated salary, wage, and benefits data that was organized by processor using letter codes to ostensibly conceal each processor's data—but those same reports also contained data that could allow Poultry Industry Survey Group members to identify which processor was associated with which letter code."

303.     Third, as Mr. Meng explained: "the Survey Results Reports for years 2013 through 2016 contained disaggregated, raw, plant-level, hourly wage data that contained plant characteristics (such as the number of employees and unionization status) that could allow Poultry Industry Survey Group members to identify which processor owned which plant."

304.     Fourth, as Mr. Meng explained: "Tyson required that the results of its Hourly Plant Maintenance and Production Surveys conducted in 2013, 2014, and 2015 display disaggregated, raw, plant-level, hourly-wage data by Agri Stats Subregion, which could allow Poultry Industry Survey Group members to identify which processor owned which plant."

305.     Fifth, as Mr. Meng explained, "members of the Poultry Industry Survey Group sometimes posed questions to WMS about the Poultry Industry Compensation Survey or Tyson-sponsored Hourly Plant Maintenance and Production Survey that could aid the deanonymization of data contained in survey results." For example, on October 30, 2014, Dominica Fleming, then a Compensation Analyst for Tyson, requested from WMS and received the number of Pilgrim's plants that were displayed in the results of the 2014 Tyson-sponsored survey.

306.     Sixth, as Mr. Meng explained, "members of the Poultry Industry Survey Group sometimes requested 'special cuts' of the results of the Poultry Industry Compensation Survey or Tyson-sponsored Hourly Plant Maintenance and Production Survey that could facilitate

deanonymization." These "special cuts" typically consisted of a subset of survey data or the presentation of survey data in a different way.

           **k.**      **Effects of the Broiler Antitrust Lawsuit on the Compensation Surveys**

307.    In September 2016, a separate lawsuit alleging the price-fixing of broilers[7] (hereafter "Broilers Antitrust Lawsuit") was filed against leading poultry processors—including most of the Defendant Processors. The Broilers Antitrust Lawsuit alleged that these poultry processors had secretly restricted the supply and inflated the prices of broilers in violation of the antitrust laws.

308.    Mr. Meng explained that "members of the Poultry Industry Survey Group expressed heightened concern about the possibility of antitrust liability following the filing of the Broilers Antitrust Lawsuit."

309.    As a result of that heightened concern, changes were made to the compensation surveys conducted by WMS. Specifically, all future compensation data and all raw salary and wage data were eliminated from the Survey Results Reports, and the Tyson-sponsored Hourly Plant Maintenance and Production Survey was no longer conducted.

310.    Mr. Meng explained that following the filing of the Broilers Antitrust Lawsuit, he "again advised the Steering Committee in 2017 that the inclusion of metrics regarding future salary increases in the Poultry Industry Compensation Survey and Survey Results Reports was not compliant with the Safe Harbor Guidelines" and also "urged members of the Poultry Industry Survey Group to halt the inclusion of disaggregated raw compensation data in the Poultry Industry Compensation Survey."

---

[7] The term "broiler" means chicken raised for meat consumption.

311.    Mr. Meng explained that "[b]efore the Broilers Antitrust Lawsuit was filed, Poultry Industry Survey Group members largely ignored my warnings regarding the risks of including future data and disaggregated raw data in the Survey Results Reports." He further explained that "after the Broilers Antitrust Lawsuit was filed, Poultry Industry Survey Group members finally heeded my warnings and agreed to eliminate future compensation information and disaggregated raw data from the Survey Results Report."

312.    Mr. Meng noted that these changes to the Survey Results Reports to make them more compliant with the Safe Harbor Guidelines "frustrated some members of the Poultry Industry Survey Group."

313.    On May 11, 2017, for example, Dominica Fleming, then Associate Director of Compensation at Tyson, prodded WMS to send her a supplement to the Survey Results Report that contained disaggregated, raw, plant-level data. Mr. Meng replied to Ms. Fleming, explaining: "The raw data hourly report was not sent this year. The report was prepared but the group decided at the meeting on May 1 that in light of the concerns over Safe Harbor, the raw data report does not meet Safe Harbor Guidelines and would not be distributed." In a verbal conversation, Ms. Fleming subsequently expressed frustration to Mr. Meng about not being able to obtain the raw data that she had requested.

314.    On February 8, 2019, Bert Neuenschwander, then Manager of Compensation and HRIS at Foster Farms and a member of the Steering Committee, sent an email to the rest of the Steering Committee members lamenting that the information in the Poultry Industry Compensation Survey about hourly paid workers was less valuable now that it was only reported in aggregated form. He wrote that "the bigger question from my part is: how useful is the 'average

rate report' now anyway? It has suffered significant obscuring of results due to aggregating, and I would ask – Is it still useful information any longer?"

### l.      Withdrawals from the Poultry Industry Survey Group

315.    Multiple Defendant Processors withdrew from the Poultry Industry Survey Group because of a fear of antitrust liability.

316.    In 2012, for example, Sanderson Farms withdrew from the Poultry Industry Survey Group and informed all the Group's members that it was withdrawing at the direction of legal counsel. Specifically, on February 14, 2012, Jennifer Buster, Sanderson's Manager of Human Resources, emailed the Poultry Industry Survey Group: "On the advice of legal counsel, our Executives have decided that we can no longer participate in this type of survey."

317.    Mr. Meng explained that although "Sanderson informed the Poultry Industry Survey Group that it was withdrawing for legal reasons, its withdrawal did not have a noticeable effect on how the Steering Committee operated the Poultry Industry Compensation Surveys and Poultry Industry Compensation Meetings."

318.    However, according to Mr. Meng, the filing of the Broilers Antitrust Lawsuit "triggered a wave of withdrawals by poultry processors from the Poultry Industry Compensation Survey and the Poultry Industry Compensation Meetings."

319.    On April 28, 2017, Brad Sievers of Pilgrim's informed the Steering Committee and WMS: "Unfortunately, due to some current legal proceedings, we've been advised by counsel not to attend our comp meeting next week. Best of luck and apologies for any inconvenience this may cause."

320.    On February 7, 2018, Mr. Meng informed Steering Committee members via email that Patrick Townsend, Mountaire's Director of Human Resources, had "told me that Mountaire

will not be participating on instructions from their General Counsel. He feels the decision is wrong but his hands are tied." In response, Bert Neuenschwander of Foster Farms wrote: "Thanks John. Keep us informed – let's hope this doesn't become a death spiral."

321.    Several other Defendant Processors—including O.K. Foods, Allen Harim, and Simmons—withdrew from the Poultry Industry Survey Group in the subsequent months and thus did not participate in Poultry Industry Compensation Surveys conducted in 2018 and 2019. Another Defendant Processor, George's, withdrew from the Poultry Survey Group in 2019 at the direction of counsel and did not participate in the Poultry Industry Compensation Survey that year.

322.    At the Poultry Industry Compensation Meeting held on May 6-7, 2019 at the Hilton Sandestin Resort in Destin, Florida, Mr. Meng gave a PowerPoint presentation. The following slide from that PowerPoint presentation addresses how multiple poultry processors had recently withdrawn from the Poultry Industry Survey Group:



The top of the slide quotes Shakespeare: "The first thing we do, let's kill all the lawyers."

323.    After this instant lawsuit was filed against Defendant Processors in August 2019, the remaining members of the Poultry Industry Survey Group halted the Poultry Industry Compensation Survey.

### 2.    Defendant Processors Discussed and Fixed Compensation at Annual Roundtable Meetings

324.    Throughout the Class Period, representatives from the Defendant Processors regularly attended and participated in annual, in-person Poultry Industry Compensation Meetings at which competitively sensitive compensation data was exchanged and the wages, salaries, bonuses, and benefits of Class Members were discussed and fixed. The annual Meetings were held each year from at least 2001 until 2019.

325.    Defendant Processors were required to attend these Meetings as a condition of participating in the annual Poultry Industry Compensation Survey administered by WMS. According to a former employee of Keystone who attended some of the Meetings, a poultry processor would be expelled from the Poultry Industry Survey Group if it failed to attend the annual in-person meeting two years in a row.

326.    Each Poultry Industry Survey Group member typically sent one or two executives with the authority to influence or determine compensation of workers at poultry processing facilities to the Poultry Industry Compensation Meetings. Those Meetings were typically attended by Directors of Compensation, Directors of Benefits, Compensation Analysts, and/or Vice-Presidents of Human Resources from each of the Poultry Industry Survey Group members.

327.    The executives of the Defendant Processors that attended the Poultry Industry Compensation Meetings frequently referred to those Meetings as "Compensation Meetings,"

"Poultry Compensation Survey Meetings," or "Poultry Industry Compensation/Benefits Survey Meetings."

328.    The Steering Committee determined the location, schedule, and agenda for each annual Poultry Industry Compensation Meeting. The Meetings were usually held in May, and the most commonly selected location was the Hilton Sandestin Resort Hotel & Spa in Destin, Florida.

329.    For example, a Poultry Industry Compensation Meeting was held on ███████████ ███████████████████████████████████████████ Executives from the following poultry processors attended this Poultry Industry Compensation Meeting: ████████████ ████████████████████████████████████████████████████████ ██████████████

330.    For example, a Poultry Industry Compensation Meeting was held on ███████████ at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida. Executives from the following poultry processors attended this Poultry Industry Compensation Meeting: ████████████ ████████████████████████████████████████████████████████ ██████████████████████████

331.    For example, a Poultry Industry Compensation Meeting was held on ███████████ ███████████████████████████████████████████ Executives from the following poultry processors attended this Poultry Industry Compensation Meeting: ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████

332.    For example, a Poultry Industry Compensation Meeting was held on ███████████ at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida. Executives from the following poultry processors attended this Poultry Industry Compensation Meeting: ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████

333.    Defendant Processors took steps to conceal their misconduct at the Poultry Industry

Compensation Meetings. According to a former senior executive of Perdue Farms, those Meetings

were "off the books" because of the confidential nature of the communications. Indeed, the Poultry

Industry Survey Group's operating standards expressly provide that "shared survey data or other

information from discussions will be used and treated in a 'confidential' manner and definitely

should not be shared with companies not participating in the survey."

334.    Each year, the cost of the Poultry Industry Compensation Meeting was split on a

pro-rata basis among the attending Defendant Processors. A Defendant Processor serving on the

Steering Committee paid the upfront costs for each annual Meeting, and the other members of the

Poultry Industry Survey Group would reimburse that Steering Committee member.

335.    The Poultry Industry Compensation Meeting lasted only one day from 2001 until

2003. From 2004 until 2019, each Poultry Industry Compensation Meeting lasted two days.

336.    Each Poultry Industry Compensation Meeting consisted of between six and seven

roundtable sessions, which each lasted between 45 minutes and two hours. During such sessions,

executives from the members of the Poultry Industry Survey Group would sit around a table and

engage in discussions that addressed compensation practices and plans.

337.    The attendees at the Poultry Industry Compensation Meetings were asked to bring,

and did bring, their compensation data and Survey Report Results to the roundtable sessions. As

Mr. Meng explained, "In earlier years, the attendees typically brought this data to the roundtable

sessions in hard-copy form using large binders. In later years, the attendees brought their laptop computers, which contained all the compensation data in electronic form."

338.    Each year until 2017, representatives from WMS were invited to attend the first one or two of those roundtable sessions to present the results of the Poultry Industry Compensation Survey. Yet, prior to 2017, representatives from WMS were not permitted to attend any of the other roundtable session. As Mr. Meng put it, at each Poultry Industry Compensation Meeting held until 2017, WMS representatives were "entirely excluded from multiple, private roundtable sessions during which executives from the participating poultry processors discussed both compensation practices and human resources practices."

339.    On March 26, 2007, for example, Annette Gilbert, then a Compensation Representative from Pilgrim's, wrote to Mr. Meng regarding the 2007 Poultry Industry Compensation Meeting: "While the meeting is scheduled for 1 1/2 days, we ask that you be available through lunch on the first day to discuss the survey results. You will not need to attend the remainder of the meeting, as this time will be spent discussing future meetings and best practices between the poultry companies."

340.    Mr. Meng noted that as "compared to WMS's other clients, it was unusual that the members of the Poultry Industry Survey Group arranged for and conducted in-person roundtable discussions about their Survey responses and compensation practices from which all WMS representatives were excluded."

### a.    Roundtable Sessions Attended by WMS

341.    Since 2004, Mr. Meng has attended the first session of each Poultry Industry Compensation Meeting. During each of those sessions, he made a PowerPoint presentation that addressed the results of the Poultry Industry Compensation Survey. The Steering Committee

requested that Mr. Meng make the PowerPoint presentation at each Poultry Industry Compensation Meeting to summarize the results of the Poultry Industry Compensation Survey.

342.    The PowerPoint presentation identified the average and median wage rates and salaries for each poultry processing position based on the survey data provided by the Defendant Processors to WMS, thereby establishing benchmarks that facilitated compensation-fixing discussions.

343.    Mr. Meng's PowerPoint presentations focused on year-to-year changes in the compensation data reported in Poultry Survey Results. Specifically, those PowerPoint presentations focused on how the compensation data reported in the current year for both salaried and hourly-paid workers compared to the prior year or prior two years.

