**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| JUDY JIEN, et al., | Case No. 1:19-CV-2521-SAG |
|                        Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR AMENDED MOTION FOR LEAVE TO FILE THIRD AMENDED CONSOLIDATED COMPLAINT** |
| vs. | |
| PERDUE FARMS, INC., et al., | |
|                       Defendants. | **REDACTED** |

## I.    INTRODUCTION

On November 19, 2021, Plaintiffs executed a settlement agreement with Defendant Webber, Meng, Sahl and Company, Inc. ("WMS") and, pursuant to that agreement, obtained a declaration from WMS President Jonathan Meng ("Meng Declaration"). Across 109 pages, the Meng Declaration provides previously unknown details about the formation, duration, and operation of Defendants' conspiracy and explains how Defendant Processors "used WMS as an unwitting tool to conceal their misconduct." Third Amended Consolidated Complaint ("TAC") ¶ 8 (attached as Exhibit 1).[1] In addition to this watershed declaration, Plaintiffs recently obtained documents from Defendants WMS, George's, Inc. ("George's"), and Agri Stats, Inc. ("Agri Stats"). Collectively, these newly discovered materials show that Plaintiffs only found the tip of the iceberg in their pre-filing investigation: Defendants' conspiracy to suppress compensation was longer and more robust than Plaintiffs knew when they filed their previous complaints.

---

[1] A redline showing the changes between the Second Amended Consolidated Complaint and the TAC is attached as Exhibit 2.

According to Mr. Meng's declaration, Defendant Processors told him that, in the 1990s, they met behind closed doors to directly exchange and discuss compensation data with each other. *Id.* ¶ 220. In 2000, they hired WMS to facilitate their data exchanges, creating an "appearance of compliance" with antitrust law while they "continued to exchange disaggregated and deanonymized compensation data and continued to discuss and harmonize their compensation practices." *Id.* ¶¶ 8, 225. Each year from 2000 to 2019, Defendant Processors "collaborated to determine the contents and structure" of an annual compensation survey and paid WMS to administer that survey and compile the results into a report. *Id.* ¶ 238. For many years, Defendant Processors insisted that those reports display disaggregated compensation information (allowing Defendant Processors to determine which of their competitors contributed which data) and the amount that Defendant Processors intended to pay workers in the future. *Id.* ¶¶ 252, 261. After receiving the reports containing the survey results, Defendant Processors held days of roundtable discussions during which they "revealed and discussed their particular compensation practices, future compensation plans, and optimal compensation rates with each other behind closed doors." *Id.* ¶ 358. Multiple Defendant Processors eventually withdrew from the compensation surveys and roundtable discussions on the advice of their own counsel for fear of antitrust liability.

The documents produced by Defendant George's also provide insight into the breadth and mechanics of Defendants' conspiracy to depress compensation. Those documents show that executives of poultry processors communicated *directly* about compensation practices by email, often seeking their competitors' input before making changes to their own wages or benefits. For example, █████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████



*Id.* ¶ 377.

*Id.* ¶ 379.

Documents produced by Agri Stats similarly show that the conspiracy was broader than Plaintiffs initially understood. Specifically, they show that Agri Stats collected and distributed, ▮

In light of the evidence obtained from WMS, George's, and Agri Stats, Plaintiffs respectfully request leave to file the TAC to conform the pleadings to the newly discovered facts, including by:

- Broadening the "Class" definition to encompass workers at poultry hatcheries, poultry feed mills, and poultry complexes;[2]

- Moving the start of the Class Period to 2000 to comport with the evidence that Defendant Processors hired WMS to administer anticompetitive compensation surveys in 2000;

---

[2] The TAC defines the "Class" as consisting of all persons employed by Defendant Processors, their subsidiaries, and/or related entities at poultry processing plants, poultry hatcheries, poultry feed mills, and/or poultry complexes in the continental United States from January 1, 2000 until July 20, 2021 (the "Class Period"). The TAC alleges the claims of the Class against all Defendants except settling Defendants Pilgrim's Pride Corporation, George's, Inc., and George's Foods, LLC. The TAC also defines a subclass ("Subclass") consisting of all persons employed by Defendant Processors, their subsidiaries, and/or related entities at poultry processing plants in the continental United States from January 1, 2009 until July 20, 2021 ("Subclass Period"). The TAC alleges the claims of Subclass solely against settling Defendants Pilgrim's Pride Corporation, George's, Inc., and George's Foods, LLC.

- Detailing how Defendant Processors disclosed their compensation schedules and discussed future compensation plans at annual roundtable meetings held to fix wages;

- Naming six additional poultry processors that participated in the unlawful compensation surveys, private roundtable meetings, and Agri Stats subscriptions as defendants;

- Describing how Defendant Processors' executives directly emailed and surveyed each other regarding compensation plans in furtherance of the conspiracy; and

- Recounting how multiple Defendant Processors withdrew from compensation surveys and roundtable sessions on the advice of counsel due to a fear of antitrust liability.

Plaintiffs also request leave to add an additional Class representative.

