**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| **JUDY JIEN,** *et al.*, | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **v.** | * | **Civil Case No. 1:19-CV-2521-SAG** |
| | * | |
| **PERDUE FARMS, INC.,** *et al.*, | * | |
| | * | |
| **Defendants.** | * | |
| | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiffs Judy Jien, Kieo Jibidi, Elaisa Clement, Glenda Robinson, Emily Earnest, and Kevin West (collectively "Plaintiffs"), on behalf of themselves individually and on behalf of a class of former and current employees, bring suit against twenty poultry processors and several of their subsidiaries or parents ("Defendant Processors"), plus two data consulting companies (collectively "Defendants"). The Third Amended Complaint ("TAC") alleges two violations of Section One of the Sherman Antitrust Act. ECF 590. Specifically, Plaintiffs allege: (1) a conspiracy among Defendants, except Peco Foods, Inc. ("Peco Foods") and Agri Stats, Inc. ("Agri Stats") to fix and depress poultry workers' compensation; and (2) a conspiracy among all Defendants for the unlawful exchange of compensation data. *Id.* Presently pending are five motions to dismiss the TAC.[1] ECF 630, 631, 632, 638, 639. Plaintiffs filed oppositions; ECF 654, 658, 659, 660, 661; and Defendants filed replies, ECF 674, 675, 676, 678, 679. For the following reasons, Defendants' motions will be denied, except that the motions filed by Jennie-O Turkey

---

[1] Mar-Jac Poultry, Inc. ("Mar-Jac GA") also filed a motion to dismiss, ECF 636, which was subsequently mooted by this Court's approval of Plaintiffs' Stipulation and Notice of Dismissal with Prejudice as to Mar-Jac GA, ECF 685, 686.

Store Inc., ("Jennie-O") and Mountaire Farms, Inc., ("Mountaire") will be granted as to Count I only.

## I.  BACKGROUND

The core allegations in this case have been set forth in detail in this Court's earlier Opinions; *see* ECF 378, 414; and will not be fully reiterated herein.[2]  Relevant here, however, is a brief discussion of the procedural posture of this case.

Plaintiffs filed this action in August, 2019, alleging a conspiracy from January, 2009, onward to fix and depress wages of hourly workers at chicken processing plants.  ECF 1; *see also* ECF 196.  In their consolidated First Amended Complaint ("FAC"), Plaintiffs asserted the same claims on behalf of an expanded class of hourly and salaried workers at Defendant Processors' poultry (not merely chicken) processing plants.  *See* FAC ¶ 245.  Defendants filed a series of motions to dismiss, which this Court granted in part and denied in part through a Memorandum Opinion and Order.  ECF 378, 379 ("MTD Op. I").  That Opinion enumerated four holdings relevant to the resolution of the instant motions.  First, the FAC provided direct evidence for its *per se* claim—namely statements by Defendants' executives fretting about the propriety of wage discussions at secret meetings—but that the claim could only be sustained against Defendants who were explicitly linked to the evidence through attendance at such meetings.  MTD Op. I at 11-14. Second, Plaintiffs' alleged product market, defined as the poultry processing labor market, was plausible in light of those workers' industry-specific expertise, limited education and language skills, and the fact that Defendants themselves appeared to perceive themselves as a distinct, nationwide unit.  *Id.* at 23-25.  Third, Plaintiffs had plausibly alleged the relevant geographic

---

[2] This Court adopts by reference its discussion of facts set forth in its earlier Opinions resolving Defendants' previous motions to dismiss, ECF 378, 414.  Relevant new factual allegations will be referenced in the discussion sections of this Opinion, *infra*.

market to be the continental United States, particularly because Defendants' arguments regarding overbreadth did not warrant dismissal. *Id*. at 21-22. Fourth, the FAC plausibly alleged anticompetitive effects in the relevant market through secret meetings, the exchange of survey data compiled by Webber, Meng, Sahl and Company, Inc. ("WMS"), and the use of Agri Stats to monitor adherence to the conspiracy. *Id.* at 25-27.

Plaintiffs subsequently filed a Second Amended Complaint ("SAC") restating its allegations against previously-dismissed Defendants, ECF 386, which Defendants sought to dismiss on multiple grounds, *see* ECF 398, 399, 400, 401. In its Memorandum Opinion and Order ("MTD Op. II"), this Court denied the motions in their entirety based in part on three key findings. ECF 414, 415. First, this Court found that under the "class certification" approach, named Plaintiffs (chicken processing workers paid hourly) had standing to pursue claims on behalf of salaried and turkey processing workers because named Plaintiffs' interests did not differ significantly from the salaried and turkey employees they sought to represent. *Id.* at 5-6. Second, this Court held that the SAC adequately stated its *per se* claim against Jennie-O, Mountaire, and Sanderson Farms Inc., ("Sanderson") by alleging that they attended at least some secret meetings, thereby linking them to direct evidence of the alleged conspiracy. *Id.* at 8-11. Third, with regards to the rule of reason claim in Count II, this Court rejected Jennie-O's argument that the SAC failed to allege anticompetitive effects against it because it operated in the Upper Midwest rather than the South. *Id.* at 12-13. In doing so, this Court explained that Jennie-O's geographic arguments were unavailing in light of its earlier determination that Plaintiffs had plausibly alleged the geographic market to extend throughout the entire continental United States. *Id*. (quoting MTD Op. I at 22-23).

In January, 2022, Plaintiffs sought and obtained leave to file a TAC.  ECF 567, 589.  The TAC expanded the scope of this action in four material ways.  First, the TAC broadened its putative class beyond employees at poultry processing plants to also include workers at Defendant Processors' poultry hatcheries and poultry feed mills (collectively, "poultry workers").  TAC at 9. Second, the TAC expanded the class period to extend from January, 2000 until July, 2021.  *Id.* Third, the TAC named seven additional Defendants—Foster Poultry Farms ("Foster"); Case Foods, Inc.; Case Farms, LLC; O.K. Foods, Inc.; Allen Harim Foods, LLC ("Allen Harim"); Amick Farms, LLC ("Amick Farms"); and Mar-Jac GA.  Fourth, the TAC added a new named Plaintiff, Kevin West.  *Id.* ¶ 33.  The TAC also attributed additional nomenclature and labels to various portions of the alleged conspiracy.  Specifically, the annual survey administered by WMS is now referred to as the Poultry Industry Compensation Survey (hereinafter "Compensation Survey"); participants in the Compensation Survey referred to themselves as the Poultry Industry Survey Group (hereinafter, "Survey Group").  *Id.* ¶¶ 7-8, 212.  The TAC alleges that the Compensation Survey and Survey Group were "governed and operated by a 'Steering Committee' that consisted of between three and five executives of different Defendant Processors."  *Id.* ¶ 230. Likewise, the "annual 'off the books' meetings" at which compensation rates were set are alleged to be called Poultry Industry Compensation Meetings (hereinafter, "Compensation Meetings"). *Id.* ¶ 11.

Five motions to dismiss are currently pending.  First, several Defendants challenge Plaintiffs' standing to pursue claims related to persons employed at Defendant Processors' hatcheries and feed mills, ECF 630.[3]  Second, Foster filed a motion to dismiss for lack of personal

---

[3] The motion to dismiss for lack of standing was filed by the following Defendants: Agri Stats, Allen Harim, Amick Farms, Butterball, LLC, Case Farms, LLC, Case Foods, Inc., Fieldale Farms Corporation ("Fieldale Farms"), Foster, Jennie-O, Keystone Foods, LLC, Koch Foods, Inc., Mar-

jurisdiction and for failure to state a claim.  ECF 631.  Finally, three individual defendants, Sanderson, Jennie-O, and Mountaire, filed motions challenging the sufficiency of the claims against them, ECF 632, 638, 639.  This Court will address each issue relevant to these five motions in turn.

