**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| JUDY JIEN, *et al.*,<br><br>                                       Plaintiffs,<br><br>        v.<br><br>PERDUE FARMS, INC., *et al.*,<br><br>                                   Defendants. | C.A. No. 1:19-CV-2521-SAG<br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS FOR CLASS REPRESENTATIVES** |

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................ 1

II.  HISTORY OF THE LITIGATION ................................................................... 3

III. THE REQUESTED ATTORNEYS' FEES ARE REASONABLE.................................. 8

   A.  The Settlement Creates a Common Fund from Which a
       "Percentage-of-the-Fund" Fee Would Be Appropriate................................................. 8

   B.  Plaintiffs' Counsel's Fee Request Is Fair and Reasonable
       Under Fourth Circuit Factors ......................................................................... 10

       1.  Plaintiffs' Counsel Obtained an Exceptionally Favorable
           Result for the Settlement Class ................................................................ 11

       2.  To Date, There Have Been No Objections by Members of the Class. ................. 12

       3.  Plaintiffs' Counsel Are Skilled and Efficient Litigators ...................................... 13

       4.  Duration and Complexity of This Action Support the Requested Fee ................. 15

       5.  Plaintiffs' Counsel Faced the Significant Risk of Nonpayment ........................... 16

       6.  Plaintiffs' Counsel Devoted Over 91,000 Hours to
           Litigating this Action ................................................................................ 19

       7.  Courts in the Fourth Circuit Routinely Award Fees of 33.3% of the
           Settlement Fund in Similar Cases ....................................................................... 20

       8.  Public Policy Considerations Support the Requested Fee ................................... 23

   C.  A Cross-Check of Plaintiffs' Counsel's Lodestar Confirms the
       Reasonableness of the Fee Request ........................................................................ 24

IV.  PLAINTIFFS' COUNSEL'S REQUEST FOR PAYMENT OF THE LITIGATION
     EXPENSES IS REASONABLE ............................................................................... 28

V.   THE REQUESTED SERVICE AWARDS ARE REASONABLE ................................. 29

VI.  CONCLUSION .................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**

*Archbold v. Wells Fargo Bank, N.A.*,
  No. 3:13-CV-24599, 2015 WL 4276295 (S.D.W. Va. July 14, 2015) ........................... 9, 29-30

*Blum v. Stenson*,
  465 U.S. 886 (1984) ...................................................................................................9

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) ...................................................................................................8

*Boyd v. Coventry Health Care Inc.*,
  299 F.R.D. 451 (D. Md. 2014) ..................................................................................11, 25

*Brown v. Transurban USA, Inc.*,
  318 F.R.D. 560 (E.D. Va. 2016) .................................................................................29

*Casa de Md., Inc. v. Arbor Realty Tr., Inc.*,
  No. DKC 21-1778, 2024 WL 1051120 (D. Md. Mar. 11, 2024) .........................................19, 25

*Clark v. Duke Univ.*,
  Nos. 1:16-CV-1044 & 1:18-CV-722, 2019 WL 2579201 (M.D.N.C. June 24, 2019) ..............26

*Conrad v. Jimmy John's Franchise, LLC*,
  No.18-CV-00133, 2021 WL 3268339 (S.D. Ill July 30, 2021) ..................................................15

*Decohen v. Abbasi, LLC*,
  299 F.R.D. 469 (D. Md. 2014) ..................................................................................12, 27

*Deem v. Ames True Temper, Inc.*,
  No. 6:10-CV-01339, 2013 WL 2285972 (S.D.W. Va. May 23, 2013) .......................................9

*DeLoach v. Phillip Morris Cos.*,
  No. 1:00CV01235, 2003 WL 23094907 (M.D.N.C. Dec. 19, 2003) .......................................28

*Fangman v. Genuine Title, LLC*,
  No. RDB-14-0081, 2016 U.S. Dist. LEXIS 160434 (D. Md. Nov. 18, 2016) .........................27

*Fangman v. Genuine Title, LLC*,
  No. RDB-14-0081, 2017 WL 3434109 (D. Md. Aug. 10, 2017) .............................................27

*Giordano v. Saks Inc.*,
  No. 23-600-cv, 2025 WL 799270 (2d Cir. Mar. 13, 2025) .....................................................15

ii

*Good v. W. Virginia-Am. Water Co.,*
  No. CV-14-1374, 2017 WL 2884535 (S.D.W. Va. July 6, 2017) ...............................................15

*Graham v. Famous Dave's of Am., Inc.,*
  No. CV DKC 19-0486, 2022 WL 17584274 (D. Md. Dec. 12, 2022) .......................................10

*Hale v. State Farm Mut. Auto. Ins. Co.*,
  No. 12-0660-DRH, 2018 WL 6606079 (S.D. Ill. Dec. 16, 2018) ...............................................23

*In re 2U, Inc. Sec. Class Action,*
  No. 8:20-cv-01006, 2022 WL 22839218 (D. Md. Dec. 9, 2022) ........................................22, 23

*In re Allura Fiber Cement Siding Litig.,*
  No. 2:19-mn-02886, 2021 WL 2043531 (D.S.C. May 21, 2021) ...............................................21

*In re Automotive Refinishing Paint Antitrust Litig.,*
  MDL No. 1426, 2008 WL 63269 (E.D. Pa. Jan. 3, 2008) ..........................................................17

*In re Celebrex (Celecoxib) Antitrust Litig.,*
  No. 2:14-cv-00361, 2018 WL 2382091 (E.D. Va. Apr. 18, 2018) .....................................21, 30

*In re Flonase Antitrust Litig.*,
  291 F.R.D. 93 (E.D. Pa. 2013) ...................................................................................................15

*In re Genworth Sec. Litig.*,
  210 F. Supp. 3d 837 (E.D. Va. 2016) ................................................................................ *passim*

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
  142 F.R.D. 588 (S.D.N.Y. 1992) ...............................................................................................17

*In re Initial Public Offering Sec. Litig.*,
  671 F. Supp. 2d 467 (S.D.N.Y. 2009) ........................................................................................15

*In re Medstar ERISA Litig.,*
  No. JKB-20-1984, 2024 WL 4110941 (D. Md. Sept. 5, 2024) ..........................................16, 26

*In re Microstrategy, Inc. Sec. Litig.*,
  172 F. Supp. 2d 778 (E.D. Va. 2001) .......................................................................................3, 24

*In re Mills Corp. Sec. Litig.*,
  265 F.R.D. 246 (E.D. Va. 2009) ........................................................................................ *passim*

*In re Novant Health, Inc.,*
  No. 1:22-CV-697, 2024 WL 3028443 (M.D.N.C. June 17, 2024) ...........................................25

*In re Peanut Farmers Antitrust Litig.,*
 No. 2:19-cv-463, 2021 WL 9494033 (E.D. Va. Aug. 10, 2021) ...................................... *passim*

*In re Rent-Way Sec. Litig.,*
 305 F. Supp. 2d 491 (W.D. Pa. 2003) .......................................................................................18

*In re Titanium Dioxide Antitrust Litig.,*
 No. 10-CV-00318, 2013 WL 6577029 (D. Md. Dec. 13, 2013) ...................................21, 28, 30

*In re Urethane Antitrust Litig.,*
 No. 04-1616-JWL, 2016 WL 4060156 (D. Kan. July 29, 2016) ..............................................22

*In re Vitamins Antitrust Litig.,*
 No. 99-197, 2001 WL 34312839 (D.D.C. July 16, 2001) ........................................................23

*In re Zetia (Ezetimibe) Antitrust Litig.,*
 699 F. Supp. 3d 448 (E.D. Va. 2023) ............................................................................. *passim*

*Jones v. Dominion Res. Servs.,*
 601 F. Supp. 2d 756 (S.D.W. Va. 2009) .............................................................................10, 24

*Kelly v. Johns Hopkins Univ.,*
 No. 1:16-cv-2835, 2020 WL 434473 (D. Md. Jan. 28, 2020) ........................................9, 14, 21

*Kirkpatrick v. Cardinal Innovations Healthcare Sols.,*
 352 F. Supp. 3d 499 (M.D.N.C. 2018) ...................................................................................30

*Krakauer v. Dish Network,*
 No. 1:14-cv-333, 2019 WL 7066834 (M.D.N.C. Dec. 23, 2019) ............................................22

*Kruger v. Novant Health, Inc.,*
 No. 1:14-cv-208, 2016 WL 6769066 (M.D.N.C. Sept. 29, 2016) .................................22, 26, 27

*Maderazo v. VHS San Antonio Partners, L.P.,*
 SA-06-CA-535, 2019 WL 4254633 (W.D. Tex. Jan. 22, 2019) ...............................................15

*Manuel v. Wells Fargo Bank, Nat'l Ass'n,*
 No. 3:14CV238, 2016 WL 1070819 (E.D. Va. Mar. 15, 2016) .............................................. 29

*McKnight v. Circuit City Stores, Inc.,*
 14 F. App'x 147 (4th Cir. 2001) ............................................................................................11

*Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co.,*
 381 U.S. 311 (1965) ...............................................................................................................23

iv

*Ohio River Valley Env't Coal., Inc. v. Green Valley Coal Co.*,
  511 F.3d 407 (4th Cir. 2007) ..............................................................................................26

*Reynolds v. Fid. Invs. Institutional Operations Co., Inc.,*
  No. 1:18-CV-423, 2020 WL 92092 (M.D.N.C. Jan. 8, 2020) .............................................28, 29

*Scott v. Fam. Dollar Stores, Inc.,*
  No. 3:08-cv-00540, 2018 WL 1321048 (W.D.N.C. Mar. 14, 2018) ........................................22

*Seaman v. Duke Univ.,*
  No. 1:15-CV-462, 2019 WL 4674758 (M.D.N.C. Sep. 25, 2019) ................................... *passim*

*Sims v. BB&T Corp.,*
  No. 1:15-cv-732, 2019 WL 1993519 (M.D.N.C. May 6, 2019) ..............................................22

*Singleton v. Domino's Pizza, LLC*,
  976 F. Supp. 2d 665 (D. Md. 2013) ...............................................................................3, 27, 28

*Smith v. Krispy Kreme Doughnut Corp.,*
  No. 1:05cv00187, 2007 WL 119157 (M.D.N.C. Jan. 10, 2007) ..............................................14

*Spell v. McDaniel*,
  852 F.2d 762 (4th Cir. 1988) ............................................................................................28

*Thomas v. FTS USA, LLC,*
  No. 3:13-CV-825, 2017 WL 1148283 (E.D. Va. Jan. 9, 2017) ..........................................10, 11

*Yost v. Elon Prop. Mgmt. Co.,*
  No. ELH-21-1520, 2023 WL 185178 (D. Md. Jan. 13, 2023) .................................................30

**Rules**

Fed. R. Civ. P. 23 ................................................................................................................8

**Other**

Manual for Complex Litigation § 14.122 (4th ed. 2004) ..............................................................10

Thomas E. Kauper & Edward A. Snyder, *Symposium: An Inquiry into the Efficiency of Private Antitrust Enforcement: Follow-on and Independently Initiated Cases Compared*,
  74 Geo. L.J. 1163 (1986) .................................................................................................12

v

## I.      INTRODUCTION

Plaintiffs' Counsel secured 20 settlements worth nearly $400 million for poultry processing workers. This result represents: *the largest recovery ever achieved in an antitrust class action for low-wage workers in the United States*. The result is also *the second-largest recovery ever achieved in a wage-fixing class action in the United States*, *and the largest financial recovery ever obtained in an antitrust class action in the Fourth Circuit*. Most importantly, it will make a meaningful financial difference in the lives of hundreds of thousands of deserving low-wage workers.

Without the initiative, skill, experience and hard work of Plaintiffs' Counsel, this case would never have been filed, let alone succeeded. No government enforcer was investigating these claims. No other firms were. The conspiracy was carefully hidden from the workers. Only Plaintiffs' Counsel's dogged nine-month investigation revealed the poultry industry's conspiracy to suppress compensation. Counsel contacted 156 witnesses and interviewed 63 of them, reviewed thousands of documents, and consulted with labor and agricultural economists. These efforts *alone* brought Defendants' misconduct to light and enabled this outstanding recovery.

Even after such a thorough investigation, Plaintiffs' Counsel took tremendous risk in litigating the case. Cases developed solely by counsel, rather than those brought by government enforcers, always face greater headwinds. And few, if any, antitrust cases seeking compensation for low-income workers have succeeded in obtaining a significant recovery. They often pose significant and unique legal challenges in proving both labor and geographic markets, and are typically more complex than antitrust cases concerning pricing for products and services. This is particularly so given that workers are paid different amounts at different times for different jobs

despite all being impacted by the same conspiracy and practices.

Represented by some of the country's most formidable litigators, Defendants aggressively pursued these and many other defenses through three rounds of motions to dismiss, extensive discovery, and right to the precipice of class certification. Had Plaintiffs not chosen to settle, they faced daunting hurdles in combatting summary judgment motions and persuading a jury at trial of a conspiracy to suppress wages when those wages increased over time and the raises were not identical. Plaintiffs' Counsel also faced the colossal risk of not being reimbursed for the more than $5 million in litigation expenses they advanced to prosecute the claims.

These defenses were only overcome through Plaintiffs' Counsel's hard work and skill. Relying on evidence uncovered during their extensive investigation, they crafted an extraordinarily detailed complaint alleging a multi-faceted wage-fixing conspiracy between 26 Defendants conducted for over 20 years. Plaintiffs' Counsel spent 91,825.65 hours developing and prosecuting this complex case over 6.5 years, generating a total lodestar of $63,878,422.25. They prevailed through three rounds of motions to dismiss; won multiple discovery disputes; analyzed over a million documents; deposed 65 current and former employees of Defendants; secured incriminating declarations from key witnesses; broadened the scope of the complaint three times; worked with economists to assemble and analyze mountains of data to measure damages; successfully settled with all the processor Defendants after extensive and adversarial negotiations; and persisted to move for certification of an injunctive relief class against Agri Stats.

Only with this backdrop do Plaintiffs' Counsel now make a request for attorneys' fees of one-third of the settlement funds. "District courts in the Fourth Circuit have frequently found that a percentage award of one-third of the Settlement Fund is within the range of reasonable percentage of recovery, and one-third is a common award in antitrust class actions." *In re Zetia*

2

*(Ezetimibe) Antitrust Litig.*, 669 F. Supp. 3d 448, 462 (E.D. Va. 2023). Indeed, the vast majority of fee awards in antitrust class actions in the Fourth Circuit have consisted of one-third of the settlement fund.

Such a sum would not be a windfall here. The requested award would represent a "lodestar multiplier" of 2.08, which is on the low end of the range of approved fee awards in similar class action cases. "Courts have generally held that lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorneys' fee." *Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 689 (D. Md. 2013).

Such an award would appropriately "provide an incentive for competent lawyers to pursue such actions in the future," a recognized public policy goal in the Fourth Circuit. *In re Microstrategy, Inc. Sec. Litig.*, 172 F. Supp. 2d 778, 788 (E.D. Va. 2001). This case is the prototype for those that plaintiffs' attorneys should be incentivized to develop and pursue even at great risk. There is no greater recognition of that fact than the Department of Justice's ("DOJ") choice to file follow-on cases against five Defendants that relied heavily on the work of Plaintiffs' Counsel. The agency then concluded that Plaintiffs' settlements with those Defendants were of such extraordinary value that, if finally approved, it would not seek any more restitution.

Accordingly, Plaintiffs respectfully request that this Court award attorneys' fees equal to 33.33% of the settlement amount plus interest earned thereon, reimbursement of litigation expenses of $5,390,389.61, and service awards of $30,000 to each class representative.

## II.   HISTORY OF THE LITIGATION

In December 2018, Plaintiffs' Counsel launched a nine-month investigation into the poultry processing industry's compensation practices. See Declaration of George F. Farah ("Farah Decl.") ¶ 5 (attached as Exhibit 1). During that investigation, Plaintiffs' Counsel contacted 156

witnesses and interviewed 63 of them, including former employees of Defendants, labor union officials, public health professors, executives of non-conspiring poultry companies, and directors of nonprofit organizations that advocate for labor rights. *Id.* As part of the investigation, Plaintiffs' Counsel also analyzed collective bargaining agreements, reviewed decades of poultry industry wage data, and consulted extensively with labor economists. *Id.*

On August 30, 2019, wholly in reliance on facts uncovered during the investigation, Plaintiffs filed the original complaint, which alleged both per se and rule-of-reason antitrust claims stemming from a conspiracy among chicken processors to depress wages beginning in 2009. ECF No. 1.

On November 22, 2019, Defendants filed six motions to dismiss the complaint. ECF Nos. 245, 247-251. During that time, Plaintiffs' Counsel's investigation was ongoing, and they obtained documents from witnesses that broadened the scope of the conspiracy. Farah Decl. ¶ 9. As a result, on December 23, 2019, Plaintiffs filed an Amended Complaint that added three turkey processors as defendants and expanded the class definition to include salaried workers. ECF No. 258.

On March 2, 2020, Defendants filed seven motions to dismiss the Amended Complaint, which Plaintiffs vigorously opposed. ECF Nos. 341-344, 348, 350, 351. On September 16, 2020, the Court issued a ruling that upheld both of Plaintiffs' antitrust claims but dismissed certain Defendants without prejudice. ECF No. 378.

On November 2, 2020, Plaintiffs filed their Second Amended Complaint, which materially supplemented the allegations against the dismissed Defendants. ECF No. 386. On December 18, 2020, Defendants filed five motions to dismiss the Second Amended Complaint, which Plaintiffs opposed. ECF Nos. 398-402. On March 10, 2021, the Court denied each of those motions to dismiss. ECF Nos. 414, 415.

