# Exhibit B

AlaFile E-Notice

09-CV-2026-900001.80

To: CRUTCHER ROBERT PEPPER JR
pcrutcher@balch.com

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

JAMES HERBERT AYERS ET AL V. AGRI STATS, INC. ET AL
09-CV-2026-900001.80

The following complaint was FILED on 10/14/2026 6:28:18 PM

Notice Date: 10/14/2026 6:28:18 PM

RASHAWN HARRIS
CIRCUIT COURT CLERK
BULLOCK COUNTY, ALABAMA
P.O. BOX 230
UNION SPRINGS, AL, 36089

334-738-2280

ELECTRONICALLY FILED
10/14/2026 6:28 PM
09-CV-2026-900001.80
CIRCUIT COURT OF
BULLOCK COUNTY, ALABAMA
RASHAWN HARRIS, CLERK

**IN THE CIRCUIT COURT OF**
**BULLOCK COUNTY, ALABAMA**

| | | |
|---|---|---|
| **JAMES HERBERT AYERS, et al.,** | ) | |
| | ) | |
| ***Plaintiffs,*** | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| **WAYNE FARMS, LLC;** | ) | |
| **WAYNE-SANDERSON FARMS,** | ) | |
| **LLC, the successor entity resulting** | ) | **CIVIL ACTION NO. 09-CV-2026-900001.80** |
| **from the merger of Sanderson Farms,** | ) | |
| **Inc. and Wayne Farms, LLC;** | ) | **Jury Trial Demand** |
| **KOCH FOODS, INC.;** | ) | |
| **KOCH FOODS OF ALABAMA, LLC;** | ) | |
| **FOSTER POULTRY FARMS, LLC;** | ) | |
| | ) | |
| **Fictitious Defendants A-BB,** | ) | |
| | ) | |
| ***Defendants.*** | ) | |

**FIRST AMENDED COMPLAINT**

**COME NOW** the Plaintiffs in the above styled cause and amend their complaint against the Defendants, named and fictitious, and say unto the Court as follows:

**INTRODUCTION**

1. This action is brought to remedy a secret, multi-decade conspiracy orchestrated by America's largest poultry processing companies. While holding themselves out to the public as fierce competitors, these corporate giants privately colluded to systematically fix, depress, and stabilize the compensation paid to hundreds of thousands of their employees, including the Plaintiffs.

2. Through "off the books" meetings, illicit exchanges of competitively sensitive data facilitated by consulting firms, and direct plant-to-plant communications, the Defendants coordinated to suppress labor costs and maximize their own profits. This conduct, which resulted in artificially depressed wages and benefits for the

Plaintiffs and other workers, constitutes a flagrant and ongoing violation of the laws of the State of Alabama.

3. This Court has subject matter jurisdiction over the claims asserted herein pursuant to the laws and Constitution of the State of Alabama.

4. Venue is proper in Bullock County, Alabama. Plaintiffs reside or resided in this County and one or more of the Defendants transacts or transacted business within this jurisdiction, regularly, systemically and actively, and the wrongful acts and omissions alleged herein occurred in or had substantial effects within this county, including the Plaintiffs.

5. The amount in controversy for each individual Plaintiff is no more than $74,999.99.

## PARTIES

### Plaintiffs

6. Plaintiffs are over the age of nineteen years and are citizens and residents of the State of Alabama. Within the time period of events made the basis of this action, Plaintiffs were employed by one or more of the Defendant Processors. As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs suffered economic damages as well as severe emotional distress.

### Defendants

7. Wayne Farms LLC, Wayne-Sanderson Farms LLC, Sanderson Farms, Inc. and their predecessors in interest, (hereinafter collectively referred to as "Sanderson" unless otherwise specified) is a foreign limited liability company that is a citizen of each and every jurisdiction of its members within the corporate hierarchy. It conducts or conducted business in this jurisdiction, purposefully availed itself of the laws, rights and protections of this jurisdiction, and has contacts within this jurisdiction that relate to the Plaintiffs' claims such that it should reasonably anticipate being subject to this court's jurisdiction.

8. Koch Foods, Inc., is a foreign corporation and their predecessors in interest that conducts or conducted business in this jurisdiction, purposefully availed itself to the laws, rights and protections of this jurisdiction, and their contacts within this

jurisdiction relate to the Plaintiffs' claims, their contacts are such that Defendant should reasonably anticipate being subject to this court's jurisdiction.

9. Koch Foods of Alabama, LLC and their predecessors and successors in interest is a domestic limited liability company that conducts or conducted business in this jurisdiction as an operating affiliate and agent of Koch Foods, Inc., (collectively referred to herein as "Koch" unless otherwise specified) purposefully availed itself to the laws, rights and protections of this jurisdiction, and their contacts within this jurisdiction relate to the Plaintiffs' claims, their contacts are such that Defendant should reasonably anticipate being subject to this court's jurisdiction.

10. Foster Poultry Farms, LLC and their predecessors and successors in interest (Hereinafter "Foster") is a foreign limited liability company that is a citizen of each and every jurisdiction of its members within the corporate hierarchy, and which maintains a domestic corporate Alabama entity within its corporate structure that conducts or conducted business in this jurisdiction. Foster purposefully availed itself to the laws, rights and protections of this jurisdiction, and has contacts within this jurisdiction that relate to the Plaintiffs' claims and are such that Defendant should reasonably anticipate being subject to this court's jurisdiction.

11. Fictitious Defendants A-G, whether singular or plural, are that person, firm, corporation or entity that was responsible for the Defendants' payroll, human resources, accounting and decisions on the setting of employee wages and benefits.

12. Fictitious Defendants H-N, whether singular or plural, are that person, firm, corporation or entity that managed, supervised and/or controlled the day-to-day business dealings of the Defendant producers' facility at which the Plaintiff(s) were employed during the time period relevant to the allegations in this action.

13. Fictitious Defendants O-U, whether singular or plural, are that entity or those entities, that individual or those individuals, other than those described above, whose negligence, wantonness, intentional conduct, willfulness, fraud, conspiracy, complicity or other wrongful conduct contributed to the cause of the occurrence made the basis of Plaintiffs' Complaint.

14. Fictitious Defendants V-BB, whether singular or plural, are those entities which are the predecessors or successors-in-interest to any of those entities or individuals described above and herein.

15. Employer Defendants- means each named Defendant that employed one or more Plaintiff during the period relevant to this action, Sanderson and Koch.

**NONJOINDER OF PARTIES**

16. Plaintiffs' claims against Agri Stats, Inc., Perdue Farms, Inc., Perdue Foods, LLC, Tyson Foods, Inc., Peco Foods, Inc., Pilgrim's Pride Corporation (Non-Joinder Parties or NJP) have been dismissed pro tanto with prejudice as to Non-Joinder Parties only with Plaintiffs preserving their right to proceed against the remaining Defendants named herein. Non-Joinder Parties are therefore not joined as a Defendant in this Complaint.

17. The Pro Tanto Dismissal and Non-Joinder do not affect, diminish, extinguish, or otherwise limit any claim asserted by Plaintiffs against any other Defendant named in this Complaint.

18. Plaintiffs reserved all rights to continue to prosecute their claims against all remaining Defendants in full. The resolution of those claims does not impair Plaintiffs' ability to obtain complete relief from the remaining Defendants, does not subject any Defendant to a risk of inconsistent obligations, and does not prejudice the interests of any Defendant, named or fictitious or Non-Joinder Parties.

19. NJPs are referred to herein for contextual and factual purposes only and nothing is intended to confer a cause of action against any NJP.