344.    For each salaried position covered by the Poultry Industry Compensation Survey, most of Mr. Meng's PowerPoint presentations identified how much the base salary, midpoint salary, and total compensation had increased, by percentage, since the previous year. Most PowerPoint presentations also identified how, for each salaried position, the percentage of employees that received a bonus in the current year compared to the percentage that had received a bonus during the prior two years.

345.    Most PowerPoint presentations specifically addressed salary increases and salary range increases. In particular, the presentations compared the prior year's projections with actual implemented salary increases to assess whether those projections were accurate. █████████

████████████████████████████████████████████████████████████████

███████████████████████████████████ and ███████████████████████████████████

███████████████████████████████

346.    Some PowerPoint presentations also addressed projections for future salary increases. ███████████████████████████████████████████████████████

███████████████████████████████████

347.    For the hourly paid positions covered by the Poultry Industry Compensation Survey, most of Mr. Meng's PowerPoint presentations identified how much the entry level start rate, weighted average base rate, highest level base rate, and shift differentials had increased since the prior year. Most of the PowerPoint presentations also identified how plant turnover for categories of hourly paid employees had, on average, changed since the prior year.

348.    Most of Mr. Meng's PowerPoint presentations also addressed each of the benefits covered by the Poultry Industry Compensation Survey and, for most of them, identified whether the benefit amounts or policies had changed since the prior year. ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████

349.    In 2013 and 2014, the PowerPoint presentations ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████

350.    On multiple occasions, during his PowerPoint presentation, Mr. Meng raised whether the inclusion of particular compensation data in Survey Results Reports was useful to the

members of the Poultry Industry Survey Group. ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ In each of these three instances, the members of

the Poultry Industry Survey Group informed Mr. Meng that the information was, in fact, useful,

which is why it was included in future Survey Results Reports.

351.    During the roundtable sessions that Mr. Meng attended at annual Poultry Industry

Compensation Meetings, executives of Defendant Processors sometimes attempted to engage in

discussions about future and optimal compensation rates, or the specific compensation practices

of a particular poultry processor, in furtherance of their conspiracy to depress compensation.

Mr. Meng typically halted such unlawful discussions when Defendant Processors attempted to

have them in his presence.

352.    Mr. Meng stated that "on many occasions, during the roundtable sessions that I

attended, the attendees … attempted to engage in inappropriate conversations that I believed were

violative of the Safe Harbor Guidelines, and I halted those discussions."

353.    Mr. Meng explained that "over the years, I witnessed many instances when

members of the Poultry Industry Survey Group sought to engage in direct and improper

communications about compensation—often until I put a stop to those communications."

354.    Mr. Meng stated that sometimes "the attendees at the roundtable sessions that I

attended sought to discuss future compensation plans, optimal compensation rates, or a particular

processor's compensation practices. I promptly halted those discussions when they occurred."

355.    Mr. Meng also stated that sometimes "the attendees at the roundtable sessions that I attended discussed how they needed to, and were actually going to, have private conversations with each other—and without me—to discuss specific compensation practices or directly exchange additional compensation data for particular positions. On such occasions, I informed the attendees that such private conversations would be improper."

### b.    Roundtable Sessions that Excluded WMS

356.    At each Poultry Industry Compensation Meeting held until 2017, the Poultry Industry Survey Group conducted multiple private roundtable sessions that excluded WMS. After WMS had summarized results of the Poultry Industry Compensation Survey to executives of the Defendant Processors, the WMS representatives were asked and expected to leave the Meeting to allow for these private roundtable sessions to proceed. Mr. Meng believes that the Steering Committee asked him "to leave so that the attendees could engage in improper discussions about the Survey results and compensation practices without my halting or witnessing those discussions."

357.    Mr. Meng stated that "whenever members of the Poultry Industry Survey Group attempted to discuss a particular processor's compensation practices, future compensation plans, or optimal compensation rates in my presence at Poultry Industry Compensation Meetings, I halted those discussions and warned the members that such discussions were violative of Safe Harbor Guidelines. But nothing prevented them from conducting such improper discussions during the private roundtable sessions that excluded me."

358.    Indeed, Mr. Meng "believe[s] that—even while contracting with WMS, which marketed itself as seeking to comply with the Safe Harbor Guidelines—the members of the Poultry

Industry Survey Group revealed and discussed their particular compensation practices, future compensation plans, and optimal compensation rates with each other behind closed doors."

359.    During these roundtable discussions that excluded WMS, executives of the Defendant Processors engaged in discussions to determine and agree upon the optimal compensation for poultry processing complex workers. Specifically, the executives of the Defendant Processors agreed upon and fixed the wages, salaries, bonuses, and benefits that they would provide to employees at poultry processing complexes, plants, hatcheries, and feed mills in the continental United States, *i.e.,* Class Members.

360.    At these roundtable sessions which excluded WMS, executives of the Defendant Processors also specifically discussed, and agreed upon, plans for salary raises and bonus budgets for the upcoming year. Such discussions and agreement had the predictable effect of limiting raises and bonuses paid to employees at poultry processing facilities owned by Defendant Processors, their subsidiaries, and related entities.

361.    During those discussions, the senior executives of the Defendant Processors also chastised any Defendant Processor that had deviated—by making unauthorized increases to worker compensation—from wages, salaries, bonuses, and benefits that had been fixed at prior Poultry Industry Compensation Meetings.

362.    Mr. Meng stated, "At the Poultry Industry Compensation Meetings, the private roundtable sessions that excluded me involved discussions between members of the Poultry Industry Survey Group regarding their compensation practices. Those discussions addressed, among other issues, the results of the Poultry Industry Compensation Survey, the compensation data that particular individual processors had reported to the Survey, and plans for future compensation rates for salaried and hourly-paid workers."

363.    A former employee of Pilgrim's said that attendees at the Poultry Industry Compensation Meetings discussed with each other whether they paid a particular position less or more than the WMS survey average and also discussed why they paid certain positions higher or lower wages depending upon the responsibility assigned to that position.

364.    According to a former employee of Perdue Farms, the executives at the Poultry Industry Compensation Meetings also discussed specific "benefit information" such as health insurance deductibles, paid time off, and 401(k) plans.

365.    A former employee of Perdue Farms explained that attendees at the Poultry Industry Compensation Meetings disclosed their own compensation data during those roundtable discussions. He noted that it was not difficult to determine which company reported which compensation data in the Poultry Industry Compensation Survey when "you're sitting in a meeting and the person across from you [from a competing processor] is reporting on what they do."

366.    A senior executive from Tyson Foods noted during a private conversation in or around 2018 that the discussions about wages, salaries, and benefits at the Poultry Industry Compensation Meetings were so inappropriate and improper that that the company would no longer attend them.

367.    The written agendas prepared by the Steering Committee for the Poultry Industry Compensation Meetings provided little information about the contents of the roundtable sessions that excluded WMS. However, each of those written agendas for the Meetings held in 2010 and 2012-2016 described at least one of the private roundtable sessions that excluded WMS as covering "[c]ontinued discussion of survey submissions and Group discussion topics."

368.    In written communications, Defendant Processors also indicated that they addressed specific compensation issues during the roundtable sessions that excluded WMS. For

example, on April 20, 2015, Linda Wray, then Tyson's Vice President of Compensation, wrote the

following to the Steering Committee and Mr. Meng:

> Jon & steering committee, we are working on our budget for FY16
> budget planning. As you know the survey results do not provide
> hourly production projected budgets and this is typically a
> discussion item during the roundtable sessions. Due to some internal
> timeline challenges do you think it would be a problem for me to
> send out the following:
>
> In anticipation of our FY16 budget planning we are compiling
> average industry data for our non-union hourly production
> budgeting process. If available, please provide your projected FY16
> increase percentage for hourly production non-union. All
> information will remain confidential and the results will be
> compiled in aggregate format and provided to all participants.

This email illustrates that future projected increases to hourly production wage rates is "typically

a discussion item during the roundtable sessions." Notably, two members of the Steering

Committee—Lori Layfield of Perdue and Jonathan Allen of Fieldale—immediately signed off on

Ms. Wray's request, subject to Mr. Meng's approval. In response to Ms. Wray's email, Mr. Meng

wrote that the Steering Committee should "not formally distribute a question pertaining to 2016

increases unless it refers specifically to union contracts that are in place for 2016."

369.    On April 29, 2009, Jonathan Allen of Fieldale sent an email to the Poultry Industry

Survey Group in anticipation of the Poultry Industry Compensation Meeting scheduled for May

4-5. In that email, he wrote: "Hope all are planning to be there for the meeting. Just a reminder to

bring you [sic] Data manual in case others have questions for you concerning your data. Please be

prepared to discuss survey issues, questions, and details with WMS. We will also be sharing

information in a round table discussion. These discussions are expected to be kept confidential.

Look forward to seeing you there!!!"

370.    On March 29, 2010, Cyndi Hudspeth, then Corporate Benefits Coordinator at Case

Foods, emailed the Poultry Industry Survey Group regarding the upcoming Poultry Industry

Compensation Meeting scheduled for May 3-4: "Just a reminder, please bring your 2010 Survey Manual. Please be prepared to discuss survey issues, questions, and details with WMS. We will also be sharing information in the Round Table discussion. (As in the past, these discussions are expected to be kept confidential.)"

371.    On April 17, 2015, Bert Neuenschwander of Foster Farms emailed the Poultry Industry Survey Group to circulate the agenda for the forthcoming Poultry Industry Compensation Meeting scheduled for May 4 and 5. In that email, Mr. Neuenschwander writes: "Attached is our standard agenda template. Please remember to bring your any [sic] discussion points you've been holding back in anticipation of our meetings. Jon from WMS will email you your survey results prior to the meetings."

> ### c.    Effect of the Broilers Antitrust Lawsuit on the Poultry Industry Compensation Meetings

372.    In 2017, the Poultry Industry Compensation Meetings changed: no additional roundtable sessions were permitted following Mr. Meng's PowerPoint presentation. Mr. Meng stated that based on his "conversations with members of the Poultry Industry Survey Group," he "understood that the reason the roundtable sessions were removed from the agenda that year was due to concerns about antitrust liability, which were significantly heightened when the Broilers Antitrust Lawsuit was filed in September 2016."

373.    In 2017, en route to the Poultry Industry Compensation Meeting, Mr. Meng ran into Bert Neuenschwander of Foster Farms at baggage claim in the Destin, Florida airport. Mr. Neuenschwander asked Mr. Meng whether he had "heard the news" and noted there was a major antitrust action alleging price-fixing against many poultry processors. Mr. Neuenschwander said he believed there would be a lot of "fallout." At that 2017 Meeting, Mr. Neuenschwander noted that Foster Farms' general counsel had prohibited him from participating in the Meeting that

year and that he only showed up to explain why he could not participate in the remaining sessions. He left the room right after these remarks but later attended dinner with other members of the Poultry Industry Survey Group.

374.     In 2018, the roundtable sessions following Mr. Meng's PowerPoint presentation resumed at the Poultry Industry Compensation Meeting. However, unlike in previous years, the Steering Committee asked Mr. Meng to attend *all* roundtable sessions in 2018. As a result, Mr. Meng was present for all the roundtable sessions held during the Poultry Industry Compensation Meeting in 2018.

375.     In 2019, Mr. Meng was again asked to attend all the roundtable sessions at the Poultry Industry Compensation Meeting. He noted that during those sessions, "at least one participant attempted to raise questions about the compensation practices of other individual competitors. I interrupted the participant to note that the question was inappropriate, and that particular discussion was immediately halted."

### 3.     Direct Communications Between Defendant Processors' Executives Regarding Compensation

376.     Throughout the Class Period, Defendant Processors' executives with the authority to determine or influence compensation of Class Members directly contacted one another to obtain information about and align their current and future compensation practices.

377.     Some of these conspiratorial communications between Defendant Processors' executives consisted of group emails that were sent to multiple Defendant Processors. For example, ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████ The email states: ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

378.   ███████████████████████████████████████████

████████████████ sent an email ███████████████████████

████████████████████████████████████████████████████

███████████████████████████ The email states: ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

379.   ███████████████████████████████████████████

████████████████████████████████████████ sent an email ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████ added in

a subsequent email: █████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

380.    A few months later, on January 28, 2010, Tyson's Linda Wray emailed executives from Allen Harim, Cargill, Case Foods, Fieldale, Foster Farms, George's, Koch, Marshall Durbin, O.K. Foods, Perdue, Pilgrim's, Sanderson, Simmons Foods, and Wayne Farms: "I have a quick question and would appreciate any feedback you can provide. Do any of you have a difference in benefits between your hourly production vs. production-related support jobs (i.e. QA & HACCP Techs, Wastewater Operators, etc.)? We have two classifications for our hourly-paid team members. Production workers on the line do not get quite the same as our technical support jobs, nurses and clerical. The difference is 5 days daily sick pay, better vacation schedule, higher short-term disability pay and the ability to utilize our flexible (pre-tax) benefits savings plan. We are considering a change that would convert some of the jobs to the hourly production classification." Multiple members of the group responded by disclosing their practices. For example, Foster Farms' Bert Neuenschwander replied to the group: "All of our non-exempt - non-union employees have the same benefits across the company." Doug Freeman of Allen Harim added: "Ditto for Allen's."