The Court should grant this motion for leave to amend in light of Rule 15's liberal standard favoring amendment and the Fourth Circuit's support for "conform[ing] the pleadings" to facts "obtained during discovery" that "arise from the same controversy" and legal theories as "the balance of the complaint." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

## II.   <u>FACTUAL BACKGROUND</u>

On November 2, 2020, Plaintiffs filed a Second Amended Consolidated Complaint ("SAC") alleging that fourteen poultry processing companies ("Defendant Processors") and two consulting companies (Agri Stats and WMS) conspired to suppress poultry processing compensation for over a decade. In furtherance of the conspiracy, the SAC alleged that Defendant Processors:

- "held recurring 'off the books' in-person meetings . . . during which they exchanged information about, discussed, agreed upon and ultimately fixed the wages, salaries and benefits of Class Members at artificially depressed levels";

- "exchanged detailed, current and non-public compensation information through surveys conducted by Agri Stats and WMS"; and

- directed "managers located at Defendant Processors' poultry processing plants" to engage "in bilateral and regional exchanges of wage, salary and benefits information."

ECF No. 386 ¶¶ 6-8. On March 10, 2021, the Court denied motions to dismiss the SAC. *See* Mem. Op., ECF No. 414; Order, ECF No. 415.

On November 19, 2021, Plaintiffs executed a settlement agreement with Defendant WMS. Pursuant to that settlement agreement, WMS produced hundreds of thousands of documents and provided a 109-page sworn declaration from WMS President Jonathan Meng, who served as the primary point of contact at WMS for Defendant Processors and had thousands of written, telephonic, and in-person discussions with Defendant Processors' executives over a twenty-year period. These materials provide extraordinary insight into the origins, breadth, and sophistication of Defendants' conspiracy.

According to Mr. Meng's declaration, Fieldale's Jonathan Allen repeatedly told Mr. Meng that, in the 1990s, executives from Defendant Processors regularly met in a private room "to directly exchange and discuss compensation data with one another" without any third party present. TAC ¶ 220. In 2000, the Defendant Processors hired WMS, an independent third-party consultant, to help them exchange compensation data. *Id.* ¶ 221. At the time, Mr. Meng believed that, by hiring WMS to conduct the survey, Defendant Processors "were, in good faith, seeking to halt their improper direct exchanges of compensation data and, instead, obtain industry-wide compensation information in an appropriate manner." *Id.* ¶ 222.

As evidence to the contrary accumulated, however, Mr. Meng "came to believe that" Defendant Processors "were not actually seeking to comply with . . . antitrust law." *Id.* ¶ 223. Based on his decades of experience with both compensation consulting and the poultry industry, he concluded that Defendant Processors "likely hired WMS as an independent consultant to establish the *appearance* of compliance with . . . antitrust law." *Id.* Specifically, he concluded that "even while retaining WMS to conduct surveys," Defendant Processors "were (1) exchanging

compensation data in a manner that allowed them to identify the wages, salaries, and benefits that each poultry processor was providing to poultry complex workers and (2) discussing both future and optimal compensation practices and rates during meetings and communications that excluded WMS." *Id.* ¶ 224. He believes that Defendant Processors "used WMS as an unwitting tool to conceal their misconduct." *Id.* ¶ 225.

As Mr. Meng explained, each year from 2000 through 2019, WMS conducted an industry-wide compensation survey of the poultry industry (the "Poultry Industry Compensation Survey") and distributed the survey results to all participating poultry processors (collectively, the "Poultry Industry Survey Group"). *Id.* ¶ 227. Each year, the Poultry Industry Survey Group subsequently held a private, in-person meeting to discuss the survey results, often in Destin, Florida (the "Poultry Industry Compensation Meetings"). *Id.* ¶¶ 324, 328.

While the operative complaint notes the existence and purpose of the Poultry Industry Compensation Meetings, Mr. Meng provides important, previously unknown details regarding these gatherings. At the beginning of each meeting, a WMS consultant would give a presentation summarizing the results of the Poultry Industry Compensation Survey. Following the presentation, the Poultry Industry Survey Group would ask the WMS consultant to leave the room while the Group held hours of completely private "roundtable" discussions, generally stretching over two days. *Id.* ¶¶ 12, 341, 356. As described below, this practice only ceased when, in 2017, the Poultry Industry Survey Group became fearful that this conduct would give rise to antitrust liability.

The Meng Declaration presents evidence that, during those roundtable discussions, members of the Poultry Industry Survey Group engaged in unlawful communications in furtherance of their conspiracy to depress compensation. Mr. Meng was copied on email correspondence confirming that roundtables "addressed, among other issues, the results of the

Poultry Industry Compensation Survey, the compensation data that particular individual processors had reported to the Survey, and plans for future compensation rates for salaried and hourly-paid workers." *Id.* ¶ 362. For example, in one email, a Fieldale executive reminded the group to "bring you[r] Data manual" to the meeting "in case others have questions for you concerning your data." *Id.* ¶ 369. In another email, a Tyson executive noted that future compensation data, including "hourly production projected budgets," were "typically a discussion item during the roundtable sessions." *Id.* ¶ 368. Mr. Meng believes that the Poultry Industry Survey Group asked him "to leave [the room] so that the attendees could engage in improper discussions about the Survey results and compensation practices without my halting or witnessing those discussions." *Id.* ¶ 356.