## II.   STANDING

### A.  Legal Standard

Federal Rule of Civil Procedure 12(b)(1) governs motion to dismiss for lack of standing, and therefore lack of subject matter jurisdiction.  As the party asserting a court's power to adjudicate the claim or controversy before it, the plaintiff bears the burden of demonstrating that jurisdiction, in fact, exists. *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999); *see also United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009).  "[W]hen a defendant raises standing as the basis for a motion under Rule 12(b)(1) to dismiss for lack of subject matter jurisdiction," the court "may consider evidence outside the pleadings without converting the proceedings to one for summary judgment." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005); *see also Richmond, Fredericksburg & Potomac R.R. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).  While the plaintiff bears the burden of proving that a court has jurisdiction over the claim or controversy at issue, a Rule 12(b)(1) motion should be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Morgan Stanley v. NIRAV BABU*, 2020 WL 1331995, at *3 (D. Md. Mar. 23, 2020) (quoting *Thomas-Lawson v. Koons Ford of Baltimore, Inc.*, 2020 WL 1675990, at *3 (D. Md. Apr. 6, 2020)).

---

Jac GA, Mountaire, O.K. Foods, Inc., Perdue Farms, Inc. ("Perdue Farms"), Perdue Foods LLC ("Perdue Foods"), Sanderson, Tyson Foods, Inc., and Wayne Farms, LLC.

**B. Analysis**

In the Rule 12(b)(1) motion, Defendants insist that named Plaintiffs, as poultry processing plant employees, lack standing with regards to claims brought on behalf of workers at poultry hatcheries and feed mills.  ECF 630.  This Court disagrees.

Standing requires that a plaintiff suffered: (1) an injury in fact; (2) caused by the defendant; and (3) redressable by a favorable decision of the court.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  This Court previously joined others in this district in following the majority, "class certification" approach to analyzing standing in the context of Plaintiffs' putative class action claims.  ECF 414 at 5; *see also Singh v. Lenovo (United States) Inc.*, 510 F. Supp. 3d 310, 319 (D. Md. 2021); *Williams v. Potomac Fam. Dining Grp. Operating Co., LLC*, No. GJH-19-1780, 2019 WL 5309628, at *4 (D. Md. Oct. 21, 2019).  Under that approach, a putative class representative has standing "where she plausibly alleges that (1) she has suffered an injury in fact traceable to a defendant and redressable by the court, and (2) her claimed injury is shared in common with others who have been similarly harmed by the same defendant's actions."  *Singh*, 510 F. Supp. 3d at 319 (quoting *In re Mutual Funds Inv. Litig.*, 519 F. Supp. 2d 580, 586 (D. Md. 2007).  Where these elements are satisfied, courts utilizing the "class certification" approach will "allow[] an action to proceed . . . leaving for the Rule 23(a) analysis questions about commonality, typicality, and adequacy of representation."  *Id*.

This Court already determined that Plaintiffs adequately alleged their own injuries for purposes of standing.  *See* MTD Op. II at 4-6.  The key inquiry, then, is whether Plaintiffs' injuries are "shared in common with others who have been similarly harmed by the same defendant's actions."  *Singh*, 510 F. Supp. 3d at 319.  Put differently, the relevant question is not whether there are differences between named Plaintiffs and workers at hatcheries and feed mills, but rather:

whether those differences create divergent interests such that "the class representative[s] [have] an insufficient personal stake in the adjudication of the class members' claims?"  MTD Op. II at 5-6 (quoting *In re Asacol Antitrust Litigation*, 907 F.3d 42, 49 (1st Cir. 2018)).  This Court previously answered that question in the negative, and does so again now.

The TAC adequately alleges that workers at Defendant Processors' poultry processing plants, hatcheries, and feed mills were similarly injured by Defendants' anticompetitive conduct effectuated through Compensation Meetings, Compensation Surveys, plant-to-plant communications, executive-to-executive communications, and extensive data sharing.  The TAC makes clear that Defendants' conduct was targeted with equal force against workers at processing plants, feed mills, and hatcheries alike.  *See, e.g.*, TAC ¶ 242 (alleging that Defendants collected and shared detailed survey data regarding positions at poultry processing plants, hatcheries, and feed mills); *see also id.* ¶ 236 (alleging that Defendants required as a condition of entry into the Survey Group that an entity managed all three of poultry processing plants, hatcheries, and feed mills).  Crucially, the TAC also alleges that as a result of Defendants' conduct, poultry processing, hatchery, and feed mill workers suffered artificially depressed wage rates, and that these injuries were similarly exacerbated by workers' vulnerable positions in society and lack of readily alternative employment.  *Id.* ¶¶ 195-97, 455-57.  Taken together, then, the TAC alleges that processing plant, hatchery, and feed mill workers were: employed by the same entities, which acted upon them in the same ways, and thereby caused the same injuries.  As such, Plaintiffs have alleged an adequate personal stake in the adjudication of hatcheries and feed mills workers' claims.

Defendants' emphasis on the potential dissimilarities among these workers' jobs, skills, and employment alternatives does not change this conclusion.  In their motion, Defendants argue that the TAC fails to allege that poultry processing workers, hatchery and feed mill employees: (1)

are employed at the same locations; (2) perform similar job functions; (3) work on the same products; or (4) are subject to the same factors that differentiate processing plant employees from other minimum wage employment.  ECF 630 at 6-8.  To some extent, Defendants' assertions are contradicted by the TAC itself.  *See* TAC ¶ 167 (alleging that "processing plants, hatcheries, and feed mills are usually located in very close proximity, on a shared site."); *id.* ¶ 195-97, 455-57 (alleging that workers at processing plants, feed mills, and hatcheries have industry-specific skills, and limited alternative options for employment).  More fundamentally, however, Defendants fail to demonstrate how these differences, to the extent they exist, create divergent interests such that named Plaintiffs lack a sufficient personal stake in the adjudication of the claims.  It is true, for instance, that a hatchery employee works with eggs on a day-to-day basis, whereas a processing plant worker deals with poultry carcasses.  Whether targeted against poultry workers handling carcasses or eggs, however, Defendants' alleged anticompetitive conduct implicates a similar set of concerns and interests.  *See Gratz v. Bollinger*, 539 U.S. 244, 265 (2003) (concluding that a "University's use of race in undergraduate transfer admissions does not implicate a significantly different set of concerns than does its use of race in undergraduate freshman admissions.").  This is particularly true where, as here, Plaintiffs have alleged that Defendants' anticompetitive conduct inflicted the same injuries across all categories of workers.