On April 23, 2021, following extensive negotiations, the parties submitted a joint status report highlighting disputes over the litigation schedule and ESI protocol, and the Court resolved those disputes in an order dated April 29, 2021. ECF Nos. 449, 451. The following month, the parties submitted a letter to the Court reflecting their opposing positions on deposition limits, ECF No. 469, and the Court resolved that dispute in an order dated June 1, 2021. ECF No. 70.

Over the next six months, after prolonged negotiations and an adversarial mediation, Plaintiffs reached settlements with three Defendants—Pilgrim's Pride, George's, and Peco Foods—that obligated them to pay a total of $37.8 million and provide material cooperation against the remaining non-settling Defendants. ECF Nos. 481, 521, 547.

During that time, Plaintiffs propounded document requests and interrogatories on the 16 Defendants named in the Second Amended Complaint and also issued document subpoenas to several non-parties. Plaintiffs' Counsel negotiated with each of those Defendants regarding the relevant time period, document custodians, search terms, and structured data. On August 20, 2021, the parties filed a 132-page joint letter to the Court outlining multiple disputes regarding those issues, ECF No. 498, and after holding two hearings, the Court ruled on them. ECF Nos. 519, 520.

During that time, Plaintiffs' Counsel also responded to 28 requests for production and 10 interrogatories that had been served on each of the six named Plaintiffs. Farah Decl. ¶ 16. Plaintiffs' Counsel collected and reviewed thousands of documents in Plaintiffs' possession and produced responsive, non-privileged materials. *Id.*

On November 19, 2021, Plaintiffs executed a settlement agreement with Defendant Webber, Meng, Sahl and Company, Inc. ("WMS") and, pursuant to that agreement, obtained a proffer and watershed declaration from WMS President Jonathan Meng ("Meng Declaration"). ECF No. 547. Across 109 pages, the Meng Declaration provides previously unknown and highly

incriminating details about the formation, duration, and operation of Defendants' conspiracy. *Id.* Plaintiffs' Counsel also reviewed hundreds of thousands of documents produced by WMS. The extraordinary Meng Declaration, along with many WMS documents, revealed that Defendants' conspiracy to suppress compensation was longer and broader than Plaintiffs had previously known.

In light of this newfound evidence, Plaintiffs successfully moved on January 20, 2022, to amend the complaint again to expand the Class Period by nine years, name six additional poultry processors as defendants, and broaden the class definition to include more workers. ECF No. 567. On April 18, 2022, Defendants filed six motions to dismiss the Third Amended Complaint, which Plaintiffs opposed. ECF Nos. 630-632, 635, 638, 639. On July 19, 2022, the Court fully denied four of those motions and denied in part two of them. ECF No. 695.

During that time, Plaintiffs negotiated for months with four Defendants—Simmons, Wayne, Sanderson, and Cargill—and reached settlements with them totaling $96.8 million. ECF Nos. 616, 745. The settlements obligated them to provide material cooperation against the remaining, non-settling Defendants. *Id.*

The Meng Declaration as well as the settlements with WMS, Wayne, Sanderson, and Cargill caught the attention of DOJ. On July 25, 2022, DOJ filed a lawsuit against those four Defendants, alleging a conspiracy between them to exchange wage plans and coordinate wage decisions. *United States v. Cargill Meat Sols. Corp., et al.*, No. 1:22-cv-1821 (D. Md. July 25, 2022) (ECF No. 1). DOJ's complaint references both the Meng Declaration and the instant action. *Id.* ¶ 91 n.5. That same day, DOJ filed a settlement with Wayne, Sanderson, and Cargill that states that Plaintiffs' settlements with those same Defendants would, if finally approved, provide sufficient restitution to poultry workers. *Cargill,* ECF No. 2.

After the Third Amended Complaint materially expanded the scope of the case, Plaintiffs'

6

Counsel negotiated discovery limits again with both the newly added Defendants and previously named Defendants. On October 28, 2022, the parties filed a 69-page joint letter to the Court outlining disputes over the relevant time period, requests for production, and document custodians. ECF No. 764. After a hearing on December 7, 2022, the Court ruled on those issues. ECF No. 783.

Plaintiffs' Counsel also filed targeted motions to force specific Defendants to produce responsive documents. For example, Plaintiffs moved to enforce the settlement agreement with Defendant Pilgrim's Pride to require it to produce documents, ECF No. 860, and moved to compel Defendant Jennie-O to designate an employee as a document custodian. ECF No. 867.

At the same time, Plaintiffs' Counsel negotiated a settlement with Defendant Perdue. The October 31, 2022 agreement obligated Perdue to pay $60.65 million and provide material cooperation against non-settling Defendants. ECF No. 814.

After Defendants produced documents, Plaintiffs' Counsel engaged in comprehensive document review. Over a multi-year period, Plaintiffs' Counsel reviewed and categorized over one million documents that were produced by Defendants and third parties. Farah Decl. ¶ 24. The thorough and labor-intensive process uncovered incriminating conspiratorial communications as well as evidence of the class-wide impact of the conspiracy on workers' wages. *Id.*

Using documents uncovered during their review as exhibits, Plaintiffs' Counsel conducted 65 depositions of former and current employees of Defendants. They secured valuable admissions from multiple deponents regarding improper conspiratorial communications, unlawful exchanges of compensation data, and the effects of both on class-wide wages. This testimony supported Plaintiffs' merits and class certification theories.

After Defendants produced more than 291 gigabytes of structured compensation data, Plaintiffs' Counsel assisted expert economists in evaluating and cleaning the data, building an

overall data set, and performing regression analyses that measured the conspiracy's impact. Farah Decl. ¶ 26. As the last settlement was reached with a processor Defendant, Plaintiffs' Counsel was finalizing a motion for class certification under Rule 23(b)(3) and recommending edits to a 265-page expert report containing applicable economic theory and econometric analyses.

Between February 20, 2024, and December 9, 2024, Plaintiffs reached settlements with eleven Defendants—Tyson, Koch, Case Foods, Jennie-O, Butterball, Mountaire, Amick, Foster, Allen Harim, Fieldale, and OK Foods—totaling $202.8 million. ECF Nos. 902, 974. Some of those settlements were reached after more than a *year* of negotiations, and three involved lengthy and adversarial mediations, where the negotiating parties submitted detailed written statements and orally debated the strengths and weaknesses of the case. Farah Decl. ¶ 29.

After settling with all processor Defendants, Plaintiffs filed a motion to certify an injunctive relief class against the lone remaining non-settling defendant, Agri Stats, on December 13, 2024. ECF No. 967. Plaintiffs did so to prevent Agri Stats from continuing to unlawfully exchange wage data to the detriment of poultry workers. Farah Decl. ¶ 32.

## III.    THE REQUESTED ATTORNEYS' FEES ARE REASONABLE

### A.    The Settlement Creates a Common Fund from Which a "Percentage-of-the-Fund" Fee Would Be Appropriate

Under Rule 23(h), "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). As the Supreme Court has recognized, a "lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

There are two methods of calculating attorneys' fees in common fund class actions: (1) the

percentage-of-the fund method; and (2) the lodestar method. *In re Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 260 (E.D. Va. 2009). The percentage-of-the-fund method involves an award based on a percentage of the class's recovery, set by the court based on several factors. *Id.* The lodestar method requires multiplying the number of hours worked by a reasonable hourly rate, the product of which the Court can then adjust by employing a "multiplier." *Id.*

The Supreme Court has indicated that percentage-of-recovery is the appropriate method for awarding fees under the common fund doctrine. *See Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984). "[T]here is a clear consensus among the federal and state courts, consistent with Supreme Court precedent, that the award of attorneys' fees in common fund cases should be based on a percentage of the recovery." *Archbold v. Wells Fargo Bank, N.A.*, No. 3:13-CV-24599, 2015 WL 4276295, at *5 (S.D.W. Va. July 14, 2015). "District courts in the Fourth Circuit 'overwhelmingly' prefer the percentage method in common-fund cases." *Seaman v. Duke Univ.*, No. 1:15-CV-462, 2019 WL 4674758, at *2 (M.D.N.C. Sep. 25, 2019) (citing *Phillips v. Triad Guar. Inc.*, No. 1:09CV71, 2016 WL 2636289, at *2 (M.D.N.C. May 9, 2016)). Courts within the Fourth Circuit "consistently apply a percentage of the fund method for calculating attorneys' fees in common fund cases." *Mills*, 265 F.R.D. at 260. *See also Kelly v. Johns Hopkins Univ.*, No. 1:16-cv-2835, 2020 WL 434473, at *5 (D. Md. Jan. 28, 2020).