20. The resolution of those claims did not make Plaintiffs whole.

**FACTUAL ALLEGATIONS**

21. Defendants, named and fictitious and NJP, participated in a multi-decade conspiracy among the nation's dominant poultry processors including the Defendant Processors. The purpose of this conspiracy was to tortiously artificially suppress the compensation of hundreds of thousands of poultry workers, including the Plaintiffs, to levels materially below what would have prevailed absent the conspiracy.

22. Sanderson Farms, Inc. ("Sanderson") is a poultry processor headquartered in Laurel, Mississippi. Sanderson Farms is, or was, a central and long-standing participant in the conspiracy with Co-Defendants and NJPs to depress and fix wages of Plaintiffs.

23. Koch Foods, Inc. is a poultry processor headquartered in Park Ridge, Illinois. Koch operates poultry facilities across the United States including in this jurisdiction. Koch Foods is one of the largest vertically integrated poultry processors in the United States and conducts substantial business nationwide, including through wholly owned and controlled operating subsidiaries in the State of Alabama. Koch is alleged to have been a consistent participant in the conspiracy with Co-Defendants and NJPs to depress and fix wages of Plaintiffs.

24. Koch Foods of Alabama, LLC is an operating affiliate and agent of Koch Foods, Inc., who operates poultry processing operations in the United States and conducts substantial business nationwide, including through wholly owned and controlled operating subsidiaries in the State of Alabama, including this jurisdiction.

25. Foster is a poultry processor headquartered in Livingston, California. Foster is, or was, a central and long-standing participant in the conspiracy with Co-Defendants and NJPs to depress and fix wages of Plaintiffs.

26. NJP Peco Foods, Inc. is an Alabama based poultry processor headquartered in Tuscaloosa, Alabama. NJP Peco Foods was a central and long-standing participant in the conspiracy to depress and fix wages of Plaintiffs.

27. Fictitious Defendants A-G, whether singular or plural, are that person, firm, corporation or entity that was responsible for the Defendants' payroll, human resources, accounting and decisions on the setting of employee wages and benefits.

28. Fictitious Defendants H-N, whether singular or plural, are that person, firm, corporation or entity that managed, supervised and/or controlled the day-to-day business dealings of the Defendant producers' facility at which the Plaintiff(s) were employed during the time period relevant to the allegations in this action.

29. Fictitious Defendants O-U, whether singular or plural, are that entity or those entities, that individual or those individuals, other than those described above, whose negligence, wantonness, intentional conduct, willfulness, fraud,

conspiracy, complicity or other wrongful conduct contributed to the cause of the occurrence made the basis of Plaintiffs' Complaint.

30. Fictitious Defendants V-BB, whether singular or plural, are those entities which are the predecessors or successors-in-interest to any of those entities or individuals described above and herein.

31. The Individual HR and Plant Manager Defendants are individuals whose identities are not yet fully known but who served as agents and employees of the Defendant Processors. At all relevant times, these individuals acted within the line and scope of their employment. Their wrongful acts, including the direct exchange of competitively sensitive wage data with rival plants, were calculated to and did benefit their corporate employers by reducing labor costs. This conduct was known to, authorized by, and subsequently ratified by their respective employers.

32. All Defendants, named and fictitious and NJP participated in the same wage-fixing information exchange that directly suppressed wages paid to the Plaintiffs causing damages.

33. All Defendant producers, named and fictitious and NJP Producers subscribed to NJP Agri Stats and attended meetings knowing Alabama plants and jobs were in the data set and that benchmark targets would be applied to Alabama wages causing damages to the Plaintiffs and those similarly situated in this jurisdiction.

**A. The Poultry Processing Industry**

34. The poultry processing industry possesses numerous structural characteristics that make it uniquely susceptible to the type of long-running conspiracy alleged herein. These factors created an environment where the conspiracy could not only form but thrive for decades.

35. The Defendants and NJP processors collectively control the majority of the U.S. poultry market.

36. Workers performing similar production and maintenance roles at different processing plants are largely interchangeable. This fungibility of labor makes it simple for competitors to compare and align compensation for any given position across the industry.

**B. The Decades-Long Conspiracy to Suppress Employee Compensation**

37. The defendant Processors and their co-conspirators entered into, and have entered into and participated in, a conspiracy to suppress the wages of their employees, including the Plaintiffs, resulting in damage to Plaintiffs. On information and belief, this conduct continued to occur into at least 2025.

38. The primary motivation for this conspiracy was to reduce labor costs, a substantial portion of each processor's operating expenses, and thereby maximize corporate profits at the direct expense of their employees. To facilitate this scheme, compensation decisions were centralized at the corporate headquarters of each Defendant Processor rather than being made at the local plant level.

**C. The Mechanics of the Conspiracy**

39. Defendants and NJP Producers did not passively receive WMS reports. Instead, competing processors formed a Poultry Industry Survey Group that collectively controlled the survey's scope, questions, participating companies, and the level of detail contained in results. A small Steering Committee of processor executives made the key decisions and met privately so that Defendants could speak candidly about compensation practices and align pay without oversight. WMS distributed survey results immediately before annual in-person compensation meetings, after which Defendants held private roundtables to coordinate how to apply the benchmarks to real-world pay decisions, including at Alabama plants.

40. The Defendants and NJP executed their conspiracy through a sophisticated, multi-pronged strategy involving secretive in-person meetings, illicit information exchanges managed by third-party consultants, and direct communications between competitors.

41. A core component of the conspiracy was a series of annual in-person meetings of senior human resources and compensation executives from the competing Defendant Processors.

42. These meetings were, upon information and belief, organized by a committee led by executives from Defendants and their co-conspirators. Upon information and belief, these meetings were intentionally kept "off the books" to avoid creating a paper trail.

43. Upon information and belief these meetings, and the information shared, were kept confidential.

44. During hours-long, private roundtable sessions, executives from the Defendants and others discussed survey results, agreed upon compensation rates for the coming year and chastised any processor that had deviated from previously fixed pay levels.

45. Webber, Meng, Sahl and Company, Inc. (WMS): WMS was hired to provide data to the producers under the guise of abiding by applicable regulations. WMS unwittingly provided the infrastructure for the conspiracy under a "veneer of legality." Its president, Jonathan Meng, repeatedly warned the Defendant Processors that their practice of exchanging future, disaggregated compensation data violated the applicable laws. Despite these warnings, WMS, at the direction of the processors, designed surveys to collect this data, resulting in sham anonymization, and its representatives were excluded from private "roundtable sessions" where illicit and conspiratorial agreements were being made.

46. The survey's framework was used as a pretext to hide Defendants' conspiracy from employees and the public. By routing their wage exchanges through WMS while dictating unlawful levels of detail and future-looking content, Defendants concealed material facts: that they were no longer competing for labor in Alabama and were instead jointly suppressing compensation. This concealment and coordinated conduct form part of the fraudulent scheme, civil conspiracy, and unjust enrichment described in this Complaint.

47. Webber, Meng, Sahl & Co. (WMS) was hired to administer an annual "Poultry Industry Compensation Survey," providing a veil of legality to the information exchange.

48. The survey was designed by the processors' Steering Committee to collect detailed data on wages, salaries, and benefits. Crucially, against the repeated warnings of WMS President Jonathan Meng, the survey collected future compensation data, including planned salary increases and their timing.

49. Mr. Meng ultimately concluded that the processors hired WMS to "create an appearance of compliance" while they "continued to exchange disaggregated and

deanonymized compensation data and continued to discuss and harmonize their compensation practices."

50. The survey employed an anonymization technique, replacing company names with letter codes. However, the reports contained such granular detail (e.g., plant locations, employee counts) that participants, Defendants, could easily identify their specific competitors. A former NJP Perdue employee confirmed this, stating it was easy when "you're sitting in a meeting and the person across from you [from a competing processor] is reporting on what they do."