381.    On September 16, 2016, Dan Watson, then Keystone's Director of Compensation and Benefits, wrote in an email that he would "like to run a spot survey" regarding how members of the Poultry Industry Survey Group planned to comply with changes to the Fair Labor Standards Act ("FLSA") relating to overtime pay. Specifically, Mr. Watson asked: "How is your company dealing with exempt employees whose current base salary is below the new threshold?" Mr. Watson then offered two options for first-line supervisors and five options for other exempt

employees. The email was distributed to executives of Allen Harim, Amick Farms, Butterball, Cargill, Case Foods, Cooper Farms, Fieldale, George's, JBS, Koch Foods, Norbest, O.K. Foods, Perdue, Simmons Foods, Tyson, and Wayne Farms. In less than a week, ten poultry processors responded by specifically disclosing which of the seven options provided by Mr. Watson they would be pursuing. Bert Neuenschwander of Foster Farms compiled those responses into an Excel spreadsheet, and he distributed the spreadsheet to the Poultry Industry Survey Group, stating: "Attached are the responses received to-date from 10 companies. If more respond, I'll republish, but the target grouping pattern already appears pretty tight." ███████████████████████

████████████████████████████████████████████████████

███████████████████████████████

382.    While many of the conspiratorial communications between Defendant Processors' executives consisted of group emails, those executives also frequently engaged in bilateral communications about compensation plans and practices during the Class Period in furtherance of the conspiracy.

383.    For example, ████████████████████████████████ ██████████ sent an email ████████████████████████████████████ ██████████ The email states: ████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████ responded ██████

███████████████████████████████████

384.    That same day, ███████████████████ also emailed ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████ responded: ███████████

████████████████████████ then emailed █████████████████████

██████████████████████████████████ who made final decisions regarding

███████ compensation schedules: ████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████

385.   ███████████████████████████████████████████████

███████████ emailed ███████████████████████████████████████

████████████████████████████████████████ That same day ██████

██████ responded, ██████████████████████ Six days later, ██████████ sent an email ██████

████████████████████████████████████ Attached to that email was a document

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████ In response, ██████████ sent ███████████████████████

██████████████████████████████████

386.   Some of the bilateral communications between Defendant Processors' executives took the form of company-sponsored surveys of rival plants. For example, ████████████████████ sent out the below ██████████████████



387. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ For example, ▮▮▮

▮▮▮▮ after receiving the above ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ emailed his ▮▮▮ colleague ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

388. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ reached out to ▮▮▮▮▮

▮▮▮▮▮ and asked: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████ emailed the
requested information to ████████████████

389.    Similarly, ████████████████████████████ wrote  to
colleagues: ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

390.    ███████████████████████████████████████
████████████████ sent an email ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ The email states: ██████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ Attached to the
email was ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ also  requested ██████████████

████████████████████████████████████████

391.    Notably, Jennie-O and other turkey processors also directly surveyed each other
regarding hourly wages. On October 14, 2014, Jack Staugler, Human Resources Director of

Cooper Farms, wrote in an email to Jonathan Allen, Corporate Human Resources Director of Fieldale Farms, that "Jenni-O does a current survey of the turkey industry that focuses largely on the hourly workforce."

392.    Defendant Processors relied on these multilateral and bilateral communications among executives to maintain their compensation suppression conspiracy. █████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████████████████

393.    After the filing of the Broiler Antitrust Lawsuit, some Defendant Processors limited the *written* communications between their executives due to a fear of antitrust liability. For example, ███████████████████████ emailed ██████████, who had served as Compensation Manager of ████████ asking to ████████████████████ Another ████████ employee responded that █████████████████████████████████████████

█████████████████████████████████████████

### 4.    Exchanging Detailed Compensation Data Through Agri Stats

394.    In furtherance of their conspiracy to depress compensation, Defendant Processors also exchanged detailed and competitively sensitive compensation data each month through a subscription to Agri Stats. The agreement to exchange, and the actual exchange of, detailed compensation data through Agri Stats itself restrained compensation competition for processing plant workers in the poultry industry, and greatly facilitated the formation, implementation, and enforcement of the conspiracy to depress compensation.

395.    Agri Stats provided an unparalleled ability for Defendant Processors to implement, and monitor each other's compliance with, their collusive agreement to depress compensation. During the Class Period, Agri Stats facilitated the electronic exchange of *terabytes* of

competitively sensitive compensation data between the Defendant Processors. Agri Stats also monitored and audited this data to ensure it was accurate. By providing these services, Agri Stats became a central part of Defendants' collusion to suppress compensation.

396.    Indeed, a former employee of Perdue Farms during the Class Period stated that Agri Stats was responsible for "collusion in the poultry industry."

397.    Agri Stats is a small company, headquartered in Fort Wayne, Indiana. Agri Stats describes itself as a "management reporting and benchmarking company" that "provides consultation on data analysis, action plan development and management practices of participating companies." Agri Stats's mission is to "[i]mprove the bottom line profitability for our participants by providing accurate and timely comparative data while preserving confidentiality of individual companies."

398.    To the outside world, the role of Agri Stats is almost invisible. No uninitiated poultry processing worker could realize the profound anticompetitive impact Agri Stats has had on the poultry processing industry. Agri Stats services are not for the public, and its reports are not publicly available. Agri Stats refuses to sell its information and reports to just any customer. Blair Snyder, the former president of Agri Stats, said in 2009, "Agri Stats has always been kind of a quiet company. There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of just in the background, and really our specialty is working directly with companies about their opportunities and so forth."

399.    During the Class Period, Agri Stats partnered with each of the Defendant Processors to electronically collect and exchange timely information regarding compensation of workers at

poultry processing ████, plants, ████████████ owned by Defendant Processors, their subsidiaries, and related entities in the United States.

400.    During the Class Period, Agri Stats gathered compensation information from, and exchanged information between, more than 95 percent of U.S. poultry processors. Agri Stats's full-market coverage of the poultry processing industry afforded Defendant Processors the power to coordinate and suppress compensation through the use of the Internet. During an October 2009 earnings call for Defendant Sanderson Farms, the former president of Agri Stats, Blair Snyder, said, "All right, who is at Agri Stats? As we talked about, it's a parent company for subsidiary companies that support the industry. The whole goal is to support the industry. We do have 97% of the broiler industry participating, about 95% of the turkey industry. …The fact that we've got high 90 percentage of both broilers and turkeys, this pretty much represents about anybody that's out there in the broiler industry. …[For t]urkey participants, pretty much it's a list of who's who in the turkey business."

401.    During the Class Period, on a monthly basis, each Defendant Processor or its affiliate provided to Agri Stats the effective salary and wage rates for categories of workers employed at each poultry processing ████ poultry processing plant, poultry ████, and poultry ████ owned by the Defendant Processor, its subsidiaries, and related entities in the continental United States. That information was transmitted to Agri Stats through direct electronic submissions by the Defendant Processor or its affiliate. Agri Stats utilized an audit process to verify the accuracy of data regarding each facility.

402.    Agri Stats subsequently compiled the compensation data that it received from Defendant Processors and, each and every month during the Class Period, distributed that disaggregated compilation to each of the subscribing Defendant Processors. The compilation

included *current* effective salaries and hourly wage rates for categories of workers at poultry processing ████, plants, ████, and ████ throughout the continental United States operated by Defendant Processors, their subsidiaries, and related entities. The compilation also included average salary and hourly wage rates for positions at poultry processing ████, plants, ████, and ████, both nationwide and broken down by region. Additionally, the compilation identified the productivity of particular processing positions, such as birds per person hour and labor hours per pound.

403.   While Agri Stats claims the distributed data was anonymous, the data was sufficiently granular and disaggregated that executives of Defendant Processors could and did easily and precisely match the distributed compensation data to specific poultry processing ████, plants, ████, and ████ owned by specific Defendant Processors and their subsidiaries in specific regions.

404.   A former employee of Perdue Farms during the Class Period said that Agri Stats data was "supposedly confidential" but he knew from being in the industry and around the "good old boy system" that Perdue Farms and every other poultry processor participating in Agri Stats knew precisely which company reported which data. He added that it is "just bullshit" to suggest that Defendant Processors did not know which company was reporting which compensation data to Agri Stats and explained that Defendant Processors had "been looking at the same numbers for years so they've figured out who is who."

405.   A former employee of Pilgrim's during the Class Period explained that Agri Stats data could "totally" be reverse engineered to determine which company's plant was associated with which reported data and that, during meetings at poultry processing plants to review Agri

Stats data, colleagues would specifically point out that certain compensation data was associated with a particular competitor's plant in a specific location.

406.    A former employee of Perdue Farms said that Perdue Farms brought in Agri Stats personnel to teach management "how to extract information" from Agri Stats data.

407.    Similarly, a former employee of Butterball explained that "you could figure out" which company reported which data to Agri Stats, including compensation data, by speaking with Agri Stats representatives who provided the data. Agri Stats representatives would often assist Defendant Processors in identifying the sources of Agri Stats data, including compensation data.

408.    During the Class Period, Agri Stats typically met with each Defendant Processor and its executives on a quarterly basis. Since Agri Stats travelled between each Defendant Processor regularly and discussed the nonpublic, proprietary data at those meetings, Agri Stats was in a unique position to share information among Defendant Processors to enforce the agreement. Additionally, during each year of the Class Period, Agri Stats and its subsidiary Express Markets Inc. held "Broiler Outlook Conferences" that were attended by senior executives of the Defendant Processors and which addressed some of the data collected by Agri Stats from Defendant Processors.

409.    As a result of their subscriptions to Agri Stats, during each month of the Class Period, Defendant Processors could determine and knew how much each subscribing Defendant Processor and co-conspirator was paying in compensation to Class Members at their poultry processing facilities. Defendant Processers used the Agri Stats exchange of current compensation data in combination with the previously discussed meetings, surveys, and conspiratorial communications to harmonize the compensation paid to Class Members and to monitor and confirm that no conspirator deviated from the compensation-fixing conspiracy. A former employee

of Perdue Farms said that it would be "stupid to think" that Agri Stats did not have "an influence on" poultry processing worker wages.

410.   Agri Stats exchanged detailed compensation information between Defendant Processors on a monthly basis during the Class Period. This monthly dissemination of compensation data from each of the Defendant Processors allowed Defendants to efficiently implement the compensation-fixing scheme and systematically monitor and enforce compliance with it. Defendants were able to *constantly* monitor each other's compensation levels to ensure that no Defendant Processor offered materially more in compensation than another. A former Butterball employee said there was "no question about it" that Agri Stats was used by poultry processors to monitor each other's performance.

411.   During the Class Period, Defendant Processors regularly reviewed Agri Stats compensation data at corporate headquarters and at each individual plant. For example, at poultry processing plants operated by Perdue, Agri Stats data was reviewed at monthly or quarterly plant meetings during the Class Period. Similarly, a former employee of George's Foods, LLC said that Agri Stats data was reviewed during quarterly plant meetings during the Class Period to assess performance. Joe Sanderson, then-CEO and Chairman of Sanderson Farms, stated publicly that "we live and die by Agri Stats." A former employee of Perdue Farms said that the company spent "enormous effort analyzing Agri Stats" and that the CEO was an "Agri Stats guru and nut" who had an "absolute understanding" of the reported Agri Stats data. A former Butterball employee said that "Agri Stats was big" at the company.

412.   Defendant Processors regularly relied upon Agri Stats data to help set the compensation of workers at poultry processing facilities. For example, a former employee at a Pilgrim's plant said that a Pilgrim's corporate officer visited the plant every quarter to review Agri

Stats data with plant management; that during those meetings, Agri Stats wage data regarding processing plant workers was extensively compared with the plant's own wage figures; and that, when the Agri Stats data was being reviewed, the shared goal of the corporate officer and the plant managers was to ensure that the Pilgrim's plant was paying wages that were exactly in the middle of the reported Agri Stats wage data. The former employee of Pilgrim's explained that a department at Pilgrim's corporate office was specifically tasked with visiting each poultry processing plant operated by Pilgrim's to ensure that their compensation rates were exactly in the middle of reported Agri Stats data.

413.    In 2009, shortly after Pilgrim's had filed for bankruptcy in December 2008, the company engaged in collective bargaining negotiations with United Food and Commercial Workers International Union as part of a reorganization plan. During the course of those negotiations, Pilgrim's executives insisted that labor costs be within the Agri Stats average range in each of the company's domestic poultry processing plants.

414.    Similarly, a former employee of Butterball explained that the company relied on Agri Stats when engaging in collective bargaining negotiations with unions that represented poultry processing workers. The former Butterball employee explained that the company would use Agri Stats to "show unions the average pay in the industry" and insisted during negotiations that wages "would have to be within the parameters" contained in Agri Stats.

415.    Notably, Pilgrim's and Butterball only disclosed "average" industrywide pay figures obtained from Agri Stats to the unions when engaging in collective bargaining negotiations—*not* disaggregated, company-specific, or plant-specific Agri Stats wage data or any actual Agri Stats written reports. Because Agri Stats will only sell its reports to processors who

also provide data for inclusion in those reports, unions and their members were not able to obtain the Agri Stats reports themselves.

416. Defendant Processors knew that they could rely on Agri Stats data to set compensation and enforce the conspiracy because Agri Stats audited the raw data collected from each Defendant Processor. Such auditing ensured that no Defendant Processor or co-conspirator could cheat on the compensation-fixing agreement by covertly providing higher wages, salaries, or benefits.