Mr. Meng also provides important details about how Defendant Processors themselves exercised tight control over the Poultry Industry Compensation Survey process and the related Compensation Meetings. According to Mr. Meng, executives from several poultry processors created what they referred to as a "Steering Committee." *Id.* ¶ 230. The Steering Committee, not WMS, made all the important decisions regarding the design and contents of the Poultry Industry Compensation Survey, including "which compensation data to seek in the Survey, how to structure the questions in the Survey, how to revise the Survey, how often to conduct the Survey, which participants to include in the Survey, and what information to display in the Survey Results Reports." *Id.* ¶ 229. At any given point, the Steering Committee was composed of executives from three to five supposed rival members of the Poultry Industry Survey Group. *Id.* ¶ 230. Over the course of the conspiracy, Tyson, Perdue, Foster Farms, Fieldale, and Pilgrim's were all represented on the Steering Committee. *Id.* Bert Neuenschwander of Foster Farms and Jonathan Allen of Fieldale assumed particularly active positions on the Committee. *See, e.g.*, *id.* ¶¶ 226, 369.

The Steering Committee was solely responsible for recruiting and admitting new members into the Poultry Industry Survey Group. *Id.* ¶ 234. The Committee developed a set of "Operating Standards" for membership in the Poultry Industry Survey Group and voted on whether to admit new members. *Id.* ¶¶ 234-35. One mandatory obligation, which the Steering Committee reinforced to the Poultry Industry Survey Group, was attendance at the Poultry Industry Compensation Meetings. *Id.* ¶ 237. As Mr. Neuenschwander told several members of the Poultry Industry Survey Group, "to remain a participant in the survey, attendance each year is not optional." *Id.*

Another key requirement for membership in the Poultry Industry Survey Group was the ability to provide compensation information about workers at hatcheries and feed mills, in addition to workers at processing plants. *Id.* ¶ 236. As Mr. Neuenschwander wrote to other Steering Committee members in 2018, a poultry processor must be a "multi complex poultry organization" to join the Poultry Industry Survey Group, meaning that to join the processor must employ "labor for tech advisors, feed/formulations, in addition to hatcheries, breeders, and so on." *Id.*

Mr. Meng observed that the members of the Poultry Industry Survey Group engaged in improper exchanges of data regarding the compensation paid to their workers. At the direction of the Steering Committee, the Poultry Industry Compensation Survey included detailed data regarding future salary increases and the timing of those increases. According to Mr. Meng, the Steering Committee instructed WMS to include such data "because members of the Poultry Industry Survey Group said they wanted to know how much and when their competitors were planning to increase salaries and salary ranges." *Id.* ¶ 253. He concluded that the "inclusion of metrics regarding future salary increases and future salary ranges in the Poultry Industry Compensation Survey . . . could allow the members of the Poultry Industry Survey Group to limit and reduce their salary increases and salary range increases." *Id.* ¶ 259.

Additionally, at multiple points during the conspiracy, in response to explicit instructions from the Steering Committee, WMS structured the Poultry Industry Compensation Survey to collect and distribute raw, disaggregated, plant-level compensation data in ways that easily allowed participating poultry companies to determine precisely which of their competitors contributed which compensation data. From at least 2001 through 2004, the Poultry Industry Compensation Survey "included disaggregated, raw data on salaries, wages, and benefits that was sorted by processor," thereby allowing participants to "match each participating processor" to its relevant compensation data through a letter code. *Id.* ¶ 494. In 2005, Mr. Meng halted the practice because of antitrust concerns. *See id.* ¶ 270. But, from 2013 to 2016, the Steering Committee again agreed, with the consent of other members of the Poultry Industry Survey Group, to distribute "disaggregated, raw data regarding the compensation of hourly paid workers . . . in the Survey Results Reports." *Id.* ¶ 271.

In September 2016, many poultry processors, including most members of the Poultry Industry Survey Group, were named as defendants in a class action lawsuit alleging a massive conspiracy to artificially inflate the price of broiler chicken. *Id.* ¶ 307. As Mr. Meng explains, the subsequent fallout from this lawsuit triggered major changes in the Poultry Industry Survey Group. *Id.* ¶¶ 308-09. First, many poultry processors stopped participating in the Group. For example, on April 28, 2017, Brad Sievers of Pilgrim's informed the rest of the Group that Pilgrim's would not be attending that year's Poultry Industry Compensation Meeting on advice of counsel, and in February of 2018, Patrick Townsend of Mountaire notified Mr. Meng that Mountaire would not be able to participate in the Group due to instructions from its general counsel. *Id.* ¶¶ 319-20. Second, the Poultry Industry Survey Group decided to remove certain information from the Poultry Industry Compensation Survey that could raise antitrust concerns. For example, in 2017, WMS

stopped reporting raw, disaggregated hourly wage data from each company's plants and, in 2018, removed all metrics regarding future salary increases. *Id.* ¶¶ 310, 313. Third, starting in 2018, the Poultry Industry Survey Group required Mr. Meng to attend all of the roundtable sessions at the annual Poultry Industry Compensation Meetings. *Id.* ¶ 374.

The Meng Declaration dovetails with documents that Defendant George's produced on November 12, 2021 pursuant to its settlement agreement with Plaintiffs. Those documents show that, ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ *Id.* ¶ 282. ██████████████████████

████████████████████████████████████████████████████████████

████████████████████████ *Id.* ¶ 283. ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████ *Id.*

      █████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ For example, ███████████████████████████████████

██████████, emailed █████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████ *Id.* ¶ 286.