Notably, albeit somewhat puzzlingly given that their motion is styled under Rule 12(b)(1), Defendants devote significant portions of their briefing to arguing that "Plaintiffs' proposed national labor market comprising only poultry processing, feed mill, and hatchery workers is facially implausible and Plaintiffs have not sufficiently alleged its existence."  ECF 630 at 8-10; ECF 674 at 7-10.  Defendants justify their fixation on the TAC's alleged market by claiming that the "argument simply identifies the absence of a plausible relevant market . . . as an indicator of

the divergent interests between named Plaintiffs and feed mill and hatchery workers."  ECF 674 at 7.  Defendants' position fails on at least three grounds.  First and foremost, Defendants' argument is contingent on a finding that TAC's alleged product or geographic market is implausible; but this Court has not made, nor has it been asked to make, such a determination.  If Defendants wished to contest the legal adequacy of the TAC's alleged markets, they could have appropriately done so through a motion to dismiss for failure to state a claim under Rule 12(b)(6).  Having declined to do so, Defendants cannot now undermine the alleged market through the guise of a challenge to standing.[4]  Second, even were this Court to examine the TAC's alleged market at this juncture, it would not alter the conclusion that Defendant Processors' hatchery, feed mill, and processing workers are alleged to have incurred the same injuries due to identical anticompetitive conduct on Defendants' part.  The ultimate merits of the alleged market for purposes of a rule of reason claim does not bear on this determination.  Third and finally, Defendants' prediction that the alleged market will create, "different—and potentially conflicting—interests in answering such questions as the size and scope of a potential geographic labor market, [and] the types of jobs that are reasonably interchangeable . . ." is both speculative and premature.  ECF 674 at 7.  Indeed, these technical and legalistic concerns are precisely the type of issues that the "class certification" approach reserves for the Rule 23(a) analysis.  *Singh*, 510 F. Supp. 3d at 319 ("Most jurisdictions, however, have adopted a 'class certification' approach, allowing an action to proceed once the named plaintiff demonstrates her individual

---

[4] Insofar as Defendants recycle arguments regarding Plaintiffs' geographic market, *see, e.g.*, ECF 630 at 9 n.4, this Court rejects them on the same reasoning as described in MTD Op. I at 21-23.

standing to bring a claim, leaving for the Rule 23(a) analysis questions about commonality, typicality, and adequacy of representation.").[5]

This Court will accordingly deny Defendants' motion under 12(b)(1).  To the extent that Defendants dispute that Plaintiffs are competent to represent the claims of persons employed at Defendant Processors' hatcheries and feed mills, they may raise such challenges in the context of a class certification motion pursuant to Fed. R. Civ. P. 23.

## III.  PERSONAL JURISDICTION

### A.  Legal Standard

Next, this Court considers the portion of Foster's motion that challenges this Court's exercise of personal jurisdiction to adjudicate Plaintiffs' claims against it.

Under Rule 12(b)(2), the burden is "on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence."  *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989); *see Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014); *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) (citing *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 59-60 (4th Cir. 1993)).  When "a district court decides a pretrial personal jurisdiction motion without conducting an evidentiary hearing, the plaintiff need

---

[5] The cases cited by Defendants do not compel a different result.  Much of this caselaw stands for the wholly uncontested principle that "a class representative must be a part of the class and possess the same interest and suffer the same injury as the class members."  ECF 674 at 8 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) and citing *Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1238 (9th Cir. 2001)).  Consistent with that basic proposition, this Court finds that Plaintiffs have standing because they have alleged the same injury: artificially depressed compensation due to Defendants' anticompetitive conduct.  Nor is this an instance where pursuing claims on behalf of hatchery or feed mill employees would require "[e]ntirely unique evidence" to prove.  *Id.* (quoting *Dimuro v. Clinique Labs.*, LLC, 572 F. App'x 27, 29 (2d Cir. 2014)).  To the contrary, Plaintiffs have alleged that the same methods were used to implement the scheme against hatchery, feed mill, and processing plant employees.  As such, there will likely be considerable overlap between the evidence required to prove the claims as to each category of worker.

only make a prima facie showing of personal jurisdiction." *Carefirst of Md.*, 334 F.3d at 396 (citing *Combs*, 886 F.2d at 676).  To determine whether the plaintiff has met this burden, "the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Combs*, 886 F.2d at 676.  The court need not "look solely to the plaintiff's proof in drawing" all reasonable inferences in plaintiff's favor, and may also look at the defendant's proffered proof and assertions regarding defendant's lack of contacts with the forum state. *Mylan Labs.*, 2 F.3d at 62.

### B. Analysis

A federal court has personal jurisdiction over a nonresident defendant if: "(1) an applicable state long-arm statute confers jurisdiction and (2) the assertion of that jurisdiction is consistent with constitutional due process." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 188 (4th Cir. 2016).  Courts must address both prongs of the personal jurisdiction analysis, despite Maryland courts consistently holding that the state's long-arm statute "authorize[s] the exercise of personal jurisdiction to the full extent allowable under the Due Process Clause." *Bond v. Messerman*, 391 Md. 706, 721, 895 A.2d 990, 999 (2006).  To satisfy the first prong, a plaintiff must identify a provision in the Maryland long-arm statute that authorizes jurisdiction.  *Ottenheimer Publishers, Inc. v. Playmore, Inc.*, 158 F. Supp. 2d 649, 652 (D. Md. 2001).  Under the second prong, a plaintiff must demonstrate that a defendant has "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

A court may exercise two types of personal jurisdiction: general or specific. *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.* ("*BMS*"), 137 S. Ct. 1773, 1780 (2017).  General jurisdiction is limited to instances where "the continuous corporate operations

within a state [are] so substantial and of such a nature as to justify suit against [defendant] on causes of action arising from dealings entirely distinct from those activities." *Int'l Shoe*, 326 U.S. at 318.  The paradigm bases for a corporation's general jurisdiction are its place of incorporation and principal place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).  Specific jurisdiction, likewise, arises where there is "an affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  The Fourth Circuit has enumerated three factors to assess specific jurisdiction: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009) (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002)).

Foster argues that this Court does not have general or specific jurisdiction over it for purposes this action.  Plaintiffs do not appear to dispute a lack of general jurisdiction.  Instead, Plaintiffs offer two bases for the exercise of specific personal jurisdiction over Foster: (1) Maryland's long-arm statute, which has been interpreted to include the conspiracy theory of personal jurisdiction, and (2) Section 12 of the Clayton Act, 15 U.S.C. § 22.  The Court finds Plaintiffs' first argument to be both persuasive and dispositive.[6]

---

[6] The parties dispute whether Section 12 authorizes nationwide service of process, or whether it must be read in conjunction with its venue clause, thereby authorizing service of process only if the suit was brought in the proper Clayton Act venue. *Compare* ECF 654 at 3, *with* ECF 675 at 5. *See DataCell ehf. v. Visa, Inc.*, 2015 WL 4624714, at *4 (E.D. Va. July 30, 2015) (outlining circuit split).  Because Plaintiffs have established personal jurisdiction on the basis of a conspiracy theory, it is unnecessary to reach the parties' Clayton Act arguments.

i.    **Conspiracy Theory of Personal Jurisdiction**

Maryland's long-arm statute confers personal jurisdiction "over a person, who directly or *by an agent* . . . [c]auses tortious injury in the State by an act or omission in the State."  Md. Code Ann., Cts. & Jud. Proc. § 6-103(b) (emphasis added).  The State's highest court has determined that a co-conspirator falls within the definition of an "agent" for purposes of its long-arm statute. *Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 142, 892 A.2d 479, 493 (2006) ("a conspirator who performs an act in furtherance of the conspiracy does so as an agent for his co-conspirators.").  This "conspiracy theory" of personal jurisdiction recognizes that certain acts of a co-conspirator done in furtherance of a conspiracy may be attributed to another co-conspirator for purposes of a jurisdictional analysis.  *Id.* at 484.  To establish personal jurisdiction under this theory, a plaintiff must make a threshold showing that:

(1) two or more individuals conspire to do something;

(2) that they could reasonably expect to lead to consequences in a particular forum, if

(3) one co-conspirator commits overt acts in furtherance of the conspiracy, and

(4) those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state . . .