Courts recognize that the percentage-of-fund method "better aligns the interests of class counsel and class members because it ties the attorneys' fee award to the overall result achieved, rather than hours expended by the attorneys." *In re Peanut Farmers Antitrust Litig.*, No. 2:19-cv-463, 2021 WL 9494033, at *1 (E.D. Va. Aug. 10, 2021); *see also Deem v. Ames True Temper, Inc.*, No. 6:10-CV-01339, 2013 WL 2285972, at *5 (S.D.W. Va. May 23, 2013) ("The percentage method 'is designed to allow courts to award fees from the fund in a manner that rewards counsel

9

for success and penalizes it for failure.'" (quoting *In re Prudential Ins. Co. Am. Sales Litig.*, 148 F.3d 283, 333 (3d Cir. 1998))).

"Some courts incorporate the lodestar analysis into the percentage method by cross-checking the lodestar calculation against the percentage calculation." *Thomas v. FTS USA, LLC*, No. 3:13-CV-825, 2017 WL 1148283, at *4 (E.D. Va. Jan. 9, 2017) (citing *Jones v. Dominion Res. Servs.*, 601 F. Supp. 2d 756, 759 (S.D.W. Va. 2009); Manual for Complex Litigation § 14.122 (4th ed. 2004)). The lodestar calculation "adds an extra layer of assurance as to reasonableness by ensuring that 'the fee award is still roughly aligned with the amount of work the attorneys contributed.'" *Thomas*, 2017 WL 1148283, at *4 (quoting *Jones*, 601 F. Supp. 2d at 759).

Plaintiffs' Counsel's application for the percentage-of-fund method is thus consistent with the prevailing Fourth Circuit law. As explained below, the factors courts consider when assessing percentage-of-fund requests demonstrate the reasonableness of Plaintiffs' Counsel's requested fee, which is further confirmed by cross-checking that amount against Plaintiffs' Counsel's lodestar.

## B.    Plaintiffs' Counsel's Fee Request Is Fair and Reasonable Under Fourth Circuit Factors

"In determining the reasonableness of attorneys' fees, courts look at the following factors: (1) the result obtained for the class; (2) the presence or absence of substantial objections by members of the class to the fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by the plaintiffs' counsel; and (7) awards in similar cases." *In re Genworth Sec. Litig.*, 210 F. Supp. 3d 837, 843 (E.D. Va. 2016). Certain courts in this Circuit "have applied a slightly different version of this standard, replacing the sixth factor with public policy considerations." *Peanut Farmers*, 2021 WL 9494033, at *2. *See, e.g.*, *Graham v. Famous*

10

*Dave's of Am., Inc.*, No. CV DKC 19-0486, 2022 WL 17584274, at *10-11 (D. Md. Dec. 12, 2022); *Mills*, 265 F.R.D. at 261. Notably, "fee award reasonableness factors 'need not be applied in a formulaic way' because each case is different, 'and in certain cases, one factor may outweigh the rest.'" *Boyd v. Coventry Health Care Inc.*, 299 F.R.D. 451, 463 (D. Md. 2014).

A consideration of each of the relevant factors strongly supports awarding Plaintiffs' Counsel the requested fee of 33.33%.

### 1. Plaintiffs' Counsel Obtained an Exceptionally Favorable Result for the Settlement Class

"The first and most important factor for a court to consider when making a fee award is the result achieved." *Genworth*, 210 F. Supp. 3d at 843. The Fourth Circuit has explained that "the most critical factor in calculating a reasonable fee award is the degree of success obtained." *McKnight v. Circuit City Stores, Inc.*, 14 F. App'x 147, 149 (4th Cir. 2001); *see also Thomas*, 2017 WL 1148283, at *3 ("[T]he Court gives the most weight to the results obtained.").

The 20 settlement agreements provide a total of $398,050,000 in cash compensation.[1] This is the second-largest recovery in a wage-fixing case in the United States; it is the largest ever recovery in an antitrust case seeking recompense for low-income workers in the United States; and it is the largest financial recovery for any antitrust class action in the Fourth Circuit.

This result is exceptional considering this case lacked the benefit of a prior governmental investigation. Many antitrust class actions, especially those alleging price or wage-fixing, follow a government investigation, where the agency has already uncovered compelling evidence of misconduct and "the risk in bringing related private action is comparatively limited." *Peanut*

---

[1] All of the funds (after deduction of attorneys' fees, expenses, and service awards) will be distributed to the settlement class. None of the funds are subject to reversion to the Defendants.

*Farmers*, 2021 WL 9494033, at *3. After a government files an antitrust complaint or obtains an antitrust indictment, "counsel can then profitably free ride on the government's successes by initiating their own actions once liability has been established." Thomas E. Kauper & Edward A. Snyder, *Symposium: An Inquiry into the Efficiency of Private Antitrust Enforcement: Follow-on and Independently Initiated Cases Compared*, 74 Geo. L.J. 1163, 1166 (1986).

Here, Plaintiffs' Counsel developed this case entirely on their own, and achieved the record-breaking settlement amounts without a preceding government prosecution paving the way. To the contrary, the filing of Plaintiffs' complaint and the strength of their allegations persuaded DOJ to bring a follow-on action against five of the Defendants. *United States v. Cargill Meat Sols. Corp., et al.*, No. 1:22-cv-1821 (D. Md. July 25, 2022) (ECF No. 1). And when DOJ settled with those five Defendants, the agency concluded that Plaintiffs' existing settlements with them would, if finally approved, provide sufficient restitution for the class of injured workers. *United States v. Cargill Meat Sols. Corp., et al.*, No. 1:22-cv-1821 (D. Md. July 25, 2022) (ECF No. 2-2).

In sum, the settlement value achieved in this case by Plaintiffs' Counsel provides an exceptional result and strongly supports Plaintiffs' Counsel's request for attorneys' fees. *See, e.g.*, *Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 481 (D. Md. 2014) (one-third fee was proper given "superior result" obtained in complex litigation).

### 2. To Date, There Have Been No Objections by Members of the Class

"A lack of objections by class members as to fees requested by counsel weighs in favor of the reasonableness of the fees." *Genworth*, 210 F. Supp. 3d at 844. On March 21, 2025, Court-approved notice was distributed to hundreds of thousands of class members, informing them that Plaintiffs' Counsel would request attorneys' fees up to one-third of the settlement fund. Farah Decl. ¶ 33. The notice explains how class members can object to Plaintiffs' fee request. *Id.*

Significantly, not a single class member has yet objected to the fees requested by Plaintiffs' Counsel (or to any of the settlements themselves). *Id.* However, the deadline for objections is May 27, and Plaintiffs will further advise the Court as to this factor in their submission due on May 30.

### 3.   Plaintiffs' Counsel Are Skilled and Efficient Litigators

The quality of the representation is another significant factor supporting Plaintiffs' Counsel's fee request. *See Genworth*, 210 F. Supp. 3d at 844 ("The skill required in complex cases such as this involving massive discovery efforts and complicated issues of fact and law also weighs in favor of supporting the substantial attorneys' fees award in this case.").

Plaintiffs' Counsel have substantial experience litigating complex class actions and antitrust cases in particular. The three co-lead firms—Cohen Milstein Sellers & Toll, Hagens Berman Sobol Shapiro, and Handley Farah & Anderson—specialize in prosecuting antitrust class actions against large corporations, and their lawyers have served as lead counsel in dozens of successful antitrust cases, including those alleging the suppression of compensation. Farah Decl. ¶ 7. Plaintiffs' Counsel's reputations as zealous advocates willing to take cases all the way to trial enabled them to negotiate the outstanding settlements.

Plaintiffs' Counsel were skillful and tenacious in developing and prosecuting this case. In December 2018, they launched a creative and labor-intensive investigation of compensation practices in the poultry processing industry. They interviewed 63 witnesses, including dozens of Defendants' former employees; analyzed collective bargaining agreements and poultry industry compensation data; and consulted extensively with labor economists. The nine-month investigation bore fruit and illuminated a secret conspiracy to depress compensation that no government agency had detected.

Plaintiffs' Counsel then aggressively prosecuted the claims. They prevailed during three

rounds of motions to dismiss. They conducted extensive written discovery and secured helpful rulings on discovery disputes. They successfully moved to compel the production of documents from recalcitrant Defendants. They carefully analyzed over a million documents produced by Defendants and coconspirators, uncovering incriminating communications. They conducted 65 depositions of former and current employees of Defendants, obtaining compelling admissions of misconduct. They secured the watershed Meng Declaration, which confirmed and expanded upon Plaintiffs' allegations. They amended the complaint three times to expand the Class Period by nine years, broaden the Class definition, and add eight additional defendants. They worked with expert labor economists to analyze structured data and develop regression models that measured damages. They moved to certify an injunctive relief class against Agri Stats to prevent unlawful exchanges of compensation data in the future.

Plaintiffs' Counsel's zeal and skill were again evident during settlement negotiations. During four mediations, they presented compelling evidence of liability and impact and effectively rebutted defense arguments. They refused to accept low settlement offers, and as a result, some settlement negotiations lasted *years*. Many Defendants settled for substantial sums because they knew Plaintiffs' Counsel was ready and motivated to try the case.