51. NJP Agri Stats, Inc. provided the mechanism for continuous monitoring and enforcement of the conspiracy.

52. NJP Agri Stats collected and distributed monthly reports containing terabytes of detailed, current, non-public, and plant-specific compensation data from over 95% of U.S. poultry processors.

53. NJP Agri Stats collected non-public, confidential, and proprietary wage and compensation data from competing poultry processors and redistributed that data among the processors on a monthly basis, including current hourly wages and salaries broken down by plant and job position. This data was not publicly available and could only be accessed by processors that reciprocated by submitting their own detailed compensation information, thereby enabling coordinated wage decision-making among competitors.

54. NJP Agri Stats falsely represented that its compensation reports were anonymized or aggregated, while knowingly distributing highly granular, disaggregated data that processors could and did reverse-engineer to identify which competitors and which specific plants corresponded to particular wage figures. This sham anonymization concealed the true nature of the inter-company wage exchange while allowing processors to coordinate compensation with precision.

55. Despite claims of anonymity, the data was easily decodable. A former NJP Perdue employee stated the anonymity claim was "just bullshit" and that every participating processor "knew precisely which company reported which data."

56. The monthly frequency of the reports allowed Defendants to ensure no co-conspirator broke ranks by raising wages. A former Butterball executive confirmed

there was "no question about it" that NJP Agri Stats was used by processors to "monitor each other's performance." The crucial role of this data is underscored by the public statement of Joe Sanderson, then-CEO of Sanderson Farms, that "we live and die by NJP Agri Stats."

57. NJP Agri Stats travelled between each Defendant Processor regularly and discussed the nonpublic, proprietary data at those meetings, including but not limited to quarterly in-person meetings with each processor's executives, involving travel between producers and discussion of non-public data.

58. NJP Agri Stats representatives physically visited each co-conspirator Defendant Processor plant, conducting on-site meetings lasting at least one week to establish data-collection processes, identify internal payroll data sources, and standardize reporting formats. These visits embedded NJP Agri Stats directly inside processor operations and facilitated the ongoing exchange of sensitive wage information.

59. NJP Agri Stats employees and representatives assisted poultry processors in interpreting and decoding NJP Agri Stats reports, including by explaining how to determine which competitor submitted specific compensation data. NJP Agri Stats personnel trained processor management on how to extract competitive intelligence from the reports, further enabling coordinated wage suppression.

60. NJP Agri Stats audited the raw wage data submitted by processors to ensure accuracy and consistency, which ensured that no processor could deviate from agreed-upon compensation levels by secretly paying higher wages. These audits functioned as a policing and enforcement mechanism, reinforcing adherence to coordinated wage suppression.

61. Through the monthly dissemination of current wage data, NJP Agri Stats enabled co-conspirator Defendant Processors to continuously monitor each other's compensation levels and detect deviations in near real time. This continuous monitoring reduced competitive uncertainty and stabilized wages across processors.

62. NJP Agri Stats data was reviewed at individual poultry processing plants, not merely at corporate headquarters. Corporate officers and plant managers used NJP Agri Stats benchmarks to compare plant wages against competitors and ensure that wages remained within coordinated ranges. Agri Stats corporate

personnel were tasked with visiting plants to ensure wages stayed precisely aligned with NJP Agri Stats benchmarks.

63. NJP Agri Stats' reports were not sold to the public, employees, or unions. NJP Agri Stats concealed the existence and mechanics of coordinated wage suppression from workers.

64. Because NJP Agri Stats regularly travelled between processors, discussed proprietary wage data with each, and audited their submissions, it acted as a central hub connecting competing employers and transmitting information that allowed the conspiracy to function, persist, and remain concealed.

65. Each of the foregoing acts was intentional, knowing, and undertaken in furtherance of a common scheme to suppress and stabilize wages. NJP Agri Stats knew that the compensation data it collected, analyzed, audited, and redistributed would be used by competing poultry processors to coordinate wage decisions, and NJP Agri Stats substantially assisted that scheme through repeated, affirmative conduct resulting in harm to Plaintiffs.

66. The conspiracy was furthered by frequent, direct communications between managers at competing plants. Plant managers and human resources personnel regularly contacted their counterparts at nearby rival facilities to request and exchange current and future wage and benefit information.

67. A former human resources manager who worked for NJP Perdue admitted to this practice, stating, "We would collaborate. We would talk among each other to see what they were doing for pay."

**D. Fraudulent Concealment of the Conspiracy**

68. The Defendants took active and deliberate steps to fraudulently conceal their unlawful conduct from their employees and the public. These steps included:

69. Holding secret, "off the books" meetings and requiring in-person attendance to avoid a paper trail.

70. Using third-party consultants and sham data anonymization techniques to create a facade of legality for their illicit information exchanges.

71. Making false and misleading public statements on company websites and in advertisements claiming they paid "competitive wages," or similar statements in postings and in person all while actively conspiring to suppress those same wages.

72. Processors were told and were aware their actions were fraudulent and knew or should have known these actions would harm Plaintiffs.

**E. Plaintiffs' Discovery of Their Claims**

73. Plaintiffs did not know, nor should they reasonably have known, of the existence of the contract, combination, conspiracy, concealment, fraud and deceit described herein or of the facts giving rise to their claims until 2025.

74. Defendants' active concealment and deceit described herein prevented Plaintiffs from discovering the basis for their claims despite the exercise of reasonable diligence.

75. Plaintiffs first learned of the existence of the facts giving rise to their claims when they received a class notification advising them of their rights to participate or opt out of a class action involving the same or similar underlying facts and behavior of Defendants. Plaintiffs filed this action within two years of that discovery.

76. Each Plaintiff exercised the right described in the preceding paragraph and elected to opt out of that class action prior to the deadline in late May 2025. Plaintiffs' counsel timely completed all steps required to submit each Plaintiff's signed exclusion request before the applicable deadline, including preparing a record identifying each excluded Plaintiff and submitting signed exclusion forms per the instructions of the settlement administrator for the class action.

77. Each Plaintiff was thereby excluded from that class action, and no release, settlement, or judgment arising from that class action applies to, bars, or limits any claim asserted by any Plaintiff in this Complaint.

78. The right to exclude oneself from a class action exists to preserve each individual's right to pursue his or her own claims, under his or her own choice of legal theory and remedy, rather than be bound by a resolution negotiated on behalf of others. Each Plaintiff's decision to opt out reflected an affirmative, individual choice to seek relief for the harms alleged in this Complaint under Alabama law, in the

manner and forum of that Plaintiff's own choosing, rather than to accept the terms of any class resolution.

79. That choice belongs to each Plaintiff alone. No Defendant, and no class action of which a Plaintiff was previously a putative member, has any right to dictate the legal theory, remedy, or forum through which that Plaintiff seeks redress for the harms alleged herein.

**F. Harm to the Plaintiffs**

80. The direct and intended result of the Defendants' conspiracy was the artificial suppression of worker compensation. While worker productivity skyrocketed with processing line speeds increasing by 54% between 1999 and 2015, the real-world earnings of those workers plummeted. During that same period, inflation-adjusted hourly wages for poultry processing workers *decreased* by more than 1%.

81. The small annual raises that workers did receive were often entirely offset by corresponding increases in costs of living and other areas. As a direct result of the conspiracy, the Plaintiffs and other similarly situated workers were paid materially less than they would have been absent this scheme.

82. In direct reliance on Defendants' representations that they paid competitive wages, including the public statements described above, and on Defendants' concealment of the wage-fixing conspiracy described herein, Plaintiffs accepted and continued their employment with the Defendant Processors, reasonably believing and expecting that their compensation was the product of a competitive labor market rather than an unlawful agreement among competitors.