417. To ensure the accuracy of its reports, Agri Stats physically visited each Defendant Processor or its affiliate to collect data. Specifically, Agri Stats would establish an initial data collection process, wherein staff would conduct on-site meetings for approximately one week to identify data locations, files, and formats. Agri Stats staff would then spend approximately three weeks inputting and converting data from the Defendant Processor and preparing auditors for monthly analysis of that data. Moving forward, the Defendant Processor would upload data in real-time to Agri Stats, and internal auditors would examine the uploaded data and perform monthly audits.

418. There is no plausible, non-conspiratorial justification for Defendant Processors, with Agri Stats' agreement and participation, to have shared, on a monthly basis, highly confidential and proprietary information about their *current* compensation rates for workers at each of their poultry processing facilities, broken down by position. In a competitive market, such proprietary, competitively sensitive information would remain a closely guarded secret.

419. Sharing the detailed compensation data contained in the Agri Stats reports between Defendant Processors was unnecessary for controlling costs. If a Defendant Processor sought to

lower its costs, it was free to do so without first exchanging disaggregated, current, granular, competitively sensitive compensation data with rival poultry processors.

420.    The data exchanged between Defendant Processors through Agri Stats bears all the hallmarks of an enforcement mechanism for an anticompetitive compensation scheme. The information contained in Agri Stats reports was current and specific to individual poultry processors and their poultry processing facilities. The information about each Defendant Processor's compensation rates was detailed, including average salary and hourly wage rates for each covered poultry processing position, both nationwide and broken down by region. Moreover, none of the Agri Stats information exchanged between Defendant Processors was publicly available. Indeed, Defendant Processors were required to pay millions of dollars over the Class Period to access the compensation data, and Agri Stats only allowed a Defendant Processor to receive compensation data if that processor reciprocated and shared detailed compensation data. Accordingly, Agri Stats's collection and dissemination of such competitively sensitive compensation data allowed Defendant Processors to compare and coordinate their compensation decisions and police each other for any violations of the conspiracy as they occurred.

421.    Defendant Processors' monthly exchange of detailed, current, and disaggregated information regarding the compensation of poultry processing workers was anticompetitive. It resulted in lower compensation for all Class Members than each would have received in a competitive market, and it materially increased the profits of Defendant Processors.

422.    On February 15, 2017, in an article titled "Is the Chicken Industry Rigged?," *Bloomberg Businessweek* reported, "Armed with Agri Stats data, the biggest chicken producers have been enjoying an unprecedented era of stability and profitability. At Tyson Foods, operating margins in the chicken division have risen sharply since 2009, when they were 1.6 percent,

according to SEC filings. The next year they were up to 5.2 percent. After a brief dip, they climbed to 7.9 percent in 2014, an astounding 12 percent in 2015, and 11.9 percent in 2016. A similar trend has been under way at Pilgrim's, where operating margins went from 3.08 percent in 2012 to 14.02 percent in 2014 and 12.77 percent in 2015, according to data compiled by Bloomberg. The recovery from recession accounts for some of the gains, but the poultry industry's profit margins still have been abnormally fat and long-lasting by historical standards."

423.    Agri Stats has profited from collecting and reporting Defendants Processors' confidential business information, including by charging substantial fees of hundreds of thousands of dollars annually to each Defendant Processor. During the Class Period, the Defendant Processors paid millions of dollars to Agri Stats.

### 5.    Communications About Compensation Between Defendant Processors' Complexes and Plants

424.    In furtherance of the compensation-fixing conspiracy, the individual complexes and plants owned and operated by the Defendant Processors, their subsidiaries, and related entities often engaged in bilateral exchanges of compensation information with competing poultry processing complexes and plants in the same region. The information obtained from these data exchanges was provided to the corporate headquarters of the respective Defendant Processors, which used this regional information to facilitate the setting of artificially depressed compensation.

425.    A former employee of a Pilgrim's poultry processing plant said that corporate headquarters would ask each plant to obtain information about current and future compensation at competing poultry processing plants. That information was often obtained *directly* from those competing poultry processing plants through information-sharing channels.

426.    A former employee of both Peco Foods and Keystone said that human resources managers at local poultry processing plants "shared [compensation information] within the

industry" all the time. He explained that "local plants talk" and "knew what competitors are doing and how much they are paying." He said that human resources staff would often contact their counterparts at a competitor plant and share information about starting pay rates, pay increases and employment benefits. He explained that this "type of thing happened all the time."

427.    These plant-to-plant and complex-to-complex communications often involved the exchange of detailed compensation data regarding *future* wages. For example, these exchanges were sometimes initiated by a Defendant Processor's plant if a competing poultry processing plant was expanding and thus intended to hire a large number of new workers. In that situation, the plant initiating the exchange of compensation data sought to ensure that its wages would be like those at the newly expanded plant in order to avoid turnover and wage competition for labor.

428.    For example, a Pilgrim's poultry processing plant in Mayfield, Kentucky requested and obtained the pay rates of plant workers from competitor poultry processing plants in the fall of 2017. A rival Tyson Foods poultry processing plant in nearby Union City, Tennessee was planning to expand its "live hang" operation. As a result, a plant manager at Pilgrim's Mayfield plant reached out to a counterpart at Tyson Foods' Union City plant and obtained *future* pay rates for processing line positions at the newly expanded plant. During the same time period, another manager at Pilgrim's Mayfield plant contacted a counterpart at a nearby Perdue poultry processing plant in Cromwell, Kentucky and obtained that rival plant's pay rates for processing line workers. These and other pay rates obtained from competing poultry processing plants were compiled into a single document and transmitted to senior executives at Pilgrim's corporate headquarters. A former employee of Pilgrim's explained that these kinds of exchanges of compensation data between regional Pilgrim's, Tyson and Perdue plants had been occurring for years.

429.    A former employee of Butterball explained that the company's poultry processing plant in Mount Olive, North Carolina would regularly exchange hourly wages for specific positions with other nearby poultry processors. The former Butterball employee explained that when the Butterball plant requested hourly wage data from a rival poultry processing plant, the Butterball plant would share its own wage data with that rival processor so that the companies could "compare" their compensation schedules.

430.    A former employee of Wayne Farms, who worked out of the company's corporate office, was tasked with developing pay bands for processing plant workers. To assist with that project, the former employee distributed surveys via an email listserv to dozens of competing poultry processing plants in the Southeast region during the Class Period. The surveys requested information about compensation paid to processing plant positions. Multiple poultry processors returned completed surveys to the former Wayne Farms employee.

431.    A former employee of Perdue Foods during the Class Period stated that the company sometimes distributed wage surveys to competing poultry processors.

432.    A former human resources manager who worked at both a Perdue poultry processing plant and a George's poultry processing plant during the Class Period stated that both plants exchanged data with rival poultry processing plants on an annual basis. The former human resources manager explained that managers of the Perdue plant and the George's plant contacted managers of rival poultry processing plants operated by Pilgrim's, Cargill, and Virginia Poultry Growers Cooperative, Inc. and requested the *current* hourly wage rates for plant workers as well as any planned *future* increases to those hourly wage rates. The former human resources manager said, "We would collaborate. We would talk among each other to see what they were doing for

pay." The former human resources manager provided the compensation data obtained from rival poultry plants to the corporate headquarters of Perdue or George's.

433.   ███████████████████████████████████████████████

███████████████████████ sent an email to ████████████████████████████

████████████████████████████████ The email asks: ████████████████████

██████████████████████████████████████████████████████████

████████████ responded: ██████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████

434.   Defendant Processors also arranged and conducted tours of each other's poultry processing plants as a means to exchange information. For example, in April 2013, the CEO of Pilgrim's, Bill Lovette; the Chairman of the Board of Perdue Farms, Jim Perdue; and the President of Sanderson Farms, Lampkin Butts, attended a "Chicken Media Summit" in North Carolina that included visits by attendees to a local Sanderson Farms poultry processing plant. Similarly, in April 2015, another "Chicken Media Summit" was held on Maryland's Eastern Shore, and it included tours of one of Perdue's local poultry processing plants. Upon information and belief, these and other plant tours included discussion of labor practices.

**6.   Plus Factors that Render the Poultry Industry Susceptible to Collusion**

435.   The poultry processing industry is characterized by numerous features, or plus factors, that render the industry particularly susceptible to collusion and bolster the plausibility of the conspiracy alleged herein. These include: (1) vertical integration; (2) high barriers to entry; (3) industry concentration; (4) fungibility of poultry processing labor; (5) inelastic labor supply;

(6) a history of government investigations into collusive actions; (7) personal relationships between executives at competing poultry processors; and (8) numerous opportunities to collude.

436.    The poultry industry is, by far, the most vertically integrated segment of agriculture. Defendant Processors, their subsidiaries, and related entities own and operate nearly every stage of poultry production, from the feed mills to the hatcheries to the processing plants. Accordingly, Defendant Processors control the compensation of the vast majority of workers in the *entire* poultry industry. Defendant Processors can and do leverage that power to form and implement a compensation-fixing conspiracy that precludes employees of poultry processing complexes, plants, hatcheries, and feed mills from switching to alternate, higher-paying positions within the poultry industry.

437.    The poultry processing industry is characterized by high entry barriers. These barriers include the high costs of: constructing and operating a processing complex, including hatcheries, feed mills, and processing plants; establishing and operating a distribution network capable of delivering poultry products to grocery chains or wholesalers; developing and investing in a skilled contract-farmer base; and ensuring compliance with onerous federal and state government mandates and regulations. The cost of constructing a poultry processing complex alone is in excess of $100 million. As a result, it is exceptionally expensive and logistically complex for new poultry processors to emerge and compete with Defendant Processors.

438.    The poultry processing industry is highly concentrated. According to a November 2013 USDA report, "[d]uring the past 16 years, firms in the Broiler industry continued to decrease in number and grow in size, thereby gaining further economies of scale and scope in processing and marketing." According to the National Chicken Council, 55 federally inspected Broiler companies operated in 1995, compared with just 30 such companies operating in 2019. The

chicken processing industry's top-eight-firms concentration ratio has increased from 53.1% in 1997 to 79.3% in 2013. Similarly, the turkey processing industry's top-eight-firms concentration ratio exceeds 75%.

439.    Poultry processors view the processing workers that comprise the Class as fungible. Workers within the same positions are generally interchangeable, permitting Defendant Processors to readily compare and match each other's compensation levels.

440.    The market for poultry processing workers is characterized by inelastic labor supply. Industry-wide changes in compensation rates do not substantially affect the rate of participation in poultry processing positions.

441.    The history of the poultry processing industry is replete with government investigations and collusive actions. For example, in April 1973, the United States Department of Justice ("DOJ") filed a civil antitrust action against the National Broiler Marketing Association ("NBMA") for conspiring to fix the price of broilers in violation of Section 1 of the Sherman Act. The DOJ sought to enjoin the NBMA and its dozens of members, including many of the Defendant Processors, from continuing a conference call program whereby members coordinated the pricing and production of broilers. As for a more recent example, in June 2019, the DOJ disclosed that the agency had launched a criminal investigation into whether poultry processors have violated the antitrust laws by fixing the prices of broilers, and the agency issued grand jury subpoenas to several of the Defendant Processors as part of that investigation. On October 6, 2020, the DOJ charged ten current and former executives and employees from Pilgrim's, Perdue, Tyson, Koch, Case Foods, George's, and Claxton Poultry Farms for engaging in a price-fixing conspiracy. The indictment explains that *at least* ten poultry processors participated in the conspiracy.

442.    Executives of Defendant Processors have close personal relationships with each other. A former employee of Perdue Farms said that management in the industry formed a "tight-knit circle" and exchanged information frequently. Another former employee who worked at three different poultry processing plants operated by Tyson, Pilgrim's and Perdue said that senior executives of those three companies knew each other very well.

443.    Defendants have had numerous opportunities to collude. As detailed above, prior to 2017, each Poultry Industry Compensation Meeting involved private "roundtable sessions" during which Defendant Processors' senior executives discussed current and future compensation practices and rates. Additionally, the backdrop of the Poultry Industry Compensation Meeting provided Defendant Processors' senior executives with many other opportunities to discuss compensation. Beyond the Meetings themselves, Defendant Processors' senior executives gathered for "dinners, drinks, and other outings." In but one example, on April 29, 2019, Lindsey Chaney emailed the Poultry Industry Survey Group to present options for a group activity at the upcoming Poultry Industry Compensation Meeting. Ms. Chaney asked recipients to "let us know if you are still willing to join a group activity and vote for your favorite option." The options included a 5-hour party fishing trip, a tiki bar boat ride, and a dolphin boat cruise.

444.    In addition to attending the annual Poultry Industry Compensation Meetings, the senior executives of Defendant Processors responsible for determining compensation for poultry processing workers attended multiple other in-person meetings during the Class Period. Many of those meetings were sponsored by trade associations that advocate for the interests of the Defendant Processors. Those meetings include:

- <u>Seminars and Meetings of the U.S. Poultry & Egg Association</u>. The U.S. Poultry & Egg Association describes itself as the world's largest and most active poultry organization, and almost all the Defendant Processors were members. Each year of the Class Period, the Association held a Human Resources Seminar, often at the Hilton

Sandestin Resort Hotel & Spa in Destin, Florida. Many of the Defendant Processors' employees responsible for setting plant worker compensation—including senior executives, Vice Presidents of Human Resources, Directors of Compensation, Directors of Benefits, and Compensation Analysts—regularly attended the Human Resources Seminar. A former employee who worked at three different poultry processing complexes operated by Tyson, Pilgrim's and Perdue said that the attendees at the Association's annual Human Resources Seminar knew each other very well and could have readily discussed compensation of processing plant workers over dinner. In addition, senior executives of most of the Defendant Processors serve on the board of directors of the Association, and that board conducted in-person meetings four times a year during the Class Period.