████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

*Id.* ¶ 287. ████ noted: ████████████████████████ *Id.* To that end, Linda Wray, then Tyson's Vice President of Compensation, requested that WMS collect and distribute disaggregated, raw data that identified how much hourly workers were paid by Tyson and its competitors. *Id.* ¶¶ 288, 290. Accordingly, from 2013 to 2015, Tyson sponsored an Hourly Plant Maintenance and Production Survey: yet another annual compensation survey conducted by WMS that "provided even more disaggregated, raw, plant-level data than the Poultry Industry Compensation Survey." *Id.* ¶ 294. According to Mr. Meng, "[t]he format of the Tyson-sponsored Hourly Plant Maintenance and Production Survey facilitated the ability of members of the Poultry Industry Survey Group to identify the sources of plant-level compensation data in that survey." *Id.* ¶ 307.

In addition, ████████████████████████████████

███████████████████████████████████████████

████████████████████████████████ For example, in a ██████

email to ████████████████████████████████████

wrote, ██████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████ *Id.* ¶ 377.

Seven months later, in ████████████████████████

████████████████████ emailed ████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████ *Id.* ¶ 379. ███████████████

███████████████████████████████████████

That same year, ███████████████████████████████████, emailed

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████ *Id.* ¶ 384. After ██████████

replied that ████████████████████████████ relayed the message to the

████████████████, who made final decisions regarding ███████ compensation schedules:

██████████████████████████████████████████████████████

██████ *Id.*

Finally, the new information Plaintiffs learned from Mr. Meng and George's accords with

new information Plaintiffs discovered from sample Agri Stats reports produced on September 10,

2021. Those documents demonstrate that workers at ██████████████████ were included in

Defendants' conspiracy to fix and depress compensation. As the reports show, Agri Stats collected

and distributed, ████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████ *Id.* ¶ 401; *accord id.* ¶ 402.[3]

---

[3] *See also, e.g.*, Agri Stats Demo Report, *Monthly Live Production: General Run*, at 9, 14, 19, 41, 45, 49; Agri Stats Demo Report, *Monthly Turkey Breeder Reports: General Run*, at 7-9; Agri

Since obtaining this new information, Plaintiffs moved quickly to notify Defendants of their intent to amend the Complaint. Plaintiffs executed their settlement agreement with WMS on Friday, November 19. The following Monday, Plaintiffs notified Defendants of their intent to file an amended complaint.[4]

## III.   <u>LEGAL BACKGROUND</u>

Under Federal Rule of Civil Procedure 15(a)(2), a party may amend its pleading more than once "with the opposing party's written consent or the court's leave."[5] *See Tucker v. Specialized Loan Servicing, LLC*, 83 F. Supp. 3d 635, 647 (D. Md. 2015) ("When . . . a plaintiff moves to amend for a second time but before the Court issues a scheduling order establishing a deadline for doing so, Rule 15(a)(2) provides the standard for whether to grant the motion.").

"The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Rule 15's "liberal rule" implements "the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc). "It is this Circuit's policy to liberally allow amendment in keeping with the spirit of Federal Rule of Civil Procedure 15(a)." *Galustian v. Peter*, 591 F.3d 724, 729 (4th Cir. 2010)**.** Thus, the Fourth Circuit has held that "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the

---

Stats Demo Report, *Monthly Turkey Growout Reports: General Run*, at 9, 15, 21. Plaintiffs would be pleased to make these reports available to the Court upon its request.

[4] Plaintiffs filed a Motion for Leave to File a Third Amended Consolidated Complaint on December 17, 2021. ECF 544. However, that Motion was withdrawn on January 20, 2022 (ECF 566), and this Amended Motion was filed that same day. The original Motion was only amended to clarify that the claims of the Class as represented by the named Plaintiffs are not proceeding against settling Defendants Pilgrim's Pride Corporation, George's, Inc., and George's Foods, LLC and, instead, are solely proceeding against the remaining 23 Defendants named in the TAC.

[5] Defendants did not consent to Plaintiffs' motion for leave to amend.

moving party, or the amendment would be futile." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986); *see also Sulton v. Baltimore Cnty.*, No. 18-cv-2864, 2021 WL 82925, at *1 (D. Md. Jan. 11, 2021) (explaining leave to amend under Rule 15(a)(2) should be denied only in the event of "prejudice, bad faith, or futility" (citation omitted)).[6]

IV.   **ARGUMENT**

A.   **JUSTICE REQUIRES GRANTING PLAINTIFFS LEAVE TO FILE THEIR AMENDED COMPLAINT.**

Under Rule 15(a)(2), "justice requires" that Plaintiffs be allowed to tailor their pleadings to newly discovered evidence. *Laber*, 438 F.3d at 426. The Fourth Circuit has held that, under Rule 15(a)(2), plaintiffs should be granted leave to amend "to conform the pleadings to the evidence and clarify the complaint with more specific facts as a result of admissions made in discovery." *Edwards*, 178 F.3d at 241. In *Edwards*, for example, "[a]fter a significant amount of discovery had taken place," the plaintiff twice sought to amend "to conform his complaint to the evidence." *Id.* at 240-41. The Fourth Circuit held that the district court had "abused its discretion" in denying those motions. In reaching that conclusion, the Fourth Circuit expressly rejected the defendants' argument that the amendment would require them "to expend a tremendous amount of time and money through discovery." *Id.* at 242-43. Regardless of any additional discovery to follow, the Fourth Circuit reasoned, leave to amend was required because the plaintiff sought to add facts "derived from evidence obtained during discovery" that "arise from the same controversy as the balance of the complaint." *Id.* at 243. And, the Fourth Circuit explained, allowing amendment