*Id.* at 486 (quoting *Cawley v. Bloch*, 544 F. Supp. 133, 135 (D. Md. 1982)).  If a plaintiff demonstrates these conditions, then a co-conspirator's conduct is "attributable to the other co-conspirators, who thus become subject to personal jurisdiction in the forum, even if they have no direct contacts with the forum."  *Id.*

The first, third, and fourth elements of this standard are easily satisfied.  Plaintiffs allege with specificity that Foster conspired with other Defendants to artificially depress workers' wages and unlawfully exchange wage compensation information.  *See, e.g.*, TAC ¶ 69.  In furtherance of

the conspiracy, Plaintiffs allege that several Defendant Processors—namely, Perdue Farms, Perdue Foods, Allen Harim, and Amick Farms—artificially suppressed the wages of persons in Maryland. *Id*. ¶ 26 (alleging that Perdue Farms and Perdue Foods used their headquarters in Salisbury, Maryland to implement and coordinate unlawful trade restraints.). Because these overt acts allegedly caused tortious injury to persons in the State, they would plainly be sufficient to extend this Court's personal jurisdiction over nonresident entities such as Foster if they had been committed by Foster directly. *See* Md. Code Ann., Cts. & Jud. Proc. § 6-103(b).

Finally, the second element is an objective one, which is satisfied by a showing that "a reasonable person in the defendant's position would have anticipated a co-conspirator committing an act in furtherance of the conspiracy within the forum jurisdiction." *Gold v. Gold*, 2017 WL 2061480, at *2 (D. Md. May 15, 2017) (citing *Mackey*, 892 A.2d at 486). "This hypothetical 'reasonable person' must form the pertinent expectation *at the time the agreement with the co-conspirator was formed*." *Ultimate Outdoor Movies, LLC v. FunFlicks, LLC*, 2019 WL 2233535, at *8 (D. Md. May 23, 2019) (quoting *Gold*, 2017 WL 2061480, at *3) (emphasis in *Gold*) (internal quotation marks omitted). This requirement ensures that an out-of-forum co-conspirator has purposely availed itself of "the privilege of conducting activities in the forum and therefore has fair warning that she could be subject to suit there." *Gold*, 2017 WL 2061480, at *3. Here, Plaintiffs allege that Foster attended every Compensation Meeting held between 2001 and 2019; also present at each of these meetings was one of Foster's alleged co-conspirators, Perdue Farms, a Maryland entity. TAC ¶¶ 35, 69. Critically, during most of that period, Foster served together with Perdue Farms or Perdue Foods on the Compensation Survey's three-to-five person Steering Committee. *Id*. ¶ 230. Put differently, Foster is alleged to have served among the small leadership group implementing the conspiracy alongside Maryland entities for the better part of two decades.

At the time it joined the conspiracy, then, a reasonable entity in Foster's position would have anticipated that its Maryland co-conspirators would further their unlawful agreement in this State.

Foster does not dispute that any particular element of the conspiracy theory of personal jurisdiction is satisfied. Rather, Foster argues that the doctrine offends due process, and did not survive the Supreme Court's rulings in *Walden v. Fiore*, 571 U.S. 277 (2014) and *BMS*, 137 S. Ct. 1773 at 1781. Foster recognizes that courts in this district have repeatedly relied on Maryland's conspiracy theory of personal jurisdiction after the issuance of the Supreme Court's rulings in *Walden* and *BMS*. *See, e.g.*, *Ultimate Outdoor Movies*, 2019 WL 2233535, at *5; *Coastal Labs., Inc. v. Jolly*, 502 F. Supp. 3d 1003, 1020-21 (D. Md. 2020); *Felichko v. Schechter*, 2019 WL 1318109 at *8 (D. Md. Mar. 22, 2019). Nonetheless, Foster argues that this caselaw is inapplicable because these courts were not presented with the antecedent question of the doctrine's continuing vitality. Foster's position is unpersuasive.

A brief examination of *Walden* and *BMS* reveals the flaws in Foster's argument. *Walden* concerned a law enforcement officer from Georgia that allegedly drafted a false and misleading affidavit regarding two individuals who had previously told the officer that they lived in California and Nevada. *Id.* at 280-81. The Supreme Court reversed the Ninth Circuit's finding that a district court in Nevada could exercise personal jurisdiction over the officer merely because his affidavit was submitted with the knowledge that it would affect persons in Nevada. In its decision, the Court emphasized that for purposes of a jurisdictional "minimum contacts" analysis the "plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State." *Id.* at 184. Because no part of the officer's relevant conduct occurred in Nevada, nor was he connected to Nevada in any meaningful way, the state could not exercise specific personal jurisdiction. Likewise, in *BMS*, the Supreme

Court determined that California could not exercise personal jurisdiction over nonresidents' products-liability claims against a pharmaceutical company that was not headquartered or incorporated in California, but engaged in extensive business activities in the state. *BMS*, 137 S. Ct. at 1776. The pharmaceutical company did not develop or manufacture the drug in question in California, nor did the nonresidents purchase or ingest the drug there. In its holding, the Supreme Court reiterated that personal jurisdiction requires a connection between the forum state and the claims at issue. *Id.* at 1778. "The mere fact that other plaintiffs were prescribed, obtained, and ingested [the drug] in California does not allow the State to assert specific jurisdiction over the nonresidents' claims." *Id.* at 1776. *Walden* and *BMS* did not address the conspiracy theory of jurisdiction, nor did either case undermine its basic premise: that a defendant may purposefully avail itself of a forum through its agents or co-conspirators. *See Daimler*, 571 U.S. 117 at 135 n.13 ("a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there."); *Walden*, 571 U.S. at 286 ("To be sure, a defendant's contacts with the forum State may be intertwined with his transactions or interactions with . . . other parties.").

This Court's exercise of personal jurisdiction over Foster is consistent with the principles espoused in *Walden* and *BMS*. Plaintiffs have alleged that Foster and several Maryland entities conspired to artificially depress the wages of persons employed at poultry processing complexes, including ones located in this State. Unlike the lower court in *Walden*, this Court does not purport to exercise personal jurisdiction based exclusively on Foster's contacts with Plaintiffs, but rather based on Foster's contacts and relationships with its co-conspirators, and the actions Foster effectuated in this State through those co-conspirators.[7] Accordingly, Plaintiffs have met their

---

[7] Foster cites several district court opinions that questioned the constitutional validity of other states' versions of the conspiracy theory of personal jurisdiction, including one district court that affirmatively rejected the theory. *See* ECF 631 at 9 n.3; *see also Rickman v. BMW of N. Am. LLC*,

burden of presenting a prima facie showing of personal jurisdiction over Foster under the conspiracy theory of jurisdiction.

### ii.    Federal Due Process

Having established a basis for personal jurisdiction under Maryland's long-arm statute, this Court must also ensure that the exercise of personal jurisdiction comports with federal due process. The relevant question here is whether an out of state defendant has "certain minimum contacts" with the forum state, "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe*, 326 U.S. at 316 (quoting *Milliken*, 311 U.S. at 463).