Furthermore, "courts often evaluate the quality of the work performed by plaintiffs' counsel in light of the quality of the opposition's representation." *Peanut Farmers*, 2021 WL 9494033, at *3. *See, e.g.*, *Mills*, 265 F.R.D. at 262 (noting counsel reached a favorable settlement against "experienced and sophisticated defense attorneys"); *Smith v. Krispy Kreme Doughnut Corp.*, No. 1:05cv00187, 2007 WL 119157, at *2 (M.D.N.C. Jan. 10, 2007) ("Additional skill is required when the opponent is a sophisticated corporation with sophisticated counsel."); *Kelly*, 2020 WL 434473, at *4. Here, Defendants were represented by highly skilled and experienced

14

litigators from the nation's leading defense firms, 15 of which are ranked by the Vault Law 100 as the most prestigious. Farah Decl. ¶ 31. Those firms mounted an aggressive, comprehensive and well-financed defense. Accordingly, this factor weighs in favor of the requested fee award. *See In re Initial Public Offering Sec. Litig.*, 671 F. Supp. 2d 467, 510 (S.D.N.Y. 2009) (awarding fees of 33.3% of $510 million fund and noting that class counsel "were pitted against . . . prominent national defense firms" and that it was "impressive" to obtain such favorable settlements "against such formidable opponents.").

### 4.  Duration and Complexity of This Action Support the Requested Fee

Courts recognize that "there are good reasons to award higher-than-typical fees when the issues in a case are particularly 'novel and complex.'" *Good v. W. Virginia-Am. Water Co.*, No. CV-14-1374, 2017 WL 2884535, at *25 (S.D.W. Va. July 6, 2017). As to the complexity of the case, "'[a]n antitrust class action is arguably the most complex action to prosecute. . . . The legal and factual issues involved are always numerous and uncertain in outcome.'" *Peanut Farmers*, 2021 WL 9494033, at *3 (citing *In re Linerboard Antitrust Litig.*, MDL No. 1261, 2004 WL 1221350, at *10 (E.D. Pa. June 2, 2004)); *see also In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 99 (E.D. Pa. 2013) (same).

That is especially true for *labor* antitrust class actions like this one, as few such cases have been successfully litigated. *See, e.g., Giordano v. Saks Inc.*, No. 23-600-cv, 2025 WL 799270 (2d Cir. Mar. 13, 2025) (affirming dismissal of complaint in antitrust case alleging suppression of retail employees' wages); *Conrad v. Jimmy John's Franchise, LLC*, No.18-CV-00133, 2021 WL 3268339, at *1 (S.D. Ill July 30, 2021) (denying class certification in antitrust case alleging suppression of Jimmy John's workers' wages); *Maderazo v. VHS San Antonio Partners, L.P.*, SA-06-CA-535, 2019 WL 4254633 (W.D. Tex. Jan. 22, 2019) (denying class certification in antitrust

15

case alleging suppression of San Antonio nurses' wages).

This case is unusually complex, involving allegations of a multi-faceted conspiracy implemented by 26 Defendants to both exchange information about and fix compensation over a 20-year period. There are innumerable conceptual challenges to proving the allegations, including the difficulty of defining labor and geographic markets, ensuring information exchanges fell outside the DOJ's "safe harbor" guidelines, and demonstrating that wages were fixed during secret meetings despite variations in Defendants' wages and increases in wages over time. Plaintiffs' Counsel overcame those obstacles by forging novel paths forward.

Due to the complexity of the allegations and multitude of defendants, it has taken more than 6.5 years for Plaintiffs' Counsel to develop and prosecute their claims against the settling Defendants. Such a lengthy lifespan for a case supports an enhanced fee award. *See, e.g.*, *Zetia*, 699 F. Supp. 3d at 462 (E.D. Va. 2023) ("A significant award is appropriate for the attorneys because they litigated the case vigorously for nearly five years . . . and fronted significant costs.").

Thus, this case's complexity and duration support the Plaintiffs' Counsel's requested fee. *See, e.g.*, *Peanut Farmers*, 2021 WL 9494033, at *5 (awarding 33.3% fee award and noting it "is well within the acceptable range of attorneys' fee awards in protracted, complex, and expensive litigation such as this.").

### 5.   Plaintiffs' Counsel Faced the Significant Risk of Nonpayment

Plaintiffs' Counsel undertook this case on a wholly contingent basis and ran a substantial risk of no recovery. The risk of nonpayment is a significant factor in this Circuit. *See In re Medstar ERISA Litig.,* No. JKB-20-1984, 2024 WL 4110941, at *7 (D. Md. Sept. 5, 2024) (awarding a fee of 33.33% and noting that "Class Counsel took on significant risk in undertaking representation in this matter on a contingency basis and in advancing litigation expenses."); *Mills*, 265 F.R.D. at

263 ("[C]ounsel bore a substantial risk of nonpayment . . . [t]he outcome of the case was hardly a foregone conclusion, but nonetheless counsel accepted representation of the plaintiff and the class on a contingent fee basis, fronting the costs of litigation.").

Courts have also recognized that "there is a greater risk of nonpayment where an antitrust class action 'did not benefit from the fruits of a prior government investigation,'" as is the case here. *Peanut Farmers*, 2021 WL 9494033, at *4 (citing *Linerboard*, 2004 WL 1221350, at *11). *See Seaman*, 2019 WL 4674758, at *4 (awarding fee of 33.3% and noting that "unlike many other antitrust class actions, this case did not follow a government investigation or enforcement proceeding that might have given some confirmation of the scope of misconduct."); *In re Automotive Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2008 WL 63269, at *5 (E.D. Pa. Jan. 3, 2008) ("The risk of nonpayment is even higher when a defendants' *prima facie* liability has not been established by the government in a criminal action."). This "is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill. They did all the work on their own." *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 597 (S.D.N.Y. 1992). Here, Plaintiffs' Counsel "investigated this case from the ground up without the benefit of a government investigation, which significantly increased the risk of bringing this action." *Peanut Farmers*, 2021 WL 9494033, at *3.

Specifically, Plaintiffs' Counsel assumed two distinct risks of nonpayment of their attorneys' fees and millions in out-of-pocket expenses. First, they committed substantial time and resources to a lengthy and uncertain investigation into compensation practices in the poultry industry without knowing whether it would bear fruit. Indeed, in Plaintiffs' Counsel's experience, few proprietary antitrust investigations do. Farah Decl. ¶ 36. Nevertheless, they assumed that risk

17

here to comprehensively investigate the underlying facts of this case.

Second, once on file, Plaintiffs' Counsel devoted years of attorney time and millions of dollars in expenses without compensation. This case could have been lost in the three rounds of motions to dismiss. Without the settlements, Plaintiffs could have lost at summary judgment, trial or appeal. At all times, Defendants vehemently disputed pivotal issues of liability and impact, and were prepared to fight class certification, seek summary judgment, and try the case. Among their potentially dispositive arguments were: (a) poultry processing workers do not constitute a viable labor market because they compete for employment with workers from other industries, (b) a nationwide market is not a viable geographic market because Defendants limit their recruitment to workers located near the poultry plants, (c) there was no conspiracy in light of multiple witness denials, evidence of inter-Defendant competition, variations in workers' wages, and increases in those wages over time; (d) procompetitive benefits of the information exchanges outweighed anticompetitive effects; (e) there was no agreement to fix or cap wages, but rather lawful conscious parallelism, and (f) common questions of liability, impact and damages do not predominate over individual issues. While Plaintiffs had strong counterarguments, if the Court or a jury lent credence to Defendants' arguments, the Class's recovery could have been entirely eliminated.

Plaintiffs' Counsel also incurred more than $5 million in litigation expenses, and none of those funds would have been reimbursed absent a successful result. *See Mills*, 265 F.R.D. at 263 (awarding requested fee and noting that even though the outcome was uncertain, "[l]ead Counsel devoted thousands of hours on the case and fronted nearly $3 million in costs in the process"); *In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 516 (W.D. Pa. 2003) ("Aside from investing their time, counsel had to front copious sums of money . . . Thus, the risks that counsel incurred in prosecuting this case were substantial and further support the requested fee award.").

18

This Court has noted that the "risk undertaken by class counsel is evaluated by, among other things, the presence of government action preceding the suit, the ease of proving claims and damages, and, if the case resulted in settlement, the relative speed at which the case was settled." *Casa de Md., Inc. v. Arbor Realty Tr., Inc.*, No. DKC 21-1778, 2024 WL 1051120, at *7 (D. Md. Mar. 11, 2024). Here, there was no government action preceding the suit; Plaintiffs' Counsel faced challenging and numerous obstacles in proving claims and damages, many of which are unique to antitrust actions on behalf of low-wage workers; and it took 5.5 years of active litigation following the complaint's filing before the last settlement with a processor Defendant was reached. Accordingly, this factor strongly supports the requested fee.