83. Independent of any specific public statement identified above, and consistent with Defendants' duty to disclose the existence of the conspiracy and its consequences as alleged herein, Plaintiffs reasonably expected that their compensation was being set through independent competition for labor rather than this conspiracy among competing employers. That reasonable expectation, and Defendants' knowing failure to disclose facts that would have corrected it, induced Plaintiffs to accept and continue their employment as alleged in the preceding paragraph.

84. In exchange for the artificially suppressed compensation Defendants paid them, Plaintiffs gave Defendants their time, labor, energy, and effort, performing the

work required of them in good faith and to Defendants' direct benefit, while Defendants concealed the true basis on which that labor was being compensated.

85. Defendants' concealment of the conspiracy deprived Plaintiffs of the information necessary to make informed decisions about their employment and compensation, including whether to seek other employment or to negotiate for higher pay. Plaintiffs were thereby deprived of the opportunity to protect their own economic interests.

86. As a direct and proximate result of Defendants' conduct, Plaintiffs were financially hindered during the period of their employment with the Defendant Processors. The artificially suppressed wages and benefits Plaintiffs actually received left them with materially less income than they would have earned in a competitive labor market, impairing their ability at the time to meet ordinary living expenses, to save, and to provide for themselves and their families.

87. The harm caused by Defendants' conduct was not limited to a one-time shortfall in pay. Because subsequent raises, bonuses, benefits, and retirement contributions are typically calculated as a percentage of, or are otherwise based upon, an employee's existing compensation, the artificial suppression of Plaintiffs' base wages compounded each year during the course of their employment, and left Plaintiffs behind in their earning capacity relative to where they would have stood in a competitive market absent Defendants' conspiracy.

88. The effects of Defendants' conduct did not end when the conspiracy ceased or when Plaintiffs' employment with the Defendant Processors ended. Plaintiffs continue to suffer the compounded economic effects of Defendants' actions through the present day, in the form of diminished lifetime earnings, diminished retirement savings and benefits, and a permanently altered earning trajectory that was directly and proximately caused by Defendants' unlawful conduct alleged herein.

**G. Non Joinder Parties**

89. NJP Perdue was a central and long-standing participant in the conspiracy. A former NJP Perdue employee described the company's CEO as an "Agri Stats guru" and stated that NJP Perdue managers regularly collaborated with rivals to exchange wage information.

90. NJP Perdue employees knew that compensation data submitted through WMS was readily attributable to specific companies and plants, particularly during in-person meetings where competitors discussed their own reported data. A former NJP Perdue employee explained that the source of compensation figures was obvious because "you're sitting in a meeting and the person across from you is reporting on what they do."

91. Upon information and belief, NJP Perdue used the Agri Stats data to incorporate and monitor the conspiracy to suppress wages and ensure compliance by all Defendants with the conspiracy.

92. NJP Perdue subscribed to NJP Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors including co-conspirator Defendants on a monthly basis.

93. NJP Perdue regularly attended the annual meetings of co-conspirator Defendants and obtained and exchanged competing processors' information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels.

94. NJP Perdue submitted data to the annual WMS survey during multiple years and subscribed to NJP Agri Stats to exchange plant-specific compensation data on a monthly basis.

95. NJP Perdue regularly exchanged current and future wages with managers from co-conspirator Defendants and any planned future wage increases.

96. NJP Perdue brought NJP Agri Stats personnel into the company to train management on how to extract and interpret competitor-specific wage information from NJP Agri Stats reports, despite the nominal claim that the data was anonymous.

97. NJP Perdue employees reviewed disaggregated NJP Agri Stats wage data during meetings held at NJP Perdue poultry processing plants, using competitor comparisons to guide wage decisions at individual facilities rather than responding to local labor market forces.

98. NJP Perdue and other co-conspirator Defendants continued to reveal and discuss their specific compensation practices, future compensation plans, and target wage

levels “behind closed doors”, even after being warned that such conduct was inconsistent with lawful compensation benchmarking.

99. NJP Perdue’s knowing participation in repeated data exchanges, secret meetings, and direct communications predictably suppressed wages and benefits paid to poultry processing workers, transferring economic value from workers to NJP Perdue in the form of reduced labor costs and increased profits.

100. Each of the foregoing acts was intentional, knowing, and undertaken in concert with other co-conspirator Defendants pursuant to a common plan to suppress employee compensation. NJP Perdue knowingly joined and materially advanced a coordinated scheme that foreseeably caused economic harm to poultry workers, including Plaintiffs, and unjustly enriched NJP Perdue at the expense of Plaintiffs and those similarly situated.

101. NJP Tyson was a leader of the conspiracy, serving on the Steering Committee that directed the WMS surveys. A NJP Tyson Vice President of Compensation admitted in a 2015 email that "hourly production projected budgets" were "typically a discussion item" at the secret meetings.

102. NJP Tyson subscribed to NJP Agri Stats and used it to exchange current, disaggregated, readily decodable, plant-specific compensation data with competing poultry processors on a monthly basis.

103. NJP Tyson relied on NJP Agri Stats reports to compare its wages to competitors and to keep its compensation within coordinated ranges rather than responding independently to labor market conditions.

104. NJP Tyson employees and executives regularly attended secret, off-the-books Poultry Industry Compensation Committee meetings, including meetings held at the Hilton Sandestin Resort in Destin, Florida, where competing poultry processors exchanged non-public compensation information and discussed wages and benefits. These meetings were intentionally conducted outside normal reporting channels and without transparency to employees, and they facilitated coordinated wage decisions rather than independent competition.

105. NJP Tyson was represented on the Steering Committee that controlled the structure, scope, and content of the WMS poultry compensation surveys. Through

this role, NJP Tyson participated in decisions to expand the surveys beyond generalized averages and to require more granular, plant-level, and job-specific compensation information, increasing the usefulness of the surveys for coordinating wages rather than benchmarking competitively.

106. NJP Tyson initiated, designed, and funded a supplemental compensation survey that collected raw, disaggregated, plant-level wage data for production, maintenance, and refrigeration workers. NJP Tyson requested this survey despite warnings that its format violated accepted safeguards and facilitated identification of individual companies' and plants' wage data. NJP Tyson paid for the survey, dictated its structure, and caused its results to be distributed to participating processors.

107. NJP Tyson employees recruited other poultry processors to participate in the NJP Tyson-sponsored survey and encouraged their submission of detailed wage data. Participants proceeded despite express warnings that the survey format defeated anonymity and allowed compensation data to be traced back to specific companies and plants.

108. NJP Tyson regularly attended the annual meetings of co-conspirator Defendants and obtained and exchanged competing processors' information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels.

109. In advance of and for use at these secret compensation meetings, NJP Tyson employees submitted highly detailed current and future compensation data to WMS, knowing and intending that the data would be distributed to, reviewed by, and discussed among competing poultry processors. NJP Tyson made these submissions repeatedly over multiple years as part of the same coordinated scheme.

110. NJP Tyson submitted data to the annual WMS survey during multiple years and subscribed to NJP Agri Stats to exchange plant-specific compensation data on a monthly basis.

111. NJP Tyson submitted highly detailed current compensation data to WMS in advance of meetings, knowing/expecting it would be distributed to and examined by competitors including co-conspirator Defendants.

112. NJP Tyson regularly exchanged current and future wages with managers from co-conspirator Defendants and any planned future wage increases.

113. NJP Tyson set compensation schedules and paid workers at "artificially depressed wage rates."

114. NJP Tyson employees directly communicated with human-resources managers at competing poultry plants, including co-conspirator Defendants to exchange current and future wage rates, including planned increases. These bilateral exchanges further reduced competition for labor and reinforced coordinated wage suppression.

115. As a result of this conduct, NJP Tyson established compensation schedules and paid poultry workers' wages and benefits that were artificially suppressed and stabilized, rather than competitively determined. NJP Tyson retained the financial benefit of reduced labor costs while workers bore the harm of depressed compensation resulting in damages to Plaintiffs.