- <u>Meetings of the National Chicken Council.</u> The National Chicken Council exclusively represents chicken processors, and its members account for approximately 95 percent of the chicken sold in the United States. Each Defendant Processor or its affiliate that processes chicken is a member of the National Chicken Council. Senior executives of those Defendant Processors serve on the board of directors of the National Chicken Council, and that board of directors met at least four times a year during the Class Period. In conjunction with some of these meetings, executives from Agri Stats made presentations and the CEOs of many Defendant Processors held private dinners.

- <u>Meetings of The National Turkey Federation.</u> The National Turkey Federation represents turkey processors, and its members account for approximately 95 percent of the turkey sold in the United States. Each Defendant Processor that processes turkey is a member of the National Turkey Federation. Executives of Defendant Processors that process turkey serve on the board of directors of the National Turkey Federation, and that board of directors met at least twice a year during the Class Period.

- <u>Meetings of the Joint Poultry Industry Human Resources Council</u>. The Joint Poultry Industry Human Resources Council was formed in 2009 by merging the human resources committees of the U.S. Poultry & Egg Association, National Chicken Council, and the National Turkey Federation. The Joint Poultry Industry Human Resources Council is comprised of senior human resources executives, including executives of the Defendant Processors who formed and implemented the compensation-fixing conspiracy. The Joint Poultry Industry Human Resources Council exclusively focuses on labor issues, such as compensation, and it held an in-person meeting every year during the Class Period, often at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida. The Council provided Defendant Processors with an especially useful forum for exchanging compensation information. On one conference call, for instance, █████████████████████████████████ On another call, the group discussed ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████

- <u>Meetings of the Georgia Poultry Federation.</u> The Georgia Poultry Federation "is a non-profit trade association which represents the poultry industry in Georgia, the nation's leading broiler producing state." Many of the Defendant Processors are members of the Georgia Poultry Federation. It conducted meetings at least three times a year during the Class Period, which were attended by executives of those Defendant Processors.

- <u>Meetings of the North Carolina Poultry Federation.</u> The mission of the North Carolina Poultry Federation "is to create a favorable climate for business success for everyone involved in the poultry industry in North Carolina." Many of the Defendant Processors are members of the North Carolina Poultry Federation. It conducted several meetings during each year of the Class Period, which were attended by executives of those Defendant Processors.

- <u>Meetings of The Poultry Federation.</u> The Poultry Federation is a non-profit trade organization that represents the poultry and egg industries in Arkansas, Missouri, and Oklahoma. Many of the Defendant Processors are members of The Poultry Federation. It conducted several meetings during each year of the Class Period, which were attended by the executives of those Defendant Processors.

## C.   Market Power of Defendant Processors

### 1.   Direct Evidence of Market Power

445.   The strongest evidence that Defendant Processors and co-conspirators collectively possessed the requisite *power* to suppress compensation for poultry plant workers is that they *actually* suppressed such compensation during the Class Period.[8] As detailed above in section VI(B), Defendants and co-conspirators engaged in various overt acts to suppress the salaries, wages, and benefits paid to poultry processing workers.

446.   First, Defendant Processors operated and participated in multiple surveys, including the Poultry Industry Compensation Survey administered by WMS, to exchange detailed current and future information about, and facilitate the fixing of, compensation provided to their workers at poultry processing facilities in the continental United States. In combination, these compensation surveys permitted Defendant Processors to accurately determine how much each

---

[8] Such "buyer" market power is also referred to as "monopsony power."

Defendant Processor was paying, and planned to pay, workers at their poultry processing facilities. According to Mr. Meng, President of WMS, the Defendant Processors participated in the Poultry Industry Compensation "to limit their wage and salary increases."

447.    Second, Defendant Processors convened annual "off the books" Poultry Industry Compensation Meetings, where their executives discussed the results of the highly detailed Poultry Industry Compensation Survey and reached agreements to depress Class Members' compensation. Defendant Processors ensured that each conspirator adhered to their agreement to depress compensation. For example, during the annual Poultry Industry Compensation Meetings, executives of the Defendant Processors would present detailed comparisons about how actual salary changes and bonus budgets from the preceding year compared with the *planned* salary changes and bonus budgets that had been collectively devised at the previous year's meeting. Defendants and co-conspirators could not carry out such plans in the absence of collective market power.

448.    Third, senior executives of Defendant Processors discussed, compared, and further fixed compensation through email and phone communications. Some of those conspiratorial communications consisted of group emails to Defendant Processors' executives for the purpose of collectively aligning their compensation practices. Other conspiratorial communications involved bilateral discussions between Defendant Processors' executives to disclose and harmonize their projected compensation increases. These conspiratorial communications could not have been effective if Defendant Processors and co-conspirators lacked the power to collectively suppress wages.

449.    Fourth, Defendant Processors and co-conspirators exchanged detailed compensation information regarding processing plant workers through Agri Stats. Former

employees of Defendant Processors and co-conspirators confirmed that those companies used Agri Stats data to ensure that they were depressing compensation for poultry processing workers. For instance, a former Pilgrim's employee explained that corporate officers would visit Pilgrim's processing plants quarterly to ensure that the plants were not compensating workers more than the "middle" amount reported to Agri Stats. Similarly, a former employee of Butterball explained that, during union negotiations, the company would insist that wages "would have to be within the parameters" contained in Agri Stats. The ability of Defendant Processors and co-conspirators to keep wages within Agri Stats "parameters" demonstrates their collective market power.

450.    And fifth, Defendant Processors and co-conspirators frequently engaged in bilateral exchanges of current and future wage data. For example, a former employee of Butterball explained that the company's processing plant in Mount Olive, North Carolina would regularly exchange hourly wages for specific positions with other nearby poultry processors. The former Butterball employee explained that when the Butterball plant requested hourly wages from a rival poultry processing plant, the Butterball plant would share its own wage data with that rival processor so that the companies could "compare" their compensation. Similarly, former employees of Wayne Farms and Perdue explained that those companies disseminated wage surveys directly to other poultry processors during the Class Period. As one former human resources manager of poultry processing plants operated by Perdue and George's put it, "We would collaborate." This collaboration could not have been effective if Defendant Processors and co-conspirators did not have the power to suppress wages as a group.

451.    More broadly, if the Defendant Processors' and co-conspirators' long-running conspiracy to suppress wages was unworkable because they lacked collective market power, they would not have conspired in the first place, and certainly would not have continued doing so.

452.     Defendant Processors' and co-conspirators' meetings, communications, and data exchanges were costly: they paid for the annual Poultry Industry Compensation Surveys and monthly Agri Stats reports, spent time and money answering detailed survey questions, paid for senior human resource executives to attend annual Poultry Industry Compensation Meetings, and exposed themselves to legal liability. Defendant Processors and co-conspirators would not have continued to incur these annual expenses for the entire Class Period—a solid two decades—unless their compensation-fixing and information exchanges were paying dividends in the form of reduced salaries, wages, and/or benefits for poultry processing workers. This indicates that Defendant Processors and co-conspirators believed and acted as though they had the market power to profitably suppress wages.

      **2.**        **Indirect Evidence of Market Power**

           **a.**        **Product or Services Market**

453.     The relevant market is the labor market for employment at poultry processing complexes, plants, hatcheries, and feed mills in the continental United States ("Relevant Market").

454.     A hypothetical cartel that controlled a large share of the Relevant Market, as Defendant Processors and co-conspirators collectively do here, could profitably suppress compensation paid to workers at poultry processing complexes, plants, hatcheries, and feed mills below competitive levels. In such circumstances, poultry processing workers would not be able to defeat such artificial compensation suppression by switching employment to other non-conspiring poultry processors.

455.     There are no close economic and/or functional substitutes for employment at poultry processing complexes, plants, hatcheries, and feed mills from the perspective of workers at those plants. As discussed above, many hourly-paid workers in poultry processing complexes, plants, hatcheries, and feed mills do not speak English and lack significant education. Accordingly,

many hourly-paid workers in poultry processing complexes, plants, hatcheries, and feed mills cannot easily obtain stable employment at a similar level of compensation outside the poultry industry.

456.    Employees in the industry have continually noted these language and educational challenges that many poultry processing workers face. A former employee of Pilgrim's during the Class Period explained that many poultry processing workers never graduated from high school and did not speak English and thus were limited from pursuing work outside a poultry processing facility. A former employee of George's Foods, LLC during the Class Period explained that poultry processors "catered" to workers who did not speak English and lacked a strong educational background and that it would be difficult for poultry processing workers to find employment outside a poultry processing plant because of "communication issues." Similarly, a former human resources manager at a Tyson Foods poultry processing plant explained that poultry processors recruited and thrived from an "underprivileged" workforce that had difficulty communicating in English and had a very limited ability to obtain jobs outside the poultry industry. Indeed, Tyson Foods has formally recognized this challenge faced by its workforce by instituting a program to "enable hourly employees to access English as a second language." Thus, many unskilled or low-skilled jobs such as retail sales, fast food, or some manual labor jobs—which require proficiency in English—are not a reasonable substitute for the majority of workers in the Relevant Market.

457.    In addition, unskilled and low-skilled jobs are not reasonable substitutes for work at poultry processing complexes, plants, hatcheries, and feed mills because those jobs rarely pay more than the minimum wage. By contrast, poultry processing workers earn significantly more than most minimum wages. In part, this is because poultry processing workers have some industry and employer-specific skills, and employers in the poultry processing industry are willing to pay

for those skills. Additionally, as explained above, poultry processing work is extremely dangerous. The types of workers who choose to work in a poultry processing plant prefer to receive extra pay for dangerous labor, instead of accepting lower wages at safer positions. This indicates that unskilled and low-skilled jobs are not reasonable economic substitutes for employment in the Relevant Market, which mostly pays hourly wages well above the minimum wage (but at the same time, less than what poultry processing workers would make in a competitive market).

458.    Similarly, employment at non-poultry meat processing plants is not a reasonable substitute for employment in the Relevant Market. For example, beef processing plants pay processing plant workers substantially more than employers in the Relevant Market—on average beef processing plants pay 25% to 35% higher compensation to plant workers than employers pay plant workers in the Relevant Market. This indicates that plant workers in the Relevant Market cannot readily switch to a job at a beef processing plant because, if such a switch was readily available, employers in the Relevant Market would have had to substantially increase their compensation so as not to lose too many employees to beef processors. The fact that such a significant wage differential can be maintained indicates that beef processing jobs require skills and/or worker attributes that cannot be readily obtained by workers in the Relevant Market, or that beef processing jobs are more dangerous and thus less appealing to workers in the Relevant Market. These differences indicate that beef processing jobs are not functionally interchangeable with jobs in the Relevant Market.

459.    There are also significant lock-in effects that result from developing skills and experience specific to the Relevant Market. For example, once on the job for an appreciable period, poultry processing workers learn new skills, such as those necessary for effectively deboning birds on processing lines. Wayne Farms recognizes this on its website where the company advertises to

potential workers that they can "develop new skills on the job." Defendant Processors value these skills in experienced poultry processing workers and recognize that such skills are differentiated from those necessary for other jobs. For example, Tyson Foods' "Talent Strategy" seeks to hire poultry workers with "the differentiated capabilities and skills that we need for the future." Perdue Farms notes its poultry workers' "unique talents."

460.    Those skills are not transferrable to other jobs even if those other jobs may be generally termed as low-skilled. For example, the skill of deboning a chicken or turkey makes a poultry processing worker a more valuable employee for poultry processing companies, but not for other companies seeking low-skilled manual labor. As a result, workers in the Relevant Market receive higher wages as they gain more experience working in poultry processing complexes, plants, hatcheries, and feed mills (even if those wages are suppressed by the conspiracy). Indeed, each Defendant Processor materially increases wages to poultry processing workers according to their level of experience, which correlates to their skill level and productivity. Those higher wages received for greater skill and experience reduce the substitutability of jobs outside of the Relevant Market and make remaining in poultry processing positions more attractive to poultry processing workers. In other words, those higher wages increase the switching or transaction costs of seeking a position outside the Relevant Market that would not value the skills obtained by the poultry processing worker.

461.    These lock-in effects arising from the development of job-specific skills apply with additional force to salaried poultry processing workers in the Class. These salaried positions require even more training and skills specific to poultry processing that would not be transferable to occupations outside of the Relevant Market and therefore make it even more difficult for salaried poultry processing workers to switch to occupations outside of the Relevant Market.

462. Poultry processing workers, like most laborers, cannot withhold their services until a later date as a means of negotiating for higher compensation. They depend on a regular income. This weakens their negotiating position with poultry processing employers and enhances the Defendant Processors' market power.