---

[6] The liberal Rule 15 standard governs Plaintiffs' motion, even though Plaintiffs seek to add new named plaintiffs and defendants. "While some courts have concluded that Rule 15(a) does not apply to amendments seeking to add parties, most courts, including this one, have concluded otherwise." *Galustian*, 591 F.3d at 730.

would "promote[] judicial economy" by preventing the need for a separate lawsuit raising "identical" legal issues. *Id.*

More recently, the Fourth Circuit drew on similar principles in *Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105 (4th Cir. 2013), holding that the district court abused its discretion when it denied the plaintiffs leave to amend their complaint to include new facts unveiled during discovery. *Id.* at 108. The district court had denied the motion in part on the perceived basis that the amended complaint added a "new theory" to avoid recent Supreme Court precedent. *Id.* at 117. Rather than allege "an entirely new theory," the Fourth Circuit explained, the plaintiffs actually sought to "elaborate on one of two allegations that were previously pled" and "include[] numerous additional facts supporting their previous assertion" based on revelations from discovery. *Id.* at 118; *see also id.* at 119 (Keenan, J., concurring). The Fourth Circuit held that the plaintiffs should be permitted to add the additional facts, even if amendment would require "additional discovery and evidentiary burdens" on Family Dollar. *Id.* at 118 (majority opinion).[7]

---

[7] *See also Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 195 (4th Cir. 2009) (holding district court abused its discretion in denying leave to amend where "Plaintiffs simply seek to add specificity to scienter allegations in a situation where defendants are aware of the circumstances giving rise to the action"); *Island Creek Coal Co. v. Lake Shore, Inc.*, 832 F.2d 274, 280-81 (4th Cir. 1987) (permitting amendment where "the basis for the proposed [amendment]" was uncovered "only as a result of . . . discovery begun after the case had been pending"); *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039, 1044 (4th Cir. 1984) (permitting amendment where the plaintiff was not "aware of evidence to support" its proposed amendment when it filed the prior complaint); *Next Generation Grp., LLC v. Sylvan Learning Ctrs., LLC*, No. 11-cv-0986, 2012 WL 37397, at *5 (D. Md. Jan. 5, 2012) (permitting "proposed amendment" that "does not add counts or legal theories, but rather clarifies the identity and basis of alleged culpability of the various defendants"); *Robinson v. GEO Licensing Co.*, 173 F. Supp. 2d 419, 425 (D. Md. 2001) ("It is acceptable to amend a complaint to add additional facts in order 'to amplify a previously alleged claim.'" (citation omitted)); *Macias v. Cleaver*, No. 13-cv-01819, 2016 WL 8730687, at *4 (E.D. Cal. Apr. 8, 2016) ("Allowing parties to amend based on information obtained through discovery is common and well established.").

Here, as in *Edwards* and *Scott*, Plaintiffs are seeking to "conform the pleadings" to newly discovered facts "obtained during discovery" that "arise from the same controversy" and legal theories as "the balance of the complaint." *Edwards*, 178 F.3d at 241-43.

First, drawing on the Meng Declaration, the TAC clarifies that Defendants' conspiracy to fix the compensation paid to Class Members began at least as early as 2000, when WMS started providing industry-wide compensation surveys for the poultry processing industry—not in 2009, as previously alleged.

Second, the TAC explains that depressing compensation for workers at hatcheries and feed mills was an integral part of Defendants' scheme and seeks to add those workers to the Class. As Mr. Neuenschwander explained, for a poultry processor to be admitted to the Poultry Industry Survey Group, the processor was required to provide compensation information about workers at hatcheries and feed mills, not just processing plants. TAC ¶ 236. And once admitted, members of the Poultry Industry Survey Group were expected to, and did, exchange detailed compensation information about workers at hatcheries and feed mills as well as discuss the compensation of those particular workers at annual roundtable meetings. Furthermore, newly produced Agri Stats reports show that Defendant Processors regularly exchanged information about compensation ■ ███████████████████

Third, the TAC expands on the SAC's allegations to include the full range of Defendant Processors' improper compensation data exchanges. In addition to the Poultry Industry Compensation Survey, the Meng Declaration and George's documents show Defendant Processors exchanged raw, disaggregated data through direct email communications between their senior executives, through the Tyson-administered CHIWI survey, and through the Tyson-sponsored Hourly Plant Maintenance and Production Survey. Prior to the WMS settlement and George's

document production, Plaintiffs were unaware that Defendants directly shared real-time, deanonymized data through both email communications between their corporate executives and Tyson-operated surveys that detailed specific wage rates at competitors' individual plants. Nor were Plaintiffs aware that Defendant Processors were using that data to inform their compensation decisions. The TAC includes these critical allegations.