As stated above, this Court is satisfied that Plaintiffs have established a prima facie case that Foster has the requisite minimum contacts with Maryland to comport with due process. Plaintiffs have alleged that Defendant conspired with several Maryland entities to suppress wages of Defendant Processors' workers in Maryland. The allegations of Foster's shared membership on the Compensation Survey's Steering Committee with Maryland entities, its long-term attendance at the Compensation Meetings with Maryland-based co-conspirators, and its communications with co-conspirators in the State all serve to support a substantial connection between Foster and Maryland. *See* TAC ¶¶ 69, 230, 236-37, 371. The fact that Foster "sold a minimal amount of poultry products in Maryland" does not change this conclusion. *See* ECF 631 at 5. For purposes of Plaintiffs' claims, Foster's relevant actions are those taken in concert with

---

538 F. Supp. 3d 429, 440 (D.N.J. 2021). The decision in *Rickman*, however, arose under New Jersey law, a state that had "not clearly recognized that theory," and, unlike Maryland, had not limited the doctrine to only those defendants that reasonably should have known of co-conspirators' overt acts in the forum. Foster cites yet other district court opinions expressing confusion regarding the doctrine's continuing vitality, which were subsequently resolved by a recent Second Circuit decision affirming the exercise of personal jurisdiction under a conspiracy theory. *See Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 125 (2d Cir. 2021). In any event, the cases cited by Foster did not concern Maryland's conspiracy theory of personal jurisdiction, nor are they binding upon this Court.

its alleged co-conspirators, not those arising from its own sale of any particular product. Plaintiffs have plausibly alleged that Foster purposefully availed itself of Maryland through the overt acts of its co-conspirators; in so doing, Foster had fair notice that its participation in the conspiracy would subject it to suit in Maryland. Accordingly, under the prima facie standard, the exercise of personal jurisdiction over Foster is constitutionally reasonable and comports with federal due process.[8]

Finally, this Court is mindful that with the benefit of full discovery, Plaintiffs may be unable to show that Foster's conduct suffices to establish personal jurisdiction over it in Maryland. *See New Wellington Financial Corp. v. Flagship Resort Development Corp*., 416 F.3d 290, 294 n.5 (4th Cir. 2005) ("[a] threshold *prima facie* finding that personal jurisdiction is proper does not finally settle the issue; plaintiff must eventually prove the existence of personal jurisdiction by a preponderance of the evidence, either at trial or at a pretrial evidentiary hearing") (emphasis in original) (internal quotation marks and citation omitted). Accordingly, this decision does not preclude Foster from renewing its 12(b)(2) motion after the close of discovery, if appropriate.

## IV.   LEGAL SUFFICIENCY

Next, this Court considers individual Defendants' various motions to dismiss for failure to state a claim under Rule 12(b)(6). ECF 631, 632 638, 639.

### A.  Legal Standard

Under Rule 12(b)(6), a defendant may test the legal sufficiency of a complaint by way of a motion to dismiss. *See In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley*

---

[8] Foster argues that the exercise of personal jurisdiction would be constitutionally unreasonable because it is based in California and therefore should not be subject to the burden of defending this action in Maryland. Although the burden of litigating in a distant forum weighs against the exercise of jurisdiction, the mere fact of California's distance from Maryland does not render an otherwise appropriate forum constitutionally deficient. *See Ultimate Outdoor Movies*, 2019 WL 2233535, at *5 (finding that the exercise of personal jurisdiction over California citizens based on conspiracy theory of jurisdiction was constitutionally appropriate).

*Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678.  An inference of a mere possibility of misconduct is insufficient to support a plausible claim, rather, "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  "A pleading that offers 'labels and conclusions' or . . . 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice.  *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557).  In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff."  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted).  However, a court is not required to accept legal conclusions drawn from the facts.  *See Twombly*, 550 U.S. at 555; *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

Courts generally do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion.  *Edwards*, 178 F.3d at 243 (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).  However, "in the relatively rare

circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009).  Because Rule 12(b)(6) challenges only to the legal sufficiency of a complaint, a court may only reach the merits of an affirmative defense "if all facts necessary to the affirmative defense 'clearly appear[] *on the face of the complaint*.'" *Goodman*, 494 F.3d at 464 (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (emphasis in *Goodman*); *see also Forst*, 4 F.3d at 250 ("A motion under Rule 12(b)(6) is intended to test the legal adequacy of the complaint, and not to address the merits of any affirmative defenses.").

### B.  Analysis of Each Defendant's 12(b)(6) Arguments

#### i.  Foster

In its motion under Rule 12(b)(6), Foster objects to the TAC's alleged geographic market for purposes of its rule of reason claim.  Specifically, Foster argues that the TAC's defined market is overbroad and implausible because—in contrast to other Defendant Processors that are concentrated in the South and Upper Midwest—it operates primarily in the West Coast.  *See* ECF 631 at 10 ("Plaintiffs have failed to plead any facts suggesting that California-based Foster Farms competes in a national labor market when the vast majority of its operations are located on the West Coast, at great distance from any other Defendant.").

This Court has previously considered and rejected similar arguments regarding the scope of Plaintiffs' pled geographic market.  *See* MTD Op. I at 21-23.  In doing so, this Court initially acknowledged that defining the relevant geographic market to extend throughout the entire continental United States may be inconsistent with the practical realities of the low-skilled labor

market.  *Id.* at 22.  The Court explained, however, that because alleging an overbroad market does not create deficiencies analogous to those that plague contradictory, undefined, or implausibly narrow markets, it does not warrant dismissal at the pleading stage:

> Plaintiffs must outline a relevant market so that they can then allege that Defendants have sufficient market power within the market for their information sharing to restrain competition.  It is therefore problematic to allege too narrow a geographic market, because it could create the illusion of market power where no market power exists, via the exclusion of nearby alternative employment opportunities . . . The same concern does not exist for a broad geographic market, because many alternative employment opportunities are included in the allegedly overbroad market, so there is no risk of creating an illusion of market power.  In fact, by alleging a broad geographic market spanning the entire country, Plaintiffs are making it *harder* to prove their case, because the level of market power necessary to control wages across the entire country is much greater.

*Id.* at 21-22 (emphasis in original) (internal citations omitted).

To the extent that Foster raises arguments not previously presented to this Court, they are unpersuasive.  Contrary to Foster's assertion, the TAC contains factual matter sufficient to infer that, like other Defendant Processors, Foster viewed itself as operating on a national scale with regards to workers' compensation.  Indeed, the TAC alleges that Defendant Processors collected and analyzed nationwide wage data to determine the compensation of its workers, which were set at similar levels across the country regardless of region.  Moreover, the TAC alleges that Foster specifically assumed an active role in establishing and enforcing these practices as a consistent member of the Survey Group's Steering Committee.  *See* TAC ¶¶ 69, 230, 236-37, 445-52. Foster's emphasis on its West Coast presence relative to other Defendant Processors, therefore, is both immaterial and largely foreclosed by this Court's prior determinations.  *See* MTD Op. II at 12-13 (rejecting Jennie-O's argument that the SAC failed to plead anticompetitive effects because its operations were limited to the Upper Midwest).  Finally, Foster insists that Plaintiffs' alleged market fails because there are "plausible, procompetitive  reasons for sharing the information, like

attempting to learn best practices for organizational structure." ECF 631 at 14-15. Again, this Court has basically acknowledged as much. *See* MTD Op. I at 19. As Foster itself recognizes, however, the existence of a plausible, lawful alternative scenario is not the basis for dismissal. ECF 631 at 15 (citing *Merryman v. J.P. Morgan Chase Bank, N.A.*, 2016 WL 5477776, at *9 (S.D.N.Y. Sept. 29, 2016) ("the Court cannot pick between equally plausible scenarios when deciding a motion to dismiss.")).[9]

In sum, this Court concludes, as it did previously, that "at this early stage in the proceeding where the bar to avoid dismissal is low, the geographic market has been plausibly alleged, despite its breadth." MTD Op. I at 23. This Court will deny Foster's motion.