### 6.    Plaintiffs' Counsel Devoted Over 91,000 Hours to Litigating this Action

Plaintiffs' Counsel have devoted considerable time investigating and litigating this case. Specifically, they have spent 91,825.65 hours prosecuting this case. Most of that time was spent:

- Investigating the underlying facts giving rise to Plaintiffs' claims, including by interviewing 63 witnesses, consulting with economists, and reviewing documents;

- Opposing 24 motions to dismiss filed by Defendants;

- Developing a protective order, clawback order, and ESI protocol;

- Propounding interrogatories and requests for production;

- Issuing 28 document subpoenas to third-party co-conspirators;

- Engaging in motion practice to resolve discovery disputes over deposition limits, relevant time periods, document requests, and custodians;

- Filing targeted motions to compel recalcitrant Defendants to produce documents;

- Participating in hearings before this Court to resolve discovery disputes;

- Analyzing over one million documents, constituting approximately 40 million pages, produced by Defendants and non-parties;

- Conducting 65 depositions of former and current employees of Defendants;

- Securing incriminating declarations from key witnesses, including the watershed Meng Declaration;

- Amending the complaint on three separate occasions to broaden the class definition, expand the class period, and add nine Defendants;

- Responding to written discovery served on Plaintiffs, reviewing thousands of their documents, and producing responsive, non-privileged materials;

- Working with expert economists to analyze 291 gigabytes of compensation data and develop regression models that measure the conspiracy's impact;

- Addressing and reviewing expert reports with expert economists concerning damages and liability;

- Moving for certification of an injunctive relief class against Agri Stats;

- Engaging in adversarial settlement negotiations, including four mediations involving written mediation statements, to reach 20 settlement agreements;

- Drafting 20 settlement agreements and moving for preliminary approval of them; and

- Devising and implementing a notice program to inform hundreds of thousands of class members of their rights and options under the settlement agreements.

The opportunity cost is significant; Plaintiffs' Counsel could have spent those attorney hours "litigating other matters, which weighs in favor of awarding the requested fees." *Peanut Farmers*, 2021 WL 9494033, at \*9. *See, e.g.*, *Seaman*, 2019 WL 4674758, at \*4 (explaining that "attorneys and staff have worked over 12,500 hours since it began," which was time "the attorneys could have directed to other simpler and less risky opportunities"); *Genworth*, 210 F. Supp. 3d at 844-45 ("counsel for plaintiffs devoted an enormous amount of time and effort into this case").

### 7. Courts in the Fourth Circuit Routinely Award Fees of 33.3% of the Settlement Fund in Similar Cases

The fee percentage customarily awarded in antitrust class actions in the Fourth Circuit strongly supports the requested fee. "District courts in the Fourth Circuit have frequently found

that a percentage award of one-third of the Settlement Fund is within the range of reasonable percentage of recovery, and one-third of the fund is a common award in antitrust class actions." *Zetia*, 699 F. Supp. 3d at 462. *See also Peanut Farmers*, 2021 WL 9494033, at *9 ("[A]n award of one-third is also common in antitrust class actions."); *In re Celebrex (Celecoxib) Antitrust Litig.*, No. 2:14-cv-00361, 2018 WL 2382091, at *5 (E.D. Va. Apr. 18, 2018) ("Fee awards of one-third of the settlement amount are commonly awarded in cases analogous to this one.") *Seaman*, 2019 WL 4674758, at *3 ("[A]n award of one-third is also common in antitrust class actions."); *In re Allura Fiber Cement Siding Litig.*, No. 2:19-mn-02886, 2021 WL 2043531, at *4 (D.S.C. May 21, 2021) ("Courts in the Fourth Circuit have held that attorneys' fees in the amount of 1/3 of the settlement fund are reasonable."); *Kelly*, 2020 WL 434473, at *3 ("great weight of authority more than demonstrates that a one-third fee is justified in this case"); 4 Newberg on Class Actions § 14:6 (4th ed.) ("[E]mpirical studies show that, regardless of whether the percentage method or the lodestar method is used, fee awards in the class action average around one-third of the recovery.").

Indeed, the *substantial majority* of attorney fee awards in antitrust class actions in the Fourth Circuit have been for one-third of the settlement fund. *See, e.g.*, *In re Titanium Dioxide Antitrust Litig.*, No. 10-CV-00318, 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) (awarding 33.33% of $163,500,000); *Peanut Farmers*, 2021 WL 9494033, at *9 (awarding 33.33% of $102,750,000); *Celebrex*, 2018 WL 2382091, at *5 (awarding 33.33% of $94,000,000); *In re Zetia (Ezetimibe) Antitrust Litig.*, 699 F.Supp.3d 448, 462 (E.D. Va. 2023) (awarding 33.33% of $70,000,000); *In re: Interior Molded Doors Antitrust Litig.*, No. 3:18-cv-00718-JAG (E.D. Va. June 3, 2021) (ECF No. 376) (awarding 33.33% of $61,600,000); *Seaman*, 2019 WL 4674758, at

21

*5 (awarding 33.33% of $54,500,000).[2]

Within the Fourth Circuit, there has been one other antitrust class action alleging a conspiracy to depress compensation, *Seaman v. Duke University*, and it awarded attorneys' fees of 33.33%. In that case, plaintiffs alleged a conspiracy between Duke University and University of North Carolina to depress the salaries of medical faculty. The court noted that "fees of one-third are common in this circuit in cases of similar complexity" and held that in "this complex case, with a high risk for Class Counsel, numerous contested issues, and a positive settlement for the class members, there is more than sufficient reason to support a one-third contingent fee." 2019 WL 4674758, at *3.

Fee awards of one-third of the settlement fund are also common in antitrust class actions involving unusually large recoveries. *See, e.g.*, *In re Urethane Antitrust Litig.*, No. 04-1616-JWL, 2016 WL 4060156, at *5 (D. Kan. July 29, 2016) (awarding fees of one-third of $850 million settlement, noting "a one-third fee is customary in contingent-fee cases"); Order ¶ 179, *Burnett v. Nat'l Ass'n of Realtors,* No. 4:19-CV-00332 (W.D. Mo. Nov. 27, 2024) (ECF No. 1622) (awarding fees of one-third of $998,375,000 settlement fund, noting that "[c]ourts have recognized that prosecution of antitrust claims should result in a one-third-of-the-fund fee award"); *Dahl v. Bain*

---

[2] Courts in the Fourth Circuit also commonly award fees of one-third in other complex class actions. *See, e.g., Krakauer v. Dish Network*, No. 1:14-cv-333, 2019 WL 7066834, at *7 (M.D.N.C. Dec. 23, 2019) (awarding 33.33% of $61,342,800 in a consumer case); *Scott v. Fam. Dollar Stores, Inc.*, No. 3:08-cv-00540, 2018 WL 1321048, at *5 (W.D.N.C. Mar. 14, 2018) (awarding 33.33% of $45,000,000 in a labor case); *In re 2U, Inc. Sec. Class Action*, No. 8:20-cv-01006, 2022 WL 22839218, at *3 (D. Md. Dec. 9, 2022) (awarding 33.40% of $37,000,000 in a securities case); *Kruger v. Novant Health, Inc.*, No. 1:14-cv-208, 2016 WL 6769066, at *5 (M.D.N.C. Sept. 29, 2016) (awarding 33.33% of $32,000,000 in an ERISA case); *Plymouth Cnty. Ret. Sys. v. GTT Commc'ns, Inc.*, No. 1:19-cv-00982, 2021WL 1659848, at *5 (E.D. Va. Apr. 23, 2021) (awarding 33.33% of $25,000,000 in a securities case); *Sims v. BB&T Corp.*, No. 1:15-cv-732, 2019 WL 1993519, at *4 (M.D.N.C. May 6, 2019) (awarding 33.33% of $24,000,000 in an ERISA case).

*Capital Partners, LLC*, No. 1:07-cv-12388 (D. Mass. Feb. 2, 2015) (ECF No. 1095) (awarding

fees of 33% of $590.5 million settlement fund); *In re Vitamins Antitrust Litig.*, No. 99-197, 2001

WL 34312839 (D.D.C. July 16, 2001) (awarding fees of 34.06% of $365 million settlement fund).