116. NJP Pilgrim's Pride was a core member of the conspiracy. A former employee stated that the company explicitly used NJP Agri Stats data to set wages with the goal of paying "exactly in the middle" of the reported industry average. Its executives also requested that plant managers obtain current and future compensation information directly from competitors.

117. NJP Pilgrim's subscribed to NJP Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

118. NJP Pilgrim's regularly attended the annual meetings of co-conspirator Defendants and obtained and exchanged competing processors' information regarding wages, agreed to the conspiracy to suppress wages at artificially depressed levels.

119. NJP Pilgrim's employees submitted detailed compensation data to WMS for inclusion in the annual Poultry Industry Compensation Surveys. NJP Pilgrim's knew and intended that this data, including current wages and planned future increases, would be distributed to and reviewed by competing processors during compensation meetings and related discussions.

120. NJP Pilgrim's was among the co-conspirator Defendants that controlled and influenced the design and operation of the WMS surveys, including decisions to collect granular, plant-level and job-specific compensation data. NJP Pilgrim's participated in surveys structured in a manner that allowed competitors, including co-conspirator Defendants, to identify and compare each other's compensation practices.

121. NJP Pilgrim's regularly exchanged current and future wages with managers from co-conspirator Defendants and any planned future wage increases.

122. NJP Pilgrim's used NJP Agri Stats data at both corporate and plant levels, reviewing competitor compensation benchmarks to ensure that wages paid at individual NJP Pilgrim's facilities remained aligned with industry benchmarks. Corporate personnel reviewed NJP Agri Stats data with plant management to guide wage decisions.

123. In addition to survey-based exchanges, NJP Pilgrim's Pride employees directly exchanged current and future wage information with employees of competing poultry processors. For example, NJP Pilgrim's personnel exchanged wage information with NJP Tyson employees regarding planned wage rates at specific plants, reducing uncertainty and reinforcing coordinated wage practices.

124. According to WMS President Jonathan Meng, NJP Pilgrim's and other processors continued to discuss specific compensation practices, future wage plans, and target pay levels "behind closed doors", even after warnings that such exchanges were inconsistent with lawful benchmarking practices. NJP Pilgrim's nevertheless continued participating in the surveys and meetings.

125. NJP Pilgrim's established compensation schedules using survey results and NJP Agri Stats benchmarks to align wages across its poultry processing facilities, rather than allowing wages to be determined by local labor supply and demand.

126. Through its participation in repeated data exchanges, secret meetings, and direct communications, NJP Pilgrim's paid poultry processing workers, including the Plaintiffs, wages and benefits that were suppressed and stabilized, transferring economic value from workers to NJP Pilgrim's in the form of reduced labor costs.

127. NJP Pilgrim's operated poultry processing facilities employing workers in Alabama and implemented compensation practices at those Alabama facilities that were informed by and aligned with the coordinated benchmarks and exchanges described above. These acts were directed at and caused harm to Alabama workers, including Plaintiffs.

128. Each of the foregoing acts was intentional, knowing, and undertaken in concert with others. NJP Pilgrim's knowingly participated in a coordinated course of conduct that foreseeably suppressed employee compensation and unjustly enriched NJP Pilgrim's at the expense of poultry processing workers, including Plaintiffs.

129. NJP Agri Stats was the central monitoring and enforcement arm of the conspiracy as previously stated herein. It collected and distributed detailed, non-public, and readily decodable compensation data on a monthly basis. A former NJP Perdue employee stated NJP Agri Stats was responsible for "collusion in the poultry industry," and by admission of a former producer, confirmed that NJP Agri Stats was used to monitor each other's performance. NJP Agri Stats profited handsomely from its role, charging each processor substantial fees.

130. NJP Agri Stats embedded itself within processor operations, repeatedly collected and audited non-public compensation data, traveled between competitors to discuss that data, trained processor personnel to interpret and apply competitor wage information, and redistributed detailed benchmarking reports that were used to guide actual wage decisions.

131. NJP Agri Stats knew that its conduct would be used to align compensation practices rather than foster independent decision-making, and it continued that conduct despite the foreseeable and intended effect of depressing wages paid to poultry processing workers, including Plaintiffs. By doing so, NJP Agri Stats materially advanced and concealed the conspiracy, causing direct harm to workers in this jurisdiction including the Plaintiffs and unjustly enriching itself and the participating processors.

132. NJP Agri Stats was not a passive service provider. It designed, executed, and enforced the information exchanges that allowed competing poultry processors to coordinate compensation practices while concealing that coordination from

workers, including the Plaintiffs. Through repeated affirmative acts, NJP Agri Stats knowingly facilitated conduct that predictably suppressed wages and caused economic harm to Plaintiffs.

133. Through the foregoing acts, NJP Agri Stats knowingly and substantially assisted in a coordinated scheme among competing poultry processors to suppress and stabilize employee compensation.

**H. Defendant Processors**

**The Sanderson Defendants:**

134. Sanderson subscribed to NJP Agri Stats to exchange current, disaggregated, readily decodable, and plant-specific compensation data with competing poultry processors on a monthly basis.

135. Sanderson employees submitted detailed compensation data to WMS for use in the annual Poultry Industry Compensation Survey, with the understanding that the data would be shared with and reviewed by competing processors at the compensation meetings including co-conspirator Defendant Processors. This included current wage information used to benchmark and align compensation across companies.

136. Sanderson Farms participated in surveys that were structured to allow competitors, including co-conspirator Defendant Processors, to identify the source of compensation data, including through granular plant-level details. Survey participants, including Sanderson Farms, reviewed compensation information in formats that allowed executives to match wage figures to specific competing companies and facilities including co-conspirator Defendant Processors.

137. Sanderson regularly attended the annual meetings of co-conspirator Defendants and obtained and exchanged competing processors' information regarding wages and participated in the conspiracy to suppress wages at artificially depressed levels.

138. Sanderson Farms was deeply integrated into the conspiracy, with its then-CEO publicly stating, "we live and die by Agri Stats." Like other conspirators, Sanderson Farms attended the secret annual meetings.

139. Following Sanderson Farms' merger with Wayne Farms, the resulting Wayne-Sanderson entity continued poultry processing operations using compensation structures informed by industry benchmarking practices, including NJP Agri Stats data, thereby perpetuating the effects of the coordinated wage-setting scheme.

140. Through the foregoing conduct, which was unknown to the Plaintiffs, Sanderson Farms paid poultry processing workers, including Plaintiffs, wages that were suppressed and stabilized, transferring economic value from workers to Sanderson in the form of reduced labor costs and increased profitability at the expense of Plaintiffs.

141. Each of the foregoing acts was intentional, coordinated, and undertaken in concert with others. Sanderson Farms knowingly participated in a shared course of conduct that predictably suppressed employee compensation and unjustly benefited Sanderson at the expense of poultry processing workers, including Plaintiffs who were unaware of any fraud or deceit.

**The Koch Defendants:**

142. Koch was a consistent participant, with its employees attending many of the annual compensation meetings. The company submitted data to the annual WMS survey during multiple years and subscribed to NJP Agri Stats to exchange plant-specific compensation data on a monthly basis.

143. Koch relied on NJP Agri Stats reports to compare its wages against competitors and to guide compensation decisions, rather than determining wages independently based on local labor conditions.

144. The Koch Defendants used NJP Agri Stats wage benchmarks at both corporate and plant levels, reviewing competitor compensation data with plant management to ensure that wages at Koch facilities remained aligned with industry benchmarks. These practices replaced independent wage setting with coordinated benchmarking.

145. Koch regularly attended the annual meetings of co-conspirator Defendants and obtained and exchanged competing processors' information regarding wages and participated in the conspiracy to suppress wages at artificially depressed levels.