463. Recent empirical econometric work has found that many low-skilled occupations face sufficiently inelastic labor supply curves that the occupation would be considered a relevant antitrust market that would satisfy the hypothetical monopsonist test. One recent paper analyzed low-skilled labor markets defined by the 6-digit Standard Occupational Classifications (SOC) tracked by the Bureau of Labor Statistics and found that for each such occupation, a hypothetical monopsonist would find it profitable to decrease wages by at least 5% or more.[9] The paper demonstrates economically that low-skilled occupations can be relevant antitrust markets and thus supports the plausibility of the Relevant Market.

### b. Geographic Market

464. The relevant geographic market is the continental United States. A slight decrease in compensation from the competitive level could be imposed collectively by the poultry processors in the continental United States without causing too many poultry workers to leave the country or move to a different occupation.

465. Defendant Processors set their compensation and recruiting policies for workers at poultry processing complexes, plants, hatcheries, and feed mills largely on a nationwide basis, and therefore treat such workers as if they were participating in a nationwide labor market. Each Defendant Processor establishes compensation for categories of workers at each of their poultry

---

[9] Jose Azar, Steven Berry, and Iona Marinescu, *Estimating Labor Market Power* (Sep. 18, 2019) *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3456277.

processing complexes, plants, hatcheries, and feed mills at identical or near identical levels, regardless of the region, state, county or locality in which those processing facilities are located. Because each Defendant Processor establishes the same, or nearly the same, compensation for categories of workers at their poultry processing facilities regardless of geographic region, state, county, or locality, conduct that suppresses compensation to those workers in one poultry processing facility in a particular location would necessarily suppress compensation to workers employed in all of those poultry processing facilities owned by the Defendant Processor, its subsidiaries, and related entities throughout the continental United States.

### c.    High Collective Market Share and Monopsony Power

466.    Defendant Processors and co-conspirators collectively possess market and monopsony power in the Relevant Market in that they have the power, collectively, and through the challenged conduct, to profitably suppress compensation to workers at poultry processing complexes, plants, hatcheries, and feed mills below competitive levels.

467.    Defendant Processors and co-conspirators pay compensation to workers at poultry processing complexes, plants, hatcheries, and feed mills that comprise more than 90 percent of the Relevant Market.

## D.    Anticompetitive Effects and Injury Suffered by Class Members

468.    As a result of Defendants' anticompetitive conduct alleged herein, competition between Defendant Processors over compensation was restrained or eliminated in the market for workers in poultry processing complexes, plants, hatcheries, and feed mills in the continental United States during the Class Period.

469.    As a result of Defendants' anticompetitive conduct alleged herein, the compensation of workers in poultry processing complexes, plants, hatcheries, and feed mills in the

continental United States was fixed, stabilized, or maintained at artificially depressed levels during the Class Period.

470.    The purpose of the conspiratorial conduct of the Defendants was to depress, fix, or maintain the compensation of workers in poultry processing complexes, plants, hatcheries, and feed mills in the continental United States, and, as a direct and foreseeable result of the conspiratorial conduct, Plaintiffs and the Class received compensation at artificially depressed rates during the Class Period.

471.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their businesses or property, having received lower compensation during the Class Period than they would have received in the absence of Defendants' illegal contract, combination, or conspiracy. As a result, Plaintiffs and the Class have suffered damages.

472.    This is an injury of the type that the antitrust laws were meant to punish and prevent.

473.    During the Class Period, as a result of the conspiracy to restrain and depress compensation, the hourly wages of poultry processing workers employed by Defendant Processors, their subsidiaries, and related entities often only increased approximately 25 cents a year. These annual "raises" for poultry processing workers were perceived by Defendant Processors to be merely cost-of-living adjustments, rather than material increases to compensation.

474.    A former human resources manager at a Tyson Foods poultry processing plant explained that, in practice, these limited annual raises to hourly wages rarely increased total compensation for poultry processing plant workers because those raises were effectively offset by annual increases to health insurance premiums. According to the former Tyson Foods human resources manager, poultry processing plant workers "really never get ahead" of their starting wage.

475.    While compensation paid to Plaintiffs and the Class was artificially depressed during the Class Period, the productivity of those workers greatly increased. One reason for that increase in productivity is that processing line speeds were substantially increased. Between 1999 and 2015, line speeds increased by 54%, poultry production increased by nearly 35%, but inflation-adjusted hourly wages for poultry processing workers, in fact, decreased by more than 1%. As a result, even while Plaintiffs and the Class worked harder during the Class Period, the compensation received by them was artificially depressed. Thus, while labor productivity in poultry processing plants owned by Defendant Processors, their subsidiaries, and related entities has substantially increased over the past two decades, labor costs have declined for Defendant Processors during that same period.

476.    In a competitive market, Defendant Processors would have competed to recruit, hire, and retain workers during the Class Period by offering higher wages, higher salaries, and superior benefits, and many Class Members would have switched employment to different poultry processors as a result of that competition for labor. Yet, by entering into the alleged conspiracy, Defendant Processors were able to reduce and stabilize turnover rates. Defendants' scheme harmonized compensation to Class Members across the poultry processing industry and thus reduced the incentive for Class Members to switch employment between Defendant Processors.

477.    The effects and injuries caused by Defendants' anticompetitive agreement commonly impacted all workers at poultry processing complexes, plants, hatcheries, and feed mills owned by Defendant Processors, their subsidiaries, and related entities in the continental United States because Defendant Processors valued internal equity, *i.e.* the idea that similarly situated employees should be compensated similarly. Each Defendant Processor established a pay structure to accomplish internal equity. Each Defendant Processor established narrow compensation ranges

for poultry processing workers in the continental United States with similar job positions and similar levels of experience and also maintained certain compensation differentials between different poultry processing positions. For example, a former employee of Perdue Foods explained that hourly wage increases for positions in processing plants were made company-wide. Similarly, a former employee of Tyson Foods explained that the company paid poultry processing plant workers "consistently" within each division and position, regardless of the plant's location.

478.     Compensation or wages generally exhibit "rigidity" which means that they take some time to adjust to changes in the labor market for workers. Economists have long recognized that compensation is rigid in labor markets across many industries.[10] This is true in the labor market for workers at poultry processing facilities, meaning it takes compensation and wages a relatively long time to adjust to a change in the market, such as an increase in competition for workers. One reason that compensation for labor in industries such as the poultry processing industry is rigid is that employers bargain with workers relatively infrequently and therefore compensation or wages are only adjusted periodically. Given the rigidity of poultry processing compensation, the effects of Defendants' misconduct lasted for years after their acts in furtherance of the conspiracy.

## VII.   STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.   Continuing Violation

479.     During the Class Period, Defendants' conspiracy was a continuing violation in which Defendants repeatedly invaded Plaintiffs' and Class Members' interests by adhering to, enforcing, and reaffirming the anticompetitive agreement described herein.

---

[10] *See, e.g.*, Armen A. Alchian, *Information Costs, Pricing, and Resource Unemployment*, 7 W. Econ. J. 109 (1969).

480.    Defendants' continuing adherence to, enforcement of, and reaffirmation of the anticompetitive agreement throughout the Class Period was and is consummated through, among other conspiratorial acts, participation in annual Poultry Industry Compensation Surveys to exchange detailed current and future compensation data, attendance at annual Poultry Industry Compensation Meetings to discuss and suppress compensation to Class Members, the monthly exchange of competitively sensitive compensation data through Agri Stats, the renewal of subscriptions to Agri Stats, and other conspiratorial communications between Defendants.

**B.     Fraudulent Concealment**

**1.     Plaintiffs Did Not and Could Not Have Discovered Defendants' Misconduct**

481.    Plaintiffs and other Class Members had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and Class Members did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy to fix and depress compensation paid to workers in poultry processing facilities.

482.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Poultry processors are not exempt from antitrust regulation, and thus, Plaintiffs reasonably considered the poultry processing industry to be competitive until recently. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of wages, salaries, or benefits paid by Defendant Processors to workers in poultry processing facilities in the continental United States.

483.    Plaintiffs exercised reasonable diligence. Plaintiffs and the other Class Members could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable

diligence because of the deceptive practices and techniques of secrecy employed by Defendants and co-conspirators to conceal their combination.

### 2. Defendants Actively Concealed the Conspiracy

484.    Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and the other Class Members.

485.    The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to, conducting secret "off the books" meetings, engaging in surreptitious communications that do not create or involve written records, exchanging competitively sensitive compensation data through a nonpublic and proprietary system, and concealing the existence and results of commissioned compensation surveys. Defendants formed and implemented the combination and conspiracy in a manner specifically designed to avoid detection.

486.    During the Class Period, Defendants affirmatively and falsely represented that they paid wages, salaries, and benefits reflective of a competitive market for labor. For example, in October 2015, in response to a report from Oxfam America decrying compensation and working conditions in chicken processing plants in the United States, Tyson Foods said in a statement, "We believe in fair compensation, a safe and healthy work environment and in providing workers with a voice." Perdue Farms also responded to the Oxfam America report by stating in October 2015 that the company provides "competitive wages" above minimum wage. That same month, the National Chicken Council and U.S. Poultry & Egg Association—the two leading trade associations that are controlled by and represent the interests of Defendant Processors—issued a joint statement that provides: "Poultry processing plants compete for the local workforce and therefore must pay

competitive wages and offer competitive benefits. … Poultry processing companies offer competitive insurance benefits that includes family and dependent coverage." These false representations were used to conceal the conspiracy.

487.  Defendant Processors also advertised to potential processing plant employees that the compensation offered and provided was "competitive," *i.e.* the result of competition in the labor market for poultry processing employees. For example, Tyson Foods claims in public advertisements that its compensation is "competitive." The company further states on its website, under the title "Fair Compensation": "We offer employees competitive pay and benefits…" Similarly, Perdue Farms advertises on its website: "We offer competitive wages and a comprehensive benefits package…" Wayne Farms advertises on its website that it offers "comprehensive and competitive" benefits. The Chief Operating Officer of Sanderson Farms called the company's wages and benefits "among the most comprehensive offered in the poultry industry, or for that matter, any industry." Indeed, all Defendant Processors have made similar statements that falsely indicated Defendant Processors' compensation for poultry processing workers was determined through genuine competition in the labor market with other Defendant Processors.

488.  Defendants took affirmative and specific steps to fraudulently conceal each component of the compensation-fixing conspiracy.

489.  First, Defendant Processors hired WMS to conceal their misconduct. As Jonathan Meng of WMS has described, several Defendant Processors regularly met behind closed doors to directly exchange and discuss their compensation and hiring practices *prior* to hiring WMS in 2000. WMS was retained to allow Defendant Processors to continue this illicit exchange, with the veneer of legality. Despite hiring WMS to conduct the Poultry Industry Compensation Survey,

Defendant Processors maintained full control of the Poultry Industry Compensation Survey. Defendant Processors also took actions to purposefully exclude WMS from roundtable sessions at annual Poultry Industry Compensation Meetings, where they discussed and ultimately agreed to suppress the compensation of Class Members. Mr. Meng himself "ultimately concluded that the members of the Poultry Industry Survey Group likely hired WMS as an independent consultant to establish the appearance of compliance with the Safe Harbor Guidelines and antitrust law." Specifically, Mr. Meng "came to believe that, even while retaining WMS to conduct surveys, the members of the Poultry Industry Survey Group were (1) exchanging compensation data in a manner that allowed them to identify the wages, salaries, and benefits that each poultry processor was providing to poultry complex workers and (2) discussing both future and optimal compensation practices and rates during meetings and communications that excluded WMS."

490.     Second, as Mr. Meng explained, Defendant Processors took steps "to conceal both the existence of, and their participation in, the Poultry Industry Compensation Surveys." The Poultry Industry Survey Group's Operating Standards specifically stated that each member of the Poultry Industry Survey Group must: "Agree and ensure that shared survey data or other information from discussions will be used and treated in a 'confidential' manner and definitely should not be shared with companies not participating in the survey. Failure to meet these requirements will result in immediate removal from the survey group." Each of the Poultry Industry Compensation Surveys and each of the Survey Results Reports provided to Defendant Processors specifically mandated that: ███████████████████████████████████████ ███████████████████████ In fact, any Defendant Processor seeking to allow third-party vendors to use the Survey Results Reports—even for purely internal purposes—were required to have that third party sign a strict nondisclosure agreement. Defendant Processors were also careful

not to let too many of their employees learn of the Poultry Industry Compensation Surveys. For example, ███████████████████████ emailed other ██████████████████ ██████████████████ admonishing them: ██████████████████████████████ ██████████████████████

491.    Third, according to a former executive of Perdue Farms, Defendant Processors' annual Poultry Industry Compensation Meetings were kept "off the books" due to the "confidential nature of communications." While these Poultry Industry Compensation Meetings often occurred around the same time as the U.S. Poultry & Egg Association's well-publicized annual Human Resources Seminar, the Meetings were not part of the association's published schedule (or any other association's published schedule).

492.    Fourth, Defendant Processors required in-person attendance at the Poultry Industry Compensation Meetings, rather than permitting the remote exchange and discussion of compensation data. This requirement ensured that attendees of the Poultry Industry Compensation Meetings discussed and depressed the compensation of Class Members in a confidential setting without leaving a paper trail.