Finally, the TAC names six additional Defendants who were identified by Mr. Meng as repeat participants in—and in some cases leaders of—the Poultry Industry Survey Group. Each of these additional Defendants—Foster Farms; Case Foods; Allen Harim Foods, LLC; Amick Farms, LLC; Mar-Jac Poultry; and O.K. Foods, Inc.—(or their predecessor companies) participated in multiple overt acts in furtherance of the conspiracy. Specifically, during the Class Period, each of these six additional Defendants (or their predecessor companies):

- Attended several Poultry Industry Compensation Meetings where the compensation of poultry processing workers was discussed and fixed;

- Participated in multiple annual Poultry Industry Compensation Surveys designed by Defendant Processors and administered by WMS;

- Engaged in email communications with executives from competing Defendant Processors to directly exchange wage data and harmonize compensation plans; and

- Subscribed (or had their subsidiary subscribe) to Agri Stats to receive monthly reports containing competing Defendant Processors' current wage rates.

*Id.* ¶¶ 69, 71, 73, 76, 78, 80, 83. In fact, several of these additional Defendants played a central role in running the Poultry Industry Compensation Surveys and Meetings. *See id.* ¶¶ 236, 370. For example, Foster Farms's Bert Neuenschwander served in a lead role on the Steering Committee for each year between 2000 to 2019. Among other leadership activities, Neuenschwander reminded Defendant Processors about the requirements for joining the Poultry Industry Survey Group, informed the Group that attendance at the annual Poultry Industry Compensation Meetings was mandatory, and circulated agendas for those Meetings. *Id.* ¶¶ 236-37, 371.

In sum, rather than add any new claims, the TAC elaborates on Plaintiffs' existing allegations of a conspiracy to suppress compensation, providing new details about the conspiracy's origins, operations, and participants. In other words, permitting the amendment will simply allow Plaintiffs to "conform the pleadings to the evidence," adding only facts "obtained during discovery regarding matters already contained in the complaint in some form." *Edwards*, 178 F.3d at 241-43.

In addition to permitting amendments to conform pleadings to new information learned in discovery, courts in the Fourth Circuit allow Plaintiffs to amend their complaints early in the discovery process, when (as here) the parties are still developing their claims and defenses. *See, e.g.*, *Scott*, 733 F.3d at 118-19 (overturning district court's denial of leave to amend complaint "[b]ecause the parties were still in discovery, and many steps removed from trial"). Whereas *years* of discovery remain in the instant case, courts in this district routinely grant leave to amend on the basis that "*months* of discovery remain." *U.S. EEOC v. Koerner Mgmt. Grp., Inc.*, No. 21-cv-652, 2021 WL 4255374, at *2 (D. Md. Sept. 17, 2021) (emphasis added); *US Wind Inc. v. Intermoor, Inc.*, No. 19-cv-02984, 2021 WL 615056, at *2-3 (D. Md. Feb. 16, 2021) (granting leave to amend complaint to add new facts and new defendant where "the relevant facts underlying [the plaintiff's] desire to amend became evident during the discovery process" and "discovery remains ongoing and is scheduled to continue for several months"); *Pridgen v. Appen Butler Hill, Inc.*, No. 18-cv-61, 2019 WL 1048950, at *2 (D. Md. Mar. 5, 2019) (allowing leave to amend because "the proposed amendments come well before trial" and "discovery does not end for nearly six months").

Here, Plaintiffs are seeking leave to amend at the threshold of the discovery process. Just four months ago, the Court ruled on a range of disputes about the general contours of permissible discovery, including the scope of Plaintiffs' Requests for Production and who Defendants should

designate as document custodians. The parties are still negotiating search terms for the production of documents, and non-settling Defendants have not produced *any* custodial documents. The deadline for the completion of fact discovery remains approximately a year away. Under these circumstances, justice requires that Plaintiffs be allowed to amend their pleadings.

### B.   THE COURT SHOULD ALLOW PLAINTIFFS TO ADD A NEW CLASS REPRESENTATIVE TO THE AMENDED COMPLAINT.

Courts evaluate motions to amend a pleading to add new named plaintiffs under the same liberal Rule 15 standard as they apply to other amendments. *See, e.g.*, *Tabas v. MoviePass, Inc.*, 401 F. Supp. 3d 928, 941-42 (N.D. Cal. 2019). In class actions, "[s]ubstitution among class representatives is . . . allowed so long as there are several and at least one has standing throughout the case." 1 William B. Rubenstein, *Newberg on Class Actions* § 2:8 (5th ed. 2021).

Plaintiffs request leave to add an additional Class representative, Kevin West, to the TAC.[8] Kevin West worked as a salaried employee at poultry processing plants operated by Defendants Tyson Foods, Koch Foods, Pilgrim's Pride Corporation, and Perdue during the Class Period. He is a member of the Class as defined in both the SAC, *see* ECF No. 386, at ¶¶ 294-95, and the TAC, *see* TAC ¶¶ 503-04, and the claims he raises are no different than those of the other named plaintiffs. Defendants have long been on notice of the substance of those claims. This amendment should be allowed as well. *Cf. Freight Drivers & Helpers Loc. Union No. 557 Pension Fund v. Penske Logistics LLC*, 784 F.3d 210, 219 (4th Cir. 2015) ("As long as defendant is fully apprised of a claim arising from specified conduct and has prepared to defend the action, defendant's ability to protect itself will not be prejudicially affected *if a new plaintiff is added* . . . ." (quoting 6A Charles Alan Wright et al., *Federal Practice & Procedure* § 1501 (3d ed. 2010 & Supp. 2014))).