### ii. Sanderson

Next, this Court addresses Sanderson's motion seeking dismissal of Count I insofar as it relates to any conduct occurring after February 14, 2012, the date that it claims to have withdrawn from the alleged wage-fixing conspiracy. ECF 632. Because withdrawal is an affirmative defense that must be raised and proved by the defendant, it is ordinarily not resolved through a motion challenging the legal adequacy of a complaint under Rule 12(b)(6). *United States v. Walker*, 796 F.2d 43, 49 (4th Cir. 1986) (the burden of proving withdrawal rests on the defendant). Even so, Sanderson insists that this Court may rule on the applicability of its withdrawal defense under Rule 12(b)(6) because it falls within the "relatively rare circumstances" in which "all facts necessary to

---

[9] Foster also points to statistics produced by the Bureau of Labor Statistics ("BLS") regarding the wages for meat, poultry, and fish cutters and trimmers, to argue that there are "significant disparities between wages in the Southeast and Midwest versus California," which undermine Plaintiffs' alleged market. ECF 631 at 14. The parties contest whether this Court may appropriately consider such data at the motion to dismiss stage. *See* ECF 654 at 20-21. Even were this Court to review such information, however, it would remain unmoved for the fundamental reason that Foster's argument is essentially a factual dispute, which this Court may not resolve through a 12(b)(6) motion. *See Edwards*, 178 F.3d at 243.

the affirmative defense 'clearly appear[] *on the face of the complaint.*'"  *Goodman*, 494 F.3d at 464 (citing *Forst*, 4. F.3d at 250) (emphasis in *Goodman*).  This Court disagrees, and will therefore deny Sanderson's motion without prejudice to reraise it upon a fuller evidentiary record.

"A defendant's membership in a conspiracy is presumed to continue until he withdraws from the conspiracy by affirmative action." *United States v. West*, 877 F.2d 281, 289 (4th Cir. 1989).  To establish withdrawal as a matter of law, a defendant must show that it has taken "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464 (1978); *United States v. Lispscomb*, 494 F. App'x 314, 316 (4th Cir. 2012).  A defendant's mere "unhelpfulness," *United States v. Cardwell*, 433 F.3d 378, 391 (4th Cir. 2005), or "cessation of activity in furtherance of the conspiracy," *Walker*, 796 F.2d at 49, does not amount to withdrawal.  Moreover, a defendant's purported withdrawal is ineffective if that defendant "continues to support or benefit from the agreement," notwithstanding the fact that it appeared to sever ties with other co-conspirators. *Osborn v. Visa Inc.*, 797 F.3d 1057, 1067 (D.C. Cir. 2015) (citing *United States v. Eisen*, 974 F.2d 246, 269 (2d Cir. 1992); *United States v. Antar*, 53 F.3d 568, 574 (3d Cir. 1995), *overruled in part on other grounds by Smith v. Berg*, 247 F.3d 532 (3d Cir. 2001)).

Sanderson argues that its withdrawal from the conspiracy alleged in Count I is established by the TAC's allegation that:

> In 2012, for example, Sanderson Farms withdrew from the [ ] Survey Group and informed all the Group's members that it was withdrawing at the direction of legal counsel.  Specifically, on February 14, 2012, Jennifer Buster, Sanderson's Manager of Human Resources, emailed the [ ] Survey Group: "On the advice of legal counsel, our Executives have decided that we can no longer participate in this type of survey."

TAC ¶ 316.  Sanderson further asserts that, consistent with its alleged withdrawal, the TAC does not allege that Sanderson participated in the Compensation Survey, executive-to-executive communications, or plant-to-plant communications after 2012.  ECF 632 at 4-6.  Rather, the TAC only alleges that a Sanderson executive attended a 2013 "Chicken Media Summit" that "included discussion of labor practices."  TAC ¶ 434.

Although the TAC contains allegations consistent with a theory that Sanderson withdrew from the alleged conspiracy, it did not adduce facts establishing such withdrawal as a matter of law.  Whether and when a defendant withdrew from an alleged conspiracy are fact-intensive inquiries that may rarely be resolved on a motion to dismiss.  *See, e.g.*, *Hengle v. Asner*, 433 F. Supp. 3d 825, 893 (E.D. Va. 2020), *aff'd sub nom. Hengle v. Treppa*, 19 F.4th 324 (4th Cir. 2021) ("Whether there was an effective withdrawal is typically a question of fact for the jury." (quoting *Osborn*, 797 F.3d at 1068)); *United States v. Grimmett*, 236 F.3d 452, 454 n.2 (8th Cir. 2001) (Noting that "[g]iven the fact intensive nature of conspiracy withdrawal issues, there is always a question whether they should be resolved before or at trial"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2014 WL 1091589, at *9 (N.D. Cal. Mar. 13, 2014) (observing that withdrawal is a generally "a fact-sensitive affirmative defense").  In this instance, there are a multitude of outstanding factual questions that may bear on the applicability of Sanderson's withdrawal defense, including whether, after 2012, it continued to set wages at artificially depressed rates, support the conspiracy, or otherwise reap the benefits of Defendant Processors' alleged wage-suppression.  While it is true that Plaintiffs did not allege facts regarding these issues in the TAC, it is not their burden to do so.  *Chin-Young v. United States*, 774 F. App'x 106, 114 (4th Cir. 2019) ("we have long recognized that a complaint need not negate affirmative defenses.").  Notwithstanding Sanderson's insistence to the contrary, it is therefore immaterial that the TAC did

not affirmatively allege Sanderson's continued participation in the conspiracy after 2012; what matters instead is that the TAC did not allege facts that would render such continued participation implausible. *Contra Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-CV-00042 JG VVP, 2015 WL 4987751, at *5 (E.D.N.Y. Aug. 19, 2015) (concluding at motion to dismiss stage that defendant withdrew from conspiracy where plaintiff pled facts that would have made defendant's continued participation in the conspiracy after its purported withdrawal implausible).

This Court expresses no view on whether Sanderson's 2012 email stating that it could no longer participate in the Survey Group was sufficient to effectuate its withdrawal from the alleged wage-fixing conspiracy. However, Sanderson's assertion that the TAC's partial quotation of a single email provided all the facts necessary to conduct an analysis of its withdrawal defense runs contrary to the fact-intensive nature of that inquiry.[10] A fuller evidentiary record is required to determine the applicability of Sanderson's withdrawal defense.[11] Sanderson is accordingly free to reraise its defense at a more appropriate juncture.

---

[10] The TAC's characterization of Sanderson's email as "withdr[awal] from the [ ] Survey Group," does not alter this conclusion. TAC ¶ 316. Establishing an "'entitle[ment] to relief' requires more than labels and conclusions." *Twombly*, 550 U.S. at 555 (quoting *Papasan*, 478 U.S. at 286) (alterations in *Twombly*). This foundational principle does not change merely because a plaintiff's conclusory label would accrue to a defendant's benefit.

[11] Unsurprisingly given the nature of the inquiry, the majority of cases cited by Sanderson concern the applicability of a withdrawal defense at the summary judgment stage. Sanderson insists that the procedural posture of its caselaw is immaterial because "the *Gypsum* standard[] [ ] applies with equal force at any posture." ECF 679 at 3 n.2. Although indisputably true, Sanderson's assertion is beside the point. The question is not whether or how the *Gypsum* standard applies, but whether it can be analyzed on the basis of only the facts alleged in the TAC. Here, it cannot.

### iii.    Mountaire and Jennie-O

Finally, this Court turns to Mountaire's and Jennie-O's respective motions to dismiss.  ECF 638, 639.  In their motions, Mountaire and Jennie-O contend that the TAC so thoroughly whittled down the allegations against them such that it no longer states a claim.  In opposition, Plaintiffs argue that the TAC still contains adequate factual matter to connect Mountaire and Jennie-O to both its *per se* and rule of reason conspiracy claims.  Plaintiffs are correct as to only the latter contention.