In fact, according to studies cited by the Eastern District of Virginia in 2021, a "majority of courts

in antitrust class actions where the recoveries ranged from $100 million to $500 million . . .

awarded attorney's fees of 30% or more of the fund." *Peanut Farmers*, 2021 WL 9494033, at *6.[3]

**8. Public Policy Considerations Support the Requested Fee**

"Congress has expressed its belief that private antitrust litigation is one of the surest

weapons for effective enforcement of the antitrust laws." *Minnesota Mining & Mfg. Co. v. New

Jersey Wood Finishing Co.*, 381 U.S. 311, 318 (1965). A "central factor in fixing the amount of

attorneys' fees is to ensure that competent, experienced counsel will be encouraged to undertake

the often risky and arduous task of representing a class . . . ." *Mills*, 265 F.R.D. at 260. "The cost

and difficulty" of bringing an antitrust class action "stands as a deterrent from doing so, and one

object of an award of attorneys' fees should be to counteract this deterrence and incentivize

competent attorneys to pursue these cases when necessary." *Id.* at 263. "Class action litigation

often requires attorneys to front costs at significant risk of nonpayment, so an attorneys' fee award

should provide sufficient incentive for competent attorneys to pursue meritorious cases." *Zetia*,

699 F. Supp. 3d at 462. Accordingly, in complex class actions, fee awards have been enhanced "to

---

[3] It is also standard practice that the percentage fee award applies not only to the settlement fund amount, but also to the interest earned on the settlement fund. *See, e.g.*, *In re 2U, Inc. Securities Class Action*, No. 8:20-cv-01006, 2022 WL 22839218, at *3 (D. Md. Dec. 9, 2022) (awarding lead counsel "attorneys' fees in the amount of 33.4% of the Settlement Amount, or $12,358,000, plus interest at the same rate and for the same periods as earned by the Settlement Fund (until paid)."); *Hale v. State Farm Mut. Auto. Ins. Co.*, No. 12-0660-DRH, 2018 WL 6606079, at *16 (S.D. Ill. Dec. 16, 2018) (awarding one-third of the $250 million common fund "inclusive of interest accrued on the fund at the time of distribution.").

provide an incentive for competent lawyers to pursue such actions in the future." *Microstrategy*, 172 F. Supp. 2d at 788. Public policy "favors attorneys' fees that will induce attorneys to act and protect individuals who may not be able to act for themselves . . ." *Jones*, 601 F. Supp. 2d at 765.

This is precisely the kind of case that plaintiffs' lawyers should be incentivized to pursue: an antitrust class action that alleges a multi-year conspiracy to depress the wages of some of the most vulnerable workers in the country; was uncovered solely due to Plaintiffs' Counsel's persistent investigation; required six years of hard-fought litigation against multinational corporations represented by leading defense firms; and resulted in record-breaking settlements for hundreds of thousands of injured workers. Plaintiffs' Counsel devoted millions of dollars in time and expenses to litigate this case without any guarantee of compensation, and it is in the interest of public policy to reward them for assuming such a substantial risk and ensure they continue to enforce the antitrust laws for workers and consumers.

The public policy benefits of this case are underscored by the fact that the DOJ relied on the work of Plaintiffs' Counsel to file a follow-on antitrust case against five Defendants. As noted above, it is usually the opposite; members of the private bar file antitrust cases following a government enforcer's complaint. The DOJ also concluded that Plaintiffs' settlements with those five Defendants were of such extraordinary value that they alone would, if finally approved, provide sufficient restitution to injured workers. Accordingly, public policy considerations support the requested fee.

### C.    A Cross-Check of Plaintiffs' Counsel's Lodestar Confirms the Reasonableness of the Fee Request

Courts often supplement their analysis of the percentage-of-fund method with a lodestar cross-check. "The purpose of a lodestar cross-check is to determine whether a proposed fee award

is excessive relative to the hours reportedly worked by counsel, or whether the fee is within some reasonable multiplier of the lodestar." *Boyd*, 299 F.R.D. at 467. "A lodestar cross-check first computes the plaintiffs' attorneys' reasonable hourly rate for the litigation and multiplies that rate by the number of hours dedicated to the case," and "then compares that figure with the attorneys' fees award, typically resulting in a positive multiplier." *Genworth*, 210 F. Supp. 3d at 845.

"Importantly, 'where the lodestar fee is used "as a mere cross-check" to the percentage method of determining reasonable attorneys' fees, "the hours documented by counsel need not be exhaustively scrutinized by the district court."'" *Arbor Realty*, 2024 WL 1051120, at \*9 (quoting *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383, 385 (D. Md. 2006)). When using the lodestar as a cross-check, the court "need not exhaustively scrutinize counsels' documented hours as it would if the lodestar method were used as the primary determiner of reasonableness. Instead, the court will use counsels' documented hours to calculate the lodestar cross-check." *Zetia*, 699 F. Supp. 3d at 462; *see also In re Novant Health, Inc.*, No. 1:22-CV-697, 2024 WL 3028443, at \*11 (M.D.N.C. June 17, 2024) ("When courts use the lodestar cross-check, they 'need not apply the exhaustive scrutiny typically mandated' and can 'accept the hours estimates provided by counsel.'" (quoting *Mills*, 265 F.R.D. at 264)).

As of May 9, 2025, Plaintiffs' Counsel have spent 91,825.65 hours working on this case. Given the complexity of the legal issues, duration of the litigation, multitude of defendants, and spirited defense mounted by Defendants, the hours incurred by Plaintiffs' Counsel are reasonable.[4]

The hourly rates charged by Plaintiffs' Counsel are reasonable, based on each person's

---

[4] The work conducted by Plaintiffs' Counsel was non-duplicative, as different firms were assigned to different Defendants for briefing, discovery, and negotiation purposes. *See* Farah Decl. ¶ 41.

25

position, experience level, and location, and have been approved by multiple courts in complex antitrust class actions. *See* Farah Decl. ¶¶ 68-69; Declaration of Brent W. Johnson ¶ 11 (attached as Exhibit 2); Declaration of Shana E. Scarlett ¶ 8 (attached as Exhibit 3). These rates are comparable to those charged by other law firms with similar experience, expertise, and reputation, for similar services. *Id.* Notably, Courts in the Fourth Circuit "often recognize national market rates when deciding reasonable billing rates for complex class action litigation." *Clark v. Duke Univ.*, Nos. 1:16-CV-1044 & 1:18-CV-722, 2019 WL 2579201, at *2 (M.D.N.C. June 24, 2019) ("a reasonable rate is usually calculated by looking at the local market . . . but a national market rate is appropriate for matters involving complex issues requiring specialized expertise[.]"); *see also Seaman*, 2019 WL 4674758, at *5 ("Here, because of the complexity of the case it is reasonable to look beyond local rates in calculating the reasonable rate for a lodestar comparison. While antitrust lawyers exist locally, as noted above there are not many firms willing to handle a high-risk matter requiring the resources, time, and skill this case demanded."); *Kruger*, 2016 WL 6769066, at *4 ("the relevant market rate for cases such as the present case [is] a nationwide market rate"); *In re Medstar ERISA Litig.*, 2024 WL 4110941, at *9 ("[A] national market rate is appropriate for matters involving complex issues requiring specialized expertise.").

These reasonable rates resulted in a total lodestar of $63,878,422.25 through May 9, 2025.[5] The requested fee of 33.33% of the settlements, or $132,670,065, thus results in a lodestar

---

[5] This lodestar is calculated based on Plaintiffs' Counsel's current rates because "the use of current as opposed to historical market rates is appropriate to account for the delay in payment to counsel." *Seaman*, 2019 WL 4674758, at *5. *See Ohio River Valley Env't Coal., Inc. v. Green Valley Coal Co.*, 511 F.3d 407, 419 (4th Cir. 2007) ("In awarding attorney fees, a district court is required to account for 'the effect of delay in payment on the value of the fee.' The delay factor may be accounted for either by using a fee rate based on the current market or by using the historical fee rate with reasonable interest added." (citing *Daly v. Hill,* 790 F.2d 1071, 1081 (4th Cir. 1986))).

multiplier of 2.08. Notably, this lodestar figure does not include the time that Plaintiffs' Counsel will expend to move for final approval of the settlements and to oversee the distribution of settlement funds to the Class. These additional hours "effectively reduce the multiplier" and should be "considered by the Court in evaluating the reasonableness of the fee request." *Peanut Farmers*, 2021 WL 9494033, at \*7.

The requested 2.08 multiplier is on the low end of the range in similar cases within the Fourth Circuit. "[T]his Court has previously held that 'lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorneys' fee.'" *Fangman v. Genuine Title, LLC*, No. RDB-14-0081, 2017 WL 3434109, at \*7 (D. Md. Aug. 10, 2017). *See Seaman*, 2019 WL 4674758, at \*6 ("Courts have found that lodestar multipliers ranging from 2 to 4.5 demonstrate the reasonableness of a requested percentage fee."). "The range of multipliers on large and complicated class actions have ranged from at least 2.26 to 4.5." *Singleton*, 976 F. Supp. 2d at 689. "District courts within the Fourth Circuit have regularly approved attorneys' fees awards with 2–3 times lodestar multipliers." *Genworth*, 210 F. Supp. 3d at 845. *See also Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 483 (D. Md. 2014) (awarding one-third fee with lodestar multiplier of 3.9); *Kruger,* 2016 WL 6769066, at \*4-5 (awarding one-third fee with lodestar multiplier of 3.69); *Freckleton v. Target Corp.*, No. 14-cv-00807 (D. Md. Dec. 11, 2017) (ECF No. 145-1) (awarding 33% fee with lodestar multiplier of 3.5); *Fangman v. Genuine Title, LLC*, No. RDB-14-0081, 2016 U.S. Dist. LEXIS 160434, at \*36-37 (D. Md. Nov. 18, 2016) (awarding lodestar multiplier of 5.6).