146. In addition to survey-based exchanges, Koch directly exchanged current and future wage information with competing poultry processors, including discussions of wage levels and timing of wage increases. These communications reduced uncertainty and reinforced coordinated compensation practices.

147. Through its participation in repeated data exchanges, secret meetings, and direct communications, Koch Foods paid poultry processing workers' wages and benefits that were suppressed and stabilized, transferring economic value from workers to Koch in the form of reduced labor costs and increased profitability.

148. The Koch Defendants operated poultry processing facilities and related operations employing workers in Alabama and implemented compensation practices at those Alabama facilities that were informed by and aligned with the coordinated benchmarks and exchanges described above. These acts were directed at and caused harm to workers in this jurisdiction, including Plaintiffs.

149. Each of the foregoing acts was intentional, knowing, and undertaken in concert with others. The Koch Defendants knowingly joined and materially advanced a coordinated scheme that foreseeably suppressed employee compensation and unjustly enriched Koch at the expense of poultry processing workers, including Plaintiffs.

150. Through the foregoing conduct, Koch paid poultry processing workers, including Plaintiffs, wages that were suppressed and stabilized, transferring economic value from workers to Koch in the form of reduced labor costs and increased profitability.

**The Foster Defendant:**

151. Upon information and belief, Foster is a co-conspirator in the actions described herein who participated in the annual WMS compensation survey and was one of only five processors represented on the Steering Committee that governed the survey and the annual compensation meetings.

**Fictitious Defendants:**

152. **Fictitious Defendants A-BB:** The individual John and Jane Doe Defendants, including but not limited to HR and Plant Managers, successors, were the agents who carried out the conspiracy on the ground. Acting within the scope of their

employment and at the direction of their corporate superiors, they engaged in regular bilateral exchanges of current and future wage information with managers at rival plants. These acts directly furthered the conspiracy and benefited their employers by ensuring local pay rates remained aligned and suppressed.

153. The foregoing factual allegations give rise to the following legal claims for relief.

## CAUSES OF ACTION

## COUNT I: FRAUDULENT CONCEALMENT (Against All Defendants)

154. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

155. Defendants, independent of and despite a history of public, private and/or specific individual representations of providing fair and competitive pay knowingly and willfully took steps in concert with each other and NJP Defendants and others to manipulate payment rates with each other to the detriment of the Plaintiffs. Defendants had a duty not to manipulate the wages market and to disclose to their employees, the Plaintiffs, the existence of a conspiracy to suppress their wages. This duty further arose from Defendants' superior knowledge of facts material to Plaintiffs' compensation, combined with Defendants' affirmative acts of fraud, concealment and deceit described herein.

156. This duty arose from the particular circumstances of the actions and relationships alleged herein.

157. Defendants had knowledge of and actively and intentionally concealed this material fact including but not limited to falsely holding themselves out by implication, agent or direct statement about offering competitive wages.

158. Defendants suppressed the existence of their wage-coordination scheme, a material fact Plaintiffs could not reasonably discover, and that would have changed their employment and bargaining decisions.

159. This fraudulent concealment resulted in the Plaintiffs accepting and continuing their employment with the Defendant Processors under the false belief that their compensation was determined by legitimate market forces.

160. Defendants, by participating in the conspiracy are responsible for the results of their participation in the conspiracy regardless of whether it employed any one particular Plaintiff.

161. As a direct and proximate result of this concealment, Plaintiffs continued to provide their labor for artificially depressed compensation, thereby suffering actual economic damage in the form of lost wages and benefits and earning power, diminished lifetime earnings, diminished retirement savings and retirement benefits, and a permanently altered lifetime earning trajectory.

162. As alleged above, Plaintiffs did not know, nor should they reasonably have known, of the facts giving rise to this claim until 2025.

**COUNT II: FRAUDULENT DECEIT (Against Defendant Processors)**

163. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

164. Each Employer Defendant set, controlled, and communicated the wages and benefits of the Plaintiffs it employed. Each therefore held superior and exclusive knowledge of the basis on which those wages and benefits were set, including that they were set by reference to current and future wage and benefit information exchanged with competing processors through the WMS surveys, the annual compensation meetings, NJP Agri Stats reports, and direct plant to plant communications described above. Plaintiffs had no access to that information.

165. Each Employer Defendant represented to its employees, including Plaintiffs, that the pay it offered and paid was competitive. Those representations were made through publicly available statements, human resources personnel, advertisements, and through private and individual statements to the community and employees[1].

[1] Plaintiffs will testify as to what they were told. Additionally, Defendants' job postings, job fair advertising, and other public facing statements, etc., advertised competitive wages.

Some illustrative, non-exhaustive examples of these representations include:

> **Wayne Farms**
> 20,126 followers
> 6y
>
> OUR SECRET INGREDIENT IS OUR PEOPLE!
>
> We are HIRING! We have immediate openings supporting multiple shifts across all of our locations. We have facilities in GA, AL, NC, MS, and AR. We offer competitive wages, attendance incentives and amazing benefits. We are committed to doing our part during this national crisis.
>
> Wayne Farms is deemed an essential infrastructure business and will continue to focus on employee health and safety and the safety of our candidates. Our goal is to hire the best and do our part to keep food stocked in your communities.
>
> Apply now at www.waynefarms.com/careers or waynefarms.jobs
> #wearehiring #applynow #recruiting #ourpeopleourheroes #waynefarmscares

[2]

> **Koch Foods of Montgomery, Alabama** is 😃 feeling excited in **Montgomery, AL.**
> April 5, 2021 ·
>
> We have exciting news! We have just increased our Retention Bonus to $1,400 for new hires!
>
> If you already work with us, you can refer someone and make $500 for every person you refer that is hired!
>
> Come be a part of our #KochFoodsFamily
>
> We offer competitive pay, great benefits, employee recognition, retention bonus, referral bonus, and much more!
>
> Share to help job seekers in your community!
>
> www.kochfoods.com/jobs
>
> (Terms and Conditions apply, must meet requirements for bonus eligibility)
>
> #Koch #KochFoodsofMontgomery #Montgomery #Alabama #AlabamaJobs #Hiring #ApplyNow #SeekingEmployees #employeeappreciation See less

[3]

---

[2] https://www.linkedin.com/posts/wayne-farms_wearehiring-applynow-recruiting-activity-6648415387283177472-wV6A (last visited October 8, 2026).

[3] https://www.facebook.com/KochFoodsofMontgomery (last visited October 14, 2026).

**HAROLD HUNT**
**COMPLEX MANAGER**
**KOCH FOODS OF GADSDEN**

> “**AGRICULTURE, FORESTRY AND RELATED INDUSTRIES CONTRIBUTE MORE THAN $70 BILLION TO ALABAMA'S ECONOMY ANNUALLY, ACCOUNTING FOR ALMOST 40 PERCENT OF ALABAMA'S GROSS DOMESTIC PRODUCT.** Agriculture is a great field with competitive wages that can provide a lot of opportunities. The type of background you need to be successful depends on which area of the industry you choose. For example, in the poultry industry on the live bird side, you would need a degree in subjects such as poultry science, agriculture economics, animal science or agriscience education; on the processing plant side, our biggest need is people who work on equipment with an industrial maintenance background. Mobility of the employee allows for more opportunity. [4]

166. Those representations were false. Plaintiffs' pay was not competitive or set through independent competition for labor. It was set, benchmarked, and held at suppressed levels by reference to non-public wage and benefit information that the Employer Defendants exchanged with their competitors, including with respect to Alabama plants including those who employed Plaintiffs.