493.    Fifth, Defendant Processors took multiple steps to conceal the actual substance of their compensation-fixing discussions at Poultry Industry Compensation Meetings. Defendant Processors excluded Mr. Meng and other potential witnesses from those roundtable sessions; Mr. Meng concluded that he was excluded "so that the attendees could engage in improper discussions about the Survey results and compensation practices without my halting or witnessing those discussions." The written agendas for the Poultry Industry Compensation Meetings also failed to disclose the purpose or details of the roundtable sessions. And in advance of those roundtable

discussions, the Steering Committee routinely reminded attendees via email that those "discussions are expected to be kept confidential."

494.    Sixth, Defendant Processors employed sham data anonymization techniques in the Poultry Industry Compensation Survey to create the illusion of legality and conceal the true purpose of the data exchange: to facilitate a compensation fixing scheme. For example, from at least 2001 through 2004, the Poultry Industry Compensation Survey included disaggregated, raw data on salaries, wages, and benefits that was sorted by processor. Though a letter code replaced each processor's name to purportedly anonymize the data, the report also included detailed demographics for each letter code. As Jonathan Meng of WMS concluded, this meant Survey participants "could match each participating processor with each letter code." Similarly, from 2013 through 2016, Defendant Processors circulated disaggregated, raw data in both the Poultry Industry Compensation Survey and the Tyson-Sponsored Hourly Plant Maintenance and Production Survey that was designed to be readily deanonymized. Defendant Processors insisted on keeping this format despite warnings from Mr. Meng and others that the format allowed deanonymization. Finally, each year, WMS circulated results of the Poultry Industry Compensation Survey with the names of Defendant Processors replaced by a randomly assigned number: yet, attendees at the annual Poultry Industry Compensation Meeting could readily ascertain which processor had reported which compensation data. A former Perdue Farms executive explained that Meeting attendees could determine which company reported which compensation data because "you're sitting in a meeting and the person across from you [from a competing processor] is reporting on what they do."

495.    Seventh, Agri Stats concealed the work that it performed on behalf of Defendant Processors. In 2009, the President of Agri Stats, Blair Snyder, commented on the secretive nature

of Agri Stats: "There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do." Indeed, when *Businessweek* sought to interview the President of Agri Stats for an article published in February 2017, he responded by email, "We view our operations and strategy as confidential and proprietary information and not appropriate to discuss in a public forum." The *Businessweek* article notes that the data maintained by Agri Stats is "remarkable not only for its size but also for the secrecy with which it's kept."

496.    Eighth, only poultry processors willing to provide their own disaggregated compensation data to Agri Stats and willing to pay millions of dollars in fees to Agri Stats could access the compensation data collected and distributed by Agri Stats during the Class Period. Accordingly, Plaintiffs and other poultry processing workers could not possibly have obtained access to the data that Agri Stats provided to Defendant Processors during the Class Period. In 2019, *The Guardian* obtained a "leaked" copy of an Agri Stats report and described some of its contents; the article, which was published in August 2019, describes Agri Stats as "a secretive data-sharing firm" and notes that "none of the information in Agri Stats' reports is available to the farmers" which "puts them at a severe disadvantage when they try to negotiate contracts or ask for pay rises [sic]."

497.    Ninth, Agri Stats employed sham anonymization techniques to create the illusion of anonymity and of legality. While Agri Stats claimed the data distributed each month was anonymous, that data was sufficiently granular and disaggregated that executives of Defendant Processors could and did easily match the distributed compensation data to specific poultry processing ███████, plants, ████████, and ████████ in specific regions. A former Perdue Farms employee said that Agri Stats data was "supposedly confidential" but that Perdue Farms

and every other subscribing poultry processor knew precisely which company reported which data. These sham anonymization techniques assured that if an Agri Stats report was ever leaked to the public or government enforcement authorities, the report would on its surface appear to be anonymized.

498.    Tenth, Agri Stats fraudulently concealed and expressly denied that the data it exchanged between poultry processors could be reverse engineered by those companies' executives. According to an article published in *The Guardian* in August 2019, Agri Stats has denied that "the data in its reports were identifiable to industry insiders," claiming that "it preserves confidentiality among processors by masking the sources of the data it reports" and thus "couldn't be used by competitors in an anti-competitive manner." Agri Stats knew these statements to be false. According to the same 2019 article, Rita Korn, a former senior executive assistant and office manager for Agri Stats, stated that executives of poultry processors could readily determine which poultry plant had reported which data: "Anybody that followed those numbers and had a brain in their head—if they were in top management at one of those places—they knew who was who in those books. Your job is to figure out who was who in this book. I think they cared more about that than they did their own numbers."

499.    Eleventh, when engaging in collective bargaining negotiations, Defendant Processors did *not* disclose disaggregated, plant-specific Agri Stats wage data to unions or their members. A former employee of Allen Harim explained that Agri Stats data was "extremely confidential" and only accessed by "executives and Agri Stats themselves" and that the processor would not disclose Agri Stats reports to union members because then those members would know "how profitable the company is" and how it is maximizing yield at the lowest cost. Accordingly,

when Defendants Processors mentioned Agri Stats during collective bargaining negotiations, they only cited average, industrywide Agri Stats figures.

500.    Disclosures during union negotiations of the mere "average" industrywide pay figures did not and could not put those unions or their members on any type of notice of the possibility that Defendant Processors were unlawfully exchanging disaggregated compensation data. Rather, at most, the disclosures could only inform the unions and their members of the fact that poultry processors were using a benchmarking company's data to inform their wages, which is insufficient to permit a circumstantial inference of collusion.

501.    Twelfth, Defendant Processors also concealed the exchanges of current and future compensation data between rival poultry processing complexes and plants from the Plaintiffs and the public. When managers of poultry processing complexes and plants operated by Defendant Processors or their subsidiaries collected current or future wage rates from managers of competing poultry processing complexes and plants, that exchanged data was *not* disclosed to poultry processing workers. Indeed, multiple Class Members have made clear that they were never informed by their employers of wage rates at rival poultry processing complexes or plants, let alone provided copies of compensation schedules comparing those rates. Instead, complex and plant managers who exchanged such compensation data transmitted that data directly to, and only to, their respective corporate headquarters, where executives used the information to facilitate the setting of company-wide wages.

502.    By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and the other Class Members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

## VIII.   CLASS ACTION ALLEGATIONS

503.   Plaintiffs Judy Jien, Kieo Jibidi, Elaisa Clement, Glenda Robinson, Emily Earnest, and Kevin West bring this action on behalf of themselves, and on behalf of the members of the following Class, under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3):

> All persons employed by Defendant Processors, their subsidiaries, and/or related entities at poultry processing plants, poultry hatcheries, poultry feed mills, and/or poultry complexes in the continental United States from January 1, 2000 until July 20, 2021.

504.   The claims of the Class are brought against all the Defendants, except for Pilgrim's and George's.

505.   Plaintiffs Judy Jien, Kieo Jibidi, Elaisa Clement, Glenda Robinson, and Emily Earnest bring this action on behalf of themselves, and on behalf of the members of the following Subclass, under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3):

> All persons employed by Defendant Processors, their subsidiaries, and/or related entities at poultry processing plants in the continental United States from January 1, 2009 until July 20, 2021.

506.   The claims of the Subclass are brought against Pilgrim's and George's.

507.   The following persons and entities are excluded from the proposed Class and Subclass: complex managers, plant managers, human resources managers, human resources staff, office clerical staff, guards, watchmen, and salesmen; Defendants, co-conspirators, and any of their subsidiaries, predecessors, officers, or directors; and federal, state, or local governmental entities.

508.   The Class and Subclass definitions provide clear, objective criteria understood by Class Members, Subclass Members, and Defendants, and they allow the parties to identify the members of the Class and Subclass.

509.   Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed.

510.    The Class and the Subclass are each so numerous that joinder of all members of the Class or the Subclass in this action is impracticable. Plaintiffs are informed and believe, and on that basis allege, that the proposed Class and Subclass each contain hundreds of thousands of similarly situated workers.

511.    The Class and the Subclass are each readily identifiable and are ones for which records should exist.

512.    Plaintiffs' claims are typical of those of the Class and the Subclass. Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the Class and the Subclass, and the relief sought is common to the Class and the Subclass.

513.    Plaintiffs, Class Members, and Subclass Members were injured by the same unlawful conduct, which resulted in them receiving less in compensation for working in poultry processing facilities than they would have in a competitive market.

514.    Plaintiffs will fairly and adequately protect and represent the interests of the Class and the Subclass. The interests of the Plaintiffs are aligned with, and not antagonistic to, the Class and the Subclass.

515.    Questions of law and fact common to Class Members and Subclass Members predominate over questions, if any, that may affect only individual members because Defendants have acted and refused to act on grounds generally applicable to Class Members and Subclass Members.

516.    Questions of law and fact common to the Class and the Subclass include:

• Whether Defendants engaged in an agreement, combination, or conspiracy to fix, depress, maintain, or stabilize the compensation paid to Class Members and Subclass Members;

- Whether Defendants' exchange of nonpublic, competitively sensitive information about compensation paid to Class Members and Subclass Members constitutes, or furthered, an agreement, combination, or conspiracy in restraint of trade;

- Whether such agreements constituted violations of the Sherman Antitrust Act;

- The identity of the participants of the alleged conspiracy;

- The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

- Whether Defendants fraudulently concealed their misconduct;

- Whether and to what extent Defendants' anticompetitive scheme suppressed compensation paid to Class Members and Subclass Members below competitive levels;

- The nature and scope of injunctive relief necessary to restore competition; and

- The measure of damages suffered by Plaintiffs, the Class, and the Subclass.

517. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

518. Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The relatively small damages suffered by individual members of the Class and the Subclass compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class or the Subclass to seek redress for the violations of law herein alleged. Further, individual joinder

of all damaged members of the Class and the Subclass is impractical, and the prosecution of separate actions by individual members of the Class and the Subclass would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that is not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

519.   Defendants have acted on grounds generally applicable to the Class and the Subclass, thereby making final injunctive relief appropriate with respect to the Class and the Subclass as a whole.

## IX.   CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### CONSPIRACY TO DEPRESS COMPENSATION IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT
**(Against All Defendants, except Peco Foods and Agri Stats)**

520.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

521.   Beginning in January 1, 2000 and continuing through the present, Defendants Perdue Farms, Perdue Foods, Tyson Foods, Keystone, Pilgrim's, Sanderson Farms, Koch Foods, Wayne Farms, Mountaire Farms, Simmons Foods, Fieldale Farms, George's, Inc., George's Foods, LLC, Foster Farms, Case Foods, Inc., Case Farms, LLC, O.K. Foods, Allen Harim, Amick Farms, Mar-Jac Poultry, Butterball, Jennie-O Turkey Store, Cargill, and WMS, as well as their co-conspirators, entered into a continuing agreement, understanding, and conspiracy in restraint of trade to fix, depress, maintain, and stabilize the compensation paid to workers at their poultry

processing complexes, plants, hatcheries, and feed mills in the continental United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

522.   In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants Perdue Farms, Perdue Foods, Tyson Foods, Keystone, Pilgrim's, Sanderson Farms, Koch Foods, Wayne Farms, Mountaire Farms, Simmons Foods, Fieldale Farms, George's, Inc., George's Foods, LLC, Foster Farms, Case Foods, Inc., Case Farms, LLC, O.K. Foods, Allen Harim, Amick Farms, Mar-Jac Poultry, Butterball, Jennie-O Turkey Store, Cargill, and WMS, as well as their co-conspirators, did those things that they combined and conspired to do, including but not limited to:

523.   Reached agreements—through in-person meetings, exchanges of information, and other communications—to fix, depress, maintain, and stabilize the compensation paid to workers at their poultry processing complexes, plants, hatcheries, and feed mills in the continental United States;

524.   Implemented, monitored, and enforced that conspiracy to depress compensation through the regular exchange of competitively sensitive, nonpublic, and detailed compensation data with the assistance of Agri Stats and WMS; and

525.   Paid the fixed, depressed, maintained, and stabilized compensation to their employees at poultry processing complexes, plants, hatcheries, and feed mills in the continental United States.

526.   This conspiracy to fix, depress, maintain, and stabilize compensation is a *per se* violation of Section 1 of the Sherman Act.

527.   The combination and conspiracy alleged herein has had the following effects, among others:

528.    Competition for the hiring and retaining of workers at poultry processing complexes, plants, hatcheries, and feed mills operated by Defendant Processors, their subsidiaries, and/or related entities has been restrained, suppressed, and/or eliminated in the continental United States; and

529.    Compensation paid to employees at poultry processing complexes, plants, hatcheries, and feed mills operated by Defendant Processors, their subsidiaries, and/or related entities has been fixed, depressed, maintained and stabilized at artificially low, noncompetitive levels throughout the continental United States.

530.    Plaintiffs, the other Class Members, and the other Subclass Members have been injured in their businesses and property by receiving less compensation from Defendant Processors, their subsidiaries, and/or related entities than they would have in the absence of the combination and conspiracy.

**SECOND CLAIM FOR RELIEF**

**CONSPIRACY TO EXCHANGE COMPENSATION INFORMATION
IN VIOLATION OF SECTION 1 OF SHERMAN ANTITRUST ACT
(Against All Defendants)**

531.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

532.    Beginning in January 1, 2000 and continuing through the present, Defendants and their co-conspirators have engaged in a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and non-public information about the compensation being paid or to be paid to their employees at poultry processing complexes, plants, hatcheries, and feed mills in the continental United States. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

533.    The relevant market is the labor market for employment at poultry processing complexes, plants, hatcheries, and feed mills in the continental United States, and the relevant geographic market is the continental United States.