---

[8] The TAC names Kevin West as a representative of the Class, but not the Subclass.

C.    **THE LIMITED EXCEPTIONS TO RULE 15'S LIBERAL POLICY IN FAVOR OF AMENDMENT DO NOT APPLY.**

As explained above, "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Johnson*, 785 F.2d at 509 (citation omitted); *see also Sulton*, 2021 WL 82925, at *1. None of those concerns are present here.

First, Defendants cannot show that they will suffer the "very narrowly defined prejudice sufficient to overcome the liberal standard for granting amendments."[9] *Next Generation*, 2012 WL 37397, at *5. Where a party opposes amendment on the basis that it will "entail additional discovery and evidentiary burdens," the Fourth Circuit has instructed that "a finding of prejudice essentially applies where the amendment is offered shortly before or during trial"—but not otherwise. *Scott*, 733 F.3d at 118-19 (quoting *Johnson*, 785 F.2d at 510). "Delay alone . . . is an insufficient reason to deny [a] motion to amend." *Laber*, 438 F.3d at 427.

To the extent Defendants may argue that Plaintiffs' proposed amendments will prejudice them by adding discovery burdens, that objection only carries weight near the date of trial, *Scott*, 733 F.3d at 118-19—not when approximately over a year of fact discovery remains. For good reason: as Plaintiffs offer their proposed amendments so early in discovery, non-settling Defendants have produced next to nothing in the way of documents, and no depositions have been taken. No Defendant has even agreed to a set of search terms they will use to cull their documents before conducting relevance and privilege reviews. Courts regularly reject claims that amendments at such a nascent stage are prejudicial. *See US Wind Inc.*, 2021 WL 615056, at *3 (finding no

---

[9] In accordance with Rule 15's presumption in favor of permitting amendment, "[t]he party opposing amendment bears the burden of showing prejudice." *Atl. Bulk Carrier Corp. v. Milan Exp. Co.*, No. 3:10-cv-103, 2010 WL 2929612, at *4 (E.D. Va. July 23, 2010).

prejudice to warrant denying leave to amend complaint because "[t]he parties have not yet conducted any depositions that might have to be retaken"); *Dicks v. Flury*, No. GLR-14-1016, 2018 WL 453525, at *3 (D. Md. Jan. 16, 2018) (holding defendant would not be prejudiced by amendment because "the parties had conducted minimal discovery—only one set of interrogatories, one request for production of documents, and a subpoena served"); *Kerrigan v. Bd. of Educ. of Carroll Cnty.*, No. 14-cv-3153, 2016 WL 470827, at *3 (D. Md. Feb. 8, 2016) (finding no prejudice where parties had "only recently exchanged written discovery requests, and no depositions had been taken or even scheduled").

Moreover, Defendants will not be prejudiced by having to duplicate any discovery negotiations already completed or currently underway. Since the Court denied Defendants' motions to dismiss the SAC in March, the parties have negotiated over custodians, the scope of Plaintiffs' Requests for Production, Plaintiffs' First and Second Sets of Interrogatories, and search terms to be used by Defendants to identify documents to review. While Plaintiffs would, of course, need to adjust their discovery requests to conform with the TAC, none of the parties' negotiations or agreements to this point would go to waste. The TAC does not disturb the SAC's allegations regarding 2009 to the present, and instead adds relevant facts to that time period. As a result, all of the custodians that have already been determined and all of the search terms that the parties are currently negotiating would remain relevant under the TAC. So would the phone numbers that Defendants have disclosed in response to Plaintiffs' Second Set of Interrogatories.

In any event, Defendants cannot show that it is "obvious from the record" that they will suffer prejudice from supposed changes to discovery brought on by the TAC, *see Edwards*, 178 F.3d at 243, because so little discovery has occurred so far in this case. Not a single non-settling Defendant has agreed to any search terms to be used to limit the number of documents they will

review for responsiveness. Therefore, no non-settling Defendant has even reviewed documents for relevancy and privilege—let alone produced documents beyond organizational charts and a small number of other, miscellaneous materials. Accordingly, Defendants will not have to duplicate *any* part of document production under the TAC.

In short, the only conceivable prejudice to Defendants caused by the TAC would be having to respond to additional discovery requests to account for the new allegations in the TAC. Yet, as the District of Maryland has repeatedly held, "Additional discovery alone … will not be prejudicial to Defendants." *Neighborhood Dev. Collaborative v. Murphy*, No. 03-cv-1283, 2006 WL 8457084, at *2 (D. Md. Feb. 7, 2006); *see also Pridgen*, 2019 WL 1048950, at *2; *Robinson v. Geo Licensing Co., LLC*, 173 F. Supp. 2d 419, 426 (D. Md. 2001).

Furthermore, there is no concern that permitting Plaintiffs to proceed on their amended complaint would "reward bad faith," *Tucker*, 83 F. Supp. 3d at 647 (citation omitted), as Plaintiffs moved expeditiously to amend the complaint. *Cf. Howard v. Inova Health Care Servs.*, 302 F. App'x. 166, 181 (4th Cir. 2008) ("[A] motion to amend should be made as soon as the necessity for altering the pleading becomes apparent." (citation omitted)).