### a.    *Per Se* Conspiracy

In Count I, Plaintiffs allege a *per se* violation of the Sherman Act by way of conspiracy to depress compensation of workers at poultry processing complexes.  TAC at 165.  This Court earlier explained that Plaintiffs provided sufficient direct evidence to plausibly allege a wage fixing conspiracy, but that "Plaintiffs must next link each specific Defendant to the [Compensation] [M]eetings in order to state a claim."  MTD Op. I at 14.  In the SAC, Plaintiffs sufficiently did so as to both Mountaire and Jennie-O.  *See* MTD Op. II at 8-9.  The allegations in the TAC, by contrast, fall short.

The expansive, 186-page TAC, alleges that Mountaire: (1) attended a Compensation Meeting in 2011; (2) submitted data to the Compensation Survey in 2011; (3) subscribed to Agri Stats; and (4) refused to participate in the Compensation Meeting in 2018 on the advice of its general counsel.  TAC ¶¶ 56, 320.  The TAC is also notable insofar as what it does not allege.  Unlike its predecessor pleadings, the TAC does not allege that Mountaire executives maintained close personal relationships with other Defendant Processors' executives, nor does it allege that Mountaire attended multiple Compensation Meetings.  *Compare id.*, *with* SAC ¶¶ 242.  Likewise, the TAC alleges that Jennie-O: (1) attended a Compensation Meeting in 2015; (2) submitted data

to the Compensation Survey in 2015; (3) subscribed to Agri Stats; and (4) was said to conduct "a current survey of the turkey industry that focuses largely on the hourly workforce" in a 2014 correspondence between two unrelated entities.  TAC ¶¶ 87, 391.  The TAC does not allege that Jennie-O attended a Compensation Meeting before or after 2015,[12] nor does it allege any plant-to-plant communications on Jennie-O's part.

Plaintiffs cannot plausibly allege Mountaire's or Jennie-O's participation in a 21-year wage-fixing conspiracy by way of their respective attendance at a single Compensation Meeting, in advance of which they submitted compensation data to WMS.  *See* TAC ¶¶ 56, 87.  As a general matter, this Court does not consider a defendant's appearance at a single meeting—from which point onward it never showed up again—to be particularly indicative of that defendant's agreement to join, or participate in, a conspiracy.  This is especially true in light of Plaintiffs' allegation that "Defendant Processors were *required to attend these Meetings as a condition of participating* in the annual [ ] Compensation Survey . . . a poultry processor would be expelled from the [ ] Survey Group if it failed to attend the annual in-person meeting two years in a row."  *Id.* ¶ 325.  By Plaintiffs' own allegations then, to the extent that Mountaire or Jennie-O had any involvement with the conspiracy to depress wages, it would have been minimal and short-lived.  If the TAC only tenuously connects Mountaire and Jennie-O to the Compensation Surveys and Compensation Meetings, it draws no link at all between these Defendants and other overt acts implementing the conspiracy.  The TAC alleges no direct communications between Mountaire or Jennie-O and other

---

[12] Notably, although the TAC alleges that Jennie-O's employees "regularly attended" the Compensation Meetings, it only alleges one instance of attendance, and unlike prior iterations of the complaint, the TAC does not allege this 2015 attendance as an "example."  TAC ¶ 87.  In their briefing in opposition to Jennie-O's motion, Plaintiffs do not appear to dispute that the TAC alleges only a single instance of attendance at the Compensation Meetings, nor do they point to the word "regularly" as a potential allegation of broader attendance.  *See* ECF 660 at 15.  Instead, they argue only that a single Compensation Meeting is sufficient.

Defendant Processors' executives,[13] and no plant-level communications involving Mountaire or Jennie-O employees.  Indeed, Mountaire and Jennie-O are only firmly connected to the *per se* conspiracy through their subscription to Agri Stats, through which Defendants allegedly "exchange[d] current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors."  TAC ¶¶ 18, 56, 87.  But as this Court has already explained, Defendants' subscription to, or use of Agri Stats's services to set compensation numbers is insufficient to support an inference that any Defendant participated in the *per se* conspiracy to suppress compensation.  MTD Op. I at 17-18.

Plaintiffs raise three main arguments in opposition: (1) that "this Court has already held that . . . attendance [at one Compensation Meeting] suffices to link a Defendant Processor to Plaintiffs' *per se* claim;" (2) that the TAC added direct evidence of conspiratorial misconduct that occurred at the Compensation Meetings; and (3) that the TAC details additional methods through which Defendants including Jennie-O and Mountaire participated in the conspiracy.  These arguments fail.

Plaintiffs' first argument is easily rejected.  Despite Plaintiffs' insistence that "this Court has explicitly held that allegations of attendance at a lone Compensation Meeting during the Class Period was sufficient to link a particular defendant to the per se claim," this Court held no such thing.  ECF 660 at 14 (citing MTD Op. I at 14).  This Court previously determined that Defendant Processors' alleged attendance at a Compensation Meeting in April, 2017 sufficed to link them to the Compensation Meetings more generally.  MTD Op. I at 14.  Unlike here, however, Plaintiffs

---

[13] The TAC alleges that in 2014, Cooper Farms wrote an email to Fieldale Farms stating that "Jenni[e]-O does a current survey of the turkey industry that focuses largely on the hourly workforce."  TAC ¶ 391.  This email cannot be considered an executive-to-executive communication because of the simple fact that Jennie-O is not alleged to have been included in it. Nor is the allegation sufficiently specific to be considered direct evidence of the *per se* conspiracy.

specifically alleged attendance at the April, 2017 meeting merely "[a]s *an example* of the scope of participation," at annual Compensation Meetings.  FAC ¶ 153 (emphasis added).  The allegation therefore characterized Defendants' attendance at that particular Compensation Meetings as indicative, not exhaustive, of their total participation in the Compensation Meetings over the scope of the conspiracy.  Moreover, to the extent that this Court's initial ruling created any ambiguity on the issue, it was resolved by its subsequent decision on the second round of motions to dismiss.  In denying Jennie-O's motion to dismiss the SAC, this Court determined that an allegation that Defendant "first started attending the 'off the books' [Compensation] [M]eetings in or around 2015," was sufficient precisely because the language implied attendance at multiple Compensation Meetings.  MTD Op. II at 8 ("Indeed, inherent in this 'first started attending' language is an allegation that that attendance in 2015 was the first of multiple meetings attended, *not* the single instance of attendance . . . This is further demonstrated by the SAC's use of the plural 'meetings' when describing Jennie-O's attendance.") (emphasis in original); *see also id.* at 8-9 ("Unlike the Complaint's previous iteration, the SAC includes a specific allegation that Mountaire *attended at least some* of the secret compensation meetings at which Defendants allegedly agreed to conspire to fix poultry wages.") (emphasis added).  Simply put, this Court has never ruled, much less expressly, that a Defendant's attendance at a single Compensation Meeting sufficed to tie that Defendant to the *per se* conspiracy generally.