The 2.08 multiplier requested by Plaintiffs' Counsel is also on the lower end of the range compared to those routinely approved in antitrust class action settlements in this Circuit. *See, e.g.*, *Peanut Farmers*, 2021 WL 9494033, at \*7 (awarding 2.92 multiplier and noting that it "is well within accepted ranges for antitrust class actions generally and is consistent with the fee rulings in

similar cases within the Fourth Circuit"); *DeLoach v. Phillip Morris Cos.*, No. 1:00CV01235, 2003 WL 23094907, at *11 (M.D.N.C. Dec. 19, 2003) (4.45 multiplier); *Seaman*, 2019 WL 4674758, at *6 (2.89 multiplier); *Titanium Dioxide*, 2013 WL 6577029 (2.39 multiplier). Accordingly, a lodestar cross-check confirms the reasonableness of the requested fee.

## IV.    PLAINTIFFS' COUNSEL'S REQUEST FOR PAYMENT OF THE LITIGATION EXPENSES IS REASONABLE

Plaintiffs' Counsel request reimbursement of reasonable and necessary litigation expenses they have incurred to prosecute this litigation. "It is well-established that plaintiffs who are entitled to recover attorneys' fees are also entitled to recover reasonable litigation-related expenses as part of their overall award." *Singleton*, 976 F. Supp. 2d at 689. Such costs include "those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services." *Spell v. McDaniel*, 852 F.2d 762, 771 (4th Cir. 1988).

Since the inception of the case, Plaintiffs' Counsel have incurred $5,390,389.61 in unreimbursed expenses. This amount is based on the declarations of Plaintiffs' Counsel, which break down the expenses by category. *See* Farah Decl. ¶¶ 49, 54. The categories of expenses include expert costs, electronic discovery costs, travel for depositions and hearings, photocopying, overnight mail, deposition services and transcripts, and legal research. *Id.* These are the types of expenses routinely charged to hourly clients. *See, e.g.*, *Reynolds v. Fid. Invs. Institutional Operations Co., Inc.*, No. 1:18-CV-423, 2020 WL 92092, at *4 (M.D.N.C. Jan. 8, 2020) (explaining that "mailing costs, online legal research, long-distance telephone use, expert and mediator fees, travel expenses for mediation and court proceedings, and court filing fees . . . are 'reasonable out-of-pocket expenses'"). Thus, Plaintiffs' Counsel's request for reimbursement of $5,390,389.61 in expenses is reasonable and should be approved.

28

## V.    THE REQUESTED SERVICE AWARDS ARE REASONABLE

Plaintiffs request approval for a $30,000 service award for each named Plaintiff. "At the end of a successful class action, it is common for trial courts to compensate class representatives for the time and effort they invested to benefit the class." *Reynolds*, 2020 WL 92092, at *4. Service awards are "intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Brown v. Transurban USA, Inc.*, 318 F.R.D. 560, 578 (E.D. Va. 2016). Among the factors to be considered in determining the reasonableness of a service award are "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefited from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Manuel v. Wells Fargo Bank, Nat'l Ass'n*, No. 3:14CV238, 2016 WL 1070819, at *6 (E.D. Va. Mar. 15, 2016).

Each of the named Plaintiffs spent significant time assisting the litigation of this case. Each of them (1) repeatedly discussed the case and their employment history with Plaintiffs' Counsel; (2) responded to multiple interrogatories and requests for production; (3) collected, reviewed, and produced documents relating to their claims; (4) reviewed and approved the complaint and other substantive pleadings; and (5) considered and approved the settlements. Farah Decl. ¶ 73.

The named Plaintiffs courageously "pursued the litigation knowing that Defendants might retaliate against them, thus risking their livelihoods," as each was either employed by a poultry processor during the litigation or contemplated future employment at a poultry plant. *Peanut Farmers*, 2021 WL 9494033, at *8. *See Seaman*, 2019 WL 4674758, at *7 ("Employees often face unique pressures and a risk of retaliation by current or prospective employers when they sue their employers."). The named Plaintiffs assumed this financial risk to benefit the entire class. *See*

29

*Archbold*, 2015 WL 4276295, at *6 ("Had the Plaintiff not stepped forward to prosecute these claims, the rest of the class would have received nothing.").

The requested service awards of $30,000 are in accord with amounts approved in other antitrust class actions in the Fourth Circuit. *See, e.g.*, *Seaman*, 2019 WL 4674758, at *7 (awarding class representative $125,000); *Celebrex*, 2018 WL 2382091, at *5 (three class representatives each awarded $100,000); *Titanium Dioxide*, 2013 WL 6577029, at *1 (one class representative awarded $125,000 and two class representatives awarded $25,000); *Peanut Farmers*, 2021 WL 9494033, at *9 (awarding $40,000 to each of the six class representatives).

Moreover, the service awards of $30,000 constitute a tiny fraction of the total settlement fund, just 0.008% of the fund. Courts in the Fourth Circuit have approved service awards that consist of one percent or more of the settlement fund. *See, e.g.*, *Kirkpatrick v. Cardinal Innovations Healthcare Sols.*, 352 F. Supp. 3d 499, 508 (M.D.N.C. 2018) (approving service awards equal to 1.3% of settlement fund); *Yost v. Elon Prop. Mgmt. Co.*, No. ELH-21-1520, 2023 WL 185178, at *10 (D. Md. Jan. 13, 2023) (approving service award equal to 1% of settlement fund).

## VI.    CONCLUSION

For the reasons discussed above, Plaintiffs respectfully request that the Court: (1) award Plaintiffs' Counsel attorneys' fees equal to 33.33% of the $398,050,000 overall settlement fund plus the interest earned thereon; (2) order reimbursement of litigation expenses incurred by Plaintiffs' Counsel in the amount of $5,390,389.61; and (3) award each named Plaintiff a service award of $30,000.

**DATED:** May 16, 2025

By *George F. Farah*
    GEORGE F. FARAH (*pro hac vice*)

Rebecca P. Chang (*pro hac vice*)
Nicholas Jackson (*pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
33 Irving Place
New York, NY 10003
Telephone: (212) 477-8090
gfarah@hfajustice.com
rchang@hfajustice.com
njackson@hfajustice.com

Matthew K. Handley (D. Md. Bar # 18636)
Rachel E. Nadas (*pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
1050 Connecticut Avenue, NW
Suite 500
Washington, DC 20036
Telephone: (202) 559-2411
mhandley@hfajustice.com
rnadas@hfajustice.com

William A. Anderson (*pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
4730 Table Mesa Drive, Suite G-200
Boulder, CO 80305
Tel.: (202) 559-2433
wanderson@hfajustice.com

Martha E. Guarnieri (*pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
1727 Snyder Avenue
Philadelphia, PA 19145
Telephone: (215) 422-3478
mguarnieri@hfajustice.com

31

**COHEN MILSTEIN SELLERS & TOLL PLLC**

By *Brent W. Johnson*
    BRENT W. JOHNSON (*pro hac vice*)

Benjamin D. Brown (*pro hac vice*)
Daniel H. Silverman (*pro hac vice*)
Alison S. Deich (*pro hac vice*)
Zachary R. Glubiak (D. Md. Bar # 20962)
Zachary I. Krowitz (D. Md. Bar # 22370)
Sabrina S. Merold (*pro hac vice*)
1100 New York Avenue NW
5th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Fax: (202) 408-4699
bjohnson@cohenmilstein.com
bbrown@cohenmilstein.com
dsilverman@cohenmilstein.com
adeich@cohenmilstein.com
zglubiak@cohenmilstein.com
zkrowitz@cohenmilstein.com
smerold@cohenmilstein.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By *Shana E. Scarlett*
    SHANA E. SCARLETT (*pro hac vice*)

Rio S. Pierce (*pro hac vice*)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel.: (510) 725-3000
Fax: (510) 725-3001
shanas@hbsslaw.com
riop@hbsslaw.com

Steve W. Berman (*pro hac vice*)
Breanna Van Engelen (*pro hac vice*)
Abigail D. Pershing (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel.: (206) 623-7292
steve@hbsslaw.com

32

breannav@hbsslaw.com
abigailp@hbsslaw.com

Elaine T. Byszewski (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
elaine@hbsslaw.com

*Interim Co-Lead Counsel for Plaintiffs and the Class*

Brian D. Clark (admitted *pro hac vice*)
Stephen J. Teti (admitted *pro hac vice*)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
bdclark@locklaw.com
steti@locklaw.com

Eric L. Cramer (admitted *pro hac vice*)
Candice J. Enders (admitted *pro hac vice*)
Julia R. McGrath (admitted *pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Tel: (215) 875-3000
ecramer@bm.net
cenders@bm.net
jmcgrath@bm.net

*Additional Counsel for Plaintiffs and the Class*

33

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice to counsel for all parties that have appeared in this case.

/s/ George F. Farah
GEORGE F. FARAH