167. Each Employer Defendant knew the representations were false when it made them. Its own personnel submitted compensation data to WMS, attended the annual compensation meetings, received and decoded NJP Agri Stats reports, and communicated directly with their counterparts at competing plants. Each did so with the knowledge that the actions described herein were unlawful. At a minimum, each Employer Defendant made the representations recklessly, without any reasonable ground for believing them true, and with intent to deceive, which the law treats as equivalent to knowledge of the falsehood.

168. Independently of those statements, each Employer Defendant gave Plaintiffs information about their pay, including the rates it set, the raises it granted or withheld, the benefits it offered, and the explanations it gave for them. That information misled Plaintiffs and Defendants never disclosed that those rates, raises, and benefits were manufactured not competitive as a result of the Defendants' actions described herein.

---

[4] https://files-backend.assets.thrillshare.com/documents/asset/uploaded_file/1904/Csh/741ec09da35d-4f7e-aa21-2fcf70495478/1_Ag_v20.pdf?disposition=inline (last visited October 8, 2026).

169. Each Employer Defendant was also bound to disclose that fact. The duty arose from its superior knowledge of facts material to Plaintiffs' compensation, from its partial and misleading statements and information about how Plaintiffs' pay was set, and from its affirmative acts of concealment and the false public statements regarding competitive wages. The fact suppressed was non-public and could not be learned by Plaintiffs.

170. The Employer Defendants did not merely remain silent. They concealed the wage coordination in a manner calculated to deceive and mislead, as described above, and that concealment and deceit is therefore actionable.

171. Each Employer Defendant intended its representations, its misleading information, and its suppression to induce Plaintiffs to alter their position by accepting employment, by remaining in employment, and by refraining from seeking other employment, all at compensation Employer Defendants suppressed below competitive levels. Each Employer Defendant knew that a workforce that believed its pay to be competitive would have no reason to look elsewhere or to press for more.

172. Plaintiffs acted on the representations and the misleading information by accepting employment with the Employer Defendant, by continuing that employment, and by accepting the pay and benefits offered in each year of employment.

173. Plaintiffs' reliance was reasonable under the circumstances. Plaintiffs worked in poultry processing, a workforce that is disproportionately comprised of persons with limited education, limited English proficiency, and limited alternative employment options. The facts that made the representations false were held in non-public data, in meetings kept off the books, and in surveys disguised as anonymous, and no reasonably prudent person exercising ordinary care in Plaintiffs' position would have discovered them before acting.

174. As a direct and proximate result, Plaintiffs suffered damage, including but not limited to lost and reduced wages and benefits, the compounding of that loss through later raises, bonuses, benefits, and retirement contributions measured against suppressed base pay, lower raise percentages, reduced income trajectory, the loss of opportunity, reduced ability to compound wealth, lower retirement

earnings, right and ability to weigh opportunity costs, and emotional distress. Each Employer Defendant is liable for any damage Plaintiffs thereby suffered.

175. Plaintiffs did not discover the facts constituting this deceit, and in the exercise of reasonable diligence could not have discovered them, until 2025, as alleged above. This Count is brought within two years of that discovery and is timely.

176. The Employer Defendants' conduct was willful and constitutes fraud within the meaning of Ala. Code § 6-11-20(b)(1) (1975), in that it was an intentional misrepresentation, deceit, or concealment of a material fact that the Employer Defendants had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention of depriving Plaintiffs of property or legal rights or otherwise causing injury. Plaintiffs are entitled to punitive damages in an amount to be determined by the trier of fact.

**COUNT III: FRAUD IN THE INDUCEMENT (Against Defendant Processors)**

177. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

178. This Count is brought under Ala. Code §§ 6-5-101, 6-5-103, and 6-5-104 (1975) by each Plaintiff against the Employer Defendant that employed that Plaintiff. It rests on representations of existing fact made to induce Plaintiffs to accept employment and to remain employed.

179. Before each Plaintiff accepted employment, the Employer Defendant that hired that Plaintiff represented, through job postings, recruiting and job-fair communications, and statements by recruiters and human resources personnel, that it paid competitive wages.

180. After hiring, and throughout each Plaintiff's employment, the Employer Defendant repeated those representations and gave Plaintiffs information about their rates of pay, raises, and benefits, through supervisors, human resources personnel, and written and posted communications, which represented or implied that pay was set through competition for labor.

181. Those representations were false when made. Plaintiffs' pay was set, benchmarked, and held at suppressed levels by reference to non-public wage and benefit information that the Employer Defendants exchanged with their

competitors through the WMS surveys, the annual compensation meetings, NJP Agri Stats reports, and direct plant-to-plant communications.

182. Each Employer Defendant made the representations willfully to deceive, or recklessly without knowledge of their truth, or, in the alternative, by mistake and innocently, within the meaning of Ala. Code § 6-5-101 (1975). Each Employer Defendant knew the facts described above, and its knowledge, intent, and other conditions of mind are alleged generally.

183. Each Employer Defendant also willfully deceived Plaintiffs with intent to induce them to alter their position to their injury or risk, within the meaning of Ala. Code § 6-5-104(a) (1975), by asserting as fact that which was not true, by suppressing facts it was bound to disclose, and by giving information likely to mislead for want of communication of those facts, as described in Section D and in Count II.

184. Each Employer Defendant made the representations and gave the misleading information intending that Plaintiffs rely on them by accepting employment, by remaining employed, and by refraining from seeking other work or negotiating for higher pay.

185. Each Plaintiff relied on the representations and on the Employer Defendant's concealment by accepting employment, by continuing that employment, and by accepting the pay offered in each year of employment, resulting in forgoing other employment opportunities and/or by refraining from asking for higher pay.

186. Plaintiffs' reliance was reasonable under the circumstances for the reasons alleged in Section D and in Count II, as well as Plaintiffs' education, limited English proficiency, and limited bargaining power, and the fact that the facts concealed were held in non-public data, in meetings kept off the books, and in surveys presented as anonymous.

187. Plaintiffs do not assert a claim for breach of any employment contract and do not seek damages in this Count for the termination or loss of employment. Plaintiffs seek damages caused by their reliance prior to and during their employment and by what they lost in accepting and continuing that employment.

188. As a direct and proximate result, Plaintiffs suffered damage, including the difference between the compensation they received and the compensation they

would have received absent the misrepresentations and concealment, the compounding of that loss through later raises, bonuses, benefits, and retirement contributions, the loss of other employment opportunities and of the opportunity to negotiate for higher pay, and mental anguish and emotional distress.

189. The Employer Defendants' conduct constitutes fraud within the meaning of Ala. Code § 6-11-20(b)(1) (1975), in that each Employer Defendant intentionally misrepresented, deceived, or concealed material facts that it had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention of depriving Plaintiffs of property or legal rights or otherwise causing injury and did so consciously and deliberately. Plaintiffs are entitled to punitive damages in an amount to be determined by the trier of fact as to each Employer Defendant.

190. Plaintiffs did not discover the facts constituting this fraud, and in the exercise of reasonable diligence could not have discovered them, until 2025, as alleged above.

**COUNT IV: UNJUST ENRICHMENT (Against Defendant Processors)**

191. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

192. The Plaintiffs provided something of value to the Defendants, their labor.

193. The Defendants requested Plaintiffs' labor efforts.

194. The employer Defendants promised, expressly and/or impliedly, to fairly compensate the Plaintiffs for their labor.

195. The Plaintiffs are entitled by law to said compensation; and

196. Said compensation is necessary to prevent the Defendants from being unjustly enriched.

197. Defendant employers' bargaining power was stronger than Plaintiffs' bargaining power, and Plaintiffs relied on their representations with the expectation of good faith and fair dealing.

198. Withholding of proper compensation to the Plaintiffs unjustly caused those monies to remain in the possession and control of the Defendants to their benefit.

199. The Plaintiffs provided a benefit to the Defendant Processors in the form of their labor. The Defendant Processors knowingly accepted and retained this benefit.