534.    Defendant Processors and co-conspirators collectively possess market power in the Relevant Market. Defendant Processors and co-conspirators together control more than 90 percent of the Relevant Market. Defendant Processors' and co-conspirators' collective market power includes the power to jointly set compensation for workers at poultry processing complexes, plants, hatcheries, and feed mills in the continental United States below competitive levels. This joint power clearly exists because it has been used by Defendant Processors and co-conspirators to pay Class Members and Subclass Members sub-competitive compensation.

535.    Defendants could and did profitably suppress compensation paid to workers at poultry processing complexes, plants, hatcheries, and feed mills in the continental United States below competitive levels. In such circumstances, poultry processing workers would not be able, and were not able, to defeat such artificial compensation suppression by switching their employment to non-conspiring poultry processors, as Defendant Processors and co-conspirators control more than 90 percent of the poultry processing complexes, plants, hatcheries, and feed mills.

536.    A slight decrease in compensation to workers at poultry processing complexes, plants, hatcheries, and feed mills in the continental United States from a competitive level could be imposed collectively by the Defendant Processors without causing too many such workers to switch employment to non-poultry occupations.

537.    Defendant Processors view workers that comprise the Class as fungible. Workers within the same positions are generally interchangeable, permitting Defendant Processors to readily compare and match each other's compensation.

538.    The information regularly exchanged by and between Defendant Processors pursuant to the agreement has consisted of detailed, competitively sensitive, and non-public information about current and future compensation to workers at poultry processing complexes, plants, hatcheries, and feed mills. The information exchanges specifically included:

539.    The exchange each month, through Agri-Stats, of *current* compensation for categories of workers at poultry processing complexes, plants, hatcheries, and feed mills in the continental United States operated by Defendant Processors and co-conspirators;

540.    The exchange each year, through the Poultry Industry Compensation Survey, of salaries, wages and benefits provided to positions at poultry processing complexes, plants, hatcheries, and feed mills in the continental United States operated by Defendant Processors and co-conspirators;

541.    The oral exchange each year, at in-person Poultry Industry Compensation Meetings, of current and future compensation paid to categories of workers at poultry processing complexes, plants, hatcheries, and feed mills operated by Defendant Processors;

542.    Regular email and telephonic exchanges directly between Defendant Processors' executives regarding compensation practices and plans, including the timing of future compensation increases and the scope of particular benefits;

543.    Frequent exchanges between managers of complexes and plants—through telephone calls, emails and electronic listservs—of current and future compensation paid to

categories of workers at particular poultry processing complexes and plants operated by Defendant

Processors and co-conspirators.

544.    Defendant Processors' regular compensation information exchanges, directly and

through Agri Stats and WMS, reflected concerted action between horizontal competitors in the

Relevant Market.

545.    Each Defendant Processor furnished competitively sensitive information to other

Defendant Processors with the understanding that it would be reciprocated. That is, one Defendant

Processor would not have provided information to Agri Stats or WMS or directly to another

Defendant Processor without the understanding that they would receive comparable information

from other Defendant Processors.

546.    The exchanging of such compensation information by Defendant Processors is

inconsistent with the joint guidance provided by the DOJ and the FTC. In October 2016, the two

agencies issued a joint "Antitrust Guidance for Human Resource Professionals," updating and

building upon the Safe Harbor guidelines issued in 1996. That 2016 Antitrust Guidance states:

> Sharing information with competitors about terms and conditions of
> employment can also run afoul of the antitrust laws. Even if an
> individual does not agree explicitly to fix compensation or other
> terms of employment, exchanging competitively sensitive
> information could serve as evidence of an implicit illegal agreement.
> While agreements to share information are not per se illegal and
> therefore not prosecuted criminally, they may be subject to civil
> antitrust liability when they have, or are likely to have, an
> anticompetitive effect. Even without an express or implicit
> agreement on terms of compensation among firms, evidence of
> periodic exchange of current wage information in an industry with
> few employers could establish an antitrust violation because, for
> example, the data exchange has decreased or is likely to decrease
> compensation. …
>
> However, not all information exchanges are illegal. It is possible to
> design and carry out information exchanges in ways that conform

with the antitrust laws. For example, an information exchange may
be lawful if:

- a neutral third party manages the exchange,

- the exchange involves information that is relatively old,

- the information is aggregated to protect the identity of the underlying sources, and

- enough sources are aggregated to prevent competitors from linking particular data to an individual source.

547.    The compensation information exchanges by Defendant Processors—through compensation surveys, Poultry Industry Compensation Meetings, Agri Stats, email and telephonic communications between Defendant Processors' executives, exchanges between managers of rival complexes and plants, and other means—have not complied with three of the four criteria established by the DOJ and FTC and violated the federal antitrust laws. The exchanged compensation information was not "relatively old" or historical; rather, the information concerned *current* and *future* compensation, including current wages paid by Defendant Processors that were exchanged each month of the Class Period through Agri Stats and future compensation information exchanged through both annual Poultry Industry Compensation Surveys and direct communications between Defendant Processors' executives. The exchanged compensation information was not "aggregated to protect the identity of the underlying sources"; rather, the information was *disaggregated*, as distinct compensation information was provided for poultry processing complexes, plants, hatcheries, and feed mills operated by each Defendant Processor and co-conspirator. The exchanged compensation information was not presented in a manner "to prevent competitors from linking particular data to an individual source"; rather, the information was shared in such a disaggregated manner that Defendant Processors' executives readily and predictably could and did reverse engineer the information to match specific compensation data to

individual poultry processing complexes, plants, hatcheries, and feed mills operated by competitors.

548.    The agreement to exchange compensation information eliminated a major incentive for Defendant Processors and co-conspirators to increase compensation to workers at their poultry processing complexes, plants, hatcheries, and feed mills in the continental United States during the Class Period. The advantage of raising compensation is to retain and attract more such workers by exceeding the compensation paid by competing poultry processing complexes, plants, hatcheries, and feed mills.

549.    The agreement to regularly exchange detailed and non-public information about current and prospective compensation to workers at poultry processing complexes, plants, hatcheries, and feed mills in the continental United States assured that the provision of superior compensation by any Defendant Processor would be timely and specifically known by its competitors. Such an agreement, therefore, eliminated the incentive of each Defendant Processor to outbid its competitors during the Class Period.

550.    When poultry processors that are competing for the same workers exchange their compensation plans and levels, comfort replaces uncertainty and reduces incentives to raise wages, salaries or benefits. Accordingly, each Defendant Processor used the compensation data obtained through the information exchanges to reduce the uncertainty that they should have faced from not knowing what their competitors were offering and providing in the labor market. This strategic information was a material factor in Defendant Processors' decisions to depress and stabilize compensation paid to workers at their and their related entities' poultry processing complexes, plants, hatcheries, and feed mills in the continental United States during the Class Period.

551.    The exchange of compensation information between Defendant Processors during the Class Period increased their relative bargaining power in setting wages, salaries, and benefits for workers at poultry processing complexes, plants, hatcheries, and feed mills owned by Defendants, their subsidiaries, and related entities in the continental United States. With such information, Defendant Processors knew what their competitors were paying comparable workers, while those workers and new applicants lacked access to most or all of such information and thus knew much less about the competitive landscape.

552.    The regularity and detail of the compensation information exchanged, the related communications about compensation between individuals exchanging the information, the relationships of trust developed among the individuals exchanging the information, and the pervasive desire to control and restrain labor costs, encouraged Defendants and their co-conspirators to use the information to depress each other's compensation levels for workers at their poultry processing complexes, plants, hatcheries, and feed mills in the continental United States during the Class Period.

553.    Defendants' unlawful agreement to exchange, and the actual exchanges of, nonpublic, timely and detailed compensation data was not reasonably necessary to further any procompetitive purpose. The information exchanged between Defendant Processors and their high-level executives was disaggregated, company-specific, current, and forward-looking, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

554.    The information-exchange agreement has had the effect of (1) reducing and suppressing competition among Defendant Processors, their subsidiaries, and related entities for

the compensation of workers at their poultry processing complexes, plants, hatcheries, and feed mills in the continental United States and (2) depressing the compensation of such employees.

555.    As a result of the unlawful agreement alleged herein to exchange compensation information during the Class Period, Plaintiffs, the other Class Members, and the other Subclass Members have been injured in their business or property by receiving artificially depressed compensation.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the Class, and the Subclass, pray that:

The Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class and the Subclass defined herein, appoint Plaintiffs as Class Representatives and (where appropriate) Subclass Representatives and their counsel of record as Class and Subclass Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class and the Subclass once certified;

A.    Defendants' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

B.    Plaintiffs, the other Class Members, and the other Subclass Members recover their damages from each Defendant, jointly and severally, in an amount to be determined, and that this damages amount be trebled pursuant to 15 U.S.C. § 15(a);

C.    Plaintiffs, the other Class Members, and the other Subclass Members be awarded pre- and post-judgment interest as allowed by law and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

D. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other entities or persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect;

E. Plaintiffs, the other Class Members, and the other Subclass Members recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

F. Plaintiffs, the other Class Members, and the other Subclass Members be granted such other relief as the case may require and deemed proper to this Court.

## XI. JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable in this case.

Dated: January [  ], 2022

Respectfully submitted,

 /s/ Matthew K. Handley
Matthew K. Handley (D. Md. Bar # 18636)
Rachel E. Nadas (admitted *pro hac vice*)
Stephen Pearson (admitted *pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
200 Massachusetts Avenue, NW, Seventh Floor
Washington, DC 20001
Telephone: (202) 559-2433
mhandley@hfajustice.com
rnadas@hfajustice.com
spearson@hfajustice.com

George F. Farah (admitted *pro hac vice*)
Rebecca P. Chang (admitted *pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
33 Irving Place
New York, NY 10003
Telephone: (212) 477-8090
gfarah@hfajustice.com
rchang@hfajustice.com

William H. Anderson (admitted *pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
4730 Table Mesa Drive, Suite G-200
Boulder, CO 80305
Telephone: (202) 559-2433
wanderson@hfajustice.com

Daniel A. Small (D. Md. Bar # 20279)
Benjamin D. Brown (admitted *pro hac vice*)
Brent W. Johnson (admitted *pro hac vice*)
Daniel Silverman (admitted *pro hac vice*)
Alison S. Deich (admitted *pro hac vice*)
Louis Katz (admitted *pro hac vice*)
Zachary Krowitz (D. Md. Bar # 22370)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, 5th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile:  (202) 408-4699
dsmall@cohenmilstein.com
bbrown@cohenmilstein.com
bjohnson@cohenmilstein.com
dsilverman@cohenmilstein.com
adeich@cohenmilstein.com
lkatz@cohenmilstein.com
zkrowitz@cohenmilstein.com

Steve W. Berman (admitted *pro hac vice*)
Breanna Van Engelen (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com
breannav@hbsslaw.com

Shana E. Scarlett (admitted *pro hac vice*)
Rio R. Pierce (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
shanas@hbsslaw.com
riop@hbsslaw.com

*Interim Co-Lead Counsel for Plaintiffs*
*and the Proposed Class and Subclass*

W. Joseph Bruckner (admitted *pro hac vice*)
Brian D. Clark (admitted *pro hac vice*)
Maureen Kane Berg (admitted *pro hac vice*)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile:  (612) 339-0981
wjbruckner@locklaw.com
bdclark@locklaw.com
mkberg@locklaw.com

*Additional Counsel for the Plaintiffs and Proposed*
*Class and Subclass*

Eric L. Cramer (admitted *pro hac vice*)
Candice J. Enders (admitted *pro hac vice*)
Julia R. McGrath (admitted *pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
ecramer@bm.net
cenders@bm.net
jmcgrath@bm.net

David Hughes (*pro hac vice* forthcoming)
Nicole Hughes (*pro hac vice* forthcoming)
HARDIN & HUGHES, LLP
2121 14th Street
Tuscaloosa, AL 35401
Telephone: (205) 523-0465
dhughes@hardinhughes.com
nhughes@hardinhughes.com

*Counsel for Plaintiff Glenda Robinson*

Kellie Lerner (admitted *pro hac vice*)
Noni J. Nelson (*pro hac vice* forthcoming)
ROBINS KAPLAN LLP
399 Park Avenue, Suite 3600
New York, NY 10022
Telephone: (212) 980-7400
Facsimile:  (212) 980-7499
hsalzman@robinskaplan.com
klerner@robinskaplan.com
nnelson@robinskaplan.com

Aaron M. Sheanin (admitted *pro hac vice*)
ROBINS KAPLAN LLP
2440 W. El Camino Real, Suite 100
Mountain View, CA 94040
Telephone: (650) 784-4040
Facsimile:  (650) 784-4041
asheanin@robinskaplan.com

M. Stephen Dampier (*pro hac vice* forthcoming)
THE DAMPIER LAW FIRM, P.C.
11 N. Water Street, Suite 10290
Mobile, AL 36602
Tel.: (251) 929-0900
Fax: (888) 387-1930
stevedampier@dampierlaw.com

*Counsel for Plaintiff Emily Earnest*