Nor can Plaintiffs' motion—which seeks to amend a complaint that the Court already has held alleges facts sufficient to state a claim against Defendants—be futile. *See Johnson*, 785 F.2d at 510 (explaining a proposed amendment is futile when it is "clearly insufficient or frivolous on its face"). Futility occurs, in relevant part, when a "proposed amended complaint fails to state a claim under the applicable rules and accompanying standards." *Tucker*, 83 F. Supp. 3d at 648 (quoting *Katyle v. Penn Nat'l Gaming Inc.*, 637 F.3d 462, 471 (4th Cir. 2011)). The Court has already ruled that Plaintiffs' SAC sufficiently states claims against Defendants, *see* Mem. Op.,

ECF No. 414, and the addition of new facts supporting those claims and new parties does nothing to alter that holding.

## V.  <u>CONCLUSION</u>

For the reasons stated above, the Court should grant Plaintiffs' motion for leave to file the Third Amended Consolidated Complaint.

Dated: January 20, 2022                          Respectfully submitted,

<u>/s/ Matthew K. Handley</u>
Matthew K. Handley (D. Md. Bar # 18636)
Rachel E. Nadas (admitted *pro hac vice*)
Stephen Pearson (admitted *pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
200 Massachusetts Ave, Seventh
Floor Washington, DC 20001
Telephone: (202) 559-2433
mhandley@hfajustice.com
rnadas@hfajustice.com
spearson@hfajustice.com

George F. Farah (admitted *pro hac vice*)
Rebecca P. Chang (admitted *pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
33 Irving Place
New York, NY 10003
Telephone: (212) 477 8090
gfarah@hfajustice.com
rchang@hfajustice.com

William Anderson (admitted *pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
4730 Table Mesa
Drive Suite G 200
Boulder, CO 80305
Telephone: (202) 559-2433
wanderson@hfajustice.com

Daniel A. Small (D. Md. Bar # 20279)
Benjamin D. Brown (admitted *pro hac vice*)
Brent W. Johnson (admitted *pro hac vice*)
Daniel H. Silverman (admitted *pro hac vice*)
Alison S. Deich (admitted *pro hac vice*)

23

Louis Katz (admitted *pro hac vice*)
Zachary Krowitz (D. Md. Bar # 22370)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW 5th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Fax: (202) 408-4699
dsmall@cohenmilstein.com
bbrown@cohenmilstein.com
bjohnson@cohenmilstein.com
dsilverman@cohenmilstein.com
adeich@cohenmilstein.com
lkatz@cohenmilstein.com
zkrowitz@cohenmilstein.com

Steven W. Berman (admitted *pro hac vice*)
Breanna Van Engelen (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Tel: (206) 623-7292
steve@hbsslaw.com
breannav@hbsslaw.com

Shana E. Scarlett (admitted *pro hac vice*)
Rio R. Pierce (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel: (510) 725-3000
shanas@hbsslaw.com
riop@hbsslaw.com

*Interim Co-Lead Counsel for Plaintiffs and
the Proposed Class*

W. Joseph Bruckner (admitted *pro hac vice*)
Brian D. Clark (admitted *pro hac vice*)
Maureen Kane Berg (admitted *pro hac vice*)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
wjbruckner@locklaw.com
bdclark@locklaw.com

mkberg@locklaw.com

*Additional Counsel for the Plaintiffs and Proposed Class*

Eric L. Cramer (admitted *pro hac vice*)
Candice J. Enders (admitted *pro hac vice*)
Julia R. McGrath (admitted *pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
ecramer@bm.net
cenders@bm.net
jmcgrath@bm.net

David Hughes (*pro hac vice* forthcoming)
Nicole Hughes (*pro hac vice* forthcoming)
HARDIN & HUGHES, LLP
2121 14th Street
Tuscaloosa, AL 35401
Telephone: (205) 523-0465
dhughes@hardinhughes.com
nhughes@hardinhughes.com

*Counsel for Plaintiff Glenda Robinson*

Kellie Lerner (admitted *pro hac vice*)
Noni J. Nelson (*pro hac vice* forthcoming)
ROBINS KAPLAN LLP
399 Park Avenue, Suite 3600
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
hsalzman@robinskaplan.com
klerner@robinskaplan.com
nnelson@robinskaplan.com

Aaron M. Sheanin (admitted *pro hac vice*)
ROBINS KAPLAN LLP
2440 W. El Camino Real, Suite 100
Mountain View, CA 94040
Telephone: (650) 784-4040
Facsimile: (650) 784-4041
asheanin@robinskaplan.com

25

M. Stephen Dampier (*pro hac vice* forthcoming)
THE DAMPIER LAW FIRM, P.C.
11 N. Water Street, Suite 10290
Mobile, AL 36602
Tel.: (251) 929-0900
Fax: (888) 387-1930
stevedampier@dampierlaw.com

*Counsel for Plaintiff Emily Earnest*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 20, 2022, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notice to counsel for all parties

that have appeared in this case.

Dated: January 20, 2022                                      /s/ *Matthew K. Handley*
                                                            Matthew K. Handley