Next, Plaintiffs' emphasis on the TAC's new factual allegations regarding conspiratorial communications that occurred at the Compensation Meetings is largely beside the point.  The issue is not whether Plaintiffs have alleged direct evidence of a *per se* conspiracy, indeed, this Court already concluded that they did.  The relevant inquiry is whether the claims as currently pled in the TAC sufficiently connect Mountaire and Jennie-O to that conspiracy.  Although the TAC

contains ample allegations to incriminate the Compensation Meetings generally, it adduces no facts suggesting that Jennie-O or Mountaire participated in any improper conduct that occurred at the single meeting they attended, or that either entity implemented the anticompetitive conduct that was agreed upon there.[14]  *Contra SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 430 (4th Cir. 2015) (denying motion to dismiss where plaintiff alleged defendants' attendance at a single meeting where they agreed to form the conspiracy through a majority vote and subsequently implemented the agreed-to boycott); *Precision Assocs. v. Panalpina World Transp. (Holding) Ltd.*, 2015 WL 13650032, at *18 (E.D.N.Y. June 24, 2015) (denying motion to dismiss where defendant attended a meeting at which attendees agree to implement the conspiracy and monitor each other's compliance, and that those defendants then imposed the agreed-upon fee).  While it is conceivable that Mountaire and Jennie-O joined a longstanding conspiracy to depress wages at the sole meeting they attended, it is also conceivable that Mountaire and Jennie-O went to a meeting that they belatedly realized was improper, did not participate, and never returned.  Absent any facts sufficient to nudge the former scenario "across the line from conceivable to plausible," Plaintiffs' *per se* claim against Mountaire and Jennie-O cannot survive.  *Twombly*, 550 U.S. at 570.

Plaintiffs finally argue that the TAC ties Jennie-O and Mountaire to their *per se* claim by detailing two new methods through of participation in the conspiracy: written communications

---

[14] In denying Mountaire's motion to dismiss the SAC, this Court rejected the argument that Plaintiffs must allege not merely attendance at the Compensation Meetings, but also allege that Mountaire actually *participated* in wage fixing while in attendance.  MTD Op. II at 8.  That conclusion is consistent with this Court's explanation herein.  A Defendant's course of attendance at multiple Compensation Meetings would be sufficient to infer participation in that conspiracy at the motion to dismiss stage, even absent specific facts regarding their participation at any particular meeting.  By contrast, where Plaintiffs allege that a Defendant went to a single Compensation Meeting over the course of two decades—particularly where co-conspirator attendance is alleged to have been compulsory—that Defendant's participation in the conspiracy is not plausible absent some facts suggesting that it actually participated in conspiratorial conduct that occurred therein or thereafter.

about compensation rates with other Defendant Processors; and Defendant Processors' direct recruitment of competing poultry processors into the Survey Group.  The first argument fails because neither Mountaire or Jennie-O are alleged to have actually engaged in these communications.  As to Mountaire, the TAC instead alleges that it received an invitation to participate in a wage survey in 2014; Mountaire is not alleged to have accepted or otherwise responded to the correspondence.  TAC ¶ 390.  Similarly, the TAC alleges that Cooper Farms sent an email to Fieldale Farms stating that Jennie-O does a "current survey of the turkey industry," but does not indicate that Jennie-O participated in this communication or that Jennie-O's survey—to the extent it existed—was somehow part of the wage-suppression conspiracy.  *Id.* ¶ 391.  Second, allegations in the TAC regarding Defendant Processors' "direct recruitment" of potential co-conspirators also fail to implicate Mountaire or Jennie-O specifically.  *See* ECF 660 at 21 (citing TAC ¶¶ 234, 292 (alleging that "[t]he Steering Committee determined which poultry processors could participate in the [ ] Survey Group," and that Tyson directly invited group members to participate in a second survey).  These allegations shed no light, even generally, on what was communicated to Survey Group invitees such that the decision to attend an initial meeting could be construed as participation in the conspiracy.  Certainly, these allegations do not give rise to an inference that Mountaire's and Jennie-O's mere appearance at a single Compensation Meeting itself constituted participation in the conspiracy.

The TAC presents both Mountaire and Jennie-O as one-time attendees to the Compensation Meetings that formed the backbone of the *per se* wage-fixing conspiracy.  It adduces no facts illuminating what actions that Mountaire or Jennie-O undertook at those respective meetings, and does not otherwise allege conduct that connects either of them specifically to direct evidence of

the conspiracy to suppress wages.  Having failed to do so, the TAC fails to state a *per se* claim against either Jennie-O or Mountaire.

### b.  Rule of Reason Conspiracy

In contrast, the TAC states viable claims against both Mountaire and Jennie-O as to its rule of reason claim in Count II.  To contest this conclusion, Mountaire and Jennie-O essentially recycle the same attacks that they raised effectively against Plaintiffs' *per se* claim.  But as this Court has already explained, to state a viable rule of reason claim, Plaintiffs must only allege: "(1) an agreement to exchange information; and (2) 'anticompetitive effect[s]' flowing from that agreement."  MTD Op. I at 19 (quoting *Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002)).  There is no requirement that these information exchanges occur at the Compensation Meetings that form the core of Plaintiffs' *per se* claim; to the contrary, this Court has already determined that Plaintiffs' rule of reason claim is properly maintained against Peco Foods, which is not alleged to have attended any Compensation Meetings.[15]  *See* MTD Op. I at 27 n.12.

The TAC contains factual matter sufficient to allege that both Mountaire and Jennie-O agreed to exchange compensation information.  Plaintiffs here have alleged that both Defendants "subscribed to Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis."  TAC ¶¶ 56, 87.  They further allege that in advance of the Compensation Meetings in 2011 and 2015, Mountaire and Jennie-O, respectively, submitted detailed compensation data to WMS.  *Id.*  Moreover, as to

---

[15] Mountaire's argument that "the allegations against Peco Foods were much more specific than they are as to Mountaire," is unavailing.  ECF 676 at 6 n.3.  Mountaire correctly notes that, unlike it, Peco Foods was alleged to have participated in plant-to-plant communications in addition to subscribing to Agri Stats.  In addition to its Agri Stats subscription, however, and unlike Peco Foods, Mountaire is also alleged to have attended a Compensation Meeting and submitted information to WMS.  As to both Mountaire and Peco Foods, then, their subscription to Agri Stats is not the sole allegation of information sharing.

Jennie-O specifically, the TAC alleges communications indicating industry knowledge of its "survey of the turkey industry that focuses largely on the hourly workforce." *Id.* ¶ 391. Given these specified allegations of information sharing, Plaintiffs' rule of reason claims against Mountaire and Jennie-O survive even absent allegations of consistent participation in Compensation Meetings or plant-to-plant communications.

As this Court has already twice determined, Plaintiffs have plausibly pled that Defendants' information sharing had anticompetitive effects. *See* MTD Op. I at 25; MTD Op. II at 11-12. Moreover, because the TAC sufficiently links Mountaire and Jennie-O to the information exchanges—principally through their use of Agri Stats—there is a factual predicate to support the inference that their use of exchanged data had anticompetitive effects. Accordingly, Mountaire's and Jennie-O's motions will be denied as to Count II.[16]

## V.    CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss for lack of standing, ECF 630, is DENIED; Defendant Foster's Motion to Dismiss, ECF 631, is DENIED; Defendant Sanderson's Motion to Dismiss, ECF 632, is DENIED; Defendant Jennie-O's Motion to Dismiss, ECF 638, is GRANTED as to Count I and DENIED as to Count II; and Defendant Mountaire's Motion to Dismiss, ECF 639, is GRANTED as to Count I and DENIED as to Count II. A separate Order follows.

Dated: July 19, 2022



/s/
Stephanie A. Gallagher
United States District Judge

---

[16] Jennie-O also renews its request for focused discovery. ECF 638-1 at 6. Insofar as Jennie-O's request related to Count I, it is mooted by this Opinion. To the extent that Jennie-O's request relates to Count II, it is denied for much the same reasons as its initial request. *See* MTD Op. II at 15-16 n.6. This Court does not discern compelling differences between Jennie-O and other Defendants, particularly those that are also not alleged to have attended multiple Compensation Meetings.