200. The Defendant Processors unlawfully reduced their operating costs in this jurisdiction and retained the resulting financial benefits at Plaintiffs' expense.

201. The retention of this benefit is unjust because it was obtained through "unconscionable conduct," namely the fraudulent, deceitful, coercive, and long-running conspiracy to illegally suppress employee wages. The Defendant Processors have been unjustly enriched by the value of the labor for which they systematically underpaid the Plaintiffs.

**COUNT V: NEGLIGENCE (Against Employer Defendants)**

202. Plaintiffs reallege and incorporate by reference the factual allegations set forth above, apart from intentional conduct. This Count is pleaded in the alternative to the intentional counts and is based on the Employer Defendants' failure to exercise reasonable care even if the trier of fact finds that an Employer Defendant did not act intentionally.

203. Employer Defendants owed a duty of reasonable care to the Plaintiffs to not engage in conduct that would cause damages to the Plaintiffs.

204. The Employer Defendants owed that duty because of the nature of their activity, their relationship with Plaintiffs, the injury threatened to Plaintiffs, and the foreseeability of that injury.

205. The injury threatened was economic loss to the workers whose pay was being set, and that injury was foreseeable. Each Employer Defendant knew that Alabama plants and jobs were included in the data it submitted and received and that benchmark targets would be applied to Alabama wages, and the president of WMS repeatedly warned the processors that their practice of exchanging future, disaggregated compensation data violated the applicable laws.

206. Employer Defendants breached this duty through their actions as alleged and caused damages to the Plaintiffs.

207. This breach was the direct and proximate cause of the Plaintiffs' harm, as it resulted in their compensation being set at artificially depressed levels, causing significant economic damages.

**COUNT VI: WANTONNESS (Against All Defendants)**

208. Plaintiffs reallege and incorporate by reference the factual allegations set forth above.

209. Wantonness is conduct carried on with a reckless or conscious disregard of the rights or safety of others, with an awareness that harm will likely result.

210. The Defendants participated in a multi-decade, systematic scheme and fraudulently conspired against the Plaintiffs, a vulnerable workforce, for the purpose of maximizing corporate profit with a conscious and reckless disregard for the rights of the Plaintiffs.

211. Defendants knew that their actions would probably and likely result in substantial harm to the Plaintiffs and cause damages to the Plaintiffs and those similarly situated in this jurisdiction. Their decision to proceed with this scheme for over two decades constitutes wantonness and directly and proximately caused damages to Plaintiffs.

**COUNT VII: CIVIL CONSPIRACY (Against All Defendants)**

212. Plaintiffs reallege and incorporate by reference the factual allegations set forth above.

213. A civil conspiracy is a combination of two or more persons to do something unlawful or to do something lawful by unlawful means. The underlying torts for this conspiracy include, but are not limited to, fraud, fraudulent concealment, fraudulent inducement, deceit and wantonness, which are sufficient to support a conspiracy claim under Alabama law.

214. As detailed herein, all Defendants agreed and worked together to achieve a common, unlawful end: the suppression of employee compensation, to the detriment of the Plaintiffs causing damages to the Plaintiffs and those similarly situated in this jurisdiction.

215. Defendants achieved this end through unlawful and other tortious acts as outlined herein. This concerted action directly and proximately caused the Plaintiffs' economic and emotional harm.

## COUNT VIII: OUTRAGE (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS) (Against All Defendants)

216. Plaintiffs reallege and incorporate by reference the factual allegations set forth above.

217. Defendants' conduct to exploit a captive and vulnerable workforce is so outrageous in character and so extreme in degree that it goes beyond all bounds of decency, and it is regarded as atrocious and utterly intolerable in a civilized society.

218. This intentional and extreme conduct caused the Plaintiffs severe emotional distress, including feelings of anxiety, hopelessness, and betrayal, resulting from the knowledge that their hard labor was systematically undervalued through an illegal and fraudulent scheme.

219. The Defendants intended to cause, or knew their conduct was likely to cause, emotional distress of Plaintiffs and those similarly situated in this jurisdiction;

220. The Defendants' conduct was extreme and outrageous;

221. The Defendants' conduct caused emotional distress; and

222. The distress to Plaintiffs was severe.

## COUNT IX: INTENTIONAL INTERFERENCE WITH A BUSINESS RELATIONSHIP (Non-employer co-conspirators)

223. Plaintiffs reallege and incorporate by reference the factual allegations set forth above.

224. Each Plaintiff had a protectible business relationship with their respective employer (one of the Defendant Processors).

225. Employment relationships existed between each Plaintiff and their direct employer.

226. The co-conspirator Defendants knew that individuals such as each Plaintiff was employed by a Defendant Processor and knew that the compensation terms of that employment were being set within the wage information they exchanged.

227. The co-conspirator Defendants intentionally interfered with these relationships by engaging in the conspiracy, thereby altering a fundamental term of the employment relationship to the Plaintiffs' detriment.

228. The co-conspirator Defendants knew that their actions would cause damages to workers in this jurisdiction, including the Plaintiffs and those similarly situated.

229. The interference was without justification. It served no legitimate interest of Plaintiffs or of Plaintiffs' employment relationships, and it was undertaken to reduce labor costs at Plaintiffs' expense.

230. This intentional interference directly and proximately damaged the Plaintiffs by causing them to receive suppressed compensation.

**COUNT X: VICARIOUS LIABILITY & RATIFICATION (Against Defendant Processors)**

231. Plaintiffs reallege and incorporate by reference the factual allegations set forth above.

232. The Defendant Processors are vicariously liable for the wrongful acts of their agents and employees, including the individual HR and Plant Manager Defendants.

233. These employees acted within the line and scope of their employment when they participated in the conspiracy.

234. The Defendant Processors also authorized the wrongful conduct of their agents and employees. Compensation decisions were centralized at the corporate headquarters of each Defendant Processor, and, upon information and belief, corporate personnel reviewed NJP Agri Stats and WMS benchmarks with plant management to keep local pay aligned with those benchmarks. The conduct of those agents and employees was also calculated to benefit, and did benefit, the Defendant Processors through reduced labor costs.

235. The Defendant Processors, with full knowledge of the facts and circumstances of this conduct, ratified the wrongful acts of their employees by accepting the benefits of suppressed labor costs and continuing the conspiracy for over two decades, which directly and proximately caused damages to the Plaintiffs.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs respectfully request that this Honorable Court enter a judgment in their favor and against the Defendants, jointly and severally, and award the following relief:

236. A judgment in favor of the Plaintiffs and against the Defendants, not to exceed $74,999.99 per Plaintiff;

237. An award of compensatory damages in an amount to be determined at trial for lost wages, salaries, and benefits;

238. An award of damages for mental anguish and emotional distress in an amount to be determined at trial;

239. An award of punitive damages in an amount sufficient to punish the Defendants for their fraudulent, wanton, and malicious conduct and to deter similar conduct in the future;

240. An award of pre-judgment and post-judgment interest as allowed by law;

241. An award for the costs of this action and reasonable attorneys' fees; and

242. Such other and further relief as the Court deems just, equitable, and proper.

*/s/ Christina D. Crow*
One of the attorneys for Plaintiffs

OF COUNSEL:
Christina D. Crow (CRO064)
C. Elizabeth Littell (LIT028)
JINKS CROW, PC
219 N. Prairie Street
Union Springs, AL 36089
334-738-4225
christy.crow@jinkscrow.com
lisa.littell@jinkscrow.com

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

*/s/ Christina D. Crow*
OF COUNSEL

**CERTIFICATE OF SERVICE**

I certify that, on this 14th day of October 2026, I electronically filed the foregoing with the Clerk of the Court using the ALAFILE system, which will send notification to all counsel of record.

/s/ Christina D. Crow
OF COUNSEL